IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| MATTHEW SOPRON, | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 19-CV-0854 |
| SCOTT CASSIDY, et al., | ) |
| Defendants. | ) |
| | ) |
| -------------------------- | ) |
| | ) |
| NICHOLAS MORFIN, | ) |
| Plaintiff, | ) Case No. 21-CV-05525 |
| vs. | ) |
| SCOTT CASSIDY, et al., | ) |
| Defendants. | ) |
| | ) |
| -------------------------- | ) |
| | ) |
| WAYNE ANTUSAS, | ) |
| Plaintiff, | ) Case No. 22-CV-00320 |
| vs. | ) |
| SCOTT CASSIDAY, et al., | ) |
| Defendants. | ) |

The videotaped deposition of GEORGE ZUGANELIS, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken at 151 North Franklin Street, Suite 2500, Chicago, Illinois, on the 15th day of March, 2023, at the hour of 10:08 a.m.

Reported by:  Gina M. Luordo, CSR, RPR, CRR

License No.:  084-004143

Page 2

APPEARANCES:

LOEVY & LOEVY
BY: MS. LINDSAY HAGY
311 North Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
lindsay@loevy.com
    Representing the Plaintiffs;

HINSHAW & CULBERTSON, LLP
BY: MR. JAMES M. LYDON
151 North Franklin Street, Suite 2500
Chicago, Illinois 60606
(312) 704-3000
jlydon@hinshawlaw.com
    Representing Scott Cassidy;

O'MARA & O'CALLAGHAN, LLC
BY: MS. MAUREEN O'BRIEN
    MR. SEAN JOSEPH O'CALLAGHAN
230 West Monroe Street, Suite 2620
Chicago, Illinois 60606
(312) 600-5588
maureen.obrien@o2lawyers.com
    Representing Neil Linehan, Colleen
    Hyland, Laura Suffield, George
    Andrews, Patricia Shea, and Steve
    DiNolfo;

TRIBLER ORPETT & MEYER P.C.,
BY: MS. AMY M. KUNZER
    (via videoconference)
225 West Washington Street, Suite 1300
Chicago, Illinois 60606-3408
(312) 201-6447
amkunzer@tribler.com
    Representing William Marley, Norfie
    DiCiolla, K. Maicke, L. McDonald,
    Bajenski, and Ptak;

Page 3

APPEARANCES (continued):

KULWIN, MASCIOPINTO & KULWIN LLP,
BY: MR. ANTHONY J. MASCIOPINTO
    MS. HEATHER AFRA
    (via videoconference)
161 North Clark Street, Suite 2500
Chicago, Illinois 60601
(312) 641-0300
amasciopinto@kmklawllp.com
hafra@kmklawllp.com
    Representing George Holmes, Thomas
    Argenbright, A. Graffeo, and William
    Moser;

NATHAN & KAMIONSKI LLP,
BY: MS. ASHLEY BRODY
    MR. EPHRAIM SIFF
    (via videoconference)
    MS. NEHA LOCKE
    (via videoconference)
33 West Monroe Street, Suite 1830
Chicago, Illinois 60603
(312) 612-1928
abrody@nklawllp.com
esiff@nklawllp.com
    - and -
MICHAEL BEST & FRIEDRICH LLP
BY: MR. JAMES O. HERACKLIS
444 West Lake Street, Suite 3200
Chicago, Illinois 60606
(312) 596-5884
joheracklis@michaelbest.com
    Representing City of Chicago.

Also Present: Mr. Peter Prezzano - Videographer

Page 4

I N D E X

| WITNESS | EXAMINATION |
|---|---|
| GEORGE ZUGANELIS | |
| By Ms. O'Brien | 9 |
| By Mr. Lydon | 168 |
| By Ms. Brody | 178 |
| By Ms. Kunzer | 181 |
| By Mr. Masciopinto | 183 |
| By Ms. Hagy | 194 |
| By Mr. Lydon (further) | 243 |
| By Ms. O'Brien (further) | 253 |
| By Mr. Masciopinto (further) | 254 |

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 4 | Appearance Filing Bates ASA Ct Clk_001424 | 33 |
| Exhibit 5 | Appearance Filing Bates ASA Ct Clk_001423 | 36 |
| Exhibit 6 | Motion for Discovery Bates ASA Ct Clk_001463-1468 | 39 |
| Exhibit 7 | Statement of Billy Bigeck Bates CCSAO CAB-004850-4671 | 48 |

Page 5

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 8 | Correspondence Dated June 20, 1996 Bates Sopron 19-CV-8254 022374 | 51 |
| Exhibit 9 | Proffer Letter Bates Sopron 19-CV-8254 022660 | 72 |
| Exhibit 10 | Investigative Report Bates SOPRON 006144-6146 | 78 |
| Exhibit 11 | Answer to Motion for Pre-Trial Discovery Pursuant to Illinois Supreme Court Rule 413 Bates CCSAO CAB-012353-12354 | 105 |
| Exhibit 12 | Motion for Severance Bates CCSAO CAB-012899-12900 | 106 |
| Exhibit 13 | Sentencing Agreement Bates SOPRON004300 | 128 |
| Exhibit 14 | Motion to Transfer Defendant Bigeck to Witness Quarters Bates CCSAO CBAB-012902 | 136 |
| Exhibit 15 | Order Bates CCSAO CAB-012905 | 139 |

2 (Pages 2 - 5)

Page 6

E X H I B I T S

NUMBER      DESCRIPTION                    PAGE
Exhibit 16   Change of Plea Bates          145
            ASA Ct Clk_001444-1460
Exhibit 17   (Not Marked)
Exhibit 18   Investigative Report          212
            Bates SOPRON 006143

Page 7

THE VIDEOGRAPHER: Good morning. We are going on the record at 10:08 a.m. according to the video monitor on March 15, 2023. This is media unit 1 of the video-recorded deposition of George Zuganelis taken by counsel for defendant in the matter of Matthew Soprin v. Scott Cassidy, et al., and related cases filed in the United States District Court for the Northern District of Illinois, Case No. 19-CV-08254. The location of the deposition is 151 North Franklin Street in Chicago, Illinois.

My name is Peter Prezzano representing Veritext, and I'm the videographer. The court reporter is Gina Luordo also from the firm Veritext. Will counsel please state their appearances and affiliations for the record beginning with the noticing attorney.

MS. O'BRIEN: Maureen O'Brien, O'Mara & O'Callaghan, representing former state's attorneys Colleen Hyland, Laura Sullivan, Neil Linehan, Patricia Shea, Steve DeNolfo, and George Andrews from the Cook County State's Attorney's Office.

MR. O'CALLAGHAN: Sean O'Callaghan also of O'Mara & O'Callaghan.

MS. BRODY: Ashley Brody from Nathan &

Page 8

Kamionski. We represent the City in the Morfin and Antusas case.

MR. HERACKLIS: James Heracklis --

MS. KUNZER: Amy Kunzer on behalf of former Cook County State's Attorney investigators, William Marley, Norfie DiCiolla, and Veronica Lopez as special representative for the estates of Thomas Ptak and Bajenski.

MR. MASCIOPINTO: Tony Masciopinto on behalf of the CPD defendant officers for all three cases.

MR. LYDON: Jim Lydon on behalf of Scott Cassidy.

MS. HAGY: Lindsay Hagy, Lindsay with an A, Hagy, H-a-g-y, on behalf of plaintiffs, Nick Morfin, Matt Sopron, and Wayne Antusas.

MR. HERACKLIS: James Heracklis on behalf of City of Chicago, Heracklis, H-e-r-a-c-k-l-i-s.

THE VIDEOGRAPHER: Will the court reporter please administer the oath, and you may proceed.

(Whereupon, the witness was sworn.)

Page 9

GEORGE ZUGANELIS, having been first duly sworn, was examined and testified as follows:

EXAMINATION
BY MS. O'BRIEN:

Q. Sir, can you please state your name?
A. My name is George Zuganelis.
Q. And please spell your last name.
A. Z-u-g-a-n-e-l-i-s.
Q. And sir, what is your date of birth?
A. April 11, 1948.
Q. And how old are you today?
A. I'm 74 today.
Q. Sir, this is a deposition. Now that you've been sworn in, I just want to remind and inform you that you're under oath to tell the truth. Do you understand?
A. I understand.
Q. I'm going to ask you a series of questions. If at any time you don't understand a question, tell me that you do not understand it, and I will rephrase it. Do you understand?
A. Yes.
Q. When answering a question, please answer

3 (Pages 6 - 9)

Page 10

it in a loud and clear voice in order for the court reporter to accurately take down your testimony. The court reporter cannot take down nonverbal responses like nodding or shaking of your head, and she can't record short responses like uh-huh. So please answer yes or no so the record can accurately reflect your answer.

Do you understand?

A. Okay. I understand.

Q. Also, please wait for me to finish the question completely before you answer even if you think you know what I'm going to ask.

Do you understand that?

A. Yes.

Q. The court reporter can only take down one of our voices at a time. If you need to stop for any reason, just let me know, and we will take a break.

Do you understand?

A. Yes.

Q. I will not take a break mid question or before any answer is given.

Do you understand that?

A. Yes.

Page 11

Q. Do you understand everything that I've told you just now?

A. Yes.

Q. Do you have any questions?

A. No.

Q. Are you currently under any form of medication?

A. Yes.

Q. Are you currently under a doctor's care?

A. Yes.

Q. Are you currently suffering from any medical condition?

A. Well, I don't know if you call it suffering, but yes, I've had heart failure, and I've got medication for that, high blood pressure, and I have medication for that.

Q. Do you have any medical condition that would prevent you from being able to understand my questions?

A. No.

Q. Do you have any medical condition that would prevent you from providing accurate and truthful answers?

A. No.

Page 12

Q. Did you prepare for today's deposition?

A. Yes, I guess so.

Q. Did you meet or speak with lawyers representing various defendants in this matter?

A. Yes.

Q. And do you know approximately how many times?

A. Three, maybe four times.

Q. Did you read any documents prior to this deposition?

A. I saw documents that I signed, and I think I read an investigator's report.

Q. And did you read any transcripts?

A. No.

Q. Were you given any documents like to keep or to prepare?

A. No.

Q. What is your business or occupation?

A. At this time?

Q. Yes.

A. Retired.

Q. And where do you live?

A. You want the address?

Q. Yes, please.

Page 13

A. 7766 West Higgins Road, Unit B, Chicago, Illinois 60631.

Q. Are you married or single?

A. I'm a widower.

Q. And how long were you married?

A. 28 years.

Q. And your wife's name?

A. Maria.

Q. Do you have any children?

A. I have a stepdaughter and two granddaughters that I love very much.

Q. Okay. And sir, were you born and raised in the Chicagoland area?

A. Yes.

Q. And where did you -- where did you grow up?

A. The southwest side of the city, nice Italian neighborhood.

Q. Where did you go to high school?

A. Harper High School on the southwest side of the city.

Q. I'd like to ask you a little bit more about your educational background. Where did you -- did you attend college?

4 (Pages 10 - 13)

Page 14

A.  Yes.

Q.  And where did you attend college?

A.  University of Michigan in Ann Arbor, Michigan.

Q.  And did you graduate from there?

A.  Yes, May of 1970.

Q.  And were you involved in any extracurricular activities while you were at the University of Michigan?

A.  Yes.

Q.  And what were they?

A.  Football.

Q.  Can you be a little bit more specific?

A.  I was a member of the University of Michigan football team.

Q.  Was there anything in particular about the 1969 season that is memorable?

A.  Yes.

Q.  What is that?

A.  We were the Big 10 champions, beat the -- never mind.  We beat Ohio State and went to the Rose Bowl.

Q.  After college, what did you -- what did you do?

Page 15

A.  I spent a little time in the United States Marine Corps until my knees gave out.

Q.  How long were you in the United States Marine Corps?

A.  Three months.

Q.  And after that, what did you do?

A.  I kind of floundered around substitute teaching and things like that until I entered law school in 1975.

Q.  All right.  1975 is the year you entered law school.  Is that fair to say?

A.  Yes.

Q.  And where did you attend?

A.  Northern Illinois University College of Law.

Q.  Where is that located?

A.  Well, it's now located in DeKalb, Illinois, but it was in -- it was a western suburb at that time, and I can't remember exactly where.

Q.  All right.  What year did you graduate from law school?

A.  1978.

Q.  Were you admitted to the Illinois bar that same year?

Page 16

A.  Yes, passed it the first time.  Thank God. Didn't want to go through that again.

Q.  While you were in law school, did you have any clerkships or jobs?

A.  Yes.

Q.  What were they?

A.  I worked for an attorney named Julius Echeles, E-c-h-e-l-e-s.

Q.  And can you briefly describe or give a short bio of who Julius Echeles is or was?

A.  He was a well-known criminal defense lawyer here in Cook County, but also in Lake County, DuPage County, McHenry County, Will County, etcetera.  He also argued two or three times before the U.S. Supreme Court.  He had a large appellate as well as a trial practice.

Q.  How many years while you were in law school did you clerk for him?

A.  Two years.

Q.  After passing and being admitted to the Illinois bar, what was your first job out of law school?

A.  I worked for Julius Echeles.

Q.  And you've already indicated what kind of

Page 17

practice he had.  My next question is what kind of work did you do for him?

A.  Well, initially I was a gopher as a young lawyer, but I would go to status hearings, you know, so that he had time to prepare appeals and things like that.  So I took away all the busy work in court when there was no hearings going on.

Q.  How long did you work for him as a lawyer?

A.  Probably five years.

Q.  And where was his office?

A.  35 East Wacker Drive, Suite 3500, Chicago, Illinois.

Q.  What venues did you and he practice in when you were working for him?

A.  Mostly Cook County Circuit Court, but also DuPage County, Lake County, Will County a few times.

Q.  And with respect to Cook County, were you and Julius Echeles centered in one specific location, or did you travel the circuit?

A.  We traveled the circuit, but most of the cases were at 26th and California, the main criminal courts building.

Q.  All right.  And -- I'm sorry.

5 (Pages 14 - 17)

Page 18

A.  I was just going to say that when I first started working for him, all the criminal cases in the county were in that building until they started building those mini civic centers around the county.  Then they spread the felonies out.

Q.  Is it fair to say that the work that you did with Julius Echeles was primarily criminal defense work?

A.  It was only criminal defense work.

Q.  Did you have an opportunity to try cases with him?

A.  Yes.

Q.  Jury trials?

A.  Yes.

Q.  Did you try misdemeanors?

A.  Yes.

Q.  And felonies?

A.  Yes, and even helped him on some appeals.

Q.  Now, at some point, did your working relationship with Julius Echeles end?

A.  Yes.

Q.  For what reason was that?

A.  Well, after five years, he thought I was well enough along to go out on my own.

Page 19

Q.  All right.  And do you recall approximately what year that might be?

A.  Probably about 1983 or '84.

Q.  After your working relationship with Julius Echeles ended, did you continue to practice law?

A.  Yes.

Q.  Did you join a firm, or were you a solo practitioner?

A.  Solo practitioner.

Q.  Did you relocate from your downtown offices?

A.  Yes.

Q.  Where did you relocate initially?

A.  It was on East Madison Avenue -- not East, West Madison Avenue, about 800 -- I don't know the exact address, I don't remember.

Q.  Now, you've indicated that you're retired.  I guess my next question is for how long, how many years did you practice law?

A.  I practiced law for 38 years.

Q.  Have you ever been the subject of discipline by the ARDC?

A.  Yes.

Page 20

Q.  What year?

A.  Well, 2000 -- the end of 2015 and 2016.

Q.  Did you voluntarily surrender your license?

A.  Yes.

Q.  Is that the last year that you practiced law?

A.  December 31, 2015 was when I ended -- the order from the Supreme Court stated January 16, 2016.

Q.  Now, prior to surrendering your law license, was your practice primarily criminal defense?

A.  Yes.

Q.  And my questions now are going to center on when you were a solo practitioner --

A.  Okay.

Q.  -- okay?

So when you were a solo practitioner, did you handle misdemeanor criminal cases?

A.  Yes.

Q.  Did you handle felony cases?

A.  Yes.

Q.  Did you handle murder cases?

Page 21

A.  A few.

MS. HAGY:  Objection.

THE WITNESS:  Not a whole lot.

BY MS. O'BRIEN:

Q.  Did you try felony bench and jury trials?

A.  Yes.

Q.  Do you recall approximately how many?

A.  Oh, geez.  I'm just trying to think how many average caseload per year.  I probably in 38 years had close to 5,000 cases.

Q.  Did you negotiate pleas with prosecutors?

A.  Yes.

MS. HAGY:  Objection.  Form.

THE WITNESS:  I'm sorry.  I didn't hear the objection.

MS. HAGY:  It was just form.

BY MS. O'BRIEN:

Q.  During the 38 years that you practiced law, did you negotiate pleas with prosecutors?

A.  Yes.

Q.  Were you a member of the Capital Litigation Trial Bar?

A.  I started applying to it, and then they -- right in the middle of my application process,

6 (Pages 18 - 21)

Page 22

Illinois abolished the death penalty, so it wasn't necessary to complete it.

Q. During the 38 years that you practiced law, would you say that you were a practicing litigator?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. Do you know a person by the name of Michael Vitale?

A. Yes.

Q. How did you meet him?

A. I met him first in law school, and he was a year behind me. And then later when he had a practice, he would call me when he got criminal cases.

Q. Did you have a working relationship with Mike Vitale?

A. Yes.

MS. HAGY: Objection. Form.

THE WITNESS: Sorry. Yes, I did.

BY MS. O'BRIEN:

Q. And when did that begin approximately?

A. Probably 1983, '84, right in there.

Page 23

Q. Were you partners together in a firm or independent contractors?

A. Independent contractors.

Q. And you indicated that he would ask you to be on cases with him, so let me ask you this again. How would you describe your law practice as a solo practitioner?

A. You mean the type of cases?

Q. Yes.

A. Primarily criminal misdemeanor and felony cases.

Q. Was your practice limited to criminal matters when you were a solo practitioner?

A. I handled a few divorces, but that got old real quick, so I stopped doing them.

Q. Did you practice all over Cook County?

A. Cook County, Will County, Lake County, DuPage County, McHenry County a few, and I think I even went down to -- I forgot the name of the county down in the south -- it's more towards the central and eastern part of the state, and I can't remember the name of the county right now.

Q. In Cook County, was your practice limited to certain venues?

Page 24

MS. HAGY: Objection. Form.

BY MS. O'BRIEN:

Q. I guess what I mean is certain courthouses.

A. Well, primarily at 26th and California, but then I started practicing a lot in Bridgeview and Rolling Meadows and Maybrook.

Q. Were there venues you frequented more often than others; in other words, courthouses that you frequented the most?

MS. HAGY: Objection. Form.

THE WITNESS: 26th and California, the main criminal courts building, and Bridgeview.

BY MS. O'BRIEN:

Q. Now, you indicated that you had a working relationship with Mike Vitale. Was -- how would you describe the type of practice that Michael Vitale had --

MS. HAGY: Objection. Form. Foundation.

BY MS. O'BRIEN:

Q. -- during the entire time that you knew him?

A. He had mostly divorce clients, but he did get some criminal cases, and he had -- he would

Page 25

handle misdemeanor criminal cases, and he would call me in on the felonies.

Q. Did you handle criminal cases jointly with him?

A. Yes.

Q. Did -- when you would handle these criminal cases jointly, would he ask you to join him on a case?

A. Yes.

Q. Did you ever ask him to be co-counsel on your cases?

A. No.

Q. What types of cases did Mike Vitale ask you to be co-counsel on?

A. Well, there was at least one murder case, and mostly it was burglaries, armed robberies, things like that, you know, maybe a few drug cases.

Q. Can you describe your business relationship with Vitale?

A. You mean who was lead counsel and things like that?

Q. Well, how would your business arrangements work?

A. Well, he would get the case. He would

7 (Pages 22 - 25)

Page 26

call me up and ask me what to charge on the fee, and I would tell him. Then he would charge the fee, and then we would split the fee 50/50.

Q. Did you -- if you were co-counsel on a case with Mike Vitale, did you always file an appearance on a case?

A. Always.

Q. If you were co-counsel on a case with Mike Vitale, would you appear in court?

A. Yes. As a matter of fact, I appeared in court primarily on those cases. He would -- he would appear from time to time.

Q. Approximately how many years did you work with Michael Vitale?

A. Oh, geez. I don't know. I think it spanned about 20 years from the early '80s to the early 2000s I think.

Q. Do you recall approximately how many cases you handled with him --

MS. HAGY: Form objection.

BY MS. O'BRIEN:

Q. -- during the 38 years that you practiced law?

MS. HAGY: Objection. Form.

Page 27

THE WITNESS: That would be hard to say. I don't know. I really don't -- I really couldn't even guess.

BY MS. O'BRIEN:

Q. Prior to 1995, do you recall how many murder cases you had handled, you, yourself?

MS. HAGY: Objection. Form.

THE WITNESS: Probably three or four by myself, but a few with Mr. Echeles when I was a young lawyer.

BY MS. O'BRIEN:

Q. Now, getting back to Mr. Vitale, when you say that you had a business arrangement with him, my question is as follows. Did you have input on all decisions made on murder cases with him generally speaking?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I really don't understand that question. I don't understand what you mean did I have input.

BY MS. O'BRIEN:

Q. Well, if you were co-counsel on a murder case with Mike Vitale, how would that -- how would your relationship with Vitale work? Who was in

Page 28

charge of the case?

MS. HAGY: Objection. Form.

THE WITNESS: He would get the case. He would get the call. He would call me and tell me about -- somewhat about the case and ask how much he would charge, and I would tell him, and then he would go back to the client. And if the client hired him, then he would bring me in the case.

BY MS. O'BRIEN:

Q. All right.

A. And from that point on, I guess I kind of took over, but he was -- he was the one who charged the client, and he was the one who collected the fees and split them with me.

Q. Would you be involved in all decision-making on a case with him?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. Would you be involved in all court appearances of any significance?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I probably went to more of the appearances than Mr. Vitale did.

Page 29

BY MS. O'BRIEN:

Q. What about things such as, you know, filing motions and pleadings, how would you divide the work up if you did?

MS. HAGY: Objection. Form.

THE WITNESS: I did most of that work, but then Mr. Vitale purchased one of the very first computer programs for criminal defense lawyers, and he started -- you know, started using the computer to punch out all these motions, and I had to approve them before I'd let him file them, but I think that way he felt like he was more involved in the case.

BY MS. O'BRIEN:

Q. When you -- when you would be co-counsel with Michael Vitale on a case, was there one of your opinions that had more weight than the other?

MS. HAGY: Objection. Form.

THE WITNESS: I would I guess I would say that because of my experience, my opinions had more weight than Mr. Vitale.

BY MS. O'BRIEN:

Q. Was there ever a time when you and Mike Vitale did not agree on a specific trial strategy?

MS. HAGY: Objection. Form.

8 (Pages 26 - 29)

Page 30

THE WITNESS: From time to time.

BY MS. O'BRIEN:

Q. And how would you resolve those differences?

A. Mostly I would tell him the reasoning for the strategy I wanted to use, and he would eventually come around to the way I was thinking.

Q. Based upon your experiences with Mike Vitale, would he ever go against your judgment or your strategy?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I think he may have once or twice, but I can't be 100 percent sure.

BY MS. O'BRIEN:

Q. Directing your attention -- oh, by the way, was there ever a time where you and Mike Vitale shared an office?

A. Yes.

Q. And do you recall when that was?

A. It was in the mid '90s. I don't recall if it was a couple years or three years. It wasn't that long a time.

Q. And where was that office located?

A. It was on West 26th Street in Berwyn.

Page 31

Yeah, 26th Street in Berwyn. I don't remember the exact address.

Q. All right. Were you partners at that time or independent contractors?

A. Independent contractors.

Q. Who owned that law office or that office building?

A. Mr. Vitale owned the building.

Q. And did you lease space from him?

A. Yes, but because I did a lot of work for him, he never really charged me rent.

Q. Directing your attention to approximately January of 1996, did you have an occasion to represent a client by the name of Billy Bigeck or William Bigeck on a murder case?

MS. HAGY: Objection. Form.

THE WITNESS: Yes, but I believe we pronounced it Bigeck. I could be wrong on that. That's just my memory.

BY MS. O'BRIEN:

Q. Do you recall how you obtained this client?

A. Through Mr. Vitale.

Q. Do you know how Vitale obtained that

Page 32

client?

A. No.

Q. Did you and Mike Vitale discuss fees with respect to that case?

MS. HAGY: Objection. Form.

THE WITNESS: I'm sorry. I really don't recall if we did or didn't.

BY MS. O'BRIEN:

Q. Did you discuss specific responsibilities that each of you would have regarding the case?

MS. HAGY: Objection. Form.

THE WITNESS: No. I think Mr. Vitale just assumed that I would have the major responsibilities and that he would interject from time to time.

BY MS. O'BRIEN:

Q. Do you recall the basic facts of the murder case with -- what did you call him? Bigeck?

MS. HAGY: Objection.

THE WITNESS: That's how I recall his name. I'm sorry.

BY MS. O'BRIEN:

Q. Do you recall the basic facts of the case?

MS. HAGY: Objection. Form.

Page 33

THE WITNESS: I recall somewhat of the facts. I don't recall all the facts of the case.

BY MS. O'BRIEN:

Q. Did Bigeck have codefendants?

A. If I remember correctly, yes.

Q. Now, I'm going to show you -- well, actually I'm going to ask you a question.

Directing your attention to approximately January 10, 1996, did you file an appearance in criminal court at 26th and California on William Bigeck's murder case?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I filed an appearance. I don't recall the exact date.

(Whereupon, Deposition Exhibit No. 4 was marked for identification.)

BY MS. O'BRIEN:

Q. I'm going to show you what has been marked as Exhibit No. 4 and ask if you recognize this document?

A. Yes, I do.

Q. And what do you recognize this document to be?

9 (Pages 30 - 33)

Page 34

A. I recognize it to be an appearance form in the case of People v -- People of the State of Illinois v. William Bigeck.

Q. And does this form bear your signature?

A. Yes, it does.

Q. And does it bear your name and address?

A. It does.

Q. And do you recognize this document as your appearance form on the People v. William Bigeck case?

A. I recognize my signature. Yes, I recognize this document.

Q. And can you please -- looking at Exhibit No. 4, can you please read into the record what is -- what the document says?

A. Do you want me to read the heading or --

Q. Yeah, starting with --

A. I'm sorry. Excuse me. I thought I turned this off. Give me one second, please, off the record. I hate this technology. Excuse me. I hope I turned it off now. Sorry. Go ahead.

Q. Looking at Exhibit No. 4, can you please read into the record what the exhibit says?

A. Do you want me to read the heading as

Page 35

well?

Q. Sure. Yes.

A. The People of the State of Illinois, plaintiffs v. William Bigeck, defendant, general number 96 CR 1838-01, charge, first-degree murder. The undersigned as attorney enters the appearance of William Bigeck as co-counsel with Michael J. Vitale.

Q. And is your signature there?

A. Yes.

Q. And then also can you please read the lower left-hand corner?

A. Yes, George M. Zuganelis for defendant -- attorney for Defendant Bigeck, 3333 West 111th Street, Chicago, Illinois 60655, (312) 239-6400, Attorney No. 23689.

Q. And sir, is Exhibit No. 4 in substantially the same condition today as when you filed your appearance?

A. Yes.

MS. HAGY: Objection.

THE WITNESS: Sorry.

MS. HAGY: I'll just object to form. Foundation.

Page 36

BY MS. O'BRIEN:

Q. I'd like to just look at this form one more time.

A. Sure.

Q. 96 CR 1838, is that an indictment number?

A. Yes.

Q. And is it fair to say that you filed your appearance after the case was indicted?

A. Yes.

(Whereupon, Deposition Exhibit No. 5 was marked for identification.)

BY MS. O'BRIEN:

Q. Now I'm also going to show you what I'm going to mark as Exhibit No. 5. Well, let me just say this. You filed -- you filed your appearance in this case. Do you recall whether Michael Vitale filed an appearance as well?

A. Yes. He filed his appearance before I did, I believe.

Q. All right. I'm going to show you Exhibit No. 5. In looking at Exhibit No. 5, do you recognize this document?

A. Well, I recognize what it is, yes.

Page 37

Q. What is it?

A. It's an appearance form.

Q. And whose appearance form is that?

A. Well, it's for William Bigeck, but it's the appearance of Michael Vitale as counsel for William Bigeck.

Q. Does the document have Michael Vitale's signature on it?

A. Yes.

Q. Do you recognize that signature?

A. Yes, I do.

Q. And what do you recognize that signature to be?

A. Michael Vitale's signature.

Q. You've seen it previously, correct?

A. Many times, yes.

Q. Does the document have a date stamp on it?

A. Yes, this one does.

Q. And what is it date stamped?

A. It appears to be January 16, 1996. I can see the 1 clearly, but the 6 might be a little blurry, so I assume it's 16.

Q. Does the document have Michael Vitale's particulars on it, in other words, his name and his

10 (Pages 34 - 37)

Page 38

address and his phone number and attorney number?

A. Yes.

Q. Now, after you and -- after you and Mr. Vitale filed your appearances on William Bigeck's case, did you file any motions for discovery?

A. I believe Mr. Vitale did. I don't recall filing motions.

Q. Can you indicate what is a motion for discovery in a criminal case?

A. A motion for discovery is pretty much a general motion that's a form followed in Cook County that's set up on Supreme Court rules regulating the dissemination of information between the prosecutors and the defense.

Q. Was it your general practice to file a motion for discovery on all criminal cases?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. And with respect to felony cases, was it your general practice to file a motion for discovery on or about the arraignment date?

MS. HAGY: Objection. Form.

Page 39

THE WITNESS: My practice was usually to file the motion the first time before the assigned judge, not on the arraignment.

(Whereupon, Deposition Exhibit No. 6 was marked for identification.)

BY MS. O'BRIEN:

Q. I'm going to show you People's -- excuse me, Exhibit No. 6. I'm asking that you look at Exhibit No. 6. Do you recognize this document?

A. I recognize what it is, yes.

Q. What do you recognize it to be?

A. It's a motion for discovery in the case of William Bigeck.

Q. And does that have a date stamp on it?

A. Yes.

Q. And what is that?

A. Here it says filed January 10, 1996. The number is much clearer on this one.

Q. Does that appear to coincide with the date that Vitale filed his appearance?

A. It appears to coincide except, as I said before, on the appearance form, the second number, which looks like a 6, could be a zero.

Page 40

Q. So is this motion in substantially the same condition as it was when Michael Vitale and yourself filed it?

MS. HAGY: Objection. Form. Foundation. Misstates the testimony.

THE WITNESS: It appears to be in the same condition except that we never filed motions on two sides. Each page had its own sheet of paper, I guess, is what you would say.

BY MS. O'BRIEN:

Q. But that is the motion for discovery that was filed on the indictment that you filed an appearance on; is that correct?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. Do you recall whether or not you or Vitale appeared at Bigeck's bond hearing on 12/16 of '95?

A. I didn't appear on his bond hearing. I don't know if Mr. Vitale did or not.

Q. Can you indicate what your experiences were at 26th and California in terms of the arraignment date --

MS. HAGY: Objection. Form.

Page 41

BY MS. O'BRIEN:

Q. -- of a case?

A. Of this case?

Q. Yes.

A. I don't recall.

Q. When you -- can you just indicate what an arraignment is?

A. An arraignment is after a preliminary hearing or grand jury proceeding where there was a finding of probable cause or a true bill by a grand jury would be assigned -- it would be sent to the chief judge on a certain date, the presiding judge at 26th and California. We would appear in front of the presiding judge there. We would acknowledge -- we would be handed a copy of the indictment. We would acknowledge receipt of the indictment and plead not guilty, and we would be assigned to a trial judge.

Q. Did you continue to represent Bigeck from the time you filed your appearance until his case was disposed of on August 27th of 1998?

A. I believe so.

MS. HAGY: Objection to form.

THE WITNESS: I'm sorry. I didn't mean to

11 (Pages 38 - 41)

Page 42

interrupt you. I believe so.

BY MS. O'BRIEN:

Q. Do you recall whether or not Bigeck was on bond or in custody at the Cook County Jail?

MS. HAGY: Objection. Form.

THE WITNESS: I don't recall. I think he was in custody, but I really don't recall if he was on bond or in custody.

BY MS. O'BRIEN:

Q. After the arraignment in this case, who was the case assigned to?

MS. HAGY: Objection. Form.

THE WITNESS: I think Judge Moran. I'm not sure. That's the name that popped in my mind. I just don't recall exactly.

BY MS. O'BRIEN:

Q. Okay. Can you describe what type of judge Judge Moran was?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Well, he's not around anymore to cause me any problems, but we used to think of him as the hanging judge, the judge no one wanted to be in front of as a defense lawyer.

Page 43

BY MS. O'BRIEN:

Q. Did he move cases along at a quick pace?

MS. HAGY: Objection. Form.

THE WITNESS: That I couldn't answer because I only had one or two cases in front of him in my career, and I really don't recall.

BY MS. O'BRIEN:

Q. So I know I've touched on this a little bit, but what type of case was Bigeck's case?

A. First-degree murder.

Q. Was there anything -- how many victims were there in the case?

A. If I recall, there were two.

Q. At that time what was the sentencing range for a double murder?

A. 20 years to natural life. Natural life being the only way out of prison is in a coffin.

Q. Was natural life a mandatory sentence at that time for essentially two victims upon a conviction?

MS. HAGY: Objection. Form.

THE WITNESS: I really don't recall if it was mandatory or not.

Page 44

BY MS. O'BRIEN:

Q. Was the State seeking the death penalty against your client?

A. I think the death penalty had been abolished by then, but I'm not sure.

Q. Well, do you recall whether or not you received any verbal or written notification that the State was seeking the death penalty against him?

A. I really don't recall.

Q. In your opinion, was Bigeck eligible for the death penalty?

A. No.

Q. And why is that?

A. Because he only carried a baseball bat. He didn't carry a firearm that was used, the other two defendants used, to commit the murder.

Q. Now, we have indicated or you have indicated, rather, that there were codefendants on this case?

A. Yes.

Q. Did you know some of the other lawyers who represented the other defendants?

MS. HAGY: Objection. Form.

Page 45

THE WITNESS: I probably did, but I couldn't recall who they are now.

BY MS. O'BRIEN:

Q. Did you know a person or do you know a person by the name of Jim Kogut?

A. Yes. I haven't heard that name in a long time, but yes, I recognize it.

Q. Do you know a person by the name of Paul Gridelli?

A. That name is not familiar to me.

Q. Do you know a person by the name of Rohalia Pena?

A. That name is familiar to me, yes.

Q. Do you know a person by the name of Irv Miller?

A. Irv Miller, yes.

Q. Do you know a person by the name of Nick Trutenko?

A. Yes.

Q. Do you know a person by the name of Rick Beuke?

A. Very well.

Q. Did you have -- if you recall, did you have any communications with them during the

12 (Pages 42 - 45)

Page 46

pendency of Bigeck's case?

MS. HAGY: Objection. Form.

THE WITNESS: I don't recall.

BY MS. O'BRIEN:

Q. Do you recall, once you got into Judge Moran's courtroom, who was the state's attorney originally handling this murder case?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I don't recall.

BY MS. O'BRIEN:

Q. Do you know a person by the name of Assistant State's Attorney James Brosnahan?

A. Yes.

Q. And how do you know that person?

A. I've had other cases with him prior to that case if he was the state's attorney on that case.

Q. Is that how you know him? Was he a state's attorney?

A. I'm pretty sure he was, yes.

Q. And did you have any cases with him other than this one?

A. Yes. That's why I recognized the name.

Q. Now, eventually after you filed your

Page 47

appearance and after you filed your motion for discovery, did you receive discovery from the state's attorneys regarding this case?

MS. HAGY: Objection. Form.

THE WITNESS: Yes, and usually the practice was the State's Attorney's Office would give us discovery even if we didn't file a motion for discovery.

BY MS. O'BRIEN:

Q. In this particular case, did you receive discovery from the State's Attorney's Office?

A. I'm sure we did. I don't have 100 percent recollection, but I'm sure we did.

Q. Would you have received a copy of the indictment?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Yes, at the arraignment, we would have received a copy of the indictment.

BY MS. O'BRIEN:

Q. Would you have received grand jury transcripts?

A. Yes.

MS. HAGY: Objection.

Page 48

BY MS. O'BRIEN:

Q. Did you receive police reports?

A. Yes.

Q. Did you receive a court reported statement given by your client to the assistant state's attorneys and police on the date of his arrest?

A. That I don't recall.

Q. Okay. I'm going to show you -- I'm going to call it Exhibit 7 and ask that you take a look at this.

(Whereupon, Deposition Exhibit No. 7 was marked for identification.)

THE WITNESS: Excuse me for a second.

MR. MASCIOPINTO: I'm sorry to interrupt. What was Exhibit 6?

MR. O'CALLAGHAN: The motion for discovery in People v. Bigeck.

MR. MASCIOPINTO: Got it. Thank you.

MS. HAGY: Is that the same what you sent?

MS. O'BRIEN: Here. You can use that if you want.

THE WITNESS: Okay.

Page 49

BY MS. O'BRIEN:

Q. Asking you to look at Exhibit 7, do you recognize that?

A. I don't recognize it, but I mean, I recognize what it is.

Q. What is it, sir?

A. It's the statement of Billy Bigeck.

Q. Does it indicate where it was taken?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Yes. It says it was taken on the second floor of Area 1 Headquarters, 5001 South Wentworth, Chicago, Cook County, Illinois.

BY MS. O'BRIEN:

Q. Does it appear to be a court reported statement made by your client in this case?

A. It appears to be a court reported statement, but it doesn't have the court reporter's -- at the end, at least on the copy you gave me, the court reporter's affirmation of -- you know, where they --

Q. Right. On the front page, does it have a court reporter's name on it?

A. Oh, yes, Timothy D. Bennett, CSR, Illinois state license and then his license number. So that

13 (Pages 46 - 49)

Page 50

would be the court reporter. I apologize. I always look at the end.

Q. So Exhibit No. 7, is that one of the documents you received in this murder case in discovery from the State's Attorney's Office?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I would imagine it is. I don't recall it 100 percent. The practice is that we would have gotten this. I don't recall if we had it.

BY MS. O'BRIEN:

Q. Is it something that you would have wanted -- if your client made a statement to the police, is that a document that you would have wanted in your defense of him?

A. Of course.

Q. Did you receive other discovery from the State's Attorney Office in this case?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I'm sure we did. I just don't recall.

BY MS. O'BRIEN:

Q. During the course of discovery, is it possible that you received lab reports and evidence

Page 51

technician reports?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Yes, it's a very strong possibility we would have in a murder case.

BY MS. O'BRIEN:

Q. Do you -- would it have been your practice to request additional items after a review of -- let me rephrase that.

Did you have an opportunity to review the discovery in this murder case?

A. Yes.

Q. During the course of reviewing discovery, would it have been your practice to request additional documentation based upon your review?

MS. HAGY: Objection. Form.

THE WITNESS: I don't recall if we did in this case, but if it was warranted, I would have.

(Whereupon, Deposition Exhibit No. 8 was marked for identification.)

BY MS. O'BRIEN:

Q. I'm going to show you Exhibit No. 8. Do you -- I'm asking you to take a look at No. 8. Do you recognize this document?

Page 52

A. No.

Q. Do you know what this document is?

A. Yes.

Q. What is it?

A. It's a letter from the assistant's state attorney from James Brosnahan to Mr. Vitale.

Q. And what is the date of that letter?

A. June 20, 1996.

Q. And what is that letter pertaining to?

A. My reading of the first paragraph indicates that it was a letter in response to additional information or additional discovery we were seeking.

Q. How many paragraphs is this letter?

MS. HAGY: Objection. Form.

THE WITNESS: Well, four paragraphs plus a closing sentence.

BY MS. O'BRIEN:

Q. Let me just ask you this. The discovery that was sent under cover to Mr. Vitale, would that eventually have come into your hands?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Yes.

Page 53

BY MS. O'BRIEN:

Q. Did you review the discovery in this case against Bigeck, the case you were defending?

A. Yes.

Q. And after reviewing the discovery, did you have an assessment of the strengths and weaknesses of the State's case against Bigeck?

MS. HAGY: Objection. Form and foundation.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. Did you -- do you recall whether or not statements were made by his codefendants?

A. I don't --

MS. HAGY: Objection. Form.

THE WITNESS: Sorry. I don't recall.

BY MS. O'BRIEN:

Q. What was your opinion of the case after reading all of the discovery?

A. My opinion was that Mr. Bigeck was in serious deep trouble.

Q. What do you mean by that?

A. It means that there was no way except an act of God we could have won that case.

Q. So you didn't think you could win the

14 (Pages 50 - 53)

Page 54

case?  Is that what you're saying?

A.  No, I didn't think we could win the case.

Q.  And why do -- what do you base that on?

A.  I base that on the discovery, conversations with our client, statements made by our client to the police, investigators, and I'm not 100 percent sure, but probably statements made by codefendants, but I'm not 100 percent sure about the codefendants' statements.

MS. O'BRIEN:  Okay.  I think we're going to take a break.  Is that okay with everybody?  Thank you.

THE VIDEOGRAPHER:  This ends media unit 1.  Now going off the record at 10:56 a.m.

(Whereupon, a short break was taken.)

THE VIDEOGRAPHER:  This begins media unit 2.  Now going back on the record at 11:09 a.m.

BY MS. O'BRIEN:

Q.  Okay.  Mr. Zuganelis, where we last left off, I think you were asked this question, and you possibly answered it.  Did you think you could win the case?

A.  After reviewing all of the discovery, my

Page 55

thought process was that the case was unwinnable for Mr. Bigeck.

Q.  At any point between the date of your appearance and after you reviewed the evidence and the date of the disposition of the case, did you discuss the merits of the case with Mike Vitale?

A.  I don't recall, but I'm sure I did.

Q.  Was that your practice with him to discuss what you guys were going to do a particular case?

A.  Yes.

MS. HAGY:  Objection.  Form.

THE WITNESS:  Sorry.  Yes.

BY MS. O'BRIEN:

Q.  And with respect to this specific case, is it fair to say that you had final say on all the decisions that were made regarding it?

MS. HAGY:  Objection.  Form.  Foundation.

THE WITNESS:  I think that would be fair to say.

BY MS. O'BRIEN:

Q.  Would it be fair to say you were involved in all decision-making on this case?

A.  Yes.

Q.  After reviewing discovery, what was your

Page 56

trial strategy or defense in this case?

A.  After reviewing the discovery and learning that, Mr. Bigeck, who's our client, my client and Mr. Vitale's client, carried a baseball bat, not a firearm.  Although he was accountable for the murders, he was the least culpable for the murders because if I recall correctly, the other two defendants shot into the -- into a van they believed to be an opposing gang member's van and killed two 13-year-old girls sitting in the van.

Although Mr. Bigeck was there and he's accountable, he only had a baseball bat.  So if there was going to be a death penalty, Mr. Bigeck was not eligible for the death penalty.  He was certainly eligible to get natural life, but he wasn't eligible for the death penalty.

Q.  Given that reasoning, what was your trial strategy?  How were you going to defend Bigeck?

A.  Well, I'm trying to recall, but I think Mr. Vitale spoke to Mr. Bigeck at the county jail and approached me about my thought process and Mr. Bigeck to cooperate with the police.

Q.  Did you determine -- based upon your experiences as a lawyer or a criminal defense

Page 57

lawyer, did you determine that Bigeck cooperating with the State's Attorney's Office was the only way he could get a term of years for his murder case?

A.  Yes.  And I'm sorry.  I said police instead of State's Attorney.

Q.  That's all right.

A.  My thought process was that Mr. Bigeck cooperate with the State's Attorney's Office and the police was the only way he would ever see liberty ever again.  It would be a number of years, but at least he had a chance.

Q.  And when you say cooperate, I mean, this case was already indicted.  What do you mean by cooperate with the State's Attorney?  What was in your mind at the time that you -- you know, that you had this discussion with Vitale or with your client?  What was in your mind about that?  What were you seeking to do?

MS. HAGY:  Objection.  Form.  Foundation.

THE WITNESS:  That Mr. Bigeck testify against the other defendants and give truthful information in addition to what the police already knew about the case in order for him to get a number of years, as I said before, where he could actually have a

15 (Pages 54 - 57)

Page 58

future where there was some way he would eventually get out of prison and have a life out of prison.

BY MS. O'BRIEN:

Q. So you were looking to have your client testify against one of the other four codefendants in that case, 96 CR 1838; is that fair to say?

MS. HAGY: Objection. Form.

THE WITNESS: Well, whether it's one or all four of the other codefendants, I was seeking for him to testify on behalf of the State, as I said before, so that at least my client had some semblance of a future outside of prison.

BY MS. O'BRIEN:

Q. But when you say testify, my question is you wanted him to testify on the case that he was under indictment for, correct?

A. Yes, and we always admonished him to testify fully and truthfully.

Q. Now, let's talk a little bit about Bigeck. I mean, when you appeared -- did you appear in court occasionally on -- not occasionally.

Did you appear in court on this case?

A. Yes. My appearance indicates that I did. I have very little recollection about the case, you

Page 59

know, court appearances and that, but yes.

Q. When you would appear in court, would you have conversations with your client?

MS. HAGY: Objection. Form.

THE WITNESS: I would imagine so. I can't give you a 100 percent answer on that.

BY MS. O'BRIEN:

Q. Well, where would you generally see him?

A. Well, because it was a murder case, I would assume that he was in custody. So I would go behind the courtroom that was commonly called the bullpen and talk to him there, and he was there with other prisoners who were incarcerated.

Q. Were you and Vitale allowed an opportunity during those court appearances to speak with your client privately in a bullpen if you recall?

A. Well, we could always speak to him in the bullpen, but it was always loaded with other defendants. We just took him off to the side, you know, and talked to him in tones that other people couldn't hear.

Q. Would you visit him in Cook County Jail?

A. No, I didn't, but Mr. Vitale did.

Q. Is -- you know, jail visits, would that be

Page 60

something that you would have discussed with Vitale in advance when you agreed to take on this case with him?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. So after you -- after you decided on your trial strategy that you've previously described here today, did you talk to Vitale about how you wanted to proceed in terms of your defense of Bigeck?

A. I don't exactly know what you mean by that.

Q. Well, after you decided, you know, you wanted him to testify against his codefendants, did you tell Mike Vitale that?

A. Of course. I discussed it with him.

Q. And was he in agreement with you?

A. Eventually he did. I don't recall if he hesitated or had objections initially, but yes, he was in agreement with me eventually.

Q. After discussing with him, did you and he have an opportunity to interview your client regarding your defense of the case?

Page 61

MS. HAGY: Objection form.

THE WITNESS: I don't recall if I did. I know Mr. Vitale did.

BY MS. O'BRIEN:

Q. Well, would that be in your normal practice to discuss the defense of a case with one of your clients?

A. Yes.

MS. HAGY: Objection. Form.

THE WITNESS: I'm sorry. Yes, it is in my practice, but I don't recall if I actually went to the county jail to discuss it with Mr. Bigeck.

BY MS. O'BRIEN:

Q. Was the sentencing range discussed with him by either you or Vitale?

A. That I don't recall.

Q. Did you or Vitale discuss the strengths and weaknesses of his case with him?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I don't recall if I did, but I'm sure Mr. Vitale did.

BY MS. O'BRIEN:

Q. Is that something that you would do in your normal practice with respect to a client?

16 (Pages 58 - 61)

Page 62

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. Did you communicate to your client in any manner that the State had a strong case against him?

A. I don't recall if I actually communicated that or if Mr. Vitale did.

Q. Would it have been communicated by either one of you?

A. Yes.

Q. Did either you or Vitale discuss a possible resolution of the murder case with Bigeck?

MS. HAGY: Objection. Form.

THE WITNESS: Would you repeat that? I forgot.

BY MS. O'BRIEN:

Q. Did you discuss a possible -- did you discuss a possible resolution of the case with Bigeck?

A. As I said, I don't recall if I did, but I'm sure Mr. Vitale did.

Q. After you decided what your trial strategy would be to have him testify or cooperate with the State's Attorney's Office, what did you do next in

Page 63

order to implement that idea?

MS. HAGY: Objection. Form.

THE WITNESS: We would approach the assistant state's attorney who was the first chair of the case and broach it to him or her.

BY MS. O'BRIEN:

Q. But would it have been your normal practice to discuss this with your client before approaching the State's Attorney?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Of course, but as I said, I don't recall if I was the one who did that or if Mr. Vitale did.

BY MS. O'BRIEN:

Q. Would you have approached the State's Attorney with this idea if your client was against it?

A. No. After all, it's his life, his decisions, his right to a trial, not ours as lawyers.

Q. Were you looking to negotiate a deal with the Cook County State's Attorney Office?

A. Yes. Sorry.

MS. HAGY: I'll just do a belated objection to

Page 64

form. Thank you.

THE WITNESS: Noted.

MR. LYDON: Do you want to ask it just again because it was unclear with the talking over.

BY MS. O'BRIEN:

Q. Were you looking to negotiate a deal for your client, Bigeck, with the Cook County State's Attorney's Office on his pending case?

A. Yes.

Q. Is that something that you would have done if Bigeck was opposed to it?

A. No.

Q. Did you have his permission to contact the State's Attorney Office about working out his case?

MS. HAGY: Objection. Form.

THE WITNESS: Yes, we had permission because that's standard procedure. It's his right, not the lawyer's right. His right to trial I should say.

BY MS. O'BRIEN:

Q. Based upon these -- based upon your strategy and based upon your conversations, did either you or Vitale approach the Cook County State's Attorney's Office regarding negotiating a deal on Bigeck's case?

Page 65

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I don't recall who approached first, but I know I was involved in some of the negotiations.

BY MS. O'BRIEN:

Q. Well, my question is did either you or Vitale contact them to even discuss this with them?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: We would have had to because otherwise, it wouldn't have been brought to the state's attorneys at all.

BY MS. O'BRIEN:

Q. Do you recall whether or not it was you that made the overture to the State's Attorney's Office?

A. That I don't recall.

Q. But it was either you or Vitale; is that fair to say?

A. That's very fair to say.

Q. It wasn't the State approaching you. You approached the State, correct?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: That's correct.

17 (Pages 62 - 65)

Page 66

BY MS. O'BRIEN:

Q. Would you consider plea negotiations to be a major part of defending a criminal case?

MS. HAGY: Objection. Form.

THE WITNESS: It is a very major part of defending a criminal case.

BY MS. O'BRIEN:

Q. And why is that?

A. Because the great majority of cases from the defense point of view are unwinnable, and so we would enter into negotiations to mitigate any punishment the defendant may have -- may get.

Q. Prior to signing on with this case or when you signed on with this case with Vitale, did you have an agreement with him that nothing significant would happen without you being present and in agreement?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: When you say an agreement with him, do you mean with Mr. Vitale?

BY MS. O'BRIEN:

Q. Yes, sir.

A. That was my usual practice. In this case, I don't recall specifically if we mentioned that,

Page 67

but that was our usual practice, and that would have been understood, I believe.

Q. If Mike Vitale spoke with or had a meeting between Scott Cassidy and Bigeck, would you have been notified?

MS. HAGY: Objection. Form.

THE WITNESS: I would have been notified, yes. I don't recall, but I'm sure I would have been notified.

BY MS. O'BRIEN:

Q. You would have insisted upon being present; is that fair to say?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Yes. I would have -- that would be fair to say, but I don't know if I could have always been present. That's why Mr. Vitale was -- went to those.

BY MS. O'BRIEN:

Q. I'm going to direct your attention to August of 1996. Were you still representing Bigeck on this case?

A. I believe so, yes.

Q. Well, you -- is it fair to say that you saw this case through to the end?

Page 68

A. Saw it through to his sentencing.

Q. At any point during your representation of Bigeck, did the state's attorneys who were prosecuting the case change if you recall?

A. I don't recall.

Q. And is it fair to say you don't know how the initial contact was made with the state's attorney like in person or by phone? You don't know that, correct?

MS. HAGY: Objection. Form.

THE WITNESS: I don't know that. Excuse me. I don't know that.

BY MS. O'BRIEN:

Q. In any event, was a meeting set up between the state's attorneys handling the case, you, and your client, Bigeck?

A. Yes, and it would have involved Mr. Vitale, too.

Q. Yes. So it would be -- yes, you and Vitale were involved, correct?

A. Yes. Now, I don't recall if I was at every one of those meetings, but I was at a few.

Q. The circumstances which led you to -- well, let me just say this.

Page 69

The meetings that you were having with the state's attorney, is it -- you were trying to conference the case with them; is that fair to say?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. And when I use the word conference a case, can you -- do you know what I'm talking about?

A. Plea negotiations.

Q. And other than what you've described, what were the circumstances which led you to conferencing the case with the state's attorney?

MS. HAGY: Objection. Form.

THE WITNESS: I really don't understand that. I mean, I read the discovery. I talked to my client. We attempted to talk to some witnesses. We weren't always successful on that. We determined the case was unwinnable. So the only way to go was to conference the case and mitigate any damages that may befall the defendant.

BY MS. O'BRIEN:

Q. Do you know a person by the name of Scott Cassidy?

A. Yes.

18 (Pages 66 - 69)

Page 70

Q. And was Scott Cassidy one of the prosecutors handling the Bigeck case at a certain amount -- at a certain point in the case?

MS. HAGY: Objection. Form.

THE WITNESS: I believe so. I'm sorry. I believe so, yes.

BY MS. O'BRIEN:

Q. Did you have any cases with him prior to this case?

A. Yes, I'm sure I have. I couldn't give you specific names of cases or dates, but I'm pretty sure I did because I knew Scott when he entered the case. I mean Mr. Cassiday I should say.

Q. So when you sought a meeting with him, were you meeting with him and requesting that your client cooperate in exchange for reduction of sentence?

A. Yes.

Sorry. I don't mean to interrupt you.

MS. HAGY: It's hard.

THE WITNESS: Yes. We were seeking a reduction of sentence. We were mitigating the damages as they would say in a civil case.

Page 71

BY MS. O'BRIEN:

Q. Were you attempting -- by having a meeting with Scott Cassidy, were you and Vitale attempting to negotiate a plea agreement with the State's Attorney's Office?

A. Yes.

MS. HAGY: Objection. Form.

THE WITNESS: I should wait a second and let you talk.

MS. HAGY: Thanks. I'll try to be faster.

BY MS. O'BRIEN:

Q. Was a meeting scheduled for August 12, 1996 at approximately 12:30 in the Cook County State's Attorney's Office regarding conferencing Bigeck's case with Scott Cassidy?

MS. HAGY: Objection. Form.

THE WITNESS: I'm sure there was. I couldn't give you a specific date and time. If I saw a document with that on there, I would happily agree to it.

BY MS. O'BRIEN:

Q. Were you present at a meeting with the Cook County -- at the Cook County State's Attorney Office regarding Bigeck's murder case?

Page 72

A. I recall being present at at least one meeting, and it was not only an assistant state's attorney or two, but there was also a police investigator there as well.

Q. All right. I'm going to show you Exhibit 9 and have you take a look at this.

(Whereupon, Deposition Exhibit No. 9 was marked for identification.)

BY MS. O'BRIEN:

Q. I'm going to ask you that look at this document, please, and take a couple of seconds, please.

A. Okay.

Q. Looking at Exhibit No. 9, what is this exhibit?

A. It's a proffer letter.

Q. And who is it regarding?

A. William Bigeck.

Q. And --

A. It's a pretty standard proffer letter I would say.

Q. What is your definition of a proffer letter?

Page 73

A. It's the agreement between the state's attorney -- assistant state's attorney and the defense regarding testimony of the defendant, but no promises made, that they will follow any investigative lead that they glean from the interview with the defendant whether it implicates the defendant or not.

Q. And is it -- let me just back up a little bit.

So this proffer letter was signed on August 12th of 1996, correct?

MS. HAGY: Objection. Form.

THE WITNESS: I don't see a date on here, but I'll take your word for it.

BY MS. O'BRIEN:

Q. Well, here, I'm looking at the exhibit. Can you please read the first paragraph?

A. Oh, yes, August 12, 1996. Yes. I'm sorry.

Q. Were you present for a meeting between Scott Cassidy and your client with Vitale present on August 12, 1996 at approximately 12:30 p.m.?

MS. HAGY: Objection. Form.

THE WITNESS: I don't recall if I was present

19 (Pages 70 - 73)

Page 74

at this meeting. I know there were several meetings. My signature isn't on this one, so I don't recall if I was present.

BY MS. O'BRIEN:

Q. Is the proffer letter something that you, in your practice, would want to be present for?

MS. HAGY: Objection. Form.

THE WITNESS: Normally, yes.

BY MS. O'BRIEN:

Q. Would you have allowed Vitale to enter into and sign a proffer letter without you being there?

MS. HAGY: Objection. Form.

THE WITNESS: That I couldn't tell you at this moment, but I would probably want to be at least notified if nothing else.

BY MS. O'BRIEN:

Q. Can you please indicate in the -- can you please read the proffer letter into the record?

A. The entire proffer letter?

Q. Yes.

A. Regarding William Bigeck.

Q. Yes.

A. The Cook County State's Attorney's Office

Page 75

hereby agrees to participate in an interview with William Bigeck on August 12, 1996. It is also agreed the Cook County State's Attorney Office will not use any statements made by William Bigeck during this interview against him in criminal prosecution. The Cook County State's Attorney Office is completely free to pursue any and all investigative leads derived in any way from the proffer which could result in the acquisition of evidence admissible against William Bigeck in subsequent proceedings.

This agreement shall not be construed as statutory immunity pursuant to 725 Illinois -- ILCS -- I forgot what that is. Illinois Criminal Statutes -- 5/106 in that evidence obtained independently from William Bigeck's statement can and will be used against him in a court of law. You are advised that the Cook County State's Attorney's Office is currently in possession of evidence incriminating William Bigeck in this matter, and nothing in this agreement will affect the admissibility of that evidence for any purpose. Excuse me for a second.

I just got a little lightheaded. I do

Page 76

have high blood pressure.

MR. LYDON: Let's take a break.

THE WITNESS: No. Give me 30 seconds. I'll be fine.

MS. HAGY: Should we get you some food?

THE WITNESS: I'm fine.

MR. LYDON: I would rather you answer the questions with a clear mind.

THE WITNESS: Okay.

THE VIDEOGRAPHER: Now going off the record at 11:33 a.m.

(Whereupon, a short break was taken.)

THE VIDEOGRAPHER: Now going back on the record at 11:39 a.m.

BY MS. O'BRIEN:

Q. Are you feeling a little better now?

A. Yes.

Q. And when we left off, you were reading the part of the proffer -- you were reading the proffer letter. Let's maybe begin with this agreement shall not be construed. Can you please finish reading the proffer letter?

A. Sure. I think that's where I left off.

Page 77

This agreement shall not be construed as statutory immunity pursuant to 725 ILCS 5/106 in that evidence obtained independently from William Bigeck's statement can and will be used against him in a court of law. You are advised that the Cook County State's Attorney's Office is currently in possession of evidence incriminating William Bigeck in this matter, and nothing in this agreement will affect the admissibility of that evidence for any purpose. This agreement also shall not be construed to bar the use of statements by William Bigeck during said interview as impeachment or rebuttal in the event that William Bigeck testifies as a defendant or witness for the defense in a criminal prosecution.

This letter embodies the entirety of the agreement for a proffer for William Bigeck's testimony. No other promise exists between the Cook County State's Attorney's Office and William Bigeck regarding this proffer.

Q. And who signed this document, please?

A. Scott Cassidy signed it, and then it appears that William Bigeck signed it acknowledging that he read the letter and understood the contents

20 (Pages 74 - 77)

Page 78

and agrees with the terms of the letter, and then an investigator whose name I can't read, and Michael Vitale.

Q. All right. And you recognize Michael Vitale's signature; is that correct?

A. Yes.

Q. And there's just one line for the attorney for William Bigeck; is that correct?

A. Yes.

Q. Now, you indicated that you were not certain what -- you were present for meetings, but you weren't certain which ones?

A. Right.

Q. And my question to you is is your memory exhausted as to what meetings you were present for?

A. Yes.

Q. And I'm going to mark Exhibit No. 10.

MS. O'BRIEN: I don't have a copy for you. You know what it is.

MS. HAGY: That's okay.

(Whereupon, Deposition Exhibit No. 10 was marked for identification.)

Page 79

BY MS. O'BRIEN:

Q. I'm going to show you this document, and if you could just -- if you could just look at the document. Please read the document, and I have some questions when you're done.

A. Well, a quick scan of the document, the first paragraph, I noticed my name right away.

Q. Well, I'd like you to at least read it.

A. Okay. During the ongoing investigation --

Q. No. No. No. Read it to yourself quietly. I'm so sorry.

A. I gotcha. Just the first paragraph, or do you want me to read the whole thing?

Q. Well, let me just say based upon the reading you've done so far, has that document refreshed your memory as to whether or not you were present on August 12th of 1996 for a meeting?

A. Yes.

Q. And were you present on August 12th of 1996 for a meeting with --

A. Yes.

Q. -- Scott Cassidy?

A. I'm sorry I interrupted you. Yes.

Q. Was your client present as well?

Page 80

A. Yes.

Q. And do you recall this proffer letter now that your memory has been refreshed? Do you recall being present when this proffer letter was signed?

A. Yes.

Q. Now, let me talk a little bit about a proffer letter. Based upon your experiences as a criminal defense attorney, have you had opportunities -- here, I'm just going to take that from you.

Have you had opportunities to be involved in cases where a proffer letter was given to your clients?

A. From time to time, yes, but mostly on murder cases, very seldom on other types of cases.

Q. All right. Is it fair to say that if you are in a conference like you were on August 12th of 1996, that the proffer letter is pretty much the first thing discussed?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. And why is that?

A. Because that sets the tone for the whole

Page 81

conference.

Q. And when you say it sets the tone for the whole conference, can you elaborate on that?

A. Well, that the investigators and the state's attorneys and the defense agree -- including the defendant, agree to testify truthfully and fully.

Q. Now --

A. Well, I mean, the prosecution doesn't agree to testify, but they agree that our client should testify truthfully and fully, and we agree as well.

Q. Now, your client was present, obviously, at this meeting, correct?

A. Yes.

Q. And were you given the proffer letter by Scott Cassidy upon arrival into wherever you were in the State's Attorney's Office?

A. If I recall correctly, our client was in custody, so wherever we were, we would have to have discussed it with our client. Since he was in custody, he couldn't leave the room, so the prosecution team, including investigators, would have had to have left the room while we discussed

21 (Pages 78 - 81)

Page 82

it with our client.

Q. Okay. So when you had this meeting on August 12th in 1996, the meeting was in the State's Attorney's Office; is that fair to say?

A. Yes. It wasn't in the county jail. It was at the State's Attorney's Office.

Q. And your client was brought over into the this meeting?

A. Yes.

Q. And was that your idea, or do you know how that all came about?

MS. HAGY: Objection. Form.

THE WITNESS: I don't recall how it came about.

BY MS. O'BRIEN:

Q. Now, in addition to Scott Cassidy being present and Vitale being present, you also indicated there was an investigator there as well?

A. I recall a Chicago Police investigator sitting there as well as being listed in the -- I mean, I can visualize him in my mind's eye.

Q. And is he -- do you know whether or not he's the person who brought your client over to the office from Cook County Jail?

A. That I couldn't tell you.

Page 83

MS. HAGY: Objection.

BY MS. O'BRIEN:

Q. Do you know whether at the time your client was in general -- at that time your client was in general population in the Cook County Jail?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: That I couldn't tell you. I don't recall if he was or he wasn't.

BY MS. O'BRIEN:

Q. Do you know a person by the name of Neil Linehan?

A. Of course I do, yes.

Q. When you say of course you do, how do you know him?

A. I've dealt with Neil as an assistant's state's attorney and also as a judge.

Q. And he was present at this meeting as well; is that fair to say?

A. Yes.

MS. HAGY: Objection to form.

THE WITNESS: I'm sorry. Yes. He's listed on the form, yes.

BY MS. O'BRIEN:

Q. Do you recall prior going to the meeting

Page 84

whether or not Scott Cassidy was assigned to the case at that time?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I don't recall.

BY MS. O'BRIEN:

Q. Were you present at this meeting because you and Vitale were seeking to have your client cooperate with the prosecution?

A. Yes.

Q. And at the time that you were present at the meeting and spoke with the state's attorneys with your client present, were you in the process of negotiating a plea agreement with the Cook County State's Attorney's Office for your client on his pending case?

A. Yes, with full agreement of our client, by the way.

Q. And -- yes. You had discussed this -- this meeting was discussed with your client prior to it occurring; is that fair to say?

A. That's fair to say because under the rules of ethics and other case law that we could not have proceeded without his permission.

Q. Did your client know or did you tell your

Page 85

client that testifying against the codefendants was one of the ways to negotiate the plea?

A. Yes.

MS. HAGY: Objection.

THE WITNESS: Sorry. Yes. The answer is yes.

BY MS. O'BRIEN:

Q. And did he agree to that?

MS. HAGY: Objection. Form.

THE WITNESS: I don't recall if specifically agreed to it, but I'm assuming he did because he was at the meeting with us. I don't recall being at the meeting with Bigeck if it was Mr. Vitale or me or Mr. Vitale and me telling him and he agreed.

BY MS. O'BRIEN:

Q. Well, let's talk about August 12, 1996, the meeting at the State's Attorney's Office. Would you have had an opportunity or did you have an opportunity to speak with your client alone before the meeting began?

A. Yes.

Q. And did you have any advice for your client?

A. Yes.

Q. And what was that advice?

Veritext Legal Solutions
www.veritext.com
888-391-3376

Page 86

A. To be truthful and cooperate fully, you know, to tell the investigators everything that he knew even if the investigators hadn't known it yet because if I recall correctly, Mr. Bigeck gave information that implicated other gang members other than the ones that were already indicted.

Q. You attended the meeting, though, pertaining to your existing -- the existing indictment against your client, though; is that fair to say?

A. Yes.

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. Were you looking for leniency or a promise of leniency?

A. I guess a promise of leniency because until the state's attorneys and the police heard what Mr. Bigeck had to say and what information they could glean from him, there was no promise -- there was no leniency granted ahead of time.

Q. Now, you indicated that the day of the meeting, you and Vitale were able to speak with Bigeck alone before the meeting began, and my

Page 87

question is did you discuss the proffer letter with him after --

MS. HAGY: Objection.

BY MS. O'BRIEN:

Q. -- after that initial meeting?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: When you say after that initial meeting, do you mean before we -- the investigators came back in or --

BY MS. O'BRIEN:

Q. Let me rephrase.

You had a conversation initially with your client privately, correct?

A. Yes.

Q. And you've already indicated that you told him to tell the truth?

A. Yes. I don't recall if the proffer letter was there yet or not.

Q. All right. When you went into the meeting and the state's attorneys were there, did you demand the proffer letter, or did they automatically give you the proffer letter?

MS. HAGY: Objection. Form.

THE WITNESS: That I don't recall, but the

Page 88

usual practice would have been if the proffer letter was already, what's the word I'm looking for, already created, typed up, whatever, they would have just come over and given it to us. There was no demanding or anything. It was sort of a cooperative process.

BY MS. O'BRIEN:

Q. All right. And did you discuss it or did you talk about the proffer letter or explain it to your client?

A. Yes. After I read it and Mr. Vitale read it, we would have had to have discussed it and explained it to the client because we could not have moved forward without his express agreement.

Q. And did he -- based upon your conversations, did he understand that proffer letter?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: If I recall correctly, yes, he understood. I don't recall 100 percent, but that would have been the standard procedure.

BY MS. O'BRIEN:

Q. If he expressed any hesitancy or confusion regarding the proffer letter, would you have

Page 89

allowed him to sign it?

A. No, not unless -- not until we explained it to him and he then understood it, then would we have allowed him to sign it.

Q. And did you know in advance of that meeting what information or what statements your client, Bigeck, was going to give the state's attorney?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I didn't personally know, but Mr. Vitale knew, and Mr. Vitale relayed that information to me.

BY MS. O'BRIEN:

Q. Okay. Now, you've indicated that you know Neil Linehan, and during that meeting, do you recall whether or not Neil Linehan questioned your client about anything?

A. I don't recall. I don't recall the specifics of the meeting.

Q. What about Scott Cassidy?

A. I know he was present, but I don't recall the specifics.

Q. Was he doing the questioning?

A. That I can't tell you. I don't recall.

23 (Pages 86 - 89)

Page 90

Q. Did Neil Linehan conduct himself in a professional manner in your presence?

MS. HAGY: Objection. Form.

THE WITNESS: As far as I can tell, I have no recollection of him not handling himself in a professional manner one way or the other. I don't recall.

BY MS. O'BRIEN:

Q. If Neil Linehan had not acted in a professional manner, would you have recalled it?

MS. HAGY: Objection. Form.

THE WITNESS: Probably. All I can say is probably I would have, but I can't say for sure 100 percent.

BY MS. O'BRIEN:

Q. What about Scott Cassidy, did he conduct himself in a professional manner in your experience?

MS. HAGY: Objection. Form.

THE WITNESS: As far as I can recall, I think he did. I don't recall if he didn't.

BY MS. O'BRIEN:

Q. If he did not, would you have recalled it?

MS. HAGY: Objection. Form.

Page 91

THE WITNESS: My answer would have been the same as with Mr. Linehan. I don't recall if I would have remembered or not. If he did act in an unprofessional manner, that probably would have stuck in my mind, but I couldn't tell you if he did or he didn't.

BY MS. O'BRIEN:

Q. Is Exhibit No. 9, the proffer letter, in substantially the same condition today as it was when William Bigeck signed it?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: All I can say is it appears to be. I couldn't tell you 100 percent for sure. It's been 30 years, but it appears to be.

BY MS. O'BRIEN:

Q. At the meeting on August 12th of 1996, did Billy Bigeck provide information to the assistant state's attorneys regarding the murder of the two girls?

A. Yes.

MS. HAGY: Objection.

THE WITNESS: Sorry. I didn't mean to interrupt you. Yes.

Page 92

BY MS. O'BRIEN:

Q. Did he speak in a narrative, or was he asked questions and gave answers?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: That I can't answer 100 percent, but I think the general practice was in meetings like that, that he would have been asked questions by the investigator and the assistant state's attorneys, and Bigeck would have given answers.

BY MS. O'BRIEN:

Q. Were you allowed to confer with your client in private during that meeting?

A. Of course --

MS. HAGY: Objection to form. Foundation.

THE WITNESS: I'm sorry. Of course we were.

BY MS. O'BRIEN:

Q. And how would those meetings take place given that your client was in custody?

A. Whenever we requested a conference with our client, the prosecution team, which consists of the assistant state's attorneys and the police investigators, would have left the room because Mr. Cassidy -- I'm sorry, Mr. Bigeck wouldn't have been allowed to leave the room because he was in

Page 93

custody.

Q. At any time during the meeting, did Bigeck complain to you or Vitale about Scott Cassidy's treatment of him?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: My recollection is that I don't recall. I don't recall if he did or he didn't.

BY MS. O'BRIEN:

Q. If Bigeck complained to you about Scott Cassidy's treatment of him, would you have allowed that interview to continue?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: My practice would have been not to allow it to continue, but it did continue.

BY MS. O'BRIEN:

Q. During this meeting, was your client, Bigeck, discussing the facts of the crime pertaining to his indictment on the case that was pending --

MS. HAGY: Objection.

BY MS. O'BRIEN:

Q. -- and that you were defending him on?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Are you referring to the

24 (Pages 90 - 93)

Page 94

investigators being back in the room or not?

BY MS. O'BRIEN:

Q. Oh, let me rephrase.

During the meeting with Scott Cassidy and Neil Linehan and you and Vitale with the investigators present, was your client discussing the facts of the crime pertaining to his indictment?

A. Yes.

MS. HAGY: Objection to form.

THE WITNESS: Sorry. I keep answering too quickly.

BY MS. O'BRIEN:

Q. Was your -- during that same meeting, was your client discussing the case that was pending against him?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. Was he discussing the roles of his codefendants in that case?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Yes.

Page 95

BY MS. O'BRIEN:

Q. Now, during this meeting, did Scott Cassidy yell at Bigeck?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I couldn't tell you because I don't recall that happening.

BY MS. O'BRIEN:

Q. Did he swear at Bigeck?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I don't recall that happening.

BY MS. O'BRIEN:

Q. Did he ever walk out of the meeting after yelling and swearing at Bigeck?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I recall him walking out of the meeting because we requested a conference with our client, but I don't recall him walking out of the meeting otherwise. I just -- I have no recollection whether he did or he didn't.

BY MS. O'BRIEN:

Q. Well, if he had sworn and yelled at your client, would you have remembered that?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Well, my practice would have been

Page 96

if he did that, we would have ended the conference right there.

BY MS. O'BRIEN:

Q. And you didn't end it; is that fair to say?

A. That's fair to say.

Q. Did Scott Cassidy ever tell Bigeck that his story was bullshit?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I don't recall that happening.

BY MS. O'BRIEN:

Q. Did he tell your client that if he didn't give the State's Attorney's Office what he wanted, he would go to jail forever?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No, because that would have been a direct threat indicating that Scott Cassidy would have wanted him to lie, and that I would not have allowed.

BY MS. O'BRIEN:

Q. Did Scott Cassidy ask Bigeck to falsely accuse others of the murder?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Not in my presence he wouldn't

Page 97

have done that, no. I don't recall that happening.

BY MS. O'BRIEN:

Q. Would you have allowed your client to do that?

A. Of course not.

Q. At any time did Scott Cassidy tell Bigeck that he wanted him to testify falsely?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Not in my presence, and if he did, I wouldn't have allowed it.

BY MS. O'BRIEN:

Q. Did he threaten Bigeck in any way?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Again, I don't recall that. So if it happened, it didn't happen in my presence because I would have ended the conference immediately.

BY MS. O'BRIEN:

Q. In your opinion, was Scott Cassiday trying to coerce Bigeck into saying things?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Not that I recall.

BY MS. O'BRIEN:

Q. Did he suggest answers to Bigeck?

25 (Pages 94 - 97)

Page 98

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Well, see, that's a hard question to answer because as an experienced cross-examiner myself, I always suggested answers in cross-examination, but in direct testimony, you can't, but we were in a conference. So I would imagine he probably did on occasion, but I don't know if that was the crux of the meeting.

BY MS. O'BRIEN:

Q. Well, was he putting words into your client's mouth?

MS. HAGY: Objection. Form.

THE WITNESS: No. That I wouldn't have allowed.

BY MS. O'BRIEN:

Q. Was he feeding him information?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Was Scott Cassidy feeding information to my client?

BY MS. O'BRIEN:

Q. Yes.

A. No.

Q. Did Neil Linehan swear at your client or yell at him?

Page 99

MS. HAGY: Objection to form.

THE WITNESS: I don't even recall Neil being there. So he didn't make an impression on me, so I don't recall.

BY MS. O'BRIEN:

Q. Is it fair to say that Scott Cassidy was leading the questioning of your client?

A. That's a fair statement. I think Neil mostly observed and was kind of quiet. I don't recall him saying anything.

Q. Now, I know you've kind of answered this already, but assuming arguendo the things that I just asked you, your client being -- you know, if he was threatened, if he was sworn at, if he was yelled at, assuming arguendo that happened, what would you have done?

MS. HAGY: Objection. Form.

THE WITNESS: I would have -- excuse me. One second. I would have -- I would have ended the questioning right there. I wouldn't have allowed it.

MS. HAGY: Do you need a break?

THE WITNESS: No. No. I'm fine.

MS. HAGY: Was that breathing from --

Page 100

THE WITNESS: No. No. I'm okay. I'm okay. It's just I'm surrounded by all these women.

MR. LYDON: Start that Q and A over again.

THE WITNESS: I'm sorry? I didn't hear.

BY MS. O'BRIEN:

Q. Assuming arguendo that either Scott Cassidy or Neil Linehan yelled or swore at your client or told him his story was bullshit or threatened him or tried to get him to testify falsely, all the questions that I just asked, assuming arguendo those things happened, what would you have done?

MS. HAGY: Objection. Form.

THE WITNESS: I would have ended the conference.

BY MS. O'BRIEN:

Q. Would you have remained in the meeting?

MS. HAGY: Objection. Form.

THE WITNESS: If we -- I'm sorry. If we ended the conference, no, I would not have.

BY MS. O'BRIEN:

Q. Would you have terminated the meeting even to the detriment of a deal that Bigeck could have possibly gotten from the State's Attorney Office?

Page 101

MS. HAGY: Objection. Form.

THE WITNESS: At that point, yes, until we talked to the assistant state's attorney's again and got a few things straightened out.

BY MS. O'BRIEN:

Q. And why is that?

A. Well --

MS. HAGY: Objection. Form.

THE WITNESS: -- because I wouldn't have allowed my client to be threatened or coerced into testifying in a certain manner except for the truth.

BY MS. O'BRIEN:

Q. If those things happened, assuming arguendo those things happened, would you have allowed your client to testify in the case?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. In your opinion, was Scott Cassidy trying to get Bigeck to fabricate a story?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No. My opinion would have been that Scott was trying to get to the truth.

26 (Pages 98 - 101)

Page 102

BY MS. O'BRIEN:

Q. Did you think, in your opinion, was Scott Cassidy trying to get Bigeck to lie?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Did either you or Vitale tell or advise Bigeck to lie?

A. Absolutely not.

Q. And why is that?

A. Because, first of all, it would have been a violation of the professional rules of responsibility. That's number one, but number two is that we would have -- we would have subjected our client to a much worse punishment than if he told the truth. I don't know if I was clear on that, but if we would have advised him to lie, then we would have been part and parcel of any criminal act that would have arose out of that. Do you understand what I'm saying?

My ethical duty was not to advise him to lie. My ethical duty was to tell him -- to advise him to tell the truth at all times whether that truth was detrimental to him or not.

Page 103

Q. If those things had happened, would you have reported it to the state's attorney who was in charge of the office at that time?

MS. HAGY: Objection. Form.

THE WITNESS: I would have ended the conference. I would have talked with my client and more than likely would have talked to the assistant state's attorney in charge of the case. I don't know exactly how I would have handled it because it's been 30 years, but, you know, we would have had to have had a lot of things cleared up before the conference continued.

BY MS. O'BRIEN:

Q. Well, let me ask you this. Would you have scheduled a second meeting with Scott Cassidy and your client if those things had happened?

A. No.

MS. HAGY: Objection. Form.

BY MS. O'BRIEN:

Q. Now, at some point --

A. At that point, I wouldn't have trusted Scott. Sorry to interrupt you.

Q. Now, at some point, did you -- you know, was your conference with the state's attorney over

Page 104

that day? Did you end the conference with -- let me rephrase that.

At some point, was the discussion with Scott Cassidy, the state's attorneys and Bigeck, did it conclude?

A. That I don't recall.

Q. Well, I mean, you didn't spend the night there, did you?

A. No. No. It would have concluded at some point, but I don't recall if it concluded at that point or if we went a little further or not. I really don't recall.

Q. Do you recall whether or not while you were at that first meeting, you were scheduling the second meeting? Do you recall the logistics of that?

A. No.

MS. HAGY: Objection.

THE WITNESS: Sorry. I keep answering too quickly. No, I don't recall.

BY MS. O'BRIEN:

Q. Nonetheless, after the meeting, the case was -- the case continued on; is that fair to say?

A. That's my recollection, yes.

Page 105

(Whereupon, Deposition Exhibit No. 11 was marked for identification.)

BY MS. O'BRIEN:

Q. I'm going to show you Exhibit 11 and ask that you take a look at this document, please. Do you recognize this? Let me ask you a question first.

Did you and Mr. Vitale file an answer to discovery on this case?

A. Yes, of course, we did.

Q. And showing you Exhibit No. 11, what is that?

A. This appears to be the answer to the motion for pretrial discovery pursuant to Supreme Court Rule 413.

Q. And is there a -- it's a two -- well, is it one-sided or two-sided?

A. Well, this one is two-sided, but we wouldn't have filed it like this.

Q. And do you recognize your signature on that document?

A. Yes, I do.

Q. And who else's signature is on that

27 (Pages 102 - 105)

Page 106

document?

A. Michael J. Vitale.

Q. And is there a date of file stamp on that?

A. Yes, on the front, there is.

Q. And what is the date of that?

A. August 26, 1996.

Q. And is that document in substantially the same condition today as it was when you or Mr. Vitale filed it?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I believe it is other than it's two-sided here, and it was not two-sided when we filed it.

(Whereupon, Deposition Exhibit No. 12 was marked for identification.)

BY MS. O'BRIEN:

Q. Now I'm going to show you Exhibit No. 12 and showing you -- let me ask you this before I show you.

A. Excuse me. Sorry.

Q. Did you file a motion for severance in this case in your defense of William Bigeck?

MS. HAGY: Objection. Form.

Page 107

THE WITNESS: It appears that we did, but it was only signed by Mr. Vitale.

BY MS. O'BRIEN:

Q. And I'm going to show you Exhibit No. 12. What is that document?

A. It's a motion for severance.

Q. And is there a date stamp on it?

A. Yes, August 26, 1996.

Q. And you indicated Vitale signed it, correct?

A. Yes.

Q. And that was filed on the same date as your answer to discovery; is that fair to say?

A. Yes.

Q. Is that document in substantially --
Exhibit No. 12, is that in substantially the same condition as it was when you or Vitale filed it?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I'm assuming so. I can't tell you 100 percent for sure.

BY MS. O'BRIEN:

Q. Can you tell us what is a motion for severance?

A. That's to sever our defendant from the

Page 108

other defendants, especially since our defendant was willing to testify against the other defendants. It wouldn't have been -- what's the word I'm looking for? It wouldn't have been possible, I guess I would say, for our defendant to have a trial or conduct in negotiations while we were still codefendants with the other defendants.

Q. Well, is it fair to say that you filed that motion based upon information you received from your client, Bigeck?

A. Yes.

Q. Is it fair to say that you filed that motion based upon your review of the discovery?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. Is it fair to say that you filed that motion to sever based upon your review of the reports regarding the indictment that your client was under?

A. Yes.

Q. By the way, did you ever file a motion to suppress your client's statements that were made at the police station, the court reported statement?

Page 109

A. That I don't recall.

Q. If you had information from Bigeck or reason to believe that, you know, something unusual or something -- your client's rights were violated during the interrogation on the court reported statement, would you have filed a motion to suppress statements?

MS. HAGY: Objection. Form.

THE WITNESS: Certainly if we believed that his Fifth Or Sixth amendment rights were violated, we would have filed a motion to suppress statements.

BY MS. O'BRIEN:

Q. If there was any police misconduct that you uncovered either from your client or your review of the discovery, would you have filed a motion to suppress statements?

A. Yes.

MS. HAGY: Objection to form.

THE WITNESS: I'm sorry. Yes.

BY MS. O'BRIEN:

Q. Is it fair to say your motion to sever is a motion to sever your client's case or have your client's case tried independently from the codefendants?

28 (Pages 106 - 109)

Page 110

A. Yes.

Q. If you had received any information regarding misconduct on behalf of the assistant state's attorneys who took the court reported statement, would you have filed a motion to suppress statements?

A. Yes.

MS. HAGY: Objection.

THE WITNESS: I'm sorry. Yes, I would have.

BY MS. O'BRIEN:

Q. Now, was a second meeting between you, Vitale, your client, Bigeck, and the state's attorneys, Scott Cassidy and Neil Linehan set up?

MS. HAGY: Objection. Form.

THE WITNESS: I don't recall.

BY MS. O'BRIEN:

Q. Well, I'm going to -- is your memory exhausted as to whether or not there was a second meeting?

A. Yes.

Q. All right. I'm going to direct your attention again -- George, do you want to take a break right now? Would that be good?

A. Yes.

Page 111

Q. You can put that down. Before I ask the question, we're just going to take a little break.

A. I'd like to get something to munch on because I'm starting to get that little --

MS. O'BRIEN: I understand.

THE VIDEOGRAPHER: This ends media unit 2. Now going off the record at 12:12 p.m.

(Whereupon, a lunch break was taken.)

THE VIDEOGRAPHER: This begins media unit 3. Now going back on the record at 1:15 p.m.

BY MS. O'BRIEN:

Q. Okay, George. When we left off, I think the question was was there a second meeting between you, Mike Vitale, your client, Bigeck, and Scott Cassidy and Neil Linehan?

A. I don't recall.

Q. All right. Is your memory exhausted as to whether or not there was a second meeting?

A. Yes.

Q. I'm going to ask you that you look at Exhibit No. 10 and just review that document.

A. Is this Exhibit 10?

Q. Yes.

Page 112

A. Do you want me to look at the whole document?

Q. Well, just review the document, and let me know when your memory is refreshed.

A. About if I was an attendant at the second meeting?

Q. Yes.

A. Okay. Yeah, the first paragraph indicates I was there on October 25, '96.

Q. So -- okay. Did you read Exhibit No. 10?

A. Only the first paragraph so far.

Q. Is your memory refreshed as to whether or not there was a second meeting between you, Vitale, Bigeck, and Scott Cassidy, and Neil Linehan?

A. Yes.

MS. HAGY: Objection. Form.

THE WITNESS: Oh, I'm sorry. Yes.

BY MS. O'BRIEN:

Q. Was there a second meeting?

A. Yes.

Q. Did you attend the second meeting?

A. According to the document, I did.

Q. Well, is your memory refreshed after looking at the document?

Page 113

MS. HAGY: Objection. Form.

THE WITNESS: My memory is refreshed, yes.

BY MS. O'BRIEN:

Q. Were you at a second meeting on August 29, 1996 at approximately 11:30 a.m. with Mike Vitale, Scott Cassidy, Neil Linehan, and your client, Billy Bigeck or Bigeck, at the State's Attorney's Office?

MS. HAGY: Objection. Form.

THE WITNESS: This exhibit says it was October 25, '96, not August.

BY MS. O'BRIEN:

Q. I'm going to ask you to -- I'm going to ask you to read the first paragraph.

A. I gotcha.

Q. Is your memory refreshed as to whether or not you were present -- after reading that document, is your memory refreshed as to whether or not you were at a meeting with Bigeck, Mike Vitale, Scott Cassidy, and Neil Linehan and an investigator on August 29, 1996?

A. Yes.

MS. HAGY: Objection. Form.

THE WITNESS: I'm sorry. Yes, it indicates that we were there are on the 12th of August as

29 (Pages 110 - 113)

Page 114

well as the 29th of August.

BY MS. O'BRIEN:

Q. I'm going to just -- for purposes right now, we're talking about the August 29, 1996 meeting, okay?

A. Yes.

Q. Now, were you still attempting to conference Bigeck's case on his pending indictment?

MS. HAGY: Objection. Form.

THE WITNESS: My recollection is that we were.

BY MS. O'BRIEN:

Q. Were you trying to negotiate a plea with the State's Attorney Office regarding Bigeck's indictment in that case, 96 CR 1838?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. Was your meeting with the state's attorneys at that time about the existing indictment against Bigeck?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. Was that meeting a continuation of your

Page 115

client's attempt to cooperate with his pending indictment?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. Was that meeting a continuation of your client's desire to testify against his codefendants in his indictment?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. Were you allowed to confer with your client in private before the meeting?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. Were you allowed to confer with your client in private during the meeting as well?

MS. HAGY: Objection. Form.

THE WITNESS: I recall that a few times the prosecution team had to leave the room so we could confer with the client, which, obviously, means that the interview was ongoing at the time.

Page 116

BY MS. O'BRIEN:

Q. All right. So when the prosecution would leave the room, you and Vitale would have a conversation with your client, correct?

A. Correct.

Q. During that time, did Bigeck provide information to the assistant state's attorneys?

A. To the best of my recollection, yes. I wouldn't have seen the point to go on further if he didn't. So he, you know...

Q. At any time during that meeting, did Bigeck complain to either you or Vitale about Scott Cassidy's treatment of him?

A. I don't recall that. All I know is that I don't recall Scott Cassidy treating him badly.

Q. Right. But my question is did Bigeck complain to you about his treatment by Scott Cassidy?

MS. HAGY: Objection. Form.

THE WITNESS: I don't recall one way or the other. I really don't recall.

BY MS. O'BRIEN:

Q. If he did, would you have remembered it?

MS. HAGY: Objection. Form.

Page 117

THE WITNESS: More than likely, I would have because it would have been an unusual occurrence.

BY MS. O'BRIEN:

Q. What advice did you provide Bigeck before this meeting?

A. Just to answer the questions asked truthfully and fully.

Q. Going into this meeting, was it your understanding that Bigeck wanted to testify against his codefendants on the case that was pending?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. Was that your understanding of why -- one of the reasons why you were at that meeting?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Yes. Sorry.

BY MS. O'BRIEN:

Q. Did you know what sort of information at this meeting Bigeck was going to give or provide to the State's Attorney's Office?

A. No. As a matter of fact, I think or I believe I heard facts from Bigeck that I had not heard before as he was providing the information.

30 (Pages 114 - 117)

Page 118

Q. Well, what observations or what led you to believe that you had not heard those facts before?

A. Because several names came up that I had never heard of.

Q. And do you recall what those names were?

A. No.

Q. When those names came up, was there any reaction by Scott Cassidy --

MS. HAGY: Objection. Form.

BY MS. O'BRIEN:

Q. -- to those names?

THE WITNESS: Not that I recall.

MS. HAGY: Form and foundation.

BY MS. O'BRIEN:

Q. Did Neil Linehan have any reaction to those names?

A. Not that I recall.

Q. But is it fair to say you were surprised to hear additional names?

A. Yes.

MS. HAGY: Objection. Form.

THE WITNESS: I'm sorry. I don't mean to interrupt you. Yes, I was surprised.

Page 119

BY MS. O'BRIEN:

Q. Was one of the names Matthew Sopron if you recall?

MS. HAGY: Objection.

THE WITNESS: I don't recall. It sounds kind of familiar, but I can't be 100 percent sure.

BY MS. O'BRIEN:

Q. Was another one of those names Wayne Antusas?

A. The Antusas name rings a bell.

Q. Were there other people whose names came up?

A. That I don't recall.

Q. Do you recall the name John Gizowski coming up?

A. No.

Q. Bryan O'Shea?

A. No.

Q. Did you say anything when these new names as you called them came up? Did you say anything about it during the meeting?

MS. HAGY: Objection. Form.

THE WITNESS: No. I didn't think -- since I wasn't part of the investigative team, I didn't

Page 120

think it was my place to say anything about the new names.

BY MS. O'BRIEN:

Q. Now, during this meeting on August 29th of 1996, did Scott Cassidy yell or swear at Bigeck?

MS. HAGY: Objection. Form.

THE WITNESS: To the best of my recollection, I don't think he did. I don't know if he did or he didn't. I just don't remember.

BY MS. O'BRIEN:

Q. All right. Would you have allowed that to happen?

A. No. I would have stopped -- I would have stopped the meeting at that point until I had -- until I talked to Scott.

Q. Did those things happen?

A. Not that I recall.

Q. Did you -- did Neil Linehan do any of those things, yell or swear at your client?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I don't recall. I'm sorry. I don't recall.

BY MS. O'BRIEN:

Q. At any time did Scott Cassidy tell Bigeck

Page 121

that he wanted him to falsely testify?

A. No, not that I recall.

Q. Would you have allowed that to happen?

A. No.

Q. At any time did Scott Cassidy tell Bigeck that his story was bullshit?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Asked and answered. No. I'm sorry. No. The answer is no, that I can recall.

BY MS. O'BRIEN:

Q. At this conversation, did Scott Cassidy tell Bigeck that if he didn't give Scott Cassidy what he wanted, he would go to jail forever?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No. That I would not have allowed, absolutely would not have because that would be a direct threat to either tell him what he wanted to hear or he would be punished.

BY MS. O'BRIEN:

Q. Did Scott Cassidy tell Bigeck that he wanted him to falsely accuse others of the murder?

A. I have no recollection of that, so I don't -- I can't say I don't believe it happened. I just don't believe Scott Cassidy would have done

31 (Pages 118 - 121)

Page 122

that.

Q. Was it your impression that Scott Cassidy was trying to get Bigeck to falsely accuse others of murder?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No. You want to know what my impression was?

BY MS. O'BRIEN:

Q. Sure.

A. My impression was that Scott felt Bigeck was holding back. He didn't threaten him, but he was holding back, and he wanted to -- he wanted Billy to be more open, and that was my impression.

Q. Did Scott Cassidy ask Bigeck questions?

A. Yes.

Q. Did Bigeck answer those questions?

A. Yes.

Q. Did Scott Cassidy walk in and out of the meeting after yelling at Bigeck?

A. Well, I know he walked in and out of the meeting. I don't recall him yelling at Bigeck as the reason for him walking in and out.

Q. You previously indicated that he walked in and out of the meeting whenever you wanted to speak

Page 123

with your client alone; is that fair to say?

A. That's exactly fair to say.

Q. Did Scott Cassidy threaten Bigeck in any way?

MS. HAGY: Objection.

THE WITNESS: Not in my presence.

BY MS. O'BRIEN:

Q. Did Neil Linehan threaten Bigeck in any way?

MS. HAGY: Objection. Form and foundation.

THE WITNESS: Not in my presence.

BY MS. O'BRIEN:

Q. During this August 29th meeting, did Scott Cassidy tell Bigeck that if he didn't cooperate, he would be going to prison for the rest of his life?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I don't recall that.

BY MS. O'BRIEN:

Q. Would you have allowed that sort of behavior directed at your client?

A. No. I would have considered that a threat.

Q. And assuming arguendo that it happened, what would you have done?

Page 124

A. I would have stopped the conference, and then I would have asked Scott to come out in the hall, and I would have talked to him about it.

Q. And did those things happen?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Not that I recall.

BY MS. O'BRIEN:

Q. If those things happened, would you have allowed Bigeck to testify?

A. Not until I cleared things up with Scott.

Q. And --

A. I'm sorry. Mr. Cassidy.

Q. Now, during this time, your client provided information to the State's Attorney's Office; is that correct?

A. Yes.

Q. Now, did you --

A. There was a Chicago Police investigator there as well as the state's attorneys.

Q. Okay. Now, did you -- at that time did you discuss the logistics or, rather, the -- any kind of plea agreement? In other words, did you throw out a number? Did you discuss those kind of things with Neil Linehan and Scott Cassidy?

Page 125

A. We did discuss that with them, but I don't know if it was right at that time.

Q. All right. Now, at some point -- at some point either during this August 29, 1996 meeting or after, did you learn or receive information from the state's attorneys that they wanted to use Bigeck as a witness against his codefendants?

MS. HAGY: Objection. Form.

THE WITNESS: I don't know when I exactly learned that, but I knew that that's what they wanted to do.

BY MS. O'BRIEN:

Q. So my question is at some point, did you learn that they wanted to use your client to testify against his codefendants?

A. Yes, but I don't recall if they told that directly to Mr. Vitale or if they told that directly to me or if they told both of us at the same time. I don't recall that.

Q. Do you know whether that was discussed at the 8/29/96 meeting or sometime shortly thereafter?

MS. HAGY: Objection. Form.

THE WITNESS: I don't recall.

32 (Pages 122 - 125)

Page 126

BY MS. O'BRIEN:

Q. Did you -- do you recall whether or not you were negotiating Bigeck's eventual sentence during the meetings in August?

A. Yes.

Q. Okay. And who did the negotiations on behalf of Bigeck?

A. Mr. Vitale and I were both there.

Q. And was it -- eventually was it a give and take like it was a negotiation, or was it a take-it-or-leave-it offer by Scott Cassidy and Neil Linehan?

A. No. It was a give and take. It wasn't a take it or leave it.

Q. Okay. So you negotiated the eventual sentence of your client with Scott and with Neil?

A. Well, I don't think it was really a negotiation because Scott offered us -- if I recall correctly, he offered us minimum time. So I couldn't negotiate lower than minimum on a murder, so that was not hard to negotiate.

Q. Well, were both you and Vitale involved in the sentencing agreement?

A. Yes.

Page 127

Q. Would Vitale have entered into a sentencing agreement without your authorization?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I don't think so.

BY MS. O'BRIEN:

Q. Okay. Well, who made the ultimate decision to accept the sentencing agreement? Was it you, Vitale, or you and Vitale together?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Vitale and me together, but Vitale deferred to me as to the reasoning for it.

BY MS. O'BRIEN:

Q. Did you present all of the options to Bigeck regarding the sentencing agreement?

A. Of course we did.

Q. And did Bigeck -- I keep saying his name wrong -- make the final decision to cooperate?

A. Of course because that's the only way it could happen.

Q. So it was his decision to testify against his codefendants in the pending case; is that correct?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Yes. It was his right to trial,

Page 128

his right to waive trial, his right to testify, his right to waive testimony, and it didn't belong to Mr. Vitale or me. All we could do is advise, and he listened to our advice, and he decided to testify for the State.

BY MS. O'BRIEN:

Q. And did he agree with you to the sentence that was being proposed?

A. Yes.

Q. Did either you or Vitale advise him to sign a sentencing agreement?

A. I don't recall advising him of that, so I'm assuming that it was Mr. Vitale who had talked to him about that.

Q. Would you have allowed your client to sign a sentencing agreement unless you reviewed it first?

A. Exactly. I would not have allowed it unless I reviewed it first.

(Whereupon, Deposition Exhibit No. 13 was marked for identification.)

BY MS. O'BRIEN:

Q. All right. And I'm going to show you

Page 129

Exhibit No. 13 and ask that you take a look at this document. Do you recognize -- well, take a look at it.

Does that Exhibit 13 appear to be the sentencing agreement that you and Mike Vitale agreed upon with the State's Attorney's Office?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Except for one thing. For some reason, my memory was that we agreed to 20 years, not 30. Of course, here it says 30, and Mr. Vitale signed it, so my recollection must be wrong about that.

BY MS. O'BRIEN:

Q. About the number?

A. Right.

Q. But your recollection is not wrong about the negotiation; is that fair to say?

A. That's fair to say.

MS. HAGY: Objection. Form.

THE WITNESS: I'm sorry. I keep interrupting you.

BY MS. O'BRIEN:

Q. And is this sentencing agreement in substantially the same condition it was when you

33 (Pages 126 - 129)

Page 130

reviewed it prior to it being signed?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I would assume that it is. The only thing is that when we went to Judge Moran with this, he didn't believe it was enough time. He added years.

BY MS. O'BRIEN:

Q. Well, I'm just asking you about the sentencing agreement that was signed by your client. Is this in substantially the same condition as it was when you reviewed the document prior to your client signing it?

A. I believe it was.

Q. All right. Who -- actually, whose signatures are on this document?

A. William Bigeck, Michael Vitale, and Michael Smith, assistant state's attorney.

Q. All right. Did you know Michael Smith from the State's Attorney's Office?

A. More than likely, I did. I don't recall him at all at this point.

Q. All right. And can you please read into the record the sentencing agreement?

A. You want me to read the whole thing?

Page 131

Q. Yes.

A. It is agreed that William Bigeck will testify in all matters in which he is subpoenaed to do so regarding the murders of Carrie Hovel and Helena Martin. It is further agreed that William Bigeck will plead guilty to Count 1 of the indictment.

That at the sentencing hearing of William Bigeck, the State will introduce any prior convictions of William Bigeck, which at this time they are not aware of any. The State will recommend that William Bigeck receive a 30-year sentence to be served in the Illinois Department of Corrections. This sentence recommendation is based upon William Bigeck's truthful testimony and is not by law binding upon the Honorable Judge John Moran. Do you want me to read the rest?

Q. Yes.

A. That the State will ask Judge Moran in determining what sentence to impose to consider whether William Bigeck was truthful in his testimony. The State will ask Judge Moran to consider what risks to his personal safety William Bigeck has placed himself in by giving his truthful

Page 132

testimony.

The State and William Bigeck agree that William Bigeck may receive up to a 100-year sentence from Judge Moran, which in effect means he will die in prison. The State and William Bigeck agree that Judge Moran has to sentence him to at least 20 years in prison and that he will not get out of prison until December 15, 2015. Judge Moran has sole discretion in determining whether William Bigeck, if he lives that long, will get out of prison anywhere between December 15, 2015 and 80 years thereafter.

Q. All right. So in looking at this Exhibit No. 13, is it fair to say that you negotiated the -- you negotiated the sentence to a term of years?

A. Yes.

Q. Otherwise, is it fair to say that with respect to being convicted of a murder of two people, he would not be eligible for a term of years? He would -- other than the death penalty, he would be entitled to -- he would get natural life?

MS. HAGY: Objection. Form. Foundation.

Page 133

THE WITNESS: Yes, he would get natural life for a double murder.

BY MS. O'BRIEN:

Q. Is it fair to say that the only way he would been able to get a term of years would have been if he only plead to one of the murders?

A. Yes.

MS. HAGY: Objection.

BY MS. O'BRIEN:

Q. Is it fair to say that you and Michael Vitale negotiated with Scott Cassidy and that Bigeck would only plead guilty to one count of the indictment?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. And that was something you negotiated, correct?

A. I don't recall if both of us negotiated it or if I negotiated alone.

Q. And -- and another condition of the sentence was that he was going to testify against his codefendants; is that fair to say?

MS. HAGY: Objection to form.

34 (Pages 130 - 133)

Page 134

THE WITNESS: That's absolutely correct.

BY MS. O'BRIEN:

Q. Now, at some point, did your client sign the sentencing agreement as you've just described?

A. Yes. That's the exhibit you just showed me, right?

Q. Yes.

On or about -- and on or about September 16, 1996, was the sentencing agreement signed, if you know?

A. Yes, it was. I don't see the date on here, but I'm sure that was the date.

Q. During the meetings in August and after your client agreed to testify against his codefendants, was it explained to you and Mike Vitale that Bigeck's name would be disclosed in discovery as a witness on the case?

A. I don't recall that, but that would have been standard procedure, I believe.

Q. Right. So did you -- is it fair to say you knew that at some point, the other codefendants would learn that Bigeck was going to testify against them?

A. Of course.

Page 135

MS. HAGY: Objection. Form and foundation.

THE WITNESS: Of course, and I think -- I don't recall, but I think I even explained that to Mr. Vitale as well.

BY MS. O'BRIEN:

Q. Did either you or Mike Vitale during your negotiations with the State's Attorney's Office ask for protection for your client?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I don't believe I did, so I think Mr. Vitale did.

BY MS. O'BRIEN:

Q. Do you know whether the State's Attorney's Office indicated that they were moving your client to the State's Attorney's witness quarters within the Cook County Jail?

A. I recall that that happened, but I don't recall who told me.

Q. Okay. I guess what my question is do you recall if it was your defense team's idea that he be moved there, or was it something that the State's Attorney's Office decided to do?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I think that was something the

Page 136

prosecution decided to do because I don't recall discussing that with anybody.

BY MS. O'BRIEN:

Q. And eventually did you discuss -- did you have that discussion with the state's attorneys?

MS. HAGY: Objection. Form.

THE WITNESS: I don't recall, but I'm sure that happened.

(Whereupon, Deposition Exhibit No. 14 was marked for identification.)

BY MS. O'BRIEN:

Q. I'm going to show you what's marked as Exhibit 14 and ask that you look at this document. Doe this document refresh your memory?

A. I have to finish reading it.

Q. I'm sorry.

A. Okay.

Q. Does this document refresh your memory as to whether or not the State's Attorney's Office indicated that they were moving your client to the witness quarters?

A. Yes.

Q. Can you please indicate -- well, after

Page 137

reviewing this document, is your memory refreshed as to whether or not they discussed that with you?

A. Yes.

Q. And did they discuss that with you?

A. Yes.

Q. And I'm going to ask that you -- Exhibit No. 14, what is that document, sir?

A. That's the document you just handed me?

Q. Yes.

A. Motion to Transfer Defendant Bigeck to Witness Quarters.

Q. And the heading on the document, what is that? Can you read it?

A. People of the State of Illinois v. William Bigeck, Eric Anderson, Nicholas Liberto, Edward Morfin, and Nicholas Morfin.

Q. And does it have an indictment number?

A. Yes.

Q. What is it?

A. 96 CR 1838.

Q. All right. And are Eric Anderson, Liberto and the two Morfins, those are the codefendants in the case that was pending against Bigeck, correct?

A. Yes.

35 (Pages 134 - 137)

Page 138

Q. Can you please read that motion into the record?

A. The entire motion?

Q. Yes.

MS. HAGY: I'm going to object because, you know, we -- I think we're getting into half of the time, and we all have questions to ask. I think this is taking a chunk of time.

MS. O'BRIEN: You know what, I'll just have him read just Paragraph 2.

BY MS. O'BRIEN:

Q. Can you just do that, please?

A. Just Paragraph 2?

Q. Yeah.

A. William Bigeck has been and is currently represented by Michael Vitale and George Zuganelis. His attorneys have been fully advised of the State's request and are in complete agreement.

Q. All right. Is that a true statement, sir?

A. Yes.

Q. Sir, do you know whether this motion was granted?

A. I believe it was. I don't have a specific recollection, but I have a recollection that he was

Page 139

in the witness quarters.

Q. On or about September 16, 1996, was an order signed by Judge Moran remanding your client, Bigeck, to the witness quarters?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I don't know if there was an order that he signed or not. All I know is that after presenting this motion, he was transferred.

BY MS. O'BRIEN:

Q. Would anything refresh your memory?

A. Yes, a copy of the order.

(Whereupon, Deposition Exhibit No. 15 was marked for identification.)

BY MS. O'BRIEN:

Q. I'm going to show you what's marked as Exhibit No. 15. Can you please indicate what that is?

A. This is an order signed by Judge Moran.

Q. And what does the order indicate?

A. That William Bigeck shall be placed in witness protection quarters in the Cook County Department of Corrections. The Cook County Department of Corrections is ordered to facilitate

Page 140

this transfer immediately.

Q. Did you continue to represent and have contact with Bigeck from the time that you filed your appearance until you disposed of his case?

MS. HAGY: Objection. Form.

THE WITNESS: I believe so, yes.

BY MS. O'BRIEN:

Q. During this time from the moment that you represented him until his case was disposed of in August of 1998, did he at any time complain to you that he was being forced or coerced to commit perjury?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I don't recall that. Though, I wasn't present when he spoke to Mr. Vitale a lot of times.

BY MS. O'BRIEN:

Q. Well, if he had complained to you, would you have done something?

A. Yes.

Q. What would you have done?

A. I would have gone to Mr. Cassidy and told him to stop it.

Q. If he -- if your client had told Vitale

Page 141

about that, would you have expected Vitale to share that information with you?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I would have expected that, yes.

BY MS. O'BRIEN:

Q. At any time from the time you began to represent Bigeck until this case was disposed of, did he complain to you that he was being forced to lie?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Are you talking about Bigeck?

BY MS. O'BRIEN:

Q. Yes.

A. No, I don't recall that.

Q. Were either you or Vitale present for any trial preparation between any member of the State's Attorney's Office and Bigeck?

A. I wasn't, and I don't know if Mr. Vitale was.

Q. Did you request to be?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I don't -- I don't recall. Perhaps, Mr. Vitale requested it, but I don't recall.

36 (Pages 138 - 141)

Page 142

BY MS. O'BRIEN:

Q. Well, would it have been your prior practice to be present during trial prep of a client that you had already reached an agreement on?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: It would have been, but I think at that point, I deferred all that to Mr. Vitale because my practice was a little more hectic than Mr. Vitale's.

BY MS. O'BRIEN:

Q. Did any of other defense attorneys regarding the case that was pending or any other defense counsels attempt to contact you while these cases were pending?

A. I don't recall if they did or they didn't.

Q. Do you recall whether or not any of the defense counsels for any of the codefendants or other defendants requested your permission to speak with Bigeck prior to their motions or trials?

A. That I don't recall either.

Q. Did you advise Bigeck regarding speaking with other defense lawyers prior to testifying on those cases?

Page 143

A. That I do not recall.

Q. Did your client, Bigeck, testify against Eric Anderson?

A. That I don't recall either.

Q. Do you recall if he testified against Nick Morfin?

A. No, I don't recall. You know, it seems vaguely familiar that he might have. I just don't recall. I'm trying to piece together everything. After 30 years, almost 30 years, it's difficult.

Q. Well, assuming that he did testify against the codefendants on his pending murder case, were you present for any of those trials?

A. No, but I believe Mr. Vitale was.

Q. Was it your understanding that Bigeck would be sentenced after those trials were concluded?

A. Yes.

Q. Did you know a lawyer by the name of Pat Walsh who represented Matthew Sopron?

A. The name is very familiar.

Q. Did you know him?

A. I believe so.

Q. Did you know a lawyer by the name of David

Page 144

Pilot?

A. Yes.

Q. Did you have a lot of cases with David Pilot?

MS. HAGY: Objection. Form.

THE WITNESS: I don't recall if I had cases with him or if I just knew him from around the courthouse.

BY MS. O'BRIEN:

Q. On August -- I'm sorry.

Was it your understanding, pursuant to your conversations with Scott Cassidy, that Bigeck would be sentenced after the trials that he testified on were concluded?

A. Yes.

MS. HAGY: Objection.

THE WITNESS: Oh, I'm sorry.

MS. HAGY: I'm going to object to form on that.

THE WITNESS: Yes. I recall that.

BY MS. O'BRIEN:

Q. On August 27, 1998, did you resolve Bigeck's murder case in front of Judge Moran?

MS. HAGY: Objection. Form.

THE WITNESS: I don't remember the exact date,

Page 145

but yes, I recall being in front of Judge Moran resolving his murder case.

BY MS. O'BRIEN:

Q. Were both you and Vitale present?

A. I don't recall if Mr. Vitale was there or not.

Q. Would anything refresh your recollection?

A. Probably a transcript of the hearing.

(Whereupon, Deposition Exhibit No. 16 was marked for identification.)

BY MS. O'BRIEN:

Q. All right. I'm going to show you what's Exhibit No. 16 and ask that you take a look at that. What do you -- do you recognize what that is?

A. Yes.

Q. What is it?

A. It's a court reported transcript of the hearing.

Q. Is that a hearing from August 27, 1998?

A. Yes.

Q. And is that a transcript of the plea of your client, Bigeck, and sentencing on that date?

37 (Pages 142 - 145)

Page 146

A. Yes. It's entitled Change of Plea, so it -- yeah. Yes.

Q. And does that document also refresh your memory as to whether or not Vitale was present?

A. Yes, it does.

Q. And was he there?

A. Yes, he was.

Q. Now, did you discuss the proceedings, in other words, what was going to happen that day with your client before it happened?

A. Yes.

MS. HAGY: Objection.

BY MS. O'BRIEN:

Q. And would that be your prior practice to discuss what was going to happen when your client was pleading guilty?

MS. HAGY: Objection. Form.

THE WITNESS: Of course because he was going to have 100 questions, and we had to answer the questions before he could make an informed decision.

BY MS. O'BRIEN:

Q. And did he -- did you answer his questions?

Page 147

A. Yes.

Q. Did Bigeck have any complaints about anything before the plea?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Not that I recall.

BY MS. O'BRIEN:

Q. Did he have any complaints that day before the plea?

MS. HAGY0: Objection. Form. Foundation.

THE WITNESS: Not that I recall.

BY MS. O'BRIEN:

Q. Between August 12, 1996 and the date of the plea, August 27, 1998, did Bigeck ever tell you or suggest to you that he lied in any trial?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I don't recall that at all.

BY MS. O'BRIEN:

Q. If he would have told you that, what would you have done?

A. I would have told him that he had to make it right, straighten it out. We would go to Mr. Cassidy and straighten it out because if he lied, it would have only been to his detriment.

Q. Would that have been a violation of his

Page 148

sentencing agreement that you negotiated with the State's Attorney's Office?

A. Yes.

Q. And these are all between August 12th -- well, actually, between August 12, 1996 and the date of the plea, August 27, 1998, did he ever complain about Scott Cassidy or any member of the State's Attorney's Office to you?

A. When you say he, you mean --

Q. Bigeck.

MS. HAGY: And I'm going to object to form.

THE WITNESS: I don't recall him complaining.

BY MS. O'BRIEN:

Q. At any time did Bigeck tell you that he was coerced to testify?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I don't recall that.

BY MS. O'BRIEN:

Q. If he did tell you that, what would you have done?

MS. HAGY: Objection. Form.

THE WITNESS: I would have gone straight to Scott Cassidy and got his side of what happened and tried to straighten everything out.

Page 149

BY MS. O'BRIEN:

Q. At any time did Bigeck tell you that he was fed the information that he was testifying about by any member of the State's Attorney's Office?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I don't recall him ever telling me something like that.

BY MS. O'BRIEN:

Q. Did you ever learn any information like that from Vitale?

A. I don't recall if I did or didn't. I don't think I did. I would have remembered it.

Q. If you did get that information from Vitale, would you have acted upon it?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Yes, I would have.

BY MS. O'BRIEN:

Q. Now, with respect to Bigeck's plea, do you recall whether or not there was an issue regarding the original deal of the State's recommendation of 30 years?

MS. HAGY: Objection. Form.

THE WITNESS: I don't understand what you mean.

38 (Pages 146 - 149)

Page 150

BY MS. O'BRIEN:

Q. Well, are you familiar with truth in sentencing?

A. Yes.

Q. And did this plea occur around the time that truth in sentencing went into effect?

A. I believe so, yes.

Q. And at the time that you negotiated the deal of 30 years, there was truth in sentencing for a murder case. In other words, the 30 years that the State recommended would be 100 percent, so it would be a 30-year sentence. Is that your understanding of that agreement?

A. I believe so, yes.

Q. At some point, if you recall based upon your experiences as a defense attorney, that truth in sentencing bill became or was ruled to be unconstitutional so that all those murder cases reverted back to the original time of 50 percent. Do you recall that?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I seem to recall. I don't have a specific recollection of that, but I seem to recall something like that happening.

Page 151

BY MS. O'BRIEN:

Q. As a result of those types of things, was there an adjustment that was made on the State's recommendation during the sentencing hearing, if you recall?

A. I don't recall.

MS. HAGY: Objection.

THE WITNESS: Sorry. I don't recall.

BY MS. O'BRIEN:

Q. Do you recall whether or not Bigeck's father was at the sentencing hearing?

A. I don't recall ever meeting the man, so I couldn't tell you.

Q. Did you and Vitale have an agreement amongst yourselves on who would speak during the plea and sentencing?

A. I don't recall, but I believe Mr. Vitale did most of the speaking at the sentencing. I just don't recall.

Q. If you reviewed your -- that transcript, Exhibit No. 16, would that refresh your recollection?

A. Probably, yes.

Q. In looking at Exhibit No. 16, do you see

Page 152

your name and words that you spoke during that sentencing?

A. Yes.

Q. Did you speak during the plea phase as well?

A. I have to get back that far.

Q. Did you address the Court -- after reviewing that, did you address the Court on August 27, 1998 during Bigeck's plea and sentencing?

A. Yes. I informed the Court that Mr. Bigeck had a statement he would like to read to the Court.

Q. And did you assist Bigeck on that elocution that he made?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I don't know what you mean. Did I tell him what to say?

BY MS. O'BRIEN:

Q. Did you write it for him?

A. No.

Q. Did you tell him what to say?

A. I don't -- no. I don't remember that.

Q. Did you give him any advice on what to say?

A. I don't remember.

Page 153

Q. Did you know he was going to say something in advance, if you recall?

A. Not until I got that there day if I recall correctly.

Q. Did you prepare Vitale's mitigation argument?

A. No.

Q. Did you have a conversation with Vitale regarding what he was going to say in mitigation?

A. More than likely I did, but I don't recall 100 percent.

Q. Do you recall -- based upon the sentencing agreement, is it fair to say that the conditions of Bigeck's sentence were that the judge had to make a finding of complete and truthful testimony on the part of Bigeck before he pronounced sentence?

A. Yes.

Q. And do you recall what Moran said in his sentencing or the findings that he made?

A. I don't recall 100 percent. I just remember he gave him more years than the State and we agreed on.

Q. Did the judge make a finding of complete and truthful testimony on the part of Bigeck before

39 (Pages 150 - 153)

Page 154

he sentenced him?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I believe he did.

BY MS. O'BRIEN:

Q. And those findings were a condition of both Bigeck's plea and his sentence; is that correct?

A. That is correct.

Q. And what does that mean? What is the reason for that?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: The judge would have to believe that Mr. Bigeck was being truthful and open. If he wasn't convicted of that, he could sentence him to whatever years he felt like sentencing him.

BY MS. O'BRIEN:

Q. Did Bigeck make any complaints or raise any issues with you about Scott Cassidy or any assistant state's attorneys that day either before, during, or after the plea and sentencing?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I don't recall that ever happening.

Page 155

BY MS. O'BRIEN:

Q. Did you ever receive correspondence from Bigeck after his plea and sentencing?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I never received any correspondence. I can't say if Mr. Vitale did.

BY MS. O'BRIEN:

Q. Did Bigeck ever direct you to file any post-trial or post-sentencing motions?

MS. HAGY: Objection. Form.

THE WITNESS: Never directed me to do that.

BY MS. O'BRIEN:

Q. If he had directed Vitale to do that, would you have been consulted and/or involved?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: More than likely, yes.

BY MS. O'BRIEN:

Q. Were you aware that Bigeck filed post-conviction petitions seeking to enforce the original deal of 30 years?

A. I don't recall that.

Q. Did Bigeck ever file an ARDC complaint against you?

A. Not that I recall.

Page 156

Q. From 1998 after the plea to the present, were you ever contacted by Bigeck?

A. No.

Q. Did any lawyers of the codefendants or any other murder defendants involved with that case contact you regarding this murder?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Not that I recall.

BY MS. O'BRIEN:

Q. Were you contacted by members of the State's Attorney's Office in connection with any post-conviction petition filed by Bigeck or any codefendants or anyone convicted of this murder?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Not that I recall.

BY MS. O'BRIEN:

Q. Did any lawyer ever contact you other than the ASAs who tried the cases in order to get permission to meet and confer with Bigeck before any of the trials?

A. Not that I recall.

Q. Did any lawyer ever seek your permission or contact you to get your permission to interview Bigeck after he was convicted?

Page 157

A. Not that I recall.

Q. Did any lawyer show you any affidavits that they wanted your client to sign after he was convicted?

A. Not that I recall.

Q. Were you ever contacted about this case or any of the codefendants' case or Bigeck's case by a person by the name of Terrence Campbell?

A. Not that I recall. I don't even recognize that name.

Q. Were you ever contacted about your client, this murder case, any of the codefendants or any other defendants from Northwestern Center for Wrongful Conviction?

A. I was going to ask the Anderson project?

Q. Any affiliation with -- anybody in the Northwestern family contact you regarding this case?

A. For some reason, that rings a bell, but I'm not 100 percent sure.

Q. Were you ever contacted by a person by the name of Mark Rodert regarding this case?

A. That name is not familiar to me. I don't recall.

40 (Pages 154 - 157)

Page 158

Q. Were you ever contacted by a person by the name of Pat Walsh regarding Matthew Sopron?

MS. HAGY: Objection. Form.

THE WITNESS: Pat Walsh, his name is familiar to me.

BY MS. O'BRIEN:

Q. Well, did he contact you?

A. That I don't recall. I should have said if he contacted me.

Q. Were you ever contacted by Jim Kogut regarding Nick Morfin's case?

MS. HAGY: Objection. Form.

THE WITNESS: The name Jim Kogut is familiar to me, but I don't recall any contact about the Morfin case.

BY MS. O'BRIEN:

Q. Do you know a person by the name of Colleen Hyland?

A. I don't recall that name.

Q. Do you know a person by the name of Laura Sullivan?

A. That name sounds familiar, but I don't recall it.

Q. Do you know Assistant State's Attorney

Page 159

Laura Sullivan? Do you know that name?

A. Okay. That's how I know it. I wasn't sure if she was an assistant state's attorney's or not.

Q. Okay. Do you know her?

A. I've had dealings with -- the name is very familiar.

Q. Well, have you -- has she always conducted herself in a professional manner in your presence?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: In my presence, I don't recall anything negative about her.

BY MS. O'BRIEN:

Q. Do you know a person by the name of Assistant State's Attorney's Patricia Shea?

A. That name does not ring a bell.

Q. Assistant State's Attorney Steve DeNolfo?

A. No, I don't recall that name.

Q. Assistant State's Attorney George Andrews?

A. George Andrews rings a bell, but I don't know why. I don't recall.

Q. At any time during your representation of -- representation of Bigeck, did he ever complain about any misconduct by any of those

Page 160

people that I just listed?

A. Not that I can recall. Let me just add this. After he was convicted, I think most of his contact was with Mr. Vitale and not with me.

Q. At any time did Bigeck tell you that he was coerced by any state's attorney while in the police station?

MS. HAGY: Objection. Form.

THE WITNESS: Not that I know of. I don't believe so.

BY MS. O'BRIEN:

Q. If he told you that, would you have filed a motion to suppress statements?

MS. HAGY: Objection. Form. Asked and answered.

THE WITNESS: Yes, I would have.

BY MS. O'BRIEN:

Q. Did Bigeck ever tell you that assistant state's attorneys or police fabricated facts during his interrogation in the police station?

MS. HAGY: Objection. Form.

THE WITNESS: I don't recall.

BY MS. O'BRIEN:

Q. If he would have told you that, would you

Page 161

have filed a motion to suppress his statements?

MS. HAGY: Objection. Form.

THE WITNESS: I would have certainly looked into it further, and if I found it to be credible, I would have.

BY MS. O'BRIEN:

Q. Did Bigeck ever tell you that his court reported statement was fabricated by assistant state's attorneys?

MS. HAGY: Objection. Form.

THE WITNESS: No, not that I recall.

BY MS. O'BRIEN:

Q. Did Bigeck ever deny making the court reported statement to police --

A. I don't recall if he denied it.

Q. -- and states attorneys? I'm sorry. I wasn't done. Did he ever deny making -- let me rephrase that.

Did Bigeck ever deny making the court reported statement to you?

A. Not that I recall.

Q. Did Bigeck ever tell you he was pressured into making the court reported statement?

A. Not that I recall.

41 (Pages 158 - 161)

Page 162

Q. Did he ever tell you he was coerced into making the court reported statement?

MS. HAGY: Objection. Form.

THE WITNESS: Not that I recall.

BY MS. O'BRIEN:

Q. Did Bigeck ever tell you that the facts he gave in the court reported statement were provided to him by the assistant state's attorneys?

MS. HAGY: Objection to form.

THE WITNESS: Not that I recall.

BY MS. O'BRIEN:

Q. Did he ever tell you that he was fed a story and details by any assistant state's attorney?

MS. HAGY: Objection. Form.

THE WITNESS: Not that I recall.

BY MS. O'BRIEN:

Q. Did he ever tell he was fed a story and details by any police officer?

A. Not that I recall.

Q. Did he ever tell you he was fed a story and details by any investigators?

MS. HAGY: Objection. Form.

THE WITNESS: Not that I recall.

Page 163

BY MS. O'BRIEN:

Q. Did you know Assistant State's Attorney Michael Smith?

A. That name is not familiar to me.

Q. Did either you or Mike Vitale ever tell Bigeck during your interviews in August of 1996 to say that it was an order?

MS. HAGY: Objection. Form.

THE WITNESS: An order for what?

BY MS. O'BRIEN:

Q. To say that it was an order -- there was an order to kill, an order to shoot?

A. Oh, okay. Would you repeat the question, please?

Q. During your meetings with Vitale -- actually, during anytime -- during anytime, did Bigeck ever tell you or Vitale -- let me rephrase that.

At any point, did you or Mike Vitale ever tell Bigeck to say that there was an order, to falsely say there was an order?

A. No.

Q. Did you or Vitale ever tell Bigeck to give up the others or instruct him to give up the other

Page 164

people to save your own life?

MS. HAGY: Objection. Form.

THE WITNESS: Only if it was true. We wouldn't have advised him to lie.

BY MS. O'BRIEN:

Q. So that's my next question. Did either you or Vitale ever tell Bigeck to lie?

A. No.

Q. Did you or Vitale ever encourage him to make things up?

A. No.

Q. At any time was Scott Cassidy or any ASA feeding Bigeck information?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Not that I know of. He certainly didn't do it in front of me or no one ever told me.

BY MS. O'BRIEN:

Q. In your presence, did Scott Cassidy pressure Bigeck to falsely claim that Sopron and Antusas participated in planning the shooting earlier on the day of the murders?

MS. HAGY: Objection. Form.

THE WITNESS: I don't believe so. I would have remembered that if that happened.

Page 165

BY MS. O'BRIEN:

Q. Did Scott -- during those meetings, did Scott Cassidy make it clear to Bigeck that if he did not repeat this lie, he would not get any deal on his sentence?

MS. HAGY: Objection. Form.

THE WITNESS: I recall Scott telling him that it was imperative for Bigeck to tell the truth. I don't recall it stated in the way that it was a threat.

BY MS. O'BRIEN:

Q. Did Scott Cassidy or Neil Linehan ever promise Bigeck benefits in exchange for lying?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Did Scott Cassidy or Neil Linehan direct Bigeck to falsely claim that the shooting was planned?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Did Scott Cassidy or Neil Linehan direct Bigeck to falsely claim that Antusas contributed to

42 (Pages 162 - 165)

Page 166

that plan by modifying how the shooting would be carried out?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Not that I recall.

BY MS. O'BRIEN:

Q. Did your client agree -- Bigeck agree to falsely claim that Nick Morfin had repeated the plan to Bigeck, Anderson, and Eddie Morfin in order to place Nick Morfin in the midst of a fake conspiracy to commit murder?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I never even heard that before, so I don't think that happened.

BY MS. O'BRIEN:

Q. Did Bigeck agree -- in your presence agree to falsely claim that Antusas changed the plan in order to make it more likely to succeed?

A. I recall that Bigeck stated something like that, but I don't recall anybody saying -- asking him to falsify that statement.

Q. Did Scott Cassidy or any assistant state's attorney direct Bigeck to falsely claim that while Sopron was at Nick Morfin's house, he instructed him to pull a roll on their enemies?

Page 167

MS. HAGY: Objection. Form.

THE WITNESS: I don't recall that. I really don't think it happened, but I don't recall it.

BY MS. O'BRIEN:

Q. Did your client agree to testify falsely and make certain claims? Did he agree to testify falsely with the state's attorneys?

A. Not in my presence, he didn't, and I don't think he did, but I'm -- you know, it didn't happen in my presence.

Q. During any of your meetings in August with the State's Attorney's Office and Bigeck, did Bigeck ever tell them that Matthew Sopron had nothing to do with the murders?

A. I don't recall that. Remember, this is almost 30 years ago. It's hard to remember all this stuff.

MS. O'BRIEN: Can I just have a second? I don't think I have anything more. Do you want to take a break?

MR. LYDON: Sure. If we want to keep rolling, we can do that, too, unless you want to talk.

MS. O'BRIEN: I'm just going to -- just a couple -- do you want me to do it?

Page 168

MR. LYDON: I don't care.

MS. O'BRIEN: I think I'm done.

MS. HAGY: Can we just break real fast for the washroom?

MR. LYDON: Yeah, that's fine.

THE VIDEOGRAPHER: Now going off the record at 2:11 p.m. This ends media unit 3.

(Whereupon, a short break was taken.)

THE VIDEOGRAPHER: This begins media unit 4. Now going back on the record at 2:18 p.m.

EXAMINATION

BY MR. LYDON:

Q. Mr. Zuganelis, if you could look at Exhibit 10 in front of you. I just want to identify what that is. You used it to refresh your recollection a couple times here today.

If you look at Exhibit 10, it's the investigative report that is prepared by a Cook County State's Attorney investigator; is that correct?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Yes, it is.

Page 169

BY MR. LYDON:

Q. Looking at it, it was prepared by an investigator named Norfie DiCiolla?

A. Yes.

Q. Like I said, you testified that this investigative report refreshed your recollection on the Bigeck proffer interviews with the State's Attorney's Office that occurred over 26 years ago?

A. Yes.

Q. And looking at this investigative report that refreshed your recollection, it details and summarizes the proffer interviews between the State and Mr. Bigeck, correct?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Yes, it summarizes that, although, I don't think I was present during this. Oh, yes, I was present. Yes. I'm sorry.

BY MR. LYDON:

Q. Right. And again, looking at the first paragraph, it indicates that the proffer interviews -- it indicates that the proffer interviews before Mr. Bigeck's plea deal occurred August 12th and August 29, 1996?

A. Yes.

43 (Pages 166 - 169)

Page 170

MS. HAGY: Objection.

BY MR. LYDON:

Q. This report that refreshed your recollection indicates that both you and Mike Vitale were present for both interviews, correct?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Yes, it does.

BY MR. LYDON:

Q. And after looking at this document, that's what you recall, correct?

A. Yes.

Q. Just to clarify, if Mr. Bigeck had complained to you or Mike Vitale in your presence or you had observed Scott Cassidy or anyone else coerce, threaten, or strong arm Mr. Bigeck into saying anything, you wouldn't have allowed it; is that fair to say?

A. That's fair to say, yes.

MS. HAGY: Objection.

BY MR. LYDON:

Q. As Mr. Bigeck's attorney, you would not let him testify to a false narrative that was coerced; is that fair to say?

MS. HAGY: Objection. Form.

Page 171

THE WITNESS: That's fair to say.

MS. HAGY: Foundation. Asked and answered.

THE WITNESS: One of the reasons is that would have made me complicit in that, and I certainly wouldn't have been complicit in anything like that.

BY MR. LYDON:

Q. Right. And in that regard, if during these proffer interviews, you saw Scott Cassidy or anyone else screaming and threatening Mr. Bigeck, that's something you would have remembered?

MS. HAGY: Objection. Form. Foundation. Asked and answered.

THE WITNESS: That's something I would have remembered, and I have no recollection of that happening.

BY MR. LYDON:

Q. And if it had occurred, you would have shut the proffer interview down, correct?

MS. HAGY: Objection.

THE WITNESS: Yes, and I would have had -- I'm sorry. I would have had a talk with Mr. Cassidy about adjusting his attitude, so to speak.

BY MR. LYDON:

Q. So you would not have allowed a plea deal

Page 172

to go forward if you had observed any coercive behavior to your client?

MS. HAGY: Objection. Form. Foundation. Asked and answered.

THE WITNESS: I would not have allowed it at all, no.

BY MR. LYDON:

Q. And your client, Mr. Bigeck, ultimately did end up testifying against other defendants in the criminal case under a cooperation deal, correct?

MS. HAGY: Objection.

THE WITNESS: That's my understanding. I wasn't present when he testified, but that's my understanding.

MS. HAGY: Form.

BY MR. LYDON:

Q. You continued to represent him after the proffer interviews, correct?

A. Yes, but I believe Mr. Vitale was there when he actually testified.

Q. Right.

A. I wasn't.

Q. But you continued to represent Mr. Bigeck

Page 173

after the proffer interviews, correct?

A. Yes.

Q. And you continued to represent Mr. Bigeck when the plea agreement was entered into with the State's Attorney's Office?

A. That's my recollection.

Q. If later you had learned either by Mr. Bigeck's complaints or otherwise that he had been threatened or coerced into giving a false narrative to the State's Attorney's Office, would you have allowed Mr. Bigeck to continue to testify under a cooperation deal?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No. As a matter of fact, I would have talked to Mr. Cassidy about it. And if I couldn't have gotten a satisfactory answer, I would have gone to the judge.

BY MR. LYDON:

Q. You and Mr. Vitale spoke to Mr. Bigeck during the proffer interviews?

MS. HAGY: Objection. Form. Foundation. Asked and answered.

THE WITNESS: You mean during like as they were going on?

44 (Pages 170 - 173)

Page 174

BY MR. LYDON:

Q. Right.

A. Yes, we did, but we had to ask -- since he was in the custody, we had to ask the prosecution team to leave the room because Mr. Bigeck couldn't leave the room. He was in custody.

Q. And when you got a chance to speak to Mr. Bigeck's alone, did you tell him that he needed to tell the state's attorneys the truth and the whole truth?

A. That's what we told him. We told him not to withhold anything.

Q. Was Scott Cassidy's demeanor during the proffer interviews professional?

MS. HAGY: Objection. Form. Foundation. Asked and answered.

THE WITNESS: All I can recall is I don't recall him not being professional. That's all I can recall. I don't know anything else.

BY MR. LYDON:

Q. You don't recall him being unprofessional in any way, shape, or form?

A. No.

MS. HAGY: Objection. Form. Foundation.

Page 175

Asked and answered.

BY MR. LYDON:

Q. Now, you testified that you met with the -- in this civil case the defense attorneys in this case?

A. Yes, including you.

Q. Including me. And that was within the last couple months; is that fair to say?

A. I would say, yeah, within the last six months or so.

Q. Within the last six months.

A. Although Maureen has been chasing me down for seven years.

Q. Was that a -- were you talking in jest?

A. Yes.

Q. Let me start over since this is -- sometimes jokes don't come through on transcripts.

A. I understand. I understand. I should be careful of how I answer.

Q. Mr. Zuganelis, so within the last six months, you first met with the defense attorneys in this civil case?

A. Yes.

Q. After Mr. Bigeck was sentenced in 1998 --

Page 176

A. Let me say something. I didn't even know he had a civil case until -- within the last six months, you and Ms. O'Brien informed me of it.

Q. Okay. So within the last six months, you first learned about this civil case?

A. Yes.

Q. And so is it fair to say within the last six months, you learned that Mr. Sopron and Mr. Antusas and Nick Morfin's criminal convictions had been dismissed?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I never heard that. That never came up at all. I didn't know that until you just mentioned it now.

BY MR. LYDON:

Q. So after Mr. Bigeck was sentenced in 1998 until you spoke to us within the last six months, had anyone else contacted you about your representation of Mr. Bigeck and his interactions with Scott Cassidy?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No. It's almost 30 years or 27 years before somebody actually contacted me about it. I totally forgot Mr. Bigeck and his case.

Page 177

BY MR. LYDON:

Q. So nobody contacted you about your representation of Mr. Bigeck and his interactions with Scott Cassidy by Sopron's attorneys or anyone that worked for Sopron?

A. No.

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Sorry. I keep interrupting you.

BY MR. LYDON:

Q. No one contacted you -- none of Wayne Antusas' attorneys or someone working for Antusas contacted you about your representation of Bigeck?

MS. HAGY: Objection. Form. Foundation. Asked and answered.

THE WITNESS: The first time I've heard Antusas' name was today since 1996. That's the first time I've heard his name.

BY MR. LYDON:

Q. So since the '90s until we contacted you, no one from the State's Attorney's Office spoke to you about your representation of Billy Bigeck and your interactions with Scott Cassidy?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Not that I recall.

45 (Pages 174 - 177)

Page 178

BY MR. LYDON:

Q. No one -- just to test your recollection, no one reached out to you and said hey, Mr. Zuganelis, your client, Mr. Bigeck, has made some serious allegations and has recanted his testimony, and since you represented him and since you have knowledge, we need to get to the bottom of this and ask you about the allegations? No one called and asked you that?

MS. HAGY: Objection. Form.

THE WITNESS: Not that I recall, no.

BY MR. LYDON:

Q. And you would recall if someone had?

MS. HAGY: Objection.

THE WITNESS: I certainly would have.

MR. LYDON: I think that's all I have.

MS. BRODY: I just have very few questions. Ashley Brody on behalf of the City.

THE WITNESS: The quiet lady.

MS. BRODY: The quiet lady.

EXAMINATION

BY MS. BRODY:

Q. This meeting or the interview on August 12, 1996, you indicated that there was an

Page 179

investigator present?

A. Yes. Oh, I'm sorry. Maureen, you look tired.

Q. The interview on August 12, 1996, you indicated that an investigator was present?

A. Yes, I believe so.

Q. And those were Cook County State's Attorney investigators; is that correct?

A. I'm not sure if it was Cook County State's Attorney investigators or a Chicago Police officer. I really don't recall. I just know that there was an investigator.

Q. Okay. Is your memory exhausted as to who was present?

A. Yes.

Q. Can you have a look at Exhibit 10?

A. And that's the investigative report?

Q. That's the investigative report.

A. Yes. I see it prepared by Investigator Norfie DiCiolla. I don't know if that's a Chicago Police officer or a Cook County State's Attorney investigator.

Q. Okay. So you see two investigators' names. Investigator Thomas, I don't know how to

Page 180

pronounce his name, Ptak.

A. Ptak. Oh, I believe he's a Chicago Police officer because that name was familiar when I was reading through.

Q. Is it possible that he is a Cook County State's Attorney investigator?

MS. HAGY: Objection. Form.

THE WITNESS: I mean, it could be possible, but his name sounded familiar to me from other cases that were on Chicago Police reports.

BY MS. BRODY:

Q. Okay. So -- but to your memory, these were the two investigators. It was Investigator Thomas --

A. Ptak.

Q. -- Ptak and Investigator Norfie DiCiolla?

A. Right. That's what's indicated in the investigative report.

Q. Okay. And you don't see any Chicago Police officers' names in there, correct?

A. Well, I don't see anybody listed as a Chicago Police officer.

Q. Okay. And to your recollection, you don't remember if these two investigators, if they worked

Page 181

for the State's Attorney or for the Chicago Police?

A. I don't recall who they worked for.

MS. BRODY: I don't have any further questions.

MR. HERACKLIS: I don't have any further questions.

MS. KUNZER: I just have a few if I could hop IN.

THE WITNESS: Oh, I'm sorry. I was wondering where your voice was coming from.

MS. KUNZER: Mr. Zuganelis, my name is Amy Kunzer. I represent the former Cook County's State's Attorney investigators, Norfie DiCiolla, Thomas Ptak, Leonard Bajenski and William Marley.

EXAMINATION

BY MS. KUNZER:

Q. You have Exhibit 10 in your hand there, and I'll represent to you that Investigator Thomas Ptak was an investigator for the Cook County's State's Attorney's Office.

A. Yes, I see that in the first paragraph.

Q. Okay. And I'll represent to you also that Norfie DiCiolla was also an investigator working for the Cook County's State's Office.

A. And I see that in the heading of the

46 (Pages 178 - 181)

Page 182

investigator's report that the report was prepared by Norfie DiCiolla. I'm sorry if I mispronounced the name.

Q. Correct. So you've been asked before about the demeanor and the atmosphere in the room on August 12th and August 29, 1996, and you testified earlier that Mr. Cassidy always was conducting himself in a professional manner, and you didn't think he was threatening anyone. I'm going to ask you the same questions regarding the investigators that were present.

Did you observe any unprofessional conduct on behalf of the Cook County State's Attorney investigators that were present those two days?

MS. HAGY: Objection. Form.

THE WITNESS: First of all, I think I testified that I don't recall any unprofessional conduct. At least there was none in front of me, not in my presence, but I didn't -- I don't believe I see -- saw it happen. I believe that if it did happen in my presence, I would have done something about it, at least talked to the people -- persons about it.

By MS. KUNZER:

Q. Fair to say no matter who was -- if anyone

Page 183

was acting unprofessional, you would have done something about it; is that fair?

MS. HAGY: Objection. Form.

THE WITNESS: That's fair.

MS. KUNZER: I don't have any other questions. Thank you for your time.

MR. MASCIOPINTO: I have just a few questions, sir. Sir, my name is Tony Masciopinto. I represent certain Chicago Police Department officers. I'll be quick. I promise. Thank you for your time today.

THE WITNESS: Coming from a lawyer, he's going to be quick.

EXAMINATION

BY MR. MASCIOPINTO:

Q. I really just want to talk about one issue, which has been alluded to by both of the lawyers who just asked you questions.

Do you recall -- you gave some testimony earlier in this case on a number occasions where you said they were, quote, unquote, police investigators during the August proffer sessions. Do you remember using words to that effect?

A. Are you talking about earlier today?

Page 184

Q. Yeah.

A. Yeah, I recall something to that effect.

Q. Okay. So counsel who just asked you questions represented to you that the two investigators who are referenced on Exhibit 10, Neil Linehan and Thomas P-t-a-c-k {sic}, were Cook County investigators, not CPD investigators. Do you remember that line of questioning?

A. Well, Neil Linehan is an assistant state's attorney, not an investigator.

Q. I apologize. Counsel who just asked you questions represented that Thomas P-t-a-k, and Norfie D-i-c-i-o-l-l-a, were employed by the Cook County State's Attorney's Office in August of 1996 as investigators. Do you remember her saying that?

A. Just a few minutes ago, yes.

Q. Okay. And I'm going to mark as an exhibit --

MR. MASCIOPINTO: Can someone allow me the ability to share screen, please?

THE VIDEOGRAPHER: We need to go off the record a moment.

MR. MASCIOPINTO: It's not necessary. It's not necessary.

Page 185

BY MR. MASCIOPINTO:

Q. Sir, I'm going to represent to you for the record that the lawsuit, the lawsuit that's filed by Matthew Sopron in this case, alleges that Thomas P-t-a-k and Norfie D-i-C-i-o-l-l-a were employees of the County's State's Attorney's Office as investigators in 1996, okay?

A. Okay. Who alleged that?

Q. The plaintiffs in this case. The plaintiff in this case.

A. You mentioned one plaintiff.

Q. Yeah, Matthew Sopron.

A. Sopron, he was not my client, so I don't know anything about his case.

Q. I understand. That's why I was going to show you the exhibit. I'm just going to represent to you that the complaint alleges that DiCiolla and P-t-a-k were Cook County's State's Attorney Office employees in 1996, not CPD employees, okay?

MS. HAGY: Objection. Form.

BY MR. MASCIOPINTO:

Q. Go ahead.

A. Okay.

Q. Do you understand?

47 (Pages 182 - 185)

Page 186

A.   For some reason, I might have been under the impression they were Chicago Police Department, but I -- it was so long ago.  I really don't remember.

Q.   Right.  This is literally over 25 years ago; right?

A.   Yeah, closer to 30 than 25, I believe.

Q.   And you and I have never spoken before, right?

A.   No, we never have.

Q.   Okay.  And so as you sit here today now after going through how many hours of testimony, four plus or so, as you sit here today right now, do you have -- do you believe that the investigators who were in the August proffers were CPD investigators or Cook County investigators, or do you not know?

A.   I don't know.  I'm sure I was introduced to them, but they were quiet during the whole thing.  They were mostly taking notes, and I don't think they asked any questions, so I really don't have a recollection of them.

Q.   If you look at your Exhibit 10, it says in the first paragraph, sir, middle, it says present

Page 187

during those interviews.

A.   Yes.

Q.   And let's stop it there.  What do you -- do you understand the interviews to be the August 12, 1996 proffer and the August 29, 1996 proffer?

A.   Yes.

Q.   It says, quote, present during those interviews were the defendant's attorneys, Mike Vitale and George Zuganelis.  Also present were Assistant State's Attorneys Scott Cassidy and Neil Linehan and Investigator Thomas P-t-a-k.  Did I read that right?

A.   Yes.

Q.   And the author is in the top, Norfie D-i-C-i-o-l-l-a.  Do you see that?

A.   Yes.

Q.   Do you have any reason to believe that there were more individuals there other than the individuals that we've just identified through Exhibit 10?

MS. HAGY:  Objection.  Form.

THE WITNESS:  I have no reason to believe that, no.  I have no independent recollection of that, but I have no reason to believe there were more

Page 188

than what's listed in the report.

BY MR. MASCIOPINTO:

Q.   And this Exhibit 10 is a document that's titled Investigative Report on whose letterhead according to Exhibit 10?

A.   Office of the State's Attorney of Cook County.

Q.   It's not on Chicago Police Department letterhead, or it's not a Chicago Police Department report.  Do you agree with that?

A.   I agree with that.

Q.   If you look at the proffer letter, Exhibit 9, sir.

A.   I don't have that in front of me.

MR. MASCIOPINTO:  Can someone please give him Exhibit 9?

BY MR. MASCIOPINTO:

Q.   Do you have it?

A.   Now I have it.

Q.   Sir, do you agree with me the proffer letter in Exhibit 9 is the foundation on which the August 12th and August 29th proffer meetings were based?

MS. HAGY:  Objection.  Form.

Page 189

THE WITNESS:  I agree that this is the summary of them, yes.

BY MR. MASCIOPINTO:

Q.   Okay.  And no proffer meeting can take place with one of your clients unless a proffer letter agreement is signed.  Do you agree with that?

A.   I agree with that.

MS. HAGY:  Objection.  Form.

BY MR. MASCIOPINTO:

Q.   And according to Exhibit 9 -- well --

A.   He froze.

THE VIDEOGRAPHER:  Now going off the record at 2:41 p.m.

(Whereupon, a short break was taken.)

THE VIDEOGRAPHER:  Now going back on the record at 2:43 p.m.

BY MR. MASCIOPINTO:

Q.   Sir, I apologize that my screen froze.  You're still under oath.  Do you understand that?

A.   Yes.  Yes.  And I accept your apology.

Q.   If you go to Exhibit 9, the last sentence above Cassidy's signature says, quote, this letter

48 (Pages 186 - 189)

Page 190

embodies the entirety of the agreement for a proffer for William Bigeck's testimony. No other promise exists between the Cook County's State's Office and William Bigeck regarding the proffer, end quote.

Other than mispronouncing his name, did I read this paragraph correct?

A. Yes.

Q. Based on your experience and knowledge, who is this proffer agreement between? Who are the parties to this proffer agreement?

A. William Bigeck and the Cook County State's Attorney's Office.

Q. The Chicago Police Department is not a party to this proffer agreement. Would you agree with that?

A. I would agree with that because usually by the time they hand over a case, it's the State's Attorney's Office witnesses. They're not anything more in my experience.

Q. Right. You entered your appearance for Mr. Bigeck in or about January of 1996, right?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I assume so. I would have to see

Page 191

the appearance form again.

BY MR. MASCIOPINTO:

Q. In any event, by the time the August 1996 proffers came along, it was many months past the charging date. Would you agree with that?

A. Oh, yes.

Q. At this -- strike that.

Sir, do you know a Chicago Police officer by the name of George Holmes, H-o-l-m-e-s?

A. The name is not familiar to me.

Q. Do you have any reason to believe that George Holmes was in the proffer sessions in August of 1996?

A. Unless his name was listed in the investigative report, I would have no reason to believe he was there.

Q. How about a CPD officer by the name of Thomas Argenbright, do you know that person?

A. No.

Q. Do you have any reason to believe that Thomas Argenbright was in any of the proffer sessions between your client and Cook County in August of 1996?

A. If his name isn't in the investigative

Page 192

report, almost 30 years later, I would have no reason to believe he was there.

Q. Same questions for CPD Officer Al Graff, G-r-a-f-f. Do you know Al Graff, CPD?

A. I have no recollection of his name, no.

Q. Do you have any reason to believe that Al Graff was in the August 1996 proffers between your client and Cook County's State's Attorney office representatives and yourself?

A. I don't believe he was there because I don't recognize his name, and his name isn't in any of the investigative reports.

Q. Same question for the last individual, Anthony Graffeo, G-r-a-f-f-e-o, CPD. Do you know that individual?

A. No.

Q. Any reason to believe that Anthony Graffeo from the CPD was involved -- strike that.

Any reason to believe that Anthony Graffeo was present during the August 1996 proffers between your client and Cook County State's Attorney's Office?

A. I have no reason to believe he was there because he's not listed in the investigative report

Page 193

summarizing that meeting. I mean, it's been almost 30 years, you know, but I have no reason to believe he was there either.

Q. As you sit here today -- as you sit here today, to the best of your memory, and I get it. It's almost 30 years, but as you sit here today to the best of your memory, after you began representing Billy Bigeck, William Bigeck, did you have any interactions at all with CPD personnel to the best of your knowledge?

A. I don't recall who I had interactions with without looking at transcripts and police reports.

Q. And you would rely on the paper to the extent the paper exists on that point, yes?

A. Yes.

MR. MASCIOPINTO: Sir, thanks for your time. I have nothing further.

THE WITNESS: Thank you for being brief.

MR. MASCIOPINTO: You doubted me.

THE WITNESS: Now the real one is going to get me. Anytime you're ready.

MS. HAGY: I'm just doing this so I can share the screen.

THE WITNESS: Will it show up on my screen?

49 (Pages 190 - 193)

Page 194

MS. HAGY: It will. It will. And it should be pretty big up on there as well.

THE WITNESS: That's good because I have glasses.

THE VIDEOGRAPHER: I put that screen there so you --

THE WITNESS: All I can see is me.

MS. HAGY: It will change.

MR. O'CALLAGHAN: I just want to clarify with Lindsay going forward that we're not all objecting? You will agree that one objection made on behalf of one defendant is an objection made for all?

MS. HAGY: Yes. That makes sense. Yes. That would take quite a while. I mean, if everybody had to object, it would be like Ring Around a Rosie or something weird.

EXAMINATION

BY MS. HAGY:

Q. So Mr. Zuganelis, do you remember your first meeting with the defense attorneys in this case?

A. Do you mean the other defense attorneys or Mr. Vitale?

Q. The defendant attorneys in the civil case.

Page 195

A. Oh, in the civil case?

Q. Yes, Mr. Cassidy's attorneys.

A. Would you repeat that question again?

Q. Yes. Do you remember when you first met with them?

A. I only -- my first interaction was with Ms. O'Brien.

Q. Where did that take place?

A. At Starbucks at Harlem and Lawrence because that's close to where I live.

Q. Okay. And how were you first contacted?

A. She called me by telephone and asked me to meet her.

Q. And did you know her before that time?

A. I've known Ms. O'Brien for 30 years, I believe, maybe even longer.

Q. How do you know each other?

A. She was an assistant state's attorney's in Maybrook courthouse, and I was a private lawyer who had cases occasionally in the courtroom she was assigned to.

Q. And did you work against each other often?

A. Well, as often as my cases were assigned to her courtroom. I couldn't tell you the number

Page 196

of times.

Q. Did you sometimes negotiate plea agreements with Ms. O'Brien?

A. Most of the time, yes.

Q. Okay. And how were you contacted for that meeting?

A. What meeting?

Q. With Ms. O'Brien at the Starbucks at Harlem and Lawrence?

A. She called me and told me about the lawsuit and asked if she could talk to me about it.

Q. What did she tell you about the lawsuit?

A. Oh, geez, that Mr. Bigeck was -- filed a lawsuit against her client. I think she represents Mr. Linehan or Judge Linehan at this time. And we just talked in general. It wasn't anything specific initially. It was just in general.

Q. And what did you remember about the case at that time?

A. Probably not much because I still don't recall much about the case now to this day.

Q. Did you remember meeting with Mr. Bigeck at all?

A. I haven't with Mr. Bigeck since he was

Page 197

convicted.

Q. Sure. But when you met with Maureen at the Starbucks, at that point, did you have an independent recollection of meeting with Mr. Bigeck?

A. At what time was the meeting?

Q. In his defense, did you remember meeting with him to defend him?

A. Well, yeah, I had to -- she had to tell me some of the circumstances of the case, which triggered some of my memory.

Q. Okay. So she -- how did she help trigger your memory?

A. Well, I didn't recall exactly what the case was about. When she told me about the two young 13-year-old girls in the van, that triggered my memory.

Q. Okay. So is it fair to say that you didn't remember anything about this case before you met with Maureen at the Starbucks?

MR. LYDON: Objection. Leading.

THE WITNESS: I wouldn't say that I didn't remember. I would say that I haven't thought about it in 20 some odd years.

50 (Pages 194 - 197)

Page 198

BY MS. HAGY:

Q. Okay. So what did you remember before you met with Maureen?

A. What did I remember? Well, I don't know what I remembered or didn't remember, but if you're suggesting that Ms. O'Brien fed me something, no, she didn't. She just told me about the two girls in the van, and that triggered my memory about things.

Q. Okay. So what did it trigger?

A. My memory.

Q. Okay. Did it trigger any specific memories of your representation?

A. Yeah. It triggered the fact that my client went with two others. The other two had firearms, and he had a baseball bat, and that I remember. It triggered that he was the least culpable of the three because even though he was accountable for the other two, he wasn't eligible for the death penalty. The death penalty was still viable at that time, although, it was tending to not be, I think, at that time if I remember correctly.

And I remember there was several meetings.

Page 199

I didn't remember where. For some reason, I had -- I thought the meetings were at Cook County Jail. I didn't remember them being at Cook County State's Attorney's Office, but other than that, there's still a lot I don't recall about the case.

Q. And then when was your next meeting with the defendants' attorneys?

A. Oh, it was probably several months later.

Q. And actually, how long was that first meeting?

A. Maybe half an hour, 40 minutes.

Q. And then when was the second meeting?

A. Are you asking for specific dates?

Q. If you can or just a month.

A. I have no recollection on what the dates were. All I know is we sat outside Starbucks. It was nice weather.

Q. And who was present at that meeting?

A. Ms. O'Brien and myself.

Q. For the second meeting?

A. Yes.

Q. And did you review any documents at either of those meetings?

A. No.

Page 200

Q. And did you -- what do you remember discussing at that meeting?

A. Not much more. I really don't recall what we discussed. I recall asking her to purchase coffee, but that was about it.

Q. So she bought your coffee?

A. At my request.

Q. Okay. And then when was your next meeting with the defendants' attorneys?

A. I don't know. It was -- it wasn't like it happened once -- one after another. It was several months between each meeting.

Q. Okay.

A. I may have met with them three times, maybe four times tops.

Q. Okay. So who was present at that third meeting?

A. Jim, I forget your last name.

MR. LYDON: Lydon.

THE WITNESS: Jim Lydon was present. That was at Starbucks as well at Lawrence and Harlem.

BY MS. HAGY:

Q. And that was Jim, Maureen, and --

A. Me.

Page 201

Q. -- you?

And do you remember what was discussed at that meeting?

A. Michigan football and a little bit about the case. You know, we just -- they were just letting me know the progress and wanted to know if I remembered anything. That's all.

Q. And did they tell you anything else about the case?

A. No. They didn't tell me anything about the case. They were trying to help me recollect, but they didn't suggest to me anything. Just like right now, except for reading some of the documents, I don't recollect much of what happened. It was almost 30 years ago.

Q. And did you -- you've been referring sometimes to Mr. Scott Cassidy as Scott.

A. Yes.

Q. And did you -- when did you first meet Scott Cassidy?

A. I don't know. Years ago. I was in -- I had cases in his courtroom, and you get to know other lawyers, and you refer to them by first name instead of Mr. So and so or Ms. So and so, Mrs. So

51 (Pages 198 - 201)

Page 202

and so. It was just -- you know, it was more collegial I guess you could say.

Q. Do you remember when you first met him?

A. No.

Q. Was it before this case?

A. That I couldn't tell you.

Q. Did you work with him on cases besides this case?

A. Well, I didn't work with him. I worked against him on cases.

Q. Sure. Did you work with him -- did you work against him on any cases in addition to this one?

A. I think two or three, but those I don't recall either, and those -- those were not murder cases because, you know, I only handled -- when I went out on my own, I only handled maybe four or five murder cases in my whole career.

Q. Okay. So when you're saying went out on your own, that means apart from the cases you did with Mr. Echeles?

A. Right.

Q. So there were about four or five murder cases?

Page 203

A. Right.

Q. Total?

A. Yes.

Q. Okay.

A. And I found that -- because most defendants could not afford a private lawyer because the fees we had to charge for expert witnesses and investigators and that, they couldn't afford. So it wasn't like I was avoiding murder cases. It was that clients could not afford the fees that I needed to prepare properly to represent them properly.

Q. And did you ever meet with Scott Cassidy in preparation for your testimony today?

A. No. I haven't seen Scott probably in 20 years.

Q. Did you meet with any of the actual defendants in preparation for your testimony today?

A. No.

Q. And so how long was that third meeting?

A. The third meeting with the defense lawyers?

Q. Yes.

A. Maybe an hour and, again, mostly asking

Page 204

questions about Michigan football because they knew me, knew what my interests were in that.

Q. And did you have another meeting with the defendants' attorneys after that?

A. I don't recall. It was three or four times. I don't recall if there was any other meetings after that.

Q. Do you remember anyone else that you met with?

A. No.

Q. And do you remember when you first talked to anybody on the plaintiff's side?

A. You were the first one, I believe.

Q. Yes. And do you remember when I first asked you if I could talk to you, do you remember if you said yes or no?

A. At first I said no, but then I kind of warmed up to you, and we talked over the phone for quite a bit.

Q. Okay. And did we also talk about Michigan football?

A. Oh, yes. That was most of it. I don't let anybody escape that.

Q. And do you still -- even after looking at

Page 205

the investigative report, do you still have difficulty remembering those meetings in August 1996 with Mr. Cassidy and the state's attorneys?

MR. LYDON: Objection. Form. Leading. Misstates his testimony. Go ahead.

THE WITNESS: All I remember about those meetings is that it seemed like we were constantly getting up and walking out of the room, or the prosecution team was walking out of the room so we could confer with Mr. Cassidy -- Mr. Bigeck.

BY MS. HAGY:

Q. Okay. So I'm going to show you -- and hopefully this will work.

You testified earlier today that you remember Mr. Bigeck testifying in Mr. Morfin's trial, right?

A. I don't recall him testifying in anybody's trial. I recall that we made a deal that he would testify, but I wasn't present when he testified.

Q. Okay. And do you remember whether or not Mr. Cassidy was the state's attorney who put on Mr. Bigeck's testimony at these trials?

MR. LYDON: Objection. Foundation.

THE WITNESS: I have no idea because I wasn't

52 (Pages 202 - 205)

Page 206

present.

BY MS. HAGY:

Q. Do you remember if that was something that was discussed?

A. No.

MR. LYDON: Same objection.

THE WITNESS: I don't recall that being discussed at all.

MS. HAGY: Okay. And then, Counsel, this is --

THE WITNESS: Former Counsel, please.

BY MS. HAGY:

Q. Oh, sorry. I'm giving the Bates stamp to everybody, so that's a plural counsel. Sopron 008871, and hopefully this won't appear --

A. This is the Sopron case?

Q. Well, it's the -- I'm going to have to reopen it. It's the Bates stamp in this case, but it is from the Morfin trial that I am going to show you. Here we go.

So do you see here this says The People versus -- People of the State of Illinois v. Wayne Antusas and Matthew Sopron?

A. Yes.

Q. And it says February 3, 1998?

Page 207

A. Yes.

Q. And then here it says that -- would you agree with me it says this is the testimony of William Bigeck?

A. Well, it says that he testified, yes.

Q. And here it says William Bigeck, right?

A. Yes.

Q. And he's cross-examined -- direct examination, pardon me, by Mr. Cassidy?

A. Yes.

Q. Because I forgot the page number, I'm going to cheat. Do you see here where Mr. Cassidy says now was your lawyer present when you talked to the State's Attorney's Office back in August of 1995. I think this is a typo. It was supposed to be 1996. And do you see that he said yes?

A. Yes.

Q. And then here he says okay, as a matter of fact, you had two lawyers present, did you not, and then he says yes, right?

A. Yes.

Q. And then he says Mr. Vitale and Mr. Zuganelis, and he said yes?

A. Right.

Page 208

Q. And then he says Mr. Vitale was present all the time; isn't that right?

A. Yes.

Q. Does that refresh your recollection that maybe you weren't present all of the time?

A. I think I said that before that I wasn't present at every single one.

Q. Okay. So you weren't present at all of those August 12th and August 29, 1996 meetings?

MR. LYDON: Objection. Leading. Misstates his testimony.

THE WITNESS: I don't recall which dates I wasn't present, but I wasn't present at every single one of them. Mr. Vitale was the lead lawyer. I had other business at times, and so he would go to meetings that I couldn't attend.

BY MS. HAGY:

Q. And you said you were pretty busy during this time, right?

A. I had a lot of cases, yeah.

Q. The report that we discussed before, Exhibit 10, did anyone -- do you remember before this day or before your meetings with the defendants' attorneys, do you remember anyone

Page 209

showing you that report?

A. Are you talking about Exhibit 10?

Q. Yes, I am.

A. I recall this statement because I was at one of the meetings.

Q. Yes. And this report, do you remember seeing this before today?

A. This exact --

Q. Yes.

A. It looks familiar, yes.

Q. Okay. Do you remember if anybody -- did anybody from the State's Attorney's Office show this to you after it was prepared?

A. Somebody would have. I would presume it would have been an assistant state's attorney showed it to me.

Q. And did you sign it?

A. I don't believe I did.

Q. Okay.

A. No, I didn't sign it. It just says investigator and supervisor.

Q. Okay. And this is not your report, right?

A. No, it's not my report.

Q. Are you able to confirm whether everything

53 (Pages 206 - 209)

Page 210

in this report is correct?

A. I can't confirm if everything in here is correct. I didn't sign it.

Q. Okay. It's fair to say this report doesn't delineate what happened on August 12th or August 29th, right?

MR. LYDON: Objection. Objection. Leading. Foundation. And then go ahead and read it if she's going to ask you about the substance of the report.

THE WITNESS: Well, a lot of it is redacted, so I'm assuming that names were redacted.

BY MS. HAGY:

Q. If you look at the top of the second page --

A. The unredacted?

Q. If you look at the top of the second page, it says interview of William Bigeck 12 and 29 August 1996?

A. Right.

Q. So is it fair to say that it presents the substance of both meetings together?

MR. LYDON: Objection. Leading. Foundation.

THE WITNESS: Okay. I'm going to assume it does because I don't recall being at both. I might

Page 211

have been there. I just don't recall being at both. I mean, this was 30 years ago.

BY MS. HAGY:

Q. And do you -- okay. Let me take this down.

Do you remember Mr. Cassidy ever asking you if he could meet with Mr. Bigeck without you?

A. I don't recall Mr. Cassidy ever asking me that.

Q. Okay. Would you have -- do you remember authorizing him to meet with Mr. Bigeck without you?

MR. LYDON: Objection. Asked and answered.

THE WITNESS: I never would have authorized a meeting like that.

BY MS. HAGY:

Q. Okay. So I'm going to show you another investigative report.

MS. HAGY: And Counsel, this is Sopron 6143.

THE WITNESS: Just recall I didn't represent Sopron, so I don't know anything about what happened to him.

MS. HAGY: Yes. What exhibit are we on?

MS. O'BRIEN: 18.

Page 212

MS. HAGY: Sorry. I only have three of them, but I e-mailed it this morning as well.

(Whereupon, Deposition Exhibit No. 18 was marked for identification.)

BY MS. HAGY:

Q. Okay. So does your name appear anywhere on this report?

A. I don't see it.

Q. Does Mr. Vitale's name appear anywhere on this report?

A. I don't see that either.

Q. Do you remember authorizing Mr. Cassidy and Mr. Linehan to meet with Mr. Bigeck without you or Mr. Vitale on September 27, 1996?

A. I have no recollection of that.

Q. Okay.

A. I mean, it may have happened. It may not have happened. I have no recollection of that.

Q. Okay. And do you have any recollection of anyone informing you that Mr. Cassidy was going to meet with Mr. Bigeck on -- sorry. Just a second.

Did you have -- did anyone ask you whether Mr. Cassidy could meet with Mr. Bigeck on

Page 213

September 18, 1996 without you or Mr. Vitale present?

A. I don't recall being asked that question, and I don't know if Mr. Vitale was asked that question.

Q. Would you have authorized that?

A. To meet with them without a lawyer present?

Q. Yes.

A. If somebody had notified me of that, I probably would not have authorized it, but I don't recall ever being notified.

Q. Do you remember anyone notifying you that Mr. Cassidy was going to meet with Mr. Bigeck without an attorney present on September 20, 1996?

A. I don't recall.

Q. And would you have authorized that?

A. To be interviewed by an assistant state's attorney without me or Mr. Vitale, I doubt it. I don't think I would have, but we're talking 30 years ago. It's very difficult to remember.

Q. Do you remember anyone asking you if Mr. Cassidy can meet with Mr. Bigeck and ASA Linehan on -- and Mr. Cassidy, pardon, on

54 (Pages 210 - 213)

Page 214

October 18, 1996 without an attorney present?

A. I have no recollection of that.

Q. And do you know whether -- and would you have authorized that?

A. Since I have no recollection of it, I don't recollect if there was any discussions between us ahead of time between Mr. Cassidy, Mr. Linehan and myself or Mr. Vitale ahead of time. So that's a difficult question to answer because I just don't have any recollection of it.

Q. Okay. Would you have wanted your client to meet with the state's attorney without you?

MR. LYDON: Objection to the form. Asked and answered. Go ahead.

THE WITNESS: Ideally, no, but ultimately, it was Mr. Bigeck's decision because he was the client, his rights and his life, not ours. So it would have been his decision to meet with them or not without us.

BY MS. HAGY:

Q. Did you give him any advice about whether or not he should meet with the state's attorney without you?

A. I don't recall if we did or we didn't.

Page 215

Q. Would that have been your practice at that time?

MR. LYDON: Objection. Foundation. Incomplete hypothetical.

THE WITNESS: Would my practice -- my practice is that a defense lawyer be there preferably, but again, that's the client's ultimate decision because it's his case, his right, his life.

BY MS. HAGY:

Q. During your practice as a defense attorney, did you have any other clients who were housed in the witness quarters of the Cook County Jail during the time that they waited for resolution of their case?

A. Are you talking about the time that Bigeck was there?

Q. At any other time.

A. No.

Q. Do you have any other client where -- do you have knowledge of whether or not Mr. Cassidy provided Mr. Bigeck magazines to read while he was in the jail?

A. I have no recollection of that or knowledge of that at all.

Page 216

Q. You don't remember anybody telling you that?

A. I don't remember anyone mentioning that.

Q. Do you -- can you remember any other client you had where the State's Attorney provided them magazines to read while they were in the jail?

A. No.

Q. Did anyone inform you that Mr. Bigeck -- that it was alleged that Mr. Bigeck had marijuana while he was in the jail?

A. No.

Q. No one informed of you that?

A. Nobody told me about anything like that.

Q. Were you ever informed that Mr. Bigeck admitted that he had marijuana in the jail?

A. I have no recollection of that whatsoever.

Q. Did you -- were you informed about any times that Mr. Bigeck may have met with Mr. Cassidy in the jail?

A. I had no idea. Whether Mr. Vitale authorized it or not, I had no idea. Mr. Vitale is deceased now. There's no way of asking him.

Q. When did he pass away?

A. I'm not exactly sure, but I think it's

Page 217

within the last few years.

Q. Did you have regular contact with him up until when he passed away?

A. No. I had very little contact with Mr. Vitale over the years.

Q. When did your contact with him kind of peter out?

A. When he decided he could do felony cases on his own, didn't need my help anymore.

Q. When was that?

A. Probably late '90s, early 2000s.

Q. Okay. So is it possible that attorneys may have contacted him about Mr. Bigeck's case after that time and you wouldn't know about that?

MR. LYDON: Objection. Foundation. Calls for speculation.

THE WITNESS: I was just going to say I have no idea if anybody contacted him because it was never mentioned to me.

BY MS. HAGY:

Q. You wouldn't know either way, right?

A. I wouldn't know.

Q. And do you know when you first filed your appearance for Mr. Bigeck?

55 (Pages 214 - 217)

Page 218

A. Well, yeah. It's on the appearance form that you showed to me today. It was January of 1996, I believe.

Q. Was it on your appearance form?

A. My signature.

Q. So let's take a look at that.

MS. HAGY: Was that Exhibit 2, his appearance?

MS. O'BRIEN: 4.

BY MS. HAGY:

Q. Here's Exhibit 4.

A. Yep, that's my appearance form and my signature.

Q. Yes. Is there a date on that form?

A. I don't see a date.

Q. And is that your handwriting on the bottom where -- it's your signature, right?

A. It's my signature and my printing. This whole thing was filled out by me.

Q. Okay. But is there a date on this?

A. I don't see a date on this one.

Q. So do you know exactly when you filed your appearance in this case?

A. I don't know exactly. Unless there was a file stamp on it, I don't know exactly when I filed

Page 219

it. 30 years ago.

Q. Is it fair to say your name was not on several of the documents that we saw today?

A. Right. It was Mr. Vitale's signature on many of the documents.

Q. And do you know did Mr. Vitale represent Mr. Bigeck before December 1995?

A. I have no idea.

Q. Do you know if Mr. Vitale knew Mr. Bigeck's parents?

A. I have no idea.

Q. Do you know if he -- if he was his attorney before this case?

A. I have no idea.

Q. Did Mr. Bigeck tell you whether or not he was given an opportunity to talk to an attorney before he spoke to police on December 15, 1995?

A. I have no idea.

Q. He didn't tell you either way?

A. No. I didn't even know that -- when he was arrested until I got in the case and got the police reports.

Q. And do you remember when that was?

A. When what was? Arrested or when I got the

Page 220

case?

Q. When you got in the case.

A. I think early 1996.

Q. And do you know whether he had the opportunity to talk to an attorney before he gave the typed statement in this case?

A. I have no idea because nobody ever mentioned that to me.

Q. Okay. And when -- when you first met Mr. Bigeck, do you know how he felt about this case?

MR. LYDON: Objection to the form.

THE WITNESS: I -- I don't recall if I asked him how he felt or if he told me how he felt. My practice how the defendant felt about the case was pretty obvious. I didn't ask them about it, and they didn't say anything to me about it. They just didn't want to be there. That's all I knew.

BY MS. HAGY:

Q. Do you know whether he understood that he had already given an incriminating statement to police?

A. I don't know.

Q. Did you advise him that the chance of him

Page 221

getting a term of years without cooperation was low?

A. Probably because that's how it turned out, so I would have had to have advised him at some point.

Q. And do you have an independent recollection of whether you approached the state's attorney about Mr. Bigeck's cooperation or whether they approached you?

A. I have no independent recollection of that.

Q. Okay. So it could have been either way?

A. It could have been either way, but don't forget Mr. Vitale was involved, too, so Mr. Vitale could have approached somebody. I just don't remember.

Q. And do you know whether anyone at the State's Attorney approached Mr. Bigeck before they approached you?

A. I don't know if that happened, and I would have -- with the state's attorneys that were involved, I would have been seriously disappointed because by that time, they knew he was -- you know, had lawyered up. It would have been a serious

56 (Pages 218 - 221)

Page 222

breach of protocol if they approached him without us being present.

Q. Okay. Mr. -- do you remember what age Mr. Bigeck was at the time?

A. I have no idea. I mean, I probably did then, but I have no idea now.

Q. Do you have any reason to disagree with me that he had just turned 18 in December 1995?

A. Well, I have no reason to disagree with you because you probably know that from talking to him much sooner than I have. I mean, much more recently than I have.

Q. Sure. So do you have any reason to disagree that he was -- had just turned 18 in December 1995?

MR. LYDON: Asked and answered.

THE WITNESS: Like I said before, I wouldn't know Mr. Bigeck if he walked in here, walked up to me and he said hi, George, how are you doing. I wouldn't know who he was. I don't recall what he looked like back then, if he looked young to me or if he looked younger. I have no recollection.

BY MS. HAGY:

Q. Do you know whether he had been involved

Page 223

with the police before?

A. I don't have any recollection of that.

Q. Okay. Do you remember whether he had any experience with the police before?

A. What do you mean by experience with the police? Having been arrested? Having been talked to? I don't know what you mean by experience with the police.

Q. Sure. Do you remember whether he had been charged with a crime before?

A. I have no recollection of that.

Q. Okay. Do you know how Mr. Bigeck prepared to give his testimony in the four criminal cases at which he testified?

A. No. I wasn't involved in that. That was Mr. Vitale who was involved in that.

Q. Okay. And do -- do you know that Mr. Vitale was involved in preparing his testimony?

A. All I know is that Mr. Vitale was supposed to be present when all of that was going on. I don't know what happened. I don't recall Mr. Vitale telling me anything about it. I don't recall anybody telling me anything about it.

Q. Do you have reason to disagree with me

Page 224

that Mr. Nick Liberto's trial took place in 2001?

A. I have no reason to disagree with you on that. I have no idea when it took place.

Q. And if Billy Bigeck testified in Mr. Liberto's case in 2001, is that the time when you already didn't have much of a relationship with Mr. Vitale?

A. It started to tail off. I mean, I still knew Mr. Vitale. It wasn't that there was any animosity between us. It was just that Mr. Vitale stopped referring business to me, so there was no reason to be around him all that much.

Q. And did you have any interaction on Mr. Bigeck's case after he plead guilty on August 27, 1998?

A. No. Once he plead guilty, that was the last I knew of Mr. Bigeck.

Q. Okay. And do you remember -- and we can look at the plea agreement, but do you remember Mr. -- Judge Moran describing the testimony that Mr. Bigeck had to give as detailed?

A. I remember Judge Moran commenting on it. I thought a little more lengthy than other judges comment, but I don't recall exactly what he said.

Page 225

Q. Would you agree that Mr. Bigeck's testimony was detailed?

A. I think it was, but I wasn't in Mr. Bigeck's head. I didn't know what he knew, but I believe he was detailed.

Q. Do you know whether Mr. Cassidy or Mr. Linehan were concerned with Mr. Bigeck remembering what his testimony was supposed to be?

MS. O'BRIEN: Objection.

THE WITNESS: I don't -- I don't have any recollection of them being concerned. You know, excuse me for a second because I really am trying to remember, all right? But I think -- I know there was a couple times when Mr. Vitale and I went out in the hallway with Mr. Cassidy and Mr. Linehan because as I said before, Mr. Bigeck was in custody. He could not leave the room since he was in custody, so we had to go out in the hall and talk.

And what that was about, I think that they were concerned about him -- about Mr. Bigeck being completely truthful. I think they felt he was holding something back, but then Mr. Vitale and I went back in to talk to him without them being

57 (Pages 222 - 225)

Page 226

present. And after we talked to him, he did come up with some other information that the State was interested in.

BY MS. HAGY:

Q. And do you remember -- prior to your meetings with the State's Attorney, do you remember Mr. Bigeck talking to you about somebody named Climber?

A. I have no idea. I saw that on the investigative report you gave me. If he said anything, this is the first time I recall that name being used.

Q. Okay. And similarly, do you remember Mr. Bigeck talking to you about somebody named John Gizowski?

A. That I don't recall.

Q. And do you remember when Mr. -- well, do you remember whether you met with Mr. Bigeck first or read the police reports first?

A. Well, when Mr. Vitale got me involved in the case, he gave me copies of the police reports, so I read them. So I'm quite certain I read the police reports before I went to see Mr. Bigeck so at least I had some semblance of an idea of what to

Page 227

talk to him about.

Q. And do you remember -- well, do you remember -- when you met with Mr. Bigeck, do you remember what he told you about that night?

A. I don't recall. I honestly don't recall what he told me.

Q. Do you remember him telling you about the baseball bat?

A. Yes. Yes. He was the only one that had -- he was the only guy there that showed up to a gun fight with a baseball bat. I didn't mean to joke about it.

Q. Do you remember him telling you how many other people were involved?

A. I believe he said two other people were involved, and they had firearms.

Q. And do you remember him telling you how he left the scene?

A. No, I don't recall that.

Q. Okay. And do you remember him telling you anything about switching jackets with anybody?

A. That sounds familiar, but I don't have a total recall of that. That does sound familiar that he may have -- now that you mention it, it

Page 228

sounds like he did switch jackets.

Q. And do you remember him telling you anything about committing a crime prior to the murders that day?

A. That also -- I think something about stealing a gun or breaking into a house or something like that. Now that you mention it, it sounds familiar.

Q. Okay. So you remember him telling you about that earlier?

A. I believe so, yes.

Q. Okay. And when you talked to him, did you encourage him to give you all of the information that he had?

A. I always encourage clients to tell me the truth and the whole truth because that's the only way I can properly defend them. It's covered by attorney-client privilege. It wasn't like I was going to run to the State and tell them or the police, but in order for me to properly prepare a case and properly defend, I had to know exactly what happened.

Q. And do you remember when you met with him, that would have been early on in your

Page 229

representation?

A. Well, it would have been, yeah. I think I met with him at the county jail before I filed my appearance, but I can't be 100 percent sure.

Q. And do you remember him telling you anything that you hadn't already seen in the police reports or in his typed statement?

A. I don't know. I just recall that when we had interviews with the State's Attorney's Office, he did give them some names that weren't in the police reports, so I don't recall if he told me that ahead of time or if I learned the first time right there in that interview.

Q. Okay. So that's the first time you remember the --

A. Yeah. That was 30 years ago. It's very difficult to remember that kind of detail that far back.

Q. Do you remember Mr. Bigeck telling you that he had been beat up in the jail?

A. No, I don't recall that.

Q. Do you remember him telling you that he was afraid of anybody?

A. That sounds a little bit familiar, but I

58 (Pages 226 - 229)

Page 230

don't know exactly what that was about. Like I said, it was almost 30 years ago. I'm sure Mr. Bigeck remembers that because that happened to him. As I said earlier, I had almost 5,000 clients during the course of my career. It's hard to remember everything and delineate and keep it separate client by client. So no, I don't have a specific recollection of anything like that.

Q. Okay. And do you remember whether Mr. Bigeck was afforded any privileges because he was housed in the witness unit of the jail?

A. I was never -- as far as I know, I was never informed that he got any special treatment or privileges by being in the witness unit at the jail. That would have been more Mr. Vitale's province because as I said, he was the lead attorney. He was the one that visited most often in the jail, not me.

Q. Do you remember anything about Mr. Bigeck's demeanor when you met with him with the State's Attorney?

A. There were times during his testimony -- during his interviews with the State's Attorney, and I believe there was one or two investigators

Page 231

there where he was hesitant to answer. I seem to recall that, and I -- we had to tell him that if he was going to get the deal, he couldn't be hesitant. He had to tell them everything.

Q. Do you remember anyone telling him that he could be charged with perjury if he didn't tell the truth?

A. I don't recall that.

Q. Do you remember who wrote the proffer letter?

A. No, I don't remember who wrote it. I assume it was an investigator who wrote it.

Q. Okay. And in the proffer letter that you read earlier --

A. Which one?

Q. Or actually, you know, I'm sorry. I'm going to direct you to that, to the sentencing agreement.

A. I don't have that.

Q. Does this have a date?

A. I don't see a date on it, no. Oh, up at the top, it says January 2, '98. It's printed and sort of like when it was photocopied on that day or something. I have no idea if that was the date or

Page 232

not. I don't recall.

Q. Right. Do you remember what date this was signed?

A. I have no idea what date it was signed.

Q. And where it says that the State agreed that Mr. Bigeck could receive up to a 100-year sentence from Judge Moran, which, in effect, means he will die in prison, is that typical language for a plea agreement?

MS. O'BRIEN: Objection.

THE WITNESS: Well, as I said before, I handled very few murders, and usually I didn't have a plea agreement like this. But under the circumstances with Judge Moran, who is considered a very harsh sentencer, I would imagine there would be a written plea agreement.

BY MS. HAGY:

Q. Did you tell Mr. Bigeck that Moran was a harsh sentencer?

A. Of course I did. As a matter of fact, I recall that the State and I went in there with an agreed number of years, and Judge Moran added five years to it, which angered me a little bit, but what was I going to do? There was nothing I could

Page 233

do about it because if we went to trial, then he was looking at 20 years being added to the sentence as opposed to the five.

Q. And did you ever observe Mr. Cassidy interacting with any of the other defendants in this case?

A. No. I don't even recall any of the other defendants being present when we were present because I think we were severed. So all I remember is that Mr. Vitale, Mr. Bigeck, myself and Mr. Cassidy or Mr. Linehan. That's all I remember and, of course, Judge Moran.

Q. So you didn't observe him interact with any other defendant in this case?

A. No, I never observed that.

Q. Were you ever informed that Mr. Cassidy visited Mr. Bigeck in prison?

A. You mean in county jail?

Q. No, in prison.

A. Oh, afterwards?

Q. Yes.

A. No, I was never informed of that.

Q. And did you know that he visited him in prison on September 8, 1998?

59 (Pages 230 - 233)

Page 234

MR. LYDON: Objection. Asked and answered.

THE WITNESS: I have no recollection of being informed of that.

BY MS. HAGY:

Q. Okay. Does that surprise you?

A. What do you mean by surprised?

MR. LYDON: Object to the form of the question.

THE WITNESS: I don't know what you mean. That Mr. Cassidy would visit him?

BY MS. HAGY:

Q. Yes.

A. I don't even know if anybody ever told me about it, so I don't -- I can't tell you if I was surprised or not.

Q. Did they seem friendly at all?

A. You mean Mr. Cassidy and Mr. -- no, because when I was present, Mr. Cassidy approached me to talk to Mr. Bigeck. It was never any conversation directly between Mr. Cassidy and Mr. Bigeck with me just standing there wondering what was going on.

Q. Did you -- when you met, had the meetings with Mr. Bigeck and the State's Attorney in August 1996, do you remember what that room was like?

Page 235

A. No.

Q. Do you remember if it was a big room?

A. It might been about half the size of this. I just don't recall.

Q. And do you remember how you were positioned in the room?

A. No. All I know is I was next to my client. That's -- I don't know if we were sitting on the side or if we were sitting at the head of the table. I don't recall.

Q. Okay.

A. I think Mr. Vitale was there, too, and I think Mr. Bigeck sat between the two of us.

Q. Okay.

A. That's my best recollection.

Q. Okay. Do you remember Mr. Bigeck saying at his sentencing hearing in his statement of elocution that he would trade places with the victims if he could?

A. Yeah. And as I scanned through it today, I recall that he said he prayed for them and that, you know, he was extremely remorseful. And I could see that because like I said before, he brought a baseball bat. He didn't bring -- I guess you can

Page 236

consider a baseball bat a deadly weapon depending on how you use it, but compared to the two weapons, the two firearms the other young men had, Mr. Bigeck certainly wasn't the cause of their death, although he was accountable for their death under the law because he went with them with the intent of doing something like that.

Q. And did you know that -- you knew he had given a inculpatory statement, right?

A. Yes.

Q. Did you know whether any other defendants had given an inculpatory statement?

A. I probably -- I know for a fact I would have gotten that in discovery, but I can't give you a 100 percent answer right now because as I said, it was almost 30 years ago. Mr. Vitale had the files. He's passed away. I have no idea what happened to his files. If he got rid of them years ago or if his estate got rid of them, I have no idea.

Q. And did you learn -- is it fair to say that the State's Attorney was open to cooperating with Mr. Bigeck, to having him cooperate with them?

A. I would say so because like I said,

Page 237

Mr. Bigeck was the only one that brought a baseball bat to a gun fight, so -- and I know that sounds a little frivolous, but that's exactly what happened.

Q. And he had also already given an incriminating statement, right?

A. Yes. We found out once we got the discovery that there was a typewritten and signed statement by Mr. Bigeck on -- I believe he gave it almost on the day of the arrest, so...

Q. And Mr. Bigeck was your client, right?

A. He was Mr. Vitale's client first, and then Mr. Vitale brought me in. I can't -- I don't remember exactly how long after Mr. Bigeck became Mr. Vitale's client that I came into the case, but it was somewhat after, not too long, but somewhat.

Q. No other defendant in this case was your client, right?

A. I didn't even know about the other defendants until I started reading the statements.

Q. Your job was to get the best result you could for Mr. Bigeck, right?

A. Mr. Bigeck was my only concern. My concerns weren't the other guys or what happened to them.

60 (Pages 234 - 237)

Page 238

Q. And at this time did you -- did you trust Mr. Cassidy?

A. Well, I had no reason not to trust him. I thought -- you know, I dealt with Mr. Cassidy on a couple of occasions prior, and he always seemed to be very honorable in his dealings, so I had no reason to distrust him.

Q. And is it fair to say that you testified earlier that if you had an issue with Mr. Cassidy, you would have raised that to Mr. Cassidy?

A. I would have taken Mr. Cassidy out in the hallway, and we would have had a talk, and I believe Scott would have preferred it that way. I don't mean to call him Scott. I seem to believe that Mr. Cassidy would have preferred it that way.

Q. He would have wanted you to raise your complaints about him to him?

A. To him instead of bringing it up to the Court or anything. And only if I wasn't satisfied with the way he would respond to that, then I would bring it to the attention of the Court.

Q. Okay. And do you -- sorry. I lost my place.

A. Take your time. Remember the countdown.

Page 239

Only seven hours.

Q. Do you know why -- do you know when the proffer letter was signed?

A. I don't recall at all, and if the date isn't on the letter, I would not have any idea when it was signed.

Q. Do you know why there were two meetings that discussed the proffer letter?

MS. O'BRIEN: Objection. Misstating the evidence.

MR. LYDON: Calls for speculation, too.

THE WITNESS: All I can say is I don't recall why there were two meetings. I think the first one was kind of like an, if you will, introductory-type meeting where Mr. Bigeck told the prosecuting team what he knew, and the second one was where there was a proffer letter, and it was an official meeting. That's what I think happened. I'm not 100 percent sure.

MS. HAGY: Okay. I'm going to need a minute to go over my notes. If we can take just a five-minute break until 3:50.

THE VIDEOGRAPHER: This ends media unit 4. Now going off the record at 3:44 p.m.

Page 240

(Whereupon, a short break was taken.)

THE VIDEOGRAPHER: This begins media unit 5. Going back on the record at 3:52 p.m.

BY MS. HAGY:

Q. When you negotiated the proffer with the State, did you understand that to achieve that proffer, Mr. Bigeck had to give the State information in addition to what they already had?

A. Yes.

Q. Okay. Did you determine whether or not he --

MR. LYDON: As a late objection, foundation as to what the state's attorneys were seeking.

BY MS. HAGY:

Q. Did they communicate that to you?

A. No. It just seemed to be the natural process. I mean, what's the purpose of a plea negotiation if all he was going to do is tell them what was in the police reports?

Q. So you had the impression after meeting with the State's Attorney that they wanted additional information?

A. Well, that's --

Page 241

MR. LYDON: Again, objection. Foundation.

THE WITNESS: That would only be the natural thing to assume.

BY MS. HAGY:

Q. And did you -- how did you determine whether Mr. Bigeck had information beyond what he had already told them?

A. Well, Mr. Vitale, I believe, told him that because he was the one that spoke most often to Mr. Bigeck.

Q. Did Mr. Cassidy communicate to you or Mr. Bigeck that they thought he had more information than what he was giving?

MR. LYDON: Object to the form.

THE WITNESS: I don't believe Mr. Cassidy related anything like that to me, and I was never told that he talked directly to Mr. Bigeck without me or Mr. Vitale being present, so I have no idea if that happened or not.

BY MS. HAGY:

Q. But at some point, he thought that Mr. Bigeck was holding things back?

A. Yes, I think so because I think Mr. Cassidy and Mr. Vitale and I had a conference

61 (Pages 238 - 241)

Page 242

outside the conference room regarding that.

Q. And did he identify topics on which he thought Mr. Bigeck was holding information back?

A. I don't recall. I don't recall the specifics of the conversation. I just remember going out there in the hall with him.

Q. Okay. And is it fair to say that a lot of the communications with Mr. Cassidy were Mr. Cassidy asking Mr. Bigeck questions?

A. Yes, and I think maybe an investigator asked a few questions, too.

Q. Do you remember Mr. Linehan asking any questions?

A. I don't recall Mr. Linehan being -- asking any questions at all. I just remember him being there.

Q. Do you remember seeing Mr. Cassidy and Mr. Linehan talking to each other?

A. I don't recall. I'm sure they did, but I don't recall seeing it.

Q. Was -- did it appear -- did you have -- strike that.

From what you observed, was Mr. Cassidy leading the investigation into what Mr. Bigeck

Page 243

knew?

MR. LYDON: Object to the form.

THE WITNESS: All I know is that Mr. Cassidy asked most of the questions.

BY MS. HAGY:

Q. Okay.

A. I don't know who was the leader or who was the observer. I have no idea.

MS. HAGY: That's all that I have right now.

FURTHER EXAMINATION

BY MR. LYDON:

Q. Mr. Zuganelis, if you look at Exhibit 10 again, this investigative report that has refreshed your recollection on the proffer meetings in August 1996 --

A. Is this the one you're talking about?

Q. Yes.

A. Okay.

Q. And again, just to be clear, this investigative report states that you were present for both of the interviews that occurred on August 12th and August 29th of 1996; is that correct?

A. That's what it says, yes.

MS. HAGY: Objection. Form.

Page 244

THE WITNESS: I'm sorry. I didn't mean to interrupt you.

BY MR. LYDON:

Q. And those were the two meetings that led to the plea agreement, correct?

A. I believe so, yeah.

Q. And Ms., is it, Hagy showed you some testimony from Bigeck regarding Vitale being present for all of the meetings or most of the meetings, something to that effect.

A. I think --

Q. Hold on. Do you remember that? Do you remember her asking you that?

A. I remember her showing me that.

Q. And is it fair to say that Mike Vitale may have been present for subsequent trial prep sessions with Mr. Bigeck without you present?

A. Yes.

MS. HAGY: Objection.

THE WITNESS: I'm sorry.

BY MR. LYDON:

Q. But looking at this report, you have no reason to disagree that you were present for the proffer interviews with Mr. Bigeck and the State's

Page 245

Attorney's Office, correct?

MS. HAGY: Objection. Form.

THE WITNESS: I have no reason to disagree with that. Otherwise, it wouldn't be there.

BY MR. LYDON:

Q. No reason to believe that the investigator, DiCiolla, made up the fact that you were present for both of the proffer meetings in August of 1996?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: State that again, please.

BY MR. LYDON:

Q. You have no reason to believe that Investigator DiCiolla in this investigative report made up the fact that you were present at both proffer meetings in August of 1996?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I would have no reason to believe that Investigator DiCiolla would make that up.

BY MR. LYDON:

Q. Now, Ms. Hagy asked you questions about a subsequent meeting with Mr. Bigeck in late September of 1996 where Mr. Bigeck's attorneys were not present. She asked you about that

62 (Pages 242 - 245)

Page 246

investigative report, correct?

A. I believe so, yes.

Q. And by the end of September 1996, Mr. Bigeck had already entered into a plea agreement with the State's Attorney's Office, correct?

MS. HAGY: Objection. Form.

THE WITNESS: I believe so, yes.

BY MR. LYDON:

Q. And at that point, Mr. Bigeck was a witness in the double murder case; is that correct?

A. Yes.

Q. And so there's a difference between authorizing your client to speak to the State's Attorney's Office without you present when you're talking about a criminal defendant who is not under a cooperation deal and the state's attorneys speaking to a defendant that is under a cooperation deal in the context of being a witness and prepping for trial?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: There's a big difference between the two.

Page 247

BY MR. LYDON:

Q. And what's the difference?

A. Well, the difference is that one is a defendant is still in jeopardy of conviction in which case he could assert his Fifth Amendment right to silence, and the other one is where he is cooperating with the State, and he's waived his Fifth Amendment right to silence.

Q. In any event, you don't know if Mr. Vitale had authorized prep sessions between Mr. Bigeck and the State's Attorney's Office without Mr. Bigeck's attorneys being present when -- after Mr. Bigeck was under a plea deal and was prepping as a witness?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I have no idea if Mr. Vitale did that, and there's no way of finding out now.

BY MR. LYDON:

Q. That wouldn't have been unusual, though, for Mr. --

A. Sorry. I thought I turned this damn thing off. Sorry.

Q. That wouldn't have been unusual where your client is under a plea deal and is a witness

Page 248

prepping for trial to allow the state's attorneys to speak with him to prepare him for testimony without an attorney being present?

A. Right, because if it were the other way around, I wouldn't want the state's attorney sticking his nose into what I was trying to prep a client or a witness.

Q. Ms. Hagy asked you some questions about our meetings within the last six months?

A. Yeah.

Q. Did we make any promises to you?

A. No. You just bought me coffee.

Q. Did we put any words in your mouth?

A. No. You just bought me coffee.

Q. Did we ask you to tell the truth?

A. Well, no. I just think you assumed I would tell the truth. You didn't really ask me, and I just assumed I would tell you the truth.

Q. And have you told the truth here today about what you recall and what you don't recall?

A. I told the truth as best as I can recall it.

Q. And you told the truth about your practice and what you would have done under certain

Page 249

circumstances?

A. Yes.

Q. And you do have a specific recollection of being present while Mr. Bigeck was proffering, correct?

MS. HAGY: Objection. Form.

THE WITNESS: Yes, I do.

BY MR. LYDON:

Q. And Ms. Hagy was asking you questions about the conferences and the hall -- conferences in the hall with Scott Cassidy and his purported belief that Mr. Bigeck may have been holding back.

In connection with that impression, you never observed Mr. Cassidy or anybody -- any other prosecutor or investigator coerce Mr. Bigeck into saying anything?

MS. HAGY: Objection. Form.

THE WITNESS: Not only would I have never -- did I never observe it, I would never have allowed it.

BY MR. LYDON:

Q. And she asked -- Ms. Hagy asked you about your job in terms of defending Mr. Bigeck was to obtain the best result for Mr. Bigeck's interest?

63 (Pages 246 - 249)

Page 250

A. That is my job to mitigate his jeopardy.

Q. And to obtain the best result for Mr. Bigeck?

A. Right.

Q. That would require Mr. Bigeck to tell the truth?

A. Exactly.

MS. HAGY: Objection. Form.

THE WITNESS: Sorry. I answered too quickly for you.

BY MR. LYDON:

Q. And that's what you saw Mr. Bigeck do when he spoke to the State's Attorney's Office as far as tell the truth?

A. That's what I --

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: That's what I observed, yes.

BY MR. LYDON:

Q. So you don't recall -- given the age of this case, some of the details of the meetings with Mr. Cassidy, would your memory have been fresher of the details of those meetings in 1996 if you had been contacted before we did six months ago?

A. I'm sure if I had been contacted prior to

Page 251

six months that somebody would have shown me the reports -- the memorandum of reports and stuff like that, that would refresh my recollection.

Q. Your memory would have been fresher if someone contacted you from the State's Attorney's Office or attorneys for Sopron if they contacted you, let's say, five years after Mr. Bigeck's conviction?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Yes, but the first time I was contacted is when Mrs. O'Brien contacted me about --

BY MR. LYDON:

Q. Six months ago?

A. -- six to eight months ago the first time. I had completely forgotten -- not only that I represented Mr. Bigeck, I had forgotten his name.

Q. And you had no idea Mr. Bigeck had recanted his testimony?

A. I had no idea of that.

Q. You had no idea that the state's attorneys had dismissed the convictions that Mr. -- for the trials that Mr. Bigeck testified in?

A. No.

Page 252

MS. HAGY: Objection. Form.

THE WITNESS: I'm sorry. No. I had no idea that any of that happened.

BY MR. LYDON:

Q. Mr. Vitale never told you that anyone had contacted him?

A. He never --

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Sorry. He never told me -- sorry.

BY MR. LYDON:

Q. That's all right. Take your time.

A. I hit the wrong button. First I hit answer, and I heard hello. I had to hang up.

No, Mr. Vitale never told me, and then he passed away without me ever knowing.

Q. So --

A. Jesus. Stop.

Q. Whenever you're ready.

A. I'm trying to turn this damn thing off.

Q. Were you aware that Matthew Sopron's attorney, Patrick Walsh, met with Mr. Bigeck in 2016?

A. No. I know Pat Walsh, but I -- I mean,

Page 253

not that well, but I know of him, and nobody ever told me that he had met with Mr. Bigeck. Nobody -- as a matter of fact, like I said, until Mrs. O'Brien contacted me and mentioned Bigeck, I had even forgotten his name. It's been so long.

Q. So after 2016, Mr. Walsh didn't reach out to you regarding some allegations that Mr. Bigeck made about the meetings you were present at?

MS. HAGY: Objection. Form.

THE WITNESS: I was never contacted, no. Whether they contacted Mr. Vitale or not, I don't know, but I think by that time, Mr. Vitale had dementia. I think. I'm not sure 100 percent.

MR. LYDON: That's all.

MS. O'BRIEN: I just have a few questions.

THE WITNESS: Sure. Just a few now.

FURTHER EXAMINATION

BY MS. O'BRIEN:

Q. Once the sentencing agreement was signed, your client, Bigeck, was transferred to the witness quarters; isn't that correct?

A. That was my understanding, yes.

Q. Have you ever had any clients before him placed in the witness quarters?

64 (Pages 250 - 253)

Page 254

A. No.

Q. You are aware that the witness quarters are the Cook County's State's Attorney's witness quarters, which are located in Cook County Jail?

A. Yes.

Q. So your client was taken out of general population and put in a -- like a safe and secure witness quarters within that jail?

A. That was my --

MS. HAGY: Objection to form.

THE WITNESS: That was my understanding of what that meant, yes.

BY MS. O'BRIEN:

Q. And so after you made the deal and after he signed off on it, he was -- as stated before, your client was essentially a witness in the case?

A. Yes.

MS. HAGY: Objection. Form.

BY MS. O'BRIEN:

Q. He was not regularly brought out to court. His appearance was waived by either you or Vitale; isn't that fair to say?

A. If I remember correctly, I think you're right. We also moved for severance, so if -- I

Page 255

don't recall if that was granted. I think it was, so we would haven't been have been in court at the same time the other defendants were in court.

Q. Is it fair to say, though, when your client's case was up, his appearance was generally waived because he was in the witness quarters, and you had already worked out the deal?

A. Right.

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I think so. I don't have 100 percent recollection of that. I think by that time, it was Mr. Vitale who attended most of the court proceedings.

BY MS. O'BRIEN:

Q. And you would not have expected to be present for trial preparation or motion preparation if your client was going to testify; is that fair to say?

A. That's very fair to say because those issues would have been off the table at that time.

MS. O'BRIEN: Nothing further.

MR. MASCIOPINTO: I have just a few.

Page 256

FURTHER EXAMINATION

BY MR. MASCIOPINTO:

Q. I neglected, sir, to ask you questions about a William Moser, M-o-s-e-r.

So my question for you is at any point, did you know an individual by the name of William Moser who worked or still works at CPD?

A. I have no idea who William Moser is.

Q. Any reason to believe that William Moser was involved in any of your meetings while you represented Billy Bigeck between, you know, early 1996 through the conclusion of your representation?

A. Well, as I said, I have no recollection of who he is. I have no reason to believe he was there or not there. I just don't know.

Q. Okay. But as you sit here today, you have no reason to believe you had any interactions with a CPD individual by the name of William Moser, fair?

A. That's fair.

MR. MASCIOPINTO: Okay. I have nothing further.

MR. LYDON: Is that it?

MR. HERACLLIS: Nothing further.

Page 257

MS. KUNZER: Nothing further.

THE WITNESS: The quiet girl from the City?

MS. BRODY: Nothing further.

MR. LYDON: Anything, Lindsay?

MS. HAGY: Yeah, I just -- sorry. A couple more.

THE WITNESS: Go ahead.

MS. HAGY: No. I'm sorry. I'm done.

MR. LYDON: Do you want to advise him of signature?

So, Mr. Zuganelis, you can either reserve signature or waive signature. If you reserve signature, the court reporter will send you a copy of the transcript. You'll get to read it. You can make any typographical changes, or you can trust that she took down everything here accurately today and waive signature. It's up to you.

THE WITNESS: I waive signature.

THE VIDEOGRAPHER: This concludes today's proceedings. Now going off the record at 4:10 p.m.

(FURTHER DEPONENT SAITH NAUGHT.)

65 (Pages 254 - 257)

Page 258

STATE OF ILLINOIS )
          ) SS:
COUNTY OF C O O K )
    I, GINA M. LUORDO, a notary public within and for the County of Cook County and State of Illinois, do hereby certify that heretofore, to-wit, on March 15, 2023, personally appeared before me, at 151 North Franklin Street, 25th Floor, Chicago, Illinois, GEORGE ZUGANELIS, in a cause now pending and undetermined in the United States District Court for the Northern District of Illinois, wherein MATTHEW SOPRON, et al. are the Plaintiffs, and SCOTT CASSIDY, et al. are the Defendants.

    I further certify that the said GEORGE ZUGANELIS was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness as aforesaid.

Page 259

    I further certify that the signature to the foregoing deposition was waived by counsel for the respective parties.

    I further certify that the taking of this deposition was pursuant to notice and that there were present at the deposition the attorneys hereinbefore mentioned.

    I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

    IN TESTIMONY WHEREOF:  I have hereunto set my hand and affixed my notarial seal this 29th day of March, 2023.

          NOTARY PUBLIC, COOK COUNTY, ILLINOIS
          LIC. NO. 084-004143

[& - 1996]                                                                 Page 1

**&**

**&**  2:2,6,11,17
3:2,9,16 7:17
7:23,24

**0**

**001423**  4:20
**001424**  4:18
**001444-1460**
6:4
**001463-1468**
4:22
**00320**  1:12
**004850-4671**
4:24
**006143**  6:7
**006144-6146**
5:9
**008871**  206:14
**012353**  5:13
**012899-12900**
5:16
**012902**  5:21
**012905**  5:23
**022374**  5:5
**022660**  5:7
**05525**  1:8
**08254**  7:9
**084-004143**
1:24 259:21
**0854**  1:5

**1**

**1**  7:3 37:21
49:11 54:13
131:6

**10**  5:8 14:20
33:9 39:18
78:17,22
111:22,23
112:10 168:15
168:18 179:16
181:16 184:5
186:23 187:20
188:3,5 208:22
209:2 243:12
**100**  30:13
47:12 50:8
54:7,8 59:6
88:20 90:13
91:13 92:5
107:20 119:6
132:3 146:19
150:11 153:11
153:20 157:20
229:4 232:6
236:15 239:19
253:13 255:10
**105**  5:10
**106**  5:15
**10:08**  1:21 7:2
**10:56**  54:14
**11**  5:10 9:11
105:2,5,12
**111th**  35:14
**11:09**  54:18
**11:30**  113:5
**11:33**  76:11
**11:39**  76:15
**12**  5:15 71:12
73:18,22 75:2

85:15 106:15
106:18 107:4
107:16 147:12
148:5 178:24
179:4 187:5
210:17
**12/16**  40:18
**12354**  5:14
**128**  5:17
**12:12**  111:7
**12:30**  71:13
73:22
**12th**  73:11
79:17,19 80:17
82:3 91:16
113:24 148:4
169:23 182:6
188:22 208:9
210:5 243:22
**13**  5:17 56:10
128:21 129:1,4
132:14 197:16
**1300**  2:19
**136**  5:19
**139**  5:22
**14**  5:19 136:10
136:14 137:7
**145**  6:3
**15**  5:22 7:3
132:8,11
139:13,17
219:17 258:7
**151**  1:19 2:7
7:10 258:8

**15th**  1:20
**16**  6:3 20:9
37:20,22 134:9
139:2 145:10
145:14 151:21
151:24
**161**  3:4
**168**  4:5
**17**  6:5
**178**  4:6
**18**  6:6 211:24
212:4 213:1
214:1 222:8,14
**181**  4:7
**183**  4:8
**1830**  3:12
**1838**  36:5 58:6
114:14 137:20
**1838-01**  35:5
**19**  1:5 5:5,7 7:9
**194**  4:9
**1948**  9:11
**1969**  14:17
**1970**  14:6
**1975**  15:9,10
**1978**  15:22
**1983**  19:3
22:24
**1995**  27:5
207:15 219:7
219:17 222:8
222:15
**1996**  5:4 31:13
33:9 37:20
39:18 52:8

**[1996 - 4]**                                                                  Page 2

67:20 71:13
73:11,18,22
75:2 79:17,20
80:18 82:3
85:15 91:16
106:6 107:8
113:5,20 114:4
120:5 125:4
134:9 139:2
147:12 148:5
163:6 169:23
177:16 178:24
179:4 182:6
184:14 185:7
185:19 187:5,5
190:22 191:3
191:13,23
192:7,20 205:3
207:16 208:9
210:18 212:15
213:1,15 214:1
218:3 220:3
234:24 243:15
243:22 245:9
245:16,23
246:3 250:22
256:12
**1998** 41:21
140:10 144:21
145:21 147:13
148:6 152:9
156:1 175:24
176:16 206:24
224:15 233:24

**1:15** 111:11

**2**

**2** 54:17 111:6
138:10,13
218:7 231:22
**20** 5:4 26:16
43:16 52:8
129:9 132:7
197:24 203:15
213:15 233:2
**2000** 20:2
**2000s** 26:17
217:11
**2001** 224:1,5
**201-6447** 2:20
**2015** 20:2,8
132:8,11
**2016** 20:2,10
252:23 253:6
**2023** 1:21 7:3
258:7 259:14
**21** 1:8
**212** 6:6
**22** 1:12
**225** 2:19
**230** 2:12
**23689** 35:16
**239-6400** 35:15
**243** 4:10
**243-5900** 2:4
**25** 112:9
113:10 186:5,7
**2500** 1:20 2:7
3:4

**253** 4:11
**254** 4:12
**25th** 258:8
**26** 106:6 107:8
169:8
**2620** 2:12
**26th** 17:22 24:5
24:12 30:24
31:1 33:10
40:22 41:13
**27** 144:21
145:21 147:13
148:6 152:9
176:22 212:15
224:15
**27th** 41:21
**28** 13:6
**29** 113:4,20
114:4 125:4
169:23 182:6
187:5 208:9
210:17
**29th** 114:1
120:4 123:13
188:22 210:6
243:22 259:13
**2:11** 168:7
**2:18** 168:11
**2:41** 189:14
**2:43** 189:18

**3**

**3** 111:10 168:7
206:24
**30** 76:3 91:14
103:10 129:10

129:10 131:12
143:10,10
149:22 150:9
150:10,12
155:20 167:16
176:22 186:7
192:1 193:2,6
195:15 201:15
211:2 213:21
219:1 229:16
230:2 236:16
**31** 20:8
**311** 2:3
**312** 2:4,8,13,20
3:5,13,18
35:15
**3200** 3:17
**33** 3:12 4:17
**3333** 35:14
**35** 17:11
**3500** 17:11
**36** 4:19
**38** 19:21 21:9
21:18 22:3
26:22
**39** 4:21
**3:44** 239:24
**3:50** 239:22
**3:52** 240:4
**3rd** 2:3

**4**

**4** 4:17 33:16,20
34:14,22 35:17
168:10 218:8
218:10 239:23

**[40 - admissibility]** Page 3

| | | | |
|---|---|---|---|
| **40** 199:11 | **6143** 211:19 | **98** 231:22 | **act** 53:23 91:3 |
| **413** 5:13 | **641-0300** 3:5 | **a** | 102:19 |
| 105:16 | **7** | **a.m.** 1:21 7:2 | **acted** 90:9 |
| **444** 3:17 | **7** 4:23 48:9,12 | 54:14,18 76:11 | 149:15 |
| **48** 4:23 | 49:2 50:3 | 76:15 113:5 | **acting** 183:1 |
| **4:10** 257:20 | **704-3000** 2:8 | **aberdeen** 2:3 | **activities** 14:8 |
| **5** | **72** 5:6 | **ability** 184:20 | **actual** 203:17 |
| **5** 4:19 36:11,15 | **725** 75:13 77:2 | **able** 11:18 | **actually** 33:7 |
| 36:22,22 240:3 | **74** 9:13 | 86:23 133:5 | 57:24 61:11 |
| **5,000** 21:10 | **7766** 13:1 | 209:24 | 62:7 130:14 |
| 230:4 | **78** 5:8 | **abolished** 22:1 | 148:5 163:16 |
| **5/106** 75:15 | **7832** 259:19 | 44:5 | 172:21 176:23 |
| 77:2 | **8** | **above** 189:24 | 199:9 231:16 |
| **50** 150:19 | **8** 5:3 51:19,22 | **abrody** 3:13 | **add** 160:2 |
| **50/50** 26:3 | 51:23 233:24 | **absolutely** | **added** 130:6 |
| **5001** 49:11 | **8/29/96** 125:21 | 102:9 121:16 | 232:22 233:2 |
| **51** 5:3 | **80** 132:11 | 134:1 | **addition** 57:22 |
| **596-5884** 3:18 | **800** 19:16 | **accept** 127:7 | 82:15 202:12 |
| **6** | **80s** 26:16 | 189:22 | 240:9 |
| **6** 4:21 37:21 | **8254** 5:5,7 | **accountable** | **additional** 51:7 |
| 39:5,9,10,24 | **84** 19:3 22:24 | 56:5,12 198:19 | 51:14 52:12,12 |
| 48:16 | **9** | 236:5 | 118:19 240:23 |
| **600-5588** 2:13 | **9** 4:4 5:6 72:6,8 | **accurate** 11:22 | **address** 12:23 |
| **60601** 3:4 | 72:15 91:8 | **accurately** 10:2 | 19:17 31:2 |
| **60603** 3:12 | 188:13,16,21 | 10:7 257:16 | 34:6 38:1 |
| **60606** 2:8,13 | 189:11,23 | **accuse** 96:22 | 152:7,8 |
| 3:17 | **90s** 30:20 | 121:21 122:3 | **adjusting** |
| **60606-3408** | 177:19 217:11 | **achieve** 240:7 | 171:22 |
| 2:19 | **95** 40:18 | **acknowledge** | **adjustment** |
| **60607** 2:3 | **96** 35:5 36:5 | 41:15,16 | 151:3 |
| **60631** 13:2 | 58:6 112:9 | **acknowledging** | **administer** |
| **60655** 35:15 | 113:10 114:14 | 77:23 | 8:19 |
| **612-1928** 3:13 | 137:20 | **acquisition** | **admissibility** |
| | | 75:9 | 75:22 77:9 |

**[admissible - andrews]** Page 4

admissible
  75:10
admitted  15:23
  16:20 216:15
admonished
  58:17
advance  60:2
  89:5 153:2
advice  85:21,24
  117:4 128:4
  152:22 214:21
advise  102:7,21
  102:22 128:3
  128:10 142:22
  220:24 257:9
advised  75:18
  77:5 102:17
  138:17 164:4
  221:4
advising
  128:12
affect  75:21
  77:9
affidavits  157:2
affiliation
  157:16
affiliations
  7:15
affirmation
  49:19
affixed  259:13
afford  203:6,9
  203:10
afforded
  230:10

aforesaid
  258:18,24
afra  3:3
afraid  229:23
age  222:3
  250:19
ago  167:16
  169:8 184:16
  186:3,6 201:15
  201:21 211:2
  213:21 219:1
  229:16 230:2
  236:16,19
  250:23 251:14
  251:15
agree  29:23
  71:19 81:5,6
  81:10,10,11
  85:7 128:7
  132:2,6 166:6
  166:6,15,15
  167:5,6 188:10
  188:11,20
  189:1,6,8
  190:15,17
  191:5 194:11
  207:3 225:1
agreed  60:2
  75:3 85:10,13
  129:6,9 131:2
  131:5 134:14
  153:22 232:5
  232:22
agreement  5:17
  60:18,21 66:15

66:17,19 71:4
  73:1 75:12,21
  76:21 77:1,8
  77:10,17 84:13
  84:16 88:14
  124:22 126:23
  127:2,7,14
  128:11,16
  129:5,23 130:9
  130:23 134:4,9
  138:18 142:4
  148:1 150:13
  151:14 153:13
  173:4 189:6
  190:1,10,11,15
  224:19 231:18
  232:9,13,16
  244:5 246:5
  253:19
agreements
  196:3
agrees  75:1
  78:1
ahead  34:21
  86:21 185:22
  205:5 210:8
  214:7,8,14
  229:12 257:7
aided  258:21
al  1:5,9,13 7:6
  192:3,4,6
  258:12,13
allegations
  178:5,8 253:7

alleged  185:8
  216:9
alleges  185:4
  185:17
allow  93:14
  184:19 248:1
allowed  59:14
  74:10 89:1,4
  92:11,24 93:10
  96:19 97:3,10
  98:14 99:20
  101:10,16
  115:12,17
  120:11 121:3
  121:16 123:19
  124:9 128:15
  128:18 170:16
  171:24 172:5
  173:11 249:19
alluded  183:17
amasciopinto
  3:5
amendment
  109:10 247:5,8
amkunzer  2:20
amount  70:3
amy  2:18 8:4
  181:10
anderson
  137:15,21
  143:3 157:15
  166:8
andrews  2:15
  7:20 159:19,20

**[angered - arrest]** Page 5

angered 232:23
animosity
  224:10
ann 14:3
answer 5:10
  9:24 10:6,7,11
  10:22 43:4
  59:6 76:7 85:5
  91:1 92:5 98:3
  105:9,14
  107:13 117:6
  121:9 122:16
  146:19,23
  173:16 175:19
  214:9 231:1
  236:15 252:14
answered
  54:22 99:11
  121:8 160:15
  171:2,12 172:4
  173:22 174:16
  175:1 177:14
  211:13 214:14
  222:16 234:1
  250:9
answering 9:24
  94:11 104:19
answers 11:23
  92:3,9 97:24
  98:4
anthony 3:2
  192:14,17,19
antusas 1:12
  8:2,15 119:9
  119:10 164:20

165:24 166:16
176:9 177:11
177:11,16
206:22
anybody 136:2
  157:16 166:19
  180:21 204:12
  204:23 209:11
  209:12 216:1
  217:18 223:23
  227:21 229:23
  234:12 249:14
anybody's
  205:17
anymore 42:20
  217:9
anytime 163:16
  163:16 193:21
apart 202:20
apologize 50:1
  184:11 189:20
apology 189:22
appeals 17:5
  18:18
appear 26:9,12
  39:20 40:19
  41:13 49:14
  58:20,22 59:2
  129:4 206:14
  212:7,10
  242:21
appearance
  4:17,19 26:6
  33:9,13 34:1,9
  35:6,19 36:8

36:16,18,19
37:2,3,5 39:21
39:23 40:13
41:20 47:1
55:4 58:23
140:4 190:21
191:1 217:24
218:1,4,7,11,22
229:4 254:21
255:5
appearances
  2:1 3:1 7:15
  28:21,24 38:4
  59:1,15
appeared 26:10
  40:18 58:20
  258:7
appears 37:20
  39:22 40:6
  49:16 77:23
  91:12,14
  105:14 107:1
appellate 16:15
application
  21:24
applying 21:23
approach 63:3
  64:22
approached
  56:21 63:15
  65:2,21 221:7
  221:9,15,18,19
  222:1 234:17
approaching
  63:9 65:20

approve 29:10
approximately
  12:6 19:2 21:7
  22:23 26:13,18
  31:12 33:8
  71:13 73:22
  113:5
april 9:11
arbor 14:3
ardc 19:23
  155:22
area 13:13
  49:11
argenbright
  3:7 191:18,21
argued 16:14
arguendo
  99:12,15 100:6
  100:11 101:15
  123:23
argument
  153:6
arm 170:15
armed 25:16
arose 102:19
arraignment
  38:23 39:3
  40:23 41:7,8
  42:10 47:17
arrangement
  27:13
arrangements
  25:22
arrest 48:6
  237:9

**[arrested - attorney's]** Page 6

**arrested** 219:21,24 223:6

**arrival** 81:17

**asa** 4:18,20,22 6:4 164:12 213:23

**asas** 156:18

**ashley** 3:9 7:24 178:18

**asked** 54:21 92:3,7 99:13 100:10 117:6 121:8 124:2 160:14 171:2 171:12 172:4 173:22 174:16 175:1 177:14 178:9 182:4 183:18 184:3 184:11 186:21 195:12 196:11 204:15 211:13 213:3,4 214:13 220:13 222:16 234:1 242:11 243:4 245:21 245:24 248:8 249:22,22

**asking** 39:9 49:2 51:23 130:8 166:19 199:13 200:4 203:24 211:6,8 213:22 216:22

242:9,12,14 244:13 249:9

**assert** 247:5

**assessment** 53:6

**assigned** 39:2 41:11,18 42:11 84:1 195:21,23

**assist** 152:12

**assistant** 46:12 48:5 63:3 72:2 73:2 91:17 92:8,21 101:3 103:7 110:3 116:7 130:17 154:19 158:24 159:3,15,17,19 160:18 161:8 162:8,13 163:2 166:21 184:9 187:10 195:18 209:15 213:18

**assistant's** 52:5 83:15

**assume** 37:22 59:10 130:3 190:24 210:23 231:12 241:3

**assumed** 32:13 248:16,18

**assuming** 85:10 99:12,15 100:6 100:11 101:14 107:19 123:23 128:13 143:11

210:11

**atmosphere** 182:5

**attempt** 115:1 142:14

**attempted** 69:16

**attempting** 71:2,3 114:7

**attend** 13:24 14:2 15:13 112:21 208:16

**attendant** 112:5

**attended** 86:7 255:12

**attention** 30:15 31:12 33:8 67:19 110:22 238:21

**attitude** 171:22

**attorney** 7:16 8:5 16:7 35:6 35:14,16 38:1 46:6,12,16,19 50:18 52:6 57:5,14 63:4,9 63:16,22 64:14 68:8 69:2,12 71:23 72:3 73:2,2 75:3,6 78:7 80:8 83:16 89:8 100:24 103:2,8 103:24 114:13

130:17 150:16 158:24 159:17 159:19 160:6 162:14 163:2 166:22 168:20 170:21 179:8 179:10,21 180:6 181:1,12 182:13 184:10 185:18 188:6 192:8 205:21 209:15 213:15 213:19 214:1 214:12,22 215:11 216:5 219:13,16 220:5 221:8,18 226:6 228:18 230:17,21,23 234:23 236:22 240:22 248:3,5 252:22

**attorney's** 7:21 47:6,11 50:5 57:2,8 62:24 64:8,23 65:14 71:5,14 74:24 75:19 77:6,19 81:18 82:4,6 84:14 85:16 96:13 101:3 113:7 117:21 124:14 129:6 130:19 135:7 135:13,15,22

**[attorney's - bear]**

136:20 141:17 148:2,8 149:4 156:11 159:3 159:15 167:12 169:8 173:5,10 177:20 181:19 184:14 185:6 190:13,19 192:21 195:18 199:4 207:14 209:12 229:9 245:1 246:5,15 247:11 250:13 251:5 254:3

**attorneys** 7:18 47:3 48:6 65:11 68:3,15 81:5 84:11 86:18 87:20 91:18 92:9,21 104:4 110:4,13 114:19 116:7 124:19 125:6 136:5 138:17 142:12 154:19 160:19 161:9 161:16 162:8 167:7 174:9 175:4,21 177:4 177:11 187:8 187:10 194:20 194:22,24 195:2 199:7 200:9 204:4 205:3 208:24

217:12 221:21 240:14 245:23 246:17 247:12 248:1 251:6,21 259:6

**august** 41:21 67:20 71:12 73:11,18,22 75:2 79:17,19 80:17 82:3 85:15 91:16 106:6 107:8 113:4,10,20,24 114:1,4 120:4 123:13 125:4 126:4 134:13 140:10 144:10 144:21 145:21 147:12,13 148:4,5,6 152:8 163:6 167:11 169:23 169:23 178:24 179:4 182:6,6 183:22 184:14 186:15 187:4,5 188:22,22 191:3,12,23 192:7,20 205:2 207:14 208:9,9 210:5,6,18 224:14 234:23 243:14,21,22 245:9,16

**author** 187:14
**authorization** 127:2
**authorized** 211:14 213:6 213:11,17 214:4 216:21 247:10
**authorizing** 211:11 212:13 246:14
**automatically** 87:22
**avenue** 19:15 19:16
**average** 21:9
**avoiding** 203:9
**aware** 131:11 155:18 252:21 254:2

**b**

**b** 4:15 5:1 6:1 13:1
**back** 27:12 28:7 54:18 73:8 76:14 87:9 94:1 111:11 122:11 122:12 150:19 152:6 168:11 189:17 207:14 222:21 225:23 225:24 229:18 240:4 241:22 242:3 249:12

**background** 13:23
**badly** 116:15
**bajenski** 2:22 8:8 181:13
**bar** 15:23 16:21 21:22 77:11
**base** 54:3,4
**baseball** 44:15 56:4,12 198:16 227:8,11 235:24 236:1 237:1
**based** 30:8 51:14 56:23 64:20,20,21 79:14 80:7 88:15 108:9,13 108:18 131:14 150:15 153:12 188:23 190:9
**basic** 32:17,23
**bat** 44:15 56:4 56:12 198:16 227:8,11 235:24 236:1 237:2
**bates** 4:17,19 4:21,24 5:4,6,8 5:13,15,17,21 5:22 6:3,7 206:12,17
**bear** 34:4,6

**[beat - bigeck]** Page 8

**beat** 14:20,21
   229:20
**befall** 69:20
**began** 85:19
   86:24 141:6
   193:7
**beginning** 7:16
**begins** 54:17
   111:10 168:10
   240:3
**behalf** 8:4,9,11
   8:14,16 58:10
   110:3 126:7
   178:18 182:13
   194:11
**behavior**
   123:20 172:2
**belated** 63:24
**belief** 249:12
**believe** 31:17
   36:20 38:7
   41:22 42:1
   67:2,22 70:5,6
   106:11 109:3
   117:23 118:2
   121:23,24
   130:5,13
   134:19 135:10
   138:23 140:6
   143:14,23
   150:7,14
   151:17 154:3
   154:12 160:10
   164:23 172:20
   179:6 180:2

182:19,20
186:7,14
187:17,22,24
191:11,16,20
192:2,6,10,17
192:19,23
193:2 195:16
204:13 209:18
218:3 225:5
227:15 228:11
230:24 237:8
238:13,14
241:8,15 244:6
245:6,13,18
246:2,8 256:9
256:14,17
**believed** 56:9
   109:9
**bell** 119:10
   157:19 159:16
   159:20
**belong** 128:2
**bench** 21:5
**benefits** 165:13
**bennett** 49:23
**berwyn** 30:24
   31:1
**best** 3:16 116:8
   120:7 193:5,7
   193:10 235:15
   237:20 248:21
   249:24 250:2
**better** 76:17
**beuke** 45:21

**beyond** 241:6
**big** 14:20 194:2
   235:2 246:22
**bigeck** 4:23
   5:20 31:14,15
   31:18 32:18
   33:4 34:3,9
   35:4,7,14 37:4
   37:6 39:14
   41:19 42:3
   44:11 48:18
   49:7 53:3,7,19
   55:2 56:3,11
   56:13,18,20,22
   57:1,7,20
   58:19 60:11
   61:12 62:13,19
   64:7,11 67:4
   67:20 68:3,16
   70:2 72:19
   74:22 75:2,4
   75:10,20 77:7
   77:12,13,20,23
   78:8 85:12
   86:4,19,24
   89:7 91:10,17
   92:9,23 93:2,9
   93:17 95:3,8
   95:13 96:7,21
   97:6,12,20,24
   100:23 101:21
   102:3,8 104:4
   106:23 108:10
   109:2 110:12
   111:15 112:14

113:7,7,18
114:20 116:6
116:12,16
117:4,9,20,23
120:5,24 121:5
121:12,20
122:3,10,14,16
122:19,21
123:3,8,14
124:9 125:7
126:7 127:14
127:16 130:16
131:2,6,9,10,12
131:21,24
132:2,3,5,10
133:12 134:22
137:10,15,23
138:15 139:4
139:21 140:3
141:7,11,17
142:20,22
143:2,15
144:12 145:24
147:2,13
148:10,14
149:2 152:10
152:12 153:16
153:24 154:13
154:17 155:3,8
155:18,22
156:2,12,19,24
159:23 160:5
160:18 161:7
161:13,19,22
162:6 163:6,17

163:20,23
164:7,13,19
165:3,8,13,18
165:24 166:6,8
166:15,18,22
167:12,13
169:7,13
170:12,15
171:9 172:8,24
173:3,11,19
174:5 175:24
176:16,19,24
177:3,12,21
178:4 190:4,12
190:22 193:8,8
196:13,22,24
197:5 205:10
205:15 207:4,6
210:17 211:7
211:11 212:14
212:22,24
213:14,23
215:15,21
216:8,9,14,18
217:24 219:7
219:15 220:10
221:18 222:4
222:18 223:12
224:4,17,21
225:7,16,21
226:7,14,18,23
227:3 229:19
230:3,10 232:6
232:18 233:10
233:17 234:18

234:20,23
235:13,16
236:4,23 237:1
237:8,10,13,21
237:22 239:15
240:8 241:6,10
241:12,17,22
242:3,9,24
244:8,17,24
245:22 246:4
246:10 247:10
247:12 249:4
249:12,15,23
250:3,5,12
251:17,18,23
252:22 253:2,4
253:7,20
256:11
**bigeck's** 33:11
38:5 40:18
43:9 46:1
64:24 71:15,24
75:16 77:4,17
114:8,13 126:3
131:15 134:16
144:22 149:19
151:10 152:9
153:14 154:6
157:7 169:22
170:21 173:8
174:8 190:2
205:22 214:16
217:13 219:10
221:8 224:14
225:1,4 230:20

245:23 247:11
249:24 251:7
**bill** 41:10
150:17
**billy** 4:23 31:14
49:7 91:17
113:6 122:13
177:21 193:8
224:4 256:11
**binding** 131:16
**bio** 16:10
**birth** 9:10
**bit** 13:22 14:13
43:9 58:19
73:9 80:6
201:4 204:19
229:24 232:23
**blood** 11:15
76:1
**blurry** 37:22
**bond** 40:18,19
42:4,8
**born** 13:12
**bottom** 178:7
218:15
**bought** 200:6
248:12,14
**bowl** 14:22
**breach** 222:1
**break** 10:18,21
54:11,15 76:2
76:12 99:22
110:23 111:2,8
167:20 168:3,8
189:15 239:22

240:1
**breaking** 228:6
**breathing**
99:24
**bridgeview**
24:6,13
**brief** 193:18
**briefly** 16:9
**bring** 28:8
235:24 238:21
**bringing**
238:18
**broach** 63:5
**brody** 3:9 4:6
7:24,24 178:17
178:18,20,22
180:11 181:3
257:3
**brosnahan**
46:12 52:6
**brought** 65:10
82:7,22 235:23
237:1,12
254:20
**bryan** 119:17
**building** 17:23
18:3,4 24:13
31:7,8
**bullpen** 59:12
59:16,18
**bullshit** 96:8
100:8 121:6
**burglaries**
25:16

**[business - cassidy]**

| | | | |
|---|---|---|---|
| **business** 12:18 25:18,22 27:13 208:15 224:11 | **carried** 44:15 56:4 166:2 | 71:15,24 84:2 84:15,22 93:18 94:15,21 | 237:14,16 246:11 247:5 250:20 254:16 |
| **busy** 17:6 208:18 | **carry** 44:16 **case** 1:5,8,12 | 101:16 103:8 104:22,23 | 255:5 **caseload** 21:9 |
| **button** 252:13 | 7:8 8:2 25:8,15 25:24 26:5,6,8 | 105:10 106:23 109:22,23 | **cases** 7:7 8:10 17:22 18:2,10 |
| **c** | 27:23 28:1,3,5 28:8,16 29:12 | 114:8,14 117:10 127:21 | 20:20,22,24 21:10 22:16 |
| **c** 8:17 16:8 184:6,13 185:5 187:15 258:3 | 29:15 31:15 32:4,10,18,23 | 134:17 137:23 140:4,9 141:7 | 23:5,8,11 24:24 25:1,3,7 |
| **cab** 4:24 5:13 5:16,23 | 33:2,11 34:2 34:10 36:8,17 38:5,10 39:13 | 142:13 143:12 144:22 145:2 | 25:11,13,17 26:11,18 27:6 |
| **california** 17:22 24:5,12 | 41:2,3,20 42:10,11 43:9 | 150:10 156:5 157:6,7,7,12,18 | 27:15 38:17,21 43:2,5 46:15 |
| 33:10 40:22 41:13 | 43:9,12 44:20 46:1,7,16,17 | 157:22 158:11 158:15 172:10 | 46:21 66:9 70:8,11 80:12 |
| **call** 11:13 22:15 25:2 | 47:3,10 49:15 50:4,18 51:4 | 175:4,5,22 176:2,5,24 | 80:15,15 142:15,24 |
| 26:1 28:4,4 32:18 48:9 | 51:10,17 53:2 53:3,7,17,23 | 183:20 185:4,9 185:10,14 | 144:3,6 150:18 156:18 180:9 |
| 238:14 | 54:1,2,23 55:1 55:5,6,9,14,22 | 190:18 194:21 194:24 195:1 | 195:20,23 201:22 202:7 |
| **called** 1:16 59:11 119:20 | 56:1 57:3,13 57:23 58:6,15 | 196:18,21 197:10,15,19 | 202:10,12,16 202:18,20,24 |
| 178:9 195:12 196:10 | 58:22,24 59:9 60:2,24 61:6 | 199:5 201:5,9 201:11 202:5,8 | 203:10 208:20 217:8 223:13 |
| **calls** 217:15 239:11 | 61:18 62:5,13 62:18 63:5 | 206:15,17 215:8,14 | **cassiday** 1:13 70:13 97:19 |
| **campbell** 157:8 | 64:8,14,24 66:3,6,13,14,23 | 217:13 218:22 219:13,21 | **cassidy** 1:5,9 2:9 7:6 8:12 |
| **capital** 21:21 **care** 11:9 168:1 | 67:21,24 68:4 68:15 69:3,7 | 220:1,2,6,11,15 224:5,14 | 67:4 69:23 70:1 71:3,15 |
| **career** 43:6 202:18 230:5 | 69:12,18,19 70:2,3,9,13,23 | 226:21 228:21 233:6,14 | 73:21 77:22 79:22 81:17 |
| **careful** 175:19 **carrie** 131:4 | | | |

**[cassidy - clearly]**

82:15 84:1 89:20 90:16 92:23 94:4 95:3 96:7,17 96:21 97:6 98:18 99:6 100:7 101:20 102:3 103:15 104:4 110:13 111:16 112:14 113:6,19 116:15,18 118:8 120:5,24 121:5,11,12,20 121:24 122:2 122:14,18 123:3,14 124:12,24 126:11 133:11 140:22 144:12 147:22 148:7 148:23 154:18 164:12,18 165:3,12,17,23 166:21 170:14 171:8,21 173:15 176:20 177:4,22 182:7 187:10 201:17 201:20 203:13 205:3,10,21 207:9,12 211:6 211:8 212:13 212:21,24 213:14,23,24

214:7 215:20 216:18 225:6 225:15 233:4 233:11,16 234:9,16,17,19 238:2,4,9,10,11 238:15 241:11 241:15,24 242:8,9,17,23 243:3 249:11 249:14 250:21 258:13

**cassidy's** 93:3 93:10 116:13 174:13 189:24 195:2

**cause** 41:10 42:21 236:4 258:10,18

**cbab** 5:21

**ccsao** 4:24 5:13 5:16,21,22

**center** 20:15 157:13

**centered** 17:19

**centers** 18:4

**central** 23:21

**certain** 23:24 24:3 41:12 70:2,3 78:11 78:12 101:11 167:6 183:9 226:22 248:24

**certainly** 56:15 109:9 161:3

164:15 171:4 178:15 236:4

**certify** 258:6,15 259:1,4,8

**chair** 63:4

**champions** 14:20

**chance** 57:11 174:7 220:24

**change** 6:3 68:4 146:1 194:8

**changed** 166:16

**changes** 257:15

**charge** 26:1,2 28:1,6 35:5 103:3,8 203:7

**charged** 28:12 31:11 223:10 231:6

**charging** 191:5

**chasing** 175:12

**cheat** 207:12

**chicago** 1:20 2:3,8,13,19 3:4 3:12,17,19 7:10 8:17 13:1 17:11 35:15 49:12 82:18 124:18 179:10 179:20 180:2 180:10,19,22 181:1 183:9 186:2 188:8,9 190:14 191:8

258:9

**chicagoland** 13:13

**chief** 41:12

**children** 13:9

**chunk** 138:8

**circuit** 17:15,20 17:21

**circumstances** 68:23 69:11 197:10 232:13 249:1

**city** 3:19 8:1,17 13:17,21 178:18 257:2

**civic** 18:4

**civil** 1:17 70:23 175:4,22 176:2 176:5 194:24 195:1

**claim** 164:19 165:18,24 166:7,16,22

**claims** 167:6

**clarify** 170:12 194:9

**clark** 3:4

**clear** 10:1 76:8 102:16 165:3 243:19

**cleared** 103:11 124:10

**clearer** 39:19

**clearly** 37:21

**[clerk - complained]** Page 12

| | | | |
|---|---|---|---|
| **clerk** 16:18 | 124:13 125:14 | **clk** 4:18,20,22 | **college** 13:24 |
| **clerkships** 16:4 | 126:16 128:15 | 6:4 | 14:2,23 15:14 |
| **client** 28:7,7,13 | 130:10,12 | **close** 21:10 | **collegial** 202:2 |
| 31:14,22 32:1 | 134:3,14 135:8 | 195:10 | **come** 30:7 |
| 44:3 48:5 | 135:14 136:21 | **closer** 186:7 | 52:21 88:4 |
| 49:15 50:13 | 139:3 140:24 | **closing** 52:17 | 124:2 175:17 |
| 54:5,6 56:3,3,4 | 142:4 143:2 | **codefendants** | 226:1 |
| 57:17 58:4,11 | 145:24 146:10 | 33:4 44:19 | **coming** 119:15 |
| 59:3,16 60:23 | 146:15 157:3 | 53:12 54:8,9 | 181:9 183:12 |
| 61:24 62:4 | 157:11 166:6 | 58:5,9 60:15 | **comment** |
| 63:8,16 64:7 | 167:5 172:2,8 | 85:1 94:21 | 224:24 |
| 68:16 69:16 | 178:4 185:13 | 108:7 109:24 | **commenting** |
| 70:16 73:21 | 191:22 192:8 | 115:7 117:10 | 224:22 |
| 79:24 81:10,13 | 192:21 196:14 | 125:7,15 | **commit** 44:17 |
| 81:19,21 82:1 | 198:15 214:11 | 127:21 133:23 | 140:11 166:10 |
| 82:7,22 83:4,4 | 214:17 215:19 | 134:15,21 | **committing** |
| 84:7,12,14,16 | 216:5 228:18 | 137:22 142:18 | 228:3 |
| 84:19,24 85:1 | 230:7,7 235:8 | 143:12 156:4 | **commonly** |
| 85:18,22 86:9 | 237:10,11,14 | 156:13 157:7 | 59:11 |
| 87:13 88:10,13 | 237:17 246:14 | 157:12 | **communicate** |
| 89:7,17 92:12 | 247:24 248:7 | **coerce** 97:20 | 62:4 240:16 |
| 92:18,20 93:16 | 253:20 254:6 | 170:15 249:15 | 241:11 |
| 94:6,15 95:17 | 254:16 255:17 | **coerced** 101:10 | **communicated** |
| 95:22 96:12 | **client's** 98:11 | 140:11 148:15 | 62:7,9 |
| 97:3 98:19,23 | 108:23 109:4 | 160:6 162:1 | **communicati...** |
| 99:7,13 100:8 | 109:22,23 | 170:23 173:9 | 45:24 242:8 |
| 101:10,16 | 115:1,7 215:7 | **coercive** 172:1 | **compared** |
| 102:15 103:6 | 255:5 | **coffee** 200:5,6 | 236:2 |
| 103:16 108:10 | **clients** 24:23 | 248:12,14 | **complain** 93:3 |
| 108:19 109:14 | 61:7 80:13 | **coffin** 43:17 | 116:12,17 |
| 110:12 111:15 | 189:5 203:10 | **coincide** 39:20 | 140:10 141:8 |
| 113:6 115:13 | 215:11 228:15 | 39:22 | 148:7 159:24 |
| 115:18,22 | 230:4 253:23 | **collected** 28:13 | **complained** |
| 116:4 120:19 | **climber** 226:8 | **colleen** 2:14 | 93:9 140:18 |
| 123:1,20 | | 7:19 158:18 | 170:13 |

complaining 148:12
complaint 155:22 185:17
complaints 147:2,7 154:17 173:8 238:17
complete 22:2 138:18 153:15 153:23
completely 10:11 75:7 225:22 251:16
complicit 171:4 171:5
computer 29:7 29:9 258:21
concern 237:22
concerned 225:7,11,21
concerns 237:23
conclude 104:5
concluded 104:9,10 143:17 144:14
concludes 257:19
conclusion 256:12
condition 11:12 11:17,21 35:18 40:2,7 91:9 106:8 107:17 129:24 130:11

133:21 154:5
conditions 153:13
conduct 90:1 90:16 108:6 182:12,17
conducted 159:8
conducting 182:8
confer 92:11 115:12,17,22 156:19 205:10
conference 69:3,7,19 80:17 81:1,3 92:19 95:16 96:1 97:16 98:6 100:15,20 103:6,12,24 104:1 114:8 124:1 241:24 242:1
conferences 249:10,10
conferencing 69:12 71:14
confirm 209:24 210:2
confusion 88:23
connection 156:11 249:13
consider 66:2 131:20,23

236:1
considered 123:21 232:14
consists 92:20
conspiracy 166:10
constantly 205:7
construed 75:12 76:22 77:1,11
consulted 155:14
contact 64:13 65:7 68:7 140:3 142:14 156:6,17,23 157:17 158:7 158:14 160:4 217:2,4,6
contacted 156:2,10 157:6 157:11,21 158:1,9,10 176:18,23 177:2,10,12,19 195:11 196:5 217:13,18 250:23,24 251:5,6,11,11 252:6 253:4,10 253:11
contents 77:24
context 246:19

continuation 114:24 115:6
continue 19:5 41:19 93:11,14 93:14 140:2 173:11
continued 3:1 103:12 104:23 172:18,24 173:3
contractors 23:2,3 31:4,5
contributed 165:24
conversation 87:12 116:4 121:11 153:8 234:19 242:5
conversations 54:5 59:3 64:21 88:16 144:12
convicted 132:19 154:14 156:13,24 157:4 160:3 197:1
conviction 43:20 155:19 156:12 157:14 247:4 251:8
convictions 131:10 176:9 251:22

**[cook - court]** Page 14

**cook** 7:21 8:5
16:12 17:15,18
23:16,17,23
38:12 42:4
49:12 59:22
63:22 64:7,22
71:13,23,23
74:24 75:3,6
75:18 77:5,19
82:23 83:5
84:13 135:16
139:22,23
168:19 179:7,9
179:21 180:5
181:11,18,23
182:13 184:6
184:13 185:18
186:16 188:6
190:3,12
191:22 192:8
192:21 199:2,3
215:12 254:3,4
258:5 259:20
**cooperate**
56:22 57:8,12
57:14 62:23
70:16 84:8
86:1 115:1
123:14 127:17
236:23
**cooperating**
57:1 236:22
247:7
**cooperation**
172:10 173:12

221:1,8 246:17
246:18
**cooperative**
88:6
**copies** 226:21
**copy** 41:15
47:14,18 49:18
78:18 139:11
257:13
**corner** 35:12
**corps** 15:2,4
**correct** 37:15
40:13 58:16
65:21,23 68:9
68:20 73:11
78:5,8 81:14
87:13 107:10
116:4,5 124:15
127:22 133:18
134:1 137:23
154:7,8 168:21
169:13 170:5
170:10 171:18
172:11,19
173:1 179:8
180:20 182:4
190:7 210:1,3
243:22 244:5
245:1 246:1,6
246:11 249:5
253:21 258:23
**corrections**
131:14 139:23
139:24

**correctly** 33:5
56:7 81:19
86:4 88:19
126:19 153:4
198:23 254:23
**corresponden...**
5:3 155:2,6
**counsel** 7:5,14
25:10,14,20
26:4,8 27:22
29:14 35:7
37:5 184:3,11
206:9,10,13
211:19 259:2,8
**counsels**
142:14,18
**count** 131:6
133:12
**countdown**
238:24
**county** 7:21 8:5
16:12,13,13,13
16:13 17:15,16
17:16,16,18
18:3,5 23:16
23:17,17,17,18
23:18,20,22,23
38:13 42:4
49:12 56:20
59:22 61:12
63:22 64:7,22
71:13,23,23
74:24 75:3,6
75:18 77:6,19
82:5,23 83:5

84:14 135:16
139:22,23
168:20 179:7,9
179:21 180:5
182:13 184:7
184:14 186:16
188:7 190:12
191:22 192:21
199:2,3 215:12
229:3 233:18
254:4 258:3,5
258:5 259:20
**county's**
181:11,18,23
185:6,18 190:3
192:8 254:3
**couple** 30:21
72:12 167:24
168:17 175:8
225:14 238:5
257:5
**course** 50:16,23
51:12 60:17
63:11 83:12,13
92:13,15 97:5
105:11 127:15
127:18 129:10
134:24 135:2
146:18 230:5
232:20 233:12
**court** 1:1 5:12
7:8,12 8:18
10:1,3,15
16:15 17:7,15
20:9 26:9,11

**[court - decided]** Page 15

28:20 33:10
38:13 48:4
49:14,16,17,19
49:22 50:1
58:21,22 59:1
59:2,15 75:17
77:5 105:16
108:24 109:5
110:4 145:19
152:7,8,10,11
161:7,13,19,23
162:2,7 238:19
238:21 254:20
255:2,3,13
257:13 258:11
**courthouse**
144:8 195:19
**courthouses**
24:4,9
**courtroom** 46:6
59:11 195:20
195:24 201:22
**courts** 1:18
17:23 24:13
**cover** 52:20
**covered** 228:17
**cpd** 8:10 184:7
185:19 186:16
191:17 192:3,4
192:14,18
193:9 256:7,18
**cr** 35:5 36:5
58:6 114:14
137:20

**created** 88:3
**credible** 161:4
**crime** 93:17
94:7 223:10
228:3
**criminal** 16:11
17:23 18:2,7,9
20:12,20 22:15
23:10,12 24:13
24:24 25:1,3,7
29:8 33:10
38:10,17 56:24
66:3,6 75:5,14
77:15 80:8
102:18 172:10
176:9 223:13
246:16
**cross** 98:3,5
207:8
**crr** 1:23
**crux** 98:8
**csr** 1:23 49:23
**ct** 4:18,20,22
6:4
**culbertson** 2:6
**culpable** 56:6
198:18
**currently** 11:6
11:9,11 75:19
77:6 138:15
**custody** 42:4,7
42:8 59:10
81:20,22 92:18
93:1 174:4,6
225:17,18

**cv** 1:5,8,12 5:5
5:7 7:9

**d**

**d** 4:1 49:23
184:13 185:5
187:15
**damages** 69:20
70:22
**damn** 247:21
252:20
**date** 9:10 33:14
37:17,19 38:23
39:15,20 40:23
41:12 48:6
52:7 55:3,5
71:18 73:13
106:3,5 107:7
107:12 134:11
134:12 144:24
145:24 147:12
148:6 191:5
218:13,14,19
218:20 231:20
231:21,24
232:2,4 239:4
**dated** 5:3
**dates** 70:11
199:13,15
208:12
**david** 143:24
144:3
**day** 1:20 86:22
104:1 146:9
147:7 153:3
154:19 164:21

196:21 208:23
228:4 231:23
237:9 259:13
**days** 182:14
**deadly** 236:1
**deal** 63:21 64:6
64:24 100:23
149:21 150:9
155:20 165:4
169:22 171:24
172:10 173:12
205:18 231:3
246:17,19
247:13,24
254:14 255:7
**dealings** 159:6
238:6
**dealt** 83:15
238:4
**death** 22:1 44:2
44:4,8,12
56:13,14,16
132:21 198:20
198:20 236:5,5
**deceased**
216:22
**december** 20:8
132:8,11 219:7
219:17 222:8
222:15
**decided** 60:7,14
62:22 128:4
135:22 136:1
217:8

**[decision - differences]** Page 16

decision 28:16
55:22 127:7,17
127:20 146:21
214:16,18
215:7
decisions 27:15
55:16 63:19
deep 53:20
defend 56:18
197:8 228:17
228:21
defendant 5:19
7:5 8:10 35:4
35:13,14 66:12
69:20 73:3,6,7
77:14 81:6
107:24 108:1,5
137:10 194:12
194:24 220:15
233:14 237:16
246:16,18
247:4
defendant's
187:8
defendants 1:6
1:10,14 12:4
44:17,23 56:8
57:21 59:19
108:1,3,7
142:19 156:5
157:13 172:9
199:7 200:9
203:6,18 204:4
208:24 233:5,8
236:11 237:19

255:3 258:14
defending 53:3
66:3,6 93:22
249:23
defense 16:11
18:8,9 20:13
29:8 38:15
42:23 50:15
56:1,24 60:10
60:24 61:6
66:10 73:3
77:14 80:8
81:5 106:23
135:20 142:12
142:14,18,23
150:16 175:4
175:21 194:20
194:22 197:7
203:21 215:6
215:10
deferred
127:11 142:8
definition
72:23
degree 35:5
43:10
dekalb 15:17
delineate 210:5
230:6
demand 87:21
demanding
88:5
demeanor
174:13 182:5
230:20

dementia
253:13
denied 161:15
denolfo 7:20
159:17
deny 161:13,17
161:19
department
131:13 139:23
139:24 183:9
186:2 188:8,9
190:14
depending
236:1
deponent
257:21
deposition 1:15
7:4,9 9:14 12:1
12:10 33:15
36:10 39:4
48:11 51:18
72:7 78:21
105:1 106:14
128:20 136:9
139:12 145:9
212:3 259:2,5
259:6
depositions
1:19
derived 75:8
describe 16:9
23:6 24:17
25:18 42:17
described 60:8
69:10 134:4

describing
224:20
description
4:16 5:2 6:2
desire 115:7
detail 229:17
detailed 224:21
225:2,5
details 162:13
162:19,22
169:11 250:20
250:22
determine
56:23 57:1
240:11 241:5
determined
69:18
determining
131:20 132:9
detriment
100:23 147:23
detrimental
102:24
diciolla 2:21
8:6 169:3
179:20 180:16
181:12,22
182:2 185:17
245:7,14,19
die 132:5 232:8
difference
246:13,22
247:2,3
differences
30:4

**[difficult - earlier]** Page 17

**difficult** 143:10 213:21 214:9 229:17
**difficulty** 205:2
**dinolfo** 2:16
**direct** 67:19 96:17 98:5 110:21 121:17 155:8 165:17 165:23 166:22 207:8 231:17
**directed** 123:20 155:11,13
**directing** 30:15 31:12 33:8
**directly** 125:17 125:18 234:19 241:17
**disagree** 222:7 222:9,14 223:24 224:2 244:23 245:3
**disappointed** 221:22
**discipline** 19:23
**disclosed** 134:16
**discovery** 4:21 5:11 38:6,10 38:11,17,23 39:13 40:11 47:2,2,7,8,11 48:17 50:5,17 50:23 51:10,12

52:12,19 53:2 53:5,18 54:4 54:24 55:24 56:2 69:15 105:10,15 107:13 108:13 109:15 134:17 236:14 237:7
**discretion** 132:9
**discuss** 32:3,9 55:6,8 61:6,12 61:17 62:12,17 62:18 63:8 65:7 87:1 88:8 124:21,23 125:1 136:4 137:4 146:8,15
**discussed** 60:1 60:17 61:14 80:19 81:21,24 84:18,19 88:12 125:20 137:2 200:4 201:2 206:4,8 208:21 239:8
**discussing** 60:22 93:17 94:6,15,20 136:2 200:2
**discussion** 57:16 104:3 136:5
**discussions** 214:6

**dismissed** 176:10 251:22
**disposed** 41:21 140:4,9 141:7
**disposition** 55:5
**dissemination** 38:14
**district** 1:1,2 1:18 7:7,8 258:11,11
**distrust** 238:7
**divide** 29:3
**division** 1:3
**divorce** 24:23
**divorces** 23:14
**doctor's** 11:9
**document** 33:21,23 34:8 34:12,15 36:23 37:7,17,23 39:10 50:14 51:24 52:2 71:19 72:12 77:21 79:2,4,4 79:6,15 105:6 105:22 106:1,7 107:5,15 111:22 112:2,3 112:22,24 113:17 129:2 130:11,15 136:14,15,19 137:1,7,8,12 146:3 170:9

188:3
**documentation** 51:14
**documents** 12:9,11,15 50:4 199:22 201:14 219:3,5
**doe** 136:15
**doing** 23:15 89:23 193:22 222:19 236:7
**double** 43:15 133:2 246:11
**doubt** 213:19
**doubted** 193:19
**downtown** 19:11
**drive** 17:11
**drug** 25:17
**duly** 9:2 258:16
**dupage** 16:13 17:16 23:18
**duty** 102:21,22

**e**

**e** 4:1,15 5:1 6:1 8:17 9:9 16:8,8 16:8 191:9 192:14 212:2 256:4
**earlier** 164:21 182:7 183:20 183:24 205:14 228:10 230:4 231:14 238:9

**[early - excuse]**                                                    Page 18

**early** 26:16,17
  217:11 220:3
  228:24 256:11
**east** 17:11
  19:15,15
**eastern** 1:3
  23:21
**echeles** 16:8,10
  16:23 17:19
  18:7,20 19:5
  27:9 202:21
**eddie** 166:8
**educational**
  13:23
**edward** 137:15
**effect** 132:4
  150:6 183:23
  184:2 232:7
  244:10
**eight** 251:15
**either** 61:15
  62:9,12 64:22
  65:6,17 100:6
  102:7 109:14
  116:12 121:17
  125:4 128:10
  135:6 141:15
  142:21 143:4
  154:19 163:5
  164:6 173:7
  193:3 199:22
  202:15 212:12
  217:21 219:19
  221:12,13
  254:21 257:11

**elaborate** 81:3
**eligible** 44:11
  56:14,15,16
  132:20 198:19
**elocution**
  152:13 235:18
**else's** 105:24
**embodies** 77:16
  190:1
**employed**
  184:13
**employees**
  185:5,19,19
**encourage**
  164:9 228:13
  228:15
**ended** 19:5
  20:8 96:1
  97:16 99:19
  100:14,19
  103:5
**ends** 54:13
  111:6 168:7
  239:23
**enemies** 166:24
**enforce** 155:19
**enter** 66:11
  74:10
**entered** 15:8,10
  70:12 127:1
  173:4 190:21
  246:4
**enters** 35:6
**entire** 24:21
  74:20 138:3

**entirety** 77:16
  190:1
**entitled** 132:22
  146:1
**ephraim** 3:10
**eric** 137:15,21
  143:3
**escape** 204:23
**esiff** 3:14
**especially**
  108:1
**essentially**
  43:19 254:16
**estate** 236:19
**estates** 8:7
**et** 1:5,9,13 7:6
  258:12,13
**etcetera** 16:14
**ethical** 102:21
  102:22
**ethics** 84:22
**event** 68:14
  77:13 191:3
  247:9
**eventual** 126:3
  126:15
**eventually** 30:7
  46:24 52:21
  58:1 60:19,21
  126:9 136:4
**everybody**
  54:11 194:14
  206:13
**evidence** 50:24
  55:4 75:10,15

  75:20,22 77:3
  77:7,9 239:10
**exact** 19:17
  31:2 33:14
  144:24 209:8
**exactly** 15:19
  42:15 60:12
  103:9 123:2
  125:9 128:18
  197:14 216:24
  218:21,23,24
  224:24 228:21
  230:1 237:3,13
  250:7
**examination**
  1:16 4:2 9:4
  98:5 168:12
  178:21 181:14
  183:14 194:17
  207:9 243:10
  253:17 256:1
**examined** 9:2
  207:8
**examiner** 98:3
**except** 39:22
  40:7 53:22
  101:11 129:8
  201:13
**exchange** 70:16
  165:13
**excuse** 34:18,20
  39:8 48:14
  68:11 75:23
  99:18 106:21
  225:12

**exhausted** 78:15 110:18 111:18 179:13
**exhibit** 4:17,19 4:21,23 5:3,6,8 5:10,15,17,19 5:22 6:3,5,6 33:15,20 34:13 34:22,23 35:17 36:10,15,21,22 39:4,9,10 48:9 48:11,16 49:2 50:3 51:18,22 72:6,7,15,16 73:16 78:17,21 91:8 105:1,5 105:12 106:14 106:18 107:4 107:16 111:22 111:23 112:10 113:9 128:20 129:1,4 132:13 134:5 136:9,14 137:6 139:12 139:17 145:9 145:14 151:21 151:24 168:15 168:18 179:16 181:16 184:5 184:18 185:16 186:23 187:20 188:3,5,13,16 188:21 189:11 189:23 208:22 209:2 211:23

212:3 218:7,10 243:12
**existing** 86:8,8 114:19
**exists** 77:18 190:3 193:14
**expected** 141:1 141:4 255:15
**experience** 29:19 90:18 190:9,20 223:4 223:5,7
**experienced** 98:3
**experiences** 30:8 40:21 56:24 80:7 150:16
**expert** 203:7
**explain** 88:9
**explained** 88:13 89:2 134:15 135:3
**express** 88:14
**expressed** 88:23
**extent** 193:14
**extracurricular** 14:8
**extremely** 235:22
**eye** 82:20

**f**

**f** 192:4,4,14,14
**fabricate** 101:21
**fabricated** 160:19 161:8
**facilitate** 139:24
**fact** 26:10 117:22 173:14 198:14 207:19 232:20 236:13 245:7,15 253:3
**facts** 32:17,23 33:1,2 93:17 94:7 117:23 118:2 160:19 162:6
**failure** 11:14
**fair** 15:11 18:6 36:7 55:15,18 55:21 58:6 65:18,19 67:12 67:15,23 68:6 69:3 80:16 82:4 83:18 84:20,21 86:10 96:4,6 99:6,8 104:23 107:13 108:8,12,17 109:21 118:18 123:1,2 129:17 129:18 132:14 132:18 133:4 133:10,23

134:20 153:13 170:17,18,23 171:1 175:8 176:7 182:24 183:2,4 197:18 210:4,20 219:2 236:21 238:8 242:7 244:15 254:22 255:4 255:17,19 256:19,20
**fake** 166:9
**false** 170:22 173:9
**falsely** 96:21 97:7 100:10 121:1,21 122:3 163:21 164:19 165:18,24 166:7,16,22 167:5,7
**falsify** 166:20
**familiar** 45:10 45:13 119:6 143:8,21 150:2 157:23 158:4 158:13,22 159:7 163:4 180:3,9 191:10 209:10 227:22 227:23 228:8 229:24
**family** 157:17
**far** 79:15 90:4 90:20 112:11

**[far - form]** Page 20

152:6 229:17
230:12 250:13
**fast** 168:3
**faster** 71:10
**father** 151:11
**february**
206:24
**fed** 149:3
162:12,18,21
198:6
**fee** 26:1,3,3
**feeding** 98:16
98:18 164:13
**feeling** 76:17
**fees** 28:14 32:3
203:7,11
**felonies** 18:5,17
25:2
**felony** 20:22
21:5 23:10
38:21 217:8
**felt** 29:12
122:10 154:15
220:10,14,14
220:15 225:22
**fifth** 109:10
247:5,8
**fight** 227:11
237:2
**file** 26:5 29:11
33:9 38:5,16
38:22 39:1
47:7 105:9
106:3,22
108:22 155:8

155:22 218:24
**filed** 7:7 33:13
35:18 36:7,16
36:16,18,19
38:4 39:18,21
40:3,7,12,12
41:20 46:24
47:1 105:20
106:9,13
107:12,17
108:8,12,17
109:6,11,15
110:5 140:3
155:18 156:12
160:12 161:1
185:3 196:13
217:23 218:21
218:24 229:3
**files** 236:17,18
**filing** 4:17,19
29:3 38:8
**filled** 218:18
**final** 55:15
127:17
**finding** 41:10
153:15,23
247:17
**findings** 153:19
154:5
**fine** 76:4,6
99:23 168:5
**finish** 10:10
76:22 136:16
**firearm** 44:16
56:5

**firearms**
198:16 227:16
236:3
**firm** 7:13 19:8
23:1
**first** 9:2 16:1
16:21 18:1
22:13 29:7
35:5 39:2
43:10 52:10
63:4 65:3
73:17 79:7,12
80:19 102:11
104:14 105:8
112:8,11
113:13 128:17
128:19 169:19
175:21 176:5
177:15,17
181:20 182:16
186:24 194:20
195:4,6,11
199:9 201:19
201:23 202:3
204:11,13,14
204:17 217:23
220:9 226:11
226:18,19
229:12,14
237:11 239:13
251:10,15
252:13 258:16
**five** 17:9 18:23
202:18,23
232:22 233:3

239:22 251:7
**floor** 2:3 49:11
258:9
**floundered**
15:7
**follow** 73:4
**followed** 38:12
**follows** 9:3
27:14
**food** 76:5
**football** 14:12
14:15 201:4
204:1,21
**forced** 140:11
141:8
**foregoing**
258:22 259:2
**forever** 96:14
121:13
**forget** 200:18
221:14
**forgot** 23:19
62:15 75:14
176:24 207:11
**forgotten**
251:16,17
253:5
**form** 11:6
21:13,16 22:6
22:20 24:1,11
24:19 26:20,24
27:7,17 28:2
28:17,22 29:5
29:17,24 30:11
31:16 32:5,11

**[form - foundation]**

| | | | |
|---|---|---|---|
| 32:24 33:12 | 99:1,17 100:13 | 158:12 159:10 | **former** 7:18 8:4 |
| 34:1,4,9 35:23 | 100:18 101:1,8 | 160:8,14,21 | 181:11 206:10 |
| 36:2 37:2,3 | 101:17,22 | 161:2,10 162:3 | **forward** 88:14 |
| 38:12,18,24 | 102:4 103:4,18 | 162:9,15,23 | 172:1 194:10 |
| 39:23 40:4,14 | 106:10,24 | 163:8 164:2,14 | **found** 161:4 |
| 40:24 41:23 | 107:18 108:14 | 164:22 165:6 | 203:5 237:6 |
| 42:5,12,19 | 109:8,18 | 165:14,20 | **foundation** |
| 43:3,21 44:24 | 110:14 112:16 | 166:3,11 167:1 | 24:19 27:17 |
| 46:2,8 47:4,16 | 113:1,8,22 | 168:22 169:14 | 28:17,22 30:11 |
| 49:9 50:6,19 | 114:9,15,21 | 170:6,24 | 33:12 35:24 |
| 51:2,15 52:15 | 115:3,9,14,19 | 171:11 172:3 | 40:4 42:19 |
| 52:22 53:8,14 | 116:19,24 | 172:16 173:13 | 46:8 47:16 |
| 55:11,17 57:19 | 117:11,16 | 173:21 174:15 | 49:9 50:6,19 |
| 58:7 59:4 60:4 | 118:9,13,21 | 174:22,24 | 51:2 52:22 |
| 61:1,9,19 62:1 | 119:22 120:6 | 176:11,21 | 53:8 55:17 |
| 62:14 63:2,10 | 120:20 121:7 | 177:7,13,23 | 57:19 61:19 |
| 64:1,15 65:1,8 | 121:14 122:5 | 178:10 180:7 | 63:10 65:1,8 |
| 65:22 66:4,18 | 123:10,16 | 182:15 183:3 | 65:22 66:18 |
| 67:6,13 68:10 | 124:5 125:8,22 | 185:20 187:21 | 67:13 83:6 |
| 69:4,13 70:4 | 127:3,9,23 | 188:24 189:9 | 84:3 87:6 |
| 71:7,16 73:12 | 129:7,19 130:2 | 190:23 191:1 | 88:18 89:9 |
| 73:23 74:7,13 | 132:24 133:14 | 205:4 214:13 | 91:11 92:4,14 |
| 80:20 82:12 | 133:24 135:1,9 | 218:1,4,11,13 | 93:5,12,23 |
| 83:6,20,22 | 135:23 136:6 | 220:12 234:7 | 94:17,22 95:4 |
| 84:3 85:8 | 139:5 140:5,13 | 241:14 243:2 | 95:9,14,23 |
| 86:12 87:6,23 | 141:3,10,21 | 243:24 245:2 | 96:9,15,23 |
| 88:18 89:9 | 142:6 144:5,18 | 245:10,17 | 97:8,13,21 |
| 90:3,11,19,24 | 144:23 146:17 | 246:7,21 | 98:1,17 101:22 |
| 91:11 92:4,14 | 147:4,9,15 | 247:15 249:6 | 102:4 106:10 |
| 93:5,12,23 | 148:11,16,21 | 249:17 250:8 | 107:18 117:16 |
| 94:10,17,22 | 149:6,16,23 | 250:16 251:9 | 118:13 120:20 |
| 95:4,9,14,23 | 150:21 152:14 | 252:1,8 253:9 | 121:7,14 122:5 |
| 96:9,15,23 | 154:2,11,21 | 254:10,18 | 123:10,16 |
| 97:8,13,21 | 155:4,10,15 | 255:9 | 124:5 127:3,9 |
| 98:1,12,17 | 156:7,14 158:3 | | 127:23 129:7 |

130:2 132:24
133:14 135:1,9
135:23 139:5
140:13 141:3
141:10,21
142:6 147:4,9
147:15 148:16
149:6,16
150:21 152:14
154:2,11,21
155:4,15 156:7
156:14 159:10
164:14 165:20
166:3,11
168:22 169:14
170:6 171:2,11
172:3 173:13
173:21 174:15
174:24 176:11
176:21 177:7
177:13,23
188:21 190:23
205:23 210:8
210:22 215:3
217:15 240:13
241:1 245:10
245:17 246:21
247:15 250:16
251:9 252:8
255:9
**four** 12:8 27:8
52:16 58:5,9
186:13 200:15
202:17,23
204:5 223:13

**franklin** 1:19
2:7 7:10 258:8
**free** 75:7
**frequented**
24:8,10
**fresher** 250:21
251:4
**friedrich** 3:16
**friendly** 234:15
**frivolous** 237:3
**front** 41:13
42:23 43:5
49:21 106:4
144:22 145:1
164:16 168:15
182:18 188:14
**froze** 189:12,20
**full** 84:16
**fully** 58:18 81:7
81:11 86:1
117:7 138:17
**further** 4:10,11
4:12 104:11
116:9 131:5
161:4 181:3,4
193:17 243:10
253:17 255:21
256:1,22,24
257:1,3,21
258:15 259:1,4
259:8
**future** 58:1,12

**g**

**g** 8:14 9:9
192:4,14
**gang** 56:9 86:5
**geez** 21:8 26:15
196:13
**general** 35:4
38:12,16,22
83:4,5 92:6
196:16,17
254:6
**generally** 27:16
59:8 255:5
**george** 1:15
2:15 3:6 4:3
7:4,20 9:1,7
35:13 110:22
111:13 138:16
159:19,20
187:9 191:9,12
222:19 258:9
258:15
**getting** 27:12
138:6 205:8
221:1
**gina** 1:23 7:13
258:4
**girl** 257:2
**girls** 56:10
91:19 197:16
198:7
**give** 16:9 34:19
47:6 57:21
59:5 70:10
71:18 76:3

87:22 89:7
96:13 117:20
121:12 126:9
126:13 152:22
163:23,24
188:15 214:21
223:13 224:21
228:13 229:10
236:14 240:8
**given** 10:22
12:15 48:5
56:17 80:12
81:16 88:4
92:9,18 219:16
220:21 236:9
236:12 237:4
250:19 258:18
258:23
**giving** 131:24
173:9 206:12
241:13
**gizowski**
119:14 226:15
**glasses** 194:4
**glean** 73:5
86:20
**go** 13:19 16:2
17:4 18:24
28:7 30:9
34:21 59:10
69:19 96:14
116:9 121:13
147:21 172:1
184:21 185:22
189:23 205:5

**[go - hagy]** Page 23

206:19 208:16
210:8 214:14
225:18 239:21
257:7
**god** 16:1 53:23
**going** 7:1 9:19
10:12 17:7
18:1 20:15
33:6,7,19
36:14,15,21
39:8 48:8,8
51:22 54:10,14
54:18 55:9
56:13,18 67:19
72:5,11 76:10
76:14 78:17
79:2 80:9
83:24 89:7
105:5 106:18
107:4 110:17
110:21 111:2,7
111:11,21
113:12,12
114:3 117:8,20
123:15 128:24
133:22 134:22
136:13 137:6
138:5 139:16
144:18 145:13
146:9,15,18
148:11 153:1,9
157:15 167:23
168:6,11
173:24 182:10
183:12 184:17

185:2,15,16
186:12 189:13
189:17 193:20
194:10 205:12
206:16,18
207:12 210:9
210:23 211:17
212:21 213:14
217:17 223:20
228:19 231:3
231:17 232:24
234:21 239:20
239:24 240:4
240:19 242:6
255:17 257:20
**good** 7:1
110:23 194:3
**gopher** 17:3
**gotcha** 79:12
113:14
**gotten** 50:9
100:24 173:16
236:14
**graduate** 14:5
15:20
**graff** 192:3,4,7
**graffeo** 3:7
192:14,17,19
**grand** 41:9,10
47:20
**granddaughters**
13:11
**granted** 86:21
138:22 255:1

**great** 66:9
**gridelli** 45:9
**grow** 13:15
**guess** 12:2
19:19 24:3
27:3 28:11
29:18 40:9
86:17 108:5
135:19 202:2
235:24
**guilty** 41:17
131:6 133:12
146:16 224:14
224:16
**gun** 227:11
228:6 237:2
**guy** 227:10
**guys** 55:9
237:23

**h**

**h** 4:15 5:1 6:1
8:14,17 16:8
191:9
**hafra** 3:6
**hagy** 2:2 4:9
8:13,13,14
21:2,13,16
22:6,20 24:1
24:11,19 26:20
26:24 27:7,17
28:2,17,22
29:5,17,24
30:11 31:16
32:5,11,19,24
33:12 35:21,23

38:18,24 40:4
40:14,24 41:23
42:5,12,19
43:3,21 44:24
46:2,8 47:4,16
47:23 48:20
49:9 50:6,19
51:2,15 52:15
52:22 53:8,14
55:11,17 57:19
58:7 59:4 60:4
61:1,9,19 62:1
62:14 63:2,10
63:24 64:15
65:1,8,22 66:4
66:18 67:6,13
68:10 69:4,13
70:4,20 71:7
71:10,16 73:12
73:23 74:7,13
76:5 78:20
80:20 82:12
83:1,6,20 84:3
85:4,8 86:12
87:3,6,23
88:18 89:9
90:3,11,19,24
91:11,21 92:4
92:14 93:5,12
93:20,23 94:10
94:17,22 95:4
95:9,14,23
96:9,15,23
97:8,13,21
98:1,12,17

**[hagy - happening]**

99:1,17,22,24
100:13,18
101:1,8,17,22
102:4 103:4,18
104:18 106:10
106:24 107:18
108:14 109:8
109:18 110:8
110:14 112:16
113:1,8,22
114:9,15,21
115:3,9,14,19
116:19,24
117:11,16
118:9,13,21
119:4,22 120:6
120:20 121:7
121:14 122:5
123:5,10,16
124:5 125:8,22
127:3,9,23
129:7,19 130:2
132:24 133:8
133:14,24
135:1,9,23
136:6 138:5
139:5 140:5,13
141:3,10,21
142:6 144:5,16
144:18,23
146:12,17
147:4,15
148:11,16,21
149:6,16,23
150:21 151:7

152:14 154:2
154:11,21
155:4,10,15
156:7,14 158:3
158:12 159:10
160:8,14,21
161:2,10 162:3
162:9,15,23
163:8 164:2,14
164:22 165:6
165:14,20
166:3,11 167:1
168:3,22
169:14 170:1,6
170:19,24
171:2,11,19
172:3,12,16
173:13,21
174:15,24
176:11,21
177:7,13,23
178:10,14
180:7 182:15
183:3 185:20
187:21 188:24
189:9 190:23
193:22 194:1,8
194:13,18
198:1 200:22
205:11 206:2,9
206:11 208:17
210:12 211:3
211:16,19,23
212:1,6 214:20
215:9 217:20

218:7,9 220:19
222:23 226:4
232:17 234:4
234:10 239:20
240:5,15 241:4
241:20 243:5,9
243:24 244:7
244:19 245:2
245:10,17,21
246:7,21
247:15 248:8
249:6,9,17,22
250:8,16 251:9
252:1,8 253:9
254:10,18
255:9 257:5,8
**hagy0** 147:9
**half** 138:6
199:11 235:3
**hall** 124:3
225:18 242:6
249:10,11
**hallway** 225:15
238:12
**hand** 35:12
181:16 190:18
259:13
**handed** 41:15
137:8
**handle** 20:20
20:22,24 25:1
25:3,6
**handled** 23:14
26:19 27:6
103:9 202:16

202:17 232:11
**handling** 46:7
68:15 70:2
90:5
**hands** 52:21
**handwriting**
218:15
**hang** 252:14
**hanging** 42:22
**happen** 66:16
97:15 120:12
120:16 121:3
124:4 127:19
146:9,15 167:9
182:20,20
**happened**
97:15 99:15
100:11 101:14
101:15 103:1
103:16 121:23
123:23 124:8
135:17 136:8
146:10 148:23
164:24 166:13
167:3 200:11
201:14 210:5
211:22 212:18
212:19 221:20
223:21 228:22
230:3 236:18
237:3,23
239:18 241:19
252:3
**happening** 95:6
95:10 96:10

**[happening - imagine]** Page 25

97:1 150:24
154:23 171:15
**happily** 71:19
**hard** 27:1
70:20 98:2
126:21 167:16
230:5
**harlem** 195:9
196:9 200:21
**harper** 13:20
**harsh** 232:14
232:19
**hate** 34:20
**head** 10:4
225:4 235:9
**heading** 34:16
34:24 137:12
181:24
**headquarters**
49:11
**hear** 21:14
59:21 100:4
118:19 121:18
**heard** 45:6
86:18 117:23
117:24 118:2,4
166:12 176:12
177:15,17
252:14
**hearing** 40:18
40:19 41:9
131:8 145:8,20
145:21 151:4
151:11 235:17

**hearings** 17:4,7
**heart** 11:14
**heather** 3:3
**hectic** 142:9
**helena** 131:5
**hello** 252:14
**help** 197:12
201:11 217:9
**helped** 18:18
**heracklis** 3:16
8:3,3,16,16,17
181:4 256:24
**hereinbefore**
259:7
**heretofore**
258:6
**hereunto**
259:12
**hesitancy** 88:23
**hesitant** 231:1
231:3
**hesitated** 60:20
**hey** 178:3
**hi** 222:19
**higgins** 13:1
**high** 11:15
13:19,20 76:1
**hinshaw** 2:6
**hinshawlaw.c...**
2:9
**hired** 28:8
**hit** 252:13,13
**hold** 244:12
**holding** 122:11
122:12 225:23

241:22 242:3
249:12
**holmes** 3:6
191:9,12
**honestly** 227:5
**honorable**
131:16 238:6
**hop** 181:6
**hope** 34:21
**hopefully**
205:13 206:14
**hour** 1:21
199:11 203:24
**hours** 186:12
239:1
**house** 166:23
228:6
**housed** 215:12
230:11
**hovel** 131:4
**huh** 10:5
**hyland** 2:15
7:19 158:18
**hypothetical**
215:4

---

**i**

**idea** 63:1,16
82:10 135:20
205:24 216:20
216:21 217:18
219:8,11,14,18
220:7 222:5,6
224:3 226:9,24
231:24 232:4
236:17,20

239:5 241:18
243:8 247:16
251:18,20,21
252:2 256:8
**ideally** 214:15
**identification**
33:17 36:12
39:6 48:13
51:20 72:9
78:23 105:3
106:16 128:22
136:11 139:14
145:11 212:5
**identified**
187:19
**identify** 168:16
242:2
**ilcs** 75:14 77:2
**illinois** 1:2,20
2:3,8,13,19 3:4
3:12,17 5:12
7:8,10 13:2
15:14,18,23
16:21 17:12
22:1 34:3 35:3
35:15 49:12,23
75:13,14
131:13 137:14
206:21 258:1,6
258:9,12
259:20
**imagine** 50:7
59:5 98:7
232:15

**[immediately - interview]**                                     Page 26

immediately
  97:17 140:1
immunity
  75:13 77:2
impeachment
  77:12
imperative
  165:8
implement   63:1
implicated   86:5
implicates   73:6
impose   131:20
impression
  99:3 122:2,7
  122:10,13
  186:2 240:21
  249:13
incarcerated
  59:13
including   81:6
  81:23 175:6,7
incomplete
  215:3
incriminating
  75:20 77:7
  220:21 237:5
inculpatory
  236:9,12
independent
  23:2,3 31:4,5
  187:23 197:4
  221:6,10
independently
  75:16 77:3
  109:23

indicate   38:9
  40:21 41:6
  49:8 74:18
  136:24 139:17
  139:20
indicated   16:24
  19:18 23:4
  24:15 44:18,19
  78:10 82:17
  86:22 87:15
  89:14 107:9
  122:23 135:14
  136:21 178:24
  179:5 180:17
indicates   52:11
  58:23 112:8
  113:23 169:20
  169:21 170:4
indicating
  96:17
indicted   36:8
  57:13 86:6
indictment
  36:5 40:12
  41:16,17 47:15
  47:18 58:16
  86:9 93:18
  94:8 108:19
  114:8,14,20
  115:2,8 131:7
  133:13 137:17
individual
  192:13,15
  256:6,18

individuals
  187:18,19
inform   9:16
  216:8
information
  38:14 52:12
  57:21 86:5,19
  89:6,12 91:17
  98:16,19 108:9
  109:2 110:2
  116:7 117:19
  117:24 124:14
  125:5 141:2
  149:3,10,14
  164:13 226:2
  228:13 240:9
  240:23 241:6
  241:13 242:3
informed
  146:20 152:10
  176:3 216:12
  216:14,17
  230:13 233:16
  233:22 234:3
informing
  212:21
initial   68:7
  87:5,7
initially   17:3
  19:14 60:20
  87:12 196:17
input   27:14,20
insisted   67:11
instruct   163:24

instructed
  166:23
intent   236:7
interact   233:13
interacting
  233:5
interaction
  195:6 224:13
interactions
  176:19 177:3
  177:22 193:9
  193:11 256:17
interest   249:24
interested
  226:3 259:10
interests   204:2
interject   32:14
interrogation
  109:5 160:20
interrupt   42:1
  48:15 70:19
  91:23 103:22
  118:23 244:2
interrupted
  79:23
interrupting
  129:20 177:8
interview   60:23
  73:6 75:1,5
  77:12 93:11
  115:23 156:23
  171:18 178:23
  179:4 210:17
  229:13

**[interviewed - judgment]** Page 27

| | | | |
|---|---|---|---|
| **interviewed** 213:18 | 168:20 169:3 179:1,5,12,19 179:22,24 180:6,13,16 181:17,18,22 184:10 187:11 209:21 231:12 242:10 245:7 245:14,19 249:15 | 227:16 256:10 | **jim** 8:11 45:5 158:10,13 200:18,20,23 |
| **interviews** 163:6 169:7,12 169:21,22 170:5 171:8 172:19 173:1 173:20 174:14 187:1,4,8 229:9 230:23 243:21 244:24 | | **irv** 45:14,16 | **jlydon** 2:9 |
| | | **issue** 149:20 183:17 238:9 | **job** 16:21 237:20 249:23 250:1 |
| | | **issues** 154:18 255:20 | **jobs** 16:4 |
| | | **italian** 13:18 | **joheracklis** 3:18 |
| | | **items** 51:7 | **john** 119:14 131:16 226:14 |
| **introduce** 131:9 | **investigator's** 12:12 182:1 | **j** | **join** 19:8 25:7 |
| **introduced** 186:18 | **investigators** 8:5 54:6 81:4 81:23 86:2,3 87:8 92:22 94:1,6 162:22 179:8,10,23 180:13,24 181:12 182:11 182:14 183:22 184:5,7,7,15 185:7 186:15 186:16,16 203:8 230:24 | **j** 3:2 35:7 106:2 | **jointly** 25:3,7 |
| **introductory** 239:14 | | **jackets** 227:21 228:1 | **joke** 227:12 |
| **investigation** 79:9 242:24 | | **jail** 42:4 56:20 59:22,24 61:12 82:5,23 83:5 96:14 121:13 135:16 199:2 215:13,22 216:6,10,15,19 229:3,20 230:11,15,18 233:18 254:4,8 | **jokes** 175:17 |
| **investigative** 5:8 6:6 73:5 75:8 119:24 168:19 169:6 169:10 179:17 179:18 180:18 188:4 191:15 191:24 192:12 192:24 205:1 211:18 226:10 243:13,20 245:14 246:1 | | | **joseph** 2:12 |
| | | | **judge** 39:3 41:12,12,14,18 42:13,17,18,22 42:22 46:5 83:16 130:4 131:16,19,22 132:4,6,8 139:3,19 144:22 145:1 153:14,23 154:12 173:17 196:15 224:20 224:22 232:7 232:14,22 233:12 |
| | **involved** 14:7 28:15,20 29:12 55:21 65:3 68:17,20 80:11 126:22 155:14 156:5 192:18 221:14,22 222:24 223:15 223:16,18 226:20 227:14 | **james** 2:7 3:16 8:3,16 46:12 52:6 | |
| | | **january** 20:9 31:13 33:9 37:20 39:18 190:22 218:2 231:22 | |
| | | **jeopardy** 247:4 250:1 | |
| **investigator** 72:4 78:2 82:17,18 92:8 113:19 124:18 | | **jest** 175:14 | **judges** 224:23 |
| | | **jesus** 252:18 | **judgment** 30:9 |

**[julius - lake]** Page 28

**julius** 16:7,10 16:23 17:19 18:7,20 19:5
**june** 5:4 52:8
**jury** 18:13 21:5 41:9,11 47:20

**k**

**k** 2:21 8:17 184:6,12 185:5 185:18 187:11 258:3
**kamionski** 3:9 8:1
**keep** 12:15 94:11 104:19 127:16 129:20 167:21 177:8 230:6
**kill** 163:12
**killed** 56:10
**kind** 15:7 16:24 17:1 28:11 99:9,11 119:5 124:22,23 204:17 217:6 229:17 239:14
**kmklawllp.co...** 3:5,6
**knees** 15:2
**knew** 24:21 57:22 70:12 86:3 89:11 125:10 134:21 144:7 204:1,2 219:9 220:18

221:23 224:9 224:17 225:4 236:8 239:16 243:1
**know** 10:12,17 11:13 12:6 17:5 19:16 22:9 25:17 26:15 27:2 29:2,9 31:24 40:20 43:8 44:22 45:4,4,8 45:11,14,17,20 46:11,14,18 49:20 52:2 57:15 59:1,20 59:24 60:12,14 61:2 65:3 67:15 68:6,9 68:11,12 69:8 69:22 74:1 78:19 82:10,21 83:3,10,14 84:24 86:2 89:5,10,14,21 98:8 99:11,13 102:16 103:9 103:10,23 109:3 112:4 116:10,14 117:19 120:8 122:6,20 125:2 125:9,20 130:18 134:10 135:13 138:6,9

138:21 139:6,7 141:18 143:7 143:19,22,24 152:15 153:1 158:17,20,24 159:1,2,5,14,21 160:9 163:2 164:15 167:9 174:19 176:1 176:13 179:11 179:20,24 185:14 186:17 186:18 191:8 191:18 192:4 192:14 193:2 195:14,17 198:4 199:16 200:10 201:5,6 201:6,21,22 202:1,16 211:21 213:4 214:3 217:14 217:21,22,23 218:21,23,24 219:6,9,12,20 220:4,10,20,23 221:17,20,23 222:10,18,20 222:24 223:7 223:12,17,19 223:21 225:4,6 225:11,13 228:21 229:8 230:1,12 231:16 233:23

234:8,12 235:7 235:8,22 236:8 236:11,13 237:2,18 238:4 239:2,2,7 243:3,7 247:9 252:24 253:1 253:12 256:6 256:11,15
**knowing** 252:16
**knowledge** 178:7 190:9 193:10 215:20 215:24
**known** 16:11 86:3 195:15
**kogut** 45:5 158:10,13
**kulwin** 3:2,2
**kunzer** 2:18 4:7 8:4,4 181:6,10 181:11,15 182:23 183:5 257:1

**l**

**l** 2:21 8:17 9:9 16:8 184:13,13 185:5,5 187:15 187:15 191:9
**lab** 50:24
**lady** 178:19,20
**lake** 3:17 16:12 17:16 23:17

**[language - listened]** Page 29

language 232:8
large 16:15
late 217:11
240:13 245:22
laura 2:15 7:19
158:20 159:1
law 15:8,11,15
15:21 16:3,17
16:21 19:6,20
19:21 20:7,11
21:19 22:4,13
23:6 26:23
31:6 75:17
77:5 84:22
131:16 236:6
lawrence 195:9
196:9 200:21
lawsuit 185:3,3
196:11,12,14
lawyer 16:12
17:4,8 27:10
42:23 56:24
57:1 143:19,24
156:17,22
157:2 183:12
195:19 203:6
207:13 208:15
213:7 215:6
lawyer's 64:18
lawyered
221:24
lawyers 12:3
29:8 44:22
63:20 142:23
156:4 183:18

201:23 203:22
207:19
lead 25:20 73:5
208:14 230:16
leader 243:7
leading 99:7
197:21 205:4
208:10 210:7
210:22 242:24
leads 75:8
learn 125:5,14
134:22 149:10
236:21
learned 125:10
173:7 176:5,8
229:12
learning 56:2
lease 31:9
leave 81:22
92:24 115:21
116:3 126:11
126:14 174:5,6
225:17
led 68:23 69:11
118:1 244:4
left 35:12 54:20
76:19,24 81:24
92:22 111:13
227:18
lengthy 224:23
leniency 86:15
86:16,17,21
leonard 181:13
letter 5:6 52:5
52:7,9,11,14

72:17,21,24
73:10 74:5,11
74:19,20 76:21
76:23 77:16,24
78:1 80:2,4,7
80:12,18 81:16
87:1,17,21,22
88:2,9,17,24
91:8 188:12,21
189:6,24
231:10,13
239:3,5,8,17
letterhead
188:4,9
letting 201:6
liberto 137:15
137:21
liberto's 224:1
224:5
liberty 57:10
lic 259:21
license 1:24
20:4,12 49:24
49:24
lie 96:18 102:3
102:8,17,22
141:9 164:4,7
165:4
lied 147:14,23
life 43:16,16,18
56:15 58:2
63:18 123:15
132:23 133:1
164:1 214:17
215:8

lightheaded
75:24
likely 103:7
117:1 130:20
153:10 155:16
166:17
limited 23:12
23:23
lindsay 2:2,4
8:13,13 194:10
257:4
line 78:7 184:8
linehan 2:14
7:19 83:11
89:15,16 90:1
90:9 91:2 94:5
98:23 100:7
110:13 111:16
112:14 113:6
113:19 118:15
120:18 123:8
124:24 126:12
165:12,17,23
184:6,9 187:11
196:15,15
212:14 213:24
214:8 225:7,15
233:11 242:12
242:14,18
listed 82:19
83:21 160:1
180:21 188:1
191:14 192:24
listened 128:4

**literally** 186:5
**litigation** 21:22
**litigator** 22:5
**little** 13:22
14:13 15:1
37:21 43:8
58:19,24 73:8
75:24 76:17
80:6 104:11
111:2,4 142:9
201:4 217:4
224:23 229:24
232:23 237:3
**live** 12:22
195:10
**lives** 132:10
**llc** 2:11
**llp** 2:6 3:2,9,16
**loaded** 59:18
**located** 15:16
15:17 30:23
254:4
**location** 7:9
17:20
**locke** 3:11
**loevy** 2:2,2
**loevy.com** 2:4
**logistics** 104:15
124:21
**long** 13:5 15:3
17:8 19:19
30:22 45:6
132:10 186:3
199:9 203:20
237:13,15

253:5
**longer** 195:16
**look** 36:2 39:9
48:9 49:2 50:2
51:23 72:6,11
79:3 105:6
111:21 112:1
129:1,2 136:14
145:14 168:14
168:18 179:2
179:16 186:23
188:12 210:13
210:16 218:6
224:19 243:12
**looked** 161:3
222:21,21,22
**looking** 34:13
34:22 36:22
58:4 63:21
64:6 72:15
73:16 86:15
88:2 108:4
112:24 132:13
151:24 169:2
169:10,19
170:9 193:12
204:24 233:2
244:22
**looks** 39:24
209:10
**lopez** 8:6
**lost** 238:22
**lot** 21:3 24:6
31:10 103:11
140:15 144:3

199:5 208:20
210:10 242:7
**loud** 10:1
**love** 13:11
**low** 221:2
**lower** 35:12
126:20
**lunch** 111:8
**luordo** 1:23
7:13 258:4
**lydon** 2:7 4:5
4:10 8:11,11
64:3 76:2,7
100:3 167:21
168:1,5,13
169:1,18 170:2
170:8,20 171:6
171:16,23
172:7,17
173:18 174:1
174:20 175:2
176:15 177:1,9
177:18 178:1
178:12,16
197:21 200:19
200:19,20
205:4,23 206:6
208:10 210:7
210:22 211:13
214:13 215:3
217:15 220:12
222:16 234:1,7
239:11 240:13
241:1,14 243:2
243:11 244:3

244:21 245:5
245:12,20
246:9 247:1,18
249:8,21
250:11,18
251:13 252:4
252:11 253:14
256:23 257:4,9
**lying** 165:13

## m

**m** 1:23 2:7,18
35:13 191:9
256:4 258:4
**made** 27:15
49:15 50:13
53:12 54:5,7
55:16 65:14
68:7 73:4 75:4
108:23 127:6
151:3 152:13
153:19 171:4
178:4 194:11
194:12 205:18
245:7,15 253:8
254:14
**madison** 19:15
19:16
**magazines**
215:21 216:6
**maicke** 2:21
**mailed** 212:2
**main** 17:22
24:12
**major** 32:13
66:3,5

**[majority - meeting]** Page 31

**majority** 66:9
**make** 99:3
  127:17 146:20
  147:20 153:14
  153:23 154:17
  164:10 165:3
  166:17 167:6
  245:19 248:11
  257:15
**makes** 194:13
**making** 28:16
  55:22 161:13
  161:17,19,23
  162:2
**man** 151:12
**mandatory**
  43:18,23
**manner** 62:5
  90:2,6,10,17
  91:4 101:11
  159:9 182:8
**march** 1:21 7:3
  258:7 259:14
**maria** 13:8
**marijuana**
  216:9,15
**marine** 15:2,4
**mark** 36:15
  78:17 157:22
  184:17
**marked** 6:5
  33:16,19 36:11
  39:5 48:12
  51:19 72:8
  78:22 105:2

106:15 128:21
136:10,13
139:13,16
145:10 212:4
**marley** 2:21 8:6
  181:13
**married** 13:3,5
**martin** 131:5
**masciopinto**
  3:2,2 4:8,12
  8:9,9 48:15,19
  183:7,8,15
  184:19,23
  185:1,21 188:2
  188:15,17
  189:3,10,19
  191:2 193:16
  193:19 255:22
  256:2,21
**matt** 8:15
**matter** 7:5 12:4
  26:10 75:21
  77:8 117:22
  173:14 182:24
  207:18 232:20
  253:3
**matters** 23:13
  131:3
**matthew** 1:4
  7:6 119:2
  143:20 158:2
  167:13 185:4
  185:12 206:22
  252:21 258:12

**maureen** 2:11
  7:17 175:12
  179:2 197:2,20
  198:3 200:23
**maureen.obri...**
  2:14
**maybrook** 24:7
  195:19
**mcdonald** 2:21
**mchenry** 16:13
  23:18
**meadows** 24:7
**mean** 23:8 24:3
  25:20 27:19
  41:24 49:4
  53:21 57:12,13
  58:20 60:12
  66:20 69:15
  70:13,19 81:9
  82:20 87:8
  91:22 104:7
  118:22 148:9
  149:24 152:15
  154:9 173:23
  180:8 193:1
  194:14,22
  211:2 212:18
  222:5,11 223:5
  223:7 224:8
  227:11 233:18
  234:6,8,16
  238:14 240:18
  244:1 252:24
**means** 53:22
  115:22 132:4

202:20 232:7
**meant** 254:12
**media** 7:3
  54:13,17 111:6
  111:10 168:7
  168:10 239:23
  240:3
**medical** 11:12
  11:17,21
**medication**
  11:7,15,16
**meet** 12:3
  22:12 156:19
  195:13 201:19
  203:13,17
  211:7,11
  212:14,22,24
  213:7,14,23
  214:12,18,22
**meeting** 67:3
  68:14 70:14,15
  71:2,12,22
  72:2 73:20
  74:1 79:17,20
  81:14 82:2,3,8
  83:17,24 84:6
  84:11,19 85:11
  85:12,16,19
  86:7,23,24
  87:5,8,19 89:6
  89:15,19 91:16
  92:12 93:2,16
  94:4,14 95:2
  95:12,16,18
  98:8 100:17,22

103:15 104:14
104:15,22
110:11,19
111:14,19
112:6,13,19,21
113:4,18 114:5
114:18,24
115:6,13,18
116:11 117:5,8
117:15,20
119:21 120:4
120:14 122:19
122:21,24
123:13 125:4
125:21 151:12
178:23 189:4
193:1 194:20
196:6,7,22
197:4,6,7
199:6,10,12,18
199:20 200:2,8
200:12,17
201:3 203:20
203:21 204:3
211:15 239:15
239:18 240:21
245:22

**meetings**  68:22
69:1 74:2
78:11,15 92:6
92:17 126:4
134:13 163:15
165:2 167:11
188:22 198:24
199:2,23 204:7

205:2,7 208:9
208:16,23
209:5 210:21
226:6 234:22
239:7,13
243:14 244:4,9
244:10 245:8
245:16 248:9
250:20,22
253:8 256:10

**member**  14:14
21:21 141:16
148:7 149:4

**member's**  56:9

**members**  86:5
156:10

**memorable**
14:17

**memorandum**
251:2

**memories**
198:13

**memory**  31:19
78:14 79:16
80:3 110:17
111:18 112:4
112:12,23
113:2,15,17
129:9 136:15
136:19 137:1
139:10 146:4
179:13 180:12
193:5,7 197:11
197:13,17
198:8,11

250:21 251:4

**men**  236:3

**mention**  227:24
228:7

**mentioned**
66:24 176:14
185:11 217:19
220:8 253:4
259:7

**mentioning**
216:3

**merits**  55:6

**met**  22:13
175:3,21 195:4
197:2,20 198:3
200:14 202:3
204:8 216:18
220:9 226:18
227:3 228:23
229:3 230:20
234:22 252:22
253:2

**meyer**  2:17

**michael**  3:16
22:10 24:17
26:14 29:15
35:7 36:17
37:5,7,14,23
40:2 78:3,4
106:2 130:16
130:17,18
133:10 138:16
163:3

**michaelbest.c...**
3:18

**michigan**  14:3
14:4,9,15
201:4 204:1,20

**mid**  10:21
30:20

**middle**  21:24
186:24

**midst**  166:9

**mike**  22:18
24:16 25:13
26:5,8 27:23
29:22 30:8,16
32:3 55:6
60:16 67:3
111:15 113:5
113:18 129:5
134:15 135:6
163:5,19 170:4
170:13 187:8
244:15

**miller**  45:15,16

**mind**  14:21
42:14 57:15,17
76:8 91:5

**mind's**  82:20

**mini**  18:4

**minimum**
126:19,20

**minute**  239:20
239:22

**minutes**  184:16
199:11

**misconduct**
109:13 110:3
159:24

**[misdemeanor - name]** Page 33

**misdemeanor**
20:20 23:10
25:1
**misdemeanors**
18:15
**mispronounced**
182:2
**mispronounc...**
190:6
**misstates** 40:5
205:5 208:10
**misstating**
239:9
**mitigate** 66:11
69:19 250:1
**mitigating**
70:22
**mitigation**
153:5,9
**modifying**
166:1
**moment** 74:15
140:8 184:22
**monitor** 7:3
**monroe** 2:12
3:12
**month** 199:14
**months** 15:5
175:8,10,11,21
176:3,4,8,17
191:4 199:8
200:12 248:9
250:23 251:1
251:14,15

**moran** 42:13
42:18 130:4
131:16,19,22
132:4,6,8
139:3,19
144:22 145:1
153:18 224:20
224:22 232:7
232:14,18,22
233:12
**moran's** 46:6
**morfin** 1:8 8:1
8:15 137:16,16
143:6 158:14
166:7,8,9
206:18
**morfin's**
158:11 166:23
176:9 205:15
**morfins** 137:22
**morning** 7:1
212:2
**moser** 3:7
256:4,7,8,9,18
**motion** 4:21
5:10,15,19
38:9,11,12,17
38:22 39:2,13
40:1,11 47:1,7
48:17 105:15
106:22 107:6
107:22 108:9
108:13,18,22
109:6,11,16,21
109:22 110:5

137:10 138:1,3
138:21 139:8
160:13 161:1
255:16
**motions** 29:3
29:10 38:5,8
40:7 142:20
155:9
**mouth** 98:11
248:13
**move** 43:2
**moved** 88:14
135:21 254:24
**moving** 135:14
136:21
**munch** 111:3
**murder** 20:24
25:15 27:6,15
27:22 31:15
32:18 33:11
35:5 43:10,15
44:17 46:7
50:4 51:4,10
57:3 59:9
62:13 71:24
80:15 91:18
96:22 121:21
122:4 126:20
132:19 133:2
143:12 144:22
145:2 150:10
150:18 156:5,6
156:13 157:12
166:10 202:15
202:18,23

203:9 246:11
**murders** 56:6,6
131:4 133:6
164:21 167:14
228:4 232:12

**n**

**n** 4:1 9:9
**name** 7:11 9:6
9:7,8 13:7 22:9
23:19,22 31:14
32:20 34:6
37:24 42:14
45:5,6,8,10,11
45:13,14,17,20
46:11,23 49:22
69:22 78:2
79:7 83:10
119:10,14
127:16 134:16
143:19,21,24
152:1 157:8,10
157:22,23
158:2,4,13,17
158:19,20,22
159:1,6,14,16
159:18 163:4
177:16,17
180:1,3,9
181:10 182:3
183:8 190:6
191:9,10,14,17
191:24 192:5
192:11,11
200:18 201:23
212:7,10 219:2

**[name - number]** Page 34

226:11 251:17
253:5 256:6,18
**named** 16:7
169:3 226:7,14
**names** 70:11
118:3,5,7,11,16
118:19 119:2,8
119:11,19
120:2 179:24
180:20 210:11
229:10
**narrative** 92:2
170:22 173:10
**nathan** 3:9
7:24
**natural** 43:16
43:16,18 56:15
132:22 133:1
240:17 241:2
**naught** 257:21
**necessary** 22:2
184:23,24
**need** 10:16
99:22 178:7
184:21 217:9
239:20
**needed** 174:8
203:11
**negative**
159:12
**neglected** 256:3
**negotiate** 21:11
21:19 63:21
64:6 71:4 85:2
114:12 126:20

126:21 196:2
**negotiated**
126:15 132:14
132:15 133:11
133:17,19,20
148:1 150:8
240:6
**negotiating**
64:23 84:13
126:3
**negotiation**
126:10,18
129:17 240:19
**negotiations**
65:4 66:2,11
69:9 108:6
126:6 135:7
**neha** 3:11
**neighborhood**
13:18
**neil** 2:14 7:19
83:10,15 89:15
89:16 90:1,9
94:5 98:23
99:2,8 100:7
110:13 111:16
112:14 113:6
113:19 118:15
120:18 123:8
124:24 126:11
126:16 165:12
165:17,23
184:6,9 187:10
**never** 14:21
31:11 40:7

118:4 155:5,11
166:12 176:12
176:12 186:8
186:10 211:14
217:18 230:12
230:13 233:15
233:22 234:18
241:16 249:14
249:18,19,19
252:5,7,9,15
253:10
**new** 119:19
120:1
**nice** 13:17
199:17
**nicholas** 1:8
137:15,16
**nick** 8:14 45:17
143:5 158:11
166:7,9,23
176:9 224:1
**night** 104:7
227:4
**nklawllp.com**
3:13,14
**nodding** 10:4
**nonverbal** 10:3
**norfie** 2:21 8:6
169:3 179:20
180:16 181:12
181:22 182:2
184:13 185:5
187:14
**normal** 61:5,24
63:7

**normally** 74:8
**north** 1:19 2:3
2:7 3:4 7:10
258:8
**northern** 1:2
7:8 15:14
258:11
**northwestern**
157:13,17
**nose** 248:6
**notarial** 259:13
**notary** 258:4
259:20
**noted** 64:2
**notes** 186:20
239:21
**notice** 259:5
**noticed** 79:7
**noticing** 7:16
**notification**
44:7
**notified** 67:5,7
67:9 74:16
213:10,12
**notifying**
213:13
**number** 4:16
5:2 6:2 35:5
36:5 38:1,1
39:19,23 49:24
57:10,23
102:13,13
124:23 129:14
137:17 183:20
195:24 207:11

**[number - objection]**                                                Page 35

| | | | |
|---|---|---|---|
| 232:22 | 68:13 69:6,21 | 117:13,18 | 164:17 165:1 |
| **o** | 70:7 71:1,11 | 118:10,14 | 165:11,16,22 |
| **o** 3:16 184:13 | 71:21 72:10 | 119:1,7 120:3 | 166:5,14 167:4 |
| 185:5 187:15 | 73:15 74:4,9 | 120:10,23 | 167:18,23 |
| 191:9 192:14 | 74:17 76:16 | 121:10,19 | 168:2 176:3 |
| 256:4 258:3,3 | 78:18 79:1 | 122:8 123:7,12 | 195:7,15 196:3 |
| **o'brien** 2:11 | 80:22 82:14 | 123:18 124:7 | 196:8 198:6 |
| 4:4,11 7:17,17 | 83:2,9,23 84:5 | 125:12 126:1 | 199:19 211:24 |
| 9:5 21:4,17 | 85:6,14 86:14 | 127:5,12 128:6 | 218:8 225:9 |
| 22:8,22 24:2 | 87:4,10 88:7 | 128:23 129:13 | 232:10 239:9 |
| 24:14,20 26:21 | 88:22 89:13 | 129:22 130:7 | 251:11 253:4 |
| 27:4,11,21 | 90:8,15,22 | 133:3,9,16 | 253:15,18 |
| 28:9,19 29:1 | 91:7,15 92:1 | 134:2 135:5,12 | 254:13,19 |
| 29:13,21 30:2 | 92:10,16 93:8 | 136:3,12 138:9 | 255:14,21 |
| 30:14 31:20 | 93:15,21 94:2 | 138:11 139:9 | **o'callaghan** |
| 32:8,16,22 | 94:13,19 95:1 | 139:15 140:7 | 2:11,12 7:18 |
| 33:3,18 36:1 | 95:7,11,20 | 140:17 141:5 | 7:22,22,23 |
| 36:13 38:20 | 96:3,11,20 | 141:12 142:1 | 48:17 194:9 |
| 39:7 40:10,16 | 97:2,11,18,23 | 142:11 144:9 | **o'mara** 2:11 |
| 41:1 42:2,9,16 | 98:9,15,20 | 144:20 145:3 | 7:17,23 |
| 43:1,7 44:1 | 99:5 100:5,16 | 145:12 146:13 | **o'shea** 119:17 |
| 45:3 46:4,10 | 100:21 101:5 | 146:22 147:6 | **o2lawyers.com** |
| 47:9,19 48:1 | 101:13,19 | 147:11,17 | 2:14 |
| 48:21 49:1,13 | 102:1,6 103:13 | 148:13,18 | **oath** 8:19 9:16 |
| 50:11,22 51:5 | 103:19 104:21 | 149:1,9,18 | 189:21 |
| 51:21 52:18 | 105:4 106:17 | 150:1 151:1,9 | **object** 35:23 |
| 53:1,10,16 | 107:3,21 | 152:17 154:4 | 138:5 144:18 |
| 54:10,19 55:13 | 108:16 109:12 | 154:16 155:1,7 | 148:11 194:15 |
| 55:20 58:3,13 | 109:20 110:10 | 155:12,17 | 234:7 241:14 |
| 59:7 60:6 61:4 | 110:16 111:5 | 156:9,16 158:6 | 243:2 |
| 61:13,22 62:3 | 111:12 112:18 | 158:16 159:13 | **objecting** |
| 62:16 63:6,14 | 113:3,11 114:2 | 160:11,17,23 | 194:10 |
| 64:5,19 65:5 | 114:11,17,23 | 161:6,12 162:5 | **objection** 21:2 |
| 65:12 66:1,7 | 115:5,11,16 | 162:11,17 | 21:13,15 22:6 |
| 66:21 67:10,18 | 116:1,22 117:3 | 163:1,10 164:5 | 22:20 24:1,11 |

**[objection - obviously]**

24:19 26:20,24
27:7,17 28:2
28:17,22 29:5
29:17,24 30:11
31:16 32:5,11
32:19,24 33:12
35:21 38:18,24
40:4,14,24
41:23 42:5,12
42:19 43:3,21
44:24 46:2,8
47:4,16,23
49:9 50:6,19
51:2,15 52:15
52:22 53:8,14
55:11,17 57:19
58:7 59:4 60:4
61:1,9,19 62:1
62:14 63:2,10
63:24 64:15
65:1,8,22 66:4
66:18 67:6,13
68:10 69:4,13
70:4 71:7,16
73:12,23 74:7
74:13 80:20
82:12 83:1,6
83:20 84:3
85:4,8 86:12
87:3,6,23
88:18 89:9
90:3,11,19,24
91:11,21 92:4
92:14 93:5,12
93:20,23 94:10

94:17,22 95:4
95:9,14,23
96:9,15,23
97:8,13,21
98:1,12,17
99:1,17 100:13
100:18 101:1,8
101:17,22
102:4 103:4,18
104:18 106:10
106:24 107:18
108:14 109:8
109:18 110:8
110:14 112:16
113:1,8,22
114:9,15,21
115:3,9,14,19
116:19,24
117:11,16
118:9,21 119:4
119:22 120:6
120:20 121:7
121:14 122:5
123:5,10,16
124:5 125:8,22
127:3,9,23
129:7,19 130:2
132:24 133:8
133:14,24
135:1,9,23
136:6 139:5
140:5,13 141:3
141:10,21
142:6 144:5,16
144:23 146:12

146:17 147:4,9
147:15 148:16
148:21 149:6
149:16,23
150:21 151:7
152:14 154:2
154:11,21
155:4,10,15
156:7,14 158:3
158:12 159:10
160:8,14,21
161:2,10 162:3
162:9,15,23
163:8 164:2,14
164:22 165:6
165:14,20
166:3,11 167:1
168:22 169:14
170:1,6,19,24
171:11,19
172:3,12
173:13,21
174:15,24
176:11,21
177:7,13,23
178:10,14
180:7 182:15
183:3 185:20
187:21 188:24
189:9 190:23
194:11,12
197:21 205:4
205:23 206:6
208:10 210:7,7
210:22 211:13

214:13 215:3
217:15 220:12
225:9 232:10
234:1 239:9
240:13 241:1
243:24 244:19
245:2,10,17
246:7,21
247:15 249:6
249:17 250:8
250:16 251:9
252:1,8 253:9
254:10,18
255:9
**objections**
60:20
**observations**
118:1
**observe** 182:12
233:4,13
249:19
**observed** 99:9
170:14 172:1
233:15 242:23
249:14 250:17
**observer** 243:8
**obtain** 249:24
250:2
**obtained** 31:21
31:24 75:15
77:3
**obvious** 220:16
**obviously**
81:13 115:22

occasion 31:13 98:7
occasionally 58:21,21 195:20
occasions 183:20 238:5
occupation 12:18
occur 150:5
occurred 169:8 169:22 171:17 243:21
occurrence 117:2
occurring 84:20
october 112:9 113:10 214:1
odd 197:24
offer 126:11
offered 126:18 126:19
office 7:21 17:10 30:17,23 31:6,6 47:6,11 50:5,18 57:2,8 62:24 63:22 64:8,14,23 65:15 71:5,14 71:24 74:24 75:3,7,19 77:6 77:19 81:18 82:4,6,23 84:14 85:16

96:13 100:24 103:3 113:7 114:13 117:21 124:15 129:6 130:19 135:7 135:14,22 136:20 141:17 148:2,8 149:5 156:11 167:12 169:8 173:5,10 177:20 181:19 181:23 184:14 185:6,18 188:6 190:4,13,19 192:8,22 199:4 207:14 209:12 229:9 245:1 246:5,15 247:11 250:13 251:6
officer 162:19 179:10,21 180:3,22 191:8 191:17 192:3
officers 8:10 180:20 183:10
offices 19:12
official 239:17
oh 21:8 26:15 30:15 49:23 73:18 94:3 112:17 144:17 163:13 169:17 179:2 180:2 181:8 191:6

195:1 196:13 199:8 204:22 206:12 231:21 233:20
ohio 14:21
okay 10:9 13:12 20:17,18 42:17 48:8,23 54:10,11,20 72:14 76:9 78:20 79:9 82:2 89:14 100:1,1 111:13 112:8,10 114:5 124:20 126:6 126:15 127:6 135:19 136:18 159:2,5 163:13 176:4 179:13 179:23 180:12 180:19,23 181:21 184:3 184:17 185:7,8 185:19,23 186:11 189:4 195:11 196:5 197:12,18 198:2,10,12 200:8,13,16 202:19 203:4 204:20 205:12 205:20 206:9 207:18 208:8 209:11,19,22 210:4,23 211:4

211:10,17 212:7,17,20 214:11 217:12 218:19 220:9 221:12 222:3 223:3,12,17 224:18 226:13 227:20 228:9 228:12 229:14 230:9 231:13 234:5 235:11 235:14,16 238:22 239:20 240:11 242:7 243:6,18 256:16,21
old 9:12 23:14 56:10 197:16
once 30:12 46:5 200:11 224:16 237:6 253:19
ones 78:12 86:6
ongoing 79:9 115:23
open 122:13 154:13 236:22
opinion 44:11 53:17,19 97:19 101:20,23 102:2
opinions 29:16 29:19
opportunities 80:9,11

**opportunity**
  18:10 51:9
  59:14 60:23
  85:17,18
  219:16 220:5
**opposed** 64:11
  233:3
**opposing** 56:9
**options** 127:13
**order** 5:22 10:1
  20:9 57:23
  63:1 139:3,7
  139:11,19,20
  156:18 163:7,9
  163:11,12,12
  163:20,21
  166:8,17
  228:20
**ordered** 139:24
**original** 149:21
  150:19 155:20
**originally** 46:7
**orpett** 2:17
**outcome**
  259:10
**outside** 58:12
  199:16 242:1
**overture** 65:14
**own** 18:24 40:8
  164:1 202:17
  202:20 217:9
**owned** 31:6,8

**p**

**p** 184:6,12
  185:5,18
  187:11
**p.c.** 2:17
**p.m.** 73:22
  111:7,11 168:7
  168:11 189:14
  189:18 239:24
  240:4 257:20
**pace** 43:2
**page** 4:16 5:2
  6:2 40:8 49:21
  207:11 210:14
  210:16
**paper** 40:8
  193:13,14
**paragraph**
  52:10 73:17
  79:7,12 112:8
  112:11 113:13
  138:10,13
  169:20 181:20
  186:24 190:7
**paragraphs**
  52:14,16
**parcel** 102:18
**pardon** 207:9
  213:24
**parents** 219:10
**part** 23:21 66:3
  66:5 76:20
  102:18 119:24
  153:16,24

**participate**
  75:1
**participated**
  164:20
**particular**
  14:16 47:10
  55:9
**particulars**
  37:24
**parties** 190:11
  259:3,9
**partners** 23:1
  31:3
**party** 190:15
**pass** 216:23
**passed** 16:1
  217:3 236:17
  252:16
**passing** 16:20
**past** 191:4
**pat** 143:19
  158:2,4 252:24
**patricia** 2:15
  7:20 159:15
**patrick** 252:22
**paul** 45:8
**pena** 45:12
**penalty** 22:1
  44:2,4,8,12
  56:13,14,16
  132:21 198:20
  198:20
**pendency** 46:1
**pending** 64:8
  84:15 93:19

  94:15 114:8
  115:1 117:10
  127:21 137:23
  142:13,15
  143:12 258:10
**people** 34:2,2,9
  35:3 48:18
  59:20 119:11
  132:20 137:14
  160:1 164:1
  182:22 206:20
  206:21 227:14
  227:15
**people's** 39:8
**percent** 30:13
  47:12 50:8
  54:7,8 59:6
  88:20 90:14
  91:13 92:5
  107:20 119:6
  150:11,19
  153:11,20
  157:20 229:4
  236:15 239:19
  253:13 255:11
**perjury** 140:12
  231:6
**permission**
  64:13,16 84:23
  142:19 156:19
  156:22,23
**person** 22:9
  45:4,5,8,11,14
  45:17,20 46:11
  46:14 68:8

69:22 82:22
83:10 157:8,21
158:1,17,20
159:14 191:18
**personal**
131:23
**personally**
89:10 258:7
**personnel**
193:9
**persons** 182:22
**pertaining** 1:18
52:9 86:8
93:18 94:7
**peter** 3:24 7:11
217:7
**petition** 156:12
**petitions**
155:19
**phase** 152:4
**phone** 38:1
68:8 204:18
**photocopied**
231:23
**piece** 143:9
**pilot** 144:1,4
**place** 92:17
120:1 166:9
189:5 195:8
224:1,3 238:23
**placed** 131:24
139:21 253:24
**places** 235:18
**plaintiff** 1:4,8
1:12 185:10,11

**plaintiff's**
204:12
**plaintiffs** 2:5
8:14 35:4
185:9 258:13
**plan** 166:1,8,16
**planned** 165:19
**planning**
164:20
**plea** 6:3 66:2
69:9 71:4
84:13 85:2
114:12 124:22
145:23 146:1
147:3,8,13
148:6 149:19
150:5 151:16
152:4,9 154:6
154:20 155:3
156:1 169:22
171:24 173:4
196:2 224:19
232:9,12,16
240:18 244:5
246:4 247:13
247:24
**plead** 41:17
131:6 133:6,12
224:14,16
**pleading**
146:16
**pleadings** 29:3
**pleas** 21:11,19
**please** 7:14
8:19 9:6,8,24

10:6,10 12:24
34:13,14,19,22
35:11 72:12,13
73:17 74:18,19
76:22 77:21
79:4 105:6
130:22 136:24
138:1,12
139:17 163:14
184:20 188:15
206:10 245:11
**plural** 206:13
**plus** 52:16
186:13
**point** 18:19
28:11 55:3
66:10 68:2
70:3 101:2
103:20,21,23
104:3,10,11
116:9 120:14
125:3,4,13
130:21 134:3
134:21 142:8
150:15 163:19
193:14 197:3
221:5 241:21
246:10 256:5
**police** 48:2,6
50:14 54:6
56:22 57:4,9
57:22 72:3
82:18 86:18
92:21 108:24
109:13 124:18

160:7,19,20
161:14 162:19
179:10,21
180:2,10,20,22
181:1 183:9,21
186:2 188:8,9
190:14 191:8
193:12 219:17
219:22 220:22
223:1,4,6,8
226:19,21,23
228:20 229:6
229:11 240:20
**popped** 42:14
**population**
83:5 254:7
**positioned**
235:6
**possession**
75:19 77:7
**possibility** 51:4
**possible** 50:24
62:13,17,18
108:5 180:5,8
217:12
**possibly** 54:22
100:24
**post** 155:9,9,19
156:12
**practice** 16:16
17:1,13 19:5
19:20 20:12
22:15 23:6,12
23:16,23 24:17
38:16,22 39:1

**[practice - private]**

Page 40

47:5 50:8 51:6
51:13 55:8
61:6,11,24
63:8 66:23
67:1 74:6 88:1
92:6 93:13
95:24 142:3,9
146:14 215:1,5
215:5,10
220:15 248:23
**practiced**  19:21
20:6 21:18
22:3 26:22
**practicing**  22:4
24:6
**practitioner**
19:9,10 20:16
20:19 23:7,13
**prayed**  235:21
**pre**  5:10
**preferably**
215:6
**preferred**
238:13,15
**preliminary**
41:8
**prep**  142:3
244:16 247:10
248:6
**preparation**
141:16 203:14
203:18 255:16
255:16
**prepare**  12:1
12:16 17:5

153:5 203:11
228:20 248:2
**prepared**
168:19 169:2
179:19 182:1
209:13 223:12
**preparing**
223:18
**prepping**
246:19 247:13
248:1
**presence**  90:2
96:24 97:9,15
123:6,11 159:9
159:11 164:18
166:15 167:8
167:10 170:13
182:19,21
258:20
**present**  3:24
66:16 67:12,16
71:22 72:1
73:20,21,24
74:3,6 78:11
78:15 79:17,19
79:24 80:4
81:13 82:16,16
83:17 84:6,10
84:12 89:21
94:6 113:16
127:13 140:15
141:15 142:3
143:13 145:4
146:4 156:1
169:16,17

170:5 172:14
179:1,5,14
182:11,14
186:24 187:7,9
192:20 199:18
200:16,20
205:19 206:1
207:13,19
208:1,5,7,8,13
208:13 213:2,8
213:15 214:1
222:2 223:20
226:1 233:8,8
234:17 241:18
243:20 244:9
244:16,17,23
245:8,15,24
246:15 247:12
248:3 249:4
253:8 255:16
259:6
**presenting**
139:8
**presents**
210:20
**presiding**  41:12
41:14
**pressure**  11:15
76:1 164:19
**pressured**
161:22
**presume**
209:14
**pretrial**  105:15

**pretty**  38:11
46:20 70:11
72:21 80:18
194:2 208:18
220:16
**prevent**  11:18
11:22
**previously**
37:15 60:8
122:23
**prezzano**  3:24
7:11
**primarily**  18:7
20:12 23:10
24:5 26:11
**printed**  231:22
**printing**  218:17
**prior**  12:9
20:11 27:5
46:15 66:13
70:8 83:24
84:19 130:1,12
131:9 142:2,20
142:23 146:14
226:5 228:3
238:5 250:24
**prison**  43:17
58:2,2,12
123:15 132:5,7
132:8,11 232:8
233:17,19,24
**prisoners**  59:13
**private**  92:12
115:13,18
195:19 203:6

**[privately - putting]** Page 41

privately 59:16
  87:13
privilege
  228:18
privileges
  230:10,14
probable 41:10
probably 17:9
  19:3 21:9
  22:24 27:8
  28:23 45:1
  54:7 74:15
  90:12,13 91:4
  98:7 145:8
  151:23 196:20
  199:8 203:15
  213:11 217:11
  221:3 222:5,10
  236:13
problems 42:21
procedure 1:17
  64:17 88:21
  134:19
proceed 8:19
  60:10
proceeded
  84:23
proceeding
  41:9
proceedings
  75:11 146:8
  255:13 257:20
process 21:24
  55:1 56:21
  57:7 84:12

88:6 240:18
professional
  90:2,6,10,17
  102:12 159:9
  174:14,18
  182:8
proffer 5:6
  72:17,21,23
  73:10 74:5,11
  74:19,20 75:9
  76:20,20,23
  77:17,20 80:2
  80:4,7,12,18
  81:16 87:1,17
  87:21,22 88:1
  88:9,16,24
  91:8 169:7,12
  169:20,21
  171:8,18
  172:19 173:1
  173:20 174:14
  183:22 187:5,5
  188:12,20,22
  189:4,5 190:2
  190:4,10,11,15
  191:12,21
  231:9,13 239:3
  239:8,17 240:6
  240:8 243:14
  244:24 245:8
  245:16
proffering
  249:4
proffers 186:15
  191:4 192:7,20

programs 29:8
progress 201:6
project 157:15
promise 77:18
  86:15,17,20
  165:13 183:10
  190:3
promises 73:4
  248:11
pronounce
  180:1
pronounced
  31:17 153:16
properly
  203:11,12
  228:17,20,21
proposed 128:8
prosecuting
  68:4 239:15
prosecution
  75:6 77:15
  81:9,23 84:8
  92:20 115:21
  116:2 136:1
  174:4 205:9
prosecutor
  249:15
prosecutors
  21:11,19 38:15
  70:2
protection
  135:8 139:22
protocol 222:1
provide 91:17
  116:6 117:4,20

provided
  124:14 162:7
  215:21 216:5
providing
  11:22 117:24
province
  230:16
ptak 2:22 8:8
  180:1,2,15,16
  181:13,18
public 258:4
  259:20
pull 166:24
punch 29:10
punished
  121:18
punishment
  66:12 102:15
purchase 200:4
purchased 29:7
purported
  249:11
purpose 75:22
  77:10 240:18
purposes 114:3
pursuant 1:16
  5:11 75:13
  77:2 105:15
  144:11 259:5
pursue 75:7
put 111:1 194:5
  205:21 248:13
  254:7
putting 98:10

**[quarters - recall]** Page 42

**q**

**quarters** 5:20 135:15 136:22 137:11 139:1,4 139:22 215:12 253:21,24 254:2,4,8 255:6

**question** 9:21 9:24 10:11,21 17:1 19:19 27:14,19 33:7 54:21 58:14 65:6 78:14 87:1 98:2 105:7 111:2,14 116:16 125:13 135:19 163:13 164:6 192:13 195:3 213:3,5 214:9 234:7 256:5

**questioned** 89:16

**questioning** 89:23 99:7,20 184:8

**questions** 9:20 11:4,19 20:15 76:8 79:5 92:3 92:7 100:10 117:6 122:14 122:16 138:7 146:19,20,24 178:17 181:3,5

182:10 183:5,7 183:18 184:4 184:12 186:21 192:3 204:1 242:9,11,13,15 243:4 245:21 248:8 249:9 253:15 256:3

**quick** 23:15 43:2 79:6 183:10,13

**quickly** 94:12 104:20 250:9

**quiet** 99:9 178:19,20 186:19 257:2

**quietly** 79:11

**quite** 194:14 204:19 226:22

**quote** 183:21 187:7 189:24 190:5

**r**

**r** 8:17 192:4,14 256:4

**raise** 154:17 238:16

**raised** 13:12 238:10

**range** 43:14 61:14

**rather** 44:19 76:7 124:21

**reach** 253:6

**reached** 142:4 178:3

**reaction** 118:8 118:15

**read** 12:9,12,13 34:14,16,23,24 35:11 69:15 73:17 74:19 77:24 78:2 79:4,8,10,13 88:11,11 112:10 113:13 130:22,24 131:17 137:13 138:1,10 152:11 187:12 190:7 210:8 215:21 216:6 226:19,22,22 231:14 257:14

**reading** 52:10 53:18 76:19,20 76:23 79:15 113:16 136:16 180:4 201:13 237:19

**ready** 193:21 252:19

**real** 23:15 168:3 193:20

**really** 27:2,2,18 31:11 32:6 42:7 43:6,22 44:10 69:14 104:12 116:21

126:17 167:2 179:11 183:16 186:3,21 200:3 225:12 248:17

**reason** 10:17 18:22 109:3 122:22 129:9 154:10 157:19 186:1 187:17 187:22,24 191:11,15,20 192:2,6,17,19 192:23 193:2 199:1 222:7,9 222:13 223:24 224:2,12 238:3 238:7 244:23 245:3,6,13,18 256:9,14,17

**reasoning** 30:5 56:17 127:11

**reasons** 117:15 171:3

**rebuttal** 77:13

**recall** 19:1 21:7 26:18 27:5 30:19,20 31:21 32:6,17,20,23 33:1,2,14 36:17 38:7 40:17 41:5 42:3,6,7,15 43:6,13,22 44:6,10 45:2 45:23 46:3,5,9

**[recall - recollection]** Page 43

48:7 50:8,9,21
51:16 53:11,15
55:7 56:7,19
59:16 60:19
61:2,11,16,20
62:7,20 63:12
65:2,13,16
66:24 67:8
68:4,5,21 72:1
73:24 74:3
80:2,3 81:19
82:13,18 83:8
83:24 84:4
85:9,11 86:4
87:17,24 88:19
88:20 89:16,18
89:18,21,24
90:7,20,21
91:2 93:7,7
95:6,10,15,17
96:10 97:1,14
97:22 99:2,4
99:10 104:6,10
104:12,13,15
104:20 109:1
110:15 111:17
115:20 116:14
116:15,20,21
118:5,12,17
119:3,5,13,14
120:17,21,22
121:2,9 122:21
123:17 124:6
125:16,19,23
126:2,18

128:12 130:20
133:19 134:18
135:3,17,18,20
136:1,7 140:14
141:14,22,24
142:16,17,21
143:1,4,5,7,9
144:6,19 145:1
145:5 147:5,10
147:16 148:12
148:17 149:7
149:12,20
150:15,20,22
150:23 151:5,6
151:8,10,12,17
151:19 153:2,3
153:10,12,18
153:20 154:22
155:21,24
156:8,15,21
157:1,5,9,24
158:8,14,19,23
159:11,18,21
160:2,22
161:11,15,21
161:24 162:4
162:10,16,20
162:24 165:7,9
166:4,18,19
167:2,3,15
170:10 174:17
174:18,19,21
177:24 178:11
178:13 179:11
181:2 182:17

183:19 184:2
193:11 196:21
197:14 199:5
200:3,4 202:15
204:5,6 205:17
205:18 206:7
208:12 209:4
210:24 211:1,8
211:20 213:3
213:12,16
214:24 220:13
222:20 223:21
223:23 224:24
226:11,16
227:5,5,19,23
229:8,11,21
231:2,8 232:1
232:21 233:7
235:4,10,21
239:4,12 242:4
242:4,14,19,20
248:20,20,21
250:19 255:1
**recalled**  90:10
  90:23
**recanted**  178:5
  251:19
**receipt**  41:16
**receive**  47:2,10
  48:2,4 50:17
  125:5 131:12
  132:3 155:2
  232:6
**received**  44:7
  47:14,18,20

50:4,24 108:9
110:2 155:5
**recently**  222:12
**recognize**
  33:20,23 34:1
  34:8,11,12
  36:23,24 37:10
  37:12 39:10,11
  39:12 45:7
  49:3,4,5 51:24
  78:4 105:7,21
  129:2 145:15
  157:9 192:11
**recognized**
  46:23
**recollect**
  201:11,14
  214:6
**recollection**
  47:13 58:24
  90:5 93:6
  95:19 104:24
  114:10 116:8
  120:7 121:22
  129:11,16
  138:24,24
  145:7 150:23
  151:22 168:17
  169:6,11 170:4
  171:14 173:6
  178:2 180:23
  186:22 187:23
  192:5 197:4
  199:15 208:4
  212:16,19,20

214:2,5,10
215:23 216:16
221:7,10
222:22 223:2
223:11 225:11
230:8 234:2
235:15 243:14
249:3 251:3
255:11 256:13
**recommend**
131:12
**recommendat...**
131:14 149:21
151:4
**recommended**
150:11
**record** 7:2,15
10:5,6 34:14
34:20,23 54:14
54:18 74:19
76:10,14 111:7
111:11 130:23
138:2 168:6,11
184:21 185:3
189:13,17
239:24 240:4
257:20
**recorded** 7:4
**redacted**
210:10,11
**reduced** 258:21
**reduction**
70:16,21
**refer** 201:23

**referenced**
184:5
**referring** 93:24
201:16 224:11
**reflect** 10:7
**refresh** 136:15
136:19 139:10
145:7 146:3
151:21 168:16
208:4 251:3
**refreshed**
79:16 80:3
112:4,12,23
113:2,15,17
137:1 169:6,11
170:3 243:13
**regard** 171:7
**regarding**
32:10 47:3
55:16 60:24
64:23 71:14,24
72:18 73:3
74:22 77:20
88:24 91:18
108:19 110:3
114:13 127:14
131:4 142:13
142:22 149:20
153:9 156:6
157:17,22
158:2,11
182:10 190:4
242:1 244:8
253:7

**regular** 217:2
**regularly**
254:20
**regulating**
38:14
**related** 7:7
241:16 259:9
**relationship**
18:20 19:4
22:17 24:16
25:19 27:24
224:6
**relayed** 89:11
**relocate** 19:11
19:14
**rely** 193:13
**remained**
100:17
**remanding**
139:3
**remember**
15:19 19:17
23:22 31:1
33:5 120:9
144:24 152:21
152:24 153:21
167:15,16
180:24 183:23
184:8,15 186:4
194:19 195:4
196:18,22
197:7,19,23
198:2,4,5,17,22
198:24 199:1,3
200:1 201:2

202:3 204:8,11
204:14,15
205:6,15,20
206:3 208:22
208:24 209:6
209:11 211:6
211:10 212:13
213:13,21,22
216:1,3,4
219:23 221:16
222:3 223:3,9
224:18,19,22
225:13 226:5,6
226:13,17,18
227:2,3,4,7,13
227:17,20
228:2,9,23
229:5,15,17,19
229:22 230:6,9
230:19 231:5,9
231:11 232:2
233:9,11
234:24 235:2,5
235:16 237:13
238:24 242:5
242:12,15,17
244:12,13,14
254:23
**remembered**
91:3 95:22
116:23 149:13
164:24 171:10
171:14 198:5
201:7

**[remembering - rick]**                                    Page 45

**remembering**
  205:2 225:8
**remembers**
  230:3
**remind** 9:15
**remorseful**
  235:22
**rent** 31:11
**reopen** 206:17
**repeat** 62:15
  163:13 165:4
  195:3
**repeated** 166:7
**rephrase** 9:22
  51:8 87:11
  94:3 104:2
  161:18 163:17
**report** 5:8 6:6
  12:12 168:19
  169:6,10 170:3
  179:17,18
  180:18 182:1,1
  188:1,4,10
  191:15 192:1
  192:24 205:1
  208:21 209:1,6
  209:22,23
  210:1,4,9
  211:18 212:8
  212:11 226:10
  243:13,20
  244:22 245:14
  246:1
**reported** 1:23
  48:4 49:14,16

103:2 108:24
109:5 110:4
145:19 161:8
161:14,20,23
162:2,7 258:19
**reporter** 7:13
  8:18 10:2,3,15
  50:1 257:13
**reporter's**
  49:18,19,22
**reports** 48:2
  50:24 51:1
  108:19 180:10
  192:12 193:12
  219:22 226:19
  226:21,23
  229:7,11
  240:20 251:2,2
**represent** 8:1
  31:14 41:19
  140:2 141:7
  172:18,24
  173:3 181:11
  181:17,21
  183:9 185:2,16
  203:11 211:20
  219:6
**representation**
  68:2 159:22,23
  176:19 177:3
  177:12,21
  198:13 229:1
  256:12
**representative**
  8:7

**representatives**
  192:9
**represented**
  44:23 138:16
  140:9 143:20
  178:6 184:4,12
  251:17 256:11
**representing**
  2:5,9,14,21 3:6
  3:19 7:11,18
  12:4 67:20
  193:8
**represents**
  196:14
**request** 51:7,13
  138:18 141:20
  200:7
**requested**
  92:19 95:16
  141:23 142:19
**requesting**
  70:15
**require** 250:5
**reserve** 257:11
  257:12
**resolution**
  62:13,18
  215:14
**resolve** 30:3
  144:21
**resolving** 145:2
**respect** 17:18
  32:4 38:21
  55:14 61:24
  132:19 149:19

**respective**
  259:3
**respond** 238:20
**response** 52:11
**responses** 10:4
  10:5
**responsibilities**
  32:9,14
**responsibility**
  102:13
**rest** 123:15
  131:17
**result** 75:9
  151:2 237:20
  249:24 250:2
**retired** 12:21
  19:18
**reverted**
  150:19
**review** 51:7,9
  51:14 53:2
  108:13,18
  109:15 111:22
  112:3 199:22
**reviewed** 55:4
  128:16,19
  130:1,11
  151:20
**reviewing**
  51:12 53:5
  54:24 55:24
  56:2 137:1
  152:8
**rick** 45:20

**[rid - scott]**                                                    Page 46

**rid** 236:18,19
**right** 15:10,20
  17:24 19:1
  21:24 22:24
  23:22 28:10
  31:3 36:21
  49:21 57:6
  63:19 64:17,18
  64:18 72:5
  78:4,13 79:7
  80:16 87:19
  88:8 96:2
  99:20 110:21
  110:23 111:18
  114:3 116:2,16
  120:11 125:2,3
  127:24 128:1,1
  128:2,24
  129:15 130:14
  130:18,22
  132:13 134:6
  134:20 137:21
  138:19 145:13
  147:21 169:19
  171:7 172:22
  174:2 180:17
  186:5,6,9,13
  187:12 190:21
  190:22 201:13
  202:22 203:1
  205:16 207:6
  207:20,24
  208:2,19
  209:22 210:6
  210:19 215:8

217:21 218:16
219:4 225:13
229:13 232:2
236:9,15 237:5
237:10,17,21
243:9 247:6,8
248:4 250:4
252:12 254:24
255:8
**rights** 109:4,10
  214:17
**ring** 159:16
  194:15
**rings** 119:10
  157:19 159:20
**risks** 131:23
**road** 13:1
**robberies**
  25:16
**rodert** 157:22
**rohalia** 45:12
**roles** 94:20
**roll** 166:24
**rolling** 24:7
  167:21
**room** 81:22,24
  92:22,24 94:1
  115:21 116:3
  174:5,6 182:5
  205:8,9 225:17
  234:24 235:2,6
  242:1
**rose** 14:22
**rosie** 194:15

**rpr** 1:23
**rule** 5:12
  105:16
**ruled** 150:17
**rules** 1:17
  38:13 84:21
  102:12
**run** 228:19

**s**

**s** 4:15 5:1 6:1
  8:17 9:9 16:8
  191:9 256:4
**safe** 254:7
**safety** 131:23
**saith** 257:21
**sat** 199:16
  235:13
**satisfactory**
  173:16
**satisfied** 238:19
**save** 164:1
**saw** 12:11
  67:24 68:1
  71:18 171:8
  182:20 219:3
  226:9 250:12
**saying** 54:1
  97:20 99:10
  102:20 127:16
  166:19 170:16
  184:15 202:19
  235:16 249:16
**says** 34:15,23
  39:18 49:10
  113:9 129:10

186:23,24
187:7 189:24
206:20,24
207:2,3,5,6,13
207:18,20,22
208:1 209:20
210:17 231:22
232:5 243:23
**scan** 79:6
**scanned** 235:20
**scene** 227:18
**scheduled**
  71:12 103:15
**scheduling**
  104:14
**school** 13:19,20
  15:9,11,21
  16:3,18,22
  22:13
**scott** 1:5,9,13
  2:9 7:6 8:11
  67:4 69:22
  70:1,12 71:3
  71:15 73:21
  77:22 79:22
  81:17 82:15
  84:1 89:20
  90:16 93:3,9
  94:4 95:2 96:7
  96:17,21 97:6
  97:19 98:18
  99:6 100:6
  101:20,24
  102:2 103:15
  103:22 104:4

**[scott - seven]**                                                            Page 47

110:13 111:15
112:14 113:6
113:19 116:12
116:15,17
118:8 120:5,15
120:24 121:5
121:11,12,20
121:24 122:2
122:10,14,18
123:3,13 124:2
124:10,24
126:11,16,18
133:11 144:12
148:7,23
154:18 164:12
164:18 165:2,3
165:7,12,17,23
166:21 170:14
171:8 174:13
176:20 177:4
177:22 187:10
201:17,17,20
203:13,15
238:13,14
249:11 258:13
**screaming**
171:9
**screen** 184:20
189:20 193:23
193:24 194:5
**seal** 259:13
**sean** 2:12 7:22
**season** 14:17
**second** 34:19
39:23 48:14

49:11 71:8
75:23 99:19
103:15 104:15
110:11,18
111:14,19
112:5,13,19,21
113:4 167:18
199:12,20
210:13,16
212:22 225:12
239:16
**seconds** 72:12
76:3
**secure** 254:7
**see** 37:21 57:9
59:8 73:13
98:2 134:11
151:24 179:19
179:23 180:19
180:21 181:20
181:24 182:19
187:15 190:24
194:7 206:20
207:12,16
212:9,12
218:14,20
226:23 231:21
235:23
**seeing** 209:7
242:17,20
**seek** 156:22
**seeking** 44:2,8
52:13 57:18
58:9 70:21
84:7 155:19

240:14
**seem** 150:22,23
231:1 234:15
238:14
**seemed** 205:7
238:5 240:17
**seems** 143:7
**seen** 37:15
116:9 203:15
229:6
**seldom** 80:15
**semblance**
58:12 226:24
**send** 257:13
**sense** 194:13
**sent** 41:11
48:20 52:20
**sentence** 43:18
52:17 70:17,22
126:3,16 128:7
131:13,14,20
132:4,6,15
133:22 150:12
153:14,16
154:6,14 165:5
189:23 232:7
233:2
**sentenced**
143:16 144:13
154:1 175:24
176:16
**sentencer**
232:15,19
**sentencing** 5:17
43:14 61:14

68:1 126:23
127:2,7,14
128:11,16
129:5,23 130:9
130:23 131:8
134:4,9 145:24
148:1 150:3,6
150:9,17 151:4
151:11,16,18
152:2,9 153:12
153:19 154:15
154:20 155:3,9
231:17 235:17
253:19
**separate** 230:7
**september**
134:9 139:2
212:15 213:1
213:15 233:24
245:23 246:3
**series** 9:19
**serious** 53:20
178:5 221:24
**seriously**
221:22
**served** 131:13
**sessions** 183:22
191:12,22
244:17 247:10
**set** 38:13 68:14
110:13 259:12
**sets** 80:24 81:2
**seven** 175:13
239:1

**[sever - sopron]** Page 48

sever 107:24
108:18 109:21
109:22
several 74:1
118:3 198:24
199:8 200:11
219:3
severance 5:15
106:22 107:6
107:23 254:24
severed 233:9
shaking 10:4
shape 174:22
share 141:1
184:20 193:22
shared 30:17
shea 2:15 7:20
159:15
sheet 40:8
shoot 163:12
shooting
164:20 165:18
166:1
short 10:5
16:10 54:15
76:12 168:8
189:15 240:1
shortly 125:21
shot 56:8
show 33:6,19
36:14,21 39:8
48:8 51:22
72:5 79:2
105:5 106:18
106:20 107:4

128:24 136:13
139:16 145:13
157:2 185:16
193:24 205:12
206:18 209:12
211:17
showed 134:5
209:16 218:2
227:10 244:7
showing 105:12
106:19 209:1
244:14
shown 251:1
shut 171:18
sic 184:6
side 13:17,20
59:19 148:23
204:12 235:9
sided 105:18,18
105:19 106:12
106:12
sides 40:8
siff 3:10
sign 74:11 89:1
89:4 128:11,15
134:3 157:3
209:17,20
210:3
signature 34:4
34:11 35:9
37:8,10,12,14
74:2 78:5
105:21,24
189:24 218:5
218:12,16,17

219:4 257:10
257:12,12,13
257:17,18
259:1,19
signatures
130:15
signed 12:11
66:14 73:10
77:21,22,23
80:4 91:10
107:2,9 129:11
130:1,9 134:10
139:3,7,19
189:6 232:3,4
237:7 239:3,6
253:19 254:15
significance
28:21
significant
66:15
signing 66:13
130:12
silence 247:6,8
similarly
226:13
single 13:3
208:7,14
sir 9:6,10,14
13:12 35:17
49:6 66:22
137:7 138:19
138:21 183:8,8
185:2 186:24
188:13,20
189:20 191:8

193:16 256:3
sit 186:11,13
193:4,4,6
256:16
sitting 56:10
82:19 235:8,9
six 175:9,11,20
176:2,4,8,17
248:9 250:23
251:1,14,15
sixth 109:10
size 235:3
smith 130:17
130:18 163:3
sole 132:9
solo 19:8,10
20:16,19 23:6
23:13
somebody
176:23 209:14
213:10 221:15
226:7,14 251:1
somewhat 28:5
33:1 237:15,15
sooner 222:11
soprin 7:6
sopron 1:4 5:4
5:6,9 6:7 8:15
119:2 143:20
158:2 164:19
166:23 167:13
176:8 177:5
185:4,12,13
206:13,15,22
211:19,21

**[sopron - state's]** Page 49

251:6 258:12
**sopron's** 177:4
252:21
**sopron004300**
5:18
**sorry** 17:24
21:14 22:21
32:6,21 34:18
34:21 35:22
41:24 48:15
53:15 55:12
57:4 61:10
63:23 70:5,19
73:19 79:11,23
83:21 85:5
91:22 92:15,23
94:11 100:4,19
103:22 104:19
106:21 109:19
110:9 112:17
113:23 117:17
118:22 120:21
121:9 124:12
129:20 136:17
144:10,17
151:8 161:16
169:17 171:21
177:8 179:2
181:8 182:2
206:12 212:1
212:22 231:16
238:22 244:1
244:20 247:21
247:22 250:9
252:2,9,10

257:5,8
**sort** 88:5
117:19 123:19
231:23
**sought** 70:14
**sound** 227:23
**sounded** 180:9
**sounds** 119:5
158:22 227:22
228:1,8 229:24
237:2
**south** 23:20
49:11
**southwest**
13:17,20
**space** 31:9
**spanned** 26:16
**speak** 12:3
59:15,17 85:18
86:23 92:2
122:24 142:19
151:15 152:4
171:22 174:7
246:14 248:2
**speaking** 27:16
142:22 151:18
246:18
**special** 8:7
230:13
**specific** 14:13
17:19 29:23
32:9 55:14
70:11 71:18
138:23 150:23
196:17 198:12

199:13 230:8
249:3
**specifically**
66:24 85:9
**specifics** 89:19
89:22 242:5
**speculation**
217:16 239:11
**spell** 9:8
**spend** 104:7
**spent** 15:1
**split** 26:3 28:14
**spoke** 56:20
67:3 84:11
140:15 152:1
173:19 176:17
177:20 219:17
241:9 250:13
**spoken** 186:8
**spread** 18:5
**ss** 258:2
**stamp** 37:17
39:15 106:3
107:7 206:12
206:17 218:24
**stamped** 37:19
**standard** 64:17
72:21 88:21
134:19
**standing**
234:20
**starbucks**
195:9 196:8
197:3,20
199:16 200:21

**start** 100:3
175:16
**started** 18:2,3
21:23 24:6
29:9,9 224:8
237:19
**starting** 34:17
111:4
**state** 7:14 9:6
14:21 23:21
34:2 35:3 44:2
44:8 49:24
52:5 58:10
62:5 65:20,21
128:5 131:9,11
131:19,22
132:2,5 137:14
150:11 153:21
169:12 206:21
226:2 228:19
232:5,21 240:7
240:8 245:11
247:7 258:1,5
**state's** 7:18,21
8:5 46:6,12,16
46:19 47:3,6
47:11 48:5
50:5,18 53:7
57:2,5,8,14
62:24 63:4,9
63:15,22 64:7
64:14,23 65:11
65:14 68:3,7
68:15 69:2,12
71:4,14,23

**[state's - substance]** Page 50

72:2 73:1,2
74:24 75:3,6
75:18 77:6,19
81:5,18 82:3,6
83:16 84:11,14
85:16 86:18
87:20 89:7
91:18 92:8,21
96:13 100:24
101:3 103:2,8
103:24 104:4
110:4,12 113:7
114:13,18
116:7 117:21
124:14,19
125:6 129:6
130:17,19
135:7,13,15,22
136:5,20
138:18 141:16
148:2,8 149:4
149:21 151:3
154:19 156:11
158:24 159:3
159:15,17,19
160:6,19 161:9
162:8,13 163:2
166:21 167:7
167:12 168:20
169:7 173:5,10
174:9 177:20
179:7,9,21
180:6 181:1,12
181:19,23
182:13 184:9

184:14 185:6
185:18 187:10
188:6 190:3,12
190:18 192:8
192:21 195:18
199:3 205:3,21
207:14 209:12
209:15 213:18
214:12,22
216:5 221:7,18
221:21 226:6
229:9 230:21
230:23 234:23
236:22 240:14
240:22 244:24
246:5,14,17
247:11 248:1,5
250:13 251:5
251:21 254:3
**stated** 20:9
165:9 166:18
254:15
**statement** 4:23
48:4 49:7,15
49:17 50:13
75:16 77:4
99:8 108:24
109:6 110:5
138:19 152:11
161:8,14,20,23
162:2,7 166:20
209:4 220:6,21
229:7 235:17
236:9,12 237:5
237:8

**statements**
53:12 54:5,7,9
75:4 77:11
89:6 108:23
109:7,11,16
110:6 160:13
161:1 237:19
**states** 1:1,17
7:7 15:1,3
161:16 243:20
258:11
**station** 108:24
160:7,20
**status** 17:4
**statutes** 75:15
**statutory** 75:13
77:2
**stealing** 228:6
**stenographic...**
258:19
**stepdaughter**
13:10
**steve** 2:15 7:20
159:17
**sticking** 248:6
**stop** 10:16
140:23 187:3
252:18
**stopped** 23:15
120:13,14
124:1 224:11
**story** 96:8
100:8 101:21
121:6 162:13
162:18,21

**straight** 148:22
**straighten**
147:21,22
148:24
**straightened**
101:4
**strategy** 29:23
30:6,10 56:1
56:18 60:8
62:22 64:21
**street** 1:19 2:7
2:12,19 3:4,12
3:17 7:10
30:24 31:1
35:15 258:8
**strengths** 53:6
61:17
**strike** 191:7
192:18 242:22
**strong** 51:3
62:5 170:15
**stuck** 91:5
**stuff** 167:17
251:2
**subject** 19:22
**subjected**
102:14
**subpoenaed**
131:3
**subsequent**
75:11 244:16
245:22
**substance**
210:9,21

**substantially** 35:17 40:1 91:9 106:7 107:15,16 129:24 130:10

**substitute** 15:7

**suburb** 15:18

**succeed** 166:17

**successful** 69:17

**suffering** 11:11 11:14

**suffield** 2:15

**suggest** 97:24 147:14 201:12

**suggested** 98:4

**suggesting** 198:6

**suit** 259:10

**suite** 1:20 2:7 2:12,19 3:4,12 3:17 17:11

**sullivan** 7:19 158:21 159:1

**summarizes** 169:12,15

**summarizing** 193:1

**summary** 189:1

**supervisor** 209:21

**supposed** 207:15 223:19 225:8

**suppress** 108:23 109:7 109:11,16 110:6 160:13 161:1

**supreme** 5:12 16:15 20:9 38:13 105:15

**sure** 30:13 35:2 36:4 42:14 44:5 46:20 47:12,13 50:20 54:7,8 55:7 61:21 62:21 67:8 70:10,12 71:17 76:24 90:13 91:13 107:20 119:6 122:9 134:12 136:7 157:20 159:3 167:21 179:9 186:18 197:2 202:11 216:24 222:13 223:9 229:4 230:2 239:19 242:19 250:24 253:13,16

**surprise** 234:5

**surprised** 118:18,23 234:6,14

**surrender** 20:3

**surrendering** 20:11

**surrounded** 100:2

**swear** 95:8 98:23 120:5,19

**swearing** 95:13

**switch** 228:1

**switching** 227:21

**swore** 100:7

**sworn** 8:21 9:2 9:15 95:21 99:14 258:16

**t**

**t** 4:15 5:1 6:1 184:6,12 185:5 185:18 187:11

**table** 235:10 255:20

**tail** 224:8

**take** 10:2,3,15 10:17,21 48:9 51:23 54:11 60:2 72:6,12 73:14 76:2 80:9 92:17 105:6 110:22 111:2 126:10 126:11,13,14 129:1,2 145:14 167:20 189:4 194:14 195:8 211:4 218:6 238:24 239:21 252:12

**taken** 1:19 7:5 49:8,10 54:16 76:13 111:9 168:9 189:16 238:11 240:2 254:6

**talk** 58:19 59:12 60:9 69:16 71:9 80:6 85:15 88:9 167:22 171:21 183:16 196:11 204:15 204:20 219:16 220:5 225:19 225:24 227:1 234:18 238:12

**talked** 59:20 69:15 101:3 103:6,7 120:15 124:3 128:13 173:15 182:22 196:16 204:11 204:18 207:13 223:6 226:1 228:12 241:17

**talking** 64:4 69:8 114:4 141:11 175:14 183:24 209:2 213:20 215:15 222:10 226:7 226:14 242:18 243:16 246:16

**[teaching - think]**                                                    Page 52

| | | | |
|---|---|---|---|
| **teaching**  15:8 | 195:24 196:12 | 224:4 238:8 | 223:18 224:20 |
| **team**  14:15 | 197:9 201:8,10 | 251:23 | 225:2,8 230:22 |
| 81:23 92:20 | 202:6 219:15 | **testifies**  77:13 | 244:8 248:2 |
| 115:21 119:24 | 219:19 228:15 | **testify**  57:20 | 251:19 258:18 |
| 174:5 205:9 | 228:19 231:2,4 | 58:5,10,14,15 | 258:23 259:12 |
| 239:15 | 231:6 232:18 | 58:18 60:15 | **thank**  16:1 |
| **team's**  135:20 | 234:13 240:19 | 62:23 81:6,10 | 48:19 54:11 |
| **technician**  51:1 | 248:15,17,18 | 81:11 97:7 | 64:1 183:6,10 |
| **technology** | 250:5,14 | 100:9 101:16 | 193:18 |
| 34:20 | **telling**  85:13 | 108:2 115:7 | **thanks**  71:10 |
| **telephone** | 149:7 165:7 | 117:9 121:1 | 193:16 |
| 195:12 | 216:1 223:22 | 124:9 125:15 | **thereof**  259:11 |
| **tell**  9:16,21 | 223:23 227:7 | 127:20 128:1,5 | **thing**  79:13 |
| 26:2 28:4,6 | 227:13,17,20 | 131:3 133:22 | 80:19 129:8 |
| 30:5 60:16 | 228:2,9 229:5 | 134:14,22 | 130:4,24 |
| 74:14 82:24 | 229:19,22 | 143:2,11 | 186:20 218:18 |
| 83:7 84:24 | 231:5 | 148:15 167:5,6 | 241:3 247:21 |
| 86:2 87:16 | **tending**  198:21 | 170:22 173:11 | 252:20 |
| 89:24 90:4 | **term**  57:3 | 205:19 255:17 | **things**  15:8 |
| 91:5,13 95:5 | 132:15,20 | 258:16 | 17:6 25:17,20 |
| 96:7,12 97:6 | 133:5 221:1 | **testifying**  85:1 | 29:2 97:20 |
| 102:7,22,23 | **terminated** | 101:11 142:23 | 99:12 100:11 |
| 107:19,22 | 100:22 | 149:3 172:9 | 101:4,14,15 |
| 120:24 121:5 | **terms**  40:22 | 205:15,17 | 103:1,11,16 |
| 121:12,17,20 | 60:10 78:1 | **testimony**  10:2 | 120:16,19 |
| 123:14 147:13 | 249:23 | 40:5 73:3 | 124:4,8,10,24 |
| 148:14,19 | **terrence**  157:8 | 77:18 98:5 | 151:2 164:10 |
| 149:2 151:13 | **test**  178:2 | 128:2 131:15 | 198:9 241:22 |
| 152:16,20 | **testified**  9:3 | 131:22 132:1 | **think**  10:12 |
| 160:5,18 161:7 | 143:5 144:14 | 153:15,24 | 12:11 21:8 |
| 161:22 162:1,6 | 169:5 172:14 | 178:6 183:19 | 23:18 26:15,17 |
| 162:12,18,21 | 172:21 175:3 | 186:12 190:2 | 29:11 30:12 |
| 163:5,17,20,23 | 182:7,16 | 203:14,18 | 32:12 42:6,13 |
| 164:7 165:8 | 205:14,19 | 205:5,22 207:3 | 42:21 44:4 |
| 167:13 174:8,9 | 207:5 223:14 | 208:11 223:13 | 53:24 54:2,10 |

**[think - told]**

54:21,22 55:18
56:19 76:24
90:20 92:6
99:8 102:2
111:13 117:22
119:23 120:1,8
126:17 127:4
135:2,3,10,24
138:6,7 142:7
149:13 160:3
166:13 167:3,9
167:19 168:2
169:16 178:16
182:9,16
186:21 196:14
198:22 202:14
207:15 208:6
213:20 216:24
220:3 225:3,13
225:20,22
228:5 229:2
233:9 235:12
235:13 239:13
239:18 241:23
241:23 242:10
244:11 248:16
253:12,13
254:23 255:1
255:10,11
**thinking**  30:7
**third**  200:16
203:20,21
**thomas**  3:6 8:7
179:24 180:14
181:13,17

184:6,12 185:4
187:11 191:18
191:21
**thought**  18:23
34:18 55:1
56:21 57:7
197:23 199:2
224:23 238:4
241:12,21
242:3 247:21
**threat**  96:17
121:17 123:22
165:10
**threaten**  97:12
122:11 123:3,8
170:15
**threatened**
99:14 100:9
101:10 173:9
**threatening**
171:9 182:9
**three**  8:10 12:8
15:5 16:14
27:8 30:21
198:18 200:14
202:14 204:5
212:1
**throw**  124:23
**time**  9:20 10:16
12:19 15:1,19
16:1 17:5
24:21 26:12,12
29:22 30:1,1
30:16,22 31:3
32:15,15 36:3

39:2 41:20
43:14,19 45:7
57:15 71:18
80:14,14 83:3
83:4 84:2,10
86:21 93:2
97:6 103:3
114:19 115:23
116:6,11
120:24 121:5
124:13,20
125:2,19
126:19 130:5
131:10 138:7,8
140:3,8,10
141:6,6 148:14
149:2 150:5,8
150:19 159:22
160:5 164:12
177:15,17
183:6,11
190:18 191:3
193:16 195:14
196:4,15,19
197:6 198:21
198:22 208:2,5
208:19 214:7,8
215:2,13,15,17
217:14 221:23
222:4 224:5
226:11 229:12
229:12,14
238:1,24
251:10,15
252:12 253:12

255:3,12,20
**times**  12:7,8
16:14 17:17
37:16 102:23
115:20 140:16
168:17 196:1
200:14,15
204:6 208:15
216:18 225:14
230:22
**timothy**  49:23
**tired**  179:3
**titled**  188:4
**today**  9:12,13
35:18 60:9
91:9 106:8
168:17 177:16
183:11,24
186:11,13
193:4,5,6
203:14,18
205:14 209:7
218:2 219:3
235:20 248:19
256:16 257:16
**today's**  12:1
257:19
**together**  23:1
127:8,10 143:9
210:21
**told**  11:2 87:15
100:8 102:16
125:16,17,18
135:18 140:22
140:24 147:18

**[told - two]** Page 54

147:20 160:12 160:24 164:16 174:11,11 196:10 197:15 198:7 216:13 220:14 227:4,6 229:11 234:12 239:15 241:7,8 241:17 248:19 248:21,23 252:5,9,15 253:2

**tone** 80:24 81:2
**tones** 59:20
**tony** 8:9 183:8
**took** 17:6 28:12 59:19 110:4 224:1,3 257:16
**top** 187:14 210:13,16 231:22
**topics** 242:2
**tops** 200:15
**total** 203:2 227:23
**totally** 176:24
**touched** 43:8
**towards** 23:20
**trade** 235:18
**transcript** 145:8,19,23 151:20 257:14 258:23
**transcription** 258:22

**transcripts** 12:13 47:21 175:17 193:12
**transfer** 5:19 137:10 140:1
**transferred** 139:8 253:20
**travel** 17:20
**traveled** 17:21
**treating** 116:15
**treatment** 93:4 93:10 116:13 116:17 230:13
**trial** 5:11 16:16 21:22 29:23 41:18 56:1,17 60:8 62:22 63:19 64:18 108:6 127:24 128:1 141:16 142:3 147:14 155:9 205:16 205:18 206:18 224:1 233:1 244:16 246:20 248:1 255:16
**trials** 18:13 21:5 142:20 143:13,16 144:13 156:20 205:22 251:23
**tribler** 2:17
**tribler.com** 2:20

**tried** 100:9 109:23 148:24 156:18
**trigger** 197:12 198:10,12
**triggered** 197:11,16 198:8,14,17
**trouble** 53:20
**true** 41:10 138:19 164:3 258:22
**trust** 238:1,3 257:15
**trusted** 103:21
**trutenko** 45:18
**truth** 9:17 87:16 101:12 101:24 102:16 102:23,24 150:2,6,9,16 165:8 174:9,10 228:16,16 231:7 248:15 248:17,18,19 248:21,23 250:6,14 258:17,17,17
**truthful** 11:23 57:21 86:1 131:15,21,24 153:15,24 154:13 225:22
**truthfully** 58:18 81:7,11

117:7
**try** 18:10,15 21:5 71:10
**trying** 21:8 56:19 69:2 97:19 101:20 101:24 102:3 114:12 122:3 143:9 201:11 225:12 248:6 252:20
**turn** 252:20
**turned** 34:18 34:21 221:3 222:8,14 247:21
**twice** 30:13
**two** 13:10 16:14,19 40:7 43:5,13,19 44:17 56:7,10 72:3 91:18 102:13 105:17 105:18,19 106:12,12 132:19 137:22 179:23 180:13 180:24 182:14 184:4 197:15 198:7,15,15,19 202:14 207:19 227:15 230:24 235:13 236:2,3 239:7,13 244:4 246:23

type 23:8 24:17 42:17 43:9 239:14
typed 88:3 220:6 229:7
types 25:13 80:15 151:2
typewriting 258:21
typewritten 237:7
typical 232:8
typo 207:15
typographical 257:15

**u**

u 9:9
u.s. 16:15
uh 10:5
ultimate 127:6 215:7
ultimately 172:8 214:15
unclear 64:4
unconstitutio... 150:18
uncovered 109:14
under 9:16 11:6,9 52:20 58:16 84:21 108:20 172:10 173:12 186:1 189:21 232:13 236:6 246:16

246:18 247:13 247:24 248:24
undersigned 35:6
understand 9:17,18,20,21 9:22 10:8,9,13 10:19,23 11:1 11:18 27:18,19 69:14 88:16 102:20 111:5 149:24 175:18 175:18 185:15 185:24 187:4 189:21 240:7
understanding 117:9,14 143:15 144:11 150:13 172:13 172:15 253:22 254:11
understood 67:2 77:24 88:20 89:3 220:20
undetermined 258:10
unit 7:3 13:1 54:13,17 111:6 111:10 168:7 168:10 230:11 230:14 239:23 240:3
united 1:1,17 7:7 15:1,3

258:10
university 14:3 14:9,14 15:14
unprofessional 91:4 174:21 182:12,17 183:1
unquote 183:21
unredacted 210:15
unusual 109:3 117:2 247:19 247:23
unwinnable 55:1 66:10 69:18
use 30:6 48:21 69:7 75:4 77:11 125:6,14 236:2
used 42:21 44:16,17 75:17 77:4 168:16 226:12
using 29:9 183:23
usual 66:23 67:1 88:1
usually 39:1 47:5 190:17 232:12

**v**

v 7:6 34:2,3,9 35:4 48:18 137:14 206:21

vaguely 143:8
van 56:8,9,10 197:16 198:8
various 12:4
venues 17:13 23:24 24:8
verbal 44:7
veritext 7:12,14
veronica 8:6
versus 206:21
viable 198:21
victims 43:11 43:19 235:19
video 7:2,4
videoconfere... 2:18 3:3,10,11
videographer 3:24 7:1,12 8:18 54:13,17 76:10,14 111:6 111:10 168:6 168:10 184:21 189:13,17 194:5 239:23 240:3 257:19
videotaped 1:15
view 66:10
violated 109:4 109:10
violation 102:12 147:24
visit 59:22 234:9

**[visited - way]**                                                    Page 56

**visited** 230:17
233:17,23
**visits** 59:24
**visualize** 82:20
**vitale** 22:10,18
24:16,18 25:13
25:19 26:5,9
26:14 27:12,23
27:24 28:24
29:7,15,20,23
30:9,17 31:8
31:23,24 32:3
32:12 35:8
36:17 37:5
38:4,7 39:21
40:2,17,20
52:6,20 55:6
56:20 57:16
59:14,23 60:1
60:9,16 61:3
61:15,17,21
62:8,12,21
63:13 64:22
65:7,17 66:14
66:20 67:3,16
68:18,20 71:3
73:21 74:10
78:3 82:16
84:7 85:12,13
86:23 88:11
89:11,11 93:3
94:5 102:7
105:9 106:2,9
107:2,9,17
110:12 111:15

112:13 113:5
113:18 116:3
116:12 125:17
126:8,22 127:1
127:8,8,10,11
128:3,10,13
129:5,10
130:16 133:11
134:16 135:4,6
135:11 138:16
140:15,24
141:1,15,18,23
142:8 143:14
145:4,5 146:4
149:11,15
151:14,17
153:8 155:6,13
160:4 163:5,15
163:17,19,23
164:7,9 170:5
170:13 172:20
173:19 187:9
194:23 207:22
208:1,14
212:15 213:1,4
213:19 214:8
216:20,21
217:5 219:6,9
221:14,14
223:16,18,19
223:22 224:7,9
224:10 225:14
225:23 226:20
233:10 235:12
236:16 237:12

241:8,18,24
244:8,15 247:9
247:16 252:5
252:15 253:11
253:12 254:21
255:12
**vitale's** 37:7,14
37:23 56:4
78:5 142:10
153:5 212:10
219:4 230:15
237:11,14
**voice** 10:1
181:9
**voices** 10:16
**voluntarily**
20:3
**vs** 1:5,9,13

| w |
|---|

**wacker** 17:11
**wait** 10:10 71:8
**waited** 215:13
**waive** 128:1,2
257:12,17,18
**waived** 247:7
254:21 255:6
259:2
**walk** 95:12
122:18
**walked** 122:20
122:23 222:18
222:18
**walking** 95:15
95:17 122:22
205:8,9

**walsh** 143:20
158:2,4 252:22
252:24 253:6
**want** 9:15
12:23 16:2
34:16,24 48:22
64:3 74:6,15
79:13 110:22
112:1 122:6
130:24 131:17
167:19,21,22
167:24 168:15
183:16 194:9
220:18 248:5
257:9
**wanted** 30:6
42:22 50:13,15
58:15 60:10,15
96:13,18 97:7
117:9 121:1,13
121:18,21
122:12,12,24
125:6,11,14
157:3 201:6
214:11 238:16
240:22
**warmed** 204:18
**warranted**
51:17
**washington**
2:19
**washroom**
168:4
**way** 29:12 30:7
30:16 43:17

**[way - witness]**

53:22 57:2,9
58:1 69:19
75:8 84:17
90:6 97:12
108:22 116:20
123:4,9 127:18
133:4 165:9
174:22 216:22
217:21 219:19
221:12,13
228:17 238:13
238:15,20
247:17 248:4
259:9,10
**wayne** 1:12
8:15 119:8
177:10 206:21
**ways** 85:2
**we've** 187:19
**weaknesses**
53:6 61:18
**weapon** 236:1
**weapons** 236:2
**weather** 199:17
**weight** 29:16
29:20
**weird** 194:16
**went** 14:21
23:19 28:23
61:11 67:17
87:19 104:11
130:4 150:6
198:15 202:17
202:19 225:14
225:24 226:23

232:21 233:1
236:6
**wentworth**
49:12
**west** 2:12,19
3:12,17 13:1
19:16 30:24
35:14
**western** 15:18
**whatsoever**
216:16
**whereof** 259:12
**widower** 13:4
**wife's** 13:7
**william** 2:21
3:7 8:5 31:15
33:10 34:3,9
35:4,7 37:4,6
38:4 39:14
72:19 74:22
75:2,4,10,16,20
77:3,7,11,13,17
77:19,23 78:8
91:10 106:23
130:16 131:2,5
131:8,10,12,15
131:21,23
132:2,3,5,9
137:14 138:15
139:21 181:13
190:2,4,12
193:8 207:4,6
210:17 256:4,6
256:8,9,18

**willing** 108:2
**win** 53:24 54:2
54:22
**wit** 258:7
**withhold**
174:12
**witness** 4:2
5:20 8:20 21:3
21:14 22:7,21
24:12 27:1,8
27:18 28:3,18
28:23 29:6,18
30:1,12 31:17
32:6,12,20
33:1,13 35:22
38:19 39:1
40:6,15 41:24
42:6,13,20
43:4,22 45:1
46:3,9 47:5,17
48:14,23 49:10
50:7,20 51:3
51:16 52:16,23
53:9,15 55:12
55:18 57:20
58:8 59:5 60:5
61:2,10,20
62:2,15 63:3
63:11 64:2,16
65:2,9,23 66:5
66:19 67:7,14
68:11 69:5,14
70:5,21 71:8
71:17 73:13,24
74:8,14 76:3,6

76:9 77:14
80:21 82:13
83:7,21 84:4
85:5,9 86:13
87:7,24 88:19
89:10 90:4,12
90:20 91:1,12
91:22 92:5,15
93:6,13,24
94:11,18,23
95:5,10,15,24
96:10,16,24
97:9,14,22
98:2,13,18
99:2,18,23
100:1,4,14,19
101:2,9,18,23
102:5 103:5
104:19 106:11
107:1,19
108:15 109:9
109:19 110:9
110:15 112:17
113:2,9,23
114:10,16,22
115:4,10,15,20
116:20 117:1
117:12,17
118:12,22
119:5,23 120:7
120:21 121:8
121:15 122:6
123:6,11,17
124:6 125:7,9
125:23 127:4

**[witness - years]**  Page 58

127:10,24
129:8,20 130:3
133:1,15 134:1
134:17 135:2
135:10,15,24
136:7,22
137:11 139:1,4
139:6,22 140:6
140:14 141:4
141:11,22
142:7 144:6,17
144:19,24
146:18 147:5
147:10,16
148:12,17,22
149:7,17,24
150:22 151:8
152:15 154:3
154:12,22
155:5,11,16
156:8,15 158:4
158:13 159:11
160:9,16,22
161:3,11 162:4
162:10,16,24
163:9 164:3,15
164:23 165:7
165:15,21
166:4,12 167:2
168:23 169:15
170:7 171:1,3
171:13,20
172:5,13
173:14,23
174:17 176:12

176:22 177:8
177:15,24
178:11,15,19
180:8 181:8
182:16 183:4
183:12 187:22
189:1 190:24
193:18,20,24
194:3,7 197:22
200:20 205:6
205:24 206:7
206:10 208:12
210:10,23
211:14,20
214:15 215:5
215:12 217:17
220:13 222:17
225:10 230:11
230:14 232:11
234:2,8 239:12
241:2,15 243:3
244:1,20 245:3
245:11,18
246:8,11,19,22
247:14,16,24
248:7 249:7,18
250:9,17
251:10 252:2,9
253:10,16,20
253:24 254:2,3
254:8,11,16
255:6,10 257:2
257:7,18
258:19,20,24

**witnesses** 69:16
190:19 203:8
**women** 100:2
**won** 53:23
**wondering**
181:8 234:20
**word** 69:7
73:14 88:2
108:4
**words** 24:9
37:24 98:10
124:22 146:9
150:10 152:1
183:23 248:13
**work** 17:2,6,8
18:6,8,9 25:23
26:13 27:24
29:4,6 31:10
195:22 202:7,9
202:11,12
205:13
**worked** 16:7,23
177:5 180:24
181:2 202:9
255:7 256:7
**working** 17:14
18:2,19 19:4
22:17 24:15
64:14 177:11
181:22
**works** 256:7
**worse** 102:15
**write** 152:18
**written** 44:7
232:15

**wrong** 31:18
127:17 129:11
129:16 252:13
**wrongful**
157:14
**wrote** 231:9,11
231:12

**x**

**x** 4:1,15 5:1 6:1

**y**

**y** 8:14
**yeah** 31:1
34:17 112:8
138:14 146:2
168:5 175:9
184:1,2 185:12
186:7 197:9
198:14 208:20
218:1 229:2,16
235:20 244:6
248:10 257:5
**year** 15:10,20
15:24 19:2
20:1,6 21:9
22:14 56:10
131:12 132:3
150:12 197:16
232:6
**years** 13:6
16:17,19 17:9
18:23 19:20,21
21:10,18 22:3
26:13,16,22
30:21,21 43:16

**[years - zuganelis]** Page 59

| 57:3,10,23 91:14 103:10 129:9 130:6 132:7,12,16,21 133:5 143:10 143:10 149:22 150:9,10 153:21 154:15 155:20 167:16 169:8 175:13 176:22,23 186:5 192:1 193:2,6 195:15 197:24 201:15 201:21 203:16 211:2 213:21 217:1,5 219:1 221:1 229:16 230:2 232:22 232:23 233:2 236:16,18 251:7 **yell** 95:3 98:24 120:5,19 **yelled** 95:21 99:15 100:7 **yelling** 95:13 122:19,21 **yep** 218:11 **young** 17:3 27:9 197:16 222:21 236:3 **younger** 222:22 | **z** **z** 9:9 **zero** 39:24 **zuganelis** 1:16 4:3 7:4 9:1,7 35:13 54:20 138:16 168:14 175:20 178:4 181:10 187:9 194:19 207:23 243:12 257:11 258:9,16 |

www.veritext.com

888-391-3376

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.