LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## —COURT REPORTERS—

CASE NO. 19-CV-08254 | CASE NO. 21-CV-05525 | CASE NO. 22-CV-00320

MATTHEW SOPRON

V.

FORMER ASSISTANT STATE'S ATTORNEY SCOTT CASSIDY, ET AL.

NICHOLAS MORFIN

V.

FORMER ASSISTANT STATE'S ATTORNEY SCOTT CASSIDY, ET AL.

WAYNE ANTUSAS

V.

FORMER ASSISTANT STATE'S ATTORNEY SCOTT CASSIDY, ET AL.

DEPONENT: SCOTT CASSIDY

DATE: JULY 21, 2023



schedule@kentuckianareporters.com
877.808.5856 | 502.589.2273

www.kentuckianareporters.com

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION
DISTRICT JUDGE JOHN F. KNESS
MAGISTRATE JUDGE MARIA VALDEZ
CASE NO. 19-CV-08254
CASE NO. 21-CV-05525
CASE NO. 22-CV-00320

MATTHEW SOPRON
Plaintiff,

V.

FORMER ASSISTANT STATE'S ATTORNEY SCOTT CASSIDY, ET AL.,
Defendants

NICHOLAS MORFIN,
Plaintiff,

V.

FORMER ASSISTANT STATE'S ATTORNEY SCOTT CASSIDY, ET AL.,
Defendants

WAYNE ANTUSAS,
Plaintiff,

V.

FORMER ASSISTANT STATE'S ATTORNEY SCOTT CASSIDY, ET AL.,
Defendants

DEPONENT:  SCOTT CASSIDY

DATE:      JULY 21, 2023

REPORTER:  SYDNEY LITTLE



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 2

APPEARANCES

ON BEHALF OF THE PLAINTIFFS, MATTHEW SOPRON, NICHOLAS

MORFIN, WAYNE ANTUSAS:

Russell Ainsworth, Esquire

Lindsay Hagy, Esquire

Megan Pierce, Esquire

Loevy & Loevy

311 North Aberdeen Street

Third Floor

Chicago, Illinois 60607

Telephone No.: (312) 243-5900

E-mail: russell@loevy.com

lindsay@loevy.com

megan@loevy.com

Page 3

APPEARANCES (CONTINUED)

ON BEHALF OF THE DEFENDANT, FORMER ASSISTANT STATE'S

ATTORNEY SCOTT CASSIDY:

Jim Lydon, Esquire

Michael Stephenson, Esquire

Stephen Mehr, Esquire (via Videoconference)

Hinshaw & Culbertson LLP

151 North Franklin Street

Suite 2500

Chicago, Illinois 60606

Telephone No.: (312) 704-3000

E-mail: jlydon@hinshawlaw.com

mstephenson@hinshawlaw.com

smehr@hinshawlaw.com

Page 4

APPEARANCES (CONTINUED)

ON BEHALF OF THE DEFENDANTS, LAURA SULLIVAN, COLLEEN

HYLAND, PATRICIA SHAE, NEIL LINEHAN, STEVE DINOLFO,

GEORGE ANDREWS:

Sean O'Callaghan, Esquire

Maureen O'Brien, Esquire (via Videoconference)

O'Mara & O'Callaghan Attorneys at Law

230 West Monroe Street

Suite 2620

Chicago, Illinois 60606

Telephone No.: (312) 600-5588

E-mail: sean.ocallaghan@o2lawyers.com

maureen.obrien@O2lawyers.com

Page 5

APPEARANCES (CONTINUED)

ON BEHALF OF THE DEFENDANTS, GEORGE HOLMES, THOMAS

ARGENBRIGHT, ANTHONY GRAFFEO, ALBERT GRAF, WILLIAM

MOSER:

Anthony Masciopinto, Esquire

Heather Afra, Esquire

Kulwin Masciopinto & Kulwin, L.L.P.

161 North Clark Street

Suite 2500

Chicago, Illinois 60601

Telephone No.: (312) 641-0300

E-mail: amasciopinto@kmklawllp.com

hafra@kmklawllp.com

(Appeared via Videoconference)

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

APPEARANCES (CONTINUED)

ON BEHALF OF THE DEFENDANTS, LEONARD BAJENSKI, WILLIAM MARLEY, NORFIE DICIOLLA, THOMAS PTAK, K. MAICKE, L. MCDONALD:

William B. Oberts, Esquire

Amy Kunzer, Esquire

Tribler Orpett & Meyer P.C.

225 West Washington Street

Suite 2550

Chicago, Illinois 60606

Telephone No.: (312) 201-6400

E-mail: wboberts@tribler.com

amkunzer@tribler.com

ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:

Veronica Mantilla, Esquire

Michael Best & Friedrich LLP

River Point

444 West Lake Street

Suite 3200

Chicago, Illinois 60606

Telephone No.: (312) 222-0800

E-mail: vamantilla@michaelbest.com

(Appeared via Videoconference)

Page 7

APPEARANCES (CONTINUED)

AND

Neha Locke, Esquire

Ephraim Siff, Esquire (via Videoconference)

Nathan & Kamionski LLP

33 West Monroe Street

Suite 1830

Chicago, Illinois 60603

Telephone No.: (312) 612-1928

E-mail: nlocke@nlkawllp.com

esiff@nklawllp.com

Also Present: Kortney Chase, Videographer; Norfie Diciolla, Named Defendant; Thomas Argenbright, Named Defendant; William Marley, Named Defendant; Matt Sopron, Plaintiff; Wayne Antusis, Plaintiff; Olivia Handly, Loevy & Loevy Intern; Nathan Kurson, Loevy & Loevy Intern

Page 8

INDEX

| | Page |
| --- | --- |
| PROCEEDINGS | 13 |
| DIRECT EXAMINATION BY MR. AINSWORTH | 17 |
| CROSS-EXAMINATION BY MR. LYDON | 334 |
| EXAMINATION BY MR. MASCIOPINTO | 337 |
| EXAMINATION BY MR. OBERTS | 345 |
| EXAMINATION BY MR. O'CALLAGHAN | 345 |
| EXAMINATION BY MS. LOCKE | 347 |
| REDIRECT EXAMINATION BY MR. AINSWORTH | 348 |

EXHIBITS

| Exhibit | Page |
| --- | --- |
| 90 - Office of the State's Attorney Cook County, Illinois Investigative Report October 25, 1996 - SOPRON 5873-5875 | 117 |
| 91 - Office of the State's Attorney Cook County, Illinois Investigative Report - SOPRON 5847-5849 | 167 |
| 92 - Office of the State's Attorney Cook County, Illinois Proffer Letter to Bryan O'Shea September 1996 - SOPRON 2162 | 212 |
| 93 - Handwritten Statement of Bryan O'Shea September 26, 1996 - SOPRON 2177-2182 | 216 |

Page 9

EXHIBITS (CONTINUED)

| Exhibit | Page |
| --- | --- |
| 94 - Handwritten Statement of John Gizowski September 26, 1996 | 228 |
| 95 - Cook County State's Attorney's Office Investigations Bureau Investigative Report October 24, 1996 - SOPRON 5856 | 235 |
| 96 - Office of the State's Attorney Cook County, Illinois Investigative Report November 3, 1996 - SOPRON 6143-6146 | 236 |
| 97 - Cook County State's Attorney's Office Investigations Bureau Investigative Report October 28, 1996 - SOPRON 5880-5882 | 248 |
| 98 - Cook County State's Attorney's Office Investigations Bureau Investigative Report October 24, 1996 - SOPRON 000001 | 249 |
| 99 - Chicago Police Department Supplementary Report December 14, 1995 - JT CITY DEFS 39-46 | 254 |
| 100 - Handwritten Statement of Sean O'Brien September 17, 1996 - SOPRON 5818-5827 | 263 |
| 101 - Cook County State's Attorney's Office Investigations Bureau Investigative Report SOPRON 005850-005851 | 263 |



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 10

EXHIBITS (CONTINUED)

Exhibit                                                    Page

102 - Affidavit of Mike Horan
      November 20, 2017 - SOPRON 111-113    267
103 - Affidavit of John P. Gizowski
      February 6, 2001 - SOPRON 5934-5937   271
104 - Affidavit of William Bigeck
      December 17, 2020 - MORFIN-KOGUT
      7043-7047                             277
105 - Logan Correctional Center Trust Fund
      Search Mail Room Receipts
      April 22, 2020 - NORTHWESTERN 020946  283
106 - Writ Memorandum April 7, 2008 -
      IDOC BIGECK 129 AND 136               289
107 - In the Circuit Court of Cook County,
      Illinois Order February 28, 2001 -
      IDOC BIGECK 248                       294
108 - E. Morfin Active Movement History
      May 15, 2023                          297
109 - Office of the State's Attorney Cook
      County, Illinois Memorandum
      April 25, 2000 - IDOC BIGECK 267      304
110 - E. Morfin Visit History Associated
      View May 15, 2023                     306

Page 11

EXHIBITS (CONTINUED)

Exhibit                                                    Page

111 - Affidavit of Patrick W. Walsh
      January 18, 2018 -
      SOPRON 19-CV-8254 4262-4277           319
112 - Choices and Decisions PowerPoint     349

Page 12

STIPULATION

The VIDEO deposition of SCOTT CASSIDY was taken at LOEVY & LOEVY, 311 NORTH ABERDEEN STREET, THIRD FLOOR, CHICAGO, ILLINOIS 60607, on WEDNESDAY the 21st day of JULY 2023 at 10:03 a.m. CT; said VIDEO deposition was taken pursuant to the FEDERAL Rules of Civil Procedure.

It is agreed that SYDNEY LITTLE, being a Notary Public and Court Reporter for the State of ILLINOIS, may swear the witness and that the reading and signing of the completed transcript is not waived.

Page 13

PROCEEDINGS

THE VIDEOGRAPHER: We are now on the record. My name is Kortney Chase. I'm the online video technician, and Sydney Little is the court reporter today, representing Kentuckiana Reporters located at 110 North Wacker Drive, Chicago, Illinois, 60606. Today is the 21st day of July 2023, and the time is 10:03 a.m. Central Time. We are convened by videoconference to take the deposition of Scott Cassidy in the matter of Matthew Sopron v. former Assistant State's Attorney Scott Cassidy, et al., Nicholas Morfin v. former Assistant State's Attorney Scott Cassidy, et al., and Wayne Antusas v. former State's Attorney Scott Cassidy, et al., pending in the United States District Court, Northern District of Illinois Eastern Division, Case Number 19-CV-08254, Case Number 21-CV-05525, and Case Number 22-CV-00320. Will everyone, but the witness, please state your appearance, how you are attending, and the location you are attending from, starting with Plaintiff's Counsel?

MR. AINSWORTH: This is Russell Ainsworth appearing on behalf of the plaintiffs, appearing in-person.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 14

MS. HAGY: Lindsay Hagy, also appearing on behalf of the plaintiffs, also in-person.

MR. LYDON: This is Jim Lydon, L-Y-D-O-N, in-person on behalf of Scott Cassidy.

MR. STEPHENSON: Michael Stevenson, appearing on behalf of Scott Cassidy, in-person.

MR. OBERTS: Bill Oberts, O-B-E-R-T-S, on behalf of former Cook County State's Attorney Ptak.

MS. KUNZER: Amy Kunzer, K-U-N-Z-E-R, on behalf the Cook County State's Attorney Bajenski, Marley, and McDonald.

MR. O'CALLAGHAN: Sean O'Callaghan on behalf of Cook County -- former County State's Attorney's Colleen Hyland, Neil Linehan --

MR. MASCIOPINTO: I'm sorry, I'm having trouble hearing people.

THE VIDEOGRAPHER: Okay. Did everyone state their appearance who are in-person?

MR. MASCIOPINTO: We can't hear anybody in the conference room.

THE REPORTER: I believe that everyone in-person, we can all keep our voices up. There's a lot of people.

MR. O'CALLAGHAN: Who's -- who is on the Zoom?

THE REPORTER: Yeah. Counsel on Zoom, will we

Page 15

please state your appearance?

MS. PIERCE: This is Megan Pierce. This is Megan Pierce on behalf of the plaintiff, appearing remotely.

MR. MASCIOPINTO: This is Tony Masciopinto on behalf of the individual CPD police officer defendants.

MS. AFRA: Heather Afra, also on behalf of the individual CPD officer defendants, appearing remotely.

MS. O'BRIEN: Maureen O'Brien, representing Former State's Attorneys Colleen Hyland, Laura Sullivan, Neil Linehan, Patricia Shae, Steve Dinolfo, and George Andrews, from the Cook County State's Attorney's Office.

MS. MANTILLA: Veronica Mantilla on behalf of the City of Chicago, appearing remotely from Madison, Wisconsin, as part of Michael Best & Friedrich.

MR. MEHR: Stephen Mehr for Scott Cassidy.

MR. AINSWORTH: And I'm going to --

MS. BRODY: Ashley Brody. Oh, sorry. Go ahead, Ephraim.

MR. SIFF: Ephraim Siff from the firm of Nathan & Kamionski, appearing remotely.

Page 16

MS. BRODY: Ashley Brody on behalf of the City, also appearing remotely.

MR. AINSWORTH: Let the record also reflect that Plaintiff's Matt Sopron and Wayne Antusas are present as well as two interns from our office, Nate and Olivia, who will -- if you'll state your names please?

MR. KURSON: Yeah, I'm Nathan Kurson, K-U-R-S-O-N.

MS. HANDLEY: Olivia Handley, H-A-N-D-L-E-Y.

THE VIDEOGRAPHER: Okay. Thank you. I believe that's everyone. Mr. Cassidy, will you please state your full name for the record.

THE WITNESS: Scott Cassidy.

THE VIDEOGRAPHER: And do all parties agree that the witness is in fact Scott Cassidy?

MR. AINSWORTH: Yes. Yes. Yes.

THE REPORTER: I think that's good. There's --

THE VIDEOGRAPHER: Thank you. All right. Mr. Cassidy, will you please raise your right hand for the court reporter to swear you in?

THE REPORTER: Do solemnly swear or affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

Page 17

THE WITNESS: I do.

THE REPORTER: Thank you. Counsel, you may begin.

DIRECT EXAMINATION

BY MR. AINSWORTH:

Q. Sir, would you please state and spell your name for the record.

A. Scott Cassidy, S-C-O-T-T C-A-S-S-I-D-Y.

Q. Do you have a middle name?

A. Yes.

Q. What is it?

A. Edward.

Q. Common spelling?

A. Yes.

Q. All right. Sir, I know you understand this procedure, but I'm going to go over this from the ground rules so we're on the same page, okay?

A. Sure.

Q. If you don't understand any of my questions, please ask me to rephrase, re-ask, or in some way indicate to me that you do not understand my question, okay?

A. Okay.

Q. The flip side of that is that if you answer my question, I'll assume that you've understood my question



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 18

as I posed it, fair?

A. Okay.

Q. Do you have any medical condition or any -- are you on any medication that would affect your ability to testify truthfully and accurately here today?

A. No.

Q. Is there any other circumstance, such as stress or fatigue or illness that affects your ability to testify truthfully and accurately here today?

A. I'm a little stressed.

Q. Well, your --

A. But it's not going to affect my ability to testify.

Q. All right. What are you stressed about, sir?

A. I've never been deposed before.

Q. Okay. Is there anything else that's causing you stress?

A. No.

Q. And why is the fact that you've never been deposed before causing you stress?

A. I mean, I just walk in. I -- I -- I see -- I didn't realize the two defendants were there. They were staring at me when I walked in and I sat down behind, their about two feet behind me. And then I have all these lawyers looking at me and a bunch of lawyers

Page 19

there. Just makes me a little -- little nervous, but I think I'm okay.

Q. When you say the two defendants, are you referring to Mr. Sopron and Mr. Antusas?

A. Right. They're about two feet behind me. Right.

Q. Those are the plaintiffs in this lawsuit. Do you understand that?

A. Yes. They're defendants in my case. They're plaintiffs in this case, but --

Q. And do you understand that you're a defendant in this case?

A. Yes.

Q. Is the fact that the plaintiffs are in this room going to affect your ability to testify truthfully and accurately here today?

A. No, it's not.

Q. Is the fact that there are lawyers in this room going to affect your ability to testify truthfully and accurately here today?

A. No, it's not.

Q. And I should have mentioned that we have a court reporter who's going to diligently take down all the questions you're asked and the answers that you give. And so we got to take turns talking so that the

Page 20

life is better for her because otherwise she'll start fits, okay?

A. Yes.

Q. I'll try and do the same for you, wait until you are done with your answer before I give my next question, all right?

A. Okay.

Q. So is there anything that will affect your ability to testify truthfully and accurately here today?

A. Nothing.

Q. If you need a break at any time, just let us know. All that we ask is that you answer any question that's pending before taking a break, okay?

A. Okay.

Q. Are you employed?

A. No.

Q. For how long have you -- when was the last time you were employed?

A. I want to say about three or four years ago. I did a little legal work for about six months. That's it.

Q. What was that -- who did you work for about six months or three to four years ago for about six months?

A. It was a guy named Chris Langone and Dan

Page 21

Johnson. I actually wasn't paid, so I shouldn't say I was employed. I did it like they needed some assistance on some cases, so I assisted them. So I really wasn't drawing a salary.

Q. And what was the name of the law firm?

A. I don't know if he ever changed it, but I think it was Langone, Cassidy, & Johnson.

Q. And so you were a named --

A. Right.

Q. Your -- the Cassidy in that name was you, right?

A. Right. My under -- I told him my understanding was I'm just going to help out here. That's all I did.

Q. Is the firm still named Langone, Johnson --

A. No.

Q. -- & Cassidy?

A. No.

MR. STEPHENSON: Just wait for him to -- Russell, you understand, will want to get full question out then --

A. I apologize.

BY MR. AINSWORTH:

Q. Yeah, it's all right.

A. Thanks for telling me that.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 22

Q. What is the name of the law firm now, if there is one?

A. I don't think there is one.

Q. Why'd you leave that firm?

A. It was not enough resources being put into it to make it viable.

Q. And when you worked there for those six months, how often -- how many hours a week were you working?

A. Maybe 20.

Q. Were you provided any compensation from that law firm?

A. No.

THE REPORTER: And if you could --

BY MR. AINSWORTH:

Q. Do --

THE REPORTER: I'm sorry, Russell. If you could speak up just a little bit, Kortney said she's having a little bit of a hard time hearing you.

THE WITNESS: Sure.

THE REPORTER: Thank you.

THE WITNESS: Sorry about that.

BY MR. AINSWORTH:

Q. What kind of work did you do for that firm, the Langone firm?

Page 23

A. I handled one criminal case. It was a UUW. And other than that, it was employment law concentration, and I knew nothing about it, so I was just learning from Chris Langone, who had all the experience in employment law.

Q. Why'd you decide to join that firm?

A. Well, it was actually my friend, Dan Johnson, I'm good friends with. I was going to go work for him. They were going to work together. And then Dan said, "Would you mind just lending your name to it in case we get some criminal cases and help us out on?" I didn't want to do criminal cases. I said, "I will do that with the understanding I really don't want to get involved in any type major criminal cases, but I would like to learn another type of law and help you out if I could." So it was employment law, it was interesting, so, basically, because it was something different than criminal law and I thought I'd like to take it -- learn a little bit about it.

Q. Why didn't you want to do major criminal cases?

A. Why did I not want to do major criminal cases?

Q. Yes, sir.

A. Because I just didn't want to.

Q. Why not?

Page 24

A. I didn't want to.

Q. What was it about the major criminal cases that made you not want to work on them?

A. Just didn't want to do them.

Q. Was it the clients that you might have? Was it going against former colleagues that might work in the office still, or was it the environment in the courthouse?

A. Neither of them. None of those.

Q. Was it something else?

A. No, I just didn't want to do them.

Q. When did you decide you didn't want to do criminal defense on major cases?

A. Probably that -- that opportunity present itself and I decided not to -- I didn't want to do it.

Q. Are you retired?

A. Yes.

Q. And so you have no intention to go back to work?

A. No.

Q. Is that correct? You have no intention to go back to work?

MR. LYDON: Asked and answered.

A. No.

BY MR. AINSWORTH:

Page 25

Q. It's not correct?

MR. LYDON: Well, now you've messed the question up.

MR. AINSWORTH: No, I had to clarify the double negative. You understand why I had to.

BY MR. AINSWORTH:

Q. So are you intending to go back to work?

A. No.

Q. What employment did you have before you worked for the Langone, Johnson & Cassidy firm?

A. I worked for the Cook County Sheriff's Police.

Q. What'd you do for the Cook County Sheriff's Police?

A. I had two titles with the Cook County Sheriff's Police. My first title was, they called it Special Assistant to the Sheriff and the second title was Deputy Chief of Investigations.

Q. When were you hired by the Cook County Sheriff's Police?

A. Best of my recollection, it was in summer, I want to say July of 2008.

Q. Had Anita Alvarez took -- taken office by that point?

A. No.

Q. So she'd been elected, but had not taken

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 26

office; is that right? Or should I say she was -- she won the primary but had not been elected yet; is that right?

A. I think that's the timeline, yes.

Q. Why'd you leave the Cook County State Attorney's Office?

A. I -- I left because I believe that the position I held at that time in the State Attorney's Office was a position that would've been changing under Anita Alvarez. Historically, those positions changed when a new administration came in. I felt like I would be perhaps out of a job.

Q. What position did you have?

A. At what time?

Q. When you decided to leave the Cook County State Attorney's Office, the position you thought would change?

A. The position was Chief of Special Prosecution Bureau.

Q. Did you campaign for Bob Milan?

A. What do you mean by campaign?

Q. Did you undertake any activity to try and support Bob Milan's campaign?

A. Just to get -- I guess I'll -- I'll say this, I went to a fundraiser for him.

Page 27

Q. Did you donate money to him?

A. That, I do not recall. I imagine at the door when you go to those usually you're paying for it, so I was -- I'll answer yes to that question. The understanding was admission for the fundraiser.

Q. What was your opinion of Anita Alvarez in 2008?

A. An opinion about what?

Q. About her abilities as a state's attorney?

A. She was very good.

Q. Did you want to work for her?

A. I don't know if I ever consciously thought about it, so I don't know the answer to that question.

Q. Would you --

A. It was never -- it was never asked of me, so I don't know if I ever thought about it.

Q. Would you want to work for her now?

A. What's she doing?

MR. LYDON: Objection. Relevance.

BY MR. AINSWORTH:

Q. What was your relationship like with Anita Alvarez?

A. At what time?

Q. In 2008.

A. What do you mean, what was it like?

Page 28

Q. What kind -- were you friendly?

A. Yes.

Q. And so tell me what you mean by having a friendly relationship with Anita Alvarez?

MR. LYDON: Objection. Vague.

A. Friendly defines like, you know, you see someone you say hello to them. How are you doing? I'd say, yeah, we was friendly.

BY MR. AINSWORTH:

Q. Have you ever criticized Anita Alvarez's job performance?

A. No.

Q. Have you ever criticized --

A. Not that I recall.

Q. Have you ever criticized Anita Alvarez's personality?

A. Her personality?

Q. Yes, sir.

A. Not that I recall.

Q. You were good friends with Bob Milan, right?

A. When?

Q. In 2008?

A. Actually, as it got closer to the, because, the election then was when? In 2009, 2007? This was around with the election, because I -- I actually asked

Page 29

Bob to -- to -- to drop out of the race. It didn't appear he was going to win -- win. And so I think -- I think our -- our relationship is a little fractured there. So, I mean, I don't know when -- what time frame you, I mean, I'm friends with him. I consider we're still friends, but I did, you know, make that request to him.

Q. Why'd you ask Bob Milan to drop out of the race?

A. Because I actually was supporting Tom Anglin, but I consider myself friends with him, but --

Q. Why'd you go to the Cook County Sheriff's Police in 2008?

A. Well, I -- I knew Tom Dart. We had worked together as assistant state's attorneys and I considered him a good -- a good administrator, a good sheriff who was doing good work and -- and he offered me a job. So the -- it was the same pension plan as the Cook County State Attorney's Office, and it was the type of work I'm somewhat familiar with, not all of it, but I thought it was something where I could help him out at -- help him out at and I could help myself out too because I'd be paying in the same pension plan.

Q. How long did you work for the Cook County Sheriff's Police?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SCOTT CASSIDY, taken on July 21, 2023

30..33

Page 30

A.    I worked there, best I can recall, July of 2008 to when I retired, which I think was 2016. December 2016, I believe.

Q.    Why'd you leave the Cook County Sheriff's Police?

A.    Well, at that time I had my pension vest -- or I was able to draw on a pension, so I was able to retire with the pension, the pension plan.

Q.    Did you retire right when you -- your pension vested?

A.    I don't think so.  I -- I think I had some overlap, but they went a little longer and I -- I don't recall the numbers, the exact numbers.

Q.    When did you graduate from high school?

A.    Graduated from Brother Rice High School in 1975.

THE REPORTER:  I'm sorry.  What high school?

THE WITNESS:  Brother Rice High School.  I'm sorry.  If I don't speak clearly, please tell me. I do -- I have a mumbling.

THE REPORTER:  You're okay.

THE WITNESS:  Thank you.

BY MR. AINSWORTH:

Q.    Where'd you go to undergrad?

A.    After Brother Rice, I went to Marquette

Page 31

University in Milwaukee, Wisconsin.

Q.    Did you graduate from Marquette?

A.    No, I did not.

Q.    What years did you attend Marquette?

A.    For the next three years.  So it'd be 1976, 1977, and 1978.

Q.    And why'd you leave Marquette?

A.    I was actually homesick and I wanted to work. Didn't have any money.  So I came home, went to night school at St. Xavier University -- St. Xavier College, and I started working.  That day --

Q.    Where was home?  I'm sorry.  Where was home?

A.    It's okay.  Home?  My home was located in Mount Greenwood, which is in Chicago, Illinois.

Q.    What was the intersection in Mount Greenwood?

A.    Intersection of what?

Q.    Where your home was?

A.    The streets?

Q.    Yes.

A.    104th and Hamlin, that's 3800 West.

Q.    What kind of work were you doing then then?

A.    Well, I was doing different jobs.  I worked on a beer truck, worked on a pop truck.  I worked, like, on moving truck, you know, weekends.  And then I eventually, I joined the Electric Union 134 and I

Page 32

started my apprenticeship program.

Q.    Did you graduate from St. Xavier?

A.    Yes, I did.

Q.    When did you graduate from St. Xavier?

A.    1980, I believe.

Q.    And did -- and what was your degree in?

A.    Criminal justice.

Q.    Why'd you study criminal justice?

A.    I like that area of the law.

Q.    Why?

A.    Because I like criminal justice.

Q.    What about criminal justice did you like?

A.    The whole thing.

Q.    Why did you like criminal justice as opposed to some other areas of study?

A.    I -- I don't know how to answer that question other than I like that -- that area.

Q.    Are you older or younger than your brother Jim?

A.    I am younger than my brother.

Q.    How many years older is he?

A.    How many years older than -- he isn't.

Q.    How many older than you -- how many years older than you is he?

A.    He is six years older than me.

Page 33

Q.    When you graduated from St. Xavier, was he working as a Chicago Police officer?

A.    Yes, he was.

Q.    Did you ever apply to be a police officer?

A.    Yes, I did.

Q.    Where'd you apply to be a police officer?

A.    The Illinois State Police in the Chicago Police Department.

Q.    What was the result of your applications with the Illinois State Police and the Chicago Police Department?

A.    They never contacted me, I don't believe, like a follow-up.  If they did, I don't recall.

Q.    So you took the test for each agency?

A.    Believe so.

Q.    But you were never called back to do the further testing; is that correct?

A.    That's correct.

Q.    Were you ever told why you weren't asked to go back?

A.    I may have been, if I was, I forgot, but as I sit here, I don't recall if I got a follow-up from them or not, either of those agencies.

Q.    Did you attend any other undergraduate institution other than Marquette and St. Xavier here?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 34

A. No.

Q. Were you asked to leave Marquette?

A. Asked to leave?

Q. Yes.

A. No.

Q. Where'd you go to law school?

A. I went to night school at John Marshall Law School. It was on a parallel track. I finished my apprenticeship program, electrical apprenticeship program during the day, and then I went to law school at night.

Q. What years did you attend John the Marshall?

A. I would say from 1981 to 1986 thereabout. I know I graduated in 1986.

Q. Did you attend any other post high school educational institution apart from Marquette, St. Xavier, or John Marshall?

A. No.

Q. Did you attend any high school other than Brother Rice?

A. No.

Q. While you were at John Marshall, did you ever intern for the Cook County State Attorney's Office?

A. No.

Q. Did you complete any legal internships while

Page 35

you were at John Marshall?

A. No.

Q. Did you take the bar upon graduating from law school?

A. Yes.

Q. Did you take the Illinois bar?

A. Yes, I did.

Q. When did you take the Illinois bar?

A. I forget the month, but I believe it was spring of 1970 -- 1986 or, yeah, I think it was spring of 1986.

Q. Is that when you joined the bar?

A. Yes.

Q. So you took the test, you passed, correct?

A. Yes.

Q. All right. So what was your first employment after becoming an attorney?

A. The Cook County State Attorney's Office.

Q. Why'd you want to work for the Cook County State Attorney's Office?

A. I like criminal law.

Q. Do you still like criminal law?

A. I -- you know, I like it now from a distance. You know, I like watching, like, crime shows, I guess. Now and then I'll, like, watch a trial on TV or

Page 36

something like that, you know?

Q. If you still like criminal law, why didn't you want to practice criminal law after you left being at Cook County Sheriff's Office?

MR. LYDON: Asked and answered. We're going back into this again?

A. I don't think one follows the other. Just because you like it doesn't you want to practice it.

BY MR. AINSWORTH:

Q. Okay. So why did you want to be a member of the Cook County State Attorney's Office?

A. I like criminal law.

Q. Okay. So just because one falls -- just because you like criminal law doesn't mean you want practice it and so I'm trying to find out what about criminal law drew you to working at Cook County State Attorney's Office?

A. Sure. I was -- I -- I liked -- I was the guy -- I was the guy who liked criminal law and he wanted to practice criminal law.

Q. When did you stop wanting to practice criminal law?

A. I -- I can't remember the conscious decision I made on that.

Q. I'm not asking you when. Oh yeah, I did ask

Page 37

when.

A. Yeah.

Q. Why did you want -- why did you stop wanting to practice criminal law?

A. I've answered -- I think I've answered that a few times. I didn't want to practice -- I just didn't want to practice anymore.

Q. So you didn't want to practice any law?

A. What's that?

Q. You didn't want to practice any law?

A. No. I said criminal law. I said, I don't want to practice criminal law.

Q. When you joined the Cook County State's Attorney's Office, was that in 1996 -- 1986?

A. Yes, it was.

Q. What was your first assignment there?

A. My first assignment was Markham, which is a Sixth District located in Markham, Illinois.

Q. What were you assigned to do in Markham?

A. I, you know, I'm sorry. I misspoke. My first assignment was traffic court.

Q. How long did you --

A. Traffic court was located at that time at 321 North LaSalle in Chicago, Illinois.

Q. How long do you stay in traffic?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 38

A.   Roughly speaking?  Can't recall.  Maybe six months.

Q.   Where'd you move after traffic?

A.   Then I went to Markham, the Sixth District in Markham, Illinois.

Q.   What were you assigned to do in Markham?

A.   I believe my first assignment, I'm pretty sure about this, was in the misdemeanor courtrooms.  They also had a, if you weren't in misdemeanor, you'd be assigned to room 101, which is like, citizen complaints, which are, you know, they -- where arrest wasn't made, they -- they'd give the people summons to go and settle their disputes in court.  All those cases went to 101.  I may have started there for a month or two.  And then you rotate into the -- the misdemeanor court.  I think that -- I think that's what that was.

Q.   How long were you in misdemeanors in Markham?

A.   Maybe -- maybe nine months, maybe a year.

Q.   What was your next assignment following misdemeanors in Markham?

A.   Felony review in Markham -- in the -- in the suburbs.  And I, as I sit here, I can't recall, like, whether it was a clear cut, you're misdemeanor, felony review, and then you go to the felony room or you do misdemeanor, go to felony review, back to the

Page 39

misdemeanor, and then you go to felonies.  So as I sit here, I -- I don't recall the order that was, but I know I was in the misdemeanor rooms, in the -- in felony review and then I went to felony court.  In what order, I can't say for sure.

Q.   How much time you spent in felony review?

A.   Six months.

Q.   When you went to felony court, which courtroom were you in or which courthouse?

A.   Sure.  I was in Sixth District Courthouse and I believe -- I believe I was assigned to Judge John Wasilewski's courtroom.

Q.   Approximately when was that that you were first assigned to a felony courtroom?

A.   Sure.  I think it was 1987.  Maybe.  Yeah, I'm pretty sure it was '87, at the end of '87, maybe even beginning of '88.

Q.   Were you a third chair in that Courtroom?

A.   Yes, I was.

Q.   How long do you remain a third chair in a -- Markham courtrooms, in felony?

A.   How long did I stay as a third chair in Markham?

Q.   Yeah.

A.   Approximately a year.

Page 40

Q.   And then what was your next assignment?

A.   Second chair.

Q.   In which courthouse?

A.   The Markham courthouse.

Q.   And how long do you remain as a second chair in Markham?

A.   Approximately a year.

Q.   What was your next assignment after that?

A.   It was a first chair in Markham courthouse.

Q.   And how long did you remain a first chair in Markham?

A.   I believe it was probably 1992 or 1993.

Q.   And how did your job duties change in 1992 or 1993?

A.   Just so it's clear, the record's clear, I -- I did a short stint between '89 and 1993, it took the 26th and California.  At that time they were bringing some assistance from the suburban courthouse down to the 26th Street, which falls into the 26th Street.  So I was brought down, told to go work in front of Judge Suria for six months, somewhere between '89 and '92, '93.

Q.   What chair were you in when you were at 26 and California during that time period?

A.   Second chair.

Page 41

Q.   And so how did your job duties change in 1992 or 1993 as you described?

A.   Sure.  So 19 -- in sometime thereabout, I was transferred to Special Prosecution Bureau.

Q.   And was that in 1992 or 1993?

A.   Yes, it was.

Q.   Did you ask to be transferred to the Special Prosecution Bureau?

A.   I think it was mutual.  Pat Quinn, I went to work for a guy named Pat Quinn, who was the supervisor of the Organized Crime Unit, which is located within -- a unit located within the Special Prosecution Bureau. So I agreed to go down there and work for Pat.

Q.   When you say you agreed, did somebody ask you to --

A.   Pat Quinn.

Q.   All right.  So Pat Quinn asked you, "Would you come work for the Special Prosecution Bureau?"

A.   For his unit within the Special Prosecution Bureau, the Organized Crime Unit.

Q.   How'd you know Pat Quinn?

A.   I didn't know Pat well, but I knew -- I knew him.  We knew each other because Pat was out at Markham the one time.

Q.   Did you work with him in Markham?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 42

A. Never did any -- I don't think I ever did any cases with him.

Q. Did you socialize with Pat Quinn?

A. At that time?

Q. Yeah.

A. In Markham? No.

Q. When you started in Special Prosecutions, what was your assignment?

A. Well, the unit was approximately three or four lawyers besides Pat and then Pat would give us cases to prosecute, or we would work on him -- work with him on cases. So we did -- we did both. We had cases that he gave us, which were already charged and we -- we were active assistant state attorneys on them. And then he was also working with agencies on cases wherein we would work on those cases with -- with those agencies.

Q. And where was your office when you were working in Special Prosecutions?

A. It was located on the 13th floor of 2650 South California, in the northeast corner of that building on the 13th floor.

Q. How long did you remain in that position in Special Prosecutions?

A. How long did I remain in Special Pros?

Q. No. In that position, working for Pat Quinn.

Page 43

A. Until approximately, I want to say June of 19 -- gosh, it's been years ago. 1996.

Q. How did your position change in June of 1996?

A. I went from the -- the Organized Crime Unit to the Gang Crime Unit.

Q. Where was the Gang Crimes Unit housed?

A. They were located on the 13th floor of 2650 South California, and they were on the south side of the building, I believe. South.

Q. Was it still in Special Prosecutions?

A. Yes, it was.

Q. When you worked in the Organized Crime Unit, did you work on interesting cases?

A. Yes.

Q. Did you work on the Harry Aleman case?

A. Yes.

Q. When you went to -- tell us why you went to the Gang Crimes Unit.

A. Well, I thought it would be good to do something different -- a little bit different. But there was a case over there that Jack Hynes, who was the supervisor of the unit, he asked me to prosecute. It was a Gang Crime Unit -- a Gang Crimes case. The assistant handling it was leaving, and I would be free to go over there and start with that case, and whatever else he had

Page 44

to do.

Q. How was Organized Crime -- or how was Gang Crimes different from Organized Crime?

A. Well, I spent seven months in the Gang Crime Unit, so I really couldn't tell you the differences. I -- I think, generally speaking though, they were sort of similar in that most of the cases -- most of the cases, which were already charged cases you got from felony review, and they were the majority of your caseload. In Pat's unit, you know, he had -- he had some interesting cases outside of felony review, he actually worked up with the police, that I like to do, too. I like -- I did. I didn't find that -- in my short stint there, I didn't find that the -- the Gang Crimes Unit, those cases that they got, felony review.

Q. But in Organized Crime, you got to work some cases up with -- alongside the police where the case wasn't yet charged; is that right?

A. Yes.

Q. And you liked that work?

A. Well, the case -- it was the Schuessler-Peterson case it was a 1955 -- that's what brought me down, Pat said we're going to work on the case, the 1955 case. Three little boys were killed. It was a serious case, and it was interesting, seemed interesting,

Page 45

so -- Harry Aleman's case was interesting. There was a couple other cases, too. There was Defendant James Blottiaux who -- who was hired to -- hired by Silas Jayne to kill George Jane, who were like -- they were like infamous force people, and a young girl named Cheri Rude got blown up. So I was working that, too. That was -- was an interesting case.

Q. Do you have cases with child victims in organized crimes?

A. Child victims? I don't know.

Q. What about the 1955 case? You said there was three boys.

A. Oh, yeah. The ones I mentioned. Sorry. Yeah, they were -- they were -- they were -- Schuessler was, I think, 13 years old. And Peterson, Bobby Peterson, was probably about -- oh, yes, I -- I did have that case that involved.

Q. You have kids?

A. Yes, I do.

Q. When were your kids born?

A. 1982, 1983, 1985, and 1987.

Q. So in 1996, your oldest kid was 14 years old; is that right?

A. My oldest kid?

Q. Yeah.



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 46

A. My, yeah, my child was -- my daughter was -- Mary was born February 27th of -- of 1982. So what -- what date do you want me --

Q. In 1996.

A. 1996. Well, she turned 14 in 1996, and that's correct.

Q. And you had a 13-year-old as well? What gender is your second child, the one born in '83?

A. He's a boy.

Q. Did you feel that, you know, by bringing justice to families where children had been killed was one of the most powerful jobs that a prosecutor could play?

MR. LYDON: Objection to form.

A. I never thought about that, to tell you the truth.

BY MR. AINSWORTH:

Q. What was --

A. I mean, it's questions. I understand what you're trying to say. It's very word powerful, most important. Those are all really terms I really didn't know. You have to sit down, really think about it. Almost start out, like what your -- your hierarchy, what -- what's important. You know, I really I -- I -- I really took every case very seriously, to be

Page 47

honest with you. So I never -- I never sat down and said one case is more important than the other. But I understand your point, you could see -- you could see where someone might say this is a very important case.

Q. What did you feel were the most important cases that you worked on as a prosecutor?

A. As I indicated, I really -- I really -- I took every case seriously and they're all important. I mean, I remember they -- I was asked to come back to Markham and talk to them, the assistants, about being a prosecutor. So if I could just tell a story if that's okay.

Q. Sure.

A. May get my point across. So I told them when I was in misdemeanor room, I can remember this case. It was -- it was a misdemeanor case. It was disorderly conduct case, it's only the lowest class misdemeanors you have. And these -- these Girl Scouts were camping out in Oak Forest and in some cabins. And so they -- they were there, some of the moms were acting as, you know, chaperones. And these young kids in -- in the neighborhood or wherever they were from, came in the middle of the night like banging on their cabin doors and scared the heck out of them, these women. Because

Page 48

these guys were drunk and they were like making, you know, yelling stuff out and all that. So anyway, I got the case and -- and it was, you know, I remember the ladies, a couple crying, like saying, "We -- you have to believe the terror we were going through that night." And no one -- you know, there's no phones in the cabins, things like that. There was no cell phones or anything like that. So, I mean, so my point was, I put a lot of time into it. You know, I went out there on this Class C misdemeanor, took photographs of it. That's when the investigators said I was crazy to go out there, you know, videotaping it and all that type of thing. And so I put a lot of time into it and -- and my point was this. That for those mothers and those kids, even though it was a Class -- ended up being only, they can only charge a Class C, but they're a misdemeanor, this was like terrorizing to them. So I hope you understand my point. Try to -- I try to take each case seriously, especially if there's a victim about even it's stolen auto where no harm is found, a residential burglary, whatever the case may be, you'll try to put as much time and effort into it as you can - - possibly can. Obviously, you got to -- you know, you are -- we are limited resources. We have to put more time. I'm sorry that I'm speaking so fast. More time to do, you know,

Page 49

the more serious cases, but we try to give each one a -- a really good shot, you know.

Q. What did you enjoy about working in the Cook County State Attorney's Office?

A. I like -- I mean, I like criminal law. I like to -- actually, I like the law aspect of it, you know, the -- you know, all the criminal procedure makes sense. All the case law makes sense, so I like arguing the cases, the criminal law cases. I enjoy that. Yeah. I don't know. I just like -- I like the fact that, you know, there's -- there's an aspect of justice to it. I mean, it was -- you know, justice is sort of a somewhat ambiguous term, but use it broadly, and it's the only place people can go to the court who have been wronged is to seek their -- seek justice. So you're representative -- you're representing them in court.

Q. Why'd you leave the Gang Crimes Unit after seven months?

A. So Pat Quinn became -- was elected to the Appellate Court, I believe, and I was then promoted to take his spot. The supervisor of the -- of the Organized Crime Unit.

Q. When you became the supervisor of the Organized Crime Unit, did you work on organized crime cases?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 50

A.   Yes.

Q.   And what's the distinction at that time between what would be a gang crimes case and what would be an organized crime case?

MR. LYDON:  Asked and answered.  Go ahead.

A.   The -- the organized crime cases were really car thefts.  Hard to describe what they were.  It wasn't really -- and now and then you might get a burglary crew organized, you know, they considered organized crime type of thing.  So it was also those types of cases. If you want to look for biggest distinction, I think the Gang Crime Unit were probably more geared towards violence as opposed to the Organized Crime Unit. I don't think we were geared towards violence that much.

BY MR. AINSWORTH:

Q.   So organized crime was more crimes against property and victim crimes?

A.   I think for the most part that'd be a fair assessment to say, if you're looking at a major distinction of it.

Q.   Let me just get the question out because --

A.   I apologize.

Q.   It's okay.  I just -- I'm going to have to work with Sydney again and so she might keep me next for what I did today.  So in organized crime, that's more

Page 51

geared towards property crime and gang crimes is more geared towards crimes against persons; is that right?

A.   Broadly speaking, I would say that's correct.

Q.   When you were the supervisor in the Organized Crime Unit, what were your job duties?

A.   Well, we probably had four or five lawyers there, assign cases out.  Make sure the cases were being sort of handled properly.

Q.   Did you work on organized crime cases?

A.   Yes.

Q.   Did you litigate those organized crime property cases?

A.   Yes.

Q.   Did you work alongside police to investigate organized crime cases?

A.   Sure we did.

Q.   Did you work on any cases while you were the supervisor of the Organized Crime Unit that were not organized crime cases?

A.   Possibly and probably.

Q.   Why do you say possibly and probably?

A.   Well, I -- I -- I had cases already I brought over.  I'm sure I -- I'm sure I have cases when I went back to the Organized Crime Unit because that's just how things work.  When you get transferred from one unit to

Page 52

another, you have cases that you're -- you're already in the middle of prosecuting, so to keep continuity with the case, you would take those cases with you.  So by its nature, then I'm going to have cases other than the ones at Organized Crime Unit.

Q.   When you first joined the Organized Crime Unit, you were brought in to take over a case for somebody else, right?

A.   No.

Q.   Then maybe I misunderstood because I -- my understanding was that you came into work on the case with the 1955 murders where a woman had been working on it before, but she left.  Is that not true?

A.   No, I don't think I said that, did I?  If I was, that's a mistake.  I mean, I'm wrong. No, I wasn't -- I was brought in there to work on the case. I don't think it was a woman in there who left.

Q.   Was it --

A.   Did I say that?

Q.   I'm not sure.  I'm -- that's what I'm trying to clarify, sir.

A.   Oh.

Q.   Was there somebody working on that case before you?

MR. LYDON:  Object to relevance.

Page 53

A.   No, sir.

BY MR. AINSWORTH:

Q.   How many cases did you bring to the Organized Crime Unit with you when you became the supervisor then?

A.   I don't know.

Q.   Can you estimate what it was?

A.   It'd be a total guess.

Q.   What is it?

A.   Half a dozen.

Q.   How did you decide which of your cases from Gang Crimes Unit you stayed on when you joined the Organized Crime Unit as the supervisor?

A.   Can you ask that again?  I'm sorry.

Q.   Sure.  How did you decide which of the cases that you're working while you're in the Gang Crimes Unit you continued to stay on as a litigator when you joined the supervisor -- as supervisor of the Organized Crime Unit?

A.   That's probably where the case status was, if they were set for trial.  And once again, not -- just so I'm clear, I probably had cases that I -- with my -- my window in -- in gang crimes was relatively small. So I probably had cases from the Organized Crime Unit I brought over to Gang Crime Unit.  And then when I went back to the Organized Crime Unit, I brought back the



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 54

same case with me. So I might have had two or three gang cases when I went back to organized crime. Plus, maybe the three cases I already had from organized crime. That's my total of six that I'm looking at, I brought back with me.

Q. And how would the procedural posture of the case determine whether you stayed on the case or whether you let -- left it to somebody else in gang crimes?

A. Sure. I think just to keep case continuity, you would -- if it's well into it, you would keep the case. It also gives -- if it's a case with a victim, a family of a victim, it keeps -- it gives them peace. You know, you're not pinballing them as to who they're -- who the prosecutor's going to be. Because that can get frustrating to them when they're getting bounced around from one prosecutor to another. So I think take both under considerations when you're making the decision. The supervisor making the decision along with the assistant as to what cases they're going to keep.

Q. And how would the assistant help to decide which cases they would keep?

A. The assistant would help by clearly stating to the supervisor or whatever, whoever the person is, is it a case status? Why should he or she should not take the case or should take the case.

Page 55

Q. And so you had an opportunity to advocate for which cases you wanted to bring with you from gang crimes to organized crimes, correct?

A. Yes.

Q. And so you were more likely to take cases from gang crimes to organized crime when you became the supervisor there in approximately January of 1997, if the case was set for trial, or close to trial in some way, right?

A. Yes. Or if it was a significant case as well.

Q. What would be a significant case?

A. Something where usually it's assigned to you by a supervisor, or it's maybe a high profile case or a media case, or -- or whatever the situation may be.

Q. And forgive me, but I thought that all cases were assigned to you by a supervisor when you're an assistant working in the Gang Crimes Unit. Was that not true?

A. No, that's true.

Q. So then why would the fact that a case was assigned to you make it more likely for you to bring it from gang crimes to organized crimes?

A. Well, it's assigned to me. If it's assigned to you specifically for -- because of the nature of the case, it's maybe a high profile case or a case that the

Page 56

supervisor really wants you to handle.

Q. What's a high profile or media case?

A. That's where, you know, that's a subjective opinion. But, you know, to receive a lot of media attention. The terminology in the office was as a high profile case.

Q. Right. And so what did that mean to you?

MR. LYDON: Objection to the form.

A. High profile means that the media's covering it with some degree of regularity, I guess.

BY MR. AINSWORTH:

Q. And how would the fact that the media is covering a case, make it more likely that you would bring a case from gang crimes to organize crime units at the time?

A. The only -- sure, sure. Only because they -- they keep continuity with it.

Q. And why would you want to have continuity as an assistant state's attorney in a case that had media coverage?

A. Well, just because there's no mix up in communication. Sometimes these cases get bounced around where needs to be communication lost. With the court, with the lawyers, the other side for the lawyer representing the defendant, victim's family.

Page 57

Those type -- that type of rationale would apply.

Q. How long do you remain the supervisor in the Organized Crime Unit?

A. 2004.

Q. How did your job duties change in 2004?

A. And just so it's clear, this -- this Organized Crime Unit also became the Cold Case Unit.

Q. When did that happen?

A. Probably 1998. So it was Organized Crime/Cold Case Unit.

Q. And how did your job duties change in 2004?

A. Didn't change at all for me. Oh, 2004?

Q. Yes.

A. I apologize. My job title then was -- was Chief of Special Prosecution Bureau.

Q. What were your job duties, the Chief of Special Prosecutions?

A. So the Special Prosecution -- Special Prosecution Bureau there had several units, and my job was just to basically provide oversight to the seven units -- or the several units that were in there. Units were, as was previously mentioned, and the one I just left from was the Cold Case/Organized Crime Unit. There was an Auto Theft Unit, there was a Gang Crimes Unit, there was an Arson Unit, there was a Public Integrity



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 58

Unit. I think I covered them all, may have left out -- maybe there's another unit I forgot about.

Q. Which of those units had the most people assigned to it?

A. I would -- can't say for sure, but I -- I would say between the Gang Crimes Unit or the Public Integrity Unit.

Q. Did you remain the Chief of Special Prosecutions until you left the Cook County State Attorney's Office?

A. Yes, I did.

Q. Did your job duties change between joining as Chief of Special Prosecutions until you left the Cook County State Attorney's Office?

A. I don't think so.

Q. What did you do to prepare for today's deposition?

A. Well, I read over the transcripts of Sopron and Antusas' trial. I read over them once a few months ago, I -- I skimmed them again in the interim, not complete. I was also provided the transcripts of the Nick Morfin trial. I believe I read over those in the entirety. I was provided a supplemental report, which was -- consisted of past -- almost 40 pages, I believe. Also, other police reports. The arrest reports, they

Page 59

also were provided. This was provided reports of interviews generated by the Investigation Bureau of the Cook County State's Attorney's Office. May have been provided something else, but I can't recall if I was.

Q. And I'm not asking what you were provided, but what you reviewed?

A. Oh, wait a minute. I'm sorry. I was provided those and reviewed those.

Q. Okay. Did you review any photographs in preparation of this deposition?

A. No.

Q. Did you review any audio or video recordings?

A. No.

Q. You said you reviewed some interviews or reports of interviews generated by the Cook County State Attorney investigators. Which of those interviews did you review or reports did you review?

A. Sure. I reviewed the report interview of Ed Morfin, Bill Bigeck, Anthony Coppollilio, I believe Thomas Mander, Mike Bielawski. That's all I can remember, but there may have been more.

Q. Did you review reports generated about interviews with John Gizowski?

A. I don't recall seeing a report of interview with -- Cook County Investigative Bureau report of

Page 60

interview of John Gizowski.

Q. What about a report of an interview with Bryan O'Shea?

A. I don't recall seeing report of interview of Bryan O'Shea.

Q. Did you review any handwritten statements taken from witnesses?

A. Yes, I did.

Q. Which handwritten statements did you review?

A. Bryan O'Shea, John Gizowski, and Sean O'Brien. If there are any more, I don't remember.

Q. Did you review a handwritten statement taken from Billy Bigeck in December of 20 -- December of 1995?

MR. LYDON: Russell, what did you say? Did you say handwritten?

MR. AINSWORTH: Yes.

A. No, I -- I don't think -- I don't think I reviewed a handwritten statement. A handwritten statement of Bill Bigeck in 1995? Sorry, I don't recall. I may have, I just don't recall.

BY MR. AINSWORTH:

Q. Were there any documents that you wanted to review in preparation for this deposition, but didn't have the opportunity?

Page 61

A. I don't know. So yes, the question, I wouldn't know the answer to that question.

Q. Well, I mean, in preparation for this deposition, were there documents that you wanted to access, but you were unable to?

A. No. I mean, I -- once again, I don't know what you're asking, so I don't know what documents I should have looked at.

Q. I just mean as you like, for example.

A. Sure.

Q. You wanted to see police reports from the 1995 investigation, but those reports weren't available with access. Was there anything like that, where there's a category of documents or a particular document that you wanted to review, but you didn't have access to?

A. Once again, no, I did not ask -- I did not ask for any documents. But my answer stands, I don't know what you're asking me, so I don't know. I mean, if you ask me some questions about some documents that I didn't review, then I'd say, yeah, I wish I would've reviewed that document.

Q. Yeah. Let's just take this --

A. I don't meant to be argumentative. I'm just saying -- yeah.

Q. I just mean as of yesterday, right. So as of



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

yesterday, knowing that you -- there's no way to know what questions you're going to be asked today.

A. Okay.

Q. But were there any documents you wanted to review, but couldn't?

A. No.

Q. Did you do everything that you wanted to do to prepare for this deposition?

MR. LYDON: Objection. Form.

A. Once again, without knowing what you are going to ask me, I cannot honestly say that I've done everything to prepare for this deposition.

BY MR. AINSWORTH:

Q. Do you feel prepared to give a deposition today?

A. Once again, it depends on what you're going to ask, but I'll try my very best.

Q. No. Do you feel prepared?

MR. LYDON: Asked and answered. Form.

A. I'm sitting here. I think you asked in the beginning are you prepared for deposition? I answered yes. I'm just qualifying with -- with that because I have to qualify with that.

BY MR. AINSWORTH:

Q. Did you meet with your attorneys in

preparation for this deposition?

A. Yes, I did.

Q. On how many occasions?

A. Well, I would say I think I first met my lawyers probably three years ago and maybe five times, five times in the interim.

Q. When was the most recent time that you met with your attorneys?

A. Last week maybe.

Q. When last week?

A. I don't know.

Q. And when you met with them last week, was that in-person or over the phone?

A. In-person.

Q. And who was present --

A. What -- what day of the week is this today?

Q. Today's Friday.

A. I'm trying to be accurate with my -- my answers. I might have met with -- I might have met with a lawyer maybe Monday, but it could have been last week. I -- I -- I -- I don't recall.

Q. At that most recent meeting, how long was that meeting?

A. About three hours.

Q. Who was present?

A. Jim, I don't think Mike was there. I think just Jim.

Q. Was anyone else present apart from you and Jim?

A. No. Best I recall, no.

Q. The time before your most recent meeting, when was that?

A. That was like a -- like the same time frame, like a week ahead before you canceled the first deposition. So whenever that first deposition was you had set, maybe a week ahead of that we met. So I -- I can't say what the date was.

Q. And who'd you meet with then?

A. I think Mike and not Jim. Jim might have been there too, I can't recall.

Q. Was there anyone else present apart from you and Mike and maybe Jim?

A. No.

Q. And how long was that meeting?

A. Two or three hours.

Q. Was it in-person?

A. Yes.

Q. Back in 1996, when you're meeting with a witness, did you -- what were the opportunities that you had to memorialize a statement provided by them?

MR. LYDON: Object to the form. Vague.

A. When you say 199 -- meeting with a witness, what are you talking? What -- what -- what are you talking about?

BY MR. AINSWORTH:

Q. When you're meeting with a witness and you wanted to memorialize a witness's statement, how could you go about doing that in 1996 as an assistant state's attorney?

A. Oh, just like generally speaking, like, what was the policy or procedure?

Q. Yeah.

A. In 1996 When you met with a witness?

Q. Yeah.

A. So the question is, in 1996, what was the procedure in the State's Attorney Office, or procedure I used when I met with a witness?

Q. To memorialize their statement.

A. To memorialize their statement. Now, that's once again, context is sort of everything. So the purpose or purpose of what? Why would you -- why would I want to memorialize the statement?

Q. Well, can we just talk about what the different possibilities were? Because my understanding is, and you correct me if I'm wrong.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 66

A. Go right ahead.

Q. That you could do a handwritten statement with the witness, you could do a court reported statement with the witness, you could just have an investigator write a report about the statement. Are those -- were those three possibilities open to you in 1996 to memorialize a witness's statement?

A. Add more. You can call a witness on the phone. "Hey, you know, come on down next week. I want to talk to you." You don't memorialize that. You can -- you can might call him on the phone and say, "Hey, you know, I got a follow-up question." Take a -- take an answer on the phone, you don't memorialize that.

Q. I'm not asking you what --

A. I -- I -- I -- but if you'd be more specific, I'd like to help out.

Q. You've got to listen to my question, okay, because I'm not asking about situations where you're not memorializing the question. That's the whole point. I'm asking, how do you memorialize a statement? And I'm trying to find out just as this predicate question, were -- was it possible in 1996 for you to memorialize a statement by either taking a handwritten statement -- let me scratch that. I'm not trying to suggest that these are the only ways that you had to memorialize the

Page 67

statement. I'm just trying to get us started to find out what all the possible ways were. So were some of the ways that you could more memorialize a statement in 1996 to take a handwritten statement, to take a court reported statement, and to have a Cook County State's Attorney investigator write a report regarding the conversation?

A. I believe felony review used court reporters in memorialized statements. I never worked felony review in the city, so I -- I can't speak firsthand about that. But if you're asking like what the office policy was, I think they used -- they used court reporters. Or they also took handwritten statements. Does that help?

Q. Sure. And what -- so tell us all the different means that were available to you to memorialize a witness's statement in 1996.

MR. LYDON: Object to form.

BY MR. AINSWORTH:

Q. And talking about the time when you were in gang crimes in 1996.

A. Yeah. I'd say -- I would say investigator written -- I'd write -- write a written report of the -- of the interview. The state's attorney can write a written -- or, can write the length of the report if

Page 68

they wish to memorialize it in a memo form. I don't think court reporters were used outside the context of felony review as a procedure. They -- I think that answered your question.

Q. And were -- and could you take a handwritten statement when you were working gang crimes in 1996?

A. Did I take a handwritten statement?

Q. Yeah.

A. Yeah, that could -- there was nothing stopping me. In the right context, yes, we can do that. Sure.

Q. And just for the record, can you explain to us what a handwritten statement is?

A. Sure. As I said, I don't know if I ever took a handwritten statement. So -- well, I think you -- I get your point. I'll try to describe what -- what it is. It's a statement wherein the assistant state's attorney speaks to someone, and then they -- they document that statement in written form with the witness present. And they review that written statement with the witness. They allow the witness to make corrections on it or -- or whatever it may be. And they both -- I think they sign it if I'm not mistaken. Or they initial it.

Q. So it's a statement written out by an assistant state's attorney for a witness to review and

Page 69

sign?

A. Yes.

Q. It that --

A. Yeah, I think that's -- you -- you said better than I did, but that's right.

Q. Whose responsibility was it to decide how a witness's statement would be memorialized, if at all?

MR. LYDON: Object to the form, vague.

BY MR. AINSWORTH:

Q. And let's stick with the same time frame. So in, you know, September 1996 in the time when you were in gang crimes?

A. Uh-huh. Probably once again, context is everything. So usually assistant state's attorney, he decides that.

Q. The assistant state's attorney who's working the case?

A. Who's taking handwritten. And it just depends what option is available to the assistant state's attorney, too.

Q. And I'm not talking about just in situations where a handwritten was taken, okay? What I mean is in September of 1996, when you were working in gang crimes, was it your responsibility on cases you were working to determine whether a report would be generated by a Cook



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 70

County state's attorney's investigator, or if you would create a memo, or if a handwritten statement would be taken, or if no documentation would be created at all?

A.   Now, I only worked in state's attorney's office in -- in the gang crime unit like I said, for six months.  I only worked in a couple of cases, mainly this one here.  I can only just tell you what we did in this case here.

Q.   Which do you mean?

A.   It -- it's like a general policy, it'd be hard to say.

Q.   What'd you do in this case?

A.   What do you mean, what'd I do?

Q.   You just said you could tell -- you could only tell us what you did in this case.

A.   Sure.

Q.   And so I'm asking you, what did you do in this case, regarding --

MR. LYDON:  Objection, vague.

BY MR. AINSWORTH:

Q.   -- regarding documenting witness statements.

A.   Well, reading over -- reading over, it appears that we -- we talked about handwritten statements were taken by Assistant State's Attorney Colleen Hyland and Laura Sullivan.

Page 71

Q.   Okay.  I understand that some handwritten statements were taken.  My question to you is, who decided, and whose responsibility was it to decide whether to memorialize a statement and how that statement should be memorialized in September of 1996?

MR. LYDON:  Objection to form, foundation.

A.   In this case here?  In the -- in the case we talk about it.

BY MR. AINSWORTH:

Q.   Sure.  Let's -- we can talk about it in the context of this case.

A.   Okay.  So, I mean, this case here, they -- I think Laura Sullivan took a -- if I remember correctly, Colleen Hyland, they were out in Bridgeview.  I think they took a handwritten statement out there of some witnesses.  So it was -- they felt it was best to memorialize it in handwritten statement.

Q.   Whose responsibility was it to decide whether to memorialize the statements, and if so, how to memorialize the statements?

A.   No, I would -- I wouldn't just -- I wouldn't say responsible.  I -- I would think that we've talked -- I -- I -- I would believe that they may have contacted me or Neil and said, "I'm going to take a handwritten statement from him."  And he said,

Page 72

"Sure. Get a written statement."

Q.   You understood as a prosecutor, you have certain ethical obligations, right?

A.   Yes.

Q.   And part of those ethical obligations include, you know, not withholding exculpatory evidence from criminal defendants, right?

A.   That's correct.

Q.   In, you know, the 1996 to 1990 or 2000 time frame, how would you ensure that you comply with your ethical obligations to not withhold exculpatory information from criminal defendants?

A.   By in fact not withholding exculpatory information.

Q.   How would you ensure that exculpatory information would make it to criminal defendants or their attorneys?

A.   By making sure it gets to them.

Q.   All right.  How would you do that?

A.   By tendering it to them.  Tendering the information.

Q.   And would you tender the information in written reports so there would be no dispute about whether the, you know, exculpatory information was provided to --

Page 73

A.   In 19 --

MR. LYDON:  Objection -- wait, wait, wait.

A.   I published --

MR. LYDON:  Objection to form, vague.

Go ahead.

A.   I think your question is, will we provided in written form, like at a written receipt as to what we're tendering?

BY MR. AINSWORTH:

Q.   No, I mean, the information itself.  So would you ensure that the information itself was reduced to writing and provided to the criminal defendant or their attorneys so that the attorneys would know in writing what the information was and there'd be no dispute about whether it was communicated?

A.   And by way of example, I know who you're speaking to.  For instance, when someone takes a handwritten statement, you make sure that handwritten statement that was taken gets to the attorney.  Is that what you're talking about?

Q.   That's one means, yes.

A.   Okay.  So I would hand them the -- I would take -- make a copy of the handwritten statement, and I would hand it to the attorney.

Q.   And when you interviewed a witness and the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 74

witness provided information to you about a criminal investigation, would you be sure to memorialize that information in a either -- a handwritten statement, or a memo written by the assistant state's attorney, or in a report by the Cook County State's Attorney investigator?

MR. LYDON: Objection to form.

A. We would try to.

BY MR. AINSWORTH:

Q. Why would you try to?

A. Because it's a statement from a witness.

Q. So if a witness is giving a statement about a murder case, that statement should be reduced to a written statement, right?

MR. LYDON: Objection to the form, vague.

A. I believe so.

BY MR. AINSWORTH:

Q. And why do you believe so?

A. Because it's a statement from a witness about an incident that you're -- that you're prosecuting. To the best of your -- best you can, you try to relay that information to the -- to the attorney for the person you're prosecuting.

Q. Before you joined the gang unit, had you prosecuted any crimes against persons? As in felony crimes against persons?

Page 75

A. Yes.

Q. In what context?

A. Well, I mean, probably in -- beginning in my misdemeanor days, you know, you get a battery and they come to court. You have a victim and you have a -- the defendant. I would then would call the victim to testify as to what took place. So that was probably like initial -- initial case type of case you'd do as crimes against persons would be a misdemeanor battery. Then you -- then you -- you go on to armed robberies, or -- or strong armed robberies, crimes against persons. Aggravated batteries, they're crime against persons. Shootings, crime against persons. Stabbings, crime against persons. Murders, crime against persons. Forceful felonies, even arsons, are considered forceful felonies, I believe. The whole -- the whole litany. And the definition what's a forceful felony, which may be -- which I think is crimes against persons, too, I mean --

Q. Before September 1996, had you litigated any murder cases?

A. Yes.

Q. How many?

A. Probably a couple dozen. Those are just litigation, whether it be bench trial or jury trial. And

Page 76

then you have a litigation, you know, litigation also includes him pleading guilty to -- it's got to be more -- probably more than --

Q. Where were you living in December 1995?

A. Where was I living? I was living in Orland Park, Illinois.

Q. What about in September of 1996?

A. Orland Park, Illinois.

Q. Where did your kids attend high school?

MR. LYDON: Objection, relevance. Is there reason for this, Russell?

MR. AINSWORTH: Yes.

MR. LYDON: What is it? Otherwise, I'm going to instruct him not to answer.

MR. AINSWORTH: Have the witness step out of the room.

MR. LYDON: Can you step out? Or just --

MR. AINSWORTH: Just go out there -- outside the door.

MR. LYDON: It won't be but a second.

MR. AINSWORTH: Since high school?

MR. LYDON: Yeah, his oldest was 14 at the time of everything in February of 1996.

MR. AINSWORTH: I want to know if she attended any of the high schools that either the witnesses or

Page 77

any of the victims -- or any of the schools that needed to be identified since.

MR. LYDON: Okay.

MR. AINSWORTH: That's all.

MR. O'CALLAGHAN: Can you guys keep your voice up, please?

MR. AINSWORTH: Oh, sorry. Thank you.

MS. MANTILLA: Actually, is it possible when the witness comes back in to have him sit closer to the mic, please?

MR. AINSWORTH: Sure.

MS. MANTILLA: Thank you.

MR. LYDON: Mr. Cassidy, there's a request that you speak up, so we're going to move the mic going a little closer to you and see if that helps.

BY MR. AINSWORTH:

Q. I'm going to repeat the question, sir. What high school did your children attend?

A. Sure. So they -- two went to Sandburg High School, and two went to Providence Catholic High School.

Q. And did they go to junior high in Orland Park?

A. Yes, they did.

Q. Have you ever been arrested?

A. Yes.

Q. How many times?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 78

A. Once.

Q. Did you ever have an order of protection taken out against you?

A. No.

Q. Have you ever had police come to your home?

A. No.

Q. When were you arrested?

A. In 19 -- I'm sorry. 2006.

Q. Where were you when you were arrested?

A. I was in Joliet, Illinois at a casino. Outside a casino.

Q. When -- where were you when you first came into contact with police?

A. I was inside the casino. No, sorry. I was on -- I was outside the casino.

Q. Do you know why you were arrested?

MR. LYDON: Objection to form, vague.

A. I was being -- very little recollection of it. I was drunk. I remember bits and pieces. I remember yelling for no good reason. I remember the police being very kind to me, very polite to me. They were offering me a -- I was drunk, but they were offering me a room. I remember that. For free. But I wanted to drive, and they said -- they said, you can't drive. That's -- that's basically the sum and substance that I remember.

Page 79

BY MR. AINSWORTH:

Q. Do you recall one of the officers being Latino?

A. No.

Q. Do you recall making racial slurs against that Latino officer?

A. First I ever heard of it. And no, I do not. You say a -- no, there were two men.

Q. Right, a Latino man.

A. Latino man, oh. No. No, I do not recall making racial slurs.

Q. Who were you with at the casino?

A. I don't know.

Q. Why were you at the casino?

A. To gamble and drink.

Q. Do you recall it being a Monday night?

MR. LYDON: Are you going to -- let's stop for a second. Are you going to tender him a report regarding this casino arrest? If so, we're going to take a break. We haven't seen any reports that have been produced.

MR. AINSWORTH: No.

MR. LYDON: Yeah, we are. If you're going to show them a report that you haven't tendered -- you can smile all you want, but that's what's going to

Page 80

happen.

MR. AINSWORTH: I answered your question. I said no.

MR. LYDON: Okay. All right.

MR. AINSWORTH: I'm not going to tender the report.

MR. LYDON: Okay. Well --

MR. AINSWORTH: So, you know, like, just wait until you see what happens and then you can interject. Because you wouldn't do that in court. You know?

MR. LYDON: I would. We're not -- it's not a trial by ambulance, like I said. I did -- I'm protecting my client's rights, and I'm going to continue to. And I would do that in court. I would -- and I'm going to do that here today. Because we're talking about a 2006 arrest that has no relevance.

BY MR. AINSWORTH:

Q. Have you ever sought treatment for -- out using alcohol?

A. Yes.

Q. Are you sober, currently?

A. Yes.

Q. And how long have you been sober?

Page 81

A. 16 years.

Q. So since 2007?

A. Yes. January of 2007.

Q. Did you seek treatment after your arrest in September of 2006 or was it before then? Or both?

A. Say that again?

Q. When did you seek treatment for alcohol use?

A. January 2007.

Q. Was it a part of a court-ordered -- were you ordered to seek treatment?

A. No.

Q. Did any prosecutor or judge suggest that you seek alcohol treatment?

A. Well, no judge. When you say prosecutor, that's a pretty broad term. I -- after I was arrested, I remember getting calls from other prosecutors who were in AA. They read about my episode. It was very embarrassing. It was -- it was in the news, and they said, "You know what? I'm a member of AA, and this kind of case, you got a problem." And I took up one of the -- one of the prosecutors on that. It was so kind of him to call. Like, many people called. But he ended up becoming my sponsor. So yes, the prosecutor.

Q. When you became the Chief of Special Prosecutions, was your office still on the 13th floor?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 82

A.   Yes.

Q.   Was it back where you were before on the -- was it the northeast corner?

A.   Yes.

Q.   In your office on the 13th floor in the northeast corner as the Chief of Special Prosecutions, did you have alcohol in your office?

A.   Occasionally, yes.

Q.   And would you have both full-sized bottles of liquor as well as like, locally referred to as airplane size bottles?

A.   Never has liquor.

Q.   Excuse me?

A.   Never had liquor.  Beer.

Q.   Beer?  What kind of beer?

A.   I think at that time -- I think at that time I was drinking Old Style Beer.

Q.   Were there bottles of liquor kept in the Organized Crime Unit when you were there?

A.   No.

Q.   In that office, in the -- when you were the Chief of Special Prosecutions, did you share that office or was it just you?

A.   Just one person.

Q.   Just you?

Page 83

A.   Yes.

Q.   And you had a computer in that office?

MR. STEPHENSON:  Objection, vague.

A.   The best of my recollection, there was a computer in there.  I didn't use it.  I don't recall using it that very often if ever.  I wasn't very computer literate.  Well, I mean, because, I had a support staff person made out specific -- specifically for that -- for that title that you give the support staff.  She did everything for me.

BY MR. AINSWORTH:

Q.   Where was your support staff seated?

A.   Right outside the door.  There's -- outside that door, there's another room, and that's where the -- a deputy, the special sat, that person.  And then right next to that person is where the support staff person, administrative assistant, whatever they call them on -- were those two people for -- for the deputy and for the chief.

Q.   When you became the chief, who was your support staff person?

A.   Margaret Murray.

Q.   How long was Margaret Murray your support staff person?

A.   Margaret Murray was there for -- right when I

Page 84

got there, or actually she -- actually she was over organized crime, and I asked her to come over.  So she was with me for 15, 20 years and we -- we worked together 15 years, I think.

Q.   When was the last time you talked to her?

A.   I saw -- I saw Margaret about ten years ago. I was down in -- in -- in Montclare and we ran into each other at a, I think it was like 7-Eleven.

Q.   Why didn't you have any bottles of alcohol -- of liquor in your office?

MR. LYDON:  Objection to form, foundation.

A.   I never bought it freely.

BY MR. AINSWORTH:

Q.   When you drank in the 2000s, what were you drinking?

MR. LYDON:  Objection, vague.

BY MR. AINSWORTH:

Q.   What types of alcohol?

A.   Just, I think, Miller Lite.

Q.   Anything other than beer?

A.   No.

Q.   What were you drinking at the casino?

A.   Beer, as far as I remember.  Like I said, I had -- at the casino, I -- I had like --

MR. LYDON:  No question pending.

Page 85

MR. AINSWORTH:  Yeah.

THE WITNESS:  Okay.

MR. STEPHENSON:  Let's mark this as Exhibit 1, please.  Oh, shit.  Hang on.  Scratch that, people on Zoom.  Let me a different version.

MR. O'CALLAGHAN:  I'm sorry, what was that?

MR. AINSWORTH:  We're on --

MR. STEPHENSON:  I can't find out.

MR. AINSWORTH:  Thank you.

MR. STEPHENSON:  Exhibit 1.

BY MR. AINSWORTH:

Q.   Good point.  In your career as a Cook County State's Attorney or Assistant Cook County State's Attorney, sometimes you dealt with criminal defendants who wanted to provide information against other criminal defendants or uncharged people in exchange for leniency in their cases; is that right?

A.   I would say that's a fair assessment. Fair -- fair way to characterize it.

Q.   And, from your experience as a prosecutor, you understood that sometimes people might provide unreliable information.  Well, strike that.  Sometimes when people are providing information against other criminal defendants or other people, the information is reliable, right?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of: SCOTT CASSIDY, taken on July 21, 2023

86..89

Page 86

A.   Yes.

Q.   And sometimes that information is unreliable, correct?

A.   I think that's a fair statement.

Q.   And their risk is that sometimes people, in order to get leniency on their pending cases, might provide unreliable information in an effort to better their circumstances; is that true?

MR. LYDON:  Object to the form.  Go ahead.

A.   I think I understand your question.  I think I understand it, so I'll -- I'll -- I'll answer it. That is always a -- something you have to consider, yes.

BY MR. AINSWORTH:

Q.   And so when you're talking to somebody who's facing criminal charges and they're providing information to you as a prosecutor, you want to assess the information to see if it's reliable, right?

A.   Assess in the broad term, yes.

Q.   Right, you want to look to see if you can corroborate the information that's being provided to you by the person who's facing criminal charges, right?

A.   And also not corroborate it.  So you're -- you're -- you want to do both, actually.  You want to -- you want to do your best to do both.  It's not true, you want to do your best to show us not true, or

Page 87

if it's true, you want to do your best to show it's true. You -- you got to do both.

Q.   And so you look for whether the information provided to you by somebody who's facing criminal charges is supported by statements by other people or contradicted by statements by other people, right?

MR. LYDON:  Object to the form.

A.   Say that again?

MR. LYDON:  Incomplete hypothetical.  Go ahead.

BY MR. AINSWORTH:

Q.   So you look to see if information provided to you by people facing criminal charges can be supported by other witness statements or contradicted by other witness statements; is that right?

A.   Yes.

Q.   And you also --

MR. LYDON:  Same objection.

BY MR. AINSWORTH:

Q.   And you also look to see if it can be corroborated or contradicted by physical forensic evidence, right?

MR. LYDON:  Objection to the form, foundation, incomplete hypothetical.  Go ahead.

A.   If you have other ways to corroborate information can give to you, you explore the -- explore

Page 88

those ways to do it.  If you have forensic information to do it forensically, then yes, I would -- I would suggest that is a good way of going about it.

BY MR. AINSWORTH:

Q.   Were you interviewed during the post-conviction proceedings by any of the plaintiffs in this case?

A.   No.

Q.   How did you learn --

A.   I -- I --

Q.   Go ahead.

A.   I'll say -- I'll say this.  I'll say this. After Sopron's case here was dismissed, I believe it was, he filed a lawsuit -- he filed a lawsuit. Somewhere in the interim, I was stopped by a reporter sometime as I was leaving a board meeting at the Sheriff's Office and told me -- said that -- made allegations -- that Billy Bigeck made the allegations. I did not know about -- I don't think I -- that's why I learned that this case was pending, whatever you want to call it post-conviction.  And I never -- I didn't receive any phone calls from anybody in the state's attorney's office --

Q.   Okay.

A.   -- about this.  My lawyer set up a meeting

Page 89

with state's attorney handling the case, and he told her that I wish to testify, I think, for -- for Antusas and Morfin.  But she probably didn't take us up on it. He also showed her a number of -- he pulled out a report -- report of interview of Bigeck, the one we spoke about earlier.  He was interviewed by -- on the -- in August of 1996.  And that was the first time that the -- the prosecutor handling the case saw that report.

Q.   So you wanted to intervene in the matters, the criminal cases against Nick Morfin and Wayne Antusas --

A.   No.

Q.   -- in order to be able to testify?

A.   I didn't --

MR. LYDON:  Wait, wait, wait.

THE WITNESS:  I'm sorry.

MR. LYDON:  Object to the form.

BY MR. AINSWORTH:

Q.   Well, let me see if I got it right then. You wanted to testify on behalf of the prosecution to prevent Wayne Antusas and Nick Morfin from having their charges overturned; is that right?

MR. LYDON:  Same objection.

A.   All -- all I wish to do was be available and testify if there was going to be a hearing in front of



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 90

the court wherein the court was going to determine whether or not there's merits to the petitions that they filed. I thought I should make myself available and just to make it clear that Scott is available. We weren't about -- I wasn't about to tell anybody how to do their job. just make -- make known that we're available to testify.

BY MR. AINSWORTH:

Q. Did you have an opinion about whether Nick Morfin or Wayne Antusas's post-conviction petition had any merit?

A. I -- yes, I -- uh-huh.

Q. What was that -- what is that opinion?

A. I believe their -- their post-conviction petitions have no merit.

Q. And did you learn about Matt Sopron's case being dismissed from that reporter?

A. Correct.

Q. What did you say to that?

A. I -- I think -- I think it was a reporter. Or -- then I looked at the media, or -- I forget what came first. Like, I don't know if the -- it was a newspaper or on TV. I think your lawyers were running around or -- weren't they spouting it or whatever? Were it on TV or something like that? Anyway, the

Page 91

lawyers and -- and him were -- are -- or it was in the media. So I'm going to learn it that way or -- or perhaps maybe from that reporter. I'm not sure. I don't think the reporter said -- I think I had to learn through the media.

Q. Who is the reporter?

A. His name was Rob Johnson from -- from --

Q. Channel 2?

A. I believe Channel 2.

Q. What'd you say to Rob Johnson?

A. I believe I said, "I don't know what know what you're talking about." Because I didn't. And then he said -- I think he made -- or, he talked to a specific allegation that somebody made, namely, I think it was Bigeck. Like, he -- because I yelled at him. I said, "Well, I know that didn't happen." Or a word to that effect.

Q. What else did Rob Johnson say to you and you say to him during that conversation?

A. I don't recall. It's on -- it's on video somewhere. It's on tape somewhere. I don't recall.

Q. How do you know it's on video somewhere?

A. Well, there -- if you -- once they air a segment, you can go back and -- and they can pull it up.

Q. And, do you think that Matt Sopron should

Page 92

still be in prison?

A. Well, I mean, that's a broader question. So he was sentenced to natural life. I thought that was a -- a harsh sentence. It was -- but that's all the law allowed, his natural life. So in my -- as I sit here today, am I upset that he's out of prison? Not really. Not really. Maybe because I've mellowed. Maybe because I really feel like life sentences, for the role that they play, are probably more than should have been. But what I'm upset about is that, if I am upset, is just the way the -- the -- it played out, by not having a legitimate hearing on -- by the state's attorney not calling witnesses which, once again, I'm not inserting myself. I never try to insert myself anywhere, but it seemed to be that's what should have taken place. There should have been -- like this here, sort of like this, where, you know, you're interviewing your witnesses. The lawyers are calling the witnesses who are relevant to it, and then put a hearing in front of one of the criminal court judges, and then make -- let the judge make the ruling on it.

Q. Have you maintained relationships with witnesses in your case after the trials ended?

A. My cases? A lot of my cases, I did, yes.

Q. Have you met with witnesses in your cases

Page 93

after the trials have ended?

A. I -- I -- matter of fact, I -- I just a couple years ago, I wrote a letter for -- matter of fact, it was really nice man, if I may say this. These two young guys, Derrick and Cragg Hardaway, they killed Yummy Sandifer. It was a high profile case. There was pictures on the trip, covered in the big time magazines, whatever. But we proffered them or wanted to proffer them in regard to the -- after their convictions, they -- they wouldn't do it. So we couldn't develop enough evidence though against them, one of the guys in -- in the gang. But he called me a couple years ago, he was down, that is Derrick Hardaway, by one of the -- one of the tenants. He was out -- he was out on -- out -- he got out of the sentence. He was in New York helping during COVID carry, like, dead bodies out of buildings. He volunteered to go out there. So I kept in contact with him. And -- and his brother Cragg, I wrote a letter just being factually accurate. He asked me to write the letter to the parole board, which I wrote. I think I directed it to -- to Whom it May Concern, laying out that he was attempting to help the state. He was always roaring and ready to do so, and I told him that I would work with his attorney. His name was Steve Drizin and I talked to Drizin on the phone, and

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 94

Drizin -- I told Drizin I would better talk to -- with -- with Drizin on the phone, I've got to talk to like the parole board or whoever it may be in that situation. But that's just the latest one. But over the years, I've kept in contact with other witnesses on cases. So it's yes, I have.

Q. So I'm not asking about keeping in contact.

A. I thought you said that. What'd you say?

Q. My question is did you meet with any witnesses from your cases after the trial were concluded?

A. Are you talking about this case, sir?

Q. Any of your cases, sir.

A. Yeah. Yes, I do.

Q. Under what circumstances did you meet with witnesses after the trial has concluded?

A. Well, I mean, I remember going to -- on the Harry Aleman case, Harry and Billy Logan was killed, I kept in contact with the family and they had a death and went down -- went to the wake.

Q. So --

A. Richard -- Richie Logan, yeah.

MR. LYDON: Wait, wait, wait, wait. Let him finish his answer. You asked him about any trials that he --

THE WITNESS: Any contact, yeah.

Page 95

MR. LYDON: -- that he met with --

MR. AINSWORTH: Yeah. He's going to finish his answer.

MR. LYDON: Hey, wait.

MR. AINSWORTH: We're just going to have one person. So you guys figure out --

MR. LYDON: No, you're not making deals. No.

MR. AINSWORTH: Excuse me. We are going to have one person making objections.

MR. LYDON: No.

MR. AINSWORTH: And only one.

MR. LYDON: No.

MR. AINSWORTH: If you're not -- if you have a problem --

MR. LYDON: I do.

MR. AINSWORTH: If you have a problem with that --

MR. LYDON: I've been -- I do. I do. If he -- if he hasn't been like chiming in, neither have I. I haven't been making many objections. If Mike does, he's going to make an objection.

MR. AINSWORTH: We're going to do it like it's in court. If you got a problem with that, then we're going to have a --

MR. LYDON: That's some judges' rules.

Page 96

That's not all Judges' rules. You know that.

MR. AINSWORTH: And --

MR. LYDON: You've tried enough cases to know that.

MR. AINSWORTH: And I, in every court in this district --

MR. LYDON: That isn't --

MR. AINSWORTH: Every single court in this district, that has been the rule. So we're just going to have one person.

MR. LYDON: I -- yeah. Beg to differ. Go ahead, and I disagree.

BY MR. AINSWORTH:

Q. So, sir, what other --

MR. LYDON: Wait. He was still in -- no, he was still in the middle of his answer. You asked him a question.

MR. AINSWORTH: Sure. I -- I'd like to hear him.

A. Well, I believe the question was that me -- did you meet with other witnesses in cases that you prosecuted, and I was explaining to you --

BY MR. AINSWORTH:

Q. Post-trial.

A. What?

Page 97

Q. Post-trial. Yes, sir.

A. Yeah. Yeah. Harry Aleman case, I went to the wake of one of the family members. So I saw the family there, too. I saw -- met with a witness there because he had a family member who died. With the -- a guy named -- what was his name? He owned a car dealership. We -- we charged some. I forget the name of the case. He owned a -- he -- I'm trying to remember the name for you. Anyway, the victim's witness testified for us and did a real nice job under tough conditions, and he got a couple traffic tickets and I went to court with him on those to see if we could get him a -- waive a fine or whatever it was in regard to the traffic ticket. A guy in the Schuessler/Peterson case, a witness did a -- really went out of his way. He was -- he moved down to Florida. I went down there to Disney World one year, and I went and stopped and visited him just to say hello to him. And there's other ones, too, if I thought about it, several other ones.

Q. Are any of those witnesses that you just referenced --

A. Sure.

Q. -- were they people who were also charged in the crime or were they witnesses who had not been charged in the crime?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 98

A. No, they were not charged. They were just witnesses.

Q. So I'm going to make the question --

A. But -- but the --

Q. Go ahead.

A. -- once -- obviously, Derrick Hardaway was charged and Cragg Hardaway was charged.

Q. And you wrote letters and everything, right?

A. Yeah.

Q. You didn't go meet with them, right?

A. No. Well, they -- it's in a penitentiary, but no, I didn't -- I didn't go visit them in the penitentiary.

Q. Now, listen to this question.

A. Sure.

Q. For any witness who was charged in the same case in which they're a witness, did you ever visit with any of them after the trials concluded?

A. Can -- can you say that one more time?

Q. Sure. So I'm talking about in situations where a witness was also charged in the same case in which they were a witness. Did you visit any of those witnesses after the trial had concluded?

A. I can only -- I can only remember one case I had that -- there might've been more, where it was

Page 99

similar to this, where the person was charged and we use him as a witness, and I didn't visit that person.

Q. Okay. Did you visit any of the witnesses in this case? The Sopron, Morfin, Antusas cases after the trials?

A. The witnesses, not the person charged. Or I -- I don't get -- I'm just trying to keep it straight. It's any witnesses at all?

Q. Yes.

A. Oh, did I meet with any witnesses?

Q. After the trials were over?

A. The only one I could speak to I think would -- certainly would be the witnesses we called were the mothers of the two girls who were killed, the 13-year-old girls. I remember going to a memorial they invited me to, which was really nice of them, at Yale Park. May have been marking like the ten-year anniversary or the 15-year anniversary. So we went to -- I went out there and met with them at the memorial. They had a plaque, I think, placed there.

Q. In 1996, if you wanted to bring somebody from the Cook County Department of Corrections to the -- to your office to be interviewed, how would you go about doing that?

MR. LYDON: Objecting to form.

Page 100

A. You would -- there was a -- I think there was a form provided, or a form letter. You would write a letter to one of the superintendents asking that the witness be allowed to be brought to wherever.

BY MR. AINSWORTH:

Q. Would that be the same?

A. But --

Q. Sorry, go ahead.

A. No, that -- that -- that -- that would be it.

Q. Would there --

A. And then you -- and you'd give it to the investigator to do.

Q. Would that be the same process if somebody was in the Cook County Department of Corrections and in protective custody?

A. Yes, I -- the -- that's how you would -- I'm sorry. I -- I was trying to answer your question, but if he's in protective custody, that's what you would do. Now you're asking for people who are in Cook County Jail not in protective custody, how would they be brought to -- up to the state's attorney's office?

Q. Yeah. What process would you use?

A. I don't know. I don't know. I don't recall.

Q. What about people in the queue or witness quarters? How would you bring people from the queue up

Page 101

to your office to be interviewed?

A. I believe we'd ask the investigator.

Q. Would you do that in writing or in orally?

A. I don't recall.

Q. Was there any record made to your knowledge of how many times people were brought to the -- from the queue to your office to be interviewed?

A. I don't -- I don't -- I don't know of any record.

Q. Would there be any record --

A. There may be. There may be, but I don't know.

Q. Would there be any record kept of your visits to the queue to visit the witness in -- near the witness quarters?

A. There may be.

Q. Did you have to sign anything or fill anything out when you go -- went to the queue to visit your witness?

A. I may have. I don't recall.

Q. Would you do that? Would you go to the queue to meet with a witness?

A. I did on a couple occasions, few occasions, two or three, as far as I can recall.

Q. What if there was a witness in IDOC custody, how would you get that witness from IDOC to your office

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 102

to be interviewed?

A.   I believe we used to have to use a writ.

THE REPORTER:  Repeat that.

THE WITNESS:  A writ.  I think it's spelled W-R-I-T.

BY MR. AINSWORTH:

Q.   And so you -- who had issued the writ?

A.   Good question.  I -- I -- I don't know. I forget.  I know of one time, and I forget what's the incident.

Q.   Have you ever gone to a prison to interview a witness?

A.   Yes.

Q.   On how many occasions?

A.   Many.

Q.   Did you visit with either William Bigeck or Ed Morfin in the Illinois Department of Corrections?

A.   Yes.

Q.   Why'd you go visit them in the Illinois Department of Corrections?

A.   I would visit them when they had an issue that they were dealing with, or they were causing specifics -- specifically, I'm sorry, were causing problems. Namely, Bigeck was.  I remember visiting for that. Should be for those two reasons.

Page 103

Q.   Why would you go visit them when they were having an issue?

A.   Well, majority of the time, I believe was safety issues.  I recall Bigeck fearing for his safety, especially -- I think to the best of my knowledge.  To the best of my knowledge, I believe when they were first committed to the Illinois Department of Corrections, in the first couple weeks, they were getting threatened. So I had an obligation since I was the prosecutor in the case to make sure that their safety -- that they're being safely placed.

Q.   When was your oldest grandchild born?

A.   12 years ago.

Q.   2011?

A.   That would be right.

Q.   You're married, correct?

A.   I'm divorced and remarried.

Q.   And does your current wife have grandchildren?

A.   No.

Q.   And what about your former wife?  Does she have grandchildren apart from the ones you share?

A.   No.

MR. LYDON:  Russell, let me know if I'm -- whenever is a good time for the break, since it's two hours here, I need to use the facilities.

Page 104

BY MR. AINSWORTH:

Q.   You mentioned that you would visit Bigeck or -- well, you specifically said you'd visit Bigeck when he was causing problems.  What kind of problems were you referring to?

A.   At least one occasion, maybe two.  I -- as I sit here today, I don't know what the problems he was causing, but he was causing problems.

Q.   Was it with -- do you know if it was with alcohol or drugs or something else?

A.   I'd be guessing as to really what it was.

Q.   Why would you go visit Bigeck in the Illinois Department of Corrections if he's causing problems?

A.   Sure.  Well, because you got to make it clear to him that he -- right now he's in -- considered a state's witness, so he's in somewhat protected custody, but that's not -- that's not permission to do whatever he wants to do.  He was told the rules need to be followed.  He's -- he's entered -- he runs the risk of losing that placement status.

Q.   And what would happen to him if he lost that placement status?

A.   I don't know where they'd put him.

Q.   With general population?

A.   Possibly.

Page 105

MR. AINSWORTH:  We can go off the record.

MR. LYDON:  How much time?

THE VIDEOGRAPHER:  We are off the record at 12:01 p.m. Central Time.

(OFF THE RECORD)

THE VIDEOGRAPHER:  We are back on the record for the deposition of Scott Cassidy being conducted by videoconference.  My name is Kortney Chase. Today is July 21, 2023, and the time is 12:25 p.m. Central Time.

BY MR. AINSWORTH:

Q.   Sir, so when you had a witness who had turned state's witness, did you as the assistant state's attorney handling the case have the authority to remove their protective custody protection?

MR. LYDON:  Object to the form, foundation. Did you mean witness or defendant?

MR. AINSWORTH:  I meant witness.  Sorry.

MR. LYDON:  Oh, okay.  I'm sorry.

A.   Can you just repeat that again?

BY MR. AINSWORTH:

Q.   Sure.

A.   Go ahead.

Q.   When you had a witness who had turned state's witness or I guess, I should say a defendant had turned

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 106

state's witness --

A.    Okay.  Okay.

Q.    -- did you have the authority to remove their protected custody status?

A.    No, I don't think I did.  I never -- never had -- never looked into who had the authority to do so, but I don't think I would have that authority.  No.

Q.    Well, when you went down to meet with Billy Bigeck because he was causing problems --

A.    Right.

Q.    -- and, you know, to communicate to him that he might lose his protective --

A.    Yes.

Q.    -- custody status, who would make the determination as to whether he would lose his protective custody status?

A.    I believe it would come from Illinois Department of Corrections.

Q.    And who would tell the Illinois Department of Corrections whether or not they should remove Billy Bigeck from this protective custody status?

A.    I think --

MR. LYDON:  Objection.  Form, foundation.  Calls for speculation.  Go ahead.

A.    No, I was going to -- I was going to say

Page 107

it's -- I'm -- I'm speculating because it never take -- never took place.  He didn't lose -- and as far as I know, he didn't lose his protective custody status.  So I don't know who would be the person ultimately or -- or the entity to ultimately decide that he should lose his protective custody status.  I would believe it's the Illinois Department of Corrections.

BY MR. AINSWORTH:

Q.    Did you ever talk to Bob Milan about Rob Blagojevich?

A.    Did I ever talk to Bob Milan about Rob Blagojevich?

Q.    Yes.

A.    I can't think of a scenario where I would talk to Bob Milan about Robert Blagojevich.

Q.    Did you ever talk to --

A.    But that doesn't -- I mean, the reason I say it's possibly because I used to actually work with Robert Blagojevich when I first started at -- at the state's attorney's office, he was in traffic court and my first day, my first assignment, was with -- was to work with Rob Blagojevich in a courtroom.  And so I've told people that only because, like, how the irony or -- or whatever you want to call it, the fact that he went on to become governor.  So I may have talked to Bob

Page 108

Milan just like I might've talked to anyone else about that fact, you know?

Q.    Have you ever talked to Pat Quinn about wanting to prosecute Rob Blagojevich for molesting a family member?

A.    That's so -- that's so -- no.  And Pat Quinn's dead, I don't know if you know that.  Are you talking about Pat Quinn, the -- my friend, Pat Quinn?

Q.    Yeah.

A.    Who was -- he went onto become an Appellate Court Judge?

Q.    Yeah.

A.    Yeah, he -- he -- he -- he died several years ago, so there's no way -- I mean, I've never -- it's so bizarre, I can't say.  I mean, no, I never talked to Pat Quinn about -- what'd you say, Robert Blagojevich molesting his daughter?

Q.    No.  A family member.

A.    A family member?  No, I never knew.  Never did.

Q.    Did you ever want prosecute Robert Blagojevich?

A.    No.

Q.    Did you have any feelings about him one way or the other?

Page 109

A.    Yeah, I think he's -- he was -- he was really nice, good guy to work with, I often talk about like I was an electrician on a Friday and I'm all of a sudden now wearing a suit on a Monday and I'm working with Rob Blagojevich, who was like the epitome of everything that I'm not because he was so like personable and like, you know, everybody liked him, you know?  I mean, he was just like real -- and he was really a nice -- he was a -- he was a nice guy to work with.  Just -- I mean, I don't know what, you know, went on, but I know he went to the penitentiary.  I know -- you know, I don't know much about it, but I wish him well.  You know, I mean, I don't understand your question to tell you the truth. I mean, I can't --

Q.    Have you ever heard rumors of Blagojevich molesting family members?

A.    No, I don't -- I don't think so.  I mean, I -- I don't really -- don't deal with rumors, but -- so I don't know what to say.  So it's a bizarre question.

Q.    How do you pronounce the last name here? Is it Hubbell?  The witness'?

A.    Yes.

Q.    And how do you pronounce -- I pronounce it Bigeck.  How do you pronounce it?

A.    Bigeck.  Is that how he -- okay.  All right.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 110

I pronounce --

Q. First --

A. I pronounced her name Carrie Hubbell.

Q. How'd you first learn about the Martin-Hubbell murders?

A. When I was handed the file.

Q. Who handed you the file?

A. Jim Brosnahan.

Q. Who is Jim Brosnahan?

A. Jim Brosnahan was an assistant state's attorney who was, I believe, assigned the case off arraignment. He -- he was a gang -- gang crimes prosecutor, and I went to -- I went to Gaines in June, I believe, of that year, of June 1996, and Jim shortly thereafter decided to leave the state attorney's office and run for office, and he -- I was then assigned that case from Jim, or through Jack Hynes.

Q. Had you heard about the case before you were assigned it?

A. I don't believe so.

Q. When was the first time you heard Matt Sopron or Wayne Antusas' names?

MR. LYDON: Met their names?

BY MR. AINSWORTH:

Q. Yeah.

Page 111

A. I met their name? What?

Q. No. I said heard their names.

A. Oh, during the proffer of Billy Bigeck.

Q. So before you met with Billy Bigeck, you had no knowledge of either Matt Sopron or Wayne Antusas, correct?

A. That's correct.

Q. Before you met with Billy Bigeck, you had no reason to suspect either Matt Sopron or Wayne Antusas of having committed a crime in any way, right?

A. That's correct.

Q. So you had no probable cause to prosecute either Matt Sopron or Wayne Antusas before you met Billy Bigeck, right?

A. You're right.

Q. What did you do to prosecute the Martin and Hubbell homicide cases before you met with Billy Bigeck?

MR. LYDON: Objection, vague.

A. What did I do to prosecute the case before I met what?

BY MR. AINSWORTH:

Q. Billy Bigeck.

A. Okay. What had -- had I done on the case?

Q. Yes.

A. Is that what you're saying? Okay. Well, I

Page 112

mean, I handled it like any other case I get. I talked to Jim. Jim had the most institutional knowledge about the case he was passing on to me. He gave me a rundown briefly what the -- what the facts were so when I'm -- I'm looking through the file, I have some type of reference point. And he told me that two of the guys were looking to proffer. Through their lawyers, that is. He learned that through lawyers, that they wished to proffer. So I -- you know, like whenever you get a case, at least I did, and I think a lot of prosecutors do, you know, when you start going for the file, you're actually preparing the case for trial. That's what your mindset is anyway. You start to read it from the first report you read to the end, and then and -- and you always -- and I reread it too, but you're thinking how is this case -- and it is now. How's that going to unfold when you present it to a fact finder, albeit a -- whether it be a -- a judge or jury. So I used that same format with this case. So that's -- to answer your question, that's what I did. I read through the file.

Q. You review -- you reviewed the file?

A. Yes, I did.

Q. Right?

A. With the -- with the goal towards prosecution of the file -- prosecution of the --

Page 113

MR. LYDON: Objection, misstates his testimony. Go ahead.

BY MR. AINSWORTH:

Q. Did you do anything else apart from the review of the file before you met with Billy Bigeck?

MR. LYDON: Objection. Asked and answered. Mischaracterizes his testimony. Go ahead.

A. No.

BY MR. AINSWORTH:

Q. And so you --

A. As far as I recall, no.

Q. But Jim Brosnahan told you that there were two guys who were looking to proper. Did he tell you who they were?

A. Yes.

Q. Who did he say they were?

A. He said they were Bill Bigeck and Eddie Morfin.

Q. And so when you got the case, you knew that both of those defendants were looking to proffer, right?

A. Correct.

Q. And what does it mean to look to proffer?

A. What it means to look to proffer?

Q. Yeah.

A. Well, my understanding of -- of what that is,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 114

is that it's the beginning of a process wherein at the end of the process, you may enter into a -- a cooperation agreement between the lawyer, his client, and the state, meaning me, the person handling the case. It's a cooperation agreement. Some people call it, it's like a pretrial sentencing agreement, in exchange for their testimony. And then you have terms up -- terms laid out in the proffers -- the proffer itself, or the plea agreement itself.

Q. Is there a difference between a proffer and a plea agreement?

A. Yes.

Q. What's the difference?

A. Proffer is in the initial stages, and a plea agreement, if it's reached, is at the end of the stage.

Q. What did you do with regard to the proffers for Billy Bigeck and Eddie Morfin after you were alerted that there were two guys looking to proffer by Jim Brosnahan?

MR. LYDON: Objection to form.

A. I -- yeah, I don't understand that question. Sorry.

BY MR. AINSWORTH:

Q. Did you talk to the lawyers for Billy Bigeck and Eddie Morfin?

Page 115

A. Yes, I did.

Q. Did you talk to them after you learned that -- from Jim Brosnahan that the clients were looking to proffer?

A. Yes.

Q. And what conversation did -- and do you recall their names?

A. Yes. Yes.

Q. What were their names?

A. Roger Pena was representing Eddie Morfin, and Mike Vitale and George -- George Zuganelis was representing Billy Bigeck.

Q. What conversation did you have with either Mike Vitale or George Zuganelis?

A. Sure. I don't remember specifically what the conversations were, but I can practice -- what's basically -- you know, my understanding is your client wishes to proffer. Am I understanding correct? Yes, it is. Okay. Then I'll get back to you. I'll set up a -- a -- a time for the proffer.

Q. And so when you -- what does it mean you set up a time for the proffer?

A. Agreeable between myself and him, I'm going to be ready for the proffer. Just have to read over the file again. You know? You -- you set a relatively good

Page 116

understanding of what the file consists of, and then make sure that the time is -- is suitable for him and make sure that -- that time, my partner is agreeable with that as well. I probably already talked to him about it, but I forgot about that. I'm sure I talked to my partner about it, make sure he's -- his date is certain for -- he can do this as well, you know? And then you set up the time, date, and location.

Q. Are there certain time periods during your day as an assistant state's attorney where you can only talk to witnesses?

A. Mr. -- to the best of my recollection, it's a pretty broad question you ask, you know? Witnesses are coming in at 9:00 in the morning for trial, noon. So I -- I -- I would say that you can talk to witnesses all day long, if -- if you need to be.

Q. So there's no prohibition against talking to witnesses during business hours, correct?

A. No prohibition talking to witnesses during business hours, I don't understand that question. I don't -- I don't -- I don't understand the question.

Q. You were allowed to talk to witnesses during business hours, right? During the business hours of 9:00 to 5:00 p.m.?

A. If it's convenient for them, it's convenient

Page 117

for us. Yes, we are. Yes.

MR. AINSWORTH: What exhibit number were we on? One moment, please. I have -- I mean, we'll start with 90. Right, let's mark this as Exhibit 90. I'm sorry to people on the Zoom, for some reason this -- oh, wait. I'm sorry. The one that's marked as Bates number Morfin-Kogut 7703. That's Exhibit 90.

BY MR. AINSWORTH:

Q. It's the proffer letter to William Bigeck. All right. Sir --

MR. LYDON: Wait a second. No, it's not.

MR. AINSWORTH: Oh, it's not. This is the sentencing report. Did not match my -- can we go off the record for a second?

THE REPORTER: Yeah, we are off the record at 12:41 p.m. Central Time.

(OFF THE RECORD)

THE REPORTER: We are back on the record for the deposition of Scott Cassidy being conducted by videoconference. My name is Kortney Chase. Today is July 21, 2023, and the time is 12:46 p.m. Central Time.

BY MR. AINSWORTH:

Q. All right. I'm not marking Exhibit 90 at this



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 118

time. Instead I'm marking what we were -- I'm handing you what was previously marked I believe as Exhibit number 9. Just make sure, I think it's the same. So showing you what's been marked as number 9, Exhibit number 9, can you please tell us what Exhibit number 9 is?

A. Appears to be the copy of the proffer letter that was used when we proffered William Bigeck and signed by myself. It appears it's signed by Mike Vitale and William Bigeck and -- and Norfie.

Q. The investigator?

A. Yes.

Q. There's no date at the bottom. Did you usually include a date of the proffer agreement at the bottom?

A. I would think I would have, but I can't say for sure.

MR. LYDON: It's up at the top.

MR. AINSWORTH: Sir.

MR. LYDON: I'm just --

MR. AINSWORTH: I don't need your help.

MR. LYDON: Okay. All right.

MR. AINSWORTH: Thank you.

THE WITNESS: Yeah, yeah.

BY MR. AINSWORTH:

Page 119

Q. There's -- so there is a date on the -- on the second line of the proffer there that was pre-printed, right?

A. Right.

Q. Or typed in there?

A. Right. So -- but you -- you were referring to like, I should have -- or your -- your question was I didn't put a date after I signed my name to it, right?

Q. Yeah, I'm just wondering, was that your typical practice to put a line for the date at the bottom?

A. Sure, like I said, I do not know. It may have been. I don't -- I don't recall. It's been -- it's been a long time. I -- I can't recall what my practice was. Specifically when the document contains a date, whether I also put a date on the bottom, I do not know.

Q. When you had the -- when you put the date in like August 12, 1996, that indicated that that's when you were intending to speak to the person; is that right?

A. Yes.

Q. And you would then -- would you sign this in advance to the August 12th, or on August 12, 1996, could you sign it on that date?

A. I would believe here's my -- what my practice

Page 120

would've been. Like I said, we -- we were fortunate enough to have an administrative assistant right there. Probably before they showed up, knowing that the -- before, when the lawyer showed up, knowing that the proffer was going to go forward, I probably asked Margaret, "Margaret, would you please type up a proffer letter for me for this interview we're going to do." So I don't think I would've done it prior -- before August 12th.

Q. Right. And then would you sign it on that date?

A. Yes, I believe so.

Q. And you'd have the witness sign it on that date as well?

A. Yeah.

Q. Correct?

A. Yes.

Q. Do you remember what Billy Bigeck told you?

A. Yeah, well, I mean, what I would do is I would not just have him sign it, I mean, I would -- my practice was to first sit down with the lawyer to go over the proffer letter with him outside the presence of his client.

Q. Okay.

A. My practice was to make sure the lawyer

Page 121

understands, which I'm sure he did, but just make sure that he understood the importance of his client telling the truth. I couldn't stress that enough to -- to the -- the person giving the proffer, but I began with the lawyer, just stress it again. So that's -- after I talked to the lawyer, then I would tell the lawyer when we go out, you know, review -- you can review with your client, but I also want to review it with your client as well, just so he understands the importance of telling the truth.

Q. And so --

A. So then -- so then the lawyer would talk to the client. He would indicate, you know, his client read the letter, read the -- over the proffer letter, willing to sign it, and then we'd go over it.

Q. Do you recall any of your conversation with Bill Bigeck on August 12, 1996?

A. Well, it began by telling him the importance of telling the truth. You know, I told -- I would -- I would tell them, it was just my practice, my practice was that the investigator here, would be Norfie, be taking down what you say and we're going to be checking out everything you say, attempting to verify it or not verify it. You're showing you to be -- telling truthful or not truthful. And that -- that if you're not willing

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

Page 122

at this point to tell the truth, then don't waste your time, don't waste my time, don't waste your lawyer's time because it's not -- it's -- it's not going to do you any good, will do you more harm than good. So we stressed that.

Q. And so whenever you had that first meeting with a witness that -- looking to proffer, you would instruct them about the importance of telling the truth and telling them that there was an investigator present who'd be taking down what they were saying?

A. Right. And I said after, and then from there we're going to check out everything you say. So anything you tell us, we're going to check it out. If -- if -- if you're -- if you're lying about it, we won't be able to reach an agreement with it because -- and I used to tell them, because if you do testify, a fact finder, whether it be a judge or juror, from the get-go is not going to want to believe you because you're looking to help yourself. So you give -- you give them any reasons to further that, then you won't be any use to us and we won't -- we won't be able to reach an agreement.

Q. So you wanted to make sure that he --

A. He understood the importance of telling the truth at that time about everything he knew.

Page 123

Q. So my question to you, sir, is do you recall any of your conversation with Billy Bigeck on August 12, 1996?

MR. LYDON: Object to the form, vague.

A. I refreshed my recollection with that interview. Specifically, I have very little specific recall of the question and answers that were given that day, but I read over the report of interview to refresh my recollection. I remember the room it was in, we held it in. I know -- I remember who was present. I remember -- is that the question? What do I remember?

BY MR. AINSWORTH:

Q. Yes.

A. Sure. I remember that Bigeck took the admonition from his attorney, I think he gave him, and from me, very seriously, that he -- he was concentrated on each -- each question or each answer before he gave it, realizing the truthfulness of it was important to him, to his future. I remember that he was very good at that.

Q. You say he took the ammunition from his --

A. The admonition.

Q. Admonition, sorry.

A. No, that's okay. I didn't pronounce it clearly, probably.

Page 124

Q. And so it seems to you like he was telling the truth, right?

A. It seemed like to me like he was trying to tell the truth. So when you -- you know, when you do a proffer, you know, one that you're -- you're trying to size up the truthfulness of it through his demeanor, you know, his mannerisms. You probably do the same thing, maybe, with me right now. And he appeared to me to be attempting to tell the truth.

Q. And you're not a truth detector, so you listen to what he says, and then you look to corroborate it for contradiction?

A. Sure, that's just to --

MR. LYDON: Object to the form. Go ahead.

A. I'm sorry. I apologize. Yes, that -- but part of it also, when you do a proffer, is you're evaluating the witness for the purpose of trial as being a witness testifying on the stand. So you're also looking at his body language, how he answers the question, things like that. So you evaluate him as a witness from the get-go. And this wasn't what I consider -- when I open a file, it's in trial posture, so that's why -- that's why I'm looking at this.

BY MR. AINSWORTH:

Q. What room did you meet in?

Page 125

A. Sure. It was the 13th floor, right behind the -- the -- the secretary or the support staff who receives people as they come off the elevator onto the 13th floor. There's two banks of elevators and they open up and you can only go one way. And then there's a desk there and that person there greets people, directs them where they want to go, or where they need -- or answers any questions, and right behind that person is a large conference room or interview room.

Q. You met with Eddie Morfin as well; is that right?

A. Yes.

Q. Did you meet with him in the same conference room?

A. I believe we did.

Q. For the proffer meeting?

A. I believe, the best of my recollection, we did.

Q. And you were present for Eddie Morfin's proffer meeting, correct?

A. Yes, I was.

Q. Before you reviewed the report of Bigeck's initial conversation with you, did you have any recollection? Or of the August 12th meeting, I should say?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 126

MR. LYDON: Object to the form, vague. Go ahead.

A. Not -- not real clear -- not real clear recollection of -- of the -- of the meeting, no.

BY MR. AINSWORTH:

Q. Do you have any recollection of the content of what Bigeck told you in that August 12th meeting?

A. It's been refreshed by the report of interview. So with that understanding, yes, I do.

Q. Did Bigeck tell you anything in that August 12th meeting that was not recorded in the report authored by, is it Norfium?

A. Norfie?

Q. Norfie, yes.

A. Well, I remember asking -- I -- I believe in this case I was interested in, like, where he grew up, that type of thing, how long he lived in the area, and - - and I -- I actually remember asking these -- these individuals I spoke to, you know, what their parents did. I was some sensitive in this case to the fact that a lot of policemen lived in that area. So those type of questions I asked were really, like, not really too relevant to what was -- we were there for, unless it -- unless he gave an answer that was relevant to it. So I -- I believe -- I don't think they -- those type of

Page 127

questions and answers were contained in the report of interview I read.

Q. So my question to you is, did he tell you anything that you recall that's not recorded in the report?

MR. LYDON: Objection, asked and answered. Go ahead.

A. And my answer to that is some non-relevant information was -- was told to me.

Q. That was it?

BY MR. AINSWORTH:

Q. What was it?

MR. LYDON: Objection, asked and answered. Did you just hear his testimony?

MR. AINSWORTH: Yeah, I did. Are you listening? Really? Are you just not --

MR. LYDON: I don't want to argue about objections. It's asked and answered.

MR. AINSWORTH: When we get this transcript, I'm going to ask you to look at your objections and look at the testimony --

MR. LYDON: All right. If you're going to talk about it, he just went through a litany of background information that he said would -- was not in the report.

Page 128

MR. AINSWORTH: What was it?

MR. LYDON: You just heard him.

BY MR. AINSWORTH:

Q. Do you recall any of the information that he provided to you? Not what might have been talked about, not what could have been discussed, but what was actually said?

MR. LYDON: Objection, argumentative.

A. As I sit here, I do not recall what I considered the non-relevant -- as I sit here, I do not recall the non-relevant information that he gave us during this -- during the proffer.

BY MR. AINSWORTH:

Q. So then my question is, sir, was there anything that Bigeck told you that you recall now that was not recorded in the report that you reviewed by Norfie --

MR. LYDON: Asked and answered.

Q. -- in that August 12, 1996?

MR. LYDON: Asked and answered.

A. I don't say. It was not relevant, so I can't recall -- recall it.

BY MR. AINSWORTH:

Q. So all the relevant information from your discussion with Billy Bigeck was included in the

Page 129

Norfie's investigative report; is that correct?

A. That is correct.

MR. AINSWORTH: Let's mark this as Exhibit 90. This is --

MR. LYDON: Your 90 or 91?

MR. AINSWORTH: 90.

MR. LYDON: What was -- the proffer letter was previously introduced?

MR. AINSWORTH: Yes.

MR. STEPHENSON: Yes.

MR. LYDON: Okay.

MR. OBERTS: That was Exhibit 9.

MR. AINSWORTH: And for the record --

MR. OBERTS: 90, you didn't mark it with -- the document --

MR. STEPHENSON: Think he's withdrawing.

MR. AINSWORTH: I withdrew.

MR. OBERTS: I'm sorry, I didn't hear that.

MR. AINSWORTH: That's okay. So just so everybody is clear, Exhibit 90 will be what's in front of the witness right now, which is a document Bates numbered SOPRON-5873 through 5875.

(EXHIBIT 90 MARKED FOR IDENTIFICATION)

MR. STEPHENSON: This is likely 10, but it's up to you.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 130

A.   You want this back?

BY MR. AINSWORTH:

Q.   Just leave it there with you.

A.   Leave it here?

Q.   Yeah.

A.   Okay.

Q.   All right.  So showing you the investigative report marked as Exhibit 90.  Is this the report prepared by Norfie regarding your conversations with Billy Bigeck on August 12th and August 29, 1996?

A.   Yes, it appears to be that report from the earlier reference.  Yes.

Q.   And you and Neil Linehan were present for this interview as well as Norfie, is it --

A.   Diciolla.

Q.   Diciolla.  All right.

A.   Diciolla.

Q.   And Thomas Ptak?

A.   Yes.

Q.   All right.  So going down to the bottom of page 1 of Exhibit 90, Billy Bigeck discusses the conversation he had with Nemchausky, correct?

A.   I'm sorry, can you give me the reference point again?

Q.   Yes, the last paragraph on page 1.

Page 131

A.   Where begins, "Joe let them in"?

Q.   Yes.  And you see the last sentence of the second last paragraph says they ran to Joe Nemchausky's house?

A.   I'm just reading the paragraph, will you just give me a second.  You want me to read the paragraph.

Q.   All right.  Sir, so from that last paragraph on Exhibit 90.

A.   Okay.

Q.   You see, "According to Billy Bigeck, he said that Joe Nemchausky told him that Matt Sopron would buy one of the guns to make it a Nation's gun," right?

A.   Yes.

Q.   And that Joe Nemchausky said that he would call Misfit, meaning Matt Sopron, to tell him about the guns, right?

A.   That's what it says.

Q.   So you would be looking, as a prosecutor, for phone records to establish that Joe Nemchausky called Matt Sopron on that date, right?

A.   That would be one of the ways I'd -- to corroborate or not corroborate what he was saying, yes.

Q.   And you'd want to talk to Joe Nemchausky to determine whether he told Billy Bigeck and Matt Sopron would buy one of the guns and said he would call Matt

Page 132

Sopron, right?

A.   That's -- yes.  That's a fair statement, yes.

Q.   Going onto the second page of Exhibit 90. So then the second full paragraph that begins, "A little later"?

A.   Okay.

Q.   You see that, sir?

A.   Yes, I do.

Q.   "According to Billy Bigeck, Misfit and two Popes from Vittum Park came by," see that?

A.   Yes, I do.

Q.   All right.  So according to Bigeck, it's Matt Sopron arriving with two other people, right?

A.   What it says here.

Q.   And Bigeck doesn't say that Matt Sopron arrives with three other people, right?

A.   Does not say that here, no.

Q.   Okay.  And then in the last sentence of that paragraph, it says Misfit, meaning Matt Sopron, also told them to clean the guns, which they did.  Do you see that?

A.   Yes, I see that.

Q.   So according to Billy Bigeck, both guns were cleaned; is that right?

A.   Yes.  According to this statement here, yes.

Page 133

Q.   You own a gun, right?

A.   No.

Q.   You have owned a gun?

A.   Yeah.

Q.   Did you have a gun on you when you were at the casino?

MR. LYDON:  Objection, relevance.

A.   No.

BY MR. AINSWORTH:

Q.   Did you clean your -- cleaned a gun before?

A.   Yes.

Q.   A handgun?

A.   Yes.

Q.   What goes into cleaning a revolver?

A.   I'm not an expert.

Q.   Well, how did you clean your gun?

MR. LYDON:  Objection.  Objection.  Is there any relevance to this?  Are you just --

MR. AINSWORTH:  How'd you clean --

MR. LYDON:  -- asking how Scott Cassidy cleaned his guns?  I will put a stop to it.  I don't care. Go ahead and answer.

MR. AINSWORTH:  Sir --

MR. LYDON:  It --

BY MR. AINSWORTH:

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 134

Q. You can answer.

A. I called someone who knows how to clean guns to do it for me.

Q. Okay. So just being a gun owner didn't tell you how to do it, right?

A. Pardon me?

Q. Just being a gun owner didn't automatically tell you how to clean your gun, right?

MR. LYDON: Objection, vague.

A. Is your point -- is your point that --

BY MR. AINSWORTH:

Q. I'm not making points, sir. I'm just asking questions.

A. Okay. What -- your question is what, then?

Q. My question is simply because you owned a gun, that didn't mean you knew how to clean it, right?

MR. LYDON: Object to the form, foundation, relevance.

A. I think -- I think that's right. Yeah, if you own a gun, you got to learn how to clean it.

BY MR. AINSWORTH:

Q. Did you ask Billy Bigeck who cleaned the guns?

A. I don't recall.

Q. Did you ask Billy Bigeck whether anybody there knew how to clean the gun?

Page 135

A. I don't recall.

Q. Did the story about --

A. I think it was understood, I mean, I know they talked about cleaning them, but I think they're talking about cleaning it so it can't be traced, if that's what you mean. So I think that we're talking about two different -- two different meanings to the term clean.

Q. So according to Billy Bigeck, Matt Sopron told them to "clean" meaning to deface the guns so that they couldn't be traced?

A. That was my meaning, at least I applied to that.

Q. Okay. And so according to Billy Bigeck, he said that both guns had the serial numbers defaced; is that right?

A. That's what he said earlier.

Q. But Billy Bigeck didn't tell you that anyone cleaned any of the guns that were in the house?

A. Now you're using the term one way and then the other, is that what you're meaning?

Q. Well, let me clarify. That is confusing. Billy Bigeck didn't tell you that anybody took apart the gun in order to -- what's another word for clean? In order to remove the residue that might come from the gun being fired?

Page 136

A. I don't recall him using that terminology, no.

Q. Okay. And that's not what's documented here in the report. There's no reference to any -- anybody in the house -- to Billy Bigeck saying that anybody took the guns apart in order to clean them out and remove the residue from being fired, correct?

A. Yeah. That's -- didn't talk about cleaning any residue or anything like that.

Q. All right. And Billy Bigeck didn't mention there being any discussion about a price for the gun or guns, right?

A. If it's not -- not in his report, then I believe he didn't mention it. Is it -- you want me read the whole report to answer your question or --

Q. Well, then let me ask you this way. If --

A. Sure.

Q. -- there's a reference to the amount of money that was being discussed to buy the gun, that would've been in the report, right?

A. I would believe that's a relevant -- relevant thing that -- that -- that should have been in the report.

Q. All right. Let's go on to the next paragraph beginning where it's "everyone was in the front room."

A. Sure.

Page 137

Q. And so here, according to Bigeck, Eric kept saying that he wanted to be the one to do it. And then Matt Sopron changed his mind and said okay. The substance of this --

A. I apologize, but are you -- were you -- were you reading from the report or are you just summarizing it?

Q. I was summarizing.

A. Okay. I -- I -- I expected to see the language, like in the report, so I couldn't really follow your question.

Q. Sure. Let me try and -- let me just read the paragraph.

A. Okay.

Q. "Everyone was in the front room. Misfit said, who wants to pull a roll on the Ridgeway Lords? Eric Anderson said that he wanted to do it. At first, Misfit said no. But Eric kept saying that he wanted to do it and Misfit changed his mind and said okay. He told Eric, don't get caught and keep your mouth shut. Misfit told Nick Morfin about how to do it. Misfit left with his two friends." Do you see that, sir?

A. Yes, I do.

Q. Is that what Billy Bigeck told you and the other people present?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 138

A.    I would believe, yes, it is.

Q.    So according to Billy Bigeck, there was a private conversation between Matt Sopron and Nick Morfin about a plan of how to carry out the attack, right?

A.    It appears that way.

Q.    Have you ever heard the term "pull a roll" before?

A.    No.

Q.    Have you heard it since?

A.    No, I don't think I have.

Q.    Do you know what it meant when Billy Bigeck said that Matt Sopron said he wants to pull a roll on the Ridgeway Lords?

A.    No, I really didn't.

Q.    Did you ask him?

A.    Pardon me?

Q.    Did you ask him?

A.    I'm sure we did.

Q.    Why are you sure you did?

A.    Well, because I wanted to know.  So probably why we did.

Q.    If Billy Bigeck told you what pull a roll meant, would you expect that that would be included in the report?

A.    Not necessarily.

Page 139

Q.    Why not?

A.    Because I think it was -- to the -- to the investigators or others, it was -- they understood what it meant.  So I think I was the only one who had the -- needed further clarification.

Q.    Why did you think that the investigators knew what it meant?

A.    I don't know, I -- I think this is language that gang members used and the investigators I was working with were gang crimes of investigators. They -- they have a better foundation as to what the verbiage is that gang members use.  I was -- I was new to the unit.  This was actually my first -- my first gang case, you know, I prosecuted.  So a lot of this stuff, you know, I -- it's all new to me, and the gang signs and Nations and People and Folks, what -- what they travel under, 5 Star and all that or whatever. I still -- I still never really got a really good grasp for it. I wasn't there that long.

Q.    So you were not familiar with gang type of terminology; is that right?

A.    Yeah.  Yes.

Q.    All right.  Looking down at the next paragraph, it reads, "Nick told them what Misfit wanted them to do.  Misfit had said to get Nick Liberto to be

Page 140

the driver.  He said they should all meet up at the Dore school.  Nick told them to go to the block east of Melvina and to go west through the gangways.  This would allow them to sneak up on the van."  Do you see that, sir?

A.    Yes, I do.

Q.    Okay.  So according to Bigeck, Nick provided instructions to the gang.  Nick was going to provide the instructions on -- or sorry, Nick told them what Matt Sopron wanted them to do, right?

A.    Yeah.  I -- I just -- I wasn't clear whether, though, it was Nick's idea to go through the gangways or if that came from Sopron.  I always thought it was Nick's idea.

Q.    Why did you think it was Nick's idea?

A.    I don't know.  I just thought based upon the evidence, Sopron told who's going to do it, who was going to go with, clean the guns, so I thought it was Nick's idea to go through the gangways in the west. But I wasn't sure, but I thought -- I thought that was the case.

Q.    According to Billy Bigeck, did Nick tell them who should do it?

A.    Pardon?

Q.    According to Billy Bigeck, did Nick tell the

Page 141

group who should do the pulling of the roll?

A.    I'm -- I'm not sure.

Q.    Well, where would we look to find out?

A.    Well, I mean, in the reports in his testimony. I -- I -- you know, I tried -- like I said, I read it over his transcripts a couple months ago and there's a lot to consume and I, you know, as far as specific set up, you know, what -- specific to your question, I would say rely upon the transcript or this report of interview, but I can't recall.

Q.    You knew that prior to speaking with Billy Bigeck, there was no reference to the murder being planned or the murders being planned, right?

A.    It didn't appear there was any planning to it prior to speaking to him.  I think it was more of a spontaneous type of a crime.

Q.    And so when you learned that there was a plan, you wanted to know what the plan was, right?

A.    Sure.

Q.    And so according to what Bigeck told you, the plan was to go to a block east of Melvina and then go west through the gangways, right?

A.    The original plan was, I believe so, yes.

Q.    Did Billy Bigeck tell you how they knew to go to the block east of Melvina and go west of the gangway?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 142

A. Once again, I -- I -- I can't recall specifically if he told us that or not.

Q. Well, here's the question. Did Bigeck tell you how they knew the van would be on Melvina sometime later in the day?

A. No, I don't -- I don't think that they had specific knowledge that the van was going to be there. I think they were going off historical practice.

Q. Well, why are you thinking -- let me strike that. Let me --

A. Because there was -- there -- no, that was -- can I finish my answer?

Q. Sure.

A. Historical facts we had were that that van was always out there at that location.

Q. Which location?

A. Where the shooting took place.

Q. They parked in that -- in front of the house before?

A. Yeah, like one of the -- the -- yes, on that street, almost probably right at that spot because on that street lived Helena Martin. She just lived a couple doors down and these guys were coming -- coming over there and that's where they would park.

Q. And so did you ask Billy Bigeck how they knew

Page 143

that the van would be there -- well, you knew that the murder happened around 6:30 p.m.?

A. I think they put it at 6:41.

Q. 6:41 p.m. it was called in, right?

A. Right.

Q. All right. And this conversation took place around 11:30 in the morning?

A. What conversation?

MR. LYDON: Objection.

BY MR. AINSWORTH:

Q. That's in Exhibit 90. If you look at page 2 at the top of Exhibit 90, it says, "When they left Nemchausky's, it was approximately 11:30 a.m."

A. Okay.

Q. Yeah. Page to the top of page 2.

A. Top of page 2. "When they left from Nemchausky's, it was approximately 11:30 a.m.," it states in report I just read, yes.

Q. And then they went over to Nick Morfin's and then they had this conversation about the -- pulling the roll, right?

A. Right.

Q. Did you ask Billy Bigeck how they knew that the van would be at its location at 6:40 p.m. some, you know, six hours later?

Page 144

MR. LYDON: Objection, asked and answered. Go ahead.

A. Yeah, I didn't -- I don't believe I answered -- asked that question specifically. I don't know if they knew it was going to be there, even. Have to defer to what came out in the record. The van was -- was over there a lot. I think they're waiting for perhaps knowing that would be there since it was there previous nights, previous occasions. And it may in fact be there again that night.

BY MR. AINSWORTH:

Q. So Billy Bigeck didn't say anything about how they knew the van would be there some six hours later during that conversation and you didn't ask?

A. I don't think I --

MR. LYDON: Objection, asked and answered. Go ahead.

A. Sure, okay. You know, I don't think I asked the question. I don't think it was too top of mind for anybody doing the questioning.

BY MR. AINSWORTH:

Q. All right. If you go on to the next paragraph of Exhibit 90, it says, "Bigeck continued that he went home and then went to the Dore school. Once by the school, he saw Wayne Antusas, who lives right across

Page 145

from the school. He told Antusas the plan and told Antusas that it was -- it was Misfit's idea. Wayne said, okay, and said that it was cool. Bigeck then told him about the guns." Do you see that?

A. Yes, I do.

Q. So according to Billy Bigeck, he told you that the plan was Misfit's idea, right?

MR. LYDON: Object to the form. Go ahead.

A. It was Misfit's idea, I took that, to do the shooting.

BY MR. AINSWORTH:

Q. Well, let's just read it again together. It says he told Antusas the plan and told Antusas that it was Misfit's idea.

A. Yeah, I -- I see what it says. I'm just telling you what I took from the interview with --

Q. So when Bigeck told you that he reported the plan was Misfit's idea, you thought the plan was Nick Morfin's idea; is that right?

A. No. Well, I mean, the plan encompasses a lot. I mean, ultimately the -- the plan is to shoot -- to shoot at the van while rolling the van. So whose idea was that? That was Sopron's idea. Now you get onto the minutiae, to like how to execute the plan. And I felt that was more of -- my -- my belief was, was more Nick

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 146

Morfin's idea.

Q. Did anyone tell you that it was Nick Morfin's idea?

A. No. No. I mean, we just -- just read it over, and you try to see what people are saying, what they recall. It seemed to me that, and I'll rely upon the record, but it seems to me that Sopron said, yeah, you can pull the roll -- you know, light up the van, whatever he said. Pull the roll. You know, 15-year-old Eric Anderson could be the shooter, clean the guns. Shut up if you get caught or whatever, don't talk about it. And then the execution was -- I thought it was from Nick -- Nick Morfin. Like, come -- come up from the west side of the park. Or I'm sorry, come up from the east side of the -- through the -- through the house on the east. Get it dropped off on east side, and come through the gangway.

Q. So going back up the paragraph --

A. Sure.

Q. -- where it says --

A. Which -- where are we at now again? I'm sorry.

Q. Sorry. I'm going to read you the beginning of the paragraph. It says, Nick told them -- do you see that?

Page 147

A. Yes, I do.

Q. "Nick told them what Misfit wanted them to do."

A. Sure.

Q. Do you see that?

A. Yes, I do.

Q. Okay. What about Bigeck telling you, Nick told them what Misfit wanted them to do. Which was, Misfit said -- had said to get Nick Liberto to be the driver. He said they should all meet up at the Dore school. And Nick told them to go to the block east of Melvina and go west through the gangway.

A. Right.

Q. What about that indicates to you that Nick Morfin is the one who devised this plan?

A. Well --

MR. LYDON: Object to the form.

A. I mean, I -- I guess just the paragraph yourself, let's take a look at it, what you just referenced, you know?

BY MR. AINSWORTH:

Q. Uh-huh.

A. Nick told them what Misfit wanted them to do. Misfit had said to get Nick Liberto to be the driver. He said they all would meet up at Dore school. Nick told

Page 148

them to go to the block east of Melvina and go west through the gangways. So to me, Nick was taking ownership of -- of that portion of it, as -- and when he -- when he references Sopron to get the other portion of it.

Q. All right, sir. According to Bigeck, he walked alone to Wayne's house, right?

A. Are you referencing somewhere? Once again, it -- I -- I can't specifically recall what the testimony was --

Q. Okay.

A. -- or what this is indicated in the report. If you -- if you point it to me, I'll agree with you. If you just --

Q. Sure. It says Bigeck continued -- so this is the following paragraph.

A. Sure.

Q. "Bigeck continued that he went home and then went to the Dore school."

A. Okay.

Q. "Walked by the school, he saw Wayne Antusas, who lives right across from the school."

A. Okay.

Q. He told Antusas there, see that?

A. Yes.

Page 149

Q. And so Bigeck is saying he's alone at that --

A. That's what it looks like.

Q. And then if you read the next paragraph, it states, "Nick Liberto, Eric Anderson, and the two Morfins came by Nick Liberto's car." You see that?

A. Yes, I do.

Q. So according to Bigeck, Ed Morfin arrives by Nick Liberto's car to get to Antusas's house, right?

A. Yes.

Q. He does not have -- according to Bigeck, he did not walk there with Eddie Morfin, right?

A. According to this report here, no.

Q. And then according to Bigeck, he said everyone was standing by Wayne's porch, and Wayne wanted to know what was going on with the Ridgeway Lords. You see that?

A. Yes, I do.

Q. So according to Bigeck, nobody was in the car. Everyone was standing by Wayne's porch, right?

A. Well, once again, according to the report -- I don't know what he testified to, how he phrased it. But according to this report, you're reading exactly what it says on the report, so I agree with you.

Q. Okay. And then going on to the next paragraph, it says --



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 150

A. One that begins, while they?

Q. Yep.

A. Okay.

Q. "While they were all still by the porch, Nick Morfin told Ed Morfin and Eric Anderson to go ahead and do it." Do you see that?

A. Yes.

Q. So according to Bigeck, the first time in this conversation where there's a mention that Eric Anderson's going to be accompanied by Ed Morfin was while they're outside by the porch, right?

MR. LYDON: Objection to the form.

A. Can you ask me that again, sir?

BY MR. AINSWORTH:

Q. Sure. Well, when you were talking to Billy Bigeck, did you want to know why it was Eric Anderson, Billy Bigeck, and Ed Morfin, who were present, who were conscripted to, you know, carry out this plan?

MR. LYDON: Objection to the form, vague.

A. I don't -- I don't think I really had Cassius thought why they were -- I just wanted to know who -- who was -- and not -- not why. I don't think I asked that question.

BY MR. AINSWORTH:

Q. Sure. But part of --

Page 151

A. Yeah.

Q. -- you know, your role as a prosecutor in determining, you know, how this is going to go to trial and thinking it through, you want to know not just what happened, but why, right? You're looking for motive, and you're looking for, you know, explanations that will resonate with the jury, correct?

MR. LYDON: Object to the form, compound.

A. In -- in broad strokes, sure.

BY MR. AINSWORTH:

Q. And so it was a little odd to you that the Popes would have a Latin Count, you know, go out and do this mission to attack the Ridgeway Lords, as opposed to another one, right?

A. Well, once again, I think you're -- you're giving me too much credit for being a gang prosecutor. If you talk to an experienced gang prosecutor, they may agree with your -- what you just said. I -- I don't know. I -- I didn't -- I didn't see that as -- me, prosecuting this case, I didn't see that inference that you -- you felt existed. I just saw, you know, Eddie Morfin was cousins to Nick Morfin, so they had a lot of trust factor there. And so really, I don't think -- going outside these -- this gang, which may -- you might be right. Maybe you -- you might have people agree with

Page 152

you, but I -- it's the first time anybody ever posed that is right now. You -- your inference, no one's ever talked about this with me before like you're talking about it. So I -- I -- I don't know.

Q. So you had no curiosity about why it was that it was Billy Bigeck and Ed Morfin were going to accompany Eric Anderson to do this plan?

MR. LYDON: Object to the form.

A. No, I no, I -- I don't think I did. If I did, I -- I can't remember that I did.

BY MR. AINSWORTH:

Q. Well, in any event, is -- according to Billy Bigeck, who was outside by the porch at Wayne Antusas's house, that Nick Morfin told Ed Morfin and Eric Anderson to go ahead and do it, right?

A. Is that what it says in there?

Q. Yeah, that paragraph that was read. While they were all still by the porch, Nick Morfin told Eric Morfin -- Ed Morfin and Eric Anderson to go ahead and do it, right?

A. Yep, that's -- that's what it says here. And I don't -- I don't know what he testified to, but that's what it says in this report.

Q. And then going on to the next paragraph --

A. Sure.

Page 153

Q. -- which leads onto the third page of Exhibit 90. It says that Eric and Eddie then ran north through the park towards 61st Street, right?

A. You know, I'm looking at the third paragraph. Is that the one that begins, Bigeck? Bigeck stated?

Q. It's the very last -- on the second page, it's the very last paragraph.

A. Second page of the very last?

Q. Where it says, while they're running through the park --

A. Okay. Got it.

Q. -- they ran by an old man --

A. Okay.

Q. -- with a white dog.

A. Right.

Q. And I should -- I should -- do you remember that the plan -- let's go back a second, just so you can get oriented to the plan. See on page 2 of Exhibit 90, there's a paragraph in the beginning, it's Nick Liberto. Second and third from the bottom.

A. Yes, I see that.

Q. All right. The last sentence that paragraph says, "After the shooting, there were to run back to the park to get picked up by Nick Liberto and Nick Morfin on 62nd Street west of the park."

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:22-cv-00320 Document #: 235-20 Filed: 07/17/26 Page 41 of 133 PageID #:4280
The Deposition of: SCOTT CASSIDY, taken on July 21, 2023
154..157

Page 154

A. Yes, I see that.

Q. Okay. So that was the plan, right?

A. Yes, appears to be. That's the plan according to this report.

Q. And then the very bottom of Exhibit -- page 3 of Exhibit 90, it says, when they're running through the park, "they ran by an old man with a white dog. Eric and Eddie then ran north through the park towards 61st Street." See that?

A. Yes, I do.

Q. All right. So the plan was to go to the west side of the park, but instead, Eric and Eddie ran north?

MR. LYDON: Objection to the form of the question.

A. If -- if there's -- if there's a contradiction there, I'll -- I'll agree to, yeah, if that's what it says. Yeah.

BY MR. AINSWORTH:

Q. Well, that is what it says.

A. If that's what the report says, yeah.

Q. Did you ask Bigeck why Eddie and Eric ran north instead of west through the park?

A. I don't have any recollection of asking them why they ran that way. I -- as -- as I sit here today, I -- I don't find it relevant. Even back -- even back

Page 155

then, I don't think I would find it relevant to ask the question. I mean, you may be. You're -- and you're entitled to that, to ask that question, but I -- and we may have asked the question, but I -- I don't find it too relevant.

Q. Why wouldn't you find it relevant to determine why the, you know, people who carried out this planned hit, didn't carry out the plan to get away?

A. I just attribute it to, you know, young people doing stupid things. And they -- they reacted the way -- no matter what the plan was going to be, they reacted wrong. They ran the other way.

Q. Well, Billy stuck to the plan, right?

A. I don't know. Did he? I know he ended up wandering the streets.

MR. LYDON: I'm going to object to the form of the question. Go ahead.

BY MR. AINSWORTH:

Q. Well, according to Bigeck -- and this is the top of --

A. Sure.

Q. -- page 3. It says Billy ran west through the park, right?

A. Okay.

Q. Billy couldn't find Liberto and Morfin at 62nd

Page 156

and Narragansett, so he ran West on 63rd Street.

A. Is that where they were supposed to meet, 62nd and Narragansett? I -- I don't -- I don't know. First I saw that. I mean, it says that he didn't find him at 62nd and Narragansett. Is there earlier verbiage anywhere where they were supposed to meet at 62nd and Narragansett?

Q. Well, they were supposed to meet at 62nd Street, west of the park, right?

A. That's what it said.

Q. And 62nd Street west of the park is right where Narragansett is.

A. Is it?

Q. All right. So you don't know one way or the other?

A. No, I -- I don't know.

Q. Okay. Fine. Was it relevant to your investigation that Liberto was the getaway driver?

A. Yes.

Q. Why was that relevant?

MR. LYDON: Object to the form of the question.

A. Well, I mean, in criminal law -- criminal law of accountability, it's well established that a -- a driver of a car is accountable for the criminal act being committed.

Page 157

BY MR. AINSWORTH:

Q. So you're looking for corroboration that there was in fact a plan for Nick Liberto to be the getaway driver, right?

MR. LYDON: Objection to the form.

A. Say -- say that again?

BY MR. AINSWORTH:

Q. You were looking for corroboration for the fact that Nick Liberto was indeed the getaway driver, right?

MR. LYDON: Objection to the form, foundation. Go ahead.

A. I'm just -- at what point am I looking for -- after I talked to Bigeck?

BY MR. AINSWORTH:

Q. Yeah, while you're talking to Bigeck.

A. Well, when I'm talking to Bigeck, I just want him to tell what happened, you know, say what happened. And then they will make the determination what's relevant, what it corroborates, or what it doesn't corroborate. So we're not -- I don't believe, I don't -- I'm not looking for anything, not looking for this or that or anything. I just want him to tell what he knows, truthfully, and then we determine then what's relevant, what needs to be corroborated.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 158

Q. Well, you asked follow-up questions, right?

A. Yes.

Q. In fact, you met with him twice in the course of creating this report that's marked as Exhibit 90, right?

MR. LYDON: Objection to the form of the question.

A. Well, I didn't create the report, but we did meet with him twice, actually a third time.

BY MR. AINSWORTH:

Q. Well, you met with him twice just to gather the information that went into this memo, right?

A. Yes.

MR. LYDON: Objection to the form of the question.

THE WITNESS: Sorry.

MR. LYDON: You're okay.

BY MR. AINSWORTH:

Q. And so after you met with him the first time, you had time to think about questions you might have for Billy Bigeck, right?

A. Yeah, that -- that's possible.

Q. You wanted to explore if there were any holes in his story, right?

A. Yeah, I think that would be a fair assessment.

Page 159

After we talked to him, we want it to sink in and evaluate what he had to say. We have a trial to proceed to. I want to know kind of witness he's going to be for that trial. So yeah, you sit back, tell you what -- what they know, then you evaluate it.

Q. All right. So the next paragraph on Exhibit 90 on page 3 states, when he was running, he, meaning Billy Bigeck, is -- it's on that page. "When he was running, he saw Chris Nemchausky drive by with his lady. They picked him up. He told Chris a little about what happened and asked Chris to be his alibi. Wayne had told them to go to Shawn's house after the shooting and to give Shawn the details. Shawn is always told about things so that he can tell everyone else that needs to know." Do you see that?

A. Yes, I do.

Q. All right. So you would expect that Eddie and Eric would also try to go to Shawn's house after the shooting to give Shawn the details because that was part of the plan, right?

MR. LYDON: Objection to the form, foundation.

A. Can I read over the paragraph just again before I answer the question?

BY MR. AINSWORTH:

Q. Sure.

Page 160

A. Okay. I get it. So the question is what now?

Q. The question is, you would expect that Eric Anderson and Ed Morfin would also try to go to Shawn's house after the shooting to give Shawn the details because that was part of the plan, right?

A. It appears --

MR. LYDON: Same objection.

A. -- based upon this report, it appears if they were following -- if they heard what you just referred to, what Chris said, told Chris -- if they heard what Wayne said, yes, that they would then make an effort to go by Shawn's house.

BY MR. AINSWORTH:

Q. Right. So now you get this information, you believe Bigeck?

A. I think Shawn wasn't home. So I don't know if they went by there or not.

Q. Listen to the question, okay? So you're --

A. Well, I think you're -- just in fairness to me though, you're offering like they didn't do that.

Q. I'm not suggesting anything.

A. Okay, sorry. I'm sorry.

Q. I'm saying you want to know.

A. All right. I just want to fully answer the question then.

Page 161

Q. Yeah.

A. Okay.

Q. Are you fully -- did you fully answer it?

A. Yes. Yep. Thank you.

Q. Did you delay meeting with Ed Morfin?

MR. LYDON: Objection to the form.

A. I don't understand that question.

BY MR. AINSWORTH:

Q. I'll represent to you that according to the proffer letter with Ed Morfin, it's not -- it's dated September 5, 1996, which is after August 12th and August 29th, right?

A. Yes. Right.

Q. And so I'm trying to find out, did you delay meeting with Ed Morfin until after you'd met with Billy Bigeck twice? Or was there a reason why you didn't meet with Ed Morfin until September 5th?

A. Sure. I understand your question, and I -- and I can't answer because I don't recall what my mindset was in regard to the timing on the second -- the interview with Eddie Morfin. I don't know if I consciously said, let's get this done, and then we'll meet with Eddie. Or just matter of timing with his lawyer, maybe with the investigators. I'm not sure. I'm not sure why that interview took

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 162

place, I guess like a week or two after the interview with -- second interview with -- with Bigeck.

Q. And, you know, three weeks after the first interview with Bigeck, right?

A. Okay.

MR. LYDON: Object to the form of that question.

BY MR. AINSWORTH:

Q. You referenced the second interview with Ed Morfin. Were you talking about your first interview with Morfin was after the second interview with Billy Bigeck? Or were you talking about a second interview with --

A. Oh, no. No, I was talking about second interview with Billy Bigeck.

MR. AINSWORTH: Okay. Let's mark proffer letter for Ed Morfin. I think was Exhibit -- do you know which one it was?

MR. STEPHENSON: Yeah, one moment. Ed Morfin was Pena 46.

BY MR. AINSWORTH:

Q. All right, I'm showing you what we'll mark -- what we previously marked as Exhibit 46 for -- and for the record, it's Bates number CCSAOCAE-11183. All right. Sir, so showing you what we

Page 163

marked as -- previously as Exhibit 46. This is a proffer letter with Ed Morfin. You see that?

A. Yes.

Q. And this refers to an interview with Ed Morfin on September 5, 1995, correct?

A. Yes.

Q. And that's your signature, right?

A. Yes, it is.

Q. And so this would've been -- it doesn't have a date at bottom, but it would've been signed on September 5th by yourself and Ed Morfin, right?

A. To the best of my recollection, but it doesn't put the date there, so -- I -- but I -- so I don't -- I can't say for sure.

Q. And Diciolla is the investigator who's with you for the interview, right?

A. Norfie again, yes.

Q. What does Ed Morfin tell you on September 5, 1995? Or it should be 1996, right?

A. You know, I -- as I sit here, I can't recall.

Q. Well, the murders happened on December 14, 1995, so it's -- couldn't have been September 5, 1995, right?

A. Oh, so you're pointing out the date is wrong, right?

Page 164

Q. Yeah, it's just a typo. I think it's supposed to be September 5, 1996. Would you agree with that?

A. Yes.

Q. Okay. So what did you say to Ed Morfin and what did Ed Morfin say to you on September 5, 1996?

A. Well, he -- I gave the -- you know, I -- I did -- began the proffer the same way I did begin the proffer with Bigeck. I talked to his lawyer first. In the same manner I described earlier, I talked to the lawyers for Billy Bigeck with the admonition of telling the truth. And the same way, I asked him to talk to his client about it. And emphasized to him that if he's not going to tell the truth, that it's not worth doing this because he's only going to hurt himself. So I wanted to be clear with Eddie -- Ed Morfin, just like I was with Bill Bigeck. They had to tell the truth or it's not worth even proffering. So then we sit down and ask some questions, in the same manner that asked -- asked Billy Bigeck. Once again, tell him that we're going to take everything you say, we're going to check it out, and make sure it's true or not true or whatever any situation may be.

Q. Do you recall anything of your conversation with -- not what you would've done, but what -- you know, what actually happened? Do you recall any of your

Page 165

conversation with Ed Morfin on September 5, 1996?

A. I recall very little of it.

Q. What do you recall?

A. Just where it took place at.

Q. Where did it take place?

A. The same room, same conference room. I recall Eddie doing the best, once again, to tell the truth. He wasn't guessing. It was simple, in his -- his mannerisms. Gave forthright answers to the questions being asked, I believe. I believe he was. I just remember his body language and took a read on him because that was important to me, to assess his viability as a witness in the case that I -- well, I -- I was in trial posture, so I was sizing him up to be a witness in the case. And that's -- that's what I recall. And not so much what he said, but how he said it and his mannerisms.

Q. So Investigator Diciolla would've written up a report memorializing what Ed Morfin told you --

A. I -- I'm not sure. I -- tell you the truth. I -- now that you show me that, I don't recall if I read a report of the interview or not.

Q. I'm not asking you whether you read one or not. My question for you is, you met with Ed Morfin on September 5, 1996.



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 166

A. Sure.

Q. You would want to know both what Ed Morfin said and have a memorialization of what you said, right?

MR. LYDON: Objection. Form of the question.

A. Sure. I would expect somehow or another that the -- the information is given to be memorialized, some manner.

BY MR. AINSWORTH:

Q. Either by a handwritten memo written by you or a report written by the investigator?

A. Yeah, there's various ways of doing it. Yes.

Q. Any other way?

A. Well, yeah, grand jury. Testify in front of the grand jury.

Q. And so where would we look to find out the contents of your conversation with Ed Morfin on September 5th?

A. I don't --

MR. LYDON: Object to the form, foundation.

A. Well, you're asking me where you look. I haven't looked at the file in 25 years, so I don't -- I'm not familiar with the file. You have more familiar -- familiar -- you know, you can subpoena it. You can go through it and you can find it.

BY MR. AINSWORTH:

Page 167

Q. All right. So you -- it should be in the file for the Cook County State's Attorney's Office, a report, or any memo, or grand jury testimony from Ed Morfin on September 5, 1996?

A. If that's when the proffer took place. I mean, I was wrong on the date. Hopefully I was -- I was wrong in the year. Hopefully I was right on the date, September 5th.

Q. Is there anything that suggests to you that you wouldn't have met with Ed Morfin?

MR. LYDON: Object to the form.

A. I met with Ed Morfin.

Q. Well, let's show you what I'll mark as Exhibit 91. All right. I'm showing you what's been marked as Exhibit 91. This is a three-page document, Bates number SOPRON-5847 through 5849. And it's an investigative report dated October 23, 1996 regarding an interview with Ed Morfin on September 18, 1996. Do you see that?

(EXHIBIT 91 MARKED FOR INVESTIGATION)

A. Yes, I do.

BY MR. AINSWORTH:

Q. And this is a report prepared by whom?

A. Per the report, it was prepared by Leonard Bajenski, Star Number 386, and William Marley, Star Number 374.

Page 168

Q. Any reason to doubt that they were the ones who prepared this report?

A. Not if it says it on there.

Q. So -- and we can agree that that's not Norfie Diciolla, right?

A. We can agree to that, that their names -- that Leonard Bajenski and William Marley are not Norfie Diciolla.

Q. And in preparation for this deposition, you reviewed this investigative report regarding an interview with Ed Morfin, right?

A. Now as I sit here, I don't recall reviewing it. I mean, I think I got everything -- that doesn't mean it wasn't given to me. I just don't -- any recollection of reviewing it.

Q. In any event, there should have been a report regarding your conversation with Ed Morfin and Norfie Diciolla and Roger Pena, right?

A. Well, I mean, I'll answer it this way. Perhaps they -- maybe, Norfie, I'm just speculating now. You'd have to ask Norfie. He may have spoken to these -- they might have -- might have been a second interview, and he might have spoken to them and they incorporated in one report.

Q. All right. And so you'd expect that if

Page 169

they're incorporating the contents of two interviews into one report that they would indicate in the report, this is the contents of two interviews with the subject, right?

A. Well, I mean, in a perfect world, perhaps you would -- you'd get that. But I mean, it's -- I don't think it's -- I don't think it's that -- they're -- they're very -- in deference to them, they're very, very busy up there. Might have been oversight. Maybe they should have, but it's not fatally defective. As long as it -- as long as it explains the extent of what the conversation was between the two of them, I find it sufficient.

Q. So --

A. I mean, it's always subject to -- excuse me?

Q. Go on.

A. Sure. They're always subject to cross-examination when they're called to testify as to why they did. So it's -- if anything, it's a -- like a harmless foul, my -- my opinion.

Q. So in your opinion, it is acceptable for a Cook County State's Attorney investigator to prepare a report regarding a conversation that they did not have with the witness without indicating that in the report?

MR. LYDON: Asked and answered.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SCOTT CASSIDY, taken on July 21, 2023

Page 170

BY MR. AINSWORTH:

Q.   Correct?

MR. LYDON:  Asked and answered.

A.   Can you answer -- ask it again?

BY MR. AINSWORTH:

Q.   Sure.

A.   Thanks.

Q.   So in your opinion, it is acceptable for a Cook County State's Attorney investigator to prepare a report documenting the contents of an -- of a conversation that they did not have with a witness, right?

MR. LYDON:  Asked and answered, and the form of the question.

BY MR. AINSWORTH:

Q.   Without indicating in the body of the report that they were not present to the conversation.

A.   I'm really -- I -- it's a confusing question. I don't mean to be -- you put a lot in one sentence. I explained it the best I could.

Q.   Sure.  Let me -- let me help you with that.

A.   So I -- I'll rely upon the answer I gave because I couldn't speak it any clearer that I said. That maybe --

Q.   Well --

Page 171

A.   -- or you'll have to ask them as to why it's -- it's documented in this report.

Q.   No, and I'm not --

A.   So I can't speak to anything else on that.

Q.   And that would be a perfectly acceptable answer.

A.   Okay.

Q.   But I'm not asking why they did what they did. That's not my question.  My question is completely different.  My question is, in your view, according to Mr. Scott Cassidy, it is acceptable for Cook County State's Attorney investigators to prepare a report regarding a conversation that they did not have with a witness and not indicate that they did not have the conversation with the witness.  It's -- correct?

MR. LYDON:  It's the same question that's been answered.

A.   I can't -- I can't follow the question.

MR. LYDON:  Hold on a second.  Let me just get -- asked and answered, form of the question.

A.   Answer -- if you could break it down real simple.  What's -- what --

BY MR. AINSWORTH:

Q.   Yeah.

A.   -- what -- what's your question?

Page 172

Q.   You told us that one explanation that would be acceptable to you, is that -- as I understand it, and this is what I'm trying to clarify.  That Bajenski and Marley could have written this report regarding information that Diciolla told them, and they just included it in their report, right?

A.   Right.  I speculated --

Q.   Yeah.

A.   So I speculated.  Now you want to -- me to comment upon my speculation?

Q.   No, I'm not.  What I'm asking now is, is it acceptable in your opinion for a Cook County State's Attorney investigator to prepare a report regarding a conversation that they had with a witness in a homicide case and -- but -- and not indicate that they were not present for the interview?

MR. LYDON:  Hold on.  Objection, asked and answered, form of the question, vague, incomplete hypothetical.  Go ahead.

A.   I really want to answer your question, but I simply do not understand the question.

BY MR. AINSWORTH:

Q.   Okay.  I'll try and --

A.   I really do.  I want -- I want to answer the question.

Page 173

Q.   Great.  So sir, was it your understanding that Cook County State's Attorney investigators should document conversations that they had with witnesses?

A.   Not necessarily.

Q.   Okay.  So is it your understanding that Cook County State's Attorney investigators could document conversations that they did not have with witnesses?

A.   That doesn't sound like it'd be a good -- good policy to have.  So --

Q.   Why not?

A.   Pardon me?

Q.   Why could that -- why does that not sound like a good policy to have?

A.   Well, unless --

MR. LYDON:  Wait.  I want to object to the form of your question.

MR. AINSWORTH:  Go ahead.

A.   Unless they offer reasons why they're doing it.

BY MR. AINSWORTH:

Q.   Right.  So if an investigator is preparing a report about a conversation they did not have with a witness, you'd expect that that would be documented in the report?

A.   No, I would not.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 174

Q. Why would you not expect that?

A. As long as I can explain at some point in time, it's fine with me.

Q. All right. So it's fine with you if a Cook County State's Attorney Investigator prepares a report -- and well, here, let me take a -- let me withdraw that question and ask it this way. So if you tender what's been marked as Exhibit 91 to the defense, the defense will think that the witnesses to this conversation are Bajenski and Marley, right?

A. Yes, that'd be a reasonable conclusion to -- to make.

Q. And so if the defense wanted to call as witnesses to the conversation, they would subpoena Bajenski and Marley based on your tendering this report to them, right?

MR. LYDON: Objection, calls for speculation. Go ahead.

A. You know, I've never -- like I said, never been a criminal defense attorney, but I would expect them to do everything they can to adequately defend their client. And that seems like a reasonable thing to do. It would be to subpoena them, to subpoena two witnesses.

BY MR. AINSWORTH:

Page 175

Q. And if you didn't tell them, the criminal defense attorney, that the information contained in this report didn't actually come from Bajenski and Marley, but rather it came from Diciolla, there'd be no way for the defense attorney to know that?

A. I --

MR. LYDON: Object to the form.

A. -- I can't answer your question because you're -- you're having me assume a question that hasn't been proven. I -- I don't -- they might have got that information from -- from them. So you -- your -- your -- your -- your -- your question is premised upon the following: that Norfie Diciolla told Bajenski and -- and Marley what to put in the report, and they weren't even present for the interview, right? I -- I can't answer a speculation question like that. And it's -- in fact, I'm not familiar with them. So I don't know if it's factually accurate.

BY MR. AINSWORTH:

Q. Who --

A. You'd have to talk to Norfie Diciolla or one of those investigators.

Q. Did you tender Exhibit 91 to the defense in the Morfin, Sopron, and Antusas cases?

A. You have to check the file.

Page 176

Q. Any reason why you wouldn't tender this report?

A. No.

Q. Okay. All right. Sir, so --

A. And -- and I -- I would just add, too, I -- they -- I'm sure the defense would be asking me, once again, a reasonable -- I'm not -- wasn't a defense attorney, but the defense attorney would be asking me, hey, Cassidy, you tendered me a proffer letter -- if they -- if they got it -- you know, with a -- a -- a date on there of September 5, 1995 or whatever. So we'd talk about -- to them about the date on it, like you did to me, and we'd talk about where's the report of interview and, hopefully, hash all out so they would -- you know, we'd all be on the same page. So nobody'd be in the dark.

Q. Let's take a look at page 1 of Exhibit 91, okay?

A. Okay.

Q. Was Pena present for this interview with Ed Morfin?

A. I don't know.

Q. Well, according to the report, was Pena present for the interview with Ed Morfin?

A. It doesn't indicate that he was present.

Page 177

Q. And if Pena was present for the conversation with Ed Morfin, that should have been documented, right?

A. That's speculation. I don't -- I don't know what the -- you'd have to ask the investigator.

Q. What's speculation? I'm -- let me --

A. Well, you're saying "if." You're asking me "if." So that's a hypothetical, but I don't know. I'm not an investigator, you know. It --

Q. How long were you at the Cook County State's Attorney's Office?

A. As I explained earlier, I joined the office in -- I think it was May 1986. And I -- I left the office in July of 2008. So I was there for 22 years and three -- three or four months.

Q. Okay. So you know how investigative reports are prepared by Cook County State's Attorney investigators in your experience, right?

MR. LYDON: Objection to the form. Vague.

A. I never really asked them what their procedure was. So the answer to my -- your question is no. I do not.

BY MR. AINSWORTH:

Q. Well, I'm not asking whether you asked them what the procedure is. But in each report, at the top -- and we can look back at, you know, Exhibit 90.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 178

You know, at the beginning, it talks about who is present for the interview, right?

A. Yes, it does. It says "prepared by" and it says "subject." Does it say somewhere who is present?

Q. In Exhibit 90, it states who is present for the interview.

A. I -- I'm sorry. I'm -- I'm looking at 91.

Q. Right. I'm asking you to look at --

A. Report of interview, Ed Morfin.

Q. Now, I'm asking you to look at Exhibit 90.

A. Okay. I got 90. Yep.

Q. You see how it indicates who is present, apart from the investigator?

A. Can you show me where it says at?

Q. Yes. In the first paragraph, the second half of the first paragraph.

A. Okay.

Q. Present during those interviews were the defendant's attorneys, Mike Vitale and George Zuganelis. Also present were Assistant State's Attorneys Scott Cassidy and Neil Linehan and Investigator Thomas Ptak.

A. That's what it says.

Q. And it doesn't include Investigator Diciolla because he's the investigator preparing the report, right?

Page 179

A. I would -- I would think so, but I -- makes sense.

Q. And so you're telling us you don't know whether it was the investigators' practice to include those present for a conversation with a defendant who's been charged with murder and who's providing information about a double homicide; is that right?

MR. LYDON: Wait. Wait. Form. Mischaracterizes his testimony. Go ahead.

A. I've never asked the investigators what their practice was.

BY MR. AINSWORTH:

Q. Oh, I'm --

A. So I do not know what their practice was.

Q. I'm just -- I'm not asking if you asked them what their practice is. I'm just saying -- you're saying, in your 22 years of experience, you don't know that Cook County State's Attorney investigators include the identity of the people present for a conversation when they document it in their reports. Is that what you're saying?

MR. LYDON: Form.

A. I do not know what their practice was, whether they identified everyone.

BY MR. AINSWORTH:

Page 180

Q. Okay. Why was Ed Morfin interviewed at 6:30 p.m. on September 18, 1996?

A. Well, now, you're really asking me to go back and draw upon something like the time of an interview. And I -- I have -- as I sit here today, 27 years later, I do not know why we chose the time or the time chosen was 6:30 p.m.

Q. Ed Morfin was in custody, right?

A. I believe so. Yes.

Q. So you could interviewed him at any time. You didn't have to, you know, clear it with his schedule, right?

A. Well, once again, we're -- you're asking me 27 years later. I -- I -- just so you're aware, and I believe it's public information, I -- I was picking a jury on October -- I looked it up in the newspaper because it was covered in the news. Just, on October 29th, six days from that date, I was picking a jury on the -- the Hardaway case, "Yummy" Sandifer case. Like I said, it was a national news story. I was pretty busy. If you can put it, like -- you have an idea of what we do up there. We're just -- we just don't have one case, you know, and then we set everything aside. We're -- actually, we like to think we can multitask a little bit. So other things are going on. There's

Page 181

other cases. There's other people being interviewed. There's other -- you know, a whole host of things to do. So I know you may seem surprised or you appear to be surprised this interview took place at 6:30 p.m. I'm not.

Q. Okay. Well, the trial started on October 29th, right?

A. I believe so.

Q. This interview occurred on September 18th.

A. Okay.

Q. So not six days before, but 41 days before?

A. Well, with that said, I -- yeah, you're right. But with that said, you still, hopefully, can appreciate that. When you're preparing for trial on that type of case or -- and you have other cases going on, we often did interviews in the evening. Perhaps you don't do them here in the evening. We -- we did. So it's really -- I don't -- I feel like any -- you know, I'm not as surprised about as you, respectfully.

Q. Did you participate in this interview with Ed Morfin on September 18th of 1996?

A. I -- I -- I was present for a proffer with Ed Morfin. I don't know the date.

Q. Well, would it be on the date that you included on your report on your proffer letter?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 182

A.   That's speculation.  I got the date, the year, wrong.  So I can't really, you know, 17 years later, pin down the date that I -- I was present for the proffer of Ed Morfin.

Q.   All right.  So you were present for the proffer whenever it happened, and --

A.   That's correct.

Q.   So according to Ed Morfin, looking at the first page of Exhibit 91 in that first big -- I guess the second paragraph on page 1, the long one --

A.   Sure.

Q.   Towards the end of it, there's a sentence that says, "Misfit was talking to the other guys, but Ed was not privy to that conversation because he is a Latin Count and not a member of the Popes."  Do you see that?

A.   Yes.

Q.   So according to Ed Morfin, Sopron and the others were talking about whatever they're discussing, but they wouldn't let him in on it because he wasn't a Pope, right?

A.   That's correct.

Q.   Did that make sense to you, as a prosecutor?

A.   Once again, I wasn't real, you know, steeped in gang behavior, you know, what's appropriate and what's not.  But it -- it made sense to me or the little

Page 183

I knew about it.

Q.   All right.  Going onto the bottom paragraph on the -- on page 1 of Exhibit 91, it states, "Upon returning to the neighborhood, Liberto drove down the west side of Hale Park, where they saw the Ridgeway Lords' van.  The van began driving behind them, and Nick Morfin said, it's them, meaning the guys that have been causing the trouble.  Nick Morfin was angry, and he told Ed that they were going to get the Ridgeway Lords.  Nick Morfin said that Eric and Billy and Ed were going to do a burn on the van."  Do you see that?

A.   Yes.

Q.   Okay.  So according to Eddie Morfin, it was while they were in the car, driving, that Nick Morfin said it was Eric and Billy, and we're going to do a burn on the van?

MR. LYDON:  Object to the form of the question.

BY MR. AINSWORTH:

Q.   Right?

A.   According to this report, that's correct.

Q.   I want you to turn to the second page of Exhibit 91.  It says, "Eric then walked away to get the gun, which he had hidden earlier.  It was hidden near the corner.  Eric then stayed by the porch.  Billy Bigeck then walked up, carrying a bag of Reese's Cups.

Page 184

Billy asked where Eric was, and Ed pointed to the corner porch with his head.  Eric was hiding by the corner house, out of sight, near a gate, not wanting to be seen because he had the gun.  Eric then came forward, and the three then walked over to the front of Wayne Antusas' house."  Do you see that?

A.   Yes, I do.

Q.   So Ed Morfin is saying that he and Billy and Eric all walked up to Wayne Antusas' house together, right?

A.   Oh, I -- you know, it speaks for itself.  That -- that's what he said.  Yeah.

Q.   Yeah.  And you know, from your conversation with Billy Bigeck, that Billy said, no, he walked up to the house, and all the other guys arrived in Nick Liberto's car.  Do you remember that?

A.   No.

Q.   All right.  Well, let's look at page --

A.   I mean, I'll rely upon -- I'll rely upon -- yeah.  Give me the document.  I'll -- I'll attest to it, if that's what it says.

Q.   Yeah.  If you have Exhibit 90 there?

A.   All right.  I'll attest -- if it's in the report, if that's what he says in the report, but I don't know what he said at trial -- at the trials.

Page 185

Q.   Well, I'm focused right now on the interviews that you're conducting with various people in August and September of 1996.

A.   Yeah.  But the way you phrased the question was, but you know Billy Bigeck said the following.  And you didn't reference the report.  You just said that's what he said.  So I want to make clear that --

Q.   I did reference Exhibit 90.

A.   Oh, after I -- no, that was after I called your attention to it.  But I don't -- you know, be arguing that, Counsel, whatever -- whatever -- what do you want?  What -- what's the question?

Q.   All right.  So if you take a look at Exhibit 90, page 2 --

A.   Okay.

Q.   -- you'll see where talks about there is a little more than halfway down the page, it says, "Bigeck continued that he went home and then went to Dore School."

A.   That's what it says.

Q.   Towards Dore School.

A.   That's what it says.

Q.   We talked about, before, how -- and then, "Once by the school, he saw Wayne Antusas, who lives right across from the school," and conversation with



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 186

Wayne. Do you see that?

A. I see what you just referenced. Yes.

Q. And then the next paragraph, referencing that Nick Liberto, Eric Anderson, and the two Morfins came behind Nick Liberto's car --

A. That's what it says.

Q. -- while Bigeck is with Wayne Antusas, right?

A. Does it say that in the report?

Q. If you look at the paragraph before, it says, "Bigeck continued. He then went home and went -- then went to the Dore School. Once by the school, he saw Wayne Antusas, who lives right across from the school. He told Antusas the plan and told Antusas that it was Misfit's idea. Wayne said okay and said that it was cool. Bigeck then told him about the guns. Nick Liberto, Eric Anderson, and the two Morfins came by in Nick Liberto's car. Everyone was standing by Wayne's porch." Do you see that?

A. That's what it says.

Q. Right. So according to Billy Bigeck, he was at Wayne's house with Wayne when Liberto and the others drove up, including Ed Morfin -- drove up in Liberto's car and came to Wayne's house, right?

A. I agree. As long as you -- as long as you follow up with "per the report."

Page 187

Q. Per the report?

A. Per the report, that's what it appears to say.

Q. Yeah.

A. Okay.

Q. And all you knew at the time was what Billy Bigeck and Ed Morfin were telling you, as reflected in these reports?

MR. LYDON: Object to the form.

BY MR. AINSWORTH:

Q. Right?

A. Pardon?

Q. All you knew from Billy Bigeck and Ed Morfin, at the time in August and September of 1996, was what they were telling you, as reflected in the report?

MR. LYDON: Object to the form.

A. Well, I knew because I was present for the interviews.

BY MR. AINSWORTH:

Q. Yeah. And you knew, and they didn't tell you anything in those interviews, substantively, that is not reflected in your reports, right?

A. I don't recall. It is 27 years later. I don't -- I don't recall, from what my recollection was of what they said, that it was exactly like it was on the report. I can't say that. I can't answer that

Page 188

question.

Q. Were Bajenski --

A. I -- I believe so, but I can't say for sure.

Q. Were Bajenski and Marley good investigators?

A. Well, just by way of background, when I went to the Gang Crime Unit, I had not worked with Norfie. I saw Norfie before, in the building. A real gentleman. I -- I said hello to him. You know, we used to have short conversations. So I'd never worked with Norfie before. I think this might have been the only time I worked with Norfie actually, but his reputation was very good. Lenny Bajenski? My first time working with him was on this case here. I don't think I worked with him again, neither. Bill Marley? I can't think of another case I -- you know, I may have worked with him on another case, but I don't -- have no recollection of that. So my -- my reference point to your -- answer your question is sort of not a very good foundation to be able for me to offer opinions to the quality of -- of -- of -- of their work.

Q. Do you have any reason to suspect that they were poor report writers, Bajenski or Marley?

A. I never contemplated, you know, whether they were poor report writers, so I really can't answer the question.

Page 189

Q. How about now? Do you have any reason to believe that they were poor report writers?

A. And I -- 27 years later, I -- I couldn't. You know, I don't want to speculate whether they were poor report writers.

Q. I'm not asking you to speculate.

A. It sounds like it.

Q. I'm just saying, do you have any reason to believe that they were bad report writers?

MR. LYDON: Asked and answered.

A. Once again, I don't have a foundation to -- to -- to offer an opinion as to whether they were poor report -- poor report writers.

BY MR. AINSWORTH:

Q. Can we agree on this? You know of no reason that would suggest that they were poor report writers, Bajenski and Marley, right?

MR. LYDON: Asked and answered. Go ahead.

A. Well, I mean, you're asking you're asking for opinion, and I don't mean to --

BY MR. AINSWORTH:

Q. I'm not. I'm asking you, do you have any reason?

MR. LYDON: Wait.

A. Yeah, that's an opinion -- opinion. So I --



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 190

MR. LYDON: Don't argue with him, Counsel.

A.   I -- it's the only case I worked with them on. I -- you know, you need a foundation to offer an opinion as to the quality -- I do, at least -- as to -- as to the quality of the work that people do.  It's not just some little snapshot, and you run with it and say, they're great at this or great at that.  I don't -- it's not -- it's not a fair way to assess.

BY MR. AINSWORTH:

Q.   Have you ever found Bajenski or Marley's work to be poor?

MR. LYDON: Asked and answered.

A.   Found?  What do you mean, "found"?

BY MR. AINSWORTH:

Q.   Have you ever seen them do poor work?

A.   And how would I see them to do poor work? Just give me an example.  Maybe I -- so we can move on or I can answer your question.

Q.   Sure.

A.   Go right ahead.

Q.   So they prepared a report that did not reflect the substance of the conversation that you had with a witness.

A.   Who said that?

Q.   You just asked for an example, sir.

Page 191

I'm providing you with an example.

A.   Oh, I'm sorry.  I didn't know you were. I thought you were telling me that that -- that, in fact, took place.  I -- I'm sorry.  So you're -- you're saying, if -- if -- if I have a factual basis, like I -- I say, you know, this -- this -- this -- here's this -- this is a -- a blue desk, and they write a report that it's a brown desk or whatever -- you really got me going.  If I have a factual basis, well-established, I -- I can offer an opinion that they were poor report writers.  But I don't have a factual basis to do so.

Q.   You worked with them in this case, right?

A.   Yes.

Q.   Did you find that either Bajenski or Marley or Diciolla prepared reports that were inaccurate in this case?

A.   Okay.  The way -- the only way I can answer that is -- is the following, okay?  And you look at the trials because that's where the test -- the test of report writing would probably be best settled.  So you look at the impeachment because that's where it comes out at.  You would -- so I -- and I haven't done that. Maybe you have.  Well, you would go through it compared to what the witness says on the stand, you said he said,

Page 192

and then you look at the report.  And if there's discrepancy, then it was up -- incumbent upon the defense attorneys to point out the discrepancies.  And then -- then you may get a -- a feel for what it is.

Q.   What are you talking -- I'm just asking --

A.   I just -- I just laid out how I -- I --

MR. LYDON: Don't argue with him, Counsel.

A.   I just laid --

MR. LYDON: Let's take --

BY MR. AINSWORTH:

Q.   Mr. Cassidy --

MR. LYDON: Let's wait.

BY MR. AINSWORTH:

Q.   Mr. Cassidy, and only Mr. Cassidy, well, do you want a break?  Let me ask you this question.

MR. LYDON: We're going to take a break. Go ahead.  Go ahead.

BY MR. AINSWORTH:

Q.   So Mr. Cassidy, when -- in the time period that you were investigating this case with the investigators, Bajenski and Marley and Diciolla, did you observe them prepare any reports that did not accurately reflect the conversations that you had with witnesses?

A.   First of all, I did not observe them preparing reports.  So can you please ask your question again?

Page 193

I did not -- I did not -- and I don't mean to argue. But what -- what question do you want me to answer?

Q.   Just did the -- did any of the reports inaccurately reflect the conversations that you had with witnesses?

A.   As I sit here today, I do not remember, 27 years later, any inaccuracies.

Q.   Okay.

MR. LYDON: We're going on break.  Thank you.

THE VIDEOGRAPHER: We are off the record at 2:16 p.m. Central Time.

(OFF THE RECORD)

THE VIDEOGRAPHER: We are back on the record for the deposition of Scott Cassidy being conducted by videoconference.  My name is Kortney Chase. Today is July 21, 2023, and the time is 2:34 p.m. Central Time.

BY MR. AINSWORTH:

Q.   So you wanted to talk to Ed Morfin because you didn't want to just rely on Billy Bigeck's statements alone, right?

MR. LYDON: Object to the form.

A.   No.

BY MR. AINSWORTH:

Q.   That's correct, you didn't want to rely on

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 194

Billy Bigeck's statements alone, or am I misunderstanding?

A. No. I wanted as much evidence as I can get, so one's not exclusive from the other.

Q. And you knew that Billy Bigeck was trying to -- you know, was facing the death penalty or life in prison, natural life in prison. And so he had an incentive to say things to try to get out from under that criminal liability, right?

A. Well, I would phrase it that, from a prosecutor's point of view, you're always suspect when someone who is charged with a crime wants to proffer. So if you don't approach it that way, then you're not doing your case justice. So that's the way I approach it. I don't know what his -- I really don't know what his -- his intent was. You'd have to speak to him about that, or his lawyer. I just -- from my point of view, I approach it like, yeah, they want to help themselves out.

Q. So you shouldn't rely solely on Billy Bigeck's statements to charge Matt Sopron and Wayne Antusas with murder, right?

MR. LYDON: Object to the form.

A. So I shouldn't have -- I didn't. I mean, I -- I had a plan in set. It was irregardless of

Page 195

what -- what Billy Bigeck said or didn't say. I still was going to proffer Ed Morfin. I mean, I -- at that point, I was preparing for trial, and I know I -- I was hoping to get -- bolster my case, you know, namely, against Eric Anderson, the shooter, which I thought was -- needed a little bit of bolstering. I understand you're smiling about something.

MR. LYDON: What happened?

BY MR. AINSWORTH:

Q. I'm just listening to your answer.

A. Oh, I'm sorry. No. So I -- I wanted to bolster my case against those two. So yeah. I -- I wanted -- I was definitely going to proffer them both, and then I was going to evaluate what they said, check it against other facts in preparation for trial.

Q. And Billy Bigeck already told you that Ed -- Eric Anderson pulled the trigger, right, and that he watched, right?

A. He already told me prior to talking to Ed Morfin.

Q. Well, no. I mean, like, before you ever proffered Billy Bigeck?

A. Well, he didn't tell me. No, he didn't tell me anything.

Q. Sorry. Before -- I should have -- I used

Page 196

"even" the wrong way. Before you ever came in contact with Billy Bigeck, you knew that he'd provided court-reported statement, right?

A. Yes.

Q. And then in that court-reported statement, he recounted how Eric Anderson had used the gun to shoot at the van, right?

A. Among other things, yes.

Q. All right. Let's go -- let's turn back to Exhibit 91, page 2, in the middle of the first full paragraph.

A. What sentence?

Q. In the middle of that, it says, "Wayne told Ed to take care of his business and then told Eric and Billy, go do it. Do what you got to do." Do you see that?

A. Yes. That's what it says.

Q. Sorry. I went one sentence too far. Before, it says, "Billy told Wayne that the Ridgeway Lord van was back in the neighborhood." You see that?

A. I see that's what it says.

Q. So according to Eddie Morfin, it is Billy Bigeck who tells Wayne about the Ridgeway Lord van being back in the neighborhood, right?

A. Well, let the sentence speak for itself.

Page 197

At this time, Billy tells Wayne that the Ridgeway Lord van -- Ridgeway Lord van was back in the neighborhood.

Q. And not that Wayne told Billy that the Ridgeway Lord van was in the van -- or Ridgeway Lord van was in the neighborhood?

A. It doesn't say that. No.

Q. Okay.

THE VIDEOGRAPHER: Sorry. If you could lower that, because it's covering your face in the video? Sorry.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. And then towards the end of that same paragraph, the sentence that reads, "Both Nick Liberto and Nick Morfin were present when Wayne changed the plan." You with me?

A. Yes.

Q. And it says, "Ed was standing with them, and they were seated in the car." Do you see that?

A. Yes.

Q. And so according to Ed Morfin's recounting of the change of the plan, Liberto and Morfin, Nick Morfin, were seated in the car, and Ed was standing outside the car, right?

A. According to this report, it appears that way.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 198

Q. But then, if you turn back to Exhibit 90, page 2, Exhibit 90, it's the other report -- according to Billy Bigeck, everyone was standing.

A. What page? What -- what are you referring to?

Q. Page 2.

A. Yeah. Where at?

Q. The paragraph, like, second from the bottom, that says, "Nick Liberto, Eric Anderson, and the two Morfins."

A. Okay.

Q. It says, according to Bigeck's -- the report of Bigeck's statement says, "Everyone was standing by Wayne's porch when Wayne changed the plan." Right?

A. It says in that report, "Everyone was standing by Wayne's porch, and Wayne wanted to know what was going on with the Ridgeway Lords." That's what it says.

Q. And then it continues, that "Bigeck discussed the plan with Wayne, and then Bigeck told Wayne about coming up the van by going through the gangway and then shooting at the van. Wayne said that shooting in the gangway would be too noisy. Wayne said they should go through Hale Park to get up to the van." Do you see that?

A. That's what it says.

Q. Okay. So -- and according to Billy Bigeck's

Page 199

statements, the change of plan occurred while everybody was standing. But, according to Ed Morfin, the -- Nick Liberto and Nick Morfin were seated in the car when the change of plan occurred, right?

MR. LYDON: Object to the form of the question and foundation.

A. I'll agree that's what the reports say.

BY MR. AINSWORTH:

Q. And so --

A. I don't know what they testified to. That's what the report said.

Q. And the location is also different because, according to Billy Bigeck, they're standing by Wayne's porch, right?

MR. LYDON: Form.

A. Well, can you ask that question again?

BY MR. AINSWORTH:

Q. Yeah. According to Billy Bigeck, they were standing by Wayne's porch when the change of plan occurred, right?

A. Okay. Yep. Is it -- if that's what it says in there?

Q. Yeah.

A. If that's what it says, then that's what it says. And I know there were different times where they

Page 200

were by the porch and they weren't by the porch. So I don't want to -- only -- only thing I agree to is what it says in the reports, if that's what it -- as long as you accurately read it, I agree to it.

Q. And so -- but when Ed Morfin is talking about it, Nick and -- Nick Morfin and Nick Liberto are still in the car, which is parked, you know, not right next to the porch, but, you know, in a place where a car can go, right?

MR. LYDON: Form, foundation. Go ahead.

A. I would just rely upon what the evidence was at trial. I really can't -- and I -- I'd like to be able to answer your question, but I really can't until I know what they said at trial and the reports. And then you can -- it speaks for itself, what they said. So I'm -- I'm not really -- I don't want to comment on something that sort of speaks for itself.

BY MR. AINSWORTH:

Q. I'm not asking, sir, what they said at trial, okay? Do you understand that?

A. Okay.

Q. I'm saying --

MR. LYDON: But the only thing is your question was not clear on that.

MR. AINSWORTH: Well, then let me clarify.

Page 201

A. Yeah.

BY MR. AINSWORTH:

Q. So I'm not asking what happened at trial. What I'm asking is simply that, according to Ed Morfin's recitation, Nick Morfin and Nick Liberto were in a car, and a car was somewhere where a car can be as opposed to right next to the porch, right?

MR. LYDON: Same objection.

A. Respectfully, I can't -- I can't agree to that.

BY MR. AINSWORTH:

Q. Because why?

A. Because I don't know where the car was. I mean, I --

Q. All you know is what Ed Morfin told you, right?

A. All I know is what's in the report that you're referring to.

Q. Okay. So I'm going on to the next paragraph.

A. And what -- what exhibit are you on?

Q. I'm on Exhibit 91.

A. Thanks.

Q. And go to the last full paragraph on page 2.

A. Sure.

Q. Six lines down. To the right-hand side of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 202

the page is a sentence that reads, "They all ran back through the park, with Billy running straight through and Eric and Ed going around the back of the school and running north." Do you see that?

A. That's what -- that's what it says.

Q. Did you ask Ed why he and Eric ran north rather than going to where the getaway driver was supposed to be?

A. I can't recall asking that question.

Q. Were you trying to corroborate whether, in fact, there was a getaway driver at all?

A. No. I believe there was a getaway driver at --

Q. I'm sorry. What?

A. I think the evidence established there -- there was a getaway driver. There was supposed to be a getaway driver. It was supposed to be Nick Liberto.

Q. Did Ed Morfin say anything about a plan to have Nick Liberto and -- be a getaway driver?

A. I do not recall if he said that or not.

MR. LYDON: Objection to the form.

BY MR. AINSWORTH:

Q. That would be something that you'd, really, you know, focus in on, in talking to Ed Morfin, whether

Page 203

there was a getaway driver, right?

MR. LYDON: Same objection.

A. I -- I really want to know what -- I wanted to know everything that they had to say and not just focus in on one thing. So to answer -- to your question is, I'd really just like them to tell -- tell me everything they knew. Then it was up to me then to go back, being the investigator or whoever else, to -- to see what they had to say and the relevance of it --

BY MR. AINSWORTH:

Q. All right. Well --

A. -- and evaluate it.

Q. In any event, you wanted to know why they didn't go to the -- to be picked up on 62nd Street, west of the park, right?

MR. LYDON: Objections. Form. Foundation.

A. I don't think I ever really posed that -- I can't remember posing that question to -- to them.

BY MR. AINSWORTH:

Q. I'm not asking if you asked them that, because this is 27 years later, you know. My question is, as an experienced prosecutor, you wanted to know whether -- why they didn't run to the place where they're supposed to get -- meet the getaway driver, if in fact there was a plan to be picked up at

Page 204

62nd West at the park, right?

MR. LYDON: Objection. Form.

A. I understand you put a lot of import into that. That's important to you, but it really -- as I sit here today, just speculating back on 27 years. It really wasn't too -- too important to that -- to me.

BY MR. AINSWORTH:

Q. And explain, because I am not an experienced prosecutor.

A. That's okay. This is common sense.

Q. Yeah. Well, so you were just using common sense; is that right?

A. I would say so, yeah.

Q. Okay. So tell me what about your common sense told you that it was not important to try and corroborate that there was a getaway driver by asking Ed Morfin, "Why didn't you run to the getaway driver's spot?"

MR. LYDON: Form.

A. As I indicated earlier, I might have asked him that question, but -- he may have answered it, but -- but it wasn't too -- it's not -- as I sit here today, it's not too important. I mean, we -- we know what happened. We know that Liberto didn't go to that spot. He just came home.

Page 205

BY MR. AINSWORTH:

Q. And so you know that Liberto wasn't at the getaway spot?

A. I believe so. Yes. I think the evidence -- not me knowing that. It's just what the evidence showed at trial.

Q. Why didn't -- and what was that evidence based on? What are you referring to when you say "the evidence at trial"?

A. Sure. Sure. Well, I -- I believe the shooting was at 6:21.

Q. 40?

A. Or -- I'm -- 6:41. And we know through the phone records that Nick Liberto was at his house at that time and the conversations with his mother -- that Bill Moser had. So I'm pretty certain -- based upon my memory from 27 years ago, I think it's pretty well established that Nick Morfin didn't go to the drop-off point -- or, I'm sorry, Nick Liberto - that, in fact, he went -- he went home.

Q. And that Nick Morfin was with Nick Liberto?

A. I'm pretty sure that's what the evidence showed.

Q. And so you were not curious as to why Ed Morfin didn't run to the spot where he had a ride to get

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 206

away?

MR. LYDON: Objection. Asked and answered. Form. Argumentative.

A. Once again, I'm speculating, but I don't believe I was as curious as you want me to be or you -- what you -- what you were questioning me in.

BY MR. AINSWORTH:

Q. Oh, I'm sorry. Just for the record there, I'm not suggesting you should be curious to any particular level.

A. Okay. Well, I'll just -- you've asked me several times. I'll just say I -- I -- I may have asked the question. I don't recall asking the question, but it wasn't too -- as I sit here today, I don't believe I found it too significant.

Q. And it wasn't significant because why?

A. Because the evidence established that Nick Liberto wasn't there to pick up Ed Morfin. So perhaps Ed Morfin could have seen the car. It was a big field, big wide open field there. Perhaps he could look down the street to the north end of -- and seen if the car was there.

Q. But at the time --

A. I mean, we're just -- I'm totally speculating there, but I knew that he -- Nick Liberto wasn't there,

Page 207

so, to answer your question, sort of not relevant.

Q. In September 1996 --

A. Okay.

Q. -- you didn't know what the evidence was going to show, right?

MR. LYDON: Objection to the form.

A. In September of 1996? I was -- I -- I -- I -- at that time, I had already interviewed -- I read over the file. I was planning out my case, preparing for trial. I was evaluating the witness testimony. I think I had -- and I already proffered Bigeck. We proffered Morfin, and then, in an attempt to evaluate their testimony or evaluate what they said, to see if it was accurate or not or verify it, we went and interviewed some other people for purposes of the trial that I was planning to do. We interviewed other people, and I think at that point probably I had a pretty good idea what the evidence was going to show.

BY MR. AINSWORTH:

Q. So you anticipated that the evidence would show -- because he had the phone records already, right?

A. He had the phone records, if it went -- all those other interviews or the -- the interviews were done. I think I had a pretty good idea how the evidence was going to play out.

Page 208

Q. And so you had an idea -- so you knew that -- at the time you talked to Ed Morfin and Billy Bigeck, you already knew that Nick Liberto and Nick Morfin didn't act as getaway drivers, right?

A. No, I didn't say that. You asked me what I knew in September, and -- and I'm trying to answer the question.

Q. That's not what I asked you. I said --

A. I -- I thought it was. I --

Q. No, I said, you didn't know how the evidence was going to play out at trial?

A. In September of that year, you said.

Q. Yeah. In September 1996, you did not know how the evidence was going to play on trial because you said, we know from trial that Nick Liberto was not the getaway driver. I'm just --

MR. LYDON: This is -- objection. Argumentative.

BY MR. AINSWORTH:

Q. So let me strike that and ask it this way, sir.

A. Sure.

Q. As you were talking to Ed Morfin in -- strike that. In September 1996, you didn't know one way or another whether Nick Liberto and Nick Morfin were

Page 209

supposed to be getaway drivers, right? You were just listening to the evidence?

MR. LYDON: Objection as to form.

A. As I evaluated the witnesses, I believe they were supposed to be the -- Nick Liberto was supposed to be the -- the getaway driver. Yes, I believe he did -- I believe he was.

BY MR. AINSWORTH:

Q. And so knowing that you --

A. And that's upon my -- what I knew about the case coming into it, upon proffers of both Bigeck and Morfin to evaluate their credibility, corroborating -- already corroborating many of the things they said. I in fact believed, yeah, Liberto was supposed to be the getaway driver. I mean, then you had the -- you had -- I think it's Peter Casanas -- mispronounced his name, Casanas -- who, you know, said, that's the car. That's the car that -- that drove by a few times. Puts them in the mix as well. You know, so there's a lot -- there's a lot of evidence there.

Q. According to Exhibit 91, page 2, continues to read, in the middle of the bottom paragraph on page 2, the right-hand side, says, "They ran down the railroad tracks and to Ed's cousin's house."

A. Can you just point -- let me see on your



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 210

sheet?

Q. Yeah.

A. I -- I'll -- thank you. Okay. I'm with you.

Q. "They all ran back through the park" -- oh, sorry.

A. "They ran down the railroad tracks"?

Q. Yeah. "They ran down the railroad tracks and to Ed's cousin's house." See that?

A. Yes, I do.

Q. All right. So there's no mention of running to Shawn's house, right?

A. That's not what it -- no. There's no mention there. It says, "They ran down the railroad tracks and to Ed's cousin's house."

Q. And there's no mention of a plan to go to Shawn's house and tell Shawn what happened, right?

A. Not in that paragraph, no.

Q. And you can -- and I'll represent to you, nothing here in this entire report marked as Exhibit 91 suggests that there's any attempt to go to Shawn.

A. I'll accept your representation and agree to that. It's not in the report then. And I'll look at it later on.

Q. Did you want to know why Ed and Eric didn't go to Shawn's house to report what was going on if that was

Page 211

the plan?

A. No. There -- there's -- there's always -- if I may, is why I didn't really care, if you want to hear it.

Q. Sure.

A. I mean, there's all -- when you -- you know, as you know, when you do trials, especially this, there's a lot of moving parts in here, different -- you know, it spans a whole spectrum of hours, really, this -- this case, so there's always going to be, like, little discrepancies that -- that are going to come up. And actually, when you have discrepancies, it goes really -- one person sees one thing, and they're not exactly on point with the other. It actually goes -- I find it to always go their credibility. They're not just -- they're just not parroting, you know, what the other person says or whatever. So I -- I -- I always somewhat welcomed the little discrepancies in the trials I did, and what you just pointed out was one of those. It really wasn't important to the whole -- and actually, I mean -- and -- and that's what you had trial for, for the defense attorneys to -- if they did find -- put weight in -- in them, they will point those out to the witness. And that's what happened in this case, and -- and obviously it wasn't -- didn't carry much

Page 212

weight. These cases, I should say.

Q. So you think that --

MR. AINSWORTH: Well, let me mark this as Exhibit 92.

THE REPORTER: 93.

MR. AINSWORTH: 93.

THE REPORTER: That's what I got.

MR. AINSWORTH: This is 91, so --

THE REPORTER: Yes.

MR. AINSWORTH: -- I think that's it.

(EXHIBIT 92 MARKED FOR IDENTIFICATION)

BY MR. AINSWORTH:

Q. Looking at Exhibit 92 -- for the record, this is Bates numbered Sopron 2162, and this is the proffer letter to Bryan O'Shea; is that correct?

A. It appears to be, yes.

Q. There's a reference to a -- an anticipated -- an interview with Bryan O'Shea in September 20, 1996. Do you see that?

A. Yes, I do.

Q. And it's signed by you, right?

A. Yes, it is.

Q. It's witnessed by Colleen Hyland?

A. Yes.

Q. Was there a -- did you have a conversation

Page 213

with Bryan O'Shea on September 20, 1996?

A. I remember I had a conversation with him, a proffer, just like this letter shows. Proffer took place, and I'm almost certain then it was on 9-20-96 --

Q. And why would --

A. -- based upon this proffer letter.

Q. Okay. And so then a report, would have been created based on what happened during that interview with Bryan O'Shea, right, on September 20, 1996?

A. No, not necessarily.

Q. Why not?

A. Because he -- we decided to reconvene for a -- a second interview and put in a -- do a handwritten statement.

Q. Why did you do a handwritten statement with Bryan O'Shea, but not a handwritten statement with either Billy Bigeck or Ed Morfin?

A. I -- you know, you can go with the -- you can -- there's no set formula for it. Probably, thinking back -- I'm only speculating now as to why we did what we did, you know. Well, why, you know, decisions were made. They both had a pretty long -- much longer narrative as far as their involvement is in the case. That is Bigeck and -- and Morfin. So a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 214

handwritten statement would have been very lengthy.  I don't know if it would have been all, you know, for us, inclusive even.  It could be one of the reasons why -- just, once again, speculating.  Other than that, I can't say why we chose to do what we did.

Q.   So you're speculating that maybe the reason you didn't get handwritten statements from either Bigeck or Ed Morfin is because it would be too much work, because it would take too long?

MR. LYDON:  Objection, argumentative. Mischaracterizes the evidence -- his testimony.

A.   I mean, you might -- if you looked at their transcripts, if you compare the transcripts of their testimonies to the witness testimony, their transcripts are -- I don't know, a lot more ground to cover, things like that.  So that would be -- like I -- speculating. Like I said, speculating as to why we did one -- one way or the other.  And that's one of the reasons why.

BY MR. AINSWORTH:

Q.   Any other reason that comes to mind?

A.   Could be.

Q.   No.  Any other reason that comes to mind?

A.   I don't -- I don't -- I haven't thought about it.

Q.   Well, think about it now.

Page 215

A.   Could be timing.  I -- I really don't know why -- why we do -- why we did it this way as opposed to the -- either way is acceptable.

Q.   What do you mean, timing?

A.   How long it would have taken, perhaps. I'm not sure.

Q.   So you -- you're saying that one of the reasons why you --

A.   I'm just speculating.

Q.   Right.

A.   Totally speculation.

Q.   One of --

A.   I -- as I sit here today, I don't know why we did it this way as -- as opposed to another one.

Q.   I'm just trying to find out if at trial, you're going to give an explanation for why you didn't get handwritten statements from --

A.   You're speculating that I might have --

Q.   I'm not.  I am trying to find out that -- if you're going to give a reason at trial for why you didn't get handwritten statements from either Bigeck or Ed Morfin, I would like to know now what that reason is. So if you have a reason, --

A.   And I haven't --

Q.   -- tell me.

Page 216

A.   Sure.  Sure.  Well, I haven't thought about it 27 years.  Thinking back to 27 years ago, and it's hard to do at this point.  So I really can't say why, but I'll give it more thought.

Q.   Well, I'm asking now.

A.   I understand that you're asking me, and I -- I can't think of another reason why.

Q.   So you can't think of any reason for why, right?

A.   No, either one is acceptable, so I -- I can't think of a reason why.

Q.   Let's mark this as Exhibit 93.

(EXHIBIT 93 MARKED FOR IDENTIFICATION)

A.   Thank you.

BY MR. AINSWORTH:

Q.   All right.  Showing you what we've marked as Exhibit 93.  This is Bates number Sopron 2177 through 2182, and this is the statement of Bryan O'Shea, the handwritten.  Do you see that, sir?

A.   Yes, I do.

Q.   It's taken on September 26, 1996, at 7:00 p.m. Do you see that?

A.   That's what it says.

Q.   Do you have any idea how long Bryan O'Shea was at the Cook County State's Attorney's Office on

Page 217

September 26, 1996?

A.   No.  I may have at the time or -- but 27 years later, I do not know how long Bryan O'Shea was at the Cook County State's Attorney's Office on September 26, 1996.

Q.   Where was he interviewed on September 26, 1996?

A.   That I do not know.  I don't -- I don't even know if I was present for this interview.

Q.   You would have gotten a copy of this handwritten statement, right?

A.   Certainly.

Q.   And you would have been interested to know what Bryan O'Shea had to say about the events that transpired on December 14, 1995, right?

A.   Well, I -- I believe I already had a pretty good idea from talking to him the first time.

Q.   Did Bryan O'Shea's handwritten statement say anything inconsistent with what he had said to you previously on September 20, 1996?

A.   Nothing was pointed out to me that was inconsistent.

Q.   And nothing that you observed, right?

A.   Pardon me?

Q.   And you didn't observe anything inconsistent,

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 218

right, whether it was pointed out to you or not?

A.   Right.  I don't believe so.  I imagine I read -- read over the statement, because I do -- I asked my practice to read it over, and if I remember something different, I will ask the -- the assistant state's attorney to incorporate it into the statement.

Q.   Or create a memo of your own to say, you know --

A.   Yeah, or --

Q.   -- this is what happened?

A.   Yeah.

Q.   All right.  Taking a look at page 3 of Exhibit 93, the first full paragraph there.  So page 3 is the handwritten.

A.   I got it.

Q.   Sorry.

A.   Yes.

Q.   All right.  First full paragraph says, "Bryan states that after approximately 15 minutes, four other members of the Popes came into Nick Morfin's home -- house."

A.   I'm sorry.  I got to -- I -- can you read that -- start again?

Q.   Sure.  "Brian states that after approximately 15 minutes, four other members of the Popes came into

Page 219

Nick Morfin's house."  Do you see that?

A.   Yes.

Q.   All right.  So he says -- and then it continues, "Bryan states that these Popes were Matthew Sopron, who he also knows to be called Misfit, Sopron was the leader.  John Gizowski, whose nickname is Climber, John's brother, Gene Gizowski, whose nickname is Huge, and Don Barnowski, whose nickname was Dudbud."  You see that?

A.   Yes.  That's with a D-U-D?

Q.   Yeah.  See that?

A.   Yes.  I see that.  You accurately read it.

Q.   Okay.

A.   You read it correctly.

Q.   So according to Bryan O'Shea, it was three people who came -- sorry, four people who came into the house, including Matt Sopron, right?

A.   That's correct.

Q.   Remember Billy Bigeck said it was three people, right?

A.   I believe Billy Bigeck said three people came in -- three -- three people came into the house.

Q.   And at the bottom of the page, the same page -- it's page 3 of Exhibit 93, on the last line, it says -- or the bottom two lines say, "Had a

Page 220

discussion about buying the guns for $300, but didn't have that much money on them."  Do you see that?

A.   Yes, I do.

Q.   So according to Sean [sic] O'Brien, there's a specific amount of money discussed, but Billy Bigeck doesn't reference any amount of money, right?

MR. LYDON:  Bryan O'Shea.

MR. AINSWORTH:  Oh, Bryan O'Shea.  Sorry.

MR. LYDON:  I think you said Sean O'Brien.

MR. AINSWORTH:  I'm sure I did.  I've done that before.

BY MR. AINSWORTH:

Q.   Bryan O'Shea --

MR. LYDON:  I will catch you.

MR. AINSWORTH:  Yeah.

BY MR. AINSWORTH:

Q.   Bryan O'Shea referenced there being a specific amount of money discussed to buy the guns, right?

A.   Right.  Here it is.  Yes, he is.

Q.   And Billy Bigeck didn't mention there being a specific amount of money discussed to buy the guns, right?

A.   If -- I'll take your representation that's what the records show, but I -- I really can't recall as I sit here today what Billy Bigeck said about that.

Page 221

Q.   All right.  Looking at page 4 of Exhibit 93, the third paragraph on that page, the bottom paragraph --

A.   Right.

Q.   -- states, "Bryan states that during this conversation, Matt Sopron told Eric Anderson, Billy Bigeck, and Nick Morfin that they had to take care of the Ridgeway Lords."  Do you see that?

A.   Yes, I do.

Q.   All right.  So according to Bryan O'Shea, this was part of the group conversation where Matt Sopron is telling these three people in specific to take care of the Ridgeway Lords, as opposed to having a private conversation with Nick Morfin about what to do, right?

MR. LYDON:  Form.

A.   That's what it says.

BY MR. AINSWORTH:

Q.   And of course, Billy Bigeck said that there's a separate conversation that he wasn't privy to between Matt Sopron and Nick Morfin where --

A.   I believe --

Q.   -- details were discussed, right?

A.   I -- I mean, I -- I -- like I said, it's 27 years.  I'm not familiar with that -- familiar with -- I -- I -- I'll agree to your representation



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 222

that's what Billy Bigeck said.

Q. Okay. See, at the last -- the very last sentence on the -- last line on the page says that, "Bryan states that Sopron also told Nick Morfin to get Nick Liberto to drive his car to the shooting."

A. Where -- I'm sorry, sir. Where -- where --

Q. It's the very last line on page 4.

A. Okay. On page --

Q. "Bryan states that Sopron also told Nick Morfin to get Nick Liberto to drive his car to the shooting. Bryan states" --

A. I -- I -- I can't -- I -- I'm sorry.

Q. Yeah. On page 4. So starting in --

A. Oh, okay. Thanks.

Q. "Bryan states that Sopron also told Nick Morfin to get Nick Liberto to drive his car to the shooting. Bryan states that Sopron told Nick Morfin that Nick Morfin and Nick Liberto should drive the other guys to do the shooting." Do you see that?

A. Yes.

Q. "Bryan states that Sopron instructed them to wipe off their fingerprints from the gun and to file down the serial numbers. Bryan states that they all went into Nick Morfin's basement and worked on the guns." Do you see that?

Page 223

A. Yes, I do.

Q. All right. So according to Bryan O'Shea, they're all going into the basement together to work on the guns, right?

A. It speaks for itself. I -- I -- I agree what you -- what you read was accurate.

Q. If you go down to the bottom of page 5, the last sentence in that page reads, "Brian states that during this conversation, Wayne Antusas told Brian that just prior to the murders, Anthony Coppollilio and Nick DeCrezenzo spotted the van -- the Lords' van over by the Hale school." Do you see that?

A. Yes.

Q. "Wayne told Brian that Anthony Coppollilio and Nick DeCrezenzo then came up to the Dore school, where they told Wayne about the van. Wayne told Brian that Wayne passed the information of the Lords' van onto Nick Liberto, Nick Morfin, Eric Anderson, Billy Bigeck, and Eddie Morfin." Do you see that?

A. Exactly what -- you stated exactly what was written.

Q. All right. So according to Bryan O'Shea, Wayne Anderson -- Wayne Antusas told --

A. He's the judge, I think.

Q. Yes. Wayne Antusas told the group, including

Page 224

Eddie Morfin, where the van was, right?

A. It appears that, based upon what you read.

Q. But according to Eddie Morfin, it was the other way around. Billy told Wayne that the van was back in the area.

A. If that's what you read earlier, and I'll -- I'll agree to that.

Q. And the next paragraph on page 6 of Exhibit 93 reads, "Bryan states that, since the murders, he has visited the jail on numerous occasions, along with Matt Sopron and Wayne Antusas. Bryan states that during these visits, they discuss the importance of all the Popes keeping their mouths shut. Bryan states that they also planned certain defenses for the Popes that were charged." Do you see that?

A. Yes, I do.

Q. What were the defenses that were planned for the Popes that were charged?

A. What were the defenses for the -- the Popes that were charged?

Q. Yes.

A. As I sit here today, I can't -- I don't know what they were, I don't think.

Q. If -- you know, if folks were planning a defense for the murder charges, you would want to know

Page 225

what that defense was, right?

A. The only --

MR. LYDON: Object to the form.

A. Regard to defenses, the -- the only information I think we received was from a letter -- in regard to the defense is what you're asking me -- was a letter recovered from the -- when they -- the home of Wayne Antusas, or the garbage can of Wayne Antusas, wherein Nick Morfin wrote to Wayne Antusas, and among other things, he said that his lawyer wants O-Dog (phonetic), I believe, Bryan O'Shea, to be the runner for the gang -- for the witnesses at the gang. And then he said -- in the letter, Nick Morfin said to go talk to his lawyer, that his lawyer will tell him what to say. So based upon that, it seemed like his lawyer met -- his lawyer, Jim Colgate, was the one who was planning out the defenses. I think that's the only information I had in regard to any -- well, he also told Antusas, if you're in the clear, you can -- you know, it's okay to talk to him about it. So he was qualifying it. He wanted to make sure that Wayne felt comfortable. They didn't feel like he was -- he was chargeable in the case. So that's the only information I believe we had about the defenses in this case.

BY MR. AINSWORTH:



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 226

Q.   Okay.

A.   If you know something else, I'll be glad to talk about it.

Q.   So when you had Bryan O'Shea in your office --

A.   Sure.

Q.   -- available to talk with you, he's saying that they're planning certain defenses for the Popes that were charged.

A.   Sure.

Q.   You would want to know from Bryan O'Shea what those defenses are, right?

A.   No, not necessarily.  The main focus for me was, you know, putting our case on -- you know, so we're going to evaluate -- what we're doing here is evaluating the witnesses as they tell us why -- see if they'd be credible witnesses, checking out what they say, and then verifying, if we can, for the purpose of going to trial with, you know -- first, with Eric Anderson, most importantly, and then the others.  So I think the prosecutor should be more -- more intent, because we have the burden of proof while presenting your case, as opposed to worrying about what defenses are going to be.

Q.   If Bryan O'Shea told you that they had a foolproof plan to get out of the charges, would you want

Page 227

to know what it was, or is that not necessarily --

A.   Once again, you're -- you're speculating because he didn't --

MR. LYDON:  Can I just interject?  Asked and answer.  Form.  Go ahead.

A.   Once again, you're speculating as to what he may have said, so I -- it's hard to answer that, you know.  At that time, though, my only state of mind was preparing for trial, seeing what the state's case was going to be, and focusing on that.  Perhaps -- perhaps after that's accomplished, perhaps we'd revisit with the -- what their defenses would -- but I don't -- I really don't see -- I -- I'm really not too concerned what the defense is going to be, as long as you -- you know, you should just be concerned what -- what your case is going to be, because their -- their defenses, in my opinion, they'll change, because if my -- if my theory is right, they're -- they're starting to be fluid with theirs.  For instance, Matt Sopron's attorney, you know, he -- you know, three days before trial, he -- he tendered the names of two witnesses, you know?  So you might know what they're going to be doing, like, in September of 1996, but come trial, like, two years later, they changed defenses, you know?  So it's -- it's sort of like a -- a rabbit hole or a -- a red herring

Page 228

sort of as you start chasing that stuff.

BY MR. AINSWORTH:

Q.   All right.  Let's mark this as Exhibit 94, please.  All right.  Showing you what has been marked as Exhibit 94.  This is the statement of John Gizowski, and you see it was taken on September 26, 1996 at 9:00 p.m.?

(EXHIBIT 94 MARKED FOR IDENTIFICATION)

A.   That's what it says.

BY MR. AINSWORTH:

Q.   Do you know where this statement was taken?

A.   I believe at 26th and California.

Q.   Why do you believe it was taken at 26th and California?

A.   Well, I believe it's the same time period that I spoke to -- to John Gizowski.  I think it was after that, and sometime after that they -- that this handwritten statement was taken, if my memory serves me correctly.

Q.   So you interviewed John Gizowski; is that right?

A.   With his father and -- and Lenny Bajenski.

Q.   Right.  Let's go to the second page of Exhibit 94.  Third page by log.  All right.  On page 3 of Exhibit 94, the first full paragraph, there's -- reads, "John states that after he talked to Matt Sopron, John

Page 229

called Nick Morfin's house, and Nick told John to come over to Nick's house because the people were still there.  John states he got his brother Gene, who is known as Huge in the gang, to drive him over to Nick Morfin's house."  Do you see that?

A.   Yes, I do.

Q.   So John Gizowski is saying that he went over to Nick Morfin's house by himself with -- oh, it's not by himself, but with Gene, his brother, right?

A.   That's what it says here.

Q.   He doesn't say he went over with Matt Sopron, right?

A.   I don't know when it -- yes.  I understand what you're saying.  Yes.  That -- that's -- that's correct.  I don't know if they arrived at the same time or not.  I think -- I think they walked in together.  What -- if that -- if that's what Bigeck said, they walked in together?

Q.   Well, let's keep reading.

A.   Okay.

Q.   It says, "John states that after he went inside Nick Morfin's house, they showed him two guns.  One gun was a 357, and the other gun was a 44.  John states that he told them that he wanted to buy the 44, and Billy Bigeck told him that the price was $300.  John

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 230

states that Billy is also a member of the 62nd and Normandy Popes. John states that he only had $160 -- 70 on him. So he told them that he still wanted to buy the gun and would get the rest of the money, and come back and get it."

A. That's what it states. Yes. I agree with -- that's what it states in that statement.

Q. If you go on to page 5 of Exhibit 94, it says, the first full paragraph there, "John states that during this conversation, Matt Sopron said that it was time that they should take care of their neighborhood. John states that Sopron told them to light up the van. John know -- knew this to mean to do a shooting." Do you see that, sir?

A. Yes, I do. You accurately read what was recorded in the statement.

Q. All right. So John Gizowski doesn't say anything about Eric being the one who was volunteering to do the shooting, right?

A. It doesn't appear to be in this statement.

Q. You would want to know if Eric Anderson was asking to be the shooter, right?

MR. LYDON: Form. Objection to form.

A. I mean, what do you mean by you want to know? I don't get it.

Page 231

BY MR. AINSWORTH:

Q. You as a prosecutor wants to know if Eric Anderson is volunteering to be the shooter in a murder.

A. So I want to know what they -- what they know, first of all, just begin with that. I want to know what they -- what they know and what they recall. And they're watching their manners and they're telling me this, okay? Now, I think you're -- you're asking a question. Is that someone else or probably during the same conversation said that Eric Anderson volunteered the -- you know, Eric Anderson volunteered to be the shooter. Why didn't this witness John Gizowksi say that? Is that what your question is?

Q. No, sir.

A. I'm sorry.

Q. My question is you wanted to know whether Eric Anderson was volunteering to be the shooter, right?

MR. LYDON: Objection. Form.

A. No.

MR. LYDON: Wait.

THE WITNESS: I apologize.

MR. LYDON: Form, foundation. Go ahead.

A. I want to know what they know. That's -- that's my primary focus. What -- what they know.

BY MR. AINSWORTH:

Page 232

Q. You told us earlier that you were really trying to gather evidence about Eric Anderson, right? Do you remember that?

MR. LYDON: Objection. Objection, mischaracterizes his testimony. Go ahead.

A. No. The purpose was to see what they knew, to evaluate what they know, and see if they could help in the prosecution, name, first of all, Eric Anderson.

BY MR. AINSWORTH:

Q. So tell me, yes or no --

A. Sure.

Q. -- did you want to know if Eric Anderson was volunteering to be the shooter in this case?

A. I already -- well, I already knew that he -- I mean, you say, do I -- do I want to know from this witness, I mean? Is that what you're asking me?

Q. Yeah.

A. Well, I mean, you say do I want to know? I didn't know when you're talking about. Okay. So from this witness, that's what I was trying to ask you. If I want to know -- if he didn't hear it, he didn't say it. If he heard it, he would've said it. So I would've asked him, perhaps asked him, did Eric Anderson volunteer to be the shooter? Perhaps that question would've came up. That -- if that's what you're asking

Page 233

me.

Q. Did you want to know or did you not want to know?

MR. LYDON: Objection. Asked and answered a number of times.

A. All I want to know is what he knew. That's what I wanted to know.

BY MR. AINSWORTH:

Q. Did you want to know what he knew about Eric Anderson volunteering to be the shooter?

MR. LYDON: Asked and answered.

A. I want to know everything he knew that took place.

BY MR. AINSWORTH:

Q. Including whether Eric Anderson volunteered to be the shooter?

A. If he knew it. Yeah. I'd want to know it.

Q. Okay. There's nothing about Nick telling the group the plan in John Gizowski's statement, right?

A. Without reading it over, I'll accept your representation if that's what it said.

Q. And there's nothing about Matt Sopron knowing what the plan was.

A. Well, just for purpose of saving time, I'll accept your representation if it's not in this

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 234

statement.

Q.   Apart from Matt Sopron telling them to lie about the thing.

A.   Okay.

Q.   Did you want to know why John Gizowski did not report that there was a discussion of how the plan was going to go down at Nick Morfin's house, either from Matt Sopron or Nick Morfin?

A.   Not necessarily.

MR. LYDON:  Form.

BY MR. AINSWORTH:

Q.   Why not necessarily?

A.   Because I think I -- I mentioned it one time before.  I'll try to be more clear.  You're -- all you -- when your prosecutor arrives and you're presenting witnesses, you just want to know what they heard, do, and say.  You don't want stories to -- it sounds like you want me to say the story to match up with it.  And that's not what you're looking for. You're just looking for what they know because the fact finder, in my experiences, accept the fact that everything's not going to match up.  The credible witness -- one person's going to hear one thing. Another person's going to hear another thing.  So I'm not concerned about these little -- the differences that

Page 235

you are. When you say once for, you know, one heard thing -- one thing, another heard another. It's just -- it's just part of life.  And a fact finder, I think, sees it the same way.  So you get -- you get -- you -- you sort of get in trouble if you do it the way you're suggesting, like, sounds like you -- I should push him to hear that statement.  And that didn't take place.

Q.   Let's mark this as Exhibit 95, please. Showing you what's been marked as Exhibit 95.  This is a one-page document Bates numbered Sopron 5856.  And it's an investigative report regarding Eugene Gizowski.

(EXHIBIT 95 MARKED FOR IDENTIFICATION)

A.   Appears to be that, right.

BY MR. AINSWORTH:

Q.   See in the first paragraph of Exhibit 95, states that he related in substance, but not verbatim, that "on December 14, 1995, at approximately 2:30 p.m., his brother received a phone call from Matt Sopron. His brother, John Gizowski, then asked if Eugene, aka Huge, would drive him to Nick's house.  He told Huge that Nick, his brother, that Nick had some guns in his house, and John wanted to look at them.  Huge drove his brother to Nick's house, but never entered the house himself. He stated that he had never been inside Nick Morfin's

Page 236

house.  After waiting about ten minutes, he knocked on the door and Nick Morfin answered.  He stood in the hallway by the door and asked Nick to tell his brother John that he was ready to leave.  He didn't see anyone else in the house, and his brother exited the house a short time later.  And he drove him back home. He said that the only conversation that he had with Nick was, 'Get John.'"  Do you see that, sir?

A.   Yes, I do.

Q.   All right.  So Eugene Gizowski agrees to speak to your -- the investigators, right?

A.   Appears that way.

Q.   And he says, I was not with Matt Sopron at Nick Morfin house, right?

A.   That -- it appears that way.  Yes.

Q.   I did not enter the house with my brother, John, right?

A.   Appears that way.

Q.   So Gene Gizowski doesn't corroborate what -- the statements made by Ed Morfin and Bryan O'Shea, right?

A.   No.  I believe he testified to that, didn't he?  The trial?  Eugene.

Q.   And then showing you what's been marked as -- or what we'll mark as Exhibit 96.  The document

Page 237

Bates numbered Sopron 6143 through 6146.  This is an investigative report regarding an interview with William Bigeck on September 27, 1996.  Do you see that?

(EXHIBIT 96 MARKED FOR IDENTIFICATION)

A.   Yes, I do.

BY MR. AINSWORTH:

Q.   Why did you want to interview Billy Bigeck on September 27, 1996?

A.   To find out if the person he couldn't remember the name of was, in fact, John Gizowski, aka Climber.

Q.   Right.

A.   But I -- I don't recall if he called that stuff, because in his testimony I read it -- it over. He said in his testimony, Billy Bigeck said, do you remember the name -- while he was -- he was in jail, of Climber.  So I don't know if he precipitated us to -- to -- to talk to him or we went down on their -- on our own.  I couldn't recall.

Q.   Right.  So at 9:00 p.m. on the 26th, the day before the 27th, you talked to --

A.   Right.

Q.   -- John Gizowski?

A.   Right.

Q.   And then the very next day, you go to see Billy Bigeck.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 238

A. Right.

Q. And then Billy Gigeck -- Bigeck then remembers that the person was Climber; is that right?

A. It -- it -- it appears that way. Yeah. Like I said, he testified that while locked up, he remembered the name. So but it could've been us -- maybe it was us asking him, was it -- name Climber? I'm not sure.

Q. You had a chance to talk to Chris Nemchausky, right?

A. I believe so.

Q. And Chris Nemchausky was the guy who Billy Bigeck first encountered after he ran from the scene of the shooting, right?

A. Yes.

Q. And so Chris Nemchausky would know what Billy Bigeck was saying right after the shooting, right?

MR. LYDON: Object to the form, foundation.

A. I -- I think he was the first person that he encountered after the shooting.

BY MR. AINSWORTH:

Q. So if Billy Bigeck was saying, that jerk Nick Liberto was supposed to give me a ride, but he never showed up, that was something that Chris Nemchausky wanted to know, right?

MR. LYDON: Objection to the form. Go ahead.

Page 239

A. Well, assuming that that's what Billy Bigeck said, assuming that the guy was listening and heard it, that's something he should know.

BY MR. AINSWORTH:

Q. Did you ask Billy Bigeck why he didn't mention the fact that he was getting picked up by Nick Liberto after the murder when he was first interviewed in summer of '95?

A. As I sit here today, 27 years later, I can't recall asking that question.

Q. Would you want to know why Billy Bigeck didn't mention anything about a getaway driver when he was first questioned and gave a, you know, lengthy court reported statement in December of 1995?

MR. LYDON: Objection to the form, foundation. Go ahead.

A. So are you saying that in his court reported statement in 1995, he didn't talk about a getaway driver?

BY MR. AINSWORTH:

Q. Right.

A. Okay. I -- I'll accept your representation for that.

Q. But he talks about Nick Liberto and Nick Morfin being in a car and pointing out the van to him.

Page 240

A. Yeah.

Q. So --

A. So your question is, why -- do I wonder why he didn't say that?

Q. Yeah. Why didn't he talk about there being a getaway driver, the same people, Nick Morfin and Nick Liberto, being the getaway driver when he was willing to implicate them as the people who told them where the van was?

MR. LYDON: Form of the question. Foundation. Go ahead.

A. I really -- so I don't know why. He -- he must have his own reasons why not. Could have been that he didn't want to further implicate him, be the getaway driver. Could be that he forgot about. It could be a whole host of reasons as to why he -- he didn't say it.

BY MR. AINSWORTH:

Q. You think Billy Bigeck forgot that there was a getaway driver when he was questioned --

A. No.

Q. -- after the murder?

MR. LYDON: Wait. Objection. Calls for speculation. Relevance. Go ahead.

A. That's what I'm saying. I -- you ought to ask Bigeck. I don't know why he --

Page 241

BY MR. AINSWORTH:

Q. So if you had the opportunity to have a conversation with Billy Bigeck, one of the things you'd want to ask him is, "Billy, why didn't you mention in December 1995 the fact that there was a getaway driver, Nick Liberto, who was supposed to be there and give you a ride to get away?"

MR. LYDON: Hold on. Objection. Asked and answered. Form, foundation.

A. There -- from my perspective, I -- once again, I just want to hear what he -- if he's telling the truth, which I implored him to do, his lawyer implored him to do, just tell the truth, what happened. It's up to us then to deal with why he didn't say -- because he didn't say a lot of things. Not only that, but there's a lot of things that he didn't say originally. He downplayed a lot of people's involvement, different roles. I think it was probably to protect those people from -- from perhaps criminal liability. I know he is -- you say he is implicating the guy already in -- in one aspect of it. And maybe he felt that aspect of it was too much. Or maybe he just forgot. I really can't speculate other -- further -- other than what I just did because I'm really speculating as to -- as to that.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 242

BY MR. AINSWORTH:

Q. And so who's the only person who would know why Billy Bigeck didn't tell back in December of 1995?

A. The only person who did --

MR. LYDON: Foundation. Go ahead.

A. Didn't tell what? Didn't tell that. Didn't tell what? The police in the statement that Liberto was supposed to be the driver?

BY MR. AINSWORTH:

Q. Yeah.

A. Probably Bigeck.

Q. So as an experienced prosecutor --

A. Sure.

Q. -- it would be a good idea to ask Billy Bigeck why he didn't say that?

MR. LYDON: Objection. Form, foundation. Asked and answered.

A. No, I -- he -- he didn't say a lot of things that -- all I want to know is what the truth was. Perhaps there were a couple things that he -- he was -- he said he was afraid of these. Sopron, Antusas explain away why he didn't mention them.

BY MR. AINSWORTH:

Q. So you -- but it's fair to say you didn't want to know why Billy Bigeck didn't mention there being a

Page 243

getaway driver when he was first questioned, et cetera?

MR. LYDON: Objection, mischaracterizes his testimony. Form, foundation, argumentative. Asked and answered. Go ahead.

A. I may have asked him the question. I can't speculate as to what I asked him about 27 years ago. All I know is my main focus is, what the truth is when he sat down with us. What took place? A lot of what he told us when he sat down with us, if you can compare it to what he was telling, different phases here, when he was running around the neighborhood, lying to the police about where he was and changing jackets and all that. I mean, there's a lot of things you could -- I could have asked him about and concentrated on, but it's really wasn't -- it's my -- my -- my important is, evaluate him as a witness and corroborating what he's saying now was the last chance of what he's telling the truth. So that -- that -- that was my -- that was my - - my primary purpose. Everything else is sort of speculation. I'm really not -- wasn't too concerned with that.

BY MR. AINSWORTH:

Q. You didn't have to ask him about why he changed jackets. He told you he changed jackets because he was trying to get away and not be caught, right?

MR. LYDON: Objection, argumentative.

Page 244

A. I just used that as an example. I -- and I couldn't recall. So I -- I just used that as a small example. There were a lot of things he said that weren't -- either they weren't true or incomplete, that I could have dwelled on with him to no end.

BY MR. AINSWORTH:

Q. What other things did Billy Bigeck tell you that weren't true or were incomplete?

A. He didn't tell me as far -- from my perspective, when we interviewed him, he was being truthful. So I don't -- I don't remember anything he said to us that was not truthful.

Q. Was he cooperative?

A. He was trying -- attempting to be very truthful.

Q. Was he cooperative?

A. It depends how you define cooperative.

Q. Was he answering your questions?

A. Yes, he was.

Q. Was there any -- did he have any difficulty asking, you know, getting answers to your questions from Billy Bigeck?

A. No. Like I said, he thought about them because he was -- he really wanted to tell the truth. He didn't want to -- he wanted to say it correctly. So he

Page 245

thought about it and considered the answer. I found his demeanor to be someone telling the truth.

Q. You agree that you don't know who's telling the truth or not, right?

A. Oh, I -- I -- I disagree.

MR. LYDON: Object to form.

A. I mean, as I see, like -- say the -- as I evaluate the case and I presented the case, I believe the witnesses were telling the truth.

BY MR. AINSWORTH:

Q. But you don't know who's telling the truth, right?

MR. LYDON: Objection to the form, foundation, argumentative.

A. I believe they're telling the truth.

BY MR. AINSWORTH:

Q. Okay. I didn't ask you --

MR. LYDON: You're asking him if he knows they're telling the truth?

MR. AINSWORTH: Yes, I -- I've said it twice.

MR. LYDON: I mean, the best he can do is believe. You know that, Russell.

BY MR. AINSWORTH:

Q. I'm just getting -- asking --

A. Sure. Well, the prosecutor, all we --



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

Page 246

we -- we -- we judge it based upon the evidence, okay? We're not going to put a witness on who we believe is not telling the truth.

Q. Can you please answer my question?

A. Sure.

MR. LYDON: Does he know it's the truth? Is that the question?

A. I believe it's the truth.

BY MR. AINSWORTH:

Q. I'm not asking you what you believe. Do you understand that?

A. Well, I mean, I don't have firsthand knowledge.

Q. Yeah. That's all I'm --

A. Then ask the question. I'm sorry.

Q. Yeah.

A. I don't have firsthand knowledge if I wasn't -- I wasn't there.

Q. You don't know what is, right?

MR. LYDON: Objection to the form, foundation. Asked and answered. Argumentative.

A. I'll just say this. I -- well --

MR. LYDON: It's okay. Go ahead and say it.

A. No, I'm just saying you -- you -- and I think, you know, 12 people, two different times, a judge,

Page 247

I -- I think they -- they were best position to decide what --

BY MR. AINSWORTH:

Q. I'm not asking you how I can find out the truth. Do you understand?

A. Well, if you want to judge what -- what the truth is.

Q. We're -- I will --

MR. LYDON: Don't argue.

BY MR. AINSWORTH:

Q. No, no, no, no.

MR. LYDON: We're not going to -- about who knows the truth. Is that what we're going to get all upset about? About who knows the truth? I mean, seriously, let's take a step back here.

BY MR. AINSWORTH:

Q. If you're going to not answer the questions, I will seek more time for your deposition. Do you understand that?

A. Yes. I understand that.

Q. Okay.

MR. LYDON: You can try.

MR. AINSWORTH: And I will get a --

MR. LYDON: About -- you're -- oh, you are, about asking about --

Page 248

MR. AINSWORTH: Yes.

MR. LYDON: -- does he know the truth? You think you're going to get another --

MR. AINSWORTH: I will present in this transcript.

MR. LYDON: Okay.

MR. AINSWORTH: Throughout this deposition, this witness has refused to answer questions, proclaimed, you know, ignorance. And I will show the -- all the examples to the Court. Let's mark this as Exhibit --

MR. LYDON: Fine. Go ahead.

MR. AINSWORTH: -- 97.

(EXHIBIT 97 MARKED FOR IDENTIFICATION)

BY MR. AINSWORTH:

Q. Exhibit 97 is Bates number Sopron 5880 through 5882. This refers -- this is a report regarding an interview with Chris Nemchausky.

A. That appears to be correct.

Q. All right. In talking with Chris Nemchausky, Nemchausky doesn't mention anything about there being a getaway driver; is that right?

A. If it doesn't -- should I read the report, answer your question or just accept your --

Q. Sure. You can just --

Page 249

A. -- accept your representation?

Q. You're welcome to read the first page of Exhibit --

A. Okay.

Q. -- 97.

A. All right. Right. You -- I read over the report. And the question is?

Q. He doesn't -- Chris Nemchausky doesn't mention anything about there being a getaway driver or a fair -- in the habit of getaway driver, right?

A. No, he does not.

Q. Let's mark this as exhibits -- it is 98. And it is showing you what we've marked as Exhibit number 98, Bates number Sopron 000001. This is a report regarding an interview with Don Barnoski. Do you see that?

(EXHIBIT 98 MARKED FOR IDENTIFICATION)

A. Yes, I do. That's accurate.

BY MR. AINSWORTH:

Q. Barnoski presented worksheets and pay stubs to show that he was at work at the time when he was supposedly at Nick Morfin's house on December 14, 1995, right?

A. Yes, that's correct.

Q. And so --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 250

A. He presented pay stubs. I -- I -- I don't think the conclusion is what I accepted, is that -- that's what he testified to. He said he presented pay stubs for the -- for the week.

Q. And worksheets, right?

A. Yes. I don't -- it doesn't say what it shows.

Q. Well, do you recall from this case that he had -- he had documentation to show that he was at work?

A. I accept your representation.

Q. Did you then go back to try and find out why Bryan O'Shea was saying that Don Barnoski was at Nick Morfin's house when Don Barnoski had work records showing he was --

A. No.

Q. -- at work at the time?

A. No.

Q. Did you go back to any of the witnesses to find out why -- well, why didn't you go back to Bryan O'Shea to find out why he was saying Don Barnoski was at Nick Morfin's house when Don Barnoski had work records to show the opposite?

A. Correct. I guess I -- speculating once again, I -- I just accepted as -- as him being mistaken without -- without concern about it. I mean,

Page 251

I -- you know, things happen. He can be mistaken about it.

Q. What evidence did you have supporting the decision to charge Matt Sopron and Wayne Antusas for the murder?

A. To arrest him? In the arrest?

Q. Yeah. To have them arrested.

A. It was large in part -- largely in part on the proffers of Bill Bigeck and -- and Eddie Morfin. But there was other corroboration on -- phone record corroboration, I believe, showing phone calls being made, which consistent with what Bigeck said, I believe. And I think we may have even had jail records showing visiting, which is -- it's significant. It's -- it's corroboration. And then also, the -- the gang investigators weighing in on the fact that this is how a typical gang hit would probably -- or shouldn't say it is -- what they said about Sopron giving the order and then listening to Antusas change it would be consistent with gang -- with what a gang would do. And the gun -- and the guns and all that. So it -- so that was, I think, large part, that was the probable cause for the arrest.

Q. Which gang investigators said it was typical for a --

Page 252

A. I -- honestly -- I don't want to say -- I'm -- I don't want to use the word typical, but --

Q. Let me get the question out.

A. I'm sorry.

Q. Which gang investigator said it was difficult for a person to give the order and then somebody else to change it?

A. I -- they -- I correct myself, I believe, on more typical. I don't know how they phrase it, but they found it very plausible, the explanations given by Bigeck and Eddie Morfin.

Q. Who said it was very plausible?

A. I don't know. Gang investigators. Yep.

Q. Were --

A. I don't recall.

Q. Were they gang investigators who were working on this case?

A. Well, Norfie Diciolla was a -- a gang investigator. I think Thomas Ptak was an -- a gang investigator.

Q. And Investigator Marley?

A. I don't know if Bajenski and Marley -- Bajenski may have been a gang investigator. I don't think Marley was a gang investigator.

Q. And so it would've been the gang investigators

Page 253

who were working on this case, whichever one of the investigators were gang investigators, right?

MR. OBERTS: Objection. Speculation.

A. I -- I really don't know who -- who posited that as -- as being, you know, that it's plug -- what they're saying makes sense. What the witness, what the two guys said made sense.

BY MR. AINSWORTH:

Q. It was the gang investigators, right?

A. Yeah.

Q. And do you have any reason to believe it would be anyone other than the gang investigators working this case?

MR. OBERTS: Objection, vague. Foundation. Speculation.

A. Do I have any reason to believe it'd be other -- other than gang investigators?

BY MR. AINSWORTH:

Q. Working this case?

A. Yes.

Q. What reason?

A. Yeah. I don't know. I can't say for sure who worked, what they were assigned to. So I -- I reasonably believe maybe some other gang investigators, but I do not know.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 254

Q.   You worked with the Chicago Police Department investigators in this case, right?

A.   No.

MR. AINSWORTH:  Well, let's mark this as Exhibit -- we're on 99?

(EXHIBIT 99 MARKED FOR IDENTIFICATION)

THE REPORTER:  99.  Yes.

BY MR. AINSWORTH:

Q.   Showing what's been marked as Exhibit 99. This is Bates number Joint City Defendant's 39 through 46.  It's the clear close supp report for --

A.   Right.  I've seen this.

Q.   -- 1996.

A.   I've seen this.  This was given to me to read.

Q.   Okay.  You turn to page 5 of Exhibit 99. You see where it states, under Investigation, "Reporting detectives were assigned by Sergeant Graffeo disciplinary to assist the Cook County State's Attorney's Office in the further investigation into the shooting deaths of Helena Martin and Carrie Hoval, which occurred on 14 December, 1995."  Skipping a bit. "Reporting detectives, along with Sergeant Graffeo met with members of the Cook County State's Attorney's Office at 26th and California at about 0600 hours on September 16, 1996.  At that time, a coordinated effort

Page 255

to locate various subjects was discussed and subsequently implemented.  This effort resulted in the location of several potential witnesses in the case. These subjects were then interviewed by assistant state attorneys and their investigators."

THE REPORTER:  Could you put there?  Sorry.

THE WITNESS:  Sorry about that.

THE REPORTER:  It's okay.

A.   I -- I read that.

BY MR. AINSWORTH:

Q.   Okay.

A.   I agree with that.

Q.   That did happen.  There was a --

A.   Yes.

Q.   -- a meeting at 6:00 a.m. at 20 --

A.   I -- I wasn't present for the meeting.

Q.   How do you know you weren't present for the meeting?

A.   I have no recollection of being in there, and I think I would remember that.

Q.   Why do you think you would remember that?

A.   Because you meet with -- 6:00 in the morning, and basically was the police function.

Q.   What do you mean, it's the police function?

A.   Well, I didn't work -- the -- the

Page 256

investigators work with the police, the Chicago Police Department.  I didn't work with them.  I -- I think I signed a search warrant for one of them.  I don't know if I -- I have no recollection of talking to the Chicago police about -- about this case at that time.

Q.   You're not saying it didn't happen, you just don't recall it happening?

MR. MASCIOPINTO:  Objection.  Misstates --

MR. LYDON:  Object, it mischaracterizes his testimony.

MR. MASCIOPINTO:  Go ahead.

MR. LYDON:  Go ahead, Tony.

MR. MASCIOPINTO:  I join.

A.   What I'm -- what I'm saying is, I have no recollection because I don't think I worked with the Chicago police other than perhaps signing a search warrant.  And I don't even know if that was actually given to me by one of the investigators to give to -- to the Chicago police or not.  So this -- this working together was between the investigator's office and the Chicago Police Department.

BY MR. AINSWORTH:

Q.   How do you know that?

A.   Well, it wasn't me.

Q.   Do you know how the -- what the

Page 257

investigators -- the Cook County State Attorney investigators' procedures are?

A.   No, I don't.  I mean, I -- I never read a manual on it.  I never -- I wasn't investigating.

Q.   Did the -- are you saying that the investigators and the Chicago Police detectives independently, without your knowledge, met the morning of September 16th and began this coordinated effort to get witnesses to bring them in to be interviewed by the Cook County state's attorneys?

A.   No, I didn't say that.

Q.   So what role did you have in setting up this meeting?

A.   I didn't have a role in setting up a meeting.

Q.   Did you talk to any investigators about how it would be a good idea to set up this interview?

A.   Well, as we evaluated the -- Bigeck, Morfin -- took down the names of the people we wished to be interviewed, to evaluate the credibility of both Bigeck and Morfin for the purposes of the trial that was pending, we had to interview the people that they state -- said were relevant.  So we talked to the investigators about it, told them who we wanted to talk to.  It was suggested, I believe, that in order to give a credible interview of the witnesses who might be

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 258

afraid of both Sopron and Antusas, if we had probable cause to arrest them, to make the interviews of the other witnesses more credible, so they wouldn't be afraid, we should arrest them. So that's what took place.

Q. Who suggested that?

A. I think it was a collective -- probably a collective between myself, Neil, and the investigators.

Q. How do you know you didn't plan the meeting or have a role in planning the meeting?

MR. LYDON: Objection. Mischaracterizes his testimony. Go ahead.

MR. MASCIOPINTO: Can we get the microphone a little closer to Russell, please?

MR. AINSWORTH: I'm sorry. I'll speak up.

MR. MASCIOPINTO: Thank you.

MR. LYDON: I guess it's foundation too as to which meeting it was.

MR. AINSWORTH: And I'm specifically referring to the September 16th, 6:00 a.m. meeting.

MR. LYDON: Okay

MR. AINSWORTH: 16.

A. Question for me is how I know -- how do I know that I wasn't there?

BY MR. AINSWORTH:

Page 259

Q. No. You testified that you -- or you stated that you were not involved in the planning, and I'm asking you, how do you know that you were not involved in the planning? Or are you simply saying you don't recall one way or the other?

MR. LYDON: I'm going to object. I believe it was asked and answered. Form. Go ahead.

MS. LOCKE: Join. It may have been.

A. Well, in my career with the state attorney's office, I never got involved in what is historically police work, that is, how to go about arresting people.

BY MR. AINSWORTH:

Q. Were you arresting people?

A. I think that's what the -- I think that's what took place on it.

Q. I thought it was -- according to the report, it says, "This effort results in the location of several potential witnesses in the case."

A. Or -- sure. Or -- or -- or -- or I'll add onto that. I'm not about to tell the police how to go -- you know, go about interviewing people or asking people to be interviewed.

Q. Sure. But you might give them, for example, the names of who you want talk to, right?

A. Well, the investigators had that.

Page 260

Q. And who would give the investigators that information?

A. Well, they were present for the interviews, and we had -- like I said, I -- I'm guessing, sort of speculative -- speculation based upon reasonable inferences, that Neil -- I -- Neil Linehan, myself, and some of the investigators would talk about who do we want to talk to.

Q. And some of those people were John Gizowski and Bryan O'Shea, right?

A. That's correct.

Q. Were John Gizowski and Bryan O'Shea brought into the State's attorney's office on September 16, 1996?

A. Is that the date the statements were -- that you showed me earlier?

Q. No.

A. They're -- they're brought up there sometime -- they -- they voluntarily came up there to be interviewed.

Q. When did you first talk to Eddie Morfin?

MR. LYDON: I'm going to object again. Asked and answered.

A. I think earlier you showed me a -- a proffer from September 5, 1995, where I got --

Page 261

BY MR. AINSWORTH:

Q. '96.

A. '96.

Q. Or '95.

A. '95, where the -- the date was wrong. And I think at that time -- we had a discussion a few hours ago about this, that I can't recall when the first date was that I spoke -- was right -- that I spoke to Eddie Morfin. But it was prior to the -- to any other witness interviews taking place.

Q. You mean interviews of other --

A. Yes.

Q. -- witnesses to the events on -- you know, other members of the Popes or --

A. That's correct.

Q. -- people around them? And you just don't know when that was, right?

A. When --

MR. LYDON: Objection to the form. Vague.

A. I do not know the date of the interview with Eddie Morfin, the first -- yes, I can't say it with specificity.

BY MR. AINSWORTH:

Q. And you don't know if it was before or after your September 18th interview that's documented



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 262

in -- that we looked at in Exhibit 91?

A.   It --

MR. LYDON:  Objection to the form.  What is "it"?

BY MR. AINSWORTH:

Q.   Sorry.  Let me clarify.  I'll withdraw the question.  You don't know if the first time you met with Eddie Morfin was on September 18th, which is the date that's -- of the documents of interview in Exhibit 91?

MR. LYDON:  Objection.  Asked and answered.  Mischaracterizes his testimony.

A.   No, I -- it was before that because, as I indicated earlier, the interviews of Billy Bigeck and Eddie Morfin preceded the interviews of the other Popes that you just mentioned earlier.

BY MR. AINSWORTH:

Q.   And, well, I'll tell you the first interview of another Pope -- we've got -- you know, we can just go through -- there's a reference to Bryan O'Shea having a proffer letter on September 20th, which we looked at as Exhibit 92, and then a number of interviews on September 26, 1996 and then one subsequent to that.  And so if there wasn't another interview until at least September 20th, you know when you would have talked to Ed Morfin?

Page 263

MR. LYDON:  Objection to the form.  Do you understand the question?

THE WITNESS:  No.

BY MR. AINSWORTH:

Q.   Well, let me -- let's mark this as Exhibit number 100.  I'm showing you what we've marked as Exhibit number 100.  Has a Bates number of Sopron 5818 through 5827.  And sir, I'm -- this is a statement from Sean O'Brien taken on September 17th at 3:30 p.m.  Do you see that?

(EXHIBIT 100 MARKED FOR IDENTIFICATION)

A.   Yes, I do.

BY MR. AINSWORTH:

Q.   Did you interact with Sean O'Brien?

A.   At the time of the statement?

Q.   Not at the time of the statement, sir, but he was -- I'll show you just for reference.  We'll mark as Exhibit 101.  I'm showing you what we marked as Exhibit 101.  This is a -- an investigative report documenting that investigators PTak and DeLacy went to an address and took Sean from -- well, went to St. Laurence High School, and then Sean O'Brien was taken from St. Laurence High School and transported to the state's attorney's office for interviews.

(EXHIBIT 101 MARKED FOR IDENTIFICATION)

Page 264

A.   Well, it reads -- I'll just read what it says, if it's okay with you.  Says, "The reporting investigators proceeded to 6138 South Rutherford in the a.m. hours of 16 September, 1996.  After having a conversation with Michael O'Brien, father of Sean, we then went to St. Laurence High School.  With the permission of Michael O'Brien, Sean was taken from the school and transported state attorney's office for interviews concerning the murders of Carrie Hovel and Helena Martin."  And the reason I read it, because it appeared that you just mistakenly left out the fact they were given permission by the father to be interviewed.  Just want to make sure that's part of the record.  That's -- that's what we're doing here. That's what it says.

BY MR. AINSWORTH:

Q.   Okay.  So Sean O'Brien was taken in the morning of September 16, 1996, right?  I get the date and the hours --

A.   A.M. hours?

Q.   Yeah.

MR. LYDON:  Objection to form.  Foundation.

A.   I don't --

BY MR. AINSWORTH:

Q.   So between he was picked up on the morning of

Page 265

September 16, 1996, and when he gave a statement the following day on September 17, 1996, did you have contact with Sean O'Brien?

A.   I don't ever recall talking to Sean O'Brien.

Q.   Did you have any issue with a 17-year-old child being held at the -- or staying at the Cook County state attorney's office overnight?

MR. LYDON:  Objection.  Foundation.

MR. O'CALLAGHAN:  Calls for speculation.

A.   Can't answer something I don't know about.

BY MR. AINSWORTH:

Q.   Well --

A.   I don't know that to be true.

Q.   Okay.

A.   I don't think it was true.

Q.   Why don't you think it's true?

A.   I don't recall it happening.  Did it happen?

Q.   Well, Sean O'Brien testified that it happened.

A.   I don't recall.  I don't remember reading that.  That he was held overnight at the state's attorney's office?

Q.   Yes.

A.   I don't recall seeing that.

Q.   Do you have any --

A.   In what trial was that?



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 266

Q. In his deposition in this case.

A. Oh, his deposition. I'm sorry. Yeah, I would strongly disagree with that.

Q. Why do you strongly disagree with that?

A. Because it didn't happen, as far as I know.

Q. How do you know it didn't happen to him?

A. That's something --

MR. LYDON: Objection. Foundation.

A. That's something so outrageous that it would -- would be well known.

BY MR. AINSWORTH:

Q. It would be outrageous to hold a 17-year-old there overnight at the Cook County state's attorney's office?

A. It certainly would.

MR. AINSWORTH: All right. Let's go off the record.

THE VIDEOGRAPHER: We are off the record at 4:09 p.m. Central Time.

(OFF THE RECORD)

THE VIDEOGRAPHER: We're back on the record for the deposition of Scott Cassidy being conducted by videoconference. My name is Kortney Chase. Today is July 21, 2023, and the time is 4:37 p.m. Central Time.

Page 267

BY MR. AINSWORTH:

Q. All right, sir. For Matt Sopron's sentencing, did you attempt to talk to additional witnesses who would testify in aggravation for -- in Matt Sopron's case?

A. I don't believe so.

Q. Why don't you believe so?

A. Well, my practice was -- I believe I followed through in this case -- was, when someone's facing an automatic natural life sentence, there was no need for aggravation.

Q. Did you talk to Mike Horan regarding Matt Sopron in the county -- Cook County Jail?

A. I have no recollection of talking to -- you say Matt Horan?

Q. Mike Horan.

A. Mike Horan? I might have.

Q. Let's marked this as Exhibit 102, please. Showing you what we've marked as Exhibit 102. This is Bates numbered Sopron 111 through 113. How tall are you?

(EXHIBIT 102 MARKED FOR IDENTIFICATION)

A. 6'.

BY MR. AINSWORTH:

Q. All right. So would you review this affidavit

Page 268

and tell us when you've been able to do so?

MS. CHASE: While he's doing that, do you want to state his appearances on the record?

MR. AINSWORTH: Yes.

MS. CHASE: Because he's here now.

MR. AINSWORTH: And for the record, at various points today, Defendants Argenbright and Diciolla were on the Zoom.

MS. CHASE: Kortney, take note William Marley was also.

MR. AINSWORTH: And -- so I ask that the record reflect that Defendant Marley was also appearing on the Zoom.

MR. O'CALLAGHAN: At certain points.

MR. AINSWORTH: At certain points in the deposition.

A. Yeah, I read over that exhibit that you handed to me.

BY MR. AINSWORTH:

Q. All right, sir. Did you tell Mike Horan that you wanted him to identify Matt Sopron, or that he had identified Matt Sopron in a lineup as somebody who'd jumped him?

A. I have no recollection of talking to Matt Horan.

Page 269

Q. Do --

A. And I wouldn't tell him what I -- like my other witness that I testified earlier, I would never tell someone what I want them to say. So no, I did not tell Matt Horan that I wanted him -- if I did talk to him, that I wanted him to do, say, or anything.

Q. And if you told a witness what to say, that would be totally improper, right?

A. Yes, it would be.

Q. Did you call Mike Horan a piece of shit?

A. No, I did not.

Q. Did you tell Mike Horan that there was still an open murder case in Cicero and that they were looking at him in that case, and that he'd better cooperate?

A. No, I did not.

Q. How do you know you didn't do that?

A. I wouldn't do that. Well, to -- to -- the whole thing is outrageous. Let me just say briefly -- tell us just -- I mean, the -- the prosecutor maybe perhaps won't realize it, but you -- you don't tell someone, no matter how -- similarly, someone who did tell him this, if they did tell him this -- I mean, I could tell them, there's an open murder case, and they're going to put it on you, and it's outrageous.

Q. It would be --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 270

A.   It's -- it's outrageous in that sense. That and you don't call them a piece of shit or whatever word that you used.

Q.   So it'd be wrong to swear at witnesses?

A.   Sure.

Q.   Be wrong to yell at witnesses?

A.   Yes, it would.

Q.   This is your photograph on page 3 of Exhibit 102.

A.   Oh, sure.  Yes.

Q.   Yeah?

A.   Somebody found my photograph and attached it to that affidavit, it appears, and they showed it to --

Q.   Did you write Mike Horan in from IDOC custody to interview him in Cook County?

A.   I have no recollection of it.  We may -- we may have, but I might have talked to the guy. I do not know.

Q.   Is it proper to writ people in from IDOC custody, even if there's no pending criminal case or criminal matter?

A.   I'm not -- I'm -- I'm not sure what the -- the requirements for the -- requirements for writ is.  If there's a pending case, arguably, I think it fits within

Page 271

the parameters of a writ document, but I'm not sure.

MR. AINSWORTH:  Let's mark this as Exhibit 103. Exhibit 103 is an affidavit of John Gizowski, Bates numbered Sopron 5929 through 5932.

(EXHIBIT 103 MARKED FOR IDENTIFICATION)

MR. O'CALLAGHAN:  I didn't get the last one.

MR. AINSWORTH:  The last number is 5932.  Is that incorrect?

MR. O'CALLAGHAN:  It's -- yeah, I got it as 37.

MR. AINSWORTH:  I'm sorry.  Can I see what you have, sir?  Well, I'll be.  All right.  I misspoke. The -- it's the same thing, but it's different Bates numbers, Sopron 5934 through 5937.  My apologies, Counsel, I misspoke.  All right.

A.   Want me to read this over?

BY MR. AINSWORTH:

Q.   No.  I'd like to direct your attention to paragraph 12 on page 2.  Says, "Investigator Bajenski and other officers brought me to meet with Assistant State's Attorney Scott Cassidy."

A.   Where are you -- I'm sorry.  Can I just know where you're reading from?

Q.   12.  Paragraph 12 on page 2.

A.   Where at?  Oh, I'm sorry, sir.  Go ahead.

Q.   It's okay.  "Investigator Bajenski and other

Page 272

officers brought me to meet with Assistant State's Attorney Scott Cassidy at the State's Attorney's office. Investigator Bajenski and Assistant State's Attorney Cassidy refused to believe me when I told them that Brian O'Shea and Matthew Sopron were not present at Nick Morfin's house when Billy Bigeck tried to sell me the gun.  They called me a liar and threatened to charge me with murdering the two girls.  Assistant State's Attorney Cassidy told me he controlled the jury and had a major influence on them.  He kept on asking me who the jury would believe, him or me.  Assistant State's Attorney Cassidy told me that all it would take would be one witness to say I laughed while the order was being given, and I could be charged with the murders.  He said he was still investigating the case and I could be charged.  I told Investigator Bajenski and Assistant State's Attorney Cassidy that Matthew Sopron did not give any orders to shoot or harm anyone. I told them that over and over again.  They kept on telling me what Billy Bigeck had told them.  I told them Billy Bigeck's story was not true.  Investigator Bajenski and Assistant State's Attorney Cassidy insisted that I was there with Bryan O'Shea and that I heard an order.  I said I did not.  They said that I was White and that there were a lot of Black people in jail that would love me.  They

Page 273

said the Popes had no juice in jail, and because I was White, the Blacks would get me in jail.  They repeatedly threatened me with charges until I would agree with them.  I only agreed to say what they told me to say because they threatened to charge me with the murders and put me in jail.  I was afraid of being charged and I wanted to go home.  They said I could go home if I agreed to go along with what they said.  I signed a statement and testified falsely before the grand jury because they kept on threatening me.  They ignored me when I told them the truth."  Did I read that correctly, sir?

A.   It appears you read it correctly.

Q.   All right.  Did you threaten Bryan O'Shea that he would be charged with the murders if he laughed while the statement was being made?

A.   You said Bryan O'Shea.  You mean him or John Gizowski?

Q.   John Gizowski.

A.   Okay.

Q.   Goodness.  I'm sorry.

A.   That's okay.  Either way, no, I didn't threaten Bryan or John.

Q.   Would it be wrong to threaten a witness to charge him with a crime if they didn't cooperate?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 274

A. Totally.

Q. Did you --

A. It's -- it's -- it's unethical. It's actually probably criminal.

Q. Did you threaten John Gizowski that he would be attacked by Black people in jail?

A. No.

Q. That would be totally wrong, too, right?

A. Yes, it would.

Q. Did John Gizowski tell you that Matt Sopron didn't give an order and he wasn't there when Matt Sopron was at Nick Morfin's?

A. No.

Q. Did you tell John Gizowski that he could go home if he agreed to go along with what you said?

A. No.

Q. That would be wrong, if you told the witness they could go home if they agreed with you?

A. Totally.

Q. Did you meet with John Gizowski two to three times more during the pendency of the criminal proceedings after your initial meeting with him?

A. I -- I know we met on subsequent occasions that he testified. As to how many times, I do not know.

Q. Would you meet with --

Page 275

A. His father -- just so the record's clear, his father was present when I talked to him.

Q. Was his father present the entire time you talked to him?

A. I believe so.

Q. Why do you believe so?

A. I remember his father being there. His father was -- I remember his father being very adamant to his son to tell the truth, not to, as he said, put a case on somebody or -- or protect someone. That's what his father told him.

Q. Did you tell John Gizowski that he could be charged with perjury if his testimony was different from his grand jury testimony?

A. No. Did he testify in front of the grand jury?

Q. Is that something you would tell a witness --

A. No.

Q. -- that they could be charged with perjury if they're testimony differed?

A. No, but I am sure -- no, I wouldn't tell him, but I was wondering if he ever did.

Q. Why would you --

A. Because it would really show if he's lying.

Q. No, I'm asking my question, sir, not yours.

Page 276

A. Okay.

Q. Why wouldn't you tell a witness that they could be charged with perjury if their testimony differed from their grand jury testimony?

A. Because you wouldn't want to be threatening -- threatening someone in that context, which would -- which sounds like it was. You might explain to him that perjury is possible for anyone who lies in front of the grand jury, but you're not going to do it in -- in that form, which is like a threatening manner.

Q. Did you tell Billy Bigeck and Ed Morfin that if they spoke with any of the lawyers for Morfin, or Nick Morfin, Liberto, or Anderson about the case, the deal that they had would be taken away?

A. No. I -- I -- I recall -- I recall at least one time Bigeck saying that lawyers wanted to speak to him, and I said the same thing to Billy Bigeck that I said over my career as a prosecutor, that all prosecutors say to witnesses. And what I told him was, I cannot tell you who to talk to and what to do, that it's totally up to you. Only thing I could tell you, when you -- before you agree to speak to him, ask -- ask yourself, who's interests do you have in mind.

Q. Did you threaten Billy Bigeck with the death

Page 277

penalty if he didn't cooperate?

A. No.

Q. Do you tell Billy Bigeck that -- something to the effect that he's looking at dying in prison if he doesn't cooperate?

A. No.

Q. I'm going to show you what we'll mark as Exhibit 104. Exhibit 104 is an affidavit of William Bigeck, Bates numbered Morfin-Kogut 7043 through 7047. Taking a look at paragraph 19 on page 3, states, "After I" -- are you on --

A. I'm getting there. Sorry.

Q. Okay. Paragraph 19.

(EXHIBIT 104 MARKED FOR IDENTIFICATION)

A. Okay. I'm with you.

BY MR. AINSWORTH:

Q. "After I pled guilty and was sentenced on August 27, 1995 to 50 years, Scott Cassidy visited me at Stateville Prison in Joliet numerous times. He visited me on September 8, 1998, September 24, 1998, and September 25, 1998. During these visits at Stateville, Scott Cassidy kept insinuate -- insinuating that I should keep quiet about lying in all the trials against Antusas, Sopron, Morfin, and Liberto, and he would help me get my sentence reduced and with getting clemency.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 278

Scott Cassidy continued to visit me to continue his manipulation of me regarding the lies he had me testify to." Do you see that, sir?

A. Yes, I do.

Q. Did you visit Billy Bigeck on -- in IDOC on September 8, 1998, September 24, 1998, and September 25, 1998?

A. I don't recall the specific dates, but those dates seem like they would probably fit into the timeline I have.

Q. Why do you say those dates probably fit into the timeline he has?

A. Because I believe it was after they were sentenced, shortly after they're sentenced. But I remember going out there because he was in -- they were being threatened, and they -- by people at the jail. That was the purpose of my visit.

Q. And so why did you go visit Billy Bigeck and Eddie Morfin if they're being threatened by people at the jail?

A. Well, it's my obligation as a prosecutor in the case, it doesn't end when their trial -- the trial, there's still one to go, but that obligation will still stay with me because their safety is -- is important not only to me, but the office for future -- future cases

Page 279

where someone may be a state's witness. We certainly don't want them to be -- be -- be hurt, beat up, or killed in jail. So we have an obligation to make sure that if they're being threatened, that you go and talk to the authorities, tell them -- tell them that they're being threatened, make sure they know they're state's witness, which I did in my pen letter. That was the purpose for me going there.

Q. All right. So when you refer to a pen letter, what are you referring to?

A. I -- guess it's a term the State's Attorney's Office used. I don't know if they still do. But when someone is sentenced to -- received a sentence to IDOC, whether it be, you know, one year already up -- or up to the death penalty at the time or now life in jail or whatever, the -- when they go down state for processing and placement it's incumbent upon the State's Attorney's Office to give a statement of facts to the Illinois Department of Corrections who are charged with placing the individuals in different institutions throughout the state. So it gives them sort of a snapshot of what the trial was all -- what the case was all about and other things that you might find relevant. So they're going to go in the Illinois Department of Corrections, wrote a pen letter indicating that -- I think I -- I haven't

Page 280

seen it, but it should say that they are witnesses for this state and asking them to replace them on medium security.

Q. Why do you want them to be in medium security as opposed to just protection status?

A. Sure, sure. Because of -- medium security carries with it inmates who are less inclined to commit violent crime as opposed to people who are in high security. They're usually there for life sentences or how many years that they really don't -- they're not looking -- looking to get out. So they're more inclined to commit crimes, violent crimes while they're locked up.

Q. So by virtue of being state's witnesses, Bigeck and Ed Morfin had the opportunity to serve time in lower restricted --

A. I hope so.

Q. -- lower classification --

A. Well --

MR. LYDON: Objection to form. Go ahead.

A. By being state witness, they were afforded -- they were afforded protection by the Illinois Department of Corrections, I hope they were, in their placement processes. In the beginning, I don't think they realized that or -- or they were getting

Page 281

threatened. So that's the reason for my visits.

BY MR. AINSWORTH:

Q. So the people who could keep them safe were the people at IDOC, right?

A. That's their charge.

Q. And so if Bigeck and Ed Morfin were being threatened, why did you go see Ed Morfin and Billy Bigeck as opposed to, you know, going to see the Illinois Department of Corrections people?

A. No, it was -- I -- I'd seen the Illinois Department of Correction people.

Q. And so why did you go see -- what could you do for Billy Bigeck and Ed Morfin by meeting with them?

A. Just tell I'm looking into it, you know, doing my best.

Q. Okay. Could you do that by letter, for example, by sending them a letter saying, "I understand your concerns and we are following up with the appropriate authorities"?

A. I don't know. Possibly, but I -- I didn't do that. I wanted to make sure they got -- they got the information and the fact I was looking out for their best interests.

Q. And so I -- that's what I'm trying to find out is, why did you visit them, you know, three times in the



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 282

same month --

MR. LYDON: Asked and --

BY MR. AINSWORTH:

Q. -- after they've been convicted --

MR. LYDON: Asked and answered. Go ahead.

BY MR. AINSWORTH:

Q. -- and sentenced?

A. Just because they were calling the investigator, I -- I think it was Bigeck, but then Morfin, too, saying they were afraid.

Q. And so did you go see them every time they called to say they were afraid?

A. Possibly.

Q. Okay. And so if they were still afraid --

A. I know -- excuse me. I -- at least I acted upon it. I think that would -- which call for me to go visit -- visit them and make sure that there wasn't anything, you know -- the institution where they're at knew the situation with them and they weren't going to be harmed. That was my duty.

Q. Did you ever give either Billy Bigeck or Ed Morfin money?

A. I was told I gave ten bucks to somebody. I don't know if it was Bigeck or Morfin.

Q. Why did you give ten bucks to either Bigeck or

Page 283

Morfin?

A. As I sit here now, I -- I don't know. Something touched my -- something touched me with -- I gave him ten bucks.

Q. Did you disclose that to anyone that you gave either Bigeck -- or Bigeck or Morfin $10? Like, you know, their criminal defense attorneys.

MR. LYDON: Objection.

BY MR. AINSWORTH:

Q. Not theirs, but the criminal defense attorneys and who represented the defense in the case?

MR. LYDON: Objection. Foundation as to time.

A. Yeah, maybe you can tell me where this ten bucks -- why I gave then ten bucks.

BY MR. AINSWORTH:

Q. I thought I had it right here. Oh, I do have it. Let's mark this as exhibit next.

THE REPORTER: 105.

MR. AINSWORTH: Thank you.

(EXHIBIT 105 MARKED FOR IDENTIFICATION)

MS. CHASE: Exhibit next works.

BY MR. AINSWORTH:

Q. All right. What we've marked as Exhibit 5 is Bates numbered Northwestern 020946. It's a document from Logan Correctional Center.

Page 284

Q. Logan is a medium security prison, right?

A. I'm assuming so.

Q. So this shows that on July 12, 2010, you provided William Bigeck $10. Do you see that?

A. Uh-huh.

THE REPORTER: Is that a yes?

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. Why did you provide William Bigeck with $10 on July 12, 2010?

A. As I indicated earlier, I don't recall as I sit here today why seven -- 13 years ago I gave the guy $10. And this was in 2010 and the trials were over with in 2001, I believe. '97, '98 for -- '98 for Sopron and Antusas, I believe, '97.

Q. Who is Investigator Duffy?

A. He's Investigator Duffy.

Q. All right. Did you work with him?

A. Yes.

Q. Where did you work with him?

A. Cook County State's Attorney's Office.

Q. Which unit?

A. The Special Prosecution Bureau.

Q. And was he assigned to a unit within that bureau?

Page 285

A. I don't remember.

Q. Would you go see Bigeck and Morfin with John Duffy?

A. I may have.

Q. Why would you bring John Duffy to go talk to Billy Bigeck or Ed Morfin?

A. Well, I believe it's probably, without remembering, the best guess I can say, is that in 2001, something like that, we -- I'm guessing at that time, I believe in 2001, a group of high school students from Brother Rice were -- were getting -- brought up to 26th Street by John Duffy's cousin, who we used to bring Brother Rice students up there to get a tour of the building whatever they wanted to learn. And Duffy and I, or one of us suggested, perhaps we should do like a little scared straight if -- if Bigeck and Morfin wouldn't mind to talk to the students about bad choices they make. And I thought it would be a great -- great case to do that if they were willing to do it. And so we did that. In 2003 or -- I read that a memo from Linas Kelecius, so we actually had the history of -- of the choice. So we'd line up on that, so we did a memo on the history of -- of this. In 2004, we actually began a program through the State's Attorney's Office called Choices and Decisions. This was a great program.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 286

Mr. Devine preceding this wanted us to, plus the bureau chiefs and some others, to think about things to do for, you know, a law enforcement way that related as opposed to just locking people up, like alternative programs, something like that. So we thought -- John Duffy and I thought this program we called Choices and Decisions. And with the blessing of State Attorney Divine, we sort of implemented the program at that time. And we did this -- John Duffy actually sort of took it over. I probably did it for the first year or two I believe with him. And then Duff ran with it. He was a great teacher or a great communicator. And I left in '08 and they continued the program then for, I believe, my understanding is like six or more years. So that's -- I give you that background because I imagine we were -- probably went down to talk to them about the Choice and Decisions program if Duff came with. Can you give -- can you give me the date when we went down there?

Q.   And so you were --

A.   And the program --

**Q.   You were gone from the Cook County State's Attorney's Office and you were still giving Bigeck money in 2010?**

A.   I visited him. That was probably the last

Page 287

time I visited him.

**Q.   Why were you visiting Bigeck even after you were outside --**

A.   Oh, sure, sure. No --

**Q.   No, let me finish the question.**

A.   Oh, go right ahead.

**Q.   Why are you visiting Billy Bigeck even after you left the Cook County State's Attorney's Office?**

A.   I still feel I got an obligation.

**Q.   Why did you still feel like you had an obligation?**

A.   Because they -- they -- if I could, I thought they did a great job for many, many years for this Cook County State's Attorney's Office after they testified. And the investigators called me and said, "Billy is complaining" -- this visit here I'm pretty sure is the visit, is complaining that he has to register as a -- a violent offender of youth. I think that was the purpose for this visit.

**Q.   Which visit?**

A.   This one in 2010.

**Q.   And so why did you visit Billy Bigeck? Because he had to register to be an offender of --**

A.   Because I -- I'm about to tell you. Because it wasn't contemplated, I thought he had a good

Page 288

argument. When our agreement was reached with Bigeck, his attorneys, and -- and then Morfin's attorneys, we didn't contemplate, because I don't think it was in effect, the registration of the -- as a violent offender. So I thought it was a legitimate beef he might have. I could see his point. So I told him that I would gladly, because of all the efforts he made for us, he did a great job in the program, would write a letter to whoever when he -- when he leaves the penitentiary, asking that he not be subjected to that registration since he did so much for kids during those 12 years or whatever, those ten years.

**Q.   And so you went in order to commiserate with him?**

MR. LYDON:  Objection.  Argumentative. Asked and answered.

A.   You -- you -- you can -- you can, you know, portray it as like something meaningless that I shouldn't have went to see this inmate, but I -- I have no regrets doing it. They affected a lot of people. We had so many compliments from people who said it was really good. And support staff would bring -- when they know that Bigeck and Morfin would be up there, they would bring their -- their -- their kids who were 14, 15 to listen to these two guys talk about a bad

Page 289

decision they made, a split second decision they made, wherein they got attached to a guy, a 15-year-old, who had no regard whatsoever for human life, probably didn't even think that these two girls would be killed, and based upon that poor decision at -- at their age, young age, they're going to do a long time in prison. So this -- this was something that really resonated with a lot of people, and they did a great job, and I -- and I -- and I -- I really enjoyed it. I -- I really enjoyed it.

BY MR. AINSWORTH:

**Q.   Did you get a birthday cake for Ed Morfin?**

A.   I saw I said that. I don't -- no, we -- we were -- no, I didn't get a birthday cake. I have no recollection of it. I could see though, in the two weeks they came up there, they had a lot of people in the office really liked them from -- from -- from the program, and -- and it's a side that we usually don't see up there at the State's Attorney's Office, like Mr. Devine intended it to be, you know. So perhaps some -- one of the people bought a birthday cake. I don't have no recollection of it.

**Q.   Did you sing happy birthday to Eddie Morfin?**

A.   No recollections.

**Q.   Let's mark this as Exhibit 106. All right.**



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 290

Well, we've marked this Exhibit 106. It's a two-page document Bates numbered IDOC Bigeck 129 and 136. Do you see this is a memorandum dated April 7, 2008? It says the case name is People v. Matt Sopron, PC Hearing?

(EXHIBIT 106 MARKED FOR IDENTIFICATION)

A. Uh-huh.

BY MR. AINSWORTH:

Q. And it has --

THE REPORTER: Is that a yes?

BY MR. AINSWORTH:

Q. Is that a yes?

A. Yes.

Q. There's a grand jury for March 2008 underneath -- on the line underneath that?

A. Yes.

Q. And saying return to IDOC on April 21, 2008, do you see that?

A. "Return to IDOC on 21 April 2008."

Q. Yes.

A. I see -- I see that, yes.

Q. And the State's Attorney is that's you, Scott Cassidy?

A. Yeah, I didn't fill this out. It's not my writing.

Q. Right, let's take a look at the next page.

Page 291

A. Okay.

Q. See where it says, "Requesting State's Attorney, Assistant State's Attorney is Scott Cassidy"?

A. Right.

Q. And then it's a command for William Bigeck to be brought before the Circuit Court of Cook County in the Grand Jury at 2600 South California Avenue on March 14, 2007. Do you see that?

A. Yes.

Q. Why did you write Scott Cassidy in to testify before the Grand Jury on March 14, 2007?

A. I didn't -- I didn't writ Scott Cassidy, but --

Q. Sorry, just writ William Bigeck?

A. That's -- that's okay. I think this was a mechanism used everybody agreed upon to bring him back for the Choices and Decisions program.

Q. Who's everyone who agreed to that?

A. State Attorney Divine. State Attorney Divine and whoever else was -- who would have been in decision making.

Q. So State's Attorney Divine said that you should make a fake writ for Bigeck and Ed Morfin to be able to brought back -- to be brought back to Cook County by saying there was a grand jury that was going

Page 292

on that wasn't actually going on?

A. It was a mechanism to get them back.

Q. I understand there was a mechanism, but was -- is that what you were supposed to do? You were supposed to lie and say there was a grand jury that was going on that wasn't actually going on?

MR. LYDON: Objection. Foundation. Speculation. Go ahead.

A. I guess you can consider that -- you can say that.

BY MR. AINSWORTH:

Q. Well, how would you say it?

A. It was a mechanism of bringing them back --

Q. Was it --

A. -- that everybody was aware of.

Q. Was it the truth?

A. What's that?

Q. Was it the truth?

A. No, there was no grand jury.

Q. Who's everybody who's aware of it?

A. The State's Attorney's Office.

Q. Was IDOC aware of it?

A. I don't know.

Q. Who decided that Bill Bigeck and Ed Morfin didn't have to serve their sentences for that period of

Page 293

time in IDOC custody, but rather could come and spend it in the -- in the witness quarters at the Cook County State's Attorney's Office?

A. The Cook County State's Attorney's Office.

MR. LYDON: Objection. Form. Go ahead.

BY MR. AINSWORTH:

Q. What lawful authority did the Cook County State Attorney's office have to direct the Illinois Department of Corrections to bring Bill Bigeck and Ed Morfin out of IDOC custody so they could be in the witness quarters?

A. Well, I think it looks like appears that we relied upon the writ.

Q. A writ that was obtained through lies, right?

MR. LYDON: Objection to form. Argumentative. Asked and answered. Go ahead.

A. I guess you -- it's a misrepresentation for -- for a good cause, but it's a misrepresentation.

BY MR. AINSWORTH:

Q. So it kind of ends justify the means?

A. Yeah. I was qualifying it a little bit. And that -- and that as I said or I don't know if the PC -- it says PC there, doesn't it?

Q. Yes, PC hearing.

A. PC hearing, was there a PC hearing at the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 294

time?

Q. No, sir.

A. Was there a PC pending at the time?

Q. There had been a Motion to Dismiss filed for the PC, but no hearing was pending.

A. Maybe -- maybe -- sure, maybe we talked to maybe someone, like Duffy talked to --

MR. LYDON: Scott, you don't have to speculate.

THE WITNESS: Okay.

MR. AINSWORTH: Let him answer to finish his answer.

BY MR. AINSWORTH:

Q. Go ahead.

A. Well, I just saw PC, so I want to flush it out, perhaps or something PC, too.

Q. All right. Can we mark this as Exhibit 107, please? All right. What we've marked as Exhibit 107 is Bates number IDOC Bigeck 248. This is a court order in the case of the People of the State of Illinois v. Nicholas Liberto. Do you see that?

(EXHIBIT 107 MARKED FOR IDENTIFICATION)

A. I'm reading it now. It's what it appears to be.

BY MR. AINSWORTH:

Q. It says, "Is hereby ordered that the Illinois

Page 295

Department of Corrections turnover custody of William Bigeck and Edward Morfin to the custody of the Cook County State's Attorney's Office. Bigeck and Morfin are to be placed into the witness quarters until resolution of the Liberto case." Do you see that?

A. Yes.

Q. And this is filled out by you, right?

A. Yes, that's my writing.

Q. And it's entered by Judge Moran on February 28, 2001. Do you see that?

A. Yes.

Q. And the Liberto trial wasn't until September of 2001, right?

A. And she's telling me that's those dates.

Q. So you got Bigeck and Morfin out of IDOC custody and back into the witness quarters for seven months in 2001?

A. I don't know. Did they state when they leave and when they go back?

Q. Well, I believe they left in February of -- or early March 2001 and --

A. Pardon me?

Q. I don't want to give you misrepresentations, but you asked for Morfin and Bigeck to be released from IDOC custody from February 28th of 2001 until the

Page 296

trial -- the Liberto trial was over in September of 2001, right?

A. That's what the request is for.

Q. Why did you ask for them to be brought out of IDOC custody and remanded to the witness quarters until the Liberto trial is over?

A. Because we need them to testify.

Q. Okay. So the typical process if you need a witness to testify is to get a writ for the date that they're going to testify, right?

MR. LYDON: Objection to the form.

BY MR. AINSWORTH:

Q. Do you understand the question?

A. No.

Q. The typical --

A. I'm not sure what you're asking me.

Q. Sure. The typical process, and maybe I missed your answer, I'm sorry.

A. I --

Q. But the typical process is to -- if you need an inmate in IDOC custody to testify, you have a writ issued for the date that they're going to testify, right?

A. I wouldn't say that's the usual process.

Q. What's the usual process to you?

Page 297

A. We read them down and took them down 26th Street.

Q. And you have them housed at 26th and California?

A. Sometimes. Obviously, we did here.

Q. Right, but you're saying that that's your typical process is to have a witness from IDOC who needs to testify in court comes to the State's Attorney's Office to go in the witness quarters?

MR. LYDON: Asked and answered, with a different tone, but asked and answered.

BY MR. AINSWORTH:

Q. You can answer.

A. Same thing.

Q. What?

A. I don't think that there's a typical situation what you said. What's the basis for you to say it's typical? I don't understand. Maybe then I can talk to you about it.

Q. Is it your belief that if you have -- well, let me show you. Let's mark this as Exhibit 108.

THE REPORTER: 108.

(EXHIBIT 108 MARKED FOR IDENTIFICATION)

MS. CHASE: I don't have that, but I have something -- but it's called E. Morfin Active



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 298

Movement History.

MR. AINSWORTH: So for people on the Zoom, Exhibit number 108, provided to us by IDOC is an Excel sheet without a Bates number. And so the name of the file is E. Morfin Active Movement History dated 5-15-20-23.

MR. STEPHENSON: Was it produced by the Plaintiffs to the parties?

MR. AINSWORTH: Yes.

MS. CHASE: Well, it was produced by E. It was your subpoena that was entered.

MR. STEPHENSON: So I produced it without a Bates stamp? Okay.

BY MR. AINSWORTH:

Q. If you look at the second page of this Exhibit 108, the second page, sir?

A. Yeah, I'd like to look at the first page first, if that's okay.

Q. Sure.

A. I'm trying to understand what it's -- what it states. Okay. Now I'm on page 2.

Q. Okay. So take a look at the entry for 1-10-2002, writ returned, about seven lines down?

A. 1-10-2002, temporary resident, 1-10-2002, Eddie Morfin, Court Joliet Hill.

Page 299

Q. So you see on February 28, 2001, it says writ out and the line below January 10th --

A. Okay, I see that.

Q. And so pursuant to your order that you got Judge Brand to sign on February 28, 2001, Ed Morfin was written out of Hill Correctional Center, and he remained out of Hill Correctional Center until he was returned on January 10, 2002. Do you see that?

A. Yes, I do.

MR. LYDON: Object to the form of the question.

BY MR. AINSWORTH:

Q. So he spent almost a year in the witness quarters outside of IDOC housing. Do you see that?

A. Yes, I do.

Q. Was that a benefit that you were providing to Eddie Morfin for cooperating and testifying on behalf of the State?

A. I would say -- I would say if you -- you could look at it as, and I'm not sure -- I'm not sure the benefit, but they certainly enjoyed it. They enjoyed -- they enjoyed doing the -- I'm sure they did the program or perhaps doing the program maybe. I'm not sure at this time period. But you'd have to ask them though whether they liked it better in witness quarters or they liked it better than IDOC. I don't

Page 300

know.

Q. When they did the program, that was for a two-week stint, right?

A. I think that's how Duff -- I think that's how it was set up, yeah.

Q. Not for 11 months, right?

A. Oh, no.

Q. No. And here, this is an 11-month period in which they're out in the witness quarters.

A. Sure, sure.

Q. And so -- and if the Liberto trial ended in September of 2001, why did you keep Eddie Morfin until January 2002?

A. I don't know.

Q. Do you think he would enjoy it more?

A. Pardon me?

Q. Did you think he would enjoy it more to be in the witness quarters?

A. He might have told me.

MR. LYDON: Objection. Asked and answered. Foundation. Go ahead.

A. They may have asked to stay longer there. That's what I'm thinking.

BY MR. AINSWORTH:

Q. Yeah. And if they asked to stay in the

Page 301

witness orders, then you were happy to allow it, right?

A. I -- I would have said yes, yes. They were -- they were -- it was -- let's put it this way. Everything about the -- the -- the -- the Choices and Decisions program was not contemplated -- was not even in my wildest imagination when I entered in this agreement at the time. So this all came post-testimony, post-trials. It was nothing at all to do with the -- the plea agreement they entered into.

Q. Well, just so we're clear.

A. Sure.

Q. When they did the 11-month stint in the witness quarters, that was a result of an order that was entered in February 28, 2001 before the Choice and Decisions program was done, right?

MR. LYDON: Objection. Mischaracterizes his testimony.

A. I mean, we -- we -- we could have brought them down just to get ready for trial.

BY MR. AINSWORTH:

Q. Just answer the question that I'm asking you, sir.

A. I am.

Q. The order -- no. The order that was entered on February 28, 2001 to writ -- the writ Eddie Morfin



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 302

and Billy Bigeck out of IDOC custody was entered before there was any contemplation about the Choices and Decisions program, right?

MR. LYDON: Objection. Asked and answered. Mischaracterized his prior testimony.

A. Like I indicated earlier, I don't know when we started doing the Choices and Decisions program, I believe it was in 2001. I think that's what I said earlier. So to answer your question, it wasn't contemplated, I can't agree to that.

BY MR. AINSWORTH:

Q. Oh, so you're saying that when you had Judge Moran enter the order saying that -- directing Illinois Department of Corrections to turn over Bigeck and Morfin to the Cook County State's Attorney's Office until the resolution of the Liberto trial, you were doing that for the Choices and Decisions program?

A. No, I --

MR. LYDON: Objection to the form.

BY MR. AINSWORTH:

Q. Did you tell Judge Moran that?

A. I don't know what I told Judge Moran. So you might talk -- talk to Judge Moran about it.

Q. Well, was the order that we marked as 107 entered so that Bigeck and Eddie Morfin could

Page 303

participate in the Choices and Decisions program for 11 months?

A. I don't -- I -- I'd be speculating.

Q. Well, speculate. Do you think it was done to allow them to participate in the program for 11 months?

A. My -- the only thing I know for sure is there was a trial that had to take place in, what, four or five months and they had to be here for it. That's the only thing I know for sure.

Q. In seven months from February. In September, right? It was still winter and it was going to be tried in the fall?

A. Yep.

Q. Right?

A. February 28th is when it was.

Q. And they moved that very day?

A. Pardon me?

Q. And they moved that very day, February 28, 2001, the day you got the order.

A. Okay. I agree.

Q. You didn't have like a lag time where you had to make sure you got the order in early because in order to get them there by September?

A. I don't remember.

Q. They could have walked from Hill Correction

Page 304

Center and gotten there.

MR. LYDON: Objection. Argumentative. Don't answer that.

MR. AINSWORTH: Fair.

MR. LYDON: Thank you.

THE WITNESS: They might have, you know.

MR. LYDON: Don't answer that.

THE WITNESS: Oh.

BY MR. AINSWORTH:

Q. Take a look at what we'll mark as Exhibit 109. I'm showing you what we've marked as Exhibit 109. This is a one-page document Bates number IDOC Bigeck 267. This is a letter from you to the office administrator at Pontiac Correctional Center telling Ms. Mattingly that per your conversation William Bigeck and Edward Morfin are being held in the witness quarters in the Cook County Jail. Do you see that?

(EXHIBIT 109 MARKED FOR IDENTIFICATION)

A. Yes.

BY MR. AINSWORTH:

Q. All right. And this is dated April 25, 2000, right?

A. Yes.

Q. So why did you have William Bigeck and Edward Morfin in the witness quarters at Cook County Jail in

Page 305

April 25, 2000?

A. I do not know with any degree of specificity. Can't recall.

Q. All right. Well, if you want to take a look back at Exhibit 108, the large spreadsheet, page 2.

A. Want this back --

Q. See there's an entry for December 15, 1999?

A. Give me that date again.

Q. December 15, 1999.

A. I got it.

Q. And he's writted out from December 15, 1999, until June 7th of 2000. Do you see that?

A. Writ out and writ return on June 7, 2000?

Q. Yes.

A. That's what it says.

Q. And so Eddie Morfin spent another six months in the witness quarters? Why was he spending six months in witness quarters instead of IDOC custody?

A. I don't know.

Q. Did he ask you? Did he say, "Mr. Cassidy, can I please come back to the witness quarters?"

A. I have no recollection of that.

Q. All right. Well, take a look at the entries right below December 15, 1999 where it says, "November 4, 1999, writ out at 6:27 in the morning. And then writ

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 306

return on the same day on November 4, 1999, at 3:15 p.m."

A. Write out, writ return. Okay.

Q. So what you could have done, and this was done here on November 4th, if you needed Mr. Morfin to testify, he's in Pontiac just an hour and a half south. You could have him writted out that day, appear in court, and then return to his institution on that same day, right?

A. If that -- according to your scenario, yes. But I don't know why he was writ up.

Q. Sure. But that's something that you could have done on any occasion. You could have just had either Billy Bigeck or Ed Morfin writted out for one day, right?

A. It appears that way.

Q. All right. Let's take a look at --

THE REPORTER: We're at six hours and 13 minutes.

MR. AINSWORTH: Thanks. Mark this as Exhibit 110.

(EXHIBIT 110 MARKED FOR IDENTIFICATION)

BY MR. AINSWORTH:

Q. I'm showing what we've marked as Exhibit 110. This is another document for those playing along on the

Page 307

Zoom that was produced to us in Excel format. And we're getting the file name. It is a visitor volunteer list for Eddie Morfin. Do you see on this list, sir -- well, why don't we start on the second page of Exhibit 110. And for the record, this document is named E. Morfin Visit History Associated View 5-15-2023. All right. Sir, do you see the last three entries?

A. Yes, I do.

Q. It states that you visited Eddie Morfin on September 8th, September 24th, and September 25th?

A. I see that.

Q. And do you see further up above about six lines from the top -- seven lines from the top, it says, "Scott Cassidy on -- visit on January 14, 1999"?

A. I see that.

Q. Why'd you visit Eddie Morfin on January 14, 1999?

A. I don't know. It was either in regards to their -- safety or they had a question about something.

Q. If they had a question about something, why did you have to drive out to Joliet to see them?

A. It was my practice.

Q. Why?

A. Why not?

Q. Well, rather than, you know -- I have children

Page 308

and I do that, you know, little back and forth with them sometimes. But I'm trying to find out why is that your practice?

A. Because it's the best practice.

Q. Why is it the best practice?

A. Because there's no -- there's no miscommunication then.

Q. Right. So could you set up a phone call with him?

A. I -- I don't -- I didn't go that route. I think it'd be -- I never tried that route.

Q. Why didn't -- why not?

A. I just didn't think it was appropriate.

Q. Why didn't you think it was appropriate?

A. Because as I indicated, I think face-to-face is the best practice.

Q. Why is face-to-face the best practice when you're talking to a convicted murderer about --

A. The safety?

Q. Yes.

A. That's the best practice. I -- I strongly recommend it for any prosecutor.

Q. But there's nothing you could do in talking to them to make them safer, right?

A. No. But you're -- no, there's nothing you can

Page 309

do talking to them. But you do let them know that their testimony was appreciated. So you're going out of your way. You know, I live in Orland Park. You know, it's a half hour to Joliet. Yeah. Probably, you know, drove there or whatever. What time did I get there?

Q. How far is it to Illinois River?

A. That -- that was more of a drive. That was, like, a two-hour drive or two-and-a-half-hour drive. I think. So yeah. So it shows that you, you know, that you really -- which I did. I really took my -- my responsibilities seriously. They did a good job on a very, you know, tough case, two 13-year-old girls were killed. I think it's the very least I could do.

Q. Take a look at the first page of Exhibit 110.

A. Go right ahead.

Q. Do you see the two entries --

A. I see it, Illinois River.

Q. Yeah.

A. Sure.

Q. So the only person who visited Ed Morfin between August of 2002 and October of 2014 is you, right?

A. I'm having a hard time, like --

Q. Sure. Let me orient you.

A. Yeah, please do if you don't mind.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 310

Q. You see "Visit Date" on the right-hand side?

A. Yep.

Q. Then if you go down to August 26, 2002 --

A. August 26, 2020 -- 2002?

Q. Yes.

A. Okay. That --

Q. And then --

A. Rosado -- Carolina Rosado?

Q. Uh-huh. And then between August 26 in 2002, and October 26, 2014, the only person who visited Eddie Morfin was you, right?

A. Really? I accept your representations for that.

Q. Why'd you visit Ed Morfin on September 1, 2003?

A. Once again, it's either for -- he had a question about something, it was a safety issue -- something along that line.

Q. How did he communicate that there was a safety issue?

A. They would -- I think they would call the investigator's office, and they would let me know. Or -- or, I remember one time, Bigeck wrote about -- I believe he did, I can't say for sure. He wrote that some lawyers from Northwestern wanted to talk to him.

Page 311

So I visited him for that.

Q. Why'd you visit him in regards to some lawyers from Northwestern wanting to talk to him?

A. Once again, it's the best practice. I highly recommend it.

Q. Well, why is it the best -- so you explained why it was the best practice for safety issues. Why is it the best practice for, you know, Northwestern post-conviction lawyers?

A. Well, it was one I adopted, so I didn't really separate the two.

Q. Why is it -- why did you want to talk to Billy Bigeck about Northwestern lawyers coming out --

A. He -- he -- he wanted to talk to me about it.

Q. What did he say to you about it?

A. Hopefully, you'll have a letter. I'm not sure if it exists. But I'm pretty sure I got a letter from him. And it was something along the lines, they were contacting him and want to talk to him. I'm just paraphrasing. I don't know exactly what was in there.

Q. Well, what did you tell him?

A. As I indicated earlier, I gave him the standard response that I believe every assistant state's attorney gives when they're posed that question because we get that question posed to a lot -- posed to us a

Page 312

lot, or frequently, I should say. And it -- we can't tell them. It's not up to us. Looks like you're going to yawn there. Not up to us whether you should talk to them. It's your decision to make. I just ask that you ask whose -- whose interest that person has in mind when he wants to talk to you.

Q. Why do you tell them to ask whose interest they have in mind when they want to --

A. Because that's what they should do.

Q. Should they ask whose interests you had in mind when they talked to you?

A. I think they did. By the --

MR. LYDON: Objection to the form of the question. Foundation. Speculation as to what somebody else should ask.

BY MR. AINSWORTH:

Q. Yes, sir?

A. Yeah. Can you ask your question again?

Q. Sure. Do you tell witnesses to think about whose interests you have in mind when you speak to them?

A. Do I tell witnesses whose interest you -- when I speak to them? Not necessarily.

Q. Well, have you ever done that?

A. Well, you know, like the proffers sort of like an opportunity to talk to a witness like I did. Sit

Page 313

down and talk to them. It's in your interest if you tell the truth, nothing but the truth, the whole truth. If you don't want to do that, it's not your -- not your interest to talk to me. So yeah, in some respects, I -- I tell them that. I do tell him that.

Q. Do you ever tell them what your interest is?

A. No. I mean, I don't sit down and, like, talk to them, like, my -- my oath or anything like that. I think it's sort of assumed, at least in my experiences, the people I've talked to know that I identify myself at the time as an assistant state's attorney. So I -- I believe they have a pretty good understanding what I do.

Q. So why'd you visit Ed Morfin on August 16 of 2006, year -- five years after the last trial?

A. As I indicated, it was either because he -- they called the office, they had a question about something, or -- or they're screwing up. Usually, I think Billy did once or twice -- or for safety reasons.

Q. Did you yell at Bill Bigeck for getting caught with weed?

A. Pardon me?

Q. Did you yell at Bill Bigeck for getting caught with weed?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SCOTT CASSIDY, taken on July 21, 2023

314..317

Page 314

A. I don't recall yelling at Billy Bigeck getting caught with weed. Did he get caught -- and I'm sorry, in the -- what, in the witness quarters?

Q. Yes.

A. Tom Donohue handled that for our office.

THE REPORTER: I'm sorry, who?

A. Tom Donohue. He was the -- he was the deputy bureau chief. So I didn't have any discussions with Bill Bigeck about the weed as far as I remember.

BY MR. AINSWORTH:

Q. Do you remember Bill Bigeck and Eddie Morfin having to go out to Kendall County?

A. I think they were transferred out there at some point in time.

Q. Do you remember that?

A. No.

Q. Do you know why they were transferred?

A. For screwing up, maybe.

Q. Do you know why?

A. No. I --

MR. LYDON: You asked him. He answered maybe --

MR. AINSWORTH: That's what I'm trying to find out.

MR. LYDON: You're getting argumentative.

Page 315

THE WITNESS: I'm -- I'm -- I'm speculating.

MR. AINSWORTH: No --

THE WITNESS: I mean, I'm sitting here speculating. I -- I don't even remember them going out there, so I really don't remember the reason why because --

MR. AINSWORTH: I actually want to know if he knows or not. And so when --

MR. LYDON: He answered.

MR. AINSWORTH: He gave me a possibility. That's not an answer.

A. Well, I should say, I don't know. I think you inferred it when I said, it's possibly [sic]. So I do not know whether or not. Nothing.

BY MR. AINSWORTH:

Q. So sir, if we subpoena your visitor number, we'll find you visiting all sorts of inmates all over the state, right? That's what you're saying?

A. Go ahead.

MR. LYDON: That's actually argumentative.

A. I don't know what you'll find.

BY MR. AINSWORTH:

Q. Well, I meant -- you should know. You visited them, right?

A. No, I don't know. I don't know -- I mean,

Page 316

I -- I don't know what you're going to find. So how can I say you're going to find something when I don't know what you're going to find?

Q. I thought that it was your practice to do face-to-face visits with any inmate who testified as a witness who had security issues or any other issues.

A. I indicated these -- these were the only witnesses I had. I visited -- the only witnesses I had to testify who were sent down the IDOC that I visited, and that was my practice that I adopted.

Q. I'm sorry. So --

A. That's okay.

Q. -- you're saying that only Bigeck and Eddie Morfin -- strike that.

A. Sure.

Q. Bigeck and Eddie Morfin were the only inmates in the IDOC custody who you visited; is that right?

A. Witnesses, I would say -- say yes, I believe. It might have been another one, one or two. But I visited inmates in -- in penitentiaries.

Q. For what purpose?

A. Probably targets or a witness -- a witness to another crime or something like that.

Q. And when you'd go visit a target, you would not go through as a visitor, right?

Page 317

A. What do you mean?

Q. You would go down to the -- to conduct an interview, right?

A. For the purpose of interviewing, yes.

Q. And you would not, for example, list yourself as legal counsel to the targets, right?

A. No.

Q. Because if you look back at Exhibit 110 --

A. Sure.

Q. Look at the fourth page --

A. Sure.

Q. 110 is this little one. Not the big one. Sorry.

A. Okay.

Q. See on page 4, Exhibit 110?

A. Page 4, Exhibit 110. Okay.

Q. See how you're listed as -- for the visits on September 25th, September 24th, and September 9, 1998, you're listed as legal counsel?

A. I -- yeah. That's what it says.

Q. And you're also listed as legal counsel --

A. Sure.

Q. -- for the January 14th --

A. That's not -- that's not how I describe myself. I told them -- I produced my identification to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 318

show that I was an assistant state's attorney. They maybe -- maybe that's how they log it in. I don't know.

Q. So when you talk about a best practice for visiting people -- witnesses in IDOC custody, you're saying this is what you did for these two witnesses, and that's your practice. Is that what you're saying?

A. Yes.

MR. LYDON: Objection to the form --

A. Sure.

MR. LYDON: -- of the question.

A. That was my practice for witnesses and I extended that practice to -- to inmates.

BY MR. AINSWORTH:

Q. These two inmates, Bigeck and --

A. Yes.

Q. -- Morfin?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. Why did you visit Bill Bigeck in -- on December 19, 2005?

A. Only for one of the three reasons I told you before.

Q. Was it to talk about the Choices and Decisions program?

Page 319

A. I don't believe so. I believe either he had -- he was causing problems, he had a question, or they were being threatened, or didn't feel safe -- if, in fact, that's what the records reflect.

MR. AINSWORTH: All right. Let's mark this as Exhibit number --

THE REPORTER: 111.

MR. AINSWORTH: 111.

(EXHIBIT 111 MARKED FOR IDENTIFICATION)

BY MR. AINSWORTH:

Q. All right. Showing you what we've marked as Exhibit 111, this is the document, Bates number SOPRON Civil Case number 19-CV-8254, 4262 through 4276, the affidavit of Patrick Walsh. Have you seen this document before, sir?

A. I believe so.

Q. Why do you believe so?

A. It looks familiar.

Q. All right. When was the last time you saw this document?

A. Been a while.

Q. Did you see it while their criminal cases were going on?

A. No. I think -- I think I got this from the attorneys who are representing me now.

Page 320

Q. All right. Let's turn to page 4, paragraph 40. It's here where it says, "Bigeck said that when he first met with Assistant State's Attorney Scott Cassidy, he told the truth and did not mention there were orders." Do you see that?

A. Yes. I see that.

Q. Is that true?

A. No.

Q. And then it says, "Bigeck said that ASA Cassidy barged out of the room swearing and called him a liar." Did you do that?

A. No.

Q. Going down to paragraph 44, Bigeck said that "ASA Cassidy blew up again, swearing and cursing. ASA Cassidy yelled at Bigeck and said, 'You'll die in jail.'" Did you yell at Bigeck and say you'll die in jail?

A. No.

Q. Did you ever mention him dying in jail?

A. No.

Q. Paragraph 48 says, "Bigeck said that ASA Cassidy started putting words in his mouth, leading him, and filling in the blanks." Did you suggest to Billy Bigeck what he should say?

A. No.

Page 321

Q. That would be totally wrong if you'd done that, right?

A. Yes.

Q. Paragraph 54 says, "Bigeck identified the three state's attorney's office investigators that handled him were Norfie, Curtis, and Duffy." Is that true?

MR. OBERTS: Objection. Vague.

A. I wouldn't know for sure if that's true.

BY MR. AINSWORTH:

Q. paragraph 55, "So Bigeck said there was an open commissary in the witness quarters, the Bigeck explained that he did not need money"; is that true?

A. I don't know.

Q. Might that be a reason why Bigeck and Morfin might have wanted to be in the witness quarters instead of in IDOC custody?

A. I don't know if they wanted to be in witness quarters.

Q. Did they ever complain to you to say, "Mr. Cassidy, would you please take us out of the witness quarters and put us back in IDOC?"

A. I don't think they said it like that, but Bigeck complained about the witness quarters.

Q. What did he complain about the witness

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 322

quarters?

A.   Well, it's sort of a misnomer calling it witness quarters.  It's actually like a -- a dungeon.  And I don't think there's any natural light.  And they have -- I don't think they get any yard time either, which I think is important to inmates.  And they don't get -- they do not get other things that inmates housed in general population get.

Q.   Have you ever been on a cellblock in Pontiac?

A.   Possibly.

Q.   How does it -- how does the witness quarters compare to the cellblock in Joliet?

A.   I -- I couldn't make any comparison.

Q.   Why not?

A.   Because you got -- I think you got to sort of got to live there and experience it to make an -- an adequate comparison.

Q.   Paragraph 71 on page 6, Bigeck said that, "he and Ed Morfin watched porn on ASA Cassidy's computer all the time.  Bigeck said the office was on the 13th floor."  Do you see that, sir?

A.   Yes.

Q.   Do you have any reason to doubt Bigeck's statement that he and Ed Morfin watched porn on your computer?

Page 323

A.   I believe the office was on the 13th floor.  Other than that, I don't believe anything else.

Q.   Okay.  Why don't you believe that Bigeck and Morfin watched porn on your computer?

A.   Well, because when I was there, there was no porn on the computer.  And they weren't watching porn on the computer.

Q.   What about the times when you left them in their -- in your office?

A.   I believe the investigators --
MR. LYDON:  Objection.
THE WITNESS:  Yeah.
MR. LYDON:  Foundation.  Go ahead.

A.   Yeah.  Yeah.  I don't believe anybody -- any investigator in their right mind would allow them to watch computer -- watch porn on their computer.
BY MR. AINSWORTH:

Q.   All right.  So to leave Eddie Morfin and Billy Bigeck unattended in your office would be completely wrong, right?
MR. LYDON:  Objection to the form, and again foundation.

A.   To leave Bigeck and Morfin unattended?
BY MR. AINSWORTH:

Q.   In your office.

Page 324

A.   I don't think the investigators would have allowed for that.

Q.   That would be totally wrong, right?

A.   That's -- you -- you have to ask them that question.  I mean, they might have sat right outside the door.  I don't think the investigators, that I know of, were -- they were very responsible men and women and they wouldn't allow that to take place.

Q.   So you think that the investigators might have left Bigeck and Morfin in your office unattended while you sat outside the door?
MR. LYDON:  Objection.  Mischaracterizes.

A.   No.
MR. LYDON:  Go ahead.

A.   The only reason I qualified it because you said, left unintended alone.  And I'm saying they weren't alone.  Yet, I'm sure an investigator always had their eyes on Bigeck and Morfin.
BY MR. AINSWORTH:

Q.   Did you have a newspaper article on the door to your office on the inside?

A.   Did I have a newspaper article on the --

Q.   Yeah, posted on the door?

A.   On the door?  I have no recollection that I had a newspaper article posted on the door of my office.

Page 325

Now, which -- not that it makes a difference, but let's be clear about what office you're talking about.  That's why, there's two offices, as you're already aware.

Q.   The chief.

A.   The one?  Okay.  So that -- I got that office in 2004.  So the time frame you're talking about is from --

Q.   Oh, not 2004 then.  Sorry.  When you're in organized -- back in organized crime.

A.   So you're saying -- or you're asking me, was there -- and I don't have -- no recollection of that.  We should have been talking more about it, which office, earlier.  But I just thought of that.

Q.   Well, I thought when you left gang crimes, you went to become the supervisor.  All right?  Yeah.  I'm talking about the supervisor office.

A.   Yeah.  From -- from 1997 to --

Q.   Yeah.

A.   Yeah, that was a very small office, that office.

Q.   Did you ever go back to visit at 26th and California after you left the office?

A.   Yes, I did.  I remember bringing my -- you asked about the -- what triggered it was when you asked about my -- my grandson.  My first grandson, I brought

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 326

up to see the -- to see the support staff and -- and I believe Bigeck and Morfin may have been presenting as well. I don't know if I had an opportunity to say hello to them, but I remember they were -- I think they were up there at that time.

Q. And that was going to be my next question. Did you see Bigeck and Morfin from your --

A. I'm -- I'm not sure if I talked to them or not. I think they were doing a presentation.

Q. Any reason to doubt them if they said that they saw you and your grandchild at the --

A. No, they might have saw me from the doorway or something like that.

Q. And Eddie Morfin holding your child -- your grandchild?

A. No.

Q. All right.

MR. LYDON: How much time do we have?

THE REPORTER: We're at six hours and 42 minutes.

MR. MASCIOPINTO: No obligation to use all seven hours, Russell.

MR. AINSWORTH: Thank you.

BY MR. AINSWORTH:

Q. All right. Going to paragraph 76, see it

Page 327

says, "Bigeck explained that there was an investigation in the witness quarters because Bigeck got caught with marijuana. Bigeck said that ASA Cassidy called him and was just -- and was screaming. Bigeck said he was sent to Kane or Kendall County Jail and everything eventually was fine." Do you see that?

A. Is that what you asked me about earlier?

Q. Yes.

A. And I didn't do that. I mean, you asked me -- I mean, let's break it down. I knew there was an investigation in the witness quarters. I was not part of the investigation. Tom Donahue was part of that investigation. I believe he got caught with marijuana. So that's accurate. I didn't call him. I don't know if I had the ability to call him. And I didn't --

THE REPORTER: Can you lower --

MR. AINSWORTH: Lower the exhibit.

A. I don't think -- I don't know if I -- I don't recall -- ever calling the witness quarters. And I didn't scream at him. What else is there? And I misplaced where I was at here. What line was that?

BY MR. AINSWORTH:

Q. 76.

A. Six. "Bigeck said he went to -- sent to Kane or Kendall County Jail and everything eventually was

Page 328

fine." I have some recollection of him being sent. But I don't know if I'm accurate -- my -- my -- my memory --

Q. Have you ever received anger management counseling?

A. No.

Q. Did you learn that Eddie Morfin had signed an affidavit for recanting?

A. I think I heard about it more recently than -- than anything.

Q. Did you scream at Bigeck and Morfin, Eddie Morfin, about Eddie Morfin's affidavit?

A. No.

Q. Did you promise Bigeck that you would file a clemency petition on his behalf?

A. No. There -- indicated earlier what I told him I would do. And I thought I was clear about it. Maybe he was confused. But I told him I would write, do whatever, make a request, that he not be -- have to register as a -- a child offender. And all I would do is lay out everything he did for the state. Everything.

Q. Did you do that?

A. No.

Q. Why not?

A. Well, that would take place when he was

Page 329

released from the penitentiary. And at that time, this was -- this -- this here was pending. So it just didn't seem practical. Didn't seem practical to do because it obviously would be turned into something like everything else was trying to be turned into something. So I thought it best that I didn't do that.

Q. Did Bigeck tell you that the van was about 100 yards away when Eric Anderson started shooting at it?

A. What number are you reading from, just so I can be clear?

Q. 83.

A. Okay. I don't recall him saying it. No.

Q. Did you --

A. I don't -- I don't If they even gave, like, a distance.

Q. Did you tell Bigeck that he had to say it was that Anderson was in the street close to the van when he shot?

A. No.

Q. If you look at -- paragraph 94 reads, "Bigeck said that State's Attorney Investigator Duffy had a personal connection to the murder case. Bigeck said that Duffy lived near the scene of the crime and that Duffy's brother was a teacher at Brother Rice High

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 330

School." Do you see that?

A. Yes. I see that.

Q. Did Duffy live near the scene of the crime?

A. I don't know how close he -- I mean, near the scene of the crime. I -- I don't know how close he was, where he lived. I was -- I don't think I was ever at his house. So I couldn't answer how close he was to the scene of the crime.

Q. Where did he live in that neighborhood?

A. Once again, I -- it's hard to define since I didn't know where he lived, like, and what you consider a neighborhood. I -- I really don't know. He may have if that's -- he may have. I -- I don't know. Can't say for sure. I'm not trying to avoid the question. I just don't know. And he did have a brother, as I indicated earlier, that -- yeah, he had a brother.
No, he had -- it wasn't a brother. It was his cousin who was a teacher at Brother Rice High School.

Q. Look at paragraph 102. "Bigeck said that ASA Cassidy called him after he arrived at Kendall County. Bigeck said that ASA Cassidy screamed at him and threatened to take his deal away. After a while, Bigeck said that ASA Cassidy was said he would take care of it and make it go away. Bigeck said that ASA Cassidy told him, 'to stay out of trouble, and I'll make it go

Page 331

away.'"

A. No, I -- I didn't say that. I had nothing to do with it -- with -- with whatever he did down there.

Q. Did he make his marijuana problem go away?

A. Like I said, I -- that was -- I had nothing to do --

MR. LYDON: Object to form.

A. -- to do. Okay. I had -- I said several times I -- that was handled by Tom Donahue of the Cook County State's Attorney's Office.

BY MR. AINSWORTH:

Q. Did you send Ed Morfin commissary money?

A. I don't know.

Q. You may have?

A. I don't think so, but I -- I -- you know, I -- if somebody would've asked me that, did you give Bill Bigeck ten bucks, I would have no recollection of that. And so the answer to your question is, I have no recollection of that, but since I can't remember giving Ed Morfin or Bill Bigeck ten bucks, maybe I did.

Q. Have you given anyone else in Illinois Department of Corrections money?

A. I don't believe so, but once again, since my memory isn't correct about that one, I -- it's hard for me to say.

Page 332

MR. LYDON: Time?

THE REPORTER: Six hours and 50 minutes.

BY MR. AINSWORTH:

Q. Did you allow Morfin and --

A. What number you reading from?

Q. None.

A. Oh.

Q. Did you allow Morfin and Bigeck to have access to your phone in your office, make phone calls?

A. That would've been an investigator call. I don't know what the rules were. I don't know if they were allowed to call out on it, so that's something you'd have to ask the investigators.

Q. Where were you on September 11, 2001?

A. I -- I was on my -- I went to -- went to work, got into the parking lot, and saw that the parking lot -- that people were leaving the building. I knew it -- I knew it happened. September 1, 2001, right? 9-11?

Q. Yeah.

A. Yeah.

Q. What time did you arrive at work?

A. Probably 10:00, quarter to 10:00. And I remember -- I remember I heard it on the radio. Oh, I -- I think it might've been quite a little bit

Page 333

before I left. I'm not sure, but I had on the radio the whole way -- way down to work. And then I pulled into the lot, and people were pulling -- walking out of the building. So I called up, and I got ahold somebody up there. They said they're evacuating the building, I believe. I think that's what happened. I think they evacuated the building, I think.

MR. AINSWORTH: All right. I'm going to reserve time for a rebuttal from Defendants, unless you don't have any questions. Then I'll keep going.

MR. STEPHENSON: I think there's some questions. How much time is left on the seven hours?

MR. AINSWORTH: Yeah.

THE REPORTER: Eight minutes.

MR. STEPHENSON: Eight minutes.

MR. OBERTS: Before we get started, why don't we take a quick break?

MR. STEPHENSON: Take five?

MR. OBERTS: Yeah. Before the end.

MR. STEPHENSON: All right. Take five?

MR. OBERTS: Take five.

THE REPORTER: Kortney, we're off the record.

THE VIDEOGRAPHER: Oh, sorry. We're off the record at 6:08 p.m. Central Time.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 334

(OFF THE RECORD)

THE VIDEOGRAPHER: We are back on the record for the deposition of Scott Cassidy being conducted by videoconference. My name is Kortney Chase. Today is July 21, 2023, and the time is 6:20 p.m. Central Time.

CROSS-EXAMINATION

BY MR. LYDON:

Q. Okay. So for the record, this is Jim Lydon, Scott Cassidy's attorney. I just have two questions. One is, Scott, what was the purpose in 1996 of meeting with Bigeck and Morfin with their attorneys for proffers?

MR. AINSWORTH: Object to the form, and question compound.

A. Yeah. As I, I think, partially answered earlier, evaluated the case, and I wanted to bolster the evidence in the case specifically against Eric Anderson, the shooter. The evidence consisted mainly of a -- of a single finger by one of the guys in the van, so, in my mind, the more evidence we got, the better -- better off we'd be. That made both Eddie Morfin and Billy Bigeck, you know, a good candidate from my -- my -- my position to -- to do that was they were with the shooter at the time this whole thing happened, and they also gave

Page 335

statements to the police indicating that Eric Anderson was the shooter. From the prosecution -- prosecution point of view, you know, you -- you -- I couldn't use, like, you know, Bigeck's statement he gave to the police unless he's going to be a -- a witness in the case against him. You just can't, like, throw his court reporter statement up there. That's a -- I think it's a violation they call Bruton, I believe, so what -- what made them attractive is that I felt if they -- we did talk to him and they said the truth was that, in fact, Eric Anderson was the shooter, then we could probably reach a plea agreement with them down the road after we evaluate everything they said, unless something they said down the road really made them less than credible, you know, because that was a risky run, you -- you know. So I really hoped or -- if I had a hope, or just thought that they would just talk about what they told the police, and if they did that, then that's called a prior consistent statement in law. And that allows the prosecutor to use that after the defense attorney gets up and talks about the deal. Once they impute a motive to a witness, then you could talk about prior consistent statements, so they were very attractive for -- for reuse as a -- as a witness.

BY MR. LYDON:

Page 336

Q. All right. And then the second question I have is, what was the purpose of interviewing of witnesses and having witnesses interviewed after Sopron and Antusas were arrested?

A. Well, you know, like -- like I indicated earlier, I think very early on, a proffer is a process, and the process consists of -- beginning of it is doing a proffer. But it ends up perhaps being reach a -- a cooperation agreement is reached, and it's in the interim, from the proffer to the time the agreement is reached, that you have to do your homework. And so when I evaluated the case, you know, for trial and they gave us their proffers, I continued to do that, evaluate it, and then I went about verifying or trying to corroborate or not corroborate what these two individuals told us. It actually took on a -- a -- sort of a dual track. My primary reason for doing this was for purpose of Eric Anderson and the trial that was pending, so I interviewed all those witnesses. But those same witnesses were also witnesses which -- some of them gave evidence against Matt Sopron and Wayne Antusas. So it was sort of -- it was like that was a secondary, but it was the -- the parallel track there.

MR. LYDON: Okay. That's all I have.

MR. MASCIOPINTO: Sir --

Page 337

MR. LYDON: Oh. Is that you, Tony?

MR. MASCIOPINTO: Yeah. Is it okay if I go?

MR. LYDON: Sure.

MR. MASCIOPINTO: All right.

EXAMINATION

BY MR. MASCIOPINTO:

Q. Sir, my name is, for the record, Tony Masciopinto. I represent certain individual CPD police officer defendants, okay?

A. Okay.

Q. I have only a few questions for you. Do you know a CPD officer, either current or retired, by the name of Thomas Argenbright?

A. Yes, I do.

THE WITNESS: May I get please -- do you have a bottle of water? My mouth is very dry. If you can.

A. Sorry about that, sir.

BY MR. MASCIOPINTO:

Q. No problem. And as you sit here today, do you know a Chicago Police Department officer, current or retired, by the name of George Holmes?

A. Yes, I do.

Q. Same question. Do you know a CPD officer, current or retired, by the name of Tony or Anthony Graffeo?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:22-cv-00320 Document #: 235-20 Filed: 07/17/26 Page 87 of 133 PageID #:4326
The Deposition of SCOTT CASSIDY, taken January 21, 2023
338..341

Page 338

A.   I know the name.  I can't say that I -- I -- I would recognize that person.

Q.   Same question.  Do you know a CPD officer by the name of a Al Graf, retired or current?

A.   Yes.

Q.   And lastly, do you know a CPD officer, retired or current, by the name of Bill or William Moser, M-O-S-E-R?

A.   Yes.

Q.   All right.  I'm going to direct your attention to the time period of December '95 through December of '96.  So just to get your head in that space, the murders occur in December '95, and your proffers and interviews occur in September of '96 along with the arrest of Sopron and Antusas in that month, okay?

A.   Okay.

Q.   All right.  So my question for you is, between December of 1995 through December of '96, did you ever communicate in any fashion with CPD Officer Thomas Argenbright?

A.   I don't believe so, except for perhaps when a search warrant needed to be reviewed for the search of the home or the -- I think it was the -- the home of Wayne Antusas.  The affiant on that was Thomas Argenbright, and per the protocols we have set up,

Page 339

a state's attorney has to review it before it's presented to a judge.  I reviewed that affidavit, but I don't know if that was given to me by Argenbright or an investigator.  And I'm leaning towards an investigator gave it to me, but I can't say for sure.  I have no recollection of talking to Argenbright.

Q.   During this time period, including this search warrant, which is -- by the way, the search warrant was in approximately September of '96.  Do you agree with that?

A.   I -- I believe so.

Q.   All right.  So in any event during this time period, December '95 through December '96, did you ever tell Officer Argenbright that you fabricated probable cause to arrest Sopron or Antusas?

A.   No.

Q.   How do you know that?

A.   Because it's something I wouldn't do. It's outrageous.

Q.   And did you ever tell Argenbright during this time period that you had framed Sopron or Antusas?

A.   No, I did not.

Q.   How do you know that?

A.   It's -- it's outrageous.

Q.   Sir --

Page 340

A.   That's something that I would remember it's so outrageous.

Q.   Right.  Did you ever speak with George Holmes between December of '95 and December of '96 to the best of your memory?

A.   No.

Q.   And same questions.  Do you -- did you ever make a statement to George Holmes between '95 through '96 that you had either framed Sopron or Antusas or fabricated probable cause to arrest them?

A.   No.

Q.   Same question for Anthony Graffeo.  Do you remember having any conversations with Anthony Graffeo between late '95 and late '96 about the murder investigation and/or prosecution?

A.   No.

Q.   Did you ever make a statement to Anthony Graffeo that you had framed either Sopron or Antusas or fabricated probable cause to arrest him -- them?

A.   No.  No.

Q.   And again, how do you know that you didn't make these statements to Holmes and Graffeo?

A.   Because it's something I would remember. It's an outrageous thing to do if you're a prosecutor. So I wouldn't do that.

Page 341

Q.   Sir, were you willing to put your law license and your reputation on the line for this murder prosecution?

A.   No.

Q.   Sir, did you have any conversations with Al Graf between December of '95 and late December '96 regarding the murder investigation and/or prosecution that we've been talking about?

A.   No.

Q.   And did you make any statements to Al Graf -- same question for Moser.  Do you remember any conversations between late '95 and late '96 with Bill Moser about this murder investigation/prosecution?

A.   No.

Q.   Do you remember ever talking to and telling Graf or Moser that you fabricated probable cause evidence to arrest Sopron or Antusas or framed them?

A.   No.

Q.   In all of your interactions in '96 through the end of the year, did you ever observe any Cook County state's attorney investigator do anything untoward with respect to this investigation and/or prosecution?

A.   No.  They -- they're -- they're all professional, very professional, in my opinion.

Q.   Sir, during this time frame, late '95 to late

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 342

'96, did any member of CPD, to your memory, attend any witness interview that you were a part of?

A.   No.

Q.   During this time frame of late '95 to late '96 for any proffer that you participated in with respect to this investigation and/or prosecution, did any CPD member participate?

A.   No.

Q.   So to the best of your memory, if you interviewed or proffered Bigeck, or O'Shea, Gizowski, O'Brien, or Eddie Morfin, to the best of your memory, CPD had nothing to do with those interviews or proffers, fair?

A.   Yes.

Q.   What was -- to the best of your memory, I know it's a long time ago, but I want to now direct your attention to the 6:00 a.m. meeting that occurs at 26th and Cal on September 16, 1996.  Is your head there?

A.   Yes.

Q.   To the best of your memory and -- or based on your file review, what was the purpose of that meeting?

MR. AINSWORTH:  Objection.  Lacks foundation. Form.

BY MR. MASCIOPINTO:

Q.   Go ahead.

Page 343

A.   I believe it was for the investigators with the Cook County State's Attorney's Office who had knowledge of the case to meet with the Chicago Police Department wherein they probably made some tactical decisions about the arrest of Wayne Antusas and Matt Sopron.

Q.   And when you say tactical decisions, what do you mean in layman's terms?

A.   How -- how the police are going to move about affecting their arrests.

Q.   And to the best of your knowledge, from that date -- to the best of your knowledge, based on your observation and involvement with the case, the last involvement that CPD had was December of 1995 relative to that meeting; is that fair?

MR. AINSWORTH:  Object to the form.  Lacks foundation.

A.   From my perspective, yes.  They did testify at the trial.  I want to be -- I think you know that, but just so there's no ambiguity there.

BY MR. MASCIOPINTO:

Q.   Yeah.  That -- that's fine.  I'm going backwards in time.  So what I'm saying is -- by the way, when did you get the prosecution?  When did you get the file to start reviewing?

Page 344

A.   I believe it was right -- right before July 4th if I'm not mistaken.  Right around July 4th.

Q.   Okay.  Fine.  And then you would do a file review in July and August, fair?

A.   In -- yeah.  Maybe if I got in June, early -- late June, I did it or certainly early -- early July of --

Q.   Okay.

A.   Yeah.

Q.   Of '96.  So here's my last question.  All I'm saying is, based on your knowledge and based on your file review, as of the September 6:00 a.m. 1996 meeting, the most recent involvement by CPD appeared to have been late December of '95 to the best of your knowledge?

A.   Yes.

MR. AINSWORTH:  Objection.  Form.  Lacks foundation.

MR. MASCIOPINTO:  Okay.  I have nothing further.  Thank you.

MR. STEPHENSON:  Bill, do you want come down here?  I don't know if --

MR. O'CALLAGHAN:  I --

MS. O'BRIEN:  That would work.

MR. O'CALLAGHAN:  I think it's probably better

Page 345

I come down there.

MR. STEPHENSON:  All right.

MR. OBERTS:  You can take my seat just to follow-up.

EXAMINATION

BY MR. OBERTS:

Q.   Just on examination, you testified that you never observed any CCSAO investigator do anything untoward.  Do you recall that testimony?

A.   Yes.

Q.   I'm not sure what untoward means.  Would it be accurate that you never observed any CCSAO investigator do anything inappropriately in regards to the case?

A.   Correct.  They're -- they're very -- they're very professional.

MR. OBERTS:  Very good.  Thank you.

THE WITNESS:  Okay.

MR. OBERTS:  Oh, maybe not.

EXAMINATION

BY MR. O'CALLAGHAN:

Q.   Scott Cassidy, my name is Sean O'Callaghan, and I represent the assistant state attorneys in this case, Steve Dinolfo, Patricia Shae, George Andrews, Neil Linehan, Colleen Hyland, and Laura Sullivan. And I just wanted to ask you a couple questions.



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 346

I think you just testified moments ago that your first involvement in the criminal case against Eric Anderson, Billy Bigeck, Nick Liberto, Nick Morfin, and Ed Morfin were in June or July of 1996 when you received the case?

A. That's correct. Yes, it is.

Q. So as you sit here today, are you aware that the felony review assistant state's attorneys who reviewed this case in December of 1995 were Steve Dinolfo, Patricia Shae, and George Andrews?

A. I -- I know that from reading over the paperwork.

Q. In December of 1995, did you have any knowledge that these three states attorneys, Patricia Shae, George Andrews, and Steve Dinolfo, were reviewing the evidence gathered by the police or charges --

A. No.

Q. -- against Nick Liberto, Eric Anderson, Eddie Morfin, Billy Bigeck, and Nick Morfin?

A. No, I did not.

Q. So then it's fair to say that you didn't have any contact with ASAs Dinolfo, Shae, or Andrews on December 14th or 15th of 1995?

A. Correct.

Q. And it's fair to say, then, that you didn't

Page 347

give them any directions or instructions directly or indirectly regarding their felony review activities on December 14th or December 15th of 1995?

A. That's correct.

Q. Did you ever discuss the murder case or any -- did you ever discuss this murder case with Pat Shae, Steve Dinolfo, or George Andrew at any time from the approval of charges of the felony review process through the last criminal trial against Nick Liberto in 2001?

A. I don't believe so.

Q. Did you ever call Pat Shae, Steve Dinolfo, or George Andrews as witnesses in any of these?

A. No.

MR. O'CALLAGHAN: I have nothing further.

MR. AINSWORTH: Anybody else?

EXAMINATION

BY MS. LOCKE:

Q. I have just one question, and maybe you actually might have already just it answered a few minutes ago. My name is Neha Locke. I represent the City of Chicago. You had already just testified that to your best of your recollection, there weren't any Chicago Police Department officers present when you conducted any of your interviews of the witnesses

Page 348

involved in this case, correct?

A. That's correct.

Q. Is it fair to say, then, that none of the interviews that you conducted or statements that were taken where you were present occurred at a Chicago Police Department facility?

A. That's correct.

MS. LOCKE: I have nothing else.

THE WITNESS: Okay.

MR. AINSWORTH: Anyone else? I have very brief questions for this witness.

REDIRECT EXAMINATION

BY MR. AINSWORTH:

Q. In the case of Melvin Brantley, did you drink beers with Daniel Washington?

A. You know, I saw -- my -- the attorney showed me that -- a newspaper article that was written in 2000, which I'd never seen before, so -- about something occurred in 1990. And as I told him, no one ever -- the first time I heard of it, first time I -- anybody ever approached me on it or talked about it, and the answer is no.

MR. AINSWORTH: All right. I'm showing you what we'll mark as Exhibit --

THE REPORTER: Where are we at? 112.

Page 349

MR. AINSWORTH: 112?

THE REPORTER: Uh-huh.

(EXHIBIT 112 MARKED FOR IDENTIFICATION)

BY MR. AINSWORTH:

Q. This was produced to us without a Bates number. It's the Choices and Decisions PowerPoint, so it was produced to us in a PowerPoint format. I want -- I'm just going to show you this photo or this map, sir. Can you take a look at this -- the escape route where it says, "Getaway car to the north of Hale Park"?

A. Before I -- I -- I can't concentrate because I have a couple of questions about what you just handed me.

Q. What's that?

A. That I've never seen this before.

Q. That's fine.

A. And I didn't produce this.

Q. I'm not asking you if you did.

A. Okay.

Q. This -- the page that says the escape route, do you know why it lists the getaway cars as being north of Hale Park?

MR. LYDON: What page is it?

MR. AINSWORTH: It doesn't have a page number.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 350

It's --

MR. LYDON: How far in here is it?

MR. AINSWORTH: It's after that. It's right after Decisions and Choices.

MR. LYDON: All right. I got it.

BY MR. AINSWORTH:

Q. Do you know why it says, "Getaway car is north of Hale Park"?

A. No. You'll have to ask the person who made this -- who did this.

Q. And this was used -- this exhibit was used as part of the PowerPoint for the Choices and Decisions Program?

A. Not when I was there.

MR. AINSWORTH: All right. That's all I got. I'll reserve the rest of the time. For the record, Counsel, you're agreeing that this witness will answer questions about his financial condition subject to the seven hours that I have if he survives summary judgment.

MR. LYDON: No. What I'm agreeing to is after summary judgment, you can address it, and similar to Serrano's, if the Court allows it, prepare an affidavit.

MR. AINSWORTH: No.

Page 351

MR. LYDON: Well, we're not going into it right now.

MR. AINSWORTH: All right. What's your --

MR. LYDON: Nope.

MR. AINSWORTH: No.

MR. LYDON: Not answering.

MR. AINSWORTH: Then what's the protective order?

BY MR. AINSWORTH:

Q. Sir, what's your -- what's your -- what assets do you have?

MR. LYDON: Do not answer.

A. On the -- on the advice of my attorney, I'm not answering.

BY MR. AINSWORTH:

Q. What -- how much is your household income each year?

MR. LYDON: Do not answer.

A. On the advice of my attorney, I'm not answering.

BY MR. AINSWORTH:

Q. What assets do you have?

MR. LYDON: Don't answer it.

A. On the advice of my attorney, I'm not answering.

Page 352

BY MR. AINSWORTH:

Q. Do you have any real property?

MR. LYDON: Same advice.

A. On the advice of my attorney, I'm not answering.

BY MR. AINSWORTH:

Q. What's the value of your real property?

A. On the advice of my attorney, --

MR. LYDON: Same.

A. -- I'm not answering.

BY MR. AINSWORTH:

Q. What's the mortgage of your real property?

A. On the advice of my attorney, I'm not answering.

Q. Do you have any -- do you own any stocks or bonds?

A. On the advice of my attorney, I'm not answering.

Q. Do you own any cryptocurrency?

A. On the advice of my attorney, I'm not answering that.

Q. Do you have any retirements?

A. On the advice of my attorney, I'm not answering.

MR. MASCIOPINTO: May I interject just quickly?

Page 353

Ms. Court Reporter, how much time has elapsed on the record for --

THE REPORTER: We're at seven hours and 14 minutes.

MR. STEPHENSON: Just a couple of minutes.

MR. AINSWORTH: I've got five minutes.

MR. MASCIOPINTO: Okay. I -- that's all I'm asking.

MR. LYDON: Really?

MR. AINSWORTH: Et tu?

BY MR. AINSWORTH:

Q. Okay. If I ask you any more financial questions, will your answer be the same, that you'll refuse to answer them?

A. On the advice of my attorney, yes.

MR. AINSWORTH: All right.

MR. LYDON: We'll reserve signature.

THE REPORTER: Reserve signature. And I'll just send that to you?

MR. LYDON: Yes, please.

THE REPORTER: Okay. And then before we go off the record, I just need to get orders really quick. Russell, would you like a copy of the transcript?

MR. AINSWORTH: Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 354

THE REPORTER: And how would you like it?

MR. AINSWORTH: E-tran.

THE REPORTER: E-tran? All right. And let's see. There's a lot of people in here, so I'm just going to make it quick. Does anyone else want a copy of the transcript?

MR. AINSWORTH: We're getting it anyways.

THE REPORTER: Oh, that's fair enough. Did you want a copy of the video?

MR. LYDON: Not at this time.

THE REPORTER: Not at this time?

MR. LYDON: Not at this time.

THE REPORTER: We'll always have it if you need it. Anyone else in the room? Would you like a copy?

MR. O'CALLAGHAN: Can I get a copy?

THE REPORTER: Okay.

MR. LYDON: Yeah, I would like one myself.

THE REPORTER: Oh. We can talk about that. Anyone on Zoom, would you like a copy of the transcript or the video?

MR. OBERTS: Not me.

MR. MASCIOPINTO: No. The only thing I would ask is that if exhibits that have been used are going to be circulated that they get circulated to

Page 355

everyone. That's all.

THE REPORTER: Okay. All right. Kortney, I think you can take us off.

THE VIDEOGRAPHER: Okay. We are now off the record at 6:44 p.m. Central.

(DEPOSITION CONCLUDED AT 6:44 P.M.)

Page 356

CERTIFICATE OF REPORTER

STATE OF ILLINOIS

I do hereby certify that the witness in the foregoing transcript was taken on the date, and at the time and place set out on the Title page here of by me after first being duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the said matter was recorded digitally by me and then reduced to type written form under my direction, and constitutes a true record of the transcript as taken, all to the best of my skill and ability. I certify that I am not a relative or employee of either counsel, and that I am in no way interested financially, directly or indirectly, in this action.

OFFICIAL SEAL
SYDNEY LITTLE
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES MARCH 18, 2026

SYDNEY LITTLE,

COURT REPORTER/NOTARY

MY COMMISSION EXPIRES ON: 03/18/2026

SUBMITTED ON: 08/01/2023

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

### Exhibits

**Exhibit 90_ Cassidy** 117:4, 8,25 129:3,20, 23 130:8,21 131:8 132:3 143:11,12 144:23 153:1,2, 18 154:6 158:4 159:6,7 177:25 178:5,10 184:22 185:8, 13,14 198:1,2

**Exhibit 91_ Cassidy** 167:13,14,15, 19 174:8 175:23 176:17 182:9 183:3,22 196:10 201:21 209:21 210:19 262:1,9,10

**Exhibit 92_ Cassidy** 212:4, 11,13 262:22

**Exhibit 93_ Cassidy** 216:12,13,17 218:12,13 219:24 221:1 224:8

**Exhibit 94_ Cassidy** 228:3, 5,7,22,23,24 230:8

**Exhibit 95_ Cassidy** 235:9, 10,13,16

**Exhibit 96_ Cassidy** 236:25 237:4

**Exhibit 97_ Cassidy** 248:14,16

**Exhibit 98_ Cassidy** 249:13,14,17

**Exhibit 99_ Cassidy** 254:6, 9,15

**Exhibit 100_ Cassidy** 263:5, 6,7,11

**Exhibit 101_ Cassidy** 263:18,19,25

**Exhibit 102_ Cassidy** 267:18,19,22 270:8,9

**Exhibit 103_ Cassidy** 271:2, 3,5

**Exhibit 104_ Cassidy** 277:8, 14

**Exhibit 105_ Cassidy** 283:20

**Exhibit 106_ Cassidy** 289:25 290:1,5

**Exhibit 107_ Cassidy** 294:16,17,21

**Exhibit 108_ Cassidy** 297:21,23 298:3,15,16 305:5

**Exhibit 109_ Cassidy** 304:10,11,18

**Exhibit 110_ Cassidy** 306:21,22,24 307:4 309:14 317:8,15,16

**Exhibit 111_ Cassidy** 319:9, 12

**Exhibit 112_ Cassidy** 349:3

### $

**$10** 283:6 284:4,9,13

**$160** 230:2

**$300** 220:1 229:25

### 0

**000001** 249:14

**020946** 283:24

**0600** 254:24

**08** 286:12

### 1

**1** 85:3,10 130:21,25 176:17 182:10 183:3 310:14 332:18

**1-10-2002** 298:23,24

**10** 129:24 299:8

**100** 263:6,7,11 329:8

**101** 38:10,13 263:18,19,25

**102** 267:18,19, 22 270:9 330:19

**103** 271:2,3,5

**104** 277:8,14

**104th** 31:20

**105** 283:18,20

**106** 289:25 290:1,5

**107** 294:16,17, 21 302:25

**108** 297:21,22, 23 298:3,16 305:5

**109** 304:10,11, 18

**10:00** 332:23

**10:03** 13:9

**10th** 299:2

**11** 300:6 303:1, 5 332:14

**11-month** 300:8 301:12

**110** 13:7 306:21,22,24 307:4 309:14 317:8,12,15,16

**111** 267:20 319:7,8,9,12

**112** 348:25 349:1,3

**113** 267:20

**11:30** 143:7,13, 17

**12** 103:13 119:18,23 121:17 123:3 128:19 246:25 271:18,23 284:3,10 288:12

**129** 290:2

**12:01** 105:4

**12:25** 105:9

**12:41** 117:17

**12:46** 117:22

**12th** 119:23 120:9 125:24 126:7,11 130:10 161:11

**13** 45:15 284:12 306:19

**13-year-old** 46:7 99:15 309:12

**134** 31:25

**136** 290:2

**13th** 42:19,21

**43:7 81:25 82:5** 125:1,4 322:20 323:1

**14** 45:22 46:5 76:22 163:21 217:15 235:18 249:22 254:21 288:25 291:8, 11 307:14,16 353:4

**14th** 317:23 346:23 347:3

**15** 84:3,4 218:19,25 288:25 305:7,9, 11,24

**15-year** 99:18

**15-year-old** 146:10 289:2

**15th** 346:23 347:3

**16** 81:1 254:25 258:22 260:13 264:4,18 265:1 313:14 342:18

**16th** 257:8 258:20

**17** 182:2 265:2

**17-year-old** 265:5 266:12

**17th** 263:9

**18** 167:18 180:2

**18th** 181:9,21 261:25 262:8

**19** 41:3 43:2 73:1 78:8 277:10,13 318:21

**19-CV-08254** 13:18

**19-CV-8254** 319:13

**1955** 44:22,23 45:11 52:12

**1970** 35:10

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**1975** 30:16

**1976** 31:5

**1977** 31:6

**1978** 31:6

**1980** 32:5

**1981** 34:13

**1982** 45:21 46:2

**1983** 45:21

**1985** 45:21

**1986** 34:13,14 35:10,11 37:14 177:12

**1987** 39:15 45:21

**199** 65:2

**1990** 72:9 348:19

**1992** 40:12,13 41:1,5

**1993** 40:12,14, 16 41:2,5

**1995** 60:14,20 61:11 76:4 163:5,19,22 176:11 217:15 235:18 239:14, 18 241:5 242:3 249:22 254:21 260:25 277:18 338:18 343:14 346:9,13,23 347:3

**1996** 37:14 43:2,3 45:22 46:4,5 64:23 65:8,13,15 66:6,22 67:3, 17,21 68:6 69:11,23 71:5 72:9 75:20 76:7,23 89:7 99:21 110:14 119:18,23 121:17 123:3 128:19 130:10 161:11 163:19

164:2,5 165:1, 25 167:4,17,18 180:2 181:21 185:3 187:13 207:2,7 208:13, 24 212:18 213:1,10 216:21 217:1,5, 7,20 227:23 228:6 237:3,8 254:13,25 260:14 262:23 264:4,18 265:1, 2 334:11 342:18 344:12 346:4

**1997** 55:7 325:17

**1998** 57:9 277:20,21 278:6,7 317:18

**1999** 305:7,9, 11,24,25 306:1 307:14,17

———————

**2**

**2** 91:8,9 143:11, 15,16 153:18 185:14 196:10 198:2,5 201:23 209:21,22 271:18,23 298:21 305:5

**20** 22:10 60:13 84:3 212:18 213:1,10 217:20 255:15

**2000** 72:9 304:21 305:1, 12,13 348:17

**2000s** 84:14

**2001** 284:14 285:8,10 295:10,13,17, 21,25 296:2 299:1,5 300:12 301:14,25 302:8 303:19 332:14,18 347:10

**2002** 299:8 300:13 309:21 310:3,4,9

**2003** 285:20 310:15

**2004** 57:4,5,11, 12 285:23 325:6,8

**2005** 318:21

**2006** 78:8 80:17 81:5 313:15

**2007** 28:24 81:2,3,8 291:8, 11

**2008** 25:21 27:7,24 28:22 29:13 30:2 177:13 290:3, 13,16,18

**2009** 28:24

**2010** 284:3,10, 13 286:24 287:21

**2011** 103:14

**2014** 309:21 310:10

**2016** 30:2,3

**2020** 310:4

**2023** 13:8 105:9 117:22 193:16 266:24 334:5

**20th** 262:21,25

**21** 105:9 117:22 193:16 266:24 290:16,18 334:5

**21-CV-05525** 13:18

**2162** 212:14

**2177** 216:17

**2182** 216:18

**21st** 13:8

**22** 177:13 179:17

**22-CV-00320** 13:19

**23** 167:17

**24** 277:20 278:6

**248** 294:18

**24th** 307:10 317:18

**25** 166:21 277:21 278:7 304:21 305:1

**25th** 307:10 317:18

**26** 40:23 216:21 217:1,4,6 228:6 262:23 310:3,4, 9,10

**2600** 291:7

**2650** 42:19 43:7

**267** 304:12

**26th** 40:17,19 228:11,12 237:19 254:24 285:11 297:1,3 325:21 342:17

**27** 180:5,14 187:22 189:3 193:7 203:21 204:5 205:17 216:2 217:2 221:23 237:3,8 239:9 243:6 277:18

**27th** 46:2 237:20

**28** 295:10 299:1,5 301:14, 25 303:18

**28th** 295:25 303:15

**29** 130:10

**29th** 161:12 180:18 181:7

**2:16** 193:11

**2:30** 235:18

**2:34** 193:16

———————

**3**

**3** 154:5 155:22 159:7 218:12, 13 219:24 228:23 270:8 277:10

**321** 37:24

**357** 229:23

**37** 271:9

**374** 167:25

**3800** 31:20

**386** 167:24

**39** 254:10

**3:15** 306:1

**3:30** 263:9

———————

**4**

**4** 221:1 222:7, 13 305:25 306:1 317:15, 16 320:1

**40** 58:24 205:12 320:2

**41** 181:11

**42** 326:19

**4262** 319:13

**4276** 319:13

**44** 229:23,24 320:13

**46** 162:20,23 163:1 254:11

**48** 320:21

**4:09** 266:19

**4:37** 266:24

**4th** 306:5 344:2

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**5**

**5** 139:17 161:11 163:5,18,22 164:2,5 165:1, 25 167:4 176:11 223:7 230:8 254:15 260:25 283:23

**5-15-20-23** 298:6

**5-15-2023** 307:6

**50** 277:18 332:2

**54** 321:4

**55** 321:11

**5818** 263:7

**5827** 263:8

**5849** 167:16

**5856** 235:11

**5875** 129:22

**5880** 248:16

**5882** 248:17

**5929** 271:4

**5932** 271:4,7

**5934** 271:13

**5937** 271:13

**5:00** 116:24

**5th** 161:17 163:11 166:17 167:8

**6**

**6** 224:8 322:18

**6'** 267:23

**60606** 13:7

**6138** 264:3

**6143** 237:1

**6146** 237:1

**61st** 153:3

154:8

**62nd** 153:25 155:25 156:3,5, 6,8,11 203:14 204:1 230:1

**63rd** 156:1

**6:00** 255:15,22 258:20 342:17 344:12

**6:08** 333:25

**6:20** 334:5

**6:21** 205:11

**6:27** 305:25

**6:30** 143:2 180:2,7 181:4

**6:40** 143:24

**6:41** 143:3,4 205:13

**6:44** 355:5,6

**7**

**7** 290:3 305:13

**7-eleven** 84:8

**70** 230:2

**7043** 277:9

**7047** 277:9

**71** 322:18

**76** 326:25 327:23

**7703** 117:7

**7:00** 216:21

**7th** 305:12

**8**

**8** 277:20 278:6

**83** 46:8 329:12

**87** 39:16

**88** 39:17

**89** 40:16,21

**8th** 307:10

**9**

**9** 118:3,4,5 129:12 317:18

**9-11** 332:19

**9-20-96** 213:5

**90** 117:4,8,25 129:3,5,6,14, 20,23 130:8,21 131:8 132:3 143:11,12 144:23 153:2, 18 154:6 158:4 159:7 177:25 178:5,10,11 184:22 185:8, 14 198:1,2

**91** 129:5 167:14,15,19 174:8 175:23 176:17 178:7 182:9 183:3,22 196:10 201:21 209:21 210:19 212:8 262:1,10

**92** 40:22 212:4, 11,13 262:22

**93** 40:22 212:5, 6 216:12,13,17 218:13 219:24 221:1 224:8

**94** 228:3,5,7,23, 24 230:8 329:21

**95** 235:9,10,13, 16 239:8 261:4, 5 338:11,13 339:13 340:4,8, 14 341:6,12,25 342:4 344:14

**96** 236:25 237:4 261:2,3 338:12, 14,18 339:9,13 340:4,9,14 341:6,12,19 342:1,4 344:10

**97** 248:13,14,16 249:5 284:14,

15

**98** 249:12,14,17 284:14

**99** 254:5,6,7,9, 15

**9:00** 116:14,24 228:6 237:19

**A**

**a.m** 143:17

**a.m.** 13:9 143:13 255:15 258:20 264:4, 20 342:17 344:12

**AA** 81:17,19

**abilities** 27:9

**ability** 18:4,8, 12 19:15,19 20:9 327:15

**accept** 210:21 233:20,25 234:21 239:22 248:24 249:1 250:10 310:12

**acceptable** 169:21 170:8 171:5,11 172:2, 12 215:3 216:10

**accepted** 250:2,24

**access** 61:5, 13,15 332:8

**accompanied** 150:10

**accompany** 152:7

**accomplished** 227:11

**accountability** 156:23

**accountable** 156:24

**accurate** 63:18

93:19 175:18 207:14 223:6 249:18 327:14 328:2 345:12

**accurately** 18:5,9 19:16,20 20:9 192:22 200:4 219:12 230:15

**act** 156:24 208:4

**acted** 282:15

**acting** 47:21

**active** 42:14 297:25 298:5

**activities** 347:2

**activity** 26:22

**adamant** 275:8

**add** 66:8 176:5 259:19

**additional** 267:3

**address** 263:20 350:22

**adequate** 322:17

**adequately** 174:21

**administration** 26:11

**administrative** 83:17 120:2

**administrator** 29:16 304:13

**admission** 27:5

**admonition** 123:15,22,23 164:10

**adopted** 311:10 316:10

**advance** 119:23

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

advice 351:13, 19,24 352:3,4, 8,13,17,20,23 353:15

advocate 55:1

affect 18:4,12 19:15,19 20:8

affected 288:20

affecting 343:10

affects 18:8

affiant 338:24

affidavit 267:25 270:13 271:3 277:8 319:14 328:8, 12 339:2 350:24

affirm 16:23

afforded 280:22

Afra 15:8

afraid 242:21 258:1,4 273:6 282:10,12,14

age 289:5,6

agencies 33:23 42:15,16

agency 33:14

Aggravated 75:12

aggravation 267:4,11

agree 16:15 148:13 149:23 151:18,25 154:16 164:2 168:4,6 186:24 189:15 199:7 200:2,4 201:9 210:21 221:25 223:5 224:7 230:6 245:3 255:12 273:3 276:23 302:10 303:20 339:9

agreeable 115:23 116:3

agreed 41:13, 14 273:4,8 274:15,18 291:16,18

agreeing 350:17,21

agreement 114:3,5,6,9,11, 15 118:14 122:15,22 288:1 301:7,9 335:12 336:9, 10

agrees 236:10

ahead 15:23 50:5 64:9,11 66:1 73:5 86:9 87:9,23 88:11 96:12 98:5 100:8 105:23 106:24 113:2,7 124:14 126:2 127:7 133:22 144:2,17 145:8 150:5 152:15, 19 155:17 157:12 172:19 173:17 174:18 179:9 189:18 190:20 192:17 200:10 227:5 231:22 232:5 238:25 239:16 240:11,23 242:5 243:4 246:23 248:12 256:11,12 258:12 259:7 271:24 280:20 282:5 287:6 292:8 293:5,16 294:13 300:21 309:15 315:19 323:13 324:14 342:25

ahold 333:4

Ainsworth 13:23 15:21 16:3,17 17:5 21:23 22:15,23

24:25 25:4,6 27:20 28:9 30:23 36:9 46:17 50:15 53:2 56:11 60:17,22 62:13, 24 65:5 67:19 69:9 70:20 71:9 73:9 74:8,16 76:12,15,18,21, 24 77:4,7,11,16 79:1,22 80:2,5, 8,19 83:11 84:13,17 85:1, 7,9,11 86:13 87:10,18 88:4 89:18 90:8 95:2,5,8,11,13, 16,22 96:2,5,8, 13,18,23 100:5 102:6 104:1 105:1,11,18,21 107:8 110:24 111:21 113:3,9 114:23 117:2,9, 13,24 118:19, 21,23,25 123:12 124:24 126:5 127:11, 15,19 128:1,3, 13,23 129:3,6, 9,13,17,19 130:2 133:9,19, 23,25 134:11, 21 143:10 144:11,21 145:11 147:21 150:14,24 151:10 152:11 154:18 155:18 157:1,7,15 158:10,18 159:24 160:13 161:8 162:8,16, 21 166:8,25 167:21 170:1,5, 15 171:23 172:22 173:17, 20 174:25 175:19 177:22 179:12,25 183:18 187:9, 18 189:14,21 190:9,14 192:10,13,18 193:18,24

195:9 197:12 199:8,17 200:18,25 201:2,11 202:23 203:10, 19 204:7 205:1 206:7 207:19 208:19 209:8 212:3,6,8,10,12 214:19 216:15 220:8,10,12,15, 16 221:17 225:25 228:2,9 231:1,25 232:9 233:8,14 234:11 235:15 237:6 238:20 239:4,20 240:17 241:1 242:1,9,23 243:21 244:6 245:10,16,20, 23 246:9 247:3, 10,16,23 248:1, 4,7,13,15 249:19 253:8, 18 254:4,8 255:10 256:22 258:15,19,22, 25 259:12 261:1,23 262:5, 17 263:4,13 264:16,24 265:11 266:11, 16 267:1,24 268:4,6,11,15, 19 271:2,7,10, 16 277:16 281:2 282:3,6 283:9,15,19,22 284:8 289:11 290:7,10 292:11 293:6, 19 294:10,12, 24 296:12 297:12 298:2,9, 14 299:11 300:24 301:20 302:11,20 304:4,9,20 306:20,23 312:16 314:10, 23 315:2,7,10, 15,22 318:13 319:5,8,10 321:10 323:17,

24 324:19 326:23,24 327:17,22 331:11 332:3 333:8,14 334:14 342:22 343:16 344:17 347:16 348:10, 13,23 349:1,4, 25 350:3,6,15, 25 351:3,5,7,9, 15,21 352:1,6, 11 353:6,10,11, 16,25 354:2,7

air 91:23

airplane 82:10

aka 235:20 237:10

albeit 112:17

alcohol 80:21 81:7,13 82:7 84:10,18 104:10

Aleman 43:15 94:17 97:2

Aleman's 45:1

alerted 114:17

alibi 159:11

allegation 91:14

allegations 88:17,18

allowed 92:5 100:4 116:22 324:2 332:12

alongside 44:17 51:14

alternative 286:4

Alvarez 25:22 26:10 27:6,22 28:4

Alvarez's 28:10,15

ambiguity 343:20

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**ambiguous** 49:13

**ambulance** 80:13

**ammunition** 123:21

**amount** 136:17 220:5,6,18,21

**Amy** 14:9

**and/or** 340:15 341:7,22 342:6

**Anderson** 137:17 146:10 149:4 150:5,16 152:7,14,19 160:3 186:4,16 195:5,17 196:6 198:8 221:6 223:18,23 226:19 230:21 231:3,10,11,17 232:2,8,12,23 233:10,15 276:14 329:8, 18 334:18 335:1,11 336:18 346:3, 18

**Anderson's** 150:10

**Andrew** 347:7

**Andrews** 15:14 345:23 346:10,15,22 347:13

**anger** 328:4

**Anglin** 29:10

**angry** 183:8

**Anita** 25:22 26:10 27:6,21 28:4,10,15

**anniversary** 99:18

**answering** 244:18 351:6, 14,20,25 352:5, 10,14,18,21,24

**answers** 19:24 63:19 123:7 124:19 125:8 127:1 165:9 244:21

**Anthony** 59:19 223:10,14 337:24 340:12, 13,17

**anticipated** 207:20 212:17

**Antusas** 13:14 16:4 19:4 89:2, 11,21 99:4 111:5,9,13 144:25 145:1,2, 13 148:21,24 175:24 185:24 186:7,12,13 194:21 223:9, 23,25 224:11 225:8,9,18 242:21 251:4, 19 258:1 277:24 284:15 336:4,21 338:15,24 339:15,21 340:9,18 341:17 343:5

**Antusas'** 58:19 110:22 184:5,9

**Antusas's** 90:10 149:8 152:13

**anymore** 37:7

**apologies** 271:13

**apologize** 21:22 50:22 57:14 124:15 137:5 231:21

**appearance** 13:20 14:18 15:1

**appearances** 268:3

**appeared** 124:8 264:11

344:13

**appearing** 13:24 14:1,5 15:3,9,17,25 16:2 268:12

**appears** 70:22 118:7,9 130:11 138:5 154:3 160:6,8 187:2 197:25 212:16 224:2 235:14 236:12,15,18 238:4 248:19 270:13 273:13 293:12 294:22 306:16

**Appellate** 49:20 108:10

**applications** 33:9

**applied** 135:11

**apply** 33:4,6 57:1

**appreciated** 309:2

**apprenticeship** 32:1 34:9

**approach** 194:13,14,18

**approached** 348:21

**approval** 347:8

**approximately** 39:13,25 40:7 42:9 43:1 55:7 143:13,17 218:19,24 235:18 339:9

**April** 290:3,16, 18 304:21 305:1

**area** 32:9,17 126:17,21 224:5

**areas** 32:15

**Argenbright**

268:7 337:13 338:20,25 339:3,6,14,20

**arguably** 270:25

**argue** 127:17 190:1 192:7 193:1 247:9

**arguing** 49:8 185:11

**argument** 288:1

**argumentative** 61:23 128:8 206:3 208:18 214:10 243:3, 25 245:14 246:21 288:15 293:15 304:2 314:25 315:20

**armed** 75:10, 11

**arraignment** 110:12

**arrest** 38:11 58:25 79:19 80:17 81:4 251:6,23 258:2, 4 338:15 339:15 340:10, 19 341:17 343:5

**arrested** 77:23 78:7,9,16 81:15 251:7 336:4

**arresting** 259:11,13

**arrests** 343:10

**arrive** 332:22

**arrived** 184:15 229:15 330:20

**arrives** 132:16 149:7 234:15

**arriving** 132:13

**Arson** 57:25

**arsons** 75:15

**article** 324:20, 22,25 348:17

**ASA** 320:9,14, 15,21 322:19 327:3 330:20, 21,23,24

**ASAS** 346:22

**Ashley** 15:22 16:1

**aspect** 49:6,11 241:21,22

**assess** 86:16, 18 165:12 190:8

**assessment** 50:19 85:18 158:25

**assets** 351:10, 22

**assign** 51:7

**assigned** 37:19 38:6,10 39:11,14 55:12, 16,21,23 58:4 110:11,16,19 253:23 254:17 284:24

**assignment** 37:16,17,21 38:7,19 40:1,8 42:8 107:21

**assist** 254:18

**assistance** 21:2 40:18

**assistant** 13:12,13 25:16 29:15 42:14 43:23 54:19,20, 22 55:17 56:19 65:8 68:16,25 69:14,16,19 70:24 74:4 83:17 85:13 105:13 110:10 116:10 120:2 178:20 218:5 255:4 271:19

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

272:1,3,8,11,
16,21 291:3
311:23 313:11
318:1 320:3
345:22 346:8

**assistants**
47:11

**assisted** 21:3

**assume** 17:25
175:9

**assumed**
313:9

**assuming**
239:1,2 284:2

**attached**
270:12 289:2

**attack** 138:4
151:13

**attacked** 274:6

**attempt** 207:12
210:20 267:3

**attempting**
93:22 121:23
124:9 244:14

**attend** 31:4
33:24 34:12,15,
19 76:9 77:18
342:1

**attended** 76:24

**attending**
13:20,21

**attention** 56:5
185:10 271:17
338:10 342:17

**attest** 184:21,
23

**attorney**
13:12,13,15
14:8,10 27:9
35:17 56:19
59:16 65:9,16
67:6,24 68:17,
25 69:14,16,20
70:24 73:19,24
74:4,5,21
85:13,14 89:1
92:12 93:24

105:14 110:11
116:10 123:15
169:22 170:9
171:12 172:13
173:2,6 174:5,
20 175:2,5
176:8 177:16
179:18 218:6
227:19 257:1
271:20 272:2,3,
9,12,17,22
286:7 290:21
291:3,19,22
311:24 313:12
318:1 320:3
329:22 334:10
335:20 339:1
341:21 348:16
351:13,19,24
352:4,8,13,17,
20,23 353:15

**attorney's**
14:13 15:15
26:6,8,16 29:19
34:23 35:18,20
36:11,17 37:14
49:4 58:10,14
59:3 70:1,4
88:22 100:21
107:20 110:15
167:2 177:10
216:25 217:4
254:19,23
259:9 260:13
263:24 264:8
265:7,21
266:13 272:2
279:11,17
284:21 285:24
286:23 287:8,
14 289:19
292:21 293:3,4,
8 295:3 297:8
302:15 321:5
331:10 343:2

**attorneys**
15:12 29:15
42:14 62:25
63:8 72:17
73:13 178:19,
20 192:3
211:22 255:5
257:10 283:7,
10 288:2
319:25 334:12

345:22 346:8,
14

**attractive**
335:9,23

**attribute** 155:9

**audio** 59:12

**August** 89:7
119:18,23
120:8 121:17
123:2 125:24
126:7,10
128:19 130:10
161:11 185:2
187:13 277:18
309:21 310:3,4,
9 313:14 344:4

**authored**
126:12

**authorities**
279:5 281:19

**authority**
105:14 106:3,6,
7 293:7

**auto** 48:20
57:24

**automatic**
267:10

**automatically**
134:7

**Avenue** 291:7

**avoid** 330:14

**aware** 180:14
292:15,20,22
325:3 346:7

**away.'** 331:1

———————

**B**

———————

**back** 24:18,22
25:7 33:16,20
36:6 38:25
47:10 51:24
53:25 54:2,5
64:23 77:9 82:2
91:24 105:6
115:19 117:19
130:1 146:18
153:17,23

154:25 159:4
177:25 180:3
193:13 196:9,
20,24 197:2
198:1 202:1,3
203:7 204:5
210:4 213:21
216:2 224:5
230:4 236:6
242:3 247:15
250:11,18,19
266:21 291:16,
24 292:2,13
295:16,19
305:5,6,21
308:1 317:8
321:22 325:9,
21 334:2

**background**
127:24 188:5
286:15

**backwards**
343:23

**bad** 189:9
285:17 288:25

**bag** 183:25

**Bajenski** 14:10
167:24 168:7
172:3 174:10,
15 175:3,13
188:2,4,12,22
189:17 190:10
191:15 192:21
228:21 252:22,
23 271:18,25
272:3,16,21

**banging** 47:24

**banks** 125:4

**bar** 35:3,6,8,12

**barged** 320:10

**Barnoski**
249:15,20
250:12,13,20,
21

**Barnowski**
219:8

**based** 140:16
160:8 174:15
205:7,16 213:7,

9 224:2 225:15
246:1 260:5
289:5 342:20
343:12 344:11

**basement**
222:24 223:3

**basically**
23:16 57:20
78:25 115:17
255:23

**basis** 191:5,9,
12 297:17

**Bates** 117:7
129:22 162:24
167:15 212:14
216:17 235:11
237:1 248:16
249:14 254:10
263:7 267:20
271:3,12 277:9
283:24 290:2
294:18 298:4,
13 304:12
319:12 349:5

**batteries**
75:12

**battery** 75:4,9

**beat** 279:2

**beef** 288:5

**beer** 31:23
82:14,15,17
84:20,23

**beers** 348:15

**Beg** 96:11

**began** 121:4,
18 164:7 183:6
257:8 285:24

**begin** 17:3
164:7 231:5

**beginning**
39:17 62:21
75:3 114:1
136:24 146:23
153:19 178:1
280:24 336:7

**begins** 131:1
132:4 150:1
153:5

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**behalf** 13:24
14:2,4,6,8,9,12
15:3,6,8,16
16:1 89:20
299:16 328:15

**behavior**
182:24

**belief** 145:25
297:20

**believed**
209:14

**bench** 75:25

**benefit** 299:15,
20

**Bielawski**
59:20

**big** 93:7 182:9
206:19,20
317:12

**Bigeck** 59:19
60:13,20 88:18
89:5 91:15
102:16,24
103:4 104:2,3,
12 106:9,21
109:24,25
111:3,4,8,14,
17,22 113:5,17
114:17,24
115:12 117:10
118:8,10
120:18 121:17
123:2,14 126:7,
10 128:15,25
130:10,21
131:10,24
132:9,12,15,23
134:22,24
135:8,13,17,22
136:4,9 137:1,
24 138:2,11,22
140:7,22,25
141:12,20,24
142:3,25
143:23 144:12,
23 145:3,6,17
147:7 148:6,15,
18 149:1,7,10,
13,18 150:8,16,
17 152:6,13
153:5 154:21
155:19 157:14,

16,17 158:21
159:8 160:15
161:16 162:2,4,
12,15 164:8,10,
16,19 183:25
184:14 185:5,
18 186:7,10,15,
20 187:6,12
194:5 195:1,16,
22 196:2,23
198:3,17,18
199:13,18
207:12 208:3
209:11 213:18,
25 214:7
215:21 219:19,
21 220:5,20,25
221:7,18 222:1
223:18 229:17,
25 237:3,7,14,
25 238:2,12,16,
21 239:1,5,11
240:18,25
241:3 242:3,11,
14,25 244:7,22
251:9,12
252:11 257:17,
20 262:14
272:6,20
276:12,17,18,
25 277:3,9
278:5,18
280:15 281:6,8,
13 282:9,21,24,
25 283:6 284:4,
9 285:2,6,16
286:23 287:2,7,
22 288:1,23
290:2 291:5,14,
23 292:24
293:9 294:18
295:2,3,15,24
302:1,14,25
304:12,15,24
306:14 310:23
311:13 313:21,
24 314:1,9,11
316:13,16
318:14,20
320:2,9,13,15,
16,21,24 321:4,
11,12,15,24
322:18,20
323:3,19,23
324:10,18
326:2,7 327:1,

2,3,4,24
328:11,14
329:7,17,22,23
330:19,21,22,
24 331:17,20
332:8 334:12,
22 342:10
346:3,19

**Bigeck's**
125:22 193:20
194:1,20
198:11,12,25
272:20 322:23
335:4

**biggest** 50:11

**Bill** 14:7 59:19
60:20 113:17
121:17 164:16
188:14 205:15
251:9 292:24
293:9 313:21,
24 314:9,11
318:20 331:17,
20 338:7
341:12 344:21

**Billy** 60:13
88:18 94:17
106:8,20 111:3,
4,8,13,17,22
113:5 114:17,
24 115:12
120:18 123:2
128:25 130:10,
21 131:10,24
132:9,23
134:22,24
135:8,13,17,22
136:4,9 137:24
138:2,11,22
140:22,25
141:11,24
142:25 143:23
144:12 145:6
150:15,17
152:6,12
155:13,22,25
158:21 159:8
161:15 162:11,
15 164:10,18
183:10,15,24
184:1,8,14
185:5 186:20
187:5,12
193:20 194:1,5,

20 195:1,16,22
196:2,15,19,22
197:1,3 198:3,
25 199:13,18
202:2 208:2
213:18 219:19,
21 220:5,20,25
221:6,18 222:1
223:18 224:4
229:25 230:1
237:7,14,25
238:2,11,15,21
239:1,5,11
240:18 241:3,4
242:3,14,25
244:7,22
262:14 272:6,
20 276:12,18,
25 277:3 278:5,
18 281:7,13
282:21 285:6
287:7,15,22
302:1 306:14
311:12 313:19
314:1 320:24
323:18 334:22
346:3,19

**birthday**
289:12,14,21,
23

**bit** 22:18,19
23:18 43:20
180:25 195:6
254:21 293:21
332:25

**bits** 78:19

**bizarre** 108:15
109:19

**Black** 272:25
274:6

**Blacks** 273:2

**Blagojevich**
107:10,12,15,
19,22 108:4,16,
22 109:5,15

**blanks** 320:23

**blessing** 286:7

**blew** 320:14

**block** 140:2
141:21,25

147:11 148:1

**Blottiaux** 45:3

**blown** 45:6

**blue** 191:7

**board** 88:16
93:20 94:3

**Bob** 26:20,23
28:20 29:1,8
107:9,11,15,25

**Bobby** 45:15

**bodies** 93:16

**body** 124:19
165:11 170:16

**bolster** 195:4,
12 334:17

**bolstering**
195:6

**bonds** 352:16

**born** 45:20
46:2,8 103:12

**bottle** 337:16

**bottles** 82:9,
11,18 84:9

**bottom** 118:13,
15 119:11,16
130:20 153:20
154:5 163:10
183:2 198:7
209:22 219:23,
25 221:2 223:7

**bought** 84:12
289:21

**bounced** 54:15
56:22

**boy** 46:9

**boys** 44:24
45:12

**Brand** 299:5

**Brantley**
348:14

**break** 20:11,13
79:20 103:24
171:21 192:15,
16 193:9

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

327:10 333:18

**Brian** 218:24 223:8,9,14,16 272:5

**Bridgeview** 71:14

**briefly** 112:4 269:19

**bring** 53:3 55:2,21 56:14 99:21 100:25 257:9 285:5,12 288:22,24 291:16 293:9

**bringing** 40:18 46:10 292:13 325:23

**broad** 81:15 86:18 116:13 151:9

**broader** 92:2

**broadly** 49:13 51:3

**Brody** 15:22 16:1

**Brosnahan** 110:8,9,10 113:12 114:19 115:3

**brother** 30:15, 18,25 32:18,20 34:20 93:18 219:7 229:3,9 235:19,20,22, 23 236:3,5,16 285:11,13 329:25 330:15, 16,17,18

**brought** 40:20 44:22 51:22 52:7,16 53:24, 25 54:5 100:4, 20 101:6 260:12,18 271:19 272:1 285:11 291:6, 24 296:4 301:18 325:25

**brown** 191:8

**Bruton** 335:8

**Bryan** 60:2,5, 10 212:15,18 213:1,10,17 216:18,24 217:3,14,18 218:18 219:4, 15 220:7,8,13, 17 221:5,10 222:4,9,11,15, 17,21,23 223:2, 22 224:9,11,13 225:11 226:4, 11,24 236:20 250:12,19 260:10,12 262:20 272:23 273:14,17,23

**bucks** 282:23, 25 283:4,14 331:17,20

**building** 42:20 43:9 188:7 285:14 332:17 333:4,5,7

**buildings** 93:16

**bunch** 18:25

**burden** 226:22

**bureau** 26:19 41:4,8,13,18,20 57:15,19 59:2, 25 284:23,25 286:1 314:8

**burglary** 48:20 50:8

**burn** 183:11,15

**business** 116:18,20,23 196:14

**busy** 169:9 180:20

**buy** 131:11,25 136:18 220:18, 21 229:24 230:3

**buying** 220:1

**C**

**C-A-S-S-I-D-Y** 17:8

**cabin** 47:24

**cabins** 47:20 48:6

**cake** 289:12, 14,21

**Cal** 342:18

**California** 40:17,24 42:20 43:8 228:11,13 254:24 291:7 297:4 325:22

**call** 66:8,11 75:6 81:22 83:17 88:20 107:24 114:5 131:15,25 174:13 235:19 269:10 270:2 282:16 308:8 310:21 327:14, 15 332:10,12 335:8 347:12

**called** 25:15 33:16 81:22 93:12 99:13 131:19 134:2 143:4 169:18 185:9 219:5 229:1 237:12 272:7 282:12 285:25 286:6 287:15 297:25 313:17 320:10 327:3 330:20 333:4 335:18

**calling** 92:13, 18 282:8 322:2 327:19

**calls** 81:16 88:22 106:23 174:17 240:22 251:11 265:9 332:9

**campaign** 26:20,21,23

**camping** 47:19

**canceled** 64:9

**candidate** 334:23

**car** 50:7 97:6 149:5,8,18 156:24 183:14 184:16 186:5, 17,23 197:19, 23,24 199:3 200:7,8 201:5, 6,13 206:19,21 209:17,18 222:5,10,16 239:25 349:10 350:7

**care** 133:21 196:14 211:3 221:7,12 230:11 330:23

**career** 85:12 259:9 276:19

**Carolina** 310:8

**Carrie** 110:3 254:20 264:9

**carried** 155:7

**carries** 280:7

**carry** 93:16 138:4 150:18 155:8 211:25

**carrying** 183:25

**cars** 349:22

**Casanas** 209:16,17

**case** 13:17,18 19:9,10,12 23:1,10 43:15, 21,23,25 44:17, 21,22,23,24,25 45:1,7,11,16 46:25 47:2,5,9, 16,17,18 48:3, 18,21 49:8 50:3,4 52:3,7, 11,17,23 53:19 54:1,7,9,11,24, 25 55:8,10,11,

13,14,20,25 56:2,6,13,14,19 57:7,10 69:17 70:8,12,15,18 71:7,11,12 74:12 75:8 81:20 88:7,13, 20 89:1,8 90:16 92:23 93:6 94:11,17 97:2, 7,14 98:17,21, 24 99:4 103:10 105:14 110:11, 17,18 111:19, 23 112:1,3,10, 12,16,19 113:19 114:4 126:16,20 139:14 140:21 151:20 165:13, 15 172:15 180:19,22 181:15 188:13, 15,16 190:2 191:13,17 192:20 194:14 195:4,12 207:9 209:11 211:10, 24 213:25 225:23,24 226:14,22 227:9,16 232:13 245:8 250:7 252:17 253:1,13,19 254:2 255:3 256:5 259:18 266:1 267:5,9 269:13,14,23 270:21,25 272:15 275:9 276:14 278:22 279:22 283:11 285:19 290:4 294:19 295:5 309:12 319:13 329:23 334:17, 18 335:5 336:12 343:3, 13 345:13,23 346:2,5,9 347:5,6 348:1, 14

**Case/ organized**

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SCOTT CASSIDY, taken on July 21, 2023

365

57:23

**caseload** 44:9

**cases** 21:3
23:11,12,14,21,
22 24:2,13
38:13 42:2,10,
12,15,16 43:13
44:7,8,11,15,17
45:2,8 47:7
49:1,9,25 50:6,
10 51:7,9,12,
15,17,19,22,23
52:1,3,4 53:3,
10,14,21,23
54:2,3,19,21
55:2,5,15 56:22
69:24 70:6
75:21 85:17
86:6 89:11
92:24,25 94:6,
10,12 96:3,21
99:4 111:17
175:24 181:1,
15 212:1
278:25 319:22

**casino** 78:10,
11,14,15 79:12,
14,19 84:22,24
133:6

**Cassidy** 13:11,
12,14,15 14:4,6
15:20 16:12,14,
16,21 17:8
21:7,10,17
25:10 77:13
105:7 117:20
133:20 171:11
176:9 178:21
192:11,14,19
193:14 266:22
271:20 272:2,4,
9,12,17,22
277:18,22
278:1 290:22
291:3,10,12
305:20 307:14
320:3,10,14,15,
22 321:21
327:3 330:20,
21,23,24 334:3
345:21

**Cassidy's**
322:19 334:10

**Cassius**
150:20

**catch** 220:14

**category**
61:14

**Catholic** 77:20

**caught** 137:20
146:11 243:24
313:21,24
314:2 327:2,13

**causing** 18:16,
20 102:22,23
104:4,8,13
106:9 183:8
319:2

**CCSAO** 345:8,
12

**CCSAOCAE-
11183** 162:25

**cell** 48:7

**cellblock**
322:9,12

**Center** 283:25
299:6,7 304:1,
14

**Central** 13:9
105:4,10
117:17,22
193:11,17
266:19,24
333:25 334:6
355:5

**cetera** 243:1

**chair** 39:18,20,
22 40:2,5,9,10,
23,25

**chance** 238:8
243:17

**change** 26:17
40:13 41:1 43:3
57:5,11,12
58:12 197:22
199:1,4,19
227:17 251:19
252:7

**changed** 21:6
26:10 137:3,19

197:15 198:13
227:24 243:23

**changing** 26:9
243:12

**Channel** 91:8,
9

**chaperones**
47:22

**characterize**
85:19

**charge** 48:16
194:21 251:4
272:7 273:5,25
281:5

**chargeable**
225:22

**charged** 42:13
44:8,18 97:7,
23,25 98:1,7,
16,21 99:1,6
179:6 194:12
224:15,18,20
226:9 272:14,
16 273:6,15
275:13,19
276:3 279:19

**charges** 86:15,
21 87:5,12
89:22 224:25
226:25 273:3
346:16 347:8

**Chase** 13:4
105:8 117:21
193:15 266:23
268:2,5,9
283:21 297:24
298:10 334:4

**chasing** 228:1

**check** 122:12,
13 164:20
175:25 195:14

**checking**
121:22 226:17

**Cheri** 45:5

**Chicago** 13:7
15:17 31:14
33:2,7,10 37:24
254:1 256:1,4,

16,19,21 257:6
337:20 343:3
347:22,24
348:5

**chief** 25:17
26:18 57:15,16
58:8,13 81:24
82:6,22 83:19,
20 314:8 325:4

**chiefs** 286:2

**child** 45:8,10
46:1,8 265:6
326:14 328:20

**children** 46:11
77:18 307:25

**chiming** 95:19

**choice** 285:22
286:16 301:14

**choices**
285:17,25
286:6 291:17
301:4 302:2,7,
17 303:1
318:24 349:6
350:4,12

**chose** 180:6
214:5

**chosen** 180:6

**Chris** 20:25
23:4 159:9,10,
11 160:10
238:8,11,15,23
248:18,20
249:8

**Cicero** 269:13

**Circuit** 291:6

**circulated**
354:25

**circumstance**
18:7

**circumstance
s** 86:8 94:14

**citizen** 38:10

**city** 15:17 16:1
67:10 254:10
347:22

**Civil** 319:13

**clarification**
139:5

**clarify** 25:4
52:21 135:21
172:3 200:25
262:6

**class** 47:18
48:9,15,16

**classification**
280:18

**clean** 132:20
133:10,16,19
134:2,8,16,20,
25 135:7,9,23
136:5 140:18
146:10

**cleaned**
132:24 133:10,
20 134:22
135:18

**cleaning**
133:14 135:4,5
136:7

**clear** 38:23
40:15 53:21
57:6 90:4
104:14 126:3
129:20 140:11
164:15 180:11
185:7 200:24
225:19 234:14
254:11 275:1
301:10 325:2
328:17 329:11

**clearer** 170:23

**clemency**
277:25 328:15

**client** 114:3
115:17 120:23
121:2,8,13
164:12 174:22

**client's** 80:14

**clients** 24:5
115:3

**Climber** 219:7
237:10,16
238:3,7

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**close** 55:8 254:11 329:18 330:4,5,7

**closer** 28:23 77:9,15 258:14

**Cold** 57:7,23

**Colgate** 225:16

**colleagues** 24:6

**collective** 258:7,8

**Colleen** 14:14 15:12 70:24 71:14 212:23 345:24

**College** 31:10

**comfortable** 225:21

**command** 291:5

**comment** 172:10 200:16

**commiserate** 288:13

**commissary** 321:12 331:12

**commit** 280:7, 12

**committed** 103:7 111:10 156:25

**common** 17:13 204:10,11,14

**communicate** 106:11 310:19 338:19

**communicated** 73:15

**communication** 56:22,23

**communicator** 286:12

**compare** 214:13 243:9 322:12

**compared** 191:24

**comparison** 322:13,17

**compensation** 22:11

**complain** 321:20,25

**complained** 321:24

**complaining** 287:16,17

**complaints** 38:10

**complete** 34:25 58:21

**completely** 171:9 323:19

**compliments** 288:21

**comply** 72:10

**compound** 151:8 334:15

**computer** 83:2,5,7 322:19,25 323:4,6,7,16

**concentrate** 349:12

**concentrated** 123:16 243:14

**concentration** 23:3

**concern** 93:21 250:25

**concerned** 227:13,15 234:25 243:20

**concerns** 281:18

**concluded** 94:10,15 98:18, 23 355:6

**conclusion** 174:11 250:2

**condition** 18:3 350:18

**conditions** 97:10

**conduct** 47:18 317:2

**conducted** 105:7 117:20 193:14 266:22 334:3 347:25 348:4

**conducting** 185:2

**conference** 14:20 125:9,13 165:6

**confused** 328:18

**confusing** 135:21 170:18

**connection** 329:23

**conscious** 36:23

**consciously** 27:12 161:22

**conscripted** 150:18

**considerations** 54:17

**considered** 29:15 50:9 75:15 104:15 128:10 245:1

**consisted** 58:24 334:19

**consistent** 251:12,20 335:19,22

**consists** 116:1 336:7

**consume** 141:7

**contact** 78:13 93:17 94:5,7, 18,25 196:1

**condition** 265:3 346:22

**contacted** 33:12 71:24

**contacting** 311:19

**contained** 127:1 175:2

**contemplate** 288:3

**contemplated** 188:23 287:25 301:5 302:10

**contemplation** 302:2

**content** 126:6

**contents** 166:16 169:1,3 170:10

**context** 65:20 68:2,10 69:13 71:11 75:2 276:6

**continue** 80:15 278:1

**continued** 53:16 144:23 148:15,18 185:18 186:10 278:1 286:13 336:13

**continues** 198:17 209:21 219:4

**continuity** 52:2 54:9 56:17,18

**contradicted** 87:6,13,20

**contradiction** 124:12 154:15

**controlled** 272:9

**convened** 13:9

**convenient** 116:25

**conversation** 67:7 91:19 115:6,13 121:16 123:2 125:23 130:22 138:3 143:6,8, 20 144:14 150:9 164:23 165:1 166:16 168:17 169:12, 23 170:11,17 171:13,15 172:14 173:22 174:10,14 177:1 179:5,19 182:14 184:13 185:25 190:22 212:25 213:2 221:6,11,14,19 223:9 230:10 231:10 236:7 241:3 264:5 304:15

**conversations** 115:16 130:9 173:3,7 188:9 192:23 193:4 205:15 340:13 341:5,12

**convicted** 282:4 308:18

**conviction** 88:6

**convictions** 93:9

**Cook** 14:8,10, 13 15:14 25:11, 12,14,18 26:5, 15 29:12,18,24 30:4 34:23 35:18,19 36:4, 11,16 37:13 49:3 58:9,13 59:3,15,25 67:5 69:25 74:5 85:12,13 99:22 100:14,19 167:2 169:22 170:9 171:11 172:12 173:2,5 174:4 177:9,16 179:18 216:25 217:4 254:18,

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

23 257:1,10 265:6 266:13 267:13 270:16 284:21 286:22 287:8,13 291:6, 24 293:2,4,7 295:2 302:15 304:16,25 331:9 341:20 343:2

**cool** 145:3 186:15

**cooperate** 269:14 273:25 277:1,5

**cooperating** 299:16

**cooperation** 114:3,5 336:9

**cooperative** 244:13,16,17

**coordinated** 254:25 257:8

**Coppollilio** 59:19 223:10, 14

**copy** 73:23 118:7 217:10 353:23 354:6,9, 15,16,20

**corner** 42:20 82:3,6 183:24 184:1,2

**correct** 24:21 25:1 33:17,18 35:14 46:6 51:3 55:3 65:25 72:8 86:3 90:18 103:16 111:6,7, 11 113:21 115:18 116:18 120:16 125:20 129:1,2 130:22 136:6 151:7 163:5 170:2 171:15 182:7, 21 183:20 193:25 212:15 219:18 229:15 248:19 249:24

250:23 252:8 260:11 261:15 331:24 345:14 346:6,24 347:4 348:1,2,7

**Correction** 281:11 303:25

**Correctional** 283:25 299:6,7 304:14

**corrections** 68:20 99:22 100:14 102:17, 20 103:7 104:13 106:18, 20 107:7 279:19,24 280:23 281:9 293:9 295:1 302:14 331:22

**correctly** 71:13 219:14 228:18 244:25 273:11,13

**corroborate** 86:20,22 87:24 124:11 131:22 157:21 202:10 204:16 236:19 336:14,15

**corroborated** 87:20 157:25

**corroborates** 157:20

**corroborating** 209:12,13 243:16

**corroboration** 157:2,8 251:10, 11,15

**could've** 238:6

**counsel** 13:22 14:25 17:2 185:11 190:1 192:7 271:14 317:6,19,21 350:17

**counseling** 328:5

**Count** 151:12 182:15

**county** 14:8, 10,13 15:14 25:11,12,14,18 26:5,15 29:12, 18,24 30:4 34:23 35:18,19 36:4,11,16 37:13 49:4 58:9,14 59:3, 15,25 67:5 70:1 74:5 85:12,13 99:22 100:14, 19 167:2 169:22 170:9 171:11 172:12 173:2,6 174:5 177:9,16 179:18 216:25 217:4 254:18, 23 257:1,10 265:6 266:13 267:13 270:16 284:21 286:22 287:8,14 291:6, 25 293:2,4,7 295:3 302:15 304:17,25 314:12 327:5, 25 330:21 331:10 341:20 343:2

**couple** 45:2 48:4 70:6 75:24 93:2,12 97:11 101:22 103:8 141:6 142:23 242:20 345:25 349:13 353:5

**court** 13:5,16 16:22 19:23 37:21,23 38:13, 15 39:4,8 49:14,16,20 56:23 66:3 67:4,8,12 68:2 75:5 80:10,15 90:1 92:20 95:23 96:5,8 97:11 107:20 108:11 239:13, 17 248:10 291:6 294:18

297:8 298:25 306:8 335:6 350:23 353:1

**court-ordered** 81:9

**court-reported** 196:3,5

**courthouse** 24:8 39:9,10 40:3,4,9,18

**courtroom** 39:8,12,14,18 107:22

**courtrooms** 38:8 39:21

**cousin** 285:12 330:17

**cousin's** 209:24 210:8, 14

**cousins** 151:22

**cover** 214:15

**coverage** 56:20

**covered** 58:1 93:7 180:17

**covering** 56:9, 13 197:9

**COVID** 93:16

**CPD** 15:6,9 337:8,12,23 338:3,6,19 342:1,6,12 343:14 344:13

**Cragg** 93:5,18 98:7

**crazy** 48:11

**create** 70:2 158:8 218:7

**created** 70:3 213:9

**creating** 158:4

**credibility** 209:12 211:15

257:19

**credible** 226:17 234:22 257:25 258:3 335:14

**credit** 151:16

**crew** 50:8

**crime** 35:24 41:11,20 43:4, 5,12,23 44:2,3, 4,16 49:22,24 50:4,6,9,12,13, 16,25 51:1,5,9, 11,15,18,19,24 52:5,6 53:4,12, 17,23,24,25 54:2,4 55:6 56:14 57:3,7,23 70:5 75:12,13, 14 82:19 84:2 97:24,25 111:10 141:16 188:6 194:12 273:25 280:8 316:23 325:9 329:24 330:3,5, 8

**Crime/cold** 57:9

**crimes** 43:6, 18,23 44:3,14 45:9 49:17 50:3,16,17 51:1,2 53:11, 15,22 54:8 55:3,6,17,22 56:14 57:24 58:6 67:21 68:6 69:12,23 74:24, 25 75:9,11,18 110:12 139:10 280:12 325:14

**criminal** 23:1, 11,12,14,17,20, 22 24:2,13 32:7,8,11,12,14 35:21,22 36:2, 3,12,14,16,19, 20,21 37:4,11, 12 49:5,7,9 72:7,12,16 73:12 74:1

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

85:14,15,24 86:15,21 87:4, 12 89:11 92:20 156:22,24 174:20 175:1 194:9 241:19 270:21,22 274:4,21 283:7, 10 319:22 346:2 347:9

**criticized** 28:10,13,15

**cross-examination** 169:18 334:7

**crying** 48:4

**cryptocurrency** 352:19

**Cups** 183:25

**curiosity** 152:5

**curious** 205:24 206:5,9

**current** 103:18 337:12,21,24 338:4,7

**cursing** 320:14

**Curtis** 321:6

**custody** 100:15,18,20 101:24 104:16 105:15 106:4, 14,16,21 107:3, 6 180:8 270:15, 21 293:1,10 295:1,2,16,25 296:5,21 302:1 305:18 316:17 318:4 321:17

**cut** 38:23

---

**D**

---

**D-U-D** 219:10

**Dan** 20:25 23:7, 9

**Daniel** 348:15

**dark** 176:16

**Dart** 29:14

**date** 46:3 64:12 116:6,8 118:13, 14 119:1,8,10, 15,16,17,24 120:11,14 131:20 163:10, 13,24 167:6,7 176:11,12 180:18 181:23, 24 182:1,3 260:15 261:5,8, 20 262:8 264:18 286:18 296:9,22 305:8 310:1 343:12

**dated** 161:10 167:17 290:3 298:6 304:21

**dates** 278:8,9, 11 295:14

**daughter** 46:1 108:17

**day** 13:8 31:11 34:10 63:16 107:21 116:9, 16 123:8 142:5 237:19,24 265:2 303:16, 18,19 306:1,7, 9,15

**days** 75:4 180:18 181:11 227:20

**dead** 93:16 108:7

**deal** 109:18 241:14 276:15 330:22 335:21

**dealership** 97:6

**dealing** 102:22

**deals** 95:7

**dealt** 85:14

**death** 94:18 194:6 276:25 279:15

**deaths** 254:20

**December** 30:2 60:13 76:4 163:21 217:15 235:18 239:14 241:5 242:3 249:22 254:21 305:7,9,11,24 318:21 338:11, 13,18 339:13 340:4 341:6 343:14 344:14 346:9,13,23 347:3

**decide** 23:6 24:12 53:10,14 54:20 69:6 71:3,18 107:5 247:1

**decided** 24:15 26:15 71:3 110:15 213:13 292:24

**decides** 69:15

**decision** 36:23 54:17,18 251:4 289:1,5 291:20 312:4

**decisions** 213:23 285:25 286:6,17 291:17 301:5, 15 302:3,7,17 303:1 318:24 343:5,7 349:6 350:4,12

**Decrezenzo** 223:11,15

**deface** 135:9

**defaced** 135:14

**defective** 169:10

**defend** 174:21

**defendant** 19:11 45:2 56:25 73:12 75:6 105:17,25 179:5 268:12

**defendant's** 178:19 254:10

**defendants** 15:7,9 18:22 19:3,9 72:7,12, 16 85:14,16,24 113:20 268:7 333:9 337:9

**defense** 24:13 174:8,9,13,20 175:2,5,23 176:6,7,8 192:3 211:22 224:25 225:1,6 227:14 283:7,10,11 335:20

**defenses** 224:14,17,19 225:4,17,24 226:8,12,23 227:12,16,24

**defer** 144:6

**deference** 169:8

**define** 244:17 330:10

**defines** 28:6

**definition** 75:17

**degree** 32:6 56:10 305:2

**Delacy** 263:20

**delay** 161:5,14

**demeanor** 124:6 245:2

**Department** 33:8,11 99:22 100:14 102:17, 20 103:7 104:13 106:18, 19 107:7 254:1 256:2,21 279:19,24 280:23 281:9, 11 293:9 295:1 302:14 331:22 337:20 343:4 347:24 348:6

**depends** 62:16 69:18 244:17

**deposed** 18:15,20

**deposition** 13:10 58:17 59:10 60:24 61:4 62:8,12, 14,21 63:1 64:10 105:7 117:20 168:9 193:14 247:18 248:7 266:1,2, 22 268:16 334:3 355:6

**deputy** 25:17 83:15,18 314:7

**Derrick** 93:5, 13 98:6

**describe** 50:7 68:15 317:24

**desk** 125:6 191:7,8

**details** 159:13, 19 160:4 221:22

**detectives** 254:17,22 257:6

**detector** 124:10

**determination** 106:15 157:19

**determine** 54:7 69:25 90:1 131:24 155:6 157:24

**determining** 151:3

**develop** 93:10

**Devine** 286:1 289:20

**devised** 147:15

**Diciolla** 130:15,16,17 163:15 165:18

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

168:5,8,18
172:5 175:4,13,
21 178:23
191:16 192:21
252:18 268:7

**die** 320:15,16

**died** 97:5
108:13

**differ** 96:11

**differed** 275:20
276:4

**difference**
114:10,13
325:1

**differences**
44:5 234:25

**difficult** 252:5

**difficulty**
244:20

**diligently**
19:23

**Dinolfo** 15:14
345:23 346:10,
15,22 347:7,12

**direct** 17:4
271:17 293:8
338:10 342:16

**directed** 93:21

**directing**
302:13

**directions**
347:1

**directly** 347:1

**directs** 125:6

**disagree** 96:12
245:5 266:3,4

**disciplinary**
254:18

**disclose** 283:5

**discrepancies**
192:3 211:11,
12,18

**discrepancy**
192:2

**discuss**
224:12 347:5,6

**discussed**
128:6 136:18
198:17 220:5,
18,21 221:22
255:1

**discusses**
130:21

**discussing**
182:18

**discussion**
128:25 136:10
220:1 234:6
261:6

**discussions**
314:8

**Dismiss** 294:4

**dismissed**
88:13 90:17

**Disney** 97:16

**disorderly**
47:17

**dispute** 72:23
73:14

**disputes** 38:13

**distance** 35:23
329:16

**distinction**
50:2,11,20

**district** 13:16
37:18 38:4
39:10 96:6,9

**Divine** 286:7
291:19,22

**Division** 13:17

**divorced**
103:17

**document**
61:14,21 68:18
119:15 129:15,
21 167:15
173:3,6 179:20
184:20 235:11
236:25 271:1
283:24 290:2

304:12 306:25
307:5 319:12,
14,20

**documentatio
n** 70:3 250:8

**documented**
136:2 171:2
173:23 177:2
261:25

**documenting**
70:21 170:10
263:19

**documents**
60:23 61:4,7,
14,17,19 62:4
262:9

**dog** 153:14
154:7

**Don** 219:8
249:15 250:12,
13,20,21

**Donahue**
327:12 331:9

**donate** 27:1

**Donohue**
314:5,7

**door** 27:2
76:19 83:13,14
236:2,3 324:6,
11,20,23,24,25

**doors** 47:24
142:23

**doorway**
326:12

**Dore** 140:1
144:24 147:10,
25 148:19
185:19,21
186:11 223:15

**double** 25:4
179:7

**doubt** 168:1
322:23 326:10

**downplayed**
241:17

**dozen** 53:9
75:24

**drank** 84:14

**draw** 30:7
180:4

**drawing** 21:4

**drew** 36:16

**drink** 79:15
348:14

**drinking** 82:17
84:15,22

**drive** 13:7
78:23,24 159:9
222:5,10,16,18
229:4 235:21
307:21 309:7,8

**driver** 140:1
147:10,24
156:18,24
157:4,9 202:7,
11,13,16,17,20
203:1,24
204:16 208:16
209:6,15
239:12,19
240:6,7,15,19
241:5 242:8
243:1 248:22
249:9,10

**driver's** 204:17

**drivers** 208:4
209:1

**driving** 183:6,
14

**Drizin** 93:25
94:1,2

**drop** 29:1,8

**drop-off**
205:18

**dropped**
146:16

**drove** 183:4
186:22 209:18
235:23 236:6
309:4

**drugs** 104:10

**drunk** 48:1
78:19,22

**dry** 337:16

**dual** 336:16

**Dudbud** 219:8

**Duff** 286:11,17
300:4

**Duffy** 284:16,
17 285:3,5,14
286:5,9 294:7
321:6 329:22,
24 330:3

**Duffy's** 285:12
329:25

**dungeon**
322:3

**duties** 40:13
41:1 51:5 57:5,
11,16 58:12

**duty** 282:20

**dwelled** 244:5

**dying** 277:4
320:19

---

**E**

---

**E-TRAN** 354:2,
3

**earlier** 89:6
130:12 135:16
156:5 164:9
177:11 183:23
204:20 224:6
232:1 260:16,
24 262:14,16
269:3 284:11
302:6,9 311:22
325:13 327:7
328:16 330:16
334:17 336:6

**early** 295:21
303:22 336:6
344:6

**east** 140:2
141:21,25
146:15,16
147:11 148:1

**Eastern** 13:17

**Ed** 59:18

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**KENTUCKIANA**
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

102:17 149:7 150:5,10,17 152:6,14,19 160:3 161:5,10, 15,17 162:9,17, 19 163:2,4,11, 18 164:4,5,15 165:1,19,24 166:2,16 167:3, 10,12,18 168:11,17 176:20,24 177:2 178:9 180:1,8 181:21, 23 182:4,8,13, 17 183:9,10 184:1,8 186:22 187:6,12 193:19 195:2, 17,20 196:13 197:18,21,23 199:2 200:5 201:4,15 202:3, 6,19,25 204:16 205:24 206:18, 19 208:2,23 210:24 213:18 214:8 215:22 236:20 262:25 276:12 280:15 281:6,7,13 282:21 285:6 289:12 291:23 292:24 293:10 299:5 306:14 309:20 310:14 313:14 322:19, 24 331:12,20 346:4

**Ed's** 209:24 210:8,14

**Eddie** 113:17 114:17,25 115:10 125:10, 19 149:11 151:21 153:2 154:8,12,21 159:17 161:21, 23 164:15 165:7 183:13 196:22 223:19 224:1,3 251:9 252:11 260:21 261:9,21 262:8, 15 278:19

289:23 298:25 299:16 300:12 301:25 302:25 305:16 307:3,9, 16 310:10 314:11 316:13, 16 323:18 326:14 328:7, 11,12 334:22 342:11 346:18

**educational** 34:16

**Edward** 17:12 295:2 304:15, 24

**effect** 91:17 277:4 288:4

**effort** 48:22 86:7 160:11 254:25 255:2 257:8 259:17

**efforts** 288:7

**elapsed** 353:1

**elected** 25:25 26:2 49:19

**election** 28:24, 25

**Electric** 31:25

**electrical** 34:9

**electrician** 109:3

**elevator** 125:3

**elevators** 125:4

**embarrassing** 81:18

**emphasized** 164:12

**employed** 20:15,18 21:2

**employment** 23:2,5,16 25:9 35:16

**encompasses** 145:20

**encountered** 238:12,19

**end** 39:16 112:14 114:2, 15 182:12 197:13 206:21 244:5 278:22 333:20 341:20

**ended** 48:15 81:22 92:23 93:1 155:14 300:11

**ends** 293:20 336:8

**enforcement** 286:3

**enjoy** 49:3,9 300:15,17

**enjoyed** 289:9, 10 299:20,21

**ensure** 72:10, 15 73:11

**enter** 114:2 236:16 302:13

**entered** 104:19 235:24 295:9 298:11 301:6,9, 14,24 302:1,25

**entire** 210:19 275:3

**entirety** 58:23

**entitled** 155:3

**entity** 107:5

**entries** 305:23 307:7 309:16

**entry** 298:22 305:7

**environment** 24:7

**Ephraim** 15:23,24

**episode** 81:17

**epitome** 109:5

**Eric** 137:1,16, 18,20 146:10

149:4 150:5,9, 16 152:7,14,18, 19 153:2 154:7, 12,21 159:18 160:2 183:10, 15,22,24 184:1, 2,4,9 186:4,16 195:5,17 196:6, 14 198:8 202:3, 6 210:24 221:6 223:18 226:19 230:18,21 231:2,10,11,16 232:2,8,12,23 233:9,15 329:8 334:18 335:1, 11 336:17 346:2,18

**escape** 349:9, 21

**establish** 131:19

**established** 156:23 202:15 205:18 206:17

**estimate** 53:6

**et al** 13:12,14, 15

**ethical** 72:3,5, 11

**Eugene** 235:12,20 236:10,23

**evacuated** 333:7

**evacuating** 333:5

**evaluate** 124:20 159:2,5 195:14 203:12 207:13 209:12 226:15 232:7 243:15 245:8 257:19 335:13 336:13

**evaluated** 209:4 257:17 334:17 336:12

**evaluating**

124:17 207:10 226:15

**evening** 181:16,17

**event** 152:12 168:16 203:13 339:12

**events** 217:14 261:13

**eventually** 31:25 327:5,25

**everything's** 234:22

**evidence** 72:6 87:21 93:11 140:17 194:3 200:11 202:15 205:5,6,7,9,22 206:17 207:4, 18,20,24 208:10,14 209:2,20 214:11 232:2 246:1 251:3 334:18,19,21 336:21 341:17 346:16

**exact** 30:13

**examination** 17:4 337:5 345:5,7,19 347:17 348:12

**examples** 248:10

**Excel** 298:4 307:1

**exchange** 85:16 114:6

**exclusive** 194:4

**exculpatory** 72:6,11,13,15, 24

**excuse** 82:13 95:8 169:15 282:15

**execute** 145:24

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

execution 146:12

exhibit 85:3,10 117:2,4,8,25 118:2,4,5 129:3,12,20,23 130:8,21 131:8 132:3 143:11, 12 144:23 153:1,18 154:5, 6 158:4 159:6 162:17,23 163:1 167:13, 15,19 174:8 175:23 176:17 177:25 178:5, 10 182:9 183:3, 22 184:22 185:8,13 196:10 198:1,2 201:20,21 209:21 210:19 212:4,11,13 216:12,13,17 218:12 219:24 221:1 224:8 228:3,5,7,22,24 230:8 235:9,10, 13,16 236:25 237:4 248:11, 14,16 249:3,13, 17 254:5,6,9,15 262:1,9,22 263:5,7,11,18, 25 267:18,19, 22 268:17 270:8 271:2,3,5 277:8,14 283:17,20,21, 23 289:25 290:1,5 294:16, 17,21 297:21, 23 298:3,15 304:10,11,18 305:5 306:21, 22,24 307:4 309:14 317:8, 15,16 319:6,9, 12 327:17 348:24 349:3 350:11

exhibits 249:12 354:24

existed 151:21

exists 311:17

exited 236:5

expect 138:23 159:17 160:2 166:5 168:25 173:23 174:1, 20

expected 137:9

experience 23:5 85:20 177:17 179:17 322:16

experienced 151:17 203:22 204:8 242:12

experiences 234:21 313:10

expert 133:15

explain 68:11 174:2 204:8 242:22 276:8

explained 170:20 177:11 311:6 321:13 327:1

explaining 96:22

explains 169:11

explanation 172:1 215:16

explanations 151:6 252:10

explore 87:25 158:23

extended 318:12

extent 169:11

eyes 324:18

---

**F**

fabricated 339:14 340:10, 19 341:16

face 197:9

face-to-face 308:15,17 316:5

facilities 103:25

facility 348:6

facing 86:15, 21 87:4,12 194:6 267:9

fact 16:16 18:19 19:14,18 49:10 55:20 56:12 72:13 93:2,3 107:24 108:2 112:17 122:17 126:20 144:10 157:3,9 158:3 175:17 191:4 202:11 203:25 205:19 209:14 234:20, 21 235:3 237:10 239:6 241:5 251:16 264:11 281:22 319:4 335:10

factor 151:23

facts 112:4 142:14 195:15 279:18

factual 191:5, 9,11

factually 93:19 175:18

fair 18:1 50:18 85:18,19 86:4 132:2 158:25 190:8 242:24 249:10 304:4 342:13 343:15 344:4 346:21, 25 348:3 354:8

fairness 160:19

fake 291:23

fall 303:12

falls 36:13

40:19

falsely 273:9

familiar 29:20 139:20 166:22, 23 175:17 221:24 319:18

families 46:11

family 54:12 56:25 94:18 97:3,5 108:5, 18,19 109:16

fashion 338:19

fast 48:25

fatally 169:10

father 228:21 264:5,12 275:1, 2,3,7,8,11

fatigue 18:8

fearing 103:4

February 46:2 76:23 295:9,20, 25 299:1,5 301:14,25 303:10,15,18

feel 46:10 47:6 62:14,18 92:8 181:18 192:4 225:22 287:9, 10 319:3

feelings 108:24

feet 18:24 19:5

felonies 39:1 75:15,16

felony 38:21, 23,24,25 39:3, 4,6,8,14,21 44:8,11,15 67:8,9 68:3 74:24 75:17 346:8 347:2,8

felt 26:11 71:16 145:24 151:21 225:21 241:21 335:9

field 206:19,20

figure 95:6

file 110:6,7 112:5,11,20,21, 25 113:5 115:25 116:1 124:22 166:21, 22 167:1 175:25 207:9 222:22 298:5 307:2 328:14 342:21 343:25 344:3,12

filed 88:14 90:3 294:4

fill 101:16 290:23

filled 295:7

filling 320:23

financial 350:18 353:12

find 36:15 44:13,14 66:21 67:1 85:8 141:3 154:25 155:1,4, 6,25 156:4 161:14 166:15, 24 169:12 191:15 211:14, 22 215:15,19 237:9 247:4 250:11,19,20 279:23 281:24 308:2 314:23 315:17,21 316:1,2,3

finder 112:17 122:17 234:21 235:3

fine 97:12 156:17 174:3,4 248:12 327:6 328:1 343:22 344:3 349:17

finger 334:20

fingerprints 222:22

finish 94:23 95:2 142:12 287:5 294:10

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**finished** 34:8

**fired** 135:25
136:6

**firm** 15:24 21:5,
15 22:1,4,12,
24,25 23:6
25:10

**firsthand**
67:10 246:12,
17

**fit** 278:9,11

**fits** 20:2 270:25

**flip** 17:24

**floor** 42:19,21
43:7 81:25 82:5
125:1,4 322:21
323:1

**Florida** 97:16

**fluid** 227:18

**flush** 294:14

**focus** 202:25
203:4 226:13
231:24 243:7

**focused** 185:1

**focusing**
227:10

**folks** 139:16
224:24

**follow** 137:11
171:18 186:25

**follow-up**
33:13,22 66:12
158:1 345:4

**foolproof**
226:25

**force** 45:5

**forceful** 75:15,
17

**forensic** 87:20
88:1

**forensically**
88:2

**Forest** 47:20

**forget** 35:9
90:21 97:7
102:9

**forgive** 55:15

**forgot** 33:21
58:2 116:5
240:15,18
241:22

**form** 46:14
56:8 62:9,19
65:1 67:18
68:1,18 69:8
71:6 73:4,7
74:6,14 78:17
84:11 86:9
87:7,22 89:17
99:25 100:2
105:16 106:23
114:20 123:4
124:14 126:1
134:17 145:8
147:17 150:12,
19 151:8 152:8
154:13 155:16
156:21 157:5,
11 158:6,14
159:21 161:6
162:6 166:4,19
167:11 170:13
171:20 172:18
173:15 175:7
177:18 179:8,
22 183:17
187:8,15
193:22 194:23
199:5,15
200:10 202:22
203:16 204:2,
19 206:3 207:6
209:3 221:15
225:3 227:5
230:23 231:18,
22 234:10
238:17,25
239:15 240:10
241:9 242:16
243:3 245:6,13
246:20 259:7
261:19 262:3
263:1 264:22
276:10 280:20
293:5,15
296:11 299:10
302:19 312:13

318:8 323:21
331:7 334:14
342:23 343:16
344:17

**format** 112:19
307:1 349:7

**formula** 213:20

**forthright**
165:9

**fortunate**
120:1

**forward** 120:5
184:4

**foul** 169:20

**found** 48:20
190:10,13
206:15 245:1
252:10 270:12

**foundation**
71:6 84:11
87:22 105:16
106:23 134:17
139:11 157:11
159:21 166:19
188:18 189:11
190:3 199:6
200:10 203:16
231:22 238:17
239:15 240:10
241:9 242:5,16
243:3 245:13
246:20 253:14
258:17 264:22
265:8 266:8
283:12 292:7
300:21 312:14
323:13,22
342:22 343:17
344:18

**fourth** 317:10

**fractured** 29:3

**frame** 29:4
64:8 69:10
72:10 325:6
341:25 342:4

**framed** 339:21
340:9,18
341:17

**free** 43:24
78:23

**freely** 84:12

**frequently**
312:1

**Friday** 63:17
109:3

**Friedrich**
15:19

**friend** 23:7
108:8

**friendly** 28:1,4,
6,8

**friends** 23:8
28:20 29:5,6,11
137:22

**front** 40:20
89:25 92:19
129:21 136:24
137:15 142:18
166:13 184:5
275:15 276:9

**frustrating**
54:15

**full** 16:13 21:20
132:4 196:10
201:23 218:13,
18 228:24
230:9

**full-sized** 82:9

**fully** 160:24
161:3

**function**
255:23,24

**fundraiser**
26:25 27:5

**future** 123:19
278:25

---

**G**

---

**Gaines** 110:13

**gamble** 79:15

**gang** 43:5,6,18,
23 44:2,4,14
49:17 50:3,12

51:1 53:11,15,
22,24 54:2,8
55:2,6,17,22
56:14 57:24
58:6 67:21 68:6
69:12,23 70:5
74:23 93:12
110:12 139:9,
10,12,14,15,20
140:8 151:16,
17,24 182:24
188:6 225:12
229:4 251:15,
17,20,24 252:5,
13,16,18,19,23,
24,25 253:2,9,
12,17,24
325:14

**gangway**
141:25 146:17
147:12 198:19,
21

**gangways**
140:3,12,19
141:22 148:2

**garbage** 225:8

**gate** 184:3

**gather** 158:11
232:2

**gathered**
346:16

**gave** 42:13
112:3 123:15,
17 126:24
128:12 164:6
165:9 170:22
239:13 265:1
282:23 283:4,5,
14 284:12
311:22 315:10
329:15 334:25
335:4 336:12,
20 339:5

**geared** 50:12,
14 51:1,2

**gender** 46:8

**Gene** 219:7
229:3,9 236:19

**general** 70:10
104:24 322:8

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**generally** 44:6
65:10

**generated**
59:2,15,22
69:25

**gentleman**
188:7

**George** 15:14
45:4 115:11,14
178:19 337:21
340:3,8 345:23
346:10,15
347:7,13

**get-go** 122:18
124:21

**getaway**
156:18 157:3,9
202:7,11,12,16,
17,20 203:1,24
204:16,17
205:3 208:4,16
209:1,6,15
239:12,18
240:6,7,14,19
241:5 243:1
248:22 249:9,
10 349:10,22
350:7

**Gigeck** 238:2

**girl** 45:5 47:19

**girls** 99:14,15
272:8 289:4
309:12

**give** 16:24
19:25 20:5
38:12 42:10
49:1 62:14 83:9
87:25 100:11
122:20 130:23
131:6 159:13,
19 160:4
184:20 190:17
215:16,20
216:4 238:22
241:6 252:6
256:18 257:24
259:23 260:1
272:18 274:11
279:18 282:21,
25 286:15,18
295:23 305:8

331:16 347:1

**giving** 74:11
121:4 151:16
251:18 286:23
331:19

**Gizowksi**
231:12

**Gizowski**
59:23 60:1,10
219:6,7 228:5,
15,19 229:7
230:17 234:5
235:12,20
236:10,19
237:10,22
260:9,12 271:3
273:18,19
274:5,10,14,20
275:12 342:10

**Gizowski's**
233:19

**glad** 226:2

**gladly** 288:7

**goal** 112:24

**good** 16:18
23:8 27:10
28:20 29:16,17
43:19 49:2
78:20 85:12
88:3 102:8
103:24 109:2
115:25 122:4
123:19 139:18
173:8,13 188:4,
12,18 207:17,
24 217:17
242:14 257:16
287:25 288:22
293:18 309:11
313:12 334:23
345:16

**Goodness**
273:21

**gosh** 43:2

**governor**
107:25

**graduate**
30:14 31:2
32:2,4

**graduated**
30:15 33:1
34:14

**graduating**
35:3

**Graf** 338:4
341:6,11,16

**Graffeo**
254:17,22
337:25 340:12,
13,18,22

**grand** 166:13,
14 167:3 273:9
275:14,15
276:4,9 290:13
291:7,11,25
292:5,19

**grandchild**
103:12 326:11,
15

**grandchildren**
103:18,21

**grandson**
325:25

**grasp** 139:18

**great** 173:1
190:7 285:18,
25 286:11,12
287:13 288:8
289:8

**Greenwood**
31:14,15

**greets** 125:6

**grew** 126:16

**ground** 17:16
214:15

**group** 141:1
221:11 223:25
233:19 285:10

**guess** 26:24
35:24 53:7
56:10 105:25
147:18 162:1
182:9 250:23
258:17 279:11
285:8 292:9
293:17

**guessing**
104:11 165:8
260:4 285:9

**guilty** 76:2
277:17

**gun** 131:12
133:1,3,5,10,16
134:4,7,8,15,
20,25 135:23,
24 136:10,18
183:23 184:4
196:6 222:22
229:23 230:4
251:21 272:7

**guns** 131:12,
16,25 132:20,
23 133:21
134:2,22 135:9,
14,18 136:5,11
140:18 145:4
146:11 186:15
220:1,18,21
222:25 223:4
229:22 235:22
251:21

**guy** 20:25
36:19 41:10
97:5,13 109:2,9
238:11 239:2
241:20 270:18
284:12 289:2

**guys** 48:1 77:5
93:5,11 95:6
112:6 113:13
114:18 142:23
182:13 183:7
184:15 222:19
253:7 288:25
334:20

---

**H**

**H-A-N-D-L-E-Y**
16:10

**habit** 249:10

**Hagy** 14:1

**Hale** 183:5
198:22 223:12
349:10,23
350:8

**half** 53:9
178:15 306:6
309:4

**halfway**
185:17

**hallway** 236:3

**Hamlin** 31:20

**hand** 16:21
73:22,24

**handed** 110:6,
7 268:17
349:14

**handgun**
133:12

**handing** 118:1

**handle** 56:1

**handled** 23:1
51:8 112:1
314:5 321:6
331:9

**Handley** 16:10

**handling** 43:24
89:1,8 105:14
114:4

**handwritten**
60:6,9,12,16,19
66:2,23 67:4,13
68:5,7,12,14
69:18,22 70:2,
23 71:1,15,17,
25 73:18,23
74:3 166:9
213:14,16,17
214:1,7 215:17,
21 216:19
217:11,18
218:14 228:17

**Hang** 85:4

**happen** 57:8
80:1 91:16
104:21 251:1
255:13 256:6
265:17 266:5,6

**happened**
143:2 151:5
157:18 159:11
163:21 164:25
182:6 195:8

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

201:3 204:24 210:16 211:24 213:9 218:10 241:13 265:18 332:18 333:6 334:25

**happening** 256:7 265:17

**happy** 289:23 301:1

**hard** 22:19 50:7 70:10 216:2 227:7 309:23 330:10 331:24

**Hardaway** 93:5,13 98:6,7 180:19

**harm** 48:20 122:4 272:18

**harmed** 282:20

**harmless** 169:20

**Harry** 43:15 45:1 94:17 97:2

**harsh** 92:4

**hash** 176:14

**head** 184:2 338:12 342:18

**hear** 14:19 96:18 127:14 129:18 211:3 232:21 234:23, 24 235:7 241:11

**heard** 79:7 109:15 110:18, 21 111:2 128:2 138:6,9 160:9, 10 232:22 234:17 235:1,2 239:2 272:23 328:9 332:24 348:20

**hearing** 14:16 22:19 89:25 92:12,19 290:4 293:24,25

294:5

**Heather** 15:8

**heck** 47:25

**held** 26:8 123:9 265:6,20 304:16

**Helena** 142:22 254:20 264:10

**helping** 93:15

**helps** 77:15

**herring** 227:25

**hey** 66:9,11 95:4 176:9

**hidden** 183:23

**hiding** 184:2

**hierarchy** 46:23

**high** 30:14,15, 17,18 34:15,19 55:13,25 56:2, 5,9 76:9,21,25 77:18,19,20,21 93:6 263:21,23 264:6 280:8 285:10 329:25 330:18

**highly** 311:4

**Hill** 298:25 299:6,7 303:25

**hired** 25:18 45:3

**historical** 142:8,14

**historically** 26:10 259:10

**history** 285:21, 23 298:1,5 307:6

**hit** 155:8 251:17

**hold** 171:19 172:17 241:8 266:12

**holding** 326:14

**hole** 227:25

**holes** 158:23

**Holmes** 337:21 340:3,8,22

**home** 31:9,12, 13,17 78:5 144:24 148:18 160:16 185:18 186:10 204:25 205:20 218:20 225:7 236:6 273:7 274:15, 18 338:23

**homesick** 31:8

**homework** 336:11

**homicide** 111:17 172:14 179:7

**honest** 47:1

**honestly** 62:11 252:1

**hope** 48:17 280:17,23 335:16

**hoped** 335:16

**hoping** 195:4

**Horan** 267:12, 15,16,17 268:20,25 269:5,10,12 270:15

**host** 181:2 240:16

**hour** 306:6 309:4

**hours** 22:8 63:24 64:20 103:25 116:18, 20,23 143:25 144:13 211:9 254:24 261:7 264:4,19,20 306:18 326:19, 22 332:2 333:13 350:19 353:3

**house** 131:4 135:18 136:4 142:18 146:16 148:7 149:8 152:14 159:12, 18 160:4,12 184:3,6,9,15 186:21,23 205:14 209:24 210:8,11,14,16, 25 218:21 219:1,17,22 229:1,2,5,8,22 234:7 235:21, 22,24 236:1,5, 14,16 249:22 250:13,21 272:6 330:7

**housed** 43:6 297:3 322:7

**household** 351:16

**housing** 299:13

**Hoval** 254:20

**Hovel** 264:9

**How'd** 41:21 110:4 133:19

**How's** 112:16

**Hubbell** 109:21 110:3 111:17

**Huge** 219:8 229:4 235:20, 21,23

**human** 289:3

**hurt** 164:14 279:2

**Hyland** 14:14 15:12 70:24 71:14 212:23 345:24

**Hynes** 43:21 110:17

**hypothetical** 87:9,23 172:19 177:7

---

**I**

**idea** 140:12,14, 15,19 145:2,7, 9,14,18,19,22, 23 146:1,3 180:21 186:14 207:18,24 208:1 216:24 217:17 242:14 257:16

**identification** 129:23 212:11 216:13 228:7 235:13 237:4 248:14 249:17 254:6 263:11, 25 267:22 271:5 277:14 283:20 290:5 294:21 297:23 304:18 306:22 317:25 319:9 349:3

**identified** 77:2 179:24 268:22 321:4

**identify** 268:21 313:11

**identity** 179:19

**IDOC** 101:24, 25 270:15,20 278:5 279:13 281:4 290:2,16, 18 292:22 293:1,10 294:18 295:15, 25 296:5,21 297:7 298:3 299:13,25 302:1 304:12 305:18 316:9, 17 318:4 321:17,22

**ignorance** 248:9

**Illinois** 13:7,17 31:14 33:7,10 35:6,8 37:18,24 38:5 76:6,8 78:10 102:17,

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

19 103:7 104:12 106:17, 19 107:7 279:18,24 280:23 281:9, 10 293:8 294:19,25 302:13 309:6, 17 331:21

**illness** 18:8

**imagination** 301:6

**imagine** 27:2 218:2 286:15

**impeachment** 191:22

**implemented** 255:2 286:8

**implicate** 240:8,14

**implicating** 241:20

**implored** 241:12

**import** 204:3

**importance** 121:2,9,18 122:8,24 224:12

**important** 46:21,24 47:2, 4,6,9 123:18 165:12 204:4,6, 15,23 211:20 243:15 278:24 322:6

**importantly** 226:20

**improper** 269:8

**impute** 335:21

**in-** 14:21

**in-person** 13:25 14:2,4,6, 18 63:13,14 64:21

**inaccuracies** 193:7

**inaccurate** 191:16

**inaccurately** 193:4

**inappropriately** 345:13

**incentive** 194:8

**incident** 74:19 102:10

**inclined** 280:7, 11

**include** 72:5 118:14 178:23 179:4,18

**included** 128:25 138:23 172:6 181:25

**includes** 76:2

**including** 186:22 219:17 223:25 233:15 339:7

**inclusive** 214:3

**income** 351:16

**incomplete** 87:9,23 172:18 244:4,8

**inconsistent** 217:19,22,25

**incorporate** 218:6

**incorporated** 168:23

**incorporating** 169:1

**incorrect** 271:8

**incumbent** 192:2 279:17

**independently** 257:7

**indicating** 169:24 170:16 279:25 335:1

**indirectly** 347:2

**individual** 15:6,9 337:8

**individuals** 126:19 279:20 336:15

**infamous** 45:5

**inference** 151:20 152:2

**inferences** 260:6

**inferred** 315:13

**influence** 272:10

**information** 72:12,14,16,21, 22,24 73:10,11, 14 74:1,3,21 85:15,22,23,24 86:2,7,16,17,20 87:3,11,25 88:1 127:9,24 128:4, 11,24 158:12 160:14 166:6 172:5 175:2,11 179:6 180:15 223:17 225:5, 17,23 260:2 281:22

**initial** 68:22 75:8 114:14 125:23 274:22

**inmate** 288:19 296:21 316:5

**inmates** 280:7 315:17 316:16, 20 318:12,14 322:6,7

**insert** 92:14

**inserting** 92:13

**inside** 78:14 229:22 235:25

324:21

**insinuate** 277:22

**insinuating** 277:22

**insisted** 272:22

**instance** 73:17 227:19

**institution** 33:25 34:16 282:18 306:8

**institutional** 112:2

**institutions** 279:20

**instruct** 76:14 122:8

**instructed** 222:21

**instructions** 140:8,9 347:1

**Integrity** 57:25 58:7

**intended** 289:20

**intending** 25:7 119:19

**intent** 194:16 226:21

**intention** 24:18,21

**interact** 263:14

**interactions** 341:19

**interest** 312:5, 7,21 313:1,4,6

**interested** 126:16 217:13

**interesting** 23:16 43:13 44:10,25 45:1,7

**interests** 276:24 281:23 312:10,20

**interim** 58:20 63:6 88:15 336:10

**interject** 80:10 227:4 352:25

**intern** 34:23

**interns** 16:5

**internships** 34:25

**intersection** 31:15,16

**intervene** 89:10

**interview** 59:18,24 60:1, 2,4 67:24 89:5 102:11 120:7 123:6,8 125:9 126:9 127:2 130:14 141:10 145:16 161:21, 25 162:1,2,4,9, 10,11,12,15 163:4,16 165:22 167:17 168:11,22 172:16 175:15 176:14,20,24 178:2,6,9 180:4 181:4,9,20 212:18 213:9, 14 217:9 237:2, 7 248:18 249:15 257:16, 21,25 261:20, 25 262:9,18,24 270:16 317:3 342:2

**interviewed** 73:25 88:5 89:6 99:23 101:1,7 102:1 180:1,10 181:1 207:8,15, 16 217:6 228:19 239:7 244:10 255:4 257:9,19 259:22 260:20 264:12 336:3, 19 342:10

**interviewing**

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

92:17 259:21 317:4 336:2

**interviews** 59:2,14,15,16, 23 169:1,3 178:18 181:16 185:1 187:17, 20 207:23 258:2 260:3 261:10,11 262:14,15,22 263:24 264:9 338:14 342:12 347:25 348:4

**introduced** 129:8

**investigate** 51:14

**investigating** 192:20 257:4 272:15

**investigation** 59:2 61:12 74:2 156:18 167:19 254:16,19 327:1,11,12,13 340:15 341:7, 22 342:6

**investigation/ prosecution** 341:13

**Investigations** 25:17

**investigative** 59:25 129:1 130:7 167:16 168:10 177:15 235:12 237:2 263:19

**investigator** 66:4 67:6,22 70:1 74:5 100:12 101:2 118:11 121:21 122:9 163:15 165:18 166:10 169:22 170:9 172:13 173:21 174:5 177:4,8 178:13,21,23, 24 203:8 252:5,

19,20,21,23,24 271:18,25 272:3,16,21 282:9 284:16, 17 323:15 324:17 329:22 332:10 339:4 341:21 345:8, 12

**investigator's** 256:20 310:22

**investigators** 48:11 59:16 139:3,6,9,10 161:24 171:12 173:2,6 175:22 177:17 179:10, 18 188:4 192:21 236:11 251:16,24 252:13,16,25 253:2,9,12,17, 24 254:2 255:5 256:1,18 257:1, 6,15,23 258:8 259:25 260:1,7 263:20 264:3 287:15 321:5 323:10 324:1,6, 9 332:13 343:1

**investigators'** 179:4 257:2

**invited** 99:16

**involved** 23:13 45:17 259:2,3, 10 348:1

**involvement** 213:24 241:17 343:13,14 344:13 346:2

**irony** 107:23

**irregardless** 194:25

**issue** 102:21 103:2 265:5 310:18,20

**issued** 102:7 296:22

**issues** 103:4 311:7 316:6

**J**

**Jack** 43:21 110:17

**jackets** 243:12, 23

**jail** 100:19 224:10 237:15 251:13 267:13 272:25 273:1,2, 6 274:6 278:16, 20 279:3,15 304:17,25 320:17,19 327:5,25

**jail.'** 320:16

**James** 45:2

**Jane** 45:4

**January** 55:7 81:3,8 299:2,8 300:13 307:14, 16 317:23

**Jayne** 45:4

**jerk** 238:21

**Jim** 14:3 32:19 64:1,2,4,14,17 110:8,9,10,14, 17 112:2 113:12 114:18 115:3 225:16 334:9

**job** 26:12 28:10 29:17 40:13 41:1 51:5 57:5, 11,14,16,19 58:12 90:6 97:10 287:13 288:8 289:8 309:11

**jobs** 31:22 46:12

**Joe** 131:1,3,11, 14,19,23

**John** 34:7,12, 17,22 35:1 39:11 59:23 60:1,10 219:6 228:5,15,19,25

229:1,3,7,21, 23,25 230:2,9, 11,12,17 231:12 233:19 234:5 235:20, 23 236:4,17 237:10,22 260:9,12 271:3 273:18,19,23 274:5,10,14,20 275:12 285:2,5, 12 286:5,9

**John's** 219:7

**John.'** 236:8

**Johnson** 21:1, 7,15 23:7 25:10 91:7,10,18

**join** 23:6 256:13 259:8

**joined** 31:25 35:12 37:13 52:6 53:11,16 74:23 177:11

**joining** 58:12

**Joint** 254:10

**Joliet** 78:10 277:19 298:25 307:21 309:4 322:12

**judge** 39:11 40:21 81:12,14 92:21 108:11 112:18 122:17 223:24 246:1, 25 247:6 295:9 299:5 302:12, 21,22,23 339:2

**judges** 92:20

**judges'** 95:25 96:1

**judgment** 350:20,22

**juice** 273:1

**July** 13:8 25:21 30:1 105:9 117:22 177:13 193:16 266:24 284:3,10 334:5

344:1,2,4,7 346:4

**jumped** 268:23

**June** 43:2,3 110:13,14 305:12,13 344:5,6 346:4

**junior** 77:21

**juror** 122:17

**jury** 75:25 112:18 151:7 166:13,14 167:3 180:16, 18 272:9,11 273:9 275:14, 16 276:4,9 290:13 291:7, 11,25 292:5,19

**justice** 32:7,8, 11,12,14 46:11 49:11,12,15 194:14

**justify** 293:20

**K**

**K-U-N-Z-E-R** 14:9

**K-U-R-S-O-N** 16:9

**Kamionski** 15:25

**Kane** 327:5,24

**keeping** 94:7 224:13

**Kelecius** 285:21

**Kendall** 314:12 327:5,25 330:20

**Kentuckiana** 13:6

**kid** 45:22,24

**kids** 45:18,20 47:22 48:14 76:9 288:11,24

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

kill 45:4

killed 44:24 46:11 93:5 94:17 99:14 279:3 289:4 309:13

kind 22:24 28:1 31:21 78:21 81:19,21 82:15 104:4 159:3 293:20

knew 23:3 29:14 41:22,23 108:19 113:19 122:25 134:16, 25 139:6 141:11,24 142:4,25 143:1, 23 144:5,13 183:1 187:5,12, 16,19 194:5 196:2 203:7 206:25 208:1,3, 6 209:10 230:13 232:6, 14 233:6,9,12, 17 282:19 327:10 332:18

knocked 236:1

knowing 62:1, 10 120:3,4 144:8 205:5 209:9 233:22

knowledge 101:5 103:5,6 111:5 112:2 142:7 246:13, 17 257:7 343:3, 11,12 344:11, 15 346:14

Kortney 13:4 22:18 105:8 117:21 193:15 266:23 268:9 333:23 334:4 355:3

Kunzer 14:9

Kurson 16:8

---

**L**

L-Y-D-O-N 14:3

Lacks 342:22 343:16 344:17

ladies 48:4

lady 159:9

lag 303:21

laid 114:8 192:6,8

Langone 20:25 21:7,15 22:25 23:4 25:10

language 124:19 137:10 139:8 165:11

large 125:9 251:8,22 305:5

largely 251:8

Lasalle 37:24

lastly 338:6

late 340:14 341:6,12,25 342:4 344:6,14

latest 94:4

Latin 151:12 182:14

Latino 79:3,6, 9,10

laughed 272:13 273:15

Laura 15:12 70:25 71:13 345:24

Laurence 263:21,23 264:6

law 21:5 22:1, 12 23:2,5,15, 16,17 32:9 34:6,7,10 35:3, 21,22 36:2,3, 12,14,16,19,20, 22 37:4,8,10,

11,12 49:5,6,8, 9 92:4 156:22 286:3 335:19 341:1

lawful 293:7

lawsuit 19:7 88:14

lawyer 56:24 63:20 88:25 114:3 120:4,21, 25 121:5,6,12 161:24 164:8 194:17 225:10, 14,15,16 241:12

lawyer's 122:2

lawyers 18:25 19:18 42:10 51:6 56:24 63:5 90:23 91:1 92:18 112:7,8 114:24 164:10 276:13,17 310:25 311:2,9, 13

lay 328:21

laying 93:22

layman's 343:8

leader 219:6

leading 320:22

leads 153:1

leaning 339:4

learn 23:14,18 88:9 90:16 91:2,5 110:4 134:20 285:14 328:7

learned 88:19 112:8 115:2 141:17

learning 23:4

leave 22:4 26:5,15 30:4 31:7 34:2,3 49:17 110:15 130:3,4 236:4

295:18 323:18, 23

leaves 288:9

leaving 43:24 88:16 332:17

left 26:7 36:3 52:13,17 54:8 57:23 58:1,9,13 137:21 143:12, 16 177:12 264:11 286:12 287:8 295:20 323:8 324:10, 16 325:14,22 333:1,12

legal 20:20 34:25 317:6,19, 21

legitimate 92:12 288:5

lending 23:10

length 67:25

lengthy 214:1 239:13

leniency 85:16 86:6

Lenny 188:12 228:21

Leonard 167:23 168:7

letter 93:3,19, 20 100:2,3 117:10 118:7 120:7,22 121:14 129:7 161:10 162:17 163:2 176:9 181:25 212:15 213:3,7 225:5, 7,13 262:21 279:7,9,25 281:16,17 288:9 304:13 311:16,17

letters 98:8

level 206:10

liability 194:9 241:19

liar 272:7 320:11

Liberto 139:25 147:9,24 149:4 153:19,24 155:25 156:18 157:3,9 183:4 186:4,16,21 197:14,22 198:8 199:3 200:6 201:5 202:18,20 204:24 205:2, 14,19,21 206:18,25 208:3,15,25 209:5,14 222:5, 10,16,18 223:18 238:22 239:6,24 240:7 241:6 242:7 276:14 277:24 294:20 295:5, 12 296:1,6 300:11 302:16 346:3,18 347:9

Liberto's 149:5,8 184:16 186:5,17,22

license 341:1

lie 234:2 292:5

lies 276:9 278:2 293:14

life 20:1 92:3,5, 8 194:6,7 235:3 267:10 279:15 280:9 289:3

light 146:8 230:12 322:4

limited 48:24

Linas 285:21

Lindsay 14:1

Linehan 14:14 15:13 130:13 178:21 260:6 345:24

lines 201:25 219:25 298:23 307:13 311:18



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

lineup 268:22

liquor 82:10, 12,14,18 84:10

list 307:2,3 317:5

listed 317:17, 19,21

listen 66:17 98:14 124:10 160:18 288:25

listening 127:16 195:10 209:2 239:2 251:19

lists 349:22

litany 75:16 127:23

Lite 84:19

literate 83:7

litigate 51:11

litigated 75:20

litigation 75:25 76:1

litigator 53:16

live 309:3 322:16 330:3,9

lived 126:17,21 142:22 329:24 330:6,11

lives 144:25 148:22 185:24 186:12

living 76:4,5

locally 82:10

locate 255:1

located 13:6 31:13 37:18,23 41:11,12 42:19 43:7

location 13:21 116:8 142:15, 16 143:24 199:12 255:3 259:17

Locke 259:8 347:18,21 348:8

locked 238:5 280:12

locking 286:4

log 228:23 318:2

Logan 94:17, 21 283:25 284:1

long 20:17 29:24 37:22,25 38:17 39:20,22 40:5,10 42:22, 24 57:2 63:22 64:19 80:25 83:23 116:16 119:14 126:17 139:19 169:10, 11 174:2 177:9 182:10 186:24 200:3 213:23 214:9 215:5 216:24 217:3 227:14 289:6 342:16

longer 30:12 213:24 300:22

looked 61:8 90:21 106:6 166:21 180:16 214:12 262:1, 21

Lord 196:19,23 197:1,2,4

Lords 137:16 138:13 149:15 151:13 183:9 198:16 221:8, 13

Lords' 183:6 223:11,17

lose 106:12,15 107:2,3,6

losing 104:20

lost 56:23 104:21

lot 14:23 48:8, 13 56:4 92:24 112:10 126:21 139:14 141:7 144:7 145:20 151:22 170:19 204:3 209:20 211:8 214:15 241:15,16,17 242:18 243:8, 13 244:3 272:25 288:20 289:8,16 311:25 312:1 332:16,17 333:3 354:4

love 272:25

lower 197:8 280:16,18 327:16,17

lowest 47:18

Lydon 14:3 24:23 25:2 27:19 28:5 36:5 46:14 50:5 52:25 56:8 60:15 62:9,19 65:1 67:18 69:8 70:19 71:6 73:2,4 74:6,14 76:10,13,17,20, 22 77:3,13 78:17 79:17,23 80:4,7,12 84:11,16,25 86:9 87:7,9,17, 22 89:15,17,23 94:22 95:1,4,7, 10,12,15,18,25 96:3,7,11,15 99:25 103:23 105:2,16,19 106:23 110:23 111:18 113:1,6 114:20 117:12 118:18,20,22 123:4 124:14 126:1 127:6,13, 17,22 128:2,8, 18,20 129:5,7, 11 133:7,17,20, 24 134:9,17 143:9 144:1,16 145:8 147:17

150:12,19 151:8 152:8 154:13 155:16 156:21 157:5, 11 158:6,14,17 159:21 160:7 161:6 162:6 166:4,19 167:11 169:25 170:3,13 171:16,19 172:17 173:15 174:17 175:7 177:18 179:8, 22 183:17 187:8,15 189:10,18,24 190:1,12 192:7, 9,12,16 193:9, 22 194:23 195:8 199:5,15 200:10,23 201:8 202:22 203:2,16 204:2, 19 206:2 207:6 208:17 209:3 214:10 220:7,9, 14 221:15 225:3 227:4 230:23 231:18, 20,22 232:4 233:4,11 234:10 238:17, 25 239:15 240:10,22 241:8 242:5,16 243:2,25 245:6, 13,18,21 246:6, 20,23 247:9,12, 22,24 248:2,6, 12 256:9,12 258:11,17,21 259:6 260:22 261:19 262:3, 11 263:1 264:22 265:8 266:8 280:20 282:2,5 283:8, 12 288:15 292:7 293:5,15 294:8 296:11 297:10 299:10 300:20 301:16 302:4,19 304:2, 5,7 312:13 314:21,25

315:9,20 318:8, 10 323:11,13, 21 324:12,14 326:18 331:7 332:1 334:8,9 335:25 336:24 337:1,3 349:24 350:2,5,21 351:1,4,6,12, 18,23 352:3,9 353:9,17,20 354:10,12,18

lying 122:14 243:11 275:24 277:23

___

**M**

___

M-O-S-E-R 338:8

made 24:3 36:24 38:11 83:8 88:17,18 91:13,14 101:5 182:25 213:23 236:20 251:12 253:7 273:16 288:7 289:1 334:22 335:9, 14 343:4 350:9

Madison 15:18

magazines 93:7

main 226:13 243:7

maintained 92:22

major 23:14, 20,22 24:2,13 50:19 272:10

majority 44:9 103:3

make 22:6 29:6 51:7 55:21 56:13 68:20 72:16 73:18,23 90:3,4,6 92:20, 21 95:21 98:3 103:10 104:14 106:14 116:2,3,

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

6 118:3 120:25 121:1 122:23 131:12 157:19 160:11 164:21 174:12 182:22 185:7 225:21 258:2 264:13 279:3,6 281:21 282:17 285:18 291:23 303:22 308:24 312:4 322:13,16 328:19 330:24, 25 331:4 332:9 340:8,17,22 341:10 354:5

**makes** 19:1 49:7,8 179:1 253:6 325:1

**making** 48:1 54:17,18 72:18 79:5,11 95:7,9, 20 134:12 291:21

**man** 79:9,10 93:4 153:12 154:7

**management** 328:4

**Mander** 59:20

**manipulation** 278:2

**manner** 164:9, 18 166:7 276:11

**mannerisms** 124:7 165:9,17

**manners** 231:7

**Mantilla** 15:16 77:8,12

**manual** 257:4

**map** 349:9

**March** 290:13 291:7,11 295:21

**Margaret** 83:22,23,25

84:6 120:6

**marijuana** 327:3,13 331:4

**mark** 85:3 117:4 129:3,14 162:16,23 167:13 212:3 216:12 228:3 235:9 236:25 248:10 249:12 254:4 263:5,17 271:2 277:7 283:17 289:25 294:16 297:21 304:10 306:20 319:5 348:24

**marked** 117:6 118:2,4 129:23 130:8 158:4 162:23 163:1 167:14,19 174:8 210:19 212:11 216:13, 16 228:4,7 235:10,13 236:24 237:4 248:14 249:13, 17 254:6,9 263:6,11,18,25 267:18,19,22 271:5 277:14 283:20,23 290:1,5 294:17, 21 297:23 302:24 304:11, 18 306:22,24 319:9,11 349:3

**Markham** 37:17,18,19 38:4,5,6,17,20, 21 39:21,23 40:4,6,9,11 41:23,25 42:6 47:10

**marking** 99:17 117:25 118:1

**Marley** 14:10 167:24 168:7 172:4 174:10, 15 175:3,14 188:4,14,22 189:17 191:15 192:21 252:21,

22,24 268:9,12

**Marley's** 190:10

**Marquette** 30:25 31:2,4,7 33:25 34:2,16

**married** 103:16

**Marshall** 34:7, 12,17,22 35:1

**Martin** 111:16 142:22 254:20 264:10

**Martin-hubbell** 110:4

**Mary** 46:2

**Masciopinto** 14:15,19 15:5 256:8,11,13 258:13,16 326:21 336:25 337:2,4,6,8,18 342:24 343:21 344:19 352:25 353:7 354:23

**match** 117:14 234:18,22

**Matt** 16:4 90:16 91:25 110:21 111:5,9,13 131:11,15,20, 24,25 132:13, 15,19 135:8 137:3 138:3,12 140:9 194:21 219:17 221:6, 11,20 224:10 227:19 228:25 229:11 230:10 233:22 234:2,8 235:19 236:13 251:4 267:2,4, 13,15 268:21, 22,24 269:5 274:10,11 290:4 336:21 343:5

**matter** 13:11 93:2,3 155:11 161:23 269:21

270:22

**matters** 89:10

**Matthew** 13:11 219:4 272:5,17

**Mattingly** 304:14

**Maureen** 15:11

**Mcdonald** 14:11

**meaning** 114:4 131:15 132:19 135:9,11,20 159:7 183:7

**meaningless** 288:18

**meanings** 135:7

**means** 56:9 67:16 73:21 113:23 293:20 345:11

**meant** 61:23 105:18 138:11, 23 139:4,7 315:23

**mechanism** 291:16 292:2,3, 13

**media** 55:14 56:2,4,12,19 90:21 91:2,5

**media's** 56:9

**medical** 18:3

**medication** 18:4

**medium** 280:2, 4,6 284:1

**meet** 62:25 64:13 94:9,14 96:21 98:10 99:10 101:21 106:8 124:25 125:13 140:1 147:10,25 156:2,6,8 158:9 161:16,23 203:24 255:22

271:19 272:1 274:20,25 343:3

**meeting** 63:22, 23 64:6,19,23 65:2,6 88:16,25 122:6 125:16, 20,24 126:4,7, 11 161:5,15 255:15,16,18 257:13,14 258:9,10,18,20 274:22 281:13 334:11 342:17, 21 343:15 344:12

**Megan** 15:2,3

**Mehr** 15:20

**mellowed** 92:7

**Melvin** 348:14

**Melvina** 140:3 141:21,25 142:4 147:12 148:1

**member** 36:10 81:19 97:5 108:5,18,19 182:15 230:1 342:1,7

**members** 97:3 109:16 139:9, 12 218:20,25 254:23 261:14

**memo** 68:1 70:2 74:4 158:12 166:9 167:3 218:7 285:20,22

**memorandum** 290:3

**memorial** 99:15,20

**memorializati on** 166:3

**memorialize** 64:25 65:7,18, 19,22 66:7,10, 13,20,22,25 67:3,17 68:1



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

71:4,17,19,20
74:2

**memorialized**
67:9 69:7 71:5
166:6

**memorializing**
66:19 165:19

**memory**
205:17 228:17
328:3 331:24
340:5 342:1,9,
11,15,20

**men** 79:8 324:7

**mention** 136:9,
13 150:9
210:10,12,15
220:20 239:5,
12 241:4
242:22,25
248:21 249:8
320:4,19

**mentioned**
19:22 45:13
57:22 104:2
234:13 262:16

**merit** 90:11,15

**merits** 90:2

**messed** 25:2

**met** 63:4,7,12,
19 64:11 65:13,
17 92:25 95:1
97:4 99:19
110:23 111:1,4,
8,13,17,20
113:5 125:10
158:3,11,19
161:15 165:24
167:10,12
225:15 254:22
257:7 262:7
274:23 320:3

**mic** 77:10,14

**Michael** 14:5
15:18 264:5,7

**microphone**
258:13

**middle** 17:9
47:24 52:2

96:16 196:10,
13 209:22

**might've** 98:25
108:1 332:25

**Mike** 59:20
64:1,14,17
95:21 115:11,
14 118:9
178:19 267:12,
16,17 268:20
269:10,12
270:15

**Milan** 26:20
28:20 29:8
107:9,11,15
108:1

**Milan's** 26:23

**Miller** 84:19

**Milwaukee**
31:1

**mind** 23:10
137:3,19
144:19 214:20,
22 227:8
276:24 285:17
309:25 312:5,8,
11,20 323:15
334:21

**mindset**
112:13 161:20

**minute** 59:7

**minutes**
218:19,25
236:1 306:19
326:20 332:2
333:15,16
347:21 353:4,5,
6

**minutiae**
145:24

**Mischaracteriz
ed** 302:5

**mischaracteri
zes** 113:7 179:9
214:11 232:5
243:2 256:9
258:11 262:12
301:16 324:12

**miscommunic
ation** 308:7

**misdemeanor**
38:8,9,15,23,25
39:1,3 47:16,17
48:10,16 75:4,9

**misdemeanor
s** 38:17,20
47:18

**Misfit** 131:15
132:9,19
137:15,17,19,
20,21 139:24,
25 147:2,8,9,
23,24 182:13
219:5

**Misfit's** 145:2,
7,9,14,18
186:14

**misnomer**
322:2

**misplaced**
327:21

**mispronounce
d** 209:16

**misrepresenta
tion** 293:17,18

**misrepresenta
tions** 295:23

**missed** 296:17

**mission**
151:13

**misspoke**
37:20 271:11,
14

**misstates**
113:1 256:8

**mistake** 52:15

**mistaken**
68:22 250:24
251:1 344:2

**mistakenly**
264:11

**misunderstan
ding** 194:2

**misunderstoo
d** 52:10

**mix** 56:21
209:19

**molesting**
108:4,17
109:16

**moment** 117:3
162:19

**moments**
346:1

**moms** 47:21

**Monday** 63:20
79:16 109:4

**money** 27:1
31:9 136:17
220:2,5,6,18,21
230:4 282:22
286:23 321:13
331:12,22

**Montclare**
84:7

**month** 35:9
38:14 282:1
338:15

**months** 20:20,
23,24 22:8
38:2,18 39:7
40:21 44:4
49:18 58:19
70:6 141:6
177:14 295:17
300:6 303:2,5,
8,10 305:16,17

**Moran** 295:9
302:13,21,22,
23

**Morfin** 13:13
58:22 59:19
89:3,11,21
90:10 99:4
102:17 113:18
114:17,25
115:10 125:10
137:21 138:3
146:13 147:15
149:7,11 150:5,
10,17 151:22
152:6,14,18,19

153:24 155:25
160:3 161:5,10,
15,17,21
162:10,11,17,
19 163:2,4,11,
18 164:4,5,15
165:1,19,24
166:2,16 167:3,
10,12,18
168:11,17
175:24 176:21,
24 177:2 178:9
180:1,8 181:21,
23 182:4,8,17
183:7,8,10,13,
14 184:8
186:22 187:6,
12 193:19
195:2,20
196:22 197:15,
22 199:2,3
200:5,6 201:5,
15 202:19,25
204:17 205:18,
21,25 206:18,
19 207:12
208:2,4,23,25
209:12 213:18,
25 214:8
215:22 221:7,
14,20 222:4,10,
16,17,18
223:18,19
224:1,3 225:9,
13 234:8 236:2,
14,20 239:25
240:6 251:9
252:11 257:18,
20 260:21
261:9,21 262:8,
15,25 276:12,
13,14 277:24
278:19 280:15
281:6,7,13
282:10,22,24
283:1,6 285:2,
6,16 288:23
289:12,23
291:23 292:24
293:10 295:2,3,
15,24 297:25
298:5,25 299:5,
16 300:12
301:25 302:14,
25 304:15,25
305:16 306:5,

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

14 307:3,5,9,16 309:20 310:11,14 313:14 314:11 316:14,16 318:16 321:15 322:19,24 323:4,18,23 324:10,18 326:2,7,14 328:7,11,12 331:12,20 332:4,8 334:12,22 342:11 346:3,4,19

**Morfin's** 125:19 143:19 145:19 146:1,2 197:21 201:4 218:20 219:1 222:24 229:1,5,8,22 234:7 235:25 249:22 250:13,21 272:6 274:12 288:2 328:12

**Morfin-kogut** 117:7 277:9

**Morfins** 149:5 186:4,16 198:9

**morning** 116:14 143:7 255:22 257:7 264:18,25 305:25

**mortgage** 352:12

**Moser** 205:16 338:7 341:11,13,16

**mother** 205:15

**mothers** 48:14 99:14

**Motion** 294:4

**motive** 151:5 335:21

**Mount** 31:14,15

**mouth** 137:20 320:22 337:16

**mouths** 224:13

**move** 38:3 77:14 190:17 343:9

**moved** 97:15 303:16,18

**Movement** 298:1,5

**moving** 31:24 211:8

**multitask** 180:24

**mumbling** 30:20

**murder** 74:12 75:21 141:12 143:2 179:6 194:22 224:25 231:3 239:7 240:21 251:5 269:13,23 329:23 340:14 341:2,7,13 347:5,6

**murderer** 308:18

**murdering** 272:8

**murders** 52:12 75:14 110:5 141:13 163:21 223:10 224:9 264:9 272:14 273:5,15 338:13

**Murray** 83:22,23,25

**mutual** 41:9

**N**

**named** 20:25 21:8,15 41:10 45:5 97:6 307:5

**names** 16:6 110:22,23 111:2 115:7,9 168:6 227:21

257:18 259:24

**Narragansett** 156:1,3,5,7,12

**narrative** 213:24

**Nate** 16:5

**Nathan** 15:24 16:8

**Nation's** 131:12

**national** 180:20

**Nations** 139:16

**natural** 92:3,5 194:7 267:10 322:4

**nature** 52:4 55:24

**necessarily** 138:25 173:4 213:11 226:13 227:1 234:9,12 312:22

**needed** 21:2 77:2 139:5 195:6 306:5 338:22

**negative** 25:5

**Neha** 347:21

**neighborhood** 47:23 183:4 196:20,24 197:2,5 230:11 243:11 330:9,12

**Neil** 14:14 15:13 71:24 130:13 178:21 258:8 260:6 345:24

**Nemchausky** 130:22 131:11,14,19,23 159:9 238:8,11,15,23 248:18,20,21 249:8

**Nemchausky's** 131:3 143:13,17

**nervous** 19:1

**news** 81:18 180:17,20

**newspaper** 90:23 180:16 324:20,22,25 348:17

**nice** 93:4 97:10 99:16 109:2,8,9

**Nicholas** 13:13 294:20

**Nick** 58:22 89:11,21 90:9 137:21 138:3 139:24,25 140:2,7,8,9,22,25 143:19 145:18,25 146:2,13,24 147:2,7,9,11,15,23,24,25 148:2 149:4,5,8 150:4 151:22 152:14,18 153:19,24 157:3,9 183:7,8,10,14 184:15 186:4,5,15,17 197:14,15,22 198:8 199:2,3 200:6 201:5 202:17,20 205:14,18,19,21 206:17,25 208:3,15,25 209:5 218:20 219:1 221:7,14,20 222:4,5,9,10,15,16,17,18,24 223:10,15,17,18 225:9,13 229:1,4,8,22 233:18 234:7,8 235:22,25 236:2,3,7,14 238:21 239:6,24 240:6 241:6 249:22 250:13,21 272:6

274:12 276:14 346:3,18,19 347:9

**Nick's** 140:12,14,15,19 229:2 235:21,24

**nickname** 219:6,7,8

**night** 31:9 34:7,11 47:24 48:5 79:16 144:10

**nights** 144:9

**nobody'd** 176:16

**noisy** 198:21

**non-relevant** 127:8 128:10,11

**noon** 116:14

**Norfie** 118:10 121:21 126:13,14 128:17 130:9,14 163:17 168:4,7,17,20,21 175:13,21 188:6,7,9,11 252:18 321:6

**Norfie's** 129:1

**Norfium** 126:12

**Normandy** 230:2

**north** 13:7 37:24 153:2 154:8,12,22 202:4,6 206:21 349:10,22 350:7

**northeast** 42:20 82:3,6

**Northern** 13:16

**Northwestern** 283:24 310:25 311:3,8,13

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

note 268:9

November
305:24 306:1,5

number 13:17,
18,19 89:4
117:2,7 118:3,
4,5 162:24
167:15,24,25
216:17 233:5
248:16 249:14
254:10 262:22
263:6,7 271:7
294:18 298:3,4
304:12 315:16
319:6,12,13
329:10 332:5
349:6,25

numbered
129:22 212:14
235:11 237:1
267:20 271:4
277:9 283:24
290:2

numbers
30:13 135:14
222:23 271:13

numerous
224:10 277:19

**O**

O'BRIEN 15:11
60:10 220:4,9
263:9,14,22
264:5,7,17
265:3,4,18
342:11 344:24

O'
CALLAGHAN
14:12,24 77:5
85:6 265:9
268:14 271:6,9
344:23,25
345:20,21
347:15 354:16

O'SHEA 60:3,
5,10 212:15,18
213:1,10,17
216:18,24
217:3,14
219:15 220:7,8,

13,17 221:10
223:2,22
225:11 226:4,
11,24 236:21
250:12,20
260:10,12
262:20 272:5,
23 273:14,17
342:10

O'Shea's
217:18

O-B-E-R-T-S
14:7

O-DOG 225:10

Oak 47:20

oath 313:8

Oberts 14:7
129:12,14,18
253:3,14 321:8
333:17,20,22
345:3,6,16,18
354:22

object 52:25
65:1 67:18 69:8
86:9 87:7 89:17
105:16 123:4
124:14 126:1
134:17 145:8
147:17 151:8
152:8 155:16
156:21 162:6
166:19 167:11
173:15 175:7
183:17 187:8,
15 193:22
194:23 199:5
225:3 238:17
245:6 256:9
259:6 260:22
299:10 331:7
334:14 343:16

Objecting
99:25

objection
27:19 28:5
46:14 56:8 62:9
70:19 71:6
73:2,4 74:6,14
76:10 78:17
83:3 84:11,16
87:17,22 89:23

95:21 106:23
111:18 113:1,6
114:20 127:6,
13 128:8 133:7,
17 134:9 143:9
144:1,16
150:12,19
154:13 157:5,
11 158:6,14
159:21 160:7
161:6 166:4
172:17 174:17
177:18 201:8
202:22 203:2
204:2 206:2
207:6 208:17
209:3 214:10
230:23 231:18
232:4 233:4
238:25 239:15
240:22 241:8
242:16 243:2,
25 245:13
246:20 253:3,
14 256:8
258:11 261:19
262:3,11 263:1
264:22 265:8
266:8 280:20
283:8,12
288:15 292:7
293:5,15
296:11 300:20
301:16 302:4,
19 304:2
312:13 318:8
321:8 323:11,
21 324:12
342:22 344:17

objections
95:9,20 127:18,
20 203:16

obligation
103:9 278:21,
23 279:3 287:9,
11 326:21

obligations
72:3,5,11

observation
343:13

observe
192:22,24
217:25 341:20

observed
217:23 345:8,
12

obtained
293:14

occasion
104:6 306:13

Occasionally
82:8

occasions
63:3 101:22
102:14 144:9
224:10 274:23

occur 338:13,
14

occurred
181:9 199:1,4,
20 254:21
348:5,19

occurs 342:17

October
167:17 180:16,
17 181:6
309:21 310:10

odd 151:11

offender
287:18,23
288:5 328:20

offer 173:18
188:19 189:12
190:3 191:10

offered 29:17

offering 78:21,
22 160:20

office 15:15
16:5 24:7 25:22
26:1,6,9,16
29:19 34:23
35:18,20 36:4,
11,17 37:14
42:17 49:4 56:5
58:10,14 59:3
65:16 67:11
70:5 81:25
82:5,7,21,22
83:2 84:10
88:16,23 99:23
100:21 101:1,7,

25 107:20
110:15,16
167:2 177:10,
11,13 216:25
217:4 226:5
254:19,24
256:20 259:10
260:13 263:24
264:8 265:7,21
266:14 272:2
278:25 279:12,
18 284:21
285:24 286:23
287:8,14
289:17,19
292:21 293:3,4,
8 295:3 297:9
302:15 304:13
310:22 313:17
314:5 321:5
322:20 323:1,9,
19,25 324:10,
21,25 325:2,5,
12,16,19,20,22
331:10 332:9
343:2

officer 15:6,9
33:2,4,6 79:6
337:9,12,20,23
338:3,6,19
339:14

officers 79:2
271:19 272:1
347:24

offices 325:3

older 32:18,21,
22,23,24,25

oldest 45:22,
24 76:22
103:12

Olivia 16:6,10

one's 152:2
194:4

one-page
235:11 304:12

online 13:4

open 66:6
124:22 125:5
206:20 269:13,
23 321:12

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**opinion** 27:6,8 56:4 90:9,13 169:20,21 170:8 172:12 189:12,20,25 190:3 191:10 227:17 341:24

**opinions** 188:19

**opportunities** 64:24

**opportunity** 24:14 55:1 60:25 241:2 280:15 312:25 326:3

**opposed** 32:14 50:13 151:13 201:6 215:2,14 221:13 226:23 280:5,8 281:8 286:3

**opposite** 250:22

**option** 69:19

**orally** 101:3

**order** 39:2,4 78:2 86:6 89:13 135:23,24 136:5 251:18 252:6 257:24 272:13,23 274:11 288:13 294:18 299:4 301:13,24 302:13,24 303:19,22 351:8

**ordered** 81:10 294:25

**orders** 272:18 301:1 320:5 353:22

**organize** 56:14

**organized** 41:11,20 43:4, 12 44:2,3,16 45:9 49:22,24 50:4,6,9,13,16,

25 51:4,9,11, 15,18,19,24 52:5,6 53:3,12, 17,23,25 54:2,3 55:3,6,22 57:3, 6,9 82:19 84:2 325:9

**orient** 309:24

**oriented** 153:18

**original** 141:23

**originally** 241:16

**Orland** 76:5,8 77:21 309:3

**outrageous** 266:9,12 269:18,24 270:1 339:19, 24 340:2,24

**overlap** 30:12

**overnight** 265:7,20 266:13

**oversight** 57:20 169:9

**overturned** 89:22

**owned** 97:6,8 133:3 134:15

**owner** 134:4,7

**ownership** 148:3

---

**P**

**p.m.** 105:4,9 116:24 117:17, 22 143:2,4,24 180:2,7 181:4 193:11,16 216:21 228:6 235:18 237:19 263:9 266:19, 24 306:2 333:25 334:5 355:5,6

**pages** 58:24

**paid** 21:1

**paperwork** 346:12

**paragraph** 130:25 131:3,5, 6,7 132:4,19 136:23 137:13 139:24 144:22 146:18,24 147:18 148:16 149:3,25 152:17,24 153:4,7,19,22 159:6,22 178:15,16 182:10 183:2 186:3,9 196:11 197:14 198:7 201:19,23 209:22 210:17 218:13,18 221:2,3 224:8 228:24 230:9 235:16 271:18, 23 277:10,13 320:1,13,21 321:4,11 322:18 326:25 329:21 330:19

**parallel** 34:8 336:23

**parameters** 271:1

**paraphrasing** 311:20

**Pardon** 134:6 138:16 140:24 173:11 187:11 217:24 295:22 300:16 303:17 313:23

**parents** 126:19

**park** 76:6,8 77:21 99:17 132:10 142:24 146:14 153:3, 10,24,25 154:7, 8,12,22 155:23 156:9,11 183:5 198:22 202:2

203:15 204:1 210:4 309:3 349:11,23 350:8

**parked** 142:18 200:7

**parking** 332:16

**parole** 93:20 94:3

**parroting** 211:16

**part** 15:18 50:18 72:5 81:9 124:16 150:25 159:19 160:5 221:11 235:3 251:8,22 264:13 327:11, 12 342:2 350:12

**partially** 334:16

**participate** 181:20 303:1,5 342:7

**participated** 342:5

**parties** 16:15 298:8

**partner** 116:3, 6

**parts** 211:8

**passed** 35:14 223:17

**passing** 112:3

**past** 58:24

**Pat** 41:9,10,13, 16,17,21,22,23 42:3,10,25 44:23 49:19 108:3,6,8,15 347:6,12

**Pat's** 44:10

**Patricia** 15:13 345:23 346:10, 14

**Patrick** 319:14

**pay** 249:20 250:1,3

**paying** 27:3 29:23

**PC** 290:4 293:23,24,25 294:3,5,14,15

**peace** 54:12

**pen** 279:7,9,25

**Pena** 115:10 162:20 168:18 176:20,23 177:1

**penalty** 194:6 277:1 279:15

**pendency** 274:21

**pending** 13:15 20:13 84:25 86:6 88:20 257:21 270:21, 25 294:3,5 329:2 336:18

**penitentiaries** 316:20

**penitentiary** 98:11,13 109:11 288:10 329:1

**pension** 29:18, 23 30:6,7,8,9

**people** 14:16, 23 38:12 45:5 49:14 58:3 81:22 83:18 85:4,16,21,23, 24 86:5 87:5,6, 12 97:23 100:19,24,25 101:6 107:23 114:5 117:5 125:3,6 132:13, 16 137:25 139:16 146:5 151:25 155:7,9 179:19 181:1 185:2 190:5 207:15,16

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

219:16,20,21, 22 221:12 229:2 240:6,8 241:18 246:25 257:18,21 259:11,13,21, 22 260:9 261:16 270:20 272:25 274:6 278:16,19 280:8 281:3,4, 9,11 286:4 288:20,21 289:8,16,21 290:4 294:19 298:2 313:10 318:4 332:17 333:3 354:4

**people's** 241:17

**perfect** 169:5

**perfectly** 171:5

**performance** 28:11

**period** 40:24 192:19 228:14 292:25 299:23 300:8 338:11 339:7,13,21

**periods** 116:9

**perjury** 275:13, 19 276:3,8

**permission** 104:17 264:7, 12

**person** 14:22 54:23 74:21 82:24 83:8,15, 16,17,21,24 86:21 95:6,9 96:10 99:1,2,6 107:4 114:4 119:19 121:4 125:6,8 211:13, 17 237:9 238:3, 18 242:2,4 252:6 309:20 310:10 312:5 338:2 350:9

**person's** 234:23,24

**personable** 109:6

**personal** 329:23

**personality** 28:16,17

**persons** 51:2 74:24,25 75:9, 11,12,13,14,18

**perspective** 241:10 244:10 343:18

**Peter** 209:16

**Peterson** 44:22 45:15

**petition** 90:10 328:15

**petitions** 90:2, 15

**phases** 243:10

**phone** 63:13 66:9,11,13 88:22 93:25 94:2 131:19 205:14 207:21, 22 235:19 251:10,11 308:8 332:9

**phones** 48:6,7

**phonetic** 225:11

**photo** 349:8

**photograph** 270:8,12

**photographs** 48:10 59:9

**phrase** 194:10 252:9

**phrased** 149:21 185:4

**physical** 87:20

**pick** 206:18

**picked** 153:24 159:10 203:14, 25 239:6 264:25

**picking** 180:15,18

**pictures** 93:7

**piece** 269:10 270:2

**pieces** 78:19

**Pierce** 15:2,3

**pin** 182:2

**pinballing** 54:13

**place** 49:14 75:7 92:15 107:2 142:17 143:6 162:1 165:4,5 167:5 181:4 191:4 200:8 203:23 213:4 233:13 235:8 243:8 258:5 259:15 261:10 303:7 324:8 328:25

**placement** 104:20,22 279:17 280:24

**placing** 279:19

**plaintiff** 15:3

**Plaintiff's** 13:22 16:4

**plaintiffs** 13:24 14:2 19:7,10,14 88:6 298:8

**plan** 29:18,23 30:8 138:4 141:17,18,21, 23 145:1,7,13, 18,20,21,24 147:15 150:18 152:7 153:17, 18 154:2,3,11 155:8,11,13 157:3 159:20 160:5 186:13 194:25 197:16,

22 198:13,18 199:1,4,19 202:19 203:25 210:15 211:1 226:25 233:19, 23 234:6 258:9

**planned** 141:13 155:7 224:14,17

**planning** 141:14 207:9, 16 224:24 225:16 226:8 258:10 259:2,4

**plaque** 99:20

**plausible** 252:10,12

**play** 46:13 92:9 207:25 208:11, 14

**played** 92:11

**playing** 306:25

**plea** 114:9,11, 14 301:9 335:12

**pleading** 76:2

**pled** 277:17

**plug** 253:5

**point** 25:23 47:3,15 48:8, 13,18 66:19 68:15 85:12 112:6 122:1 130:23 134:10 148:13 157:13 174:2 188:17 192:3 194:11, 17 195:3 205:19 207:17 209:25 211:14, 23 216:3 288:6 314:14 335:3

**pointed** 184:1 211:19 217:21 218:1

**pointing** 163:24 239:25

**points** 134:12 268:7,14,15

**police** 15:6 25:11,13,15,19 29:13,25 30:5 33:2,4,6,7,8,10 44:12,17 51:14 58:25 61:11 78:5,13,20 242:7 243:11 254:1 255:23, 24 256:1,5,16, 19,21 257:6 259:11,20 335:1,4,18 337:8,20 343:3, 9 346:16 347:24 348:6

**policemen** 126:21

**policy** 65:11 67:12 70:10 173:9,13

**polite** 78:21

**Pontiac** 304:14 306:6 322:9

**poor** 188:22,24 189:2,5,13,16 190:11,15,16 191:11 289:5

**pop** 31:23

**Pope** 182:20 262:19

**Popes** 132:10 151:12 182:15 218:20,25 219:4 224:13, 14,18,19 226:8 230:2 261:14 262:16 273:1

**population** 104:24 322:8

**porch** 149:14, 19 150:4,11 152:13,18 183:24 184:2 186:18 198:13, 15 199:14,19 200:1,8 201:7



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

porn 322:19,24 323:4,6,16

portion 148:3,4

portray 288:18

posed 18:1 152:1 203:17 311:24,25

posing 203:18

posited 253:4

position 26:8,9,13,16,18 42:22,25 43:3 247:1 334:23

positions 26:10

possibilities 65:24 66:6

possibility 315:10

possibly 48:22 51:20,21 104:25 107:18 281:20 282:13 315:13 322:10

post 34:15

post- 88:5

post-conviction 88:21 90:10,14 311:9

post-testimony 301:8

Post-trial 96:24 97:1

post-trials 301:8

posted 324:23,25

posture 54:6 124:22 165:14

potential 255:3 259:18

powerful

46:12,20

Powerpoint 349:6,7 350:12

practical 329:3

practice 36:3,8,15,20,21 37:4,6,7,8,10,12 115:16 119:10,14,25 120:21,25 121:20 142:8 179:4,11,14,16,23 218:4 267:8 307:22 308:3,4,5,16,17,21 311:4,7,8 316:4,10 318:3,6,11,12

pre-printed 119:2

preceded 262:15

preceding 286:1

precipitated 237:16

predicate 66:21

premised 175:12

preparation 59:10 60:24 61:3 63:1 168:9 195:15

prepare 58:16 62:8,12 169:22 170:9 171:12 172:13 192:22 350:23

prepared 62:14,18,21 130:9 167:22,23 168:2 177:16 178:3 190:21 191:16

prepares 174:5

preparing

112:12 173:21 178:24 181:14 192:24 195:3 207:10 227:9

presence 120:22

present 16:5 24:14 63:15,25 64:3,16 68:19 112:17 122:9 123:10 125:19 130:13 137:25 150:17 170:17 172:16 175:15 176:20,24,25 177:1 178:2,4,5,12,18,20 179:5,19 181:22 182:3,5 187:16 197:15 217:9 248:4 255:16,17 260:3 272:5 275:2,3 347:24 348:5

presentation 326:9

presented 245:8 249:20 250:1,3 339:2

presenting 226:22 234:16 326:2

pretrial 114:6

pretty 38:7 39:16 81:15 116:13 180:20 205:16,17,22 207:17,24 213:23 217:16 287:16 311:17 313:12

prevent 89:21

previous 144:9

previously 57:22 118:2 129:8 162:23 163:1 217:20

price 136:10 229:25

primary 26:2 231:24 243:18 336:17

prior 120:8 141:11,15 195:19 223:10 261:9 302:5 335:18,22

prison 92:1,6 102:11 194:7 277:4,19 284:1 289:6

private 138:3 221:13

privy 182:14 221:19

probable 111:12 251:22 258:1 339:14 340:10,19 341:16

problem 81:20 95:14,16,23 331:4 337:19

problems 102:24 104:4,7,8,13 106:9 319:2

procedural 54:6

procedure 17:16 49:7 65:11,16 68:3 177:19,24

procedures 257:2

proceed 159:2

proceeded 264:3

proceedings 13:1 88:6 274:22

process 100:13,22 114:1,2 296:8,17,20,24,25

297:7 336:6,7 347:8

processes 280:24

processing 279:16

proclaimed 248:9

produce 349:18

produced 79:21 298:7,10,12 307:1 317:25 349:5,7

professional 341:24 345:15

proffer 93:8 111:3 112:7,9 113:20,22,23 114:8,10,14,18 115:4,18,20,22,24 117:10 118:7,14 119:2 120:5,6,22 121:4,14 122:7 124:5,16 125:16,20 128:12 129:7 161:10 162:16 163:2 164:7,8 167:5 176:9 181:22,25 182:3,6 194:12 195:2,13 212:14 213:3,7 260:24 262:21 336:6,8,10 342:5

proffered 93:8 118:8 195:22 207:11,12 342:10

proffering 164:17

proffers 114:8,16 209:11 251:9 312:24 334:13 336:13 338:13 342:12

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**profile** 55:13, 25 56:2,6,9 93:6

**program** 32:1 34:9,10 285:24, 25 286:6,8,13, 17,21 288:8 289:18 291:17 299:22 300:2 301:5,15 302:3, 7,17 303:1,5 318:25 350:13

**programs** 286:4

**prohibition** 116:17,19

**promise** 328:14

**promoted** 49:20

**pronounce** 109:20,23,24 110:1 123:24

**pronounced** 110:3

**proof** 226:22

**proper** 113:13 270:20

**properly** 51:8

**property** 50:17 51:1,12 352:2, 7,12

**Pros** 42:24

**prosecute** 42:11 43:22 108:4,21 111:12,16,19

**prosecuted** 74:24 96:22 139:14

**prosecuting** 52:2 74:19,22 151:20

**prosecution** 26:18 41:4,8, 12,18,19 57:15, 18,19 89:20

112:24,25 232:8 284:23 335:2 340:15 341:3,7,22 342:6 343:24

**Prosecutions** 42:7,18,23 43:10 57:17 58:9,13 81:25 82:6,22

**prosecutor** 46:12 47:7,12 54:16 72:2 81:12,14,23 85:20 86:16 89:8 103:9 110:13 131:18 151:2,16,17 182:22 203:22 204:9 226:21 231:2 234:15 242:12 245:25 269:19 276:19 278:21 308:22 335:20 340:24

**prosecutor's** 54:14 194:11

**prosecutors** 81:16,21 112:10 276:20

**protect** 241:18 275:10

**protected** 104:16 106:4

**protecting** 80:14

**protection** 78:2 105:15 280:5,22

**protective** 100:15,18,20 105:15 106:12, 15,21 107:3,6 351:7

**protocols** 338:25

**proven** 175:10

**provide** 57:20 85:15,21 86:7

140:8 284:9

**provided** 22:11 58:21,23 59:1,4,5,7 64:25 72:25 73:6,12 74:1 86:20 87:4,11 100:2 128:5 140:7 196:2 284:4 298:3

**Providence** 77:20

**providing** 85:23 86:15 179:6 191:1 299:15

**Ptak** 14:8 130:18 178:21 252:19 263:20

**public** 57:25 58:6 180:15

**published** 73:3

**pull** 91:24 137:16 138:6, 12,22 146:8,9

**pulled** 89:4 195:17 333:2

**pulling** 141:1 143:20 333:3

**purpose** 65:21 124:17 226:18 232:6 233:24 243:19 278:17 279:8 287:19 316:21 317:4 334:11 336:2, 17 342:21

**purposes** 207:15 257:20

**pursuant** 299:4

**push** 235:7

**put** 22:5 48:8, 13,21,24 92:19 104:23 119:8, 10,16,17 133:21 143:3

163:13 170:19 175:14 180:21 204:3 211:22 213:14 246:2 255:6 269:24 273:6 275:9 301:3 321:22 341:1

**Puts** 209:19

**putting** 226:14 320:22

_____

**Q**

**qualified** 324:15

**qualify** 62:23

**qualifying** 62:22 225:20 293:21

**quality** 188:19 190:4,5

**quarter** 332:23

**quarters** 100:25 101:14 293:2,11 295:4, 16 296:5 297:9 299:13,25 300:9,18 301:13 304:16, 25 305:17,18, 21 314:3 321:12,16,19, 22,24 322:1,3, 11 327:2,11,19

**question** 17:21,25 20:6, 12 21:21 25:3 27:4,13 32:16 50:21 61:1,2 65:15 66:12,17, 19,21 68:4 71:2 73:6 77:17 80:2 84:25 86:10 92:2 94:9 96:17,20 98:3, 14 100:17 102:8 109:13, 19 112:20 114:21 116:13, 20,21 119:7

123:1,7,11,17 124:20 127:3 128:14 134:14, 15 136:14 137:11 141:8 142:3 144:4,19 150:23 154:14 155:2,3,4,17 156:21 158:7, 15 159:23 160:1,2,18,25 161:7,18 162:7 165:24 166:4 170:14,18 171:9,10,16,18, 20,25 172:18, 20,21,25 173:16 174:7 175:8,9,12,16 177:20 183:17 185:4,12 188:1, 18,25 190:18 192:15,25 193:2 199:5,16 200:13,23 202:9 203:5,18, 21 204:21 206:13 207:1 208:7 231:9,13, 16 232:24 239:10 240:3, 10 243:5 246:4, 7,15 248:24 249:7 252:3 258:23 262:7 263:2 275:25 287:5 296:13 299:10 301:21 302:9 307:19, 20 310:17 311:24,25 312:14,18 313:17 318:10 319:2 324:5 326:6 330:14 331:18 334:15 336:1 337:23 338:3,17 340:12 341:11 344:10 347:19

**questioned** 239:13 240:19 243:1

**questioning** 144:20 206:6

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**questions** 17:19 19:24 46:19 61:19 62:2 125:8 126:22 127:1 134:13 158:1, 20 164:18 165:9 244:18, 21 247:17 248:8 333:10, 12 334:10 337:11 340:7 345:25 348:11 349:13 350:18 353:13

**queue** 100:24, 25 101:7,13,17, 20

**quick** 333:18 353:23 354:5

**quickly** 352:25

**quiet** 277:23

**Quinn** 41:9,10, 16,17,21 42:3, 25 49:19 108:3, 8,16

**Quinn's** 108:6

---

**R**

---

**rabbit** 227:25

**race** 29:1,9

**racial** 79:5,11

**radio** 332:24 333:1

**railroad** 209:23 210:6,7, 13

**raise** 16:21

**ran** 84:7 131:3 153:2,12 154:7, 8,12,21,24 155:12,22 156:1 202:1,6 209:23 210:4,6, 7,13 238:12 286:11

**rationale** 57:1

**re-ask** 17:20

**reach** 122:15, 22 335:12 336:8

**reached** 114:15 288:1 336:9,11

**reacted** 155:10,12

**read** 58:18,19, 22 81:17 112:13,14,20 115:24 121:14 123:8 127:2 131:6 136:13 137:12 141:5 143:18 145:12 146:4,23 149:3 152:17 159:22 165:11,21,23 200:4 207:9 209:22 218:3,4, 22 219:12,14 223:6 224:2,6 230:15 237:13 248:23 249:2,6 254:14 255:9 257:3 264:1,10 268:17 271:15 273:11,13 285:20 297:1

**reading** 70:22 131:5 137:6 149:22 229:19 233:20 265:19 271:22 294:22 329:10 332:5 346:11

**reads** 139:24 197:14 202:1 223:8 224:9 228:24 264:1 329:21

**ready** 93:23 115:24 236:4 301:19

**real** 97:10 109:8 126:3 171:21 182:23 188:7 352:2,7, 12

**realize** 18:22 269:20

**realized** 280:25

**realizing** 123:18

**reason** 76:11 78:20 107:17 111:9 117:5 161:16 168:1 176:1 188:21 189:1,8,15,23 214:6,20,22 215:20,22,23 216:7,8,11 253:11,16,21 264:10 281:1 315:5 321:15 322:23 324:15 326:10 336:17

**reasonable** 174:11,22 176:7 260:5

**reasons** 102:25 122:20 173:18 214:3, 18 215:8 240:13,16 313:20 318:22

**rebuttal** 333:9

**recall** 27:2 28:14,19 30:1, 13 33:13,22 38:1,22 39:2 59:4,24 60:4,21 63:21 64:5,15 79:2,5,10,16 83:5 91:20,21 100:23 101:4, 19,23 103:4 113:11 115:6 119:13,14 121:16 123:1,7 127:4 128:4,9, 11,15,22 134:23 135:1 136:1 141:10 142:1 146:6 148:9 161:19 163:20 164:23, 25 165:2,3,6, 16,21 168:12

187:22,23 202:9,21 206:13 220:24 231:6 237:12, 18 239:10 244:2 250:7 252:15 256:7 259:5 261:7 265:4,17,19,23 276:16 278:8 284:11 305:3 314:1 327:19 329:13 345:9

**recanting** 328:8

**receipt** 73:7

**receive** 56:4 88:21

**received** 225:5 235:19 279:13 328:4 346:5

**receives** 125:3

**recent** 63:7,22 64:6 344:13

**recently** 328:9

**recitation** 201:5

**recognize** 338:2

**recollection** 25:20 78:18 83:4 116:12 123:5,9 125:17, 24 126:4,6 154:23 163:12 168:15 187:23 188:16 255:19 256:4,15 267:14 268:24 270:17 289:15, 22 305:22 324:24 325:11 328:1 331:17, 19 339:6 347:23

**recollections** 289:24

**recommend** 308:22 311:5

**reconvene** 213:13

**record** 13:3 16:3,13 17:7 68:11 101:5,9, 10,12 105:1,3, 5,6 117:15,16, 18,19 129:13 144:6 146:7 162:24 193:10, 12,13 206:8 212:13 251:10 264:13 266:17, 18,20,21 268:3, 6,11 307:5 333:23,25 334:1,2,9 337:7 350:16 353:2, 22 355:5

**record's** 40:15 275:1

**recorded** 126:11 127:4 128:16 230:16

**recordings** 59:12

**records** 131:19 205:14 207:21,22 220:24 250:13, 21 251:13 319:4

**recounted** 196:6

**recounting** 197:21

**recovered** 225:7

**red** 227:25

**REDIRECT** 348:12

**reduced** 73:11 74:12 277:25

**Reese's** 183:25

**refer** 279:9

**reference** 112:6 130:12,



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SCOTT CASSIDY, taken on July 21, 2023

388

23 136:3,17 141:12 185:6,8 188:17 212:17 220:6 262:20 263:17

**referenced** 97:21 147:20 162:9 186:2 220:17

**references** 148:4

**referencing** 148:8 186:3

**referred** 82:10 160:9

**referring** 19:4 104:5 119:6 198:4 201:18 205:8 258:19 279:10

**refers** 163:4 248:17

**reflect** 16:3 190:21 192:23 193:4 268:12 319:4

**reflected** 187:6,14,21

**refresh** 123:8

**refreshed** 123:5 126:8

**refuse** 353:14

**refused** 248:8 272:4

**regard** 93:9 97:13 114:16 161:20 225:4,6, 18 289:3

**register** 287:17,23 328:20

**registration** 288:4,11

**regrets** 288:20

**regularity** 56:10

**related** 235:17 286:3

**relationship** 27:21 28:4 29:3

**relationships** 92:22

**relative** 343:14

**relay** 74:20

**released** 295:24 329:1

**relevance** 27:19 52:25 76:10 80:18 133:7,18 134:18 203:9 240:23

**relevant** 92:19 126:23,24 128:21,24 136:20 154:25 155:1,5,6 156:17,20 157:20,25 207:1 257:22 279:23

**reliable** 85:25 86:17

**relied** 293:13

**rely** 141:9 146:6 170:22 184:19 193:20, 25 194:20 200:11

**remain** 39:20 40:5,10 42:22, 24 57:2 58:8

**remained** 299:6

**remanded** 296:5

**remarried** 103:17

**remember** 36:23 47:10,16 48:3 59:21 60:11 71:13 78:19,20,23,25 81:16 84:23

94:16 97:8 98:24 99:15 102:24 115:15 120:18 123:9, 10,11,14,19 126:15,18 152:10 153:16 165:11 184:16 193:6 203:18 213:2 218:4 219:19 232:3 237:9,15 244:11 255:20, 21 265:19 275:7,8 278:15 285:1 303:24 310:23 314:9, 11,15 315:4,5 325:23 326:4 331:19 332:24 340:1,13,23 341:11,15

**remembered** 238:5

**remembering** 285:8

**remembers** 238:2

**remotely** 15:4, 10,17,25 16:2

**remove** 105:14 106:3,20 135:24 136:5

**repeat** 77:17 102:3 105:20

**repeatedly** 273:2

**rephrase** 17:20

**replace** 280:2

**report** 58:23 59:18,24,25 60:2,4 66:5 67:6,23,25 69:25 74:5 79:18,24 80:6 89:5,9 112:14 117:14 123:8 125:22 126:8, 11 127:1,5,25

128:16 129:1 130:8,11 136:3, 12,14,19,22 137:6,10 138:24 141:9 143:18 148:12 149:12,20,22, 23 152:23 154:4,20 158:4, 8 160:8 165:19, 22 166:10 167:2,17,22,23 168:2,10,16,24 169:2,23,24 170:10,16 171:2,12 172:4, 6,13 173:22,24 174:6,15 175:3, 14 176:2,13,23 177:24 178:9, 24 181:25 183:20 184:24 185:6 186:8,25 187:1,2,14,25 188:22,24 189:2,5,9,13,16 190:21 191:8, 11,21 192:1 197:25 198:2, 11,14 199:11 201:17 210:19, 22,25 213:8 234:6 235:12 237:2 248:17, 23 249:7,14 254:11 259:16 263:19

**reported** 66:3 67:5 145:17 239:14,17

**reporter** 13:5 14:21,25 16:18, 22,23 17:2 19:23 22:14,17, 21 30:17,21 88:15 90:17,20 91:3,4,6 102:3 117:16,19 212:5,7,9 254:7 255:6,8 283:18 284:6 290:9 297:22 306:18 314:6 319:7 326:19 327:16 332:2 333:15,

23 335:7 348:25 349:2 353:1,3,18,21 354:1,3,8,11, 13,17,19 355:2

**reporters** 13:6 67:8,13 68:2

**reporting** 254:17,22 264:2

**reports** 58:25 59:1,15,17,22 61:11,12 72:23 79:20 141:4 177:15 179:20 187:7,21 191:16 192:22, 25 193:3 199:7 200:3,14

**represent** 161:9 210:18 337:8 345:22 347:21

**representation** 210:21 220:23 221:25 233:21, 25 239:22 249:1 250:10

**representation s** 310:12

**representative** 49:16

**represented** 283:11

**representing** 13:6 15:11 49:16 56:25 115:10,12 319:25

**reputation** 188:11 341:2

**request** 29:6 77:13 296:3 328:19

**Requesting** 291:2

**requirements** 270:24

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

reread 112:15

reserve 333:9 350:16 353:17, 18

resident 298:24

residential 48:20

residue 135:24 136:6,8

resolution 295:4 302:16

resonate 151:7

resonated 289:7

resources 22:5 48:24

respect 341:22 342:5

respectfully 181:19 201:9

respects 313:4

response 311:23

responsibilities 309:11

responsibility 69:6,24 71:3,18

responsible 71:22 324:7

rest 230:4 350:16

restricted 280:16

result 33:9 301:13

resulted 255:2

results 259:17

retire 30:7,9

retired 24:16 30:2 337:12,21, 24 338:4,6

retirements 352:22

return 290:16, 18 305:13 306:1,3,8

returned 298:23 299:7

returning 183:4

reuse 335:24

review 38:21, 24,25 39:4,6 44:9,11,15 59:9,12,17,22 60:6,9,12,24 61:15,20 62:5 67:8,10 68:3, 19,25 112:21 113:4 121:7,8 267:25 339:1 342:21 344:4, 12 346:8 347:2, 8

reviewed 59:6, 8,14,18 60:19 61:20 112:21 125:22 128:16 168:10 338:22 339:2 346:9

reviewing 168:12,15 343:25 346:15

revisit 227:11

revolver 133:14

Rice 30:15,18, 25 34:20 285:11,13 329:25 330:18

Richard 94:21

Richie 94:21

ride 205:25 238:22 241:7

Ridgeway 137:16 138:13 149:15 151:13 183:5,9 196:19, 23 197:1,2,4

198:16 221:8, 13

right-hand 201:25 209:23 310:1

rights 80:14

risk 86:5 104:19

risky 335:15

River 309:6,17

road 335:12,14

roaring 93:23

Rob 91:7,10,18 107:9,11,22 108:4 109:4

robberies 75:10,11

Robert 107:15, 19 108:16,21

Roger 115:10 168:18

role 92:8 151:2 257:12,14 258:10

roles 241:18

roll 137:16 138:6,12,22 141:1 143:21 146:8,9

rolling 145:22

room 14:20 19:15,19 38:10, 24 47:16 76:16 78:22 83:14 123:9 124:25 125:9,14 136:24 137:15 165:6 320:10 354:14

rooms 39:3

Rosado 310:8

rotate 38:15

Roughly 38:1

route 308:10, 11 349:10,21

Rude 45:6

rule 96:9

rules 17:17 95:25 96:1 104:18 332:11

ruling 92:21

rumors 109:15,18

run 110:16 153:23 190:6 203:23 204:17 205:25 335:15

rundown 112:3

runner 225:11

running 90:23 153:9 154:6 159:7,9 202:2,4 210:10 243:11

runs 104:19

Russell 13:23 21:20 22:17 60:15 76:11 103:23 245:22 258:14 326:22 353:23

Rutherford 264:3

—————

S

—————

S-C-O-T-T 17:8

safe 281:3 319:3

safely 103:11

safer 308:24

safety 103:4,10 278:24 307:19 308:19 310:17, 19 311:7 313:19

salary 21:4

Sandburg 77:19

Sandifer 93:6 180:19

sat 18:23 47:1 83:15 243:8,9 324:5,11

saving 233:24

scared 47:25 285:16

scenario 107:14 306:10

scene 238:12 329:24 330:3,5, 8

schedule 180:12

school 30:14, 15,17,18 31:10 34:6,7,8,10,15, 19 35:4 76:9,21 77:18,20 140:2 144:24,25 145:1 147:11, 25 148:19,21, 22 185:19,21, 24,25 186:11, 12 202:3 223:12,15 263:22,23 264:6,8 285:10 330:1,18

schools 76:25 77:1

Schuessler 45:14

Schuessler- 44:21

Schuessler/ peterson 97:14

Scott 13:10,12, 14,15 14:4,6 15:20 16:14,16 17:8 90:4 105:7 117:20 133:20 171:11 178:20 193:14 266:22 271:20 272:2 277:18,22 278:1 290:22



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

291:3,10,12
294:8 307:14
320:3 334:3,10,
11 345:21

**Scouts** 47:19

**scratch** 66:24
85:4

**scream** 327:20
328:11

**screamed**
330:21

**screaming**
327:4

**screwing**
313:18 314:18

**Sean** 14:12
60:10 220:4,9
263:9,14,21,22
264:5,7,17
265:3,4,18
345:21

**search** 256:3,
16 338:22
339:7,8

**seat** 345:3

**seated** 83:12
197:19,23
199:3

**secondary**
336:22

**secretary**
125:2

**security** 280:3,
4,6,9 284:1
316:6

**seek** 49:15
81:4,7,10,13
247:18

**sees** 211:13
235:4

**segment** 91:24

**sell** 272:6

**send** 331:12
353:19

**sending**
281:17

**sense** 49:7,8
179:2 182:22,
25 204:10,12,
14 253:6,7
270:1

**sensitive**
126:20

**sentence** 92:4
93:15 131:2
132:18 153:22
170:19 182:12
196:12,18,25
197:14 202:1
222:3 223:8
267:10 277:25
279:13

**sentenced**
92:3 277:17
278:14 279:13
282:7

**sentences**
92:8 280:9
292:25

**sentencing**
114:6 117:14
267:2

**separate**
221:19 311:11

**September**
69:11,23 71:5
75:20 76:7 81:5
161:11,17
163:5,10,18,22
164:2,5 165:1,
25 166:17
167:4,8,18
176:11 180:2
181:9,21 185:3
187:13 207:2,7
208:6,12,13,24
212:18 213:1,
10 216:21
217:1,4,6,20
227:23 228:6
237:3,8 254:25
257:8 258:20
260:13,25
261:25 262:8,
21,22,24 263:9
264:4,18 265:1,
2 277:20,21
278:6 295:12

**296:1** 300:12
303:10,23
307:10 310:14
317:18 332:14,
18 338:14
339:9 342:18
344:12

**Sergeant**
254:17,22

**serial** 135:14
222:23

**Serrano's**
350:23

**serve** 280:15
292:25

**serves** 228:17

**set** 53:20 55:8
64:11 88:25
115:19,21,25
116:8 141:7
180:23 194:25
213:20 257:16
300:5 308:8
338:25

**setting** 257:12,
14

**settle** 38:12

**settled** 191:21

**Shae** 15:13
345:23 346:10,
15,22 347:7,12

**share** 82:22
103:21

**Shawn** 159:13,
19 160:4,16
210:16,20

**Shawn's**
159:12,18
160:3,12
210:11,16,25

**she'd** 25:25

**she'll** 20:1

**sheet** 210:1
298:4

**sheriff** 25:16
29:16

**Sheriff's**
25:11,12,15,19
29:12,25 30:4
36:4 88:16

**shit** 85:4
269:10 270:2

**shoot** 145:21,
22 196:6
272:18

**shooter** 146:10
195:5 230:22
231:3,12,17
232:13,24
233:10,16
334:19,24
335:2,11

**shooting**
142:17 145:10
153:23 159:12,
19 160:4
198:20 205:11
222:5,11,17,19
230:13,19
238:13,16,19
254:20 329:8

**Shootings**
75:13

**short** 40:16
44:13 188:9
236:6

**shortly** 110:14
278:14

**shot** 49:2
329:19

**show** 79:24
86:25 87:1
165:21 167:13
178:14 207:5,
18,21 220:24
248:9 249:21
250:8,22
263:17 275:24
277:7 297:21
318:1 349:8

**showed** 89:4
120:3,4 205:6,
23 229:22
238:23 260:16,
24 270:13
348:16

**showing** 118:4
121:24 130:7
162:22,25
167:14 216:16
228:4 235:9
236:24 249:13
250:14 251:11,
13 254:9 263:6,
18 267:19
304:11 306:24
319:11 348:23

**shows** 35:24
213:3 250:6
284:3 309:9

**shut** 137:20
146:11 224:13

**sic** 220:4
315:13

**side** 17:24 43:8
56:24 146:14,
15,16 154:12
183:5 201:25
209:23 289:18
310:1

**Siff** 15:24

**sight** 184:3

**sign** 68:22 69:1
101:16 119:22,
24 120:10,13,
20 121:15
299:5

**signature**
163:7 353:17,
18

**signed** 118:9
119:8 163:10
212:21 256:3
273:8 328:7

**significant**
55:10,11
206:15,16
251:14

**signing** 256:16

**signs** 139:16

**Silas** 45:3

**similar** 44:7
99:1 350:22

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**similarly**
269:21

**simple** 165:8
171:22

**simply** 134:15
172:21 201:4
259:4

**sing** 289:23

**single** 96:8
334:20

**sink** 159:1

**sir** 17:6,15
18:14 23:23
28:18 52:21
53:1 77:17
94:11,12 96:14
97:1 105:12
117:11 118:19
123:1 128:14
131:7 132:7
133:23 134:12
137:22 140:5
148:6 150:13
162:25 173:1
176:4 190:25
200:19 208:21
216:19 222:6
230:14 231:14
236:8 263:8,16
267:2 268:20
271:11,24
273:12 275:25
278:3 294:2
298:16 301:22
307:3,7 312:17
315:16 319:15
322:21 336:25
337:7,17
339:25 341:1,5,
25 349:9
351:10

**sit** 33:22 38:22
39:1 46:22 77:9
92:5 104:7
120:21 128:9,
10 154:24
159:4 163:20
164:17 168:12
180:5 193:6
204:5,22
206:14 215:13
220:25 224:22

239:9 283:2
284:12 312:25
313:7 337:19
346:7

**sitting** 62:20
315:3

**situation** 55:14
94:4 164:22
282:19 297:16

**situations**
66:18 69:21
98:20

**Sixth** 37:18
38:4 39:10

**size** 82:11
124:6

**sizing** 165:14

**skimmed**
58:20

**Skipping**
254:21

**slurs** 79:5,11

**small** 53:22
244:2 325:19

**smile** 79:25

**smiling** 195:7

**snapshot**
190:6 279:21

**sneak** 140:4

**sober** 80:23,25

**socialize** 42:3

**solely** 194:20

**solemnly**
16:23

**someone's**
267:9

**son** 275:9

**Sopron** 13:11
16:4 19:4 58:18
91:25 99:4
110:21 111:5,9,
13 131:11,15,
20,24 132:1,13,
15,19 135:8
137:3 138:3,12

140:10,13,17
146:7 148:4
175:24 182:17
194:21 212:14
216:17 219:5,
17 221:6,11,20
222:4,9,15,17,
21 224:11
228:25 229:11
230:10,12
233:22 234:2,8
235:11,19
236:13 237:1
242:21 248:16
249:14 251:4,
18 258:1 263:7
267:13,20
268:21,22
271:4,13 272:5,
17 274:10,12
277:24 284:14
290:4 319:12
336:3,21
338:15 339:15,
21 340:9,18
341:17 343:6

**Sopron's**
88:13 90:16
145:23 227:19
267:2,4

**SOPRON-5847**
167:16

**SOPRON-5873**
129:22

**sort** 44:6 49:12
51:8 65:20
92:16 188:18
200:17 207:1
227:25 228:1
235:5 243:19
260:4 279:21
286:7,9 312:24
313:9 322:2,15
336:16,22

**sorts** 315:17

**sought** 80:20

**sound** 173:8,
12

**sounds** 189:7
234:18 235:6
276:7

**south** 42:19
43:8,9 264:3
291:7 306:6

**space** 338:12

**spans** 211:9

**speak** 22:18
30:19 67:10
77:14 99:12
119:19 170:23
171:4 194:16
196:25 236:10
258:15 276:17,
23 312:20,22
340:3

**speaking** 38:1
44:6 48:25 51:3
65:10 73:17
141:11,15

**speaks** 68:17
184:11 200:15,
17 223:5

**special** 25:16
26:18 41:4,7,
12,18,19 42:7,
18,23,24 43:10
57:15,17,18
58:8,13 81:24
82:6,22 83:15
284:23

**specific** 66:15
83:8 91:13
123:6 141:7,8
142:7 220:5,17,
21 221:12
278:8

**specifically**
55:24 83:8
102:23 104:3
115:15 119:15
123:6 142:2
144:4 148:9
258:19 334:18

**specificity**
261:22 305:2

**specifics**
102:23

**spectrum**
211:9

**speculate**

189:4,6 241:23
243:6 294:8
303:4

**speculated**
172:7,9

**speculating**
107:1 168:20
204:5 206:4,24
213:21 214:4,6,
16,17 215:9,18
227:2,6 241:24
250:23 303:3
315:1,4

**speculation**
106:24 172:10
174:17 175:16
177:3,5 182:1
215:11 240:23
243:19 253:3,
15 260:5 265:9
292:8 312:14

**speculative**
260:5

**spell** 17:6

**spelled** 102:4

**spelling** 17:13

**spend** 293:1

**spending**
305:17

**spent** 39:6
44:4 299:12
305:16

**split** 289:1

**spoke** 89:6
126:19 228:15
261:8 276:13

**spoken**
168:21,23

**sponsor** 81:23

**spontaneous**
141:16

**spot** 49:21
142:21 204:18,
25 205:3,25

**spotted** 223:11

**spouting**

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

90:24

**spreadsheet** 305:5

**spring** 35:10

**St** 31:10 32:2,4 33:1,25 34:17 263:21,22 264:6

**Stabbings** 75:13

**staff** 83:8,10, 12,16,21,24 125:2 288:22 326:1

**stage** 114:15

**stages** 114:14

**stamp** 298:13

**stand** 124:18 191:25

**standard** 311:23

**standing** 149:14,19 186:17 197:18, 23 198:3,12,14 199:2,13,19

**stands** 61:17

**Star** 139:17 167:24

**staring** 18:23

**start** 20:1 43:25 46:23 112:11,13 117:3 218:23 228:1 307:4 343:25

**started** 31:11 32:1 38:14 42:7 67:1 107:19 181:6 302:7 320:22 329:8 333:17

**starting** 13:21 222:13 227:18

**state** 13:20 14:17 15:1

16:6,12 17:6 26:5,8,16 29:19 33:7,10 34:23 35:18,20 36:11, 16 42:14 49:4 58:9,14 59:15 93:22 110:15 114:4 227:8 255:4 257:1,22 259:9 264:8 265:7 268:3 279:16,21 280:2,21 286:7 291:19 293:8 294:19 295:18 299:17 315:18 328:21 345:22

**state's** 13:12, 13,15 14:8,10, 13 15:12,15 27:9 29:15 37:13 56:19 59:3 65:8,16 67:5,24 68:16, 25 69:14,16,19 70:1,4,24 74:4, 5 85:13 88:22 89:1 92:12 100:21 104:16 105:13,24 106:1 107:20 110:10 116:10 167:2 169:22 170:9 171:12 172:12 173:2,6 174:5 177:9,16 178:20 179:18 216:25 217:4 218:6 227:9 254:18,23 257:10 260:13 263:23 265:20 266:13 271:20 272:1,2,3,8,11, 17,22 279:1,6, 11,17 280:14 284:21 285:24 286:22 287:8, 14 289:19 290:21 291:2,3, 22 292:21 293:3,4 295:3 297:8 302:15 311:23 313:11 318:1 320:3

321:5 329:22 331:10 339:1 341:21 343:2 346:8

**stated** 153:5 223:20 235:25 259:1

**statement** 60:12,19,20 64:25 65:7,18, 19,22 66:2,3,5, 7,20,23 67:1,3, 4,5,17 68:6,7, 12,14,16,18,19, 24 69:7 70:2 71:4,5,15,17,25 72:1 73:18,19, 23 74:3,10,11, 12,13,18 86:4 132:2,25 196:3, 5 198:12 213:15,16,17 214:1 216:18 217:11,18 218:3,6 228:5, 10,17 230:7,16, 20 233:19 234:1 235:7 239:14,18 242:7 263:8,15, 16 265:1 273:9, 16 279:18 322:24 335:4,7, 19 340:8,17

**statements** 60:6,9 67:9,13 70:21,23 71:2, 19,20 87:5,6, 13,14 193:20 194:1,21 199:1 214:7 215:17, 21 236:20 260:15 335:1, 23 340:22 341:10 348:4

**states** 13:16 143:18 149:4 159:7 178:5 183:3 218:19, 24 219:4 221:5 222:4,9,11,15, 17,21,23 223:8 224:9,11,13 228:25 229:3,

21,24 230:1,2, 6,7,9,12 235:17 254:16 277:10 298:21 307:9 346:14

**Stateville** 277:19,21

**stating** 54:22

**status** 53:19 54:24 104:20, 22 106:4,14,16, 21 107:3,6 280:5

**stay** 37:25 39:22 53:16 278:24 300:22, 25 330:25

**stayed** 53:11 54:7 183:24

**staying** 265:6

**steeped** 182:23

**step** 76:15,17 247:15

**Stephen** 15:20

**STEPHENSON** 14:5 21:19 83:3 85:3,8,10 129:10,16,24 162:19 298:7, 12 333:11,16, 19,21 344:21 345:2 353:5

**Steve** 15:13 93:24 345:23 346:9,15 347:7, 12

**Stevenson** 14:5

**stick** 69:10

**stint** 40:16 44:13 300:3 301:12

**stocks** 352:15

**stolen** 48:19

**stood** 236:2

**stop** 36:21 37:3 79:17 133:21

**stopped** 88:15 97:17

**stopping** 68:9

**stories** 234:17

**story** 47:12 135:2 158:24 180:20 234:18 272:21

**straight** 99:8 202:2 285:16

**street** 40:19,20 142:21,22 153:3,25 154:9 156:1,9,11 203:14 206:21 285:12 297:2 329:18

**streets** 31:18 155:15

**stress** 18:8,17, 20 121:3,5

**stressed** 18:10,14 122:5

**strike** 85:22 142:9 208:20, 23 316:14

**strokes** 151:9

**strong** 75:11

**strongly** 266:3,4 308:21

**stubs** 249:20 250:1,4

**stuck** 155:13

**students** 285:10,13,17

**study** 32:8,15

**stuff** 48:2 139:15 228:1 237:13

**stupid** 155:10

**Style** 82:17

**subject** 169:3, 15,17 178:4



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

350:19

**subjected**
288:10

**subjective**
56:3

**subjects**
255:1,4

**subpoena**
166:23 174:14,
23 298:11
315:16

**subsequent**
262:23 274:23

**subsequently**
255:2

**substance**
78:25 137:4
190:22 235:17

**substantively**
187:20

**suburban**
40:18

**suburbs** 38:22

**sudden** 109:3

**sufficient**
169:13

**suggest** 66:24
81:12 88:3
189:16 320:23

**suggested**
257:24 258:6
285:15

**suggesting**
160:21 206:9
235:6

**suggests**
167:9 210:20

**suit** 109:4

**suitable** 116:2

**Sullivan** 15:13
70:25 71:13
345:24

**sum** 78:25

**summarizing**
137:6,8

**summary**
350:20,22

**summer** 25:20
239:7

**summons**
38:12

**superintenden
ts** 100:3

**supervisor**
41:10 43:22
49:21,23 51:4,
18 53:4,12,17
54:18,23 55:7,
13,16 56:1 57:2
325:15,16

**supp** 254:11

**supplemental**
58:23

**support** 26:23
83:8,9,12,16,
21,23 125:2
288:22 326:1

**supported**
87:5,12

**supporting**
29:10 251:3

**supposed**
156:2,6,8 164:1
202:8,16,17
203:24 209:1,5,
14 238:22
241:6 242:8
292:4,5

**supposedly**
249:22

**Suria** 40:21

**surprised**
181:3,4,19

**survives**
350:20

**suspect** 111:9
188:21 194:11

**swear** 16:22,23
270:4

**swearing**
320:10,14

**Sydney** 13:5
50:24

---

**T**

**tactical** 343:4,
7

**takes** 73:17

**taking** 20:13
66:23 69:18
121:22 122:10
148:2 218:12
261:10 277:10

**talk** 47:11
65:23 66:10
71:8,10 94:1,2
107:9,11,14,16
109:2 114:24
115:2 116:10,
15,22 121:12
127:22 131:23
136:7 146:12
151:17 164:11
175:21 176:12,
13 193:19
225:13,20
226:3,7 237:17
238:8 239:18
240:5 257:15,
23 259:24
260:7,8,21
267:3,12 269:5
276:21 279:4
285:5,17
286:16 288:25
297:18 302:23
310:25 311:3,
12,14,19 312:3,
6,25 313:1,4,7
318:3,24
335:10,17,22
354:19

**talked** 70:23
71:23 84:5
91:13 93:25
107:25 108:1,3,
15 112:1 116:4,
5 121:6 128:5
135:4 152:3
157:14 159:1
164:8,9 185:23
208:2 228:25
237:20 257:22

262:25 270:18
275:2,4 294:6,7
312:11 313:10
326:8 348:21

**talking** 19:25
65:3,4 67:20
69:21 73:20
80:17 86:14
91:12 94:11
98:20 108:7
116:17,19
135:4,6 150:15
152:3 157:16,
17 162:10,12,
14 182:13,18
192:5 195:19
200:5 202:25
208:23 217:17
232:19 248:20
256:4 265:4
267:14 268:24
308:18,23
309:1 325:2,6,
12,16 339:6
341:8,15

**talks** 178:1
185:16 239:24
335:21

**tall** 267:20

**tape** 91:21

**target** 316:24

**targets** 316:22
317:6

**teacher** 286:11
329:25 330:18

**technician**
13:5

**telling** 21:25
121:2,9,18,19,
24 122:8,9,24
124:1 145:16
147:7 164:10
179:3 187:6,14
191:3 221:12
231:7 233:18
234:2 241:11
243:10,17
245:2,3,9,11,
15,19 246:3
272:19 295:14
304:14 341:15

**tells** 196:23
197:1

**temporary**
298:24

**ten** 84:6 236:1
282:23,25
283:4,13,14
288:12 331:17,
20

**ten-year** 99:17

**tenants** 93:14

**tender** 72:22
79:18 80:5
174:8 175:23
176:1

**tendered**
79:24 176:9
227:21

**tendering**
72:20 73:8
174:15

**term** 49:13
81:15 86:18
135:7,19 138:6
279:11

**terminology**
56:5 136:1
139:21

**terms** 46:21
114:7 343:8

**terror** 48:5

**terrorizing**
48:17

**test** 33:14
35:14 191:20

**testified** 97:9
149:21 152:22
199:10 236:22
238:5 250:3
259:1 265:18
269:3 273:9
274:24 287:14
316:5 345:7
346:1 347:22

**testify** 18:5,9,
13 19:15,19
20:9 75:7 89:2,
13,20,25 90:7

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

122:17 166:13 169:18 267:4 275:15 278:2 291:10 296:7,9, 10,21,22 297:8 306:6 316:9 343:18

**testifying** 124:18 299:16

**testimonies** 214:14

**testimony** 16:24 113:1,7 114:7 127:14, 21 141:4 148:10 167:3 179:9 207:11, 13 214:11,14 232:5 237:13, 14 243:3 256:10 258:12 262:12 275:13, 14,20 276:3,4 301:17 302:5 309:2 345:9

**testing** 33:17

**that'd** 50:18 174:11

**Theft** 57:24

**thefts** 50:7

**theory** 227:18

**there'd** 73:14 175:4

**thereabout** 34:13 41:3

**thing** 32:13 48:12 50:10 124:8 126:17 136:21 174:22 200:2,23 203:5 211:13 234:3, 23,24 235:2 269:18 271:12 276:18,22 297:14 303:6,9 334:25 340:24 354:23

**things** 48:7 51:25 124:20

155:10 159:14 180:25 181:2 194:8 196:8 209:13 214:15 225:10 241:3, 15,16 242:18, 20 243:13 244:3,7 251:1 279:23 286:2 322:7

**thinking** 112:15 142:9 151:4 213:21 216:2 300:23

**Thomas** 59:20 130:18 178:21 252:19 337:13 338:19,24

**thought** 23:18 26:16 27:12,16 29:20 43:19 46:15 55:15 90:3 92:3 94:8 97:18 140:13, 16,18,20 145:18 146:12 150:21 191:3 195:5 208:9 214:23 216:1,4 244:23 245:1 259:16 283:16 285:18 286:5,6 287:12,25 288:5 316:4 325:13,14 328:17 329:6 335:16

**threaten** 273:14,23,24 274:5 276:25

**threatened** 103:8 272:7 273:3,5 278:16, 19 279:4,6 281:1,7 319:3 330:22

**threatening** 273:10 276:6, 10

**three-page** 167:15

**throw** 335:6

**ticket** 97:13

**tickets** 97:11

**time** 13:8,9 20:11,18 22:19 26:8,14 27:23 29:4 30:6 37:23 39:6 40:17,24 41:24 42:4 48:9,13,21,24, 25 50:2 56:15 63:7 64:6,8 67:20 69:10,11 72:9 76:22 82:16 84:5 89:7 93:7 98:19 102:9 103:3,24 105:2,4,9,10 110:21 115:20, 22 116:2,3,8,9 117:17,22,23 118:1 119:14 122:2,3,25 150:8 152:1 158:9,19,20 174:3 180:4,6, 10 187:5,13 188:10,12 192:19 193:11, 16,17 197:1 205:15 206:23 207:8 208:2 217:2,17 227:8 228:14 229:15 230:10 233:24 234:13 236:6 247:18 249:21 250:16 254:25 256:5 261:6 262:7 263:15, 16 266:19,24, 25 275:3 276:17 279:15 280:15 282:11 283:12 285:9 286:8 287:1 289:6 293:1 294:1,3 299:23 301:7 303:21 309:5,23 310:23 313:11 314:14 319:19 322:5,20 325:6 326:5,18 329:1

332:1,22 333:9, 12,25 334:5,6, 25 336:10 338:11 339:7, 12,21 341:25 342:4,16 343:23 347:7 348:20 350:16 353:1 354:10, 11,12

**timeline** 26:4 278:10,12

**times** 37:6 63:5,6 77:25 101:6 199:25 206:12 209:18 233:5 246:25 274:21,24 277:19 281:25 323:8 331:9

**timing** 161:20, 23 215:1,4

**title** 25:15,16 57:14 83:9

**titles** 25:14

**today** 13:6,8 18:5,9 19:16,20 20:9 50:25 62:2,15 63:16 80:16 92:6 104:7 105:9 117:21 154:24 180:5 193:6,16 204:5,23 206:14 215:13 220:25 224:22 239:9 266:23 268:7 284:12 334:5 337:19 346:7

**today's** 58:16 63:17

**told** 21:12 33:19 40:20 47:15 88:17 89:1 93:23 94:1 104:18 107:23 112:6 113:12 120:18 121:19 126:7 127:9 128:15 131:11, 24 132:20

135:8 137:19, 21,24 138:22 139:24 140:2,9, 17 141:20 142:2 145:1,3, 6,13,17 146:24 147:2,8,11,23, 25 148:24 150:5 152:14, 18 159:10,11, 13 160:10 165:19 172:1,5 175:13 183:9 186:13,15 195:16,19 196:13,14,19 197:3 198:18 201:15 204:15 221:6 222:4,9, 15,17 223:9,14, 16,23,25 224:4 225:18 226:24 229:1,24,25 230:3,12 232:1 235:21 240:8 243:9,23 257:23 269:7 272:4,9,12,16, 18,20 273:4,11 274:17 275:11 276:20 282:23 288:6 300:19 302:22 317:25 318:22 320:4 328:16,18 330:24 335:17 336:15 348:19

**Tom** 29:10,14 314:5,7 327:12 331:9

**tone** 297:11

**Tony** 15:5 256:12 337:1,7, 24

**top** 118:18 143:12,15,16 144:19 155:20 177:25 307:13

**total** 53:7 54:4

**totally** 206:24 215:11 269:8 274:1,8,19 276:22 321:1

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

324:3

**touched** 283:3

**tough** 97:10
309:12

**tour** 285:13

**traced** 135:5,
10

**track** 34:8
336:16,23

**tracks** 209:24
210:6,7,13

**traffic** 37:21,
23,25 38:3
97:11,13
107:20

**transcript**
127:19 141:9
248:5 353:24
354:6,21

**transcripts**
58:18,21 141:6
214:13,14

**transferred**
41:4,7 51:25
314:13,17

**transpired**
217:15

**transported**
263:23 264:8

**travel** 139:17

**treatment**
80:20 81:4,7,
10,13

**trial** 35:25
53:20 55:8
58:19,22 75:25
80:13 94:10,15
98:23 112:12
116:14 124:17,
22 151:3 159:2,
4 165:14 181:6,
14 184:25
195:3,15
200:12,14,19
201:3 205:6,9
207:10,15
208:11,14,15
211:21 215:15,

20 226:18
227:9,20,23
236:23 257:20
265:25 278:22
279:22 295:12
296:1,6 300:11
301:19 302:16
303:7 313:15
336:12,18
343:19 347:9

**trials** 92:23
93:1 94:23
98:18 99:5,11
184:25 191:20
211:7,18
277:23 284:13

**trigger** 195:17

**triggered**
325:24

**trip** 93:7

**trouble** 14:15
183:8 235:5
330:25

**truck** 31:23,24

**true** 52:13
55:18,19 86:8,
25 87:1,2
164:21 244:4,8
265:13,15,16
272:21 320:7
321:7,9,13

**trust** 151:23

**truth** 16:25
46:16 109:13
121:3,10,19
122:1,8,25
124:2,4,9,10
164:11,13,16
165:7,20
241:12,13
242:19 243:7,
17 244:24
245:2,4,9,11,
15,19 246:3,6,8
247:5,7,13,14
248:2 273:11
275:9 292:16,
18 313:2 320:4
335:10

**truthful**

121:24,25
244:11,12,15

**truthfully** 18:5,
9 19:15,19 20:9
157:24

**truthfulness**
123:18 124:6

**tu** 353:10

**turn** 183:21
196:9 198:1
254:15 302:14
320:1

**turned** 46:5
105:12,24,25
329:4,5

**turnover** 295:1

**turns** 19:25

**TV** 35:25 90:23,
25

**two-and-a-
half-hour**
309:8

**two-hour**
309:8

**two-page**
290:1

**two-week**
300:3

**type** 23:14,15
29:19 48:12
50:10 57:1 75:8
112:5 120:6
126:17,21,25
139:20 141:16
181:14

**typed** 119:5

**types** 50:10
84:18

**typical** 119:10
251:17,24
252:2,9 296:8,
15,17,20 297:7,
16,18

**typo** 164:1

———————
**U**
———————

**uh-huh** 69:13
90:12 147:22
284:5 290:6
310:9 318:17
349:2

**ultimately**
107:4,5 145:21

**unable** 61:5

**unattended**
323:19,23
324:10

**uncharged**
85:16

**undergrad**
30:24

**undergraduat
e** 33:24

**underneath**
290:14

**understand**
17:15,19,21
19:8,11 21:20
25:5 46:19 47:3
48:17 71:1
86:10,11
109:13 114:21
116:20,21
161:7,18 172:2,
21 195:6
200:20 204:3
216:6 229:13
246:11 247:5,
19,20 263:2
281:17 292:3
296:13 297:18
298:20

**understanding**
21:13 23:13
27:5 52:11
65:24 113:25
115:17,18
116:1 126:9
173:1,5 286:14
313:13

**understands**
121:1,9

**understood**
17:25 72:2
85:21 121:2
122:24 135:3
139:3

**undertake**
26:22

**unethical**
274:3

**unfold** 112:17

**unintended**
324:16

**Union** 31:25

**unit** 41:11,12,
19,20 42:9
43:4,5,6,12,18,
22,23 44:5,10,
14 49:17,22,24
50:12,13 51:5,
18,24,25 52:5,7
53:4,11,12,15,
18,23,24,25
55:17 57:3,7,
10,23,24,25
58:1,2,6,7 70:5
74:23 82:19
139:13 188:6
284:22,24

**United** 13:16

**units** 56:14
57:19,21 58:3

**University**
31:1,10

**unreliable**
85:22 86:2,7

**untoward**
341:21 345:9,
11

**upset** 92:6,10
247:14

**usual** 296:24,
25

**UUW** 23:1

———————
**V**
———————

**vague** 28:5
65:1 69:8 70:19

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

73:4 74:14 78:17 83:3 84:16 111:18 123:4 126:1 134:9 150:19 172:18 177:18 253:14 261:19 321:8

**van** 140:4 142:4,7,14 143:1,24 144:6, 13 145:22 146:8 183:6,11, 16 196:7,19,23 197:2,4 198:19, 20,22 223:11, 16,17 224:1,4 230:12 239:25 240:8 329:7,18 334:20

**verbatim** 235:17

**verbiage** 139:12 156:5

**verify** 121:23, 24 207:14

**verifying** 226:18 336:14

**Veronica** 15:16

**version** 85:5

**vest** 30:6

**vested** 30:10

**viability** 165:13

**viable** 22:6

**victim** 48:19 50:17 54:11,12 75:5,6

**victim's** 56:25 97:9

**victims** 45:8, 10 77:1

**video** 13:4 59:12 91:20,22 197:9 354:9,21

**videoconferen ce** 13:10 105:8 117:21 193:15 266:23 334:4

**view** 171:10 194:11,17 307:6 335:3

**violation** 335:8

**violence** 50:13,14

**violent** 280:8, 12 287:18 288:4

**virtue** 280:14

**visit** 98:12,17, 22 99:2,3 101:13,17 102:16,19,21 103:1 104:2,3, 12 278:1,5,17, 18 281:25 282:17 287:16, 17,19,20,22 307:6,14,16 310:1,14 311:2 313:14 316:24 318:20 325:21

**visited** 97:17 224:10 277:18, 19 286:25 287:1 307:9 309:20 310:10 311:1 315:23 316:8,9,17,20

**visiting** 102:24 251:14 287:2,7 315:17 318:4

**visitor** 307:2 315:16 316:25

**visits** 101:12 224:12 277:21 281:1 316:5 317:17

**Vitale** 115:11, 14 118:9 178:19

**Vittum** 132:10

**voice** 77:5

**voices** 14:22

**voluntarily** 260:19

**volunteer** 232:24 307:2

**volunteered** 93:17 231:10, 11 233:15

**volunteering** 230:18 231:3, 17 232:13 233:10

---

**W**

**W-R-I-T** 102:5

**Wacker** 13:7

**wait** 20:4 21:19 59:7 73:2 80:8 89:15 94:22 95:4 96:15 117:6,12 173:15 179:8 189:24 192:12 231:20 240:22

**waiting** 144:7 236:1

**waive** 97:12

**wake** 94:19 97:3

**walk** 18:21 149:11

**walked** 18:23 148:7,21 183:22,25 184:5,9,14 229:16,18 303:25

**walking** 333:3

**Walsh** 319:14

**wandering** 155:15

**wanted** 31:8 36:20 55:2 60:23 61:4,11, 15 62:4,7 65:7 78:23 85:15

89:10,20 93:8 99:21 122:23 137:2,17,18 138:20 139:24 140:10 141:18 147:2,8,23 149:14 150:21 158:23 164:14 174:13 193:19 194:3 195:11, 13 198:15 203:3,13,22 225:21 229:24 230:3 231:16 233:7 235:23 238:24 244:24, 25 257:23 268:21 269:5,6 273:7 276:17 281:21 285:14 286:1 310:25 311:14 321:16, 18 334:17 345:25

**wanting** 36:21 37:3 108:4 184:3 311:3

**warrant** 256:3, 17 338:22 339:8

**Washington** 348:15

**Wasilewski's** 39:12

**waste** 122:1,2

**watch** 35:25 323:16

**watched** 195:18 322:19, 24 323:4

**watching** 35:24 231:7 323:6

**water** 337:16

**Wayne** 13:14 16:4 89:11,21 90:10 110:22 111:5,9,13 144:25 145:2 148:21 149:14

152:13 159:11 160:11 184:5,9 185:24 186:1,7, 12,14,21 194:21 196:13, 19,23 197:1,3, 15 198:13,15, 18,20,21 223:9, 14,16,17,23,25 224:4,11 225:8, 9,21 251:4 336:21 338:24 343:5

**Wayne's** 148:7 149:14,19 186:17,21,23 198:13,15 199:13,19

**ways** 66:25 67:2,3 87:24 88:1 131:21 166:11

**wearing** 109:4

**weed** 313:22, 25 314:2,9

**week** 22:8 63:9,10,12,16, 20 64:9,11 66:9 162:1 250:4

**weekends** 31:24

**weeks** 103:8 162:3 289:16

**weighing** 251:16

**weight** 211:23 212:1

**welcomed** 211:18

**well- established** 191:10

**west** 31:20 140:3,19 141:22,25 146:14 147:12 148:1 153:25 154:11,22 155:22 156:1,9,



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

11 183:5 203:14 204:1

**what'd** 25:12 70:12,13 91:10 94:8 108:16

**whatsoever** 289:3

**Where'd** 30:24 33:6 34:6 38:3

**whichever** 253:1

**white** 153:14 154:7 272:24 273:2

**who'd** 64:13 122:10 268:22

**why'd** 22:4 23:6 26:5 29:8, 12 30:4 31:7 32:8 35:19 49:17 102:19 307:16 310:14 311:2 313:14

**wide** 206:20

**wife** 103:18,20

**wildest** 301:6

**William** 102:16 117:10 118:8, 10 167:24 168:7 237:2 268:9 277:8 284:4,9 291:5, 14 295:1 304:15,24 338:7

**win** 29:2

**window** 53:22

**winter** 303:11

**wipe** 222:22

**Wisconsin** 15:18 31:1

**wished** 112:8 257:18

**wishes** 115:18

**withdraw** 174:7 262:6

**withdrawing** 129:16

**withdrew** 129:17

**withhold** 72:11

**withholding** 72:6,13

**witness'** 109:21

**witness's** 65:7 66:7 67:17 69:7

**witnessed** 212:23

**witnesses** 60:7 71:16 76:25 92:13,18, 23,25 94:5,9,15 96:21 97:20,24 98:2,23 99:3,6, 8,10,13 116:11, 13,15,18,19,22 173:3,7 174:9, 14,24 192:23 193:5 209:4 225:12 226:16, 17 227:21 234:16 245:9 250:18 255:3 257:9,25 258:3 259:18 261:13 267:3 270:4,6 276:20 280:1, 14 312:19,21 316:8,18 318:4, 5,11 336:3,19, 20 347:13,25

**woman** 52:12, 17

**women** 47:25 324:7

**won** 26:2

**wondering** 119:9 275:22

**word** 46:20 91:16 135:23 252:2 270:3

**words** 320:22

**work** 20:20,22

22:24 23:8,9 24:3,6,19,22 25:7 27:11,17 29:17,19,24 31:8,21 35:19 40:20 41:10,13, 18,25 42:11,16 43:13,15 44:16, 20,23 49:24 50:24 51:9,14, 17,25 52:11,16 93:24 107:18, 22 109:2,9 188:20 190:5, 10,15,16 214:8 223:3 249:21 250:9,13,16,21 255:25 256:1,2 259:11 284:18, 20 332:15,22 333:2 344:24

**worked** 22:7 25:9,11 29:14 30:1 31:22,23 43:12 44:11 47:7 67:9 70:4, 6 84:3 188:6,9, 11,13,15 190:2 191:13 222:24 253:23 254:1 256:15

**working** 22:9 31:11 33:2 36:16 42:15,18, 25 45:6 49:3 52:12,23 53:15 55:17 68:6 69:16,23,24 109:4 139:10 188:12 252:16 253:1,12,19 256:20

**works** 283:21

**worksheets** 249:20 250:5

**world** 97:16 169:5

**worrying** 226:23

**worth** 164:13, 17

**would've** 26:9 61:20 120:1,8 136:18 163:9, 10 164:24 165:18 232:22, 25 252:25 331:16 332:10

**writ** 102:2,4,7 270:20,24 271:1 291:12, 14,23 293:13, 14 296:9,21 298:23 299:1 301:25 305:13, 25 306:3,11

**write** 66:5 67:6, 23,24,25 93:20 100:2 191:7 270:15 288:8 291:10 306:3 328:18

**writers** 188:22, 24 189:2,5,9, 13,16 191:11

**writing** 73:12, 13 101:3 191:21 290:24 295:8

**writted** 305:11 306:7,14

**written** 67:23, 25 68:18,19,24 72:1,23 73:7 74:4,13 165:18 166:9,10 172:4 223:21 299:6 348:17

**wrong** 52:15 65:25 155:12 163:24 167:6,7 182:2 196:1 261:5 270:4,6 273:24 274:8, 17 321:1 323:20 324:3

**wronged** 49:15

**wrote** 93:3,18, 20 98:8 225:9 279:24 310:23, 24

**X**

**Xavier** 31:10 32:2,4 33:1,25 34:17

**Y**

**Yale** 99:16

**yard** 322:5

**yards** 329:8

**yawn** 312:3

**year** 38:18 39:25 40:7 97:16 110:14 167:7 182:1 208:12 279:14 286:10 299:12 313:15 341:20 351:17

**years** 20:19,23 31:4,5 32:21, 22,23,25 34:12 43:2 45:15,22 63:5 81:1 84:3, 4,6 93:3,12 94:5 103:13 108:13 166:21 177:13 179:17 180:5,14 182:2 187:22 189:3 193:7 203:21 204:5 205:17 216:2 217:2 221:24 227:23 239:9 243:6 277:18 280:10 284:12 286:14 287:13 288:12 313:15

**yell** 270:6 313:21,24 320:16

**yelled** 91:15 320:15

**yelling** 48:2 78:20 314:1

**yesterday** 61:25 62:1



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**York** 93:15

**young** 45:5
47:22 93:4
155:9 289:5

**younger**
32:18,20

**youth** 287:18

**Yummy** 93:5
180:19

---

### Z

---

**Zoom** 14:24,25
85:5 117:5
268:8,13 298:2
307:1 354:20

**Zuganelis**
115:11,14
178:19



**Kentuckiana Reporters**
**30 South Wacker Drive, 22nd Floor**
**Chicago, Illinois 60606**

**502.589.2273 Phone**
**502.584.0119 Fax**
**schedule@kentuckianareporters.com**
**www.kentuckianareporters.com**