Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

MATTHEW SOPRON,                    )
    Plaintiff,                     )
vs.                                ) Case No. 19-CV-0854
SCOTT CASSIDY, et al.,             )
    Defendants.                    )
                               )
-------------------------   )
                               )
NICHOLAS MORFIN,                   )
    Plaintiff,                     ) Case No. 21-CV-05525
vs.                                )
SCOTT CASSIDY, et al.,             )
    Defendants.                    )
                               )
-------------------------   )
                               )
WAYNE ANTUSAS,                     )
    Plaintiff,                     ) Case No. 22-CV-00320
vs.                                )
SCOTT CASSIDAY, et al.,            )
    Defendants.                    )

The videotaped deposition of LARRY AXELROOD, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken at 151 North Franklin Street, Suite 2500, Chicago, Illinois, on the 16th day of March, 2023, at the hour of 10:13 a.m.

Reported by:  Gina M. Luordo, CSR, RPR, CRR

License No.:  084-004143

Page 2

APPEARANCES:

LOEVY & LOEVY
BY: MS. LINDSAY HAGY
311 North Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
lindsay@loevy.com
    Representing the Plaintiffs;

HINSHAW & CULBERTSON, LLP
BY: MR. MICHAEL C. STEPHENSON
151 North Franklin Street, Suite 2500
Chicago, Illinois 60606
(312) 704-3000
mstephenson@hinshawlaw.com
    Representing Scott Cassidy;

O'MARA & O'CALLAGHAN, LLC
BY: MS. MAUREEN O'BRIEN
    MR. SEAN JOSEPH O'CALLAGHAN
    (via videoconference)
230 West Monroe Street, Suite 2620
Chicago, Illinois 60606
(312) 600-5588
maureen.obrien@o2lawyers.com
sean.ocallaghan@o2lawyers.com
    Representing Neil Linehan, Colleen
    Hyland, Laura Suffield, George
    Andrews, Patricia Shea, and Steve
    DiNolfo;
        TRIBLER ORPETT & MEYER P.C.,
BY: MS. AMY M. KUNZER
225 West Washington Street, Suite 1300
Chicago, Illinois 60606-3408
(312) 201-6447
amkunzer@tribler.com
    Representing William Marley, Norfie
    DiCiolla, K. Maicke, L. McDonald,
    Bajenski, and Ptak;

Page 3

APPEARANCES (continued):

KULWIN, MASCIOPINTO & KULWIN LLP,
BY: MR. ANTHONY J. MASCIOPINTO
    MS. HEATHER AFRA
    (via videoconference)
161 North Clark Street, Suite 2500
Chicago, Illinois 60601
(312) 641-0300
amasciopinto@kmklawllp.com
hafra@kmklawllp.com
    Representing George Holmes, Thomas
    Argenbright, A. Graffeo, and William
    Moser;

NATHAN & KAMIONSKI LLP,
BY: MR. EPHRAIM SIFF
    (via videoconference)
33 West Monroe Street, Suite 1830
Chicago, Illinois 60603
(312) 612-1928
esiff@nklawllp.com
    - and -
MICHAEL BEST & FRIEDRICH LLP
BY: MR. JAMES O. HERACKLIS
444 West Lake Street, Suite 3200
Chicago, Illinois 60606
(312) 596-5884
joheracklis@michaelbest.com
    Representing City of Chicago.

          * * * * *

Also Present: Mr. Peter Prezzano - Videographer

Page 4

          I N D E X

WITNESS                    EXAMINATION

LARRY AXELROOD
    By Mr. Stephenson           8
    By Ms. O'Brien              74
    By Ms. Kunzer               129
    By Mr. Masciopinto          133
    By Mr. Heracklis            139
    By Mr. Siff                 140
    By Ms. Hagy                 141
    By Mr. Stephenson (further)     212
    By Ms. O'Brien (further)        217
    By Ms. Hagy (further)           234
    By Mr. Stephenson (further)     238


          E X H I B I T S
NUMBER      DESCRIPTION              PAGE
Exhibit 19   Report of Proceedings Bates    10
             CCSAO CAB-018411-18459
Exhibit 20   Proffer Letter Bates           30
             CCSAO CAB-012970
Exhibit 21   Proffer Letter Bates           33
             SOPRON000008

Page 5

          E X H I B I T S
NUMBER      DESCRIPTION              PAGE
Exhibit 22   Statement of Bryan O'Shea       51
             Bates SOPRON 005832-5837
Exhibit 23   Affidavit Bates Morfin-         197
             Kogut 001081-1082

2 (Pages 2 - 5)

Page 6

THE VIDEOGRAPHER: Good morning. We are going on the record at 10:13 a.m. according to the video monitor on March 16, 2023. This is media unit 1 of the video-recorded deposition of Larry Axelrood taken by counsel for the defendant in the matter of Matthew Sopron v. Scott Cassidy, et al., and related cases filed in the United States District Court for the Northern District of Illinois of Illinois, Case No. 19-CV-08254.

The location of this deposition is 151 North Franklin Street, Chicago, Illinois. My name is Peter Prezzano representing Veritext. I'm the videographer. The court reporter is Gina Luordo also from the firm Veritext.

Will all attorneys please state their appearances and affiliations for the record beginning with the noticing attorney.

MR. STEPHENSON: Michael Stephenson on behalf of defendant Scott Cassidy.

MS. O'BRIEN: Maureen O'Brien, O'Mara & O'Callaghan on behalf of former Assistant State's Attorney's Neil Linehan, Colleen Hyland, Laura Sullivan, Patricia Shea, Steve DiNolfo, George Andrews of the Cook County State's Attorney's

Page 7

Office.

MS. KUNZER: Amy Kunzer --

MR. O'CALLAGHAN: Sean -- I'm sorry. Sean O'Callaghan, O'Mara & O'Callaghan, representing the same.

MR. SIFF: Ephraim Siff from the firm Nathan & Kamionski on behalf of the defendant, City of Chicago.

MR. HERACKLIS: James Heracklis from Michael Best & Friedrich also on behalf of City of Chicago.

MS. KUNZER: Amy Kunzer on behalf of former Cook County Investigators William Marley, Leonard Bajenski, Thomas Ptak, and Norfie DiCiolla.

MR. MASCIOPINTO: Tony Masciopinto on behalf of the City of Chicago CPD officer individual defendants.

MS. HAGY: And Lindsay Hagy on behalf of plaintiffs Matthew Sopron, Nick Morfin, and Wayne Antusas.

THE VIDEOGRAPHER: Will the court reporter please administer the oath, and you may proceed.

(Whereupon, the witness was sworn.)

Page 8

LARRY AXELROOD, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. STEPHENSON:

Q. Good morning, Mr. Axelrood. Can you please state your name and spelling your last for the court reporter?

A. My name is Larry Axelrood, A-l-e-x-r-o-o-d.

Q. Mr. Axelrood, how would you prefer I address you today?

A. Larry.

Q. Larry is fine?

A. Yes, sir.

Q. Thanks, Larry.

Larry, do you understand that the oath you take today is the same as if you were testifying in court?

A. I do.

Q. Now, if I ask a question today and you answer that question, I'm going to assume that you understood the question. Is that fair?

A. Yes.

Page 9

Q. Is there anything that would prevent you from testifying truthfully today?

A. No.

Q. Is there anything that would prevent you from testifying -- let me rephrase.

Is there anything that would prevent you from thinking clearly today?

A. No.

Q. Did you review any documents in preparation for today's deposition?

A. I think that I saw the handwritten statement, and I read the deposition that I gave in, I think, a post-conviction hearing somewhere like in the early 2000s before Judge Kazmierski.

MR. STEPHENSON: If the court reporter could please mark as Exhibit 19 -- this is going to be a report of proceedings dated September 3, 2003. It's the testimony of Larry Axelrood Bates stamp CCSAO CAB-018411 through 18457. If you could mark that, please, and hand it to the witness.

(Whereupon, Deposition Exhibit No. 19 was marked for identification.)

3 (Pages 6 - 9)

Page 10

BY MR. STEPHENSON:

Q. Larry, does that appear to be the transcript of your testimony?

A. It appears so, yes.

Q. Did the Cook County State's Attorney's Office call you as a witness to testify during Matt Sopron's post-conviction proceeding on September 3, 2003?

A. Yes.

Q. Did your testimony relate to your deposition of Bryan O'Shea in connection with the Martin and Hovel cases?

A. Yes.

Q. Did you give truthful testimony at that time?

A. Yes.

Q. Thanks, Larry. You can put that aside for a moment. I want to switch topics. I want to get to learn about you a little bit and about your background.

Can you tell us your higher education background, where you went to school, when you graduated?

A. I graduated from Indiana State University

Page 11

in 1982. I went to Chicago Kent College of Law. I graduated in 1985. Do you want me to go into my professional history?

Q. Right before we get to that, did you take the bar?

A. I did, and I passed the first time. Thank God for small miracles.

Q. When did you pass the bar?

A. I was sworn in as a lawyer November 7th of 1985. I took the bar, I believe it was, in July. I got the results in the fall, and then there was a lag time before we were sworn in.

Q. So after you were admitted in November of 1985 to the Illinois bar, what was your first job?

A. Cook County State's Attorney.

Q. How long did you work at the Cook County State's Attorney Office?

A. From 1985 to 1989.

Q. During that time frame, could you please just describe the different units or positions that you held at the Cook County State's Attorney's Office?

A. I began in criminal appeals, and then I was transferred to 26th and California to be in the

Page 12

chief judge's courtroom. The chief judge was Richard Fitzgerald. We did arraignments and mandates back from the Appellate and Supreme Court and other assorted oddities. And then after that, I went to First Municipal doing misdemeanor prosecutions throughout the city.

Then after that, I went to felony review. And then after felony review, I went to preliminary hearings. And after preliminary injuries, I was in the felony trial division.

Q. While at the Cook County State's Attorney's Office, did you gain experience or exposure to trying cases?

A. I did.

Q. So you were at the State's Attorney Office until 1989. Where did you go after that?

A. I went into private practice.

Q. How long were you in private practice for?

A. From 1989 until 2005. I think my swearing-in date as a judge was June 1st, 2005. Don't hold me to that. It was 2005. I think it was June 1st.

Q. Okay. So you were approximately in private practice from 1989 until right before you

Page 13

were sworn in as a judge in 2005?

A. Correct.

Q. So I want to focus on the private practice real quick.

What was your first job after you left the State's Attorney's Office?

A. I went -- I went to work with a friend of mine who was attempting to become a judge, and he had his own criminal defense practice, and I worked with him for some -- I don't remember if it was a month or three months or something, but for a period of time before he became a judge, and then I was left with his practice. And I, in essence, finished his practice. And then in 1992, I left his former suite with the people that he was affiliated with, and I went on my own and was with a different group of people.

Q. When you say you went on your own, did you open up your own sole proprietorship?

A. I did.

Q. What was that office called?

A. Law Offices of Larry Axelrood.

Q. Were you the sole proprietor for that practice until you became a judge?

4 (Pages 10 - 13)

Page 14

A. Yes.

Q. So while in private practice from when you left the State's Attorney's Office up to and including 1996, did your practice, your private practice, consist of mostly representing defendants in criminal cases?

A. Yes.

Q. Now I want to focus on your judicial background. Did you become a judge, an associate judge, June 1st, 2005 or on or about June 1st?

A. I think it was June 1st, but -- yeah, I think it was June 1st, 2005 I got sworn in.

Q. Are there two different types of judges, circuit court judges in Cook County?

A. Yes. There are associate judges who are -- go through a vetting process. They submit their credentials to more than a dozen bar associations and are evaluated. Reports are issued on each of the individual candidates. And then a committee of presiding judges interviews all of the aspiring associate judges, and they narrow the list depending on the number of openings.

There are two people for each opening. So if there are 10 openings, 20 people get on what's

Page 15

known as the short list. Those people then campaign by going and being interviewed by all the full circuit judges, then the full circuit judges vote on those candidates.

I made the associate judge list approximately two years earlier and didn't get through the final cut. And then two years later I made the list again, did get through the final cut. Somewhere down the road, I ran for and was elected to a circuit spot in the 9th Judicial Sub-Circuit, and then in, I think, 2018, I was retained countywide for my circuit judgeship.

Q. What's the term of years for an associate judge?

A. Four.

Q. And how long do you think you were an associate judge for?

A. Well, I was an associate judge -- you can do the math -- from 2005 until December of 2000 -- let me go backwards. So I think 2012 because then I was retained in '18. It's a six-year term.

Q. So let's focus on the associate judgeship. Where did you preside?

A. Well, everybody starts in traffic court,

Page 16

and then after that, I went to Rolling Meadows, which is the 3rd District. Then after that, I went to the 2nd District, which is in Skokie, and I was -- I had a dual designation when I was in Skokie. I was assigned to the suburban district and also to the criminal division, which is headquartered at 26th and California, but there were four Chicago felony courtrooms in Skokie.

And so I spent my time either in the Chicago courtrooms in Skokie doing felony cases from Chicago, or I was doing either felonies from the suburbs. I think there's 30 some odd municipalities or agencies that would get their cases sent to Skokie, and then I would do whatever else they needed, whether it was bonds, preliminary hearings, traffic, village ordinance, whatever.

If I was doing Chicago call and it started at 10:00 in the morning and a judge called in sick and they had a forest preserve call at 9:00, I would jump in and cover that. We were very collaborative.

Q. And how long were you -- let me rephrase that question.

Where did you go or where did you preside

Page 17

after presiding in the 2nd Municipal District?

A. I went to the Law Division at the Daley Center.

Q. How long were you in the Law Division at the Daley Center for?

A. I think a little over five years. You know, the dates, they're not -- it's not like your wedding anniversary. You go from one courthouse to the other. It's not a big memorable day that you put in your calendar.

I can tell you, I think, that I spent about two and a half years on the 22nd floor doing motions, and I think I did two and a half years in civil trial. My courtroom was 2401. So between the two of them, I think it was a little over five years.

Q. And during that five-year time, what types of cases did you preside over in the Law Division?

A. Well, almost any civil case from car accidents to wrongful death, medical malpractice, personal injury, premises liability, insurance claims, if I said this already, car accidents, premises liabilities, people falling on different things, products liability. I mean, pretty much a

5 (Pages 14 - 17)

Page 18

lot, a lot of different things.

Q. When did you retire from the bench?

A. I retired July 4, 2019, and I started -- that was a Thursday, and I started my current job on Monday, July 8th.

Q. What is your current job?

A. I'm a senior mediator and arbitrator at ADR Systems in Chicago.

Q. I want to go back a little bit further during your private practice years. Did you ever teach or serve as an adjunct professor?

A. Yeah. I taught at Oakton Community College in their, I would say, criminology, but I think at the time it was called law enforcement or -- I don't know the precise title of it, but yes, I taught there for a few years.

Q. Can you ballpark those few years when that happened?

A. Probably the end of the '80s and the beginning of the '90s. No, it had to be in the '90s because I was in private practice, and the way it came about was I had taken classes there one summer in college, and one of the professors I had was Jim O'Shea, who was the head of that

Page 19

department. I was in private practice, and I was in a courthouse. It might have been Skokie. It might have been the 4th District. Jim O'Shea was there with some students.

So I recognized him. I walked up. I started talking to him, and he invited me at some point to come speak to a class, and that evolved to him hiring me to teach classes there.

Q. I apologize if you said this. Jim O'Shea was one of your teachers or professors when you were enrolled at Oakton?

A. Yeah. He taught -- I think I took three classes, two in the summer and one in what they call the spring session, which was three weeks before the summer session started, and he was one of the classes that I took in the summer that I really enjoyed his class. I went off and went back to a four-year institution, and he ran that department for decades.

Q. Is Jim related to Bryan O'Shea?

A. As I understand, Jim O'Shea is Bryan O'Shea's uncle.

Q. Was it through Jim O'Shea that you met Bryan O'Shea?

Page 20

A. Yes.

Q. We're going to move past the background, Larry, and going to move on to the Martin and Hovel cases now.

In 1996, did you represent Bryan O'Shea in connection with the Martin and Hovel cases?

A. I represented him. He was a witness. Yes.

Q. How did you first become involved in the Martin and Hovel cases?

A. I got a phone call. I don't know if it was -- that I got -- someone put a number in my beeper. Back then, we had beepers, and -- so I don't remember who I was returning a call for a beeper or if I talked to Jim who said, you know, my nephew needs help, but my recollection is that Bryan had a brother, an older brother, who was a very good guy, you know, working young professional, and my recollection is that that brother, and I don't remember his name. It might have been Kevin, but I'm not sure what his name was, but whatever his name was, he -- my recollection is he said there's some cops at the door wanting my brother to open the door and let

Page 21

him in. And I'm afraid because it's about a murder case.

And I don't know if Bryan called me or I called Bryan, but I distinctly remember being on the phone with Bryan while the cops were outside of his house, and I said to him ask them if they'll talk to me. He handed the phone, and I talked to somebody that identified themselves as a police officer or investigator or detective, something.

Q. All right. So we're going to get to that with the investigators. Your conversation with Bryan when you called him back, what did you learn from your conversation with Bryan?

MS. HAGY: Objection. Form.

THE WITNESS: Do I answer that?

BY MR. STEPHENSON:

Q. Yeah. Go ahead.

A. I learned that there were people outside his door that wanted him to open the door, and I did not want that to happen.

Q. What did you tell Bryan?

A. I told him, in essence, do not open the door. Let me talk to them, and he -- my understanding is he handed them the phone because

6 (Pages 18 - 21)

Page 22

the next thing I know I'm talking to some voice.

Q. Did you confirm with Bryan that these people were at least not in the house?

A. Yes.

Q. And Bryan somehow -- did Bryan somehow then give them the phone to the investigators outside the house?

A. Well, I was talking to somebody on the phone who identified them in some way as being involved in this case.

Q. When you spoke with those people outside the house, did you learn who they were?

A. At the time I did, yes.

Q. And what did you learn from that conversation with them?

A. Well, they told me that Bryan was a witness, and I said if he's witness, then I'll be happy to bring him in on a mutually convenient date at a mutually convenient venue, but I don't want him speaking to them without representation.

Q. Did they give you any push-back on that?

MS. HAGY: Objection. Form.

THE WITNESS: May I answer?

Page 23

BY MR. STEPHENSON:

Q. Yes.

A. No, I wouldn't say push-back. I think that they probably were relieved that they were going to deal with a lawyer instead of dealing directly with Bryan.

Q. Did they leave with any contact information or who to talk to to schedule this meeting?

A. Yeah. They -- I have no idea if they left something for Bryan, but I asked them who I should follow up with to set up this potential interview, and they said Assistant State's Attorney Scott Cassidy. They may have given me other names, but I just remember that I followed up with Scott Cassidy.

Q. So sometime after speaking with these investigators that wanted to speak with Bryan, did you call Scott?

A. I did.

Q. What did you learn from your conversation with Scott?

A. That Bryan was a witness and had no exposure for charges for murder and that they

Page 24

wanted to interview him. And after talking to him, I set up a meeting with Bryan and whatever concerned family members so that we can move forward.

Q. When you spoke with Scott, did you try to negotiate an immunity deal, or did you ask for an immunity deal for Bryan?

A. Not initially. Initially I was trying to find out what was going on because I had -- Mr. O'Shea, the O'Shea family, had consulted with me, but I wasn't the lawyer yet. So I needed to be the lawyer to be able to represent him.

You know, a lot of times people would call a lawyer when their tears are hot, but then when things calm down, they might go with somebody else. So I wasn't representing Bryan until we had a retainer agreement, and they hired me to be his lawyer.

Q. Okay. So the next step was then you were to meet with Bryan and, perhaps, his family?

A. Yes.

Q. Did you meet with Bryan and, perhaps, his family at your office in the city?

A. Yes.

Page 25

Q. And where was your office?

A. 53 West Jackson, the Monadnock Building, Suite 1650.

Q. During that meeting, did Bryan or anyone else tell you that the investigators that came to his house threatened him at all?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MR. STEPHENSON:

Q. During this meeting with Bryan and, perhaps, his family, did he tell you that the investigators that came to his house tried to arrest him?

A. No.

Q. Did he tell you that they tried to handcuff him?

A. No.

MS. HAGY: Objection. Form.

MR. STEPHENSON: Was that clear on the record?

THE COURT REPORTER: Uh-huh.

MR. STEPHENSON: Do you mind just reading it back to me?

(Whereupon, the record was read as requested.)

7 (Pages 22 - 25)

Page 26

BY MR. STEPHENSON:

Q. Would it have been your custom and practice to learn what a client like Bryan would, perhaps, tell the prosecution before actually meeting with the prosecution?

MS. HAGY: Objection. Form.

THE WITNESS: We would go over in general. What I was concerned about was I wanted to make sure that he had no exposure for criminal charges on a double murder. And I talked to Mr. Cassidy, and he told me that Bryan was a witness.

And after talking to Bryan, I confirmed from his version that he was a witness. And so I needed to represent him as a witness to make sure that although he wasn't a target or a potential defendant for the murders, I wanted to make sure that he was not going to create a situation for himself where he could be charged with something else like obstruction or perjury.

BY MR. STEPHENSON:

Q. Did you advise or explain to Bryan at that time during this meeting about potential perjury or obstruction charges?

A. We talked about what his exposure was.

Page 27

Q. Did that include perjury or obstruction or anything else?

MS. HAGY: Objection. Form.

THE WITNESS: Yes. It included perjury and obstruction. I don't remember if there was anything else that I thought was possible, but I don't think that there was anything other than those potential charges.

BY MR. STEPHENSON:

Q. Now, after this meeting with Bryan and, perhaps, his family, did you ultimately agree to represent Bryan for, you know, his connection with the Martin and Hovel cases?

A. Yeah, I agreed to represent him.

Q. Did you then speak with Scott to schedule this meeting?

A. Yes.

Q. So at some time before the actual meeting with the prosecution, did you try to negotiate with the prosecution an immunity deal?

A. Yes.

MS. HAGY: Objection. Form.

THE WITNESS: Yes, I did.

Page 28

BY MR. STEPHENSON:

Q. Why did you do that?

A. Because I'm representing this young man in a serious case, and I wanted to get him the maximum amount of protection. I attempted to get -- you always ask for immunity. It's, you know, the best you can do, and I think that we came to the conclusion that he would do a proffer and then see where we stood at that point.

Q. Okay. So let me start with this question. What is a proffer?

A. A proffer is an agreement between the parties to have the questions and answers, and as long as you're truthful, the contents of your proffer, what you tell them in the proffer cannot be used as substantive evidence against you. The way that it could be used is if you were to testify contrary, it could be used for impeachment purposes, but in most of the proffer agreements, the content of what you tell them can be used to discover evidence, more evidence. The proffer agreement usually does not prohibit the prosecutors from using evidence that's discovered from the proffer agreement.

Page 29

In this case, after talking to Bryan, I didn't think there was any risk whatsoever of him giving any truthful answer that would lead to evidence against him committing a crime because to me, he was present for conversations, and he had observations and heard things, but he wasn't remotely an active participant that led to the death of these two girls.

Q. Now, this proffer that you just described, was this something that you negotiated with Scott?

A. Yes. There may have been other people, but my recollection was that the two main people were the two of us, Scott and me.

Q. Did you and Scott eventually memorialize this proffer agreement that you described in writing?

A. Yes.

Q. We're going to get to the proffer letter in a moment, Larry, but let me ask you this. Let's assume for a moment that the prosecution did have evidence against Bryan in connection with the Martin and Hovel shooting and murders. What would you have advised Bryan to do?

MS. HAGY: Objection. Form.

8 (Pages 26 - 29)

Page 30

THE WITNESS: He would have -- I would have had him assert his constitutional rights to remain silent.

BY MR. STEPHENSON:

Q. Would there have been a proffer meeting?

A. No, not without immunity.

MR. STEPHENSON: Let's please mark Exhibit 20. It's going to be the proffer letter. It's Bates stamped CCSAO CAB-012970.

(Whereupon, Deposition Exhibit No. 20 was marked for identification.)

BY MR. STEPHENSON:

Q. Larry, is what's been marked as Exhibit 20 a copy of the proffer letter that you agreed to with the prosecution?

A. Yes.

Q. Do you recognize what's been marked as Exhibit 20?

A. I do.

Q. Is Exhibit 20 in the same or substantially same condition as you last saw?

A. Yes. This is a photocopy, but yes.

Q. I want to go through the proffer letter a

Page 31

little bit. Paragraph 1 at the top, Larry, it states, quote, the Cook County State's Attorney's Office hereby agrees to participate in an interview with Bryan O'Shea on September 1996.

Do you have any reason to believe that the proffer meeting occurred on some other day?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MR. STEPHENSON:

Q. I want to focus on Paragraph 3 of Exhibit 20. The second sentence, I'm going to read it. It says, quote, you are advised that the Cook County State's Attorney's Office is currently in possession of evidence incriminating Bryan O'Shea in this matter, and nothing in this agreement will affect the admissibility of that evidence for any purpose.

Do you see that, Larry?

A. I do.

Q. Did you cross that out?

A. I did.

Q. Why did you cross that out?

A. Because that was not true, and it shouldn't have been in this letter.

Page 32

MS. HAGY: Counsel, I'm sorry. I do want to put on the record that this copy is a little cut off because there's more on the side.

MR. STEPHENSON: Okay. Thanks.

BY MR. STEPHENSON:

Q. Larry --

A. I'll be happy to look at your copy. You can just pass it down.

MS. HAGY: This one is still a little cut off. I haven't found a perfect copy of it yet.

MR. STEPHENSON: Thanks.

MS. HAGY: I just handed it, but Mike, would you mind saying what the Bates number is on there?

MR. STEPHENSON: On what we marked as Exhibit 20?

MS. HAGY: Or on the one I just handed you.

MR. STEPHENSON: Yeah. Sure. For the record, counsel handed me -- is this our exhibit stamp sticker, this Exhibit 2?

MS. HAGY: No. It's from a filing. So it's -- the Bates is at the right bottom.

MR. STEPHENSON: So counsel has handed me what's been Bates stamped SOPRON 8, and we can use this copy. Does that work?

Page 33

MS. HAGY: That would be great. Thank you.

MR. STEPHENSON: Sure.

THE WITNESS: Can I give you back this one? Thank you.

MR. STEPHENSON: Now is a good time to take a break.

THE VIDEOGRAPHER: Now going off the record at 10:46 a.m. This ends media unit No. 1.

(Whereupon, a short break was taken.)

THE VIDEOGRAPHER: This begins media unit 2. Now going back on the record at 10:59 a.m.

(Whereupon, Deposition Exhibit No. 21 was marked for identification.)

BY MR. STEPHENSON:

Q. For the record, we have marked as Exhibit 21 the proffer letter for Bryan O'Shea that's Bates stamped SOPRON000008.

So as counsel pointed out, Exhibit 21 is a bit more legible and encompassing the original proffer letter in that it shows some additional initials in Paragraph 3. So, Larry, let's look at Paragraph 3 again if you don't mind.

9 (Pages 30 - 33)

Page 34

You crossed out that second sentence, right?

A. Yes.

Q. Did you then initial the cross-out?

A. I did.

Q. Is that your initial there, LGA?

A. Yes.

Q. Do you see other initials next to it?

A. I see a partial, yes.

Q. And what does it look like to you? SE?

A. SE, yeah.

Q. Would it have been your custom and practice to ask the prosecution to also initial the cross-out?

A. Absolutely.

Q. Does this cross-out also reflect what you had negotiated with Scott regarding the proffer letter?

A. Yes.

Q. Was it important for you to reaffirm that the prosecution still viewed Bryan as a witness in connection with the double murders?

A. Yes.

Q. Larry, on Exhibit 21 going down towards

Page 35

the bottom there, the last paragraph reads I, Bryan O'Shea, hereby acknowledge that I have read the above letter and understand the contents of the letter. Further that I agree with the terms of the letter.

Do you see that paragraph?

A. Yes.

Q. Did you observe Bryan sign underneath that paragraph?

A. Yes.

Q. Who else signed this proffer letter in conjunction with Bryan?

A. Colleen Hyland, and that's my signature as well.

Q. Your signature is above where it says attorney?

A. Yes.

Q. Did Scott Cassidy also sign it?

A. No.

Q. Is his name and signature above your signature, Colleen's, and Bryan's?

A. Yeah, but I think that's preprinted.

Q. Who was Colleen Hyland?

A. Colleen Hyland at the time was an

Page 36

assistant state's attorney.

Q. Were these the four people that were present for the proffer letter and meeting?

A. Yes.

Q. Now, before the proffer meeting and the interview began, did you speak privately with Bryan to explain him the terms of the letter?

A. Yes.

Q. Did you advise Bryan of anything else privately before he started the interview?

A. Yes.

Q. What had you advised him?

A. I told him that he was a witness, and he is not going to be charged in connection with the murder, and as long as he told the truth, he had protection. And if he lied in the interview, he could be charged with obstruction. I didn't -- and I told him ultimately if you -- the only things that you're looking at if you lie or try to deviate from the truth or hide something, there are charges that were possible, obstruction or perjury.

Q. During this private meeting with Bryan, did he acknowledge that he understood what you told him?

Page 37

A. Yes.

Q. At the time of the proffer meeting, did you know whether Bryan had a substance abuse problem?

A. I think it was evident that he did.

Q. In 2003 at Mr. Sopron's post-conviction hearing, you testified that Bryan, quote, wasn't functioning well, end quote.

What did you mean by that?

A. Bryan, I don't remember what it was, but this was the Popes, and he was sort of on the edge of the Popes. I don't think he was really an active gang member, but he was friends with these guys. And the Popes had a nickname for him, which I don't remember, that was based on the fact that he drank a lot or smoked a lot of weed or whatever the case was. But my recollection was at that time in his life, he basically spent his time drinking and getting high.

Q. Is that also why you testified in 2003 that Bryan might be fragile?

MS. HAGY: Objection. Form.

THE WITNESS: I thought Bryan was fragile. This has brought back that I'm afraid as I think

10 (Pages 34 - 37)

Page 38

about him, I sadly envision him sitting on a street corner with a piece of cardboard with some note panhandling for money. So I think that this was devastating to Bryan.

BY MR. STEPHENSON:

Q. Why was it devastating to Bryan?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: When we went through the two interviews, it became obvious to me that one of these individuals was his best friend.

BY MR. STEPHENSON:

Q. And because it was his best friend, it appeared to be tough on him?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: It appeared to me that he was forthcoming on everybody, but wanted to, as best he could, not get into everything about his one friend. And I don't know which one of them it was. I don't remember which one it was.

BY MR. STEPHENSON:

Q. At the time of this proffer meeting on September 20, 1996, were you concerned about Bryan's ability to give truthful answers to the prosecution?

Page 39

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No. He was able to communicate with me.

BY MR. STEPHENSON:

Q. Was he able to communicate with the state's attorneys as well?

A. Absolutely.

MS. HAGY: Objection.

MR. STEPHENSON: Hang on. We'll give you a moment. Objection.

BY MR. STEPHENSON:

Q. And then Larry, if you could please answer.

A. Absolutely.

MR. STEPHENSON: Could you please read the question back so we can get question, objection, answer.

(Whereupon, the record was
read as requested.)

MS. HAGY: Objection. Form. Foundation. Thank you.

(Whereupon, the record was
read as requested.)

Page 40

BY MR. STEPHENSON:

Q. Were you concerned about Bryan's ability to give accurate answers to the prosecution at the time of the proffer meeting?

A. No.

MS. HAGY: Objection.

THE WITNESS: I'm sorry.

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No, I was not concerned about that.

BY MR. STEPHENSON:

Q. If you had any concerns about Bryan's ability to give truthful and accurate answers to the prosecution during the proffer meeting, what would you have done?

A. Oh, I would have cancelled it and tried to figure out if there was a path for him to be ready in the future or whether or not it would be counterproductive to have him go through this.

Q. So after you spoke with Bryan privately and you execute the proffer letter, did the prosecution then interview Bryan about what he knew in regards to the Martin and Hovel cases?

A. Yes.

Page 41

Q. And which of the two prosecutors that were present for the meeting asked all or most of the questions of Bryan?

A. The first interview, it was Scott Cassidy.

Q. Would you describe that interview with Scott as conversational?

MS. HAGY: Objection. Form.

BY MR. STEPHENSON:

Q. I'll rephrase it.
How would you describe the interview that Scott conducted of Bryan?

A. I would say that Scott was being very gentle with him in asking him questions. I had explained to Bryan before we went in there something to the effect of they'll ask you 99 questions they know the answer to so that when they ask the one question they don't know, they determine whether or not you're being truthful.
I said if you don't know something, tell them you don't know something. Don't make something up. Don't fill something in. Don't lie about anything and just remember that you're here. It wasn't your choice why you're here. Other people put you here, and now I'm here to protect

11 (Pages 38 - 41)

Page 42

you, and you have to think of yourself and be honest.

Q. Did Scott ask Bryan nonleading questions during the interview?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MR. STEPHENSON:

Q. Did Bryan answer Scott's questions?

A. Yes.

Q. Did it appear to you that Bryan was answering Scott's questions truthfully?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I wasn't privy to what Bryan saw or what he heard. They were asking him questions, and I thought Bryan was pretty forthcoming until it hit to the one friend, and then it was Bryan hedging and kind of trying to not be as forthcoming against the one friend.

BY MR. STEPHENSON:

Q. Well, did Scott put any words in Bryan's mouth during the interview?

MS. HAGY: Objection. Form.

THE WITNESS: No.

Page 43

BY MR. STEPHENSON:

Q. Did he tell him what to say?

A. No.

Q. Did Scott put any pressure on Bryan on what to say?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No.

BY MR. STEPHENSON:

Q. You were there for the entire interview with Scott, correct?

A. Yes.

Q. Did it appear that Scott or anyone else present for the proffer meeting was ignoring or rebuffing what Bryan was telling them?

MS. HAGY: Objection. Form. Foun -- just form.

THE WITNESS: No.

BY MR. STEPHENSON:

Q. Did Scott or anyone else appear to coerce Bryan?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MR. STEPHENSON:

Q. Did Scott or anyone else present suggest

Page 44

that Bryan should tell anything else other than the truth?

A. No.

Q. Did Scott or anyone else raise their voice to Bryan?

A. No.

Q. You testified at Mr. Sopron's post-conviction hearing in 2003 that Scott, quote, may have said at one point or another this is bullshit or don't bullshit me or something like that, end quote.

Was Scott swearing at Bryan?

MS. HAGY: Objection. Form.

THE WITNESS: No. In 2003, the events, obviously, were fresher, but my recollection was he said something to the effect of I don't want to hear any bullshit. Just tell me the truth. Just tell me the truth.

And he wasn't pointing his finger saying that's bullshit. What he was saying is I don't want any bullshit. Just tell me what you heard, what you saw, who was there, things like that.

BY MR. STEPHENSON:

Q. So did Scott or anyone else get angry with

Page 45

Bryan?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: It didn't appear to me that he was angry. It appeared to me that he was trying to get Bryan through the conversation.

BY MR. STEPHENSON:

Q. So did Scott get up and threaten to leave the room?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MR. STEPHENSON:

Q. Did Scott or anyone else present threaten Bryan?

A. No.

MS. HAGY: Objection.

THE WITNESS: I'm sorry. I apologize.

MS. HAGY: Form objection. Thank you.

THE WITNESS: No.

BY MR. STEPHENSON:

Q. Did Scott or anyone else tell Bryan that he would be charged with the murders of the two girls?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No. He was -- Bryan was never a

12 (Pages 42 - 45)

Page 46

potential defendant for the murders.

BY MR. STEPHENSON:

Q. Did Scott or anyone else threaten him with the murder charges?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No.

BY MR. STEPHENSON:

Q. Did Scott or anyone else present for this proffer meeting give any impression that Bryan might be charged with the murders?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No.

BY MR. STEPHENSON:

Q. Did Scott or anyone else tell Bryan that if he did not testify against Matthew Sopron, then Bryan would be charged with perjury or worse?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No.

BY MR. STEPHENSON:

Q. Did Scott or anyone else call him a liar during the meeting?

A. No.

Q. Did Scott or anyone else accuse him of lying?

Page 47

A. No.

Q. If Scott or anyone else during this proffer meeting had threatened, coerced, or mistreated Bryan in any way, what would you have done?

MS. HAGY: Objection. Form.

THE WITNESS: I would have terminated the interview.

BY MR. STEPHENSON:

Q. Did Bryan appear to be confused by what the prosecution was asking or telling him during the proffer meeting?

A. No.

Q. Did Bryan appear to be scared of Scott during the meeting?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MR. STEPHENSON:

Q. Did he appear to be intimidated by Scott during the meeting?

MS. HAGY: Objection. Form.

THE WITNESS: I don't know if he was intimidated. It's people sitting in a room asking uncomfortable questions kind of like this, but I

Page 48

don't -- I don't see anything that was intimidating. You know, what was going on in the room was Scott was trying to draw out everything from Bryan, and Bryan was forthcoming to a point.

And the point where he wasn't forthcoming was -- and I apologize. I don't remember which one it was. One them was, you know, probably his best friend, and that's where things would slow down, and Scott would, you know, ask him questions, and it was -- in that aspect, it was a lot of baby steps.

BY MR. STEPHENSON:

Q. Did you ever tell Bryan to tell the prosecutors to say what they wanted him to say in order to avoid any trouble?

A. No.

Q. Did you ever tell Bryan that he could be charged with a double murder if he did not say what the prosecution wanted to hear?

A. No.

Q. After this meeting, the proffer meeting with Scott and Colleen Hyland, did you ever tell Bryan that he was close or on the edge of getting charged with the murders?

Page 49

A. No, never.

Q. Did you ever tell Bryan that his family was not going to pay you enough money to defend him if the prosecution charged him with the murders?

A. No.

Q. Did Bryan ever tell you that he was -- let me withdraw that question.

Did Bryan ever tell you that he was uncomfortable telling the prosecutors lies in connection with what he knew about the Martin and Hovel murders?

A. No.

Q. Did he ever tell you that he did lie to the prosecutors?

A. No. If he had, we would have terminated it because I didn't want to expose him to obstruction. I don't believe he -- I didn't believe he would get charged with perjury if he went in and lied to them in the proffer. I thought he might be able to get charged with obstruction, but if he lied in the proffer and they then put him in the grand jury, then I know he would be walking into a perjury trap. So if he told me he lied, I would have terminated it.

13 (Pages 46 - 49)

Page 50

Q. Even after the proffer meeting, did he ever tell you that hey, Larry, I lied to the prosecutors?

A. No.

Q. Did you ever leave Bryan alone with the prosecutors during this proffer meeting?

A. No.

Q. Did you ever observe Scott or anyone else present for the proffer meeting mistreat, coerce, or threaten Bryan?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MR. STEPHENSON:

Q. Did Bryan ever complain to you that he was mistreated, threatened, or coerced by Scott or anyone else?

A. No.

Q. Based on what you knew at the time, did Bryan tell Scott during this proffer meeting anything that was inconsistent with what Bryan had originally told you about what he knew in connection with the Martin and Hovel murders?

A. I'm sorry. You lost me. Ask me again.

Q. It's a tough question. I'll try it one

Page 51

more time.

Did Bryan tell Scott anything during the proffer meeting that was inconsistent with what Bryan had previously told you about what he knew?

A. No.

Q. Larry, we're going to move past the proffer. We're going to move on to the handwritten statement.

Did you and Bryan return to the Cook County State's Attorney's Office to memorialize Bryan's statement?

A. We went for a second interview, and it was memorialized. It was reduced to a statement. I don't remember if we went there for that purpose. I think it was just a second meeting to do some follow-up questions.

MR. STEPHENSON: We will mark this as Exhibit 22. This is going to be Bryan O'Shea's handwritten statement. It's Bates stamped SOPRON005832 through 5837.

(Whereupon, Deposition Exhibit No. 22 was marked for identification.)

Page 52

BY MR. STEPHENSON:

Q. Larry, do you recognize what's been marked as Exhibit 22?

A. I do.

Q. Is Exhibit 22 a copy of Bryan O'Shea's handwritten statement?

MS. HAGY: Objection. Form.

THE WITNESS: It's a copy of a statement that was taken. Bryan O'Shea didn't write it. One of the prosecutors wrote it, but yes, it's a handwritten statement, but it was not drafted by Bryan.

BY MR. STEPHENSON:

Q. Is the -- what's been marked as Exhibit 22 in the same or substantially same condition as you last saw it?

MS. HAGY: Objection. Form.

THE WITNESS: It appears so. I mean, it's a photocopy. It's clearly not the original --

BY MR. STEPHENSON:

Q. Sure.

A. -- but it appears so, yes.

Q. Does this copy appear to be in the same or substantially same condition as the original when

Page 53

you last saw it?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MR. STEPHENSON:

Q. Larry, at the top of Exhibit 22, it reads statement of Bryan O'Shea taken on 9/26/96 at 7:00 p.m. at Cook County State's Attorney's Office, present, ASA Laura Sullivan, ASA Colleen Hyland, Attorney Axelrood. Do you see that at the top?

A. Yes.

Q. Were ASA Sullivan, Hyland, yourself, and Bryan the only people present for this handwritten statement?

A. I believe so. I mean, 1996, but I think that everyone who was there would have been on the statement. I would have insisted, so I believe that's correct.

Q. And you don't have any reason to disagree with the top of Exhibit 22 who says that was present?

MS. HAGY: Objection. Form.

THE WITNESS: Well, all the people that are listed were present, yes.

14 (Pages 50 - 53)

Page 54

BY MR. STEPHENSON:

Q. Do you have an independent recollection of meeting with Scott at all before this was memorialized?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MR. STEPHENSON:

Q. Let's assume for a moment that you did meet with Scott. If during that meeting with Scott, if he had mistreated, threatened, or coerced Bryan, would you have then sat down with Bryan to have a handwritten statement?

MS. HAGY: Objection. Form.

THE WITNESS: No. If they had been abusive, I would have left. I would have taken Bryan and left. I wouldn't have left him. Yes, I would have taken him, and we would have terminated the interview.

BY MR. STEPHENSON:

Q. On Exhibit 22, about a third of the way down, do you see the preprinted Miranda warnings?

A. Yes.

Q. That paragraph is crossed -- let me withdraw that.

Page 55

Is that paragraph crossed out?

A. Yes.

Q. Do you have any recollection of the prosecution giving or reading Bryan his Miranda warnings during this handwritten statement?

A. No. He was a witness.

Q. Because he was a witness, was there any reason to give him his Miranda warnings?

MS. HAGY: Objection. Form.

THE WITNESS: Miranda is for an in-custody -- it's for a custodial interrogation. This was a voluntary interview of a witness.

BY MR. STEPHENSON:

Q. So was Bryan free to leave at any time?

A. Yes.

Q. Larry, on Page 1 of Exhibit 22, second paragraph, second sentence, it states Bryan states that he has had an opportunity to speak with his lawyer, Larry Axelrood, prior to giving this statement.

Was that true?

A. Yes.

Q. What did you tell Bryan?

MS. HAGY: Objection. Form.

Page 56

THE WITNESS: I told Bryan that he had to tell the truth. This was a second interview, so I said to him the hard part is over. You went through the initial interview. Now we're going to go over it again, and I said what will happen is if you complete today and you tell the truth and you're forthcoming, then you will probably be put in the grand jury where you're -- you'll be questioned under oath, and then at that point, you will be locked in as a witness.

BY MR. STEPHENSON:

Q. Was this a private meeting outside the presence of the prosecution?

A. Yes.

Q. Did Bryan acknowledge that he understood what you told him?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MR. STEPHENSON:

Q. At that time did you have any concerns with Bryan's ability to provide truthful and accurate statements to the prosecution?

MS. HAGY: Objection. Form.

THE WITNESS: No.

Page 57

BY MR. STEPHENSON:

Q. During this second interview on September 22nd, was it ASA Colleen Hyland that was posing the questions to Bryan?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MR. STEPHENSON:

Q. I'll rephrase the question. I'll withdraw it.

Who was asking Bryan questions at the interview?

A. So Colleen was asking the questions, and Laura Sullivan was to my left, and she was, I think, just there as a prover. And I don't remember if Laura asked any questions at all, but Colleen was the one that was doing the interview.

Q. Do you know whether Laura was contemporaneously writing down what Bryan was saying?

A. I --

MS. HAGY: Objection. Form.

THE WITNESS: I'm sorry.

MS. HAGY: Form objection. Thank you.

THE WITNESS: I don't remember.

15 (Pages 54 - 57)

Page 58

BY MR. STEPHENSON:

Q. How would you describe Colleen Hyland's interview of Bryan?

MS. HAGY: Objection. Form.

THE WITNESS: Colleen Hyland was, I thought, doing a very good job of being gentle and upbeat and trying to put Bryan at ease, and I thought she was very effective in keeping this for Bryan at the lowest level of stress that it could be.

BY MR. STEPHENSON:

Q. Did Hyland ask Bryan non-leading questions?

A. Yes.

Q. Did Bryan answer those questions?

A. Yes.

Q. Did it appear to you based on what you knew that Bryan was answering those questions truthfully?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Yes.

BY MR. STEPHENSON:

Q. Did Colleen Hyland tell Bryan what to say?

MS. HAGY: Objection. Form.

THE WITNESS: No.

Page 59

BY MR. STEPHENSON:

Q. Did she put any pressure on Bryan about what to say?

MS. HAGY: Objection. Form.

THE WITNESS: No. She was doing her very best to come off as a nice person.

BY MR. STEPHENSON:

Q. Did she call Bryan a liar?

A. No.

Q. Did she accuse Bryan of lying?

A. No.

Q. Did Colleen Hyland or anyone else present yell or raise their voice to Bryan?

A. No.

Q. Did Hyland or anyone else present threaten Bryan with perjury charges or worse if he did not testify against Matt Sopron?

MS. HAGY: Objection. Form.

THE WITNESS: No. I'm sorry. No.

BY MR. STEPHENSON:

Q. Did Hyland or anyone else threaten Bryan with the charges for the murders of Martin and Hovel?

MS. HAGY: Objection. Form.

Page 60

THE WITNESS: No.

BY MR. STEPHENSON:

Q. Did Hyland or anyone else present give any impression whatsoever to Bryan that he might be charged with the murders?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No.

BY MR. STEPHENSON:

Q. Did Colleen Hyland or anyone else present threaten Bryan in any way?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No.

BY MR. STEPHENSON:

Q. Did Colleen Hyland or anyone else present promise Bryan anything in exchange for Bryan giving his handwritten statement?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MR. STEPHENSON:

Q. Did Bryan appear to be scared of Colleen Hyland?

MS. HAGY: Objection. Form.

THE WITNESS: No.

Page 61

BY MR. STEPHENSON:

Q. Did he appear to be intimidated by her or anyone else present?

A. I don't --

MS. HAGY: Objection.

THE WITNESS: I'm sorry. Forgive me.

MS. HAGY: Form.

THE WITNESS: No.

BY MR. STEPHENSON:

Q. Did Bryan appear to be confused at all during the second meeting with the handwritten statement?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No.

BY MR. STEPHENSON:

Q. Did the prosecutors review each page of Exhibit 22 with Bryan in your presence to confirm that it accurately reflected what he told them?

A. Yes. I'm sorry. Did you want to pose an objection?

MS. HAGY: No.

THE WITNESS: I apologize. Yes. We went over every page.

16 (Pages 58 - 61)

Page 62

BY MR. STEPHENSON:

Q. All right, Larry. Are you able to describe the review process?

MS. HAGY: Objection. Form.

THE WITNESS: Sorry. Yes, I can describe it. I don't know who drafted it. Whoever did, the nuns did a great job with the handwriting, their cursive. It's very legible, but we would have gone through it, and somebody read it out loud word for word verbatim. And there are some corrections, and those corrections were -- as we went through it, corrections were made. The people initialed the corrections.

And then on the bottom of the first page, it's signed by Colleen Hyland, Laura Sullivan, Bryan O'Shea. And throughout each page, the next couple of pages, there were either signatures or initials for each of the pages. And then at the very end, it was signed by Bryan. It was signed by me. It was signed by Laura Sullivan. It was signed by Colleen Hyland.

BY MR. STEPHENSON:

Q. Was that entire review process done in your presence?

Page 63

A. Yes.

Q. Did the prosecutors ask Bryan if he wanted to make any corrections?

A. Well, corrections were made, and so I think -- I don't think they said do you want to make any corrections. I think we went through it, and as things came up organically, corrections were made. So I don't remember if they said do you want to make any corrections, but somebody was reading it, and as we went along, corrections were made as you can see on various pages, and those corrections were inserted, and then everybody initialed it. So the corrections were made after reading every word in this.

Q. Bryan also or did Bryan also initial where the corrections were made?

A. Yes.

Q. Then you signed or did you sign the last page on Page 6 of Exhibit 22?

A. Yes. That's my signature below Bryan O'Shea's signature and above Laura Sullivan's signature.

Q. Thank you.

So on Exhibit 22, Larry, I want to look at

Page 64

the last page, Page 6. The last paragraph states that Bryan was treated well. Was that true?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MR. STEPHENSON:

Q. The last paragraph also states that you were present for the entire statement. Was that true?

MS. HAGY: I'm okay.

THE WITNESS: Yes.

BY MR. STEPHENSON:

Q. Was Bryan ever alone with the prosecution during the second meeting?

A. No.

Q. The last paragraph also states that Bryan reviewed the statement with his attorney. Was that true?

A. Yes.

Q. Were any of Bryan's statements that are contained in Exhibit 22 inconsistent with what he told Scott Cassidy during the proffer meeting?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No.

Page 65

BY MR. STEPHENSON:

Q. Did you observe Hyland, Sullivan, or anyone else mistreat, threaten, or coerce Bryan in any way during the memorialization of this handwritten statement, Exhibit 22?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No, it didn't happen.

BY MR. STEPHENSON:

Q. If it had, what would you have done?

MS. HAGY: Form objection.

THE WITNESS: Well, we would have left, but it didn't happen.

BY MR. STEPHENSON:

Q. After the completion of Exhibit 22, the handwritten statement, did Bryan ever complain to you that any of the prosecutors, Cook County investigators, had coerced, mistreated, or threatened Bryan in connection with what he knew about the Martin and Hovel murders?

A. No.

MR. STEPHENSON: Do you mind if we take a 10-minute break? Is that okay?

THE VIDEOGRAPHER: This ends media unit 2. Now going to off the record at 11:31 a.m.

17 (Pages 62 - 65)

Page 66

(Whereupon, a short break was taken.)

THE VIDEOGRAPHER: This begins media unit 3. Now going back on the record at 11:51 a.m.

BY MR. STEPHENSON:

Q. I want to go back real briefly to the two meetings with the State's Attorney's Office. Were both of the meetings with the prosecutors, were they both at the State's Attorney's Office?

A. Yes, at 26th Street.

Q. Did Bryan ultimately testify before the grand jury in connection with the Martin and Hovel cases?

A. Yes.

Q. Prior to testifying before the grand jury, did Bryan express any concern or distress to you?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No.

BY MR. STEPHENSON:

Q. After testifying before the grand jury, did Bryan ever tell you that he lied to the grand jury?

A. No.

Q. Did you ever learn that Bryan was having

Page 67

trouble in the neighborhood because he was going to testify for the prosecution in the Martin and Hovel cases?

MS. HAGY: Objection. Form.

THE WITNESS: I knew he was having trouble in the neighborhood. I don't know if it was, you know, before he testified or -- I know he had a considerable amount of trouble after these guys were convicted.

BY MR. STEPHENSON:

Q. What did you advise Bryan, if anything?

MS. HAGY: Objection to form.

THE WITNESS: Well, I would have said to him you really shouldn't be in the neighborhood anymore. My observation was that this was a really big deal in the neighborhood, and there were different sides and factions and whatnot. And you know, I probably advised his brother that it would be good if Bryan went somewhere or did something other than just staying at his mom's house.

BY MR. STEPHENSON:

Q. Did Bryan ultimately testify in the murder trials for Martin and Hovel?

MS. HAGY: Objection. Form.

Page 68

THE WITNESS: Yes.

BY MR. STEPHENSON:

Q. Do you know whether the prosecution met with Bryan to prepare him for those trials?

A. Oh, I'm sure they did. He was a witness.

Q. Did the prosecutors need to ask for your permission in order to speak with Bryan for that trial prep?

MS. HAGY: Objection. Form.

THE WITNESS: I'm sure they would have given me the courtesy of calling, but after he had given his handwritten statement and after he had been in front of the grand jury, he was a witness, and so they would have had the ability to interview and prepare him to testify, and I'm sure they did. And I'm pretty confident that they would call me out of courtesy and say we're going to interview him or prepare him or whatever.

And they didn't have to, but I'm sure that they did, and I would have said go ahead. Let me know how it goes.

BY MR. STEPHENSON:

Q. Okay. So there was nothing wrong with the prosecutors meeting with Bryan to prepare him for

Page 69

trial outside of your presence?

MS. HAGY: Objection. Form.

THE WITNESS: After he had testified in front of the grand jury and his testimony had been what we would say at 26th Street, locked in, I was very comfortable that he was purely a witness, and my constant refrain was Bryan, just tell the truth.

BY MR. STEPHENSON:

Q. Did Bryan ever contact you and discuss ways for him to not testify at the criminal trials?

MS. HAGY: Objection. Form.

THE WITNESS: I'm sorry. Go ahead.

MS. HAGY: Objection. Form.

THE WITNESS: At some point, Bryan -- I don't know. Maybe he talked to somebody in the neighborhood or came up with this on his own, but he was asking me what would happen if he got on the witness stand and said I don't remember anything. And I said whoever told you that is giving you bad advice, and I said as long as you tell the truth, you're fine.

They now have a statement from you and your testimony in front of the grand jury. So if you want to talk yourself into getting charged for

18 (Pages 66 - 69)

Page 70

obstruction or perjury, then you can go ahead and try to do something like that. I said the die is cast. You're a witness. You tell the truth. You finish your obligation, and then you will leave this case as you came into it as a witness.

BY MR. STEPHENSON:

Q. Did Bryan ever complain to you that the prosecutors mistreated him or threatened him or coerced him during these trial preparation sessions after the grand jury?

A. No.

MS. HAGY: Objection. Form.

THE WITNESS: I'm sorry.

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No.

BY MR. STEPHENSON:

Q. Did you know that Bryan met with Matthew Sopron's criminal defense lawyer, Pat Walsh, in July of 2000 to discuss the Martin and Hovel cases?

MS. HAGY: Objection. Form.

THE WITNESS: I found out about that long after it happened.

BY MR. STEPHENSON:

Q. Okay. So Pat Walsh, did he contact you

Page 71

beforehand to ask your permission to speak with Bryan about the Martin and Hovel cases?

A. No.

Q. Were you ever interviewed by attorneys or their agents for Matthew Sopron, Wayne Antusas, Nicholas Morfin about your representation of Bryan or his testimony?

A. Was I interviewed?

Q. Yes.

A. No.

Q. Were you ever contacted by them?

A. They might have asked me to talk -- might have asked to talk to me, but I would not have talked to them.

Q. Were you ever interviewed by any attorneys or their agents for any of the other criminal defendants about your representation of Bryan over his testimony?

A. Other than the people you just named?

Q. Correct.

A. I don't have any recollection. I would not have talked to anybody about this. I represented a witness, and it would not have been to his advantage or to my advantage to have a

Page 72

conversation with them.

Q. Since your testimony in Matthew Sopron's PC hearing in 2003, have you spoken with anybody at the State's Attorney's Office about your representation of Bryan or Bryan's testimony in connection with the Martin and Hovel murders?

MS. HAGY: Objection. Form.

THE WITNESS: Since --

BY MR. STEPHENSON:

Q. Since you testified at the PC.

A. I mean, recently when this started to percolate, I don't think I talked to a state's attorney. I thought I talked to you or -- I don't remember who. I just know that someone left a card at my house asking to call. It was an investigator.

And then I called, and I said you don't have to chase me. Just drop the subpoena at my office. And then whoever was on that subpoena, I called.

Q. Okay. And that was the defense attorneys in this case, right?

A. Yeah. I don't know if it was you or if it was someone else, but whoever it was that issued

Page 73

the subpoena.

Q. So between the time you received the subpoena in this case and you testified at Matthew Sopron's PC hearing, did the State's Attorney's Office contact you during that time frame?

A. Between 2003 and recently?

Q. Correct.

A. Not that I remember.

Q. Did you ultimately speak with the defense attorneys in this case?

A. You. I talked to you and Ms. O'Brien. I don't think that I had spoken to anyone else other than the two of you.

Q. How many times did you speak with Maureen and I?

A. Either once or twice. The plaintiff's lawyer called me, but I told her I wasn't going to talk to her.

Q. When you spoke with the defense attorneys, Maureen or I, did we show you any documents?

A. You showed me the proffer letter, the written statement, and the transcript.

Q. Was it your transcript?

A. Yes. You didn't show them to me. You

19 (Pages 70 - 73)

Page 74

provided them to me, and I read them.

Q. And did the defense attorneys, did they ask you to tell the truth at your deposition?

A. Yes.

Q. And did they promise you anything in exchange you're your testimony?

A. Nobody has promised me anything.

MR. STEPHENSON: All right, Larry. That's all the questions I have for you right now. I'm going to pass you over to the other defense attorneys.

EXAMINATION

BY MS. O'BRIEN:

Q. Do you know any of the defendants in this case? And let me just begin with Neil Linehan. Do you know a person by the name of Neil Linehan?

A. I do.

Q. And have you had cases with Neil Linehan or against Neil Linehan? Any kind of professional relationship with him?

A. You mean over the course of my career?

Q. Yes.

A. Maybe. I don't know.

Q. Do you -- do you have an opinion regarding his reputation in the legal community?

Page 75

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Neil Linehan, after being a state's attorney, I don't know if he went from the State's Attorney's Office to the bench, but he was a judge. He served with distinction and was held in high regard.

BY MS. O'BRIEN:

Q. Do you hold him in high regard in terms of his reputation?

A. Yeah.

Q. Did you have any contact with Neil Linehan regarding this murder case on either September 20th or September 26th of 1996?

A. I did not have any contact with him.

Q. Did you have any dealings with Neil Linehan with respect to your client, Bryan O'Shea, at all?

A. No.

Q. Do you know a person, and you've indicated, but Colleen Hyland?

A. Yes.

Q. Do you have an opinion or do you -- do you know Colleen Hyland?

A. I do.

Page 76

Q. Have you had opportunities during the course of your legal career to be involved in cases in which she was involved in as well?

A. Probably. I mean, you mean beyond this case?

Q. Yes.

A. Yeah, probably.

Q. Do you have -- do you know her reputation within the legal community?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

MS. HAGY: Foundation.

THE WITNESS: I'm sorry. Had you finished?

MS. HAGY: Yeah.

BY MS. O'BRIEN:

Q. Do you know her reputation in the legal community?

A. Yes.

Q. Do you have an opinion regarding her reputation and what kind of lawyer or person she is?

A. Yes.

MS. HAGY: Objection.

Page 77

BY MS. O'BRIEN:

Q. What is that opinion?

MS. HAGY: Form and foundation.

THE WITNESS: I hold her in the highest regard possible. She was a state's attorney. She was a judge. She is not a personal friend. I don't have her cell phone number. I've never had lunch or dinner with her. I don't know her family. I only know her professionally, and she's a star.

BY MS. O'BRIEN:

Q. Laura Sullivan, do you have an opinion regarding Laura Sullivan's reputation within the legal community?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. And during the course of your career, how long have you known Laura Sullivan?

A. I don't know. I mean, she's younger than I am. I probably was out of the State's Attorney's Office when she got there. So as I'm sitting here now, I realize that I've probably been a lawyer for like 38 years, which is scary, but I've known her probably 25 years, maybe more.

20 (Pages 74 - 77)

Page 78

Q.  And do you have an opinion regarding her reputation and her integrity?

MS. HAGY: Objection.  Form.  Foundation.

THE WITNESS:  I do.

BY MS. O'BRIEN:

Q.  What is that opinion?

A.  She's held in high regard.

Q.  Do you know a person by the name of Patricia Shea?

A.  Yes.

Q.  Do you know a person also referred to as Assistant State's Attorney Patricia Shea?

A.  Yes.

Q.  During the course of your legal career, have you had an opportunity to be involved in cases with her?

A.  Probably.  Maybe.

Q.  Do you have an opinion regarding Patricia Shea's reputation for truth and veracity?

MS. HAGY: Objection.  Form.  Foundation.

THE WITNESS:  Yes.

BY MS. O'BRIEN:

Q.  Do you have an opinion regarding her reputation in the legal community?

Page 79

MS. HAGY:  You can go ahead.

THE WITNESS: Yes, I do.

BY MS. O'BRIEN:

Q.  And what is that opinion?

A.  She was regarded as an honest, straightforward prosecutor.

Q.  Did you have any communication with Patricia Shea regarding your client in this matter --

A.  No.

Q.  -- regarding Bryan O'Shea?

A.  No.

Q.  Was she involved in any of the negotiations or conversations that you had with members of the State's Attorney's Office on September 20th of 1996 or September 26th of 1996?

A.  No.

Q.  Do you know a person by the name of Steve DiNolfo?

A.  No.

Q.  Do you know a person by the name of George Andrews?

A.  Yes.

Q.  During your career, have you had dealings

Page 80

with Assistant State's Attorney George Andrews?

A.  Yes.

Q.  And do you have an opinion regarding George Andrews's reputation within the legal community?

MS. HAGY: Objection.  Form.

THE WITNESS:  Yes.

BY MS. O'BRIEN:

Q.  And what is that opinion?

A.  What's his opinion in the legal community?

Q.  Yes.

A.  He's a respected, well-liked person.

Q.  Now, you indicated in this case that you had an opportunity to discuss a proffer with Scott Cassidy on September 20th of 1996.  My questions are going to be before September 20th of 1996.

You indicated that you contacted Scott Cassidy on the phone; is that fair to say?

A.  Yes.

Q.  Do you recall how many conversations you may have had with Scott Cassidy, before you even went with your client to 26th Street on the 20th?

MS. HAGY:  Objection.  Form.

THE WITNESS:  Are you asking me how many?

Page 81

BY MS. O'BRIEN:

Q.  Yes.

A.  A few, two, three, maybe four, but that was about it.

Q.  Did you use those conversations to get information from Scott Cassidy regarding why they wanted to talk to your client, Bryan O'Shea?

A.  Yes.  I would have -- the initial conversation was to find out what -- why they wanted to talk to him.  Then I would have met with my client, and I called Scott to try and pick a little bit more and find out a little bit more and confirmed that Bryan was going to be treated as a witness.  And when I got to the point where I was confident that going in Bryan was to be treated as a witness, that's when we would have agreed to come in for a proffer.

Q.  So you received the assurances that you were seeking, you got from Scott Cassidy before you even arrived at 26th Street with your client; is that fair to say?

MS. HAGY:  Objection.  Form.

THE WITNESS:  Yes, or we wouldn't have gone.

21 (Pages 78 - 81)

Page 82

BY MS. O'BRIEN:

Q. Now, during those conversations you had with Scott Cassidy, is it fair to say that only you and Scott were parties to those telephone conversations?

A. I don't know if he had his phone on speaker, if we even had speaker phones back then, but my conversation with him, it was I was on the phone, and he was on the phone, and nobody else was involved in the conversation.

Q. Did you know through your conversations with him that there was an existing indictment, in other words, that there was an indictment pending in a trial courtroom regarding five defendants on that murder case?

MS. HAGY: Objection. Form.

THE WITNESS: I'm sorry. I don't know when I learned that there was an indictment.

BY MS. O'BRIEN:

Q. At some point before your client spoke with Scott Cassidy, did you know there was an existing indictment pending?

A. I don't remember.

Q. Did you know whether or not when you went

Page 83

in to talk to Scott, did you know whether he was prosecuting the murder case that was pending?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: It was obvious to me that Scott was prosecuting the case. I don't know who was going to second or third chair it, and it was obvious to me that he and his -- and the other prosecutors were interviewing witnesses to prepare for trial.

BY MS. O'BRIEN:

Q. Did you -- now, you indicated that one of the things that you discussed with Scott, I know on the 20th, but it's possible before, is you were looking for either immunity or a proffer letter for your client; is that correct?

A. My -- my dream was to get immunity. We settled for a proffer.

Q. And when you say that your dream was to get immunity, can you please describe what immunity you were seeking?

A. Well, immunity is, in essence, a get-out-of-jail-free card. They use it in federal court a lot where they say we'll give your guy immunity if he truthfully testifies against the

Page 84

other people that were engaged in this conduct.

If you think about it in 26th Street terms, they might use a passenger who was unarmed to testify against the driver and the shooter in a drive-by shooting because he had less culpability. So if I could have gotten Bryan immunity, then that would have been the ultimate protection that he could have gotten.

When we did the proffer, and we -- which culminated in the handwritten statement, which led to the grand jury testimony, after he finished the grand jury testimony, I was confident that based on everything that occurred, that he was safe as long as he told the truth and didn't try to minimize, lie, mislead, or misdirect.

Q. Would you -- did you have these conversations regarding immunity and the proffer before you went there on the 20th? Did you have those conversations with Scott during your phone conversations?

A. Yes.

MS. HAGY: Objection to form.

THE WITNESS: I'm sorry. Yes, I had it. The conversation about immunity was very brief. I

Page 85

asked for it. He said no, and then we moved on.

BY MS. O'BRIEN:

Q. Did you discuss the proffer letter during those conversations before you met with him on the 20th?

A. We discussed doing a proffer. When you discuss doing a proffer, you know there's going to be a proffer letter. So it's like we're going to buy the house, and then you say well, are we going to do closing documents. Of course you are, but the proffer -- once we agreed to the proffer, we didn't have to talk about the letter. The letter had to be resolved.

And then when we got there, they -- we resolved that letter by striking some of the language that was in there that -- I'm sorry. I'm talking about the -- yes. Can I take a second here?

Q. Sure.

A. So showing you the proffer letter, you can see that it was preprinted. So we got there, and there was this preprinted proffer letter. And then when I saw it, I wanted to strike certain things. We had that conversation. I struck those lines

22 (Pages 82 - 85)

Page 86

that I didn't want in there. I had them initial, and I initialed, and then this proffer letter was acceptable.

I did not get this ahead of time. It would have been something that once we agreed to do a proffer, we would have dealt with immediately prior to beginning the interview.

Q. Who has the power and authority to make a proffer letter?

A. The prosecutor.

Q. And would you agree that a proffer letter is something that only a prosecutor can grant in their official capacity as an assistant state's attorney?

A. Yes.

Q. The police or an investigator can't -- doesn't have the power to give someone a proffer letter; is that fair to say?

A. That's correct. It also goes back to the original conversation I had with the two guys that were outside of Bryan O'Shea's home when they said well, here's the prosecutor that you'll be dealing with. So that, to me, led credence to the fact that he was not going to be charged with the murder

Page 87

because I don't think the police would have left without him if he was going to be charged with murder, and they would have gotten in and gotten him if that were the case.

So when they -- I had the conversation. They gave me the name of Scott, and I followed up. Then it ended up culminating in the proffer. That all gave me a high level of confidence that Mr. O'Shea was going to be fine.

Q. Let's talk a little bit about immunity.

Would you agree that immunity is something that only a prosecutor can grant in their official capacity as an assistant state's attorney?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Well, yes, for state, but federal prosecutors do immunity also for their cases, but only a prosecutor can give immunity. A judge can't do it. A defense attorney can't do it.

BY MS. O'BRIEN:

Q. When you had these conversations before the 20th with Scott Cassidy, would you agree that your discussion with him regarding immunity and a proffer letter were negotiations --

MS. HAGY: Objection.

Page 88

BY MS. O'BRIEN:

Q. -- between lawyers?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. Now, you indicated that you did not have any agreement with any prosecutors regarding whether or not your presence was required during trial preparations. Do you remember saying that?

A. Yes.

Q. And you also indicated that your client was a witness. My question is this. Did you feel that your -- you didn't need to be there because you had already protected the rights of your client?

MS. HAGY: Objection. Form.

THE WITNESS: Yes. Once he had gone to the grand jury and his testimony under oath was locked in and transcribed, I felt that at that point, he had gone through the eye of the needle and was now a witness, solely a witness, and could only blow it by lying or something along those lines.

BY MS. O'BRIEN:

Q. Now, I'm going to direct your attention to

Page 89

Exhibit No. 21, the offer letter, please. On September 20th of 1996, you met with Scott Cassidy at the State's Attorney's Office with your client; is that correct?

A. Yes.

Q. And you indicated just briefly that your -- when you got there, the proffer letter was presented to you; is that fair to say?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. When you first got to the office of the State's Attorney's Office, did you meet privately with any of the state's attorneys before engaging in a meeting with your client with them?

A. No.

Q. So is it fair to say that the first thing that happened was you were presented with a proffer letter?

A. We came into a room, and I don't remember if it was on the table or if it was handed to me, but it was presented to me. And because we weren't going to do anything until we had executed -- excuse me, had executed the proffer letter.

Page 90

Q. And it is essentially a preprinted form, correct?

A. This was.

Q. It bears the name Office of the State's Attorney Cook County, Illinois, Proffer Letter at the top of the exhibit. Fair to say?

A. Yes.

Q. And also, you indicated that you negotiated -- well, let me ask you this. You read this upon receiving it, correct?

A. Yes.

Q. And you reviewed it. Fair to say?

A. Yes.

Q. And during your review of it, you saw something in this document that you deemed to be not good for your client; is that fair to say?

MS. HAGY: Objection. Form.

THE WITNESS: It was unacceptable to me.

BY MS. O'BRIEN:

Q. Why is that?

A. I wanted it to be clear that he was coming and giving this protected interview as a potential witness and not as a potential defendant.

Q. And so is it fair to say that you

Page 91

negotiated the terms of this proffer letter with Scott Cassidy?

A. It was a very short negotiation. I said I object to these things, this particular language, and he said strike it, and that was it.

Q. All right. And did you actually strike the words on the document?

A. I believe I did. I believe those squiggly lines are mine.

Q. And the other -- and your initials are there, correct, LGA?

A. LaGuardia Airport, LGA.

Q. And the other initials you think are Scott Cassidy's, correct, even though they're kind of --

A. Yeah. I was dealing with Scott. I don't know what his middle initial is, but let's assume it's E. So I think it's SEC, but yes. I know it wasn't Colleen Hyland, so I believe it was Scott and I -- I would have -- you know, belt and suspenders, I would have required someone from them to agree to striking out the language.

Q. Well, you mentioned Colleen Hyland. So on September 20th of 1996 when you arrived at the Cook County State's Attorney's Office, Colleen Hyland

Page 92

was present during this conversation that you had regarding the proffer letter as well as the conversation with your client, Bryan O'Shea; is that correct?

MS. HAGY: Objection. Form.

THE WITNESS: I'm sorry. You lost me.

BY MS. O'BRIEN:

Q. Was Colleen Hyland present on September 20, 1996?

A. Yeah. The first one was Scott and Colleen Hyland, and the second one was Colleen Hyland and Laura Sullivan.

Q. Right. I'm talking only about September 20th. Did you have any conversation with Colleen Hyland at all about the proffer letter?

MS. HAGY: Objection. Form.

THE WITNESS: I don't think so.

BY MS. O'BRIEN:

Q. Who were you negotiating with in terms of the proffer letter on September 20th of 1996?

MS. HAGY: Objection. Form.

THE WITNESS: Scott Nelson. I'm sorry. Forgive me. Scott Cassidy.

Page 93

BY MS. O'BRIEN:

Q. Did Assistant State's Attorney Colleen Hyland interject at all during these negotiations, if you recall?

A. I don't remember her. I think she was there as a prover.

Q. The proffer letter is also signed by -- well, it's signed by Scott Cassidy, Assistant State's Attorney; is that correct?

A. Well, I think that was preprinted where it says Scott Cassidy and then his name, and then I think Colleen Hyland, Bryan O'Shea, and I signed at the bottom. So I'm not sure if Scott actually signed it above his name or if that was preprinted. I don't remember which it was.

Q. Well, above his name is also the name Jack O'Malley, Cook County State's Attorney; is that correct?

A. Yes.

Q. And you indicated before that Colleen Hyland signed this form as a witness, correct?

A. Yes.

Q. Now, eventually you had a conversation with Scott Cassidy and your client, and you've

24 (Pages 90 - 93)

Page 94

discussed that, but my question is who was running the interview? Was it Scott Cassidy or Colleen Hyland?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: The first one on the 20th --

BY MS. O'BRIEN:

Q. Yes.

A. -- was Scott Cassidy and Colleen Hyland was basically -- I call her a prover. She basically was there as a witness. We call them provers. The second interview, Colleen Hyland was the one running the interview, and Laura Sullivan was in the role as a prover. She was a witness.

And so the first one, it was all Scott. When I say all Scott, I mean, I don't know if Colleen said anything at all, but she was not a participant in any meaningful way. And the second one, Colleen ran it, and Laura Sullivan was not a meaningful participant in any way.

Q. During this first conversation on September 20th of 1996, did your client, Bryan O'Shea, have the ability to relate events to both you and Scott Cassidy?

MS. HAGY: Objection. Form.

Page 95

THE WITNESS: He was asked questions, and he gave answers, and it was about what he saw, what he heard related to this crime.

BY MS. O'BRIEN:

Q. Were Bryan O'Shea's answers responsive to the questions that he was being asked?

A. They were.

Q. Now, I'm going to direct your attention to the exhibit, the handwritten Exhibit No. 22, please. You had indicated that you had gone back to the State's Attorney's on September 26th of 1996 with your client; is that correct?

A. Yes.

Q. And during that time, you have indicated that Laura Sullivan was, in your words, a prover; is that correct?

A. Yes.

Q. At that time what -- were you sitting at a table in that room? Were you in a room at the State's Attorney's Office on the 26th?

A. Yes.

Q. Were you at a table?

A. Yes.

Q. Where were you in relationship to your

Page 96

client, if you recall?

A. Well, I was next to him, but I don't recall exactly if we were facing north, south, east, or west.

Q. Who else was seated at that table?

A. On which?

Q. On the 26th. We've moved on from the 20th.

A. On the 26th, my recollection was Colleen Hyland was seated across from where Bryan and I were. There was a table between us. She was facing us. My recollection was that Laura Sullivan was back away, that she wasn't next to Colleen, but she was some distance away.

Q. Did you see any interaction between the two of them during that meeting?

A. Nothing meaningful. I mean, Colleen was engaged with us, and we were engaged with her. Laura she wasn't hovering. She was nearby.

Q. And I am actually going to go back to the 20th when Scott and Colleen were there. Did you see any interaction between Scott and Colleen Hyland on the 20th, the day of the proffer?

A. Nothing meaningful. I mean, they weren't

Page 97

conferring or anything like that.

Q. Now, on September 26th of 1996, is it fair to say that Colleen was asking your client questions?

A. Yes.

Q. And did he have the ability on that day to relate events her?

A. Yes.

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. Was she asking him questions?

A. Yes.

Q. Were his answers responsive to her questions?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. Now, you've talked a little bit about the Miranda rights. Do you recall who crossed these out on the form?

A. No.

Q. Was your client handcuffed during the time that he gave his statement?

25 (Pages 94 - 97)

Page 98

A. No.

Q. Were you allowed during the time this discussion was had on September 26th of 1996, were you allowed the opportunity to speak to your client alone?

A. Yes.

Q. At any time did your client during those discussions ask to speak with you alone, do you recall?

A. I don't recall.

Q. And is it fair to say that your client was asked if he wanted to agree to memorialize his statement that he gave to the assistant state's attorney?

MS. HAGY: Objection. Form.

THE WITNESS: He was asked, and he agreed.

BY MS. O'BRIEN:

Q. And did you agree?

A. Yes.

Q. Did you advise him to give a memorialized handwritten statement?

MS. HAGY: Objection. Form.

THE WITNESS: If he had asked me, I would have said it's okay. You can go ahead and do that.

Page 99

BY MS. O'BRIEN:

Q. And also the statement, after -- the statement was prepared by an assistant state's attorney handwritten, correct?

A. Yes.

Q. And you indicated previously that the statement was reviewed. My question is did the state's attorney read this statement out loud to you and your client after it was completed?

MS. HAGY: Objection. Form. Asked and answered.

THE WITNESS: Either they read it out loud, or I read it out loud. I don't remember, but it was read out loud to Bryan, and Bryan made some changes.

BY MS. O'BRIEN:

Q. Did your client either sign or initial every single page of this document?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. Did you -- now, you also indicated that your client was friends with some of the people that he was discussing with the state's attorneys;

Page 100

is that correct?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. Do you know the names of the people that he was friends with?

MS. HAGY: Objection. Form. Asked and answered.

THE WITNESS: I think on some level, he was friends with all of the people, but there was one specifically that he was very close to.

BY MS. O'BRIEN:

Q. Okay. And how do you know that?

A. Because he was very forthcoming on some things, and other things he was not, and the things that he was not forthcoming on had to do with one of the defendants.

Q. During the September 20th proffer letter meeting, did Colleen Hyland pressure O'Shea in any manner?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: At no time did she pressure Bryan O'Shea.

Page 101

BY MS. O'BRIEN:

Q. And during the handwritten statement on September 26th of 1996, did either Colleen Hyland or Laura Sullivan pressure your client?

MS. HAGY: Objection. Form. Foundation. Asked and answered.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. On either September 20, 1996 or September 26th of 1996, did your client repeatedly tell either Scott Cassidy, Colleen Hyland, or Laura Sullivan that he did not want to lie?

MS. HAGY: Objection. Form.

THE WITNESS: I don't remember him saying that.

BY MS. O'BRIEN:

Q. Was either Colleen Hyland or Laura Sullivan trying to get your client to say something other than what he was actually telling them?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: They were -- this was the second interview. They had gone through -- in the first interview, he had gone through, and by the time we finished, he had answered all their questions. The second interview was a little bit more pointed, and

26 (Pages 98 - 101)

Page 102

they were asking him about specific things, and he was more responsive and less hesitant than in the original interview.

Does that answer your question?

BY MS. O'BRIEN:

Q. Well, my question is did they try to get him to falsify his statement?

A. No.

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Were they feeding him -- Colleen and Laura, were they feeding him information?

MS. HAGY: Objection. Form. Foundation. Asked and answered.

THE WITNESS: No. It appeared that they wanted to make sure that he was the one testifying, not them and that he wasn't just acquiescing to statements they were making. They were making a concerted effort to have him tell the story.

BY MS. O'BRIEN:

Q. Were they -- were they giving him ideas of what they were looking for --

MS. HAGY: Objection. Form.

Page 103

BY MS. O'BRIEN:

Q. -- when they were questioning him or when Colleen was questioning him?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: They just were asking him questions and eliciting his response.

BY MS. O'BRIEN:

Q. Did any of the states attorneys tell your client during any of the interviews to falsely say that Antusas confessed to him the day after the shooting?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Did any of them tell him to falsely say that Antusas confessed to O'Shea the day after the shooting that Antusas had relayed the victims' location for purposes of carrying out the shooting?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Did any of the state's attorneys ask your client to agree to falsely claim that the shooting was planned?

Page 104

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Now, are you aware that your client testified against a person by the name of Eric Anderson? Do you know any of the defendants' names in this case? Do you recall them?

A. There was a time that I did, but I don't -- all I know is Sopron because his name was on the subpoena.

Q. Okay. And your client testified in a number of matters against a number of defendants with respect to this murder case; is that fair to say?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. And he testified against the some of the defendants who were originally charged in the case. Do you recall that?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. And then subsequently he testified against

Page 105

Sopron and Antusas. Do you recall that?

A. Yes.

Q. Did you speak with him prior to any of those trials, if you recall?

MS. O'BRIEN: Objection. Form. Foundation.

THE WITNESS: I might have, but it wasn't -- I don't think it was necessary, but I might have just given him a tell the truth, you know, it's a bad circumstance, but, you know, you have to tell the truth so that you can get through this. You know, a horrible catastrophic thing occurred, and, you know, there are consequences.

BY MS. O'BRIEN:

Q. Do you have an opinion as to whether or not your client was reluctant to testify against people who were his friends?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I believe he was reluctant in general, but especially reluctant against the one guy that -- as far as I could tell, the one guy was his best friend in the world, and he was especially reluctant to testify in that case.

BY MS. O'BRIEN:

Q. And he was getting pressure from the

27 (Pages 102 - 105)

Page 106

neighborhood, correct, before the trials? Is that your opinion?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Absolutely.

BY MS. O'BRIEN:

Q. How about after he testified in the trials, was he being harassed by people?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. Do you know a person by the name of Frank Morfin?

A. The last name Morfin rings a bell. I'm certain it's one of the people. If Frank Morfin is the father, if he's the father, then I have some recollections about his name surfacing.

Q. Were you aware that your client was harassed by a person by the name of Frank Morfin?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: My recollection is that my client suffered harassment frequently, and I have a recollection, and again, it's been over 25 years, that somebody physically attacked him.

Page 107

BY MS. O'BRIEN:

Q. Do you know whether or not that case was put into the criminal justice system?

A. I don't know if it was put into the system, but I know that it was reported, but I don't know what consequences flowed from that.

Q. Did your client, O'Shea, come to you for advice after that incident happened, if you recall?

A. He called me at some point that he was being harassed or something, and I told him that he should call the police or call the State's Attorney's Office and let them know that he was a witness in the case and now he's being harassed because that is a crime.

Q. Did you -- did you give your client any advice -- hang on.

Did you give your client, O'Shea, any advice regarding dealing with the defense attorneys on the murder cases?

MS. HAGY: Objection. Form.

THE WITNESS: I told him he was under no obligation to speak to them and that if he did speak to them, they would use it in a way to help their clients, which would be probably harmful to

Page 108

him.

BY MS. O'BRIEN:

Q. Did you -- did any defense attorneys prior to those cases going to trial, did any of those defense attorneys try to contact you in an effort to discuss anything with your client?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Not that I recall.

BY MS. O'BRIEN:

Q. Did any of those lawyers contact you regarding O'Shea's proffer letter or handwritten statement?

A. If they did, I would have told them I'm not going to talk to them about it.

Q. Are you familiar with the fact that there are two indictments -- there were two indictments regarding the murder of the two girls?

A. Two sets of indictments?

Q. Yes. Are you familiar with the fact that five defendants were charged on one case and then subsequently two more defendants were charged?

MS. HAGY: Objection. Form.

THE WITNESS: I was aware it was more than one case emanating from this, but I don't know if it

Page 109

was two or three or what.

BY MS. O'BRIEN:

Q. As you sit here today -- well, let me ask you this.

Did you know at the time the lawyers who represented the defendants in those murder cases?

MS. HAGY: Objection. Form.

THE WITNESS: I probably knew some of them. If you told me their names, I'd be able to tell you if I did.

BY MS. O'BRIEN:

Q. Did you know Rick Beuke?

A. Yes.

Q. And did you have any conversations with Mr. Beuke about your representation of O'Shea or the circumstances of the handwritten or anything like that during the pendency of Eric Anderson's trial?

A. No.

Q. Do you know a person by the name of Paul Gridelli?

A. No.

Q. Do you know a person by the name of Jim Kogut?

28 (Pages 106 - 109)

Page 110

A. Yes.

Q. Did you have an occasion to have any conversations with Jim Kogut about your representation of O'Shea, about your client, O'Shea, or the handwritten statement or the proffer letter during the pendency of Nick Morfin's case?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Did you know Irv Miller?

A. Yes.

Q. And did you know Nick Trutenko?

A. Yes.

Q. And how did you know Nick Trutenko?

A. Nick Trutenko was an assistant state's attorney when I was ending my time as a law clerk in Tom Fitzgerald's courtroom at 26th Street. Nick came in as a third chair. I met him. He introduced me to Jim Kogut, which is how I met Kogut, and then I left that courtroom as he was coming in. It was a brief overlap, and that's how I met Nick Trutenko, and that's how I met Jim Kogut.

Q. Were Nick Trutenko and Kogut friends?

Page 111

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. And did you ever talk to either Irv Miller or Nick Trutenko regarding your involvement with Bryan O'Shea or the handwritten statement or the proffer letter during the pendency of their representation of Nick Liberto?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Do you know a lawyer by the name of Dave Pilot?

A. Yes.

Q. Do you know an attorney by the name of Pat Walsh, Patrick Walsh?

A. It's a familiar name, but I don't know him. I mean, I don't know if I know him.

Q. Did you ever have a conversation with either -- did Pat Walsh or David Pilot ever contact you regarding Bryan O'Shea, his handwritten statement, or the proffer letter during their representation of the defendant prior to trial, Matthew Sopron?

Page 112

MS. HAGY: Objection. Form.

THE WITNESS: If they tried, I would not have cooperated. I would not have talked to them. It wouldn't have been in my client's best interest. It wouldn't have been in my best interest.

BY MS. O'BRIEN:

Q. Do you know a lawyer by the name of Roger Pena or Rogelio Pena?

A. No.

Q. Do you know a lawyer by the name of George Zuganelis or Mike Vitale?

A. I know George Zuganelis.

Q. Did any of those lawyers that I just mentioned reach out to you at any time prior to their trials to get information about Bryan O'Shea?

A. No.

Q. Did any of those lawyers reach out to you post trial regarding Bryan O'Shea?

MS. HAGY: Objection. Form.

THE WITNESS: I don't remember anyone reaching out to me because I wouldn't have talked to them, and they probably knew I wouldn't have talked to them. So they could have tried, and I would have said I'm not talking about it.

Page 113

BY MS. O'BRIEN:

Q. Now, you indicated that at some point, your client asked you what would happen if he said he didn't remember anything, and my question is sometime in 1997, did anybody from the State's Attorney's Office reach out to you and indicate to you that Bryan O'Shea told us that he couldn't remember anything?

A. They may have. I don't remember.

Q. During that time, did you ever have a conversation with either Jim Kogut or Nick Trutenko regarding that issue?

A. No. I would not have talked to either of those people.

Q. Is it fair to say that when O'Shea contacted you regarding that, he was afraid to testify?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I'm sorry. I missed that. Would you ask me the question again?

BY MS. O'BRIEN:

Q. When O'Shea contacted you and said what would happen if I didn't remember anything, is it fair to say that he was afraid to testify at that

29 (Pages 110 - 113)

Page 114

point?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I took it as him being -- looking for a way out so he didn't have to do it, not that he was afraid, but that he -- again, one of these guys was his very close friend, and I think that he would have been very happy to not have to testify.

BY MS. O'BRIEN:

Q. Did you believe he was actually having memory issues?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I knew for a fact he was not having memory issues because he said to me what if I said I don't remember.

BY MS. O'BRIEN:

Q. I'm going to direct your attention to approximately September 23, 1997. Do you recall having a conversation in the hallway at 26th and California with Pat Walsh, Jim Kogut, and Jim Kogut's investigator, Anthony Menina?

A. No. It didn't happen.

Q. Did you ever have a conversation with Pat Walsh and Jim Kogut regarding your client, Bryan O'Shea?

Page 115

A. I would not have had a conversation about my client with anyone. I especially would not have had a conversation with Jim Kogut under any circumstances anywhere anytime ever.

Q. Is it fair to say you would not have allowed any conversation between your client, Bryan O'Shea, and any member of the Cook County State's Attorney's Office until after the proffer was agreed upon and signed?

A. Yes.

Q. At any time did either Colleen Hyland or Laura Sullivan dictate or tell O'Shea what to say in his handwritten statement?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Did Colleen Hyland ever direct O'Shea what to say?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Did Colleen Hyland or Laura Sullivan ever direct or tell O'Shea what to say in the handwritten statement?

Page 116

A. No.

Q. At any time in your presence, did your client agree with any of the prosecutors to falsely accuse Matt Sopron?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Or Wayne Antusas?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Or Nick Morfin?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Or any defendant in those indictments?

MS. HAGY: Objection. Form. Asked and answered.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. At any time in your presence, did either Scott Cassidy, Laura Sullivan, or Colleen Hyland ever ask Bryan O'Shea to falsely testify against Nick Morfin?

Page 117

MS. HAGY: Objection. Form. Asked and answered.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Did your client, Bryan O'Shea, ever tell Cassidy, Highland, or Sullivan that Nick Morfin did not have any involvement in the December 14, 1995 shooting?

A. No.

Q. At any time did Scott Cassidy pressure O'Shea into saying that Nick Morfin was involved in the shooting?

A. No.

Q. At any time did you see either Colleen Hyland or Laura Sullivan encourage Scott Cassidy into pressuring your client, Bryan O'Shea?

MS. HAGY: Objection. Form.

THE WITNESS: I'm sorry. You lost me. Would you repeat the question?

BY MS. O'BRIEN:

Q. Did you at any time observe Colleen Hyland or Laura Sullivan encourage Scott Cassidy into pressuring your client?

MS. HAGY: Objection. Form.

30 (Pages 114 - 117)

Page 118

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Did -- in your experience, did O'Shea repeatedly tell either Scott Cassidy, Colleen Hyland, or Laura Sullivan that he did not want to lie?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. In your presence on either September 20th or September 26th of 1996, did your client repeatedly tell Scott Cassidy or Colleen Hyland or Laura Sullivan that Nick Morfin had nothing to do with and did not have any involvement in the shooting?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Did either Colleen Hyland, Scott Cassidy, or Laura Sullivan order or otherwise direct your client, Bryan O'Shea, to say that Sopron ordered the shooting?

MS. HAGY: Objection. Form.

THE WITNESS: No.

Page 119

BY MS. O'BRIEN:

Q. Did Scott Cassidy, Colleen Hyland, or Laura Sullivan order or otherwise direct or tell Bryan O'Shea to say that Matthew Sopron's plan was to have Nick Morfin and Liberto drive Bigeck, Anderson, and Ed Morfin to and from the scene?

MS. HAGY: Objection. Form.

THE WITNESS: I'm sorry. Are you asking me if they told him to say that?

BY MS. O'BRIEN:

Q. Yes.

A. No.

Q. Did either Scott Cassidy, Colleen Hyland, or Laura Sullivan order or otherwise direct or tell Bryan O'Shea to say that Nick Morfin ordered the destruction of serial numbers from the murder weapon?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Did Scott Cassidy, Colleen Hyland, or Laura Sullivan order or otherwise direct or tell Bryan O'Shea to say that Sopron ordered the destruction of the serial numbers from the murder

Page 120

weapon?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. During the time that you were interviewing with your client with the state's attorneys, did either -- did your client tell either Scott Cassidy, Laura Sullivan, or Colleen Hyland that he knew nothing about the shooting being planned?

MS. HAGY: Objection. Form.

THE WITNESS: I'm sorry. Did you ask me if Bryan O'Shea said he knew nothing about this case?

BY MS. O'BRIEN:

Q. Right.

A. He never -- Bryan O'Shea never said that.

Q. Now, were you contacted -- I mean, were you informed that your client signed an affidavit on February 6th of 2001?

A. I would have learned about it afterwards.

Q. Did Pat Walsh ever contact you before that date to say I'd like to talk to your client and, you know, interview him?

A. No.

Q. Did you -- did anybody try to contact you

Page 121

to tell that you -- to ask your permission or to tell you that your client signed an affidavit in 2015?

MS. HAGY: Objection. Form.

THE WITNESS: Are you asking me if someone contacted me before that?

BY MS. O'BRIEN:

Q. Yeah. Were you ever informed that he signed an affidavit -- O'Shea signed an affidavit in 2015?

A. I learned about it afterwards.

Q. Were you contacted by O'Shea before he signed any affidavits?

A. No.

Q. Were you contacted by O'Shea in 2000 before he gave an interview to Pat Walsh?

A. No.

Q. Were you ever informed that O'Shea signed an affidavit on December 7th of 2020 prepared by Jim Kogut?

A. No.

Q. At any time during your conversations with the state's attorneys, whether it is Scott Cassidy, Colleen Hyland, or Laura Sullivan, and your client,

31 (Pages 118 - 121)

Page 122

was your client indicating to the state's attorneys that you're not -- that they weren't listening to what he had to say?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Did he show any signs of being -- I mean, did he express frustration with them regarding anything?

MS. HAGY: Objection. Form.

THE WITNESS: The only constant was that Bryan would be reluctant when it came to questioning about one of the guys. That was something that, you know, we -- I noticed and that they had to continually ask him, and they were very gentle trying to get him to answer questions fully about everybody.

BY MS. O'BRIEN:

Q. Did you ever advise or tell Bryan O'Shea to lie -- to lie or fabricate a story?

MS. HAGY: Objection. Form.

THE WITNESS: No. I wouldn't have because lying was the only thing that could have gotten him in trouble.

Page 123

BY MS. O'BRIEN:

Q. Did you ever advise Bryan O'Shea to commit perjury?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Did you ever advise Bryan O'Shea to commit perjury to avoid murder charges?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Did you ever advise Bryan O'Shea to just, you know, lie or give the state's attorneys the information that they want?

MS. HAGY: Objection. Form. Asked and answered.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Do you know how many times you have spoken with Bryan O'Shea since he testified in the various trials?

MS. HAGY: Objection. Form.

THE WITNESS: I don't, but it wouldn't have been many.

Page 124

BY MS. O'BRIEN:

Q. But you have spoken with him, is it fair to say, since he testified in these trials?

A. Yes.

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. Has Bryan O'Shea ever told you that he lied during the trial of Matt Sopron and Wayne Antusas?

MS. HAGY: Objection. Form. Asked and answered.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Has Bryan O'Shea ever told you that he lied during the Nick Morfin trial?

MS. HAGY: Objection. Form. Asked and answered.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Has Bryan O'Shea ever told you that he lied during Eric Anderson's trial?

MS. HAGY: Objection. Form. Asked and answered.

Page 125

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Has Bryan O'Shea ever told you that he lied in the grand jury?

MS. HAGY: Objection. Form. Asked and answered.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Has Bryan O'Shea ever told you that he lied when speaking to assistant state's attorneys on September 20, 1996 or September 26th of 1996?

MS. HAGY: Objection. Form. Asked and answered.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Did Bryan O'Shea ever file an ARDC complaint against you?

A. I don't remember if he did. I don't think so.

Q. Would that be something that you would have remembered?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: If he would have filed a complaint and they not asked for my response, I

32 (Pages 122 - 125)

Page 126

probably wouldn't. I probably wouldn't, but I don't remember getting an ARDC complaint, and I don't remember having to respond to one. I mean, I know I've never have been sanctioned and had a complaint founded against me at the ARDC.

BY MS. O'BRIEN:

Q. During your discussions with Bryan O'Shea and the assistant state's attorneys on both September 26th and September 20th of 1996, were the facts of the pending indictment discussed with him?

MS. HAGY: Objection. Form.

THE WITNESS: You mean the murder indictments?

BY MS. O'BRIEN:

Q. Yes.

A. I don't remember.

Q. Prior to the meetings with the state's attorneys in September of 1996, did you know that Bryan O'Shea visited any of the defendants on the pending case in jail?

A. I think I know that he visited one of his buddies at some point. I don't remember if it was after the conviction, whether it was at Cook County Jail or IDOC, but like I said, one of these guys was his good friend, and I don't know if -- I don't

Page 127

know that he did visit him, but I have a vague recollection that he stayed in contact with one of them.

Q. Did he tell you that he visited? Is that a discussion that you had?

A. I don't remember that.

Q. Is it fair to say that during your conversations with Scott Cassidy before September 20th of 1996, you were representing your client, Bryan O'Shea?

A. I was representing Bryan O'Shea, who was a witness in a case.

Q. Is it fair to say that your loyalty was with your client, Bryan O'Shea?

A. Yes.

Q. And during the September 20, 1996 proffer letter and discussions and the September 26th of 1996 handwritten statement, was your loyalty -- did your loyalty remain to your client, Bryan O'Shea?

A. At all times I was representing Bryan and Bryan's best interest.

Q. Did you have any motive to have your client falsely testify or cooperate in this matter?

A. No.

Page 128

Q. If you had not received the proffer letter with respect to your client, would you have allowed him to speak with the assistant state's attorneys in this case?

MS. HAGY: Objection. Form.

THE WITNESS: No. I would have left, and I would have told them that he's going to assert his Fifth Amendment rights because I would then be uncertain as to what his exposure would be.

BY MS. O'BRIEN:

Q. And this is going to seem like a -- so when you indicate that he was going to assert his Fifth Amendment rights, specifically what would you have advised your client to do?

MS. HAGY: Objection. Form.

THE WITNESS: As I was saying, I would have told him if we didn't have the proffer letter, if they didn't allow me to strike that language, if they didn't initial striking that language, I would have said we have to go, and I would have told them he's asserting his Fifth Amendment rights. And then I would have said if you want him, you either give him immunity, or he'll go into the grand jury and take Five.

Page 129

BY MS. O'BRIEN:

Q. And can you please delineate the Fifth Amendment rights that you were talking about asserting?

MS. HAGY: Objection. Form.

THE WITNESS: Well, you've all seen the movies. What it is is the Fifth Amendment of the Constitution of the United States gives a person the right against self-incrimination. So if someone has a good-faith basis that their testimony or conversation, the language is intended to incriminate them, then they can assert their Fifth Amendment rights and refuse to answer questions or testify.

MS. O'BRIEN: I don't have anything further.

MS. KUNZER: I just have a few. Do you want to keep going or --

THE WITNESS: I would love to keep going. I know I'm going to get outvoted.

EXAMINATION

BY MS. KUNZER:

Q. Sir, my name is Amy Kunzer. I represent some of the Cook County investigators in this case. I just have a few questions for you.

33 (Pages 126 - 129)

Page 130

You talked about when you first got a phone call regarding the fact that there was somebody at the door at the O'Shea residence, you testified that you said it was either police officers or investigators. Do you have any personal knowledge as to either -- whether it was a police officer or investigator that was at the door that day?

A. I don't know.

Q. Did you -- and fair to say that whether it was a police officer or an investigator, the individuals that came to the door never had the opportunity to enter the house that day?

MS. HAGY: Objection. Form.

THE WITNESS: Correct.

BY MS. KUNZER:

Q. And those individuals never had the opportunity to speak with Bryan O'Shea, correct?

MS. HAGY: Objection. Form.

THE WITNESS: They had enough of a conversation for me to talk to him, but nothing in depth.

BY MS. KUNZER:

Q. Do you have any personal knowledge of an individual named William Marley?

Page 131

A. No.

Q. Do you know anyone by the name of Thomas Ptak?

A. The name rings the bell. I don't know if it's the same, but there was a detective named Ptak in the '80s, '90s. I don't know if it's the same person. He was a retired detective that was doing something else.

Q. And nothing pertaining to this case regarding Detective Ptak?

A. No. I don't know if it's one in the same. I don't remember who it was. I remember that I was real happy when they said call the state's attorney and left, and that was a very good indication to me that he was not looking at being charged with murder in this case because my experience tells me that if he was going to be a defendant, whoever these law enforcement people were were not going to go away after talking to his lawyer.

Q. Okay. Did you know an individual by the name of Norfie DiCiolla?

A. No.

Q. We looked at the proffer letter that had signatures on it. Was there anyone else in the

Page 132

room whose name did not appear on the proffer letter?

A. No.

Q. And same thing for Bryan's handwritten statement that he gave on September 26th. Was there any other individual in the room that day whose name did not appear on that statement?

A. No.

Q. Your observations of Bryan on the date that he gave the statement, in your opinion, was he oriented to reality?

A. Yes.

Q. Was he oriented to person?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Yes.

BY MS. KUNZER:

Q. Did he know where he was?

A. Yes.

Q. Was his thought flow congruent in your opinion?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Yes.

BY MS. KUNZER:

Q. Did his memory appear intact at that time?

Page 133

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: He appeared -- his memory appeared intact, and he was responsive, and his answers were consistent with the questions that were put to him.

MS. KUNZER: That's all I have. Thanks.

MR. MASCIOPINTO: I just have a few, sir, similar line of questioning. I represent Chicago Police officers whose names I'll give you in a minute, but let me take a step back.

EXAMINATION

BY MR. MASCIOPINTO:

Q. The proffer agreement that your client signed, is it fair to say that is, in fact, an agreement?

A. Yes.

Q. Who are the parties to that agreement?

A. The Cook County State's Attorney's Office and my client represented by me.

Q. Based on your training, experience, and knowledge, is the Chicago Police Department a party to your client's proffer agreement?

A. No.

Q. Is the City of Chicago a party to the

34 (Pages 130 - 133)

Page 134

proffer agreement that your client signed in September of 1996?

A. No.

Q. You said to counsel just now that the only individuals present for the first proffer on September 20, 1996 are the people whose names appear on Exhibit 20 and 21; is that right?

A. Yes.

Q. Is it fair to say then no Chicago Police Department personnel was present, to the best of your knowledge, for your client's first proffer on September 20, 1996?

A. There were no Chicago Police officers there, correct.

Q. Same question for the handwritten statement and the second proffer on September 26, 1996. You told counsel just now that the only parties present were the parties who appear at the top of the handwritten statement, Exhibit 22, yes?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Correct.

BY MR. MASCIOPINTO:

Q. Fair to say that no Chicago Police Department personnel was present for the second

Page 135

proffer and the handwritten statement on September 26, 1996?

A. Correct.

Q. No City representatives present at that time?

A. Correct.

Q. Do you know a Chicago Police -- a CPD employee by the name of Thomas Argenbright?

A. No.

Q. To the best of your knowledge, did you have any interactions with a CPD employee by the name of Thomas Argenbright in the context of your representation of Bryan O'Shea?

A. No.

Q. Do you know a Chicago Police Department personnel by the name of George Holmes, H-o-l-m-e-s?

A. No.

Q. To the best of your memory and knowledge, did you have any interactions with George Holmes from CPD in the context of your representation of Bryan O'Shea?

A. No.

Q. Did you know CPD personnel by the name of

Page 136

William Moser, M-o-s-e-r?

A. No.

Q. To the best of your knowledge and memory, did you have any interactions at all with CPD William Moser in the context of your representation of Bryan O'Shea?

A. No.

Q. Same question, Anthony Graffeo. Do you know an Anthony Graffeo from CPD?

A. No.

Q. To the best of your knowledge and memory, did you have any interactions with an Anthony Graffeo from the CPD in the context of your representation of Bryan O'Shea?

A. No.

Q. Last question for these. Al Graff, do you know an Al Graff from CPD?

A. No.

Q. To the best of your memory and knowledge, did you have any interactions with an Al Graff from CPD in your representation of Bryan O'Shea?

A. No.

Q. As you sit here today, the entire time that you represented Bryan O'Shea, do you think you

Page 137

interacted with any CPD personnel at all?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I don't have a recollection of interacting with any CPD people at all from the beginning of my involvement in this case until today.

BY MR. MASCIOPINTO:

Q. And last line of questioning then. You did testify early on that maybe there were cops outside Bryan's door or police outside of Bryan's door or other investigators outside his door when he first called you, correct? That's what you testified to.

A. Right. Either when I called him or he called me, there was somebody outside. I believe there were two people outside that wanted to talk to him. They -- I was put on the phone with them. They identified themselves in some capacity. I don't remember if it was investigators or police or detectives or whatever. I don't know if it was Cook County, State, Chicago. We had our conversation, and they left.

Q. So as you sit here today now, and I don't want to put words in your mouth, but the best that you

35 (Pages 134 - 137)

Page 138

you can say is you understood the people outside Bryan's door to be some type of law enforcement?

A. That was my belief.

Q. No reason to believe as you sit here today that it was CPD personnel?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I have no idea who it was, but whoever it was, when I talked to them and they gave me the information and they left, that was the best possible outcome. And I don't know if it was CPD or a Cook County investigator. I don't know who it was. At the time I did, but I don't remember.

MR. MASCIOPINTO: I have nothing further. Thank you.

MS. HAGY: Could we just do a little washroom break?

THE VIDEOGRAPHER: Now going off the record at 1:11 p.m. This ends media unit 3.

(Whereupon, a short break was taken.)

THE VIDEOGRAPHER: This begins media unit 4. Now going back on the record at 1:34 p.m.

MR. HERACKLIS: Larry, my name is James Heracklis. I represent the City of Chicago.

Page 139

EXAMINATION

BY MR. HERACKLIS:

Q. I just wanted to clarify your earlier testimony. You testified that during your representation of Bryan O'Shea, you did not interact with CPD officers; is that correct?

A. Yes.

Q. And is it fair to say that you did not interact with agents, officials, or other personnel representing the City of Chicago?

A. Correct.

MR. HERACKLIS: That's all I have.

MR. MASCIOPINTO: I think one of the City counsels remote had one or two questions. I'm not sure if he's there. Effraim?

MR. STEPHENSON: Did you have any questions?

MR. SIFF: Yes. Are we back on the record?

MR. STEPHENSON: Yeah. I think counsel for the City from Michael Best asked a couple questions. I think we may have been muted. Do you mind reading those back.

(Whereupon, the record was read as requested.)

MR. STEPHENSON: It's your turn if you have any

Page 140

questions.

EXAMINATION

BY MR. SIFF:

Q. Just briefly when did your representation begin? Was that with the phone call or the pager call as you put it?

A. I was initially contacted, and I think it was -- I don't know if there was a call ahead of time, but I was -- what I would think is when the people were outside his door, and then I talked to them. And then at that point, I considered that they were thinking about hiring me, and then subsequent to that, they formally hired me.

Q. And was that sometime in September of 1996?

A. Sometime before the first interview.

Q. And the first interview was September 20, 1996?

A. Yes.

Q. So within a week before that?

A. Could be. I don't remember the date.

MR. SIFF: Okay. I don't have any other questions.

MR. STEPHENSON: I think that's it for the

Page 141

defense.

MS. HAGY: Good afternoon, Judge Axelrood. I'll say Larry, too, but it feels weird.

EXAMINATION

BY MS. HAGY:

Q. When you testified earlier that you took over somebody's defense practice, who was that person?

A. James Linn. He went out and became a judge. He's still a judge. He's at 26th and California.

Q. And prior to this case, had you ever worked against Mr. Cassidy?

A. I had cases against Scott Cassidy. I just don't recall if they were before or after this event.

Q. Okay. Did you know who he was when Bryan gave you that name?

A. Yes. It wasn't Bryan that gave me the name. It was one of the investigators.

Q. Okay. And do you -- after that time, did you work with Mr. Cassidy?

A. I've never worked with Mr. Cassidy.

Q. Well, against, worked on cases where he

36 (Pages 138 - 141)

Page 142

was also on the case.

A. I had one case that I remember distinctly where he was prosecuting, and I was defending. And I don't know if our paths crossed on other cases, but I remember distinctly one case.

Q. And do you have an opinion on Mr. Cassidy's reputation?

A. I do.

Q. And what is that opinion?

A. The opinion depends on who you talk to. I found him to be an honorable person. In that other case that I had, it was a case in Markham, and it was a Chicago case in Markham like I had Chicago cases in Skokie, and he was an honorable person.

It was a trial where my client was rightfully acquitted, and he was a gentleman and above board the entire case. I know that you and your firm are here because you think his reputation is not good.

Q. And how many times did you speak with defense counsel in this case?

A. In this case?

Q. Yes.

A. Two or three times. I think it was two

Page 143

phone calls.

Q. Did you ever meet in person?

A. No.

Q. And how long were those phone calls?

A. I don't know. They were probably -- one of them was longer, and one of them was pretty brief.

Q. How long would you say the longer one was?

A. Maybe half hour, 45 minutes.

Q. And who was on that phone call?

A. I think it was these two lawyers to my left.

Q. And what did you discuss?

A. They told me that this case was pending and that I was a witness, which I knew because I got a subpoena, and we talked about, you know, the protocol going forward. And the second phone call -- and we talked a little bit about, you know, what the case was about. I had read a -- my deposition, the proffer letter, and the handwritten statement. So they asked me, you know, was that accurate at the time, things like that.

And then I think the second conversation was just checking dates that I would be available.

Page 144

And if there was a third conversation, it was just this is the date that it's going to go.

Q. And did they e-mail you before that?

A. I don't think they e-mailed me.

Q. How were you provided with the documents?

A. I got a -- I came home one day, and there was a business card stuck into my outer door at my house, and I read it. It was from someone that I didn't recognize, and on the back, it said Judge, please call me. And I don't know if there was a signed name, but I think it was just Judge, please call me.

I called the person, and he told me he was trying to serve me with a subpoena. And I said you don't have to come looking for me. Just leave it at my office, and I told them my office, and he did. And when I got the subpoena, there was the transcript, the proffer letter, and the written statement.

Q. How did you eventually make contact with the defense attorneys? Did they -- defendants' attorneys? Did they call you, or did you call them?

A. I'm pretty sure I called Mr. Stephenson.

Page 145

Am I saying your name correctly?

MR. STEPHENSON: Yes.

THE WITNESS: Mr. Stephenson and said I have -- I said to him you left a subpoena for me. You don't have to get personal service on me. I'm going to cooperate with the proceedings.

BY MS. HAGY:

Q. Did you know Mr. Stephenson before then?

A. I did not.

Q. Did you know -- I'm sorry that I'm forgetting your last name. But did you know Maureen before then?

A. I knew Maureen a little bit. I knew her -- I knew her mostly when she was a state's attorney in the Fourth District and I was a defense attorney.

Q. And did you guys work against each other on the same cases?

A. I think she was the first chair in a courtroom that I had cases in.

Q. And why were you willing to talk to them?

MS. O'BRIEN: Objection.

THE WITNESS: I got a subpoena from them, and that's a court order, and I was -- it's not that

37 (Pages 142 - 145)

Page 146

I'm willing to talk to them, but I'm going to obey the rules of the court just like when I was a judge, I would enforce the rules of the court. So yes, I was going to talk to them.

MR. HERACKLIS: Counsel, I'm sorry. Can we stipulate that an objection by one is an objection by all the parties?

MS. HAGY: Oh, sure. Yeah.

BY MS. HAGY:

Q. But you answered questions that they asked you previous to this deposition; is that fair?

A. I did, yes.

Q. And why were you willing to do that?

MS. O'BRIEN: Objection. Form.

THE WITNESS: I asked them questions. They asked me questions. I wanted to know what this was about.

BY MS. HAGY:

Q. Okay. And is it fair to say you were not willing to talk to me before this?

A. Correct.

Q. And why was that?

A. Because you are, in essence, calling me a criminal saying I suborned perjury and that I'm

Page 147

unethical. That's the essence of your lawsuit, so I think that I'm going to be careful with you.

Q. And have you seen the complaint in this case?

A. No.

Q. So what are you deducing that from?

A. Well, your -- the questions I'm asked are if I suborned perjury with Bryan O'Shea, and that's not true. So the only reason these questions are relevant is because you're asserting that I suborned perjury.

Q. And when did --

A. I mean, you are saying I suborned perjury, right?

Q. Well, I'm not going to answer that.

A. Of course. You don't have to.

Q. And -- but where are you getting that understanding from?

MS. O'BRIEN: Objection.

THE WITNESS: I'm getting it from you.

BY MS. HAGY:

Q. But we haven't talked, right?

A. That's correct. I wasn't going to talk to you. So it's my belief that you're asserting that

Page 148

I suborned perjury. That's criminal conduct. Not only is it false, but it's insulting, and it's inapposite.

This is the third time I've been with Loevy & Loevy. The first time was Klupperberg, and at that point, you said that I did everything right. The second time was in Andy Thayer, and you said I did everything right. So when it's convenient for you, you want me to be a perjurer.

Q. Okay. So do you have an opinion on -- well, strike that.

So when did your -- did your reputation of Mr. O'Shea end at some point?

MR. STEPHENSON: Objection. Form. Do you mean representation?

THE WITNESS: You asked me reputation. You mean representation?

BY MS. HAGY:

Q. Oh, yes. I'm sorry. Representation.

A. I represented Mr. O'Shea, and then after the case went to convictions, Mr. O'Shea -- the case was closed. Then there was post conviction. Mr. O'Shea was no longer my client, but I still had a duty, and I kept that duty until he made

Page 149

representations against me at which time I was free to answer to those accusations.

Q. Okay. Do you know about what time that was?

A. You mean what year?

Q. Yes.

A. No. It was sometime after when Judge -- it was sometime after I had to testify in front of Judge Kazmierski.

Q. And was there a time that you -- you said at some point, your representation stopped, but you still had a duty to him; is that fair?

A. No. My duty ended when my representation ended when he made accusations and I was called as a witness about my conduct.

Q. Okay. So that is -- you consider that that was the time that your representation of him ended as well?

A. It might have been sooner.

Q. Okay. Did he ever tell you that your representation of him was ending?

A. I don't recall.

Q. Did you ever tell Mr. O'Shea that your representation of him was ending?

Veritext Legal Solutions

www.veritext.com                                        888-391-3376

Page 150

A. Not that I remember.

Q. Did you communicate with him when you had the understanding that your duty to him ended?

A. No.

Q. When do you think was the last time you spoke to Mr. O'Shea?

A. I have no idea.

Q. Do you think -- well, were you present when he testified at the grand jury?

A. No.

Q. Were you present when he testified at Mr. Sopron's trial?

A. No.

Q. Were you present when he testified at any of the trials in this case?

A. No.

Q. Were you present at a hearing in -- on March 10, 1998?

A. I don't think so.

Q. Did you have knowledge of Mr. O'Shea entering rehab?

A. I know that he was in rehab at some point.

Q. Okay. And do you -- did you understand that he entered rehab on September 23, 1996?

Page 151

A. Could be. I know that he either came out of rehab or was going into rehab around the time that this was all jumping off.

Q. And did you know that he -- well, first of all, when is the first time you remember talking to Mr. O'Shea?

A. I don't know.

Q. Had you ever represented him before?

A. Before the phone call?

Q. Yes.

A. Maybe. I don't remember.

Q. Okay. And do you remember what that -- what that representation would have consisted of?

A. Well, he probably had some drug cases or something along those lines. I don't remember. If you told me I represented him before this, it could be. I don't really remember. I remember he had an ongoing drug and alcohol problem.

Q. Do you have personal knowledge of that?

A. I had personal knowledge that he had been in and out of rehab. I have personal knowledge that he had a nickname among the gang members that was -- and I wish I could remember it -- that was based on his -- the amount of alcohol and/or drugs

Page 152

that he consumed that was significant. So I had some personal knowledge of that, and I'm sure that his brother probably told me that he has some issues.

Q. Did you ever -- did you meet with -- did you ever meet with Bryan O'Shea one on one?

A. Yes.

Q. And did you meet with him with his family?

A. Yes.

Q. And did you ever talk to -- do you remember talking to Bryan O'Shea about any drug or alcohol use?

A. I think so, but I don't -- it's been a while.

Q. Okay. Were you surprised when Bryan called you or paged you in September 1996?

MS. O'BRIEN: Objection. Form.

THE WITNESS: About this case?

BY MS. HAGY:

Q. Yes.

MR. STEPHENSON: I'm just going to object to foundation.

THE WITNESS: Okay. Yeah, I was surprised there were people knocking on the door about a

Page 153

double murder for Bryan because I just didn't see that as being in his makeup, and it wasn't.

BY MS. HAGY:

Q. Okay. So you did know him before that?

A. I think so.

Q. And you knew his family before that?

A. I knew his uncle, and then at some point, I had interactions with his brother, who was very impressive.

Q. And did you have any interactions with his mom?

A. I think I met him mom.

Q. Okay. When you talked to him, could you hear anything in the background when you talked to Mr. O'Shea on the phone?

A. At what point?

Q. Sorry. When you talked in September 1996.

A. When the people were outside his door?

Q. Yes.

A. I don't remember if there was anything in the background.

Q. And did you talk to his brother at that point?

A. I don't remember specifically when I

39 (Pages 150 - 153)

Page 154

talked to his brother. If I represented Bryan on a case before then, I probably talked to his brother at that time because his brother was trying to help Bryan. If it was later, I don't remember exactly where it was in context to this phone call with the investigator.

Q. And how did Bryan sound when you talked to him?

A. At what point?

Q. During the September 1996 phone call.

A. He was nervous. There were people outside of his door that wanted to talk to him about a double murder.

Q. And did he tell you what the murder was?

A. Not at that time.

Q. Did he tell you whether he knew what the murder was?

A. We didn't have that conversation. My immediate need was to see if I can back them off and set up a time to talk to Bryan and find out what was going on. To my surprise, after I talked to the investigators, they agreed to leave, and that made me happy because it indicated to me that he really wasn't a suspect in a double murder

Page 155

because if he really was a suspect in a double murder, he would have left in handcuffs.

Q. And had you -- prior to this time, had you represented anybody who was a witness in a case before?

A. Not that I'm aware of. I don't think I represented any of the Almighty Popes or whatever they called themselves.

Q. But had you -- sorry. That question wasn't clear.

Had you represented anyone who was a witness in a case, solely a witness in a case, before this time?

A. You mean outside of this one?

Q. Yes.

A. I'm sure I had. I can't tell you names, but I'm sure I had. It's not uncommon.

Q. Okay. How many -- as a criminal defense attorney, how many -- can you estimate how many cases you've worked on?

A. As a criminal defense attorney?

Q. Yeah.

A. Well, I mean, a very safe base would be, you know, 50 or 100 a year for 16 years, so more

Page 156

than 1,000.

Q. And how many murder cases had you worked on?

MR. STEPHENSON: Objection. Vague. Time frame.

THE WITNESS: Solely as a defense attorney?

BY MS. HAGY:

Q. Yes.

A. Probably my best estimate would be 50 give or take some.

Q. When you first talked to Bryan in that September 1996 phone call, did he tell you whether or not any of his friends had been arrested?

A. The first phone call?

Q. Yes.

A. The first phone call was him telling me there were people at the door and they want to talk to him about this case, me asking him to put them on the phone with me, me talking to them, and then me saying to them we have to talk about this, come in.

Q. Okay. So when -- after this phone call, do you remember when you first met with Bryan to talk about the case?

Page 157

A. It would have been after that night before we went to the first interview.

Q. Do you remember if it was directly before?

MR. STEPHENSON: Objection. Vague.

THE WITNESS: Do you mean did we have the conversation and drive to 26th Street, or do you mean -- it was in that time period, and it wouldn't have been me having the conversation and driving to 26th Street because after that conversation, excuse me, I had to have follow-up conversation with Scott Cassidy before I would bring him in.

BY MS. HAGY:

Q. Okay. So did you -- is it fair to say you talked to him sometime before September 20, 1996?

A. Yes.

Q. And did you meet in person?

A. I believe we did. I don't -- yes, we would have met in person.

Q. Okay. Did you review anything before you met with him?

A. You mean like police reports or something like that.

Q. Yes.

A. No. I didn't have anything.

40 (Pages 154 - 157)

Page 158

Q.   And would you say -- how was your memory of your meetings with Mr. O'Shea?

A.   My memory of my meetings with Mr. O'Shea is better than it would have been with someone else 28 years ago because apparently every few years I'm being reminded of things.

Q.   Do you remember where you met with Mr. O'Shea?

A.   At what point?  Which time?

Q.   I'm sorry.  During that first meeting.

A.   I believe it would have been my office, but I don't have a specific memory of the date or time.

Q.   Where was your office at that time?

A.   53 West Jackson, Monadnock Building, Suite 1650.

Q.   Okay.  Did you ever meet with Bryan at his house?

A.   I don't think so.

Q.   Did you ever --

A.   Could be, but I don't think so.

Q.   Did you ever meet Bryan with Mr. Jim O'Shea present?

A.   No.

Page 159

Q.   Did you ever meet with Bryan at a rehab facility?

A.   No.

Q.   Did you ever -- when you first -- when you went to the September 20, 1996 meeting, did you drive together?

A.   I'm sorry.  When we went to 26th and Cal?

Q.   Yes.

A.   I don't remember.

Q.   Okay.  Do you remember ever driving in a car with Bryan?

A.   Could have happened, but I don't remember it.

Q.   And during your first conversation with Bryan after the phone call but before you met with Mr. Cassidy, what did he tell you about -- well, did he know what murder they were wanting to talk to him about?

A.   Yes.

Q.   What did he tell you about any knowledge that he had in the case?

A.   Well, I can't give you verbatim, but in essence, what he -- they were all at somebody's house, all the guys that were in the gang, and that

Page 160

he was -- it was not clear to me whether he was fully in the gang or on the periphery or just a friend or a hanger-on, but he was, from my conversation with him, not active doing gang stuff.  He was about drinking and getting high and hanging out, and that, in essence, there was a van, and I believe it was parked at a park, and that angered their gang because it was a van that belonged to a rival gang, and that -- again, this is a long time ago.  They had gotten some guns, a gun or guns, from a burglary, and they were now the gang's guns and that there was a conversation about having to light up that van.

And then somebody gave somebody a gun or guns and then other guys went to, as I remember it, a park and shot up the van.  And I think that it was not their intention to kill these two little girls, but that these girls were in the van, and they probably didn't know about it.  And then after that, pretty much all hell broke loose.

Q.   And do you remember during that first meeting, did he tell you the names of any of the other people who were involved?

A.   I think he told me who was there and who

Page 161

went, who got the guns, who left, who went to go do the shooting.  I think he told me things like that.

Q.   Do you have any memory or knowledge of that now?

A.   Do I have memory -- I just told you my memory of what, in essence, he told me.  I don't have any notes or a file or anything from 1996.

Q.   Do you have any memory of any specific names that he told you during that first conversation?

A.   I don't remember the names of the people that are involved in this, but I remember that the names that he told me were the names that came up and were ultimately charged for different points of participation in this event.

Q.   But you don't have an independent memory of all those different names; is that --

A.   No, I don't.  I absolutely do not.

Q.   Okay.  So did you ever -- but prior to the September 20, 1996 meeting, did you meet with Mr. Cassidy in person?

A.   No.

Q.   So did you talk to him over the phone?

A.   Yes.

41 (Pages 158 - 161)

Page 162

Q. And do you know how many times you talked to him?

A. A couple. I know that the first conversation was the day after the investigators came that I would have met with Bryan. I don't know exactly when that was. And then I would have called Mr. Cassidy again after talking to Bryan to try and see what Bryan's telling me and what Scott Cassidy was telling me, if they lined up. And then after that, I don't know -- obviously, there would have been a phone call to talk about a next step, whether or not there would be immunity or a proffer or whatever. So I don't know how many phone calls that was, but those would have been the phone calls.

Q. And do you have an independent recollection of what Mr. Cassidy told you about the murders during that first phone call?

A. In essence or verbatim?

Q. Well, let's start with verbatim.

A. Verbatim, no.

Q. How about in essence?

A. In essence, he told me that some of the Popes, right, Almighty Popes, shot up a van, and

Page 163

there were two 13 or 14-year-old little girls in the van who were murdered and that the shooting started at somebody's house, and they were interviewing everybody that was at the house who wasn't directly involved in the criminal acts.

Q. Did he tell you whether anybody had already been indicted for the murders?

A. I don't remember that.

Q. Did he tell you the names of anybody who he was looking for information about?

A. Beyond Mr. O'Shea?

Q. Yes.

A. You mean like other witnesses or defendants? What are you asking me?

Q. Yes. Who was -- did he tell you who he was investigating?

A. No.

MR. STEPHENSON: Objection to form.

MS. O'BRIEN: Objection.

THE WITNESS: No. He only told me that he wanted to talk to Bryan O'Shea. I represented Bryan O'Shea who was a witness to some aspect of this event, and he was not going to share with me anything else, and I wasn't interested in anything

Page 164

else other than my client and his status.

BY MS. HAGY:

Q. And how did you and Mr. Cassidy figure out whether Mr. O'Shea had any information that Mr. Cassidy wanted?

MR. STEPHENSON: Objection. Form. Vague. And compound.

THE WITNESS: I don't understand what figure out means.

BY MS. HAGY:

Q. Well, did Mr. Cassidy tell you that he would give -- he would enter into a proffer or enter into the immunity that you were seeking just for any conversation with Mr. O'Shea?

MR. STEPHENSON: Objection. Form.

MR. HERACKLIS: Objection. Form.

THE WITNESS: I'll try to answer your questions. I think I know what you're asking me, and you can tell me if I'm not. The gist of the conversation was, that Mr. Cassidy said, that Bryan O'Shea was not a target for charges either directly or as an accomplice or accountable for the two murders. He said he's a witness.

And so I said -- I asked him questions

Page 165

about how I can verify that and asked for -- I would have asked for immunity. And then as we continued to talk, he said bring him in as a proffer. When I brought him in as a proffer, one of the possible outcomes could have been immunity, but after I heard what Bryan said over the course of two days and after his handwritten statement, I knew that Bryan was not remotely a target of being charged for the murders.

BY MS. HAGY:

Q. Do you remember how long was that first meeting with Mr. Cassidy on September 20, 1996?

A. I don't know. It wasn't short.

Q. Were you -- were you there for several hours, do you think?

A. Yeah. I mean, if you're asking me whether it was two hours or six hours, I would say it wasn't an hour. So whether it was two hours or four hours or, you know, longer, it wasn't short. It wasn't brief.

Q. And do you know at that time did you -- did you meet with Bryan alone during some of that time on September 20th?

A. We would take breaks and go out, and we

42 (Pages 162 - 165)

Page 166

would -- we stood in an area by the elevators that was -- the area that we were doing this was in a section of the State's Attorney's Office that I had never been in when I was a state's attorney. It was in -- it was -- I don't know. It was kind of an isolated place within the complex. And we got out of the room, and we were standing in the elevator -- past the elevators. There was a few feet before the windows that overlooked Division 1. We were there, and we would have -- that's where we would take our breaks and have conversations.

Q. And did you have a private room to meet in?

A. We could have, but the area that we were talking was very private and isolated, and I was comfortable that there was no one that could hear us.

Q. And what was Bryan's demeanor like that day?

A. You know, he wished that he wasn't caught up in this, and I think that he was -- he was reluctant to talk about one of the guys and much less reluctant to talk about other things and other people in the scope of it. So about 90 percent of

Page 167

it, he was pretty forthcoming, and then the 10 percent was what took the most time because he was walking on eggshells trying to minimize what this one friend, what his involvement and culpability would be. That's my guess.

Q. How did that reluctance manifest itself?

A. They would ask him questions, and he would be forthcoming and answer them without any difficulty. And then they would ask about the one guy or something about the guy, and then he would get hypertechnical like asking questions and want everything defined so he can answer it as narrowly as possible.

You know, sometimes -- you know, a couple times during the break, I would say Bryan it's about everybody. You have to be truthful about everybody. You can't pick and choose. That was the essence of how that conversation went.

Q. And did he ever tell them that that person was not involved?

A. No.

Q. Did he -- did he tell you that -- when you met privately, did he tell you that that person was involved?

Page 168

A. No. When we met privately, I said to him Bryan, you have to be truthful, and you have to be truthful in the entirety. You can't pick and choose.

Q. Did he tell you whether or not that person was involved when you talked to him about that?

A. So I wasn't present when the guns were handed out and the orders were given or whatever had happened. I don't know what happened there, and Bryan was there. My thing to Bryan was tell the truth. You asked -- there's another allegation that somebody said that I said just tell him what they want to hear, and that would never be the case because if they were testing him to see if he was telling the truth about something that I don't know about and it turns out he's lying, well, now he's a liar.

So my refrain to him was constantly tell the truth, tell the whole truth. And this --- unfortunately, it's not about what happens to them. It's about what happens to you, and the only way that you get hurt here is if you lie and get caught.

Q. And did you ask him was that person

Page 169

involved?

A. I didn't go through with him about what every party did and didn't do. It's my understanding there were a couple of people that went and did the shooting. It's my understanding there was a discussion, in essence, saying go light them up. That's how I remember it. I don't know if that's exactly what they said, but go light it up. And then the guns were handed out, and then people went and did the shooting.

At the time that that happened, Bryan was in the home and heard and saw what happened. I was not. I didn't know. I didn't know who all these people were. My -- all I would say to him is Bryan, just tell the truth. So I didn't ask him what did A do, what did B do, what did C do. All I cared about was him telling the truth.

Q. Where did you get your -- when you just said your understanding of what happened, where did that understanding come from?

A. From listening to Bryan give answers and the questions and the answers from the first interview and then the second interview.

Q. And do you know why -- you described

Veritext Legal Solutions
www.veritext.com
888-391-3376

Page 170

earlier that at the September 20th meeting, the proffer letter was signed pretty early on in that meeting. Is that fair to say?

A. It was a prerequisite to us having the conversation.

Q. So do you know why a written statement wasn't taken from Bryan during that meeting?

A. I can tell you why I think it wasn't.

Q. Well, do you know?

A. No. I can guess, but no, I don't know.

Q. Okay. Have you -- had you done other -- had you represented other people where a proffer letter was signed, where a proffer was signed?

A. Yeah. In federal court, I must have done it 50 times. It was pretty standard. In state court, a couple times.

Q. And would the proffer letter -- would sometimes the witness's statement be taken on the same day as the proffer?

A. Sometimes.

Q. And here in the proffer letter, you -- well, first of all, you dated the proffer letter, right, or there's a date on it; is that fair, Exhibit 21?

Page 171

A. Yes, 9/20/96.

Q. Is that your handwriting?

A. I don't think so, but it could be.

Q. And I noticed in the handwritten statements, you also -- if you look at it, when you signed, that's your signature, the second one, right? And is that your handwriting next to it with a date?

A. It could be.

Q. Was it important to you to have the date on things that you signed?

A. Yeah, it's important for me to have dates. It's important for like on the proffer letter when I make changes, that people initial it, so it's important. As a lawyer, you try to make things as -- maybe it's a belt and suspenders approach, but you want to try to make it clear.

Q. When the proffer letter was -- you said maybe it was on the table or maybe it was given to you. Do you remember did you look at it by yourself?

A. My client was sitting next to me.

Q. Did you look at it together?

A. Well, at some point, I explained it to

Page 172

him, but the first thing I would have done was read it. Whether he was looking over my shoulder, it really doesn't matter because I was going to make sure to explain it to him before. You know, to execute it, I wanted to make sure he understood everything, so I probably read it to him and the changes that were made. And so I would have reviewed it, and then I would have gone over it with him.

Q. And when you reviewed it, were you surprised when you saw the language that said that the State's Attorney's Office was currently in possession of evidence incriminating Bryan O'Shea? Were you surprised about that?

MS. O'BRIEN: Objection to the form.

THE WITNESS: No, I'm not surprised because this appears to have been a preprinted form that's used in instances of a proffer which shows that, yeah, they -- at the time, yeah, they were doing this. And this was probably -- I don't know my technological history, but that was back in the day where they were still using preprinted forms rather than computer printouts. So no, I'm not surprised it was there, and I did strike it because it was

Page 173

not applicable.

BY MS. HAGY:

Q. This letter, this proffer letter, has Bryan O'Shea's name in it several times, right?

A. Yes.

Q. So it was at least customized to the extent that his name was added quite a bit, right?

A. Yeah, that's true.

Q. Did you ask Mr. Cassidy why that language was in there?

A. I don't remember the conversation other than I wanted to strike it, and he agreed.

Q. Was the inclusion of that language contrary to what you expected to be in the proffer letter based on your conversations with Mr. Cassidy?

A. You can say that. This language didn't belong there, so it was stricken. So why it was there, it probably was just the word processor, and they put name in, and that was it. Like I said, I don't know if his signature was part of the preprinted or if it was -- or if he signed it that day or whatever, but it looks like a multiple long version. Whether it's the second, third, fifth or

44 (Pages 170 - 173)

Page 174

10th copy of it, it's not the original, but that language didn't belong in there. Gesundheit. God bless you. That language didn't belong in there, so I told him that that was unacceptable, and I told him I'd like to strike it. He agreed, and we did that.

Q. Did you ask Mr. Cassidy when you saw this language, did you ask him do you have incriminating evidence against Mr. O'Shea?

A. I probably would have asked it differently, but yeah, something like that.

Q. And do you know if you would have asked that question in front of Bryan?

A. Bryan was sitting next to me, and before I would let him open his mouth, we had to execute the proffer letter. I would have probably said something like Bryan is here as a witness. This language has to go unless you're telling me you have evidence against him. And he said no. He's a witness. I don't profess that this is exactly, but it would have been exactly like this.

We agreed to strike the language because Bryan was not there as a potential defendant in the murders of these girls. He was there as a witness,

Page 175

and the only potential charges that I believed he could get was primarily obstruction of justice if he went in and lied, and perjury, as you know, would not have been possible unless he lied under oath to the grand jury and or at trial.

Q. So when you -- you saw this language, and then you -- you said you wouldn't have let Bryan talk until this was signed, right?

A. This was a prerequisite. We were not going to begin the conversation until he had the protection of the proffer letter.

Q. Did you and Bryan go out in the hall and discuss it, or did you discuss it one on one before --

A. I don't remember.

Q. Do you remember whether -- if Bryan told you, you know, his reaction to seeing this language?

A. I was the lawyer, and I would have been explaining things to him. I don't think that Bryan had a level of sophistication to be -- he was relying on me. I was explaining to him I got the changes made so I was comfortable, and once I was comfortable, we were able to go forward.

Page 176

Q. And how old was Bryan at this time?

A. I don't know exactly, probably 21 give or take a year.

Q. Do you know if he had ever been a witness in a murder case before?

A. I don't know it, but I would guess that he never had been a witness in a murder case before.

Q. Did you know whether Bryan was under the influence of drugs or alcohol during this time?

A. I don't know if he had been drinking or smoking weed or doing anything else, but he was coherent. He was responsive to me. We were able to communicate, but I don't know that there were times where he -- that there were many days back then where he wasn't using something.

Q. So you have the impression that he was basically using some substance every day back then?

MR. STEPHENSON: Objection. Mischaracterizes his testimony.

THE WITNESS: I believed he was sober when we were having this interaction. If he were sober when he had that interaction, my guess is that night he would have ended his sobriety and finished the night using whatever his drug of choice that

Page 177

day would have been or alcohol.

BY MS. HAGY:

Q. Now, when you testified in 2003 that you remember Mr. Cassidy using the word bullshit at some point, when was that that you remember him using that word bullshit?

A. First of all, it would have only been the day that we had the interview where Scott Cassidy was there because the second one Scott Cassidy was not there, so it had to be that day. When he used the word bullshit, he was saying to Bryan look, all we want is the truth. We don't want any bullshit. Just tell us the truth.

So it wasn't him confronting him going bullshit, bullshit, bullshit. It was like we don't want any bullshit. Just tell the truth, tell the truth.

And Bryan would do a pretty good job on most of it, but when he got to his one buddy, then it would be -- that would be the time Scott would say come on, Bryan. No bullshit. Just tell us what happened. All we want is the truth. And that was constantly saying to him Bryan, just tell us the truth.

45 (Pages 174 - 177)

Page 178

You know, they knew a lot from talking to other people, so they were very patient with Bryan because he was good at a lot of it, and some of it he was -- he hit the slow-down button.

Q. And during your career in that time as a defense attorney, were there other times when you heard a prosecutor use the word bullshit to a witness?

A. Outside of court or in court? Outside the court, sure. In court, no.

Q. And how about in a proffer negotiation, had you heard prosecutors use that --

A. In virtually --

MS. O'BRIEN: Objection. Mischaracterizes the testimony.

THE WITNESS: In virtually every proffer I ever did in federal court, they followed the three walk-out rule, and that was you would sit down with your client. Your client, we'd tell them at some point, the prosecutor with his hand would say bullshit, you're a liar and walk out. Then the agent would bring him back in and say we're going to give you one more chance. So go along, go along, go along. Then the second time, he goes you

Page 179

were doing okay, but now you're bullshitting. The deal is off. Everything is off. Screw you. You're in trouble. I'm going to put you under the jail.

Then they would go out, and then the third time, and then it would be -- you know, we would finish it, and everything would be fine. And I would prepare my clients that in federal court, they were -- I think they were at that point kind of trained in that way to challenge the witnesses, but that wasn't something that I saw -- first of all, that didn't happen in this case, but that was something that happened pretty regularly back when I was a defense attorney doing proffers at 219 Dearborn, 219 South Dearborn, federal court.

BY MS. HAGY:

Q. When was the time that you were doing that?

A. I practiced criminal defense from 1989 to 2005. In my practice over time, I did more and more federal work. So between, let's say, 1990 and 2005, what is that, 10, 15 years, so more and more increasing, yeah.

Q. And so -- and you said you've done about

Page 180

50 proffers in federal court?

MR. STEPHENSON: Objection. That mischaracterizes his testimony.

THE WITNESS: I said I've done a lot. I think that you asked me how many murder trials I did, and I said probably 50 give or take.

BY MS. HAGY:

Q. Okay. Sorry. Apologies.

But you said you've done quite a few proffers in federal court, right?

A. Yes.

Q. And you just said that that three walk-out rule was pretty -- that happened in almost every federal proffer?

A. No. What I said is that I would prepare my client because that was not unusual. It would happen somewhat regularly.

Q. So it was something that you were kind of used to?

A. Yeah, but it didn't happen in this case.

Q. And would you -- did you usually remember when it did happen, or was it pretty commonplace in your work?

A. Well, you're asking -- you're conflating

Page 181

two different things that you asked me. So you asked me about bullshit being used in this case, and I told you that it a nonconfrontational where Scott said something along the lines of come on. Don't bullshit us. All we want is the truth.

In federal court, which is what you asked me about had I heard the word bullshit before, and I told you yeah, it was common in federal court when the assistant U.S. attorneys would often accuse the clients of that. And I would warn my clients that they -- if they storm out of the room and they tell you that, you have to tell the truth, and sometimes they'll do that just to make sure that you understand that you have to be truthful and not downplay something or try to mislead them in any way.

So you asked two different questions with two different answers. When Scott Cassidy was using the word bullshit, he was saying to him come on, Bryan. Don't bullshit us. All we want is the truth. Then you asked me have I ever heard it before, and in federal court, I've heard it quite a few times.

Q. Had you heard it in state court before in,

46 (Pages 178 - 181)

Page 182

you know, plea agreements or proffer agreements?

A. In court?

Q. No.

A. People didn't use profanity in court.

Q. Right. Just outside of court, right?

A. Outside of court, my client would not be part of the plea negotiation between me and the prosecutor, so it would be me talking about mitigation and the prosecutor talking about aggravation and what they wanted and what I wanted. And sometimes we could agree, and sometimes we couldn't.

If we couldn't agree, we'd do a 402 conference and talk to the judge, and the judge would say what she or he was willing to do. So, you know, if I said to a prosecutor hey, this is a class X felony, can my guy get probation and he said no way or said you're nuts or FU or something like that, was that possible? It could have happened, you know, but not with my client involved in it. That just didn't happen.

My client was never involved in a plea negotiation or a 402 conference. They weren't involved. It was the lawyers only. Does that

Page 183

answer your question?

Q. No.

A. I'm sorry. Ask me another one. I'll try to do better.

Q. Did you ever hear a state's attorney, a different state's attorney, use the word bullshit to one of your clients?

A. They didn't talk to my clients. They might have used it to me, but they -- I mean, the King's English wasn't the only thing uttered at 26th and California, but they didn't have any interaction with my clients. So if I was talking to them about the case, it would be in the back. It would be in the hallway, but my client would not be there for that conversation, and the state's attorney would not be talking to my client because that could be a problem for the state's attorney because you can't -- they can't talk to a client who's represented by an attorney without the attorney's permission.

Q. Would you say that as a defense attorney, that this kind of like rough language was maybe something that you were accustomed to?

MR. STEPHENSON: Objection. Form.

Page 184

THE WITNESS: I would say that's a very fair statement.

BY MS. HAGY:

Q. Can you elaborate?

MS. O'BRIEN: Objection.

MR. STEPHENSON: Actually, before you answer that, Larry, can I just get the last two questions back, please.

(Whereupon, the record was read as requested.)

MR. STEPHENSON: I'm going to object to the form. If you understand the question.

THE WITNESS: I'm sorry. You want me to elaborate on that?

BY MS. HAGY:

Q. Yes.

A. I'm married to a wonderful woman who is not a lawyer, and she's spectacular, and I thank God every day. And she points out to me if I use a profanity. She will say to me you would never use that word in front of the queen. The queen is Judge Kathy Flanagan, who is my friend and mentor and is very -- well, the nickname the queen says it all.

Page 185

And so yes, my time from the mid '80s until 2005 being in the criminal milieu, there was some rough language, and I'm doing my very best to step away from using that language. I've gotten to the point where I, when I get upset, will say mother loving son of a pup, which replaces something else. And I'm trying to use fudgie bear instead of something else.

So I'm trying, but yes, there's bad language in that milieu. Is that -- do you want me to elaborate any further?

Q. No. Thank you.

How tall is Mr. Cassidy, do you know?

A. I don't know. He's not especially tall or especially short, so whatever an average male is, that's how I perceive or remember him.

Q. Do you remember how big Bryan O'Shea was at this time?

A. No. I mean, again, I think he was on the taller side. I don't know if he was 6'3" or 5'11", but I think he was probably closer to 6'3" than 5'11", but I don't know. He slouched a lot.

Q. When Mr. Cassidy told Bryan not to lie, did you have any understanding what Mr. Cassidy

47 (Pages 182 - 185)

Page 186

would consider was a lie?

MR. STEPHENSON: I'm just going to -- before you answer, Larry, real quick, I'm going to object. Form. Mischaracterizes prior testimony. Go ahead.

THE WITNESS: He didn't say don't lie. He -- again, Bryan was very forthcoming in a lot of it, but we would get to certain spots where we were like now stuck in the mud, and he would say to him come on, Bryan. Don't bullshit. Just tell me the truth. He never said to him you're a liar or you're lying or anything like that.

And Bryan, it wasn't him telling a lie or anything like that. It was him basically not wanting to discuss his one friend. So that's the point where Scott would say come on, Bryan. We know a lot of this already. We just want you to -- we just want to know you telling us. Just tell us the truth. We just want to know what you saw, what you heard. That's it. And don't bullshit us. Just tell us the truth.

BY MS. HAGY:

Q. And did Bryan tell you maybe not in these words, but did he tell you directly I have one friend who I don't want to discuss?

Page 187

A. No.

Q. So how did you glean that? From his behavior?

A. Yeah. I mean --

MR. STEPHENSON: Objection. Asked and answered.

THE WITNESS: -- it became obvious to me because it was only one area that he would kind of slow down and dig his heels in, and that was whenever the conversation shifted to one person. And I apologize. I don't remember the name of who that person was.

I also got the impression that one of the people he wasn't real keen on, but I don't remember the name of that person either. But basically he was fine for all of them except for when it came to his pal.

BY MS. HAGY:

Q. And did he tell you directly like this one is my pal?

A. I think at one point, I asked him. I said to him you have to talk about everybody, including this guy, and I said what is he, your best friend or something? And he said something along the

Page 188

lines of yeah, we grew up together. So it became obvious that one of the guys was special to him.

Q. Did you have -- did you get the impression from Bryan that he wanted to cooperate?

A. I got the impression from Bryan that he wished he wasn't there when this jumped off, and he was in a very bad place, and this was the biggest thing in his life because he was forced to tell what happened.

Q. And he -- is it fair to say he didn't want to be charged with murder?

A. Yeah, I think that's very fair to say.

Q. And is it fair to say that the state's attorney made it clear to him that if Mr. O'Shea was not truthful, he could be charged with perjury?

MR. STEPHENSON: Objection. Form.

THE WITNESS: Well, first of all, the state's attorney -- I'll take that as all of the state's attorneys I dealt with, the three of them. That's not an accurate statement. What happened was I made it clear to him and they made it clear to him that if he was truthful, there would be no -- nothing he could be charged with. The murder -- he was not involved in the murder either directly or

Page 189

as an accomplice or in any way accountable for that. So that was off the table.

So it was you -- it was made clear to him that if he was truthful, then he had no problems. He was not going to be charged. The conversation I had with him on multiple occasions was explaining the difference between obstruction and perjury. And in essence, what I said to him was obstruction will be if you go and you lie to the prosecutors. The perjury would be if you lie in the grand jury or at trial under oath, and I explained those things to him. And that was his understanding going into this.

BY MS. HAGY:

Q. And during this meeting, was it made clear to Mr. O'Shea during the meeting with the prosecutors that if he did not cooperate, he could be charged with obstruction of justice?

MR. STEPHENSON: I'm going to object real quick. The question is vague. There's more than one meeting. There's more than one prosecutor. If you understand the question.

THE WITNESS: So in the first meeting and the second meeting, they never said to him we're going

48 (Pages 186 - 189)

Page 190

to charge you. What they said to him is you have to tell the truth. We had already explained to him that pursuant to the proffer, his speech was protected as long as it was truthful.

I explained to him if he was truthful, he could not be charged with obstruction or perjury. I explained the difference between obstruction and perjury. There was never a time in either of those meetings that I was present where the prosecutors threatened Bryan with prosecution of the murder or of any other charges.

BY MS. HAGY:

Q. Do you remember giving testimony in the post-conviction hearing in 2003?

A. Yes, ma'am. Sheet and line, please.

Q. Yes. Page 26. And I forget is this Exhibit --

A. I have 19.

MR. STEPHENSON: This is 19.

MS. HAGY: Oh, sorry.

BY MS. HAGY:

Q. Okay. So it's Page 26, and then starting on Line 2. So it says -- and just to -- let's go back for a second because I want to make sure that

Page 191

it is clear who was questioning you during this time because honestly I don't know. So this is a cross-examination by Mr. Cohen, who at that time represented Mr. Sopron it looks like.

So he said you also told him if they don't think you're cooperative, they could try and get you for obstruction of justice, right? And you said yes?

A. Yes, that's correct.

Q. Okay. And then it says you not only told them that, but Scott Cassidy told him that in front of you, right? And you said I think so. I don't recall. Is that fair?

A. Yeah. That's what it says.

Q. Okay. And how would you answer that question now?

A. Well, I would say the same thing. If you read the next question, it says well, certainly he was told that by a member of the State's Attorney's Office. The answer is it was made clear to him. Let's put it that way.

So I would say that what I just testified to was that I made it clear to him the difference between obstruction and perjury, and I told him as

Page 192

long as he told the truth, he could not be charged. So if you want to call this impeachment, God bless you.

Q. The next place where it says it was made clear to him by a member of the State's Attorney's Office in your presence if he was not truthful, he could be charged with perjury, correct, and then you said I would agree with that, yes?

A. Yes. And I stand by this statement, and I stand by what I said today, which is, as I said, made it clear to him that as long as he told the truth, he could not be charged, and I explained the difference between obstruction and perjury to him.

Q. And would you agree that with the testimony before that somebody from the State's Attorney told him that if he wasn't truthful, he could be charged with perjury?

A. No. I -- are you talking about Line 11, it was made clear to him, let's put it that way?

Q. No. I'm talking about Lines 13 to 16.

A. 13 to 16, it was made clear to him by members of the State's Attorney's Office in his presence that if he was not truthful, he could -- well, again, I said I would agree with that. This

Page 193

doesn't mean that they said we're going to charge you with perjury. It was both myself and the state's attorney told him that he had to be truthful, and as long as he was truthful, he would not be charged with obstruction or perjury. So I stand by this testimony and what I just told you today.

Q. Okay. So going back to the proffer letter for a minute, do you have a memory of whether or not Scott Cassidy signed this letter in your presence?

A. As I said, there's a point here for a signature, and I don't know if it was preprinted when the form was given to me or if he signed it that day. This was a preprinted form, which we've gone over, which I made the changes. And all I can tell you is that on the bottom, there's a signature where Brian signed, where Colleen Hyland signed as a witness and where I signed, and it was dated. This signature from Scott Cassidy is either him affixing it there or preprinted, and I don't have a recollection.

Q. Would you have expected him to sign it?

A. You mean by hand or this?

49 (Pages 190 - 193)

Page 194

Q. Well, by hand. Would you expect somebody from the State's Attorney to sign it not only as a witness?

A. Well --

MR. STEPHENSON: I'm going to object to the form of the question to suggest that it's not signed by Scott Cassidy.

THE WITNESS: I was satisfied that Scott Cassidy's signature there as either mechanically reproduced or by his hand and the signature by Colleen Hyland provided the protection to make -- to provide the legal efficacy for this letter.

BY MS. HAGY:

Q. Okay. So would you consider Ms. Hyland to be a party to this letter?

MS. HAGY: Objection to the form.

THE WITNESS: I would consider the parties to this letter to be Scott Cassidy, Colleen Hyland on behalf of the State's Attorney's Office, Bryan O'Shea, and me as his lawyer. I would consider those to be the parties binding on the State's Attorney Office.

BY MS. HAGY:

Q. Okay. So do you know or do you remember

Page 195

how you understood -- how you were informed that Bryan needed to return to talk to the state's attorney on September 26th?

A. No.

Q. Do you remember how Bryan got there that day?

A. No.

Q. So did you did you know that Bryan was in rehab at --

A. St. Mary's?

Q. Yes.

A. I knew he was in rehab at one of the hospitals on 95th Street. There's two of them, Christ and St. Mary's, I think, they are. He was at one of them, but I don't remember if he was at it before, during, or after, but it was contemporaneous to the beginning of this chaos.

Q. Okay. So did you know that he was in rehab as of September 23, 1996?

MR. STEPHENSON: Objection. Asked and answered.

THE WITNESS: I'm sorry if I wasn't clear. I knew he was in rehab at some point around the time that this was happening. I don't know if he was in

Page 196

before our first meeting or he was in between these two meetings or was there after, but I know at the time that this was going on, he was in and/or out of rehab. And I know that it was at one of the hospitals on 95th Street, whether it was St. Mary's or Christ. Is it St. Mary's on 95th Street? There's two Catholic hospitals on 95th Street.

Q. Okay. And so did you tell Ms. Hyland or Ms. Sullivan on the 26th that Bryan was in rehab at that time?

A. I don't know if he was in rehab at that time. I know -- this will be the third time. I know at some point before, during, or after he had been in rehab. So I don't know when exactly it was. I don't have any recollection of rehab being talked about during either of these meetings.

Q. Okay. And so I'm going to -- I'm sorry that I don't remember what exhibit we're on.

MR. STEPHENSON: Your next exhibit is 23.

MS. O'BRIEN: Are you marking one?

MS. HAGY: I am. So Counsel, this is going to be Morfin-Kogut 1081 to 1082.

Page 197

(Whereupon, Deposition Exhibit No. 23 was marked for identification.)

BY MS. HAGY:

Q. Is it fair to say you don't remember having a conversation with Mr. Kogut and Mr. Walsh in the hallway of the court?

MS. O'BRIEN: Objection.

MR. STEPHENSON: Mischaracterizes testimony.

THE WITNESS: I would not have had a conversation with Kogut, period. Now, if they tried to walk up on me, I would have said I'm not talking to you just like when you tried calling me. I said I'm not going to talk to you for the same reasons.

So this affidavit, I think this is the first time I've seen this. I don't know, but this is absolute -- this is absolutely 100 percent untrue that I had a conversation with Mr. Kogut and these two other people. It didn't happen.

BY MS. HAGY:

Q. Okay.

A. It doesn't mean they didn't try, but this did not happen.

50 (Pages 194 - 197)

Page 198

Q. Okay. So why is it that -- can you explain a little more why you wouldn't talk to Mr. Kogut?

MS. O'BRIEN: Objection.

THE WITNESS: I found him to be untrustworthy. I met him through Nick Trutenko, who recently got indicted for perjury. The two of them were best friends. I didn't want anything to do with them. I didn't trust them, and this bears out my concern about Mr. Kogut because I -- first of all, I wouldn't had a conversation with them without a prover. I wouldn't have had a conversation to begin with, but I certainly wouldn't have a conversation without a prover.

Second of all, I wouldn't have talked to them about my client. And this where they're saying that I had this conversation, no. I would not have voluntarily had a conversation with Kogut ever.

BY MS. HAGY:

Q. Okay.

A. In case it's unclear, I deny that September 23, 1997 that I had a voluntary conversation with them. Not that they didn't try.

Page 199

They could have tried. They could have walked up on me, but I would not have talked about my client, and I would not have talked to them at all because there is no advantage to my client or me because they can say whatever they want to say, and this is not true.

Q. Okay.

A. Not only that. This has things in here that I didn't know, so this is more complete fabrication on behalf of Mr. Kogut.

Q. What does it say that you didn't know?

A. Well, as I told you, I knew that Bryan O'Shea was at rehab at some point, and I didn't know the dates, and this is them saying that I knew specific dates.

Q. Okay.

A. I just would not have had that conversation with Mr. Kogut under any circumstances. It doesn't say where this happened. It doesn't say, but in essence, it's saying that I agreed to talk to a lawyer that I don't trust at all, a lawyer that I don't know, and a third person who I have no idea who this person is and that I would have then had a conversation with them about

Page 200

my client.

No, that would not have happened. It did not happen. You can bring these guys in, and I'm happy to have that -- to talk about this now. That did not happen.

Q. Okay. Is it possible that closer to the time that you did know what dates Mr. O'Shea was in rehab?

A. Is it possible?

MS. O'BRIEN: Objection to the form of the question.

THE WITNESS: It's possible, but this statement is a lie.

BY MS. HAGY:

Q. Sure. But in -- I understand your testimony, but in 1996, in September 1996, he was your client, right, Mr. O'Shea?

A. Yes.

MS. O'BRIEN: Objection to the form. '97.

MR. STEPHENSON: No, '96.

MS. O'BRIEN: It says '97.

THE WITNESS: Go ahead. Yes, he was my client in 1996.

Page 201

BY MS. HAGY:

Q. And you were actively representing him, right?

A. When did this trial go? When was the trial?

Q. Well, there were several trials.

A. Okay. Was there a trial after September 23, 1997?

Q. Yes.

A. Do you understand the absurdity that I'm going to -- that they're going to walk up to me, and I'm going to talk about my client and his testimony when he still has to testify in a case? That's ridiculous.

Q. Okay.

A. That just points out how much of a lie this is. There's no way that I could talk about my client or his testimony when he's a witness in ongoing cases. You know that.

Q. Okay. But in September 1996, you were actively representing Mr. O'Shea, right?

A. Correct.

Q. And so would you at that time have known when he was in rehab?

51 (Pages 198 - 201)

Page 202

MR. STEPHENSON: Objection.

MR. HERACKLIS: Objection. Asked and answered.

THE WITNESS: I promise you that I knew that he was in rehab before, during, or after, but I didn't know the specific dates.

BY MS. HAGY:

Q. Do you remember if Mr. O'Shea was transported to any of these meetings by the Cook County State's Attorney's investigators?

A. I don't remember.

Q. You don't remember either way?

A. I don't remember how I got there. I presumed I drove there. I don't know how Bryan got there. I just don't remember.

Q. Do you remember -- when you were meeting with Bryan O'Shea and Mr. Cassidy, do you remember Mr. Cassidy saying anything to Bryan like I don't want to hear it?

A. No.

Q. Did you think that -- was Mr. -- did Mr. Cassidy show any frustration during that meeting?

A. Well, he kept saying to Bryan, Bryan, just tell the truth, and he would say things to him

Page 203

along the lines of we have a lot of -- we know a lot about what happened. We just want to hear you tell us what you saw, what you heard. That was -- that was pretty much it. So if you want to say he was getting frustrated, you know, Bryan was very forthcoming on some things, and then on some things, he would try to shut down because of his one pal.

Q. And did Mr. Cassidy indicate to Bryan that he knew things -- that Mr. Cassidy already knew things about that one pal?

A. Say that again.

Q. Did he communicate to Bryan that he already knew that Cassidy himself already knew things about that one pal?

A. In my preparation with Bryan, I told him over and over again they'll ask you nine questions -- 10 questions. They know the answer to nine, which is how they gauge whether you're telling the truth. So when they're asking you questions, I don't know what it is that they don't know or what they do know, but you have to tell the truth. And that was something that in every break, I would impress upon Bryan that he would have to be

Page 204

truthful because I don't know what they knew, and I didn't know what Bryan knew.

Q. Do you remember if Mr. Cassidy already said we know these things about this one pal?

A. I don't know if he said about one pal, but he would say Bryan, we know a lot about what's going on. We just want to hear you tell the truth.

Q. Did you ever have a conversation with -- well, after September 20, 1996, did you -- was Mr. Cassidy -- do you remember whether or not he was present at any time when you went to the State's Attorney's Office on September 29th?

A. September 26th?

Q. September 26th.

A. I don't remember. I don't know if he popped in to say hello, but during that conversation, it was Colleen Hyland doing the questioning, Laura Sullivan in the background. It was me and my client.

Q. On the handwritten statement, you didn't -- you signed the last page, right?

A. Correct.

Q. And you didn't sign every page at the bottom, right?

Page 205

A. No.

Q. And was that typical that you would sign the last page, but not every page?

MS. O'BRIEN: Objection. Form.

THE WITNESS: I don't know if it's typical. Some of the pages are signed. Some are initialed. I didn't. I don't know why, but I signed the last page. I don't remember why I didn't sign or initial the other pages.

BY MS. HAGY:

Q. And so do you remember after -- do you remember any other meetings that you had with Mr. Cassidy about this case?

A. I don't remember having any meetings with them. Once Bryan had given his testimony in front of the grand jury, he was a witness, and I was not hovering on this case anymore.

Q. Did you have any conversations about -- with Mike Smith about this case?

A. Not that I remember.

Q. And do you know if ASA Smith or ASA Cassidy ever asked you to meet with them again with Mr. O'Shea?

A. Could be. I don't remember that, but it

52 (Pages 202 - 205)

Page 206

could be.

Q. And did -- do you remember if Mr. O'Shea or Mr. Cassidy told you before Eric Anderson's trial on June 16, 1997 that Bryan was saying he couldn't remember anything?

A. I have a specific memory of Bryan asking me, in essence, what if I can't remember, and we had that conversation, and we've already covered that. I can do it again if you want, but I don't remember -- it could be, but I don't remember either -- I don't remember talking to Mike Smith at all on this. It could be, but I don't remember either of them reaching out to me saying, you know, he's saying he doesn't remember anything, but I do remember Bryan asking me, in essence, would that be an out for him.

Q. But you don't remember somebody from the State's Attorney talking to you about it?

A. It could be, but I don't remember. I'm sorry.

Q. Okay. And do you remember whether you told Jim Kogut at some point in August 1997 not to talk to Bryan without you?

A. Well, he, obviously wouldn't listen. He

Page 207

didn't care about the attorney-client relationship because he is what he is. I don't -- I'm sure I did tell him that because they were all chasing him, but they kept chasing him.

Q. Do you remember talking to someone named -- do you remember whether or not you ever talked to someone named Carmen Aguilar about this case?

A. Carmen Aguilar, the judge, now judge?

Q. Honestly I just don't know.

A. She was a state's attorney at that time?

Q. Yes.

A. I don't remember talking to Carmen about this case.

Q. Okay. Do you remember when you first learned that Mr. O'Shea had talked to Pat Walsh about this case?

A. No.

Q. Do you remember who told you about that?

A. No.

Q. Do you remember who asked you to testify in the September 2003 post-conviction hearing?

A. Do I remember who asked me?

Q. Yes.

Page 208

A. No.

Q. Do you remember talking to Kurt Smitko about this case?

A. I know Kurt Smitko was a prosecutor, but was that the person that put me on?

Q. So I'll just be honest with you. I'm reading this, so I --

A. So he would have been the state's attorney that put me on?

Q. I don't -- I don't know. I'm sorry. I'm looking now.

A. I remember Kurt Smitko being a prosecutor, nice guy. I don't -- it looks -- looking at the transcript, it looks like Mr. Smitko was asking me questions. So it looks like he was the -- excuse me, the person that called me as a witness, either him or Mr. Ackerman. No, direct examination, Mr. Smitko. Yeah, Mr. Smitko did the direct, and I think that Neil Cohen, Judge Cohen, did the cross-examination, I think.

Q. Okay. So do you remember talking -- before this talking to Mr. Smitko about this case?

A. I don't, but I would have, but I don't remember that conversation.

Page 209

Q. Okay. And do you remember talking to Mark Etler -- Ertler about this case? And I'll tell you I'm just saying that because his name is on this front page.

A. I don't remember Mark Ertler being involved in this case, but if he was partners with Smitko, there's a real strong chance that I talked to both of them, but I just don't remember.

Q. Do you remember if they showed you the transcript of Bryan's discussion with Mr. Walsh?

A. I don't remember.

Q. Do you remember reading that transcript at any point?

A. No.

Q. Did you remember -- at this hearing, did you listen to Bryan testify?

A. No.

Q. Do you remember how you prepared to testify on September 3, 2003?

A. No.

Q. And at this time, was this during -- you said at one point, you were applying to become an associate judge. Do you remember what time that was that you were applying for that?

53 (Pages 206 - 209)

Page 210

A. Well, I can tell you that I made it in 2005, and I did not make it the time before. And it was probably 2003 because there was probably about two years between them. So whether or not the applications were before or after this, I don't know.

Q. And do you remember when you found out what Bryan said that you had said to him, was that upsetting to you?

MS. O'BRIEN: Objection. Form.

MR. STEPHENSON: Also mischaracterizes.

MS. O'BRIEN: No foundation.

THE WITNESS: The lawyers that have been pursuing this case on behalf of the defendants now plaintiffs pursued Bryan from the very beginning, and they have been trying over and over again to have this overturned. So I was not surprised, and I was not upset because I knew that if Bryan didn't move out of the neighborhood, he would be subject to harassment, incentives, enticements, anything to get him to recant.

So I was not surprised. I'm sad because I think that this -- that Bryan was not in a good place when this happened, and I think this probably

Page 211

knocked him off course to being able to get to a good place.

BY MS. HAGY:

Q. Did you witness any harassment of Bryan in his community?

A. No, ma'am. I was not in his community ever.

Q. Okay.

A. I mean, I don't know. He lived -- isn't it by Midway Airport? I've driven by, but I didn't spend time, nor did I then spend any time in the neighborhood.

MS. HAGY: Okay. I think I'm finishing up. If we can just take a five-minute break.

MR. STEPHENSON: Just take 10. I feel like every five-minute break turns into 10, so just take 10.

THE WITNESS: Well, then wouldn't the 10-minute break turn into 15?

THE VIDEOGRAPHER: This ends media unit 4. Now going off the record at 3:11 p.m.

(Whereupon, a short break was taken.)

THE VIDEOGRAPHER: This begins media unit No.

Page 212

5. Now going back on the record at 3:26 p.m.

MS. HAGY: I think I actually am done. I am done.

FURTHER EXAMINATION

BY MR. STEPHENSON:

Q. Larry, the handwritten, was it done on the same day as the proffer meeting on September 20th?

A. No.

Q. Do you have any idea why that might be?

A. Oh, I think they wanted to verify things that they were told and come back and get things, you know, nailed down.

Q. The proffer letter that's marked as Exhibit 21, there are lines that are crossed out in Paragraph 3, right?

A. Yes.

Q. When you crossed that line out, that second sentence there in Paragraph 3, did Scott Cassidy push back at all?

A. Well, I wouldn't have crossed it out until we had an agreement. I don't just mark things. We agreed. I don't remember any real push-back on it. I think it was this shouldn't be here. Yes, you're right. I'm going to strike it. Okay. Initial.

Page 213

Initial. Let's go.

Q. Was that a quick conversation then?

A. It probably was. I mean, I can't tell you exactly how long it was now.

Q. After you crossed that line out and you signed the document with all those present, did you meet with Bryan privately to discuss these terms?

MS. HAGY: Objection. Form.

THE WITNESS: I'm sure that we went over it, and we didn't proceed until after I explained it again to him.

BY MR. STEPHENSON:

Q. And when you met with him -- let me rephrase.

When you did meet with him privately, did you make it clear to Bryan that the State didn't have any evidence against him in connection with the murders?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I told him that that he has no exposure for the murders, that as long as he told the truth, he was going to be fine and that -- I explained to him again that under this setting, if he went in and lied, he could be charged with

54 (Pages 210 - 213)

Page 214

obstruction. And if he persisted and lied under oath in the grand jury or a trial, he could be charged with perjury.

I didn't think he could be charged with perjury if he just lied to them in the course of their investigation, but I did believe he could have potentially been charged with obstruction. So we had that conversation again. I had that conversation with him multiple times.

BY MR. STEPHENSON:

Q. And he acknowledged that he understood what you were telling him?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Yes, he understood.

BY MR. STEPHENSON:

Q. Larry, during cross-examination, you were explaining generally how the proffers go with the AUSAs in federal court.

MS. HAGY: Objection. Form.

BY MR. STEPHENSON:

Q. In light of that testimony, can you please describe whether that's how it goes or proceeds in state court, or is it different?

A. I've never had an assistant state's

Page 215

attorney's in a proffer do that show. I've had it happen in federal court multiple times. I'm not saying it happened every time, but it was something that I would advise my client about going in that the AUSA may storm out once or twice in order to put the fear into them that they could blow their proffer agreement.

In federal court, most of the proffer agreements were for plea negotiations. Under the federal guidelines, acceptance of responsibility is a departure. Substantial assistance is a departure. Early acceptance is a departure. So it's advantageous to someone in federal court if they're going to plead guilty that they do a proffer and they go in and basically confess their sins.

Q. Okay. And that proffer experience is different than what you experienced at the state level in the Cook County's State's Attorney Office?

A. Completely different.

MS. HAGY: Objection to form.

THE WITNESS: I'm sorry. Completely different.

BY MR. STEPHENSON:

Q. Did you testify earlier that you knew of

Page 216

instances generally that Bryan was pressured in the neighborhood when they knew that he was going to testify at the criminal trials?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: When this happened, the neighborhood was, from my observation, split into two factions. Everybody except the decedent's families were working to get any of the potential witnesses to not cooperate or testify.

BY MR. STEPHENSON:

Q. And do you know that because of discussions you had with Bryan, or was there another source?

A. I knew that from Bryan, and periodically I would hear different things through the lawyer gossip at 26th Street.

Q. So there were specific conversations that you had with Bryan where he told you he was at least the recipient of some of this pressure?

A. There was one specific time where he was confronted, and I told him to call the police. I think he was -- I think he was physically assaulted. I don't -- I'm not 100 percent sure on that, but he certainly was accosted.

Page 217

MR. STEPHENSON: Larry, that's all I have for you.

MS. O'BRIEN: Okay, Judge. I have a few questions, okay?

FURTHER EXAMINATION

BY MS. O'BRIEN:

Q. Since testifying in 2003, has anyone from the Cook County State's Attorney's Office contacted you regarding Bryan O'Shea?

MS. HAGY: Objection. Form.

THE WITNESS: Not that I remember.

BY MS. O'BRIEN:

Q. Since testifying in 2003, has anyone from the Cook County State's Attorney's Office contacted you regarding the Matthew Sopron case, murder case?

A. Well, all of the post convictions were denied, so I thought the case was over. So I don't remember anyone contacting me until I got the card on my door and called Mr. Stephenson and told me there was a subpoena for me.

Q. Right, but he's not with the Cook County State's Attorney's Office. Would you agree?

A. Right. What I was saying was in the interim, I don't remember anybody reaching out to

55 (Pages 214 - 217)

Page 218

me.

Q. Since testifying in 2003 on the post-conviction hearing, has anyone from the Cook County State's Attorney's Office contacted you regarding the Wayne Antusas murder case?

A. No.

Q. Since testifying in 2003, has anyone from the Cook County State's Attorney's Office contacted you regarding the Nick Morfin murder case?

A. No.

Q. Now, you had previously said that something to the effect that Scott Cassidy said well, we know what happened or we kind of know what happened. Is that a fair characterization of your testimony?

A. I think he said we know a lot.

Q. But did he provide those details of what he knew to your client, Bryan O'Shea, during any of the meetings that you had either in -- in September?

A. No.

MS. HAGY: Objection. Form.

THE WITNESS: Sorry. No.

Page 219

BY MS. O'BRIEN:

Q. During the time that you spoke with your client with Scott Cassidy present on the 20th of September 1996, did Scott Cassidy tell O'Shea that he knew that he was at Nick Morfin's house and heard Matt Sopron give an order to shoot at the Ridgeway Lords? Did Scott Cassidy say that to your client?

A. No.

Q. Is it fair to say your client told Scott Cassidy that?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. Was Scott Cassidy on September 20th of 1996 force feeding information to O'Shea?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. On September 20th of 1996, did Scott Cassidy single out one particular person to focus on during his questioning of Bryan O'Shea?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No.

Page 220

BY MS. O'BRIEN:

Q. During the time that you spoke with Scott Cassidy and Bryan O'Shea, did Scott Cassidy -- did your client deny everything that Scott Cassidy told him?

MS. HAGY: Objection. Form.

THE WITNESS: I don't understand the question.

BY MS. O'BRIEN:

Q. Well --

A. What does that mean did he deny everything Scott Cassidy told him?

Q. I guess you've indicated that Scott was not giving him information. He was not force feeding him information, correct?

A. Correct.

Q. During that conversation, did it appear to you that Scott Cassidy was not listening to what your client was telling him?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No. He was listening.

BY MS. O'BRIEN:

Q. In any manner, was Scott Cassidy giving the impression that he wasn't paying attention to him or didn't want to hear what he had to say?

Page 221

MS. HAGY: Objection. Form.

THE WITNESS: No. He wanted to hear what he had to say.

BY MS. O'BRIEN:

Q. At any time during your September 20th interview with your client and Scott Cassidy in which Colleen Hyland was present, did she ever force feed information to your client?

A. No.

Q. Did she engage in the conversation at all?

A. The first time?

Q. Yes.

A. No. When I say no, I don't remember if she said nothing at all, but she basically was just there observing. She was a witness.

Q. During that September 20, 1996 interview with your client and Scott Cassidy, did you get the impression or did Scott Cassidy through his words and actions leave the impression that Bryan O'Shea would be charged with the murders of two girls?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No, quite the opposite.

BY MS. O'BRIEN:

Q. Was Scott Cassidy pressuring your client

56 (Pages 218 - 221)

Page 222

to say that Matt Sopron gave an order to shoot at the Ridgeway Lords on that date?

A. No.

Q. Did he -- did your client on September 20th of 1996 convey to you in any manner that you were not listening to what your client had to say?

A. No.

Q. In any manner, did your client on September 20th of 1996 convey that he was trying to tell the truth, but no one else would listen to him?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. You have indicated on several occasions that someone was a prover. Can you just indicate what you -- when you say a person is a prover like, for instance, you said Colleen Hyland was a prover on the proffer, can you please indicate what you mean by that?

A. Well, if I want to have a conversation with Individual A and I'm lawyer, I can't be a witness, too, so I would bring somebody. Like I would bring you, and I would -- if the person

Page 223

denied something, I could call you as a witness to say, you know, were you present at this time or whatever.

You know, again, that indicates why I would not have talked to Kogut under the circumstances he's alleging because I was without a prover. And first of all, I wouldn't have talked to him, and second of all, I wouldn't have done it without a prover. So a prover is there to be able to relate the circumstances at a later date.

Q. So, for instance, with the proffer, the circumstances surrounding the proffer?

A. Right. So in the first one, Scott Cassiday is there, and he's asking questions, and Colleen Hyland is there in case there's a question about what transpired. If I asserted something that was different than they did, then she could testify, and there would be a matter of credibility.

On the second one, Scott Cassidy wasn't there. Colleen Hyland stepped into the shoes of the person that was asking the questions, and then Laura Sullivan was in as a prover to Colleen Hyland's questioning. So Mr. Cassidy wasn't there

Page 224

at the second one, and Ms. Sullivan wasn't there at the first one.

Q. At any time on either September 20, 1996 or September 26, 1996, did you convince your client, Bryan O'Shea, to go along with what the state's attorneys were saying?

MS. HAGY: Objection. Form.

THE WITNESS: No, and I wouldn't do it because if he went along with something that they knew was untrue, now they would know he's lying, and it could blow up our deal.

BY MS. O'BRIEN:

Q. At any time on either date, did your client tell you -- on either date, the 9/20/96 or 9/26/96, did your client tell you that he was more afraid of being charged with murder than telling the truth, so he signed the statement?

A. No.

MS. HAGY: Objection.

THE WITNESS: I'm sorry.

MS. HAGY: Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. On September 26, 1996 during the

Page 225

circumstances surrounding the handwritten statement, at any time did Colleen Hyland force feed information to your client, Bryan O'Shea?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. At any time during that same date, 9/26/96, did Laura Sullivan provide or force feed information to your client?

MS. HAGY: Objection. Form. Asked and answered.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. On that same date, did Colleen Hyland threaten your client with perjury charges?

A. No.

Q. On that same date, did Colleen Hyland threaten your client with obstruction of justice?

MS. HAGY: Objection. Form. Asked and answered.

THE WITNESS: No. On the 26th, he had already -- we already had gotten through everything, and they were just going over it again. The vibe was a lot more low-key than on the 20th.

57 (Pages 222 - 225)

Page 226

BY MS. O'BRIEN:

Q. On the 26th, 9/26 of '16, did Laura Sullivan force feed information to your client to include into that handwritten statement?

A. No.

Q. Did either one of those state's attorneys, Hyland or Sullivan, single out one particular person to focus on with respect to your client?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. At any time did either Colleen Hyland or Laura Sullivan appear to you that -- to refuse to listen to what your client was telling them?

A. No.

Q. On September 26, 1996, did you convince Bryan O'Shea to go along with what ASA Hyland and/or Sullivan were saying?

A. No. I'm sorry. Go ahead.

MS. HAGY: Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Now, did -- you've indicated that on the 20th of September of 1996, you had an opportunity

Page 227

to speak with your client occasionally in private; is that fair to say?

A. Yes.

Q. And did you also have that same luxury on September 26th of 1996?

MS. HAGY: Objection. Form.

THE WITNESS: Yes. I would call it a necessity, not a luxury.

BY MS. O'BRIEN:

Q. I understand.

Prior to the signing of the handwritten statement, did O'Shea ever tell you that he was being pressured by ASA Hyland or Sullivan?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. At any time on the 20th of -- September 20, 1996 did O'Shea ever tell you that he was being pressured by Scott Cassidy?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. At any time on the 20th, did O'Shea tell you that he felt intimidated by Scott Cassidy?

Page 228

MR. CHEN: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. At any time on the 20th, did he tell you that he was feeling intimidated by Colleen Hyland?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Did he ever tell you on either the 20th or the 26th that he was intimidated by ASA Hyland or Sullivan?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. On the 20th -- on September 20, 1996 and September 26, 1996, did -- in private, did Bryan O'Shea ever tell you that he was being -- he was afraid of being charged with murder?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. At any time did Assistant State's Attorney Hyland or Sullivan threaten your client with perjury?

Page 229

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. At any time did ASA Hyland or Sullivan threaten your client with obstruction of justice charges?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. At any time did -- either on September 20th or September 26th of 1996, did Colleen Hyland Hyland suggest the answers to her questions to your client?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. At any time on September 26, 1969, did Laura Sullivan suggest answers to the questions posed to your client?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. At any time on September 20, 1996, did Scott Cassidy tell Bryan O'Shea to falsely say that

58 (Pages 226 - 229)

Page 230

Antusas confessed to him the day before the shooting that Antusas had relayed the victims' location for purposes of carrying out the shooting?

MS. HAGY: Objection. Form. Asked and answered.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Did your client repeatedly tell Scott Cassidy on September 20, 1996 that Scott {sic} did not want to lie?

MS. HAGY: Objection. Form.

THE WITNESS: You lost me on that.

BY MS. O'BRIEN:

Q. Did O'Shea tell Scott he didn't want to lie?

A. No.

Q. Did he repeatedly tell Scott Cassidy that he didn't want to lie?

A. No.

Q. Did -- was Scott Cassidy intimidating your client in any way?

MS. HAGY: Objection. Form. Asked and answered.

THE WITNESS: No.

Page 231

BY MS. O'BRIEN:

Q. At any time in any manner, were Laura Sullivan or Colleen Hyland intimidating your client in any way?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Based upon your conversations with Scott Cassidy and your client, Bryan O'Shea, prior to going to the State's Attorney Office and having a conversation, in your opinion, was your client subject to criminal prosecution for his actions on December 14, 1995, the day of the murders?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I don't believe that he had any exposure to being charged with the murder. As I told him, I think that as long as he told the truth, he had -- there was no avenue to charge him with anything. If he lied, then the possibilities that I saw were obstruction and/or perjury, but if he told the truth, I didn't see any exposure for any criminal conduct on his part.

BY MS. O'BRIEN:

Q. In your professional opinion, had Bryan

Page 232

O'Shea done anything illegal on December 14, 1995 for which he was in danger of being charged?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I don't know how that's different. No, I don't -- there was nothing about December 14th that I thought he could be charged criminally in regard to the murders or anything related to it.

BY MS. O'BRIEN:

Q. My next question is going to be regarding the grand jury in state court. Is it fair to say that lawyers are not allowed to accompany their clients in the grand jury?

A. That's correct.

Q. During the time that you had breaks with your client and you had private conversations with your client, Bryan O'Shea, on either September 20, 1996 or September 26, 1996, did he ever tell you that he did not want to lie?

MS. HAGY: Objection. Form. Asked and answered.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Did you ever tell him that he didn't have

Page 233

the money to fight a murder trial?

MS. HAGY: Objection. Form. Asked and answered.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Did you ever tell him you might as well say what they want you to say and save your own ass?

A. No.

Q. Did he ever tell you outside of the presence -- you know, in private that he just didn't want to lie against Matt?

A. No.

Q. Did he tell you I just don't want to lie against any of the defendants?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. One second. I'm sorry.

At any time during those private conversations, did you tell your client, Bryan O'Shea, that he was a hair away from being charged?

A. No.

Q. At any time during those private

59 (Pages 230 - 233)

Page 234

conversations on those two dates, did Bryan O'Shea ever tell you that he was uncomfortable lying?

MS. HAGY: Objection. Form.

THE WITNESS: No.

MS. O'BRIEN: I don't have anything further.

MR. HERACKLIS: I don't have anything further.

MR. STEPHENSON: Recross?

MS. HAGY: Yes, I do have a couple questions.

FURTHER EXAMINATION

BY MS. HAGY:

Q. Before you -- before you and Bryan met with prosecutors in this case, did you talk to him about what he could expect during the meetings with the prosecutors?

A. Yes.

Q. And do you remember what you told him?

A. Well, I told him something to the effect that they're going to ask you 10 questions and know the answers to nine to test whether you're telling the truth. Don't lie about anything. Don't exaggerate. Don't minimize. Don't try to save anybody. As long as you tell the truth, you're fine.

I said you're not -- you're not going to

Page 235

face any criminal charges based on the murder. So as long as you tell the truth, you won't be charged with anything. I would have explained to him that the only two things that I thought was possible for him was obstruction and/or perjury, and I told him that will not be a problem as long as you're truthful.

Q. And did you tell him -- did you prepare him at all for the way that the state's attorneys could behave?

MR. STEPHENSON: Objection. Form.

THE WITNESS: I told him that as long as he told the truth, that it would be fine.

BY MS. HAGY:

Q. This was state court, so you didn't give him the preparation about that the ASAs could storm out; is that fair?

A. That's fair. I did not think that that was a tactic they were using at 26th Street.

Q. When you -- I believe, and please do correct me if I'm wrong, but I believe that you earlier described that there were baby steps towards the ASAs getting some of -- some testimony from Bryan. Do you know what any of those baby

Page 236

steps were?

MS. O'BRIEN: Objection. Form.

THE WITNESS: So that description was, as I explained, there were some things that were easy for him to relate and explain and tell them about, and then there were some areas mostly related to one of his guys that he was a little bit more reluctant about. So they would break it down into tiny little questions because he wasn't as forthcoming in that small area of it as the rest of it.

BY MS. HAGY:

Q. Are you able to give an estimate of how long the meeting was with the state's attorneys on September 26th?

MR. STEPHENSON: Objection. Asked and answered.

THE WITNESS: The second one?

BY MS. HAGY:

Q. Yes, the second one.

A. It was substantially less than the first one. The first one I said could have been two hours. It could have been four. If you told me it was six, I would go okay. But the second one, I

Page 237

think, was in the evening, and it went much quicker than the first one.

Q. So if you look at the handwritten statement, it does say 7:00 p.m. so -- and it says the statement -- sorry. It does say 7:00 p.m. So do you know what time you arrived there that day?

A. Not really.

Q. And I believe that during Maureen's testimony, you said -- she asked if O'Shea was -- if he was the one who said that Matt said to light up the van. Do you remember that?

MR. HERACKLIS: Objection to form.

THE WITNESS: I don't remember her asking about who said light up the van. That was my language. I don't remember her asking me. So maybe the court reporter can read it back. I don't remember the question about lighting up the van.

MS. HAGY: Gina, how hard is it to go back to that?

THE COURT REPORTER: Let me just search for lighting up the van.

MS. HAGY: And it might just be light.

(Whereupon, a discussion was had off the record.)

60 (Pages 234 - 237)

Page 238

BY MS. HAGY:

Q. Is it fair to say that you don't remember exactly what is in this statement?

A. What statement?

Q. Sorry. In the handwritten statement.

MS. O'BRIEN: Objection.

THE WITNESS: As I sit here now, do I remember everything in the statement?

BY MS. HAGY:

Q. Yes.

A. No.

MS. HAGY: Okay. That's all I have.

MR. STEPHENSON: I have one question for you, Larry.

FURTHER EXAMINATION

BY MR. STEPHENSON:

Q. Did you -- when this form was presented to you before you crossed it out and that second sentence was there in the third paragraph, did you interpret that as Scott trying to trick, deceive, or pull a fast one on you?

MR. CHEN: Objection. Form.

THE WITNESS: No. I perceived that as being a preprinted form.

Page 239

MR. STEPHENSON: Nothing else. Anything else from plaintiff.

MS. HAGY: No.

THE VIDEOGRAPHER: This concludes today's proceedings. Now going off the record at 3:59 p.m.

MR. STEPHENSON: Larry, do you want to reserve signature so you can take a review of it?

THE WITNESS: No, I'll waive signature.

MR. STEPHENSON: Signature waived.

(FURTHER DEPONENT SAITH NAUGHT.)

Page 240

STATE OF ILLINOIS )
             ) SS:
COUNTY OF C O O K )

I, GINA M. LUORDO, a notary public within and for the County of Cook County and State of Illinois, do hereby certify that heretofore, to-wit, on March 16, 2023, personally appeared before me, at 151 North Franklin Street, 25th Floor, Chicago, Illinois, LARRY AXELROOD, in a cause now pending and undetermined in the United States District Court for the Northern District of Illinois, wherein MATTHEW SOPRON, et al. are the Plaintiffs, and SCOTT CASSIDY, et al. are the Defendants.

I further certify that the said LARRY AXELROOD was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness as aforesaid.

Page 241

I further certify that the signature to the foregoing deposition was waived by counsel for the respective parties.

I further certify that the taking of this deposition was pursuant to notice and that there were present at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF: I have hereunto set my hand and affixed my notarial seal this 31st day of March, 2023.

NOTARY PUBLIC, COOK COUNTY, ILLINOIS

LIC. NO. 084-004143

61 (Pages 238 - 241)

[& - 20]                                                                                    Page 1

**&**

**&** 2:2,6,11,18
3:2,9,14 6:20
7:4,6,10 148:5

**0**

**001081-1082**
5:6
**00320** 1:12
**005832-5837**
5:4
**012970** 4:22
30:9
**018411** 9:19
**018411-18459**
4:20
**05525** 1:8
**08254** 6:9
**084-004143**
1:24 241:21
**0854** 1:5

**1**

**1** 6:3 31:1 33:8
55:16 166:9
**1,000** 156:1
**10** 4:19 14:24
65:22 150:18
167:2 179:22
203:18 211:15
211:16,17,18
234:18
**100** 155:24
197:18 216:23
**1081** 196:22

**1082** 196:22
**10:00** 16:18
**10:13** 1:21 6:2
**10:46** 33:8
**10:59** 33:12
**10th** 174:1
**11** 192:18
**11:31** 65:24
**11:51** 66:4
**129** 4:6
**13** 163:1
192:20,21
**1300** 2:19
**133** 4:7
**139** 4:8
**14** 117:7 163:1
231:13 232:1
**140** 4:9
**141** 4:10
**14th** 232:6
**15** 179:22
211:19
**151** 1:19 2:7
6:10 240:8
**16** 6:3 155:24
192:20,21
206:4 226:2
240:7
**161** 3:4
**1650** 25:3
158:16
**16th** 1:20
**18** 15:21
**1830** 3:10

**18457** 9:19
**19** 1:5 4:19 6:9
9:16,22 190:18
190:19
**1969** 229:17
**197** 5:5
**1982** 11:1
**1985** 11:2,10,14
11:18
**1989** 11:18
12:16,19,24
179:19
**1990** 179:21
**1992** 13:14
**1995** 117:7
231:13 232:1
**1996** 14:4 20:5
31:4 38:22
53:14 75:13
79:16,16 80:15
80:16 89:2
91:23 92:9,20
94:21 95:11
97:2 98:3
101:3,9,10
118:11 125:11
125:11 126:9
126:17 127:9
127:16,18
134:2,6,12,17
135:2 140:15
140:18 150:24
152:16 153:17
154:10 156:12
157:14 159:5

161:7,20
165:12 195:19
200:16,16,23
201:20 204:9
219:4,16,20
221:16 222:5,9
224:3,4,24
226:16,24
227:5,18
228:15,16
229:11,23
230:9 232:18
232:18
**1997** 113:5
114:17 198:23
201:8 206:4,22
**1998** 150:18
**1:11** 138:18
**1:34** 138:22
**1st** 12:20,22
14:10,10,11,12

**2**

**2** 32:19 33:11
65:23 190:23
**20** 4:21 14:24
30:7,11,14,19
30:21 31:11
32:15 38:22
92:9 101:9
125:11 127:16
134:6,7,12
140:17 157:14
159:5 161:20
165:12 204:9
221:16 224:3

**[20 - 50]**                                                                 Page 2

227:18 228:15
229:23 230:9
232:17
**2000** 15:19
70:19 121:15
**2000s** 9:14
**2001** 120:18
**2003** 9:17 10:8
37:6,20 44:8
44:14 72:3
73:6 177:3
190:14 207:22
209:19 210:3
217:7,13 218:2
218:7
**2005** 12:19,20
12:21 13:1
14:10,12 15:19
179:20,22
185:2 210:2
**201-6447** 2:20
**2012** 15:20
**2015** 121:3,10
**2018** 15:11
**2019** 18:3
**2020** 121:19
**2023** 1:21 6:3
240:7 241:14
**20th** 75:12
79:16 80:15,16
80:22 83:13
84:18 85:5
87:21 89:2
91:23 92:14,20
94:5,21 96:8

96:21,23
100:18 118:10
126:9 127:9
165:23 170:1
212:7 219:3,15
219:20 221:5
222:5,9 225:24
226:24 227:17
227:23 228:4,9
228:15 229:11
**21** 1:8 4:23
33:14,18,20
34:24 89:1
134:7 170:24
176:2 212:14
**212** 4:11
**217** 4:12
**219** 179:14,15
**22** 1:12 5:3
51:18,22 52:3
52:5,14 53:5
53:19 54:20
55:16 61:17
63:19,24 64:20
65:5,14 95:9
134:19
**225** 2:19
**22nd** 17:12
57:3
**23** 5:5 114:17
150:24 195:19
196:19 197:2
198:23 201:8
**230** 2:13

**234** 4:13
**238** 4:14
**2401** 17:14
**243-5900** 2:4
**25** 77:24
106:22
**2500** 1:20 2:7
3:4
**25th** 240:8
**26** 134:16
135:2 190:16
190:22 224:4
224:24 226:16
228:16 229:17
232:18
**2620** 2:13
**26th** 11:24 16:7
66:10 69:5
75:13 79:16
80:22 81:20
84:2 95:11,20
96:7,9 97:2
98:3 101:3,10
110:17 114:18
118:11 125:11
126:9 127:17
132:5 141:10
157:6,9 159:7
183:11 195:3
196:9 204:13
204:14 216:16
225:21 226:2
227:5 228:10
229:11 235:19
236:15

**28** 158:5
**29th** 204:12
**2nd** 16:3 17:1

**3**

**3** 9:17 10:7
31:10 33:23,24
66:3 138:18
209:19 212:15
212:18
**30** 4:21 16:12
**311** 2:3
**312** 2:4,8,14,20
3:5,11,16
**31st** 241:13
**3200** 3:15
**33** 3:10 4:23
**38** 77:23
**3:11** 211:21
**3:26** 212:1
**3:59** 239:5
**3rd** 2:3 16:2

**4**

**4** 18:3 138:21
211:20
**402** 182:13,23
**444** 3:15
**45** 143:9
**4th** 19:3

**5**

**5** 212:1
**5'11** 185:20,22
**50** 155:24
156:9 170:15
180:1,6

**[51 - advantage]**

**51** 5:3
**53** 25:2 158:15
**5837** 51:20
**596-5884** 3:16

**6**

**6** 63:19 64:1
**6'3** 185:20,21
**600-5588** 2:14
**60601** 3:4
**60603** 3:11
**60606** 2:8,13
  3:15
**60606-3408**
  2:19
**60607** 2:3
**612-1928** 3:11
**641-0300** 3:5
**6th** 120:18

**7**

**704-3000** 2:8
**74** 4:5
**7832** 241:19
**7:00** 53:7 237:4
  237:5
**7th** 11:9 121:19

**8**

**8** 4:4 32:23
**80s** 18:19 131:6
  185:1
**8th** 18:5

**9**

**9/20/96** 171:1
  224:14

**9/26** 226:2
**9/26/96** 53:6
  224:15 225:8
**90** 166:24
**90s** 18:20,21
  131:6
**95th** 195:13
  196:5,6,7
**96** 200:20
**97** 200:19,21
**99** 41:15
**9:00** 16:19
**9th** 15:10

**a**

**a.m.** 1:21 6:2
  33:8,12 65:24
  66:4
**aberdeen** 2:3
**ability** 38:23
  40:2,13 56:21
  68:14 94:22
  97:6
**able** 24:12 39:2
  39:5 49:20
  62:2 109:9
  175:24 176:12
  211:1 223:9
  236:13
**above** 35:3,15
  35:20 63:21
  93:14,16
  142:17
**absolute**
  197:18

**absolutely**
  34:15 39:7,14
  106:4 161:18
  197:18
**absurdity**
  201:10
**abuse** 37:3
**abusive** 54:14
**acceptable** 86:3
**acceptance**
  215:10,12
**accidents** 17:20
  17:22
**accompany**
  232:12
**accomplice**
  164:22 189:1
**accosted**
  216:24
**accountable**
  164:22 189:1
**accurate** 40:3
  40:13 56:22
  143:22 188:20
**accurately**
  61:18
**accusations**
  149:2,14
**accuse** 46:23
  59:10 116:4
  181:10
**accustomed**
  183:23
**ackerman**
  208:17

**acknowledge**
  35:2 36:23
  56:15
**acknowledged**
  214:11
**acquiescing**
  102:18
**acquitted**
  142:16
**actions** 221:19
  231:12
**active** 29:7
  37:13 160:4
**actively** 201:2
  201:21
**acts** 163:5
**actual** 27:18
**actually** 26:4
  91:6 93:13
  96:20 101:18
  114:9 184:6
  212:2
**added** 173:7
**additional**
  33:22
**address** 8:12
**adjunct** 18:11
**administer**
  7:21
**admissibility**
  31:16
**admitted** 11:13
**adr** 18:8
**advantage**
  71:24,24 199:4

advantageous 215:13

advice 69:20 107:8,16,18

advise 26:21 36:9 67:11 98:20 122:19 123:2,7,12 215:4

advised 29:23 31:12 36:12 67:18 128:14

affect 31:16

affidavit 5:5 120:17 121:2,9 121:9,19 197:16

affidavits 121:13

affiliated 13:16

affiliations 6:16

affixed 241:13

affixing 193:21

aforesaid 240:18,24

afra 3:3

afraid 21:1 37:24 113:16 113:24 114:5 224:16 228:18

afternoon 141:2

agencies 16:13

agent 178:22

agents 71:5,16 139:9

aggravation 182:10

ago 158:5 160:10

agree 27:11 35:4 86:11 87:11,21 91:21 98:12,18 103:23 116:3 182:11,13 192:8,14,24 217:22

agreed 27:14 30:15 81:16 85:11 86:5 98:16 115:9 154:22 173:12 174:5,22 199:21 212:22

agreement 24:17 28:12,22 28:24 29:15 31:15 88:7 133:13,15,17 133:22 134:1 212:21 215:7

agreements 28:19 182:1,1 215:9

agrees 31:3

aguilar 207:7,9

ahead 21:17 68:20 69:12 70:1 79:1 86:4 98:24 140:8 186:4 200:22 226:19

aided 240:21

airport 91:12 211:10

al 1:5,9,13 6:6 136:16,17,20 240:12,13

alcohol 151:18 151:24 152:12 176:9 177:1

allegation 168:11

alleging 223:6

allow 128:18

allowed 98:2,4 115:6 128:2 232:12

almighty 155:7 162:24

amasciopinto 3:5

amendment 128:8,13,21 129:3,7,13

amkunzer 2:20

amount 28:5 67:8 151:24

amy 2:18 7:2 7:11 129:22

anderson 104:6 119:6

anderson's 109:17 124:22 206:3

andrews 2:16 6:24 79:22 80:1

andrews's 80:4

andy 148:7

angered 160:7

angry 44:24 45:4

anniversary 17:8

answer 8:22 21:15 22:23 29:3 39:13,17 41:16 42:8 58:14 102:4 122:16 129:13 147:15 149:2 164:17 167:8 167:12 183:1 184:6 186:3 191:15,20 203:18

answered 99:11 100:8 101:6,23 102:15 116:18 117:2 123:16 124:12,18,24 125:6,13 146:10 187:6

195:21 202:2
225:11,20
230:5,23
232:21 233:3
236:17
**answering**
42:11 58:17
**answers** 28:13
38:23 40:3,13
95:2,5 97:14
133:4 169:21
169:22 181:18
229:12,18
234:19
**anthony** 3:2
114:20 136:8,9
136:12
**antusas** 1:12
7:19 71:5
103:10,16,17
105:1 116:8
124:10 218:5
230:1,2
**anybody** 71:22
72:3 113:5
120:24 155:4
163:6,9 217:24
234:22
**anymore** 67:15
205:17
**anytime** 115:4
**apologies** 180:8
**apologize** 19:9
45:16 48:6
61:22 187:11

**apparently**
158:5
**appeals** 11:23
**appear** 10:2
42:10 43:12,19
45:3 47:10,14
47:19 52:23
58:16 60:20
61:2,10 132:1
132:7,24 134:7
134:18 220:16
226:13
**appearances**
2:1 3:1 6:16
**appeared** 38:13
38:15 45:4
102:16 133:2,3
240:7
**appears** 10:4
52:18,22
172:17
**appellate** 12:3
**applicable**
173:1
**applications**
210:5
**applying**
209:22,24
**approach**
171:16
**approximately**
12:23 15:6
114:17
**arbitrator** 18:7

**ardc** 125:16
126:2,5
**area** 166:1,2,14
187:8 236:10
**areas** 236:6
**argenbright**
3:7 135:8,12
**arraignments**
12:2
**arrest** 25:13
**arrested**
156:13
**arrived** 81:20
91:23 237:6
**asa** 53:8,8,11
57:3 205:21,21
226:17 227:13
228:10 229:4
**asas** 235:16,23
**aside** 10:17
**asked** 23:11
41:2 57:15
71:12,13 85:1
95:1,6 98:12
98:16,23 99:10
100:7 101:6
102:15 113:3
116:17 117:1
123:15 124:11
124:17,23
125:5,12,24
139:19 143:21
146:10,15,16
147:7 148:16
164:24 165:1,2

168:11 174:10
174:12 180:5
181:1,2,6,17,21
187:5,21
195:20 202:2
205:22 207:21
207:23 225:10
225:19 230:4
230:22 232:20
233:2 236:16
237:9
**asking** 41:13
42:14 47:11,23
57:10,12 69:17
72:15 80:24
97:3,12 102:1
103:5 119:8
121:5 156:18
163:14 164:18
165:16 167:11
180:24 203:20
206:6,15
208:14 223:14
223:22 237:13
237:15
**aspect** 48:10
163:22
**aspiring** 14:21
**ass** 233:8
**assaulted**
216:23
**assert** 30:2
128:7,12
129:12

**[asserted - background]** Page 6

asserted 223:16
asserting
  128:21 129:4
  147:10,24
assigned 16:5
assistance
  215:11
assistant 6:21
  23:13 36:1
  78:12 80:1
  86:13 87:13
  93:2,8 98:13
  99:3 110:15
  125:10 126:8
  128:3 181:9
  214:24 228:22
associate 14:9
  14:15,21 15:5
  15:13,17,18,22
  209:23
associations
  14:18
asserted 12:4
assume 8:22
  29:20 54:8
  91:16
assurances
  81:18
attacked
  106:23
attempted 28:5
attempting
  13:8
attention 88:24
  95:8 114:16

220:23
attorney 6:17
  11:15,17 12:15
  23:13 35:16
  36:1 53:9
  64:16 72:13
  75:3 77:5
  78:12 80:1
  86:14 87:13,18
  90:5 93:2,9,17
  98:14 99:4,8
  110:16 111:15
  131:13 145:15
  145:16 155:19
  155:21 156:6
  166:4 178:6
  179:14 183:5,6
  183:16,17,19
  183:21 188:14
  188:18 192:16
  193:3 194:2,22
  195:3 206:18
  207:1,11 208:8
  215:19 228:22
  231:10
attorney's 6:22
  6:24 10:5
  11:21 12:12
  13:6 14:3 31:2
  31:13 51:10
  53:7 66:7,9
  72:4 73:4 75:4
  77:20 79:15
  89:3,13 91:24
  95:11,20

107:12 113:6
  115:8 133:18
  166:3 172:12
  183:20 191:19
  192:5,22
  194:19 202:9
  204:12 215:1
  217:8,14,22
  218:4,8
attorneys 6:15
  39:6 71:4,15
  72:21 73:10,19
  74:2,10 89:14
  99:24 103:8,22
  107:18 108:3,5
  120:6 121:23
  122:1 123:13
  125:10 126:8
  126:17 128:3
  144:21,22
  181:9 188:19
  224:6 226:6
  235:9 236:14
  241:6
august 206:22
ausa 215:5
ausas 214:18
authority 86:8
available
  143:24
avenue 231:18
average 185:15
avoid 48:15
  123:8

aware 104:4
  106:17 108:23
  155:6
axelrood 1:16
  4:3 6:4 8:1,6,9
  8:11 9:18
  13:22 53:9
  55:19 141:2
  240:9,16

**b**

b 4:17 5:1
  169:16
baby 48:10
  235:22,24
back 12:3 18:9
  19:18 20:13
  21:12 22:21
  23:3 25:22
  33:3,12 37:24
  39:16 66:4,6
  82:7 86:19
  95:10 96:13,20
  133:10 138:22
  139:17,21
  144:9 154:19
  172:21 176:14
  176:17 178:22
  179:13 183:13
  184:8 190:24
  193:8 212:1,11
  212:19,22
  237:16,18
background
  10:20,22 14:9
  20:2 153:14,21

204:18
**backwards**
15:20
**bad** 69:19
105:8 185:9
188:7
**bajenski** 2:22
7:13
**ballpark** 18:17
**bar** 11:5,8,10
11:14 14:17
**base** 155:23
**based** 37:15
50:18 58:16
84:12 133:20
151:24 173:15
231:8 235:1
**basically** 37:18
94:9,10 176:17
186:13 187:15
215:15 221:14
**basis** 129:10
**bates** 4:19,21
4:23 5:4,5 9:18
30:8 32:13,21
32:23 33:19
51:19
**bear** 185:7
**bears** 90:4
198:9
**beeper** 20:13
20:15
**beepers** 20:13
**began** 11:23
36:6

**beginning** 6:17
18:20 86:7
137:5 195:17
210:15
**begins** 33:11
66:3 138:21
211:24
**behalf** 6:18,21
7:7,10,11,14,17
194:19 199:10
210:14
**behave** 235:10
**behavior** 187:3
**belief** 138:3
147:24
**believe** 11:10
31:5 49:17,18
53:14,16 91:8
91:8,18 105:18
114:9 137:15
138:4 157:17
158:11 160:7
214:6 231:15
235:20,21
237:8
**believed** 175:1
176:20
**bell** 106:13
131:4
**belong** 173:18
174:2,3
**belonged** 160:8
**belt** 91:19
171:16

**bench** 18:2
75:4
**best** 3:14 7:10
28:6 38:10,12
38:16 48:7
59:5 105:21
112:4,5 127:21
134:10 135:10
135:19 136:3
136:11,19
137:24 138:9
139:19 156:9
185:3 187:23
198:7
**better** 158:4
183:4
**beuke** 109:12
109:15
**beyond** 76:4
163:11
**big** 17:9 67:16
185:17
**bigeck** 119:5
**biggest** 188:7
**binding** 194:21
**bit** 10:19 18:9
31:1 33:21
81:12,12 87:10
97:19 101:24
143:18 145:13
173:7 236:7
**bless** 174:3
192:2
**blow** 88:21
215:6 224:11

**board** 142:17
**bonds** 16:15
**bottom** 32:21
35:1 62:14
93:13 193:17
204:24
**break** 33:6,9
65:22 66:1
138:16,19
167:15 203:23
211:14,16,19
211:22 236:8
**breaks** 165:24
166:11 232:15
**brian** 193:18
**brief** 84:24
110:21 143:7
165:20
**briefly** 66:6
89:6 140:4
**bring** 22:18
157:11 165:3
178:22 200:3
222:23,24
**broke** 160:20
**brother** 20:17
20:17,20,24
67:18 152:3
153:8,22 154:1
154:2,3
**brought** 37:24
165:4
**bryan** 5:3
10:11 19:20,21
19:24 20:5,17

| | | | |
|---|---|---|---|
| 21:3,4,5,12,13 | 59:21 60:4,10 | 135:13,22 | 209:16 210:8 |
| 21:21 22:2,5,5 | 60:15,15,20 | 136:6,14,21,24 | 210:15,18,23 |
| 22:16 23:6,11 | 61:10,17 62:16 | 139:5 141:17 | 211:4 213:7,16 |
| 23:18,23 24:2 | 62:19 63:2,15 | 141:19 147:8 | 216:1,12,14,18 |
| 24:7,16,20,22 | 63:15,20 64:2 | 152:6,11,15 | 217:9 218:18 |
| 25:4,10 26:3 | 64:12,15 65:3 | 153:1 154:1,4 | 219:22 220:3 |
| 26:11,12,21 | 65:15,18 66:11 | 154:7,20 | 221:19 224:5 |
| 27:10,12 29:1 | 66:16,21,24 | 156:11,23 | 225:3 226:17 |
| 29:21,23 31:4 | 67:11,19,22 | 158:17,22 | 228:16 229:24 |
| 31:14 33:18 | 68:4,7,24 69:7 | 159:1,11,15 | 231:9,24 |
| 34:21 35:1,8 | 69:9,14 70:7 | 162:5,7 163:21 | 232:17 233:21 |
| 35:12 36:6,9 | 70:17 71:2,6 | 163:22 164:20 | 234:1,11 |
| 36:22 37:3,7 | 71:17 72:5 | 165:6,8,22 | 235:24 |
| 37:10,21,23 | 75:16 79:11 | 167:15 168:2 | **bryan's** 35:21 |
| 38:4,6 40:20 | 81:7,13,15 | 168:10,10 | 38:23 40:2,12 |
| 40:22 41:3,11 | 84:6 86:21 | 169:11,15,21 | 42:20 51:11 |
| 41:14 42:3,8 | 92:3 93:12 | 170:7 172:13 | 56:21 64:19 |
| 42:10,13,15,16 | 94:21 95:5 | 173:4 174:13 | 72:5 127:21 |
| 43:4,14,20 | 96:10 99:14,14 | 174:14,17,23 | 132:4 137:10 |
| 44:1,5,12 45:1 | 100:22 111:6 | 175:7,12,16,20 | 137:10 138:2 |
| 45:5,13,20,24 | 111:21 112:15 | 176:1,8 177:11 | 162:8 166:18 |
| 46:9,14,16 | 112:18 113:7 | 177:18,21,23 | 209:10 |
| 47:4,10,14 | 114:23 115:6 | 178:2 181:20 | **buddies** 126:21 |
| 48:4,4,13,17,23 | 116:23 117:5 | 185:17,23 | **buddy** 177:19 |
| 49:2,6,8 50:5 | 117:16 118:21 | 186:6,9,12,15 | **building** 25:2 |
| 50:10,14,19,20 | 119:4,15,23 | 186:22 188:4,5 | 158:15 |
| 51:2,4,9,18 | 120:12,15 | 190:10 194:19 | **bullshit** 44:10 |
| 52:5,9,12 53:6 | 122:11,19 | 195:2,5,8 | 44:10,17,20,21 |
| 53:12 54:11,11 | 123:2,7,12,20 | 196:9 199:12 | 177:4,6,11,12 |
| 54:15 55:4,14 | 124:8,15,21 | 202:13,16,17 | 177:15,15,15 |
| 55:17,23 56:1 | 125:3,9,16 | 202:23,23 | 177:16,21 |
| 56:15 57:4,10 | 126:7,18 | 203:5,9,13,16 | 178:7,21 181:2 |
| 57:18 58:3,7,8 | 127:10,11,14 | 203:24 204:2,6 | 181:5,7,19,20 |
| 58:11,14,17,22 | 127:19,20 | 205:15 206:4,6 | 183:6 186:9,19 |
| 59:2,8,10,13,16 | 130:18 132:9 | 206:15,23 | |

**[bullshitting - cassidy]** Page 9

**bullshitting** 179:1
**burglary** 160:11
**business** 144:7
**button** 178:4
**buy** 85:9

**c**

**c** 2:7 169:16 240:3
**cab** 4:20,22 9:19 30:9
**cal** 159:7
**calendar** 17:10
**california** 11:24 16:7 114:19 141:11 183:11
**call** 10:6 16:17 16:19 19:14 20:11,14 23:19 24:13 46:20 59:8 68:16 72:15 94:9,10 107:11,11 130:2 131:13 140:5,6,8 143:10,18 144:10,12,22 144:22 151:9 154:5,10 156:12,14,16 156:22 159:15 162:11,18 192:2 216:21

223:1 227:7
**called** 1:16 13:21 16:18 18:14 21:3,4 21:12 72:17,20 73:17 81:11 107:9 137:12 137:14,15 144:13,24 149:14 152:16 155:8 162:7 208:16 217:19
**calling** 68:11 146:23 197:13
**calls** 143:1,4 162:13,15
**calm** 24:15
**campaign** 15:2
**cancelled** 40:16
**candidates** 14:19 15:4
**capacity** 86:13 87:13 137:18
**car** 17:19,22 159:11
**card** 72:14 83:22 144:7 217:18
**cardboard** 38:2
**care** 207:1
**cared** 169:17
**career** 74:20 76:2 77:17 78:14 79:24 178:5

**careful** 147:2
**carmen** 207:7,9 207:13
**carrying** 103:18 230:3
**case** 1:5,8,12 6:9 17:19 21:2 22:10 28:4 29:1 37:17 70:5 72:22 73:3,10 74:14 75:12 76:5 80:13 82:15 83:2,5 87:4 104:7,13,19 105:22 107:2 107:13 108:20 108:24 110:6 120:12 126:19 127:12 128:4 129:23 131:9 131:16 137:5 141:12 142:1,2 142:5,12,12,13 142:17,21,22 143:14,19 147:4 148:21 148:22 150:15 152:18 154:2 155:4,12,12 156:18,24 159:21 168:13 176:5,7 179:12 180:20 181:2 183:13 198:22

201:13 205:13 205:17,19 207:8,14,17 208:3,22 209:2 209:6 210:14 217:15,15,17 218:5,9 223:15 234:12
**cases** 6:7 10:12 12:13 14:6 16:10,14 17:18 20:4,6,10 27:13 40:23 66:13 67:3 70:19 71:2 74:17 76:2 78:15 87:16 107:19 108:4 109:6 141:14 141:24 142:4 142:14 145:18 145:20 151:14 155:20 156:2 201:19
**cassiday** 1:13 223:14
**cassidy** 1:5,9 2:9 6:6,19 23:14,16 26:10 35:18 41:4 64:21 80:15,18 80:21 81:6,19 82:3,21 87:21 89:2 91:2 92:23 93:8,11

93:24 94:2,8
94:23 101:11
116:22 117:6
117:10,15,22
118:4,12,19
119:2,13,21
120:8 121:23
127:8 141:13
141:14,22,23
157:11 159:16
161:21 162:7,9
162:17 164:3,5
164:11,20
165:12 173:9
173:16 174:7
177:4,8,9
181:18 185:13
185:23,24
191:11 193:10
193:20 194:7
194:18 202:16
202:17,21
203:9,10,14
204:3,10
205:13,22
206:3 212:19
218:12 219:3,4
219:7,11,15,21
220:3,3,4,11,17
220:22 221:6
221:17,18,24
223:20,24
227:19,24
229:24 230:9
230:17,20

231:9 240:13
**cassidy's** 91:14
142:7 194:9
**cast** 70:3
**catastrophic**
105:11
**catholic** 196:7
**caught** 166:20
168:23
**cause** 240:10
240:18
**ccsao** 4:20,22
9:19 30:9
**cell** 77:7
**center** 17:3,5
**certain** 85:23
106:14 186:7
**certainly**
191:18 198:13
216:24
**certify** 240:6,15
241:1,4,8
**chair** 83:6
110:18 145:19
**challenge**
179:10
**chance** 178:23
209:7
**changes** 99:15
171:14 172:7
175:23 193:16
**chaos** 195:17
**characterizati...**
218:14

**charge** 190:1
193:1 231:18
**charged** 26:18
36:14,17 45:21
46:10,16 48:18
48:24 49:4,18
49:20 60:5
69:24 86:24
87:2 104:19
108:20,21
131:15 161:14
165:9 188:11
188:15,23
189:5,18 190:6
192:1,7,12,17
193:5 213:24
214:3,4,7
221:20 224:16
228:18 231:16
232:2,6 233:22
235:2
**charges** 23:24
26:9,23 27:8
36:20 46:4
59:16,22 123:8
164:21 175:1
190:11 225:15
229:6 235:1
**chase** 72:18
**chasing** 207:3,4
**checking**
143:24
**chen** 228:1
238:22

**chicago** 1:20
2:3,8,13,19 3:4
3:11,15,17
6:11 7:8,10,15
11:1 16:8,10
16:11,17 18:8
133:8,21,24
134:9,13,23
135:7,15
137:21 138:24
139:10 142:13
142:13 240:9
**chief** 12:1,1
**choice** 41:23
176:24
**choose** 167:17
168:4
**christ** 195:14
196:6
**circuit** 14:14
15:3,3,10,10,12
**circumstance**
105:9
**circumstances**
109:16 115:4
199:19 223:6
223:10,12
225:1
**city** 3:17 7:7,10
7:15 12:6
24:23 133:24
135:4 138:24
139:10,13,19
**civil** 1:17 17:14
17:19

**claim** 103:23
**claims** 17:22
**clarify** 139:3
**clark** 3:4
**class** 19:7,17
  182:17
**classes** 18:22
  19:8,13,16
**clear** 25:19
  90:21 155:10
  160:1 171:17
  188:14,21,21
  189:3,15 191:1
  191:20,23
  192:5,11,19,21
  195:22 213:16
**clearly** 9:7
  52:19
**clerk** 110:16
**client** 26:3
  75:16 79:8
  80:22 81:7,11
  81:20 82:20
  83:15 88:11,15
  89:3,15 90:16
  92:3 93:24
  94:21 95:12
  96:1 97:3,23
  98:4,7,11 99:9
  99:17,23 101:4
  101:10,17
  103:9,23 104:4
  104:11 105:15
  106:17,20
  107:7,15,17

108:6 110:4
113:3 114:23
115:2,6 116:3
117:5,16,23
118:11,21
120:6,7,17,21
121:2,24 122:1
127:9,14,19,23
128:2,14
133:13,19
134:1 142:15
148:23 164:1
171:22 178:19
178:19 180:16
182:6,20,22
183:14,16,18
198:16 199:2,4
200:1,17,22
201:12,18
204:19 207:1
215:4 218:18
219:3,8,10
220:4,18 221:6
221:8,17,24
222:4,6,8
224:5,14,15
225:3,9,15,18
226:3,8,14
227:1 228:23
229:5,13,19
230:8,21 231:3
231:9,11
232:16,17
233:21

**client's** 112:4
  133:22 134:11
**clients** 107:24
  179:8 181:10
  181:11 183:7,8
  183:12 232:13
**close** 48:23
  100:11 114:6
**closed** 148:22
**closer** 185:21
  200:6
**closing** 85:10
**coerce** 43:19
  50:9 65:3
**coerced** 47:3
  50:15 54:10
  65:17 70:9
**cohen** 191:3
  208:19,19
**coherent**
  176:12
**collaborative**
  16:21
**colleen** 2:15
  6:22 35:13,23
  35:24 48:22
  53:8 57:3,12
  57:16 58:2,5
  58:22 59:12
  60:9,14,20
  62:15,21 75:20
  75:23 91:18,22
  91:24 92:8,10
  92:11,14 93:2
  93:12,20 94:2

94:8,11,16,18
96:9,13,17,21
96:22 97:3
100:19 101:3
101:11,16
102:12 103:3
115:11,17,22
116:22 117:14
117:21 118:4
118:12,19
119:2,13,21
120:8 121:24
193:18 194:11
194:18 204:17
221:7 222:18
223:15,21,23
225:2,14,17
226:12 228:5
229:11 231:3
**colleen's** 35:21
**college** 11:1
  18:13,23
**come** 19:7 59:6
  81:16 107:7
  144:15 156:20
  169:20 177:21
  181:4,19 186:9
  186:15 212:11
**comfortable**
  69:6 166:16
  175:23,24
**coming** 90:21
  110:21
**commit** 123:2,7

**[committee - contents]**                                    Page 12

committee
  14:20
committing
  29:4
common   181:8
commonplace
  180:22
communicate
  39:2,5 150:2
  176:13 203:13
communication
  79:7
community
  18:12 74:24
  76:9,17 77:13
  78:24 80:5,10
  211:5,6
complain   50:14
  65:15 70:7
complaint
  125:17,24
  126:2,5 147:3
complete   56:6
  199:9
completed   99:9
completely
  215:20,22
completion
  65:14
complex   166:6
compound
  164:7
computer
  172:23 240:21

concern   66:16
  198:9
concerned   24:3
  26:8 38:22
  40:2,9
concerns   40:12
  56:20
concerted
  102:20
concludes
  239:4
conclusion   28:8
condition   30:22
  52:15,24
conduct   84:1
  148:1 149:15
  231:22
conducted
  41:11
conference
  182:14,23
conferring   97:1
confess   215:15
confessed
  103:10,16
  230:1
confidence
  87:8
confident   68:16
  81:15 84:12
confirm   22:2
  61:17
confirmed
  26:12 81:13

conflating
  180:24
confronted
  216:21
confronting
  177:14
confused   47:10
  61:10
congruent
  132:19
conjunction
  35:12
connection
  10:11 20:6
  27:12 29:21
  34:22 36:14
  49:10 50:22
  65:18 66:12
  72:6 213:17
consequences
  105:12 107:6
consider
  149:16 186:1
  194:14,17,20
considerable
  67:8
considered
  140:11
consist   14:5
consisted
  151:13
consistent
  133:4
constant   69:7
  122:11

constantly
  168:18 177:23
constitution
  129:8
constitutional
  30:2
consulted
  24:10
consumed
  152:1
contact   23:7
  69:9 70:24
  73:5 75:11,14
  108:5,10
  111:20 120:20
  120:24 127:2
  144:20
contacted
  71:11 80:17
  113:16,22
  120:16 121:6
  121:12,15
  140:7 217:8,14
  218:4,8
contacting
  217:18
contained
  64:20
contemporan...
  195:17
contemporan...
  57:18
content   28:20
contents   28:14
  35:3

Case: 1:22-cv-00320 Document #: 235-21 Filed: 07/17/26 Page 74 of 120 PageID #:4446

**[context - county]**                                          Page 13

| | | | |
|---|---|---|---|
| **context** 135:12 135:21 136:5 136:13 154:5 | 198:17,18,24 199:18,24 204:8,17 206:8 208:24 213:2 | 14:14 31:2,12 51:9 53:7 65:16 90:5 | 130:15,18 134:14,21 135:3,6 137:12 139:6,11 |
| **continually** 122:15 | 214:8,9 220:16 221:10 222:21 | 91:23 93:17 115:7 126:22 | 146:21 147:23 191:9 192:7 |
| **continued** 3:1 165:3 | 231:11 **conversational** | 129:23 133:18 137:21 138:11 | 201:22 204:22 220:14,15 |
| **contrary** 28:18 173:14 | 41:6 **conversations** | 202:8 215:19 217:8,14,21 | 232:14 235:21 240:23 |
| **convenient** 22:18,19 148:9 | 29:5 79:14 80:20 81:5 | 218:3,8 240:5 241:20 | **corrections** 62:10,11,12,13 |
| **conversation** 21:11,13 22:15 | 82:2,5,11 84:17,19,20 | **cooperate** 127:23 145:6 | 63:3,4,6,7,9,10 63:11,13,16 |
| 23:21 45:5 72:1 81:9 82:8 | 85:4 87:20 109:14 110:3 | 188:4 189:17 216:9 | **correctly** 145:1 **counsel** 6:5 |
| 82:10 84:24 85:24 86:20 | 121:22 127:8 166:11 173:15 | **cooperated** 112:3 | 32:1,18,22 33:20 134:4,17 |
| 87:5 92:1,3,14 93:23 94:20 | 205:18 216:17 231:8 232:16 | **cooperative** 191:6 | 139:18 142:21 146:5 196:21 |
| 111:19 113:11 114:18,22 | 233:21 234:1 **convey** 222:5,9 | **cops** 20:23 21:5 137:9 | 241:2,8 **counsels** |
| 115:1,3,6 129:11 130:20 | **convicted** 67:9 **conviction** 9:13 | **copy** 30:15 32:2,7,10,24 | 139:14 **counterprodu...** |
| 137:22 143:23 144:1 154:18 | 10:7 37:6 44:8 126:22 148:22 | 52:5,8,23 174:1 | 40:19 **county** 6:24 |
| 157:6,8,9,10 159:14 160:4 | 190:14 207:22 218:3 | **corner** 38:2 **correct** 13:2 | 7:12 10:5 11:15,16,21 |
| 160:12 161:10 162:4 164:14 | **convictions** 148:21 217:16 | 43:10 53:17 71:20 73:7 | 12:11 14:14 31:2,13 51:10 |
| 164:20 167:18 170:5 173:11 | **convince** 224:4 226:16 | 83:15 86:19 89:4 90:2,10 | 53:7 65:16 90:5 91:24 |
| 175:10 183:15 187:10 189:5 | **cook** 6:24 7:12 10:5 11:15,16 | 91:11,14 92:4 93:9,18,21 | 93:17 115:7 126:22 129:23 |
| 197:6,11,19 198:11,12,14 | 11:21 12:11 | 95:12,16 99:4 100:1 106:1 | 133:18 137:21 |

www.veritext.com                                          888-391-3376

138:11 202:9 217:8,14,21 218:4,8 240:3 240:5,5 241:20

**county's** 215:19

**countywide** 15:12

**couple** 62:17 139:19 162:3 167:14 169:4 170:16 234:8

**course** 74:20 76:2 77:17 78:14 85:10 147:16 165:6 211:1 214:5

**court** 1:1 6:8 6:13 7:20 8:8 8:19 9:15 12:3 14:14 15:24 25:20 83:23 145:24 146:2,3 170:14,16 178:9,9,10,10 178:17 179:8 179:15 180:1 180:10 181:6,8 181:22,24 182:2,4,5,6 197:7 214:18 214:23 215:2,8 215:13 232:11 235:15 237:15 237:20 240:11

**courtesy** 68:11 68:17

**courthouse** 17:8 19:2

**courtroom** 12:1 17:14 82:14 110:17,20 145:20

**courtrooms** 16:8,10

**courts** 1:18

**cover** 16:20

**covered** 206:8

**cpd** 7:15 135:7 135:11,21,24 136:4,9,13,17 136:21 137:1,4 138:5,10 139:6

**create** 26:17

**credence** 86:23

**credentials** 14:17

**credibility** 223:19

**crime** 29:4 95:3 107:14

**criminal** 11:23 13:9 14:6 16:6 26:9 69:10 70:18 71:16 107:3 146:24 148:1 155:18 155:21 163:5 179:19 185:2 216:3 231:12

231:22 235:1

**criminally** 232:7

**criminology** 18:13

**cross** 31:20,22 34:4,14,16 191:3 208:20 214:16

**crossed** 34:1 54:23 55:1 97:20 142:4 212:14,17,20 213:5 238:18

**crr** 1:23

**csr** 1:23

**culbertson** 2:6

**culminated** 84:10

**culminating** 87:7

**culpability** 84:5 167:5

**current** 18:4,6

**currently** 31:13 172:12

**cursive** 62:8

**custodial** 55:11

**custody** 55:10

**custom** 26:2 34:12

**customized** 173:6

**cut** 15:7,8 32:2 32:9

**cv** 1:5,8,12 6:9

**d**

**d** 4:1 8:10

**daley** 17:2,5

**danger** 232:2

**date** 12:20 22:18 120:21 132:9 140:21 144:2 158:12 170:23 171:8 171:10 222:2 223:10 224:13 224:14 225:7 225:14,17

**dated** 9:17 170:22 193:19

**dates** 17:7 143:24 171:12 199:14,15 200:7 202:5 234:1

**dave** 111:12

**david** 111:20

**day** 1:20 17:9 31:6 96:23 97:6 103:10,16 130:8,13 132:6 144:6 162:4 166:19 170:19 172:21 173:23 176:17 177:1,8 177:10 184:19 193:15 195:6 212:7 230:1 231:13 237:6

[day - direct]                                                    Page 15

241:13
days   165:7
  176:14
deal   23:5 24:6
  24:7 27:20
  67:16 179:2
  224:11
dealing   23:5
  86:22 91:15
  107:18
dealings   75:15
  79:24
dealt   86:6
  188:19
dearborn
  179:15,15
death   17:20
  29:8
decades   19:19
decedent's
  216:7
deceive   238:20
december
  15:19 117:7
  121:19 231:13
  232:1,6
deducing   147:6
deemed   90:15
defend   49:3
defendant   6:5
  6:19 7:7 26:16
  46:1 90:23
  111:23 116:16
  131:17 174:23

defendants   1:6
  1:10,14 7:16
  14:5 71:17
  74:13 82:14
  100:17 104:6
  104:12,19
  108:20,21
  109:6 126:18
  144:21 163:14
  210:14 233:15
  240:14
defending
  142:3
defense   13:9
  70:18 72:21
  73:9,19 74:2
  74:10 87:18
  107:18 108:3,5
  141:1,7 142:21
  144:21 145:15
  155:18,21
  156:6 178:6
  179:14,19
  183:21
defined   167:12
delineate   129:2
demeanor
  166:18
denied   217:17
  223:1
deny   198:22
  220:4,10
department
  19:1,19 133:21
  134:10,24

135:15
departure
  215:11,12,12
depending
  14:22
depends   142:10
deponent
  239:10
deposition   1:15
  6:4,10 9:10,12
  9:21 10:11
  30:10 33:13
  51:21 74:3
  143:20 146:11
  197:1 241:2,5
  241:6
depositions
  1:19
depth   130:21
describe   11:20
  41:5,10 58:2
  62:3,5 83:19
  214:22
described   29:9
  29:15 169:24
  235:22
description
  4:18 5:2 236:3
designation
  16:4
destruction
  119:16,24
details   218:17
detective   21:9
  131:5,7,10

detectives
  137:20
determine
  41:18
devastating
  38:4,6
deviate   36:19
diciolla   2:21
  7:13 131:21
dictate   115:12
die   70:2
difference
  189:7 190:7
  191:23 192:13
different   11:20
  13:17 14:13
  17:23 18:1
  67:17 161:14
  161:17 181:1
  181:17,18
  183:6 214:23
  215:18,20,22
  216:15 223:17
  232:5
differently
  174:11
difficulty   167:9
dig   187:9
dinner   77:8
dinolfo   2:17
  6:23 79:19
direct   88:24
  95:8 114:16
  115:17,23
  118:20 119:3

**[direct - either]** Page 16

119:14,22 208:17,18

**directly** 23:6 157:3 163:5 164:21 186:23 187:19 188:24

**disagree** 53:18

**discover** 28:21

**discovered** 28:23

**discuss** 69:9 70:19 80:14 85:3,7 108:6 143:13 175:13 175:13 186:14 186:24 213:7

**discussed** 83:12 85:6 94:1 126:10

**discussing** 99:24

**discussion** 87:22 98:3 127:5 169:6 209:10 237:23

**discussions** 98:8 126:7 127:17 216:12

**distance** 96:14

**distinction** 75:5

**distinctly** 21:4 142:2,5

**distress** 66:16

**district** 1:1,2 1:18 6:7,8 16:2

16:3,5 17:1 19:3 145:15 240:11,11

**division** 1:3 12:10 16:6 17:2,4,18 166:9

**document** 90:15 91:7 99:18 213:6

**documents** 9:9 73:20 85:10 144:5

**doing** 12:5 16:10,11,17 17:12 57:16 58:6 59:5 85:6 85:7 131:7 160:4 166:2 172:19 176:11 179:1,14,17 185:3 204:17

**door** 20:24,24 21:19,19,23 130:3,7,12 137:10,11,11 138:2 140:10 144:7 152:24 153:18 154:12 156:17 217:19

**double** 26:10 34:22 48:18 153:1 154:13 154:24 155:1

**downplay** 181:15

**dozen** 14:17

**drafted** 52:11 62:6

**drank** 37:16

**draw** 48:3

**dream** 83:16,18

**drinking** 37:18 160:5 176:10

**drive** 84:5 119:5 157:6 159:6

**driven** 211:10

**driver** 84:4

**driving** 157:8 159:10

**drop** 72:18

**drove** 202:13

**drug** 151:14,18 152:11 176:24

**drugs** 151:24 176:9

**dual** 16:4

**duly** 8:2 240:16

**duty** 148:24,24 149:12,13 150:3

**e**

**e** 4:1,17 5:1 8:10 91:17 135:17 136:1 144:3,4

**earlier** 15:6 139:3 141:6

170:1 215:24 235:22

**early** 9:14 137:9 170:2 215:12

**ease** 58:7

**east** 96:4

**eastern** 1:3

**easy** 236:4

**ed** 119:6

**edge** 37:11 48:23

**education** 10:21

**effect** 41:15 44:16 218:12 234:17

**effective** 58:8

**efficacy** 194:12

**effort** 102:20 108:5

**effraim** 139:15

**eggshells** 167:3

**either** 16:9,11 62:17 73:16 75:12 83:14 99:12,17 101:3 101:9,11,16 111:4,20 113:11,13 115:11 116:21 117:14 118:4 118:10,19 119:13 120:7,7 128:22 130:4,6

**[either - exhibit]** Page 17

137:14 151:1 164:21 187:15 188:24 190:8 193:20 194:9 196:16 202:11 206:11,13 208:16 218:19 224:3,13,14 226:6,12 228:9 229:10 232:17

**elaborate** 184:4 184:14 185:11

**elected** 15:9

**elevator** 166:8

**elevators** 166:1 166:8

**eliciting** 103:6

**emanating** 108:24

**employee** 135:8 135:11

**encompassing** 33:21

**encourage** 117:15,22

**ended** 87:7 149:13,14,18 150:3 176:23

**ends** 33:8 65:23 138:18 211:20

**enforce** 146:3

**enforcement** 18:14 131:18 138:2

**engage** 221:10

**engaged** 84:1 96:18,18

**engaging** 89:14

**english** 183:10

**enjoyed** 19:17

**enrolled** 19:11

**enter** 130:13 164:12,13

**entered** 150:24

**entering** 150:21

**enticements** 210:20

**entire** 43:9 62:23 64:7 136:23 142:17

**entirety** 168:3

**envision** 38:1

**ephraim** 3:9 7:6

**eric** 104:5 109:17 124:22 206:3

**ertler** 209:2,5

**esiff** 3:12

**especially** 105:19,21 115:2 185:14 185:15

**essence** 13:13 21:22 83:21 146:23 147:1 159:23 160:6 161:6 162:19

162:22,23 167:18 169:6 189:8 199:20 206:7,15

**essentially** 90:1

**estimate** 155:19 156:9 236:13

**et** 1:5,9,13 6:6 240:12,13

**etler** 209:2

**evaluated** 14:18

**evening** 237:1

**event** 141:16 161:15 163:23

**events** 44:14 94:22 97:7

**eventually** 29:14 93:23 144:20

**everybody** 15:24 38:16 63:12 122:17 163:4 167:16 167:17 187:22 216:7

**evidence** 28:16 28:21,21,23 29:4,21 31:14 31:16 172:13 174:9,19 213:17

**evident** 37:5

**evolved** 19:7

**exactly** 96:3 154:4 162:6 169:8 174:20 174:21 176:2 196:14 213:4 238:3

**exaggerate** 234:21

**examination** 1:16 4:2 8:4 74:11 129:20 133:11 139:1 140:2 141:4 191:3 208:17 208:20 212:4 214:16 217:5 234:9 238:15

**examined** 8:2

**except** 187:16 216:7

**exchange** 60:15 74:6

**excuse** 89:24 157:9 208:15

**execute** 40:21 172:5 174:15

**executed** 89:23 89:24

**exhibit** 4:19,21 4:23 5:3,5 9:16 9:21 30:7,10 30:14,19,21 31:11 32:15,18 32:19 33:13,18

**[exhibit - final]** Page 18

33:20 34:24
51:17,21 52:3
52:5,14 53:5
53:19 54:20
55:16 61:17
63:19,24 64:20
65:5,14 89:1
90:6 95:9,9
134:7,19
170:24 190:17
196:18,19
197:1 212:14
**existing** 82:12
82:22
**expect** 194:1
234:13
**expected**
173:14 193:23
**experience**
12:12 118:3
131:16 133:20
215:17
**experienced**
215:18
**explain** 26:21
36:7 172:4
198:2 236:5
**explained**
41:14 171:24
189:11 190:2,5
190:7 192:12
213:10,23
235:3 236:4
**explaining**
175:20,22

189:6 214:17
**expose** 49:16
**exposure** 12:13
23:24 26:9,24
128:9 213:21
231:16,21
**express** 66:16
122:8
**extent** 173:7
**eye** 88:20

**f**

**fabricate**
122:20
**fabrication**
199:10
**face** 235:1
**facility** 159:2
**facing** 96:3,12
**fact** 37:15
86:23 108:15
108:19 114:12
130:2 133:14
**factions** 67:17
216:7
**facts** 126:10
**fair** 8:23 80:18
81:21 82:3
86:18 89:8,17
90:6,12,16,24
97:2 98:11
104:13 113:15
113:24 115:5
124:2 127:7,13
130:10 133:14
134:9,23 139:8

146:11,19
149:12 157:13
170:3,23 184:1
188:10,12,13
191:13 197:5
218:14 219:10
227:2 232:11
235:17,18
238:2
**faith** 129:10
**fall** 11:11
**falling** 17:23
**false** 148:2
**falsely** 103:9,15
103:23 116:3
116:23 127:23
229:24
**falsify** 102:7
**familiar** 108:15
108:19 111:17
**families** 216:8
**family** 24:3,10
24:20,23 25:11
27:11 49:2
77:8 152:8
153:6
**far** 105:20
**fast** 238:21
**father** 106:15
106:15
**fear** 215:6
**february**
120:18
**federal** 83:22
87:15 170:14

178:17 179:8
179:15,21
180:1,10,14
181:6,8,22
214:18 215:2,8
215:10,13
**feed** 221:8
225:3,8 226:3
**feeding** 102:12
102:13 219:16
220:14
**feel** 88:12
211:15
**feeling** 228:5
**feels** 141:3
**feet** 166:9
**felonies** 16:11
**felony** 12:7,8
12:10 16:8,10
182:17
**felt** 88:19
227:24
**fifth** 128:8,13
128:21 129:2,7
129:12 173:24
**fight** 233:1
**figure** 40:17
164:3,8
**file** 125:16
161:7
**filed** 6:7 125:23
**filing** 32:20
**fill** 41:21
**final** 15:7,8

**find** 24:9 81:9 81:12 154:20
**fine** 8:14 69:21 87:9 179:7 187:16 213:22 234:23 235:13
**finger** 44:19
**finish** 70:4 179:7
**finished** 13:14 76:13 84:11 101:23 176:23
**finishing** 211:13
**firm** 6:14 7:6 142:18
**first** 8:2 11:6 11:14 12:5 13:5 20:9 41:4 62:14 89:12,17 92:10 94:5,14 94:20 101:21 130:1 134:5,11 137:12 140:16 140:17 145:19 148:5 151:4,5 156:11,14,16 156:23 157:2 158:10 159:4 159:14 160:21 161:9 162:3,18 165:11 169:22 170:22 172:1 177:7 179:11 188:17 189:23

196:1 197:17 198:10 207:15 221:11 223:7 223:13 224:2 236:21,22 237:2 240:16
**fitzgerald** 12:2
**fitzgerald's** 110:17
**five** 17:6,15,17 82:14 108:20 128:24 211:14 211:16
**flanagan** 184:22
**floor** 2:3 17:12 240:9
**flow** 132:19
**flowed** 107:6
**focus** 13:3 14:8 15:22 31:10 219:21 226:8
**follow** 23:12 51:16 157:10
**followed** 23:15 87:6 178:17
**follows** 8:3
**force** 219:16 220:13 221:8 225:2,8 226:3
**forced** 188:8
**foregoing** 240:22 241:2
**forest** 16:19

**forget** 190:16
**forgetting** 145:11
**forgive** 61:6 92:23
**form** 21:14 22:22 25:7,18 26:6 27:3,22 29:24 31:7 37:22 38:7,14 39:1,20 40:8 41:7 42:5,12 42:22 43:6,15 43:16,21 44:13 45:2,9,17,23 46:5,11,17 47:6,16,21 50:11 52:7,17 53:2,21 54:5 54:13 55:9,24 56:17,23 57:5 57:21,23 58:4 58:19,23 59:4 59:18,24 60:6 60:11,17,22 61:7,13 62:4 64:3,22 65:6 65:10 66:17 67:4,12,24 68:9 69:2,11 69:13 70:12,14 70:20 72:7 75:1 76:10 77:3,14 78:3 78:20 80:6,23

81:22 82:16 83:3 84:22 87:14 88:3,16 89:9 90:1,17 92:5,16,21 93:21 94:4,24 97:9,16,21 98:15,22 99:10 99:19 100:2,7 100:21 101:5 101:13,19 102:9,14,24 103:4,12,19 104:1,15,21 105:5,17 106:3 106:8,19 107:20 108:7 108:22 109:7 110:7 111:1,9 112:1,19 113:18 114:2 114:11 115:14 115:19 116:5,9 116:13,17 117:1,17,24 118:7,16,23 119:7,18 120:2 120:10 121:4 122:4,10,21 123:4,9,15,22 124:5,11,17,23 125:5,12,22 126:11 128:5 128:15 129:5 130:14,19

**[form - future]** Page 20

132:14,21
133:1 134:20
137:2 138:6
146:14 148:14
152:17 163:18
164:6,15,16
172:15,17
183:24 184:12
186:4 188:16
193:14,15
194:6,16
200:10,19
205:4 210:10
213:8,19
214:13,19
215:21 216:4
217:10 218:22
219:12,17,23
220:6,19 221:1
221:21 222:12
224:7,21 225:4
225:10,19
226:9,20 227:6
227:14,20
228:1,6,12,19
229:1,7,14,20
230:4,11,22
231:5,14 232:3
232:20 233:2
233:16 234:3
235:11 236:2
237:12 238:17
238:22,24
**formally**
140:13

**former** 6:21
7:11 13:15
**forms** 172:22
**forthcoming**
38:16 42:15,17
48:4,5 56:7
100:14,16
167:1,8 186:6
203:6 236:10
**forward** 24:4
143:17 175:24
**foun** 43:15
**found** 32:10
70:21 142:11
198:5 210:7
**foundation**
38:7,14 39:1
39:20 40:8
42:12 43:6
45:2,23 46:5
46:11,17 58:19
60:6,11 61:13
64:22 65:6
66:17 70:14
75:1 76:12
77:3,14 78:3
78:20 83:3
87:14 88:3
94:4 97:9,16
100:21 101:5
101:19 102:14
103:4,12 105:5
105:17 106:3,8
106:19 108:7
111:1 113:18

114:2,11
125:22 132:14
132:21 133:1
134:20 137:2
138:6 152:22
210:12 213:19
214:13 216:4
219:23 220:19
221:21 231:5
231:14 232:3
**founded** 126:5
**four** 15:15 16:8
19:18 36:2
81:3 165:19
236:23
**fourth** 145:15
**fragile** 37:21,23
**frame** 11:19
73:5 156:5
**frank** 106:11
106:14,18
**franklin** 1:19
2:7 6:11 240:8
**free** 55:14
83:22 149:1
**frequently**
106:21
**fresher** 44:15
**friedrich** 3:14
7:10
**friend** 13:7
38:10,12,18
42:16,18 48:8
77:6 105:21
114:6 126:24

160:3 167:4
184:22 186:14
186:24 187:23
**friends** 37:13
99:23 100:6,10
105:16 110:24
156:13 198:8
**front** 68:13
69:3,23 149:8
174:13 184:21
191:11 205:15
209:4
**frustrated**
203:5
**frustration**
122:8 202:21
**fu** 182:18
**fudgie** 185:7
**full** 15:3,3
**fully** 122:16
160:2
**functioning**
37:8
**further** 4:11,12
4:13,14 18:9
35:4 129:15
138:13 185:11
212:4 217:5
234:5,6,9
238:15 239:10
240:15 241:1,4
241:8
**future** 40:18

**[gain - good]**                                           Page 21

**g**

**gain** 12:12
**gang** 37:13
  151:22 159:24
  160:2,4,8,9
**gang's** 160:11
**gauge** 203:19
**general** 26:7
  105:19
**generally**
  214:17 216:1
**gentle** 41:13
  58:6 122:15
**gentleman**
  142:16
**george** 2:16 3:6
  6:23 79:21
  80:1,4 112:10
  112:12 135:16
  135:20
**gesundheit**
  174:2
**getting** 37:19
  48:23 69:24
  105:24 126:2
  147:17,20
  160:5 203:5
  235:23
**gina** 1:23 6:13
  237:18 240:4
**girls** 29:8 45:22
  108:17 160:18
  160:18 163:1
  174:24 221:20

**gist** 164:19
**give** 10:14 22:6
  22:21 33:3
  38:23 39:9
  40:3,13 46:9
  55:8 60:3
  83:23 86:17
  87:17 98:20
  107:15,17
  123:13 128:23
  133:9 156:9
  159:22 164:12
  169:21 176:2
  178:23 180:6
  219:6 235:15
  236:13
**given** 23:14
  68:10,11 105:8
  168:8 171:19
  193:14 205:15
  240:18,23
**gives** 129:8
**giving** 29:3
  55:4,19 60:15
  69:19 90:22
  102:22 190:13
  220:13,22
**glean** 187:2
**go** 11:2 12:16
  14:16 15:20
  16:24 17:8
  18:9 21:17
  24:15 26:7
  30:24 40:19
  56:4 66:6

  68:20 69:12
  70:1 79:1
  96:20 98:24
  128:20,23
  131:19 144:2
  161:1 165:24
  169:2,6,8
  174:18 175:12
  175:24 178:23
  178:23,24
  179:5 186:4
  189:9 190:23
  200:22 201:4
  213:1 214:17
  215:15 224:5
  226:17,19
  236:24 237:18
**god** 11:7 174:2
  184:19 192:2
**goes** 68:21
  86:19 178:24
  214:22
**going** 6:1 8:22
  9:16 15:2 20:2
  20:3 21:10
  23:5 24:9
  26:17 29:18
  30:8 31:11
  33:7,12 34:24
  36:14 48:2
  49:3 51:6,7,18
  56:4 65:24
  66:4 67:1
  68:17 73:17
  74:9 80:16

  81:13,15 83:6
  85:7,8,9 86:24
  87:2,9 88:24
  89:23 95:8
  96:20 108:4,14
  114:16 128:7
  128:11,12
  129:17,18,19
  131:17,18
  138:17,22
  143:17 144:2
  145:6 146:1,4
  147:2,15,23
  151:2 152:21
  154:21 163:23
  172:3 175:10
  177:14 178:22
  179:3 184:11
  186:2,3 189:5
  189:13,19,24
  193:1,8 194:5
  196:3,17,21
  197:14 201:11
  201:11,12
  204:7 211:21
  212:1,24
  213:22 215:4
  215:14 216:2
  225:23 231:10
  232:10 234:18
  234:24 239:5
**good** 6:1 8:6
  20:18 33:5
  58:6 67:19
  90:16 126:24

**[good - hagy]** Page 22

129:10 131:14
141:2 142:19
177:18 178:3
210:23 211:2
**gossip** 216:16
**gotten** 84:6,8
87:3,3 122:23
160:10 185:4
225:22
**graduated**
10:23,24 11:2
**graff** 136:16,17
136:20
**graffeo** 3:7
136:8,9,13
**grand** 49:22
56:8 66:12,15
66:20,21 68:13
69:4,23 70:10
84:11,12 88:18
125:4 128:23
150:9 175:5
189:10 205:16
214:2 232:11
232:13
**grant** 86:12
87:12
**great** 33:1 62:7
**grew** 188:1
**gridelli** 109:21
**group** 13:17
**guess** 167:5
170:10 176:6
176:22 220:12

**guidelines**
215:10
**guilty** 215:14
**gun** 160:10,14
**guns** 160:10,10
160:11,15
161:1 168:7
169:9
**guy** 20:18
83:23 105:20
105:20 167:10
167:10 182:17
187:23 208:13
**guys** 37:14 67:8
86:20 114:6
122:13 126:23
145:17 159:24
160:15 166:22
188:2 200:3
236:7

**h**

**h** 4:17 5:1
135:17
**hafra** 3:6
**hagy** 2:2 4:10
4:13 7:17,17
21:14 22:22
25:7,18 26:6
27:3,22 29:24
31:7 32:1,9,12
32:16,20 33:1
37:22 38:7,14
39:1,8,20 40:6
40:8 41:7 42:5
42:12,22 43:6

43:15,21 44:13
45:2,9,15,17,23
46:5,11,17
47:6,16,21
50:11 52:7,17
53:2,21 54:5
54:13 55:9,24
56:17,23 57:5
57:21,23 58:4
58:19,23 59:4
59:18,24 60:6
60:11,17,22
61:5,7,13,21
62:4 64:3,9,22
65:6,10 66:17
67:4,12,24
68:9 69:2,11
69:13 70:12,14
70:20 72:7
75:1 76:10,12
76:14,23 77:3
77:14 78:3,20
79:1 80:6,23
81:22 82:16
83:3 84:22
87:14,24 88:3
88:16 89:9
90:17 92:5,16
92:21 94:4,24
97:9,16 98:15
98:22 99:10,19
100:2,7,21
101:5,13,19
102:9,14,24
103:4,12,19

104:1,15,21
105:17 106:3,8
106:19 107:20
108:7,22 109:7
110:7 111:1,9
112:1,19
113:18 114:2
114:11 115:14
115:19 116:5,9
116:13,17
117:1,17,24
118:7,16,23
119:7,18 120:2
120:10 121:4
122:4,10,21
123:4,9,15,22
124:5,11,17,23
125:5,12,22
126:11 128:5
128:15 129:5
130:14,19
132:14,21
133:1 134:20
137:2 138:6,15
141:2,5 145:7
146:8,9,18
147:21 148:18
152:19 153:3
156:7 157:12
164:2,10
165:10 173:2
177:2 179:16
180:7 184:3,15
186:21 187:18
189:14 190:12

190:20,21 194:13,16,23 196:21 197:4 197:21 198:20 200:14 201:1 202:6 205:10 211:3,13 212:2 213:8,19 214:13,19 215:21 216:4 217:10 218:22 219:12,17,23 220:6,19 221:1 221:21 222:12 224:7,19,21 225:4,10,19 226:9,20 227:6 227:14,20 228:6,12,19 229:1,7,14,20 230:4,11,22 231:5,14 232:3 232:20 233:2 233:16 234:3,8 234:10 235:14 236:12,19 237:18,22 238:1,9,12 239:3

**hair** 233:22

**half** 17:12,13 143:9

**hall** 175:12

**hallway** 114:18 183:14 197:7

**hand** 9:20 178:20 193:24 194:1,10 241:13

**handcuff** 25:16

**handcuffed** 97:23

**handcuffs** 155:2

**handed** 21:7,24 32:12,16,18,22 89:21 168:8 169:9

**handwriting** 62:7 171:2,7

**handwritten** 9:11 51:7,18 52:6,11 53:12 54:12 55:5 60:16 61:11 65:5,15 68:12 84:10 95:9 98:21 99:4 101:2 108:11 109:16 110:5 111:6,21 115:13,24 127:18 132:4 134:15,19 135:1 143:20 165:7 171:4 204:20 212:6 225:1 226:4 227:11 237:3 238:5

**hang** 39:9 107:16

**hanger** 160:3

**hanging** 160:5

**happen** 21:20 56:5 65:7,12 69:17 113:3,23 114:21 179:12 180:17,20,22 182:21 197:20 197:24 200:3,5 215:2

**happened** 18:18 70:22 89:18 107:8 159:12 168:9,9 169:11,12,19 177:22 179:13 180:13 182:20 188:9,20 199:19 200:2 203:2 210:24 215:3 216:5 218:13,14

**happening** 195:24

**happens** 168:20,21

**happy** 22:18 32:7 114:7 131:13 154:23 200:4

**harassed** 106:7 106:18 107:10 107:13

**harassment** 106:21 210:20 211:4

**hard** 56:3 237:18

**harmful** 107:24

**he'll** 128:23

**head** 18:24

**headquartered** 16:7

**hear** 44:17 48:19 153:14 166:16 168:13 183:5 202:18 203:2 204:7 216:15 220:24 221:2

**heard** 29:6 42:14 44:21 95:3 165:6 169:12 178:7 178:12 181:7 181:21,22,24 186:19 203:3 219:6

**hearing** 9:13 37:7 44:8 72:3 73:4 150:17 190:14 207:22 209:15 218:3

**hearings** 12:9 16:16

**heather** 3:3

**hedging** 42:17

**heels** 187:9
**held** 11:21 75:5
  78:7
**hell** 160:20
**hello** 204:16
**help** 20:16
  107:23 154:3
**heracklis** 3:14
  4:8 7:9,9
  138:23,24
  139:2,12 146:5
  164:16 202:2
  234:6 237:12
**hereinbefore**
  241:7
**heretofore**
  240:6
**hereunto**
  241:12
**hesitant** 102:2
**hey** 50:2
  182:16
**hide** 36:20
**high** 37:19 75:6
  75:8 78:7 87:8
  160:5
**higher** 10:21
**highest** 77:4
**highland** 117:6
**hinshaw** 2:6
**hinshawlaw.c...**
  2:9
**hired** 24:17
  140:13

**hiring** 19:8
  140:12
**history** 11:3
  172:21
**hit** 42:16 178:4
**hold** 12:21 75:8
  77:4
**holmes** 3:6
  135:16,20
**home** 86:21
  144:6 169:12
**honest** 42:2
  79:5 208:6
**honestly** 191:2
  207:10
**honorable**
  142:11,14
**horrible** 105:11
**hospitals**
  195:13 196:5,7
**hot** 24:14
**hour** 1:21
  143:9 165:18
**hours** 165:15
  165:17,17,18
  165:19 236:23
**house** 21:6 22:3
  22:7,12 25:6
  25:12 67:20
  72:15 85:9
  130:13 144:8
  158:18 159:24
  163:3,4 219:5
**hovel** 10:12
  20:3,6,10

27:13 29:22
40:23 49:11
50:22 59:23
65:19 66:12
67:2,23 70:19
71:2 72:6
**hovering** 96:19
  205:17
**huh** 25:20
**hurt** 168:22
**hyland** 2:16
  6:22 35:13,23
  35:24 48:22
  53:8,11 57:3
  58:5,11,22
  59:12,15,21
  60:3,9,14,21
  62:15,21 65:2
  75:20,23 91:18
  91:22,24 92:8
  92:11,11,15
  93:3,12,21
  94:3,8,11
  96:10,23
  100:19 101:3
  101:11,16
  115:11,17,22
  116:22 117:15
  117:21 118:5
  118:12,19
  119:2,13,21
  120:8 121:24
  193:18 194:11
  194:14,18
  196:8 204:17

221:7 222:18
223:15,21
225:2,14,17
226:7,12,17
227:13 228:5
228:10,23
229:4,11,12
231:3
**hyland's** 58:2
  223:24
**hypertechnical**
  167:11

**i**

**idea** 23:10
  138:7 150:7
  199:23 212:9
**ideas** 102:22
**identification**
  9:23 30:12
  33:15 51:23
  197:3
**identified** 21:8
  22:9 137:18
**idoc** 126:23
**ignoring** 43:13
**illegal** 232:1
**illinois** 1:2,20
  2:3,8,13,19 3:4
  3:11,15 6:8,9
  6:11 11:14
  90:5 240:1,6,9
  240:12 241:20
**immediate**
  154:19

**immediately**
 86:6
**immunity** 24:6
 24:7 27:20
 28:6 30:6
 83:14,16,19,19
 83:21,24 84:6
 84:17,24 87:10
 87:11,16,17,22
 128:23 162:12
 164:13 165:2,5
**impeachment**
 28:18 192:2
**important**
 34:20 171:10
 171:12,13,15
**impress** 203:24
**impression**
 46:9 60:4
 176:16 187:13
 188:3,5 220:23
 221:18,19
**impressive**
 153:9
**inapposite**
 148:3
**incentives**
 210:20
**incident** 107:8
**include** 27:1
 226:4
**included** 27:4
**including** 14:4
 187:22

**inclusion**
 173:13
**inconsistent**
 50:20 51:3
 64:20
**increasing**
 179:23
**incriminate**
 129:12
**incriminating**
 31:14 172:13
 174:8
**incrimination**
 129:9
**independent**
 54:2 161:16
 162:16
**indiana** 10:24
**indicate** 113:6
 128:12 203:9
 222:16,19
**indicated** 75:20
 80:13,17 83:11
 88:6,11 89:6
 90:8 93:20
 95:10,14 99:6
 99:22 113:2
 154:23 220:12
 222:15 226:23
**indicates** 223:4
**indicating**
 122:1
**indication**
 131:14

**indicted** 163:7
 198:7
**indictment**
 82:12,13,18,22
 126:10
**indictments**
 108:16,16,18
 116:16 126:12
**individual** 7:15
 14:19 130:24
 131:20 132:6
 222:22
**individuals**
 38:10 130:12
 130:17 134:5
**influence** 176:9
**information**
 23:8 81:6
 102:13 112:15
 123:14 138:9
 163:10 164:4
 219:16 220:13
 220:14 221:8
 225:3,9 226:3
**informed**
 120:17 121:8
 121:18 195:1
**initial** 34:4,6,13
 56:4 63:15
 81:8 86:1
 91:16 99:17
 128:19 171:14
 205:9 212:24
 213:1

**initialed** 62:12
 63:12 86:2
 205:6
**initially** 24:8,8
 140:7
**initials** 33:23
 34:8 62:18
 91:10,13
**injuries** 12:9
**injury** 17:21
**inserted** 63:12
**insisted** 53:16
**instance** 222:18
 223:11
**instances**
 172:18 216:1
**institution**
 19:18
**insulting** 148:2
**insurance**
 17:21
**intact** 132:24
 133:3
**integrity** 78:2
**intended**
 129:11
**intention**
 160:17
**interact** 139:6
 139:9
**interacted**
 137:1
**interacting**
 137:4

**[interaction - judicial]**                                    Page 26

**interaction**
  96:15,22
  176:21,22
  183:12
**interactions**
  135:11,20
  136:4,12,20
  153:8,10
**interest** 112:4,5
  127:21
**interested**
  163:24 241:10
**interim** 217:24
**interject** 93:3
**interpret**
  238:20
**interrogation**
  55:11
**interview** 23:12
  24:1 31:3 36:6
  36:10,16 40:22
  41:4,5,10 42:4
  42:21 43:9
  47:8 51:12
  54:18 55:12
  56:2,4 57:2,11
  57:16 58:3
  68:14,17 86:7
  90:22 94:2,11
  94:12 101:21
  101:22,24
  102:3 120:22
  121:16 140:16
  140:17 157:2
  169:23,23

177:8 221:6,16
**interviewed**
  15:2 71:4,8,15
**interviewing**
  83:8 120:5
  163:4
**interviews**
  14:20 38:9
  103:9
**intimidated**
  47:19,23 61:2
  227:24 228:5
  228:10
**intimidating**
  48:2 230:20
  231:3
**introduced**
  110:19
**investigating**
  163:16
**investigation**
  214:6
**investigator**
  21:9 72:16
  86:16 114:20
  130:7,11
  138:11 154:6
**investigators**
  7:12 21:11
  22:6 23:18
  25:5,12 65:17
  129:23 130:5
  137:11,19
  141:20 154:22
  162:4 202:9

**invited** 19:6
**involved** 20:9
  22:10 76:2,3
  78:15 79:13
  82:10 117:11
  160:23 161:12
  163:5 167:20
  167:24 168:6
  169:1 182:20
  182:22,24
  188:24 209:6
**involvement**
  111:5 117:7
  118:14 137:5
  167:4
**irv** 110:10
  111:4
**isolated** 166:6
  166:15
**issue** 113:12
**issued** 14:18
  72:24
**issues** 114:10
  114:13 152:4

**j**

**j** 3:2
**jack** 93:16
**jackson** 25:2
  158:15
**jail** 83:22
  126:19,23
  179:4
**james** 3:14 7:9
  138:23 141:9

**jim** 18:24 19:3
  19:9,20,21,23
  20:15 109:23
  110:3,19,22
  113:11 114:19
  114:19,23
  115:3 121:20
  158:22 206:22
**job** 11:14 13:5
  18:4,6 58:6
  62:7 177:18
**joheracklis**
  3:16
**joseph** 2:12
**judge** 9:14 12:1
  12:20 13:1,8
  13:12,24 14:9
  14:10 15:5,14
  15:17,18 16:18
  75:5 77:6
  87:17 141:2,10
  141:10 144:9
  144:11 146:3
  149:7,9 182:14
  182:14 184:22
  207:9,9 208:19
  209:23 217:3
**judge's** 12:1
**judges** 14:13
  14:14,15,20,21
  15:3,3
**judgeship**
  15:12,22
**judicial** 14:8
  15:10

**[july - know]** Page 27

**july** 11:10 18:3 18:5 70:19
**jump** 16:20
**jumped** 188:6
**jumping** 151:3
**june** 12:20,22 14:10,10,11,12 206:4
**jury** 49:22 56:8 66:12,15,20,22 68:13 69:4,23 70:10 84:11,12 88:18 125:4 128:23 150:9 175:5 189:10 205:16 214:2 232:11,13
**justice** 107:3 175:2 189:18 191:7 225:18 229:5

**k**

**k** 2:21 240:3
**kamionski** 3:9 7:7
**kathy** 184:22
**kazmierski** 9:14 149:9
**keen** 187:14
**keep** 129:17,18
**keeping** 58:8
**kent** 11:1
**kept** 148:24 202:23 207:4

**kevin** 20:21
**key** 225:24
**kill** 160:17
**kind** 42:17 47:24 74:18 76:20 91:14 166:5 179:9 180:18 183:22 187:8 218:13
**king's** 183:10
**klupperberg** 148:5
**kmklawllp.co...** 3:5,6
**knew** 40:22 49:10 50:18,21 51:4 58:17 65:18 67:5 109:8 112:22 114:12 120:9 120:12 143:15 145:13,13,14 153:6,7 154:16 165:8 178:1 195:12,23 199:12,14 202:3 203:10 203:10,14,14 204:1,2 210:18 215:24 216:2 216:14 218:18 219:5 224:9
**knocked** 211:1
**knocking** 152:24

**know** 17:7 18:15 20:11,15 20:18 21:3 22:1 24:13 27:12 28:6 37:3 38:18 41:16,17,19,20 47:22 48:2,7,9 49:22 57:17 62:6 67:6,7,7 67:18 68:3,21 69:15 70:17 72:14,23 74:13 74:15,22 75:3 75:19,23 76:8 76:16 77:8,9 77:19 78:8,11 79:18,21 82:6 82:11,17,21,24 83:1,5,12 85:7 91:16,17,19 94:15 100:5,13 104:6,9 105:8 105:9,10,12 106:11 107:2,4 107:5,6,12 108:24 109:5 109:12,20,23 110:10,12,14 111:12,15,17 111:18,18 112:7,10,12 120:22 122:14 123:13,19 126:4,17,20,24 127:1 129:19 130:9 131:2,4 131:6,11,20 132:17 135:7 135:15,24 136:9,17 137:20 138:10 138:11 140:8 141:17 142:4 142:17 143:5 143:16,18,21 144:10 145:8 145:10,11 146:16 149:3 150:22 151:1,4 151:7 153:4 155:24 159:17 160:19 162:1,3 162:6,10,13 164:18 165:13 165:19,21 166:5,20 167:14,14 168:9,15 169:7 169:13,13,24 170:6,9,10 172:4,20 173:21 174:12 175:3,17 176:2 176:4,6,8,10,13 178:1 179:6 182:1,16,20 185:13,14,20 185:22 186:16 186:17,18

191:2 193:13 194:24 195:8 195:18,24 196:2,4,11,12 196:13,14 197:17 199:9 199:11,14,22 200:7 201:19 202:5,13 203:1 203:5,18,21,22 203:22 204:1,2 204:4,5,6,15 205:5,7,21 206:13 207:10 208:4,10 210:6 211:9 212:12 216:11 218:13 218:13,16 223:2,4 224:10 232:4 233:11 234:18 235:24 237:6

**knowledge** 130:6,23 133:21 134:11 135:10,19 136:3,11,19 150:20 151:19 151:20,21 152:2 159:20 161:3

**known** 15:1 77:18,23 201:23

**kogut** 5:6 109:24 110:3 110:19,20,23 110:24 113:11 114:19,23 115:3 121:20 196:22 197:6 197:11,19 198:3,10,18 199:10,18 206:22 223:5

**kogut's** 114:20

**kulwin** 3:2,2

**kunzer** 2:18 4:6 7:2,2,11,11 129:16,21,22 130:16,22 132:16,23 133:6

**kurt** 208:2,4,12

**l**

**l** 2:21 8:10 135:17

**lag** 11:12

**laguardia** 91:12

**lake** 3:15

**language** 85:16 91:4,21 128:18 128:19 129:11 172:11 173:9 173:13,17 174:2,3,8,18,22 175:6,18 183:22 185:3,4

185:10 237:14

**larry** 1:15 4:3 6:4 8:1,9,13,14 8:16,17 9:18 10:2,17 13:22 20:3 29:19 30:14 31:1,18 32:6 33:23 34:24 39:12 50:2 51:6 52:2 53:5 55:16,19 62:2 63:24 74:8 138:23 141:3 184:7 186:3 212:6 214:16 217:1 238:14 239:6 240:9,15

**laura** 2:16 6:22 53:8 57:13,15 57:17 62:15,20 63:21 77:11,12 77:18 92:12 94:12,18 95:15 96:12,19 101:4 101:11,16 102:13 115:12 115:22 116:22 117:15,22 118:5,13,20 119:3,14,22 120:8 121:24 204:18 223:23 225:8 226:2,13 229:18 231:2

**law** 11:1 13:22 17:2,4,18 18:14 110:16 131:18 138:2

**lawsuit** 147:1

**lawyer** 11:9 23:5 24:11,12 24:14,18 55:19 70:18 73:17 76:20 77:22 111:12 112:7 112:10 131:19 171:15 175:19 184:18 194:20 199:21,22 216:15 222:22

**lawyers** 88:2 108:10 109:5 112:13,17 143:11 182:24 210:13 232:12

**lead** 29:3

**leading** 58:11

**learn** 10:19 21:12 22:12,14 23:21 26:3 66:24

**learned** 21:18 82:18 120:19 121:11 207:16

**leave** 23:7 45:7 50:5 55:14 70:4 144:15 154:22 221:19

**led** 29:7 84:10
  86:23
**left** 13:5,13,14
  14:3 23:10
  54:15,16,16
  57:13 65:11
  72:14 87:1
  110:20 128:6
  131:14 137:22
  138:9 143:12
  145:4 155:2
  161:1
**legal** 74:24
  76:2,9,16
  77:13 78:14,24
  80:4,10 194:12
**legible** 33:21
  62:8
**leonard** 7:12
**letter** 4:21,23
  29:18 30:8,15
  30:24 31:24
  33:18,22 34:18
  35:3,4,5,11
  36:3,7 40:21
  73:21 83:14
  85:3,8,12,12,15
  85:20,22 86:2
  86:9,11,18
  87:23 89:1,7
  89:19,24 90:5
  91:1 92:2,15
  92:20 93:7
  100:18 108:11
  110:6 111:7,22

127:17 128:1
  128:17 131:23
  132:2 143:20
  144:18 170:2
  170:13,17,21
  170:22 171:13
  171:18 173:3,3
  173:15 174:16
  175:11 193:8
  193:10 194:12
  194:15,18
  212:13
**level** 58:9 87:8
  100:9 175:21
  215:19
**lga** 34:6 91:11
  91:12
**liabilities** 17:23
**liability** 17:21
  17:24
**liar** 46:20 59:8
  168:17 178:21
  186:10
**liberto** 111:8
  119:5
**lic** 241:21
**license** 1:24
**lie** 36:19 41:21
  49:13 84:15
  101:12 118:6
  122:20,20
  123:13 168:22
  185:23 186:1,5
  186:12 189:9
  189:10 200:13

201:16 230:10
  230:15,18
  232:19 233:12
  233:14 234:20
**lied** 36:16
  49:19,21,23
  50:2 66:21
  124:9,16,22
  125:4,10 175:3
  175:4 213:24
  214:1,5 231:19
**lies** 49:9
**life** 37:18 188:8
**light** 160:13
  169:6,8 214:21
  237:10,14,22
**lighting** 237:17
  237:21
**liked** 80:12
**lindsay** 2:2,4
  7:17
**line** 133:8
  137:8 190:15
  190:23 192:18
  212:17 213:5
**lined** 162:9
**linehan** 2:15
  6:22 74:14,15
  74:17,18 75:2
  75:11,16
**lines** 85:24
  88:22 91:9
  151:15 181:4
  188:1 192:20
  203:1 212:14

**linn** 141:9
**list** 14:21 15:1
  15:5,8
**listed** 53:23
**listen** 206:24
  209:16 222:10
  226:14
**listening** 122:2
  169:21 220:17
  220:20 222:6
**little** 10:19 17:6
  17:15 18:9
  31:1 32:2,9
  81:12,12 87:10
  97:19 101:24
  138:15 143:18
  145:13 160:17
  163:1 198:2
  236:7,9
**lived** 211:9
**llc** 2:11
**llp** 2:6 3:2,9,14
**location** 6:10
  103:18 230:3
**locked** 56:10
  69:5 88:18
**loevy** 2:2,2
  148:5,5
**loevy.com** 2:4
**long** 11:16
  12:18 15:16
  16:22 17:4
  28:14 36:15
  69:20 70:21
  77:18 84:13

143:4,8 160:9 165:11 173:23 190:4 192:1,11 193:4 213:4,21 231:17 234:22 235:2,6,12 236:14

**longer** 143:6,8 148:23 165:19

**look** 32:7 33:23 34:10 63:24 171:5,20,23 177:11 237:3

**looked** 131:23

**looking** 36:19 83:14 102:23 114:3 131:15 144:15 163:10 172:2 208:11 208:13

**looks** 173:23 191:4 208:13 208:14,15

**loose** 160:20

**lords** 219:7 222:2

**lost** 50:23 92:6 117:18 230:12

**lot** 18:1,1 24:13 37:16,16 48:10 83:23 178:1,3 180:4 185:22 186:6,16 203:1 203:2 204:6 218:16 225:24

**loud** 62:9 99:8 99:12,13,14

**love** 129:18

**loving** 185:6

**low** 225:24

**lowest** 58:9

**loyalty** 127:13 127:18,19

**lunch** 77:7

**luordo** 1:23 6:13 240:4

**luxury** 227:4,8

**lying** 46:24 59:10 88:22 122:23 168:16 186:11 224:10 234:2

**m**

**m** 1:23 2:18 135:17 136:1 240:4

**ma'am** 190:15 211:6

**made** 15:5,8 62:12 63:4,8 63:10,13,16 99:14 148:24 149:14 154:23 172:7 175:23 188:14,21,21 189:3,15 191:20,23 192:4,11,19,21 193:16 210:1

**maicke** 2:21

**mail** 144:3

**mailed** 144:4

**main** 29:12

**make** 26:8,14 26:16 41:20 63:3,6,9 86:8 102:17 144:20 171:14,15,17 172:3,5 181:13 190:24 194:11 210:2 213:16

**makeup** 153:2

**making** 102:19 102:19

**male** 185:15

**malpractice** 17:20

**man** 28:3

**mandates** 12:3

**manifest** 167:6

**manner** 100:20 220:22 222:5,8 231:2

**march** 1:21 6:3 150:18 240:7 241:14

**mark** 9:16,19 30:7 51:17 209:1,5 212:21

**marked** 9:22 30:11,14,18 32:14 33:14,17 51:22 52:2,14 197:2 212:13

**markham** 142:12,13

**marking** 196:20

**marley** 2:21 7:12 130:24

**married** 184:17

**martin** 10:12 20:3,6,10 27:13 29:22 40:23 49:10 50:22 59:22 65:19 66:12 67:2,23 70:19 71:2 72:6

**mary's** 195:10 195:14 196:5,6

**masciopinto** 3:2,2 4:7 7:14 7:14 133:7,12 134:22 137:7 138:13 139:13

**math** 15:19

**matt** 10:6 59:17 116:4 124:9 219:6 222:1 233:12 237:10

**matter** 6:5 31:15 79:9 127:23 172:3 223:18

**matters** 104:12

**matthew** 1:4 6:6 7:18 46:15 70:17 71:5

72:2 73:3 111:24 119:4 217:15 240:12

**maureen** 2:11 6:20 73:14,20 145:12,13

**maureen's** 237:8

**maureen.obri...** 2:14

**maximum** 28:4

**mcdonald** 2:21

**meadows** 16:1

**mean** 17:24 37:9 52:18 53:14 72:11 74:20 76:4,4 77:19 94:15 96:17,24 111:18 120:16 122:7 126:3,12 147:13 148:14 148:17 149:5 155:14,23 157:5,7,21 163:13 165:16 183:9 185:19 187:4 193:1,24 197:23 211:9 213:3 220:10 222:20

**meaningful** 94:17,19 96:17 96:24

**means** 164:9

**mechanically** 194:9

**media** 6:3 33:8 33:11 65:23 66:3 138:18,21 211:20,24

**mediator** 18:7

**medical** 17:20

**meet** 24:20,22 54:9 89:13 143:2 152:5,6 152:8 157:16 158:17,22 159:1 161:20 165:22 166:12 205:22 213:7 213:15

**meeting** 23:9 24:2 25:4,10 26:5,22 27:10 27:16,18 30:5 31:6 36:3,5,22 37:2 38:21 40:4,14 41:2 43:13 46:9,21 47:3,12,15,20 48:21,21 50:1 50:6,9,19 51:3 51:15 54:3,9 56:12 61:11 64:13,21 68:24 89:15 96:16 100:19 158:10 159:5 160:22

161:20 165:12 170:1,3,7 189:15,16,21 189:23,24 196:1 202:15 202:22 212:7 236:14

**meetings** 66:7,8 126:16 158:2,3 190:9 196:2,16 202:8 205:12 205:14 218:19 234:13

**member** 37:13 115:7 191:19 192:5

**members** 24:3 79:15 151:22 192:22

**memorable** 17:9

**memorializat...** 65:4

**memorialize** 29:14 51:10 98:12

**memorialized** 51:13 54:4 98:20

**memory** 114:10 114:13 132:24 133:2 135:19 136:3,11,19 158:1,3,12 161:3,5,6,8,16

193:9 206:6

**menina** 114:20

**mentioned** 91:22 112:14 241:7

**mentor** 184:22

**met** 19:23 68:3 70:17 81:10 85:4 89:2 110:18,19,22 110:22 153:12 156:23 157:18 157:20 158:7 159:15 162:5 167:23 168:1 198:6 213:13 234:11

**meyer** 2:18

**michael** 2:7 3:14 6:18 7:9 139:19

**michaelbest.c...** 3:16

**mid** 185:1

**middle** 91:16

**midway** 211:10

**mike** 32:12 112:11 205:19 206:11

**milieu** 185:2,10

**miller** 110:10 111:4

**mind** 25:21 32:13 33:24 65:21 139:20

**[mine - name]** Page 32

**mine** 13:8 91:9
**minimize** 84:14
　167:3 234:21
**minute** 65:22
　133:10 193:9
　211:14,16,18
**minutes** 143:9
**miracles** 11:7
**miranda** 54:21
　55:4,8,10
　97:20
**mischaracteri...**
　176:18 178:14
　180:3 186:4
　197:9 210:11
**misdemeanor**
　12:5
**misdirect** 84:15
**mislead** 84:15
　181:15
**missed** 113:19
**mistreat** 50:9
　65:3
**mistreated** 47:4
　50:15 54:10
　65:17 70:8
**mitigation**
　182:9
**mom** 153:11,12
**mom's** 67:20
**moment** 10:18
　29:19,20 39:10
　54:8
**monadnock**
　25:2 158:15

**monday** 18:5
**money** 38:3
　49:3 233:1
**monitor** 6:3
**monroe** 2:13
　3:10
**month** 13:11
**months** 13:11
**morfin** 1:8 5:5
　7:18 71:6
　106:12,13,14
　106:18 116:12
　116:24 117:6
　117:11 118:13
　119:5,6,15
　124:16 196:22
　218:9
**morfin's** 110:6
　219:5
**morning** 6:1
　8:6 16:18
**moser** 3:7
　136:1,5
**mother** 185:6
**motions** 17:13
**motive** 127:22
**mouth** 42:21
　137:24 174:15
**move** 20:2,3
　24:3 51:6,7
　210:19
**moved** 85:1
　96:7
**movies** 129:6

**mstephenson**
　2:9
**mud** 186:8
**multiple**
　173:23 189:6
　214:9 215:2
**municipal** 12:5
　17:1
**municipalities**
　16:13
**murder** 21:1
　23:24 26:10
　36:15 46:4
　48:18 67:22
　75:12 82:15
　83:2 86:24
　87:3 104:13
　107:19 108:17
　109:6 119:16
　119:24 123:8
　126:12 131:16
　153:1 154:13
　154:14,17,24
　155:2 156:2
　159:17 176:5,7
　180:5 188:11
　188:23,24
　190:10 217:15
　218:5,9 224:16
　228:18 231:16
　233:1 235:1
**murdered**
　163:2
**murders** 26:16
　29:22 34:22

　45:21 46:1,10
　48:24 49:4,11
　50:22 59:22
　60:5 65:19
　72:6 162:18
　163:7 164:23
　165:9 174:24
　213:18,21
　221:20 231:13
　232:7
**muted** 139:20
**mutually** 22:18
　22:19

**n**

**n** 4:1
**nailed** 212:12
**name** 6:11 8:7
　8:9 20:20,21
　20:22 35:20
　74:15 78:8
　79:18,21 87:6
　90:4 93:11,14
　93:16,16 104:5
　104:9 106:11
　106:13,16,18
　109:20,23
　111:12,15,17
　112:7,10
　129:22 131:2,4
　131:21 132:1,7
　135:8,12,16,24
　138:23 141:18
　141:20 144:11
　145:1,11 173:4
　173:7,20

187:11,15
209:3
**named** 71:19
130:24 131:5
207:6,7
**names** 23:14
100:5 104:6
109:9 133:9
134:6 155:16
160:22 161:9
161:11,13,13
161:17 163:9
**narrow** 14:21
**narrowly**
167:12
**nathan** 3:9 7:6
**naught** 239:10
**nearby** 96:19
**necessary**
105:7
**necessity** 227:8
**need** 68:6 88:13
154:19
**needed** 16:15
24:11 26:14
195:2
**needle** 88:20
**needs** 20:16
**negotiate** 24:6
27:19
**negotiated**
29:10 34:17
90:9 91:1
**negotiating**
92:19

**negotiation**
91:3 178:11
182:7,23
**negotiations**
79:14 87:23
93:3 215:9
**neighborhood**
67:1,6,14,16
69:16 106:1
210:19 211:12
216:2,6
**neil** 2:15 6:22
74:14,15,17,18
75:2,11,15
208:19
**nelson** 92:22
**nephew** 20:16
**nervous** 154:11
**never** 45:24
49:1 77:7
120:15,15
126:4 130:12
130:17 141:23
166:4 168:13
176:7 182:22
184:20 186:10
189:24 190:8
214:24
**nice** 59:6
208:13
**nicholas** 1:8
71:6
**nick** 7:18 110:6
110:12,14,15
110:17,22,24

111:5,8 113:11
116:12,24
117:6,11
118:13 119:5
119:15 124:16
198:6 218:9
219:5
**nickname**
37:14 151:22
184:23
**night** 157:1
176:23,24
**nine** 203:17,19
234:19
**nklawllp.com**
3:12
**non** 58:11
**nonconfronta...**
181:3
**nonleading**
42:3
**norfie** 2:21
7:13 131:21
**north** 1:19 2:3
2:7 3:4 6:11
96:3 240:8
**northern** 1:2
6:8 240:11
**notarial** 241:13
**notary** 240:4
241:20
**note** 38:2
**notes** 161:7
**notice** 241:5

**noticed** 122:14
171:4
**noticing** 6:17
**november** 11:9
11:13
**number** 4:18
5:2 14:22
20:12 32:13
77:7 104:12,12
**numbers**
119:16,24
**nuns** 62:6
**nuts** 182:18

**o**

**o** 3:14 8:10,10
135:17 136:1
240:3,3
**o'brien** 2:11
4:5,12 6:20,20
73:11 74:12
75:7 76:15
77:1,10,16
78:5,22 79:3
80:8 81:1 82:1
82:19 83:10
85:2 87:19
88:1,5,23
89:11 90:19
92:7,18 93:1
94:6 95:4
97:11,18 98:17
99:1,16,21
100:4,12 101:1
101:8,15 102:5
102:11,21

**[o'brien - objection]**

103:1,7,14,21
104:3,17,23
105:5,13,23
106:5,10 107:1
108:2,9 109:2
109:11 110:9
111:3,11 112:6
113:1,21 114:8
114:15 115:16
115:21 116:7
116:11,15,20
117:4,20 118:2
118:9,18 119:1
119:10,20
120:4,13 121:7
122:6,18 123:1
123:6,11,18
124:1,7,14,20
125:2,8,15
126:6,13
128:10 129:1
129:15 145:22
146:14 147:19
152:17 163:19
172:15 178:14
184:5 196:20
197:8 198:4
200:10,19,21
205:4 210:10
210:12 217:3,6
217:12 219:1
219:14,19
220:1,8,21
221:4,23
222:14 224:12

224:23 225:6
225:13 226:1
226:11,22
227:9,16,22
228:3,8,14,21
229:3,9,16,22
230:7,13 231:1
231:7,23 232:9
232:23 233:5
233:18 234:5
236:2 238:6
**o'callaghan**
2:11,12 6:21
7:3,4,4
**o'malley** 93:17
**o'mara** 2:11
6:20 7:4
**o'shea** 5:3
10:11 18:24
19:3,9,20,21,23
19:24 20:5
24:10,10 31:4
31:14 33:18
35:2 52:9 53:6
62:16 75:16
79:11 81:7
87:9 92:3
93:12 94:22
100:19,23
103:16 107:7
107:17 109:15
110:4,5 111:6
111:21 112:15
112:18 113:7
113:15,22

114:24 115:7
115:12,17,23
116:23 117:5
117:11,16
118:3,21 119:4
119:15,23
120:12,15
121:9,12,15,18
122:19 123:2,7
123:12,20
124:8,15,21
125:3,9,16
126:7,18
127:10,11,14
127:19 130:3
130:18 135:13
135:22 136:6
136:14,21,24
139:5 147:8
148:13,20,21
148:23 149:23
150:6,20 151:6
152:6,11
153:15 158:2,3
158:8,23
163:11,21,22
164:4,14,21
172:13 174:9
185:17 188:14
189:16 194:20
199:13 200:7
200:17 201:21
202:7,16
205:23 206:2
207:16 217:9

218:18 219:4
219:16,22
220:3 221:19
224:5 225:3
226:17 227:12
227:18,23
228:17 229:24
230:14 231:9
232:1,17
233:22 234:1
237:9
**o'shea's** 19:22
51:18 52:5
63:21 86:21
95:5 108:11
173:4
**o2lawyers.com**
2:14,15
**oakton** 18:12
19:11
**oath** 7:21 8:17
56:9 88:18
175:5 189:11
214:2
**obey** 146:1
**object** 91:4
152:21 184:11
186:3 189:19
194:5
**objection** 21:14
22:22 25:7,18
26:6 27:3,22
29:24 31:7
37:22 38:7,14
39:1,8,10,16,20

**[objection - office]** Page 35

| | | | |
|---|---|---|---|
| 40:6,8 41:7 | 103:4,12,19 | 187:5 188:16 | **observing** |
| 42:5,12,22 | 104:1,15,21 | 194:16 195:20 | 221:15 |
| 43:6,15,21 | 105:5,17 106:3 | 197:8 198:4 | **obstruction** |
| 44:13 45:2,9 | 106:8,19 | 200:10,19 | 26:19,23 27:1 |
| 45:15,17,23 | 107:20 108:7 | 202:1,2 205:4 | 27:5 36:17,21 |
| 46:5,11,17 | 108:22 109:7 | 210:10 213:8 | 49:17,20 70:1 |
| 47:6,16,21 | 110:7 111:1,9 | 213:19 214:13 | 175:2 189:7,8 |
| 50:11 52:7,17 | 112:1,19 | 214:19 215:21 | 189:18 190:6,7 |
| 53:2,21 54:5 | 113:18 114:2 | 216:4 217:10 | 191:7,24 |
| 54:13 55:9,24 | 114:11 115:14 | 218:22 219:12 | 192:13 193:5 |
| 56:17,23 57:5 | 115:19 116:5,9 | 219:17,23 | 214:1,7 225:18 |
| 57:21,23 58:4 | 116:13,17 | 220:6,19 221:1 | 229:5 231:20 |
| 58:19,23 59:4 | 117:1,17,24 | 221:21 222:12 | 235:5 |
| 59:18,24 60:6 | 118:7,16,23 | 224:7,19 225:4 | **obvious** 38:9 |
| 60:11,17,22 | 119:7,18 120:2 | 225:10,19 | 83:4,7 187:7 |
| 61:5,13,20 | 120:10 121:4 | 226:9 227:6,14 | 188:2 |
| 62:4 64:3,22 | 122:4,10,21 | 227:20 228:1,6 | **obviously** |
| 65:6,10 66:17 | 123:4,9,15,22 | 228:12,19 | 44:15 162:10 |
| 67:4,12,24 | 124:5,11,17,23 | 229:1,7,14,20 | 206:24 |
| 68:9 69:2,11 | 125:5,12,22 | 230:4,11,22 | **occasion** 110:2 |
| 69:13 70:12,14 | 126:11 128:5 | 231:5,14 232:3 | **occasionally** |
| 70:20 72:7 | 128:15 129:5 | 232:20 233:2 | 227:1 |
| 75:1 76:10,23 | 130:14,19 | 233:16 234:3 | **occasions** 189:6 |
| 77:14 78:3,20 | 132:14,21 | 235:11 236:2 | 222:15 |
| 80:6,23 81:22 | 133:1 134:20 | 236:16 237:12 | **occurred** 31:6 |
| 82:16 83:3 | 137:2 138:6 | 238:6,22 | 84:13 105:11 |
| 84:22 87:14,24 | 145:22 146:6,6 | **obligation** 70:4 | **odd** 16:12 |
| 88:3,16 89:9 | 146:14 147:19 | 107:22 | **oddities** 12:4 |
| 90:17 92:5,16 | 148:14 152:17 | **observation** | **offer** 89:1 |
| 92:21 94:4,24 | 156:4 157:4 | 67:15 216:6 | **office** 7:1 10:6 |
| 97:9,16 98:15 | 163:18,19 | **observations** | 11:17,22 12:12 |
| 98:22 99:10,19 | 164:6,15,16 | 29:6 132:9 | 12:15 13:6,21 |
| 100:2,7,21 | 172:15 176:18 | **observe** 35:8 | 14:3 24:23 |
| 101:5,13,19 | 178:14 180:2 | 50:8 65:2 | 25:1 31:3,13 |
| 102:9,14,24 | 183:24 184:5 | 117:21 | 51:10 53:7 |

**[office - own]** Page 36

66:7,9 72:4,19
73:5 75:4
77:21 79:15
89:3,12,13
90:4 91:24
95:20 107:12
113:6 115:8
133:18 144:16
144:16 158:11
158:14 166:3
172:12 191:20
192:6,22
194:19,22
204:12 215:19
217:8,14,22
218:4,8 231:10
**officer** 7:15
21:9 130:7,11
**officers** 130:5
133:9 134:13
139:6
**offices** 13:22
**official** 86:13
87:12
**officials** 139:9
**oh** 40:16 68:5
146:8 148:19
190:20 212:10
**okay** 12:23
24:19 28:10
32:4 64:9
65:22 68:23
70:24 72:21
98:24 100:13
104:11 131:20

140:22 141:17
141:21 146:19
148:10 149:3
149:16,20
150:23 151:12
152:15,23
153:4,13
155:18 156:22
157:13,19
158:17 159:10
161:19 170:11
179:1 180:8
190:22 191:10
191:15 193:8
194:14,24
195:18 196:8
196:17 197:22
198:1,21 199:7
199:16 200:6
201:7,15,20
206:21 207:15
208:21 209:1
211:8,13
212:24 215:17
217:3,4 236:24
238:12
**old** 163:1 176:1
**older** 20:17
**once** 73:16
85:11 86:5
88:17 175:23
205:15 215:5
**ongoing** 151:18
201:19

**open** 13:19
20:24 21:19,22
174:15
**opening** 14:23
**openings** 14:22
14:24
**opinion** 74:23
75:22 76:19
77:2,11 78:1,6
78:18,23 79:4
80:3,9,10
105:14 106:2
132:10,20
142:6,9,10
148:10 231:11
231:24
**opportunities**
76:1
**opportunity**
55:18 78:15
80:14 98:4
130:13,18
226:24
**opposite**
221:22
**order** 48:15
68:7 118:20
119:3,14,22
145:24 215:5
219:6 222:1
**ordered** 118:21
119:15,23
**orders** 168:8
**ordinance**
16:16

**organically**
63:7
**oriented**
132:11,13
**original** 33:21
52:19,24 86:20
102:3 174:1
**originally**
50:21 104:19
**orpett** 2:18
**outcome**
138:10 241:10
**outcomes** 165:5
**outer** 144:7
**outside** 21:5,18
22:7,11 56:12
69:1 86:21
137:10,10,11
137:15,16
138:1 140:10
153:18 154:11
155:14 178:9,9
182:5,6 233:10
**outvoted**
129:19
**overlap** 110:21
**overlooked**
166:9
**overturned**
210:17
**own** 13:9,16,18
13:19 69:16
233:7

**[p.c. - permission]** Page 37

| p | | | |
|---|---|---|---|
| **p.c.** 2:18 | **partial** 34:9 | **patrick** 111:16 | **perceive** |
| **p.m.** 53:7 | **participant** | **paul** 109:20 | 185:16 |
| 138:18,22 | 29:7 94:17,19 | **pay** 49:3 | **perceived** |
| 211:21 212:1 | **participate** | **paying** 220:23 | 238:23 |
| 237:4,5 239:5 | 31:3 | **pc** 72:3,10 73:4 | **percent** 166:24 |
| **page** 4:18 5:2 | **participation** | **pena** 112:8,8 | 167:2 197:18 |
| 55:16 61:16,23 | 161:15 | **pendency** | 216:23 |
| 62:14,16 63:19 | **particular** 91:4 | 109:17 110:6 | **percolate** 72:12 |
| 63:19 64:1,1 | 219:21 226:7 | 111:7 | **perfect** 32:10 |
| 99:18 190:16 | **parties** 28:13 | **pending** 82:13 | **period** 13:12 |
| 190:22 204:21 | 82:4 133:17 | 82:22 83:2 | 157:7 197:11 |
| 204:23 205:3,3 | 134:18,18 | 126:10,19 | **periodically** |
| 205:8 209:4 | 146:7 194:17 | 143:14 240:10 | 216:14 |
| **paged** 152:16 | 194:21 241:3,9 | **people** 13:15,17 | **periphery** |
| **pager** 140:5 | **partners** 209:6 | 14:23,24 15:1 | 160:2 |
| **pages** 62:17,18 | **party** 133:21 | 17:23 21:18 | **perjurer** 148:9 |
| 63:11 205:6,9 | 133:24 169:3 | 22:3,11 24:13 | **perjury** 26:19 |
| **pal** 187:17,20 | 194:15 | 29:11,12 36:2 | 26:22 27:1,4 |
| 203:8,11,15 | **pass** 11:8 32:8 | 41:24 47:23 | 36:21 46:16 |
| 204:4,5 | 74:10 | 53:12,22 62:12 | 49:18,23 59:16 |
| **panhandling** | **passed** 11:6 | 71:19 84:1 | 70:1 123:3,8 |
| 38:3 | **passenger** 84:3 | 99:23 100:5,10 | 146:24 147:8 |
| **paragraph** | **past** 20:2 51:6 | 105:16 106:7 | 147:11,13 |
| 31:1,10 33:23 | 166:8 | 106:14 113:14 | 148:1 175:3 |
| 33:24 35:1,6,9 | **pat** 70:18,24 | 131:18 134:6 | 188:15 189:7 |
| 54:23 55:1,17 | 111:15,20 | 137:4,16 138:1 | 189:10 190:6,8 |
| 64:1,6,15 | 114:19,22 | 140:10 152:24 | 191:24 192:7 |
| 212:15,18 | 120:20 121:16 | 153:18 154:11 | 192:13,17 |
| 238:19 | 207:16 | 156:17 160:23 | 193:2,5 198:7 |
| **park** 160:7,16 | **path** 40:17 | 161:11 166:24 | 214:3,5 225:15 |
| **parked** 160:7 | **paths** 142:4 | 169:4,10,14 | 228:24 231:20 |
| **part** 56:3 | **patient** 178:2 | 170:12 171:14 | 235:5 |
| 173:21 182:7 | **patricia** 2:16 | 178:2 182:4 | **permission** |
| 231:22 | 6:23 78:9,12 | 187:14 197:20 | 68:7 71:1 |
| | 78:18 79:8 | | 121:1 183:20 |

**[persisted - post]** Page 38

| | | | |
|---|---|---|---|
| **persisted** 214:1 | **peter** 3:24 6:12 | **plan** 119:4 | **pointed** 33:20 |
| **person** 59:6 | **phone** 20:11 | **planned** 103:24 | 101:24 |
| 74:15 75:19 | 21:5,7,24 22:6 | 120:9 | **pointing** 44:19 |
| 76:20 78:8,11 | 22:9 77:7 | **plea** 182:1,7,22 | **points** 161:14 |
| 79:18,21 80:12 | 80:18 82:6,9,9 | 215:9 | 184:19 201:16 |
| 104:5 106:11 | 84:19 130:2 | **plead** 215:14 | **police** 21:8 |
| 106:18 109:20 | 137:17 140:5 | **please** 6:15 | 86:16 87:1 |
| 109:23 129:8 | 143:1,4,10,17 | 7:21 8:7 9:16 | 107:11 130:4,7 |
| 131:7 132:13 | 151:9 153:15 | 9:20 11:19 | 130:11 133:9 |
| 141:8 142:11 | 154:5,10 | 30:7 39:12,15 | 133:21 134:9 |
| 142:14 143:2 | 156:12,14,16 | 83:19 89:1 | 134:13,23 |
| 144:13 157:16 | 156:19,22 | 95:10 129:2 | 135:7,15 |
| 157:18 161:21 | 159:15 161:23 | 144:10,11 | 137:10,19 |
| 167:19,23 | 162:11,13,14 | 184:8 190:15 | 157:21 216:21 |
| 168:5,24 | 162:18 | 214:21 222:19 | **popes** 37:11,12 |
| 187:10,12,15 | **phones** 82:7 | 235:20 | 37:14 155:7 |
| 199:22,23 | **photocopy** | **point** 19:7 28:9 | 162:24,24 |
| 208:5,16 | 30:23 52:19 | 44:9 48:4,5 | **popped** 204:16 |
| 219:21 222:17 | **physically** | 56:9 69:14 | **pose** 61:19 |
| 222:24 223:22 | 106:23 216:22 | 81:14 82:20 | **posed** 229:19 |
| 226:8 | **pick** 81:11 | 88:19 107:9 | **posing** 57:4 |
| **personal** 17:21 | 167:17 168:3 | 113:2 114:1 | **positions** 11:20 |
| 77:6 130:6,23 | **piece** 38:2 | 126:21 140:11 | **possession** |
| 145:5 151:19 | **pilot** 111:13,20 | 148:6,13 | 31:14 172:13 |
| 151:20,21 | **place** 166:6 | 149:11 150:22 | **possibilities** |
| 152:2 | 188:7 192:4 | 153:7,16,23 | 231:19 |
| **personally** | 210:24 211:2 | 154:9 158:9 | **possible** 27:6 |
| 240:7 | **plaintiff** 1:4,8 | 171:24 177:5 | 36:21 77:5 |
| **personnel** | 1:12 239:2 | 178:20 179:9 | 83:13 138:10 |
| 134:10,24 | **plaintiff's** | 185:5 186:15 | 165:5 167:13 |
| 135:16,24 | 73:16 | 187:21 193:12 | 175:4 182:19 |
| 137:1 138:5 | **plaintiffs** 2:5 | 195:23 196:13 | 200:6,9,12 |
| 139:9 | 7:18 210:15 | 199:13 206:22 | 235:4 |
| **pertaining** 1:18 | 240:13 | 209:13,22 | **post** 9:13 10:7 |
| 131:9 | | | 37:6 44:8 |

**[post - probably]** Page 39

112:18 148:22
190:14 207:22
217:16 218:3
**potential** 23:12
26:15,22 27:8
46:1 90:22,23
174:23 175:1
216:8
**potentially**
214:7
**power** 86:8,17
**practice** 12:17
12:18,24 13:3
13:9,13,14,24
14:2,4,5 18:10
18:21 19:1
26:3 34:13
141:7 179:20
**practiced**
179:19
**precise** 18:15
**prefer** 8:11
**preliminary**
12:8,9 16:15
**premises** 17:21
17:23
**prep** 68:8
**preparation**
9:10 70:9
203:16 235:16
**preparations**
88:9
**prepare** 68:4
68:15,18,24
83:8 179:8

180:15 235:8
**prepared** 99:3
121:19 209:18
**preprinted**
35:22 54:21
85:21,22 90:1
93:10,14
172:17,22
173:22 193:13
193:15,21
238:24
**prerequisite**
170:4 175:9
**presence** 56:13
61:17 62:24
69:1 88:8
116:2,21
118:10 192:6
192:23 193:11
233:11 240:20
**present** 3:24
29:5 36:3 41:2
43:13,24 45:12
46:8 50:9 53:8
53:12,20,23
59:12,15 60:3
60:9,14 61:3
64:7 92:1,8
134:5,10,18,24
135:4 150:8,11
150:14,17
158:23 168:7
190:9 204:11
213:6 219:3
221:7 223:2

241:6
**presented** 89:8
89:18,22
238:17
**preserve** 16:19
**preside** 15:23
16:24 17:18
**presiding** 14:20
17:1
**pressure** 43:4
59:2 100:19,22
101:4 105:24
117:10 216:19
**pressured**
216:1 227:13
227:19
**pressuring**
117:16,23
221:24
**presumed**
202:13
**pretty** 17:24
42:15 68:16
143:6 144:24
160:20 167:1
170:2,15
177:18 179:13
180:13,22
203:4
**prevent** 9:1,4,6
**previous**
146:11
**previously** 51:4
99:6 218:11

**prezzano** 3:24
6:12
**primarily**
175:2
**printouts**
172:23
**prior** 55:19
66:15 86:7
105:3 108:3
111:23 112:14
126:16 141:12
155:3 161:19
186:4 227:11
231:9
**private** 12:17
12:18,24 13:3
14:2,4 18:10
18:21 19:1
36:22 56:12
166:12,15
227:1 228:16
232:16 233:11
233:20,24
**privately** 36:6
36:10 40:20
89:13 167:23
168:1 213:7,15
**privy** 42:13
**probably** 18:19
23:4 48:7 56:7
67:18 76:4,7
77:20,22,24
78:17 107:24
109:8 112:22
126:1,1 143:5

151:14 152:3
154:2 156:9
160:19 172:6
172:20 173:19
174:10,16
176:2 180:6
185:21 210:3,3
210:24 213:3
**probation**
182:17
**problem** 37:4
151:18 183:17
235:6
**problems** 189:4
**procedure** 1:17
**proceed** 7:21
213:10
**proceeding**
10:7
**proceedings**
4:19 9:17
145:6 239:5
**proceeds**
214:22
**process** 14:16
62:3,23
**processor**
173:19
**products** 17:24
**profanity** 182:4
184:20
**profess** 174:20
**professional**
11:3 20:19
74:18 231:24

**professionally**
77:9
**professor** 18:11
**professors**
18:23 19:10
**proffer** 4:21,23
28:8,11,12,15
28:15,19,21,24
29:9,15,18
30:5,8,15,24
31:6 33:18,22
34:17 35:11
36:3,5 37:2
38:21 40:4,14
40:21 43:13
46:9 47:3,12
48:21 49:19,21
50:1,6,9,19
51:3,7 64:21
73:21 80:14
81:17 83:14,17
84:9,17 85:3,6
85:7,8,11,11,20
85:22 86:2,6,9
86:11,17 87:7
87:23 89:7,18
89:24 90:5
91:1 92:2,15
92:20 93:7
96:23 100:18
108:11 110:5
111:7,22 115:8
127:16 128:1
128:17 131:23
132:1 133:13

133:22 134:1,5
134:11,16
135:1 143:20
144:18 162:12
164:12 165:4,4
170:2,12,13,17
170:19,21,22
171:13,18
172:18 173:3
173:14 174:16
175:11 178:11
178:16 180:14
182:1 190:3
193:8 212:7,13
215:1,7,8,15,17
222:19 223:11
223:12
**proffers** 179:14
180:1,10
214:17
**prohibit** 28:22
**promise** 60:15
74:5 202:3
**promised** 74:7
**proprietor**
13:23
**proprietorship**
13:19
**prosecuting**
83:2,5 142:3
**prosecution**
26:4,5 27:19
27:20 29:20
30:16 34:13,21
38:24 40:3,14

40:22 47:11
48:19 49:4
55:4 56:13,22
64:12 67:2
68:3 190:10
231:12
**prosecutions**
12:6
**prosecutor**
79:6 86:10,12
86:22 87:12,17
178:7,20 182:8
182:9,16
189:21 208:4
208:12
**prosecutors**
28:22 41:1
48:14 49:9,14
50:3,6 52:10
61:16 63:2
65:16 66:8
68:6,24 70:8
83:8 87:16
88:7 116:3
178:12 189:9
189:17 190:9
234:12,14
**protect** 41:24
**protected**
88:14 90:22
190:4
**protection** 28:5
36:16 84:7
175:11 194:11

**[protocol - reality]**

Page 41

**protocol** 143:17
**prover** 57:14 93:6 94:9,13 95:15 198:12 198:14 222:16 222:17,18 223:7,9,9,23
**provers** 94:11
**provide** 56:21 194:12 218:17 225:8
**provided** 74:1 144:5 194:11
**ptak** 2:22 7:13 131:3,5,10
**public** 240:4 241:20
**pull** 238:21
**pup** 185:6
**purely** 69:6
**purpose** 31:17 51:14
**purposes** 28:19 103:18 230:3
**pursuant** 1:16 190:3 241:5
**pursued** 210:15
**pursuing** 210:14
**push** 22:21 23:3 212:19,22
**put** 10:17 17:10 20:12 32:2 41:24 42:20

43:4 49:21 56:7 58:7 59:2 107:3,4 133:5 137:17,24 140:6 156:18 173:20 179:3 191:21 192:19 208:5,9 215:6

**q**

**queen** 184:21 184:21,23
**question** 8:21 8:22,23 16:23 28:10 39:16,16 41:17 49:7 50:24 57:8 88:12 94:1 99:7 102:4,6 113:4,20 117:19 134:15 136:8,16 155:9 174:13 183:1 184:12 189:20 189:22 191:16 191:18 194:6 200:11 220:7 223:15 232:10 237:17 238:13
**questioned** 56:8
**questioning** 103:2,3 122:12 133:8 137:8 191:1 204:18 219:22 223:24

**questions** 28:13 41:3,13,16 42:3,8,11,14 47:24 48:9 51:16 57:4,10 57:12,15 58:12 58:14,17 74:9 80:15 95:1,6 97:4,12,15 101:23 103:6 122:16 129:13 129:24 133:4 139:14,16,19 140:1,23 146:10,15,16 147:7,9 164:18 164:24 167:7 167:11 169:22 181:17 184:7 203:18,18,21 208:15 217:4 223:14,22 229:12,18 234:8,18 236:9
**quick** 13:4 186:3 189:20 213:2
**quicker** 237:1
**quite** 173:7 180:9 181:22 221:22
**quote** 31:2,12 37:7,8 44:8,11

**r**

**r** 8:10 136:1
**raise** 44:4 59:13
**ran** 15:9 19:18 94:18
**rather** 172:22
**reach** 112:14 112:17 113:6
**reaching** 112:20 206:13 217:24
**reaction** 175:17
**read** 9:12 25:24 31:11 35:2 39:15,19,23 62:9 74:1 90:9 99:8,12,13,14 139:23 143:19 144:8 172:1,6 184:10 191:18 237:16
**reading** 25:21 55:4 63:9,13 139:20 208:7 209:12
**reads** 35:1 53:5
**ready** 40:17
**reaffirm** 34:20
**real** 13:4 66:6 131:13 186:3 187:14 189:19 209:7 212:22
**reality** 132:11

**[realize - remember]** Page 42

**realize** 77:22
**really** 19:17
  37:12 67:14,15
  151:17 154:24
  155:1 172:3
  237:7
**reason** 31:5
  53:18 55:8
  138:4 147:9
**reasons** 197:15
**rebuffing** 43:14
**recall** 80:20
  93:4 96:1,3
  97:20 98:9,10
  104:7,20 105:1
  105:4 107:8
  108:8 114:17
  141:15 149:22
  191:13
**recant** 210:21
**received** 73:2
  81:18 128:1
**receiving** 90:10
**recently** 72:11
  73:6 198:6
**recipient**
  216:19
**recognize**
  30:18 52:2
  144:9
**recognized**
  19:5
**recollection**
  20:16,19,23
  29:12 37:17

44:15 54:2
55:3 71:21
96:9,12 106:20
106:22 127:2
137:3 162:17
193:22 196:15
**recollections**
  106:16
**record** 6:2,16
  25:19,23 32:2
  32:17 33:7,12
  33:17 39:18,22
  65:24 66:4
  138:17,22
  139:17,22
  184:9 211:21
  212:1 237:24
  239:5
**recorded** 6:4
**recross** 234:7
**reduced** 51:13
  240:21
**referred** 78:11
**reflect** 34:16
**reflected** 61:18
**refrain** 69:7
  168:18
**refuse** 129:13
  226:13
**regard** 75:6,8
  77:4 78:7
  232:7
**regarded** 79:5
**regarding**
  34:17 74:23

75:12 76:19
77:12 78:1,18
78:23 79:8,11
80:3 81:6
82:14 84:17
87:22 88:7
92:2 107:18
108:11,17
111:5,21
112:18 113:12
113:16 114:23
122:8 130:2
131:10 217:9
217:15 218:5,9
232:10
**regards** 40:23
**regularly**
  179:13 180:17
**rehab** 150:21
  150:22,24
  151:2,2,21
  159:1 195:9,12
  195:19,23
  196:4,9,11,14
  196:15 199:13
  200:8 201:24
  202:4
**relate** 10:10
  94:22 97:7
  223:10 236:5
**related** 6:7
  19:20 95:3
  232:8 236:6
  241:9

**relationship**
  74:19 95:24
  207:1
**relayed** 103:17
  230:2
**relevant** 147:10
**relieved** 23:4
**reluctance**
  167:6
**reluctant**
  105:15,18,19
  105:22 122:12
  166:22,23
  236:8
**relying** 175:22
**remain** 30:2
  127:19
**remember**
  13:10 20:14,20
  21:4 23:15
  27:5 37:10,15
  38:19 41:22
  48:6 51:14
  57:15,24 63:8
  69:18 72:14
  73:8 82:23
  88:9 89:20
  93:5,15 99:13
  101:14 112:20
  113:4,8,9,23
  114:14 125:18
  126:2,3,15,21
  127:6 131:12
  131:12 137:19
  138:12 140:21

**[remember - retire]**

Page 43

142:2,5 150:1
151:5,11,12,15
151:17,17,23
152:11 153:20
153:24 154:4
156:23 157:3
158:7 159:9,10
159:12 160:15
160:21 161:11
161:12 163:8
165:11 169:7
171:20 173:11
175:15,16
177:4,5 180:21
185:16,17
187:11,14
190:13 194:24
195:5,15
196:18 197:5
202:7,10,11,12
202:14,15,16
204:3,10,15
205:8,11,12,14
205:20,24
206:2,5,7,10,10
206:11,12,14
206:15,17,19
206:21 207:5,6
207:13,15,19
207:21,23
208:2,12,21,24
209:1,5,8,9,11
209:12,15,18
209:23 210:7
212:22 217:11

217:18,24
221:13 234:16
237:11,13,15
237:16 238:2,7
**remembered**
125:21
**reminded**
158:6
**remote** 139:14
**remotely** 29:7
165:8
**repeat** 117:19
**repeatedly**
101:10 118:4
118:12 230:8
230:17
**rephrase** 9:5
16:22 41:9
57:8 213:14
**replaces** 185:6
**report** 4:19
9:17
**reported** 1:23
107:5 240:19
**reporter** 6:13
7:20 8:8 9:15
25:20 237:16
237:20
**reports** 14:18
157:21
**represent** 20:5
24:12 26:14
27:12,14
129:22 133:8
138:24

**representation**
22:20 71:6,17
72:5 109:15
110:4 111:8,23
135:13,21
136:5,14,21
139:5 140:4
148:15,17,19
149:11,13,17
149:21,24
151:13
**representations**
149:1
**representatives**
135:4
**represented**
20:7 71:23
109:6 133:19
136:24 148:20
151:8,16 154:1
155:4,7,11
163:21 170:12
183:19 191:4
**representing**
2:5,9,15,21 3:6
3:17 6:12 7:4
14:5 24:16
28:3 127:9,11
127:20 139:10
201:2,21
**reproduced**
194:10
**reputation**
74:24 75:9
76:8,16,20

77:12 78:2,19
78:24 80:4
142:7,18
148:12,16
**requested**
25:24 39:19,23
139:23 184:10
**required** 88:8
91:20
**reserve** 239:6
**residence** 130:3
**resolved** 85:13
85:15
**respect** 75:16
104:13 128:2
226:8
**respected**
80:12
**respective**
241:3
**respond** 126:3
**response** 103:6
125:24
**responsibility**
215:10
**responsive** 95:5
97:14 102:2
133:3 176:12
**rest** 236:10
**results** 11:11
**retained** 15:11
15:21
**retainer** 24:17
**retire** 18:2

**retired** 18:3
  131:7
**return** 51:9
  195:2
**returning**
  20:14
**review** 9:9 12:7
  12:8 61:16
  62:3,23 90:14
  157:19 239:7
**reviewed** 64:16
  90:12 99:7
  172:8,10
**richard** 12:2
**rick** 109:12
**ridgeway** 219:7
  222:2
**ridiculous**
  201:14
**right** 11:4
  12:24 21:10
  32:21 34:2
  62:2 72:22
  74:8,9 91:6
  92:13 120:14
  129:9 134:7
  137:14 147:14
  147:22 148:7,8
  162:24 170:23
  171:7 173:4,7
  175:8 180:10
  182:5,5 191:7
  191:12 200:17
  201:3,21
  204:21,24

212:15,24
  217:21,23
  223:13
**rightfully**
  142:16
**rights** 30:2
  88:14 97:20
  128:8,13,21
  129:3,13
**rings** 106:13
  131:4
**risk** 29:2
**rival** 160:9
**road** 15:9
**rogelio** 112:8
**roger** 112:7
**role** 94:13
**rolling** 16:1
**room** 45:8
  47:23 48:3
  89:20 95:19,19
  132:1,6 166:7
  166:12 181:11
**rough** 183:22
  185:3
**rpr** 1:23
**rule** 178:18
  180:13
**rules** 1:17
  146:2,3
**running** 94:1
  94:12

**s**

**s** 4:17 5:1
  135:17 136:1
**sad** 210:22
**sadly** 38:1
**safe** 84:13
  155:23
**saith** 239:10
**sanctioned**
  126:4
**sat** 54:11
**satisfied** 194:8
**save** 233:7
  234:21
**saw** 9:11 30:22
  42:13 44:22
  52:16 53:1
  85:23 90:14
  95:2 169:12
  172:11 174:7
  175:6 179:11
  186:18 203:3
  231:20
**saying** 32:13
  44:19,20 57:19
  88:9 101:14
  117:11 128:16
  145:1 146:24
  147:13 156:20
  169:6 177:11
  177:23 181:19
  198:17 199:14
  199:20 202:17
  202:23 206:4
  206:13,14

209:3 215:3
  217:23 224:6
  226:18
**says** 31:12
  35:15 53:19
  93:11 184:23
  190:23 191:10
  191:14,18
  192:4 200:21
  237:4
**scared** 47:14
  60:20
**scary** 77:23
**scene** 119:6
**schedule** 23:8
  27:15
**school** 10:22
**scope** 166:24
**scott** 1:5,9,13
  2:9 6:6,19
  23:13,15,19,22
  24:5 27:15
  29:10,13,14
  34:17 35:18
  41:4,6,11,12
  42:3,20 43:4
  43:10,12,19,24
  44:4,8,12,24
  45:7,12,20
  46:3,8,14,20,23
  47:2,14,19
  48:3,9,22 50:8
  50:15,19 51:2
  54:3,9,10
  64:21 80:14,17

**[scott - setting]** Page 45

| | | | |
|---|---|---|---|
| 80:21 81:6,11 | **scott's** 42:8,11 | 117:14 153:1 | 154:10 156:12 |
| 81:19 82:3,4 | **screw** 179:2 | 154:19 162:8 | 157:14 159:5 |
| 82:21 83:1,4 | **se** 34:10,11 | 168:14 231:21 | 161:20 165:12 |
| 83:12 84:19 | **seal** 241:13 | **seeing** 175:17 | 165:23 170:1 |
| 87:6,21 89:2 | **sean** 2:12 7:3,3 | **seeking** 81:19 | 195:3,19 |
| 91:2,13,15,18 | **sean.ocallagh...** | 83:20 164:13 | 198:23 200:16 |
| 92:10,22,23 | 2:15 | **seem** 128:11 | 201:7,20 204:9 |
| 93:8,11,13,24 | **search** 237:20 | **seen** 129:6 | 204:12,13,14 |
| 94:2,8,14,15,23 | **seated** 96:5,10 | 147:3 197:17 | 207:22 209:19 |
| 96:21,22 | **sec** 91:17 | **self** 129:9 | 212:7 218:20 |
| 101:11 116:22 | **second** 31:11 | **senior** 18:7 | 219:4,15,20 |
| 117:10,15,22 | 34:1 51:12,15 | **sent** 16:14 | 221:5,16 222:4 |
| 118:4,12,19 | 55:16,17 56:2 | **sentence** 31:11 | 222:9 224:3,4 |
| 119:2,13,21 | 57:2 61:11 | 34:1 55:17 | 224:24 226:16 |
| 120:7 121:23 | 64:13 83:6 | 212:18 238:19 | 226:24 227:5 |
| 127:8 141:14 | 85:17 92:11 | **september** 9:17 | 227:17 228:15 |
| 157:10 162:8 | 94:11,17 | 10:7 31:4 | 228:16 229:10 |
| 177:8,9,20 | 101:20,24 | 38:22 57:3 | 229:11,17,23 |
| 181:4,18 | 134:16,24 | 75:12,13 79:16 | 230:9 232:17 |
| 186:15 191:11 | 143:17,23 | 79:16 80:15,16 | 232:18 236:15 |
| 193:10,20 | 148:7 169:23 | 89:2 91:23 | **serial** 119:16 |
| 194:7,8,18 | 171:6 173:24 | 92:9,13,20 | 119:24 |
| 212:18 218:12 | 177:9 178:24 | 94:21 95:11 | **serious** 28:4 |
| 219:3,4,7,10,15 | 189:24 190:24 | 97:2 98:3 | **serve** 18:11 |
| 219:20 220:2,3 | 198:15 212:18 | 100:18 101:3,9 | 144:14 |
| 220:4,11,12,17 | 223:8,20 224:1 | 101:9 114:17 | **served** 75:5 |
| 220:22 221:6 | 233:19 236:18 | 118:10,11 | **service** 145:5 |
| 221:17,18,24 | 236:20,24 | 125:11,11 | **session** 19:14 |
| 223:13,20 | 238:18 | 126:9,9,17 | 19:15 |
| 227:19,24 | **section** 166:3 | 127:8,16,17 | **sessions** 70:9 |
| 229:24 230:8,9 | **see** 28:8 31:18 | 132:5 134:2,6 | **set** 23:12 24:2 |
| 230:14,17,20 | 34:8,9 35:6 | 134:12,16 | 154:20 241:12 |
| 231:8 238:20 | 48:1 53:9 | 135:1 140:14 | **sets** 108:18 |
| 240:13 | 54:21 63:11 | 140:17 150:24 | **setting** 213:23 |
| | 85:21 96:15,22 | 152:16 153:17 | |

**[settled - son]**

Page 46

settled  83:17

several  165:14
  173:4 201:6
  222:15

share  163:23

shea  2:16 6:23
  78:9,12 79:8

shea's  78:19

sheet  190:15

shifted  187:10

shoes  223:21

shoot  219:6
  222:1

shooter  84:4

shooting  29:22
  84:5 103:11,17
  103:18,23
  117:8,12
  118:15,22
  120:9 161:2
  163:2 169:5,10
  230:2,3

short  15:1 33:9
  66:1 91:3
  138:19 165:13
  165:19 185:15
  211:22

shot  160:16
  162:24

shoulder  172:2

show  73:20,24
  122:7 202:21
  215:1

showed  73:21
  209:9

showing  85:20

shows  33:22
  172:18

shut  203:7

sic  230:9

sick  16:18

side  32:3
  185:20

sides  67:17

siff  3:9 4:9 7:6
  7:6 139:17
  140:3,22

sign  35:8,18
  63:18 99:17
  193:23 194:2
  204:23 205:2,8

signature  35:13
  35:15,20,21
  63:20,21,22
  171:6 173:21
  193:13,17,20
  194:9,10 239:7
  239:8,9 241:1
  241:19

signatures
  62:17 131:24

signed  35:11
  62:15,19,19,20
  62:21 63:18
  93:7,8,12,14,21
  115:9 120:17
  121:2,9,9,13,18
  133:14 134:1
  144:11 170:2
  170:13,13

171:6,11
  173:22 175:8
  193:10,14,18
  193:18,19
  194:7 204:21
  205:6,7 213:6
  224:17

significant
  152:1

signing  227:11

signs  122:7

silent  30:3

similar  133:8

single  99:18
  219:21 226:7

sins  215:16

sir  8:15 129:22
  133:7

sit  109:3
  136:23 137:23
  138:4 178:18
  238:7

sitting  38:1
  47:23 77:21
  95:18 171:22
  174:14

situation  26:17

six  15:21
  165:17 236:24

skokie  16:3,5,8
  16:10,14 19:2
  142:14

slouched
  185:22

slow  48:8 178:4
  187:9

small  11:7
  236:10

smith  205:19
  205:21 206:11

smitko  208:2,4
  208:12,14,18
  208:18,22
  209:7

smoked  37:16

smoking
  176:11

sober  176:20
  176:21

sobriety  176:23

sole  13:19,23

solely  88:21
  155:12 156:6

somebody  21:8
  22:8 24:15
  62:9 63:9
  69:15 106:23
  130:3 137:15
  160:14,14
  168:12 192:15
  194:1 206:17
  222:23

somebody's
  141:7 159:23
  163:3

somewhat
  180:17

son  185:6

sooner 149:19
sophistication
 175:21
sopron 1:4 5:4
 6:6 7:18 32:23
 46:15 59:17
 71:5 104:9
 105:1 111:24
 116:4 118:21
 119:23 124:9
 191:4 217:15
 219:6 222:1
 240:12
sopron's 10:7
 37:6 44:7
 70:18 72:2
 73:4 119:4
 150:12
sopron000008
 4:24 33:19
sopron005832
 51:19
sorry 7:3 32:1
 40:7 45:16
 50:23 57:22
 59:19 61:6,19
 62:5 69:12
 70:13 76:13
 82:17 84:23
 85:16 92:6,22
 113:19 117:18
 119:8 120:11
 145:10 146:5
 148:19 153:17
 155:9 158:10

159:7 180:8
 183:3 184:13
 190:20 195:22
 196:17 206:20
 208:10 215:22
 218:23 224:20
 226:19 233:19
 237:5 238:5
sort 37:11
sound 154:7
source 216:13
south 96:3
 179:15
speak 19:7
 23:18 27:15
 36:6 55:18
 68:7 71:1 73:9
 73:14 98:4,8
 105:3 107:22
 107:23 128:3
 130:18 142:20
 227:1
speaker 82:7,7
speaking 22:20
 23:17 125:10
special 188:2
specific 102:1
 158:12 161:8
 199:15 202:5
 206:6 216:17
 216:20
specifically
 100:11 128:13
 153:24

spectacular
 184:18
speech 190:3
spelling 8:7
spend 211:11
 211:11
spent 16:9
 17:11 37:18
split 216:6
spoke 22:11
 24:5 40:20
 73:19 82:20
 150:6 219:2
 220:2
spoken 72:3
 73:12 123:19
 124:2
spot 15:10
spots 186:7
spring 19:14
squiggly 91:8
ss 240:2
st 195:10,14
 196:5,6
stamp 9:18
 32:18
stamped 30:9
 32:23 33:19
 51:19
stand 69:18
 192:9,10 193:6
standard
 170:15
standing 166:7

star 77:9
start 28:10
 162:20
started 16:17
 18:3,4 19:6,15
 36:10 72:11
 163:3
starting 190:22
starts 15:24
state 6:15 8:7
 10:24 87:15
 137:21 170:15
 181:24 213:16
 214:23 215:18
 232:11 235:15
 240:1,5
state's 6:21,24
 10:5 11:15,17
 11:21 12:11,15
 13:6 14:3
 23:13 31:2,13
 36:1 39:6
 51:10 53:7
 66:7,9 72:4,12
 73:4 75:3,4
 77:5,20 78:12
 79:15 80:1
 86:13 87:13
 89:3,13,14
 90:4 91:24
 93:2,9,17
 95:11,20 98:13
 99:3,8,24
 103:22 107:11
 110:15 113:5

115:7 120:6
121:23 122:1
123:13 125:10
126:8,16 128:3
131:13 133:18
145:14 166:3,4
172:12 183:5,6
183:15,17
188:13,17,18
191:19 192:5
192:15,22
193:3 194:2,19
194:21 195:2
202:9 204:12
206:18 207:11
208:8 214:24
215:19 217:8
217:14,22
218:4,8 224:6
226:6 228:22
231:10 235:9
236:14
**statement** 5:3
9:12 51:8,11
51:13,19 52:6
52:8,11 53:6
53:13,16 54:12
55:5,20 60:16
61:12 64:7,16
65:5,15 68:12
69:22 73:22
84:10 97:24
98:13,21 99:2
99:3,7,8 101:2
102:7 108:12

110:5 111:6,22
115:13,24
127:18 132:5,7
132:10 134:16
134:19 135:1
143:21 144:19
165:7 170:6,18
184:2 188:20
192:9 200:12
204:20 224:17
225:2 226:4
227:12 237:4,5
238:3,4,5,8
**statements**
56:22 64:19
102:19 171:5
**states** 1:1,17
6:7 31:2 55:17
55:17 64:1,6
64:15 103:8
129:8 240:11
**status** 164:1
**stayed** 127:2
**staying** 67:20
**stenographic...**
240:19
**step** 24:19
133:10 162:11
185:4
**stephenson** 2:7
4:4,11,14 6:18
6:18 8:5 9:15
10:1 21:16
23:1 25:9,19
25:21 26:1,20

27:9 28:1 30:4
30:7,13 31:9
32:4,5,11,14,17
32:22 33:2,5
33:16 38:5,11
38:20 39:4,9
39:11,15 40:1
40:11 41:8
42:7,19 43:1,8
43:18,23 44:23
45:6,11,19
46:2,7,13,19
47:9,18 48:12
50:13 51:17
52:1,13,20
53:4 54:1,7,19
55:13 56:11,19
57:1,7 58:1,10
58:21 59:1,7
59:20 60:2,8
60:13,19 61:1
61:9,15 62:1
62:22 64:5,11
65:1,8,13,21
66:5,19 67:10
67:21 68:2,22
69:8 70:6,16
70:23 72:9
74:8 139:16,18
139:24 140:24
144:24 145:2,3
145:8 148:14
152:21 156:4
157:4 163:18
164:6,15

176:18 180:2
183:24 184:6
184:11 186:2
187:5 188:16
189:19 190:19
194:5 195:20
196:19 197:9
200:20 202:1
210:11 211:15
212:5 213:12
214:10,15,20
215:23 216:10
217:1,19 234:7
235:11 236:16
238:13,16
239:1,6,9
**stepped** 223:21
**steps** 48:11
235:22 236:1
**steve** 2:16 6:23
79:18
**sticker** 32:19
**stipulate** 146:6
**stood** 28:9
166:1
**stopped** 149:11
**storm** 181:11
215:5 235:16
**story** 102:20
122:20
**straightforward**
79:6
**street** 1:19 2:7
2:13,19 3:4,10
3:15 6:11 38:1

**[street - taken]**

Page 49

66:10 69:5 80:22 81:20 84:2 110:17 157:6,9 195:13 196:5,6,7 216:16 235:19 240:8

**stress** 58:9

**stricken** 173:18

**strike** 85:23 91:5,6 128:18 148:11 172:24 173:12 174:5 174:22 212:24

**striking** 85:15 91:21 128:19

**strong** 209:7

**struck** 85:24

**stuck** 144:7 186:8

**students** 19:4

**stuff** 160:4

**sub** 15:10

**subject** 210:19 231:12

**submit** 14:16

**suborned** 146:24 147:8 147:11,13 148:1

**subpoena** 72:18,19 73:1 73:3 104:10 143:16 144:14 144:17 145:4

145:23 217:20

**subsequent** 140:13

**subsequently** 104:24 108:21

**substance** 37:3 176:17

**substantial** 215:11

**substantially** 30:21 52:15,24 236:21

**substantive** 28:16

**suburban** 16:5

**suburbs** 16:12

**suffered** 106:21

**suffield** 2:16

**suggest** 43:24 194:6 229:12 229:18

**suit** 241:10

**suite** 1:20 2:7 2:13,19 3:4,10 3:15 13:15 25:3 158:15

**sullivan** 6:23 53:8,11 57:13 62:15,20 65:2 77:11,18 92:12 94:12,18 95:15 96:12 101:4,12 101:17 115:12 115:22 116:22 117:6,15,22

118:5,13,20 119:3,14,22 120:8 121:24 196:9 204:18 223:23 224:1 225:8 226:3,7 226:13,18 227:13 228:11 228:23 229:4 229:18 231:3

**sullivan's** 63:21 77:12

**summer** 18:23 19:13,15,16

**supreme** 12:3

**sure** 20:21 26:9 26:14,16 32:17 33:2 52:21 68:5,10,15,19 85:19 93:13 102:17 139:15 144:24 146:8 152:2 155:16 155:17 172:4,5 178:10 181:13 190:24 200:15 207:2 213:9 216:23

**surfacing** 106:16

**surprise** 154:21

**surprised** 152:15,23 172:11,14,16 172:23 210:17

210:22

**surrounding** 223:12 225:1

**suspect** 154:24 155:1

**suspenders** 91:20 171:16

**swearing** 12:20 44:12

**switch** 10:18

**sworn** 7:23 8:2 11:9,12 13:1 14:12 240:16

**system** 107:3,5

**systems** 18:8

**t**

**t** 4:17 5:1

**table** 89:21 95:19,22 96:5 96:11 171:19 189:2

**tactic** 235:19

**take** 8:18 11:4 33:5 65:21 85:17 128:24 133:10 156:10 165:24 166:11 176:3 180:6 188:18 211:14 211:15,16 239:7

**taken** 1:19 6:5 18:22 33:10 52:9 53:6 54:15,17 66:2

**[taken - terminated]**                                           Page 50

138:20 170:7
170:18 211:23
**talk** 21:7,23
23:8 69:24
71:12,13 73:18
81:7,10 83:1
85:12 87:10
108:14 111:4
120:21 130:21
137:16 142:10
145:21 146:1,4
146:20 147:23
152:10 153:22
154:12,20
156:17,20,24
159:17 161:23
162:11 163:21
165:3 166:22
166:23 175:8
182:14 183:8
183:18 187:22
195:2 197:14
198:2 199:21
200:4 201:12
201:17 206:23
234:12
**talked** 20:15
21:7 26:10,24
69:15 71:14,22
72:12,13 73:11
97:19 112:3,21
112:22 113:13
130:1 138:8
140:10 143:16
143:18 147:22

153:13,14,17
154:1,2,7,21
156:11 157:14
162:1 168:6
196:16 198:15
199:2,3 207:7
207:16 209:7
223:5,7
**talking** 19:6
22:1,8 24:1
26:12 29:1
85:17 92:13
112:24 129:3
131:19 151:5
152:11 156:19
162:7 166:15
178:1 182:8,9
183:12,16
192:18,20
197:13 206:11
206:18 207:5
207:13 208:2
208:21,22
209:1
**tall** 185:13,14
**taller** 185:20
**target** 26:15
164:21 165:8
**taught** 18:12
18:16 19:12
**teach** 18:11
19:8
**teachers** 19:10
**tears** 24:14

**technological**
172:21
**telephone** 82:4
**tell** 10:21 17:11
21:21 25:5,11
25:15 26:4
28:15,20 41:19
43:2 44:1,17
44:18,21 45:20
46:14 48:13,13
48:17,22 49:2
49:6,8,13 50:2
50:19 51:2
55:23 56:1,6
58:22 66:21
69:7,20 70:3
74:3 101:10
102:20 103:8
103:15 105:8,9
105:20 109:9
115:12,23
117:5 118:4,12
119:3,14,22
120:7 121:1,2
122:19 127:4
149:20,23
154:14,16
155:16 156:12
159:16,20
160:22 163:6,9
163:15 164:11
164:19 167:19
167:22,23
168:5,10,12,18
168:19 169:15

170:8 177:13
177:16,16,21
177:23 178:19
181:12,12
186:9,17,20,22
186:23 187:19
188:8 190:2
193:17 196:8
202:24 203:3
203:22 204:7
207:3 209:2
210:1 213:3
219:4 222:10
224:14,15
227:12,18,23
228:4,9,17
229:24 230:8
230:14,17
232:18,24
233:6,10,14,21
234:2,22 235:2
235:8 236:5
**telling** 43:14
47:11 49:9
101:18 156:16
162:8,9 168:15
169:17 174:18
186:12,17
203:20 214:12
220:18 224:16
226:14 234:19
**tells** 131:16
**term** 15:13,21
**terminated**
47:7 49:15,24

**[terminated - third]**                                    Page 51

54:17
**terms**  35:4 36:7
  75:8 84:3 91:1
  92:19 213:7
**test**  234:19
**testified**  8:3
  37:7,20 44:7
  67:7 69:3
  72:10 73:3
  104:5,11,18,24
  106:6 123:20
  124:3 130:4
  137:13 139:4
  141:6 150:9,11
  150:14 177:3
  191:22
**testifies**  83:24
**testify**  10:6
  28:17 46:15
  59:17 66:11
  67:2,22 68:15
  69:10 84:4
  105:15,22
  113:17,24
  114:7 116:23
  127:23 129:14
  137:9 149:8
  201:13 207:21
  209:16,19
  215:24 216:3,9
  223:18 240:16
**testifying**  8:18
  9:2,5 66:15,20
  102:17 217:7
  217:13 218:2,7

**testimony**  9:18
  10:3,10,14
  69:4,23 71:7
  71:18 72:2,5
  74:6 84:11,12
  88:18 129:10
  139:4 176:19
  178:15 180:3
  186:4 190:13
  192:15 193:6
  197:9 200:16
  201:13,18
  205:15 214:21
  218:15 235:23
  237:9 240:18
  240:23 241:12
**testing**  168:14
**thank**  11:6 33:1
  33:4 39:21
  45:17 57:23
  63:23 138:14
  184:18 185:12
**thanks**  8:16
  10:17 32:4,11
  133:6
**thayer**  148:7
**thereof**  241:11
**thing**  22:1
  89:17 105:11
  122:23 132:4
  168:10 172:1
  183:10 188:8
  191:17
**things**  17:24
  18:1 24:15

29:6 36:18
  44:22 48:8
  63:7 83:12
  85:23 91:4
  100:15,15,15
  102:1 143:22
  158:6 161:2
  166:23 171:11
  171:15 175:20
  181:1 189:12
  199:8 202:24
  203:6,7,10,11
  203:15 204:4
  212:10,11,21
  216:15 235:4
  236:4
**think**  9:11,13
  12:19,21 14:11
  14:12 15:11,16
  15:20 16:12
  17:6,11,13,15
  18:14 19:12
  23:3 27:7 28:7
  29:2 35:22
  37:5,12,24
  38:3 42:1
  51:15 53:14
  57:14 63:5,5,6
  72:12 73:12
  84:2 87:1
  91:13,17 92:17
  93:5,10,12
  100:9 105:7
  114:6 125:18
  126:20 136:24

139:13,18,20
  140:7,9,24
  142:18,24
  143:11,23
  144:4,11
  145:19 147:2
  150:5,8,19
  152:13 153:5
  153:12 155:6
  158:19,21
  160:16,24
  161:2 164:18
  165:15 166:21
  170:8 171:3
  175:20 179:9
  180:4 185:19
  185:21 187:21
  188:12 191:6
  191:12 195:14
  197:16 202:20
  208:19,20
  210:23,24
  211:13 212:2
  212:10,23
  214:4 216:22
  216:22 218:16
  231:17 235:18
  237:1
**thinking**  9:7
  140:12
**third**  54:20
  83:6 110:18
  144:1 148:4
  173:24 179:5
  196:12 199:22

**[third - told]** Page 52

238:19
**thomas** 3:6
7:13 131:2
135:8,12
**thought** 27:6
37:23 42:15
49:19 58:5,7
72:13 132:19
217:17 232:6
235:4
**threaten** 45:7
45:12 46:3
50:10 59:15,21
60:10 65:3
225:15,18
228:23 229:5
**threatened**
25:6 47:3
50:15 54:10
65:18 70:8
190:10
**three** 13:11
19:12,14 81:3
109:1 142:24
178:17 180:12
188:19
**thursday** 18:4
**time** 10:15 11:6
11:12,19 13:12
16:9 17:17
18:14 22:13
26:22 27:18
33:5 35:24
37:2,17,18
38:21 40:4

50:18 51:1
55:14 56:20
73:2,5 86:4
95:14,18 97:23
98:2,7 100:22
101:22 104:8
109:5 110:16
112:14 113:10
115:11 116:2
116:21 117:10
117:14,21
120:5 121:22
132:24 135:5
136:23 138:12
140:9 141:21
143:22 148:4,5
148:7 149:1,3
149:10,17
150:5 151:2,5
154:3,15,20
155:3,13 156:4
157:7 158:9,13
158:14 160:9
165:21,23
167:2 169:11
172:19 176:1,9
177:20 178:5
178:24 179:6
179:17,20
185:1,18 190:8
191:2,3 195:23
196:3,10,12,12
197:17 200:7
201:23 204:11
207:11 209:21

209:23 210:2
211:11,11
215:3 216:20
219:2 220:2
221:5,11 223:2
224:3,13 225:2
225:7 226:12
227:17,23
228:4,22 229:4
229:10,17,23
231:2 232:15
233:20,24
237:6
**times** 24:13
73:14 123:19
127:20 142:20
142:24 162:1
167:15 170:15
170:16 173:4
176:14 178:6
181:23 214:9
215:2
**tiny** 236:9
**title** 18:15
**today** 8:12,18
8:21 9:2,7 56:6
109:3 136:23
137:6,23 138:4
192:10 193:7
**today's** 9:10
239:4
**together** 159:6
171:23 188:1
**told** 21:22
22:16 26:11

36:13,15,18,23
49:23 50:21
51:4 56:1,16
61:18 64:21
69:19 73:17
84:14 107:10
107:21 108:13
109:9 113:7
119:9 124:8,15
124:21 125:3,9
128:7,17,20
134:17 143:14
144:13,16
151:16 152:3
160:24 161:2,5
161:6,9,13
162:17,23
163:20 174:4,5
175:16 181:3,8
185:23 191:5
191:10,11,19
191:24 192:1
192:11,16
193:3,6 199:12
203:16 206:3
206:22 207:19
212:11 213:20
213:21 216:18
216:21 217:19
219:10 220:4
220:11 231:17
231:17,21
234:16,17
235:5,12,13
236:23

**[tom - twice]**                                             Page 53

**tom** 110:17

**tony** 7:14

**took** 11:10
19:12,16 114:3
141:6 167:2

**top** 31:1 53:5,9
53:19 90:6
134:19

**topics** 10:18

**tough** 38:13
50:24

**towards** 34:24
235:23

**traffic** 15:24
16:16

**trained** 179:10

**training** 133:20

**transcribed**
88:19

**transcript** 10:3
73:22,23
144:18 208:14
209:10,12
240:23

**transcription**
240:22

**transferred**
11:24

**transpired**
223:16

**transported**
202:8

**trap** 49:23

**treated** 64:2
81:13,15

**trial** 12:10
17:14 68:8
69:1 70:9
82:14 83:9
88:9 108:4
109:18 111:23
112:18 124:9
124:16,22
142:15 150:12
175:5 189:11
201:4,5,7
206:4 214:2
233:1

**trials** 67:23
68:4 69:10
105:4 106:1,7
112:15 123:21
124:3 150:15
180:5 201:6
216:3

**tribler** 2:18

**tribler.com**
2:20

**trick** 238:20

**tried** 25:12,15
40:16 112:2,23
197:12,13
199:1

**trouble** 48:15
67:1,5,8
122:24 179:3

**true** 31:23
55:21 64:2,8
64:17 147:9
173:8 199:6

240:22

**trust** 198:9
199:21

**trutenko**
110:12,14,15
110:22,24
111:5 113:11
198:6

**truth** 36:15,20
44:2,17,18
56:2,6 69:7,20
70:3 74:3
78:19 84:14
105:8,10
168:11,15,19
168:19 169:15
169:17 177:12
177:13,16,17
177:22,24
181:5,12,21
186:10,18,20
190:2 192:1,12
202:24 203:20
203:23 204:7
213:22 222:10
224:17 231:18
231:21 234:20
234:22 235:2
235:13 240:16
240:17,17

**truthful** 10:14
28:14 29:3
38:23 40:13
41:18 56:21
167:16 168:2,3

181:14 188:15
188:22 189:4
190:4,5 192:6
192:16,23
193:4,4 204:1
235:7

**truthfully** 9:2
42:11 58:18
83:24

**try** 24:5 27:19
36:19 50:24
70:2 81:11
84:14 102:6
108:5 120:24
162:8 164:17
171:15,17
181:15 183:3
191:6 197:23
198:24 203:7
234:21

**trying** 12:13
24:8 42:17
45:4 48:3 58:7
101:17 122:16
144:14 154:3
167:3 185:7,9
210:16 222:9
238:20

**turn** 139:24
211:19

**turns** 168:16
211:16

**twice** 73:16
215:5

**[two - veritext]**                                                    Page 54

**two**   14:13,23
   15:6,7 17:12
   17:13,15 19:13
   29:8,12,13
   38:8 41:1
   45:21 66:6
   73:13 81:3
   86:20 96:16
   108:16,16,17
   108:18,21
   109:1 137:16
   139:14 142:24
   142:24 143:11
   160:17 163:1
   164:22 165:7
   165:17,18
   181:1,17,18
   184:7 195:13
   196:2,7 197:20
   198:7 210:4
   216:7 221:20
   234:1 235:4
   236:22
**type**   138:2
**types**   14:13
   17:17
**typewriting**
   240:21
**typical**   205:2,5

**u**

**u.s.**   181:9
**uh**   25:20
**ultimate**   84:7
**ultimately**
   27:11 36:18

   66:11 67:22
   73:9 161:14
**unacceptable**
   90:18 174:4
**unarmed**   84:3
**uncertain**
   128:9
**uncle**   19:22
   153:7
**unclear**   198:22
**uncomfortable**
   47:24 49:9
   234:2
**uncommon**
   155:17
**under**   56:9
   88:18 107:21
   115:3 175:4
   176:8 179:3
   189:11 199:18
   213:23 214:1
   215:9 223:5
**underneath**
   35:8
**understand**
   8:17 19:21
   35:3 150:23
   164:8 181:14
   184:12 189:22
   200:15 201:10
   220:7 227:10
**understanding**
   21:24 147:18
   150:3 169:4,5
   169:19,20

   185:24 189:12
**understood**
   8:23 36:23
   56:15 138:1
   172:5 195:1
   214:11,14
**undetermined**
   240:10
**unethical**   147:1
**unfortunately**
   168:20
**unit**   6:3 33:8,11
   65:23 66:3
   138:18,21
   211:20,24
**united**   1:1,17
   6:7 129:8
   240:10
**units**   11:20
**university**
   10:24
**untrue**   197:19
   224:10
**untrustworthy**
   198:5
**unusual**   180:16
**upbeat**   58:6
**upset**   185:5
   210:18
**upsetting**   210:9
**use**   32:23 81:5
   83:22 84:3
   107:23 152:12
   178:7,12 182:4
   183:6 184:19

   184:20 185:7
**used**   28:16,17
   28:18,20
   172:18 177:10
   180:19 181:2
   183:9
**using**   28:23
   172:22 176:15
   176:17,24
   177:4,6 181:19
   185:4 235:19
**usually**   28:22
   180:21
**uttered**   183:10

**v**

**v**   6:6
**vague**   127:1
   156:4 157:4
   164:6 189:20
**van**   160:6,8,13
   160:16,18
   162:24 163:2
   237:11,14,17
   237:21
**various**   63:11
   123:20
**venue**   22:19
**veracity**   78:19
**verbatim**   62:10
   159:22 162:19
   162:20,21
**verify**   165:1
   212:10
**veritext**   6:12,14

**[version - went]** Page 55

**version** 26:13 173:24
**vetting** 14:16
**vibe** 225:24
**victims** 103:17 230:2
**video** 6:2,4
**videoconfere...** 2:12 3:3,10
**videographer** 3:24 6:1,13 7:20 33:7,11 65:23 66:3 138:17,21 211:20,24 239:4
**videotaped** 1:15
**viewed** 34:21
**village** 16:16
**virtually** 178:13,16
**visit** 127:1
**visited** 126:18 126:20 127:4
**vitale** 112:11
**voice** 22:1 44:4 59:13
**voluntarily** 198:18
**voluntary** 55:12 198:23
**vote** 15:4
**vs** 1:5,9,13

**w**
**waive** 239:8
**waived** 239:9 241:2
**walk** 178:18,21 180:12 197:12 201:11
**walked** 19:5 199:1
**walking** 49:22 167:3
**walsh** 70:18,24 111:16,16,20 114:19,23 120:20 121:16 197:6 207:16 209:10
**want** 10:18,18 11:2 13:3 14:8 18:9 21:20 22:19 30:24 31:10 32:1 44:16,21 49:16 61:19 63:5,8 63:24 66:6 69:24 86:1 101:12 118:5 123:14 128:22 129:16 137:24 148:9 156:17 167:11 168:13 171:17 177:12 177:12,16,22 181:5,20 184:13 185:10

186:16,17,18 186:24 188:10 190:24 192:2 198:8 199:5 202:18 203:2,4 204:7 206:9 220:24 222:21 230:10,14,18 232:19 233:7 233:12,14 239:6
**wanted** 21:19 23:18 24:1 26:8,16 28:4 38:16 48:14,19 63:2 81:7,10 85:23 90:21 98:12 102:16 137:16 139:3 146:16 154:12 163:21 164:5 172:5 173:12 182:10,10 188:4 212:10 221:2
**wanting** 20:24 159:17 186:14
**warn** 181:10
**warnings** 54:21 55:5,8
**washington** 2:19
**washroom** 138:15

**way** 18:21 22:9 28:17 47:4 54:20 60:10 65:4 94:17,19 107:23 114:4 168:21 179:10 181:16 182:18 189:1 191:21 192:19 201:17 202:11 230:21 231:4 235:9 241:9,10
**wayne** 1:12 7:18 71:5 116:8 124:9 218:5
**ways** 69:10
**we've** 96:7 193:15 206:8
**weapon** 119:17 120:1
**wedding** 17:8
**weed** 37:16 176:11
**week** 140:20
**weeks** 19:14
**weird** 141:3
**went** 10:22 11:1 12:5,7,8 12:17 13:7,7 13:16,18 16:1 16:2 17:2 19:17,17 38:8 41:14 49:19 51:12,14 56:3

**[went - witness]** column continues:

61:22 62:11
63:6,10 67:19
75:3 80:22
82:24 84:18
141:9 148:21
157:2 159:5,7
160:15 161:1,1
167:18 169:5
169:10 175:3
204:11 213:9
213:24 224:9
237:1
**west** 2:13,19
  3:10,15 25:2
  96:4 158:15
**whatnot** 67:17
**whatsoever**
  29:2 60:4
**whereof** 241:12
**william** 2:21
  3:7 7:12
  130:24 136:1,5
**willing** 145:21
  146:1,13,20
  182:15
**windows** 166:9
**wish** 151:23
**wished** 166:20
  188:6
**wit** 240:7
**withdraw** 49:7
  54:24 57:8
**witness** 4:2
  7:22 9:20 10:6
  20:7 21:15

22:17,17,23
23:23 25:8
26:7,11,13,14
27:4,23 30:1
31:8 33:3
34:21 36:13
37:23 38:8,15
39:2 40:7,9
42:6,13,23
43:7,17,22
44:14 45:3,10
45:16,18,24
46:6,12,18
47:7,17,22
50:12 52:8,18
53:3,22 54:6
54:14 55:6,7
55:10,12 56:1
56:10,18,24
57:6,22,24
58:5,20,24
59:5,19 60:1,7
60:12,18,23
61:6,8,14,22
62:5 64:4,10
64:23 65:7,11
66:18 67:5,13
68:1,5,10,13
69:3,6,12,14,18
70:3,5,13,15,21
71:23 72:8
75:2 76:11,13
77:4,15 78:4
78:21 79:2
80:7,24 81:14

81:16,23 82:17
83:4 84:23
87:15 88:4,12
88:17,21,21
89:10 90:18,23
92:6,17,22
93:21 94:5,10
94:13 95:1
97:10,17 98:16
98:23 99:12,20
100:3,9,22
101:7,14,20
102:10,16
103:5,13,20
104:2,16,22
105:6,18 106:4
106:9,20
107:13,21
108:8,23 109:8
110:8 111:2,10
112:2,20
113:19 114:3
114:12 115:15
115:20 116:6
116:10,14,19
117:3,18 118:1
118:8,17,24
119:8,19 120:3
120:11 121:5
122:5,11,22
123:5,10,17,23
124:6,13,19
125:1,7,14,23
126:12 127:12
128:6,16 129:6

129:18 130:15
130:20 132:15
132:22 133:2
134:21 137:3
138:7 143:15
145:3,23
146:15 147:20
148:16 149:15
152:18,23
155:4,12,12
156:6 157:5
163:20,22
164:8,17,23
172:16 174:17
174:20,24
176:4,7,20
178:8,16 180:4
184:1,13 186:5
187:7 188:17
189:23 193:19
194:3,8,17
195:22 197:10
198:5 200:12
200:22 201:18
202:3 205:5,16
208:16 210:13
211:4,18 213:9
213:20 214:14
215:22 216:5
217:11 218:23
219:13,18,24
220:7,20 221:2
221:15,22
222:13,23
223:1 224:8,20

**[witness - zuganelis]** Page 57

224:22 225:5
225:12,21
226:10,21
227:7,15,21
228:2,7,13,20
229:2,8,15,21
230:6,12,24
231:6,15 232:4
232:22 233:4
233:17 234:4
235:12 236:3
236:18 237:13
238:7,23 239:8
240:19,20,24
**witness's**
  170:18
**witnesses** 83:8
  163:13 179:10
  216:9
**woman** 184:17
**wonderful**
  184:17
**word** 62:9,10
  63:13 173:19
  177:4,6,11
  178:7 181:7,19
  183:6 184:21
**words** 42:20
  82:13 91:7
  95:15 137:24
  186:23 221:18
**work** 11:16
  13:7 32:24
  141:22 145:17
  179:21 180:23

**worked** 13:9
  141:13,23,24
  155:20 156:2
**working** 20:18
  216:8
**world** 105:21
**worse** 46:16
  59:16
**write** 52:9
**writing** 29:16
  57:18
**written** 73:22
  144:18 170:6
**wrong** 68:23
  235:21
**wrongful** 17:20
**wrote** 52:10

| x |
| --- |

**x** 4:1,17 5:1
  8:10 182:17

| y |
| --- |

**yeah** 14:11
  18:12 19:12
  21:17 23:10
  27:14 32:17
  34:11 35:22
  72:23 75:10
  76:7,14 91:15
  92:10 121:8
  139:18 146:8
  152:23 155:22
  165:16 170:14
  171:12 172:19
  172:19 173:8

174:11 179:23
180:20 181:8
187:4 188:1,12
191:14 208:18
**year** 15:21
  17:17 19:18
  149:5 155:24
  163:1 176:3
**years** 15:6,7,13
  17:6,12,13,16
  18:10,16,17
  77:23,24
  106:22 155:24
  158:5,5 179:22
  210:4
**yell** 59:13
**young** 20:18
  28:3
**younger** 77:19

| z |
| --- |

**zuganelis**
  112:11,12

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.