Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

MATTHEW SOPRON,                    )

          Plaintiff,               )

     vs.                           ) No. 1:19-CV-08254

FORMER ASSISTANT STATE'S           )

ATTORNEY SCOTT CASSIDY,            )

et al.,                            )

          Defendants.              )

     The deposition of EUGENE GIZOWSKI, SR., called for examination pursuant to Notice and the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Elizabeth L. Vela, an Illinois Certified Shorthand Reporter, at 151 North Franklin Street, on February 22, 2023, at the time of 10:08 a.m.

(Proceedings concluded at 12:36 p.m.)

Reported by:  Elizabeth L. Vela, CSR

License No.:  084-003650

Page 2

APPEARANCES:

LOEVY & LOEVY, by
MS. LINDSAY HAGY,
311 North Aberdeen Street, Suite 3
Chicago, IL 60607
(312) 243-5900
lindsay@loevy.com
    Representing the Plaintiffs,
    Matt Sopron, Nick Morfin, and
    Wayne Antusas;

HINSHAW & CULBERTSON, by
MR. JAMES M. LYDON,
151 North Franklin Street, Suite 2500
Chicago, IL 60606
(312) 704-3000
jlydon@hinshawlaw.com
    Representing the Defendant,
    Former Assistant State's Attorney
    Scott Cassidy;

MICHAEL BEST & FRIEDRICH, LLP, by
MS. BRIANNA SIEBKEN,
444 West Lake Street, Suite 3200
Chicago, IL 60606
(312) 222-0800
bjsiebken@michaelbest.com
    Representing the Defendant,
    City of Chicago;

NATHAN & KAMIONSKI, LLP, by
MS. ASHLEY BRODY and
MR. SHNEUR NATHAN,
33 West Monroe Street
Chicago, IL 60603
(312) 612-1928
abrody@nklawllp.com
snathan@nklawllp.com
    Representing the Defendant, City of
    Chicago for Nick Morfin's case and
    Wayne Antusas' case;

Page 3

APPEARANCES CONTD.:

O'MARA & O'CALLAGHAN, by
MS. MAUREEN O'BRIEN,
230 West Monroe Street, Suite 2620
Chicago, IL 60606
(312) 600-5588
maureen.obrien@o2lawyers.com
    Representing the individual
    Defendant State's Attorneys other
    than Scott Cassidy;

KULWIN MASCIOPINTO & KULWIN, by
MR. ANTHONY MASCIOPINTO,
161 North Clark Street
Chicago, IL 60601
(312) 641-0300
amasciopinto@kmklawllp.com
    Representing the Defendant
    CPD Officers Holmes, Argenbright, and
    Graffeo;

TRIBLER ORPETT & MEYER, by
MS. AMY KUNZER and
MR. WILLIAM OBERTS,
225 West Washington Street, Suite 2550
Chicago, IL 60606
(312) 201-6400
amkunzer@tribler.com
wboberts@tribler.com
    Representing the Defendants,
    Former Cook County State's Attorney
    Investigators Marley, Bajenski, Ptak,
    and Diciolla.

Page 4

I N D E X

WITNESS                    EXAMINATION

EUGENE GIZOWSKI, SR.
    BY MR. LYDON                 8
    BY MS. O'BRIEN               46
    BY MS. SIEBKEN               59
    BY MS. KUNZER                60
    BY MR. MASCIOPINTO           62
    BY MS. HAGY                  68
    BY MR. LYDON (Further)       108
    BY MR. MASCIOPINTO (Further)  111
    BY MS. KUNZER (Further)      115

E X H I B I T S

NUMBER                     MARKED FOR ID

Exhibit 1 - Statement of John Gizowski,
Sr.                        36

Exhibit 2 - Letter to John Gizowski, Sr. From
Patrick Walsh dated February 13th, 1997    45

Exhibit 3 - Letter to John Gizowski, Sr. From
the State's Attorney's Office dated
December 10th, 2001        103

Page 5

THE VIDEOGRAPHER: Good morning. We are going on the record at 10:08 a.m. on February 22nd, 2023. Please note that the microphones are sensitive and may pick up whispering, private conversations, and cellular interference. Please turn off all cell phones or place them away from the microphones, as they can interfere with deposition audio. Audio and video record will continue to take place unless all parties agree to go off the record.

This is Media Unit No. 1 of the video-recorded deposition of Eugene Gizowski, Sr., taken in the matter of Matthew Sopron vs. Former State's Attorney Scott Cassidy, et al. This deposition is being held at the offices of Hinshaw & Culbertson, LLC, located at 151 North Franklin Street, Chicago, Illinois.

My name is Nick Page from the firm Veritext. I'm the videographer. The court reporter is Elizabeth Vela, also from the firm Veritext. I'm not related to any parties in this action, nor am I financially interested in the outcome.

Counsel, all present in the room, and everyone attending remotely will now state their

2 (Pages 2 - 5)

Page 6

appearances and affiliations for the record. If there any objections to the proceedings, please state them at the time of your appearance, beginning with the noticing attorney.

MR. LYDON: Good morning. Jim Lydon, last name spelled L-y-d-o-n, on behalf of Scott Cassidy.

MS. HAGY: Lindsay Hagy, L-i-n-d-s-a-y, H-a-g-y, on behalf of plaintiffs Matt Sopron, Nick Morfin, and Wayne Antusas.

MS. O'BRIEN: Maureen O'Brien of O'Mara & O'Callaghan representing the individual State's Attorneys other than Scott Cassidy.

MS. BRODY: Ashley Brody, B-r-o-d-y, from Nathan & Kamionski. We represent the City for Nick Morfin's case and Wayne Antusas' case.

MS. KUNZER: Amy Kunzer, K-u-n-z-e-r. I represent the former Cook County State's Attorney Investigators Marley, Bajenski, Ptak, and Diciolla.

MR. MASCIOPINTO: Tony Masciopinto. I represent the CPD Officers Holmes, Argenbright, and Graffeo.

MS. SIEBKEN: This is Brianna Siebken. I was just let into the meeting, but for the record, Brianna Siebken on behalf of Defendant City of

Page 7

Chicago.

MR. OBERTS: Good morning. Bill Oberts on behalf of the defendant investigators -- former investigators.

MS. NATHAN: Good morning. Shneur Nathan. I was also just let into the meeting on behalf of the City of Chicago, as well.

THE WITNESS: My turn?

THE VIDEOGRAPHER: Will the court reporter please swear in the witness?

(Witness sworn.)

MR. LYDON: Good morning, Mr. Gizowski. Can you state your full name?

THE WITNESS: Eugene Gizowski, III.

MR. LYDON: Mr. Gizowski, have you ever given a deposition before?

THE WITNESS: No.

MR. LYDON: Just a few rules. If you can speak in a loud clear voice. The court reporter here is taking everything down. Try and allow me to finish my question before you begin to answer, as again, the court reporter is trying to take everything down. You're going to hear objections from the attorneys from time to time. If you could just

Page 8

pause for a moment, let them get the objection out, and then, unless you're instructed otherwise, answer the question despite the objection.

If there's a question that calls for a yes or no answer, try and answer yes or no versus uh-huh or uh-uh, because that again doesn't translate in the transcript she is preparing. And if you don't understand a question, please let me know. I'll attempt to rephrase. If you answer a question, we'll assume you understood it.

You're going to be asked about events from a long time ago. If you don't recall something, let us know. Don't feel compelled to remember something that you don't remember. And then, if you need to take a break, for any reason, let us know, and we can do that. Fair enough?

THE WITNESS: Yes.

EUGENE GIZOWSKI, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. LYDON:

Q. Okay. Mr. Gizowski, where do you currently live?

Page 9

A. 5056 South Lavergne Avenue, Chicago, Illinois 60638.

Q. Is that a house or an apartment?

A. It's a house.

Q. Is that near Midway Airport?

A. Yes, it is.

Q. Does that -- does your residence -- is it in a particular neighborhood of Chicago?

A. Yes, it is.

Q. And what is that neighborhood called?

A. Well, it's on Chicago Ridge, but where we live, it's kind of like Vittum Park.

Q. Okay. Are you married?

A. Yes.

Q. And what's your wife's name?

A. Sandra.

Q. Does Sandra live at the Lavergne address?

A. Yes, she does.

Q. How long have you been married to Sandra?

A. Since 2003.

Q. Were you married to Sandra before 2003?

A. Yes.

Q. And from when to when?

A. I think it was '74 to maybe '86, something

3 (Pages 6 - 9)

Page 10

like that.

Q. And roughly how long has Sandra lived at 56 South Lavergne?

A. 48 years, I'd say.

Q. So --

A. It was, I think -- it was December 1976, we moved in there.

Q. And Sandra has lived at that address continuously since then?

A. Yes, she has.

Q. Before your divorce, did you live at the Lavergne address?

A. Yes, I did.

Q. And where did you live during the period of time that you were divorced from Sandra?

A. 1539 West 46th Street.

Q. And is that in Chicago?

A. Yes, Chicago, Illinois.

Q. And is that where you lived in the mid 1990s?

A. Yes.

Q. You -- do you and Sandra have children --

A. Yes.

Q. -- kids? What are their names and ages?

Page 11

A. Eugene, he's 49. John, he's dead. And Michael, I think he's 47.

Q. When did John pass away?

A. 2005, March. Was it March? April. April 2005.

Q. What was the cause of John's death?

A. Narcotics overdose.

Q. Does Sandra have any other kids?

A. Yes, she does.

Q. And what are their names?

A. There's one. Her name is Lisa Pistello, P-i-s-t-e-l-l-o.

Q. Did your kids, Eugene, John, and Michael live at the 5056 South Lavergne address in the 1990s?

A. Yes.

Q. Do any of your kids -- I guess they're not kids now. They're adults. Your adult children currently live at the Lavergne address?

A. Could you say that again? I was thinking and I just missed it.

Q. No worries. Do any of your kids currently live at the Lavergne address?

A. Yes. Yes.

Page 12

Q. Who is that?

A. Michael.

Q. And does he live at the Lavergne address with anyone else?

A. Yes.

Q. Who's that?

A. His daughter, Olivia Gizowski.

Q. And when did Michael and his daughter move back into the Lavergne address, roughly?

A. About three years ago.

Q. Is Michael married?

A. Yes.

Q. What's his wife's name?

A. Shannon Gizowski.

Q. And are they currently married or divorced?

A. They're married.

Q. Where does Shannon live?

A. I don't know the exact address, but it's 62nd and Austin, Chicago.

Q. Where does -- is it Gene, Jr. that -- does he go by junior?

A. The IVth. He's number IV.

Q. Number IV?

Page 13

A. Yeah.

Q. Gene, IV, where does he live -- currently live?

A. He lives in Essex, Illinois. I don't know the address.

Q. Is he married?

A. Yeah.

Q. What's his wife's name?

A. Shelly. Shelly.

Q. Are you currently working or retired?

A. I'm working. I'm retired from the Chicago Police Department, but I'm working.

Q. By the way, how old are you?

A. 74.

Q. And what's your February 22, 2023 of birth?

A. October 9, 1948.

Q. I'm sorry. So you're currently working. Where do you work and what's your position?

A. Chicago Park District, and I'm a security guard.

Q. How long have you been a security guard at the Chicago Park District?

A. I think 11 years.

4 (Pages 10 - 13)

Page 14

Q. Where did you work before?
A. Chicago Police Department.
Q. How long were you with the Chicago Police Department?
A. 41 years.
Q. And what was your position with the Chicago Police Department?
A. Patrolman.
Q. What year did you retire?
A. 2010.
Q. And I don't mean this to be a memory test, but to the best of your ability, can you give me what your district assignments were, maybe in chronological order, when you were --
A. Chronological?
Q. By time. Where -- starting where you first were assigned as a patrol officer, and then, taking us through.
A. Okay. I did some time in 5. And I got assigned out of the Academy to 3, Grand Crossing. Then, I went to the task force. Then, they changed that to the special operations group. Then, I went to 11, Harrison and Kedzie. Then, I went to 8. And then, I went to 7, Englewood. And then, I went

Page 15

to mass transit.
Q. And -- well, when were you in the 8th district, roughly?
A. From maybe the mid '80s to the early '90s.
Q. Is that the same neighborhood that your Lavergne address is in?
A. Yes, it is.
Q. Okay. You said you were a member of a task force. What kind of work did that involve?
A. Curb to curb, we called it. You didn't really do anything but stop cars and -- you know, for traffic violations, and then, you know, maybe see if you could find some contraband and answer in progress calls, we called them. They're, you know, robbery, burglary, whatever was coming over the -- coming over the radio, you know, police work.
Q. And where was that -- where was that task force?
A. The task force?
Q. Where?
A. It was 51st and Wentworth.
Q. Okay. So Area 1?
A. Area 1.

Page 16

Q. Okay. Did you -- have you ever had any gangs -- gang unit assignments?
A. Oh, yeah, yeah. I was in gangs for a couple of years.
Q. And what district were you working out of when you were in gangs?
A. Gangs was -- they put you where they needed you. Say they had an influx of crime. The 5th District, we worked, 3rd district, 7, 2nd district. It was 2nd district mostly, but they'd send us all over where -- wherever the commander of that district needed extra personnel.
Q. And where -- or I'm sorry. Can you describe what type of work that gangs unit involved, just generally?
A. Well, I wasn't a gang specialist. They investigated gang crimes. We were basically uniform and in a marked car. They'd send us to an area, and you know, it was a high concentration, hoping that our presence would slow down the crime.
Q. So you worked with gang specialists?
A. Yeah, I knew gang specialists. I really didn't -- wasn't in a car with them, but I knew them guys, yeah.

Page 17

Q. And when were you in this gangs unit, approximately?
A. 1984 maybe. You know, I'm sorry, but I don't remember the dates.
Q. Sometime in the 1980s?
A. Yeah.
Q. Okay. Where were you assigned in 1995 and 1996?
A. I must have been in mass transit.
Q. How long were you in mass transit, roughly?
A. Eight, nine years.
Q. Okay. What unit were you in when you retired?
A. Mass transit.
Q. Okay. Were Gene, IV, Michael, and John in a street gang in the 1990s?
MS. HAGY: Objection. Form and foundation.
BY MR. LYDON:
Q. Go ahead.
A. I can talk?
Q. Yep.
A. Yeah.
Q. What gang were they in?

5 (Pages 14 - 17)

Page 18

A. Popes.

Q. And are you familiar with the name Almighty Popes?

A. Yes.

Q. Is that another name for the street gang that your sons were in?

A. Yeah, that was them.

Q. Did Gene, Michael, and John have gang nicknames?

A. Yes, they did.

Q. What was John's gang nickname?

A. Climber.

Q. What was Gene's gang nickname?

A. Huge, H-u-g-e.

Q. What was Mike's gang nickname?

A. Menace, M-e-n-a-c-e.

Q. And back in the 1990s, were the Popes gang in the neighborhoods around Midway Airport?

A. Yeah.

MS. HAGY: Objection. Go ahead.

BY MR. LYDON:

Q. Go ahead and answer.

A. Yes.

Q. Were there groups of Popes associated with

Page 19

different neighborhoods?

MS. HAGY: Objection. Foundation.

THE WITNESS: Yes.

BY MR. LYDON:

Q. Do you know if your sons were in a particular neighborhood group of Popes?

A. Yes.

MS. HAGY: Objection. Foundation. Go ahead.

THE WITNESS: Yes.

MS. HAGY: Sorry.

THE WITNESS: It's okay.

MS. HAGY: That's going to happen. You can just --

THE WITNESS: It's all right.

MS. HAGY: -- just ignore it.

BY MR. LYDON:

Q. I can start over.

A. I'm here for the duration.

Q. Yeah. As I said, there's going to be objections, and you know, we'll do our best to try and not talk over each other, but just let her get the objection out, and then, you can answer.

A. Okay.

Q. So do you know if your sons were in a

Page 20

particular neighborhood group of Popes?

A. Yes.

Q. And what neighborhood group?

A. Almighty Popes.

Q. And what --

A. From Vittum Park.

Q. Are you aware of whether your sons had any criminal cases?

A. Yes.

Q. And what cases are you aware of?

A. I remember John had a shooting case. He was involved in -- allegedly involved in a shooting. And Mike, I don't know what his cases were. I just don't -- I'm not sure right now.

Q. Okay.

A. I know -- I don't think Gene was arrested at all.

Q. Okay. Do you know what happened with any of the cases?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Yes. John's was thrown out, and apparently, Mike's must have been disposed of, too. He didn't do any jail time or anything.

Page 21

BY MR. LYDON:

Q. Do you know a Matthew Sopron?

A. Yeah.

Q. And how do you know Matthew Sopron?

A. He was friends with my sons.

Q. All three of your sons?

A. Yeah.

Q. Do you know how they got to know each other?

MS. HAGY: Objection. Foundation.

THE WITNESS: No, I don't really know how they got together, but you know, I knew that they hung with him.

BY MR. LYDON:

Q. Was Matthew Sopron a Pope?

MS. HAGY: Objection. Foundation.

THE WITNESS: Yes.

BY MR. LYDON:

Q. Do you know what neighborhood group Matthew Sopron was from?

MS. HAGY: Objection. Foundation.

THE WITNESS: Yes. He was 63rd Street -- they called it In & Out back then. It's some 7-Eleven. That was just, I guess, a location or something.

6 (Pages 18 - 21)

Page 22

BY MR. LYDON:

Q. Do you know whether Sopron had some leadership at the Popes?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Well, I think he was the leader of that operation over there.

BY MR. LYDON:

Q. Did Matthew Sopron have a nickname?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Yes.

BY MR. LYDON:

Q. What was it?

A. Misfit.

Q. Are you aware that Sopron went to prison for the double murder of two 13-year-old girls near Hale Park back in late 1995?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Yes.

BY MR. LYDON:

Q. And where is Hale Park?

A. Hale Park is like 63rd and -- right in the area of 63rd and Narragansett. I think it's Mulligan. It's -- one of the streets it's on is Mulligan. 62nd and Mulligan or something like

Page 23

that.

Q. And Mr. Gizowski, do you --

A. I don't know the exact address.

Q. Do you recall hearing about the double murder in the news at the time?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MR. LYDON:

Q. Are you aware that Matthew Sopron was released from prison in recent years?

A. Yes.

MS. HAGY: Objection.

THE WITNESS: I'm sorry.

MS. HAGY: Go ahead. That's okay.

BY MR. LYDON:

Q. Do you know why?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I actually don't know why. I know he was released. I don't know what the basis was.

BY MR. LYDON:

Q. Have you seen Sopron since he's been released?

A. Yes.

Page 24

Q. Where have you seen him?

A. By my house.

Q. Are Michael and Gene, IV still friends with Matthew Sopron?

A. Yes.

Q. How many times have you seen Sopron come around and -- well, strike that.

When you said come around the house, is that the Lavergne address?

A. Yes, sir.

Q. Approximately how many times have you seen Sopron come around the Lavergne address since he's been released?

MS. HAGY: Objection. Form.

THE WITNESS: Three times.

BY MR. LYDON:

Q. And is that to see one or both of your sons?

A. Yes, sir.

Q. All right. Have you had any conversations with your sons about Sopron coming around the house?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

Page 25

BY MR. LYDON:

Q. What was said?

A. I told them I didn't want them around the house.

Q. Why didn't you want Sopron around your house?

A. I just -- to me, it's, you know, bad news.

Q. Do you know how Sandra feels about Sopron?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I don't know how she really feels about him, but I think she, you know, likes him like a mother likes her sons' friends and things like that, but I don't know what she thinks about him, you know, way down deep.

BY MR. LYDON:

Q. Are you aware that John -- your son John testified adversely to Sopron at his criminal trial?

MS. HAGY: Objection. Form.

THE WITNESS: Yes. Yes.

BY MR. LYDON:

Q. Do you -- are you aware that your sons Gene and Michael testified at Sopron's trial?

A. Yes.

7 (Pages 22 - 25)

Page 26

Q. And are you aware whether they testified favorably to Sopron?

MS. HAGY: Objection. Form.

THE WITNESS: Favorably, I'd say.

BY MR. LYDON:

Q. I want to bring your attention to September 26, 1996 in the late afternoon hours. Did you learn where your son John was at that time?

A. Yes.

Q. And what did you learn?

A. I got a phone call saying he was at 26th and Cal at an office and if I could come down there. I don't know what for, but I ended up going down there and meeting Scott Cassidy.

Q. Okay. When you arrived at 26th Street, do you recall where you went?

A. Yeah.

Q. Where did you go?

A. Well, when I first got there, you got to go through security, and then, I went up to the office.

Q. Is that the State's Attorney's Office?

A. Yes. Scott Cassidy's, I guess.

Q. So you said you met with Scott Cassidy.

Page 27

Was your son John there at the time?

A. Yes, he was.

Q. Was this in an office?

A. Yes, sir.

Q. All right. Do you recall who else was present when you arrived?

A. I think there was a detective. I think he was a detective and a lady that was there. She -- I think she was taking notes.

Q. And the detective and lady, do you know their names?

A. No.

Q. Did you speak with Scott Cassidy when you arrived?

A. Yes.

Q. Were you aware that Scott Cassidy was a prosecutor with the State's Attorney's Office?

A. Yeah. He introduced himself.

Q. All right. And what, if anything, did Scott tell you when you arrived?

A. Well, he was going to take a statement from John.

Q. Did he tell you what the subject matter of the statement was?

Page 28

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MR. LYDON:

Q. What did he tell you?

A. It was about the murder of those two girls.

Q. Did Scott Cassidy or anyone else there tell you that John was under arrest?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MR. LYDON:

Q. Can you describe when you spoke with Scott Cassidy what his demeanor was?

MS. HAGY: Objection. Form.

THE WITNESS: He -- to me, he was very, you know, professional. He was a typical State's Attorney. He -- but he did -- it seemed like he was doing everything by the rules, you know. I thought he did a good job.

BY MR. LYDON:

Q. All right. Do you have any idea of whether John was questioned at all before you got there?

MS. HAGY: Objection. Form. Foundation.

Page 29

THE WITNESS: No.

BY MR. LYDON:

Q. All right. Did you get a chance to speak with John alone when you arrived?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Yeah, but I don't know about being alone. I think there was people in the room still.

BY MR. LYDON:

Q. And what was said when you spoke with John?

MS. HAGY: Objection. Form.

THE WITNESS: I told him to tell the truth.

BY MR. LYDON:

Q. Did John tell you that he had been threatened by Scott Cassidy?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MR. LYDON:

Q. Did John tell you he had been threatened by the detective or the lady or anyone else there?

MS. HAGY: Objection. Form.

THE WITNESS: No.

8 (Pages 26 - 29)

Page 30

BY MR. LYDON:

Q. Did John tell you he was being coerced or forced into saying anything?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MR. LYDON:

Q. Did John tell you that words were being put in his mouth by Scott Cassidy or anyone else?

A. No.

MS. HAGY: Objection. Form.

THE WITNESS: Excuse me. No.

BY MR. LYDON:

Q. Did John tell you that he was yelled or screamed at by Scott Cassidy or anyone else?

A. No.

Q. Did John tell you that he had been arrested and brought down to 26th Street against his will?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MR. LYDON:

Q. Did John tell you that investigators broke down his door?

A. No.

Page 31

Q. Did John tell you that Scott Cassidy or anyone else threatened to have John charged with a crime?

MS. HAGY: Objection. Form and foundation.

THE WITNESS: No.

BY MR. LYDON:

Q. Did John tell you that Scott Cassidy told John that he'd be raped in prison?

MS. HAGY: Objection. Form.

THE WITNESS: No, he didn't say that.

BY MR. LYDON:

Q. Did John tell you he was afraid of Scott Cassidy or anyone else there at 26th Street?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MR. LYDON:

Q. Did John appear nervous?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MR. LYDON:

Q. Did he express any concerns about the statement?

MS. HAGY: Objection. Form.

THE WITNESS: No.

Page 32

BY MR. LYDON:

Q. Would you remember if John had told you that he was being mistreated by prosecutors or investigators?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MR. LYDON:

Q. Would you remember if John had told you he was being threatened or forced to say something that wasn't true?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MR. LYDON:

Q. And if John had told you when you arrived at 26th Street that he was being mistreated, coerced, or threatened by Scott Cassidy or anyone else, what would you have done?

MS. HAGY: Objection. Form.

THE WITNESS: I'd have probably wanted him to get a lawyer.

BY MR. LYDON:

Q. After meeting with John, did you witness John being questioned?

A. Yes.

Page 33

Q. Who was asking the questions?

A. Scott Cassidy.

Q. Was John giving answers?

A. Yes.

Q. Do you recall the general subject matter of the conversation between Scott Cassidy and John?

MS. HAGY: Objection. Form.

THE WITNESS: Yeah. It was about the double homicide.

BY MR. LYDON:

Q. Did you observe Scott Cassidy or anyone else threatening or coercing John in any way during the interview?

A. No. They didn't do anything coercive or suggestive or -- they just asked questions. He answered them.

Q. Did you observe Scott Cassidy or anyone putting words in John's mouth?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No, nobody put words in his mouth.

BY MR. LYDON:

Q. Did you observe Scott Cassidy or anyone else screaming, yelling, or swearing at John?

9 (Pages 30 - 33)

Page 34

MS. HAGY: Objection.

THE WITNESS: No.

MS. HAGY: Form and foundation.

THE WITNESS: They weren't. It was all kind of monotone and just answer the questions that we're asking you, you know.

BY MR. LYDON:

Q. Did you observe Scott Cassidy or anyone else tell John he was going to be charged with a crime or raped in prison?

A. No.

MS. HAGY: Objection.

THE WITNESS: No.

BY MR. LYDON:

Q. Did Scott Cassidy ask John to tell the truth?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MR. LYDON:

Q. Do you believe John was telling the truth?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Yes.

BY MR. LYDON:

Q. Based on your observations, can you

Page 35

describe Scott Cassidy's demeanor when he was questioning John?

MS. HAGY: Objection. Form.

THE WITNESS: As I said, he was -- you know, he's a professional. He did his job. He asked the questions and John answered them.

BY MR. LYDON:

Q. If you had observed John being threatened or coerced into saying something or mistreated, would that be something you'd remember?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Yes.

BY MR. LYDON:

Q. What would you have done if you had seen that?

MS. HAGY: Objection. Form.

THE WITNESS: I would have had him -- you know, I would have told him, you know, you don't have to answer the questions and let's go get a lawyer. To me, they never did that, so it never came up.

MR. LYDON: We'll call this 1. Do you want to do rolling exhibits throughout discovery? We just start out with just one, and then -- we've done that before in other cases. We can talk about it

Page 36

later.

MS. HAGY: Yeah, let's think about -- like so this would be Exhibit 1 for like every deposition?

MR. LYDON: We just keep going numerically to avoid confusion later.

MS. HAGY: Yeah, let's talk about that. I'm interested in that idea.

MR. LYDON: Okay.

(Whereupon, Exhibit 1 was marked for identification.)

BY MR. LYDON:

Q. Okay. Mr. Gizowski, showing you Exhibit 1, do you see at the top, it says statement of John Gizowski?

A. Yes.

Q. And do you recognize this --

A. Yes.

Q. -- five-page document?

A. Yes, I do.

Q. All right. And does your signature appear on each page?

A. Yes, my signature is on every page.

Q. Is John's signature on every page?

MS. HAGY: Objection. Form. Foundation.

Page 37

THE WITNESS: Yes, it is.

BY MR. LYDON:

Q. And did you sign each page of this handwritten statement?

A. Yes, I did.

Q. And did you observe John sign each page of this statement?

A. Yes, I did.

Q. And was this statement prepared in your presence?

A. Yes, it was.

Q. All right. Do you recall the female that you saw in the office going through this statement with John?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MR. LYDON:

Q. Was it the same subject matter that Scott Cassidy had been speaking with John about?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MR. LYDON:

Q. Did the female write out John's statement?

A. Yes.

10 (Pages 34 - 37)

Page 38

MS. HAGY: Object --

THE WITNESS: I'm sorry.

MS. HAGY: Oh, no.

BY MR. LYDON:

Q. Do you recall the female going through the statement with John by reading it out loud? Go ahead.

A. Yes. I'm so busy interrupting the lady, I just want to make sure.

Q. Did John agree to and verify the contents of this handwritten statement?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MR. LYDON:

Q. Was he allowed to make corrections if he wanted to?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MR. LYDON:

Q. And -- strike that. The entire time you were present at 26th Street, did you ever witness John being mistreated in any way?

MS. HAGY: Objection. Form.

THE WITNESS: No.

Page 39

BY MR. LYDON:

Q. Do you recall approximately -- well, strike that.

Did John at any time ever tell you that he had been threatened or forced to say anything or promised anything in connection with speaking with Scott Cassidy and giving this handwritten statement that's Exhibit 1?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MR. LYDON:

Q. Can you -- approximately how long were you at 26th Street?

A. I don't know. It might have been an hour, hour and a half, something like that.

Q. Did you drive John home that night?

A. Yes.

Q. Were you present, I guess a few weeks later, when John testified before the Grand Jury?

A. No, I wasn't there.

Q. Were you aware that John -- your son John testified later at the criminal trials for the double murder?

A. Yes.

Page 40

Q. Were you present?

A. I might have been. I was with him in the back before the trial. I didn't really go into the courtroom, though.

Q. Are you aware that John -- after the criminal trials and convictions, are you aware that John recanted his testimony?

A. Yes.

MS. HAGY: Objection.

THE WITNESS: I'm sorry.

MS. HAGY: Oh, that's okay.

THE WITNESS: Yes.

BY MR. LYDON:

Q. Why do you think John recanted?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I don't know. Maybe he had a friendship or maybe he was threatened. Maybe -- I got no idea, though.

BY MR. LYDON:

Q. Did John have a drug problem?

A. Yes.

Q. Did he ever go to rehab?

A. Yeah.

Q. Were you ever interviewed by Sopron's

Page 41

attorneys --

A. No.

Q. -- about -- well, let me finish.

A. I'm sorry.

Q. Were you ever interviewed by Sopron's attorneys about John and his meeting at the State's Attorney's Office in 1996?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MR. LYDON:

Q. Were you ever interviewed by Sopron's attorneys about the handwritten statement that you signed?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MR. LYDON:

Q. It was a poorly phrased question. Were you ever interviewed by Sopron's attorneys about John's handwritten statement that you signed?

A. No.

Q. Were you ever interviewed by anyone working for Sopron?

MS. HAGY: Objection. Form.

THE WITNESS: One time.

11 (Pages 38 - 41)

Page 42

BY MR. LYDON:

Q. When was that?

A. Yesterday.

Q. And how were you contacted yesterday?

A. By phone.

Q. And someone identified themselves as working for Sopron?

A. Yes.

Q. And can you tell us that conversation?

A. It was a lady. And she said that -- do I want to change the -- this hearing time, because she was concerned that my wife was having -- whatever. A medical thing today. And she wanted to know if I wanted to, you know, be with her.

And I says no, you know. And then, she says you know what could happen. I says yeah, she could die. You know, you can die from -- doctors kill people all the time by accident. And when I got home and I told my wife that I had that conversation, she gave me all hell.

Q. So this person --

A. I didn't mean nothing by it.

Q. So this person -- this lady working for Sopron told you you could delay this deposition?

Page 43

A. She asked me if I -- yeah, if I wanted to.

Q. Outside of that, have you ever been interviewed by anyone working for Sopron?

A. No.

Q. Did you ever speak to Sopron's family members about John and his meeting at the State's Attorney's Office in 1996 or his handwritten statement?

A. No.

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MR. LYDON:

Q. Have you ever been interviewed by an attorney or someone working for any of the other Popes charged with the double murders regarding John, his meeting at the State's Attorney's Office, or his handwritten statement?

A. No.

MS. HAGY: Objection. Form.

BY MR. LYDON:

Q. Over the last 20 years, have you ever been interviewed by anyone at the State's Attorney's Office?

MS. HAGY: Objection. Form.

Page 44

THE WITNESS: No. Wait a minute. What did you --

BY MR. LYDON:

Q. The State's --

A. The State's Attorney's Office?

Q. Yeah.

A. No. Just you guys, you know.

Q. And that was my next question. Did you meet with me and other defense attorneys who have been -- who are representing individuals who have been sued in this civil lawsuit?

MS. HAGY: Objection. Form. Strike that. No objection.

THE WITNESS: Yes.

BY MR. LYDON:

Q. And approximately when was the first time you met with us?

A. Was it a couple months back?

Q. And was that the first time you were asked to recall the meeting with John at the State's Attorney's Office and his handwritten statement in at least 20 years?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

Page 45

BY MR. LYDON:

Q. And how many times have you met with us?

A. Three times.

Q. Were you shown any documents?

A. Yes.

Q. What documents?

A. This one.

Q. And you're referring to Exhibit 1, John's handwritten statement?

A. Yes.

Q. And in those interviews with us as attorneys, were you ever told what to say?

A. No.

Q. Were you asked to tell the truth?

A. Yes.

Q. Have you been promised anything for your testimony here?

A. No.

Q. I want to quickly show you --

MR. LYDON: We'll call this Exhibit 2.

(Whereupon, Exhibit 2 was marked for identification.)

BY MR. LYDON:

Q. Mr. Gizowski, taking a look at Exhibit 2,

12 (Pages 42 - 45)

Page 46

this is a letter addressed to you from an attorney named Patrick Walsh dated February 13th, 1997. Do you see that?

A. Yes.

Q. Did you ever see this letter back in 1997?

A. I don't think I've ever seen this letter before last time I met with you.

Q. And so you -- just to be clear, did we show you this letter in one of the meetings over the last couple months?

A. Yes.

Q. And before that, have you ever seen this letter?

A. No. I don't recall this letter at all.

MR. LYDON: Could we take a break?

THE VIDEOGRAPHER: Off the record at 10:49.

(A short break was taken.)

THE VIDEOGRAPHER: We are back on the record at 11:02.

EXAMINATION

BY MS. O'BRIEN:

Q. Okay. Gene, I'd like to direct your attention back to --

MS. HAGY: I'm sorry. Are we switching

Page 47

who's -- what party is taking the deposition?

MR. LYDON: Yes.

MS. HAGY: Okay. Can -- so does that mean -- are you done, because we didn't discuss this.

MR. LYDON: What do you mean?

MS. HAGY: Like how we were going to divide time or like who was going to go. Like we -- you just went to introduce that exhibit, and then, you're done.

MR. LYDON: Well, I might have some follow-ups, you know, based on what's -- I'm done with my primary questions. I may have some follow-ups based on anything that comes out in any of the other attorneys' questions.

MS. HAGY: Okay. Well, we didn't discuss like order, who was going to go, like what the order was going to be.

MR. LYDON: Did you want to go first?

MS. HAGY: No. I just think we should, you know, discuss that.

MS. O'BRIEN: All right. Do you want to discuss it?

MS. HAGY: Yeah. So can you restate which parties you're representing?

Page 48

MS. O'BRIEN: I'm representing Colleen Hyland -- why am I drawing a blank? I'm representing all the State's Attorneys who -- other than Scott Cassidy.

MS. HAGY: Okay.

MS. O'BRIEN: So it's Cook County State's Attorney's Office, individual State's Attorneys --

MS. HAGY: Okay.

MS. O'BRIEN: -- on all the cases.

MS. HAGY: Okay.

MS. O'BRIEN: So some are relevant for some of the line of questioning today and some are not, but that's who I'm representing.

MS. HAGY: Okay. So then, your questions will go after everybody else's, right? Like you guys aren't going to just go back and forth?

MR. LYDON: No. I mean, I'm done with my primary line of questioning. I said I may have some follow-ups based on information that comes out, you know, from other attorneys' questions.

MS. HAGY: Okay. That's fine. I just think --

MS. O'BRIEN: Do you have a problem with -- tell us what the issue is.

MS. HAGY: No, I just think --

Page 49

MS. O'BRIEN: What's the problem?

MS. HAGY: -- that these decisions should be made with all counsel, not just some counsel going into a room and talking about what's going to happen, and then, coming in and switching questions.

MS. O'BRIEN: What do you want?

MR. LYDON: I'm just -- like so what decisions need to be made? Because my assumption is with all these depositions, many times, you're going to have attorneys -- multiple attorneys asking questions based on the clients that they represent.

So I guess are you saying there should be ground rules as to who asks questions?

MS. HAGY: Yeah. I mean, I think eventually, we're going to want ground rules as far as like the order, and then, also like who is -- how much time we all have. Like you got to go first because you served the subpoena, right, but then, that doesn't determine who gets to go second.

MS. O'BRIEN: Okay.

MR. LYDON: If you want to go --

MS. O'BRIEN: If you want to go --

MR. LYDON: Yeah.

13 (Pages 46 - 49)

Page 50

MS. O'BRIEN: I mean, let's have -- are we on the -- we're not --

THE VIDEOGRAPHER: We are still on the record.

MR. LYDON: We're on the record? You know, I don't have any particular preference as to the order. I'm done with my primary line of questions. If you'd like to go now, you're more than welcome to, but Maureen, obviously, has a right and obligation to question the witness, as do all the other attorneys here.

MS. HAGY: Sure. Definitely.

MS. O'BRIEN: Lindsay, if you want to go, that's fine.

MS. HAGY: It's okay.

MR. LYDON: Timing-wise, we're not going to be anywhere near --

MS. HAGY: That's true.

MR. LYDON: -- you know, with this case like a seven-hour dep. And you know, maybe you're right. When we're talking about a witness that's going to be seven hours long, we should have that type of discussion.

MS. HAGY: Right. Yeah. That will make sense. I just want to make sure that we have like

Page 51

discussions about order and stuff among all the counsel.

MS. O'BRIEN: Yeah. I'm sorry about that.

MS. HAGY: No.

MS. O'BRIEN: If you want to go, go ahead.

MS. HAGY: No, it's okay. I just -- you know, and I do just like need a refresher on who represents who.

MS. O'BRIEN: Right. I know.

MS. HAGY: I should make myself a chart.

MS. O'BRIEN: I don't have the caption in front of me, but I don't want to get everybody's name wrong.

MR. LYDON: All right so. Who's going?

MS. HAGY: You can go.

MS. O'BRIEN: Are you sure?

MS. HAGY: Yes. Yes.

MS. O'BRIEN: Okay.

BY MS. O'BRIEN:

Q. Okay. Gene, I just have a few questions for you, okay?

A. Yes, Ma'am.

Q. All right. I'm going to direct your attention back to September 26th of 1996 with this

Page 52

handwritten statement.

A. Yes, Ma'am.

Q. Okay. Now, you -- before you even went to the State's Attorney's Office that day, you received a phone call from someone saying that your son was down at 26th and California, isn't that right?

A. Yes.

Q. And that person also told you that your son was a witness on a case, is that correct?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. And did that person also tell you that John, your son, wanted them to reach out to you?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: I'm sorry. I don't remember that part of it.

BY MS. O'BRIEN:

Q. All right. Did the person on the phone tell you that John did not want to make any statements until he spoke with you?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No. No.

Page 53

BY MS. O'BRIEN:

Q. All right. Now, when this handwritten statement was taken, the person who was taking down the handwritten statement was a female State's Attorney, isn't that correct?

A. I didn't know at that time.

Q. All right.

A. But it was a female.

Q. All right. And when she was taking the statement, you were present, along with your son John, isn't that right?

A. Yes.

MS. HAGY: Objection. Form.

BY MS. O'BRIEN:

Q. And there was another person in the room, an investigator, correct?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

MS. HAGY: Foundation.

BY MS. O'BRIEN:

Q. When this statement was made, was the person who was taking the handwritten statement asking John questions as she was writing down the statement?

14 (Pages 50 - 53)

Page 54

MS. HAGY: Objection. Form.

THE WITNESS: I don't think so. I don't think she was -- I don't remember that. I remember Cassidy.

BY MS. O'BRIEN:

Q. Well, then, when the handwritten statement was given, it was just the girl, isn't that correct?

MS. HAGY: Objection. Form.

THE WITNESS: She was the only one there? No.

BY MS. O'BRIEN:

Q. Okay. So you and your son John signed every page of the statement, the Exhibit 1 that you have in front of you, correct?

A. Yes.

Q. All right. Did anybody put words into John's mouth when he was giving that handwritten statement?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. When you drove John home from -- after this -- after the meeting at the State's Attorney's Office, did he ever tell you that the -- any of the

Page 55

State's Attorneys made him lie?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Did he ever complain to you that day -- or excuse me.

Did he ever complain to you that he was forced to lie in the Grand Jury?

A. No.

MS. HAGY: Objection.

BY MS. O'BRIEN:

Q. I'm sorry. What was your answer?

A. No.

Q. Did he ever tell you that he did lie in the Grand Jury?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Did he ever tell you at any time that he lied at trial?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Did you ever -- did you know that your son

Page 56

Gene and your son Mike testified for Sopron at his bench trial?

MS. HAGY: Objection. Form. Asked and answered.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. Did you ever discuss their testimony before that trial? In other words -- let me rephrase that.

Did you have -- ever have a discussion with Gene about his testimony before Sopron's trial?

A. No.

Q. Did you ever have a discussion with Mike about his testimony before he testified at Sopron's trial?

A. No.

Q. Did you know that -- did they ever discuss with you, Gene or Mike, the fact that they had received a subpoena to testify at Sopron's trial?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Did you ever discuss with either Gene or

Page 57

Mike the fact that they were testifying in a post trial motion or a post conviction hearing?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Did the female State's Attorney who took the statement ever threaten John?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Did she ever tell him that he would be charged with perjury or murder if he did not give a statement?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. Did she ever have an argument with John over what he was saying in terms of his statement?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No.

BY MS. O'BRIEN:

Q. When John was speaking to the female State's Attorney with the handwritten statement, was he speaking in a narrative or was it question

15 (Pages 54 - 57)

Page 58

and answer? In other words, was he being asked questions and was he giving answers?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Now, you said the female State's Attorney that I didn't know -- I thought she was a recorder?

BY MS. O'BRIEN:

Q. Right.

A. Was she asking him questions? No, I think --

Q. My question is, was John -- was John giving a narrative or was he answering questions when he was giving his statement?

A. He was just answering questions.

MS. O'BRIEN: Okay. I have nothing further. Oh. Can we go off --

MR. LYDON: Anyone? Oh. What was that? Anyone else?

MS. SIEBKEN: I --

MS. KUNZER: I have just a few.

MR. LYDON: Do you want to let them go or --

MS. SIEBKEN: Go ahead. Sorry.

MS. HAGY: Yeah, that's fine.

MR. LYDON: Somebody that's on Zoom --

Page 59

MS. KUNZER: Can I ask a few or --

MS. SIEBKEN: This is Brianna Siebken. I represent the City in this case. And sorry, everybody, but I'm on -- I can't get on with video. I have an Internet connection that does not allow enough bandwidth to support video or audio. I do -- I just have a couple of follow-up questions, but I'm happy to let everyone else go, as well.

MR. LYDON: You're up.

EXAMINATION

BY MS. SIEBKEN:

Q. All right. Mr. Gizowski, I just have a couple questions about the phone call you mentioned that took place yesterday with someone who you believe was working for Sopron. Do you know who that person was?

A. No.

Q. Did they call you on your cell phone?

A. Yes.

Q. Do you have the phone number that they called you from?

A. No. I deleted it.

Q. Okay. And it was a woman. Do you know, was she -- did she identify herself as an attorney?

Page 60

A. Yeah. She said she represented Matt Sopron.

Q. Okay. And I think she referenced your wife's medical procedure. Do you know how she knew about your wife's medical procedure?

A. No.

Q. Did you tell her about that procedure?

A. No.

Q. So she mentioned it on her own accord?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

MS. SIEBKEN: Okay. All right. I think that's all the questions I had for you. Thank you, sir.

THE WITNESS: You're welcome.

MR. LYDON: Anybody else?

MR. MASCIOPINTO: Amy, do you want to go, and then, I'll go?

EXAMINATION

BY MS. KUNZER:

Q. Hi, Mr. Gizowski. My name is Amy Kunzer. I represent the former ASA investigators, and I just have a few questions for you.

You said, you know, on September 26, 1996, when they took a statement from your son John that

Page 61

there was one detective who was present, is that correct?

A. Yes.

Q. Do you recall what this detective looked like?

A. He was maybe --

MR. NATHAN: Object to the form of the question, the term detective.

BY MS. KUNZER:

Q. Do you recall what this investigator looked like?

A. Yeah.

Q. Okay. Can you describe him?

A. A male white, 50, five eight, street clothes, a star, gun. That's about it.

Q. Okay. Did the detective say anything to John?

A. No. No.

MR. NATHAN: Objection. Form. Foundation.

BY MS. KUNZER:

Q. Did the detective say -- or investigator say anything to you?

MS. HAGY: Objection. Form.

THE WITNESS: No.

16 (Pages 58 - 61)

Page 62

BY MS. KUNZER:

Q. Was this investigator asking any questions?

A. No.

MS. KUNZER: That's all I have. Thank you.

EXAMINATION

BY MR. MASCIOPINTO:

Q. I have a couple. Sir, my name is Tony Masciopinto, and I represent CPD Officers Holmes, Argenbright, and Graffeo. Thank you for your time today.

A. You're welcome.

Q. Prior to September 26th, 1996, did you know Detective George Holmes?

A. No.

Q. Prior to September 26, 1996, did you know Thomas Argenbright from CPD?

A. No.

Q. And prior to September 26, 1996, did you know Sergeant Graffeo, G-r-a-f-f-e-o?

A. No.

Q. If you can look at Exhibit 1 that's in front of you, please. This is the handwritten statement.

Page 63

A. Sure.

Q. I want to direct your attention to the top of it.

Do you see where it says statement of John Gizowski?

A. Yes, sir.

Q. And then, it says it was taken on 9-26-1996 at 9:00 p.m. Do you see that?

A. Yes, sir.

Q. And that's consistent with your memory as being accurate?

A. Yes, sir.

Q. And then, it says the location is at Cook County State's Attorney's Office. Do you see that?

A. Yes, sir.

Q. And is that accurate, to the best of your memory?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: Yes.

BY MR. MASCIOPINTO:

Q. And then, it says present, ASA Colleen -- I don't know the first initial, but then, it says Hylan, H-y-l-a-n. Do you see that?

Page 64

A. Yes.

Q. All right. And then, also, under present, it says Inv Lenny Bajinski, I think it is, B-a-j-i-n-s-k-i. Do you see that?

A. Yes, sir.

Q. And then, it has your name, Eugene Gizowski, is that right?

A. Yes, sir.

Q. Okay. When you were with your son John throughout the period of time, whether it was 60 minutes or 90 minutes at 26th and Cal, was there ever more than these individuals and Cassidy that you saw?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No.

BY MR. MASCIOPINTO:

Q. Okay. So to the best of your memory, as you sit here today, the entirety of the attendees for this meeting was the female, who you now know to be an ASA, right?

A. Yes.

Q. Cassidy, your son, yourself, and one other individual who was an investigator, correct?

MS. HAGY: Objection. Form.

Page 65

THE WITNESS: Yes.

BY MR. MASCIOPINTO:

Q. And with respect to this person who you've occasionally called a detective -- sometimes we're calling him an investigator. Was that person in a Chicago Police Department uniform, to your knowledge?

A. No, he wasn't.

Q. Okay. And to your knowledge, did that five eight individual who we've called both an investigator and a detective, did he have any indication, badge or otherwise, vest that indicated he was an employee or personnel from CPD?

A. He had a five point star on. I didn't really get, you know -- it looked like one of our stars.

Q. Okay.

A. Police -- Chicago Police star.

Q. But were you able to read the star to determine whether he was CPD or Cook County State's Attorney's Office?

A. Oh. I didn't know the State's Attorney had their own star, but it could have been. You know, I didn't really get into it.

17 (Pages 62 - 65)

Page 66

Q. Okay. That's fine. Since -- at any point -- at any point in time in history, have you talked to an individual who you now know to be Detective George Holmes about this matter?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No.

BY MR. MASCIOPINTO:

Q. At any point in history, do you have a memory of speaking to someone who you believed to be Detective Thomas Argenbright about this matter?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No.

BY MR. MASCIOPINTO:

Q. And same question for Sergeant Graffeo. At any point in history, do you have a memory of speaking to someone who you understood to be Sergeant Graffeo about this matter?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No.

MR. MASCIOPINTO: I just need 30 seconds. Let me just -- I may be done. I apologize.

BY MR. MASCIOPINTO:

Q. Sir, these meetings to prepare yourself for your deposition, I was not in those meetings,

Page 67

correct?

A. Yes.

Q. You and I have never met or spoken with one another, is that true?

A. Not to my knowledge, no.

Q. You know, I just have a question about this phone call with Mr. Sopron's counsel yesterday.

Did you -- what was your impression as the female lawyer was saying that maybe you should cancel the deposition, reschedule it because of the medical procedure and the concerns? I mean, did you have any reaction one way or the other?

MS. HAGY: Objection. Form.

THE WITNESS: I thought -- it was a lady. I don't remember the name, but I thought she was concerned, you know, over the fact that maybe I wanted -- the way I took it, maybe I wanted to be with my wife instead of here. And I said, you know, no, I'm coming in.

BY MR. MASCIOPINTO:

Q. Okay. And have you ever -- have you found out how this lawyer found out about your wife's medical procedure? Have you asked Gene or Mike

Page 68

about how that information got in a third party's hands?

A. No.

MR. MASCIOPINTO: Sir, thanks for your time. I don't have anything further.

THE WITNESS: You're welcome.

MR. LYDON: Anyone else before Sopron's attorney?

MS. HAGY: I'm just looking at my notes for one second. Okay. Everybody ready?

EXAMINATION

BY MS. HAGY:

Q. Okay. So Mr. Gizowski, I'm Lindsay Hagy. I represent Mr. Sopron, Mr. Morfin, and Mr. Antusas.

Just to clear some things up, do you know if I was the person who called you last night? Did it sound like me? You don't --

A. I don't think so, no.

Q. If I represent that it was me, do you have any reason to dispute that?

A. No.

Q. Okay.

MS. SIEBKEN: Objection to form.

Page 69

BY MS. HAGY:

Q. Okay. Do you -- did you -- did anyone tell you that I had called your house to try to talk to you a couple times?

A. No.

Q. And is it true that your wife is having pacemaker surgery today?

A. I don't know. She's going in for a pacemaker. I don't know if she's getting a new one or a battery or whatever.

Q. Okay. When I called, when you said no, I'm okay -- or when that person called and you said no, I'm okay, the deposition can go forward, do you know what that person said?

A. No.

Q. Do you know if they said okay?

A. Might have. It was kind of a short call.

Q. Okay. Do you remember -- when that person said can I ask you a few questions about the case, do you remember what you said?

A. Yeah. I said no, I'm at work.

Q. Yes. And how many times have you met with Scott Cassidy's attorneys in this case?

A. Three times.

18 (Pages 66 - 69)

Page 70

Q. And did any representatives from any of the defense attorneys visit you at your house?

A. The State's Attorney's Office or whatever or --

Q. Yes, from --

A. No, no. Nobody visited me at the house.

Q. Did any investigators from the defendants come to your house and knock on the door?

A. Not to my knowledge.

Q. Did an investigator from one of the defendants drive you here today?

A. Investigator, yeah.

Q. And what was his name?

A. Dave -- he's got the same name as a movie star. Dave -- can I look at my phone?

Q. That's okay if you don't know. How many times have you met with Dave?

A. Well, this would be the fourth time.

Q. Okay.

A. This would be the fourth time.

Q. And is this the first time that he came to your house?

A. No.

Q. Okay. So he came to your house other

Page 71

days?

A. Yes.

Q. Did -- how many times has he come to your house?

A. Four times.

Q. Did -- so when he came to your house, did you know that he was coming?

A. Yes.

Q. So how did you first get in touch with Scott Cassidy's attorneys? Did they call you?

A. No. I think Dave took care of that.

Q. Okay.

A. He picked me up and took me to where they were at.

Q. And did Dave call you before he came?

A. Yes.

Q. And did you know Dave before he called?

A. No.

Q. Do you know, did he -- do you -- did he tell you if he also has ever been a Chicago Police Officer?

A. Yes.

Q. Has he been?

A. Yes.

Page 72

Q. And did you know any of the same people when you worked for the Chicago Police Department?

A. No.

Q. And when did you retire from the Chicago Police Department?

A. November 15th, 2010.

Q. Okay. And do you still -- do you have a pension from the Chicago Police Department?

A. Yes.

Q. And how did Dave introduce himself to you when he called?

A. Well, he told me that he was coming to pick me up, and I had -- he was an investigator for the State's Attorneys, Scott Cassidy and --

Q. Did he say if he was an investigator for other State's Attorneys?

A. No. I don't think so, no.

Q. And did he say what he wanted to talk to you about?

MR. LYDON: Object to form.

THE WITNESS: No.

BY MS. HAGY:

Q. Did he say what the attorneys wanted to talk to you about?

Page 73

A. Yeah.

Q. And what did he say?

A. He said it was about that double homicide that happened.

Q. And what did you say to him? Were you willing to come talk to the attorneys?

A. Yeah.

Q. Okay. And why were you willing to talk to them?

A. I don't want to sound smart ass, but why not, you know.

Q. Okay. And what did you discuss during those meetings?

A. What I said, what I heard, what the other people did at the meeting and what my son's -- I guess -- I'm not a real good speaker but maybe his -- you know, his attitude, whatever to the -- what did I think was going on, things like that. And that's about it, you know.

Q. And you said they showed you documents?

A. Yeah, this.

Q. Just -- you're pointing to Exhibit 1 there?

A. Yeah. Then, later, just recently, this

19 (Pages 70 - 73)

Page 74

one. And I never saw that one. I don't even know if I was -- I don't think I was living at 5056 Lavergne then.

MR. LYDON: For the record, he's referring to Exhibit 2.

BY MS. HAGY:

Q. And did you look at any other documents?

A. No.

Q. And did you know -- have you ever talked to Scott Cassidy outside of the one meeting on September 26?

A. No.

MR. LYDON: Object to the form. It misstates his testimony about speaking to Scott Cassidy.

MS. HAGY: Okay.

MR. LYDON: Oh, I'm sorry. Are you talking about back in '96 or are you talking about -- foundation, I guess.

BY MS. HAGY:

Q. Okay. Do you know if you spoke to Scott Cassidy any other time besides September 26, 1996?

A. No. I don't think so, no.

Q. Okay. Did you know him from -- did you

Page 75

know of him before that time?

A. No, I didn't.

Q. Do you know if he's from your same -- if he also lives in Vittum Park?

A. Scott Cassidy? No, I don't know any -- actually, all I know is his name and he's a State's Attorney.

Q. Okay. And had you prior to -- or at any other time, have you seen a State's Attorney take a statement from a witness?

A. Take a statement? No, I don't think so.

Q. Okay. When -- on September 26, 1996, when John's statement was being taken, was Scott Cassidy present?

A. Yes.

Q. Was he asking any questions of John?

A. Yes.

Q. And was John during that statement answering questions from Scott Cassidy?

A. Yes, Ma'am.

Q. Was --

A. Yes.

Q. Was he answering questions from Ms. Hyland?

Page 76

A. I -- you know, that is like -- I don't remember her asking questions too much, but I remember her reading -- I think she -- the only thing I remember was her reading that back to John.

Q. So in your mind, she kind of seemed more like she was the court reporter?

A. That's what I thought, yeah.

MR. LYDON: Object to the form. Go ahead.

BY MS. HAGY:

Q. So Scott Cassidy was leading that interview?

MR. LYDON: Object to the form.

THE WITNESS: Leading as the -- you know, like trying to coerce and answer or --

BY MS. HAGY:

Q. Sure. Let me restate that. He was the person running the meeting, asking the questions?

A. Yes, Ma'am.

MR. LYDON: Form and foundation.

THE WITNESS: Yes, Ma'am.

BY MS. HAGY:

Q. In September 1996, do you know who called you to come to the station?

A. No, Ma'am.

Page 77

Q. Did the person identify themselves?

A. I don't remember. It was quite a while ago.

Q. And where did they call you?

A. Probably my cell phone.

Q. And do you know who -- well, do you know where John -- how John got to the station? Do you know how he got to the station on September 26, 1996?

A. No, I don't.

Q. Do you know, did any of your other family members tell you that they were present when he left for the station?

A. No.

Q. Okay. So have you talked -- did you ever talk to John about how he got to the station?

A. No.

MR. MASCIOPINTO: I'm going to object to form, the term station, but you can answer.

MS. HAGY: 26th and Cal. That's fair.

BY MS. HAGY:

Q. Did you know how long John was at 26th and Cal before you got there?

A. No.

20 (Pages 74 - 77)

Page 78

Q. And how long did you talk to him before the statement started to be taken?

A. A couple minutes maybe.

Q. And who else was present when you were talking to John?

A. The lady that repeated the questions, Scott Cassidy, and that detective.

Q. And they were there the whole time that the two of you were talking?

A. Yes.

Q. And could you tell if John had been crying?

A. No.

Q. And where were you when they called you on September 26, 1996?

A. Where was I when they called me?

Q. When they called you. Where -- oh, you said you were on your cell, but do you know where you were?

A. No.

Q. And at that time, is it accurate that you didn't live with John?

A. No. I don't think I was living there, no.

Q. And were you and John close at that time?

Page 79

A. Yeah. We were always close, all -- me and my kids.

Q. And was he experiencing drug addiction at that time?

A. Yes.

Q. And about when did that start that he began struggling with addiction?

A. I don't know the exact February 22, 2023.

Q. Okay. And when you talked about -- you talked earlier. You said that John had maybe a shooting charge against him?

A. Yeah.

Q. Do you remember what year that was?

A. No.

Q. Okay. Was it before 1996?

A. Yeah.

Q. Do you know, was it five years before?

A. It could have been, yeah.

Q. And do you know what happened with that case? Did he --

A. It got discharged.

Q. And did you talk to any -- was it being investigated -- was it in Chicago?

A. Yeah.

Page 80

Q. Was it being investigated by the Chicago Police Department?

MR. MASCIOPINTO: I'm going to object to foundation, form. Go ahead.

THE WITNESS: Maybe it wasn't.

BY MS. HAGY:

Q. Okay. Did you talk to any Chicago Police Officers about that?

A. No.

Q. Okay. Did you ever go with John to court about that case?

A. Yeah.

Q. Okay. And what do you remember happening when you were at court?

A. Well, I was sitting in the audience and they called the case. He came up, and there's -- I think there was like a -- where I could stand and listen, you know, being the parent. And the Judge asked him questions, the State's Attorney, whoever asked questions, and they threw it out.

Q. Was he a juvenile at that time? Was it in juvenile court?

A. I'd say juvenile, yeah.

Q. Okay. And so is it fair to say that you

Page 81

said in 1995, you were working for mass transit?

A. In '95, yeah, I was in mass transit.

Q. Okay. And in September 1996, did anyone talk -- before September 26, 1996, did anyone talk to you about any of your sons possibly being witnesses in this case?

A. Nobody talked to me about it, no.

Q. Okay. Were you surprised when you got the call that John was at 26th and Cal?

A. Well, I guess yes. As surprised as you could be, yeah.

Q. Did -- in 2001, did any officers talk to you --

A. 2001? No. About the case?

Q. Yes.

A. No, I never had contact.

Q. Okay. And in -- after September 26, 1996 until the Matt Sopron's trial, did any -- do you know if anyone from the State's Attorney's Office visited John at home?

A. I don't know.

Q. You weren't living with him at that time, right?

A. I don't think so, no.

21 (Pages 78 - 81)

Page 82

Q. Do you remember anyone -- any windows being broken at that home?

A. No.

Q. Do you remember Scott Cassidy offering to pay for any windows that were broken at that home?

A. No.

Q. Okay. You just -- you don't remember either way?

A. I remember something about windows, but I don't remember what it was about.

Q. Okay. Did you remember -- did -- when you were -- you said you were with John during the time that he testified at Matt Sopron's trial, right? You were in the back with him?

A. Yeah, in the little area in the back, you know, the witness kind of area.

Q. Did anybody -- while you were there with him, did anybody come talk to him about his testimony?

A. No.

Q. Do you know if anybody was helping him prepare to testify?

A. No, I don't.

Q. Did you see Mr. Cassidy at that time?

Page 83

A. No, I didn't. I don't remember if Cassidy was there.

Q. Did you see any other officers at that time?

A. Well, there was cops all over, you know, but I --

Q. Just walking around?

A. Yeah. Yeah.

Q. Were any cops talking to him?

A. No.

Q. Did you -- how long were you with John during the time that he was testifying?

A. I don't know. Maybe 20 minutes.

Q. Okay. So you were there for his entire testimony?

A. Yeah. I guess so, yeah, whatever he said, and I think we left after that.

Q. Okay. Did John ever tell you -- during the time after September 26 until the February 22, 2023 of the Grand Jury, did he tell you about any contacts that anyone from the State's Attorney's Office had made with him?

A. No.

Page 84

Q. Did he tell you about any contacts that any Chicago Police Detectives had made with him?

A. No.

Q. And then, before the trial, did John tell you about any contacts that anyone from the State's Attorney's Office had had with him?

A. No.

Q. Did he tell you about any contacts that anyone from the Chicago Police Department had had with him?

A. No.

Q. And you weren't living together at that time, right?

A. I don't think so.

Q. Do you have an estimate of how often you'd talk to John during that time?

A. Not very often.

Q. Okay. And do you know how often the two of you saw each other during that time?

A. It wasn't a lot.

Q. Okay. What was John like back in 1996?

MR. LYDON: Object to the form.

THE WITNESS: What was John like? Well, he's my son and -- you know, my son. You know, to me,

Page 85

he's a good kid, you know.

BY MS. HAGY:

Q. How old was he in 1996?

A. Well, he was born in '76. So 20.

Q. Okay.

A. 21.

Q. And at that time -- in September 1996, was he -- do you know whether or not he was addicted to drugs at that time?

A. I don't really know, you know, if he was addicted, but it seems like, you know, everybody's doing drugs and -- I don't know. You know, I don't know. I wish he would have got -- accepted help.

Q. Do you know what type of drugs he was doing?

A. Heroin and I guess -- I think Fentanyl was in that last -- his last time he used. I think that might have been what killed him.

Q. Okay. And you testified that to your knowledge, he was involved in gangs?

A. Yes.

Q. Are you -- do you know whether any of your -- you know what? Strike that.

Had you met -- when you arrived at 26th

22 (Pages 82 - 85)

Page 86

and Cal on September 26, 1996, do you remember who -- you went through security, right?

A. Yes.

Q. And then, did you go right up to the State's Attorney's Office?

A. Yes.

Q. And did you already know where that was?

A. Yeah, because they told me where to come.

Q. Okay. And then, what happened when you got there?

A. You know, they introduced themselves and who's this, who's this, who's this, you know, and they told me that he was going to have -- you know, give a statement. And then, they did the statement, and the lady read it back and we signed it, and the next thing I know, I'm taking him home.

Q. And did you talk to Mr. Cassidy first?

A. Yeah. I think so, yeah.

Q. Did you get to see John right away or did you talk to --

A. John was right there.

Q. Okay.

A. Right when we walked in, John was there. It was kind of set up -- why they were waiting for

Page 87

me, I still don't know.

Q. And were they in like an open space?

A. Open, yeah. Like this, you know.

Q. Okay. So was it a room?

A. Yeah.

Q. How big was the room?

A. Wow. 20 by 20 maybe. I don't know. I'm not sure.

Q. And was there a table in the room?

A. Yeah.

Q. And what -- where was John in the room?

A. John was -- I'd say he was on the north side of the room by the door. And the lady that was taking the information was on the other side of the table, the south side of the table. I was kind of like right here on the east end of it. Mr. Cassidy was over on the south side of the table. And that's the best I can do.

Q. And the person who you had described as a detective or an investigator, he was also in the room?

A. Yeah. He was just in the back, kind of off -- he was on the north wall.

Q. So --

Page 88

A. A little bit further west.

Q. On the same wall as John?

A. Yeah.

Q. Maybe behind him?

A. He was pretty much away from him.

Q. Okay. And how tall was John?

A. John's six two.

Q. Okay. And was he -- at that time, do you remember, was he a big guy, was he a thinner guy?

A. He was thin, I guess.

Q. Okay. And besides the one time where he was involved in a possible -- there was a shooting case, do you know if he had any other experience with police officers?

A. Yeah.

Q. He had? So he had been arrested other times?

A. Sure. Yeah.

Q. Okay. Do you know if he had had other interactions with State's Attorneys?

A. Only the juvenile thing, I think. That's all I know of. You know, I don't know what -- they wouldn't tell me anyways.

Q. And who wouldn't tell you?

Page 89

A. My kids.

Q. Okay.

A. They wouldn't let me know what was going on.

Q. Okay. So they didn't really talk to you much about their interactions with police?

A. No.

Q. Okay. Do you remember, when you were at 26th and Cal, did they give -- on September 26, 1996, did they give John a chance to call an attorney?

A. Apparently so, you know, before I got there, and then, they got into the thing, but I think they -- they might have notified him of his rights. I'm not sure, but --

Q. Were you there when --

A. I was there, yeah.

Q. Did you --

A. Right when they started the interrogation.

Q. Right when they started the interrogation, you heard them read him his rights?

A. I'm not sure.

MR. LYDON: Objection. It misstates his testimony.

23 (Pages 86 - 89)

Page 90

BY MS. HAGY:

Q. Sure. Just tell me -- I'm sorry. I'm just trying to understand what you're saying. So did you hear them read him his rights?

A. Not to my knowledge, no.

Q. Okay. Did you hear them offer him a chance to call an attorney?

A. No, I don't think so.

Q. When you were called, did the person say would you like to call an attorney for John?

A. No.

Q. Did any -- did John tell you how long he had been there?

A. No.

Q. Did you know how long he had been there --

A. No.

Q. -- before you got there?

A. No.

Q. Did John tell you -- before the statement taking started, did John tell you about anything that had happened before you got there?

A. No.

Q. Did John seem nervous?

A. No.

Page 91

Q. And did -- you said that there -- that they were asking him questions?

A. Yeah.

Q. And then, he was responding to those questions?

A. Yes.

Q. Okay. Did John tell you that he wanted to go home?

A. No.

Q. Okay. And when you left -- where did you go after you left 26th and California?

A. I dropped him off at the house.

Q. Okay. And then, did you talk to him the next day?

A. No.

Q. Okay. And had you ever -- the -- had you ever met the woman who was in the room before?

A. No.

Q. And had you ever met the detective investigator who was in the room before?

A. No. These people were all new to me.

Q. Okay. Did John make any revisions to the statement?

A. No.

Page 92

Q. And so did he review each page of the statement?

MR. LYDON: Foundation. Go ahead.

THE WITNESS: Yes.

BY MS. HAGY:

Q. And do you remember him ever saying I want to change this --

A. No.

Q. -- or this isn't accurate?

A. No.

Q. Did he sign each page at the bottom?

A. Yes.

Q. And was the woman writing everything while he was talking?

A. Yes.

Q. Do you know if any of it was written before you got there?

A. No.

Q. Did you watch her write everything?

A. I couldn't really see what she was doing.

Q. Okay. Do you remember anything that they told John after the interview was done?

A. No.

Q. Do you remember being contacted by the

Page 93

State's Attorney's Office in December 2001?

A. No.

Q. Do you remember anyone from the State's Attorney's Office contacting you before December 2001?

A. No.

Q. Do you remember anyone -- well, first of all, were you aware that John had given an affidavit for Mr. Sopron in February 2001?

A. No.

Q. So did anyone -- in early 2001, do you remember anyone from the State's Attorney's Office telling you that John had given a new statement in the case?

A. No.

Q. Did John tell you that he had given an affidavit in the case?

A. No.

Q. Did anyone from the police department tell you that John had given a statement in the case?

A. No.

Q. You said earlier today that you were aware that John had recanted his testimony from Mr. Sopron's trial?

24 (Pages 90 - 93)

Page 94

A. Yeah.

Q. How did you become aware of that?

A. I think my wife told me.

Q. Okay. Do you remember going to 26th and Cal again in December 2001?

A. No.

Q. Did anyone show you a summary of an interview that had taken place in 2001?

A. No. I don't remember that.

Q. Okay. So did anyone ask you if a summary of an interview from December 2001 was accurate?

A. No.

Q. Did anyone from the State's Attorney's Office ask you to give a written statement in 2001?

A. No.

Q. Did anyone ask you to sign anything in 2001 from the State's Attorney's Office?

A. No.

Q. So the letter that's marked as Exhibit 2, where it says that Mr. Walsh says it seems that you did not receive or ignored my previous messages, do you remember Mr. Walsh trying to contact you in this case?

A. No.

Page 95

Q. If he had contacted you, do you know whether you would have been willing to talk to him?

MS. O'BRIEN: Objection.

THE WITNESS: I don't know. I might have. I might have been. I don't know. It didn't happen to me.

BY MS. HAGY:

Q. Is it possible that you wouldn't have been willing to talk to him?

MR. LYDON: Object to the form. Asked and answered.

BY MS. HAGY:

Q. You can still answer.

A. Oh, okay. Maybe if I was subpoenaed or something. I don't know. I don't want to be --

Q. If you were what?

A. Subpoenaed.

Q. Oh. Subpoenaed. Okay. But if you weren't subpoenaed, you might not have been willing to talk to him?

A. Yeah, I don't really want to talk to people, you know. It's just -- I didn't kill nobody. You know, why am I being involved in all this. And that's the thing, you know, but all I

Page 96

know is that the State's Attorneys, to my estima -- they didn't do nothing wrong. They didn't threaten him. They didn't do anything like that and -- all the time I was there. So that's all -- that's all I know, you know.

Q. In the time that you were --

A. All these other answers and questions and things is -- I don't remember them.

Q. In the time that you were there, you said it was about an hour, an hour and a half?

A. Maybe, yeah.

Q. And do you know how long John was there total?

A. No.

Q. And do you remember John testifying in a hearing regarding Mr. Sopron back in 2002?

A. No.

Q. So you weren't present when he was testifying?

A. I was in the back room.

Q. Oh. Sorry.

A. I wasn't in the courtroom.

Q. Sorry. Let -- strike that. In 2002, when he testified in a hearing, were you present?

Page 97

A. No.

Q. Okay. Are you aware of what his testimony was in 2002?

A. No. If it was anything with this page here, yeah, I'm aware. If this is what he said, then I thought he was telling the truth and --

Q. Did you --

MR. LYDON: And for the -- wait. For the record, he's pointing to Exhibit 1, John's handwritten statement.

MS. HAGY: Okay. That's fair.

BY MS. HAGY:

Q. Did -- are you aware that John said that Cassidy swore at him? He didn't swear at --

A. No.

Q. You're not aware?

A. I'm shaking my head. No, he didn't -- not in my presence, he didn't swear at him.

Q. Are you aware that John said that Cassidy called him a scumbag?

A. No.

Q. Are you aware that -- or did you know that John said that Cassidy threatened him that he would charge him with a murder?

25 (Pages 94 - 97)

Page 98

A. No.

Q. Were -- are you aware that John said that Cassidy threatened to charge him with perjury?

A. No.

Q. Are you aware that John said that Cassidy told him that he would get sexually assaulted in prison?

A. No.

Q. Were --

A. No.

Q. Are you aware that John said that Cassidy told him that he could manipulate the Grand Jury like puppets?

A. No.

Q. Are you aware that John said that representatives from the State's Attorney's Office visited him at his house?

A. No.

Q. Were you aware that John said that Cassidy did not treat him professionally?

A. No.

Q. And you said earlier today that to your knowledge, Cassidy followed the rules when he was talking to John, right?

Page 99

A. Yeah.

Q. And --

A. Yes.

Q. What are -- how do you know what those rules are?

MR. LYDON: Object to the form, foundation.

THE WITNESS: Well, I don't know what the rules are, you know, if there are rules, and all I know is that Cassidy seemed to be doing his job in a professional manner, asking questions, accepting the answers.

And I thought that John was telling the truth, because how did he invent this story, you know, right now, you know what I mean, right when he was sitting there. I think that this statement is probably the most truthful one that is in -- going on in this case, which two young little girls died, and I didn't like that a bit.

Q. Yeah. That's upsetting, right?

A. Exactly. When I heard it on the radio, I couldn't believe it, you know. It's our neighborhood. Stuff don't happen like that over there.

Q. And when you arrived at the police station

Page 100

on September 26, 1996, did -- were you told what John's statement was going to be about?

MR. LYDON: Objection to form. It misstates his testimony. He wasn't at the police station.

MS. HAGY: Sorry. 26th and Cal.

BY MS. HAGY:

Q. Were you told what the -- what John's statement was going to be about?

A. Well, they -- you know, they told me that it was about the homicide -- the double homicide, but that was about all, and then, they went into their, you know, questioning, and he answered. And I thought it was the truth, because I told him tell them the truth.

Q. Did you know -- did they tell you whether John was considered a witness?

A. No, I don't think so.

Q. Did they tell you whether John was considered a suspect?

A. No.

Q. Did you know whether John was concerned that he could become a suspect?

A. No.

Q. You didn't know either way?

Page 101

A. No.

Q. Meaning that you didn't know wheth --

A. I didn't know.

Q. Okay. And did you know whether -- did John tell you whether he had talked to anyone from the State's Attorney's Office before you got there?

A. Repeat that, please.

Q. Did John tell you whether he -- well, you know what? Strike that.

Did they tell you that they had -- did Mr. Cassidy tell you that he had already been discussing the events with John?

A. No, they didn't say that.

Q. And when somebody called you, did they tell you -- when the person called you, did they tell you why John was at the station?

A. I'm not sure, but I know that I went to that room because they gave me the information.

Q. And do you know how long it took you to get there?

A. A half hour, 45 minutes.

Q. Okay. And did they tell you how long John had been there before that?

A. No.

26 (Pages 98 - 101)

Page 102

Q. So -- let's see.

MS. HAGY: I am going to offer Exhibit 3, which counsel, this is Sopron 5921. And I only -- I didn't know how many people were going to be here, so I --

THE WITNESS: This is mine?

MS. HAGY: Yes. I'm sorry. I need one for myself, but I have one here.

MR. MASCIOPINTO: What's the Bates number?

MS. HAGY: Sopron 5921.

(Whereupon, Exhibit 3 was marked for identification.)

BY MS. HAGY:

Q. Are you taking a look? It's okay if you want to take a look.

A. Yeah.

Q. Have you seen this before?

A. No.

Q. Does this refresh your recollection about whether you were contacted by the State's Attorney's Office on December 10th, 2001?

A. No.

Q. Do you --

MR. LYDON: You mean December 13th?

Page 103

MS. HAGY: Well, he was contacted on the 10th.

MR. LYDON: Oh, I'm sorry. You're right.

MS. HAGY: That's okay.

BY MS. HAGY:

Q. So do you remember if you were contacted by the State's Attorney on December 10th, 2001?

A. No, I just don't remember.

Q. You don't remember?

A. No. I mean, really, I don't remember.

Q. Do you think you -- well, do you remember being at 26th and Cal on December 13th, 2001?

A. No, I don't. Was that the trial going on or something or --

Q. No. Well, do you remember if you went to 26th and Cal on December 1st?

A. Oh, I got no idea.

Q. Sorry. I'm reading it wrong. December 13th, 2001?

A. No.

Q. So you could have been?

A. I could have been.

Q. Okay. You just -- you don't remember?

A. I'm just -- I just don't remember right now.

Page 104

Q. Okay. Do you remember meeting with somebody named John Duffy?

A. No.

Q. Do you remember meeting with someone named Curtis Conley?

A. No.

Q. Do you remember meeting with somebody named ASA Carroll?

A. No.

Q. Do you remember meeting with someone named ASA Smitko?

A. No.

Q. And do you remember anybody showing this statement to you and asking you if it was accurate?

MR. LYDON: Objection. What statement?

MS. HAGY: Sorry. The summary here.

THE WITNESS: This?

BY MS. HAGY:

Q. Yes.

A. I don't remember, but I mean, it's true, you know.

Q. Right. It's true that you were present when a female State's Attorney took a statement from John, right?

Page 105

A. Yes.

Q. And Mr. Cassidy was also present during that time, right?

A. Yes.

Q. And this says that you learned that John was at the State's Attorney's Office as a witness, right?

A. This?

Q. Yes.

A. No. The -- No. 1. I was there for No. 1. This is after.

Q. Sure. Sure. But when you were there on September 26, 1996, did you know whether John was considered a witness?

MR. LYDON: Objection. Asked and answered.

THE WITNESS: Well, it was apparent, because they were questioning about the incident.

MS. HAGY: Okay. So I'm finishing up, but would it be okay, could we take like a five-minute break?

THE WITNESS: Why not?

THE VIDEOGRAPHER: Off the record at 12:10.

(A short break was taken.)

THE VIDEOGRAPHER: Back on the record at 12:23.

27 (Pages 102 - 105)

Page 106

BY MS. HAGY:

Q. So I just have a few more questions. When you were at 26th and Cal on September 26, 1996 -- actually, do you remember what floor you were on?

A. No.

Q. And did you see -- did you see Mr. Cassidy talking to John --

A. No.

Q. -- or asking him the questions?

A. Not when I got there, no. Kind of everything stopped, and you know, I didn't see nothing going on.

Q. Okay. Did you -- you talked to Mr. Cassidy, right?

A. Yeah.

Q. And Mr. Cassidy asked questions of John?

A. Yeah.

Q. Did you see Mr. Cassidy talking to the female State's Attorney?

A. Yeah, but I wasn't really paying attention to what they were saying.

Q. Okay. And did you see him talking to the detective or investigator who was there?

A. No. He didn't say anything to him, I

Page 107

don't think.

Q. Okay. And you said the investigator was there in the room and he was wearing his gun in his holster?

A. He might have been.

Q. Okay. And in 2001, did anybody from the State's Attorney's Office ask you about why John was -- had changed his testimony?

A. No. I don't think so, no.

Q. Did anybody from the State's Attorney ever ask you to talk to John about his testimony?

A. No.

Q. Did anyone from the Police Department ever ask you to talk to John about his testimony?

A. Not to my recollection. Not to my recollection.

Q. Did anybody from -- did any of Matt Sopron's counsel ask you to talk to John about his testimony?

A. No.

Q. And when -- you said you met with the attorneys in this case three times, right?

A. Yeah.

Q. And did they talk to you about this

Page 108

investigative report in 2001?

A. No.

Q. Did they talk to you about any interactions that the State's Attorney had with you in 2001?

A. No, I don't think so. No.

Q. Okay. And did anybody from the State's Attorney ever ask you about Scott Cassidy paying for window repairs for your family?

A. I don't think so, no.

Q. Okay. And --

MS. HAGY: Okay. That's all I have.

EXAMINATION (Further)

BY MR. LYDON:

Q. I just had a couple follow-ups, Mr. Gizowski.

With regard to the three meetings where you met with us as attorneys for Scott Cassidy and some of the other defendants in this civil lawsuit, you were asked questions about Dave, the investigator, do you remember that, just being asked about questions about Dave?

A. Yeah.

Q. And is it fair to say Dave, the

Page 109

investigator, just gave you rides for these meetings?

MS. HAGY: Objection. Form.

THE WITNESS: Yes.

BY MR. LYDON:

Q. And he gave you a ride to this deposition today?

A. Yes, he did. Yeah.

Q. And is it fair to say Dave did not interview you at all regarding your son John or the meetings with the State's Attorney's Office?

MS. HAGY: Objection. Form.

THE WITNESS: No.

BY MR. LYDON:

Q. I know you've testified that John used drugs. On September 26, 1996, when you went to 26th Street and you saw John, did he appear to be under the influence of drugs on that day?

MS. HAGY: Objection. Form. Foundation.

THE WITNESS: No, I don't think he was.

BY MR. LYDON:

Q. And you were a Chicago Police Officer for 41 years?

A. Yes, sir.

28 (Pages 106 - 109)

Page 110

Q.   And in those 41 years, did you commonly encounter people under the influence of drugs?

MS. HAGY:  Objection.  Form.

THE WITNESS:  Yes, I did.

BY MR. LYDON:

Q.   So you know what someone under the influence of drugs looks and acts like, correct?

MS. HAGY:  Objection.  Form.  Foundation.

THE WITNESS:  Yes.  I'd say so, yes.

BY MR. LYDON:

Q.   This investigator report, Exhibit 3, I know you haven't seen this before and you don't recall the meeting in 2001, but I want to ask you about the summary at the bottom there.

Where it says at no time did John Gizowski indicate that he had been threatened by anyone during this interview or at any time before Mr. Gizowski's arrival, that's a true statement, correct?

A.   Yes.  Yes.

Q.   And where this summary says Mr. Gizowski told John to be truthful with the police and do not cover up for any of the Popes, that's a true statement, correct?

Page 111

A.   Yes.

Q.   Where it states Mr. Gizowski further stated he was present when a female State's Attorney took a statement from John, that's a true statement?

MS. HAGY:  Objection.  Form.

THE WITNESS:  Yes.

BY MR. LYDON:

Q.   And where it says Eugene signed the bottom of the statement as a witness, that's a true statement, correct?

MS. HAGY:  Objection.  Form.

THE WITNESS:  Yes.

MR. LYDON:  That's all I have.

EXAMINATION (Further)

BY MR. MASCIOPINTO:

Q.   I have a couple follow-ups.  This will end, I promise you.

Sir, put No. 3 in front of you and No. 2 -- or I'm sorry.  No. 3 in front of you and the handwritten statement, No. 1, in front of you.

A.   Yeah.

Q.   We'll start with No. 3, which counsel was just talking about.  So do you have 3 in front of

Page 112

you?

A.   Yeah.

Q.   Okay.

MR. LYDON:  Yeah.

BY MR. MASCIOPINTO:

Q.   Right where you were reading, right in front of it, before it -- I think it's the third line.

It says Mr. Gizowski stated that when he learned that his son John was at the State's Attorney's Office as a witness, he drove to 26th and Cal to locate his son.  Is that consistent with your memory?

A.   Yeah.

Q.   Okay.  Then, the next sentence says Mr. Gizowski located his son John, who was being interviewed by Inv period Byinski, B-y-i-n-s-k-i.  Did I read that right?

A.   Yes.

Q.   Okay.  And then, if you go to handwritten statement No. 1 -- if you go to handwritten statement No. 1, just to refresh your memory, in the top, it says someone who was present was Inv period Lenny Bazinski, B-a-z-i-n-s-k-i.  Do you

Page 113

see that on the handwritten statement?

A.   Yes.

Q.   Do you have any reason to doubt that the person in the room at 26th and Cal, besides Cassidy, besides the female ASA, besides yourself, besides your son was an individual by the name of -- was an Investigator Bazinski or Bazinski?

MR. LYDON:  You might want to repeat that one.

BY MR. MASCIOPINTO:

Q.   Do you have any reason to doubt that that other person was a person who had the title of investigator and went by the name of Bazinski or Bazinski?

A.   I'd say that it was probably him, because I signed the statement and I just took it for granted that that was his name.  I don't really remember them introducing him to me, but you know, there was only those people in the office and I take it for granted that that's his name.

Q.   Okay.  Fine.  And then, one other question.  Just one other question.

You mentioned that you thought this investigator had a badge or a patch or a star of some type.  Do you remember saying that?

29 (Pages 110 - 113)

Page 114

A. Yeah. I think he had --

Q. So if you go to the very top of 3, in the right-hand corner, do you see a star that says State's Attorney, Cook County in the upper right hand corner of 3?

A. Okay. Yeah, I see it.

Q. Do you have any reason -- now looking at that star -- and I know this was a long time ago, but did the identification on the individual who we've been calling investor -- Investigator Bazinski -- did the badge or the patch resemble the -- what you see on Exhibit 3, the top right-hand corner?

A. I'd like to say that I'm around -- I was around police officers and detectives for a long time. And you kind of just glance, you know.

Q. Okay.

A. I don't know if that was the star or he might have had a five pointed star. I'm not sure right now.

MR. MASCIOPINTO: Okay. That's fine. I have no further questions. Thank you, sir. I appreciate your time.

MR. LYDON: Going once --

Page 115

EXAMINATION (Further)
BY MS. KUNZER:

Q. I have one quick question.

A. Okay.

Q. Mr. Gizowski, are you aware of any communication that your wife Sandra has had with Mr. Sopron's attorneys?

A. I heard that she had something to do with them, yeah.

Q. Do you recall any specifics about those communications with them?

A. The only thing that she said was that she -- John told her that he lied on Statement No. 1. I didn't think he did. That's the end of that, you know. I thought he was telling the truth.

And who knows what happens. You know, like they said in the movie, the dark side, hard to see. You know, you don't know what's going on with these people. And there's a lot of them and they're all around you in the neighborhood. And maybe they coerced him into changing his story. I don't -- I don't know, but I hope not.

Q. And when you're talking about these

Page 116

people, are you talking about members of the Popes?

MS. HAGY: Objection. Form.

THE WITNESS: Well, I don't really think that they're in the Popes anymore, but they're out there. And there's other clubs out there, too, you know. Johnny's dead. He can't be brought back. I thought he was telling the truth.

MS. KUNZER: Okay. I don't have anything further.

MR. LYDON: I think we're done.

THE WITNESS: No, you're not.

THE VIDEOGRAPHER: This concludes the deposition. We're off the record at 12:36.

MR. MASCIOPINTO: Jim, do you want to explain signature to him?

MR. LYDON: Yeah. So Mr. Gizowski, you have a right to either waive or reserve signature, which means before this transcript that she's taken down becomes official, they can send you a copy, and you can review it and make corrections, such as typos, stuff like that, or you can trust that the court reporter here has taken everything down accurately today and waive signature.

THE WITNESS: Yeah, the court reporters,

Page 117

they're exceptionally bright -- brilliant people, because it's like they don't miss a trick, you know, and I think that you could send it to me and I'll -- I told you we weren't done, and then, I'll have to sign it.

MR. LYDON: Well, you don't have to. You can trust that she took everything down and waive signature and just say it on the record.

THE WITNESS: Oh, okay. You mean right now?

MR. LYDON: Yeah. Say --

THE WITNESS: Yeah, yeah, yeah, I think she did a good job.

MR. LYDON: So you waive?

THE WITNESS: Yeah. They're -- you know, I've never -- you know, all these years I was a cop and you never hear, oh, the State's -- the court reporter didn't do that right, you know. I mean, never have I heard that, so --

MR. LYDON: Thanks for your time today, Mr. Gizowski.

(FURTHER DEPONENT SAITH NOT)

30 (Pages 114 - 117)

Page 118

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

I, Elizabeth L. Vela, an Illinois Certified Shorthand Reporter, do hereby certify that heretofore, to-wit, on the 22nd day of February, 2023, personally appeared before me, at 151 North Franklin, Chicago, Illinois, EUGENE GIZOWSKI, SR., in a cause now pending and undetermined in the United States District Court, wherein MATTHEW SOPRON, et al. are the Plaintiffs, and FORMER ASSISTANT STATE'S ATTORNEY SCOTT CASSIDY, et al. are the Defendants.

I further certify that the said witness was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness as aforesaid.

I further certify that the signature to the

Page 119

foregoing deposition was waived by the witness.

I further certify that the taking of this deposition was pursuant to Notice, and that there were present at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF: I have hereunto set my hand this 16th day of March, 2023.

_Elizabeth L. Vela_

31 (Pages 118 - 119)

[& - 312]                                    Page 1

**&**

**&** 2:1,7,13,19 3:1,7,13 5:15 6:10,14 21:23

**0**

**08254** 1:6
**084-003650** 1:24

**1**

**1** 4:16 5:10 15:23,24 35:21 36:3,9,13 39:8 45:8 54:13 62:22 73:22 97:9 105:10,10 111:21 112:21 112:22 115:14
**103** 4:24
**108** 4:10
**10:08** 1:18 5:2
**10:49** 46:16
**10th** 4:24 102:21 103:1,6
**11** 13:24 14:23
**111** 4:11
**115** 4:12
**11:02** 46:19
**12:10** 105:22
**12:23** 105:24
**12:36** 1:19 116:13
**13** 22:15
**13147** 119:21

**13th** 4:20 46:2 102:24 103:11 103:18
**151** 1:16 2:8 5:15 118:7
**1539** 10:16
**15th** 72:6
**161** 3:8
**16th** 119:10
**1948** 13:17
**1976** 10:6
**1980s** 17:5
**1984** 17:3
**1990s** 10:20 11:15 17:17 18:17
**1995** 17:7 22:16 81:1
**1996** 17:8 26:7 41:7 43:7 51:24 60:23 62:13,16,19 74:22 75:12 76:22 77:9 78:15 79:15 81:3,4,17 84:21 85:3,7 86:1 89:10 100:1 105:13 106:3 109:16
**1997** 4:20 46:2 46:5
**1:19** 1:6
**1st** 103:15

**2**

**2** 4:19 45:20,21 45:24 74:5 94:19 111:20
**20** 43:21 44:22 83:13 85:4 87:7,7
**2001** 4:24 81:12,14 93:1 93:5,9,11 94:5 94:8,11,14,17 102:21 103:6 103:11,18 107:6 108:1,5 110:13
**2002** 96:16,23 97:3
**2003** 9:20,21
**2005** 11:4,5
**201-6400** 3:16
**2010** 14:10 72:6
**2023** 1:17 5:2 13:15 79:8 83:20 118:7 119:10
**21** 85:6
**22** 1:17 13:15 79:8 83:19
**222-0800** 2:15
**225** 3:15
**22nd** 5:2 118:6
**230** 3:2
**243-5900** 2:3

**2500** 2:8
**2550** 3:15
**26** 26:7 60:23 62:16,19 74:11 74:21 75:12 77:8 78:15 81:4,17 83:19 86:1 89:9 100:1 105:13 106:3 109:16
**2620** 3:2
**26th** 26:11,15 30:17 31:13 32:15 38:21 39:13 51:24 52:6 62:13 64:11 77:20,22 81:9 85:24 89:9 91:11 94:4 100:5 103:11,15 106:3 109:17 112:12 113:4
**2nd** 16:10,10

**3**

**3** 2:2 4:22 14:20 102:2,11 110:11 111:19 111:20,23,24 114:2,5,12
**30** 66:20
**311** 2:2
**312** 2:3,9,15,21 3:3,9,16

**[3200 - answer]**                                                        Page 2

| | | | |
|---|---|---|---|
| **3200** 2:14 | **612-1928** 2:21 | **academy** 14:20 | **aforesaid** |
| **33** 2:20 | **62** 4:8 | **accepted** 85:13 | 118:17,23 |
| **36** 4:17 | **62nd** 12:20 | **accepting** | **afraid** 31:12 |
| **3rd** 16:9 | 22:24 | 99:10 | **afternoon** 26:7 |

**4**

**41** 14:5 109:23
  110:1
**444** 2:14
**45** 4:20 101:21
**46** 4:5
**46th** 10:16
**47** 11:2
**48** 10:4
**49** 11:1

**5**

**5** 14:19
**50** 61:14
**5056** 9:1 11:14
  74:3
**51st** 15:22
**56** 10:3
**59** 4:6
**5921** 102:3,10
**5th** 16:9

**6**

**60** 4:7 64:11
**600-5588** 3:3
**60601** 3:9
**60603** 2:21
**60606** 2:9,15
  3:3,15
**60607** 2:3
**60638** 9:2

**63rd** 21:22
  22:21,22
**641-0300** 3:9
**68** 4:9

**7**

**7** 14:24 16:9
  21:23
**704-3000** 2:9
**74** 9:24 13:14
**76** 85:4

**8**

**8** 4:4 14:23
**80s** 15:4
**86** 9:24
**8th** 15:2

**9**

**9** 13:17
**9-26-1996** 63:8
**90** 64:11
**90s** 15:4
**95** 81:2
**96** 74:17
**9:00** 63:8

**a**

**a.m.** 1:18 5:2
**aberdeen** 2:2
**ability** 14:12
**able** 65:19
**abrody** 2:22

**accident** 42:18
**accord** 60:9
**accurate** 63:11
  63:17 78:21
  92:9 94:11
  104:14
**accurately**
  116:22
**action** 5:21
**acts** 110:7
**actually** 23:18
  75:6 106:4
**addicted** 85:8
  85:11
**addiction** 79:3
  79:7
**address** 9:17
  10:8,12 11:14
  11:19,23 12:3
  12:9,19 13:5
  15:6 23:3 24:9
  24:12
**addressed** 46:1
**adult** 11:18
**adults** 11:18
**adversely**
  25:17
**affidavit** 93:9
  93:17
**affiliations** 6:1

**ages** 10:24
**ago** 8:12 12:10
  77:3 114:8
**agree** 5:9 38:10
**ahead** 17:20
  18:20,22 19:8
  23:14 38:7
  51:5 58:22
  76:8 80:4 92:3
**aided** 118:20
**airport** 9:5
  18:18
**al** 1:9 5:13
  118:11,13
**allegedly** 20:12
**allow** 7:20 59:5
**allowed** 38:15
**almighty** 18:3
  20:4
**amasciopinto**
  3:10
**amkunzer** 3:16
**amy** 3:14 6:16
  60:16,20
**answer** 7:21
  8:3,5,5,9 15:13
  18:22 19:22
  34:5 35:19
  55:12 58:1
  76:14 77:19
  95:13

**answered**
33:16 35:6
56:4 95:11
100:12 105:15
**answering**
58:12,14 75:19
75:23
**answers** 33:3
58:2 96:7
99:11
**anthony** 3:8
**antusas** 2:5,24
6:9,15 68:15
**anybody** 54:16
60:15 82:17,18
82:21 104:13
107:6,10,17
108:7
**anymore** 116:4
**anyways** 88:23
**apartment** 9:3
**apologize** 66:21
**apparent**
105:16
**apparently**
20:22 89:12
**appear** 31:17
36:20 109:17
**appearance** 6:3
**appearances**
2:1 3:1 6:1
**appeared** 118:7
**appreciate**
114:23

**approximately**
17:2 24:11
39:2,12 44:16
**april** 11:4,4
**area** 15:23,24
16:19 22:22
82:15,16
**argenbright**
3:11 6:20
62:10,17 66:10
**argument**
57:17
**arrest** 28:8
**arrested** 20:16
30:17 88:16
**arrival** 110:18
**arrived** 26:15
27:6,14,20
29:4 32:14
85:24 99:24
**asa** 60:21 63:22
64:20 104:8,11
113:5
**ashley** 2:19
6:13
**asked** 8:11
33:15 35:5
43:1 44:19
45:14 56:3
58:1 67:24
80:19,20 95:10
105:15 106:16
108:20,22
**asking** 33:1
34:6 49:11

53:23 58:9
62:2 75:16
76:2,17 91:2
99:10 104:14
106:9
**asks** 49:14
**ass** 73:10
**assaulted** 98:6
**assigned** 14:17
14:20 17:7
**assignments**
14:13 16:2
**assistant** 1:7
2:11 118:12
**associated**
18:24
**assume** 8:10
**assumption**
49:9
**attempt** 8:9
**attendees** 64:18
**attending** 5:24
**attention** 26:6
46:23 51:24
63:2 106:20
**attitude** 73:17
**attorney** 1:8
2:11 3:18 5:13
6:4,17 28:17
43:14 46:1
53:5 57:6,23
58:5 59:24
65:22 68:8
75:7,9 80:19
89:11 90:7,10

103:6 104:23
106:19 107:10
108:4,8 111:4
114:4 118:12
**attorney's** 4:23
26:22 27:17
41:7 43:7,16
43:22 44:5,21
48:7 52:4
54:23 63:14
65:21 70:3
81:19 83:22
84:6 86:5 93:1
93:4,12 94:13
94:17 98:16
101:6 102:21
105:6 107:7
109:11 112:11
**attorneys** 3:5
6:12 7:24 41:1
41:6,12,18
44:9 45:12
47:14 48:3,7
48:20 49:11,11
50:10 55:1
69:23 70:2
71:10 72:14,16
72:23 73:6
88:20 96:1
107:22 108:18
115:7 119:4
**audience** 80:15
**audio** 5:7,7
59:6

**[austin - cassidy]** Page 4

austin 12:20
avenue 9:1
avoid 36:5
aware 20:7,10
22:14 23:9
25:16,22 26:1
27:16 39:21
40:5,6 93:8,22
94:2 97:2,5,13
97:16,19,22
98:2,5,11,15,19
115:5

**b**

b 4:14 6:13
64:4 112:17,24
back 12:9
18:17 21:23
22:16 40:3
44:18 46:5,18
46:23 48:16
51:24 74:17
76:4 82:14,15
84:21 86:15
87:22 96:16,20
105:24 116:6
bad 25:7
badge 65:12
113:23 114:11
bajenski 3:18
6:18
bajinski 64:3
bandwidth
59:6
based 34:24
47:11,13 48:19

49:12
basically 16:17
basis 23:19
bates 102:9
battery 69:10
bazinski
112:24 113:7,7
113:12,13
114:11
began 79:7
beginning 6:4
behalf 6:6,8,24
7:3,6
believe 34:20
59:15 99:21
believed 66:9
bench 56:2
best 2:13 14:12
19:20 63:17
64:17 87:18
big 87:6 88:9
bill 7:2
birth 13:16
bit 88:1 99:18
bjsiebken 2:16
blank 48:2
born 85:4
bottom 92:11
110:14 111:9
break 8:15
46:15,17
105:20,23
brianna 2:14
6:22,24 59:2

bright 117:1
brilliant 117:1
bring 26:6
brody 2:19
6:13,13
broke 30:22
broken 82:2,5
brought 30:17
116:6
burglary 15:15
busy 38:8
byinski 112:17

**c**

c 18:16 118:3
cal 26:12 64:11
77:20,23 81:9
86:1 89:9 94:5
100:5 103:11
103:15 106:3
112:12 113:4
california 52:6
91:11
call 26:11
35:21 45:20
52:5 59:13,18
67:7 69:17
71:10,15 77:4
81:9 89:10
90:7,10
called 1:11 8:19
9:10 15:10,14
21:23 59:21
65:4,10 68:17
69:3,11,12
71:17 72:11

76:22 78:14,16
78:17 80:16
90:9 97:20
101:14,15
calling 65:5
114:10
calls 8:4 15:14
cancel 67:11
caption 51:11
car 16:18,23
care 71:11
carroll 104:8
cars 15:11
case 2:23,24
6:15,15 20:11
50:18 52:10
59:3 69:19,23
79:20 80:11,16
81:6,14 88:13
93:14,17,20
94:23 99:17
107:22
cases 20:8,10
20:13,19 35:24
48:9
cassidy 1:8
2:11 3:5 5:13
6:6,12 26:14
26:24 27:13,16
28:7,13 29:16
30:8,14 31:1,7
31:13 32:16
33:2,6,11,17,23
34:8,15 37:19
39:7 48:4 54:4

64:12,22 72:14
74:10,14,21
75:5,13,19
76:10 78:7
82:4,24 83:1
86:17 87:17
97:14,19,23
98:3,5,11,19,23
99:9 101:11
105:2 106:6,14
106:16,18
108:8,18 113:5
118:12
**cassidy's** 26:23
35:1 69:23
71:10
**cause** 11:6
118:9,16
**cell** 5:5 59:18
77:5 78:18
**cellular** 5:5
**certified** 1:16
118:4
**certify** 118:5,14
118:24 119:2,6
**chance** 29:3
89:10 90:7
**change** 42:11
92:7
**changed** 14:21
107:8
**changing**
115:22
**charge** 79:11
97:24 98:3

**charged** 31:2
34:9 43:15
57:12
**chart** 51:10
**chicago** 2:3,9
2:15,17,21,23
3:3,9,15 5:16
7:1,7 9:1,8,11
10:17,18 12:20
13:12,20,23
14:2,3,7 65:6
65:18 71:20
72:2,5,8 79:23
80:2,7 84:2,9
109:22 118:8
**children** 10:22
11:18
**chronological**
14:14,15
**city** 2:17,23
6:14,24 7:7
59:3
**civil** 1:13 44:11
108:19
**clark** 3:8
**clear** 7:19 46:8
68:16
**clients** 49:12
**climber** 18:12
**close** 78:24
79:1
**clothes** 61:15
**clubs** 116:5
**coerce** 76:14

**coerced** 30:2
32:16 35:9
115:22
**coercing** 33:12
**coercive** 33:14
**colleen** 48:2
63:22
**come** 24:6,8,12
26:12 70:8
71:3 73:6
76:23 82:18
86:8
**comes** 47:13
48:19
**coming** 15:15
15:16 24:21
49:5 67:20
71:7 72:12
**commander**
16:12
**commonly**
110:1
**communication**
115:6
**communicati...**
115:11
**compelled** 8:13
**complain** 55:5
55:7
**computer**
118:20
**concentration**
16:19
**concerned**
42:12 67:17

100:21
**concerns** 31:21
67:12
**concluded** 1:19
**concludes**
116:12
**confusion** 36:5
**conley** 104:5
**connection**
39:6 59:5
**considered**
100:16,19
105:14
**consistent**
63:10 112:12
**contact** 81:16
94:22
**contacted** 42:4
92:24 95:1
102:20 103:1,5
**contacting** 93:4
**contacts** 83:21
84:1,5,8
**contd** 3:1
**contents** 38:10
**continue** 5:8
**continuously**
10:9
**contraband**
15:13
**conversation**
33:6 42:9,20
**conversations**
5:4 24:20

[conviction - determine] Page 6

conviction 57:2
convictions 40:6
cook 3:18 6:17 48:6 63:14 65:20 114:4
cop 117:15
cops 83:5,9
copy 116:19
corner 114:3,5 114:13
correct 52:10 53:5,16 54:8 54:14 61:2 64:23 67:1 110:7,19,24 111:11 118:22
corrections 38:15 116:20
counsel 5:23 49:3,3 51:2 67:7 102:3 107:18 111:23 119:6
county 3:18 6:17 48:6 63:14 65:20 114:4 118:3
couple 16:4 44:18 46:10 59:7,13 62:8 69:4 78:3 108:15 111:17
court 1:1 5:18 7:9,19,22 76:6

80:10,14,22 116:21,24 117:16 118:10
courtroom 40:4 96:22
courts 1:14
cover 110:23
cpd 3:11 6:20 62:9,17 65:13 65:20
crime 16:8,20 31:3 34:10
crimes 16:17
criminal 20:8 25:17 39:22 40:6
crossing 14:20
crying 78:12
csr 1:23
culbertson 2:7 5:15
curb 15:10,10
currently 8:24 11:19,22 12:15 13:2,10,18
curtis 104:5
cv 1:6

**d**

d 4:1 6:6,7,13
dark 115:18
dated 4:20,23 46:2
dates 17:4
daughter 12:7 12:8

dave 70:14,15 70:17 71:11,15 71:17 72:10 108:20,22,24 109:9
day 52:4 55:5 91:14 109:18 118:6 119:10
days 71:1
dead 11:1 116:6
death 11:6
december 4:24 10:6 93:1,5 94:5,11 102:21 102:24 103:6 103:11,15,18
decisions 49:2 49:8
deep 25:14
defendant 2:10 2:16,23 3:5,10 6:24 7:3
defendants 1:10 3:17 70:7 70:11 108:19 118:13
defense 44:9 70:2
definitely 50:11
delay 42:24
deleted 59:22
demeanor 28:13 35:1

dep 50:19
department 13:12 14:2,4,7 65:6 72:2,5,8 80:2 84:9 93:19 107:13
deponent 117:21
deposition 1:11 5:7,11,14 7:16 36:3 42:24 47:1 66:24 67:11 69:13 109:6 116:13 119:1,3,4
depositions 1:14 49:10
describe 16:14 28:12 35:1 61:13
described 87:19
despite 8:3
detective 27:7,8 27:10 29:21 61:1,4,8,16,21 62:14 65:4,11 66:4,10 78:7 87:20 91:19 106:23
detectives 84:2 114:15
determine 49:20 65:20

**[diciolla - experiencing]** Page 7

**diciolla** 3:19
6:18
**die** 42:17,17
**died** 99:18
**different** 19:1
**direct** 46:22
51:23 63:2
**discharged**
79:21
**discovery**
35:22
**discuss** 47:4,15
47:20,22 56:7
56:18,24 73:12
**discussing**
101:12
**discussion**
50:22 56:10,14
**discussions**
51:1
**disposed** 20:22
**dispute** 68:21
**district** 1:1,2
1:13 13:20,23
14:13 15:3
16:5,9,9,10,10
16:12 118:10
**divide** 47:6
**division** 1:3
**divorce** 10:11
**divorced** 10:15
12:16
**doctors** 42:17
**document**
36:18

**documents**
45:4,6 73:20
74:7
**doing** 28:18
85:12,15 92:20
99:9
**door** 30:23
70:8 87:13
**double** 22:15
23:4 33:8
39:23 43:15
73:3 100:10
**doubt** 113:3,10
**drawing** 48:2
**drive** 39:16
70:11
**dropped** 91:12
**drove** 54:22
112:11
**drug** 40:20
79:3
**drugs** 85:9,12
85:14 109:16
109:18 110:2,7
**duffy** 104:2
**duly** 8:19
118:15
**duration** 19:18

**e**

**e** 4:1,14 6:16
11:12 18:14,16
18:16 62:20
**earlier** 79:10
93:22 98:22

**early** 15:4
93:11
**east** 87:16
**eastern** 1:3
**eight** 17:12
61:14 65:10
**either** 56:24
82:8 100:24
116:17
**eleven** 21:23
**elizabeth** 1:15
1:23 5:19
118:4
**else's** 48:15
**employee** 65:13
**encounter**
110:2
**ended** 26:13
**englewood**
14:24
**entire** 38:20
83:14
**entirety** 64:18
**essex** 13:4
**estima** 96:1
**estimate** 84:15
**et** 1:9 5:13
118:11,13
**eugene** 1:11 4:3
5:11 7:14 8:18
11:1,13 64:6
111:9 118:8
**events** 8:11
101:12

**eventually**
49:15
**everybody**
48:15 59:4
68:10
**everybody's**
51:12 85:11
**exact** 12:19
23:3 79:8
**exactly** 99:20
**examination**
1:12 4:2 8:21
46:20 59:10
60:18 62:6
68:11 108:13
111:15 115:1
**examined** 8:20
**exceptionally**
117:1
**excuse** 30:11
55:6
**exhibit** 4:16,19
4:22 36:3,9,13
39:8 45:8,20
45:21,24 47:8
54:13 62:22
73:22 74:5
94:19 97:9
102:2,11
110:11 114:12
**exhibits** 35:22
**experience**
88:13
**experiencing**
79:3

**[explain - full]** Page 8

| | | | |
|---|---|---|---|
| explain 116:14 | 66:1 113:20 | 30:4,10,19 | forward 69:13 |
| express 31:21 | 114:21 | 31:4,9,14,18,23 | found 67:22,23 |
| extra 16:12 | finish 7:20 41:3 | 32:5,11,18 | foundation |
| **f** | finishing | 33:7,19 34:3 | 17:18 19:2,8 |
| f 62:20,20 | 105:18 | 34:17,21 35:3 | 20:20 21:10,16 |
| fact 56:19 57:1 | firm 5:17,19 | 34:17,21 35:3 | 21:21 22:4,9 |
| 67:17 | first 8:19 14:17 | 35:11,16 36:24 | 22:17 23:17 |
| fair 8:16 77:20 | 26:19 44:16,19 | 37:15,20 38:12 | 25:9 28:24 |
| 80:24 97:11 | 47:18 49:18 | 38:17,23 39:9 | 29:5 31:4 |
| 108:24 109:9 | 63:23 70:21 | 40:15 41:8,14 | 33:19 34:3,21 |
| familiar 18:2 | 71:9 86:17 | 41:23 43:10,19 | 35:11 36:24 |
| family 43:5 | 93:7 118:15 | 43:24 44:12,23 | 40:15 52:16,23 |
| 77:11 108:9 | five 36:18 | 52:11,16,23 | 53:19 56:21 |
| far 49:16 | 61:14 65:10,14 | 53:13,17 54:1 | 57:19 58:3 |
| favorably 26:2 | 79:17 105:19 | 54:9,19 55:2 | 61:19 63:19 |
| 26:4 | 114:19 | 55:16,21 56:3 | 64:14 66:5,11 |
| february 1:17 | floor 106:4 | 56:21 57:3,8 | 66:18 74:18 |
| 4:20 5:2 13:15 | follow 47:10,12 | 57:14,19 58:3 | 76:19 80:4 |
| 46:2 79:8 | 48:19 59:7 | 60:10 61:7,19 | 92:3 99:6 |
| 83:19 93:9 | 108:15 111:17 | 61:23 63:19 | 109:19 110:8 |
| 118:6 | followed 98:23 | 64:14,24 66:5 | four 71:5 |
| feel 8:13 | follows 8:20 | 66:11,18 67:14 | fourth 70:18,20 |
| feels 25:8,10 | force 14:21 | 68:24 72:20 | franklin 1:16 |
| female 37:12 | 15:9,19,20 | 74:13 76:8,12 | 2:8 5:16 118:8 |
| 37:23 38:5 | forced 30:3 | 76:19 77:18 | friedrich 2:13 |
| 53:4,8 57:6,22 | 32:9 39:5 55:8 | 80:4 84:22 | friends 21:5 |
| 58:4 64:19 | foregoing | 95:10 99:6 | 24:3 25:12 |
| 67:10 104:23 | 118:21 119:1 | 100:3 109:3,12 | friendship |
| 106:19 111:3 | form 17:18 | 109:19 110:3,8 | 40:17 |
| 113:5 | 20:20 22:4,9 | 111:6,12 116:2 | front 51:11 |
| fentanyl 85:16 | 22:17 23:6,17 | former 1:7 2:11 | 54:14 62:23 |
| financially 5:21 | 24:14,23 25:9 | 3:18 5:12 6:17 | 111:19,20,21 |
| find 15:13 | 25:19 26:3 | 7:3 60:21 | 111:24 112:7 |
| fine 48:21 | 28:1,9,14,24 | 118:12 | full 7:13 |
| 50:13 58:23 | 29:5,12,17,22 | forth 48:16 | |

**[further - hagy]** Page 9

**further** 4:10,11
4:12 58:15
68:5 88:1
108:13 111:2
111:15 114:22
115:1 116:9
117:21 118:14
118:24 119:2,6

**g**

**g** 6:8 18:14
62:20
**gang** 16:2,16
16:17,21,22
17:17,24 18:5
18:8,11,13,15
18:17
**gangs** 16:2,3,6
16:7,14 17:1
85:20
**gene** 12:21 13:2
17:16 18:8
20:16 24:3
25:23 46:22
51:20 56:1,11
56:19,24 67:24
**gene's** 18:13
**general** 33:5
**generally** 16:15
**george** 62:14
66:4
**getting** 69:9
**girl** 54:7
**girls** 22:15 28:6
99:17

**give** 14:12
57:12 86:14
89:9,10 94:14
**given** 7:15 54:7
93:8,13,16,20
118:17,22
**giving** 33:3
39:7 54:17
58:2,12,13
**gizowski** 1:11
4:3,16,19,22
5:11 7:12,14
7:15 8:18,23
12:7,14 23:2
36:12,14 45:24
59:12 60:20
63:5 64:7
68:13 108:16
110:15,21
111:2 112:9,16
115:5 116:16
117:20 118:8
**gizowski's**
110:18
**glance** 114:16
**go** 5:9 12:22
17:20 18:20,22
19:8 23:14
26:18,20 35:19
38:6 40:3,22
47:7,16,18
48:15,16 49:18
49:20,22,23
50:7,12 51:5,5
51:15 58:16,21

58:22 59:8
60:16,17 69:13
76:8 80:4,10
86:4 91:8,11
92:3 112:20,21
114:2
**going** 5:1 7:23
8:11 19:12,19
26:13 27:21
34:9 36:4
37:13 38:5
47:6,7,16,17
48:16 49:3,4
49:10,16 50:15
50:20 51:14,23
69:8 73:18
77:18 80:3
86:13 89:3
94:4 99:17
100:2,8 102:2
102:4 103:12
106:12 114:24
115:19
**good** 5:1 6:5
7:2,5,12 28:19
73:16 85:1
117:12
**graffeo** 3:11
6:21 62:10,20
66:14,17
**grand** 14:20
39:19 55:8,15
83:21 98:12
**granted** 113:16
113:19

**ground** 49:14
49:16
**group** 14:22
19:6 20:1,3
21:19
**groups** 18:24
**guard** 13:21,22
**guess** 11:17
21:24 26:23
39:18 49:13
73:16 74:18
81:10 83:16
85:16 88:10
**gun** 61:15
107:3
**guy** 88:9,9
**guys** 16:24 44:7
48:15

**h**

**h** 4:14 6:8
18:14 63:24
**hagy** 2:2 4:9
6:7,7 17:18
18:20 19:2,8
19:10,12,15
20:20 21:10,16
21:21 22:4,9
22:17 23:6,12
23:14,17 24:14
24:23 25:9,19
26:3 28:1,9,14
28:24 29:5,12
29:17,22 30:4
30:10,19 31:4
31:9,14,18,23

**[hagy - identify]** Page 10

32:5,11,18
33:7,19 34:1,3
34:12,17,21
35:3,11,16
36:2,6,24
37:15,20 38:1
38:3,12,17,23
39:9 40:9,11
40:15 41:8,14
41:23 43:10,19
43:24 44:12,23
46:24 47:3,6
47:15,19,23
48:5,8,10,14,21
48:24 49:2,15
50:11,14,17,23
51:4,6,10,15,17
52:11,16,23
53:13,17,19
54:1,9,19 55:2
55:10,16,21
56:3,21 57:3,8
57:14,19 58:3
58:23 60:10
61:23 63:19
64:14,24 66:5
66:11,18 67:14
68:9,12,13
69:1 72:22
74:6,15,19
76:9,15,21
77:20,21 80:6
85:2 90:1 92:5
95:7,12 97:11
97:12 100:5,6

102:2,7,10,13
103:1,3,4
104:16,18
105:18 106:1
108:12 109:3
109:12,19
110:3,8 111:6
111:12 116:2
**hale** 22:16,20
22:21
**half** 39:15
96:10 101:21
**hand** 114:3,5
114:13 119:10
**hands** 68:2
**handwritten**
37:4 38:11
39:7 41:12,19
43:8,17 44:21
45:9 52:1 53:2
53:4,22 54:6
54:17 57:23
62:23 97:10
111:21 112:20
112:21 113:1
**happen** 19:12
42:16 49:5
95:5 99:22
**happened**
20:18 73:4
79:19 86:9
90:21
**happening**
80:13

**happens**
115:17
**happy** 59:8
**hard** 115:18
**harrison** 14:23
**head** 97:17
**hear** 7:23 90:4
90:6 117:16
**heard** 73:14
89:21 99:20
115:8 117:18
**hearing** 23:4
42:11 57:2
96:16,24
**held** 5:14
**hell** 42:20
**help** 85:13
**helping** 82:21
**hereinbefore**
119:5
**heretofore**
118:6
**hereunto** 119:9
**heroin** 85:16
**hi** 60:20
**high** 16:19
**hinshaw** 2:7
5:15
**hinshawlaw.c...**
2:10
**history** 66:2,8
66:15
**holmes** 3:11
6:20 62:10,14
66:4

**holster** 107:4
**home** 39:16
42:19 54:22
81:20 82:2,5
86:16 91:8
**homicide** 33:9
73:3 100:10,10
**hope** 115:23
**hoping** 16:20
**hour** 39:14,15
50:19 96:10,10
101:21
**hours** 26:7
50:21
**house** 9:3,4
24:2,8,22 25:4
25:6 69:3 70:2
70:6,8,22,24
71:4,6 91:12
98:17
**huge** 18:14
**huh** 8:6
**hung** 21:12
**hylan** 63:24
**hyland** 48:2
75:24

i

**idea** 28:21 36:7
40:18 103:16
**identification**
36:10 45:22
102:12 114:9
**identified** 42:6
**identify** 59:24
77:1

**ignore** 19:15
**ignored** 94:21
**iii** 7:14
**il** 2:3,9,15,21
  3:3,9,15
**illinois** 1:2,15
  5:16 9:2 10:18
  13:4 118:1,4,8
**impression**
  67:9
**incident** 105:17
**indicate** 110:16
**indicated** 65:12
**indication**
  65:12
**individual** 3:4
  6:11 48:7
  64:23 65:10
  66:3 113:6
  114:9
**individuals**
  44:10 64:12
**influence**
  109:18 110:2,7
**influx** 16:8
**information**
  48:19 68:1
  87:14 101:18
**initial** 63:23
**instructed** 8:2
**interactions**
  88:20 89:6
  108:4
**interested** 5:21
  36:7 119:8

**interfere** 5:7
**interference**
  5:5
**internet** 59:5
**interrogation**
  89:19,20
**interrupting**
  38:8
**interview** 33:13
  76:11 92:22
  94:8,11 109:10
  110:17
**interviewed**
  40:24 41:5,11
  41:18,21 43:3
  43:13,22
  112:17
**interviews**
  45:11
**introduce** 47:8
  72:10
**introduced**
  27:18 86:11
**introducing**
  113:17
**inv** 64:3 112:17
  112:24
**invent** 99:13
**investigated**
  16:17 79:23
  80:1
**investigative**
  108:1
**investigator**
  53:16 61:10,21

  62:2 64:23
  65:5,11 70:10
  70:12 72:13,15
  87:20 91:20
  106:23 107:2
  108:21 109:1
  110:11 113:7
  113:12,23
  114:11
**investigators**
  3:18 6:18 7:3,4
  30:22 32:4
  60:21 70:7
**investor** 114:10
**involve** 15:9
**involved** 16:15
  20:12,12 85:20
  88:12 95:23
**issue** 48:23
**iv** 12:23,24
  13:2 17:16
  24:3
**ivth** 12:23

**j**

**j** 64:4
**jail** 20:23
**james** 2:8
**jim** 6:5 116:14
**jlydon** 2:10
**job** 28:19 35:5
  99:9 117:12
**john** 4:16,19,22
  11:1,3,13
  17:16 18:8
  20:11 25:16,16

  26:8 27:1,22
  28:8,22 29:4
  29:11,15,20
  30:2,7,13,16,22
  31:1,2,7,8,12
  31:17 32:2,8
  32:14,22,23
  33:3,6,12,24
  34:9,15,20
  35:2,6,8 36:14
  37:6,14,19
  38:6,10,22
  39:4,16,19,21
  39:21 40:5,7
  40:14,20 41:6
  43:6,16 44:20
  52:15,21 53:11
  53:23 54:12,22
  57:7,17,22
  58:11,11 60:24
  61:17 63:5
  64:9 75:16,18
  76:4 77:7,7,16
  77:22 78:5,11
  78:22,24 79:10
  80:10 81:9,20
  82:12 83:11,18
  84:4,16,21,23
  86:19,21,23
  87:11,12 88:2
  88:6 89:10
  90:10,12,19,20
  90:23 91:7,22
  92:22 93:8,13
  93:16,20,23

**[john - lady]** Page 12

96:12,15 97:13
97:19,23 98:2
98:5,11,15,19
98:24 99:12
100:16,18,21
101:5,8,12,16
101:22 104:2
104:24 105:5
105:13 106:7
106:16 107:7
107:11,14,18
109:10,15,17
110:15,22
111:4 112:10
112:16 115:13
**john's** 11:6
18:11 20:21
33:18 36:23
37:23 41:19
45:8 54:17
75:13 88:7
97:9 100:2,7
**johnny's** 116:6
**jr** 12:21
**judge** 80:18
**junior** 12:22
**jury** 39:19 55:8
55:15 83:21
98:12
**juvenile** 80:21
80:22,23 88:21

**k**

**k** 6:16 64:4
112:17,24
118:3

**kamionski** 2:19
6:14
**kedzie** 14:23
**keep** 36:4
**kid** 85:1
**kids** 10:24 11:8
11:13,17,18,22
79:2 89:1
**kill** 42:18 95:22
**killed** 85:18
**kind** 9:12 15:9
34:4 69:17
76:5 82:16
86:24 87:15,22
106:10 114:16
**kmklawllp.co...**
3:10
**knew** 16:22,23
21:12 60:4
**knock** 70:8
**know** 8:9,13,16
12:19 13:4
15:11,12,15,16
16:19 17:3
19:5,20,24
20:13,16,18
21:2,4,8,8,11
21:12,19 22:2
23:3,16,18,19
23:19 25:7,8
25:10,11,13,14
26:13 27:10
28:16,19 29:6
34:6 35:4,17
35:18 39:14

40:16 42:14,14
42:15,16,17
44:7 47:11,20
48:20 50:4,18
50:19 51:6,9
53:6 55:24
56:18 58:5
59:15,23 60:4
60:23 62:14,16
62:20 63:23
64:19 65:15,22
65:24 66:3
67:6,17,20
68:16 69:8,9
69:14,16 70:16
71:7,17,19
72:1 73:11,17
73:19 74:1,9
74:20,24 75:1
75:3,5,6 76:1
76:13,22 77:6
77:6,8,11,22
78:18 79:8,17
79:19 80:18
81:19,21 82:16
82:21 83:5,13
84:18,24,24
85:1,8,10,10,11
85:12,12,13,14
85:22,23 86:7
86:11,12,13,16
87:1,3,7 88:13
88:19,22,22,22
89:3,12 90:15
92:16 95:1,4,5

95:15,22,23,24
96:1,5,5,12
97:22 99:4,7,8
99:8,14,14,21
100:9,12,15,21
100:24 101:2,3
101:4,9,17,19
102:4 104:21
105:13 106:11
109:15 110:6
110:12 113:17
114:8,16,18
115:15,17,19
115:19,23
116:6 117:3,14
117:15,17
**knowledge**
65:7,9 67:5
70:9 85:20
90:5 98:23
**knows** 115:17
**kulwin** 3:7,7
**kunzer** 3:14 4:7
4:12 6:16,16
58:20 59:1
60:19,20 61:9
61:20 62:1,5
115:2 116:8

**l**

**l** 1:15,23 6:6,7
11:12,12 63:24
118:4
**lady** 27:8,10
29:21 38:8
42:10,23 67:15

**[lady - make]** Page 13

78:6 86:15 87:13
**lake** 2:14
**late** 22:16 26:7
**lavergne** 9:1,17 10:3,12 11:14 11:19,23 12:3 12:9 15:6 24:9 24:12 74:3
**lawsuit** 44:11 108:19
**lawyer** 32:20 35:19 67:10,23
**leader** 22:5
**leadership** 22:3
**leading** 76:10 76:13
**learn** 26:8,10
**learned** 105:5 112:10
**left** 77:13 83:17 91:10,11
**lenny** 64:3 112:24
**letter** 4:19,22 46:1,5,6,9,13 46:14 94:19
**license** 1:24
**lie** 55:1,8,14
**lied** 55:20 115:13
**likes** 25:11,12
**lindsay** 2:2,4 6:7 50:12 68:13

**line** 48:12,18 50:6 112:8
**lisa** 11:11
**listen** 80:18
**little** 82:15 88:1 99:17
**live** 8:24 9:12 9:17 10:11,14 11:14,19,23 12:3,18 13:2,3 78:22
**lived** 10:2,8,19
**lives** 13:4 75:4
**living** 74:2 78:23 81:22 84:12
**llc** 5:15
**llp** 2:13,19
**locate** 112:12
**located** 5:15 112:16
**location** 21:24 63:13
**loevy** 2:1,1
**loevy.com** 2:4
**long** 8:12 9:19 10:2 13:22 14:3 17:10 39:12 50:21 77:22 78:1 83:11 90:12,15 96:12 101:19 101:22 114:8 114:15

**look** 45:24 62:22 70:15 74:7 102:14,15
**looked** 61:4,11 65:15
**looking** 68:9 114:7
**looks** 110:7
**lot** 84:20 115:20
**loud** 7:19 38:6
**lydon** 2:8 4:4 4:10 6:5,5 7:12 7:15,18 8:22 17:19 18:21 19:4,16 21:1 21:14,18 22:1 22:7,11,19 23:8,15,21 24:16 25:1,15 25:21 26:5 28:3,11,20 29:2,9,14,19 30:1,6,12,21 31:6,11,16,20 32:1,7,13,21 33:10,22 34:7 34:14,19,23 35:7,13,21 36:4,8,11 37:2 37:17,22 38:4 38:14,19 39:1 39:11 40:13,19 41:10,16 42:1 43:12,20 44:3

44:15 45:1,20 45:23 46:15 47:2,5,10,18 48:17 49:8,22 49:24 50:4,15 50:18 51:14 58:17,21,24 59:9 60:15 68:7 72:20 74:4,13,16 76:8,12,19 84:22 89:23 92:3 95:10 97:8 99:6 100:3 102:24 103:2 104:15 105:15 108:14 109:5,14,21 110:5,10 111:8 111:14 112:4 113:8 114:24 116:10,16 117:6,10,13,19

**m**

**m** 2:8 18:16
**ma'am** 51:22 52:2 75:20 76:18,20,24
**made** 49:3,9 53:21 55:1 83:22 84:2
**make** 38:9,15 50:23,24 51:10 52:21 91:22 116:20

**male**  61:14
**manipulate**  98:12
**manner**  99:10
**march**  11:4,4  119:10
**marked**  4:15  16:18 36:9  45:21 94:19  102:11
**marley**  3:18  6:18
**married**  9:13  9:19,21 12:11  12:15,17 13:6
**masciopinto**  3:7,8 4:8,11  6:19,19 60:16  62:7,9 63:21  64:16 65:2  66:7,13,20,22  67:21 68:4  77:18 80:3  102:9 111:16  112:5 113:9  114:21 116:14
**mass**  15:1 17:9  17:10,15 81:1  81:2
**matt**  2:5 6:8  60:2 81:18  82:13 107:18
**matter**  5:12  27:23 33:5  37:18 66:4,10

66:17
**matthew**  1:4  5:12 21:2,4,15  21:20 22:8  23:9 24:4  118:11
**maureen**  3:2  6:10 50:8
**maureen.obri...**  3:4
**mean**  14:11  42:22 47:3,5  48:17 49:15  50:1 67:12  99:14 102:24  103:9 104:20  117:9,17
**meaning**  101:2
**means**  116:18
**media**  5:10
**medical**  42:13  60:4,5 67:12  67:24
**meet**  44:9
**meeting**  6:23  7:6 26:14  32:22 41:6  43:6,16 44:20  54:23 64:19  73:15 74:10  76:17 104:1,4  104:7,10  110:13
**meetings**  46:9  66:23,24 73:13

108:17 109:2  109:11
**member**  15:8
**members**  43:6  77:12 116:1
**memory**  14:11  63:10,18 64:17  66:9,15 112:13  112:22
**menace**  18:16
**mentioned**  59:13 60:9  113:22 119:5
**messages**  94:21
**met**  26:24  44:17 45:2  46:7 67:3  69:22 70:17  85:24 91:17,19  107:21 108:18
**meyer**  3:13
**michael**  2:13  11:2,13 12:2,8  12:11 17:16  18:8 24:3  25:23
**michaelbest.c...**  2:16
**microphones**  5:3,6
**mid**  10:19 15:4
**midway**  9:5  18:18
**mike**  20:13  56:1,14,19

57:1 67:24
**mike's**  18:15  20:22
**mind**  76:5
**mine**  102:6
**minute**  44:1  105:19
**minutes**  64:11  64:11 78:3  83:13 101:21
**misfit**  22:13
**missed**  11:21
**misstates**  74:13  89:23 100:3
**mistreated**  32:3  32:15 35:9  38:22
**moment**  8:1
**monotone**  34:5
**monroe**  2:20  3:2
**months**  44:18  46:10
**morfin**  2:5 6:9  68:14
**morfin's**  2:23  6:15
**morning**  5:1  6:5 7:2,5,12
**mother**  25:12
**motion**  57:2
**mouth**  30:8  33:18,21 54:17
**move**  12:8

**[moved - objection]** Page 15

**moved** 10:7
**movie** 70:14
 115:18
**mulligan** 22:23
 22:24,24
**multiple** 49:11
**murder** 22:15
 23:5 28:5
 39:23 57:12
 97:24
**murders** 43:15

**n**

**n** 4:1 6:6,7,16
 18:16 63:24
 64:4 112:17,24
**name** 5:17 6:5
 7:13 9:15
 11:11 12:13
 13:8 18:2,5
 51:12 60:20
 62:8 64:6
 67:16 70:13,14
 75:6 113:6,12
 113:16,19
**named** 46:2
 104:2,4,8,10
**names** 10:24
 11:10 27:11
**narcotics** 11:7
**narragansett**
 22:22
**narrative** 57:24
 58:12
**nathan** 2:19,20
 6:14 7:5,5 61:7

61:19
**near** 9:5 22:15
 50:16
**need** 8:15 49:9
 51:7 66:20
 102:7
**needed** 16:8,12
**neighborhood**
 9:8,10 15:5
 19:6 20:1,3
 21:19 99:22
 115:21
**neighborhoods**
 18:18 19:1
**nervous** 31:17
 90:23
**never** 35:20,20
 67:3 74:1
 81:16 117:15
 117:16,18
**new** 69:9 91:21
 93:13
**news** 23:5 25:7
**nick** 2:5,23
 5:17 6:9,15
**nickname**
 18:11,13,15
 22:8
**nicknames** 18:9
**night** 39:16
 68:17
**nine** 17:12
**nklawllp.com**
 2:22,22

**north** 1:16 2:2
 2:8 3:8 5:15
 87:12,23 118:7
**northern** 1:2
**note** 5:3
**notes** 27:9 68:9
**notice** 1:12
 119:3
**noticing** 6:4
**notified** 89:14
**november** 72:6
**number** 4:15
 12:23,24 59:20
 102:9
**numerically**
 36:4

**o**

**o** 6:6,13 11:12
 62:20 118:3,3
**o'brien** 3:2 4:5
 6:10,10 46:21
 47:21 48:1,6,9
 48:11,22 49:1
 49:7,21,23
 50:1,12 51:3,5
 51:9,11,16,18
 51:19 52:13,19
 53:1,14,20
 54:5,11,21
 55:4,11,18,23
 56:6,23 57:5
 57:10,16,21
 58:7,15 95:3
**o'callaghan** 3:1
 6:11

**o'mara** 3:1
 6:10
**o2lawyers.com**
 3:4
**oberts** 3:14 7:2
 7:2
**object** 38:1
 61:7 72:20
 74:13 76:8,12
 77:18 80:3
 84:22 95:10
 99:6
**objection** 8:1,3
 17:18 18:20
 19:2,8,22
 20:20 21:10,16
 21:21 22:4,9
 22:17 23:6,12
 23:17 24:14,23
 25:9,19 26:3
 28:1,9,14,24
 29:5,12,17,22
 30:4,10,19
 31:4,9,14,18,23
 32:5,11,18
 33:7,19 34:1
 34:12,17,21
 35:3,11,16
 36:24 37:15,20
 38:12,17,23
 39:9 40:9,15
 41:8,14,23
 43:10,19,24
 44:12,13,23
 52:11,16,23

53:13,17 54:1
54:9,19 55:2
55:10,16,21
56:3,21 57:3,8
57:14,19 58:3
60:10 61:19,23
63:19 64:14,24
66:5,11,18
67:14 68:24
89:23 95:3
100:3 104:15
105:15 109:3
109:12,19
110:3,8 111:6
111:12 116:2
**objections** 6:2
7:23 19:20
**obligation** 50:9
**observations**
34:24
**observe** 33:11
33:17,23 34:8
37:6
**observed** 35:8
**obviously** 50:8
**occasionally**
65:4
**october** 13:17
**offer** 90:6
102:2
**offering** 82:4
**office** 4:23
26:12,21,22
27:3,17 37:13
41:7 43:7,16

43:23 44:5,21
48:7 52:4
54:24 63:14
65:21 70:3
81:19 83:22
84:6 86:5 93:1
93:4,12 94:14
94:17 98:16
101:6 102:21
105:6 107:7
109:11 112:11
113:18
**officer** 14:17
71:21 109:22
**officers** 3:11
6:20 62:10
80:8 81:12
83:3 88:14
114:15
**offices** 5:14
**official** 116:19
**oh** 16:3 38:3
40:11 58:16,17
65:22 74:16
78:17 95:14,18
96:21 103:2,16
117:9,16
**okay** 8:23 9:13
14:19 15:8,23
16:1 17:7,13
17:16 19:11,23
20:15,18 23:14
26:15 36:8,12
40:11 46:22
47:3,15 48:5,8

48:10,14,21
49:21 50:14
51:6,18,20,21
52:3 54:12
58:15 59:23
60:3,12 61:13
61:16 64:9,17
65:9,17 66:1
67:22 68:10,13
68:23 69:2,11
69:12,13,16,18
70:16,19,24
71:12 72:7
73:8,12 74:15
74:20,24 75:8
75:12 77:15
79:9,15 80:7
80:10,13,24
81:3,8,17 82:7
82:11 83:14,18
84:18,21 85:5
85:19 86:9,22
87:4 88:6,8,11
88:19 89:2,5,8
90:6 91:7,10
91:13,16,22
92:21 94:4,10
95:14,18 97:2
97:11 101:4,22
102:14 103:3
103:22 104:1
105:18,19
106:13,22
107:2,6 108:7
108:11,12

112:3,15,20
113:20 114:6
114:17,21
115:4 116:8
117:9
**old** 13:13 22:15
85:3
**olivia** 12:7
**once** 114:24
**open** 87:2,3
**operation** 22:6
**operations**
14:22
**order** 14:14
47:16,16 49:17
50:6 51:1
**orpett** 3:13
**outcome** 5:22
119:8
**outside** 43:2
74:10
**overdose** 11:7
**own** 60:9 65:23

**p**

**p** 11:12
**p.m.** 1:19 63:8
**pacemaker**
69:7,9
**page** 5:17
36:18,21,22,23
37:3,6 54:13
92:1,11 97:4
**parent** 80:18
**park** 9:12
13:20,23 20:6

**[park - professionally]** Page 17

22:16,20,21 75:4
**part** 52:18
**particular** 9:8 19:6 20:1 50:5
**parties** 5:9,20 47:24 119:7
**party** 47:1
**party's** 68:1
**pass** 11:3
**patch** 113:23 114:11
**patrick** 4:20 46:2
**patrol** 14:17
**patrolman** 14:8
**pause** 8:1
**pay** 82:5
**paying** 106:20 108:9
**pending** 118:9
**pension** 72:8
**people** 29:7 42:18 72:1 73:15 91:21 95:22 102:4 110:2 113:18 115:20 116:1 117:1
**period** 10:14 64:10 112:17 112:24
**perjury** 57:12 98:3

**person** 42:21 42:23 52:9,14 52:20 53:3,15 53:22 59:16 65:3,5 68:17 69:12,14,18 76:17 77:1 87:19 90:9 101:15 113:4 113:11,11
**personally** 118:7
**personnel** 16:12 65:13
**pertaining** 1:14
**phone** 26:11 42:5 52:5,20 59:13,18,20 67:7 70:15 77:5
**phones** 5:6
**phrased** 41:17
**pick** 5:4 72:13
**picked** 71:13
**pistello** 11:11
**place** 5:6,8 59:14 94:8
**plaintiff** 1:5
**plaintiffs** 2:4 6:8 118:11
**please** 5:3,5 6:2 7:10 8:8 62:23 101:7
**point** 65:14 66:2,2,8,15

**pointed** 114:19
**pointing** 73:22 97:9
**police** 13:12 14:2,3,7 15:16 65:6,18,18 71:20 72:2,5,8 80:2,7 84:2,9 88:14 89:6 93:19 99:24 100:4 107:13 109:22 110:22 114:15
**poorly** 41:17
**pope** 21:15
**popes** 18:1,3,17 18:24 19:6 20:1,4 22:3 43:15 110:23 116:1,4
**position** 13:19 14:6
**possible** 88:12 95:8
**possibly** 81:5
**post** 57:1,2
**preference** 50:5
**prepare** 66:23 82:22
**prepared** 37:9
**preparing** 8:7
**presence** 16:20 37:10 97:18 118:19

**present** 5:23 27:6 38:21 39:18 40:1 53:10 61:1 63:22 64:2 75:14 77:12 78:4 96:18,24 104:22 105:2 111:3 112:23 119:4
**pretty** 88:5
**previous** 94:21
**primary** 47:12 48:18 50:6
**prior** 62:13,16 62:19 75:8
**prison** 22:14 23:10 31:8 34:10 98:7
**private** 5:4
**probably** 32:19 77:5 99:16 113:14
**problem** 40:20 48:22 49:1
**procedure** 1:13 60:4,5,7 67:12 67:24
**proceedings** 1:19 6:2
**professional** 28:16 35:5 99:10
**professionally** 98:20

[progress - remember]                                                  Page 18

progress 15:14
promise 111:18
promised 39:6
   45:16
prosecutor
   27:17
prosecutors
   32:3
ptak 3:18 6:18
puppets 98:13
pursuant 1:12
   119:3
put 16:7 30:8
   33:20 54:16
   111:19
putting 33:18

**q**

question 7:21
   8:3,4,8,10
   41:17 44:8
   50:9 57:24
   58:11 61:8
   66:14 67:6
   113:21,21
   115:3
questioned
   28:22 32:23
questioning
   35:2 48:12,18
   100:12 105:17
questions 33:1
   33:15 34:5
   35:6,19 47:12
   47:14 48:14,20
   49:6,11,14

50:6 51:20
53:23 58:2,9
58:12,14 59:7
59:13 60:13,22
62:3 69:19
75:16,19,23
76:2,17 78:6
80:19,20 91:2
91:5 96:7
99:10 106:2,9
106:16 108:20
108:22 114:22
quick 115:3
quickly 45:19
quite 77:2

**r**

r 6:13,16 62:20
radio 15:16
   99:20
raped 31:8
   34:10
reach 52:15
reaction 67:13
read 65:19
   86:15 89:21
   90:4 112:18
reading 38:6
   76:3,4 103:17
   112:6
ready 68:10
real 73:16
really 15:11
   16:22 21:11
   25:10 40:3
   65:15,24 85:10

89:5 92:20
95:21 103:9
106:20 113:16
116:3
reason 8:15
   68:21 113:3,10
   114:7
recall 8:12 23:4
   26:16 27:5
   33:5 37:12
   38:5 39:2
   44:20 46:14
   61:4,10 110:13
   115:10
recanted 40:7
   40:14 93:23
receive 94:21
received 52:5
   56:20
recent 23:10
recently 73:24
recognize
   36:16
recollection
   102:19 107:15
   107:16
record 5:2,8,9
   6:1,23 46:16
   46:18 50:3,4
   74:4 97:9
   105:22,24
   116:13 117:8
recorded 5:11
recorder 58:6

reduced 118:20
referenced 60:3
referring 45:8
   74:4
refresh 102:19
   112:22
refresher 51:7
regard 108:17
regarding
   43:15 96:16
   109:10
rehab 40:22
related 5:20
   119:7
released 23:10
   23:19,23 24:13
relevant 48:11
remember 8:13
   8:14 17:4
   20:11 32:2,8
   35:10 52:17
   54:3,3 67:16
   69:18,20 76:2
   76:3,4 77:2
   79:13 80:13
   82:1,4,7,9,10
   82:11 83:1
   86:1 88:9 89:8
   92:6,21,24
   93:3,7,12 94:4
   94:9,22 96:8
   96:15 103:5,7
   103:8,9,10,14
   103:22,23
   104:1,4,7,10,13

**[remember - scott]** Page 19

104:20 106:4
108:21 113:17
113:24
**remotely** 5:24
**repairs** 108:9
**repeat** 101:7
113:8
**repeated** 78:6
**rephrase** 8:9
56:9
**report** 108:1
110:11
**reported** 1:23
118:18
**reporter** 1:16
5:19 7:9,19,22
76:6 116:22
117:17 118:5
**reporters**
116:24
**represent** 6:14
6:17,20 49:12
59:3 60:21
62:9 68:14,20
**representatives**
70:1 98:16
**represented**
60:1
**representing**
2:4,10,16,23
3:4,10,17 6:11
44:10 47:24
48:1,3,13
**represents** 51:8

**reschedule**
67:11
**resemble**
114:12
**reserve** 116:17
**residence** 9:7
**respect** 65:3
**responding**
91:4
**restate** 47:23
76:16
**retire** 14:9 72:4
**retired** 13:10
13:11 17:14
**review** 92:1
116:20
**revisions** 91:22
**ride** 109:6
**rides** 109:1
**ridge** 9:11
**right** 19:14
20:14 22:21
24:20 27:5,19
28:21 29:3
36:20 37:12
47:21 48:15
49:19 50:8,19
50:23 51:9,14
51:23 52:7,20
53:2,7,9,11
54:16 58:8
59:12 60:12
64:2,7,20
81:23 82:13
84:13 86:2,4

86:19,21,23
87:16 89:19,20
98:24 99:14,14
99:19 103:2,23
104:22,24
105:3,7 106:14
107:22 112:6,6
112:18 114:3,4
114:13,20
116:17 117:9
117:17
**rights** 89:15,21
90:4
**robbery** 15:15
**rolling** 35:22
**room** 5:23 29:7
49:4 53:15
87:4,6,9,11,13
87:21 91:17,20
96:20 101:18
107:3 113:4
**roughly** 10:2
12:9 15:3
17:11
**rules** 1:12 7:18
28:18 49:14,16
98:23 99:5,7,8
**running** 76:17

**s**

**s** 4:14 6:7 11:12
64:4 112:17,24
**saith** 117:21
**sandra** 9:16,17
9:19,21 10:2,8
10:15,22 11:8

25:8 115:6
**saw** 37:13
64:13 74:1
84:19 109:17
**saying** 26:11
30:3 35:9
49:13 52:5
57:18 67:10
90:3 92:6
106:21 113:24
**says** 36:13
42:15,16,16
63:4,7,13,22,23
64:3 94:20,20
105:5 110:15
110:21 111:9
112:9,15,23
114:3
**scott** 1:8 2:11
3:5 5:13 6:6,12
26:14,23,24
27:13,16,20
28:7,13 29:16
30:8,14 31:1,7
31:13 32:16
33:2,6,11,17,23
34:8,15 35:1
37:19 39:7
48:4 69:23
71:10 72:14
74:10,14,21
75:5,13,19
76:10 78:7
82:4 108:8,18
118:12

**[screamed - sopron's]**                                    Page 20

screamed  30:14
screaming
  33:24
scumbag  97:20
second  49:20
  68:10
seconds  66:20
security  13:20
  13:22 26:20
  86:2
see  15:13 24:17
  36:13 46:3,5
  63:4,8,14,24
  64:4 82:24
  83:3 86:19
  92:20 102:1
  106:6,6,11,18
  106:22 113:1
  114:3,6,12
  115:19
seem  90:23
seemed  28:17
  76:5 99:9
seems  85:11
  94:20
seen  23:22 24:1
  24:6,11 35:14
  46:6,12 75:9
  102:17 110:12
send  16:11,18
  116:19 117:3
sense  50:23
sensitive  5:3
sentence
  112:15

september  26:7
  51:24 60:23
  62:13,16,19
  74:11,21 75:12
  76:22 77:8
  78:15 81:3,4
  81:17 83:19
  85:7 86:1 89:9
  100:1 105:13
  106:3 109:16
sergeant  62:20
  66:14,17
served  49:19
set  86:24 119:9
seven  50:19,21
sexually  98:6
shaking  97:17
shannon  12:14
  12:18
shelly  13:9,9
shneur  2:20 7:5
shooting  20:11
  20:13 79:11
  88:12
short  46:17
  69:17 105:23
shorthand  1:16
  118:5
show  45:19
  46:9 94:7
showed  73:20
showing  36:12
  104:13
shown  45:4

side  87:13,14
  87:15,17
  115:18
siebken  2:14
  4:6 6:22,22,24
  58:19,22 59:2
  59:2,11 60:12
  68:24
sign  37:3,6
  92:11 94:16
  117:5
signature  36:20
  36:22,23
  116:15,17,23
  117:8 118:24
  119:21
signed  41:13,19
  54:12 86:15
  111:9 113:15
sir  24:10,19
  27:4 60:13
  62:8 63:6,9,12
  63:16 64:5,8
  66:23 68:4
  109:24 111:19
  114:22
sit  64:18
sitting  80:15
  99:15
six  88:7
slow  16:20
smart  73:10
smitko  104:11
snathan  2:22

somebody
  58:24 101:14
  104:2,7
son  25:16 26:8
  27:1 39:21
  52:6,10,15
  53:10 54:12
  55:24 56:1
  60:24 64:9,22
  84:24,24
  109:10 112:10
  112:12,16
  113:6
son's  73:15
sons  18:6 19:5
  19:24 20:7
  21:5,6 24:18
  24:21 25:12,22
  81:5
sopron  1:4 2:5
  5:12 6:8 21:2,4
  21:15,20 22:2
  22:8,14 23:9
  23:22 24:4,6
  24:12,21 25:5
  25:8,17 26:2
  41:22 42:7,24
  43:3 56:1
  59:15 60:2
  68:14 93:9
  96:16 102:3,10
  118:11
sopron's  25:23
  40:24 41:5,11
  41:18 43:5

56:11,15,20
67:7 68:7
81:18 82:13
93:24 107:18
115:7
**sorry** 13:18
16:13 17:3
19:10 23:13
38:2 40:10
41:4 46:24
51:3 52:17
55:12 58:22
59:3 74:16
90:2 96:21,23
100:5 102:7
103:2,17
104:16 111:20
**sound** 68:18
73:10
**south** 9:1 10:3
11:14 87:15,17
**space** 87:2
**speak** 7:18
27:13 29:3
43:5
**speaker** 73:16
**speaking** 37:19
39:6 57:22,24
66:9,16 74:14
**special** 14:22
**specialist** 16:16
**specialists**
16:21,22
**specifics**
115:10

**spelled** 6:6
**spoke** 28:12
29:10 52:22
74:20
**spoken** 67:3
**sr** 1:11 4:3,17
4:19,22 5:11
118:8
**ss** 118:2
**stand** 80:17
**star** 61:15
65:14,18,19,23
70:15 113:23
114:3,8,18,19
**stars** 65:16
**start** 19:17
35:23 79:6
111:23
**started** 78:2
89:19,20 90:20
**starting** 14:16
**state** 5:24 6:3
7:13 118:1
**state's** 1:7 2:11
3:5,18 4:23
5:13 6:12,17
26:22 27:17
28:17 41:7
43:7,16,22
44:4,5,21 48:3
48:6,7 52:4
53:5 54:23
55:1 57:6,23
58:5 63:14
65:20,22 70:3

72:14,16 75:7
75:9 80:19
81:19 83:22
84:6 86:5
88:20 93:1,4
93:12 94:13,17
96:1 98:16
101:6 102:21
103:6 104:23
105:6 106:19
107:7,10 108:4
108:8 109:11
111:4 112:11
114:4 117:16
118:12
**stated** 111:3
112:9
**statement** 4:16
27:21,24 31:22
36:13 37:4,7,9
37:13,23 38:6
38:11 39:7
41:12,19 43:8
43:17 44:22
45:9 52:1 53:3
53:4,10,21,22
53:24 54:6,13
54:18 57:7,13
57:18,23 58:13
60:24 62:24
63:4 75:10,11
75:13,18 78:2
86:14,15 90:19
91:23 92:2
93:13,20 94:14

97:10 99:15
100:2,8 104:14
104:15,23
110:18,24
111:4,5,10,11
111:21 112:21
112:22 113:1
113:15 115:14
**statements**
52:22
**states** 1:1,13
111:2 118:10
**station** 76:23
77:7,8,13,16,19
99:24 100:4
101:16
**stenographic...**
118:18
**stop** 15:11
**stopped** 106:11
**story** 99:13
115:22
**street** 1:17 2:2
2:8,14,20 3:2,8
3:15 5:16
10:16 17:17
18:5 21:22
26:15 30:17
31:13 32:15
38:21 39:13
61:14 109:17
**streets** 22:23
**strike** 24:7
38:20 39:3
44:12 85:23

**[strike - thing]** Page 22

96:23 101:9
**struggling** 79:7
**stuff** 51:1 99:22
 116:21
**subject** 27:23
 33:5 37:18
**subpoena**
 49:19 56:20
**subpoenaed**
 95:14,17,18,19
**sued** 44:11
**suggestive**
 33:15
**suit** 119:7
**suite** 2:2,8,14
 3:2,15
**summary** 94:7
 94:10 104:16
 110:14,21
**support** 59:6
**sure** 20:14 38:9
 50:11,24 51:16
 63:1 76:16
 87:8 88:18
 89:15,22 90:2
 101:17 105:12
 105:12 114:19
**surgery** 69:7
**surprised** 81:8
 81:10
**suspect** 100:19
 100:22
**swear** 7:10
 97:14,18

**swearing** 33:24
**switching**
 46:24 49:5
**swore** 97:14
**sworn** 7:11
 8:20 118:15

**t**

**t** 4:14 11:12
**table** 87:9,15
 87:15,18
**take** 5:8 7:22
 8:15 27:21
 46:15 75:9,11
 102:15 105:19
 113:19
**taken** 1:15 5:12
 46:17 53:3
 63:7 75:13
 78:2 94:8
 105:23 116:18
 116:22
**talk** 17:21
 19:21 35:24
 36:6 69:4
 72:18,24 73:6
 73:8 77:16
 78:1 79:22
 80:7 81:4,4,12
 82:18 84:16
 86:17,20 89:5
 91:13 95:2,9
 95:20,21
 107:11,14,18
 107:24 108:3

**talked** 66:3
 74:9 77:15
 79:9,10 81:7
 101:5 106:13
**talking** 49:4
 50:20 74:16,17
 78:5,9 83:9
 92:14 98:24
 106:7,18,22
 111:24 115:24
 116:1
**tall** 88:6
**task** 14:21 15:9
 15:18,20
**tell** 27:20,23
 28:4,8 29:13
 29:15,20 30:2
 30:7,13,16,22
 31:1,7,12 34:9
 34:15 39:4
 42:9 45:14
 48:23 52:14,21
 54:24 55:14,19
 57:11 60:7
 69:3 71:20
 77:12 78:11
 83:18,21 84:1
 84:4,8 88:23
 88:24 90:2,12
 90:19,20 91:7
 93:16,19
 100:13,15,18
 101:5,8,10,11
 101:15,16,22

**telling** 34:20
 93:13 97:6
 99:12 115:16
 116:7
**term** 61:8
 77:19
**terms** 57:18
**test** 14:11
**testified** 8:20
 25:17,23 26:1
 39:19,22 56:1
 56:15 82:13
 85:19 96:24
 109:15
**testify** 56:20
 82:22 118:15
**testifying** 57:1
 83:12 96:15,19
**testimony** 40:7
 45:17 56:7,11
 56:15 74:14
 82:19 83:15
 89:24 93:23
 97:2 100:4
 107:8,11,14,19
 118:17,22
 119:9
**thank** 60:13
 62:5,10 114:22
**thanks** 68:4
 117:19
**thereof** 119:8
**thin** 88:10
**thing** 42:13
 76:4 86:16

**[thing - trial]**                                                    Page 23

88:21 89:13
95:24 115:12
**things** 25:12
68:16 73:18
96:8
**think** 9:24 10:6
11:2 13:24
20:16 22:5,22
25:11 27:7,7,9
29:7 36:2
40:14 46:6
47:19 48:21,24
49:15 54:2,2
58:10 60:3,12
64:3 68:19
71:11 72:17
73:18 74:2,23
75:11 76:3
78:23 80:17
81:24 83:17
84:14 85:16,17
86:18 88:21
89:14 90:8
94:3 99:15
100:17 103:10
107:1,9 108:6
108:10 109:20
112:7 114:1
115:14 116:3
116:10 117:3
117:11
**thinking** 11:20
**thinks** 25:13
**thinner** 88:9

**third** 68:1
112:7
**thomas** 62:17
66:10
**thought** 28:19
58:5 67:15,16
76:7 97:6
99:12 100:13
113:22 115:15
116:7
**threaten** 57:7
96:2
**threatened**
29:16,20 31:2
32:9,16 35:8
39:5 40:17
97:23 98:3
110:16
**threatening**
33:12
**three** 12:10
21:6 24:15
45:3 69:24
107:22 108:17
**threw** 80:20
**thrown** 20:21
**time** 1:17 6:3
7:24,24 8:12
10:15 14:16,19
20:23 23:5
26:8 27:1
38:20 39:4
41:24 42:11,18
44:16,19 46:7
47:7 49:17

53:6 55:19
62:11 64:10
66:2 68:4
70:18,20,21
74:21 75:1,9
78:8,21,24
79:4 80:21
81:22 82:12,24
83:4,12,19
84:13,16,19
85:7,9,17 88:8
88:11 96:4,6,9
105:3 110:15
110:17 114:8
114:16,23
117:19
**times** 24:6,11
24:15 45:2,3
49:10 69:4,22
69:24 70:17
71:3,5 88:17
107:22
**timing** 50:15
**title** 113:11
**today** 42:13
48:12 62:11
64:18 69:7
70:11 93:22
98:22 109:7
116:23 117:19
**together** 21:12
84:12
**told** 25:3 29:13
31:7 32:2,8,14
35:18 42:19,24

45:12 52:9
72:12 86:8,13
92:22 94:3
98:6,12 100:1
100:7,9,13
110:22 115:13
117:4
**tony** 6:19 62:9
**took** 57:6 59:14
60:24 67:18
71:11,13
101:19 104:23
111:4 113:15
117:7
**top** 36:13 63:2
112:23 114:2
114:12
**total** 96:13
**touch** 71:9
**traffic** 15:12
**transcript** 8:7
116:18 118:22
**transcription**
118:21
**transit** 15:1
17:9,10,15
81:1,2
**translate** 8:7
**treat** 98:20
**trial** 25:18,23
40:3 55:20
56:2,8,12,16,20
57:2 81:18
82:13 84:4
93:24 103:12

[trials - went]                                                      Page 24

**trials**  39:22 40:6
**tribler**  3:13
**tribler.com** 3:16,17
**trick**  117:2
**true**  32:10 50:17 67:4 69:6 104:20,22 110:18,23 111:5,10 118:21
**trust**  116:21 117:7
**truth**  29:13 34:16,20 45:14 97:6 99:13 100:13,14 115:16 116:7 118:15,16,16
**truthful**  99:16 110:22
**try**  7:20 8:5 19:20 69:3
**trying**  7:22 76:14 90:3 94:22
**turn**  5:5 7:8
**two**  22:15 28:5 78:9 84:18 88:7 99:17
**type**  16:14 50:21 85:14 113:24

**typewriting** 118:20
**typical**  28:16
**typos**  116:20

**u**

**u**  6:16 18:14
**uh**  8:6,6,6
**under**  28:8 64:2 109:18 110:2,6
**understand**  8:8 90:3
**understood** 8:10 66:16
**undetermined** 118:9
**uniform**  16:18 65:6
**unit**  5:10 16:2 16:14 17:1,13
**united**  1:1,13 118:10
**upper**  114:4
**ups**  47:10,12 48:19 108:15 111:17
**upsetting**  99:19
**used**  85:17 109:15

**v**

**vela**  1:15,23 5:19 118:4
**verify**  38:10

**veritext**  5:18,20
**versus**  8:5
**vest**  65:12
**video**  5:8,11 59:4,6
**videographer** 5:1,18 7:9 46:16,18 50:3 105:22,24 116:12
**violations** 15:12
**visit**  70:2
**visited**  70:6 81:20 98:17
**vittum**  9:12 20:6 75:4
**voice**  7:19
**vs**  1:6 5:12

**w**

**wait**  44:1 97:8
**waiting**  86:24
**waive**  116:17 116:23 117:7 117:13
**waived**  119:1
**walked**  86:23
**walking**  83:7
**wall**  87:23 88:2
**walsh**  4:20 46:2 94:20,22
**want**  25:3,5 26:6 35:21 38:9 42:11 45:19 47:18,21

49:7,16,22,23 50:12,24 51:5 51:12 52:21 58:21 60:16 63:2 73:10 92:6 95:15,21 102:15 110:13 113:8 116:14
**wanted**  32:19 38:16 42:13,14 43:1 52:15 67:18,18 72:18 72:23 91:7
**washington** 3:15
**watch**  92:19
**way**  13:13 25:14 33:12 38:22 67:13,18 82:8 100:24 119:7,8
**wayne**  2:5,24 6:9,15
**wboberts**  3:17
**we've**  35:23 65:10 114:10
**wearing**  107:3
**weeks**  39:18
**welcome**  50:7 60:14 62:12 68:6
**went**  14:21,22 14:23,24,24 22:14 26:16,20 47:8 52:3 86:2

**[went - yeah]** Page 25

| | | | |
|---|---|---|---|
| 100:11 101:17 103:14 109:16 113:12 | 25:20 26:4 28:2,10,15 29:1,6,13,18,23 | 110:4,9 111:7 111:10,13 112:11 116:3 | **x** |
| **wentworth** 15:22 | 30:5,11,20 31:5,10,15,19 | 116:11,24 117:9,11,14 | **x** 4:1,14 |
| **west** 2:14,20 3:2,15 10:16 88:1 | 31:24 32:6,12 32:19,22 33:8 33:20 34:2,4 | 118:14,18,19 118:23 119:1 **witnesses** 81:6 | **y** |
| **whereof** 119:9 | 34:13,18,22 | **woman** 59:23 | **y** 6:6,7,8,13 63:24 112:17 |
| **wheth** 101:2 | 35:4,12,17 | 91:17 92:13 | **yeah** 13:1,7 |
| **whispering** 5:4 | 37:1,16,21 | **words** 30:7 | 16:3,3,22,24 |
| **white** 61:14 | 38:2,13,18,21 | 33:18,20 54:16 | 17:6,23 18:7 |
| **wife** 42:12,19 67:19 69:6 94:3 115:6 | 38:24 39:10 40:10,12,16 41:9,15,24 | 56:8 58:1 **work** 13:19 14:1 15:9,17 | 18:19 19:19 21:3,7 26:17 27:18 29:6 |
| **wife's** 9:15 12:13 13:8 60:4,5 67:23 | 43:11 44:1,14 44:24 50:9,20 52:10,12,17,24 | 16:14 69:21 **worked** 16:9,21 72:2 | 33:8 36:2,6 40:23 42:16 43:1 44:6 |
| **william** 3:14 | 53:18 54:2,10 | **working** 13:10 | 47:23 49:15,24 |
| **willing** 73:6,8 95:2,9,19 | 54:20 55:3,17 55:22 56:5,22 | 13:11,12,18 16:5 41:22 | 50:23 51:3 58:23 60:1 |
| **window** 108:9 | 57:4,9,15,20 | 42:7,23 43:3 | 61:12 69:21 |
| **windows** 82:1,5 82:9 | 58:4 60:11,14 61:24 63:20 | 43:14 59:15 81:1 | 70:12 73:1,7 73:21,24 76:7 |
| **wise** 50:15 | 64:15 65:1 | **worries** 11:22 | 79:1,12,16,18 |
| **wish** 85:13 | 66:6,12,19 | **wow** 87:7 | 79:24 80:12,23 |
| **wit** 118:6 | 67:15 68:6 | **write** 37:23 | 81:2,11 82:15 |
| **witness** 4:2 7:8 7:10,11,14,17 | 72:21 75:10 76:13,20 80:5 | 92:19 **writing** 53:23 | 83:8,8,16,16 86:8,18,18 |
| 8:17,19 19:3,9 | 82:16 84:23 | 92:13 | 87:3,5,10,22 |
| 19:11,14 20:21 | 92:4 95:4 99:7 | **written** 92:16 | 88:3,15,18 |
| 21:11,17,22 | 100:16 102:6 | 94:14 | 89:17 91:3 |
| 22:5,10,18 | 104:17 105:6 | **wrong** 51:13 | 94:1 95:21 |
| 23:7,13,18 | 105:14,16,21 | 96:2 103:17 | 96:11 97:5 |
| 24:15,24 25:10 | 109:4,13,20 | | 99:1,19 102:16 106:15,17,20 107:23 108:23 109:8 111:22 112:2,4,14 |

**[yeah - zoom]**                                                    Page 26

114:1,6 115:9
116:16,24
117:10,11,11
117:11,14
**year**  14:9 22:15
  79:13
**years**  10:4
  12:10 13:24
  14:5 16:4
  17:12 23:10
  43:21 44:22
  79:17 109:23
  110:1 117:15
**yelled**  30:13
**yelling**  33:24
**yep**  17:22
**yesterday**  42:3
  42:4 59:14
  67:8
**young**  99:17

**z**

**z**  6:16 112:24
**zoom**  58:24

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.