IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION
DISTRICT JUDGE JOHN F. KNESS
MAGISTRATE JUDGE MARIA VALDEZ
CASE NO. 19-CV-08254
CASE NO. 21-CV-05525
CASE NO. 22-CV-00320

MATTHEW SOPRON
Plaintiff,

V.

FORMER ASSISTANT STATE'S
ATTORNEY SCOTT CASSIDY, ET AL.,
Defendants

NICHOLAS MORFIN,
Plaintiff,

V.

FORMER ASSISTANT STATE'S
ATTORNEY SCOTT CASSIDY, ET AL.,
Defendants

WAYNE ANTUSAS,
Plaintiff,

V.

FORMER ASSISTANT STATE'S
ATTORNEY SCOTT CASSIDY, ET AL.,
Defendants

DEPONENT:  NORFIE DICIOLLA
DATE:      AUGUST 22, 2023
REPORTER:  KRYSTAL BARNES



Read and Sign Only

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 2

APPEARANCES

ON BEHALF OF THE PLAINTIFFS, MATTHEW SOPRON, NICHOLAS
MORFIN, WAYNE ANTUSAS:

Lindsay Hagy, Esquire

Loevy & Loevy

311 North Aberdeen Street

Third Floor

Chicago, Illinois 60607

Telephone No.: (312) 243-5900

E-mail: lindsay@loevy.com

ON BEHALF OF THE DEFENDANT, FORMER ASSISTANT STATE'S
ATTORNEY SCOTT CASSIDY:

Michael Stephenson, Esquire

Matthew Howroyd, Esquire

Hinshaw & Culbertson LLP

151 North Franklin Street

Suite 2500

Chicago, Illinois 60606

Telephone No.: (312) 704-3000

E-mail: mstephenson@hinshawlaw.com

(Appeared in person and via videoconference)

Page 3

APPEARANCES (CONTINUED)

ON BEHALF OF THE DEFENDANTS, LAURA SULLIVAN, COLLEEN
HYLAND, PATRICIA SHAE, NEIL LINEHAN, STEVE DINOLFO,
GEORGE ANDREWS:

Maureen O'Brien, Esquire

Sean O'Callaghan, Esquire

O'Mara O'Callaghan Attorneys at Law

230 West Monroe Street

Suite 2620

Chicago, Illinois 60606

Telephone No.: (312) 600-5588

E-mail: maureen.obrien@o2lawyers.com

sean.ocallaghan@o2lawyers.com

(Appeared via videoconference)

Page 4

APPEARANCES (CONTINUED)

ON BEHALF OF THE DEFENDANTS, GEORGE HOLMES, THOMAS
ARGENBRIGHT, ANTHONY GRAFFEO, ALBERT GRAF, WILLIAM
MOSER:

Anthony Masciopinto, Esquire

Heather Afra, Esquire

Kulwin, Masciopinto & Kulwin

161 North Clark Street

Suite 2500

Chicago, Illinois 60601

Telephone No.: 312-641-0300

E-mail: amaciopinto@kmklawllp.com

hafra@kmklawllp.com

(Appeared via videoconference)

Page 5

APPEARANCES (CONTINUED)

ON BEHALF OF THE DEFENDANTS, LEONARD BAJENSKI, WILLIAM
MARLEY, NORFIE DICIOLLA, THOMAS PTAK, K. MAICKE, L.
MCDONALD:

William Oberts, Esquire

Amy Kuzner. Esquire

Tribler Orpett & Meyer P.C.

225 West Washington Street

Suite 2550

Chicago, Illinois 60606

Telephone No.: 312-201-6400

E-mail: woberts@tribler.com

amkuzner@tribler.com

ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:

Veronica Mantilla, Esquire

Michael Best & Friedirch LLP

444 West Lake Street

Suite 3200

Chicago, Illinois 60606

Telephone No.: 312-222-0800

E-mail: vamantilla@michaelbest.com



**Kentuckiana Reporters**
**30 South Wacker Drive, 22nd Floor**
**Chicago, Illinois 60606**

**502.589.2273 Phone**
**502.584.0119 Fax**
**schedule@kentuckianareporters.com**
**www.kentuckianareporters.com**

Page 6

INDEX

                                                    Page

PROCEEDINGS                                         8

DIRECT EXAMINATION BY MS. HAGY                      9

CROSS-EXAMINATION BY MR. STEPHENSON               309

EXAMINATION BY MS. O'BRIEN                        325

EXAMINATION BY MR. MASCIOPINTO                    347

EXAMINATION BY MR. OBERTS                         358

REDIRECT EXAMINATION BY MS. HAGY                  359

RECROSS-EXAMINATION BY MR. STEPHENSON             366

FURTHER CROSS-EXAMINATION BY MR. OBERTS           369

EXHIBITS

Exhibit                                           Page

  9 - Proffer letter Re: William Bigeck          181

 46 - Proffer letter Re: Edward Morfin           226

126 - Investigative report                       191

127 - Transcript Sopron 9219-9241                239

128 - Investigative report                       252

129 - Investigative report                       355

130 - Investigative report                       271

131 - Memorandum                                 290

132 - Witness protection program list            302

Page 7

STIPULATION

The deposition of NORFIE DICIOLLA was taken at LOEVY & LOEVY 311 NORTH ABERDEEN THIRD FLOOR CHICAGO ILLINOIS 60607 in person and via videoconference in which some participants attended remotely, on TUESDAY the 22nd day of AUGUST 2023 at 10:17 a.m. (CT); said deposition was taken pursuant to the FEDERAL Rules of Civil Procedure.

It is agreed that KRYSTAL BARNES, being a Notary Public and Digital Reporter for the State of ILLINOIS, may swear the witness and that the reading and signing of the completed transcript by the witness is not waived.

Page 8

PROCEEDINGS

THE REPORTER: Okay. We're on record.

MS. HAGY: Can we have everybody update their appearances? Do you want to do that part?

THE REPORTER: Okay. We are going to do appearances on the record. Can we start with the people in the room first?

MS. HAGY: Lindsay Hagy, H-A-G-Y, on behalf of plaintiffs, Wayne Antusas, Matt Sopron, and Nick Morfin.

MR. KURSON: Nate Kurson, observing.

MR. STEPHENSON: Michael Stephenson on behalf of defendant, Scott Cassidy.

MS. KUZNER: Amy Kuzner on behalf of Norfie Diciolla today.

MR. OBERTS: Bill Oberts on behalf of the deponent.

THE WITNESS: Norfie Diciolla, the deponent. That's what you call me.

MR. MASCIOPINTO: Tony Masciopinto on behalf of the CPD officer defendants, Argenbright, Moser, Holmes, Graf, and Graffeo.

MS. MANTILLA: Veronica Mantilla on behalf of defendant, City of Chicago.

Page 9

MR. O'CALLAGHAN: Sean O'Callaghan on behalf of former Cook County state's attorneys, Neil Linehan, Colleen Hyland, Laura Suffield, George Andrews, Steve Dinolfo, and Patricia Shea.

MS. O'BRIEN: Maureen O'Brien from O'Mara O'Callaghan representing the defendants, Linehan, Hyland, Suffield, Andrews, Shea, and Dinolfo.

MR. HOWROYD: Matt Howroyd from Hinshaw & Culbertson representing defendant, Scott Cassidy.

THE REPORTER: All right. I'm going to swear in the witness. Sir, can you raise your right hand, please? Do you solemnly swear or affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE REPORTER: You may begin.

DIRECT EXAMINATION

BY MS. HAGY:

Q. First of all, I want to make sure I'm saying your last name correctly, so --

A. Diciolla.

Q. Diciolla?

A. Yeah, just the way it's spelled. It's D-I-C-I-O-L-L-A, so Diciolla. Yeah.

Q. Diciolla. Okay, great. And, Mr. Diciolla,

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 10

have you ever been deposed before?

A. No.

Q. Okay. But you have testified before, right?

A. In courts, yes.

Q. In court. So it's pretty similar, but I just want to go over the rules really quick because there are some differences. First of all, if you don't understand a question, please let me know and I'll rephrase it.

A. Okay.

Q. And if you do answer the question, then I'll assume that you understood it; is that fair?

A. Yes.

Q. And it's also helpful for the court reporter if we try not to talk over each other, so I will try hard to let you answer the question before I start talking again. And the same thing: If you can let me get my whole question out, that'll help her out. Also, the one thing that is different than court is there's no one to rule on objections, so after I ask a question, pause so that your counsel can object if they want to. And unless they instruct you not to answer, then you can answer since there's no judge to rule on the objections; does that make sense?

A. Yeah, I understand.

Q. Okay. And the other thing is, if you need a

Page 11

break, you can take a break any time. Just let me know. So try not to do it while I have a question out to you. Answer a question and then you can ask for a break any time. And then also it's important to verbalize your answers, rather than, like, shaking your head or saying uh-huh. It's easiest for the court reporter if we use whole words like yes.

A. Yes, that I understand.

Q. Okay. Yeah, that part is similar to court.

A. Yeah.

Q. So Mr. Diciolla, where were you born?

A. Born in Chicago. Not too far from here, actually.

Q. Oh, really?

A. Yeah.

Q. Where have you -- what neighborhoods of Chicago have you lived in?

A. Well, predominantly, like I say, not too far from here. Grand Avenue and Ogden. Grand and Halsted. That's where I was born and raised and got me through all the schools that I attended, which is basically a Catholic grammar school and Catholic high school in the area. And then -- you're asking for all the neighborhoods I lived in?

Q. Yes.

Page 12

A. I -- well, later on, when we moved out of this neighborhood -- when I say "we," my parents and I and my sister and brother. We moved out to the west side, more around Chicago Avenue in Pulaski. And that's where we resided until, you know, I -- I was drafted into the Army, Korea, so.

Q. Okay. So what high school did you attend?

A. Holy Trinity High School. It's located on Division and Noble Street.

Q. And is that where you spent your entire --

A. High school career, yes.

Q. -- high school? And what did you do after high school?

A. After high school I worked on construction for a while with my father who was a cement finisher at the time. And I did some odd jobs, a couple of factory jobs, you know? Not for very long. But then within a couple of years of graduating high school, I got drafted in the Army.

Q. Okay. And then how long were you in the Army?

A. Two years.

Q. And what did you do after you came home from the Army?

A. Well, when I came home from the Army, I worked as a -- a driver for United Parcel Service. And then I

Page 13

ended up driving bread trucks for Continental Baking Company, which is basically Wonder Bread. If you remember that? And I delivered to stores and things of that nature.

Q. What year was that that you --

A. Well, I -- I got out of the military in '63, so that would've been like part of -- partial '63 and '64, '65, or thereabouts.

Q. At some point, did you obtain any other education?

A. No, not really.

Q. So when -- did you at some point start working for the Chicago Police Department?

A. Well, I -- I applied for the Chicago Police Department in '66 and was called to the job in '67.

Q. Okay. And why did you apply to the police department?

A. Well, I was looking for more solid work plus I always wanted to be a police officer. I always wanted to try to help people and, you know, just get the bad guys off the street, so to speak. And so I applied. And there was other people in my neighborhood that were in the police department at the time, some which were friends of mine, and they enjoyed the job, so I applied.

Q. And so when did you -- so you said you were

Read and Sign Only

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 14

accepted in '67, right?

A.   Correct.

Q.   So what happened after your application was accepted?

A.   Well, I was called to the Chicago Police Department in '67 and went to training at the Police Academy for almost three months.  Two-and-a-half months.

Q.   And was that basic officer training or --

A.   Yes.  Basic, yes.

Q.   And did you have to take an exam to apply?

A.   Yes.

Q.   And when did you take that; was that in '66?

A.   Yes, it would've been sometime early, maybe, in '66.  It was -- they put out the notices.  The City, I'm talking about, put out notices, "Applications will be accepted for the police department."  And then you have to go to designated high schools throughout the city, you know, from wherever the kids are applying for the job, and you would go take a written exam.  And then after that, then you had to take a physical exam.

Q.   And so you passed both of those --

A.   Yes.

Q.   -- in '67?  And after you finished your training, what was your first job with the police department?

Page 15

A.   Well when I graduated from the Chicago Police Academy, I was sent to the west side, to the old 11th District, which was called the Fillmore District at that time.

Q.   And what was your role there?

A.   I was a patrolman; you know, patrol officer.

Q.   And for how long were you a patrolman in the Fillmore District?

A.   I was in the Fillmore District for approximately two years.

Q.   And what was your role after that?

A.   After that I was recruited to go into what was called the Task Force and worked out of the Maxwell Street Station at that time.  And the Task Force was a -- a group of police officers basically throughout the city, in three different sections of the city, that would respond to strictly high crime areas.

Q.   Okay.  And what was your role in the Task Force; were you still a patrolman or --

A.   Yes, still a patrolman, but the -- the duties were somewhat different in the sense that we didn't -- we -- we weren't tied down to radio calls, like domestics and things of that nature.  We would be responding to on -- in-progress calls.

Q.   And so how long were you with the task force?

Page 16

A.   I was with the task force, probably, three years.  Don't remember exactly.

Q.   And so, what was your next role after that?

A.   Well, while I was at -- in the task force, I -- I -- I took a detective's examination and passed that test.

Q.   Do you know about what year that was?

A.   Yes, it was about '72, '73, something like that.

Q.   So then what happened after you took the detective examination?

A.   Well, we -- we went to detective school when we got called, you know.

Q.   So did you pass on the first try then?

A.   Yes.

Q.   Okay.  So then you got asked to enroll in the detective school?

A.   Well, yeah, they -- well, you have to enroll in the detective school, yeah.  You can't bypass it.  Anyways, yeah, that lasted like a month of training.

Q.   And so, do you know approximately when you graduated from the detective school?

A.   Yeah, I can't recall the year.  It had to be '72, maybe '73.

Q.   Okay.  And then what was your first role after

Page 17

that?

A.   Well, my actual first role, I was actually -- out of detective school, I was assigned to the area for homicide.  But it never actually materialized because I got recruited into the Gang Crimes Unit, which was newly formed in the CPD.

Q.   Okay.  And do you know about what year that was?  Was it --

A.   Well, that would've been --

MR. OBERTS:  In the Gang Crime Unit?

MS. HAGY:  Yes.

A.   The Gang Crime Unit was probably '73.

BY MS. HAGY:

Q.   Okay.  And did you know who recruited you into the Gang Crimes Unit?

A.   Yes, it was -- at the time he was a lieutenant, and the name was Joseph DiLeonardi, who was the lieutenant in charge of the Gang Crimes Unit.

Q.   And did they tell you why they were recruiting you into the Gang Crimes Unit?

A.   Well, like I said, they were forming a new unit, which was the Gang Investigation Unit within the CPD.  And what they did was they recruited people from Detective Division, either new detectives or some of the ones that were more experienced, and they also recruited



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 18

juvenile officers and some tactical officers throughout the city, and they dispersed us in three different areas.

Q. Okay. What were the three areas that they dispersed you?

A. Well, it was Area 4, Area 5, and Area 1.

Q. And did they tell you at that time what -- which gangs they were concerned with?

MR. OBERTS: Objection. Vague. Go ahead.

THE WITNESS: Okay?

MR. OBERTS: Yeah. Go ahead.

THE WITNESS: Oh, sorry.

MR. OBERTS: You're good.

A. Yeah, they were obviously the -- the more prominent gangs throughout the city that were, you know, initiating a lot of the crimes in the different districts. They basically would assign us to certain gangs or certain areas within the city to monitor those gangs.

BY MS. HAGY:

Q. Do you know what -- which gangs people were assigned to?

A. You mean do I remember which officers were assigned to what gangs?

Q. No. Do you remember which gangs people were

Page 19

assigned to? Just generally, like a list of --

A. Well, there were so many of them in them days. It was like the Vice Lords, the Latin Kings, the Cobras -- so many -- Black P. Stone Nation, the Popes, the -- lot of -- lot of different gangs, so I can't remember them all now, to tell you the truth.

Q. So when you first joined the Gang Crimes Unit, which area where you assigned to?

A. I was assigned to the north side gang -- gang prosecution or Gang Investigation Unit.

Q. And which area was that?

A. Well, I was specifically assigned to mostly the far west side, which would be like the 15th District, Boston area, and some of the 13th District, which was called the Wood Street area.

Q. And was that part of Area 4, Area 5, or Area 1?

A. That was part of Area 5.

Q. Area 5?

A. Yeah.

Q. Okay. And when you joined Gang Crimes, who was your supervisor?

A. Well, the -- the -- the officer that recruited me was Lieutenant Joseph DiLeonardi. He was our commanding officer in the Gangs North Unit, which --

Page 20

that's what our title was.

Q. Okay. And at that point you were -- your title was police detective?

A. I was a detective.

Q. Okay. And how long were you in the Gangs North Unit?

MR. OBERTS: Objection. Vague. And to the extent it mischaracterized the testimony. But go ahead.

A. Well, I was in the Gangs North Unit from about '73, '74 to about '94. It's about 20 years.

BY MS. HAGY:

Q. And during that time, were you always part of Area 5?

A. No. In the later part of that stint with the -- with the Gang Investigation Unit or Gang Prosecution Unit -- I got that confused, I was detailed then to the Gang Prosecution Unit of the state's attorney's Office, somewhere in the area of '91, '92; something like that.

Q. And then from about '73 or '74 to '91 or '92, during that whole time, were you in -- assigned to the 15th -- 13th District area?

A. Well, yeah, in general, but then we -- we also investigated gang crimes in other areas too.

Page 21

Q. Okay. And during that period from '72, '73 to '91, '92, was that always part of Area 5?

A. Yes.

Q. Okay. And in your work in the Gang Crimes Unit, what kind of crimes were you investigating?

A. Well, we would work in conjunction with the Detective Divisions from that area. So a lot of times we would be working on homicides, robberies that were somewhat gang related in their -- in the belief of the Detective Division.

Q. And I'm sorry, what was the last thing that you said?

A. Well, within the -- the Detective Division's belief, when they were handling the follow-up case, if they decided or thought that it was gang related, they would ask our assistance in the Gang Investigation Unit, based on our knowledge of the street gangs.

Q. And as part of the Gang Crime Unit, were you given any training on gangs?

MR. OBERTS: Objection. Vague. Go ahead.

A. Well, we did have inservice training at times in the police department.

BY MS. HAGY:

Q. And how -- in that role, how did you learn about how gangs -- well, first of all, did you learn

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 22

about how gangs operate?

A. You mean from the inservice training, or from just my experience on the street?

Q. Just in that role; did you learn about how gangs operate?

A. Well, yes, I learned how gangs operated and learned who gang members were.

Q. How did you learn that?

A. Well, through speaking to people and while reacting to cases on the street that I was assigned to.

Q. And so at some point in '91, '92, you said you were recruited into the Gang Prosecution Unit?

A. Yes, I was detailed there.

Q. Oh, detailed. And during your 20 years in the Gang Crimes Unit, did you have the same supervisor the whole time?

A. No, the -- the supervisors rotated through there at times, you know.

Q. Okay. Who was your last supervisor in the Gang Crimes Task Force?

MR. OBERTS: Objection. Vague. Just year?

A. Well, are you -- are you speaking up until the last time I was in the CPD unit?

BY MS. HAGY:

Q. Let's see. So let me start that over because

Page 23

I think that's confusing. So when you were detailed to the Gang Prosecution Unit, was that still part of the Gang Crimes Task Force?

A. Well, I was detailed to the Gang Prosecution Unit, but I was detailed there as a Chicago Police Officer.

Q. Okay. So what did it mean to be detailed to the Gang Prosecution Unit?

A. Well, it meant to help the Gang Prosecution, in other words the state's attorney's Office, prosecute gang cases because at that time, they -- just about the -- the late '80s, they started -- state's Attorney's Office started the -- a Gang Prosecution Unit that consisted of -- of obviously state's attorneys, CPD officers, Cook County Sheriff police officers, a couple of state police officers were assigned. And then they had a section for victim-witness protection people. And they -- when they started that in the late '80s, there was two Chicago police officers detailed there, but they moved on and I -- then I was detailed there. And I was there as detailed officer through '94. Then I retired from the CPD in '94 and took on a permanent position with the Gang Investigation Unit at the state's attorney's Office, which I was already doing, because I was detailed there.

Page 24

Q. And when you were detailed there to the Gang Prosecution Unit, was there -- how many other CPD officers were detailed there?

A. During the time I was detailed there?

Q. Yeah.

A. I was the only one CPD guy at the time.

Q. Okay. And do you remember; which state's attorney did you work with?

A. Well, I worked with them all, depending on what the requests were from each state's attorney and whatever case they were working on. At that time, there was -- I don't know. When I first got detailed there, there probably was about 15 state's attorneys in the Gang Prosecution Unit.

Q. Was there -- at that time, was there one state's attorney who was the head of the Gang Crimes Prosecution Unit?

A. Yes, there was a lead state's attorney there at the time.

Q. Do you remember who that was?

A. Yeah, I think it was Ernie Dibernnedto at the time.

THE REPORTER: I'm sorry, did someone say something?

THE WITNESS: I heard somebody say something.

Page 25

MS. HAGY: Yes.

BY MS. HAGY:

Q. So what was your role as a CPD officer detailed to the Gang Prosecution Unit?

A. Well, it was to assist the state's attorneys in the investigation and prosecution of the case. And that would be to locate witnesses, go interview witnesses, in some cases, testify in court.

Q. And once you were detailed to the Gang Prosecution Unit, is it fair to say that you were working on cases from across the city?

A. Yes.

Q. And do you remember what your first case was that you worked on at the Gang Prosecution Unit?

A. No, I don't.

Q. Okay. Do you remember; about how many cases did you work on when you were a CPD officer detailed to the Gang --

A. You mean --

MR. OBERTS: Objection. Time frame, scope, and vague. And over broad.

MS. HAGY: Okay.

BY MS. HAGY:

Q. So let me start that over then. When you worked for the Gang Prosecution Unit, when you were

Re-sign and Ou Restand



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Read and Sign Version only

Page 26

detailed there as a CPD officer, so from about '91, '92 to '94, do you know about how many different cases you worked on?

MR. OBERTS: Just objection. Vague as broad as time scope.

A.   I don't know. Many.

BY MS. HAGY:

Q.   Okay.

A.   There was many.

Q.   And were you often working on homicide cases in that role?

A.   Predominantly, yes.

Q.   Okay. And about how many different -- if you can estimate, about how many different gang-related homicides have you worked on in your career at the police department?

A.   Between the police department and the state's attorney's Office?

Q.   Just as you were a CPD officer.

MR. OBERTS: Prior to being detailed?

BY MS. HAGY:

Q.   And when you were detailed. Just as --

A.   Oh -- Oh, in general. Okay.

Q.   Yes.

A.   I -- I really don't know how many - it's 100s.

Page 27

Q.   Okay. Mainly in your role as a Gangs Unit detective, did you learn about gang hierarchies?

A.   Yes.

Q.   Okay. How did you learn about gang hierarchies?

A.   Well, from intelligence, working on the street, talking to the gang members.

Q.   And what did you learn about how gang hierarchies operate?

MR. OBERTS: Objection. Vague. Over-broad.

THE WITNESS: Somebody said something.

THE REPORTER: Did someone lodge an objection?

MR. OBERTS: You just had mine.

THE REPORTER: Yeah, just yours, but --

MR. OBERTS: Thank you.

MS. HAGY: And do you --

MR. OBERTS: Oh, I was going to say, "Do you not -- do you remember the question?"

THE WITNESS: Could you repeat it?

MR. OBERTS: What were you going to say?

MS. HAGY: Oh. Do you guys want to do the thing where an objection from one defendant is for all the defendants?

MR. OBERTS: Sure. One defendant and joined -- everybody joined.

Page 28

MS. HAGY: Yeah. If you guys want to. Maybe that will help.

MR. OBERTS: Let's agree here. Mike?

MR. STEPHENSON: Yeah, agreed.

MR. OBERTS: I don't know if everybody heard that? I didn't hear anything from the other attorneys.

MR. STEPHENSON: Agreed here.

MR. OBERTS: Okay, good. So there was a question, objection: vague and over broad. And do you remember the question or would you like --

THE WITNESS: No, I'd like to --

MS. HAGY: Do you mind? Yeah, thank you.

MR. OBERTS: I'm sorry. Were you just about to say that? I was just getting -- sorry about that. Well, you already were ready to roll. What am I talking about?

(REPORTER PLAYS BACK REQUESTED QUESTION)

BY MS. HAGY:

Q.   Can you hear that? My voice is a little hopping.

MR. OBERTS: Yeah.

A.   Well, it's okay. I got hearing aids, so sometimes it's a little difficult. But how do I -- did I learn how gangs operate? Is that the question?

Page 29

BY MS. HAGY:

Q.   Well, what did you learn about how gang hierarchies operate?

MR. OBERTS: Objection. Vague. Over broad.

A.   Well, I would learn from the gang members themselves and from specific inservice training that we would have.

BY MS. HAGY:

Q.   Did you ever work on cases involving the El Rukn gang?

A.   The what gang?

Q.   El Rukn. El Rukn.

A.   El Rukn?

Q.   Yes.

A.   Oh. We pronounce it El Rukn.

Q.   Oh.

A.   Yeah. There -- there was gangs, the -- the El Rukn, that was predominantly in the penitentiary system, and that's where my familiarity with them became --

Q.   Okay. When did you start working on cases involving that El -- I'm not going to --

A.   El Rukn.

Q.   El Rukn gang.

A.   I -- I --

MR. OBERTS: Objection. Mischaracterizes the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 30

testimony and vague. Go ahead.

A. There was only a couple of cases that I actually worked on with the El Rukn gang because they were predominantly a south side gang and -- and very heavy in the penitentiary system.

BY MS. HAGY:

Q. Do you remember anything about the cases that you worked on that involved the El Rukn gang?

A. I don't remember specifically, no.

Q. Okay. Did you ever hear about misconduct by the El Rukn gang members in the state's attorney's Office?

MR. OBERTS: Objection. Form. Vague. Over-broad.

A. Not sure I understand that. What kind of conduct?

BY MS. HAGY:

Q. Misconduct.

A. Misconduct?

Q. Yes.

MR. OBERTS: Objection. Vague.

A. No.

BY MS. HAGY:

Q. One more time?

A. I said, "no."

Page 31

Q. Okay.

MR. STEPHENSON: I apologize. Can I get the question back?

THE REPORTER: Yep.

(REPORTER PLAYS BACK REQUESTED QUESTION)

MR. STEPHENSON: Thank you.

BY MS. HAGY:

Q. Okay. You don't have to answer that again.

A. Yeah. Okay.

Q. When you were a CPD officer detailed to the Gang Prosecution Unit, do you remember any state's attorneys that you worked with?

MR. OBERTS: Objection. Asked and answered.

A. I knew a lot of state's attorneys, sure.

BY MS. HAGY:

Q. Which state's attorneys do you remember working with during that time period?

A. Oh, my, it was quite a few of them.

MR. OBERTS: And this is just the time period he was detailed, correct?

MS. HAGY: Yes.

MR. OBERTS: Thank you.

A. And I can't remember all of them, but in the time that I spent in the state's attorney's, there had to be 50 state's attorneys that were in that office.

Page 32

Yeah. They got rotated out, got promoted, became judges. You know?

BY MS. HAGY:

Q. Okay. And during the time that you were a CPD officer detailed to the Gang Prosecution Unit, were you the only CPD officer with that detail during the entire time that you were detailed there?

A. Yes.

Q. Okay. And so, during that time, about how many different cases were you working on at a time in that role?

MR. OBERTS: Objection. Vague. Over-broad. Go ahead.

A. There were so many cases that at any one given time I'd be working on ten, 12, 13, 14 cases at a time from different attorneys. Yeah.

BY MS. HAGY:

Q. And then when did you retire from the police department?

A. Well, I retired in '94. I can't remember the month. I think it was May of '94 or something like that.

Q. And why did you retire?

A. Well, I retired because I was actually recruited by the state's attorney's office to work

Page 33

permanently for the state's attorney's office. And I had already put in almost 30 year, or 28 years with the CPD. So I thought it was time to move on.

Q. Who recruited you to the state's attorney's office?

A. Well, there was a couple people, a couple state's attorneys that were already in the gang prosecution unit, like Jack Hynes, Ernie Dibernnedto.

Q. And did they tell you why they wanted you to work with the state's attorney's office directly?

A. Well, they knew I was going to retire from the CPD, so they basically asked me to stay on with the state's attorney's office in their investigation bureau. They -- I guess didn't want to lose my expertise and that, you know.

Q. So I want to go back for a minute with your training with the CPD, at CPD -- at the Chicago Police Department, were you trained on how to interview witnesses?

A. Yes.

Q. And were you trained on a witness's Miranda Rights at the CPD?

A. Yes.

Q. What did you understand Miranda Rights to include?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Read and Sign only

Page 34

A.   Well, they had the right to remain silent, anything they said could be used against them in a court of law.  And if they couldn't afford attorneys, they would be appointed.

Q.   And were you trained on how to avoid witness coercion by the CPD?

MR. OBERTS:  Objection.  Vague.  Form.  Go ahead.

A.   Yes.

BY MS. HAGY:

Q.   Okay.  And what were you trained on with that topic?

A.   Well, the main -- the main issue with that be was to not to lead the witnesses or the victims into making statements that you basically brought up first to them.

Q.   Okay.  And were you given any training on how long a witness could be detained?

A.   Well, there were standard rules to how long you can keep a person.  I don't remember what -- what the rules were as far as like time limit, you know?  But obviously there was a time element that you would keep a person in an office or wherever you were at.

Q.   And when you were at CPD, did they have written policies or procedures on witness interrogation?

Page 35

A.   Yes.  There were general orders.  That's what they called general orders.

Q.   And when you worked with CPD, were you given training on something called Brady?

A.   Yes.

Q.   And what were you trained on in relation to Brady?

A.   Well, we -- we learned the -- the new rules of the Brady Law that was passed now.

Q.   And what did you understand the Brady rules to be?

MR. OBERTS:  Objection to the extent it calls for a legal conclusion.  But his understanding.

A.   Well, the Brady rules were basically, you know, to -- the witnesses or victims or -- or what suspects to be -- not to be coerced into anything and to let them know that they -- they have the right to not say anything.  So

BY MS. HAGY:

Q.   And were you trained that defense attorneys needed to be provided with any exculpatory evidence?

A.   Yes -- yes.

Q.   Okay.  And sorry, that was yes?

A.   Yes.

Q.   Okay.  And with the Chicago Police Department,

Page 36

were you given training on report writing?

A.   Yes.

Q.   And were there written policies and procedures on report writing?

A.   I wouldn't say there was written policies, there -- the training in the detective division was generally a class instruction.

Q.   Okay.  And how were you trained to -- what were you trained to include in your reports?

A.   Well, the person and persons present during an interview and the -- the -- the basic facts of what was being said.  Maybe not verbatim, you know, just a summary of what was being told.

Q.   And is it fair to say that at that time, when you first started, reports were handwritten?

MR. OBERTS:  Just objection.  Vague.  At what time?  Scope.  Objection base, scope.

BY MS. HAGY:

Q.   I guess I'm also forgetting about typewriters.  So when you first started writing reports, did you use - - were they handwritten and typed?

MR. OBERTS:  Objection.  Vague.  Scope.  Over broad.

A.   Yes.  We did type.  Most detectives typed their own reports.

Page 37

BY MS. HAGY:

Q.   Okay.

A.   Yeah.

Q.   So you would -- is it accurate that you would sometimes hand write things and then type up your report?

MR. OBERTS:  Objection.  Vague.  Scope.  Over broad.

A.   Yes.

BY MS. HAGY:

Q.   And were you given training on what to do with your handwritten notes?

MR. OBERTS:  Objection.  Vague.  Scope.  Over-broad.

A.   Yes.  We were instructed to submit those too, but -- but that was be -- after there -- there was a -- the old street file thing that was in play at the -- the city, and a lot of officers kept their own notes at the time, but then they were told to submit all their notes with any kind of reports we made.

BY MS. HAGY:

Q.   Okay.  And do you know -- did -- before that happened, did you keep any of your own notes?

A.   Yes, there was times I did.

Q.   Okay.  And the notes that you kept, did you

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Read and Sign Only

Page 38

preserve them or destroy them?

MR. OBERTS: Objection. Vague. Over broad. Scope.

A. They were destroyed. But the -- as long as the report reflected what was in my notes.

BY MS. HAGY:

Q. So as long as the report reflected what was in your notes then the CPD considered that to be acceptable?

MR. OBERTS: Objection. Vague. Speculation.

A. I don't know.

BY MS. HAGY:

Q. Okay. When did you start submitting? When was the decision made that notes needed to be submitted with the report?

A. Well, I whenever that law was or that rule was passed within the city that CPD was to submit the notes of an investigator or detective. I don't remember when.

Q. By the time that you were working for the gang -- well, when you were detailed as a CPD officer with the gang prosecution unit, at that time, were you submitting your notes with your report?

A. Yes.

Q. And when you were working as a CPD officer detailed to the gang prosecution unit, did you use the

Page 39

same reporting forms that you had used previously as a CPD officer?

A. No.

Q. Okay. So what were the new forms that you were using?

A. Well, in the state's attorney's office, it was called an Investigative Report and in the CPD, it was a Case Report.

Q. Okay. So prior to '91 or '92, when you were detailed to the gang prosecution unit, up to that time, is it fair to say you were using the CPD Case Reports?

A. Yes.

Q. Okay. And then when you were detailed to the gang prosecution unit, were you immediately using the Investigative Reports?

A. Yes, I was.

Q. And who trained you on how to do the Investigative Reports?

A. I never had any specific training in it.

Q. Okay. Was it a different format?

A. Investigative Report was somewhat of a different format than the Case Report. Yes.

Q. Okay. So what was different about the format?

A. Well, in the Investigative Report of the state's attorney's office, it was pretty much a -- a

Page 40

section just of all narrative. And the Chicago Police Report -- and the Chicago Police Department Case Report was basically boxes to check, beside the narrative.

Q. So going back to -- well, when you first were detailed for the gang prosecution unit, were you given any training, any formal training for that role?

A. No.

Q. When you started that role, did you start to work more closely with the state's attorneys than you had before?

A. Yes.

Q. Who was your supervisor in that role as a CPD officer detailed to the gang prosecution unit?

A. You mean --

MR. OBERTS: Objection. Vague.

A. Yeah. Within the state's attorney's office?

BY MS. HAGY:

Q. Right. Did you have a CPD supervisor and the state's attorney's office supervisor?

A. No.

Q. Okay. So which -- did you have a CPD supervisor?

MR. OBERTS: Objection. Form. The time scope.

BY MS. HAGY:

Q. Okay. So when you were detailed to the gang

Page 41

prosecution unit --

A. Uh-huh.

Q. -- did you have a CPD supervisor?

A. I still was answerable to the CPD people, too. Yeah.

Q. Okay. So who was your supervisor on the CPD side?

A. There was many of them over the years.

Q. Sorry, let me make that a little more narrow. When you started working for the gang prosecution unit in '91 or '92, do you know who was your supervisor on the CPD side when you started that role?

A. It was Lieutenant Frank Radke.

Q. Okay. How do you spell that?

A. R-A-D-K-E, Frank the first name.

Q. And was he your CPD supervisor during that entire time that you were a CPD officer detailed to the gang --

A. That detailed period? Yes.

Q. Okay. And then did you have a supervisor on the state's attorneys side?

A. Yes.

Q. Okay. And who was that?

A. Well, depending on what year you were talking about. Again, there was like I mentioned earlier, Ernie

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 42

Dibernnedto, Jack Hynes, Paul Delo. Can't remember all of them. They -- but the -- the immediate supervisors were -- were mostly those three.

Q. Okay. And at that time when you were a CPD officer detailed to the gang prosecution unit, did you have performance reviews?

A. Within -- a performance review?

Q. Yes.

A. Within the CPD or the state's attorney's office?

Q. Well, let's start with the CPD first. Did you have CPD performance reviews?

A. Yes.

Q. Okay. And then did you also have -- did you have separate state's attorneys performance reviews?

A. Not within the state's attorney's office. Not that I'm aware of.

Q. Okay. And so, as far as you know, did the state's attorneys have input into your performance reviews?

A. I'm sure they did.

Q. Okay. And when you started working as a CPD officer detailed to the gang prosecution unit, were you given any training on how to conduct interviews in that role?

Page 43

MR. OBERTS: Objection. Asked and answered. Go ahead.

A. You mean from the state's attorney's office?

BY MS. HAGY:

Q. Yes.

A. No.

Q. Were you given any training, any different training or new training by the CPD in how to conduct interviews as an officer detailed to the gang prosecution unit?

A. No.

Q. As far as you know, and only as far as you know, were you aware of any other CPD -- any other state's attorneys units that had CPD officers detailed to them?

MR. OBERTS: Objection. Foundation. Speculation. Go ahead.

A. I'm not sure. There might have been.

BY MS. HAGY:

Q. Okay. Fine. How are you doing? I think we've been doing --

A. Good. Good.

Q. Okay.

MR. OBERTS: Whenever you want to take a break. Take a break.

Page 44

THE WITNESS: I'm good. Yeah.

MR. OBERTS: Yeah. It's going great.

THE WITNESS: Yeah.

BY MS. HAGY:

Q. When you started -- when you got detailed to the gang prosecution unit, was there any changes in the type of cases you were working on?

A. No, it was mostly homicide cases.

Q. Okay. And was there a change in what your daily activities were?

MR. OBERTS: Objection. Vague.

A. Yes.

BY MS. HAGY:

Q. How did your daily activities change when you got detailed to the gang prosecution unit?

A. Well, when I got detailed to the gang prosecution unit, I was more or less directed with tasks to be done by the state's attorney's office.

Q. And what kind of -- well, when you first started in '91, '92, what kind of tasks did the state's attorney ask you to do?

A. Well, basically what every investigator within the gang or within the investigation bureau did. And that was to locate, find witnesses, interview witnesses. Sometimes interview suspects, reduce interviews,

Page 45

sometimes to writing of if it's asked of you. Also, to coordinate any kind of law enforcement, local -- local and state and federal agencies.

Q. And would state's attorneys assign these tasks to you directly?

MR. OBERTS: Objection. Time frame. Scope. Go ahead.

A. Well, they would mostly assign or would make the -- what they call a request slip and would give it to the supervisor of whatever unit that it was regarding. And then in my case was the gang prosecution unit, and they would in turn assign it to investigators.

BY MS. HAGY:

Q. So the state's attorney would make the request slip and give it to the supervisor, and was that a state's attorney supervisor?

A. Correct.

Q. Okay. And then the state's attorney supervisor would decide -- would then give that task to you?

A. Correct.

Q. And when you started working for the gang prosecution unit in '91, '92, did they tell you what to do with any handwritten notes?

MR. OBERTS: Objection. Vague and ambiguous

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 46

regarding they. Go ahead.

A. They would request our notes usually.

BY MS. HAGY:

Q. Okay. So they would -- okay. Let me just make sure I'm understanding what you're saying. They would request you to submit your notes?

A. If I was asked --

MR. OBERTS: Objection. Vague. Ambiguous regarding they.

A. If I was asked to submit them, I would submit them. Yeah.

BY MS. HAGY:

Q. Okay. And were there times that you in '91, '92 when you first started, were there times that you did not submit your notes?

MR. OBERTS: Objection. Vague. Ambiguous.

A. Not that I remember.

BY MS. HAGY:

Q. Okay. And when you stopped working for the Chicago Police Department, up until then in '94, did you -- were you given any different instructions on what to do with your handwritten notes?

A. No.

Q. And did you receive regular training while you were a CPD officer detailed to the gang prosecution

Page 47

unit?

MR. OBERTS: Objection. Vague.

A. Not while it was detailed there. No.

BY MS. HAGY:

Q. Okay. Before you were detailed there, when you were in the -- when you were a CPD officer in the gang unit, did you receive regular training?

A. Occasionally we would go for what was called in-service training. Yeah.

Q. Okay. And about how frequent was that?

A. Well, that'd be every few years or so.

Q. And then -- so is it accurate that when you started working for the -- being detailed to the gang prosecution unit, you no longer went to the in-service trainings?

A. Yes.

MR. OBERTS: Objection. Form.

BY MS. HAGY:

Q. Did you -- when you were detailed to the gang prosecution unit, did you attend any trainings run by the state's attorney?

A. No.

Q. Okay. Were there any written policies that you were expected to follow as a CPD officer detailed to the gang prosecution unit?

Page 48

A. No.

Q. At that time, were you still expected to follow CPD's general orders and other written policies and procedures?

A. Yes.

Q. Okay. But there weren't any new policies or procedures, any, strike that. Were there any additional written policies or procedures that you were to follow as a CPD officer detailed to the gang prosecution unit?

A. No.

Q. When you were -- as a CPD officer, were you aware of any policies or procedures regarding interviewing juveniles?

MR. OBERTS: Objection. Vague. Time frame. Scope.

A. Say that question again.

BY MS. HAGY:

Q. Okay. When you were a CPD officer --

A. Uh-huh.

Q. -- were you aware of any policies or procedures related to interviewing juvenile?

A. Yes.

Q. Okay. And what were those policies or procedures related to interviewing juvenile?

MR. OBERTS: Objection. Vague. Time frame.

Page 49

Scope. Go ahead.

A. The policies were to -- usually interviewing one with the presence of a parent or teacher or -- or even a juvenile officer or attorney.

BY MS. HAGY:

Q. And was there any policy on how long a juvenile could be detained?

MR. OBERTS: Objection. Vague. Time frame.

A. I'm not sure if there was any policy on regarding time.

BY MS. HAGY:

Q. As a gang unit officer, before you were detailed to the prosecution unit, were you sometimes interviewing juveniles?

A. Yes.

Q. And how about as a CPD officer detailed to the gang prosecution unit?

MR. OBERTS: Objection. Form. Vague.

A. Yes.

BY MS. HAGY:

Q. Did you often see -- were -- strike that. Were gang members -- were juveniles sometimes gang members?

A. Yes.

Q. When you were a CPD officer assigned to the gang unit, did -- what did you wear every day as a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Read and Sign Version Only

Page 50

detective?  Sorry.  When you were a detective in the gang unit?

A.  Well, normally we would wear what they call soft clothes.  In other words, shirt, pants, of course. But we wouldn't be -- it wouldn't be mandatory to wear a tie and jacket like we did in the detective division.

Q.  Sorry.  It was mandatory or it wasn't?

A.  No, it wasn't -- wasn't mandatory to wear a suit or jacket in the gang unit.

Q.  Okay.  So was that a change from the detective unit to the?

A.  Well, the detective unit in the sense of being in the CPD detective unit, you had to wear a sports jacket or a suit.  That -- that -- that was the proper dress.

Q.  Okay.

A.  But then the gang unit, even as a detective, you could wear soft clothes, which what we call soft clothes, which would be casual shirt, tie, you know, or either/or, you know.  And if you went to testify in court, of course you dressed in the suit and tie.

Q.  Okay.  And how often or were you -- when you were on duty, were you usually carrying a firearm?

MR. OBERTS:  Objection.  Vague.  Time frame.

BY MS. HAGY:

Page 51

Q.  Did you -- when you were a detective assigned to the gang crimes unit, did you usually have a badge?

A.  Yes.

Q.  Did you usually wear it or carry it on your person?

A.  Carry it.

Q.  And how about when you got detailed to the prosecution unit, did anything change about what you wore on a daily basis?

A.  No.

Q.  Did you have the same badge?

A.  I had -- when I was detailed there, I still had the Chicago Police Department badge.

Q.  Okay.  And when you were a CPD officer detailed to the gang prosecution unit, would there be -- were there staffing meetings?

A.  Staffing meetings?

Q.  Yes.

MR. OBERTS:  Objection.  Vague.  Over broad. Go ahead.

A.  I'm not sure what that means.  As far as like within the -- you mean the state's attorneys themselves or within the investigation bureau?

BY MS. HAGY:

Q.  Staffing meetings that you were involved in?

Page 52

MR. OBERTS:  Objection.  Vague.  Over-broad.

A.  No.

BY MS. HAGY:

Q.  Did you attend any regular team meeting?

MR. OBERTS:  Objection.  Vague.  Over-broad.

A.  No.

BY MS. HAGY:

Q.  Did you sometimes meet in person with the state's attorneys?

A.  Yes.

MR. OBERTS:  Objection.  Vague.  Over-broad.

BY MS. HAGY:

Q.  Were those usually -- were those one-on-one meetings?

MR. OBERTS:  Objection.  Vague.  Over-broad.

A.  Sometimes.

BY MS. HAGY:

Q.  Did you sometimes have team meetings?

MR. OBERTS:  Objection.  Asked and answered. Vague.  Over-broad.

A.  I -- you'd have to explain to me what you mean by a team.

BY MS. HAGY:

Q.  Did you ever have -- did you have times where you would meet about a case with members from the

Page 53

state's attorney's office and the Chicago Police Department together?

MR. OBERTS:  Objection.  Vague.  Time frame.

A.  There were times we did.  Yep.

BY MS. HAGY:

Q.  And were there any like regular meetings where you learned about what cases other people were working on?

MR. OBERTS:  Objection.  Vague.  Time frame. Scope.

A.  Well, we'd, you know, if you did your due diligence, you'd ask the other investigators what they were doing on a case.  Yes.  Yeah.  If you call that a meeting?  Yeah.

BY MS. HAGY:

Q.  And when you were a CPD officer detailed to the gang prosecution unit, were there people who were investigators for the state's attorney's office at that time?

A.  Yes.

Q.  And do you remember if when you began in that role, who were some of the people that worked as state's attorney's investigators?

A.  Geez.  I don't remember.  When I was detailed there, like I think I said earlier, there was two state

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 54

police officers detailed there, four Cook County Sheriff's Police Officers and myself as a CPD officer. And then they occasionally they would have people from the investigation bureau be working with us on some cases, you know.

Q. And when you say investigation bureau, was that the Cook County State's Attorney?

A. That was Cook County State's Attorney's Office Bureau of Investigations.

Q. Okay. And when you first started in that role in '91 '92, do you remember who any of those people from the bureau of investigations for the state's attorney were?

MR. OBERTS: Objection. Form. Go ahead.

A. I don't remember the names.

BY MS. HAGY:

Q. Okay. And did you sometimes work on a case alongside individuals from the state's attorney's investigation bureau?

MR. OBERTS: Objection. Vague. Scope.

A. Yes. There were times. Yes.

BY MS. HAGY:

Q. And would you sometimes interview witnesses together?

MR. OBERTS: Objection. Vague. Scope.

Page 55

A. There were times, yes.

BY MS. HAGY:

Q. Would you sometimes work on locating witnesses together?

MR. OBERTS: Objection. Vague. Scope. Form.

A. Yes.

BY MS. HAGY:

Q. And when you were a CPD officer assigned to the gang prosecution unit, would you -- so you would get the slip that the state's attorney wrote for the assignment; is that right?

A. Correct.

Q. And what would -- what information was contained on that assignment slip?

MR. OBERTS: Objection. Vague. Over-broad.

A. Well, it would be the state's attorney's name, obviously. The case number on -- on the request slip, the date that it was generated, what date they would request the -- request it be done by. And then in the narrative part, detail what they were requesting. And in some cases, if it was incorporated a subpoena, they would be attached to the request.

BY MS. HAGY:

Q. Okay. So then would you get that slip directly from your -- from your supervisor?

Page 56

A. Yes.

MR. OBERTS: Objection. Vague. Over-broad.

BY MS. HAGY:

Q. And then what would you do once you received the assignment slip?

MR. OBERTS: Objection. Vague. Over-broad.

A. Well, then depending on what the actual request was, sometimes they needed some. Clarification. You go speak to this particular state's attorney that was making that request.

BY MS. HAGY:

Q. Okay. And in that role as a CPD officer detailed to the Gang Prosecution Unit, would you sometimes meet with witnesses, with the state's attorney?

MR. OBERTS: Objection. Vague. Over broad.

A. Yes.

BY MS. HAGY:

Q. And when you met with the witness, with the state's attorney, was there any general role that you had during that time?

MR. OBERTS: Objection. Vague.

A. Most of the time, we were there as approver, so to speak, you know, and the -- the questioning would be directed by the state's attorney, so --

Page 57

BY MS. HAGY:

Q. And when -- were there times where you were assigned to interview -- as a CPD officer assigned to the Gang Prosecution Unit, were there times where you were assigned to talk to a witness without the ASA present?

A. Yes.

Q. And then during those interviews, what did you understand your role to be?

MR. OBERTS: Objection. Vague. Over-broad.

A. I'm not sure what you're getting at.

BY MS. HAGY:

Q. Sure. When you were conducting an interview and the state's attorney wasn't there, were you the person asking questions?

A. Yes, if it was me on the street or in an office, talking to them, yeah.

Q. And who would tell you what kind of -- or would someone tell you what kind of questions to ask, or what information was being looked for?

MR. OBERTS: Objection. Vague. Over-broad.

A. Well, after confirming with whatever state's attorney was making the request for me to speak to the person, I've established some idea on what I was going to be asking them.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 58

BY MS. HAGY:

Q. Okay. So do you remember -- you retired in May 1994, as a CPD officer, right?

A. Yes. That's correct.

Q. And when did you start working for the state's attorney's Office?

A. Well, it was immediate, you know. I -- you know, I just basically stayed where I was at, at, you know, the detail, being detailed to the Gang Prosecution Unit. So I stayed within the Gang Prosecution Unit.

Q. So actually, when you were a CPD officer detailed to the Gang Prosecution Unit, where was your office?

A. It was at the state's attorney's Office, 26th and California.

Q. Okay.

A. 13th floor.

Q. And prior to that, when you were a CPD officer in the gang unit, but not assigned yet to the Prosecution Bureau, where was your office then?

A. You mean were the CPD officers go?

Q. Yes.

A. Was at Belmont and Western, at that time.

Q. And when you were a CPD officer in the gang unit, was the Belmont and Western location your office

Page 59

for that entire time period?

MR. OBERTS: Just objection, vague.

A. Yeah, I'm not sure where you're going with that. I mean, that was my office, but I worked out of 26th and California, so that's where I would have my desk, and where I would do my follow-up investigations from.

BY MS. HAGY:

Q. Okay. Well, let me go back and make sure I have the time period right. So when you started working for the gang crimes unit -- hang on, I'm looking for the -- What -- about what year was it that you started working for the gang crimes unit?

MR. OBERTS: This is CPD?

MS. HAGY: Yes.

A. As CPD?

BY MS. HAGY:

Q. Yes. But not as a prosecution unit person, just in the gang crimes unit.

A. Well, are you saying in the gang crimes unit now, or the Gang Prosecution Unit?

Q. Gang crimes unit. When CPD started that unit --

A. Yeah.

Q. -- and you were assigned there, what year was

Page 60

that?

A. Well, that'd be 1973, something like that.

Q. And at that time, in 1973, when you were assigned to the gang investigation unit, where was your office then?

MR. OBERTS: Just objection, vague, and to the extent it mischaracterizes.

A. The first office that we were detailed -- or we -- assigned to was at Palmer and California. It was the old 14th District Station. We had an office on the second floor.

BY MS. HAGY:

Q. Okay. And then at some point did your office change?

A. Yes.

Q. Where did it change to?

A. To Belmont and Western.

Q. Okay. And what year was that?

A. I don't remember what year it was.

Q. Okay. And after it changed to Belmont and Western, did you stay at that office the whole time, until you were detailed to the Gang Prosecution Unit?

A. Yes.

Q. Okay. And so, then once you were detailed to the Gang Prosecution Unit, at that time, you were

Page 61

assigned to -- your office was 26th and California, right?

A. Yes.

Q. And at the time that you were assigned to the Gang Prosecution Unit, were there any other CPD officers who had their office at 26th and Cal?

MR. OBERTS: Objection. Vague and it's not going to -- mischaracterize his testimony. Go ahead.

A. Any other officers from the -- then the Gang Prosecution Unit?

BY MS. HAGY:

Q. From Chicago Police Department officers?

A. In the state's attorney's Office?

Q. Yes.

A. No, not that I'd know of.

Q. Okay. So as far as you know, you -- at that time, you were the only CPD --

A. CPD.

Q. -- officer with --

A. That they had at 26th.

Q. Okay. The only CPD officer with an office at 26th Street?

A. Right.

Q. Okay. And so, when you moved your -- when

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Read and Sign Only

Page 62

your -- when your office moved to 26th and Cal, did you have an office of your own?

A.   No.

Q.   Were you sitting, like, in an open area?

A.   Yes.

Q.   Did you have a cubicle that you were assigned to?

A.   No.  It was a -- when I was first detailed there, it was just an -- an open-type forum in the middle of a floor, amongst other cubicles, you know, where the state's attorneys had their own privacy.

Q.   Okay.  And who else was assigned to that open area?

A.   Well, there were two Illinois State Police officers, and there were four Cook County Sheriff's police officers.

Q.   And did any of the Cook County State's Attorney's investigators also use that space?

A.   No, they -- they were up on the 14th floor.

Q.   Okay.  And so, in this whole time period that you were assigned to the Gang Prosecution Unit, were you assigned to that open area on the 13th floor, or did that change at any point?

A.   No --

MR. OBERTS:  Objection.  Vague.

Page 63

A.   -- the 13th floor.

BY MS. HAGY:

Q.   Okay.  In the open-seating area?

A.   Yes.

Q.   And during that whole time period, were there still two ISP officers and four Cook County Sheriff's officers also assigned to that unit?

A.   Yes.

Q.   So when you started working directly for the state's attorney, were you still -- did your office location change?

A.   Yes.

MR. OBERTS:  Objection.  Vague.  So when you say directly for -- now, employed by state's attorney or detailed?

MS. HAGY:  Employment.

MR. OBERTS:  Very good, thank you.

A.   So working directly for the state's attorney?

BY MS. HAGY:

Q.   Yes.

A.   Yeah, no, it -- my spot changed.  I had to go up to the 14th floor, in the Investigation Bureau.

Q.   Okay.  And then as -- just to the extent of your personal knowledge, once you were working directly for the Cook County State's Attorney, do you know

Page 64

whether the Chicago Police Department detailed a different officer to the Gang Prosecution Unit?

A.   No, they didn't have -- they didn't have that.

Q.   Okay.  So after you went to the Cook County State's Attorney, is it accurate that CPD then no longer had an officer detailed to the Gang Prosecution Unit?

MR. OBERTS:  Objection.  Foundation, speculation.  But go ahead.

A.   No, I -- apparently for manpower purposes, they didn't feel they had to detail anybody there, and that I was already there, working for them in their capacity as a State's Attorney's Officer investigator.

BY MS. HAGY:

Q.   Okay.  So working for the state's attorney?

A.   Yeah.

Q.   So it was your understanding at that point, that the state's attorney didn't think they needed another CPD officer specifically assigned to --

A.   Well, I don't know what they were thinking, but --

MR. OBERTS:  Objection.  Speculation. Foundation.  But -- yeah.

A.   I don't know what they were thinking, but obviously being -- it'd be the manpower situation.  They weren't -- weren't in a position, obviously, to start

Page 65

detailing people there, when the office of the state's attorney wasn't even requesting anybody to come up.

BY MS. HAGY:

Q.   So when you started working directly for the state's attorney, what was your role?  What was your title?

A.   Gang investigator.  Or investigator -- investigator with the state's attorney's Office. Because they were just going through a change at that time, and they were developing the Gang Investigation Unit in -- as a separate entity from the rest of them, which would be arson and those type of things.

Q.   And so, it -- your -- is it right that you're talking about the state's attorney --

A.   Right.

Q.   -- at that point in May or June 1994, was developing a specific Gang Investigation Unit?

A.   Yes, it was -- it was, like, a regime change in -- within the state's attorney's Office, and they were doing some restructuring.

Q.   And at that time, in June 1994, did you know whether there were any other state's attorneys' investigators who were specifically assigned to the -- this new gang unit?

A.   Do you mean investigators?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 66

Q. Yes.

A. Yes.

Q. Do you know who any of those people were?

A. Yes.

Q. Okay. Who were some of those people?

A. Well, at that time, in '94, there was Bobby Pravier (phonetic), Bill Pavlik (phonetic). I don't recall all of them. There was about ten people that were assigned -- now you're specifically talking about the gang unit?

Q. Yes.

A. I don't remember all their names, but there was about ten. Mike Delacey (phonetic), Tom Peck, Tom Ptak. I -- I -- I'm missing somebody out there, but there was about 10 of us, maybe.

Q. And did you-all -- to your knowledge, and it's okay if you don't know, but to your knowledge, did you-all start at the same time, about, or were some of them already in that role before you came into that role?

A. No, there were some that already were in that role in -- in the Investigation Bureau.

Q. And when you came into that role in June -- would -- is it fair to say that was about June --

A. June -- June '94, yes.

Q. Were you a supervisor in that unit?

Page 67

A. No.

Q. At some point, did you become a supervisor in that unit?

A. Yes. I don't know what year.

MR. OBERTS: Objection. Vague.

BY MS. HAGY:

Q. Do you know approximately what time you became a supervisor in the Gang Investigation Unit?

A. Probably was in around '97 or '98, maybe. Maybe later.

Q. So when you started in June 1994, who was your supervisor at that time?

A. If I'm remembering correctly, it was Larry McDonald.

Q. And when you were hired by the Cook County State's Attorney, did you get any -- did they give you any training?

MS. KUZNER: Objection. Asked and answered.

A. No.

BY MS. HAGY:

Q. And when you took on -- when you were directly hired by the state's attorney, did they give you any written policies or procedures?

A. No.

Q. And when you made that change from being

Page 68

detailed to the Cook County State's Attorney's Office, to working directly for the state's attorney's Office, were you given -- what -- were there any new expectations, as far as report writing?

MR. OBERTS: Objection. Vague. Speculation. Over broad.

A. Not that I'm aware of, no.

BY MS. HAGY:

Q. Were you using the same forms, the same reporting forms?

A. No.

MR. OBERTS: Just objection. Vague.

BY MS. HAGY:

Q. Okay. So when you switched from being a CPD officer assigned to the Gang Prosecution Unit, to being an investigator directly employed by the CCSAO, you were using different forms, different reporting forms?

A. Oh, I -- I think I misunderstood your first question. No. While I was detailed to the Gang Prosecution Unit, I was using the state's attorney's forms, the same as the ones that I had when I was actually assigned -- I mean, working there.

Q. Okay.

A. Yeah.

Q. And when -- what was the -- once you began

Page 69

working directly for the state's attorney, what was the assignment process then?

MR. OBERTS: Objection. Vague.

A. Well, the immediate supervisor would issue the request slips from the particular state's attorney and give them to different investigators within that unit. And in our case, it was the Gang Prosecution Unit.

BY MS. HAGY:

Q. And so, was -- were the request slips -- were they the same -- was it the same format as when you were a CPD officer, detailed to the unit?

A. Yes.

Q. And what outfit were you supposed to wear once you were an investigator for the state's attorney?

MR. OBERTS: Objection. Vague.

BY MS. HAGY:

Q. What was your uniform?

A. There was no uniform. It was basically the same thing we had worn before. It didn't require a suit and tie, except for when you were going to go testify.

Q. And did you have a badge, as an investigator?

A. Yes.

Q. And was it the same badge that you had before, or a new badge?

MR. OBERTS: Objection. Vague.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 70

A. New badge.

BY MS. HAGY:

Q. And did you carry a firearm, as a Cook County State's Attorney investigator?

A. Yes.

Q. Was it one firearm, or would it be two firearms?

MR. OBERTS: Objection. Vague. Scope. Time frame.

A. I only -- only carry one firearm.

BY MS. HAGY:

Q. Okay. And when you started as an investigator directly for the state's attorney, would you identify yourself to witnesses that you were interviewed?

A. Oh, yes.

Q. How would you identify yourself?

A. It'd show my badge and my ID card.

Q. And what would you tell them what your title was?

A. Yes.

Q. And what would you say?

A. I said I was an investigator from the Cook County State's Attorney's Office.

Q. And when you were a CPD officer detailed to the Gang Prosecution Unit, how would you identify

Page 71

yourself to --

A. Also, as an investigator from the state's attorney's Office.

Q. Okay. So when you were a CPD officer detailed to the Gang Prosecution Unit, you would still identify yourself as a Cook County State's Attorney investigator, to witnesses?

MR. OBERTS: Objection. Asked and answered. Form.

A. Yes, because I was the doing the task of the state's attorney's Office.

BY MS. HAGY:

Q. And when you -- do you know whether, when you were assigned -- when you started working directly for the Cook County State's Attorney's Office, did they still -- did the state's attorney still have officers from the state police and the Cook County Sheriff's Office, who were detailed to the state's attorney Prosecution Unit?

A. I don't remember what year it was, but they eventually were taken back to their particular law enforcement agencies. The state -- two state police officers and the four Cook County Sheriff police officers were no longer there. I can't remember exactly what year it was.

Page 72

Q. Do you have any recollection of about -- of when they were no longer there?

MR. OBERTS: Objection. Foundation asked and answered.

A. I don't remember.

BY MS. HAGY:

Q. And so, when your office moved up to the 14th floor, did you have -- were you still assigned to a general area, or did you have your own office?

A. It was a general area, it was -- they were cubicles and --

Q. And so -- well, first of all, when you were a CPD officer detailed to the Gang Prosecution Unit, is it fair to say that you only worked on cases that were believed to involve gangs?

A. (No audible answer.)

MR. OBERTS: Objection. Vague.

BY MS. HAGY:

Q. And when you were an investigator working directly for the state's attorney, at that time, were you also working only on cases that involved gangs?

A. For the most part, yes.

Q. Were there exceptions to that?

A. There was one or two exceptions, when I was requested or assigned to work on a case from another

Page 73

division, like Sex Crime Unit or something.

Q. And when you were assigned -- when you first were employed as an investigator by the state's attorney, were you working on cases from all over the city, or just particular areas of the city?

A. No, all over the city.

Q. And were you working on cases that involved any specific gangs, or could it be any gang?

A. Could be any gangs.

Q. During your time as a CPD detective in the Gang Unit, did you develop any expertise on a specific gang?

MR. OBERTS: Objection. Vague.

A. While I was a CPD officer?

BY MS. HAGY:

Q. Yes.

A. Yes.

Q. Which gang?

A. The Vice Lords on the west side. Different factions now. When I mention a gang, there's different factions, and this was the west side Vice Lords, the Cobras, Latin Kings, Latin Disciples, Simon City Royals, Palmer Street Gaylords. I can go on and on.

Q. And were these -- did you learn at some point the division between People and Folk?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 74

A.   Yes.

Q.   About what -- when did you learn that?

A.   Well, that came about in the -- actually, probably early '70s, it started with the Folks and People, basically initiated out of the prison system, where gangs -- different gangs, even though they might be in wars with themselves, once they were in prisons, they start forming gangs within the prison, for safety purposes.  So different gangs would go into different sections of the so-called Folks or People.

Q.   And is it your testimony that that distinction originated within the prison system?

A.   Yes.

Q.   And as a CPD gang detective, did you have expertise primarily with People, or Folk, or was it with both?

A.   With both.

MR. OBERTS:  Lindsay, can we take a break sometime?

MS. HAGY:  Sure.  Yeah, we can do that now.

THE REPORTER:  All right.  We're off the record.  It is 11:48 a.m.

(OFF THE RECORD)

THE REPORTER:  We're back the record.  The time is 12:04 p.m.

Page 75

BY MS. HAGY:

Q.   Earlier this morning, you mentioned that part of your role as a CPD officer assigned to the Gang Investigation Unit, was to serve as a proofer?

A.   Correct.

Q.   And did your role as an investigator, did it -- did it change in any way, from when you were assigned -- when you started working directly for the Cook County State's Attorney?

A.   No, not really.

Q.   Okay.  And as an investigator coming in as a state's attorney employee, did you understand that you were considered a gang expert of any sort?

MR. OBERTS:  Objection.  Speculation. Foundation.

A.   I don't know what they thought of me as.

BY MS. HAGY:

Q.   Okay.  Were you consulted at times about gang activity?

MR. OBERTS:  Objection.  Vague.  Over broad. Time frame.

A.   There'd be times I'd be assigned to a case, and the state's attorney might be asking me about a particular gang that's involved in that particular case that he's prosecuting, yeah.

Page 76

BY MS. HAGY:

Q.   And you said earlier that there was a determination about whether a crime involved a gang; is that fair?

MR. OBERTS:  Objection.  Form.  Vague.

A.   When you're -- can you rephrase that, or --

BY MS. HAGY:

Q.   Yes.  Definitely.  Is it fair to say that there was a determination made about whether or not a crime was a gang-involved crime or not?

MR. OBERTS:  Objection.  Vague.  Form.  Time frame.  Scope.

A.   Well, in most cases --

MR. OBERTS:  Speculation.

A.   -- in most cases, I'd be assigned to a -- a case that was considered a gang case, whether it be determined that way by the detective division, or from whatever law enforcement agency got into a gang case, yeah.

BY MS. HAGY:

Q.   Were you ever involved in the process of determining whether or not a crime would be considered a gang-involved crime?

A.   Yes.

Q.   Okay.  And were you involved in that process

Page 77

when you were a CPD officer detailed to the Gang Prosecution Unit?

A.   No.

Q.   How about when you were a Gang Unit detective?

A.   Yes.

Q.   And how about when you were a Cook County State's Attorney investigator?

MR. OBERTS:  Objection.  Form.

A.   Well --

MR. OBERTS:  Vague.

A.   Yeah, I'm not sure.  We was assigned to the Gang Prosecution Unit, which obviously were considered gang cases, so I personally did classify it as a gang case.

BY MS. HAGY:

Q.   Okay.

A.   Yeah.

Q.   So you were -- is it fair to say that you were involved in classifying something as a gang case at times, when you were a CPD Gang Unit detective?

A.   Yes.

Q.   And is it also fair to say that once you were a Cook County State's Attorney investigator, the cases that you were assigned to had already been determined to be gang-involved cases?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of NORRIE DIFOGGIA, taken on August 22, 2023

78..81

Page 78

A. That's correct.

Q. Was there ever a time when you told someone that a case you were investigating, was not actually a gang-involved case?

MR. OBERTS: Objection. Vague. Time frame. Scope.

A. You mean when I was assigned to the Gang Prosecution Unit?

BY MS. HAGY:

Q. Yes.

A. Not that I recall.

Q. Okay. How about when you were a police detective, did you ever determine that a crime was not a gang-involved case?

MR. OBERTS: Objection. Form. Vague. Over broad.

A. There might have been a time. I don't recall exactly what, but there -- seems as though I remember something, but -- I don't remember right now, yeah.

BY MS. HAGY:

Q. Okay. Do you know what was considered in -- when you were at the state's attorney, do you know what was considered in determining whether something was a gang-involved crime or not?

MR. OBERTS: Objection. Vague. Time frame.

Page 79

When you say when at state's attorney, employed by state's attorney?

MS. HAGY: Yes.

MR. OBERTS: Very good.

A. Well, like I said, it was -- I was assigned to the Gang Prosecution Unit, and most of the -- almost all the gang -- all the cases that the gang prosecutors had, were considered gang cases, via the detective division from the CPD, or whatever other jurisdiction brought the case into the system.

BY MS. HAGY:

Q. Okay. And do you have any personal knowledge of what the process was for determining whether something was considered a gang-involved case?

MR. OBERTS: Objection. Speculation. Time frame.

A. Within the state's attorney's Office?

BY MS. HAGY:

Q. Yes.

A. No, I don't know what their process was.

Q. And is it right that when you were assigned -- when you were hired by the State Attorney's Office to be an investigator, the Gang Crime Unit was pretty new?

A. Yes.

MR. OBERTS: Objection. Form.

Page 80

BY MS. HAGY:

Q. And was it -- do you know when it was established?

MR. OBERTS: Objection. Form.

A. Are you talking about the gang prosecution itself?

BY MS. HAGY:

Q. Yes. The Gang Prosecution Unit?

A. With the state's attorneys in it, you mean?

Q. Yes.

A. Well, like I said, that was probably sometime in the '80s, late '80s.

Q. Okay. That the Cook County State's Attorney was --

A. Cook County State's Attorney's Office, yeah.

Q. Okay. It was sometime in the 1980s, when the Cook County State's Attorney's Office was developing their Gang Prosecution Unit?

A. Gang Prosecution, correct.

Q. And when you were hired by the state's attorney, to be an investigator, in June 1994, was the Gang Prosecution Unit for the state's attorney established by that point?

A. Yes.

Q. Did you ever have a role in educating

Page 81

individual state's attorneys on aspects of gangs?

MR. OBERTS: Objection. Vague. Asked and answered.

A. I don't know what you would consider educating. They would ask my opinions about things.

BY MS. HAGY:

Q. Okay.

A. Ask me about particular gang members or gang people.

MS. HAGY: Do you remember what kind of questions they would ask you?

MR. OBERTS: Objection. Vague. Time. Scope.

A. No, not really.

MS. HAGY: And when you were a CPD officer assigned to the Prosecution Unit, were there any specific gangs that you worked on during that time?

MR. OBERTS: Objection. Asked and answered.

A. No.

BY MS. HAGY:

Q. Okay. And how about when you were a state's attorney hired -- or sorry, when you were an investigator hired by the state's attorney's Office?

MR. OBERTS: Objection to form.

A. No.

MR. OBERTS: Vague.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 82

A.   No.

BY MS. HAGY:

Q.   So when you were an investigator for the state's attorney's Office, what were -- what were your daily activities in that role?

MR. OBERTS:  Objection.  Asked and answered.

A.   We were tasked with the job of finding witnesses, interviewing witnesses at times, interviewing victims, interviewing suspects, serving subpoenas, when necessary, locating evidence, if there was evidence to be found.  And then we -- and one of the things was to be a go-between different -- between different law -- law enforcement agencies, and in some -- a lot of cases, end up having to testify when needed, you know.

BY MS. HAGY:

Q.   Was one of the agencies that you were go-between for, the Chicago Police Department?

A.   Yes, of course.  Yeah.

Q.   And what would you -- how would you interact with Chicago Police Department officers?

MR. OBERTS:  Objection.  Vague.  Over-broad.

A.   Well, for the -- the -- the beginning of a case, to get into the system, it'd be generated by whatever law enforcement agency it would be.  And in the case of Chicago Police detectives, generating a case and

Page 83

being accepted by the state's attorney's Office.  That's -- I would be maybe, a -- communicating with the particular detectives or maybe on -- on site, the CPD guy, a patrol officer.

BY MS. HAGY:

Q.   Do you remember when -- in what year was the first time that you testified in a case?

A.   In a case?

Q.   Yes.

A.   Let's see, I came out of jail in' 67, '68 then, 1968.

Q.   And when you were a detective in the Gang Crimes Unit, did you sometimes testify in court in that role?

A.   Yes.

Q.   Do you have an estimate of how many cases you testified in, in that role as a CPD Gang Crimes detective?

A.   No, I don't remember how many.  It was quite a few.

Q.   Okay.  And as a CPD detective assigned to the Gang Prosecution Unit, did you sometimes testify in court?

A.   Yes.  As needed, yeah.

Q.   And was -- did you testify more frequently

Page 84

when you were an officer detailed to the Gang Prosecution Unit?

A.   No, not really.

Q.   Okay.  And how about when you became a Cook County State's Attorney investigative employee, would you sometimes testify in court in that role?

A.   Sometimes.

Q.   And was that more frequent or less frequent, or the same?

A.   I would say about less -- less frequent.

Q.   Okay.  And as someone who interfaced with the Chicago Police Department, did you -- did you ever give assignments to Chicago Police Department officers?

A.   Did I ever give assignments?

Q.   Yes.

A.   No.

Q.   Did you ever communicate an assignment to an officer from a state's attorney?

MR. OBERTS:  Objection.  Asked and answered.

THE WITNESS:  Yeah.  That -- you mean within the Investigation Bureau?

MS. HAGY:  Yes.

MR. OBERTS:  Objection.  Asked and answered, vague.

A.   What -- what -- at what time moment are you

Page 85

talking about?

BY MS. HAGY:

Q.   Sure.  So once you became an employee with the state's attorney's Office, did you ever communicate about assignments from the state's attorney to Chicago Police officers?

MR. OBERTS:  Objection.  Vague, over-broad.

A.   You mean assign the investigator?

BY MS. HAGY:

Q.   Discuss a -- an assignment with --

A.   Oh, yes.  Yeah, sure.

Q.   And did you sometimes meet about an investigation with investigators and Chicago Police Officers together?

MR. OBERTS:  Objection.  Vague, over-broad.

A.   There's been times, yes.

BY MS. HAGY:

Q.   Do you -- did you ever work -- meet about a case with Chicago Police Officers and State's Attorneys together?

MR. OBERTS:  Objection.  Vague, over-broad.

A.   There probably was some cases.  I don't remember exactly which at the time.

BY MS. HAGY:

Q.   So what do you understand a prover to be?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 86

A. A prover, in my estimation, is a -- somebody who sits on -- in on an interview or even an interrogation, and then listens to what has been communicated, takes notes, and then reduces it to a report of facts to do so.

Q. So let's break that down a little bit. When you testified earlier that when you were a police officer, you were trained to -- in how to avoid coercion in an interview; is that fair?

A. Yes.

Q. And did you understand that you were expected to make sure that coercion didn't happen in an interview in which you were participating?

A. Yes.

Q. And did you have that same expectation as an investigator, what the Cook County State's Attorney's Office?

MR. OBERTS: Objection. Vague.

A. Yes, I did. Yeah.

BY MS. HAGY:

Q. Okay. And did you have -- as an investigator with the state's attorney's Office, did you understand that you had a responsibility to make sure that witnesses being interviewed by investigators were not being coerced?

Page 87

MR. OBERTS: Objection. Vague, to the extent it calls for legal conclusion or duty.

A. Yes.

BY MS. HAGY:

Q. And similarly, did you understand that you had a response -- did you have a responsibility to make sure that witnesses being interviewed by a State's Attorney were not being coerced?

MR. OBERTS: Objection. Vague.

A. Yes.

BY MS. HAGY:

Q. And did you understand, and I think you did touch on this, but did you understand that you might have to present testimony in court if a witness changed his story after an interview?

MR. OBERTS: Objection. Vague.

A. Yes.

BY MS. HAGY:

Q. And did you -- when -- what other circumstances were there in which you understood that you might have to testify in court?

MR. OBERTS: Objection. Speculation, foundation.

A. Well, if I was asked to testify then, in regarding the location of a witness that was interviewed

Page 88

by me on the street or in the office, and did testify in cases were cases I attempted to locate certain witnesses that were necessary for the Court presentation, and maybe weren't able to find, and what my duties or what I did in -- in -- in trying to find that witness.

BY MS. HAGY:

Q. Would you sometimes testify about who was present during a witness interview?

A. If they asked me, yeah.

Q. And when you -- when you talked about -- sorry, strike that. Would you sometimes you were a prover when a State's Attorney was present during an interview; is that fair?

A. Yes.

MS. HAGY: Did you ever serve as a prover when a State's Attorney was not present for an interview?

MR. OBERTS: Objection. Vague.

A. I'm not sure what you mean as a prover, in the sense of another investigator speaking to a witness or -- or a suspect?

BY MS. HAGY:

Q. Right.

A. Well, I -- if I was present and you considered me a prover, yes then.

Q. Were you given any guidelines by the state's

Page 89

attorney's Office about where to interview witnesses?

A. If far -- as far as the facilities that we would bring witnesses to, in the 26th Street anyway, we would not obviously be directed to where we should put the witness at because it was, you know, crowded up on that 13th floor, so we had, like, designated rooms.

Q. So at this time, when you were an investigator for the state's attorney, your office was on the 14th floor.

A. That's correct.

Q. But you would interview witnesses on the 13th floor?

A. That's correct.

Q. And where -- do you remember where the state's attorney's Offices were?

MR. OBERTS: Objection. Vague, over-broad.

A. Well, there was some kind of reconstruction done on the floors. Do you mean, each and every individual in a State's Attorney, you're talking about?

BY MS. HAGY:

Q. No, just generally. Were there State's Attorney's Offices on both floors?

A. Yes.

Q. Okay. And would -- when invest -- when State's Attorneys gave you assignments, would they tell

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 90

you whether they wanted to be present during an interview, or whether they wanted you to interview a witness without them?

MR. STEPHENSON: Objection. Mischaracterizes his testimony.

MR. OBERTS: And vague and over-broad.

BY MS. HAGY:

Q. And please, I am trying to recall your prior testimony, but I'm not re-characterizing it. So please tell me if I'm restating something incorrectly, but were there times when you were assigned to interview -- when you were given an assignment and asked to interview a witness with the state's attorney?

A. Yes.

Q. And were there times when the state's attorney asked you to interview a witness without them present?

MR. STEPHENSON: Objection. Mischaracterizes his testimony.

MR. OBERTS: And vague.

THE WITNESS: Should I answer?

MR. STEPHENSON: If you understand the question.

MR. OBERTS: If you can and you understood the question.

A. I'm not sure if you're talking about if I'm on

Page 91

the street talking to a witness on the street, obviously the state's attorney can't always be with -- with you on the street.

BY MS. HAGY:

Q. Okay.

A. Yeah.

Q. Were you ever asked to interview a witness without a State's Attorney present?

A. Yes.

Q. And were there guidelines for interviews of witnesses where the state's attorney was not present?

MR. OBERTS: Objection. Asked and answered.

A. There was no guidelines. He -- he would -- he or she would basically trust me and my experience as a police officer on how to -- how to conduct an interview.

BY MS. HAGY:

Q. And were you instructed on whether or not an interview should be conducted by one person or two people, or could it vary?

MR. OBERTS: Objection. Vague. Over-broad.

A. It could vary.

MR. OBERTS: Incomplete hypothetical.

BY MS. HAGY:

Q. And did you understand that you were present at witness interviews with a State's Attorney and a

Page 92

witness so that if a witness changed his or her story, you could impeach them with what they told you during that interview?

MR. OBERTS: Objection. Vague, over-broad, incomplete hypothetical, and foundation.

A. I'm not sure.

BY MS. HAGY:

Q. Okay. Did you have an understanding that when you were present at an interview with the state's attorney, that you were tasked with memorializing the witness's statement?

MR. OBERTS: Objection. Vague, over-broad, incomplete hypothetical, and foundation.

A. If I was asked to memorialize the interview, yes, I would.

BY MS. HAGY:

Q. Okay. And did you -- were there sometimes interviews where you were present where you were asked not to memorialize the interview?

MR. OBERTS: Objection. Vague and over-broad.

A. I was never asked not to memorialize. I just wasn't asked to memorialize, you know, so

BY MS. HAGY:

Q. Okay. So is it fair to say that there were interviews that you were present at, where you were

Page 93

asked to make a report on the interview? That's fair?

MR. OBERTS: Say it again.

BY MS. HAGY:

Q. Sir, if you can say, "Yes"?

A. Oh, yes. I'm sorry.

Q. No, that's okay. No, it's a weird -- depositions are weird.

A. Yeah.

Q. And were there times when you were present at interviews when you were not asked to memorialize the interview?

A. Yes.

Q. And in the cases where you were not asked to memorialize the interview, did you not memorialize it?

MR. OBERTS: Objection. Vague, over-broad, incomplete hypothetical, and foundation.

A. I did not memorialize something that I wasn't asked to do.

BY MS. HAGY:

Q. Okay. So when you met, were there times -- well, what we just talked about, when you were asked to memorialize an interview or not, did -- when you met with a witness without a State's Attorney, were you sometimes asked to memorialize that interview?

MR. OBERTS: Objection. Vague, over-broad and

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 94

incomplete hypothetical.

A.  Yes.

BY MS. HAGY:

Q.  And were you sometimes not asked to memorialize that interview?

MR. OBERTS:  Objection.  Vague and over-broad.

A.  Yes.

BY MS. HAGY:

Q.  And when you -- let's say, with interviews where a State's Attorney was present, when you started the interview, would you know whether or not you were going to be asked to memorialize that meeting?

MR. OBERTS:  Objection.  Vague.

A.  No, I would have no idea.

BY MS. HAGY:

Q.  Okay.  So when you started an interview with a witness and a SA, meaning State's Attorney, did you have an understanding that you might later have to recall that meeting in court?

A.  Yes.

Q.  And would you take any steps to help you remember what happened in that meeting?

MR. OBERTS:  Objection.  Vague, over-broad, incomplete hypothetical.

A.  Yes.

Page 95

BY MS. HAGY:

Q.  What were those steps?

A.  Mainly take notes.

Q.  And were those handwritten notes?

A.  Yes.

Q.  And were there times when you were in a meeting with a witness where there was also a court reporter?

MR. OBERTS:  Objection.  Time frame and vague.

A.  There -- there were times, yes.

BY MS. HAGY:

Q.  And who would decide whether or not a court reporter will be present?

A.  That would be up to the state's attorney.

Q.  Okay.  Well, let me ask you:  When did you -- at some point, did you stop working as a Cook County State's Attorney investigator?

A.  That -- do you mean when I -- did I retire from there?  Yes.

Q.  Yes.  When was that?

A.  2006.

Q.  Okay.  And so, from June of 1994 to 2006, were you an investigator in the Gang Unit during that entire time?

A.  Yes.

Page 96

Q.  And so, at some point during that time, was there a time when interviews started to be videotaped?

A.  Not while I was there.

Q.  Okay.  Was there ever a time where an interview, at which you were present, was audiotaped?

A.  No.

MS. HAGY:  Do you -- do you know why any of the interviews weren't audiotaped?

MR. OBERTS:  Objection.  Speculation, foundation.

A.  I don't know.

BY MS. HAGY:

Q.  Okay.  Do you know why any of the interviews weren't videotaped?

MR. OBERTS:  Objection.  Speculation, foundation.

A.  I don't know.

BY MS. HAGY:

Q.  So when -- going back to how you would make sure that you could remember an interview, you said that you would take notes?

A.  Uh-huh, yes.  Sorry.

Q.  And those would be handwritten notes?

A.  Yes.

Q.  Were you given a format for those notes?

Page 97

A.  No.

Q.  So would you just take them on, like, a notepad?

A.  Legal -- a legal pad.

Q.  Legal pad, okay.  And how would you organize your notes for yourself?

MR. OBERTS:  Objection.  Vague.

A.  Well, if the interview was requiring the -- the communication to be about dates and times and places, I would jot those down, and names of individuals that might come up in those interviews.

BY MS. HAGY:

Q.  And did anybody -- during an interview, did anybody ever direct you on what to include in your notes?

A.  No.

Q.  Would anybody ever say, "Oh, don't write that down"?

A.  No.

Q.  And if a State's Attorney asked you not to write something down, would you follow that direction?

MR. OBERTS:  Objection.  Foundation, incomplete hypothetical.

A.  I don't think I would, actually.

BY MS. HAGY:

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 98

Q. Okay. You understood that you had an independent duty to record what was happening during those meetings, right?

MR. OBERTS: Objection. Speculation, foundation, incomplete hypothetical, to the extent it calls for a legal duty.

A. No.

BY MS. HAGY:

Q. You didn't?

A. I don't think I had the responsibility unless the state's attorney asked me to.

Q. Okay. But if you -- if you did memorialize an interview, did you consider that, as a former police officer, and as an investigator, that you had a duty to make sure that that recording was accurate?

A. Yes.

Q. Okay. And would you ever take notes of the tactics that were used during an interview?

MR. OBERTS: Objection. Vague, regarding tactic.

A. What tactics?

MR. OBERTS: And over-broad.

A. I don't know what you mean by tactics.

BY MS. HAGY:

Q. If a State's Attorney raised their voice

Page 99

during an interview, would you record that?

A. No.

Q. If an investigator threatened a witness, would you record that?

MR. OBERTS: Objection. Vague, incomplete hypothetical and foundation.

A. I don't ever remember anybody threatening anybody.

BY MS. HAGY:

Q. Okay.

A. Not in my presence anyway.

Q. And so, if that did happen, would you have recorded it?

MR. OBERTS: Objection. Incomplete hypothetical and foundation.

A. I don't know.

MR. OBERTS: And speculation.

BY MS. HAGY:

Q. If a State's Attorney swore during an interview with a witness, would you record that?

MR. OBERTS: Objection. Foundation, speculation, incomplete hypothetical.

A. No.

BY MS. HAGY:

Q. And what would you do with the notes that you

Page 100

took during an interview?

MR. OBERTS: Objection. Over-broad, and time frame.

A. In a particular case of -- that I was assigned to an interview, I would hold onto the notes until I was told to memorialize them or not memorialize them, then I would destroy them. Okay.

BY MS. HAGY:

Q. Okay. And so, if you would be -- is it fair to say that after an interview, at some point, you would be told to either memorialize that interview or you would not be told to memorialize that interview?

A. Yes.

Q. And then at that point, you would destroy those notes?

MR. OBERTS: Objection. Vague, incomplete hypothetical to the extent that it mischaracterizes his testimony.

A. Yeah. Depending the -- the time element afterwards, you know, like I'd hold onto them for a while.

BY MS. HAGY:

Q. How long about?

MR. OBERTS: Objection. Vague, incomplete hypothetical, over-broad.

Page 101

A. I -- I don't know.

BY MS. HAGY:

Q. Okay. And would you ever make a report without a State's Attorney telling you to?

A. Actually, no.

Q. Okay. And did you understand that you might have to testify in court to say that a witness had the opportunity to have a lawyer present in an interview?

MR. OBERTS: Objection. Vague, incomplete hypothetical, foundation.

A. Yes.

BY MS. HAGY:

Q. And did you have an understanding that you might have to testify in court that a juvenile had the opportunity to have a parent present in an interview?

MR. OBERTS: Objection. Vague, over-broad, incomplete, hypothetical, and foundation.

A. Yes.

BY MS. HAGY:

Q. And did you have an understanding that you might have to take the stand and testify that a -- that you did not hear a State's Attorney threaten a witness during an interview?

MR. OBERTS: Objection. Vague, incomplete hypothetical, over-broad, and foundation.

Read and Sign Only

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 102

A.   Can you rephrase that again?

BY MS. HAGY:

Q.   Sure.  Did you understand that you might have to testify -- take the stand and testify that a witness had not been -- said facts during an interview?

MR. OBERTS:  Objection.  Form, incomplete hypothetical, vague.

A.   Yes.

BY MS. HAGY:

Q.   And did you have an understanding that you might have to take the stand and testify that a witness had not been coerced by a State's Attorney during an interview?

MR. OBERTS:  Objection.  Form, vague, incomplete hypothetical.

A.   Yes.

BY MS. HAGY:

Q.   And that it -- given that, did you have a responsibility to make sure that a witness was not, in fact, coerced during the interview?

MR. OBERTS:  Objection.  Form, vague, and foundation.

A.   Yes.

BY MS. HAGY:

Q.   And when a witness gave you facts, did you --

Page 103

were you ever assigned to verify whether or not those facts were true?

MR. OBERTS:  Objection.  Vague, incomplete hypothetical, and time frame.

A.   Yes, in most cases.

BY MS. HAGY:

Q.   And did you have an independent duty -- strike that.  Would you -- would you only verify -- would you -- sorry, strike that.  Would a State's Attorney sometimes assign you to verify whether or not the facts that the witness gave you were true?

A.   Yes.

Q.   And in that case, would you investigate whether or not those facts were true?

A.   Yes.

MR. OBERTS:  Objection.  Vague, incomplete hypothetical.

BY MS. HAGY:

Q.   And if a State's Attorney didn't assign you to verify whether or not those facts were true, would you still do it?

MR. OBERTS:  Objection.  Form, vague, incomplete hypothetical.

A.   I might have.  I don't know.

BY MS. HAGY:

Page 104

Q.   Did you understand that you had an independent duty to make sure that the facts given to you by a witness were true?

MR. OBERTS:  Objection.  Vague.

A.   Yes.

MR. OBERTS:  Foundation.  Objection.  Vague.  Foundation, to the extent it calls for him having a duty.

BY MS. HAGY:

Q.   Okay.  And did you get that answer?  Okay.  And how would you verify whether those facts were true?

MR. OBERTS:  Objection.  Vague, incomplete hypothetical, and over-broad and form.

A.   What kind of facts are you talking about?

BY MS. HAGY:

Q.   Sure.  If a witness gave you a fact about how a crime happened, how would it -- how would you verify whether those facts were true?

MR. OBERTS:  Objection.  Vague, incomplete hypothetical.

A.   Well, interview witnesses, and depending on what the circumstances were, who the person that gave us that information, verify it through other accomplices.

BY MS. HAGY:

Q.   That you would sometimes verify it through

Page 105

other accomplices?

A.   Well if there was co-Defendants in a case.

Q.   And would you --

A.   That's if they were cooperative, of course.  Yeah.

Q.   Would you -- so you would sometimes verify a witness's statement against a -- with a statement by another witness; is that fair?

MR. OBERTS:  Objection.  Vague, incomplete hypothetical, over-broad, and foundation.

A.   That -- that wouldn't be just the only avenue you could take.

BY MS. HAGY:

Q.   Okay.  But would that be one avenue?

A.   Yes.

Q.   And if you were given accounts by two different co-Defendants, let's say, would you check for inconsistencies between those two statements?

MR. OBERTS:  Objection.  Vague, incomplete hypothetical, and over-broad.

A.   Yes.

BY MS. HAGY:

Q.   And what would you do if you found an inconsistency between the statements of two co-Defendants?

Read and sign only

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 106

MR. OBERTS: Objection. Vague, over-broad, incomplete hypothetical.

A. Well, we would try to prove which one was telling the truth.

BY MS. HAGY:

Q. Okay. And how would you try to do that?

MR. OBERTS: Objection. Vague, incomplete hypothetical.

A. Well, as best we could, through our investigations, whatever follow-up we could do regarding whatever facts we're talking about here.

BY MS. HAGY:

Q. Would you ever -- would you try to verify the facts someone gave you by visiting a crime scene?

A. Yes.

MR. OBERTS: Objection. Vague, incomplete Hypothetical.

BY MS. HAGY:

Q. Were there other ways that state's attorneys told you to -- were there other methods state's attorneys gave you to verify whether the facts someone gave you were true?

MR. OBERTS: Objection. Mischaracterizes his testimony. Objection. Vague. Incomplete hypothetical.

Page 107

A. Well, there'd be specific requests that they would make for us to check.

BY MS. HAGY:

Q. Sure. Do you remember what any of those requests were, as far as how they would ask you to verify whether a fact was true?

A. I mean, you talking anything specific? I don't -- you know, in general, we would do what was -- we were requested to do.

Q. Would they sometimes ask you to check a statement against physical evidence?

MR. OBERTS: Objection. Vague. Incomplete hypothetical.

A. Yes.

BY MS. HAGY:

Q. And would you sometimes take your own initiative to check the facts against physical evidence?

MR. OBERTS: Objection. Vague. Incomplete hypothetical.

A. It depends. I'm not sure. No.

BY MS. HAGY:

Q. Okay. For example, if a witness told you that a certain type of gun was used in a crime, would you check whether or not there was -- whether the murder weapon was in custody?

Page 108

MR. OBERTS: And just him independently without ASA request?

MS. HAGY: Yes. Independently.

MR. OBERTS: Do you understand the question?

A. Yes. No, I wouldn't do it independently.

BY MS. HAGY:

Q. Okay. And would you do it if the state's attorney asked you to?

A. Yes.

Q. And if you were there ever times where you were interviewing a witness, and you did not believe them?

MR. OBERTS: Objection. Vague.

A. Ever, ever, or in this particular case? What are we talking about?

BY MS. HAGY:

Q. No. In your role as a State's Attorney investigator.

A. Yeah. There would be times that I wouldn't. Yeah.

Q. What would you do if you didn't believe a witness?

A. Well, I'd say --

MR. OBERTS: Vague, incomplete hypothetical.

A. -- I don't -- I'm not sure specifically

Page 109

what -- what nature the -- of the person would be in -- regarding to a case. Is it somebody that we brought in and is basically lying to us? You know, I don't -- you know, I would tell -- obviously, I would inform the state's attorney of the case that's being handled by them.

BY MS. HAGY:

Q. Okay. And would you -- was there ever a time where you would ask to -- if you could verify the facts that someone had given you?

MR. OBERTS: Object. What -- objection, vague. And incomplete hypothetical.

A. Think most of the times I was asked to verify the facts. Yeah.

BY MS. HAGY:

Q. Okay. And was there ever a time where you suggested a course of investigation to a state's attorney?

MR. OBERTS: Objection. Vague. Over-broad.

A. There might have been a time or two. Yeah.

BY MS. HAGY:

Q. Was there ever a time where during or after an interview, a State's Attorney asked you for your impression of information that was given based on your gang experience?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Preview and signoff only

Page 110

A. Yes.

Q. And were there times where you were working with state's attorneys who had less gang experience than you did?

MR. OBERTS: Objection. Vague. Foundation. Speculation.

A. I would say yes.

BY MS. HAGY:

Q. Is it fair to say that sometimes the state's attorneys saw you as an expert on gangs?

MR. OBERTS: Objection. Speculation. Asked and answered. Foundation and form.

A. Well, I don't know what they thought, but I'm assuming that they would.

BY MS. HAGY:

Q. Okay. Did the state's attorney ever ask you for your experience with gang hierarchies?

A. Yes.

Q. And did a state's -- did you know what the term to be violated meant?

A. Yes.

Q. When did you learn that? Do you know about what year you learned that?

A. About what year I learned it?

Q. Yes.

Page 111

A. Well, probably 1958, 1959.

Q. Okay. And what does the term to be violated mean?

A. It means violated, a member of a gang that gives up information or does something that the hierarchy didn't want him to do. And that usually means a beating and a violation.

Q. Okay.

A. That goes back to the greaser days, '50s.

Q. And it -- so the idea of a violation went back to the greasers. And is it something that you -- did you see violations during your entire tenure as a gang investigator?

A. Oh, yes.

Q. If you -- what -- sorry. When you started an interview with a witness, were there times where you would tell them that you were going to -- you or the state's attorney would tell them what you were going to verify the facts that were given to you?

MR. OBERTS: Objection. Vague. Over broad.

A. There might have been times where I suggested that I go check on something, yes.

BY MS. HAGY:

Q. Okay. And if you found that a witness had given you a fact that you could not verify, what would

Page 112

you do?

MR. OBERTS: Objection. Speculation. Incomplete hypothetical. Form.

A. Well, I informed the state's attorney.

BY MS. HAGY:

Q. Okay. Would you ever tell the witness that you had not been able to verify a fact that they gave you?

MR. OBERTS: Objection. Speculation. Incomplete hypothetical and over broad.

A. There might have been times with -- had a re-interview with somebody.

BY MS. HAGY:

Q. And what would you do when you re-interviewed them?

MR. OBERTS: Objection. Speculation. Incomplete hypothetical and over broad.

A. Well, when we were trying to maybe find out more facts, and facts that were given to us previously weren't right, we would re-interview the person and -- and confront them with it. Yep.

BY MS. HAGY:

Q. And if a witness changed their story, is that something that you would memorialize?

MR. OBERTS: Objection. Vague. Incomplete

Page 113

hypothetical.

A. If I was asked, though, yes.

BY MS. HAGY:

Q. Okay. So if they changed their story, you would memorialize it if you were asked to, but not if you weren't asked to?

MR. OBERTS: Objection. Vague.

A. No, I'm not sure about that. No.

BY MS. HAGY:

Q. That might not be right?

A. No.

Q. So if a witness changed their stories, would you always memorialize that?

A. No.

Q. Sometimes you wouldn't memorialize it, right?

MR. OBERTS: Objection. Vague. Over broad.

BY MS. HAGY:

Q. Did you sometimes interview people pursuant to proffer agreements?

MR. OBERTS: Objection. Vague. Him?

A. Did me interview him?

BY MS. HAGY:

Q. Yes.

MR. OBERTS: Objection. Vague. Over broad and form.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 114

A.   I think most of the times at the proffers, we were just there as approver.

BY MS. HAGY:

Q.   Okay.

A.   Without conducting the interview.

Q.   Okay.  So you were there as approver to any conversation that happened with a proffer agreement?

A.   Yes.

Q.   And did you -- so sometimes after someone was under a proffer agreement, would you then interview them?

MR. OBERTS:  Objection.  Vague.  Him personally?

BY MS. HAGY:

Q.   Yes.  We're --

MR. OBERTS:  We'll just -- I'll just -- you just if you could define who you is.  Him personally? Or that's what I'm asking.  Vague. Objection.  Vague.

BY MS. HAGY:

Q.   Sure.  Okay.  So I'm going to start that over. So did you sometimes understand that you were interviewing witnesses who had proffer agreements in place?

MR. OBERTS:  Objection.  Vague and incomplete

Page 115

hypothetical.

A.   I would most often know that it was under a proffer agreement.

BY MS. HAGY:

Q.   Okay.

A.   Yeah.

Q.   So you would be informed whether or not a witness had a proffer agreement in place when you were interviewing them?

A.   Yeah.  For -- because for the most part, we had to sign off on it.

Q.   You had to sign off on at proffer agreement?

A.   As a witness.

Q.   Sure.  And did you sometimes interview a witness who a different investigator had witnessed their proffer agreement?

MR. OBERTS:  Objection.  Vague.  Incomplete hypothetical and form.

A.   I don't know.

BY MS. HAGY:

Q.   Okay.  So who -- were you ever involved in the decision of whether or not a witness should get a proffer agreement?

A.   No.

Q.   Okay.  Who would make that -- do you know who

Page 116

would make that decision?

THE WITNESS:  No, I don't.

BY MS. HAGY:

Q.   Okay.  And so, is it fair to say that sometimes you were interviewing witnesses who had a proffer agreement in place?

MR. OBERTS:  Objection.  Vague as to "you," and over broad.

A.   I would know if I had signed off on it as the witness.

BY MS. HAGY:

Q.   Okay.  So you did -- I mean, you did sometimes interview people who had proffer agreements in place, right?

MR. OBERTS:  Objection.  Vague as "you," and over broad and incomplete hypothetical.

BY MS. HAGY:

Q.   And that means that you.  You as a person.

A.   I don't know.

MR. OBERTS:  Him, I mean when you say you, though --

THE WITNESS:  Yeah.

MR. OBERTS:  -- he's personally interviewing the person?  Or is he a witness, as he keeps saying, sign off as a witness to the interview?  That's what

Page 117

I don't understand the question.

MS. HAGY:  Okay.  So --

MR. OBERTS:  That's what the basis is.  That's what my objection is.

MS. HAGY:  Okay.  I see.

BY MS. HAGY:

Q.   So would you be present in interviews where someone -- where the witness had proffer agreement in place?

A.   Yes.

Q.   And would you sometimes be conducting an interview with a witness who had a proffer agreement in place?

MR. OBERTS:  Objection.  Vague.

A.   Most of the times, was never involved the investigator in a proffer.  The investigator was there as number one, security for the state's attorney.  And number two is approval for the state's attorney.

BY MS. HAGY:

Q.   But sometimes you did conduct interviews of witnesses without a State Attorney present, right?

MR. OBERTS:  Objection.  Vague.

A.   Yes.

MR. OBERTS:  Scope.

BY MS. HAGY:

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 118

Q.   And so, were any of those interviews of people who had proffer agreements in place?

MR. OBERTS:  Objection.  Vague.

A.   Not that I ever recall.

BY MS. HAGY:

Q.   Is it fair to say that if a witness had a proffer agreement in place, that a State's Attorney would be present for that interview?

A.   Yes.

MR. OBERTS:  Objection.  Vague.  Incomplete hypothetical.

BY MS. HAGY:

Q.   And were you given any instructions on how to look at facts given to you by someone under a proffer agreement?

MR. OBERTS:  Objection.  Vague.

A.   No, I was never given instruction.

BY MS. HAGY:

Q.   Do -- did you, during your time as an investigator, have an understanding of what a proffer agreement was?

A.   Yes.  I knew what it was, yes.

Q.   Okay.  What was that understanding?

A.   My understanding, it was a written agreement between the state's attorney's Office and the person

Page 119

that was going to be a -- a subject of the proffer, and they would be present with an attorney.  And no determination was made about any promises or anything like that made.  And they -- that witness or that particular person had information regarding the case that the state's attorney was looking into.  So there -- it could be very well just a witness or a prisoner, you know.

Q.   And did you -- how would you learn what the terms of a specific proffer agreement were?

MR. OBERTS:  Objection.  Vague.  Foundation.  Speculation.

A.   Well, I would see the proffer form in which I had to sign off on, so I knew what was in the narrative of the -- of the proffer.

BY MS. HAGY:

Q.   Were you sometimes present during discussions in which the state attorney and a witness or the witness's lawyer would discuss whether a proffer agreement will be reached?

A.   No.

Q.   And did you -- were you ever instructed by the state's attorney's Office, on what level of scrutiny should be applied to statements given by witnesses under proffer agreements?

Page 120

MR. OBERTS:  Objection.  Vague.  Over broad.  Incomplete hypothetical.

A.   No, not that I remember.

BY MS. HAGY:

Q.   Did -- were you ever told that -- let me strike that.  Did you -- were you ever -- did a State's Attorney ever communicate a concern to you that someone might present a set of facts just so that they could get a proffer agreement?

A.   No, not that I recall.

Q.   And were you ever given instructions on corroborating statements given by someone under a proffer agreement?

A.   Yes.  We had to corroborate the -- whatever was communicated in the -- in the proffer, you know, proffer interview, I should say.

Q.   Was there more concern about corroborating the statement of someone given pursuant to a proffer agreement then if they didn't have a proffer agreement?

MR. OBERTS:  Objection.  Vague.  Speculation.  Foundation.  When you say "concern," his concern or somebody else's concern?

A.   I don't know what concern of anybody else.  I -- I don't know.

BY MS. HAGY:

Page 121

Q.   Okay.  Did you have any heightened concern about verifying the facts given to you by someone pursuant to a proffer agreement?

MR. OBERTS:  Objection.  Vague and over broad.  And foundation.

A.   Any interview that I conducted or was part of as a -- as approver or otherwise, I thought whatever was being discussed needed to be verified, whether under a proffer or whether I was talking to somebody on the street.

BY MS. HAGY:

Q.   Did any State's Attorney ever communicate to you a specific concern about corroborating testimony given pursuant to a proffer agreement?

MR. OBERTS:  Objection.  Vague.

A.   I'm not sure I understand it.  The State's Attorney that issued a proffer?  Are you saying -- asking me to verify what was said as a result of the proffer?

BY MS. HAGY:

Q.   Well, yes.  Did the state's attorneys ask you to do that?

A.   Yes.

Q.   And did the state's attorney ever tell you that they were more concerned about verifying a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 122

statement given to them under a proffer agreement?

MR. OBERTS: Objection. Asked and answered.

A. I don't remember them being more concerned then.

BY MS. HAGY:

Q. Okay. And when you said that part of your role during interview was to provide security to a state's attorney, what would that entail?

A. Well, because in -- in most cases, they will be a prisoner that was being brought over from the jail. So number one, they had to be guarded. Number two, you didn't want to leave them alone in the room with them, you know?

Q. Did -- were you ever asked to leave a State's Attorney alone in a room with a witness?

MR. OBERTS: Objection. Vague.

A. Not that I recall.

BY MS. HAGY:

Q. Were -- as a Cook County State's Attorney investigator, were you ever asked to find witnesses?

A. Yes.

Q. And were you -- were you ever given instructions on where to find a witness?

A. Well, if I was given some information as about -- about their residencies and things of that

Page 123

nature, they would give me as much information as they could about the particular witness. And then I would do the tracking from that point on, you know. Because oftentimes we had false addresses on witnesses, especially involving gang cases.

Q. And how would you look up the addresses? Would the state's attorney look that up for you, or did you have access to a database of addresses?

MR. OBERTS: Objection. Vague. Over broad. Incomplete hypothetical.

A. Well, if the addresses were supplied in the case reports by the police officers, you know, you'd start there. And oftentimes, though, witnesses in the immediate time that the incident would occur, oftentimes gave false addresses, you know. And then they didn't want to become involved because of the sheer nature of the gang case. So they would maybe step forward, give their name and everything, give a fake address, and then they jot it down as being a witness. But then they have false address. So we would've to track it down, eliminate that particular address, and try to find out where they actually are.

BY MS. HAGY:

Q. And did you have access to, like, a missing person's database or database of addresses for people?

Page 124

A. Well, we had -- we had some databases, like arrest records, of course, and we would do name checks.

Q. Name checks in a computer?

A. Name checks. We -- you know, we would use the Illinois Secretary of State database, the Criminal Information base.

Q. And would it -- is that something investigators would look up themselves or would they --

A. Yeah.

Q. Okay. And were you given instructions on whether or not you could find someone at their place of work?

MR. OBERTS: Objection. Vague.

A. You mean to -- for what purposes?

BY MS. HAGY:

Q. Well if you needed a witness.

A. Yes.

MR. OBERTS: Objection to form.

A. If we found out where they worked and we couldn't locate them otherwise, we'd go to their job. Yes.

MS. HAGY:

Q. And were you ever given -- were you given instructions on whether to try to find someone at their home first, or could you just find them anywhere?

Page 125

MR. OBERTS: Objection. Vague. Incomplete hypothetical.

A. Well, we'd start with the home, of course.

BY MS. HAGY:

Q. Okay. And were you given any specific instructions on finding juveniles?

MR. OBERTS: Objection. Vague.

A. Yes.

BY MS. HAGY:

Q. What were those?

A. Well, to find them as we do of any other witness, what addresses they were at. And if they're of school age, we'd have to contact either the school or the parents or both, to not -- attempted to locate them at the school, we couldn't locate them on the street.

Q. And if you were locating somebody at a school, did you always have to notify their parents first?

MR. OBERTS: Objection. Foundation.

A. Yes, we would attempt to.

BY MS. HAGY:

Q. And what if you couldn't?

A. When we'd notify the people in the -- in the school.

Q. Okay. And when you were finding a juvenile, did you try to find them at their home first, or could

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 126

you go to either their home or their school?

A. No.

MR. OBERTS: Objection. Asked and answered. Vague.

A. We would normally go to their home first.

BY MS. HAGY:

Q. Okay. And were -- did you -- were you ever instructed to look for witnesses at hospitals?

A. Yes. There was times, yes.

Q. And were you ever instructed to look for witnesses at rehabilitation centers?

A. Not that I recall, no. Not me, no.

Q. Were you ever instructed to find a witness at a drug treatment center?

A. No.

Q. Okay. And did you sometimes have a role in transporting witnesses to meet with the prosecutor?

A. Yes.

Q. And would you sometimes transport them from their school?

A. Not that I recall from school.

Q. Okay. How about from their home?

A. From their home? No.

Q. How about from other towns in Illinois?

MR. OBERTS: Objection. Vague. Form.

Page 127

A. Not sure what -- what you mean from out of state that would need -- would need a ride. Is that what you're talking about?

BY MS. HAGY:

Q. Right. Like, were you ever assigned to -- assigned a witness in another city in Illinois? Like Kankakee?

A. Yes.

Q. And were you ever instructed to transport a witness from a rehab center to meet within it?

MR. OBERTS: Objection. Asked --

A. A rehab center? No.

MR. OBERTS: Objection. Asked and answered and foundation.

A. I've never done a rehab center transport that I can remember.

BY MS. HAGY:

Q. Okay. And were you ever instructed to transport a witness from a prison to meet with a state's attorney?

A. Yes.

Q. Okay. And were you ever instructed to transport a witness from the Cook County Jail to the state's attorneys?

A. Yes.

Page 128

Q. And were there protocols for picking someone up from the jail?

A. Yes.

Q. What were those protocols?

A. Well, they -- they --

MR. STEPHENSON: I'm just going to -- real quick. I'm sorry, before you answer, just objection. Form. Vague as to which jail. You can answer.

A. Yeah. Like, which jail I --

MR. OBERTS: Incomplete hypocritical.

BY MS. HAGY:

Q. Okay. So how about the Cook County Jail? What were the protocols for picking up a witness to talk to a State's Attorney from the Cook County Jail?

MR. OBERTS: Just objection, vague with regards to that, but go ahead.

A. Well, depending what the state's attorney would do about calling over to the Cook County Department of Corrections to set up and meet for us and investigators to pick them up, to bring them over the 26th and Cal on the 13th or 14th floor.

BY MS. HAGY:

Q. Were there different procedures for interviewing somebody from the Cook County Jail than

Page 129

from, say, Will County Jail?

A. Yes. Yeah.

Q. What were the differences?

A. Well, there have to be, I -- I believe it was called a writ to bring them out.

Q. If it was from the Will County Jail?

A. Yeah. Right.

Q. And did you need a writ to bring someone from the Cook County Jail?

MR. OBERTS: Objection. Vague, foundation.

A. No, I don't think so.

BY MS. HAGY:

Q. When someone was brought from the Cook County Jail, would that be recorded?

A. Yes.

Q. Who would report that?

A. The Cook County Department of Corrections, or if you're talking about the witness orders protection, the Cook County Sheriff's Police.

Q. Okay. And during the time where you worked with the Cook County's Attorney Investigator's Office, both as a detail officer and as their own investigator, was there always a process for recording when someone was met with from the protective custody?

MR. OBERTS: Objection. Vague. Form.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 130

Incomplete hypothetical.

A.   What method did you mean, the -- the papers? Signed papers?

BY MS. HAGY:

Q.   Yes.

A.   Yeah.  There'd be a -- a request slip, plus the sign-off and the log that the Sheriffs -- sheriffs -- police officers would maintain.

Q.   And do you know how long those records were maintained for?

A.   I have no idea.

Q.   And was there a computerized version of those sign-ins?

MR. OBERTS:  Objection.  Foundation.

A.   That, I don't know.

BY MS. HAGY:

Q.   Okay.  Would you -- was it a handwritten sign-in?

A.   Physically signed paper, basically recording the time and the date that you would remove the prisoner, and the date and time you would review the prisoner back.

Q.   Okay.  And when someone was in protective custody, were they -- were they always signed out when you had a meeting with them?

Page 131

MR. OBERTS:  Objection.  Vague.

A.   I am not sure what you mean by that.  When I -- when I had a meeting with them?

BY MS. HAGY:

Q.   When you would take somebody out of protective custody, did you sign in and out every time?

A.   Yes.

Q.   Did you need the permission of the Court to take someone from Cook County Jail?

MR. OBERTS:  Objection.  Vague.  Foundation.  Speculation.

A.   Not that I'm -- not that I'm aware of.  No.

BY MS. HAGY:

Q.   You didn't need a writ like you would --

A.   No.

Q.   -- with Lake County?

MR. OBERTS:  Objection.  Speculation.  Foundation.

BY MS. HAGY:

Q.   And how about from protective custody, you also did need a writ to take someone out, right?

MR. STEPHENSON:  Objection.  Vague.  Taking them out to where?

MR. OBERTS:  And objection.  Speculation and foundation.

Page 132

MS. HAGY:  Okay.  There's a lot of speaking objections, so I just wanted to --

MR. OBERTS:  Speculation and foundation.  Just said that.

MS. HAGY:  Well --

MR. STEPHENSON:  I'll admit mine was a little bit speaking, but you're saying taking them out of prison, but you know that it matters where they're taking them to.  He's taking them to court, or he's taking him to the 13th floor.

MS. HAGY:  I know, but I can --

MR. STEPHENSON:  I -- that was my first one.

MS. HAGY:  I know, but you have also changed a lot of my questions and that I don't, you know --

MR. OBERTS:  I never changed a question.  I asked you a specific regarding the import of your question.  Would never change your question.

MS. HAGY:  Okay.  I'm just asking for a few words speaking objections, because I think there have been quite a few.

MR. OBERTS:  Okay.  I just ask that you be more specific sometimes.  That's fair for both of us.

BY MS. HAGY:

Q.   So what -- if you were taking someone from protective custody to meet with the prosecutor, did you

Page 133

need a writ to do that?

MR. OBERTS:  Objection.  Foundation.  The speculation.

A.   No.

BY MS. HAGY:

Q.   Were there any limits on how frequently you could take someone from protective custody to meet with a prosecutor?

MR. OBERTS:  Objection.  Speculation and the foundation.

A.   Not that I'm aware of.  I don't know.

BY MS. HAGY:

Q.   And if you took someone from the protective custody to meet with a prosecutor, would they always be returned to protective custody in the same day?

MR. OBERTS:  Objection.  Speculation.  Foundation.  Incomplete hypothetical.

A.   Yes.

BY MS. HAGY:

Q.   And where was protective custody?

A.   In the Cook County Jail.  Cook County Jail, it was in Division 10, which was a section -- it's hard to explain.  It was a kind of a section not used by the Cook County Jail people.  So they had, like, a special little section with their own little yard, so to speak

Read and Sign Only

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of NORRIE DIFOGLIA, taken on August 22, 2024

134..137

Page 134

yard, meaning a little area where they would be able to go outside if they could, you know. It -- but what I -- I think I said Division 10. Division 1, it was.

Q. Okay.

A. And the -- it was a section of Division 1 that wasn't being utilized by the general population. So they sectioned this one little part off. It -- it was, like, in the bottom part of the building itself, kind of away from all the other prisoners.

Q. Who operated the protective custody division?

MR. OBERTS: Objection. Speculation.

A. Well, the actual operation of the -- the protective custody section was done by the Cook County Sheriff's Police, not the Department of Corrections.

BY MS. HAGY:

Q. Did you personally ever have a role in determining whether or not someone would be placed in protective custody?

A. Me personally?

Q. Yeah.

A. No.

Q. Did you -- did you have an understanding of whether witnesses generally preferred being in protective custody to being in the jail at large?

MR. OBERTS: Objection. Speculation.

Page 135

Foundation.

A. Yes, they should be.

BY MS. HAGY:

Q. Did you --

A. Because they should be if they're -- they're in danger, yes.

Q. Oh.

A. But that's the whole idea of protective custody.

Q. Okay. And were -- did you have an understanding of whether the conditions in protective custody were considered more favorable than the conditions in the jail at large?

MR. OBERTS: Objection. Vague. Foundation and speculation.

A. Well, favorable in the sense that they would feel safer, as opposed to being in general population.

BY MS. HAGY:

Q. Did you know whether or not a protective custody had an open commissary?

MR. OBERTS: Objection. Vague.

A. They ate differently than the general population did, and they ate within their confines, where they were under protective custody.

BY MS. HAGY:

Page 136

Q. And they didn't -- sorry, go ahead.

A. I don't know if you call that open commissary, but they had their own eating area there. Is that what you're talking about?

Q. And do you know whether or not they had to pay for items from commissary?

A. I don't remember that.

Q. Did -- were witnesses who were in protective custody, ever brought food?

MR. OBERTS: Objection. Vague.

A. To the facility?

BY MS. HAGY:

Q. Yes.

MR. OBERTS: Objection. Vague.

A. I don't know. The sheriff's police officers would do the shopping and the like.

BY MS. HAGY:

Q. Okay. Did you ever bring a witness food at the protective custody?

A. No.

Q. Did you ever bring food to a witness when they were being interviewed at the 13th or 14th floor?

MR. OBERTS: Objection. Incomplete hypothetical and vague.

A. Well, actually, yes, I did.

Page 137

BY MS. HAGY:

Q. What kind of food would you bring them?

A. Well, we'd get something from the cafeteria of 26th and Cal, or if somebody was going out for a lunch, they'd bring us something back. We'd get that witness a sandwich too, because they were basically -- if they were in there for any length of time, they were missing their lunch, or dinner, or whatever it is at -- at the jail.

Q. And would they sometimes get fast food?

MR. OBERTS: Object to vague, incomplete hypothetical.

A. Yes, a sandwich from McDonald's, you know.

BY MS. HAGY:

Q. Did you know whether witnesses kept in protective custody had access to items like bread?

MR. OBERTS: Objection. Vague.

A. I believe they did, yes.

BY MS. HAGY:

Q. How about items like juice?

A. That, I'm not sure.

MR. OBERTS: Vague.

BY MS. HAGY:

Q. Did you ever work with an -- did you ever bring witnesses from protective custody in another

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 138

county jail?

A.   I have, yes.

Q.   What jail was that?

A.   Well, there was a couple in, well, Will County, and I think one from Lake County one time. It was a few counties, you know, outlying counties.

Q.   And did you need a writ to bring witnesses from those protective custody units?

MR. OBERTS: Objection. Speculation. Foundation.

A.   If I remember right, yes.

BY MS. HAGY:

Q.   Did you ever participate in obtaining writs for witnesses to appear from other jails or from IDOC?

A.   No.

Q.   Were the state's attorneys responsible for completing writs?

A.   Yes.

Q.   So you never --

A.   I never --

Q.   -- filled out a writ?

A.   No, I never constructed a writ.

Q.   Okay.  So is it fair to say that sometimes, as a state's attorney investigator, you had a role as a record-keeper?

Page 139

MR. OBERTS: As a what?

MS. HAGY: Record-keeper.

MR. OBERTS: Objection. Form. Add objection. Form. Incomplete hypothetical. Speculation. Excuse me. Incomplete hypothetical. Vague and over broad.

A.   Record-keeper in the sense of what?  What -- keeping what kind of records?

BY MS. HAGY:

Q.   Sure.  Recording statements.

MR. OBERTS: Objection. Vague. Form. Incomplete hypothetical.

A.   Not -- recording, do you mean electronically or -- no.

BY MS. HAGY:

Q.   Summarizing a statement?

A.   Summarizing a statement, yes.

Q.   And actually, let me back up a little bit here.  So you -- sometimes you would serve as a trooper for a state's attorney's interview, right?

A.   Yes.

Q.   And sometimes you were asked to memorialize those conversations?

A.   Yes.

MR. OBERTS: Objection. Vague.

Page 140

BY MS. HAGY:

Q.   Were you given instructions by the state's attorney, on what level of detail they wanted in those summaries?

A.   No.

Q.   Did you understand whether the recordings were supposed to be verbatims of the interviews?

A.   Any report I ever submitted was not verbatim, it was a summary.

Q.   And did anyone ever instruct you on making your reports a summary, rather than a verbatim account?

MR. OBERTS: Objection.  Asked -- to the extent been asked and answered and vague.  But go ahead.

A.   No, it's the way we -- I always thought -- did my reports, even on the Chicago Police Department.

BY MS. HAGY:

Q.   Okay.  And is it fair to say that you were often following your training from the police department, in your state's attorney's activities?

A.   Correct.

Q.   And were you ever -- did anyone at the state's attorney give you -- state's attorney's office give you instructions on how to do things differently for them?

MR. OBERTS: Objection.  Asked and answered and vague.

Page 141

A.   No.

BY MS. HAGY:

Q.   And did you understand that the prosecutor -- that prosecutors needed to learn -- record facts as they were learned by them?

MR. OBERTS: Objection.  Vague --

MR. STEPHENSON: Foundation.

MR. OBERTS: Foundation.  Speculation.  Over broad and incomplete hypothetical.

A.   Yes, they did need them, yes.

BY MS. HAGY:

Q.   And they needed to record what they learned, right?

MR. OBERTS: Objection.  Foundation.  Incomplete hypothetical.  Vague and over broad.

A.   When you say they needed to record?

BY MS. HAGY:

Q.   Right.  The state's attorney needed -- when they learned things, they needed that to be recorded, right?

MR. OBERTS: Objection.  Speculation.  Vague. Incomplete hypothetical and form.

MR. STEPHENSON: Foundation.

MR. OBERTS: Need context.

A.   I'm not sure I understand that.  If they're

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 142

going to be informed by whatever summary report I give them, yes.

BY MS. HAGY:

Q. And the prosecutor needed to know how to present the case to the jury, right?

MR. OBERTS: Objection. Speculation. Foundation and vague and over broad.

A. Yes.

BY MS. HAGY:

Q. And the prosecutor also needed to know whether there were viable cases against suspects, right?

MR. OBERTS: Objection. Speculation. Over broad. Foundation.

A. I would say yes.

BY MS. HAGY:

Q. And you also understood that the prosecutor had a duty to provide facts that they learned to the defense, if those facts were exculpatory, right?

MR. OBERTS: Objection. Speculation. Foundation and incomplete hypothetical.

A. I would think so.

BY MS. HAGY:

Q. And did you understand that you, as an investigator, had a duty to make sure that the statements you recorded accurately reflected those

Page 143

interviews?

A. Yes.

Q. And the -- because the prosecutor had a duty to provide exculpatory facts to the defense, they needed those facts recorded in order to give those statements to the defense, right?

MR. OBERTS: Objection. Speculation. Incomplete hypothetical. Foundation and over broad.

A. Yes, they needed them.

BY MS. HAGY:

Q. Did you understand that you had a duty to make sure that exculpatory -- or did you have a duty to make sure that exculpatory facts were reported?

A. Yes.

Q. And so, when you were a member of the Cook County State's Attorney's Office, you were aware that the prosecuted -- prosecution had certain discovery obligations to the defense, right?

MR. OBERTS: Objection. Speculation. Foundation and incomplete hypothetical.

A. I believe so, yeah.

BY MS. HAGY:

Q. And if the state learned about material information from a witness, did that have to be disclosed?

Page 144

MR. OBERTS: Objection. Speculation. Foundation.

A. I would think so, yes.

BY MS. HAGY:

Q. Was it permitted to withhold facts learned during a witness interview, from a criminal defendant?

MR. OBERTS: Objection. Vague. Over broad. Speculation and incomplete hypothetical.

MR. STEPHENSON: And foundation.

A. I forgot already.

BY MS. HAGY:

Q. Did you have an understanding of whether you were permitted to withhold facts learned during a witness interview, from a criminal defendant?

A. Yes.

Q. Were you permitted to?

A. What? Withhold facts?

Q. Yes.

MR. OBERTS: Objection. Vague. Speculation --

A. No -- no. I misunderstood.

MR. OBERTS: -- incomplete hypothetical.

BY MS. HAGY:

Q. And would you attempt to comply with your discovery obligations, by documenting your interviews

Page 145

with witnesses?

MR. OBERTS: Him?

MS. HAGY: Yes.

MR. OBERTS: Objection. Speculation. Foundation, to the extent it calls for a legal conclusion, and incomplete hypothetical and vague.

A. Like I said before, I would only memorialize what I was told to memorialize.

BY MS. HAGY:

Q. Okay. And so, if a -- if no state's attorney asked you to memorialize an exculpatory interview, you wouldn't memorialize it?

MR. OBERTS: Objection to form and to vague and incomplete hypothetical.

A. No.

MS. HAGY: So it's 1:30. Are you still good? Do we want to take a lunch break, or do we want to --

THE WITNESS: It's up to you guys.

MR. OBERTS: Yeah.

THE REPORTER: I'm good, too.

MS. HAGY: Okay.

MR. OBERTS: Will we just take a -- like, a five-minute bathroom break, then?

MS. HAGY: Sure.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 146

THE REPORTER: We're off the record. The time is 1:28 p.m.

(OFF THE RECORD)

THE REPORTER: We're back on the record. The time is 1:37 p.m.

BY MS. HAGY:

Q. When you recorded a statement for the state's attorney's office, were you instructed to list everyone who was present for an interview?

MR. OBERTS: Objection. Vague.

A. Yes.

BY MS. HAGY:

Q. And would an investigator ever record a conversation that they were not present for?

MR. OBERTS: Objection. Vague. Speculation.

A. Are you saying it would've -- the investigator recorded a conversation when -- by not being present -- not being present?

MS. HAGY: Right?

MR. OBERTS: Objection. Vague. Form.

A. I've never heard of anything like that.

BY MS. HAGY:

Q. Did you ever take another investigator's notes and reduce those --

A. No -- no.

Page 147

Q. And would record the date that an interview took place?

A. Most of the times, yes.

Q. Were there times when you didn't?

A. Maybe possibly left them out inadvertently, or something, yeah.

Q. Would -- were you instructed about whether a report should cover one day, or could a report cover multiple days?

MR. OBERTS: Objection. Vague and incomplete hypothetical. But go ahead.

A. There's been times we could record a report that incorporated a couple different times, like, interviews or whatever, yeah.

BY MS. HAGY:

Q. Okay.

UNIDENTIFIED SPEAKER: If I could just close that door.

BY MS. HAGY:

Q. And so, a few days of the interview could possibly be incorporated into one report, right?

A. Yes.

MR. OBERTS: Objection. Vague.

BY MS. HAGY:

Q. And were you instructed on whether or not the

Page 148

report should record what discussions took place on which day?

MR. OBERTS: Objection. Form and vague. Go ahead.

A. No, I mean, it would be up to my notes and my recollection of what was said, when I'm memorializing the report, you know.

BY MS. HAGY:

Q. And is it fair to say that you took your notes while a conversation was happening?

A. Yes.

Q. And when you reduced those notes to a summary, were you usually writing those notes exactly or, like, synchronizing those notes into a report?

MR. OBERTS: Objection. Vague and incomplete hypothetical and over broad.

A. Sometimes I would do it differently. Sometimes I would start writing, the -- the -- the notes in the form of a -- of a -- like, a report, then incorporate. Depending how fast or slow the interview was going, you know, if I had time to, you know, fill out sentences as opposed to just jotting little names or dates and that, you know. So I would do it both ways.

BY MS. HAGY:

Q. And would you then type up -- would you type

Page 149

up your report once you were asked to memorialize an interview?

A. Yes.

Q. Would you ever type it up before then?

A. Before the interview?

Q. No. Before you were asked to memorialize it?

A. No, normally not. When I was asked, I -- with the task of doing the memorialization of the report, I would do it.

Q. And was there any standard time frame for which you were asked to memorialize the report? Like, could that have been the day after, or could it have been the month after?

A. You mean the state's attorney asking me a certain date or --

Q. Yes.

A. No, there would be no set time. A lot of it would -- sometimes would be done on the basis of what I had to do within the office of the state's attorney's office, because I wouldn't be working on any one particular case at a time. Sometimes I'd be involved in three, four, five different murders at the same time, three or four or five different states attorneys. Some would take priority on something that had to be done before court presentation, blah, blah, blah. And I

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Read and sign only

Page 150

would do them reports first, as opposed to the other ones. You know, that type of thing.

Q. Okay.

A. So -- but there was no set time order set, no.

Q. Okay. Thanks. Sorry.

UNIDENTIFIED SPEAKER: How are we doing, Maureen?

MS. O'BRIEN: I'm good. How are you? Are you almost done? Wow. Thank --

UNIDENTIFIED SPEAKER: We'll pick a little bit again.

MS. O'BRIEN: Okay, I'll -- you want --

MR. OBERTS: Hey, we're on Zoom. Maureen, you're being heard.

UNIDENTIFIED SPEAKER: From the thing here.

A. And with that.

BY MS. HAGY:

Q. And when you were writing the reports, you knew that you could be called to testify about who was present when an interview took place, right?

MR. OBERTS: Objection. Vague. When you say "writing" -- the typing of the reports?

MS. HAGY: Sure. Okay. Let me state that --

MR. OBERTS: Just, yeah --

BY MS. HAGY:

Page 151

Q. When you were recording what happened during an interview, you knew that there was a possibility that you could be called to testify about who was present during the interview, right?

A. Yes.

Q. So you would try to record who was present during the interview, right?

MR. OBERTS: Objection. Asked and answered.

A. Yes.

BY MS. HAGY:

Q. And would you record whether an AAA was present during an interview?

MR. OBERTS: Objection. Asked and answered.

A. Yes.

BY MS. HAGY:

Q. If more than one ASA was present, would you record all of the ASAs who were present?

A. Yes.

Q. Was there ever a time when an ASA came in and out of an interview?

MR. OBERTS: Objection. Over broad. Vague. Speculation -- over broad and vague.

A. I'm sure there was, yes.

BY MS. HAGY:

Q. And would you make note of that, if a

Page 152

prosecutor was in and out of an interview?

A. No.

Q. And sometimes you were present for statements where the ASA recorded the interview; is that fair?

A. I would say so. Would -- are you talking about the -- you mean note taking or -- or just -- just recording audio itself?

Q. Well, sometimes you were present at interviews where that ASA would take a written -- sign a written statement, right?

A. Yeah. Yeah. I was present, yes.

Q. And sometimes you would be a witness for those --

A. Exactly.

Q. -- statements?

A. Yes.

Q. And when an ASA was taking notes of an interview, when they were recording the interview, would you also record it?

MR. OBERTS: Objection. Vague. Incomplete hypothetical. Time frame and position.

A. I could be, might've -- might've done it, yeah.

BY MS. HAGY:

Q. Okay. So sometimes when the state's attorney

Page 153

was taking the signed statement, sometimes you would take your own notes?

A. Correct.

MR. OBERTS: Objection. Vague and incomplete hypothetical.

BY MS. HAGY:

Q. And would you maintain those notes?

A. As I said earlier, up to a point, that unless I had to memorialize them, then I would get rid of the notes or submit them with the report.

Q. Okay.

A. Depending -- depending on how in-depth it was.

Q. Okay. And you would want to record if a parent was present during an interview, right?

A. Yes.

Q. And you would want to record if a witness' attorney was present during an interview, right?

A. Yes.

Q. And would you record whether other investigators were present?

A. Yes.

Q. And when an ASA was taking a statement, a signed statement from a witness, what was your role during those interviews?

MR. OBERTS: Objection. Vague as context. Over

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Read and Sign Only

Page 154

broad and incomplete hypothetical.

A. I don't know what kind of witness you're talking about. If it was somebody that voluntarily came in or if it was a prisoner, it'd be a little bit of a different role. Obviously, I'd stay right with the prisoner when he was doing a signed statement, as opposed to maybe a witness that was brought in via subpoena or whatever, voluntarily came in. So I might not just stay in the room with them if wasn't necessary.

BY MS. HAGY:

Q. Okay. So if it wasn't a prisoner, you might stay in the room during -- when an -- when an ASA-signed statement was taken, and you might not?

MR. OBERTS: Objection. Vague.

A. A prisoner?

MR. OBERTS: Objection. Vague. Incomplete hypothetical. Context and time frame.

BY MS. HAGY:

Q. If it wasn't a prisoner?

A. Oh, it wasn't a prisoner. Yeah, I might -- might not have stated every second there, you know.

Q. And if there was a statement where you were signing every page of a witness that -- a witness' statement, do you remember times where a witness would give a signed -- a written statement and then they would

Page 155

sign at the bottom of every page, and there were times where you signed at the bottom of every page, right?

MR. OBERTS: Objection. Vague. Incomplete hypothetical.

A. I don't remember, but yes, that was the norm.

BY MS. HAGY:

Q. And if you did that, would you stay during that entire interview, or would you maybe come and go?

MR. OBERTS: Objection. Vague. Incomplete hypothetical.

A. Yes, I more than likely would've.

BY MS. HAGY:

Q. Stayed?

A. Yeah.

Q. Okay. So I know that you did answer this question earlier today, so you'll have to forgive me, but --

MR. OBERTS: Objection. Asked and answered.

BY MS. HAGY:

Q. When did you become a supervisor in the CCSAO investigator office?

A. See, I can't remember --

MR. OBERTS: Objection. Foundation.

A. Yeah, the --

MR. OBERTS: And asked and answered.

Page 156

A. It had to be sometime in maybe '99, 2000, something like that.

BY MS. HAGY:

Q. Who was your supervisor when you were promoted to be a supervisor?

A. You mean as the supervisor, who was my supervisor?

Q. Who --

A. Because there were people above me, obviously, you know?

Q. Yeah. Right. Who promoted you to supervisor?

A. Well, the chief of the Investigation Bureau.

Q. And who was that?

A. At that time, it was Gus Wirller, Bill Gus Wirller.

Q. Was he a state's attorney or an investigator?

A. No, he was an investigator, a retired police captain that took over the Bureau of Investigations under the new regime, which was, at that time -- oh -- can't think of the state's attorney's name. I forget the state's attorney's name. But whenever that new state's attorney came in, he brought in Bill Gus Wirller. Bill Gus Wirller started moving people around within the Bureau of Investigations, and he called me in one day and he told me that he wanted me to take over

Page 157

the gang unit.

Q. And so, then when you were a supervisor, were you supervisor of the gang unit?

A. The gang prosecution investigators.

Q. And how many investigators reported to you?

A. At any one time, I had anywhere from eight to 12 guys under my SV, so --

Q. And did you supervise all of the gang investigators?

A. Yes.

Q. And before you were a supervisor, when you were an investigator, did you have performance reviews?

A. They did performance reviews within the state's attorney's office, yeah, I think once a year.

Q. And then when you were a supervisor, did you do reviews for other people?

A. Yes.

Q. Did you know whether personnel files were maintained for the investigators?

A. Yeah, they were maintained, but not by me. They were in the -- the -- the -- or not the superintendent, the chief's office.

Q. Were you ever disciplined as an investigator?

A. No.

Q. Were you ever disciplined as a police officer?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 158

A.  Nope.

Q.  Do you know whether any complaints were filed against you as a police officer?

A.  Never.

Q.  And how about as an investigator?

A.  Never.

Q.  How did you prepare for this deposition today?

A.  As far as -- well, I -- as far as reviewing the -- the reports that I had submitted?

Q.  Yeah.  What documents did you review?

A.  Well, my attorneys were nice enough to supply with some of the reports that I had submitted in this particular case.  And I also sat in on audio, on State's Attorney Cassidy's deposition.  Although, the first parts of that deposition, I could hardly hear anything. They had some trouble with the microphone or something. Plus, I wear hearing aids, and I couldn't hear anything. And I actually terminated my part of the listening midway through, you know.  I couldn't hear anything, you know.  But then it got clearer, but then I had to go. But Cassidy was basically being deposed for, like, I don't know how many hours, for God's sake, you know? But -- so I walked out.  I had to go take my daughter's dog out, so --

Q.  Did you meet with any other defendants to

Page 159

prepare for today?

A.  No.

Q.  And I don't want to know the context of -- or the content of your meeting with your attorneys, but did you meet with your attorneys to prepare for today?

A.  Yes.

Q.  Did you meet with attorneys for any of the other defendants, to prepare for today?

A.  No.

Q.  Okay.  So you just met with Bill and Amy, and other people from that firm?

A.  There was no other people from the firm, it was just those two.

Q.  Okay.  So you didn't meet with any other attorneys to prepare for today?

A.  No.

Q.  Have you ever been a defendant in a civil lawsuit before?

A.  No.

Q.  As a Cook County investigator, did you have any role in overseeing the protective custody unit of the Cook County Jail?

A.  Overseeing it, as far as like --

MR. OBERTS:  Objection.  Vague.

A.  Yeah.  No.

Page 160

BY MS. HAGY:

Q.  Okay.  Did you ever -- did you supervise any of the witnesses within protective custody?

A.  I'm not sure I understand.  Supervising the witnesses that are in protective custody?

Q.  Yes.

MR. OBERTS:  Objection.  Vague.

A.  No.

BY MS. HAGY:

Q.  Did you supervise -- if you took a witness from protective custody, were you then responsible for that witness during that time?

A.  Oh, yes -- yes, for sure.

Q.  And how would you supervise that witness?

A.  Well, we'd -- we'd take them out of protective custody.  The mechanics of it was that you signed in to pick them up with the Cook County Sheriff's police officers who were in charge of protecting these guys and keeping them in custody.  We'd cuff them, bring them over to the building at 26th and California, and bring them up to whatever facility or whatever room we were going to, and then sit on them until they were done being interviewed or whatever, and then bring them back in -- in custody, in cuffs, you know?

Q.  When did you -- when they were being

Page 161

interviewed, were you sometimes part of those interviews?

A.  When I was interviewing?

MR. OBERTS:  Objection.  Vague.  Incomplete hypothetical.  Go ahead and ask her.

A.  When I was part of the state's attorney's interview?

BY MS. HAGY:

Q.  Yes.

A.  Yeah, I would sit in on the interview, yes. If that's what you're saying, yeah.

Q.  Sure.  So my question was a little different. When you brought someone from -- a witness from protective custody, to meet with the state's attorney, would you sometimes be part of that interview, or would they sometimes meet without you?

MR. OBERTS:  Objection.  Vague and incomplete hypothetical.

A.  If I brought a prisoner over, I was basically in the room with them.  Maybe not directing the questions, but yeah.

BY MS. HAGY:

Q.  And would -- when a witness was meeting with a witness -- when a witness from protective custody was meeting with the state's attorney, would you take notes

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 162

during those meetings?

MR. OBERTS: Objection. Vague. Incomplete hypothetical and over broad.

A. If it was pertinent to the case, yes.

BY MS. HAGY:

Q. Okay. And would you -- was the process the same, that sometimes you would moralize those interviews if you were asked to, but you would not memorialize them if you were not asked to?

A. Yes.

MR. OBERTS: Objection. Vague.

BY MS. HAGY:

Q. Did the investigators have an office at the Cook County Jail?

A. No. The investigators? No.

Q. Yeah. And where would witnesses from protective custody, be interviewed at the state's attorney's office?

MR. OBERTS: Objection. Over broad. Speculation.

A. You know, it depends What state's attorney from what division of the department, or the investigation process would be asking for. In other words, if -- was this somebody from arson, who -- they would take it to the state's attorneys where their

Page 163

offices are at for their arson, and then gangs -- gangs and that type of thing, narcotics -- narcotics.

BY MS. HAGY:

Q. So how about for gangs? Would you -- would they meet in a conference room in the Gangs Unit?

MR. OBERTS: Objection. Form. Speculation. Incomplete hypothetical. Over broad.

A. There was a couple rooms that were on the 13th floor that were designated interrogation or investigation rooms.

BY MS. HAGY:

Q. Did witnesses from protective custody ever meet with state's attorneys in their offices?

MR. OBERTS: Objection. Vague. Speculation. Over broad. Incomplete hypothetical. Foundation.

A. They -- they might've one or twice, or if the interview rooms were already occupied by other state's attorneys, yeah.

BY MS. HAGY:

Q. Was there any policy regarding whether or not witnesses from protective custody could be interviewed in a state's attorney's office?

MR. OBERTS: Objection. Speculation. Foundation.

A. No policy for that, no.

Page 164

BY MS. HAGY:

Q. Okay. Was there a policy related to -- was there a phone protocol for witnesses in protective custody, that you were aware of?

MR. OBERTS: Objection. Vague.

A. You mean for the prisoners to make a phone call?

BY MS. HAGY:

Q. Yes.

A. I'm not sure if there was an actual protocol. I know they were able to make a phone call with the permission of the sheriff's police officers. Yeah.

Q. Did -- do you ever remember calling a witness in protective custody?

A. No.

Q. Did you ever interview witnesses over the phone?

A. In protective custody?

Q. At all?

A. I -- I don't ever recall in -- doing an interview over the phone.

Q. Okay.

A. I mean, I might have asked the prospective witness if they were going to be home, so when I can meet with them, that type of thing.

Page 165

Q. Okay.

A. Yeah. I spoke to him on the phone. Yeah, I did. Yeah.

Q. Do you remember state's attorneys showing documents to witnesses from protective custody?

MR. OBERTS: Objection. Vague, incomplete hypothetical, context, time frame.

A. Showing documents, like court -- court cases?

BY MS. HAGY:

Q. Yes.

A. No.

MR. OBERTS: Same objections.

BY MS. HAGY:

Q. Do you remember state's attorneys showing witnesses from protective custody, transcripts?

MR. OBERTS: Objection. Vague, speculation.

A. Not that I recall.

BY MS. HAGY:

Q. And if you made a report of a witness from protective custody, would that still be on the same form on the investigative report form?

MR. OBERTS: Objection. Speculation, incomplete hypothetical.

A. Yes.

BY MS. HAGY:

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

Page 166

Q. Now I -- I'm going to ask you about the Hoval Martin (phonetic) case. Do you remember when you were assigned to work on that case?

A. To the best of my recollection, but was in '95, or something.

MR. STEPHENSON: We do -- we want to take a break? It's 2:00.

MS. O'BRIEN: It's up to you-all.

THE WITNESS: It's up to you guys. I'm -- I'm all right.

MR. STEPHENSON: I'm indifferent, but.

MR. OBERTS: I'd like to take some break, whether we leave or not, I'd like to take some type of food break.

MS. HAGY: Okay.

THE REPORTER: All right. Right now? Let's go off the record. It's 2:03 p.m.

(OFF THE RECORD)

THE REPORTER: We're back in the record. The time is 2:53 p.m.

BY MS. HAGY:

Q. Okay. So who assigned you to work on the Hoval Martin murder case?

MR. OBERTS: Objection. Vague in regard to, assigned.

Page 167

A. Well, the immediate supervisor then, of the Gang Investigation Unit was Larry McDonald.

BY MS. HAGY:

Q. And do you remember whether he was the one who asked you to work on the Hoval Martin case?

A. Yeah, he was pretty good about not just throwing an assignment at you. He'd ask you, "Are you willing to work on this," and stuff like that. And --

Q. Do you remember if he asked you if you wanted to work on the Hoval Martin case?

A. Yeah.

MR. OBERTS: Objection. Vague.

A. I believe he did, yes.

BY MS. HAGY:

Q. And do you -- were you given an assignment slip for the Hoval Martin case?

A. Yes.

Q. And do you remember who submitted the assignment slip?

A. Yes. It was State's Attorney Scott Cassidy.

Q. And when you were assigned to the Hoval Martin case, was Scott Cassidy a state's attorney on the case?

A. Yes. I believe he was, yes.

Q. Was this the first time that you had worked with Scott Cassidy?

Page 168

A. No. I think I worked with him on another -- another case a while back, prior to this case. Yeah.

Q. Do you remember what that case was?

A. No, I -- I don't remember what the case was.

Q. Do you remember if that case was a gang related case?

A. Yes, it was. Yeah. He was in the Gang Unit a -- for a short period of time at that time. Yeah.

Q. And when you were assigned to work on the Hoval Martin case, do you do you know whether or not Scott Cassidy -- Scott Cassidy was part of the Gang Unit at that time?

A. I don't remember. He -- he was in special prosecution, but he was there on the 13th floor, right where the Gang Unit was on. I forget what his title was, actually, at that time.

Q. Okay.

A. Yeah.

Q. Do you remember any titles that he held when you worked with him?

A. Well, at one time, he was a supervisor, if I'm not mistaken, or a deputy supervisor, they -- of the Special Prosecution Unit.

Q. So once you got the assignment -- well, first of all, do you remember what your first assignment was

Page 169

in the Hoval Martin case?

A. Yeah, that would've been in '96. It was regarding an interview with Billy William Bigeck. I forget the exact month it was, but I think it was, like, September or something.

Q. And do you remember doing any work on the Hoval Martin case prior to that?

A. No.

MR. OBERTS: You did not, correct?

A. I did not, no.

BY MS. HAGY:

Q. And do you -- do you have an independent recollection of interviewing Billy Bigeck, or did you review documents in preparation for today?

MR. STEPHENSON: Objection. Compound.

A. Well, I -- I had seen some of the investigative reports that I turned in, one of when -- one of which was with Billy Bigeck and that, you know, I had the independent recollection, and then I had the recollection from what I saw in my report.

BY MS. HAGY:

Q. Okay. And for the Martin Hoval case, every time that you did something on -- did a piece of work on the case, was that given to you via an assignment slip or was -- or were you just assigned to that case?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 170

A. No.

MR. OBERTS: Objection. Compound, vague.

A. All -- all the tasks I did in that and all -- any other case I did were via an assignment assigned to me by the -- a request slip, yeah.

BY MS. HAGY:

Q. Okay. And do you remember what other investigators were assigned to work on the Hoval Martin case?

A. Well, there was Investigator Thomas Ptak. At different points of that case, there was numerous investigators, you know, at one time or another. I don't remember all their names, but Ptak was one. Then because of a shortage of manpower within the Gang Unit that we were in, I think Bill Marley got involved in it and Lenny Bajenski, I think was another investigator. I remember seeing him at something. They were from the Trial Division actually, you know, so. But there were other investigators involved, but I can't recall all of them, you know, to tell you the truth.

Q. Okay. So Ptak was a gang investigator, right?

A. Yes -- yes.

Q. And Bajenski was not a gang investigator?

A. No.

Q. He was --

Page 171

MR. OBERTS: Objection.

THE WITNESS: Pardon?

MR. OBERTS: He said -- objection for -- I'm just clarifying you, "No." How you interpret the, "No."

MS. HAGY: So Bajenski was not a gang investigator, right?

A. No.

MR. OBERTS: Is that true?

A. Yes.

MR. OBERTS: Okay. Just the way you said, "No," and you don't know if he said -- she's saying --

THE WITNESS: Well, he was assigned to the Trial Division --

MR. OBERTS: Understood.

THE WITNESS: -- is the way I remember, you know. He was never in my unit, you know, I knew of him and worked around him, you know?

BY MS. HAGY:

Q. Do you know what it meant to be assigned to the Trial Division?

A. Well, those are investigators that were, more or less, assigned to the general state's attorneys that were doing the courtrooms, and sometimes Special

Page 172

Prosecution Units, besides the Gang Unit, like arson and narcotics.

Q. Did you ever work for the Trial Division?

A. Actually, no. No.

Q. Okay. Well, and I apologize, I just realized that I need to print one more thing while I was chatting. I might be able to print some here, but maybe in a couple minutes, we'll go -- we'll go off.

A. Okay.

Q. When you first were assigned to the Martin Hoval case, were you overseeing the work of any other investigator on the case?

A. No -- no. You mean as a supervisor type? No.

Q. Right. And at some point, when you -- when you did become a supervisor in the -- for the Gang Unit, did you supervise any other investigators work on the Sopron (phonetic) case?

A. I don't remember. You know, I don't remember what the timeline was, but that -- that the case was already over with or what. Like I said, I didn't become a supervisor until '98 or something like that, '99. I forget. So I'm -- I would imagine maybe I did at -- towards the tail end of it. Yeah.

Q. Okay. Yeah. So we're going to have to take a quick break. I'm sorry. I just need to --

Page 173

THE REPORTER: All right. We are now off the record at 3:03.

(OFF THE RECORD)

THE REPORTER: Back on the record. It's 3:07 p.m.

BY MS. HAGY:

Q. Okay. Thank you for your patience. Are there any other state's attorneys that you remember working with on the Hoval Martin case?

A. Yes. I recall Neil Linehan, and I remember Coleen Hyland was involved, and Laura Sullivan. When you say, involved, I mean, were present for some interviews and things of that nature?

Q. Yes.

A. Yeah. I remember them being somewhat involved in that -- that nature.

Q. And when were -- when you were given an assignment slip, did the assignment slip tell you who was making the assignment, like which -- in which AFN?

A. Well, yes, of course. Yeah.

Q. And do you know if the assignment slips were retained by the office? Were they kept or would you --

A. I -- I don't know what they did with them, yeah.

MR. OBERTS: Objection. Speculation and

Read and Sign Only



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 174

foundation.

A.   I -- I have no idea what their recordkeeping was like.

BY MS. HAGY:

Q.   Okay.  Were you instructed to keep the assignment slips?

A.   These -- when I became a supervisor, the norm was just to keep them for a short period of time and then destroy them, yeah.

Q.   Okay.

A.   But that was only a partial because it was like a three-page request slip.

Q.   What were on those three pages?

A.   Well, it was a duplicate.

MR. OBERTS:  Objection.  Asked and answered.

BY MS. HAGY:

Q.   Oh, I see.

A.   It was a duplicate, yeah.

Q.   One page, but --

A.   Yeah, it was a duplicate thing, yeah.

Q.   Was it the good old, like, carbon copy?

A.   Carbon copy, right.

Q.   Okay.  And so, before you were a supervisor, when you were an investigator, were you given any instruction on keeping copies of the assignment slips?

Page 175

A.   Not in that particular field, no.

Q.   And if you had a question about an assignment slip, were you directed to go to your supervisor or to the state's attorney who wrote the assignment slip?

A.   More often than not, I would go to the state's attorney because he would keep copies of it.  Yeah.

Q.   Okay.  And that was the same method that was used when you were a CPD officer assigned to the Gang Prosecution Unit, right?

A.   Yes, pretty much.

Q.   And do you know whether or not that assignment you -- slip was used to give assignments to CPD officers who were not assigned to the Gang Prosecution Unit?

MR. OBERTS:  Objection.  Speculation, foundation, and vague.

A.   I'm not -- I'm not sure I understand that part of it.  The -- the other CPD officers getting copies of state's attorney's request slips?

BY MS. HAGY:

Q.   Sorry, let me -- let me re-ask that question.

A.   Yeah, sure.

Q.   Are you aware of any instances in which state's attorney's assignments slips were given to other CPD officers?

A.   No, I'm not.

Page 176

MR. OBERTS:  Objection.  Speculation.

BY MS. HAGY:

Q.   You're not aware of that?

A.   I'm not aware of that.

Q.   Okay.  And on the Martin Hoval case, did you work with any CPD officers on that case?

MR. OBERTS:  Objection.  Vague, incomplete hypothetical.

A.   Can you specify with?

BY MS. HAGY:

Q.   Sure.  Did you meet with any Chicago police officers about the Martin Hoval case?

MR. OBERTS:  Objection.  Vague.

A.   Do you mean like, meet personally in the office or something like that?

BY MS. HAGY:

Q.   Yes.

A.   I did meet with them on occasions -- on occasions.  Yeah.

Q.   Okay.  Which officers did you meet with?

A.   Geez, I can't even remember their names.  Albright, maybe one of them, and I forget what the other guy's name was.

Q.   Okay.  And when -- were there times when you met with the officers where a state's attorney was also

Page 177

present?

MR. OBERTS:  Objection.  Vague, incomplete hypothetical.

A.   I don't remember.  Yeah.  I mean, the -- there were times when I remember the state's attorney being present and it would be very brief meets with these detectives.  You know, it wasn't like a meeting, per se.  It was just to go over what they did and what we - - we were doing, you know, that type of thing.

BY MS. HAGY:

Q.   Okay.  So you would meet and update each other on your work in the case?

A.   Yeah.  More or less, we'd update each other on it.

MR. STEPHENSON:  Objection to that.  Mischaracterizes testimony and vague.

BY MS. HAGY:

Q.   Do you remember if you ever worked with Detective Holmes?

A.   I don't remember.

Q.   How about Detective Graf?

A.   I don't remember that one, either.

Q.   How about -- I forget his title, but a supervisor named Graffeo.

MR. OBERTS:  Objection.  Vague, incomplete

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 178

hypothetical and form.

A. I remember seeing those names in reports, but I don't remember, myself, working with them, yeah, so.

BY MS. HAGY:

Q. Okay. Do you remember being -- do you remember whether or not you were part of a meeting with Chicago Police Officers on September 26, 1996?

MR. STEPHENSON: Objection. Mischaracterizes the evidence.

A. I don't remember.

MR. OBERTS: And an objection. Incomplete hypothetical. Or sorry. I'm sorry. Objection. Vague.

A. I don't remember.

BY MS. HAGY:

Q. Okay. And do you remember hearing about a meeting that took place, any meeting that took place between investigators and Chicago Police Officers on September 26, 1996?

A. I don't remember, but I think they met.

MR. OBERTS: Objection. Foundation and speculation.

A. And I'm not sure what the dates were.

BY MS. HAGY:

Q. Okay. What did you learn about this meeting?

Page 179

MR. OBERTS: Objection. Speculation and foundation and form.

A. Well, if I remember correctly, it had something to do with the actual physical arrest of a couple people involved in the case.

BY MS. HAGY:

Q. Okay.

A. Yeah.

Q. And were you ever -- were you involved in any of the arrests of suspects in this case?

A. No. At the physical arresting, no.

Q. Okay. And were you ever asked to help locate any of the suspects to be arrested?

A. Not that I recall, no.

Q. Okay. And do you remember ever discussing the arrest of any suspects with Chicago Police officers?

A. Yes.

Q. What do you remember discussing?

A. Well, I remember that they had planned to go out early one morning to pick up a couple of the subjects involved in the case.

Q. Okay.

A. Yeah.

MS. HAGY: So I'm looking for that -- using my continuing exhibit, that I recall -- although I

Page 180

realize now that I printed a proffer letter. I was looking at the Bates number. Okay. Sorry. I have the agent proffer letter, but it doesn't have the Bates number, so I'm going to have to go reprint and go off the record.

THE REPORTER: Okay.

MS. HAGY: I apologize.

THE REPORTER: Back off the record. It is 3:17 p.m.

(OFF THE RECORD)

THE REPORTER: Back on the record. It is 3:20 p.m.

MS. HAGY: So Counsel, I am going to present the witness with Continuing Depo Exhibit 8, which is William Bigeck's Proffer Letter, and the Bates Number is Sopron 19CB-825422660.

MS. HAGY: And then Krystal, I know they're kind of weird because it's like they're continuing ones.

THE REPORTER: So this one starts at 8?

MS. HAGY: Yes.

THE REPORTER: Okay.

MR. STEPHENSON: Hey Tony, you may want to mute. We're going to go back on the record.

MR. MASCIOPINTO: Yeah, I got you. Thank you.

Page 181

MR. OBERTS: Here, you keep the one with the other thing, and I'll pass these around, okay?

MR. STEPHENSON: If you get proffer, it's Exhibit 9.

MS. HAGY: Oh, it's Exhibit 9. Okay.

(EXHIBIT 9 MARKED FOR IDENTIFICATION)

MR. OBERTS: Do you want to correct that now then?

MS. HAGY: Yeah, sure. Sorry.

THE REPORTER: This is Number 9. Yes?

MR. STEPHENSON: Yeah, Number 9.

THE REPORTER: Okay.

MR. OBERTS: Thank you.

THE REPORTER: You're welcome.

MS. HAGY: Sorry. I think I gave you guys my copy as well.

MR. STEPHENSON: I wrote Exhibit 9 at the bottom right.

BY MS. HAGY:

Q. Okay. So do you remember being present for the proffer letter of William Bigeck being signed?

MR. OBERTS: Just to clarify the record, it's Exhibit 9, correct?

MS. HAGY: Yes.

MR. OBERTS: Thank you.

Reprint and Sign Only

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 182

A.   I -- I remember after I realized I've signed this, I guess.

BY MS. HAGY:

Q.   Okay.  And here, it says on the top that, "The Cook County State's Attorney's Office hereby agrees to participate in an interview with William Bigeck on August 12, 1996," right?

A.   Correct.

Q.   And you were present during that interview, right?

A.   That's correct.

Q.   And here it says that "Mr. Vitale was present during the interview," right?

A.   Yes.

Q.   And Mr. Cassidy signed the proffer agreement, right?

A.   Correct.

Q.   And was he also present during the interview?

A.   Yes.

Q.   Okay.  And were you there when the proffer agreement was discussed?

A.   I don't recall, no.

Q.   Okay.  And according to your report, the -- part of the interview also took place on this day, August 12, 1996, right?

Page 183

MR. OBERTS:  Objection.  Vague.

A.   If that's -- if that's when my report says, then

BY MS. HAGY:

Q.   Okay.  And so, is it fair to say that this was one of -- the August 12th meeting was a meeting that you were asked to reduce to a report?

A.   One of two meetings, yes.

Q.   Okay.  And did you take notes on those meetings?

A.   Yes.

Q.   Okay.  And if those notes are not with the report, does that mean that you did not keep those notes?

MR. OBERTS:  Objection.  Vague, speculation, incomplete hypothetical.

A.   I don't know what happened to them, no.

BY MS. HAGY:

Q.   Okay.  Did you sometimes destroy your notes from an interview?

A.   Not till after the -- the case was presented, and if I wasn't asked to memorialize the reports regarding that particular date, and that time period.

Q.   Okay.

A.   Yeah.

Page 184

Q.   And so, is it fair to say that some -- when you memorialize the report, sometimes you kept the notes and sometimes you didn't?

A.   Correct.

Q.   Okay.  And do you have any -- at this point in time, do you have any of your notes at home?

A.   No.

Q.   Okay.  During the meetings with William Bigeck, the August 12th, and I'll show you your report in a moment, that that other meeting was August 26th.  Do you remember, ASA Cassidy telling Bigeck that your office would verify whether the things he said to you were true?

MR. OBERTS:  Objection.  Compound, over-broad and vague.

A.   Yes.  I'm pretty sure he said that to him, yes.

BY MS. HAGY:

Q.   Okay.  Do you remember -- well, first of all, did you do you remember whether you talked to William Bigeck during these meetings?

A.   I did talk to him very briefly, but Scott directed the interview himself, you know.

Q.   Okay.

A.   That was the norm in those days.

Page 185

Q.   What do you remember talking to William about?

A.   I can't remember everything, but I think I might have, during his -- his telling about the incident itself and the places that he went to after, I might have asked to explain who was there and the address of where he went, you know, to clarify, that type of thing.

Q.   Do you remember asking him where he ran after the shootings?

A.   Well, I didn't -- I didn't have to ask him that.  That's what he related during the interview.  Yeah.

Q.   Okay.  And do you remember, we just discussed that Mr. Vitale was present during the interview, right?

A.   As best I can recollect, yes.

Q.   Okay.  And he was Mr. Bigeck's attorney, right?  One of his attorneys.

A.   That's what I was told, yes.

Q.   Okay.  And do you remember whether or not Mr. Bigeck had the opportunity to meet with his attorney alone?

A.   I don't remember.

Q.   Okay.  And where did this meeting with Billy Bigeck take place?

A.   I don't remember exactly, but I know it would've been on the 13th floor in one of the interview

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Read and Sign Version Only

Page 186

rooms.

Q. And was this the first time that you had ever met with Billy Bigeck?

A. Yes.

Q. Did you, prior to being assigned to the Martin Hoval case, had you ever worked on a case involving the Almighty Popes?

A. Not in the south side.

Q. Okay. Had you worked on a case involving the Almighty Popes in a different neighborhood?

A. Yes.

Q. What neighborhood was that?

A. That was on the far north side, around Lawrence and Kedzie.

Q. And do you remember what case that was?

A. No, I don't remember.

Q. Do you remember around what year that was?

A. No, sometime in the '70s.

Q. Okay. And do you remember ever working on a case involving the Insane Popes?

A. No, not really.

Q. And do you remember anything that you knew about the Almighty Popes when you started working on the Martin Hoval Case?

MR. OBERTS: Objection. Assumes a fact not in

Page 187

evidence, and foundation, but go ahead.

A. Like what -- what kind of memories? I mean, what I knew about the gang itself?

BY MS. HAGY:

Q. Yes.

A. Well, I wasn't familiar with the south side faction of the Popes, and I wasn't that familiar actually anymore with the north side Popes. I knew what they were standing for, you know, what the -- the title and all that is. And I knew they were on the north side and the south side. We -- we -- we got the federal intelligence reports over the years saying that there was factions on the north side and factions in the south side.

Q. What did you understand the Almighty Popes to stand for?

A. You mean the actual word Popes?

Q. Yes. You want to hear it? It's people -- well, I -- I'm going to clean it up a little bit.

MR. OBERTS: No, I mean, you -- well, go ahead. I don't want to interrupt.

BY MS. HAGY:

Q. If you can -- I know it's not that pleasant, but if you can just say the actual words.

A. Yeah, it's -- it's -- it -- if I remember

Page 188

correctly, it's people -- people. I forget what the O stands for, P-O. Then the E is the elimination, and the S is like -- originally it was like for spics. Pope like people objection -- objecting to and eliminating spics, and then they cleaned it up later on. When they start getting some Hispanic gang members, they -- they turned into a scum, the word scum instead of the other word.

Q. And did you have any understanding of who members of the Popes typically were?

MR. OBERTS: Objection. Vague.

A. I don't remember now, no.

BY MS. HAGY:

Q. Okay. And prior to being assigned to the Martin Hubble investigation, had you ever been familiar with a game called the Ridgeway Wars?

A. No, not really.

Q. Okay. And did you know whether or not -- at this time did you know whether or not the Popes were people or Popes?

A. I don't recall. They were, as part of the jail prison type atmosphere that -- that aligned themselves with the, I believe, the Popes, they were part of the Folks. I'm not sure. Different factions aligned themselves with different people so, like, there was the South side Popes and the north side Popes and

Page 189

both of them, I think, were aligned with different groups.

Q. Okay. Do you remember before you had this meeting with William Bigeck, did you do anything to familiarize yourself with the facts of the Martin Hubbell investigation so far?

A. Up to that point, I looked at case reports filed by the detective division.

Q. Okay. And do you remember whether you met with anybody, any other witnesses before you met with William Bigeck?

MR. OBERTS: Objection. Asked and answered.

BY MS. HAGY:

Q. Did you meet with ASA Cassidy before you met with William Bigeck?

A. Yeah, prior to his arrival in the office, yes.

Q. Okay. And did Scott Cassidy tell you anything about what his goals were for the interview?

A. I don't remember anything like that, no.

Q. Okay. Did Scott Cassidy tell you anything that he had learned about the investigation so far?

A. I believe -- believe he did, but I don't remember exactly what it was.

Q. Okay. Do you remember anything that he told you?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 190

A. Well, I remember discussing the case with him and that they told me that there were other individuals that needed to be looked at.

Q. Other what?

A. Other individuals that were supposedly involved in the -- that we needed to talk to other witnesses about.

Q. Okay. Did he -- so did he think that there might be other people who were involved in the murders?

MR. OBERTS: Objection. Speculation.

BY MS. HAGY:

Q. And did he tell you who he thought these people were?

A. No.

Q. Did he tell you what he thought their role in the gang was?

A. No.

Q. Do you remember whether Scott Cassidy asked you any questions about your gang experience before you met with William Bigeck?

A. I believe he did, but he kind of knew me from past instances in the office.

Q. So would it be fair to say he knew you had some experience investigating gang crimes?

MR. OBERTS: Objection. Speculation.

Page 191

BY MS. HAGY:

Q. Okay. So now I'm going to show you what -- I have to mark this as a new exhibit although we've had pieces of this before. Does anybody know what exhibit?

MR. STEPHENSON: You would be marking that as 126.

MS. HAGY: So Counsel, I'm going to be marking Sopron 6143-6146 as Exhibit 126.

(EXHIBIT 126 MARKED FOR IDENTIFICATION)

MR. O'CALLAGHAN: This is two separate reports?

MS. HAGY: It is, yes. Morgan's going to go over the first one real fast and really a function of them being a double-sided print. So what --

MR. OBERTS: Just one -- so she's going to tell you the Bates stamp, but look, it means double-sided in two different reports. So listen to whatever page she directs you to.

THE WITNESS: Okay.

MR. OBERTS: It's going to be -- this is what's called the Bates stamp.

THE WITNESS: Okay.

BY MS. HAGY:

Q. Thank you. So I'll have you start with the page that's marked Sopron 6144.

A. Okay.

Page 192

Q. So is it fair to say that this is a report of your interviews with William Bigeck on August 12, 1996, and August 29, 1996?

A. Yes.

Q. And up here where it says, Reporting Dates, October 25, 1996, is that the date that you reduced your report to writing, reduced your notes to writing?

A. I believe so, yes.

Q. Okay. And is the fact that it's dated October 25, 1996, is -- does that mean that that is when a state's attorney asked you to reduce your notes to a summary?

MR. OBERTS: Objection. Vague.

A. I don't remember.

BY MS. HAGY:

Q. Okay.

A. Yeah.

Q. But you wouldn't have written this investigative report, you wouldn't have typed this up until a state's attorney asked you to, right?

A. Correct.

Q. And if the state's attorney hadn't asked you to write up this report, you wouldn't have?

MR. OBERTS: Objection. Form.

A. I'm sure I wouldn't.

Page 193

MR. OBERTS: You would not have read the report, correct?

THE WITNESS: Yeah.

MR. OBERTS: It was just a double negative.

BY MS. HAGY:

Q. So here do you know -- here it doesn't delineate what Mr. Bigeck said on the 12th and what he said on the 29th, right?

MR. OBERTS: Well, objection. Form and vague.

A. Say that again, please?

BY MS. HAGY:

Q. The report doesn't specify what information --

A. Oh, I know what date and the other date. No, it doesn't.

Q. And do you know why it doesn't?

A. No. I believe that I just reduced my whole notes not to verbatim, obviously, and reduced the two interviews that I had that I sat in on to a report and it was all based off notes that I took for those two meetings. Yeah.

Q. Okay. And here the report says that the people present -- well, first of all, it says, "During the ongoing investigation into the shooting deaths of Helena Martin and Carey Hubble, which occurred on 14 December 1995," I'm going to skip a little bit, "the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 194

recording investigator was assigned to assist Cook County State's Attorney in the interview of the subject Defendant William Bigeck." So is it fair to say you were present and William Bigeck was present, right?

A. Correct.

Q. And then it continues on to say that, "Also present were Assistant State's Attorney Scott Cassidy and Neil Linehan and Investigator Thomas Ptak," right?

A. Correct.

Q. And I skipped a line where it says, "Present during these interviews were the defendant's attorneys, Mike Vitale and George Zuganelis"?

A. Correct.

Q. And do you remember how long these interviews were?

A. I can't remember.

Q. Okay. Was the length of an interview something that you were asked to record in these reports?

A. No.

Q. Okay. And when we're looking at this report right here, was this the typical format that you used for your investigative reports for the Cook County State's Attorney's Office?

A. Yes.

Page 195

Q. And was this the format you used both when you were an employee for the office and when you were a Chicago police officer detailed to the prosecution -- gang Prosecution Unit?

A. Yes.

Q. Okay. And because you said that these people were present during the interview, does that mean that they were present for the entire interview?

A. That I don't remember.

Q. Okay. So it's possible they came in and out?

MR. OBERTS: Objection. Speculation and foundation.

A. I wouldn't remember, no.

BY MS. HAGY:

Q. Okay. And do you -- do you have any memory of whether Mike Vitale left at all during this meeting?

MR. OBERTS: Objection. Speculation and foundation.

A. I don't recall.

BY MS. HAGY:

Q. Okay. And do you have any memory of whether George Zuganelis left at all during this meeting?

A. No, I don't.

MR. OBERTS: Objection.

BY MS. HAGY:

Page 196

Q. Do you have any memory of whether Scott Cassidy left at all during this meeting?

MR. OBERTS: Objection. Asked and answered, speculation and foundation.

A. I don't recall.

BY MS. HAGY:

Q. Okay. And so, at the beginning of this report, is it fair to say that Billy Bigeck was describing his activities with Eric Anderson on the day of December 14, 1995?

MR. OBERTS: Objection. Objection. That the report speaks for itself, or objection to the extent how he characterized the report. It's vague.

BY MS. HAGY:

Q. So you answered yes, right?

A. Yes.

Q. Okay. Did you have any understanding of what kind of testimony -- either way of what kind of testimony Mr. Bigeck needed to give pursuant to his proffer?

MR. OBERTS: Objection. Vague.

A. No, I don't know.

BY MS. HAGY:

Q. Okay. And do you remember whether he -- did you have any knowledge either way of whether he would

Page 197

have been able to have a proffer agreement if he only gave testimony on Eric Anderson?

MR. OBERTS: Objection to foundation. Asked and answer.

BY MS. HAGY:

Q. You don't know either way, right?

A. No.

Q. Okay. And do you remember whether you had to -- do you remember Mr. Cassidy asking Bigeck questions to understand his knowledge of the case?

A. Yes.

Q. Are there any questions that you remember Mr. Cassidy asking?

A. No, I don't recall all the questions. I -- Scott asked him a couple few questions right off the get go, and Bigeck start relating the whole case, how it was submitted, what was done afterwards.

Q. Okay. And do you know whether or not you knew at this time how old Eric Anderson was?

A. I don't recall at that time, no.

Q. Okay. And did you have any knowledge of whether kids in a gang were usually leaders or usually not leaders?

MR. OBERTS: Objection. Vague. Speculation.

A. Well, the history of gangs always dictated

Read and Sign Only

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Read and sign only

Page 198

that usually the older kids in the gang or older guys, in some cases up to 24, 25 years old, and these youth gangs would be more or less the hierarchy or the leaders of the gang.

BY MS. HAGY:

Q. Okay. And in your experience was a young person like a 15-year-old usually someone who is lower down in the gang?

MR. OBERTS: Objection. Speculation.

A. Yes.

BY MS. HAGY:

Q. And if a 15-year-old took an action in a gang, was it your experience that that would usually be something that they would decide to do themselves or something they would be directed to do by someone else?

MR. OBERTS: Objection. Speculation.

A. Well, in most cases that I remember usually gang leaders told the gang underlings what to do and when to do it, or they would be, as you asked before, be violated for doing things that they didn't want to be done.

BY MS. HAGY:

Q. And was someone who was 15-years old typically more of an underling in a gang?

MR. OBERTS: Objection. Speculation.

Page 199

A. Yes.

BY MS. HAGY:

Q. And is it fair to say that when you were interviewing Billy Bigeck you were trying to determine what the hierarchy was in the gang?

MR. OBERTS: Objection. Him? What his -- Objection. Speculation. Mischaracterizes interview and prior testimony.

A. My personal recollection --

MR. OBERTS: And incomplete hypothetical.

BY MS. HAGY:

Q. Okay. Did you have any understanding of whether during this interview Scott Cassidy was trying to understand what the hierarchy was in the -- in the Almighty Popes gang?

MR. OBERTS: Objection. Speculation.

A. I don't know what he was think -- what his objective was, or thinking was.

BY MS. HAGY:

Q. Okay.

MR. OBERTS: That's not the one --

THE WITNESS: I know.

BY MS. HAGY:

Q. In this report, do you remember Billy Bigeck --

Page 200

MR. OBERTS: Go to 6144? You're referring to 6144?

THE WITNESS: 6144, yeah.

BY MS. HAGY:

Q. We're going to go to 6145. You -- if you can, you can look at it.

A. Okay.

Q. Do you remember during the -- according to this report -- okay. I'm going to strike that, please. This report does not memorialize Billy Bigeck on August 12th and August 29th describing anyone named John Gizowskit, right?

MR. OBERTS: Objection. Vague.

A. Say that again?

BY MS. HAGY:

Q. This report doesn't memorialize that Billy Bigeck told you anything about someone named John Gizowskit on August 12th and August 29, 1996, right?

MR. OBERTS: Objection. Form and vague.

A. Well, this -- this report doesn't say anything, but he might have mentioned them. I don't remember.

BY MS. HAGY:

Q. Okay. And it doesn't mention him describing

Page 201

anybody named Climer (phonetic), right?

MR. OBERTS: Objection. Form, vague.

A. It doesn't reflect that name, no.

BY MS. HAGY:

Q. Okay. And if he -- if Bigeck had listed people who were present during these activities on December 14, 1995, is that something you would have wanted to capture in your report?

MR. OBERTS: Objection. Speculation. Object to form.

A. I probably would've, yes.

BY MS. HAGY:

Q. Okay. In your experience as a gang investigator, did you suspect that someone higher up in the gang had directed these murders?

MR. OBERTS: Objection. Foundation. Objection. Assumes facts not in evidence.

A. In my mind after reading the case reports, the original case reports, I would -- I would believe that there was somebody telling them what to do.

BY MS. HAGY:

Q. Okay. And so that was what was in your mind after you read the original police reports?

A. Yes.

Q. Okay. And do you remember whether you shared

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 202

that understanding with ASA Cassidy?

A. Actually, no.

Q. You don't remember either way?

A. No because we -- I didn't really discuss it with any -- any length with him prior to that process again.

Q. Okay. Did you know during this -- before you had these meetings with Billy Bigeck, had you heard the term pull a roll?

A. Yes.

Q. And what -- when had you heard that term before?

A. It's a term used on the street-by-street gangs usually by telling somebody to or deciding to pull a roll, which would be namely a shooting. In other words, either on foot or from a car, ride by shootings and stuff like that.

Q. And when did you first learn that term?

A. That's -- that goes way back to when I was a kid.

Q. And how about the term light up?

A. Yeah.

MR. OBERTS: Objection. Vague. Form.

A. Again, we're talking terms that have been used for years in gangs.

Page 203

BY MS. HAGY:

Q. And what does light up mean?

A. It means to shoot somebody.

Q. And during this time when you were working on this case, do you remember any other cases that you were working on at this time?

MR. OBERTS: Objection. Vague.

A. I was working on numerous cases at the same time.

BY MS. HAGY:

Q. Okay. Do you remember any of them?

A. Not off the top of my head for that period. I couldn't possibly --

Q. Okay.

A. -- you know, figure out which ones.

Q. At that time were you working on any other cases with Scott Cassidy?

A. No, not at that time, no.

Q. After this time, do you remember any other cases you worked on with Scott Cassidy?

A. Actually, no.

Q. Are there other terms that you had become familiar with in your work as a gang investigator?

MR. OBERTS: Objection. Vague. Over-broad.

A. Other terms? You mean --

Page 204

BY MS. HAGY:

Q. Yes.

A. -- slang terms? Is that --

Q. Yeah.

A. Well, yeah. Pulling a roll, pumpkin head, violate. You know, I mean, there's -- they've got slang for a lot of different things.

Q. How about clean?

A. Yeah, clean.

Q. What did you understand that clean to mean?

A. Clean is referring to -- with the gangland type thinking of cleaning a gun. And cleaning a gun means erasing all the serial numbers off the gun. It doesn't mean swabbing the barrel with a cloth, so --

Q. Okay. And did you in your work with gangs understand that they often use nicknames?

A. Yes.

Q. And in the investigator's office did you have any method by which you recorded nicknames that were used in gangs?

A. Recorded?

Q. Right. Did you -- did you have any database where you kept information about gangs?

A. Not in the gang prosecution, you know, or the Gang Investigation Unit, no.

Page 205

Q. Okay.

A. That wasn't a CPD unit.

Q. And so, the CPD had a database where they kept --

A. Yes.

Q. -- information about gang records, right?

A. Yes.

Q. And did you as an investigator have any access to that database?

A. As an investigator?

Q. Yes.

A. Yes, I would get permission only because of my former position with the CPD.

Q. Okay. So you would because of your former position with the CPD, be able to access the CPD gang database?

A. Yes, I would get permitted. I would have to get permission, though, yeah.

Q. Okay. Do you remember getting -- do you remember whether or not you got permission to use the gang database for this case?

A. No, I don't think I did.

Q. Okay. Do you remember anything that you did to verify the statements -- Billy Bigeck's statements after the -- this meeting?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 206

MR. OBERTS: Objection. Assumes a fact not in evidence and incomplete hypothetical and vague.

A. There were things that we did to try to verify some of the things he said, of course.

BY MS. HAGY:

Q. Is there anything specific that you remember doing?

A. Well, we reflected that -- my recall was we did a crime scene search and went over the area, actually took photos. One of our investigators in the Bureau took photos in the area based on Bigeck's statements about how they escaped from the scene of the murders, where they ran to, so we went over the areas like that. Then we talked to people on the street if they knew anything about any of the Popes street gang. And most people obviously knew mostly about these gangbangers and what their names were, but obviously didn't want to get involved, so there's a point of safety. We didn't record everybody's name that we interviewed, you know.

Q. Do you remember any interviews that you -- any of these interviews that you didn't record? Do you remember the people's names?

A. No, I don't. There was a lot of elderly citizens that even knew about it. And I -- like I said,

Page 207

for the sake of their safety, we didn't get them involved.

Q. And did some of these people tell you who the gang leaders were?

A. There was one or two that might have mentioned the name of the leaders, yeah.

Q. But you didn't keep reports of those interviews?

MR. OBERTS: Objection. Form, vague.

A. Well, it -- it was recorded in my report that reflected the interviews with Bigeck who told us who the leaders were.

BY MS. HAGY:

Q. Right. But you -- the --

A. That was another way we verified what he had told us is. Like when I was there for that interview, I didn't know any of these names at all. Except when I looked at the case reports from the police department, I saw the original three guys who were arrested for the murder. I had no knowledge of any of the other people.

Q. But then you talked to -- when you talked to people in the neighborhood, some of them told you who leaders were in the gangs, right?

A. Yeah, yeah.

Q. But you didn't keep reports?

Page 208

A. No.

Q. And did any of them tell you who wasn't involved in gangs?

A. Who wasn't?

Q. Yes.

MR. OBERTS: Objection. Form, vague.

A. I don't know why I would even ask that, but we were interested in the gang people.

BY MS. HAGY:

Q. Okay. So when you got -- you got some reports from people in the neighborhood, did some of those reports verify what Billy Bigeck had told you about?

A. Well, regarding some of the names, yes.

Q. Okay. But you didn't think that you should keep reports of those verifications?

A. I didn't make reports on those, so yeah.

Q. Okay. And did you -- have you ever heard the phrase do a burn?

A. Yeah.

Q. What does that mean?

A. Well, do a burn means multiple things. You know, sometimes it means going after a vehicle, and then some cases another shooting, of sprays, they use.

Q. And when did you first learn that phrase?

A. I don't remember. Sometime during my career.

Page 209

Q. Sometimes prior to --

A. Yeah, prior to this, yeah.

Q. Okay. And when you went -- is it fair to say you went to the crime scene and looked at the gangways around the crime scene?

A. That's correct, to verify Bigeck's statements regarding his escape route from the scene, yeah.

Q. Did you take any notes of whether any of the gangways had fences?

A. Yes, there were some that had -- when you say fences, you mean fences with gates and things like that?

Q. Right. And did you take any notes of whether any of those gates had locks?

A. I don't recall.

Q. And if you look at your report here on page 6145 -- here -- thank you for your patience. Just a moment here. Okay. So here it's the second to last full paragraph on page 6145. And here it says, "Bigeck told Wayne about coming up on the van by going through the gangways and then shooting at the van."

A. Okay.

Q. Do you see that?

A. Right.

Q. So do you remember doing anything to investigate what -- which gangway they were supposed to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Preview and sign only

Page 210

go through?

A.   Well, we -- we looked at several of the gangways in that area, yeah.

Q.   And did you determine whether it was possible to go through any of those gangways?

A.   There was a possibility, yeah.  There was -- we didn't know exactly which gangway he -- we didn't bring him out to the scene, so we were just looking around to see what gangways they could have gone through.

Q.   And did you ask him to give you any information about which gangway he had planned to go through?

A.   I don't remember asking him that.

Q.   Did you try to verify whether it was possible to go through the gangway that he had planned to go through?

A.   Well, that's what we looked for.

MR. OBERTS:  Objection.  Speculation and foundation.

BY MS. HAGY:

Q.   So you looked for one where it was possible to go through, right?

MR. OBERTS:  Objection.  Speculation. Incomplete hypothetical.

Page 211

A.   Well, I believe there was more than one, yeah.

BY MS. HAGY:

Q.   But did you ask him which one he had planned to go through?

A.   No.

MR. OBERTS:  Objection.  Asked and answered. And here he makes mention of Eddie Morfin being part of the shooting on December 14, 1995, right?

A.   Uh-huh.

BY MS. HAGY:

Q.   And at some point, you guys also interviewed Eddie Morfin, right?

MR. OBERTS:  Objection.

A.   I --

MR. OBERTS:  Objection.  Vague, you guys.

A.   I don't remember.  I think we did, yes.

BY MS. HAGY:

Q.   Okay.  And did you take any steps to determine whether William Bigeck's and Eddie Morfin's statements were consistent with each other?

MR. OBERTS:  Objection.  Vague.

A.   I think we did, and most of it was.

BY MS. HAGY:

Q.   Were there parts of it that weren't?

A.   There were some discrepancies, yeah.

Page 212

Q.   What were the discrepancies?

A.   I don't remember that.

Q.   Do you remember what you did to address those discrepancies?

MR. OBERTS:  Him, personally?

A.   Me, personally?

BY MS. HAGY:

Q.   Yes.

A.   Nothing.

Q.   Do you remember any steps that the office took, that the investigator's office or the state's attorneys took to address those discrepancies?

A.   I don't -- I don't know.

Q.   Did you -- did you come to understand that there was a discrepancy between William Bigeck and Eddie Morfin's testimony about where they planned to meet the getaway car?

MR. OBERTS:  Objection.  Vague.

A.   I don't remember exactly, but there was some discrepancy, yes.

BY MS. HAGY:

Q.   Did you take any steps to determine why there was a discrepancy between those two accounts?

MR. OBERTS:  Objection.  Asked and answered. He already said that.

Page 213

A.   Well, most of the discrepancies as I -- the best of my recollection, were so minor, it didn't really mean anything, you know, as far as like, I can understand the excitement of the night between these kids running after they killed two girls and the -- the nervousness of -- so sometimes witnesses get things mixed up and describe different things.  Different people describe different things.  You can get 25 people and you'll get 25 different descriptions of what they did or what -- where they were at.  You know --

BY MS. HAGY:

Q.   What was --

A.   -- so that wasn't an unusual thing, no.

Q.   Was the fact that there was a plan to have a getaway driver, a minor or a major point in this investigation?

MR. OBERTS:  Objection.  Foundation. Speculation.

A.   Well, depending on what the -- the state's attorney thought was a major or minor thing.  I would -- I would consider it somewhat of a major problem, yeah.

BY MS. HAGY:

Q.   Do you know whether the state's attorney's Office thought it was a major or minor --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 214

A. I don't know.

Q. Was the fact that there was a plan for this murder a major or minor point?

MR. OBERTS: In his opinion?

MS. HAGY: Yes.

MR. OBERTS: And that's assuming he has an opinion.

MS. HAGY: Okay. Let me finish the question. So I -- think you --

MR. OBERTS: I don't know what you're saying.

MS. HAGY: -- can make your objection after I'm done with question, but --

MR. OBERTS: Sure. I didn't know you were done -- weren't done.

BY MS. HAGY:

Q. Okay. So is -- from your -- from your standpoint as an investigator, when you were talking to William Bigeck, was the fact that there was a plan for these murders something that you were interested in?

A. Yes.

Q. Did you consider that to be a major or minor point in this investigation?

MR. OBERTS: Objection. Assumes a fact not in evidence and speculation.

A. Well, being that it would involve other

Page 215

culpable people, yes.

BY MS. HAGY:

Q. And did you want to understand what that plan was?

MR. OBERTS: Objection. Vague. Him, personally?

A. He told us what his -- what their plans were and who told them to do it, yeah.

BY MS. HAGY:

Q. And if there was a discrepancy in how William Bigeck said this plan was communicated and how Eddie Morfin said this plan was communicated, in your mind, was that a major or minor point?

MR. OBERTS: Objection. Vague. Incomplete hypothetical and assumes facts not in evidence.

A. Depending on what the discrepancies were, I would say mostly minor.

BY MS. HAGY:

Q. But the fact that there was a plan was a major --

A. That's --

Q. -- right?

A. That's major.

Q. And did you -- in your mind, as an investigator in this case, was it important to you

Page 216

that -- did the fact that Eddie and -- Eddie Morfin and William Bigeck described some parts of the plan in a similar matter -- manner, was that significant to you?

MR. OBERTS: Objection. Compound. Form. Assumes fact not in evidence. Incomplete hypothetical.

A. Yes.

BY MS. HAGY:

Q. And conversely, was it significant to you that there were discrepancies in the -- in their testimony about the plan?

MR. OBERTS: Objection. Asked and answered and incomplete hypothetical.

A. Again, if the discrepancies were minor, it wasn't important.

BY MS. HAGY:

Q. Okay. And did you also try to verify the facts that Mr. Bigeck described against other -- the testimony of other witnesses that you interviewed?

MR. OBERTS: Objection. Assumes fact not in evidence and incomplete hypothetical and vague. Do you remember the question?

THE WITNESS: No. Can you repeat? I'm sorry. Sometimes I get a little feedback with these hearing aids, and I'll miss a word, so I'm not 100 percent

Page 217

sure.

THE REPORTER: My computer is -- there it is.

MS. HAGY: Sorry. So what --

THE REPORTER: No. I was playing it back for you, but you couldn't hear it, because my computer --

MS. HAGY: Oh, but it did --

THE REPORTER: It did record, but it just wasn't playing any sound.

MS. HAGY: Okay.

THE REPORTER: There we go.

MS. HAGY: That's okay.

(REPORTER PLAYS BACK REQUESTED QUESTION)

MS. HAGY: Yeah, let's grab that.

THE REPORTER: Okay.

BY MS. HAGY:

Q. Did you try to verify some of the facts that Bigeck provided against the statements that other witnesses provided to you? That's a little more clear, I think.

MR. OBERTS: Objection. Asked and answered. Mischaracterizes prior testimony and vague.

A. I don't remember.

BY MS. HAGY:

Q. Okay. After you heard this -- after William

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 218

Bigeck described this plan to you, do you remember telling ASA Cassidy that you thought that it was plausible that Sopron would make a plan and then Antusas would change it?

MR. OBERTS: Objection. Vague.

A. Did I tell Scott -- Scott Cassidy that?

BY MS. HAGY:

Q. Yes.

A. I don't remember saying that to him, but very likely possible.

Q. Okay. Do you -- after this interview, do you remember Scott Cassidy asking you whether based on your gang experience, that whether certain aspects of Mr. Bigeck's testimony sounded plausible?

A. Yes, he did.

Q. And what else do you remember about your discussions with Mr. Cassidy about your interviews with Mr. Bigeck?

MS. KUZNER: Objection. Form. Foundation.

A. Well, he -- he would ask me about the -- about the reliability of this individual and, you know, if he thought I was -- he was telling the truth also. You know, and we both were on the same page. We both thought his -- that all his body mannerisms and everything indicated that he was giving up information

Page 219

that he didn't want to give up to begin with, but he was afraid and that's why he wanted some protection. That's why he came forward.

BY MS. HAGY:

Q. So is it fair to say at first when you talked to Mr. Bigeck, he didn't give you-all of this information?

MR. OBERTS: Objection. Mischaracterizes testimony.

A. I can't remember.

BY MS. HAGY:

Q. Okay. But you just said that at first, it seemed like there was information that he wasn't giving?

MR. OBERTS: Objection. Mischaracterizes testimony.

A. No, I meant that as when he was first arrested.

BY MS. HAGY:

Q. Okay.

A. When him and Anderson and Morfin were arrested, they obviously didn't give up any information to the arresting detectives. They didn't give up their higher echelon people.

Q. Okay. And so, after he entered into the proper agreement, he was then willing to give

Page 220

information about the higher echelon people?

MR. OBERTS: Objection. Speculation.

A. I guess, yes. Yeah.

BY MS. HAGY:

Q. And so, is it fair to say what you just described, is that you, in your opinion, his body language, when he was giving information about these higher up people, indicated that he didn't want to give that information?

MR. OBERTS: Objection. Mischaracterizes testimony. Form and speculation.

A. Well, what they had already given up -- and I say they, Eric -- Eric Anderson, Bob Bigeck and Morfin, based on what they had already given up to the police and his language of the way he was saying the -- the story that he was relaying to us, it all sounded very true and reliable.

BY MS. HAGY:

Q. Okay. So in your opinion, he -- Mr. Bigeck was being truthful with you?

A. Yes.

Q. And you told Mr. Cassidy that you thought Mr. Bigeck was being truthful with you?

A. Yes, I did.

MS. O'BRIEN: Objection. Asked and answered.

Page 221

BY MS. HAGY:

Q. And during his -- during the original arrest -- original police reports, Mr. Bigeck had described his role -- his role in the murder, right?

A. Yes.

MR. OBERTS: Objection. Foundation.

MS. KUZNER: Objection.

BY MS. HAGY:

Q. And he --

MR. OBERTS: Objection. Foundation and vague regarding original reports.

BY MS. HAGY:

Q. And in those police reports from December 1995, he had also given information about Eric Anderson being present with him during the shooting, right?

MS. O'BRIEN: Objection. Form. Foundation.

MR. OBERTS: Objection. Foundation.

MS. HAGY: Have we decided to have more than one person object or --

MR. OBERTS: We could have more people object, but if -- like, she said -- I said foundation, she also said form, so I didn't say form.

MS. HAGY: Okay.

THE REPORTER: So did I get an answer to that?

MS. HAGY: Okay. Do you mind playing that

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 222

back?

THE REPORTER: Yes.

(REPORTER PLAYS BACK REQUESTED QUESTION)

MR. OBERTS: And the objection? If you could play the objection too, for us.

THE REPORTER: Yeah.

(REPORTER PLAYS BACK REQUESTED QUESTION)

MR. OBERTS: Do you understand the question and then the objections?

THE WITNESS: I'm still not clear on what was asked now.

MS. HAGY: Okay.

THE WITNESS: Yeah.

BY MS. HAGY:

Q. So during -- you read the December 1995 police reports --

A. Yes.

Q. -- before you met with --

A. Yes.

Q. -- Mr. Bigeck, right?

A. Uh-huh.

Q. And in those reports, he had described that Eric Anderson was the shooter, right?

MR. OBERTS: Objection. Foundation.

BY MS. HAGY:

Page 223

Q. And so, he had given that information without a proffer agreement, right?

MR. OBERTS: Objection. Speculation.

A. Yes, from my knowledge.

BY MS. HAGY:

Q. Sorry?

A. Yes, from my knowledge.

Q. Okay. And so, when you first -- when you read those reports from December 1995, did you think that Billy Bigeck was holding back any information at that point?

MS. KUZNER: Objection. Form. Foundation.

MR. OBERTS: And speculation.

A. I don't know if he was.

BY MS. HAGY:

Q. Okay. And after you met with him in August of 1996, did you think he was holding back any information at that point?

MR. OBERTS: After the meetings?

MS. HAGY: Yes.

MR. OBERTS: Objection. Speculation. But go ahead.

A. Oh, that -- you mean after the second meeting?

BY MS. HAGY:

Q. Yes.

Page 224

A. No, I don't think he was holding anything back.

Q. It was your impression that he was giving you-all the information that he could, right?

A. I personally thought so, yeah.

Q. Okay. But your report doesn't reflect that he told you anything about John Gizowskit at that time, right?

MR. OBERTS: Objection. Asked and answered.

MR. STEPHENSON: Also mischaracterizes the report.

A. Yeah, didn't say anything about him.

BY MS. HAGY:

Q. Okay. And when you first met with Billy Bigeck in August 1996, he again started telling you about Eric Anderson, right?

MR. OBERTS: Objection. Asked and answered.

A. Yes.

BY MS. HAGY:

Q. But then -- and did you have an understanding of whether he would be willing to provide more information once a proffer agreement was in place?

MR. OBERTS: Objection. Form and foundation.

MS. KUZNER: Objection. Form. Foundation.

A. I don't know.

Page 225

BY MS. HAGY:

Q. Okay. But then he did give you more information about that higher echelon of the gang once that proffer agreement was in place, right?

A. Correct.

Q. And when you were an investigator for the state's attorney in 1996, did you have an understanding of who made the decision about whether there was probable cause to arrest someone?

MS. KUZNER: Objection. Form. Foundation.

MR. OBERTS: And it calls for a legal conclusion.

A. I don't know who -- who makes that decision.

BY MS. HAGY:

Q. Okay. Were you part of that decision?

A. No.

MR. STEPHENSON: I think whenever you feel comfortable if we can have just quick bathroom break?

MS. HAGY: Sure. We can do that now.

MR. STEPHENSON: Okay. Thanks.

THE REPORTER: All right. We're off record. The time is 4:20 p.m.

(OFF THE RECORD)

BY MS. HAGY:

Read and Sign Version Only

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 226

Q. We're back on the record. It's 4:30 p.m. I'm now going to show the witness what was previously marked as Exhibit 46, which is the proffer letter of Edward Morfin, and this is CPSAODAB111183. Do you have that? I have that as Exhibit 46.

(EXHIBIT 46 MARKED FOR IDENTIFICATION)

MR. STEPHENSON: 46, Edward Morfin proffer letter, Bates stamp CTSA011183?

MS. HAGY: Yes.

THE WITNESS: Thank you.

BY MS. HAGY:

Q. Do you recognize this document in front of you?

A. According to my signature, it's a proffer letter for Edward Morfin.

Q. Okay. And this proffer letter says, "The Cook County State's Attorney's Office hereby agrees to participate in an interview with Edward Morfin on September 5, 1995," right?

A. That's correct.

Q. And that's the same format as in the Billy Bigeck proffer letter, right?

A. Yes.

Q. And so, this says that an interview happened with Eddie Morfin on September 5, 1995, right?

Page 227

A. That's what it says, yeah. That's -- it's not right though, is it, that date? Is that the right date?

Q. Well, do you have knowledge that it's not the right date?

A. No, I'm not sure. It just sounded -- it sounded like the wrong date.

Q. Oh, I see. But perhaps it was supposed to be 1996?

A. Yeah, I would think so.

Q. Okay. And you were present when this proffer letter was signed, right?

A. That's my signature at the bottom, yes.

Q. Okay. And do you -- do you have -- you wouldn't have signed this if you weren't present during --

MR. OBERTS: Objection --

BY MS. HAGY:

Q. -- when the proffer letter was signed, right?

MR. OBERTS: Objection to form.

A. You mean as being part of the interview of the witness?

BY MS. HAGY:

Q. Right.

A. Ninety-nine percent of the times I would sign a proffer letter, I'd be there for the interview, yes.

Page 228

Q. Okay. And do you have any reason to think that you weren't part of the interview in this case, in this --

A. Of this person?

Q. Yes.

A. The only way that I would not have been is if I signed a proffer letter and then had to leave the office for an emergency reason or anything for another case or something.

Q. Okay.

MR. OBERTS: I just object to speculation.

A. Yeah, but I can't remember, you know, or why I would be not be there.

BY MS. HAGY:

Q. Okay. And so, this letter indicates that there was an interview with Eddie Morfin on September 5th?

A. Correct.

Q. And do you remember being present for an interview with Eddie Morfin?

A. I do not remember.

Q. Okay. And if you were -- strike that. You were the -- well, sometimes you memorialized an interview into writing and sometimes you weren't asked to, right?

Page 229

A. Yes.

Q. And if there is not a report from a September 5th meeting with Eddie Morfin, would that be because you were not asked to memorialize that interview?

MR. OBERTS: Objection. Speculation. Foundation and form.

A. I don't remember why I wouldn't do it. I don't know.

BY MS. HAGY:

Q. Okay. Do you have any reason to think that you weren't present for an interview with Eddie Morfin when this proffer letter was signed on September 5th?

MR. OBERTS: Objection. Asked and answered and form.

A. I don't know why I wouldn't be there. I signed it. I more than likely was there.

BY MS. HAGY:

Q. Okay. And did you -- when you weren't asked to memorialize an interview, did you have an understanding of why you weren't asked to memorialize it?

MR. OBERTS: Objection. Speculation. Foundation. Vague and incomplete hypothetical and form.

A. No. Whatever it is, State's Attorney's task

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 230

that was given to me, that's what I would do.

BY MS. HAGY:

Q. And even if exculpatory evidence was revealed during an interview, if you weren't asked to memorialize a report from that interview, you wouldn't have, right?

MR. OBERTS: Objection. Form. Vague and incomplete hypothetical.

MR. STEPHENSON: And mischaracterizes prior testimony.

A. I don't know.

BY MS. HAGY:

Q. But you wouldn't have written a memorialized a meeting if you weren't asked to, right?

A. Correct.

MR. OBERTS: Objection. Vague.

BY MS. HAGY:

Q. So do you have any memory of why there is not a report of this interview with Eddie Morfin on September 5th?

MR. OBERTS: Objection. Foundation. Speculation.

A. I have no idea.

BY MS. HAGY:

Q. And if -- another investigator wouldn't have summarized this meeting without saying that you were

Page 231

present at the meeting, right?

MR. OBERTS: Objection. Speculation.

MS. KUZNER: Objection.

MR. OBERTS: Foundation and form.

A. I don't see why they would not incorporate me in their reports, no.

BY MS. HAGY:

Q. Right. If you -- if they were summarizing a meeting that you had been part of, they would have put the date and your name, right?

MR. OBERTS: Objection. Speculation and foundation and form.

A. I don't know what somebody else would do. I don't know.

BY MS. HAGY:

Q. Okay. But you were -- you understood that as an investigator you were supposed to -- when you did write a report, record the date and who was present?

A. Yes.

Q. And you understood, or did you understand that proffer letters would be produced to the defense?

MR. OBERTS: Objection. Speculation. Foundation.

A. No, I don't know that.

BY MS. HAGY:

Page 232

Q. You didn't know either way?

A. I didn't know that.

Q. Okay. But you understood that this proffer letter showed that there was an interview that took place with Eddie Morfin on September 5th, right?

A. Yes.

Q. But you don't --

MS. O'BRIEN: Objection. Form and foundation.

BY MS. HAGY:

Q. But you don't have any knowledge of why there is not a report of that interview, right?

MS. KUZNER: Objection. Asked and answered.

MR. OBERTS: Speculation and foundation.

A. I don't know why.

BY MS. HAGY:

Q. Okay. Is it possible that Eddie Morfin told you something that didn't work with the state's attorney's theory of the case?

MR. OBERTS: Objection --

MS. KUZNER: Objection. Form and foundation.

MR. OBERTS: Speculation. Foundation.

A. I don't know.

MR. OBERTS: And mischaracterizes testimony.

BY MS. HAGY:

Q. When the state's attorney didn't ask you to

Page 233

memorialize the interview, you don't know why they didn't?

MS. KUZNER: Objection. Asked and answered.

MR. OBERTS: And objection. Form.

A. Yes. I don't know why.

BY MS. HAGY:

Q. And if you hadn't met with Eddie Morfin, if you hadn't had an interview with Eddie Morfin on September 5, 1995, after this proffer letter says that you did, would you have wanted to document that in fact no interview took place?

MR. OBERTS: Objection --

MS. O'BRIEN: Objection. Form. Foundation.

MR. OBERTS: And objection. Speculation. And objection. Already mischaracterizes his testimony regarding '95 versus '96.

MS. HAGY: Okay.

MR. OBERTS: And incomplete hypothetical.

BY MS. HAGY:

Q. So if an interview had not happened on September 5th, would you have wanted to document that that interview did in fact not happen?

MS. O'BRIEN: Objection. Form. Foundation.

MR. OBERTS: And speculation and very vague.

A. Yeah, I don't -- I'm not sure what you're

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 234

saying there.

BY MS. HAGY:

Q. So if a defense attorney understood that there was a proffer agree -- if a defense attorney was given this proffer letter and understood that an interview had taken place on September 5th, did you have any understanding of whether then a defense attorney would want to have a report of that interview?

MR. OBERTS: Objection. Speculation as to defense attorney. Objection. Foundation. And objection to the extent it's been asked and answered.

MS. O'BRIEN: Form. Objection. Form.

A. I don't know what the defense attorney would want.

BY MS. HAGY:

Q. But would you have been -- did you have any concern about allegations from the defense that you may have been withholding reports?

MR. OBERTS: Objection. Speculation. Foundation. Form and incomplete hypothetical and assumes fact not in evidence.

A. I was never informed of any negative things from any defense attorneys, not to me personally.

BY MS. HAGY:

Page 235

Q. Okay. But you wouldn't have wanted to withhold reports from defense attorneys; is that right?

MR. OBERTS: Objection. Speculation.

MS. O'BRIEN: Objection. Asked and answered.

MR. OBERTS: Assumes facts not in evidence that he's withholding anything. It's -- objection. Speculation and form and assumes fact not in evidence and yes, to the extent it's been asked and answered.

MS. O'BRIEN: And foundation.

A. The answer --

MR. OBERTS: Do you understand the question?

THE WITNESS: No, I get the lost when you get -- whenever there's a lengthy objection, I'm screwed.

MR. OBERTS: That's all right. That's fine. If you don't --

THE WITNESS: I don't know.

MR. OBERTS: No, I mean if you don't remember the question --

THE WITNESS: Yeah, I don't remember.

MR. OBERTS: -- then let's get the --

MS. HAGY: Can I want to put on the record that I think these speaking objections are consuming time unnecessarily.

Page 236

MR. OBERTS: Well, let's say this: You are repeating various questions unnecessarily and all those objections, form, speculation, foundation, those are not speaking objections. They're not. You could replay then, and we could see if we could have --

MS. HAGY: With the questions asked is -- standing order says that to the extent possible objections should be limited to form and foundation. So all of the things that are extraneous to that are not -- are speaking objections, I would argue.

MR. OBERTS: I disagree. So you're stating that the only objections an attorney can make are form and foundation?

MS. HAGY: I -- to the extent possible, he has asked that, so that you're not, you know, making suggestions to a witness. And I think at this point, especially if both of you are going to be doing it every time, it is --

MR. OBERTS: Well, I don't know what Maureen's going to object to, nor do I know what anybody else is going to object to. Sometimes we might be saying the same thing, sometimes we might not be. So I don't know, but certainly speculation is not -- that's a very standard objection. Incomplete

Page 237

hypothetical, very standard objection. So I disagree. I'm not trying to, you know, argue with you. I -- we can proceed.

MS. HAGY: Okay.

THE REPORTER: I've got the question.

MS. HAGY: Okay. Thank you.

THE REPORTER: All right.

(REPORTER PLAYS BACK REQUESTED QUESTION)

MS. O'BRIEN: Objection. Form. Foundation.

MR. OBERTS: Oh, are you repeating the objection or no? Object -- I didn't know what we're doing.

THE REPORTER: I think she just objected just now in response to the playback.

MR. OBERTS: Okay.

THE REPORTER: You want me to keep going?

MR. OBERTS: Yes. Could you play back all the objections?

THE REPORTER: Yeah, absolutely.

MS. HAGY: We can also just agree that when the question needs to be replayed, that all objections --

MR. OBERTS: Agreed --

MS. HAGY: -- still apply.

MR. OBERTS: -- completely, that -- well, not

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 238

only that all the objections, but if he's listening to the question again, he should be listening to the objections again.

MS. HAGY: Well, the objections are for the judge, not for the witness, but I understand your position.

(REPORTER PLAYS BACK REQUESTED QUESTION)

MR. OBERTS: Did you get all that now?

A. I think so. Basically, asking me I wouldn't want to withhold information because I -- no, I wouldn't want to.

BY MS. HAGY:

Q. Okay. And so, sitting here today, you don't have any knowledge of why there is no report of this September 5th interview, right?

MR. OBERTS: Objection. Asked and answered, like two, three, or four times. And that's not fair, because you were asking -- you were just asserting about objections with -- by me, but you just repeated a question at least three, four times.

MS. HAGY: Okay. So now you made your speaking objections, so you're both.

MR. OBERTS: Okay. That's fair. Has your answer changed?

A. Again -- again, no, I don't know why.

Page 239

BY MS. HAGY:

Q. Okay. Were you present when John Gizowskit was interviewed?

A. Yes. I think I was, yes.

Q. Okay. So do you have an independent memory of being present when John Gizowskit was interviewed?

A. No, I don't.

Q. Okay. So -- and if you had been there, your -- is it fair that if you had been present for his -- an interview that was reduced to a report, your name would have been on the report, right?

MR. OBERTS: Objection. Speculation. Foundation.

A. I believe so. It should.

BY MS. HAGY:

Q. Okay. And you -- you don't do you remember being present for any interviews with John Gizowskit?

MR. OBERTS: Objection. Compound and form.

A. I don't remember.

MS. HAGY: Okay. Counsel, I'm going -- do you remember what exhibit number we're on?

MS. KUZNER: The last one was -- do you mean the 127?

MS. HAGY: 127, okay. So Counsel, I'm going to mark Sopron 9219 to 9241 as Exhibit 127.

Page 240

(EXHIBIT 127 MARKED FOR IDENTIFICATION)

MR. OBERTS: Thank you.

BY MS. HAGY:

Q. So Mr. Diciolla, do you remember testifying in the trial of Wayne Antusas and Matthew Sopron February 5, 1998?

A. Yes.

Q. Okay. And how did you prepare to testify?

A. I was prepared by the state's attorney. In this case, it was Scott Cassidy.

Q. Okay. Did any other state's attorney prepare you to testify?

A. I don't recall any other ones. Possibly -- no. I don't recall any of the other ones.

Q. Okay. And did you review -- do you remember whether you reviewed any documents before you testified in 1998?

A. Yes.

Q. What did you review?

A. I reviewed some of the case reports for the -- the police, and some of the investigative request slips that were submitted, and a basic overview of what was done and who did it, you know, that type of thing.

Q. Okay. So at that time, when you testified, the case investigation request slips still existed?

Page 241

MR. OBERTS: Objection. Foundation. Speculation.

A. Yes.

BY MS. HAGY:

Q. And do you know whether any of those were produced to the defense?

MS. O'BRIEN: Objection.

A. I have no idea.

MS. O'BRIEN: Form. Foundation.

BY MS. HAGY:

Q. And what information did you review on the request slips?

MR. OBERTS: Objection. Speculation and foundation.

A. Well, to my best of recollection, I interviewed what investigators did what, on that particular case involved there.

BY MS. HAGY:

Q. And during your testimony on February 5, 1990, do you remember whether you have been promoted to be an -- a supervisor by that time?

MR. OBERTS: Objection. Foundation. Asked and answered.

BY MS. HAGY:

Q. Only if you remember.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 242

A. I don't remember if that -- if at that time, I was a supervisor.

Q. Okay. And so here, I'm going to go to Page Sopron 9222. So here on line 20, it says, "Sir, I would ask you then, if you spoke with the following individuals, and you gave me a yes or no answer, if you would, you or your team of investigators"; do you see that?

A. Uh-huh.

Q. So do you remember whether you understood that you were being asked to give testimony about not only your work, but the work of other investigators on your team?

MR. OBERTS: Objection. Speculation. Foundation. Form.

A. Well, first of all, the word, team, is misleading. We weren't a team, but they were investigators within the bureau.

BY MS. HAGY:

Q. So what -- why do you say that you weren't a team?

A. Well because we didn't work in conjunction and hand-in-hand with each other. Some of the state's attorney investigators that were involved in this case, like I said, were not of the Gang Prosecution Unit

Page 243

investigators, coming from the trial division.

Q. Okay. And here the -- on the next page, the prosecutor said, "John Gizowskit," and then you said, "Yes."

A. Uh-huh.

Q. And then -- but that doesn't indicate whether or not it was you or another investigator who met with him, right?

A. Yes, it was another investigator.

Q. Okay. And same with Brian O'Shea, you said, "Yes," but that could have been you or another investigator, right?

A. Yes, right.

Q. Do you remember whether you were present for any interviews with Brian O'Shea?

A. I don't remember.

Q. Okay. And how about Sean O'Brien? Do you remember whether or not you were present for any interviews with Sean O'Brien?

A. I don't remember at this time, no.

Q. And you spoke earlier about how someone took photographs, an investigator took photographs of the crime scene, right?

A. That's correct.

Q. Do you remember who that was?

Page 244

A. It was Thomas Ptak.

Q. And do you know whether or not that was something that he was asked to do via assignment slip?

A. I believe so, yes.

Q. And do you -- do you have any knowledge of who he gave those photos to?

A. Well, the photos were given, I believe, to the state's attorney, Scott Cassidy.

Q. Okay. And after an interview happened with a witness and you were trying to verify the facts, is that something that you would -- like, deciding what facts to verify, is that something that the state's attorney would just tell you or that he would put in an assignment slip?

MR. OBERTS: Objection. Speculation.

MS. O'BRIEN: Objection.

MR. OBERTS: Foundation. Incomplete hypothetical and over-broad.

MS. O'BRIEN: Form.

A. I would be assigned a task, a particular task, and that's what I would follow.

BY MS. HAGY:

Q. Okay. And would you be assigned that verbally or through an assignment slip?

MR. OBERTS: Objection. Asked and answered.

Page 245

A. Through an assignment slip.

MS. HAGY: Okay. And so, going to the bottom of page Sopron 9223, it says, "When you spoke to John Gizowskit, was his father present?"

MR. OBERTS: I'm just going to ask that you start with the 19th, for context.

MS. HAGY: Okay, sure.

MR. OBERTS: Or just allow him to read 19 for -- I'm not making you change your question, but I'm just asking you to let him read starting with 19 for context.

THE WITNESS: Do you want me to read it?

MR. OBERTS: But I'm sorry. You know what? You never even finished your question.

MS. HAGY: Okay.

MR. OBERTS: So please finish your question and then I'll --

BY MS. HAGY:

Q. Okay. So going up to line 19, I'll just read it, it says, "Sir, I'm going to go back through these names and I'm going to ask you whether or not there were persons or lawyers with them when speaking to them." And then it says, "When you spoke to John Gizowskit, was his father present"; do you see that?

A. Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 246

Q. And then on the next page, it says, "Your answer is, 'Yes, he was.'"

A. Yes.

Q. Did you have personal knowledge of whether John Gizowskit's father was present during his interview?

MR. OBERTS: Objection. Foundation.

A. Personally, I don't know if I read it in the report or -- I don't recall right now.

BY MS. HAGY:

Q. Okay. So when you were answering that question, is it possible that you were looking at the reports to determine who was present during these interviews?

MS. O'BRIEN: Objection. Form. Foundation.

MR. OBERTS: Objection. Asked and answered.

A. Well, I was prepped for court, and I was at the advantage of looking at reports that were submitted to the state's attorney's office. Now I can't remember exactly not -- not having being privy to all the reports in the later days here. I don't know what I signed off on and what was done by me as far as being on what particular report, on what particular individual. I know I submitted reports on several individuals that I interviewed, and most of those individuals that were

Page 247

interviewed by me, were done in the presence of either lawyers or parents and things of that -- school personnel. So I don't remember this, to tell you the truth.

BY MS. HAGY:

Q. You don't remember giving this testimony or you don't --

A. No, I remember giving testimony in the case, yeah. And I was prepped for the case for trial like normally you do, you know.

Q. Okay. And so here, when it says, "When you spoke to Brian O'Shea, was his lawyer present," and then you said, "Yes, he was," right?

A. According to what I read in reports that were given to me for court prep -- prepping.

Q. Right. Because you didn't speak with Brian O'Shea, right?

A. No.

MR. OBERTS: Do you say, "No," that's true?

A. I'm not sure. I -- I'd have to see whose report it was that O'Shea was spoken to. It could have been me, could have been somebody else.

BY MS. HAGY:

Q. Okay.

A. But for court answering, I know he was spoken

Page 248

to. I don't know if it was me or somebody else.

Q. Okay.

A. They didn't get specific in the questioning, so.

Q. Okay. And so, is it possible that when you said that his lawyer -- when you testified that his lawyer was present, you were testifying to that based on reading someone else's report?

A. From the report, yeah.

MS. O'BRIEN: Objection. Form. Foundation.

MR. OBERTS: Objection. Speculation, foundation.

A. Yes, whether it be mine or some other investigators.

BY MS. HAGY:

Q. Okay. And do you know whether you ever made a report of your investigation of the crime scene?

MS. O'BRIEN: Objection. Form. Foundation.

A. Do you mean the actual investigation of the scene itself? Well, the detectives had made their initial investigation, and we just followed up on the patterns of where they said the escape route was. And I believe a diagram was drawn at one time, not me, but I remember seeing one.

BY MS. HAGY:

Page 249

Q. Okay. Do you know who drew that diagram?

A. No, I don't remember.

MS. O'BRIEN: Objection.

BY MS. HAGY:

Q. Do you know whether it was part of a report?

MS. O'BRIEN: Objection. Form. Foundation.

MR. OBERTS: Objection.

A. I believe it was.

BY MS. HAGY:

Q. Okay. So here, I'll have you go down to page 9234.

A. Okay.

Q. And here on at the end, Question 23, it says, "Do you recall being on the scene where a lot of the gangs had fences?" And then the next page, you answered, "There were fences in the area. I can't tell you which one had the fences from here, though. Some had fences"; do you see that?

A. Yes.

Q. Do you remember ever yourself writing a report of your investigation of the crime scene?

MS. O'BRIEN: Objection. Form Foundation. Investigation.

A. I don't remember writing a report regarding the layout of the area with the fences.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 250

BY MS. HAGY:

Q. Okay. And were there times where a state's attorney would ask you to write a report of your investigation of a crime scene?

MR. OBERTS: Objection. Vague. Incomplete hypothetical.

A. Yes. There'd be times they'd ask me, and sometimes that -- they would require photos, to the point where we took either ground photos, and I -- oftentimes, I went up in helicopters and took aerial photos.

BY MS. HAGY:

Q. Oh, okay. Do you remember doing that in this case?

A. No.

Q. And you wouldn't -- is it fair to say you wouldn't have made a report about your investigation of the crime scene unless the state's attorney asked you to, right?

MR. OBERTS: Objection to form. Foundation and speculation.

A. Yes.

BY MS. HAGY:

Q. Do you remember -- did -- strike that. Did you ever transport Brian O'Shea to any of his interviews

Page 251

with the state's attorney?

A. I don't recall.

Q. Okay. Do you -- did you have knowledge of whether or not Brian O'Shea was transported to meetings with the state's attorney from a rehab center?

A. No, I never recalled that or even heard of it, so.

Q. Okay. Do you know whether or not Brian O'Shea was in a rehab center at any of the times that he was interviewed by the state's attorney?

A. I have no idea, no.

Q. Okay. And in the meetings with Billy Bigeck on August 12th and 29th, do you remember transporting Billy Bigeck to those meetings?

A. For those two meetings?

Q. Yes.

A. Yes.

Q. Okay. And do you remember where you transported him from?

A. The original --

MR. OBERTS: Objection. Speculation. Withdraw the objection.

A. The original transportation, the first day was from Cook County jail custody to the state's attorney's office.

Page 252

BY MS. HAGY:

Q. Okay. And was that true for the second meeting also?

A. No. I believe by the second meeting, I think he had already been placed in the witness protection program because of the threats against him.

Q. Okay. Do you remember the meeting with a witness named Chris Nemchawsky on October 31, 1996?

A. Yes.

Q. Okay. I'm going to mark this as Exhibit 128.

(EXHIBIT 128 MARKED FOR IDENTIFICATION)

MS. HAGY: And Counsel, this is Sopron 5880 to 5882. I'm sorry, Amy, are you able to --

MS. KUZNER: I'm fine.

BY MS. HAGY:

Q. Okay.

A. Was -- was there a question posed? I didn't catch that.

Q. No, not yet. So I -- going back down to the bottom here, where -- do you know --

MR. OBERTS: What page? Can you say again?

MS. HAGY: Sorry. So it's Exhibit 128, and it's Sopron 5880.

MR. OBERTS: Great. Thank you.

BY MS. HAGY:

Page 253

Q. So here, where it says invest --

MR. OBERTS: This page right here, 5880.

THE WITNESS: Okay.

MR. OBERTS: Sorry.

BY MS. HAGY:

Q. Where it says, "Investigator," and then it says the dates?

THE WITNESS: Which one are we talking about?

MR. OBERTS: Right here. 5880.

THE WITNESS: Yeah. I got it.

MR. OBERTS: So we're on 5880.

THE WITNESS: Right.

MR. OBERTS: And it says, "Investigator," and date.

THE WITNESS: Okay.

BY MS. HAGY:

Q. Okay. Do you know when would you sign one for?

MR. OBERTS: Objection. Vague. Objection. Vague. Foundation and incomplete hypothetical. Are you just referring to this report or in general?

BY MS. HAGY:

Q. Well, this report. I'm just trying to understand the report writing process here. So in this case, it says the period covered was October 3, 1996,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 254

right?  If you -- if you look --

A.  Yeah, yeah.

Q.  And then it says the date is October 28, 1996.

MR. OBERTS:  Pardon me.  Where are you --

A.  Where's that at?

BY MS. HAGY:

Q.  The top left corner.

MR. OBERTS:  You said October 28th?

A.  28th October, you're talking about?

BY MS. HAGY:

Q.  Yes.

MR. OBERTS:  I thought she said the 20th.

BY MS. HAGY:

Q.  Yes, 28th.  October 1996.  And then so what's that date?

MR. OBERTS:  Which one?  Top left?

BY MS. HAGY:

Q.  Yeah.

A.  I'm not sure, but most of the times, that would be the date that the report was generated.

Q.  Okay.  And so, then down here, you signed it on November 20, 1996?

A.  Correct.

Q.  Why did you sign it so much later?

MR. OBERTS:  Objection.  Speculation.

Page 255

Foundation.

A.  I don't know.  But like I said, I was involved in so many different cases.  Some of the reports languish until we decided to turn them in, it wasn't an immediate handover, you know.

BY MS. HAGY:

Q.  And the state's attorney didn't always ask you right after the interview to memorialize it, right?  Sometimes that request came later?

THE WITNESS:  Yeah.

MR. OBERTS:  Objection.  Form.

MS. O'BRIEN:  Objection.  Form.  Foundation.

MR. OBERTS:  Incomplete hypothetical.  Speculation.

A.  Yeah.  It could be like, later on, he asked me to do it.

BY MS. HAGY:

Q.  And so, when a supervisor signs a report, what does that mean?  Does that mean that they've approved the report?

MR. OBERTS:  Objection.  Foundation.

A.  Yes.

BY MS. HAGY:

Q.  Okay.  Did you ever give a report to state's attorney to review before you finalized it?

Page 256

MR. OBERTS:  Objection.  Incomplete hypothetical.

A.  Not that I recall.

BY MS. HAGY:

Q.  Okay.  So here, you interviewed Chris Nemchawsky, right?  On October 3, 1996?

MR. OBERTS:  Do you understand the question that she's referring to?

A.  She said October 3rd, right?

BY MS. HAGY:

Q.  Yes.

A.  Is that what you asked?

Q.  That's what I asked.

A.  I'm trying to see what --

MR. OBERTS:  Objection.  Foundation.

A.  Okay.

MR. OBERTS:  And speculation.

A.  That's the period covered would be October 3rd of 1996, of when the interview took place, yeah.

BY MS. HAGY:

Q.  Okay.  And this report said that ASA Linehan was present, right?

A.  Yes.

Q.  And Chris Nemchawsky's attorney, Daniel Frank was present, right?

Page 257

A.  Correct.

Q.  Okay.  And so, that records -- does that record everybody who you remember being present during that interview?

A.  To the best of my recollection, yes.

Q.  Okay.  And if you look at the next page, this is your handwritten version of the report, right?

A.  Yeah, correct.  Right.

Q.  But do you know whether or not that -- this is also your handwritten notes of the interview?

A.  Well, this -- what this basically reflected what I had in my handwritten notes.  And some -- sometimes what I would do is I -- I would print it all out and then type it up.

Q.  Okay.

A.  Yeah.

Q.  So this isn't necessarily all your notes from the meeting?

A.  No.

Q.  Okay.  And so, the notes, you often ended up not keeping, right?

A.  Correct.

Q.  Did a state's attorney -- do you ever remember a time where a state's attorney asked you to keep your notes from an interview?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Read and Sign Only

Page 258

MS. O'BRIEN: Objection. Form. Foundation.

A.   Not that I recall, no.

BY MS. HAGY:

Q.   Okay.  And do you remember, before you met with Mr. Nemchawsky, did you meet with ASA Linehan to plan for this meeting?

MR. OBERTS: Objection.  Vague regarding - objection.  Vague and foundation.

MS. O'BRIEN: And form.  Foundation.

A.   I don't remember.

BY MS. HAGY:

Q.   Okay.  And here, he said, "He stated that he did not have any prior knowledge of plans to attack anyone in the park that night"; do you see that?

A.   Yes.

Q.   And do you remember whether anyone asked him if he had knowledge of plans?

MR. OBERTS: Objection.  Form.  Vague.

A.   I would think somebody would've had asked a question if he gave that kind of an answer.

BY MS. HAGY:

Q.   Okay.

A.   Yeah.

Q.   So it's likely that someone did ask him?

A.   Yeah.

Page 259

MR. OBERTS: Objection.  Speculation. Foundation.

BY MS. HAGY:

Q.   And at this point, Mr. Nemchawsky had already testified at the grand jury on December 21, 1995, right?

MR. OBERTS: Objection.  Speculation. Foundation.

A.   I don't remember.

BY MS. HAGY:

Q.   Okay.  Well, the report says, "Christopher Nemchawsky was consistent with his grand jury testimony that he gave on the 21st of December 1995," right?

A.   Correct.

Q.   And this is your report, right?

A.   Yes.

Q.   And so, when you made a statement like that, that his testimony was consistent with the grand jury testimony, would you have made that determination yourself?

MR. OBERTS: Objection.  Form.  Speculation. Foundation.

A.   Yeah.  With discussion with the state's attorney, yes.

BY MS. HAGY:

Page 260

Q.   Okay.

A.   Yeah.

Q.   So the state's attorney would help you make the determination as to whether someone's statement was consistent with other statement?

MR. OBERTS: Objection.

MS. O'BRIEN: Objection.  Form.  Foundation.

MR. OBERTS: And speculation.

BY MS. HAGY:

Q.   Are you able to answer?

A.   I forgot.  I'm sorry.

Q.   No worries.  Yes please, thanks.

(REPORTER PLAYS BACK REQUESTED QUESTION)

MR. OBERTS: Could we play the objection?

THE REPORTER: Yeah.  Oh, sorry about that.

(REPOTER PLAYS BACK REQUESTED QUESTION)

MR. OBERTS: Do you understand the question and the objection?

A.   Yes -- yes.

BY MS. HAGY:

Q.   Okay.  Thank you.  And here -- strike that. Okay.  Do you have any personal knowledge of Sean O'Brien being interviewed in this case?

A.   Personal knowledge?  No.

Q.   I'm Sorry?

Page 261

A.   Personal knowledge?  No.

Q.   Okay.  And do you remember, in this case, conducting any interviews at any of the courthouses, like besides 26th and Cal?

MR. OBERTS: Objection.

A.   I'm not sure.

MR. OBERTS: Objection.  Foundation, vague.

A.   What kind of courthouses do you mean?

BY MS. HAGY:

Q.   Like Bridgeview or Malcolm?

MR. OBERTS: Objection.  Form.  Vague.

A.   I don't remember, no.

BY MS. HAGY:

Q.   Do you remember any cases where you interviewed a witness at the Bridgeview Courthouse?

MS. O'BRIEN: Objection.  Form.  Foundation.

A.   I don't recall.

BY MS. HAGY:

Q.   Do you know whether or not you were given any directions as to whether investigators could interview witnesses at the courthouses?

MR. OBERTS: Objection.  Foundation.

MS. O'BRIEN: Objection.  Form.

A.   Yes.  It would be -- it would be permission to go to other courthouses.  Sure.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

Page 262

BY MS. HAGY:

Q. Okay. And do you, as an investigator, ever remember keeping a witness overnight at a courthouse?

A. No.

Q. Would that be unusual?

MR. OBERTS: Objection. Speculation. Over broad. Foundation.

A. I never heard of it, no.

BY MS. HAGY:

Q. You never heard of that?

A. Never heard of it.

Q. And is that something that you would have done?

A. No.

MR. OBERTS: Objection. Speculation. Foundation.

BY MS. HAGY:

Q. And would -- did -- had you ever -- do you ever remember keeping a juvenile overnight --

MR. OBERTS: Objection. Asked and answered.

BY MS. HAGY:

Q. -- at a courthouse?

A. No.

MS. O'BRIEN: Objection. Form. Foundation.

MR. OBERTS: Asked and answered.

Page 263

BY MS. HAGY:

Q. Do you remember interviewing a witness named Mike Bielawski?

A. Yes.

Q. Okay. And do you remember -- well, I'll show you your report in a minute, but do you have knowledge of how many times you met with Mr. Bielawski?

A. Can't remember. No.

Q. Okay.

A. Maybe twice. I don't know.

Q. Do you remember whether you had any meetings with Billy Bigeck, any interviews with Billy Bigeck where you were not asked to memorialize those interviews?

MR. OBERTS: Objection. Form. Vague. And --

A. I don't -- I don't remember.

MR. OBERTS: -- speculation.

BY MS. HAGY:

Q. You don't remember either way?

A. Yeah.

Q. Okay. And did you, as a gang investigator, learn -- ever learn what the phrase, "Do the van," would mean?

A. What it meant?

MR. OBERTS: Objection. Go ahead.

Page 264

A. Yeah. It's the same kind of terminology that we talked about earlier. "Do the van," was like, in other words, shoot at it, grab the people occupying the van, do some violent damage to them.

BY MS. HAGY:

Q. Okay.

A. And maybe the van, too.

Q. And is that something that you learned during your time as a CPD gang detective?

A. Yes.

Q. Okay. So now I'm going to show you --

MR. OBERTS: And before we go with -- can we take a break?

MS. HAGY: Yeah, of course.

THE REPORTER: All right. We are off the record. The time is 5:21 p.m.

(OFF THE RECORD)

THE REPORTER: Back on the record. The time is 5:35 p.m.

BY MS. HAGY:

Q. Okay. So Mr. Diciolla, does this refresh your recollection about meeting -- whether you met with a witness named Michael Bielawski?

A. Yes.

Q. Okay. And so, you met with him at his home in

Page 265

Tennessee, right?

A. That's correct.

Q. Did you -- in your position as an investigator, did you often go out of state, or just sometimes?

MR. OBERTS: Objection. Vague. Form. Speculation. Incomplete hypothetical.

A. Sometimes.

BY MS. HAGY:

Q. Okay. And here, do you remember -- do you see part of the way down it said, "He and Brandon stopped to talk with them when DeCriss, Nick DiCresenso drove up in an auto, and Nick Liberto showed up in a gray car."

MR. OBERTS: Can you repeat that? Where?

BY MS. HAGY:

Q. It says -- it's about midway through the report.

A. He and Brandon.

MR. OBERTS: You said he and Brandon?

MS. HAGY: Yes.

MR. OBERTS: That sentence. Very good.

BY MS. HAGY:

Q. "Stopped to talk with them when DeCriss, Nick DiCresenso drove up in an auto, and Nick Liberto showed up in a gray car."

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 266

A. Yes.

Q. Do you see that?

A. Yes.

Q. Do you remember, did you do any follow up with Nick DiCresenso?

A. I think we tried to speak to him, I think.

Q. Okay.

A. If I remember right.

Q. And do you remember whether he was willing to talk to you?

MR. OBERTS: Objection. Foundation. Speculation.

A. I don't remember. I think he might've been one of the guys that refused to speak to us.

BY MS. HAGY:

Q. Okay. And when Mike Bielawski came to testify in front of the Grand Jury in -- on October 7, 1996, did you play any role in helping transport him to testify?

A. Not that I recall.

Q. Okay. And do you remember how old -- well, Mike Bielawski, he was about 13 or 14 at the time of this interview, right?

MR. OBERTS: Objection. Speculation. Foundation.

A. He was born in '81. He was 15 years old.

Page 267

BY MS. HAGY:

Q. 15? Okay. And so, is that why you had his mother present when you interviewed him?

A. That's correct.

MR. OBERTS: Objection to the extent it mischaracterized the report.

BY MS. HAGY:

Q. Do you remember asking Mike Bielawski about his house getting bricked?

A. Don't recall.

Q. Okay. And that's not described in this report, right?

A. No. I'm looking for it. I don't see it. No.

Q. Okay. And do you remember asking Mike Bielawski or his dad, Joe Corozzo about a conversation that the -- that Joe Corozzo had with Peter Casanas?

MR. OBERTS: Objection. Form. Do you understand the question?

A. Yeah, I'm not sure I -- who were you talking about though?

BY MS. HAGY:

Q. Peter Casanas. One of the victims.

MR. OBERTS: Objection. Form and vague. Can you repeat the entire --

A. Yeah. Really, I don't --

Page 268

THE REPORTER: Okay.

(REPORTER PLAYS BACK REQUESTED QUESTION)

MS. O'BRIEN: Objection. Form. Foundation.

A. I don't remember that.

BY MS. HAGY:

Q. Okay. Do you know whether or not your office spoke with, your office being the investigator, spoke with Mike Bielawski when he came to testify at the Grand Jury?

MR. OBERTS: Objection. Speculation. Foundation.

MS. O'BRIEN: Form. Foundation.

A. I don't know if they did.

BY MS. HAGY:

Q. Okay. And here -- so I'm going to have you go back to --

MS. HAGY: 128?

THE REPORTER: Sopron 92 --

MS. HAGY: Yes.

THE REPORTER: Yes, ma'am.

BY MS. HAGY:

Q. Yes. Okay. Go back to 128 and look at Page Sopron 9234.

MR. OBERTS: I think the transcript's 127.

MS. HAGY: Oh, I'm sorry.

Page 269

MR. OBERTS: Nemchawsky Report is 128.

MS. HAGY: Sorry. 127.

MR. OBERTS: And what page of Exhibit 127?

MS. HAGY: Sopron 9224.

THE WITNESS: Okay.

MR. OBERTS: Wait, you're not on it.

THE WITNESS: No.

MR. OBERTS: Hold on just a second.

A. Okay.

BY MS. HAGY:

Q. Okay. So do you see the bottom of 9224?

A. Yes.

Q. And here, at 14, the question was, "Sir, when you spoke to a Mike Bielawski, was his mother present?" And then you said, "We spoke to Mike Bielawski twice. Once in Tennessee with both parents present, and the second time here in Chicago when he testified in the Grand Jury. His mother was present then"; do you see that?

A. Yes, I do.

Q. And do you have any recollection of why there isn't a report of that second meeting with Mike Bielawski?

MR. OBERTS: Objection. Foundation. Speculation.

Preview and Sign Only

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 270

MS. O'BRIEN: Objection. Form. Foundation.

BY MS. HAGY:

Q. Only if you know.

A. No, I don't.

Q. Okay. Is it possible that you weren't asked to memorialize that meeting?

MR. OBERTS: Objection. Foundation. Speculation.

MS. O'BRIEN: Objection. Form. Foundation.

A. Well, he was about to, well, testify in the Grand Jury, you know, so

BY MS. HAGY:

Q. Okay. And in your report says that he testified at the Grand Jury, but it doesn't give any summary of the -- of any conversations with him at that time, right?

A. Yes.

MR. OBERTS: Objection. --

MS. O'BRIEN: Objection. Form. Foundation.

MR. OBERTS: The report states what it states.

BY MS. HAGY:

Q. But your testimony here said that you spoke with him the second time when he came to the Grand Jury, right?

MR. OBERTS: Objection. Mischaracterizes the

Page 271

testimony. Doesn't say "he."

MS. O'BRIEN: Objection. Asked and answered.

A. He could have spoken to me in -- in the halls before the Grand Jury or something of that nature or something. You know? Because I did speak to him in Tennessee, so he -- he was familiar with me.

BY MS. HAGY:

Q. Okay. All right. Sir, do you remember meeting with someone named Thomas Mander on October 2, 1997?

A. I remember the name, but I don't remember the circumstance.

Q. Okay.

MS. HAGY: I'm going to mark this as 130?

THE REPORTER: Yes.

(EXHIBIT 130 MARKED FOR IDENTIFICATION)

MS. HAGY: And, Counsel, this is Sopron 5883-5885.

MR. OBERTS: Thank you.

BY MS. HAGY:

Q. Okay. All right. Do you see the report?

A. Yes, I do.

Q. And here, it doesn't list the period cover, right?

A. Yeah. For some reason, no.

Page 272

MR. OBERTS: Well, it's -- objection. Vague.

BY MS. HAGY:

Q. Okay. Do you have any -- well, on the next page, on Sopron 5884, for the period you covered, it said, "Ongoing," right?

A. Ongoing investigation. Yes.

Q. Yeah. So is this usual that you wouldn't have the date of an interview with a witness?

MR. OBERTS: You say usual or unusual?

MS. HAGY: Usual.

MS. O'BRIEN: Objection. Form. Foundation.

MR. OBERTS: Objection. Form. And speculation. And mischaracterizes prior testimony.

A. No, I don't think it would be usual. No.

BY MS. HAGY:

Q. Okay. And then here again, the date on the top left corner said October 28, 1996. And then you signed it down here with the date, November 20, 1996, right?

A. Correct.

Q. And here it says on the second paragraph, "The recording investigator" -- that's what RI means, right?

A. Correct.

Q. -- "accompanied ASA Cassidy to the home of Thomas R Mander and interviewed him there at his home at

Page 273

6914 West 63rd Place. Present for that interview were the reporting investigator, ASA Cassidy, and Thomas's father, Thomas Mander, Senior"; do you see that?

A. Uh-huh. Yes, I do.

Q. Was that typical that that ASA would accompany you to a witness's home to interview them?

MR. OBERTS: Objection. Vague. Form. Foundation.

A. There were many --

MR. OBERTS: Speculation.

A. -- times where State's attorneys went out to the scene or the area of the incident and interviewed witnesses at their homes, basically giving them the break, so to speak, of the -- having to come all the way down to 26th Cal. That type of nature, you know.

BY MS. HAGY:

Q. Okay.

A. So it wasn't unusual.

Q. Okay. And do you see here it says -- in the last paragraph, I'm going to read, "The next day, Thomas Mander, Senior, called the CCFAO on the phone and stated that after the RIs and ASA Cassidy, left their home, his son Thomas A. [sic] Mander admitted to his father that he did in fact get beat up by the Almighty Popes street gang for comments made to one of the gang member's

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 274

girlfriends"; do you see that?

A. Uh-huh. Yes.

Q. And do you see above that, it says that "Thomas Mander never received a beating from any of the gang members. The interview was concluded after repeated denials"? So after you learned that he -- that Thomas Mander had not told the truth, did you go back to interview him again?

MR. OBERTS: Objection. Compound. Speculation.

A. No, I didn't.

MR. OBERTS: And foundation.

BY MS. HAGY:

Q. Okay. Okay. So when Billy Bigeck was in protective custody, did you visit Billy Bigeck in protective custody?

MR. OBERTS: Objection. Vague.

MS. O'BRIEN: Objection. Form. Foundation.

MR. OBERTS: And objection, vague.

A. Protective custody or in the witness quarters?

BY MS. HAGY:

Q. Witness quarters.

A. I don't --

MR. OBERTS: And objection. Form and vague.

A. I don't recall actually visiting him there. More or less would -- would've went there to pick him up

Page 275

and bring him over to the state's attorney's Office.

BY MS. HAGY:

Q. Okay. And do you know approximately how many times you went to pick him up from the witness quarters?

MR. OBERTS: Objection. Asked and answered. Foundation.

A. No, I don't remember the number of times. Would be a matter of record though with the sheriff's police.

BY MS. HAGY:

Q. Okay. And how about Eddie Morfin? Did you go to pick him up at the sheriff's quarters?

MR. OBERTS: Sheriff's --

BY MS. HAGY:

Q. Or sorry, the witness quarters?

MR. OBERTS: Objection. Foundation.

A. I don't remember picking him up. I don't remember.

BY MS. HAGY:

Q. You don't remember. Okay. Do you remember if you picked Billy Bigeck up more than five times from the witness quarters?

MR. OBERTS: Objection. Foundation.

MS. O'BRIEN: Objection.

MR. OBERTS: He said he doesn't remember how

Page 276

many.

A. I don't remember picking him up.

MR. OBERTS: Objection. Foundation. And asked and answered.

A. It was more than twice, less than six, seven times, I would think.

BY MS. HAGY:

Q. Okay. Did you -- would you say that you were one of the people who handled Billy Bigeck while he was in witness quarters?

MR. OBERTS: Objection. Vague --

MS. O'BRIEN: Objection. Form. Foundation.

MR. OBERTS: Objection. Vague regarding handle.

A. What you mean by handle, I'm not sure. I had contact with him on several occasions, yes. But I don't know what you mean by handling.

BY MS. HAGY:

Q. Okay. Well, did you ever -- when Billy Bigeck was in protective custody, did he ever reach out to you with any concerns?

MS. O'BRIEN: Objection. Form. Foundation.

A. I do remember him reaching out to me via the telephone from the witness quarters regarding him being in trouble in the witness quarters.

Page 277

BY MS. HAGY:

Q. Okay. And why did he get in trouble in the witness quarters?

MR. OBERTS: Objection. Speculation. Foundation and form.

A. Well, from what my mind remembers, they were making some kind of a hooch, if you know what I'm talking about, some kind of liquor. Him -- not just him. There was several of the people that were in protective custody in the witness quarters were saving their fruits and vegetables and whatever, and making some kind of cockamamie liquor or -- you know. So I don't know. So he -- he was in trouble with the -- obviously with the sheriff's police officers who were in control of that facility. And they -- they actually called me and put him on the phone, if I remember right. I basically chastised him about, you know, he's going to violate himself by doing stuff like that, so

BY MS. HAGY:

Q. And did you tell anybody else at the state's attorney's Office that Billy Bigeck was in trouble for making hooch?

A. Yes.

MS. O'BRIEN: Objection. Form. Foundation.

BY MS. HAGY:

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 278

Q. Who did you tell?

A. Well, I told my immediate supervisor at the time, I think. Or maybe it was one of the other investigators. I -- I don't remember who I told, you know. But I did inform other people that he had got jammed up in the witness quarters.

Q. Do you remember if you told any of the State's attorneys?

A. I don't recall.

MR. OBERTS: Objection. Form.

BY MS. HAGY:

Q. Either way.

A. I don't remember.

Q. Okay. And do you remember about what year that was?

A. No, I don't. So --

MR. OBERTS: Objection. Speculation.

A. He was put in the witness quarters in '96. I'm not sure when that occurred.

BY MS. HAGY:

Q. Okay.

A. He was still in there. I know that, obviously.

Q. And you were at the state's attorney's Office until 2006, right?

Page 279

A. That's correct.

Q. Did you ever participate in something called the Choice Within Decisions Program?

A. No. Never even heard of it.

Q. Okay. You haven't heard of the Choice --

A. No.

MR. OBERTS: Objection. Asked and answered.

BY MS. HAGY:

Q. Did you ever hear of Billy Bigeck participating in a crime prevention program?

A. Not until this lawsuit started.

Q. Okay.

A. I had heard something about the fact that he --

MR. OBERTS: Just objection to the extent you learned anything from your attorneys. Outside of your attorneys, you go ahead. But it's an objection that would be attorney-client privilege.

BY MS. HAGY:

Q. Okay.

A. That's -- that's correct.

Q. Okay.

MR. OBERTS: And that's correct, meaning that any --

THE WITNESS: Meaning that I --

Page 280

MR. OBERTS: -- anything further would be --

THE WITNESS: -- learned from my attorneys --

MR. OBERTS: Yeah. So we would not --

THE WITNESS: -- that that had occurred.

A. I'd never -- never even heard of that program. Never knew that he was being utilized in that fashion.

BY MS. HAGY:

Q. Okay. And is that also true about Eddie Morfin? Not to talk about the -- your conversations with your attorneys, but had you ever heard about Eddie Morfin, beside your attorneys, had you ever heard about Eddie Morfin being involved in a crime prevention program?

A. No, Eddie Morfin --

MS. O'BRIEN: Objection. Foundation.

BY MS. HAGY:

Q. Okay. And did you ever work with someone named John Duffy?

A. He was in the gang investigation -- or -- or not gang, but he was in the investigative bureau. Yeah, I knew who he was. Yeah.

Q. Do you know what part of the bureau was he in, if you know?

A. I believe he was in the narcotics unit and then trial division. No, I don't know. They, you know,

Page 281

they kind of transferred back and forth a couple times.

Q. And did you have any involvement in an affidavit from Eddie Morfin in 2002?

MR. OBERTS: Objection. Foundation.

MS. O'BRIEN: Objection. Form. Foundation.

A. Not that I recall. No.

BY MS. HAGY:

Q. Okay. Do you ever remember Billy Bigeck being up in the state's attorney's Office during a birthday celebration?

MS. O'BRIEN: Objection. Form. Foundation.

MR. OBERTS: Objection. Vague as well.

A. Like whose birthday celebration?

BY MS. HAGY:

Q. Just any birthday celebration.

A. No, I don't.

Q. Okay.

A. Yeah.

Q. And do you ever remember bringing Billy Bigeck any fast food that he requested?

MR. OBERTS: Objection. Asked and answered. And foundation.

A. I think I asked -- answered that earlier that if they missed -- and I say they, any prisoner from the witness quarters, if they missed their lunch period at

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 282

the witness quarters, sometimes we might get them some kind of fast food, yeah. So he could have been one of them, obviously.

BY MS. HAGY:

Q. Okay. Sure. So my question was just a little different, but do you have any specific memory of bringing Billy Bigeck any fast food to the witness quarters?

MR. OBERTS: Objection. Asked and answered.

A. I don't remember.

BY MS. HAGY:

Q. Okay. And how about Eddie Morfin?

MR. OBERTS: Objection. Form. Foundation.

A. I don't remember.

BY MS. HAGY:

Q. Okay. Did you sometimes talk to Billy Bigeck when he was up in the ASA offices?

MR. OBERTS: Objection. Vague.

MS. O'BRIEN: Objection. Form. Foundation.

A. Like any particular time or something? Or any time that he was up there are you saying?

BY MS. HAGY:

Q. Yeah, that's not a good question. Okay. Let me try again. Do you remember -- when you brought Billy Bigeck up to the state's attorney's, would he meet

Page 283

with anybody?

MR. OBERTS: Objection. Vague. Over-broad. Speculation. Foundation.

A. Well, he was only brought over to the state's attorney's Office at the request of a State's attorney. Otherwise, we didn't indiscriminately just go over to witness quarters, pick him up and bring him up there to hang around, you know?

BY MS. HAGY:

Q. And if a State's attorney wanted you to bring a witness from the witness quarters, would they have to fill out one of those assignment slips?

A. Yes.

MR. OBERTS: Objection. Speculation. Foundation.

BY MS. HAGY:

Q. And do you remember any ASAs who requested for you to bring Billy Bigeck up to the state's attorney's Office?

MS. O'BRIEN: Objection. Form. Foundation.

A. Do I remember any State's attorney?

BY MS. HAGY:

Q. Yes. Which State's attorney?

MR. OBERTS: Objection. Vague and form.

A. Well, the -- the only way he would go up there

Page 284

is by a request of a State's attorney. Yes.

BY MS. HAGY:

Q. And do you remember any State's attorney who -- do you remember the name of any State's attorney who requested for him to go up to?

A. Well, I remember Scott Cassidy requested him because it was his case.

Q. And did you ever bring Billy Bigeck to speak to Scott Cassidy in his office?

MR. OBERTS: Objection. Vague.

A. Ever in his office?

BY MS. HAGY:

Q. Yeah.

A. You mean in his office -- office, not the office on the 13th floor?

Q. Right. His office -- office.

A. I don't remember. And only time it could have happened is if the interview room -- interview rooms were filled with other State's attorneys interviewing people, we might have slipped into his office for a minute or so --

Q. Do --

A. -- until they were available.

Q. Do you remember going to Scott Cassidy's office at any point?

Page 285

MR. OBERTS: Him personally?

MS. O'BRIEN: Objection. Form. Foundation.

MR. OBERTS: Objection. Vague.

A. Yeah, I was in his office. Yes.

BY MS. HAGY:

Q. What did his office look like?

MR. OBERTS: Objection. Time frame?

MS. O'BRIEN: Objection. Form. Foundation.

MR. OBERTS: What time frame?

A. Jesus, I don't remember. It was in a corner section of the building. You know, and I forget which end the building, but I know he had, like, a corner office.

BY MS. HAGY:

Q. Do you ever remember seeing any pictures of any criminal defendants up on his wall?

A. On his wall?

Q. Yes.

A. There were -- the entire gang crimes office had pictures throughout the entire floor of criminals that were convicted that were all gang-related.

Q. Oh, okay. So they had that -- pictures of gang-related convicted criminals --

MR. OBERTS: Objection.

BY MS. HAGY:

Read and Sign Only

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 286

Q. -- on the wall throughout the office?

A. Yeah, I don't remember anything in his office like that. That was, you know, outside of his office in the general area where all the secretaries were, and the clerical people were. And the -- it was pretty much a -- kind of a famous thing at that time because people that were convicted, because of the difficulties of prosecuting gang cases, they would post the people that were convicted on the walls and their pictures, you know.

Q. Do you remember ever seeing Matt Sopron's picture up on the wall?

MR. OBERTS: Objection. Form.

A. No, I don't.

BY MS. HAGY:

Q. How about Wayne Antusas?

MR. OBERTS: Objection. Form.

A. No. Because I think by the time they were convicted, there was -- there was a move afoot to do some redecorating or something in there and they might have taken the pictures down. In fact, they don't have the pictures anymore, I don't think, so. I don't know what they did with the photos, you know.

BY MS. HAGY:

Q. Do you ever remember seeing Nick Morfin's

Page 287

picture?

A. No.

Q. And did you have any understanding of whether Scott Cassidy stayed on the case after he -- when he was in the special prosecutor -- special investigations unit?

MR. OBERTS: Objection. Form. Foundation. And --

A. I don't remember. I don't know.

BY MS. HAGY:

Q. Did you ever talk to Scott Cassidy after Nick Morfin was convicted?

MR. OBERTS: Objection. Vague.

MS. O'BRIEN: Form. Foundation.

A. I don't recall.

BY MS. HAGY:

Q. Did -- after Eric -- do you remember whether you talked to Scott Cassidy about this case after Eric Anderson was convicted?

MR. OBERTS: Objection. Vague.

MS. O'BRIEN: Objection. Form. Foundation.

A. I don't recall.

BY MS. HAGY:

Q. And how about, do you remember whether you talked to Scott Cassidy about this case after

Page 288

Wayne Antusas and Matt Sopron were convicted?

MS. O'BRIEN: Objection. Form. Foundation.

A. I don't recall.

BY MS. HAGY:

Q. Did you ever see any kind of alcohol in Scott Cassidy's office?

A. No.

MS. O'BRIEN: Objection. Form. Foundation.

BY MS. HAGY:

Q. Did you ever hear of or know of Scott Cassidy having a drinking problem?

MR. OBERTS: Objection. Foundation.

A. No.

BY MS. HAGY:

Q. Okay. Did you ever hear Scott Cassidy yell at a witness?

MR. OBERTS: Objection. Vague.

MS. O'BRIEN: Objection. Form. Foundation.

A. No.

BY MS. HAGY:

Q. Did you ever hear him use a curse word at a witness?

MS. O'BRIEN: Objection. Form. Foundation.

BY MS. HAGY:

Q. Did you ever hear any State's attorney yell at

Page 289

a witness?

MS. O'BRIEN: Objection. Form. Foundation.

A. I don't remember. But there was sometimes some state's attorneys would get upset about a case, about the way it was going.

BY MS. HAGY:

Q. Do you have -- at some point, an inmate reported that a correction officer had brought marijuana to Billy Bigeck in protective custody, right?

MR. OBERTS: Objection. --

MS. O'BRIEN: Objection. Form. Foundation.

A. I never heard that.

BY MS. HAGY:

Q. Okay. Do you remember being contacted by an investigator about Billy Bigeck being given marijuana?

A. Yes.

Q. Okay. So what do you remember about that?

A. I remember it was --

MR. OBERTS: Objection. Form. Foundation and vague.

A. I remember it was an investigator from the Cook County Department of Corrections.

BY MS. HAGY:

Q. Yes. Do you remember being contacted by that investigator?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Read and sign only

Page 290

A. Yes.

Q. Okay. And prior to that time, had you ever heard about Billy Bigeck having access to marijuana in witness quarters?

A. No.

Q. Did you ever hear about Billy Bigeck having access to pornography in witness quarters?

A. No.

Q. Apart from when Billy Bigeck called you about the -- being jammed up with the hooch issue, do you remember any other times that he called you from witness quarters?

MR. OBERTS: Objection. Mischaracterizes testimony.

A. Not that I recall, no.

BY MS. HAGY:

Q. Do you remember any other witness ever calling you from witness quarters?

A. Yes. There was another time another witness called me, yeah.

Q. Do you know about what year that was?

A. I can't remember.

Q. Okay. So 132? Okay. So and Counsel, I'm going to be handing the witness Exhibit 131, which is Sopron 652 to 662.

Page 291

MR. OBERTS: So it's 652 to 662.

BY MS. HAGY:

Q. Okay. Do you recognize this report?

MR. OBERTS: Objection. Vague.

BY MS. HAGY:

Q. This document. Do you recognize this document?

A. I don't remember it, no.

Q. Have you seen it before?

MR. OBERTS: Objection. Foundation.

A. I don't remember seeing it.

BY MS. HAGY:

Q. Okay. Do you see that it's dated, up on the top right, December 22, 1997?

A. Yes, I do.

Q. Okay. So I'm going to have you turn to the second page, which is Sopron 653, and here it says, "The reporting investigators proceeded to the stated location and arrived at about 12 hours. Reporting investigators were met by Supervisor Diciolla who in turn, took the RIs to the Deputy Chief Thomas Donahue." So does this refresh your recollection, in any way, about whether you were supervisor in 1997?

A. Yeah. Well, obviously that's the way they titled me, yes.

Page 292

Q. Okay.

A. Well then, I'd say it was about '97 or something, '98, so.

MR. OBERTS: Objection. Foundation.

BY MS. HAGY:

Q. Well, do you have any reason to dispute this report's listing you as a supervisor in September of 1997?

MR. OBERTS: Objection. Form. Speculation and foundation.

A. Except for the fact that a lot of times these Cook County investigators from the Cook County jail, they weren't the swiftest of foot, to tell you right now, so. I mean, they might've just considered me a supervisor because my name was on the list of people eligible to take him out of the witness quarters. So I don't know if they considered me a supervisor or not. I don't remember making supervisor that early, though.

BY MS. HAGY:

Q. Okay. But you don't have a concrete memory of that.

A. I don't remember and --

MR. OBERTS: Asked and answered multiple times.

A. I don't know what the significance of that is.

MR. OBERTS: And objection. Foundation.

Page 293

BY MS. HAGY:

Q. Okay. So here it says that, "At this point, in the company of Supervisor Diciolla, Inmate Williams was interviewed and he related in substance what he had previously related in his telephone calls to the reporting investigators, with the exception that another inmate, whose name he didn't recall, but was referred to as 'The Jamaican,' had received narcotics from a correctional officer," and then it's blacked out. So do you remember being present when Inmate Turner Williams gave a statement about a CO providing William Bigeck with marijuana?

MR. OBERTS: Objection. Form. Foundation and speculation.

A. I don't remember being there.

BY MS. HAGY:

Q. You don't remember this?

MR. OBERTS: Objection. Asked and answered. Objection. Asked and answered. You just asked it twice. What's the difference?

MS. HAGY: I didn't say anything in between them.

MR. OBERTS: And -- well, you said, "You don't -- do you remember," and then he said, "I don't remember," then, "You don't remember this?"

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 294

What was the difference?  You just asked and he answered that question.

MS. HAGY:  Okay.  Well, he hadn't answered yet, so you're kind of objecting to that.

MR. OBERTS:  Yeah.  I said, "Objection.  Asked and answered," because you just asked the question prior.  We could read -- we could reread.

MS. HAGY:  Yeah, sure.  Let's play that back.

MR. OBERTS:  Both questions.  The one before, "You don't remember this?"

MS. HAGY:  Okay.

MR. OBERTS:  And the answer.

(REPORTER PLAYS BACK REQUESTED QUESTION)

MR. OBERTS:  What --

MS. HAGY:  Keep going.  Keep playing that.

THE REPORTER:  Yeah, okay.

(REPORTER PLAYS BACK REQUESTED QUESTION)

MS. HAGY:  See, the first answer's not eligible.

(REPORTER PLAYS BACK REQUESTED QUESTION)

MS. HAGY:  I couldn't hear the first answer.  Then I asked again, then you objected, then you objected.  So I do need to be able to hear the answer.

MR. OBERTS:  He said, "I don't remember."  And

Page 295

you said, "You don't remember this?"  Basically, your question was then based upon -- you -- he already answered.  And then he said, "I don't remember this." Of course you had to have heard that.  I'm not speculating.  Maybe you didn't, but you said -- certainly asked the same question, asked and answered twice.  I mean, you did.

MS. HAGY:  But then I asked again, then you objected.  Then he didn't answer, then you objected again.  Like, I just need him to answer these questions, even if you believe he's asked and answered --

MR. OBERTS:  But he did, but it was -- do you dispute it or was it asked and answered?

MS. HAGY:  Not the second time.  The second time I asked, and then you objected and then you objected.  He never answered the second time.  And --

MR. OBERTS:  But why would you ask the second time if he just answered, "I don't remember"?

MS. HAGY:  You could repeat questions, too.  I just --

MR. OBERTS:  That's not fair, that's not fair.  It is an 82-year-old man who was here seven some hours. That's not fair.  I mean, six some hours.

Page 296

That's not fair.

BY MS. HAGY:

Q.  I'm trying.  So there is a report that says that you were present for this incident where it was reported that Billy Bigeck had marijuana in jail, right?

MR. OBERTS:  Objection.  Foundation.

BY MS. HAGY:

Q.  And so -- what was that answer?

A.  I said, "Yes, I understand what you're saying."

Q.  And so, are you saying that you don't remember any of this happening or that it didn't happen?

MR. OBERTS:  Mischaracterizes his testimony.

A.  I don't remember.  I don't remember.

MR. OBERTS:  And asked and answered.

MS. HAGY:  Okay.  I mean, we're finishing up here, but it's going to be a lot easier if you let him answer.  That you're talking over him.

MR. OBERTS:  It'd be a lot easier if you didn't completely repeat the same questions as well.

BY MS. HAGY:

Q.  So one -- do you remember learning that Billy Bigeck was accused of having marijuana in the witness quarters?

A.  Yes.

Page 297

MR. OBERTS:  Objection.  Asked and answered multiple times now.  Objection.  Asked.  This is abusive.

A.  I don't remember.

MR. OBERTS:  It's abusive.

MS. HAGY:  It's not.

MR. OBERTS:  It is.

A.  I remember about the hooch, the liquor, but I don't remember about the marijuana.

BY MS. HAGY:

Q.  Okay.  And would it have been significant to you if you learned that a witness had marijuana in the witness quarters?

MR. OBERTS:  Objection.  Vague.  Foundation. Form.  Speculation.  Incomplete hypothetical. Context.

A.  Would I -- would I have thought it would be unethical?

BY MS. HAGY:

Q.  Yes.

A.  Yes.

Q.  And would it be something that you would think that the state's attorney should know?

MR. OBERTS:  Objection.  Speculation. Foundation.  Form.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 298

A. Yes. I believe that. Yeah.

BY MS. HAGY:

Q. And do you remember reporting this situation to the state's attorney's office?

MS. O'BRIEN: Objection. Form. Foundation.

MR. OBERTS: Objection. Foundation. Speculation.

MS. O'BRIEN: Asked and answered.

THE REPORTER: One more time, Ms. O'Brien?

MS. O'BRIEN: Objection. Form. Foundation. Asked and answered.

A. No, I don't remember.

BY MS. HAGY:

Q. Do you think you would have wanted the state's attorney's office to know that this accusation had been made?

MR. OBERTS: Objection. Asked and answered and foundation and speculation.

A. I think I would've wanted them to know, yes.

BY MS. HAGY:

Q. Okay. And do you remember -- were you informed that Billy Bigeck was asked to give a statement against this correctional officer? Were you informed of that?

MS. O'BRIEN: Objection. Form. Foundation.

Page 299

A. No, I don't remember.

BY MS. HAGY:

Q. Okay. And here, I'm going to point you to the fourth paragraph. It says, "At this point" --

MR. OBERTS: This is on 653?

BY MS. HAGY:

Q. Yes. "At this point, in the company of Supervisor Diciolla, Inmate Williams was interviewed, and he related" -- or sorry, we did this part, but --

MR. OBERTS: Asked and answered.

BY MS. HAGY:

Q. Sorry. I'm going to move down to the next paragraph. And here it says, "Both Mr. Donahue and Supervisor Diciolla concurred that the witness quarter's telephone procedure had been breached." Do you remember agreeing that the telephone procedure had been breached by Billy Bigeck?

A. I don't remember.

Q. Okay. And here in the next paragraph, it says, "Supervisor Diciolla reported at this time that he felt that reporting investigators should interview Williams without him, because he felt Williams might have been nervous with his Dean in the room, and he also felt Williams was holding some information back." Do you have any memory of that?

Page 300

A. No.

Q. Okay. And in the last paragraph, it says, "Supervisor Diciolla told the reporting investigators that he would put the names of investigators, Frank Podolsky and Guy Santillo on Williams' authorized telephone list and show the investigators names as listed as attorneys for Williams."

MR. OBERTS: What's the -- objection. Form. Vague. What's the question?

A. Listed as attorneys for Williams?

BY MS. HAGY:

Q. That's how I read it.

A. Okay.

Q. Do you read it differently?

A. Yeah. Well, there's a blue line through it, so I can't make it out.

Q. Did you have the ability to put in people on the phone list of someone who was in witness quarters?

MR. OBERTS: Objection. Form. Vague.

A. No, I did not have the authority for that.

BY MS. HAGY:

Q. Okay. So this would be incorrect?

MR. OBERTS: Objection. Speculation. Foundation.

A. I don't know why they put that in the report.

Page 301

I don't know.

BY MS. HAGY:

Q. And would you have listed an investigator as an attorney for a witness?

A. No. I wouldn't.

Q. That wouldn't be accurate, right?

A. No, it would not be accurate.

Q. Do you remember supplying these investigators with William Bigeck's birthdate?

MR. OBERTS: Objection. Foundation.

A. Did I supply these investigators from the Cook County Department of Corrections with William Bigeck's birthday?

BY MS. HAGY:

Q. Yeah. Do you remember doing that?

A. No, I don't remember.

Q. Okay.

A. I see it in the report that I did.

Q. Okay. And do you remember informing any defense attorneys that William Bigeck had been caught making hooch in the witness quarters?

A. No.

Q. Did you -- do you remember informing any defense attorney that William Bigeck, having caught with marijuana in the witness quarters?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 302

A.   No.

MS. O'BRIEN:  Objection.  Form.  Foundation.

MS. HAGY:  Are we on 132?

THE REPORTER:  Yes.

MS. HAGY:  So Counsel, I'm going to mark this next exhibit as 132, and it's Bates stamped CCFAO-CAB-2908 to 2925.

(EXHIBIT 132 MARKED FOR IDENTIFICATION)

MR. MASCIOPINTO:  Are we hearing seven hours?

MR. OBERTS:  Yeah.  Can you say the time?

MS. HAGY:  Six hours, 17 minutes 80 seconds.

MR. STEPHENSON:  This is Exhibit 132?

MS. HAGY:  Yeah.

MR. OBERTS:  But just to be clear, so we have seven hours, and if seven hours, then that would be obviously, the balance of your time, which knowing that --

MS. O'BRIEN:  Well, what's --

MR. OBERTS:  Which means no rebuttal for you if you took seven hours, just so that's a mutual understanding.

MS. HAGY:  Okay.  Are other people planning to question the witness?

MR. STEPHENSON:  Yes.  There'll be questions.

MS. O'BRIEN:  Yes.

Page 303

BY MS. HAGY:

Q.   Okay.  So Mr. Diciolla, I'm going to have you look at page, on CCFAO-CAB-2909.

A.   Okay.

Q.   Do you see where it says -- first of all, do you recognize this document?

A.   No.

Q.   Okay.  And do you see -- sorry.  I'll have you have you turn to the first page for a minute, where it says, "Cook County State's Attorney's Office Inmate Witness Protection Program"?

MS. O'BRIEN:  Objection.  Form.  Foundation. He doesn't recognize the document.

A.   I don't recognize it.

BY MS. HAGY:

Q.   Okay.  So here, on page 2909, the -- it says the name, "William Bigeck," at the top, right?

A.   Okay.

MS. O'BRIEN:  Objection.  Form.  Foundation.

BY MS. HAGY:

Q.   And then further down, it says, "February 20, 2001" right?

MR. OBERTS:  Objection.  Foundation.  Did -- do you -- did you -- object to foundation.

A.   What -- what part in the middle of the part

Page 304

are you talking about?

BY MS. HAGY:

Q.   On page 2909?

A.   Yeah, I got nine.  And what part of the document?

Q.   Midway down, it says, "February 20, 2001," right?

A.   Yes.

MR. OBERTS:  Objection.  Foundation.  So wait, does -- I'm objecting that you're asking him questions regarding what a document states that he didn't author and does not recognize.  So what would be the purpose?

MS. HAGY:  Well, this is a Cook County State's Attorney's Office document.

MR. OBERTS:  Very good, but he didn't author it and he doesn't recognize it.  So how does he have a foundation?  How did -- you don't -- you haven't established any foundation for asking questions.  So I'm objecting to introduction of this document without foundation.

MS. HAGY:  Okay.  So you've made your objection.  I'm going to keep going unless you instruct him not to answer.

MR. OBERTS:  Well, I'm going to instruct him to

Page 305

answer to the extent he has personal knowledge.

MS. HAGY:  Sure.

MR. OBERTS:  Because this this document shouldn't be -- well, when you say personal knowledge, it's deceiving to say whether or not the document states such.

MS. HAGY:  Okay --

MR. OBERTS:  Because if he didn't author the document, that's not fair.  The document, if this is in trial, it wouldn't be entered into trial unless there was a foundation set.  So you haven't set the necessary foundation for questioning regarding this document for this witness.

MS. HAGY:  Are you going to instruct him not to answer?

MR. OBERTS:  No.

BY MS. HAGY:

Q.   Okay.  So do you see where it says, under February 20, 2001, it says, "First day"?

MR. OBERTS:  Objection to foundation.

A.   Yes.  I see it.

BY MS. HAGY:

Q.   Do you see that?  Was this Billy Bigeck's first day in the witness quarters placement?

MR. OBERTS:  Objection.  Foundation and

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Reproduction Prohibited - For Review Only

Page 306

speculation.

A. No.

BY MS. HAGY:

Q. And prior to this time did -- to your knowledge, did the state's attorney have any records of witnesses being in the witness protection quarters?

MR. OBERTS: Objection. Foundation.

MS. O'BRIEN: Objection. Form. Foundation.

BY MS. HAGY:

Q. Prior to this time?

MR. OBERTS: Objection. Vague and foundation.

A. Records kept by the state's attorney?

BY MS. HAGY:

Q. Yes.

A. On that, I don't know.

Q. Is it fair to say that before this time, you described a check-in process that was operated by the Sheriff's Office, right?

A. The Sheriff's Police, yes.

Q. And so, do you know -- do you have any personal knowledge of why the Cook County State's Attorney's Office started keeping their own records in 2001?

MS. O'BRIEN: Objection. Form. Foundation.

A. I have no idea.

Page 307

BY MS. HAGY:

Q. Okay. And here, did you ever interact with Billy Bigeck after he testified in the Sopron and Antusas case?

MS. O'BRIEN: Objection. Asked and answered.

MR. OBERTS: Objection. Vague.

BY MS. HAGY:

Q. Did you ever interact with Billy Bigeck --

MR. OBERTS: And just -- I'm sorry, the question -- the answer was no?

A. No, I said no.

BY MS. HAGY:

Q. Did you ever interact with Billy Bigeck during the trial of Nick Liberto?

MR. OBERTS: Objection. Vague, and form.

A. Interact in what way? What do you mean?

BY MS. HAGY:

Q. Bring him up to meet with the state's attorney?

A. I don't know. I don't remember the dates I brought him up.

Q. Okay. And do you remember Billy Bigeck being in the witness quarters in 2004?

MS. O'BRIEN: Objection. Form. Foundation.

MR. OBERTS: And vague.

Page 308

A. No, I don't remember.

BY MS. HAGY:

Q. Do you have any knowledge of why Billy Bigeck would've been in the witness quarters in 2004?

MR. OBERTS: Objection. Speculation.

MS. O'BRIEN: Objection. Form. Foundation.

A. No, I don't.

BY MS. HAGY:

Q. Do you have any personal knowledge of why Billy Bigeck would've been in the witness quarter in 2005?

MR. OBERTS: Objection. Foundation. Speculation.

A. No, I don't.

BY MS. HAGY:

Q. Do you have any personal knowledge of why Billy Bigeck would've been in the witness quarters in 2008?

MR. OBERTS: Objection. Foundation. Speculation.

A. No, I'd already left the office.

BY MS. HAGY:

Q. How about in 2000? What happened? Okay. Do you remember any other time when a witness what -- when it was reported to you, that a witness had marijuana in

Page 309

the witness quarters?

A. No.

MR. OBERTS: Objection. Foundation.

MS. O'BRIEN: Form. Objection.

MS. HAGY: Okay. I'm going to reserve the rest of my time.

MR. OBERTS: How much time do we have?

THE REPORTER: Six hours, 24 minutes.

MR. OBERTS: I'm sorry, let me just write that down. So far, we had total time, six hours, 24 minutes and?

THE REPORTER: 52 seconds.

MR. OBERTS: 52 seconds. And Counsel is reserving her time and passing it to Counsel for examination. Very good.

MR. STEPHENSON: Does the witness need a break before?

MR. OBERTS: Yeah. Why don't we take a --

THE WITNESS: No, I'm fine.

MR. OBERTS: You don't want to take a break, stretch your legs?

THE WITNESS: No. I'm good. I want this over with.

CROSS-EXAMINATION

BY MR. STEPHENSON:

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 310

Q. All right. Well, if we're ready to go, I'll jump in next. All right. Good evening, Mr. Diciolla. My name is Mike Stephenson, I represent the defendant, Scott Cassidy in this matter. Sir, if you could please look at Exhibit 126. It is the investigative reports, memorializing Bigeck's statements to the state.

MR. KURSON: Is that what we called Exhibit 9?

MR. STEPHENSON: No, I believe it's 1.6.

MR. OBERTS: It's 6143 to 6146.

THE WITNESS: 6143?

MR. OBERTS: 6143 to 6146.

A. Okay. Got it.

MR. OBERTS: Wait. Let's get it all 6143, 6144, and there's one more page, 6145 and 6146. There you go. And what page did we start on?

MR. STEPHENSON: Let's start with 644. That's going to be --

MR. OBERTS: 6144?

BY MR. STEPHENSON:

Q. Yes, exactly, 6144. It's the longer of the two reports that you generated.

A. Okay.

Q. Do you have that in front of you, sir?

A. Yes, I do.

Q. All right. So we are looking at a report, for

Page 311

the record, Exhibit 126, Sopron 6144 through 6146. Sir, do you recognize this report?

A. Yes.

Q. This is a report that you prepared; is that true?

A. Yes.

Q. And is this report in the same -- substantially same condition as you last saw it?

MS. HAGY: Objection. Form. Foundation.

BY MR. STEPHENSON:

Q. I'm laying it. Go ahead, sir.

A. Is it the same condition?

Q. Yeah. Is it the same -- in the same or substantially same condition as you last saw your report?

A. Yes.

Q. Do you recognize this report because this is report that you prepared of an interview of William Bigeck on two dates, August 12th, and August 29, 1996; is that true?

A. Yes.

Q. And sir, this report, it summarizes, not verbatim, but in summary what Bigeck told the State on two different dates, August 12th, and August 29, 1996?

A. That's correct.

Page 312

Q. And in the first paragraph of this report, you'll see there, and I'll read the sentence, it's the second one in the first paragraph says, "Present during those interviews were the defense attorneys, Mike Vitale and George Zuganelis"; did I read that correctly?

A. Yes.

Q. That means that George Zuganelis along with Mike Vitale was present with their client, Billy Bigeck for both interviews in August; is that true?

A. That's correct.

MS. HAGY: Objection. Form.

BY MR. STEPHENSON:

Q. Same report, sir, I want to direct your attention to the second page. It's Bates stamped at the bottom 6145. I'm specifically looking at the second full paragraph on that page, it starts with, "A little later." Let me know when you have that.

A. Okay. Got it.

Q. I'm going to read the first two sentences. It states, "A little later, Misfit and two Popes from Vittum Park came by. They were about 21 to 23 YOA"; do you see that, sir?

A. Yes.

Q. Does the YOA mean years --

A. Year -- years of age.

Page 313

Q. Okay, thank you. So it appears that Billy is telling the State on August 12th and August 29, 1996, that there were two other Popes that came to Nick Morfin's house with Matt Sopron, that he couldn't identify -- or he couldn't name at that time?

MS. HAGY: Objection. Form.

A. Yes.

BY MR. STEPHENSON:

Q. And then sir, I want to then look at -- it's the same exhibit but it's on the other page. It's Bates stamped 6143 at the bottom.

A. Okay.

Q. Sir, this is a report prepared by Investigator William Marley, and another interview of Billy Bigeck; is that true?

MR. OBERTS: Objection. Foundation.

BY MR. STEPHENSON:

Q. Is that what it -- is that what the document appears to be?

A. Yes.

Q. Okay. I'm going to read the second full paragraph, okay? "William Bigeck was asked to recall his activities on 14, December 1995. Bigeck related essentially the same account as reported on 12 and 29 August, with the following addition." "Bigeck stated

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 314

that on that date, he was at Nick Morfin's house with several other friends. All present were Popes, except Ed Morfin, Nick Morfin's cousin. Misfit, Matt Sopron, arrived with two unknown Vittum Park Popes. As he went on relating his activities. William Bigeck stated that he had remembered the name of one of the two Vittum Park Popes who had accompanied Matt Sopron to Nick Morfin's house. He identified that subject as Climber. Climber was identified as John Gizowskit"; did I read that correctly, sir?

A. Yes.

Q. So it appears that Mr. Bigeck did, in fact, describe John Gizowskit to the State during his interviews on August 12th and August 29, 1996. He just couldn't remember his name at first?

MS. HAGY: Objection. Form.

A. That -- that's correct.

BY MR. STEPHENSON:

Q. When you read those two reports in conjunctions, that's what they tell us?

A. Yes.

MS. HAGY: Objection. Form.

BY MR. STEPHENSON:

Q. Sir, there was a meeting between yourself and some Chicago police officers in September 1996, to

Page 315

discuss arresting the certain suspects.

MR. OBERTS: Objection. Mischaracterizes testimony and -- objection. Mischaracterizes testimony.

A. I was not present at the actual date that they were arrested at that meeting.

BY MR. STEPHENSON:

Q. Oh, you -- so you were not present with CPD for that meeting in September 1996?

A. I don't believe I was.

MR. OBERTS: That's true, correct?

A. Yeah.

BY MR. STEPHENSON:

Q. Okay. Thank you. Would you consider the Martin and Hoval murders a gang case?

A. Yes.

Q. I want to ask you about some of your observations of the interviews that took place in connection with the Martin and Hoval murders, okay?

A. Okay.

Q. Did you ever observe Scott Cassidy or any ASA working on the Martin Hoval cases ever threaten a witness?

MS. HAGY: Objection. Form.

A. No.

Page 316

BY MR. STEPHENSON:

Q. Did you observe Scott Cassidy or any ASA working on the Martin and Hoval cases ever try to put words in a witness's mouth?

MS. HAGY: Objection. Form.

A. No.

BY MR. STEPHENSON:

Q. Did you observe Scott Cassidy or any ASA working on the Martin and Hoval cases ever force a witness to say something?

A. No.

MS. HAGY: Objection. Form. If you can give me a minute, I get to object, too.

THE WITNESS: Oh, I'm sorry.

MS. HAGY: That's okay.

THE WITNESS: Okay.

BY MR. STEPHENSON:

Q. Sir, did you ever observe Scott Cassidy or any ASA working on the Martin and Hoval cases tell a witness what to say?

MS. HAGY: Objection. Form.

A. No.

BY MR. STEPHENSON:

Q. Assuming that Scott Cassidy or any ASA working on the Martin and Hoval cases did one of those things,

Page 317

what would you have done?

MR. OBERTS: Objection. Vague. Foundation. Speculation. Go ahead.

A. I don't know. I don't know. I'm not sure.

BY MR. STEPHENSON:

Q. You're not sure because it never happened?

A. It never happened, no.

Q. Did Scott Cassidy or any ASA working on the Martin and Hoval cases ever tell you how to write one of your reports?

A. No.

MS. HAGY: Objection. Form.

A. Sorry.

BY MR. STEPHENSON:

Q. Did Scott Cassidy or any ASA working on the Martin and Hoval cases ever tell you what to write down in your report?

MS. HAGY: Objection. Form.

A. No.

BY MR. STEPHENSON:

Q. Did Scott Cassidy or any ASA working on the Martin and Hoval cases ever tell you not to write something down in a report?

MS. HAGY: Objection. Form.

A. No.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of NORFIE DIPIROLLA, taken on August 12, 2023

Page 318

BY MR. STEPHENSON:

Q. Sir. I'm going to now want to review some of -- some things that Bigeck has stated, okay?

A. Okay.

Q. Then I'm going to ask you whether -- if you know anything about them or if they're true. Sir, you have a -- if I understood your testimony correctly, you have an independent recollection of the interviews with Mr. Bigeck and the State on August 12th and 29, 1996?

A. Yes, I do.

Q. Okay. "Bigeck said that ASA Cassidy barged out of the room swearing and called him a liar." Did that happen during those interviews?

A. Not that I remember.

Q. Bigeck said that ASA Cassidy blew up, swearing and cursing. That happened during the interviews in August with Mr. Bigeck?

A. No.

MS. HAGY: Objection.

BY MR. STEPHENSON:

Q. ASA Cassidy yelled at Bigeck and said, "You'll die in jail." Did that happen during the interviews with Mr. Bigeck?

Q. No.

Q. Bigeck said that ASA Cassidy starting --

Page 319

started putting words in his mouth, leading him, and filling in the blanks. Did that happen any interviews with Bigeck in the state in August 1986?

MS. HAGY: Objection. Form.

A. No.

BY MR. STEPHENSON:

Q. All righty, so, sir, I'm going to switch to some Bigeck statements involving yourself. I want to ask if things are true or happened, okay?

A. Okay.

Q. Bigeck said that Investigator Norfie told him he knew about the El Rukns having sex in the US attorney's office.

A. Nothing, no.

MR. OBERTS: That -- meaning that never happened?

A. Never happened.

BY MR. STEPHENSON:

Q. Bigeck said that Investigator Norfie joked that he used to bring drugs in for them, referring to the El Rukns?

A. No.

MR. OBERTS: No, meaning that never happened?

A. Never happened.

BY MR. STEPHENSON:

Page 320

Q. Sir, did you ever see full liquor bottles in Scott Cassidy's office at the States Attorney's office?

A. No.

Q. Did you ever see small airplane -- small airline sized bottles of Cognac on Scott Cassidy's desk at the state's attorney's office?

A. You mean those little miniature bottles they got? No.

Q. All right, sir, I want to ask a little bit about transporting these witnesses. If I understood your testimony earlier, you would on occasion take -- transport a witness such as Billy Bigeck from the witness quarters to the state's attorney's office, for example, for an interview?

A. Yes.

Q. Okay. Would you take certain safety precautions to ensure the safety of, not only the individual in custody, but others around him as well when you were transporting a witness from the witness quarters to the state's attorney's office?

A. Yes.

Q. Do you recall what some of those precautions were?

A. Well, when we would pick up the prisoner, and even out of the witness quarters, we would handcuff them

Page 321

behind their back, walk them across the parking lot, which was right behind 26th and California, and oftentimes we would use a private elevator that was basically built to transport prisoners or key -- people that were witnesses that were threatened up that elevator, up to this area that we were bringing up to. And then once we got them into that area, we would sometimes just cuff them to a table or sit right across the table from them.

Q. Would an individual in custody like Mr. Bigeck, would he always have some kind of mechanical restraint on him?

A. No. There was a couple of times where he was allowed to eat or drink coffee. Yeah.

Q. Other than that, was he at least have some kind of mechanical restraint on him?

MS. HAGY: Objection. Form and foundation.

A. Yes.

BY MR. STEPHENSON:

Q. Would you ever let a witness -- excuse me, an individual in custody like Mr. Bigeck wander around the state's attorney's office unsupervised?

A. No.

Q. Would you or one of the other investigators always maintain eyes on Mr. Bigeck at all times?

Read and Sign Only

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 322

MS. HAGY: Objection. Form. Foundation.

A. Yes.

BY MR. STEPHENSON:

Q. Would you ever search the individuals in custody like Mr. Bigeck when you were transporting them to and from the state's attorney's office?

MS. HAGY: Objection. Form. Foundation.

A. Yeah. There were times we pat them down, but it's actually unnecessary, yeah.

BY MR. STEPHENSON:

Q. It was unnecessary?

A. Well unnecessary in the sense that we had them observation all the time, you know, but just in case they stole something off a desk or something.

Q. And while you were observing Mr. Bigeck in the state's attorney's office, did he ever go on Scott's computer, Scott Cassidy's computer, and look at porn?

A. No.

Q. Did you ever see Mr. Bigeck in Scott Cassidy's office looking through and perusing evidence in cases?

A. No.

Q. Okay. None of those things would be allowed?

MS. HAGY: Objection. Form. Foundation.

A. At all.

BY MR. STEPHENSON:

Page 323

Q. Would you on occasion transport Mr. Bigeck or an individual in custody from the witness quarters to court?

A. Yes.

Q. Would they have mechanical restraints on them during the transportation?

A. Yes.

Q. And what mechanical experience would they have?

A. Handcuffs.

Q. Behind the back?

A. Yes.

Q. Did you ever pat them down and search them before bringing them to court?

MS. HAGY: Objection. Form.

A. No -- no, and they -- well, they were in custody in the witness quarters. They were pretty well secured, you know, by the Cook County Police.

BY MR. STEPHENSON:

Q. I'm just reviewing my notes, sir. Just one moment. I'm probably going to have two more questions for you. Was the first time that you learned of the names Matthew Sopron and Wayne Antusas from Mr. Bigeck during his first interview on August 12, 1996?

MS. HAGY: Objection. Form.

Page 324

A. Yes.

BY MR. STEPHENSON:

Q. Prior to meeting with Bigeck on August 12, 1996, you didn't have any personal knowledge of whether this was a -- I would -- I'll withdraw that question. Did you learn from Bigeck for the first time on that August 12, 1996, meeting that the murders of Novel and Martin were ordered by gang leaders?

A. Yes.

MS. HAGY: Objection. Form.

BY MR. STEPHENSON:

Q. And you had no discussion with Mr. Scott Cassidy prior to the meeting with Bigeck as to whether this was ordered by gang leaders; is that true?

MS. HAGY: Objection. Form.

MR. OBERTS: Objection. Form.

A. True.

MR. OBERTS: Meaning true you did not, correct?

A. I did not.

MR. STEPHENSON: Yes. I have no further questions for you, Mr. Diciolla.

MS. O'BRIEN: I only have a few questions. Can I -- can we just take a two-minute break?

MR. OBERTS: Sure.

THE REPORTER: All right. We're off the

Page 325

record. The time is 6:47 p.m.

(OFF THE RECORD)

THE REPORTER: We're back on the record. The time is 6:53 p.m.

EXAMINATION

BY MS. O'BRIEN:

Q. Sir, my name is Maureen O'Brien. I work with O'Mara O'Callaghan, and I represent former Assistant State's Attorneys Colleen Hyland, Laura Sullivan, Neil Linehan, Steve Dinolfo, Pat Shae, and George Andrews. I'm going to try to be brief and thank you for your patience with all of us today. I'd like to just begin with what date you retired from the Cook County State's Attorney's office. Can you tell us that date?

A. Yes. Well, I can't tell the exact date, but it was May of 2006.

Q. All right. And is it fair to say that your basic job as a Cook County State's Attorney Investigator was trial support?

MS. HAGY: Objection. Form.

A. Yes.

BY MS. O'BRIEN:

Q. Is it fair to say that you were not investigating cases? In other words, you weren't investigating cases in order to solve the crimes and

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 326

make an arrest during your capacity as a Cook County State's Attorney Investigator?

MS. HAGY: Objection. Form.

A. Yes, that's correct.

BY MS. O'BRIEN:

Q. Now, with respect to trial support -- well, let me just say this: You know, Counsel for Plaintiff has been talking a lot about the -- referring to the Hovel and Martin murder case. Is it fair to say that when you got involved in the case, it was -- the case name was the People of the State of Illinois v. Billy Bigeck, Ed Morfin, Nick Morfin, Nick Liberto and Eric Anderson?

MS. HAGY: Objection. Form. Foundation.

A. Yes.

BY MS. O'BRIEN:

Q. Is it fair to say that the murder case, the murder of those two young girls, was already solved in part by -- oh, well solved by the Chicago Police Department?

A. Yes.

MS. HAGY: Objection. Form. Foundation.

BY MS. O'BRIEN:

Q. And when you were involved in the case, and when you got involved in the case, the case had already

Page 327

been indicted; is that fair to say, sir?

MS. HAGY: Objection. Form. Foundation.

A. Yes.

BY MS. O'BRIEN:

Q. You were assisting Scott Cassidy and, for a period of time, Neil Linehan in the prosecution of that indictment, correct?

A. Yes.

MS. HAGY: Objection. Form. Foundation. Calls for a legal conclusion.

BY MS. O'BRIEN:

Q. You got involved in this case after two of those co-defendants, Billy Bigeck and Ed Morfin, negotiated a plea agreement with the Assistant State's Attorneys who were prosecuting that indictment; is that correct?

MS. HAGY: Objection. Form.

A. Yes.

BY MS. O'BRIEN:

Q. That case was pending, that indictment of those five defendants that I previously mentioned, that case was pending before you even got involved in it before Judge Moran; do you recall that?

MS. HAGY: Objection. Form. Foundation.

A. Yes, that's correct.

Page 328

BY MS. O'BRIEN:

Q. In terms of trial support, you assisted the assistant state's attorneys who you were assigned to track down witnesses, correct?

A. Correct.

Q. Serve subpoenas, correct?

A. Correct.

Q. Be approver for certain interviews, correct?

A. Correct.

Q. When you when I say the word approver, what does that mean to you?

MS. HAGY: Objection. Form.

A. Approver to me means sitting in on an interview and being able to verify what was said in that interview.

BY MS. O'BRIEN:

Q. Was it -- was your duty as a Cook County State's Attorney Investigator to assist Assistant State's Attorneys in ongoing prosecutions?

MS. HAGY: Objection. Form. Foundation.

A. Yes.

BY MS. O'BRIEN:

Q. Your duties as a Cook County State's Attorney Investigator was not to solve crimes, correct?

MS. HAGY: Objection. Form. Foundation.

Page 329

A. That's correct. Yes.

BY MS. O'BRIEN:

Q. Now, a lot of things have been talked about these proffers today, but a proffer would you agree, is a legal -- is legal terminology?

A. Yes.

MS. HAGY: Objection. Form. Foundation.

BY MS. O'BRIEN:

Q. A proffer is something that only a State's Attorney as a prosecutor and a lawyer can give to a witness in a case; is that correct?

A. Yes, that's correct.

Q. When you -- well, you are familiar with the fact that Billy Bigeck signed a proffer agreement with his lawyers present to speak to the state's attorney's office, correct?

A. Yes.

Q. And the same holds for Ed Morfin? He also signed a proffer agreement and -- with his lawyers present to give information to the state's attorney's office, correct?

A. Yes.

MS. HAGY: Objection. Form. Foundation.

BY MS. O'BRIEN:

Q. When each of these proffers were signed, those

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 330

two individuals were defendants in a pending criminal indictment for murder of those two girls, correct?

A. Yes.

Q. When -- I want to talk to you about a couple of other things. Well, let me just ask you this. When you spoke at any time with Billy Bigeck, he was -- he had already signed a proffer agreement, correct, sir?

A. Yes.

MS. HAGY: Objection.

BY MS. O'BRIEN:

Q. He had already signed a plea agreement with the Assistant State's Attorneys handling his murder case, correct?

MS. HAGY: Objection. Form.

A. Yes.

BY MS. O'BRIEN:

Q. He was, for all intents and purposes, a witness for the Cook County State's Attorney's office in their prosecution against the three remaining defendants of the murder case, correct?

MS. HAGY: Objection.

A. Yes.

MS. HAGY: Objection. Form. Foundation.

BY MS. O'BRIEN:

Q. When you spoke with Ed Morfin, he had already

Page 331

signed a proffer agreement, correct?

MS. HAGY: Objection. Form. Mischaracterizes both the documents and the testimony today.

A. Yes.

BY MS. O'BRIEN:

Q. He, Ed Morfin, was also a witness for the Cook County State's Attorney's office at the time that you ever came into contact with him; is that fair to say?

MS. HAGY: Objection. Form. Foundation.

A. Yes.

BY MS. O'BRIEN:

Q. As witnesses for the Cook County State's Attorney's office in their case, in that pending indictment brought, Billy Bigeck provided information to you and the assistant state's attorneys regarding the murder that he was going to testify about; is that correct?

MS. HAGY: Objection. Form. Foundation.

A. Yes.

BY MS. O'BRIEN:

Q. Counselor asked you today if you verified certain statements and I want to talk a little bit about that, because I just want to talk a little bit about it. Some of the statements that Billy Bigeck -- well, let me just ask you this. Part of your duty as an investigator

Page 332

with the Cook County State's Attorney's office who's providing trial support for the state's attorneys was to assist the Assistant State's Attorney in determining the truthfulness or veracity of a potential witness; is that correct?

MS. HAGY: Objection. Form.

A. Yes.

BY MS. O'BRIEN:

Q. When you were verifying Billy Bigeck's statements that he made in your presence, were you acting as an investigator to determine what type of witness Billy Bigeck would be in a trial?

MS. HAGY: Objection. Form.

A. Yes.

BY MS. O'BRIEN:

Q. Counselor also asked you if you interviewed other witnesses in the case and -- or other witnesses. Is it fair to say that the other witnesses that you interviewed in this case were in furtherance of the existing criminal prosecution against -- on the -- in the case People v. Nicholas Morfin, Nick Liberto, and Eric Anderson?

MS. HAGY: Objection. Form. Foundation.

A. Yes.

BY MS. O'BRIEN:

Page 333

Q. When you first got involved with the case, you were working on an existing criminal prosecution, correct?

MS. HAGY: Objection. Form. Foundation.

A. Yes.

BY MS. O'BRIEN:

Q. As a result of your interviews with Billy Bigeck, you received information regarding the existing murder, correct? The one that was pending, correct?

MS. HAGY: Objection.

A. Yes.

MS. HAGY: Form. Foundation.

BY MS. O'BRIEN:

Q. When you received this additional information as part of your duties as trial support, you then interviewed witnesses that were given to you by Billy Bigeck, correct?

A. Yes.

MS. HAGY: Objection. Form. Foundation.

A. I keep doing that. Just a habit. I want to get it over with.

BY MS. O'BRIEN:

Q. Now, you -- again, you weren't investigating the murder? You were assisting the state's attorneys in

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 334

prosecuting the murder; is that correct?

MS. HAGY: Objection. Form. Asked and answered and calls for a legal conclusion.

A. Yes.

BY MS. O'BRIEN:

Q. Would you characterize the interviews that you had with the witnesses as trial preparation?

MS. HAGY: Objection. Foundation. Asked and answered.

A. Yes.

BY MS. O'BRIEN:

Q. Counselor's asked you a few questions regarding you -- reports made by either you or other assistants or other State's Attorney investigators; is it fair to say that your reports are summaries?

A. Yes.

Q. Is it true that your reports are not verbatim, nor in their entirety?

A. Yes.

MS. HAGY: Objection. Form.

BY MS. O'BRIEN:

Q. I'd like to just talk a little bit about your -- the Cook County State's Attorney's Investigations Unit. Originally, I know you've already testified that you were detailed to the Cook County

Page 335

State's Attorney's office while working as a Chicago police detective, correct?

A. Yes.

Q. At some point there was an overhaul in the Cook County State's Attorney's office investigation unit, correct?

A. Yes.

MS. HAGY: Objection. Form. Foundation.

A. Yes.

BY MS. O'BRIEN:

Q. And is it fair to say, I think you gave the date, but at some point, the sheriffs and police officers from various organizations were no longer detailed to the Cook County State's Attorney's office and they had to hire their own investigators; is that correct?

A. Yes.

MS. HAGY: Objection. Form. Foundation.

A. Yes.

BY MS. O'BRIEN:

Q. When you were hired by the Cook County State's Attorney's Office as an investigator, you were assigned to, was it the special prosecutions unit or the gang unit?

A. The gang unit.

Page 336

Q. All right. And you had -- there was a hierarchy in the Investigations Bureau of the Cook County State's Attorney's Office, correct?

A. Yes.

Q. All right. You didn't work -- I mean, I know there's been a lot of talk about you worked with Scott Cassidy, but he wasn't your boss; is that fair to say?

A. Yes.

MS. HAGY: Objection. Form.

BY MS. O'BRIEN:

Q. You were not assigned -- you weren't -- were you a personal investigator for either Scott Cassidy or Neil Linehan?

A. No.

Q. Were you specifically assigned to the -- assist the ASAs in the prosecution of this case?

A. Yes.

MS. HAGY: Objection. Form.

BY MS. O'BRIEN:

Q. Who made that assignment?

A. The supervisor from the gang prosecution unit. Larry McDonald.

Q. And he was an investigator, correct?

A. Yes.

Q. Your reports had to be signed off by your

Page 337

investigator boss, correct?

MS. HAGY: Objection. Form.

A. Yes.

BY MS. O'BRIEN:

Q. The state's attorneys, I think you had indicated, but neither Neil Linehan or Scott Cassidy signed off on your reports, correct?

A. Correct.

Q. They didn't edit your reports, correct?

A. Correct.

Q. Do you -- did Colleen Hyland or Laura Sullivan ever direct or cause you to write a report on any of your involvement in this case?

A. No.

Q. All right. You -- were you dealing just merely with the Assistant State's Attorneys who were prosecuting the murder of those two young girls, Hovel, and Martin?

MS. HAGY: Objection. Form. Foundation.

A. Yes.

BY MS. O'BRIEN:

Q. Is it fair to say that the Assistant State's Attorneys were not your supervisors during your term with the Cook County State's Attorney's office?

MS. HAGY: Objection. Asked and answered.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 338

A.   Yes.
BY MS. O'BRIEN:
Q.   I'd like to talk to you a little bit about investigator request slips.  If a State's Attorney wanted to have you do something for them, they had to fill out an investigator request slip; is that correct?
      MS. HAGY:  Objection.  Asked and answered.
A.   Yes.
BY MS. O'BRIEN:
Q.   That investigator request slip was then turned into your boss, correct?
A.   Yes.
Q.   And is it fair to say that your boss then assigned you to whatever the task was that the Assistant State's Attorney was requesting, correct?
      MS. HAGY:  Objection.  Asked and answered.
A.   Yes, that's correct.
BY MS. O'BRIEN:
Q.   It's not like some State's Attorney can say, hey, by the way I know you're heading out of the building, but would you mind picking up a witness for me?  That's not how it worked, correct?
      MS. HAGY:  Objection.  Form.
A.   Yes.
      MR. OBERTS:  Yes, that's true?

Page 339

A.   Yes, that's true.  They might ask me like that, but they would fill out a request slip and give it to me.
BY MS. O'BRIEN:
Q.   Okay.  I'd like to talk a little bit about the witness quarters.  First of all, is there a different -- there is a difference between protective custody at the Cook County Jail and the state's attorney's office witness quarters, correct?
A.   Yes.
Q.   Can you tell -- can you indicate what protective custody means within the Cook County Jail?
A.   Well, protective custody when the -- within the Cook County Jail is usually a section within whatever division they've been assigned to, where they're kind of isolated from the general population and more oftentimes they're in custody in their cells themselves for lengthy periods of time, where they're not intermingling with the other prisoners.
Q.   And the Cook County Jail, I mean, that's run by the whoever the Cook County Sheriff is at the time, correct?
A.   Yes, correct.
Q.   And the Cook County Sheriff has the ability to manage and maintain the jail as he sees fit, correct?

Page 340

A.   Yes.
Q.   In other words, to the best of your knowledge, the Sheriff's Department can put anybody into protective custody if they feel that he's in danger in any way, shape, or form; fair to say?
A.   I believe so.  Yes.
Q.   The Cook County State's Attorney's witness quarters is something different, correct?
A.   That's correct.  Yes.
Q.   There is a court order that is required to put in inmate into the Cook County State's Attorney's office witness quarters, correct?
A.   That's correct.
Q.   And it's called, as I've indicated a couple of times here, the Cook -- the witness quarters, correct?
A.   That's correct.
Q.   All right.  So based upon your knowledge of the state's attorney's witness quarters, the inmates that are put into that witness quarters are witnesses on existing criminal cases, correct?
A.   That's correct.
      MS. HAGY:  Objection.  Form.
BY MS. O'BRIEN:
Q.   There is paperwork that needs to be filled out, or do you know if there's paperwork that needs to

Page 341

be filled out by an Assistant State's Attorney who's seeking to have a person placed in the witness -- the state's attorney's office witness quarters?
A.   Yes, there is.
Q.   And along with that paperwork, there is a call list which indicates who the inmate or witness can receive make calls to and receive calls from, correct?
A.   Yes.  That's true.
Q.   As you sit here today, do you know if you were ever on Billy Bigeck's call list from the witness quarters?
A.   I don't recall.
Q.   As you sit here today, do you know if you were ever on the call list for Ed Morfin?
A.   I don't recall.
Q.   If an Assistant State's Attorney wanted their witness to come out of the witness quarters for either a trial prep or for trial, did they have to fill out an investigator request slip?
A.   Yes.
Q.   Would then you be assigned to transport somebody to and from the witness quarters from your supervisor?
      MS. HAGY:  Objection.  Asked and answered.
A.   Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 342

BY MS. O'BRIEN:

Q. Did you -- was it a rule that the investigators had to take those witnesses in and out of the witness quarters in teams of two?

A. Yes.

Q. And, as you've indicated, the witness was handcuffed when you brought them out of the witness quarters, correct?

A. Yes.

Q. And if you brought the witnesses -- well, let me just ask you. When you -- if you ever brought Billy Bigeck to the Cook County State's Attorney's office, he was handcuffed, correct?

A. Yes.

Q. He was not allowed to roam the Cook County State's Attorney's office once you arrived at your destination, was he?

MS. HAGY: Objection.

A. No, he was not.

MS. HAGY: Form. Asked and answered.

BY MS. O'BRIEN:

Q. You had to sign out Billy Bigeck from the Cook County State's Attorney's office witness quarters before you transported him anywhere where, correct?

A. Yes.

Page 343

Q. And similarly, you had to sign him back in, is that fair to say?

A. Yes.

Q. Is it fair to say that during the time that you signed Billy Bigeck out of custody, you and whoever your partner was responsible for, you know, the security of him? In other words, keeping him and maintaining his custody status?

A. Yes.

Q. Do you recall being present during any conversations Assistant State's Attorney Colleen Hyland had with any witnesses in this case?

A. I don't recall.

Q. Do you recall having -- being present for any conversations that Assistant State's Attorney Laura Sullivan had with anybody in this case?

A. I don't remember. No.

Q. Would you have conducted any interviews of any witnesses in this murder case without receiving a -- an investigator request or slip from either Scott Cassidy or whoever else was prosecuting the case?

MR. OBERTS: This -- objection. Vague. Receiving it directly from him or the investigator? The supervising investigator?

MS. O'BRIEN: That's a bad question, yes.

Page 344

A. No.

BY MS. O'BRIEN:

Q. Did --

MR. OBERTS: Well, just if you could rephrase.

BY MS. O'BRIEN:

Q. Sorry. Okay.

A. No.

Q. Did you conduct interviews of witnesses on this case at the behest of the state's attorney?

A. Yes.

MS. HAGY: Objection. Form.

BY MS. O'BRIEN:

Q. Is it fair to say that you wouldn't just randomly decide to, you know, interview a witness? You couldn't do that on your own, correct?

A. Correct.

Q. Because you're supporting the state's attorney who's prosecuting the case, correct?

A. That's right.

MS. HAGY: Objection.

A. They assigned tasks.

BY MS. O'BRIEN:

Q. When a witness in -- well, let's just say this: In the witnesses that you were involved with in this particular case, you're just there to interview the

Page 345

witnesses, correct?

MS. HAGY: Objection. Form.

A. Yes.

BY MS. O'BRIEN:

Q. Well, you're not there -- you know, whatever statement a witness gives you in terms of telling you either what happened on a particular evening or discussion that they had, their statements are their statements, correct? It's not for you to determine whether or not you think it's truthful in terms of everything else that you may have heard in the case, correct?

MS. HAGY: Objection. Form.

A. Yes.

BY MS. O'BRIEN:

Q. In other words, you can't impose what you -- knowledge you have on the case onto your witness? You can't suggest, well, maybe this happened or that happened if they've already given you a statement, correct?

A. Yes.

Q. Is it fair to say that in this particular case, when you were assisting the assistant State's attorneys in the prosecution of this case, you learned information that other people were involved in the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 346

murder?

A. Yes.

Q. Is it also fair to say that you, when you are interviewing witnesses, that you -- let me just say this. You received information about certain witnesses from Billy Bigeck, correct?

A. Yes.

Q. Like the identity of the witnesses, correct?

A. Yes.

Q. When you interview those witnesses, you were simply taking a statement as opposed to interrogating those witnesses, correct?

A. That's correct.

MS. HAGY: Objection. Form.

BY MS. O'BRIEN:

Q. You were not looking to arrest anyone or solve the crime in this case. You were facilitating the information that Billy Bigeck provided to you, correct?

A. Yes.

MS. HAGY: Objection. Form.

MR. OBERTS: Just hold on one second, please. Okay.

BY MS. O'BRIEN:

Q. Just -- I'm just trying to go through this really quickly. I'm sorry. When you got involved with

Page 347

Billy Bigeck, he was a co-defendant on an existing murder indictment who was flipping, or in other words, testifying against his co-defendants, correct?

MS. HAGY: Objection. Form. Asked and answered. And calls for a legal conclusion.

MR. OBERTS: Just object regarding vague regarding involved. First met, interviewed? Do you understand --

A. Yes.

BY MS. O'BRIEN:

Q. When you -- at any time that you -- I'm sorry. At any time that you talked to Billy Bigeck, he was testifying against his co-defendants. He had made that agreement already, correct?

MS. HAGY: Objection. Form. Foundation.

A. Yes.

MS. O'BRIEN: I'm sorry, guys.

MS. HAGY: No, you're fine.

MS. O'BRIEN: I have nothing further at this time. Thank you.

EXAMINATION

BY MR. MASCIOPINTO:

Q. Sir, my name's Tony Masciopinto. I represent CPD Officer Defendant's Argenbright, Holmes, Graf, Graffeo, Moser and Argenbright. I have maybe 15

Page 348

minutes, maybe ten-minutes worth of questions. Thanks for your patience. I want to direct your attention to a time frame, okay? Is it accurate to say that you first became involved, in or about early August of 1996 with this murder prosecution work; is that fair?

A. Yes.

Q. Okay. Now, I want to put a pin in early August 1996. And I want to use an endpoint. And the endpoint I want to use is the third week of September 1996. And I'll represent to you in the third week of September 1996, Antusas and Sopron were arrested, okay?

A. Okay.

Q. Okay. So we're talking about those four or five weeks for these -- for this line of questioning. So in those four or five weeks between mid or early August 1996 and the third week of September 1996, you did a number of duties as part of your job at the Cook County State's Attorney's Office with respect to this murder prosecution; is that fair?

A. Yes.

MS. HAGY: Objection. Form.

A. Yes.

BY MR. MASCIOPINTO:

Q. And we don't need to talk about them, but you sat in proffers, you identified witnesses, maybe you

Page 349

interviewed a witness. You did all the things that you previously testified about during that time frame, right?

A. Yes.

Q. In all of the duties that you did as a Cook County State's Attorney personnel between the second week of August and the third week of September 1996, you did them without any CPD officer; is that fair?

MS. HAGY: Objection. Form.

A. Yes.

BY MR. MASCIOPINTO:

Q. Argenbright didn't help you at all between August and late September of 1996 with respect to this murder prosecution, right?

MS. HAGY: Objection. Form. Mischaracterized testimony.

A. Yes.

BY MR. MASCIOPINTO:

Q. And Holmes and Graf, Graffeo, Moser, they also did not assist you in any way with respect to your duties between August of '96 and the third week of September 1996; is that fair?

MS. HAGY: Objection. Form.

A. That's true.

BY MR. MASCIOPINTO:

Read and Sign Only

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 350

Q. All right. Now, in the summer of 1996, did you know George -- police Officer George Holmes?

A. I don't think I did. No. I don't remember.

Q. Okay. And in the summer of 1996, did you know a police officer by the name of Al Graf?

A. I think I might've seen him and met him one time, but I didn't know him to work with.

Q. Okay. And then same question, summer of '96, Did you know Anthony Graffeo?

A. No.

Q. And same question, summer of '96, do you know a Police Officer William Moser?

A. No.

Q. Okay. And then the other name that you said I think you did know in the summer of '96 was Thomas Argenbright, yes?

A. Yes.

Q. Okay. So I don't want to put words in your mouth, but I want to know during the time frame -- let's talk about before August of 1996. Before August of 1996, as you sit here right now today, is it fair to say you have no memory of speaking about the Hovel Martin murders or murder prosecution with any of those CPD officers prior to August of 1996; is that fair?

MS. HAGY: Objection. Form.

Page 351

A. Yes.

BY MR. MASCIOPINTO:

Q. Okay. And during the time frame I've been talking about, the second week of August or even early August 1996 through the third week of September 1996, I just want to make sure I understand your testimony, your best memory as you sit here today is you have no memory of talking to a George Holmes and Al Graf and Anthony Graffeo or a William Moser about the Hovel Martin murder prosecution, fair?

MS. HAGY: Objection. Form. Asked and answer.

A. Yes.

BY MR. MASCIOPINTO:

Q. Okay. You said earlier that you might have a memory, or you think you have a memory of perhaps conversing during -- well, I don't want to put words in your mouth. As you see there today, what do you remember about communicating with Thomas Argenbright about the Martin Hovel murder prosecutions? Give me a time frame, if you recall.

MS. HAGY: Objection.

A. I don't recall the exact time frame, but I remember discussing them with one or two of the detectives in Scott Cassidy's office telling him what I had been doing on the case. Yeah.

Page 352

BY MR. MASCIOPINTO:

Q. Okay. And do you have any memory if that would've been before the arrests of Sopron and Antusas in the third week of September of '96 or after?

MS. HAGY: Objection. Form.

A. It was before.

BY MR. MASCIOPINTO:

Q. Okay. And to the best of your memory, you think that was Argenbright and maybe some other detective whose name you can't remember at this time?

A. Yes.

Q. Okay. And in those one or two meeting -- and you think there was maybe one or two of those types of meetings, yes?

A. Very casual meetings in the office. Yes.

Q. Okay. And I do want to talk about this very casual issue with you in a second, but you think Cassidy was present for both those meetings?

A. I believe so, yes.

Q. Okay. Now you've said they were casual encounters or brief. What -- tell me what you mean by that?

MS. HAGY: Objection. Form. Mischaracterizes his testimony.

A. Was casual meetings, in other words, they

Page 353

weren't planned meetings. I went down to talk to Scott Cassidy to tell him about what transpired on certain tasks that he assigned me to. And if they were present, we kind of converse with them briefly, talking about certain subjects that I went out and talked to.

BY MR. MASCIOPINTO:

Q. And did you ever ask for their assistance in any of those one or two meetings?

MS. HAGY: Objection. Form.

A. No.

BY MR. MASCIOPINTO:

Q. And --

A. No.

Q. And during those one or two meetings where Argenbright was present with this other unknown detective, did you ever communicate to him, Argenbright, or the other detective that there was any misconduct occurring with respect to your duties or Cassidy's duties with respect to the murder prosecution work?

A. No. There was no discussion about misconduct.

Q. And why -- and that's because why?

A. Because there was none.

Q. And did you ever tell Argenbright or this other detective during this window of time that probable cause was being manufactured to frame Sopron or Antusas

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 354

or any words to that effect?

A. No.

MS. HAGY: Objection. Form. Calls for legal conclusion.

MR. OBERTS: And assumes a fact not in evidence.

A. No.

BY MR. MASCIOPINTO:

Q. And why didn't you have that type of communication with Argenbright or CPD?

A. Because --

MS. HAGY: Objection. Form.

BY MR. MASCIOPINTO:

Q. Go ahead.

A. Because there was none.

Q. Did you do your duties with respect to this murder prosecution to the best of your ability in good faith?

A. Yes.

Q. And based on your observations of Cassidy and the other prosecutors and the other investigators, did you see any other different type of effort other than law enforcement officers doing the best they could in good faith?

MS. HAGY: Objection. Form. Foundation.

Page 355

A. None -- none other than the officers doing what they were supposed to do.

BY MR. MASCIOPINTO:

Q. And when you say officers, you're referring to investigators and/or --

A. Investigators, detectives, State's attorneys.

Q. Okay. And you never -- with respect to CPD detectives, you never observed any personal work that they performed on this murder investigation; is that fair?

A. That's true.

MS. HAGY: Objection. Form.

A. That's true.

BY MR. MASCIOPINTO:

Q. Sir, I just have one other question about a document. I'm going to try to share it, if I can find it quickly. It's this Exhibit 129. Let me see if I can find it for my purposes, but you should go look for it. Sir, do you have 129 in front of you?

MR. OBERTS: Not yet. Hold on.

A. I'm looking.

MR. OBERTS: 129 is Bielawski Report 5860587.

A. Yeah, I got it. Yeah.

BY MR. MASCIOPINTO:

Q. All right. So you've talked about this a

Page 356

bunch, but the bottom line is this is the interview that occurs in Tennessee, I think on September 24, 1996, yes?

A. Yes.

Q. Okay. And then obviously CPD is not with you during this interview, is he -- are they?

A. No, they were not.

MS. HAGY: Objection. Form.

BY MR. MASCIOPINTO:

Q. Okay. Directing your attention to the middle of the 2nd Paragraph, you wrote in your Report -- if you're with me, it starts with the line, "Gray car." Do you see the line that starts with, "In a gray car"?

MR. OBERTS: Right there.

A. Yes. In the gray car. Okay.

BY MR. MASCIOPINTO:

Q. Okay. So the next sentence you wrote, quote, "He spoke to Eric and Nick Morfin, and they asked -- they asked him to take a drive with them to Nick Liberto's house. And then they were going to do the van in the park"; did I read that right?

A. That's correct.

Q. Okay. So when you wrote, "He spoke to Eric and Nick Morfin," the he refers to whom? Is it Michael Bielawski?

MR. OBERTS: Why don't you read the paragraph?

Page 357

THE WITNESS: Yeah. Let's see.

MR. OBERTS: Why don't you read the whole paragraph and see if you can put context to that?

THE WITNESS: Yeah.

A. Okay.

BY MR. MASCIOPINTO:

Q. So my question for you is: When you wrote, "He spoke to Eric and Nick Morfin," the he is referring to the person you're interviewing, Michael; is that right?

A. That's correct.

Q. Okay. So Michael is relaying to you that he, Michael, spoke with Eric and Nick Morfin on December 14, 1995, on or about this time, yeah?

A. Yes.

Q. And when then you wrote, "And they asked him to take a drive with them," the they and the them refers to Eric and Nick Morfin as you wrote it, yeah?

A. Yes.

Q. And then when you wrote, "And then they were going to do the van," the they refers to Eric and Nick Morfin; is that correct?

A. That's correct.

Q. Okay. So this witness is telling you this information and then you're writing it down, right?

A. Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 358

Q. Okay. And then later on you note that this witness comes into Chicago, and he testifies in the grand jury on October 7, 1996, at the end last paragraph, right?

A. That's correct.

MR. MASCIOPINTO: Okay. Sir, that's all the questions I have. I appreciate your time.

THE WITNESS: Thank you.

MS. MANTILLA: I don't have any questions.

MR. OBERTS: And that would be City, correct?

MS. MANTILLA: Yes.

MR. OBERTS: That go for everybody?

MR. STEPHENSON: That's all for defense. Lindsey?

MS. HAGY: Well, I -- do you guys have any?

MR. OBERTS: Yeah. I have a couple questions.

EXAMINATION

BY MR. OBERTS:

Q. Just -- sir, you never threatened any witness, correct?

A. No.

Q. You never coerced any witness, correct?

A. No.

Q. That's both true?

A. Both true.

Page 359

Q. Let me restart that. Is it true that you never threatened a witness?

A. I never did, no.

Q. Is it true that you never coerced a witness; is that true?

A. I never -- true.

Q. And is it true that you never told a witness what to say; is that true?

A. That's true.

Q. And is it true that you never suggested what a witness should say; is that true?

A. That's true.

Q. You did not speak to any defense attorneys regarding this case, correct?

A. No, I did not.

Q. And you were assigned to this murder prosecution to provide trial support to the extent you were assigned certain request slips to respond to, correct?

A. That's correct.

MS. HAGY: Objection. Form.

MR. OBERTS: No other questions.

REDIRECT EXAMINATION

BY MS. HAGY:

Q. I just have a few. Okay. I believe that 129

Page 360

was the Billy Bigeck statements?

MR. OBERTS: So starting at 735 Counsel? And I'm sorry, what did you want? You wanted --

MS. HAGY: The Billy Bigeck statement which I think is 129.

A. 129, yes.

BY MS. HAGY:

Q. You have it? Okay, great. So if you could please go to page 6145.

A. 6145?

Q. Yes.

A. I got different numbers.

Q. Yeah. Oh, so I'm --

A. Oh, I'm -- I'm looking at the wrong one. I'm sorry.

Q. No, that's okay.

A. I thought I had 1 29. I got --

Q. Yes. I was wrong. Must be --

A. You want Bigeck?

Q. Yes, please.

A. Okay.

MR. OBERTS: Okay. Let's see. What --

MS. HAGY: Do you have --

MR. OBERTS: -- page are you looking for?

MS. HAGY: 6145.

Page 361

THE WITNESS: 75, yeah.

MR. OBERTS: No. Hold on. Let's get everything -- okay. So we have 6143, 6144, 6145, 6146. Okay. And you're directing him to page what?

MS. HAGY: 6145.

MR. OBERTS: 6145. Okay.

THE WITNESS: Thank you.

BY MS. HAGY:

Q. In that 3rd paragraph where it says, "A little later Misfit and two Popes from Vittum Park came by," does it say there that he couldn't remember the Vittum Park Popes names?

MR. OBERTS: Objection.

A. Say that again.

BY MS. HAGY:

Q. Does it say there that Billy Bigeck could not remember those two Vittum Park Popes names?

MR. OBERTS: Objection. Vague. And form.

A. Doesn't say it right here.

BY MS. HAGY:

Q. Okay. So your report doesn't say that he couldn't remember their names?

MR. OBERTS: Objection. Asked and answered. And form.

A. Doesn't say their names.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Read and sign only

Page 362

BY MS. HAGY:

Q. And you didn't record their names here, right?

MR. STEPHENSON: Objection. Mischaracterizes his testimony, the evidence. Form.

A. Whatever he had said, that's what I got in my Report. It's not in there.

BY MS. HAGY:

Q. And at the time that you interviewed Billy Bigeck in -- on August 12th and August 29th, Matt Sopron had not been charged with any crime, right?

A. That's correct.

Q. And Wayne Antusas had not been charged with any crime, right?

A. Yes.

Q. And Billy did call you from the witness quarters, right?

MR. OBERTS: Objection. Mischaracterizes testimony. Stated the Cook County Sheriff's called him. Objection. Mischaracterized his testimony.

A. Cook County Sheriff's please called me, put him on the phone.

BY MS. HAGY:

Q. Okay.

MR. OBERTS: And objection beyond the scope of cross.

Page 363

MS. HAGY: That's not true.

MR. OBERTS: Yes. Beyond the cross.

BY MS. HAGY:

Q. Were -- so do you know whether you were on -- were there any other times that Billy Bigeck called you from the witness protection orders?

MR. OBERTS: Objection. Asked and answered. Beyond the scope of cross.

A. No.

BY MS. HAGY:

Q. Okay. And so, who ran the Cook County witness orders?

MR. OBERTS: Objection. Asked and answered.

A. Cook County Sheriff's Police Department.

BY MS. HAGY:

Q. Okay. And you had discussed earlier that a couple of the investigators in this case, I think Bajenski and Marley, they were specifically assigned to the trial support unit, right?

MR. OBERTS: Objection. Vague. Foundation.

A. Their original assignment was the trial support unit.

BY MS. HAGY:

Q. Okay. And you were not assigned to the trial support unit, right?

Page 364

A. I was assigned to the gang prosecution unit.

Q. Okay. And do you know whether or not when you -- so you described in the questioning just now that you came across -- you had some meetings in Scott Cassidy's office with Scott Cassidy and Chicago police officers, right?

MR. OBERTS: Objection. Vague. Foundation.

A. I don't know what you mean by meetings. I saw them, talked to them, but it wasn't like a sit-down meeting. No.

BY MS. HAGY:

Q. Okay. But you had a couple casual --

A. Yes.

Q. -- meetings with them? And is -- am I right in understanding that you said that they were -- it is possible that the officers were talking to Scott Cassidy and then you happened down to his office?

A. It's possible.

Q. And did you hear Scott Cassidy ask those officers to do any tasks?

A. Not that I recall.

Q. Okay. But did you also have an understanding that Scott Cassidy was meeting with those officers, and you weren't there for the entire meeting, right?

A. Yes.

Page 365

MR. MASCIOPINTO: Objection. Form. Foundation. Go ahead.

BY MS. HAGY:

Q. And when you interviewed Billy Bigeck, did those reports indicate how long those interviews with Billy Bigeck were?

MR. OBERTS: Objection. Asked and answered.

A. No. My reports don't indicate them.

BY MS. HAGY:

Q. They could have been quite lengthy, right?

MS. O'BRIEN: Objection. Form.

MR. OBERTS: Foundation.

A. Yes.

BY MS. HAGY:

Q. And do you know for sure that you were present during the entire interviews?

MS. O'BRIEN: Objection. Form. Foundation.

A. Yes.

BY MS. HAGY:

Q. Okay. And were there times that Eddie Morfin was brought up to the Cook County State's Attorney's Office and you were not present?

MR. OBERTS: Objection. Foundation. Speculation.

A. I don't know.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Read and Sign Only

Page 366

BY MS. HAGY:

Q. And were you ever present when Eddie Morfin was brought up to the Cook County State's Attorney's Office?

MS. O'BRIEN: Objection. Form.

MR. OBERTS: Foundation.

A. I believe I was for the proffer, you know.

BY MS. HAGY:

Q. Okay. And at the time of the -- okay. Were -- do you know whether or not there were times where Scott Cassidy met with Billy Bigeck or Eddie Morfin in the state's attorney's Office, and you were not present?

A. I don't know.

MS. HAGY: Okay. That's all I have.

RECROSS-EXAMINATION

BY MR. STEPHENSON:

Q. All right. Real quick, Mr. Diciolla, about those conversations in Scott's office, okay? These discussions in Scott's office where you saw CPD present and you also became present for the discussions, how many times did that happen?

A. Oh, I don't know. Maybe once or twice over the duration of the trial.

Q. Okay. Do you recall who exactly was present

Page 367

for those two discussions?

A. No, I don't remember.

Q. Do you remember what time those discussions were?

A. No, they were casual discussions. Like I just happened to walk in when they were there or I was there and they happened to walk in, one of those two things.

Q. Okay.

A. The case was ongoing, you know, so.

Q. Did they happen during normal business hours, 9:00 to 5:00?

A. Oh, yeah -- yeah.

Q. Do you recall approximately how long those discussions were?

A. You mean the specific discussions between me and the detectives?

Q. Yeah, when -- in Scott's office.

A. It was very brief. Minutes, you know.

Q. And do you recall what was discussed generally during those discussions?

A. No. They basically more or less listened to what I was telling Scott about what I had done on some of the tasks that I was assigned.

Q. Okay. So you weren't conspiring with Scott Cassidy and the Chicago police officers to frame

Page 368

Matt Sopron and Wayne Antusas for the murders of Martin Hovel during this?

MS. HAGY: Objection. Form.

A. No.

BY MR. STEPHENSON:

Q. Okay. That's true?

A. That's true.

Q. Did you conspire with anyone else, including Colleen Hyland, Laura Sullivan or Neil Linehan to frame Matt Sopron or Wayne Antusas for the murders of Martin and Hovel?

A. No, I did not.

MS. HAGY: Objection. Form. Calls for a legal conclusion.

BY MR. STEPHENSON:

Q. During -- a legal -- okay. So did you guys ever discuss or agree to frame Matt Sopron or Wayne Antusas for the murders of Martin and Hovel?

MS. HAGY: Objection. Form.

A. No, we did not.

BY MR. STEPHENSON:

Q. When I say you guys, did you come to a -- did you discuss or agree with Scott Cassidy, Neil Linehan, Laura Sullivan, Colleen Hyland, any Chicago police officer, or anyone for that matter to frame Matt Sopron

Page 369

or Wayne Antusas for the murders of Martin and Hovel?

A. No, I did not.

MS. HAGY: Objection. Form.

BY MR. STEPHENSON:

Q. During these discussions in Scott's office where one or more CPD detectives are present, did you hear Scott Cassidy direct, instruct or tell the Chicago Police officer or officers to do anything in connection with the prosecution of the murders of Martin and Hovel?

MS. HAGY: Objection. Form.

A. Do anything?

BY MR. STEPHENSON:

Q. Yeah. To do anything in connection with that prosecution?

A. No.

MR. STEPHENSON: I have nothing further. Thank you, sir.

MR. OBERTS: Maureen, do you have anything else? Tony?

MS. O'BRIEN: No, thanks.

MR. MASCIOPINTO: Nope.

MS. O'BRIEN: No, thank you.

FURTHER CROSS-EXAMINATION

BY MR. OBERTS:

Q. One last question. You talked about you were

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 370

assigned to the gang prosecution unit, correct?

A.    Yes.

Q.    But you provided trial support to the gang prosecution unit, correct?

A.    Well, yeah.

MS. HAGY:  Objection.

A.    Of course.  That's what we did if there was -- for trials.

MR. OBERTS:  Very good.  No other questions.

MS. HAGY:  So I believe I still have a few minutes, last minute.  I don't know, can we reserve --

MR. OBERTS:  Based on that cross you have time?

MS. HAGY:  No.  I'm going to need to reserve this time later for questioning about punitive damages, if we can avoid doing that today.  And --

MR. OBERTS:  I --

MR. STEPHENSON:  I would not agree to that.

MR. OBERTS:  Yeah.  I'm objecting to that. I'm objecting to the questions regarding punitive damages.  I think you've already -- I mean, we've already gone past -- I don't agree.

MS. HAGY:  Okay.  But I haven't used all my time, right?

MR. OBERTS:  But the -- any types of questions

Page 371

regarding punitive damages would not be within the scope of any of the crosses.  Would be outside of the scope, said a different way.  Would be outside the scope of all crosses.

MS. HAGY:  Right.  But we have agreed before, because we haven't done the punitive, we can delay the punitive damages discovery.  I'm just asking if you would allow me to have that time for punitive damages at another date?

MR. STEPHENSON:  You know, one second, are you saying that there's an agreement in this case to that effect?

MS. HAGY:  I'm asking if you would agree.  I know that you guys didn't agree.

MR. STEPHENSON:  Okay.

MS. HAGY:  I'm asking.

MR. OBERTS:  No, I'm not agreeing.

MS. HAGY:  Okay.  So can you tell me how much time I would have left?

THE REPORTER:  That might be a little hard for me to do.  Give me one second.

THE WITNESS:  Do you need these reports back?

MS. HAGY:  I don't --

THE REPORTER:  I don't have them.  Sorry.  It's going to take me a while.

Page 372

MS. HAGY:  Okay.

THE REPORTER:  Yeah.

MS. HAGY:  Let's not -- forget about it.

THE REPORTER:  Okay.

MS. HAGY:  Okay.  We'll figure it out.

THE REPORTER:  Okay.  Before we off the record --

MR. OBERTS:  But I want to just waive or reserve signature.  We'll reserve signature.

THE REPORTER:  Absolutely.  Your e-mail is okay for that?

MR. OBERTS:  Yes.

THE REPORTER:  Orders for the transcription?

MS. HAGY:  Not at this time.

MR. STEPHENSON:  No.  Thank you.

THE REPORTER:  And you guys?

MR. OBERTS:  I'm not.  We're not.  We're reserving signature.

THE REPORTER:  Anyone on Zoom ordering the transcript?

MR. MASCIOPINTO:  No.

MS. O'BRIEN:  No.

THE REPORTER:  Okay.  We're now off the record. The time is 7:49 p.m.

(DEPOSITION CONCLUDED AT 7:49 P.M. (CT))

Page 373

CERTIFICATE OF DIGITAL REPORTER

STATE OF ILLINOIS

I do hereby certify that the witness in the foregoing transcript was taken on the date, and at the time and place set out on the Title page hereof by me after first being duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the said matter was recorded digitally by me and then reduced to typewritten form under my direction, and constitutes a true record of the transcript as taken, all to the best of my skills and ability. I certify that I am not a relative or employee of either counsel, and that I am in no way interested financially, directly or indirectly, in this action.

KRYSTAL M BARNES
Official Seal
Notary Public - State of Illinois
My Commission Expires Feb 18, 2026

KRYSTAL BARNES,

DIGITAL REPORTER / NOTARY

COMMISSION EXPIRES ON: 02/18/2026

SUBMITTED ON: 10/05/2023

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:22-cv-00320 Document #: 235-23 Filed: 07/17/26 Page 95 of 132 PageID #:4646
The Deposition of NORMIE BICICHLA, taken on August 22, 2023

374

**1**

**1** 18:6 19:17 134:3,5 360:17

**1.6** 310:8

**10** 66:15 133:22 134:3

**100** 216:25

**100s** 26:25

**11:48** 74:22

**11th** 15:2

**12** 32:15 157:7 182:7,25 192:2 291:19 313:24 323:24 324:3,7

**126** 191:6,8,9 310:5 311:1

**127** 239:23,24, 25 240:1 268:24 269:2,3

**128** 252:10,11, 22 268:17,22 269:1

**129** 355:17,19, 22 359:25 360:5,6

**12:04** 74:25

**12th** 183:6 184:9 193:7 200:11,18 251:13 311:19, 24 313:2 314:14 318:9 362:9

**13** 32:15 266:21

**130** 271:14,16

**131** 290:24

**132** 290:23 302:3,6,8,12

**13th** 19:14 20:23 58:17 62:22 63:1 89:6,11 128:22 132:10 136:22 163:8 168:14

185:25 284:15

**14** 32:15 193:24 196:10 201:7 211:8 266:21 269:13 313:23 357:13

**14th** 60:10 62:19 63:22 72:7 89:8 128:22 136:22

**15** 24:13 266:25 267:2 347:25

**15-year-old** 198:7,12

**15-years** 198:23

**15th** 19:13 20:23

**17** 302:11

**19** 245:8,10,19

**1958** 111:1

**1959** 111:1

**1968** 83:11

**1973** 60:2,3

**1980s** 80:16

**1986** 319:3

**1990** 241:19

**1994** 58:3 65:16,21 67:11 80:21 95:22

**1995** 193:25 196:10 201:7 211:8 221:14 222:15 223:9 226:19,25 233:9 259:5,13 313:23 357:13

**1996** 178:7,19 182:7,25 192:2, 3,6,10 200:18 223:17 224:15 225:7 227:8 252:8 253:25 254:3,14,22 256:6,19 266:17 272:17,

18 311:19,24 313:2 314:14, 25 315:9 318:9 323:24 324:4,7 348:4,8,10,11, 16 349:7,13,22 350:1,4,20,21, 24 351:5 356:2 358:3

**1997** 271:10 291:14,23 292:8

**1998** 240:6,17

**19CB-825422660** 180:16

**19th** 245:6

**1:28** 146:2

**1:30** 145:16

**1:37** 146:5

**2**

**2** 271:9

**20** 20:11 22:14 242:4 254:22 272:18 303:21 304:6 305:19

**2000** 156:1 308:23

**2001** 303:22 304:6 305:19 306:23

**2002** 281:3

**2004** 307:23 308:4

**2005** 308:11

**2006** 95:21,22 278:25 325:16

**2008** 308:18

**20th** 254:12

**21** 259:5 312:21

**21st** 259:12

**22** 291:14

**23** 249:13 312:21

**24** 198:2 309:8, 10 356:2

**25** 192:6,10 198:2 213:8,9

**26** 178:7,19

**26th** 58:14 59:5 61:1,6,21,23 62:1 89:3 128:22 137:4 160:20 184:10 261:4 273:15 321:2

**28** 33:2 254:3 272:17

**28th** 254:8,9,14

**29** 192:3 200:18 311:19,24 313:2,24 314:14 318:9 360:17

**2909** 303:16 304:3

**2925** 302:7

**29th** 193:8 200:11 251:13 362:9

**2:00** 166:7

**2:03** 166:17

**2:53** 166:20

**2nd** 356:10

**3**

**3** 253:25 256:6

**30** 33:2

**31** 252:8

**3:03** 173:2

**3:07** 173:5

**3:17** 180:9

**3:20** 180:12

**3rd** 256:9,18 361:9

**4**

**4** 18:6 19:16

**46** 226:3,5,6,7

**4:20** 225:23

**4:30** 226:1

**5**

**5** 18:6 19:16,18, 19 20:14 21:2 226:19,25 233:9 240:6 241:19

**50** 31:25

**50s** 111:9

**52** 309:12,13

**5860587** 355:22

**5880** 252:12,23 253:2,9,11

**5882** 252:13

**5883-** 271:17

**5884** 272:4

**5885** 271:18

**5:00** 367:11

**5:21** 264:16

**5:35** 264:19

**5th** 228:17 229:3,12 230:19 232:5 233:21 234:6 238:15

**6**

**6143** 310:9,10, 11,13 313:11 361:3

**6143-6146** 191:8

**6144** 191:24 200:1,2,3 310:14,18,20



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

311:1 361:3

**6145** 200:5 209:16,18 310:14 312:15 360:9,10,25 361:3,5,6

**6146** 310:9,11, 14 311:1 361:4

**63** 13:6,7

**63rd** 273:1

**64** 13:8

**644** 310:16

**65** 13:8

**652** 290:25 291:1

**653** 291:17 299:5

**66** 13:15 14:12, 14

**662** 290:25 291:1

**67** 13:15 14:1,6, 23 83:10

**68** 83:10

**6914** 273:1

**6:47** 325:1

**6:53** 325:4

---

**7**

**7** 266:17 358:3

**70s** 74:4 186:18

**72** 16:8,24 21:1

**73** 16:8,24 17:12 20:11,21 21:1

**735** 360:2

**74** 20:11,21

**75** 361:1

**7:49** 372:24,25

---

**8**

**8** 180:14,20

**80** 302:11

**80s** 23:12,18 80:12

**81** 266:25

**82-year-old** 295:24

---

**9**

**9** 181:4,5,6,10, 11,17,23 310:7

**91** 20:19,21 21:2 22:11 26:1 39:9 41:11 44:20 45:23 46:13 54:11

**92** 20:19,21 21:2 22:11 26:1 39:9 41:11 44:20 45:23 46:14 54:11 268:18

**9219** 239:25

**9222** 242:4

**9223** 245:3

**9224** 269:4,11

**9234** 249:11 268:23

**9241** 239:25

**94** 20:11 23:21, 22 26:2 32:20, 21 46:20 66:6, 24

**95** 166:5 233:16

**96** 169:2 233:16 278:18 349:21 350:8,11,15 352:4

**97** 67:9 292:2

**98** 67:9 172:21 292:3

**99** 156:1 172:21

**9:00** 367:11

---

**A**

**a.m.** 74:22

**AAA** 151:11

**ability** 300:17 339:24 354:17

**absolutely** 237:19 372:10

**abusive** 297:3, 5

**Academy** 14:7 15:2

**acceptable** 38:9

**accepted** 14:1, 4,16 83:1

**access** 123:8, 24 137:16 205:8,15 290:3, 7

**accompanied** 272:24 314:7

**accompany** 273:5

**accomplices** 104:23 105:1

**account** 140:11 313:24

**accounts** 105:16 212:23

**accurate** 37:4 47:12 64:5 98:15 301:6,7 348:3

**accurately** 142:25

**accusation** 298:15

**accused** 296:23

**acting** 332:11

**action** 198:12

**activities** 44:10,14 82:5 140:19 196:9 201:6 313:23 314:5

**activity** 75:19

**actual** 17:2 56:7 134:12 164:10 179:4 187:17,24 248:19 315:5

**Add** 139:3

**addition** 313:25

**additional** 48:7 333:15

**address** 123:18,20,21 185:5 212:3,12

**addresses** 123:4,6,8,11, 15,25 125:12

**admit** 132:6

**admitted** 273:23

**advantage** 246:18

**aerial** 250:10

**affidavit** 281:3

**affirm** 9:12

**afford** 34:3

**AFN** 173:19

**afoot** 286:19

**afraid** 219:2

**age** 125:13 312:25

**agencies** 45:3 71:22 82:13,16

**agency** 76:18 82:24

**agent** 180:3

**agree** 28:3 234:4 237:20

329:4 368:17, 23 370:18,22 371:13,14

**agreed** 28:4,8 237:23 371:5

**agreeing** 299:16 371:17

**agreement** 114:7,10 115:3, 8,12,16,23 116:6 117:8,12 118:7,15,21,24 119:10,20 120:9,13,19 121:3,14 122:1 182:15,21 197:1 219:25 223:2 224:22 225:4 327:14 329:14,19 330:7,11 331:1 347:14 371:11

**agreements** 113:19 114:23 116:13 118:2 119:25

**agrees** 182:5 226:17

**ahead** 18:9,11 20:9 21:20 30:1 32:13 34:8 43:2,17 45:7 46:1 49:1 51:20 54:14 61:9 64:8 128:17 136:1 140:13 147:11 148:4 161:5 187:1,20 223:22 263:25 279:17 311:11 317:3 354:14 365:2

**aids** 28:23 158:17 216:25

**airline** 320:5

**airplane** 320:4

**Albright** 176:22

**alcohol** 288:5

*Read and Sign Version Only*



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

aligned 188:21,24 189:1

allegations 234:18

allowed 321:14 322:22 342:15

Almighty 186:7,10,23 187:15 199:15 273:24

alongside 54:18

ambiguous 45:25 46:8,16

Amy 8:15 159:10 252:13

and/or 355:5

Anderson 196:9 197:2,19 219:20 220:13 221:14 222:23 224:16 287:19 326:13 332:22

Andrews 9:3,7 325:10

answer's 294:18

answerable 41:4

answering 246:11 247:25

answers 11:5

Anthony 350:9 351:8

Antusas 8:10 218:3 240:5 286:16 288:1 307:4 323:23 348:11 352:3 353:25 362:12 368:1,10,18 369:1

anymore 187:8 286:22

apologize 31:2 172:5 180:7

apparently 64:9

appearances 8:5,7

appears 313:1, 19 314:12

application 14:3

Applications 14:15

applied 13:14, 21,24 119:24

apply 13:16 14:10 237:24

applying 14:18

appointed 34:4

approval 117:18

approved 255:19

approver 56:23 114:2,6 121:7 328:8,10, 13

approximately 15:10 16:21 67:7 275:3 367:13

area 11:23 17:3 18:6 19:8,11, 14,15,16,18,19 20:14,19,23 21:2,7 62:4,13, 22 63:3 72:9,10 134:1 136:3 206:9,11 210:3 249:16,25 273:12 286:4 321:6,7

areas 15:17 18:3,4,18 20:25 73:5 206:13

Argenbright 8:22 347:24,25

349:12 350:16 351:18 352:9 353:15,16,23 354:10

argue 236:11 237:2

Army 12:6,19, 20,23,24

arrest 124:2 179:4,16 221:3 225:9 326:1 346:16

arrested 179:13 207:19 219:17,21 315:6 348:11

arresting 179:11 219:22 315:1

arrests 179:10 352:3

arrival 189:16

arrived 291:19 314:4 342:16

arson 65:12 162:24 163:1 172:1

ASA 57:5 108:2 151:16,19 152:4,9,17 153:22 184:11 189:14 202:1 218:2 256:21 258:5 272:24 273:2,5,22 282:17 315:21 316:2,8,19,24 317:8,15,21 318:11,15,21, 25

ASA-SIGNED 154:13

ASAS 151:17 283:17 336:16

aspects 81:1 218:13

asserting 238:19

assign 18:17 45:4,8,12 85:8 103:10,19

assigned 17:3 18:22,24 19:1, 8,9,12 20:22 22:10 23:16 49:24 51:1 55:8 57:3,5 58:19 59:25 60:4,9 61:1,4 62:6,12, 21,22 63:7 64:18 65:23 66:9 68:15,22 71:14 72:8,25 73:2 75:3,8,22 76:15 77:11,24 78:7 79:5,21 81:15 83:21 90:11 100:4 103:1 127:5,6 166:3,22,25 167:21 168:9 169:25 170:4,8 171:14,21,24 172:10 175:8, 13 186:5 188:13 194:1 244:20,23 328:3 335:22 336:11,15 338:14 339:15 341:21 344:21 353:3 359:16, 18 363:18,24 364:1 367:23 370:1

assignment 55:11,14 56:5 69:2 84:17 85:10 90:12 167:7,15,19 168:24,25 169:24 170:4 173:18,19,21 174:6,25 175:2, 4,11 244:3,14, 24 245:1 283:12 336:20 363:21

assignments 84:13,14 85:5 89:25 175:12, 23

assist 25:5 194:1 328:18 332:3 336:16 349:20

assistance 21:16 353:7

assistant 194:7 325:8 327:14 328:3, 18 330:12 331:15 332:3 337:16,22 338:14 341:1, 16 343:11,15 345:23

assistants 334:14

assisted 328:2

assisting 327:5 333:25 345:23

assume 10:11

assumes 186:25 201:17 206:1 214:23 215:15 216:5, 20 234:22 235:5,7 354:5

assuming 110:14 214:6 316:24

ate 135:22,23

atmosphere 188:21

attached 55:22

attack 258:13

attempt 125:19 144:24

attempted 88:2 125:14

attend 12:7 47:20 52:4

attended 11:21

attention 312:14 348:2 356:9



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**attorney** 24:8, 10,16,18 44:21 45:14,16,18 47:21 49:4 54:7,12 55:10 56:9,15,20,25 57:14,23 63:10, 15,18,25 64:5, 14,17 65:2,5,14 67:16,22 69:1, 5,14 70:4,13 71:6,16,18 72:20 73:4 75:9,12,23 77:7,23 78:22 79:1,2 80:13, 21,22 81:21 84:5,18 85:5 87:7 88:12,16 89:8,19 90:13, 15 91:2,8,11,25 92:10 93:23 94:10,17 95:14, 17 97:20 98:11, 25 99:19 101:4, 22 102:12 103:9,19 108:8, 17 109:5,18,23 110:16 111:18 112:4 117:17, 18,21 118:7 119:2,6,18 120:7 121:12, 17,24 122:8,15, 19 123:7 127:20 128:15, 18 129:21 138:24 140:3, 22 141:18 145:10 149:14 152:25 153:17 156:16,22 158:14 161:14, 25 162:21 167:20,22 175:4,6 176:25 177:5 185:15, 19 192:11,20, 22 194:2,7 213:20 225:7 232:25 234:3,4, 7,10,14 236:13 240:9,11 242:24 244:8, 12 250:3,18 251:1,5,10

255:7,25 256:24 257:23, 24 259:24 260:3 283:5,10, 21,23 284:1,3,4 288:25 297:23 301:4,24 306:5, 12 307:19 325:18 326:2 328:18,23 329:10 332:3 334:14 338:4, 15,19 341:1,16 343:11,15 344:9,17 349:6

**attorney's** 20:19 23:10,12, 24 26:18 30:11 31:24 32:25 33:1,4,10,13 39:6,25 40:16, 19 42:9,16 43:3 44:18 53:1,18, 23 54:8,18 55:16 58:6,14 61:14 62:18 64:12 65:8,19 68:1,2,20 70:23 71:3,11,15 79:17,22 80:15, 17 81:22 82:4 83:1 85:4 86:16,22 89:1, 15,22 118:25 119:23 139:20 140:19,22 143:16 146:8 149:19 156:20, 21 157:14 161:6 162:18 163:22 175:18, 23 182:5 194:24 213:24 226:17 229:25 232:18 246:19 251:24 275:1 277:21 278:24 281:9 282:25 283:5,18 298:4, 15 303:10 304:15 306:22 319:13 320:2,6, 13,20 321:22 322:6,16 325:14 329:15,

20 330:18 331:7,13 332:1 334:23 335:1,5, 14,22 336:3 337:24 339:9 340:7,11,18 341:3 342:12, 16,23 348:18 365:21 366:3, 12

**attorney-client** 279:18

**attorneys** 9:2 23:14 24:13 25:5 28:7 31:12,14,16,25 32:16 33:7 34:3 35:20 40:9 41:21 42:15,19 43:14 45:4 51:22 52:9 62:11 80:9 81:1 85:19 89:25 106:19,21 110:3,10 121:21 127:24 138:16 149:23 158:11 159:4,5, 7,15 162:25 163:13,18 165:4,14 171:24 173:8 185:16 194:11 212:12 234:24 235:2 273:11 278:8 279:16, 17 280:2,10,11 284:19 289:4 300:7,10 301:20 312:4 325:9 327:15 328:3,19 330:12 331:15 332:2 333:25 337:5,16,23 345:24 355:6 359:13

**attorneys'** 65:22

**audible** 72:16

**audio** 152:7 158:13

**audiotaped** 96:5,8

**August** 182:7, 25 183:6 184:9, 10 192:2,3 200:10,11,18 223:16 224:15, 251:13 311:19, 24 312:9 313:2, 25 314:14 318:9,17 319:3 323:24 324:3,7 348:4,8,15 349:7,13,21 350:20,24 351:4,5 362:9

**author** 304:12, 16 305:8

**authority** 300:20

**authorized** 300:5

**auto** 265:13,24

**avenue** 11:19 12:4 105:11,14

**avoid** 34:5 86:8 370:16

**aware** 42:17 43:13 48:12,20 68:7 131:12 133:11 143:16 164:4 175:22 176:3,4

———————

**B**

**back** 28:18 31:3,5 33:16 40:4 59:9 71:21 74:24 96:19 111:9,10 130:22 137:5 139:18 146:4 160:23 166:19 168:2 173:4 180:8,11,24 202:19 217:4, 13 222:1,3,7 223:10,17 224:2 226:1 237:8,17 238:7

245:20 252:19 260:13,16 264:18 268:2, 16,22 274:7 281:1 294:8,13, 17,20 299:24 321:1 323:11 325:3 343:1 371:22

**bad** 13:20 343:25

**badge** 51:2,11, 13 69:21,23,24 70:1,17

**Bajenski** 170:16,23 171:6 363:18

**Baking** 13:1

**balance** 302:16

**barged** 318:11

**barrel** 204:14

**base** 36:17 124:6

**based** 21:17 109:24 193:19 206:11 218:12 220:14 248:7 295:2 340:17 354:20 370:13

**basic** 14:8,9 36:11 240:22 325:18

**basically** 11:21 13:2 15:15 18:17 33:12 34:15 35:14 40:3 44:22 58:8 69:18 74:5 91:14 109:3 130:19 137:6 158:21 161:19 238:9 257:11 273:13 277:17 295:1 321:4 367:21

**basis** 51:9 117:3 149:18



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:22-cv-00320 Document #: 235-23 Filed: 07/17/26 Page 99 of 132 PageID #:4650
The Deposition of NORMIE BIGIESLA, taken on August 22, 2023

378

**Bates** 180:2,4, 15 191:15,20 226:8 302:6 312:14 313:10

**bathroom** 145:24 225:18

**beat** 273:24

**beating** 111:7 274:4

**began** 53:21 68:25

**begin** 9:16 219:1 325:12

**beginning** 82:22 196:7

**behalf** 8:9,13, 15,17,21,24 9:1

**behest** 344:9

**belief** 21:9,14

**believed** 72:15

**Belmont** 58:23,25 60:17, 20

**Bielawski** 263:3,7 264:23 266:16,21 267:8,15 268:8 269:14,15,23 355:22 356:24

**Bigeck** 169:3, 13,18 181:21 182:6 184:9,11, 21 185:19,23 186:3 189:4,11, 15 190:20 192:2 193:7 194:3,4 196:8, 19 197:9,16 199:4,25 200:10,17 201:5 202:8 207:11 208:12 209:18 212:15 214:18 215:11 216:2,18 217:18 218:1, 18 219:6 220:13,19,23 221:3 222:20

223:10 224:15 226:22 251:12, 14 263:12 274:13,14 275:21 276:9, 19 277:21 279:9 281:8,19 282:7,16,25 283:18 284:8 289:9,15 290:3, 6,9 293:11 296:5,23 298:22 299:17 301:20,24 303:17 307:3,8, 13,22 308:3,10, 17 311:19,23 312:8 313:14, 22,23,25 314:5, 12 318:3,9,11, 15,17,21,23,25 319:3,8,11,19 320:12 321:11, 21,25 322:5,15, 19 323:1,23 324:3,6,13 326:12 327:13 329:14 330:6 331:14,24 332:12 333:8, 18 342:12,22 343:5 346:6,18 347:1,12 360:1, 4,19 361:16 362:9 363:5 365:4,6 366:11

**Bigeck's** 180:15 185:15 205:24 206:11 209:6 211:19 218:14 301:9, 13 305:23 310:6 332:9 341:10

**Bill** 8:17 66:7 156:15,22,23 159:10 170:15

**Billy** 169:3,13, 18 185:23 186:3 196:8 199:4,25 200:10,17 202:8 205:24 208:12 223:10

224:14 226:22 251:12,14 263:12 274:13, 14 275:21 276:9,19 277:21 279:9 281:8,19 282:7, 16,25 283:18 284:8 289:9,15 290:3,6,9 296:5,23 298:22 299:17 305:23 307:3,8, 13,22 308:3,10, 17 312:8 313:1, 14 320:12 326:11 327:13 329:14 330:6 331:14,24 332:9,12 333:8, 17 341:10 342:12,22 343:5 346:6,18 347:1,12 360:1, 4 361:16 362:8, 15 363:5 365:4, 6 366:11

**birthdate** 301:9

**birthday** 281:9,13,15 301:13

**bit** 86:6 132:7 139:18 150:10 154:4 187:19 193:25 320:9 331:22,23 334:22 338:3 339:5

**Black** 19:4

**blacked** 293:9

**blah** 149:25

**blanks** 319:2

**blew** 318:15

**blue** 300:15

**Bob** 220:13

**Bobby** 66:6

**body** 218:24 220:6

**born** 11:11,12, 20 266:25

**boss** 336:7 337:1 338:11, 13

**Boston** 19:14

**bottles** 320:1, 5,7

**bottom** 134:8 155:1,2 181:18 227:12 245:2 252:20 269:11 312:15 313:11 356:1

**boxes** 40:3

**Brady** 35:4,7,9, 10,14

**Brandon** 265:11,18,19

**breached** 299:15,16

**bread** 13:1,2 137:16

**break** 11:1,3 43:24,25 74:18 86:6 145:17,24 166:7,12,14 172:25 225:19 264:13 273:14 309:16,20 324:23

**Brian** 243:10, 15 247:12,17 250:25 251:4,8

**bricked** 267:9

**Bridgeview** 261:10,15

**briefly** 184:22 353:4

**bring** 89:3 128:21 129:5,8 136:18,21 137:2,5,25 138:7 160:19, 20,23 210:8 275:1 283:7,10, 18 284:8 307:18 319:20

**bringing** 281:19 282:7 321:6 323:14

**broad** 25:21 26:4 28:10 29:4 30:14 36:23 37:8,14 38:2 51:19 56:16 68:6 75:20 78:16 111:20 112:10,17 113:16,24 116:8,16 120:1 121:4 123:9 139:6 141:9,15 142:7,13 143:8 144:7 148:16 151:21,22 154:1 162:3,19 163:7,15 262:7

**brother** 12:3

**brought** 34:15 79:9 109:2 122:10 129:13 136:9 154:7 156:22 161:13, 19 282:24 283:4 289:8 307:21 331:14 342:7,10,11 365:21 366:3

**building** 134:8 160:20 285:11, 12 338:21

**built** 321:4

**bunch** 356:1

**bureau** 33:13 44:23 51:23 54:4,6,9,12,19 58:20 63:22 66:21 84:21 156:12,18,24 206:11 242:18 280:20,22 336:2

**burn** 208:18,21

**business** 367:10

**bypass** 16:19



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of NORI... B... CIOLLA, taken on August 22, 2023

379

**C**

**CAB-2908** 302:7

**cafeteria** 137:3

**Cal** 61:6 62:1 128:22 137:4 261:4 273:15

**California** 58:15 59:5 60:9 61:1 160:20 321:2

**call** 8:20 45:9 50:3,18 53:13 136:2 164:7,11 341:5,10,14 362:15

**called** 13:15 14:5 15:3,13 16:13 19:15 35:2,4 39:7 47:8 129:5 150:19 151:3 156:24 188:15 191:20 273:21 277:16 279:2 290:9,11,20 310:7 318:12 340:14 362:18, 20 363:5

**calling** 128:19 164:13 290:17

**calls** 15:22,24 35:12 87:2 98:6 104:7 145:5 225:11 293:5 327:9 334:3 341:7 347:5 354:3 368:13

**capacity** 64:12 326:1

**captain** 156:18

**capture** 201:8

**car** 202:16 212:17 265:13, 25 356:11,12, 14

**carbon** 174:21,

22

**card** 70:17

**career** 12:11 26:15 208:25

**Carey** 193:24

**carry** 51:4,6 70:3,10

**carrying** 50:23

**Casanas** 267:16,22

**case** 21:14 24:11 25:6,13 39:8,11,22 40:2 45:11 52:25 53:13 54:17 55:17 69:7 72:25 75:22,24 76:16,18 77:14, 19 78:3,4,14 79:10,14 82:23, 25 83:7,8 85:19 100:4 103:13 105:2 108:14 109:2,5 119:5 123:12,17 142:5 149:21 158:13 162:4 166:2,3,23 167:5,10,16,22 168:2,3,4,5,6, 10 169:1,7,22, 24,25 170:4,9, 11 172:11,12, 17,19 173:9 176:5,6,12 177:12 179:5, 10,21 183:21 186:6,9,15,20, 24 189:7 190:1 197:10,16 201:18,19 203:5 205:21 207:18 215:25 228:2,9 232:18 240:10,20,25 241:17 242:24 247:8,9 250:14 253:25 260:23 261:2 284:7 287:4,18,25 289:4 307:4 315:15 322:13

326:9,10,17,24, 25 327:12,20, 22 329:11 330:13,20 331:13 332:17, 19,21 333:1 336:16 337:13 343:12,16,19, 21 344:9,18,25 345:11,17,23, 24 346:17 351:25 359:14 363:17 367:9 371:11

**cases** 22:10 23:11 25:8,11, 16 26:2,10 29:9,20 30:2,7 32:10,14,15 44:7,8 53:7 54:5 55:21 72:14,21 73:4,7 76:13,15 77:13, 23,25 79:7,8 82:13 83:16 85:22 88:2 93:13 103:5 122:9 123:5 142:11 165:8 198:2,17 203:5, 8,17,20 208:23 255:3 261:14 286:8 315:22 316:3,9,19,25 317:9,16,22 322:20 325:24, 25 340:20

**Cassidy** 8:14 9:9 158:21 167:20,22,25 168:11 182:15 184:11 189:14, 17,20 190:18 194:7 196:2 197:9,13 199:13 202:1 203:17,20 218:2,6,12,17 220:22 240:10 244:8 272:24 273:2,22 284:6, 9 287:4,11,18, 25 288:10,15 310:4 315:21 316:2,8,18,24

317:8,15,21 318:11,15,21, 25 324:13 327:5 336:7,12 337:6 343:20 352:17 353:2 354:20 364:5, 16,19,23 366:11 367:25 368:23 369:7

**Cassidy's** 158:14 284:24 288:6 320:2,5 322:17,19 351:24 353:18 364:5

**casual** 50:19 352:15,17,20, 25 364:12 367:5

**catch** 252:18

**Catholic** 11:22

**caught** 301:20, 24

**CCFAO** 273:21

**CCFAO-** 302:6

**CCFAO-CAB-2909** 303:3

**CCSAO** 68:16 155:20

**celebration** 281:10,13,15

**cells** 339:17

**cement** 12:15

**center** 126:14 127:10,12,15 251:5,9

**centers** 126:11

**change** 44:9, 14 50:10 51:8 60:14,16 62:23 63:11 65:9,18 67:25 75:7 132:17 218:4 245:9

**changed** 60:20 63:21 87:14

92:1 112:23 113:4,12 132:13,15 238:24

**characterize** 334:6

**characterized** 196:13

**charge** 17:18 160:18

**charged** 362:10,12

**chastised** 277:17

**chatting** 172:7

**check** 40:3 105:17 107:2, 10,17,24 111:22

**check-in** 306:17

**checks** 124:2, 3,4

**Chicago** 8:25 11:12,17 12:4 13:13,14 14:5 15:1 23:5,19 33:17 35:25 40:1,2 46:20 51:13 53:1 61:13 64:1 82:17,20,25 84:12,13 85:5, 13,19 140:15 176:11 178:7, 18 179:16 195:3 269:17 314:25 326:19 335:1 358:2 364:5 367:25 368:24 369:7

**chief** 156:12 291:21

**chief's** 157:22

**Choice** 279:3,5

**Chris** 252:8 256:5,24

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Christopher
259:11

circumstance
271:12

circumstances 87:20 104:22

citizens
206:25

city 8:25 14:14, 18 15:16 18:2, 15,18 25:11 37:18 38:17 73:5,6,22 127:6 358:10

civil 159:17

Clarification
56:8

clarify 181:22 185:6

clarifying
171:4

class 36:7

classify 77:13

classifying
77:19

clean 187:19 204:8,9,10,11

cleaned 188:5

cleaning
204:12

clear 217:19 222:10 302:14

clearer 158:20

clerical 286:5

client 312:8

Climber 314:8

Climer 201:1

close 147:17

closely 40:9

cloth 204:14

clothes 50:4, 18,19

co- 105:24

co-defendant
347:1

co-defendants
105:2,17 327:13 347:3, 13

Cobras 19:4 73:22

cockamamie
277:12

coerced 35:16 86:25 87:8 102:12,20 358:22 359:4

coercion 34:6 86:8,12

coffee 321:14

Cognac 320:5

Coleen 173:11

Colleen 9:3 325:9 337:11 343:11 368:9, 24

comfortable
225:18

commanding
19:25

comments
273:25

commissary
135:20 136:2,6

communicate 84:17 85:4 120:7 121:12 353:16

communicated 86:4 120:15 215:11,12

communicating 83:2 351:18

communication 97:9 354:10

company 13:2 293:3 299:7

complaints
158:2

completely
237:25 296:20

completing
138:17

comply 144:24

Compound 169:15 170:2 184:14 216:4 239:18 274:9

computer 124:3 217:2,6 322:17

computerized
130:12

concern 120:7, 17,21,22,23 121:1,13 234:18

concerned 18:8 121:25 122:3

concerns
276:21

concluded
274:5 372:25

conclusion 35:13 87:2 145:6 225:12 327:10 334:3 347:5 354:4 368:14

concrete
292:20

concurred
299:14

condition 311:8,12,14

conditions
135:11,13

conduct 30:16 42:24 43:8 91:15 117:20 344:8

conducted
91:18 121:6

343:18

conducting 57:13 114:5 117:11 261:3

conference
163:5

confines
135:23

confirming
57:22

confront
112:21

confused
20:17

confusing
23:1

conjunction 21:6 242:22

conjunctions
314:20

connection 315:19 369:8, 13

considered 38:8 75:13 76:16,22 77:12 78:21,23 79:8, 14 88:23 135:12 292:14, 17

consisted
23:14

consistent 211:20 259:11, 18 260:5

conspire
368:8

conspiring
367:24

constructed
138:22

construction
12:14

consulted
75:18

consuming
235:24

contact 125:13 276:16 331:8

contacted
289:14,24

contained
55:14

content 159:4

context 141:24 153:25 154:17 159:3 165:7 245:6,11 297:16 357:3

Continental
13:1

continues
194:6

continuing 179:25 180:14, 18

control 277:15

conversation 114:7 146:14, 17 148:10 267:15

conversations 139:23 270:15 280:10 343:11, 15 366:19

converse
353:4

conversely
216:9

conversing
351:16

convicted 285:21,23 286:7,9,19 287:12,19 288:1

Cook 9:2 23:15 54:1,7,8 62:15, 17 63:6,25 64:4 67:15 68:1 70:3,22 71:6, 15,17,23 75:9



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

77:6,23 80:13, 15,17 84:4 86:16 95:16 122:19 127:23 128:13,15,19, 25 129:9,13,17, 19,21 131:9 133:21,24 134:13 143:15 159:20,22 160:17 162:14 182:5 194:1,23 226:16 251:24 289:22 292:12 301:12 303:10 304:14 306:21 323:18 325:13, 18 326:1 328:17,23 330:18 331:6, 12 332:1 334:23,25 335:5,14,21 336:2 337:24 339:8,12,14,20, 21,24 340:7,11, 15 342:12,15, 23 348:17 349:5 362:18, 20 363:11,14 365:21 366:3

**cooperative** 105:4

**coordinate** 45:2

**copies** 174:25 175:6,17

**copy** 174:21,22 181:16

**corner** 254:7 272:17 285:10, 12

**Corozzo** 267:15,16

**correct** 14:2 31:20 45:17,21 55:12 58:4 75:5 78:1 80:19 89:10,13 140:20 153:3 169:9 181:7,23 182:8,11,17

184:4 192:21 193:2 194:5,9, 13 209:6 225:5 226:20 228:18 230:14 243:24 254:23 257:1,8, 22 259:14 265:2 267:4 272:20,23 279:1,21,23 311:25 312:10 314:17 315:11 324:18 326:4 327:7,16,25 328:4,5,6,7,8,9, 24 329:1,11,12, 16,21 330:2,7, 13,20 331:1,17 332:5 333:3,9, 10,18 334:1 335:2,6,16 336:3,23 337:1, 7,8,9,10 338:6, 11,15,17,22 339:9,22,23,25 340:8,9,12,13, 15,16,20,21 341:7 342:8,13, 24 344:15,16, 18 345:1,9,12, 20 346:6,8,12, 13,18 347:3,14 356:21 357:10, 21,22 358:5,10, 20,22 359:14, 19,20 362:11 370:1,4

**correction** 289:8

**correctional** 293:9 298:23

**Corrections** 128:20 129:17 134:14 289:22 301:12

**correctly** 9:20 67:13 179:3 188:1 312:5 314:10 318:7

**corroborate** 120:14

**corroborating** 120:12,17

121:13

**counsel** 10:20 180:13 191:7 239:20,24 252:12 271:17 290:23 302:5 309:13,14 326:7 360:2

**Counselor** 331:21 332:16

**Counselor's** 334:12

**counties** 138:6

**county** 9:2 23:15 54:1,7,8 62:15,17 63:6, 25 64:4 67:15 68:1 70:3,23 71:6,15,17,23 75:9 77:6,23 80:13,15,17 84:5 86:16 95:16 122:19 127:23 128:13, 15,19,25 129:1, 6,9,13,17,19 131:9,16 133:21,24 134:13 138:1,5 143:16 159:20, 22 160:17 162:14 182:5 194:2,23 226:17 251:24 289:22 292:12 301:12 303:10 304:14 306:21 323:18 325:13, 18 326:1 328:17,23 330:18 331:7, 12 332:1 334:23,25 335:5,14,21 336:3 337:24 339:8,12,14,20, 21,24 340:7,11 342:12,15,23 348:17 349:6 362:18,20 363:11,14 365:21 366:3

**County's** 129:21

**couple** 12:16, 18 23:15 30:2 33:6 138:4 147:13 163:8 172:8 179:5,20 197:15 281:1 321:13 330:4 340:14 358:16 363:17 364:12

**court** 10:5,13, 18 11:6,9 25:8 34:2 50:21 83:13,23 84:6 87:14,21 88:3 94:19 95:7,12 101:7,14 131:8 132:9 149:25 165:8 246:17 247:15,25 323:3,14 340:10

**courthouse** 261:15 262:3, 22

**courthouses** 261:3,8,21,25

**courtrooms** 171:25

**courts** 10:4

**cousin** 314:3

**cover** 147:8 271:23

**covered** 253:25 256:18 272:4

**CPD** 8:22 17:6, 23 22:23 23:14, 22 24:2,6 25:3, 17 26:1,19 31:10 32:4,6 33:3,12,17,22 34:6,24 35:3 38:8,17,20,24 39:2,7,11 40:12,18,21 41:3,4,6,12,16, 17 42:4,9,11, 12,22 43:8,13,

14 46:25 47:6, 24 48:9,11,18 49:16,24 50:13 51:14 53:16 54:2 55:8 56:12 57:3 58:3,11, 18,21,24 59:14, 16,22 61:5,18, 19,22 64:5,18 68:14 69:11 70:24 71:4 72:13 73:10,14 74:14 75:3 77:1,20 79:9 81:14 83:3,17, 21 175:8,12,17, 24 176:6 205:2, 3,13,15 264:9 315:8 347:24 349:8 350:23 354:10 355:7 356:4 366:20 369:6

**CPD's** 48:3

**CPSAODAB11 1183** 226:4

**crime** 15:17 17:10,12 21:18 73:1 76:3,10, 22,23 78:13,24 79:23 104:17 106:14 107:23 206:9 209:4,5 243:23 248:17 249:21 250:4, 18 279:10 280:12 346:17 362:10,13

**crimes** 17:5, 15,18,20 18:16 19:7,21 20:25 21:4,5 22:15,20 23:3 24:16 51:2 59:11,13,19,20, 22 83:13,17 190:24 285:19 325:25 328:24

**criminal** 124:5 144:6,14 285:16 330:1 332:20 333:2 340:20



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**criminals** 285:20,23

**cross** 362:25 363:2,8 370:13

**CROSS-EXAMINATION** 309:24 369:23

**crosses** 371:2,4

**crowded** 89:5

**CT** 372:25

**CTSA011183** 226:8

**cubicle** 62:6

**cubicles** 62:10 72:11

**cuff** 160:19 321:8

**cuffs** 160:24

**Culbertson** 9:9

**culpable** 215:1

**curse** 288:21

**cursing** 318:16

**custody** 107:25 129:24 130:24 131:6,20 132:25 133:7,14,15,20 134:10,13,18,24 135:9,12,20,24 136:9,19 137:16,25 138:8 159:21 160:3,5,11,16,19,24 161:14,24 162:17 163:12,21 164:4,14,18 165:5,15,20 251:24 274:14,15,19 276:20 277:10 289:9 320:18 321:10,21 322:5 323:2,17 339:8,12,13,17 340:4 343:5,

**8**

---

**D**

**D-I-C-I-O-L-L-A** 9:24

**dad** 267:15

**daily** 44:10,14 51:9 82:5

**damage** 264:4

**damages** 370:16,21 371:1,7,9

**danger** 135:6 340:4

**Daniel** 256:24

**database** 123:8,25 124:5 204:22 205:3,9,16,21

**databases** 124:1

**date** 55:18 130:20,21 147:1 149:15 183:23 192:6 193:13 227:2,4,6 231:10,18 253:14 254:3,15,20 272:8,16,18 314:1 315:5 325:13,14,15 335:12 371:9

**dated** 192:9 291:13

**dates** 97:9 148:22 178:23 192:5 253:7 307:20 311:19,24

**daughter's** 158:23

**day** 49:25 133:15 147:8 148:2 149:12 156:25 182:24 196:9 251:23 273:20 305:19,

**24**

**days** 19:3 111:9 147:9,20 184:25 246:21

**dealing** 337:15

**Dean** 299:23

**deaths** 193:23

**deceiving** 305:5

**December** 193:25 196:10 201:7 211:8 221:13 222:15 223:9 259:5,12 291:14 313:23 357:13

**decide** 45:19 95:12 198:14 344:14

**decided** 21:15 221:18 255:4

**deciding** 202:14 244:11

**decision** 38:14 115:22 116:1 225:8,13,15

**Decisions** 279:3

**Decriss** 265:12,23

**defendant** 8:14,25 9:9 27:22,24 144:6,14 159:17 194:3 310:3

**defendant's** 194:11 347:24

**defendants** 8:22 9:6 27:23 105:25 158:25 159:8 285:16 327:21 330:1,19

**defense** 35:20 142:18 143:4,6,18 231:21 234:3,4,7,10,

**14,18,24** 235:2 241:6 301:20,24 312:4 358:13 359:13

**define** 114:17

**Delacey** 66:13

**delay** 371:6

**delineate** 193:7

**delivered** 13:3

**Delo** 42:1

**denials** 274:6

**department** 13:13,15,17,23 14:6,16,25 21:22 26:16,17 32:19 33:18 35:25 40:2 46:20 51:13 53:2 61:13 64:1 82:17,20 84:12,13 128:20 129:17 134:14 140:15,19 162:22 207:18 289:22 301:12 326:20 340:3 363:14

**depending** 24:9 41:24 56:7 100:19 104:21 128:18 148:20 153:12 213:19 215:16

**depends** 107:20 162:21

**Depo** 180:14

**deponent** 8:18,19

**deposed** 10:1 158:21

**deposition** 158:7,14,15 372:25

**depositions** 93:7

**deputy** 168:22

**291:21**

**describe** 213:7,8 314:13

**describing** 196:9 200:11,25

**descriptions** 213:9

**designated** 14:17 89:6 163:9

**desk** 59:6 320:5 322:14

**destination** 342:17

**destroy** 38:1 100:7,14 174:9 183:19

**destroyed** 38:4

**detail** 32:6 55:20 58:9 64:10 129:22 140:3

**detailed** 20:17 22:13,14 23:1,4,5,7,19,20,21,25 24:1,3,4,12,25 4:9,17 26:1,20,22 31:10,20 32:5,7 38:20,25 39:10,13 40:5,13,25 41:17,19 42:5,23 43:9,14 44:5,15,16 46:25 47:3,5,13,19,24 48:9 49:13,16 51:7,12,15 53:16,24 54:1 56:13 58:9,12 60:8,22,24 62:8 63:15 64:1,6 68:1,19 69:11 70:24 71:4,18 72:13 77:1 84:1 195:3 334:25 335:14

**detailing** 65:1



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**detained** 34:18 49:7

**detective** 16:11,12,17,19, 22 17:3,24 20:3,4 21:7,10, 13 27:2 36:6 38:18 50:1,6, 10,12,13,17 51:1 73:10 74:14 76:17 77:4,20 78:13 79:8 83:12,18, 21 177:19,21 189:8 264:9 335:2 352:10 353:16,17,24

**detective's** 16:5

**detectives** 17:24 36:24 82:25 83:3 177:7 219:22 248:20 351:24 355:6,8 367:16 369:6

**determination** 76:3,9 119:3 259:19 260:4

**determine** 78:13 199:4 210:4 211:18 212:22 246:13 332:11 345:9

**determined** 76:17 77:24

**determining** 76:22 78:23 79:13 134:17 332:3

**develop** 73:11

**developing** 65:10,17 80:17

**diagram** 248:23 249:1

**Dibernnedto** 24:21 33:8 42:1

**Diciolla** 8:16, 19 9:21,22,24,

25 11:11 240:4 264:21 291:20 293:3 299:8,14, 20 300:3 303:2 310:2 324:21 366:18

**Dicresenso** 265:12,24 266:5

**dictated** 197:25

**die** 318:22

**difference** 293:20 294:1 339:7

**differences** 10:7 129:3

**differently** 135:22 140:23 148:17 300:14

**difficult** 28:24

**difficulties** 286:7

**Dileonardi** 17:17 19:24

**diligence** 53:12

**dinner** 137:8

**Dinolfo** 9:4,7 325:10

**direct** 9:17 97:14 312:13 337:12 348:2 369:7

**directed** 44:17 56:25 89:4 175:3 184:23 198:15 201:15

**directing** 161:20 356:9 361:4

**direction** 97:21

**directions** 261:20

**directly** 33:10

45:5 55:25 63:9,14,18,24 65:4 67:21 68:2,16 69:1 70:13 71:14 72:20 75:8 343:23

**directs** 191:17

**disagree** 236:12 237:2

**Disciples** 73:22

**disciplined** 157:23,25

**disclosed** 143:25

**discovery** 143:17 144:25 371:7

**discrepancies** 211:25 212:1,4, 12 213:1 215:16 216:10, 14

**discrepancy** 212:15,20,23 215:10

**discuss** 85:10 119:19 202:4 315:1 368:17, 23

**discussed** 121:8 182:21 185:12 363:16 367:19

**discussing** 179:15,18 190:1 351:23

**discussion** 259:23 324:12 345:8 353:20

**discussions** 119:17 148:1 218:17 366:20, 21 367:1,3,5, 14,15,20 369:5

**dispersed** 18:2,5

**dispute** 292:6 295:14

**distinction** 74:11

**District** 15:3,8, 9 19:14 20:23 60:10

**districts** 18:17

**division** 12:9 17:24 21:10 36:6 50:6 73:1, 25 76:17 79:8 133:22 134:3,5, 10 162:22 170:18 171:15, 22 172:3 189:8 243:1 280:25 339:15

**Division's** 21:13

**Divisions** 21:7

**document** 226:12 233:10, 21 291:6,7 303:6,13 304:5, 11,15,20 305:3, 6,9,13 313:18 355:16

**documenting** 144:25

**documents** 158:10 165:5,8 169:14 240:16 331:3

**dog** 158:24

**domestics** 15:23

**Donahue** 291:21 299:13

**door** 147:18

**double** 193:4

**double-** 191:15

**double-sided** 191:13

**drafted** 12:5,18

**drawn** 248:23

**dispute** (col 5)

**dress** 50:15

**dressed** 50:21

**drew** 249:1

**drink** 321:14

**drinking** 288:11

**drive** 356:18 357:16

**driver** 12:25 213:15

**driving** 13:1

**drove** 265:12, 24

**drug** 126:14

**drugs** 319:20

**due** 53:11

**Duffy** 280:18

**duplicate** 174:14,18,20

**duration** 366:24

**duties** 15:20 88:4 328:23 333:16 348:17 349:5,21 353:18,19 354:16

**duty** 50:23 87:2 98:2,6,14 103:7 104:2,8 142:17, 24 143:3,11,12 328:17 331:25

---

**E**

**e-mail** 372:10

**earlier** 41:25 53:25 75:2 76:2 86:7 153:8 155:16 243:21 264:2 281:23 320:11 351:14 363:16

**early** 14:13 74:4 179:20 292:18 348:4,7,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:22-cv-00320 Document #: 235-23 Filed: 07/17/26 Page 105 of 132 PageID #:4656
The Deposition of NORFIE DiCIOLLA, taken on August 22, 2023
384

15 351:4

**easier** 296:17, 19

**easiest** 11:6

**eat** 321:14

**eating** 136:3

**echelon** 219:23 220:1 225:3

**Ed** 314:3 326:12 327:13 329:18 330:25 331:6 341:14

**Eddie** 211:7, 12,19 212:16 215:11 216:1 226:25 228:16, 20 229:3,11 230:18 232:5, 16 233:7,8 275:11 280:9, 11,12,14 281:3 282:12 365:20 366:2,11

**edit** 337:9

**educating** 80:25 81:5

**education** 13:10

**Edward** 226:3, 7,15,18

**effect** 354:1 371:12

**effort** 354:22

**either/or** 50:20

**EI** 29:9,12,13, 15,17,21,22,23 30:3,8,11 319:12,21

**elderly** 206:24

**electronically** 139:13

**element** 34:22 100:19

**elevator** 321:3, 6

**eligible** 292:16 294:19

**eliminate** 123:21

**eliminating** 188:4

**elimination** 188:2

**else's** 120:22 248:8

**emergency** 228:8

**employed** 63:14 68:16 73:3 79:1

**employee** 75:12 84:5 85:3 195:2

**Employment** 63:16

**encounters** 352:21

**end** 82:14 172:23 249:13 285:12 358:3

**ended** 13:1 257:20

**endpoint** 348:8,9

**enforcement** 45:2 71:22 76:18 82:13,24 354:23

**enjoyed** 13:24

**enroll** 16:16,18

**ensure** 320:17

**entail** 122:8

**entered** 219:24 305:10

**entire** 12:10 32:6 41:17 59:1 95:23 111:12 155:8 195:8 267:24 285:19, 20 364:24 365:16

**entirety** 334:18

**entity** 65:11

**erasing** 204:13

**Eric** 196:9 197:2,19 220:13 221:14 222:23 224:16 287:17,19 326:12 332:22 356:17,22 357:8,12,17,20

**Ernie** 24:21 33:8 41:25

**escape** 209:7 248:22

**escaped** 206:12

**essentially** 313:24

**established** 57:24 80:3,23 304:19

**estimate** 26:14 83:16

**estimation** 86:1

**evening** 310:2 345:7

**eventually** 71:21

**everybody's** 206:19

**evidence** 35:21 82:10 107:11,17 178:9 187:1 201:17 206:2 214:24 215:15 216:5,21 230:3 234:22 235:5,8 322:20 354:6 362:4

**exact** 169:4 325:15 351:22

**exam** 14:10,19, 20

**examination** 9:17 16:5,11 309:15 325:5 347:21 358:17 359:23

**exception** 293:6

**exceptions** 72:23,24

**excitement** 213:4

**exculpatory** 35:21 142:18 143:4,12,13 145:11 230:3

**excuse** 139:5 321:20

**exhibit** 179:25 180:14 181:4,5, 6,17,23 191:3, 4,8,9 226:3,5,6 239:21,25 240:1 252:10, 11,22 269:3 271:16 290:24 302:6,8,12 310:5,7 311:1 313:10 355:17

**existed** 240:25

**existing** 332:20 333:2,9 340:20 347:1

**expectation** 86:15

**expectations** 68:4

**expected** 47:24 48:2 86:11

**experience** 22:3 91:14 109:25 110:3, 17 190:19,24 198:6,13 201:13 218:13 323:8

**experienced** 17:25

**expert** 75:13 110:10

**expertise** 33:14 73:11 74:15

**explain** 52:21 133:23 185:5

**extent** 20:8 35:12 60:7 63:23 87:1 98:5 100:17 104:7 140:12 145:5 196:12 234:11 235:8 236:8,15 267:5 279:15 305:1 359:17

**extraneous** 236:10

**eyes** 321:25

---

**F**

---

**facilitating** 346:17

**facilities** 89:2

**facility** 136:11 160:21 277:15

**fact** 102:20 104:16 107:6 111:25 112:7 186:25 192:9 206:1 213:14 214:2,18,23 215:19 216:1,5, 20 233:10,22 234:22 235:7 273:24 279:13 286:21 292:11 314:12 329:14 354:5

**faction** 187:7

**factions** 73:20, 21 187:13 188:23

**factory** 12:16

**facts** 36:11 86:5 102:5,25 103:2,10,14,20 104:2,11,14,18

Read and Sign Version Only

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

106:11,14,21 107:17 109:9, 14 111:19 112:19 118:14 120:8 121:2 141:4 142:17, 18 143:4,5,13 144:5,13,17 189:5 201:17 215:15 216:18 217:17 235:5 244:10,11

**fair** 10:11 25:10 36:14 39:11 66:23 72:14 76:4,8 77:18,22 86:9 88:13 92:24 93:1 100:9 105:8 110:9 116:4 118:6 132:22 138:23 140:17 148:9 152:4 183:5 184:1 190:23 192:1 194:3 196:8 199:3 209:3 219:5 220:5 238:18,23 239:9 250:16 295:23,25 296:1 305:9 306:16 325:17, 23 326:9,17 327:1 331:8 332:18 334:15 335:11 336:7 337:22 338:13 340:5 343:2,4 344:13 345:22 346:3 348:5,19 349:8,22 350:21,24 351:10 355:10

**faith** 354:18,24

**fake** 123:18

**false** 123:4,15, 20

**familiar** 187:6, 7 188:14 203:23 271:6 329:13

**familiarity** 29:19

**familiarize** 189:5

**famous** 286:6

**fashion** 280:6

**fast** 137:10 148:20 191:12 281:20 282:2,7

**father** 12:15 245:4,24 246:5 273:3,23

**favorable** 135:12,16

**February** 240:5 241:19 303:21 304:6 305:19

**federal** 45:3 187:11

**feedback** 216:24

**feel** 64:10 135:17 225:17 340:4

**felt** 299:21,22, 24

**fences** 209:9, 11 249:15,16, 17,18,25

**field** 175:1

**figure** 203:15 372:5

**file** 37:17

**filed** 158:2 189:8

**files** 157:18

**fill** 148:21 283:12 338:6 339:2 341:18

**filled** 138:21 284:19 340:24 341:1

**filling** 319:2

**Fillmore** 15:3, 8,9

**finalized** 255:25

**find** 44:24 88:4, 5 112:18 122:20,23 123:21 124:11, 24,25 125:11, 25 126:13 355:16,18

**finding** 82:7 125:6,24

**fine** 43:20 235:16 252:14 309:19 347:18

**finish** 214:8 245:16

**finished** 14:23 245:14

**finisher** 12:15

**finishing** 296:16

**firearm** 50:23 70:3,6,10

**firearms** 70:7

**firm** 159:11,12

**fit** 339:25

**five-minute** 145:24

**flipping** 347:2

**floor** 58:17 60:11 62:10,19, 22 63:1,22 72:8 89:6,9,12 128:22 132:10 136:22 163:9 168:14 185:25 284:15 285:20

**floors** 89:18,22

**Folk** 73:25 74:15

**Folks** 74:4,10 188:23

**follow** 47:24 48:3,8 97:21

244:21 266:4

**follow-up** 21:14 59:6 106:10

**food** 136:9,18, 21 137:2,10 166:14 281:20 282:2,7

**foot** 202:16 292:13

**force** 15:13,14, 19,25 16:1,4 22:20 23:3 316:9

**forget** 156:20 168:15 169:4 172:22 176:22 177:23 188:1 285:11 372:3

**forgetting** 36:19

**forgive** 155:16

**forgot** 144:10 260:11

**form** 30:13 34:7 40:23 47:17 49:18 54:14 55:5 71:9 76:5,11 77:8 78:15 79:25 80:4 81:23 102:6,14,21 103:22 104:13 110:12 112:3 113:25 115:18 119:13 124:18 126:25 128:8 129:25 139:3,4, 11 141:22 145:13 146:20 148:3,19 163:6 165:20,21 178:1 179:2 192:24 193:9 200:20 201:2, 10 202:23 207:9 208:6 216:4 218:19 220:11 221:16, 22 223:12 224:23,24

225:10 227:19 229:6,14,24 230:6 231:4,12 232:8,20 233:4, 13,23 234:13, 21 235:7 236:3, 9,14 237:9 239:18 241:9 242:15 244:19 246:15 248:10, 18 249:6,22 250:20 255:11, 12 258:1,9,18 259:21 260:7 261:11,16,23 262:24 263:15 265:6 267:17, 23 268:3,12 270:1,9,19 272:11,12 273:7 274:17, 23 276:12,22 277:5,24 278:10 281:5, 11 282:13,19 283:20,24 285:2,8 286:13, 17 287:7,14,21 288:2,8,18,23 289:2,11,19 292:9 293:13 297:15,25 298:5,10,25 300:8,19 302:2 303:12,19 306:8,24 307:15,24 308:6 309:4 311:9 312:11 313:6 314:16, 22 315:24 316:5,12,21 317:12,18,24 319:4 321:17 322:1,7,23 323:15,25 324:10,15,16 325:20 326:3, 14,22 327:2,9, 17,24 328:12, 20,25 329:7,23 330:14,23 331:2,9,18 332:6,13,23 333:4,13,20 334:2,20 335:8,



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

18 336:9,18 337:2,19 338:23 340:5,22 342:20 344:11 345:2,13 346:14,20 347:4,15 348:21 349:9,15,23 350:25 351:11 352:5,23 353:9 354:3,12,25 355:12 356:7 359:21 361:18,24 362:4 365:1,11,17 366:5 368:3,13,19 369:3,10

**formal** 40:6

**format** 39:20,22,23 69:10 96:25 194:22 195:1 226:21

**formed** 17:6

**forming** 17:21 74:8

**forms** 39:1,4 68:9,10,17,21

**forum** 62:9

**forward** 123:17 219:3

**found** 82:11 105:23 111:24 124:19

**foundation** 43:16 64:7,22 72:3 75:15 87:23 92:5,13 93:16 96:10,16 97:22 98:5 99:6,15,21 101:10,17,25 102:22 104:6,7 105:10 110:5,12 119:11 120:21 121:5 125:18 127:14 129:10 130:14 131:10,18,25 132:3 133:2,10,17 135:1,14 138:10 141:7,8,

14,23 142:7,13,20 143:8,20 144:2,9 145:5 155:23 163:15,24 174:1 175:15 178:21 179:2 187:1 195:12,18 196:4 197:3 201:16 210:20 213:17 218:19 221:6,10,16,17,21 222:24 223:12 224:23,24 225:10 229:6,23 230:20 231:4,12,23 232:8,13,20,21 233:13,23 234:10,21 235:10 236:3,9,14 237:9 239:13 241:1,9,14,22 242:15 244:17 246:7,15 248:10,12,18 249:6,22 250:20 253:20 255:1,12,21 256:15 258:1,8,9 259:2,7,22 260:7 261:7,16,22 262:7,16,24 266:11,24 268:3,11,12 269:24 270:1,7,9,19 272:11 273:8 274:11,17 275:6,16,23 276:3,12,22 277:5,24 280:15 281:4,5,11,22 282:13,19 283:3,15,20 285:2,8 287:7,14,21 288:2,8,12,18,23 289:2,11,19 291:10 292:4,10,25 293:13 296:6 297:14,25 298:5,6,10,18,25 300:24 301:10 302:2 303:12,19,23,24 304:9,18,19,

21 305:11,12,20,25 306:7,8,11,24 307:24 308:6,12,19 309:3 311:9 313:16 317:2 321:17 322:1,7,23 326:14,22 327:2,9,24 328:20,25 329:7,23 330:23 331:9,18 332:23 333:4,13,20 334:8 335:8,18 337:19 347:15 354:25 363:20 364:7 365:1,12,17,23 366:6

**fourth** 299:4

**frame** 25:20 45:6 48:14,25 49:8 50:24 53:3,9 70:9 75:21 76:12 78:5,25 79:16 95:9 100:3 103:4 149:10 152:21 154:17 165:7 285:7,9 348:3 349:2 350:19 351:3,20,22 353:25 367:25 368:9,17,25

**Frank** 41:13,15 256:24 300:4

**frequent** 47:10 84:8,10

**frequently** 83:25 133:6

**friends** 13:24 314:2

**front** 226:12 266:17 310:23 355:19

**fruits** 277:11

**full** 209:18 312:16 313:21 320:1

**function** 191:12

**furtherance** 332:19

———

**G**

———

**game** 188:15

**gang** 17:5,10,12,15,18,20,22 19:7,9,10,21 20:16,18,25 21:4,9,15,16,18 22:7,12,15,20 23:2,3,4,8,9,11,13,23 24:1,14,16 25:4,9,14,18,25 27:2,4,7,8 29:2,5,10,11,23 30:3,4,8,11 31:11 32:5 33:7 38:20,21,25 39:10,14 40:5,13,25 41:10,18 42:5,23 43:9 44:6,15,16,23 45:11,22 46:25 47:7,13,19,25 48:9 49:12,17,22,25 50:2,9,17 51:2,15 53:17 55:9 56:13 57:4 58:9,10,12,19,24 59:11,13,19,20,21,22 60:4,22,25 61:5,10 62:21 64:2,6 65:7,10,17,24 66:10 67:8 68:15,19 69:7 70:25 71:5 72:13 73:8,11,12,18,20 74:14 75:3,13,18,24 76:3,16,18 77:1,4,12,13,19,20 78:7 79:6,7,8,23 80:5,8,18,19,22 81:8 83:12,17,22 84:1 95:23 109:25 110:3,17 111:4,12 123:5,17 157:1,

3,4,8 167:2 168:5,7,11,15 170:14,21,23 171:6 172:1,15 175:8,13 187:3 188:6 190:16,19,24 195:4 197:22 198:1,4,8,12,18,24 199:5,15 201:13,15 203:23 204:24,25 205:6,15,21 206:15 207:4 208:8 218:13 225:3 242:25 263:21 264:9 273:25 274:5 280:19,20 285:19 286:8 315:15 324:8,14 335:23,25 336:21 364:1 370:1,3

**gang-involved** 76:10,23 77:25 78:4,14,24 79:14

**gang-related** 26:14 285:21,23

**gangbangers** 206:17

**gangland** 204:11

**gangs** 18:8,15,18,19,21,24,25 19:5,25 20:5,10 21:17,19,25 22:1,5,6 27:1 28:25 29:17 72:15,21 73:8,9 74:6,8,9 81:1,16 110:10 163:1,4,5 197:25 198:3 202:13,25 204:15,20,23 207:23 208:3 249:15

**gangway** 209:25 210:7,12,16



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of NORRIS BICIOLLA, taken on August 22, 2023

387

**gangways**
209:4,9,20
210:3,5,9

**gates** 209:11,
13

**gave** 89:25
102:25 103:11
104:16,22
106:14,21,22
112:7 123:15
181:15 197:2
242:6 244:6
258:20 259:12
293:11 335:11

**Gaylords**
73:23

**Geez** 53:24
176:21

**general** 20:24
26:23 35:1,2
48:3 56:20
72:9,10 107:8
134:6 135:17,
22 171:24
253:21 286:4
339:16

**generally** 19:1
36:7 89:21
134:23 367:19

**generated**
55:18 82:23
254:20 310:21

**generating**
82:25

**George** 9:3
194:12 195:22
312:5,7 325:10
350:2 351:8

**get all** 238:8

**getaway**
212:17 213:15

**girlfriends**
274:1

**girls** 213:5
326:18 330:2
337:17

**give** 9:13 45:9,
15,19 67:16,22

69:6 84:12,14
123:1,17,18
140:22 142:1
143:5 154:25
175:12 196:19
210:11 219:1,6,
21,22,25 220:8
225:2 242:11
255:24 270:14
298:22 316:12
329:10,20
339:2 351:19
371:21

**giving** 218:25
219:13 220:7
224:3 247:6,8
273:13

**Gizowskit**
200:12,18
224:7 239:2,6,
17 243:3 245:4,
23 314:9,13

**Gizowskit's**
246:5

**go-** 82:16

**go-between**
82:12

**goals** 189:18

**God's** 158:22

**good** 18:13
28:9 43:22 44:1
63:17 79:4
145:16,21
150:8 167:6
174:21 265:21
282:23 304:16
309:15,22
310:2 354:17,
24 370:9

**grab** 217:14
264:3

**graduated**
15:1 16:22

**graduating**
12:18

**Graf** 8:23
177:21 347:24
349:19 350:5
351:8

**Graffeo** 8:23
177:24 347:25
349:19 350:9
351:9

**grammar**
11:22

**grand** 11:19
259:5,11,18
266:17 268:9
269:18 270:11,
14,23 271:4
358:3

**gray** 265:13,25
356:11,12,14

**greaser** 111:9

**greasers**
111:11

**great** 9:25 44:2
252:24 360:8

**ground** 250:9

**group** 15:15

**groups** 189:2

**guarded**
122:11

**guess** 33:14
36:19 182:2
220:3

**guidelines**
88:25 91:10,13

**gun** 107:23
204:12,13

**Gus** 156:14,15,
22,23

**guy** 24:6 83:4
300:5

**guy's** 176:23

**guys** 13:21
27:21 28:1
145:19 157:7
160:18 166:9
181:15 198:1
207:19 211:11,
15 266:14
347:17 358:15
368:16,22
371:14 372:16

**H**

**H-A-G-Y** 8:9

**habit** 333:21

**Hagy** 8:4,9
9:18 17:11,13
18:20 20:12
21:23 22:24
25:1,2,22,23
26:7,21 27:16,
21 28:1,13,19
29:1,8 30:6,17,
23 31:7,15,21
32:3,17 34:10
35:19 36:18
37:1,10,21
38:6,12 40:17,
24 43:4,19
44:4,13 45:13
46:3,12,18
47:4,18 48:17
49:5,11,20
50:25 51:24
52:3,7,12,17,23
53:5,15 54:16,
22 55:2,7,23
56:3,11,18
57:1,12 58:1
59:8,15,17
60:12 61:12
63:2,16,19
64:13 65:3
67:6,20 68:8,13
69:8,16 70:2,11
71:12 72:6,18
73:15 74:20
75:1,17 76:1,7,
20 77:15 78:9,
20 79:3,11,18
80:1,7 81:6,10,
14,19 82:2,15
83:5 84:22
85:2,9,17,24
86:20 87:4,11,
18 88:6,15,21
89:20 90:7
91:4,16,23
92:7,16,23
93:3,19 94:3,8,
15 95:1,11
96:7,12,18
97:12,25 98:8,
24 99:9,18,24

100:8,22 101:2,
12,19 102:2,9,
17,24 103:6,18,
25 104:9,15,24
105:13,22
106:5,12,18
107:3,15,21
108:3,6,16
109:7,15,21
110:8,15
111:23 112:5,
13,22 113:3,9,
17,22 114:3,14,
20 115:4,20
116:3,11,17
117:2,5,6,19,25
118:5,12,18
119:16 120:4,
25 121:11,20
122:5,18
123:23 124:15,
22 125:4,9,20
126:6 127:4,17
128:12,23
129:12 130:4,
16 131:4,13,19
132:1,5,11,13,
18,23 133:5,12,
19 134:15
135:3,18,25
136:12,17
137:1,14,19,23
138:12 139:2,9,
15 140:1,16
141:2,11,17
142:3,9,15,22
143:10,22
144:4,11,23
145:3,9,16,22,
25 146:6,12,19,
22 147:15,19,
24 148:8,24
150:17,23,25
151:10,15,24
152:24 153:6
154:10,18
155:6,12,19
156:3 160:1,9
161:8,22 162:5,
12 163:3,11,19
164:1,8 165:9,
13,18,25
166:15,21
167:3,14
169:11,21
170:6 171:6,20



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

173:6 174:4,16 175:19 176:2, 10,16 177:10, 17 178:4,15,24 179:6,24 180:7, 13,17,21 181:5, 9,15,19,24 182:3 183:4,18 184:18 187:4, 22 188:12 189:13 190:11 191:1,7,11,22 192:15 193:5, 11 195:14,20, 25 196:6,14,23 197:5 198:5,11, 22 199:2,11,19, 23 200:4,15,24 201:4,12,21 203:1,10 204:1 206:5 207:13 208:9 210:21 211:2,10,17,23 212:7,21 213:11,23 214:5,8,11,15 215:2,9,18 216:8,16 217:3, 7,10,12,14,16, 24 218:7 219:4, 11,18 220:4,18 221:1,8,12,18, 23,25 222:12, 14,25 223:5,15, 20,24 224:13, 19 225:1,14,20, 25 226:9,11 227:17,22 228:14 229:9, 17 230:2,11,16, 23 231:7,15,25 232:9,15,24 233:6,17,19 234:2,16,25 235:23 236:7, 15 237:4,6,20, 24 238:4,12,21 239:1,15,20,24 240:3 241:4,10, 18,24 242:19 244:22 245:2,7, 15,18 246:10 247:5,23 248:15,25 249:4,9 250:1, 12,23 252:1,12,

15,22,25 253:5, 16,22 254:6,10, 13,17 255:6,17, 23 256:4,10,20 258:3,11,21 259:3,9,25 260:9,20 261:9, 13,18 262:1,9, 17,21 263:1,18 264:5,14,20 265:9,15,20,22 266:15 267:1,7, 21 268:5,14,17, 19,21,25 269:2, 4,10 270:2,12, 21 271:7,14,17, 20 272:2,10,15 273:16 274:12, 20 275:2,10,14, 19 276:7,18 277:1,19,25 278:11,20 279:8,19 280:7, 16 281:7,14 282:4,11,15,22 283:9,16,22 284:2,12 285:5, 14,25 286:15, 24 287:10,16, 23 288:4,9,14, 20,24 289:6,13, 23 290:16 291:2,5,12 292:5,19 293:1, 16,21 294:3,8, 11,15,18,21 295:8,15,21 296:2,7,16,21 297:6,10,19 298:2,13,20 299:2,6,11 300:11,21 301:2,14 302:3, 5,11,13,22 303:1,15,20 304:2,14,22 305:2,7,14,17, 22 306:3,9,13 307:1,7,12,17 308:2,8,15,22 309:5 311:9 312:11 313:6 314:16,22 315:24 316:5, 12,15,21 317:12,18,24

318:19 319:4 321:17 322:1,7, 23 323:15,25 324:10,15 325:20 326:3, 14,22 327:2,9, 17,24 328:12, 20,25 329:7,23 330:9,14,21,23 331:2,9,18 332:6,13,23 333:4,11,13,20 334:2,8,20 335:8,18 336:9, 18 337:2,19,25 338:7,16,23 340:22 341:24 342:18,20 344:11,20 345:2,13 346:14,20 347:4,15,18 348:21 349:9, 15,23 350:25 351:11,21 352:5,23 353:9 354:3,12,25 355:12 356:7 358:15 359:21, 24 360:4,7,23, 25 361:5,8,15, 20 362:1,7,22 363:1,3,10,15, 23 364:11 365:3,9,14,19 366:1,8,15 368:3,13,19 369:3,10 370:6, 10,14,23 371:5, 13,16,18,23 372:1,3,5,14

**halls** 271:3

**Halsted** 11:19

**hand** 9:11 37:5

**hand-in-hand** 242:23

**handcuff** 320:25

**handcuffed** 342:7,13

**Handcuffs** 323:10

**handing** 290:24

**handle** 276:14, 15

**handled** 109:5 276:9

**handling** 21:14 276:17 330:12

**handover** 255:5

**handwritten** 36:15,21 37:12 45:24 46:22 95:4 96:23 130:17 257:7, 10,12

**hang** 59:11 283:8

**happen** 86:12 99:12 233:22 296:12 318:13, 22 319:2 366:22 367:10

**happened** 14:3 16:10 37:23 94:22 104:17 114:7 151:1 183:17 226:24 233:20 244:9 284:18 308:23 317:6,7 318:16 319:9, 16,17,23,24 345:7,18,19 364:17 367:6,7

**happening** 98:2 148:10 296:12

**hard** 10:15 133:22 371:20

**head** 11:5 24:16 203:12 204:5

**heading** 338:20

**hear** 28:6,20 30:10 101:22 158:15,17,19 187:18 217:5

279:9 288:10, 15,21,25 290:6 294:21,23 364:19 369:7

**heard** 24:25 28:5 146:21 150:14 202:8, 11 208:17 217:25 251:6 262:8,10,11 279:4,5,13 280:5,11,12 289:12 290:3 295:4 345:11

**hearing** 28:23 158:17 178:16 216:24 302:9

**heavy** 30:5

**heightened** 121:1

**held** 168:19

**Helena** 193:24

**helicopters** 250:10

**helpful** 10:13

**helping** 266:18

**hey** 150:13 180:23 338:20

**hierarchies** 27:2,5,9 29:3 110:17

**hierarchy** 111:6 198:3 199:5,14 336:2

**high** 11:22 12:7,8,11,12, 13,14,18 14:17 15:17

**higher** 201:14 219:23 220:1,8 225:3

**Hinshaw** 9:8

**hire** 335:15

**hired** 67:15,22 79:22 80:20 81:21,22 335:21

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Hispanic** 188:6

**history** 197:25

**hold** 100:5,20 269:8 346:21 355:20 361:2

**holding** 223:10,17 224:1 299:24

**holds** 329:18

**Holmes** 8:23 177:19 347:24 349:19 350:2 351:8

**Holy** 12:8

**home** 12:22,24 124:25 125:3, 25 126:1,5,22, 23 164:24 184:6 264:25 272:24,25 273:6,22

**homes** 273:13

**homicide** 17:4 26:10 44:8

**homicides** 21:8 26:15

**hooch** 277:7, 22 290:10 297:8 301:21

**hopping** 28:21

**hospitals** 126:8

**hours** 158:22 291:19 295:25 302:9,11,15,20 309:8,10 367:10

**house** 267:9 313:4 314:1,8 356:19

**Hoval** 166:1,23 167:5,10,16,21 168:10 169:1,7, 22 170:8 172:11 173:9 176:5,12 186:6,

24 315:15,19, 22 316:3,9,19, 25 317:9,16,22

**Hovel** 324:7 326:9 337:17 350:22 351:9, 19 368:2,11,18 369:1,9

**Howroyd** 9:8

**Hubbell** 189:6

**Hubble** 188:14 193:24

**Hyland** 9:3,7 173:11 325:9 337:11 343:11 368:9,24

**Hynes** 33:8 42:1

**hypocritical** 128:11

**hypothetical** 91:22 92:5,13 93:16 94:1,24 97:23 98:5 99:6,15,22 100:17,25 101:10,17,25 102:7,15 103:4, 17,23 104:13, 20 105:10,20 106:2,8,17,25 107:13,19 108:24 109:12 112:3,10,17 113:1 115:1,18 116:16 118:11 120:2 123:10 125:2 130:1 133:17 136:24 137:12 139:4,5, 12 141:9,15,22 142:20 143:8, 20 144:8,22 145:6,14 147:11 148:16 152:21 153:5 154:1,17 155:4, 10 161:5,18 162:3 163:7,15 165:7,23 176:8 177:3 178:1,12 183:16 199:10

206:2 210:25 215:15 216:6, 13,21 229:23 230:7 233:18 234:21 237:1 244:18 250:6 253:20 255:13 256:2 265:7 297:15

_____

**I**

**ID** 70:17

**idea** 57:24 94:14 111:10 130:11 135:8 174:2 230:22 241:8 251:11 306:25

**IDENTIFICATI ON** 181:6 191:9 226:6 240:1 252:11 271:16 302:8

**identified** 314:8,9 348:25

**identify** 70:13, 16,25 71:5 313:5

**identity** 346:8

**IDOC** 138:14

**Illinois** 62:14 124:5 126:24 127:6 326:11

**imagine** 172:22

**immediately** 39:14

**impeach** 92:2

**import** 132:16

**important** 11:4 215:25 216:15

**impose** 345:16

**impression** 109:24 224:3

**in'** 83:10

**in-depth** 153:12

**in-progress** 15:24

**in-service** 47:9,14

**inadvertently** 147:5

**incident** 123:14 185:3 273:12 296:4

**include** 33:25 36:9 97:14

**including** 368:8

**incomplete** 91:22 92:5,13 93:16 94:1,24 97:22 98:5 99:5,14,22 100:16,24 101:9,17,24 102:6,15 103:3, 16,23 104:12, 19 105:9,19 106:2,7,16,24 107:12,18 108:24 109:12 112:3,10,17,25 114:25 115:17 116:16 118:10 120:2 123:10 125:1 128:11 130:1 133:17 136:23 137:11 139:4,5,12 141:9,14,22 142:20 143:8, 20 144:8,22 145:6,14 147:10 148:15 152:20 153:4 154:1,16 155:3, 9 161:4,17 162:2 163:7,15 165:6,23 176:7 177:2,25 178:11 183:16 199:10 206:2 210:25 215:14 216:5,13,21 229:23 230:7

233:18 234:21 236:25 244:17 250:5 253:20 255:13 256:1 265:7 297:15

**inconsistencie s** 105:18

**inconsistency** 105:24

**incorporate** 148:19 231:5

**incorporated** 55:21 147:13, 21

**incorrect** 300:22

**incorrectly** 90:10

**independent** 98:2 103:7 104:1 169:12, 19 239:5 318:8

**independently** 108:1,3,5

**indicted** 327:1

**indictment** 327:7,15,20 330:2 331:14 347:2

**indifferent** 166:11

**indiscriminate ly** 283:6

**individual** 81:1 89:19 218:21 246:23 320:18 321:10,21 323:2

**individuals** 54:18 97:10 190:2,5 242:6 246:24,25 322:4 330:1

**inform** 109:4 278:5

**information** 55:13 57:20

Preparation Session Only



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

104:23 109:24 111:5 119:5 122:24 123:1 124:6 143:24 193:12 204:23 205:6 210:12 218:25 219:7, 13,21 220:1,7,9 221:14 223:1, 10,17 224:4,22 225:3 238:10 241:11 299:24 329:20 331:14 333:8,15 345:25 346:5, 18 357:24

**informed** 112:4 115:7 142:1 234:23 298:22,23

**informing** 301:19,23

**initial** 248:21

**initiated** 74:5

**initiating** 18:16

**initiative** 107:17

**inmate** 289:7 293:3,7,10 299:8 303:10 340:11 341:6

**inmates** 340:18

**input** 42:19

**Insane** 186:20

**inservice** 21:21 22:2 29:6

**instances** 175:22 190:22

**instruct** 10:21 140:10 304:24, 25 305:14 369:7

**instructed** 37:15 91:17 119:22 126:8, 10,13 127:9,18, 22 146:8 147:7,

25 174:5

**instruction** 36:7 118:17 174:25

**instructions** 46:21 118:13 120:11 122:23 124:10,24 125:6 140:2,23

**intelligence** 27:6 187:12

**intents** 330:17

**interact** 82:19 307:2,8,13,16

**interested** 208:8 214:19

**interfaced** 84:11

**intermingling** 339:19

**interpret** 171:4

**interrogating** 346:11

**interrogation** 34:25 86:3 163:9

**interrupt** 187:21

**interview** 25:7 33:18 36:11 44:24,25 54:23 57:3,13 86:2,9, 12 87:15 88:8, 13,16 89:1,11 90:2,11,12,16 91:7,15,18 92:3,9,14,19 93:1,11,14,22, 24 94:5,11,16 96:5,20 97:8,13 98:13,18 99:1, 20 100:1,5,10, 11,12 101:8,15, 23 102:5,13,20 104:21 109:23 111:16 112:12 113:18,21 114:5,10 115:14 116:13,

25 117:12 118:8 120:16 121:6 122:7 139:20 144:6, 14 145:11 146:9 147:1,20 148:20 149:2,5 150:20 151:2,4, 7,12,20 152:1, 4,18 153:14,17 155:8 161:7,10, 15 163:17 164:16,21 169:3 182:6,9, 13,18,24 183:20 184:23 185:10,13,25 189:18 194:2, 17 195:7,8 199:7,13 207:16 218:11 226:18,24 227:20,25 228:2,16,20,24 229:4,11,19 230:4,5,18 232:4,11 233:1, 8,11,20,22 234:5,8 238:15 239:10 244:9 246:6 255:8 256:19 257:4, 10,25 261:20 266:22 272:8 273:1,6 274:5,8 284:18 299:21 311:18 313:14 320:14 323:24 328:14,15 344:14,25 346:10 356:1,5

**interviewed** 70:14 86:24 87:7,25 136:22 160:23 161:1 162:17 163:21 206:20 211:11 216:19 239:3,6 241:16 246:25 247:1 251:10 256:5 260:23 261:15 267:3 272:25 273:12 293:4 299:8 332:16,19

333:17 347:7 349:1 362:8 365:4

**interviewing** 48:13,21,24 49:2,14 82:8,9 108:11 114:23 115:9 116:5,23 128:25 161:3 169:13 199:4 263:2 284:19 346:4 357:9

**interviews** 42:24 43:9 44:25 57:8 91:10,25 92:18, 25 93:10 94:9 96:2,8,13 97:11 117:7,20 118:1 140:7 143:1 144:25 147:14 152:8 153:24 161:2 162:7 173:13 192:2 193:18 194:11, 14 206:21,22 207:8,11 218:17 239:17 243:15,19 246:14 250:25 261:3 263:12, 14 312:4,9 314:14 315:18 318:8,13,16,22 319:2 328:8 333:7 334:6 343:18 344:8 365:5,16

**introduction** 304:20

**invest** 89:24 253:1

**investigate** 103:13 209:25

**investigated** 20:25

**investigating** 21:5 78:3 190:24 325:24, 25 333:24

**investigation** 17:22 19:10

20:16 21:16 23:23 25:6 33:13 44:23 51:23 54:4,6,19 60:4 63:22 65:10,17 66:21 67:8 75:4 84:21 85:13 109:17 156:12 162:23 163:10 167:2 188:14 189:6, 21 193:23 204:25 213:16 214:22 240:25 248:17,19,21 249:21,23 250:4,17 272:6 280:19 335:5 355:9

**investigations** 54:9,12 59:6 106:10 156:18, 24 287:5 334:24 336:2

**investigative** 39:7,15,18,21, 24 84:5 165:21 169:17 192:19 194:23 240:21 280:20 310:5

**investigator** 38:18 44:22 64:12 65:7,8 68:16 69:14,21 70:4,12,22 71:2,6 72:19 73:3 75:6,11 77:7,23 79:23 80:21 81:22 82:3 85:8 86:16,21 88:19 89:7 95:17,23 98:14 99:3 108:18 111:13 115:15 117:16 118:20 122:20 129:22 138:24 142:24 146:13, 16 155:21 156:16,17 157:12,23 158:5 159:20 170:10,16,21, 23 171:7

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

172:12 174:24 194:1,8 201:14 203:23 205:8, 10 214:17 215:25 225:6 230:24 231:17 243:7,9,12,22 253:6,13 262:2 263:21 265:4 268:7 272:22 273:2 289:15, 21,25 301:3 313:13 319:11, 19 325:18 326:2 328:18, 24 331:25 332:11 335:22 336:12,23 337:1 338:4,6, 10 341:19 343:20,23,24

**investigator's** 129:21 146:23 204:18 212:11

**investigators** 45:12 53:12,18, 23 62:18 65:23, 25 69:6 85:13 86:24 124:8 128:21 153:20 157:4,5,9,19 162:13,15 170:8,12,19 171:23 172:16 178:18 206:10 241:16 242:7, 12,18,24 243:1 248:14 261:20 278:4 291:18, 19 292:12 293:6 299:21 300:3,4,6 301:8,11 321:24 334:14 335:15 342:3 354:21 355:5,6 363:17

**involve** 72:15 214:25

**involved** 30:8 51:25 72:21 73:7 75:24 76:3,21,25 77:19 115:21

117:15 123:16 149:21 170:15, 19 173:11,12, 15 179:5,9,21 190:6,9 206:18 207:2 208:3 241:17 242:24 255:2 280:12 326:10,24,25 327:12,22 333:1 344:24 345:25 346:25 347:7 348:4

**involvement** 281:2 337:13

**involving** 29:9, 21 123:5 186:6, 9,20 319:8

**isolated** 339:16

**ISP** 63:6

**issue** 34:13 69:4 290:10 352:17

**issued** 121:17

**items** 136:6 137:16,20

---

**J**

**Jack** 33:8 42:1

**jacket** 50:6,9, 14

**jail** 83:10 122:10 127:23 128:2,8,10,13, 15,25 129:1,6, 9,14 131:9 133:21,24 134:24 135:13 137:9 138:1,3 159:22 162:14 188:21 251:24 292:12 296:5 318:22 339:8, 12,14,20,25

**jails** 138:14

**Jamaican** 293:8

**jammed** 278:6 290:10

**Jesus** 285:10

**job** 13:15,24 14:19,24 82:7 124:20 325:18 348:17

**jobs** 12:16,17

**Joe** 267:15,16

**John** 200:11,18 224:7 239:2,6, 17 243:3 245:4, 23 246:5 280:18 314:9, 13

**joined** 19:7,21 27:25

**joked** 319:19

**Joseph** 17:17 19:24

**jot** 97:10 123:19

**jotting** 148:22

**judge** 10:22 238:5 327:23

**judges** 32:1

**juice** 137:20

**jump** 310:2

**June** 65:16,21 66:22,23,24 67:11 80:21 95:22

**jurisdiction** 79:9

**jury** 142:5 259:5,12,18 266:17 268:9 269:18 270:11, 14,23 271:4 358:3

**juvenile** 18:1 48:21,24 49:4,7 101:14 125:24 262:19

**juveniles** 48:13 49:14,22

125:6

---

**K**

**Kankakee** 127:7

**Kedzie** 186:14

**keeping** 139:8 160:19 174:25 257:21 262:3, 19 306:22 343:7

**key** 321:4

**kid** 202:20

**kids** 14:18 197:22 198:1 213:5

**killed** 213:5

**kind** 21:5 30:15 37:20 44:19,20 45:2 57:18,19 81:10 89:17 104:14 133:23 134:8 137:2 139:8 154:2 180:18 187:2 190:21 196:18 258:20 261:8 264:1 277:7,8, 12 281:1 282:2 286:6 288:5 294:4 321:11, 16 339:16 353:4

**Kings** 19:3 73:22

**knew** 31:14 33:11 118:22 119:14 150:19 151:2 171:18 186:22 187:3,8, 10 190:21,23 197:18 206:15, 16,25 280:6,21 319:12

**knowing** 302:16

**knowledge** 21:17 63:24

66:16,17 79:12 196:25 197:10, 21 207:20 223:4,7 227:3 232:10 238:14 244:5 246:4 251:3 258:13, 17 260:22,24 261:1 263:6 305:1,5 306:5, 21 308:3,9,16 324:4 340:2,17 345:17

**Korea** 12:6

**Krystal** 180:17

**Kurson** 8:12 310:7

**Kuzner** 8:15 67:18 218:19 221:7 223:12 224:24 225:10 231:3 232:12, 20 233:3 239:22 252:14

---

**L**

**Lake** 131:16 138:5

**language** 220:7,15

**languish** 255:4

**large** 134:24 135:13

**Larry** 67:13 167:2 336:22

**lasted** 16:20

**late** 23:12,18 80:12 349:13

**Latin** 19:3 73:22

**Laura** 9:3 173:11 325:9 337:11 343:15 368:9,24

**law** 34:3 35:9 38:16 45:2 71:21 76:18

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

82:12,13,24 354:23

**Lawrence** 186:14

**lawsuit** 159:18 279:11

**lawyer** 101:8 119:19 247:12 248:6,7 329:10

**lawyers** 245:22 247:2 329:15,19

**laying** 311:11

**layout** 249:25

**lead** 24:18 34:14

**leaders** 197:22,23 198:3,18 207:4, 6,12,23 324:8, 14

**leading** 319:1

**learn** 21:24,25 22:4,8 27:2,4,8 28:25 29:2,5 73:24 74:2 110:22 119:9 141:4 178:25 202:18 208:24 263:22 324:6

**learned** 22:6,7 35:8 53:7 110:23,24 141:5,12,19 142:17 143:23 144:5,13 189:21 264:8 274:6 279:16 280:2 297:12 323:22 345:24

**learning** 296:22

**leave** 122:12, 14 166:13 228:7

**left** 147:5, 195:16,22 196:2 254:7,16

272:17 273:22 308:21 371:19

**legal** 35:13 87:2 97:4,5 98:6 145:5 225:11 327:10 329:5 334:3 347:5 354:3 368:13,16

**legs** 309:21

**length** 137:7 194:17 202:5

**lengthy** 235:14 339:18 365:10

**Lenny** 170:16

**letter** 180:1,3, 15 181:21 226:3,8,15,16, 22 227:11,18, 25 228:7,15 229:12 232:4 233:9 234:5

**letters** 231:21

**level** 119:23 140:3

**liar** 318:12

**Liberto** 265:13, 24 307:14 326:12 332:21

**Liberto's** 356:19

**lieutenant** 17:17,18 19:24 41:13

**light** 202:21 203:2

**limit** 34:21

**limited** 236:9

**limits** 133:6

**Lindsay** 8:9 74:18

**Lindsey** 358:14

**Linehan** 9:2,6 173:10 194:8 256:21 258:5

325:10 327:6 336:13 337:6 368:9,23

**liquor** 277:8,12 297:8 320:1

**list** 19:1 146:8 271:23 292:15 300:6,18 341:6, 10,14

**listed** 201:5 300:7,10 301:3

**listen** 191:16

**listened** 367:21

**listening** 158:18 238:1,2

**listens** 86:3

**listing** 292:7

**lived** 11:17,24

**local** 45:2

**locate** 25:7 44:24 88:2 124:20 125:14, 15 179:12

**located** 12:8

**locating** 55:3 82:10 125:16

**location** 58:25 63:11 87:25 291:18

**locks** 209:13

**lodge** 27:12

**log** 130:7

**long** 12:17,20 15:7,25 20:5 34:18,19 38:4,7 49:6 100:23 130:9 194:14 365:5 367:13

**longer** 47:14 64:5 71:24 72:2 310:20 335:13

**looked** 57:20 189:7 190:3 207:18 209:4

210:2,18,22

**Lords** 19:3 73:19,21

**lose** 33:14

**lost** 235:13

**lot** 18:16 19:5 21:7 31:14 37:18 82:13 132:1,14 149:17 204:7 206:24 249:14 292:11 296:17, 19 321:1 326:8 329:3 336:6

**lower** 198:7

**lunch** 137:4,8 145:17 281:25

**lying** 109:3

---

**M**

**made** 37:20 38:14 67:25 76:9 119:3,4 165:19 225:8 238:21 248:16, 20 250:17 259:17,19 273:25 298:16 304:22 332:10 334:13 336:20 347:13

**main** 34:13

**maintain** 130:8 153:7 321:25 339:25

**maintained** 130:10 157:19, 20

**maintaining** 343:7

**major** 213:15, 20,21,25 214:3, 21 215:13,20, 23

**make** 9:19 10:23 41:9 45:8,14 46:5

59:9 86:12,23 87:6 93:1 96:19 98:15 101:3 102:19 104:2 107:2 115:25 116:1 142:24 143:11,12 151:25 164:6, 11 208:16 214:11 218:3 236:13 260:3 300:16 326:1 341:7 351:6

**makes** 211:7 225:13

**making** 34:15 56:10 57:23 140:10 173:19 236:16 245:9 277:7,11,22 292:18 301:21

**Malcolm** 261:10

**man** 295:24

**manage** 339:25

**mandatory** 50:5,7,8

**Mander** 271:9 272:25 273:3, 21,23 274:4,7

**manner** 216:3

**mannerisms** 218:24

**manpower** 64:9,24 170:14

**Mantilla** 8:24 358:9,11

**manufactured** 353:25

**marijuana** 289:8,15 290:3 293:12 296:5, 23 297:9,12 301:25 308:25

**mark** 191:3 239:25 252:10 271:14 302:5



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**marked** 181:6 191:9,24 226:2, 6 240:1 252:11 271:16 302:8

**marking** 191:5, 7

**Marley** 170:15 313:14 363:18

**Martin** 166:2, 23 167:5,10,16, 21 168:10 169:1,7,22 170:8 172:11 173:9 176:5,12 186:5,24 188:14 189:5 193:24 315:15, 19,22 316:3,9, 19,25 317:9,16, 22 324:8 326:9 337:18 350:22 351:9,19 368:2, 10,18 369:1,9

**Masciopinto** 8:21 180:25 302:9 347:22, 23 348:23 349:11,18,25 351:2,13 352:1, 7 353:6,11 354:8,13 355:3, 14,24 356:8,15 357:6 358:6 365:1 369:21 372:21

**material** 143:23

**materialized** 17:4

**Matt** 8:10 9:8 286:11 288:1 313:4 314:3,7 362:9 368:1,10, 17,25

**matter** 216:3 275:8 310:4 368:25

**matters** 132:8

**Matthew** 240:5 323:23

**Maureen** 9:5 150:7,13 325:7 369:18

**Maureen's** 236:20

**Maxwell** 15:13

**Mcdonald** 67:14 167:2 336:22

**Mcdonald's** 137:13

**meaning** 94:17 134:1 279:23, 25 319:15,23 324:18

**means** 51:21 111:4,6 116:18 191:15 203:3 204:13 208:21, 22 272:22 302:19 312:7 328:13 339:12

**meant** 23:9 110:20 171:21 219:16 263:24

**mechanical** 321:11,16 323:5,8

**mechanics** 160:16

**meet** 52:8,25 56:14 85:12,18 126:17 127:10, 19 128:20 132:25 133:7, 14 158:25 159:5,7,14 161:14,16 163:5,13 164:25 176:11, 14,18,20 177:11 185:19 189:14 212:17 258:5 282:25 307:18

**meeting** 52:4 53:14 94:12,19, 22 95:7 130:25 131:3 159:4 161:23,25

177:7 178:6,17, 25 183:6 184:10 185:22 189:4 195:16, 22 196:2 205:25 223:23 229:3 230:13, 25 231:1,9 252:3,4,7 257:18 258:6 264:22 269:22 270:6 271:9 314:24 315:6,9 324:3,7,13 352:12 364:10, 23,24

**meetings** 51:16,17,25 52:14,18 53:6 98:3 162:1 183:8,10 184:8, 21 193:20 202:8 223:19 251:4,12,14,15 263:11 352:14, 15,18,25 353:1, 8,14 364:4,8,14

**meets** 177:6

**member** 111:4 143:15

**member's** 273:25

**members** 22:7 27:7 29:5 30:11 49:22 52:25 81:8 188:6,9 274:5

**memorializati on** 149:8

**memorialize** 92:14,19,21,22 93:10,14,17,22, 24 94:5,12 98:12 100:6,11, 12 112:24 113:5,13,15 139:22 145:7,8, 11,12 149:1,6, 11 153:9 162:8 183:22 184:2 200:10,16 229:4,19,20

230:4 233:1 255:8 263:13 270:6

**memorialized** 228:23 230:12

**memorializing** 92:10 148:6 310:6

**memories** 187:2

**memory** 195:15,21 196:1 230:17 239:5 282:6 292:20 299:25 350:22 351:7, 15 352:2,8

**mention** 73:20 200:25 211:7

**mentioned** 41:25 75:2 200:22 207:5 327:21

**met** 56:19 93:20,22 129:24 159:10 176:25 178:20 186:3 189:9,10, 14 190:20 222:18 223:16 224:14 233:7 243:7 258:4 263:7 264:22, 25 291:20 347:7 350:6 366:11

**method** 130:2 175:7 204:19

**methods** 106:20

**Michael** 8:13 264:23 356:23 357:9,11,12

**microphone** 158:16

**mid** 348:15

**middle** 62:10 303:25 356:9

**midway** 158:19 265:16 304:6

**might've** 152:22 163:16 266:13 292:14 350:6

**Mike** 28:3 66:13 194:12 195:16 263:3 266:16,21 267:8,14 268:8 269:14,15,22 310:3 312:4,8

**military** 13:6

**mind** 28:13 201:18,22 215:12,24 221:25 277:6 338:21

**mine** 13:24 27:13 132:6 248:13

**miniature** 320:7

**minor** 213:2, 15,20,25 214:3, 21 215:13,17 216:14

**minute** 33:16 263:6 284:21 303:9 316:13 370:11

**minutes** 172:8 302:11 309:8, 11 348:1 367:18 370:11

**Miranda** 33:22, 24

**mischaracteri ze** 61:8

**mischaracteri zed** 20:8 267:6 349:15 362:19

**mischaracteri zes** 29:25 60:7 90:4,17 100:17 106:23 177:16 178:8 199:7

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

217:22 219:8,
14 220:10
224:10 230:8
232:23 233:15
270:25 272:13
290:13 296:13
315:2,3 331:2
352:23 362:3,
17

**misconduct**
30:10,18,19
353:17,20

**Misfit** 312:20
314:3 361:10

**misleading**
242:17

**missed**
281:24,25

**missing** 66:14
123:24 137:7

**mistaken**
168:22

**misunderstoo
d** 68:18 144:21

**mixed** 213:7

**moment** 84:25
184:10 209:17
323:21

**monitor** 18:18

**month** 16:20
32:21 149:13
169:4

**months** 14:7

**moralize** 162:7

**Moran** 327:23

**Morfin** 8:11
211:7,12
215:12 216:1
219:20 220:13
226:4,7,15,18,
25 228:16,20
229:3,11
230:18 232:5,
16 233:7,8
275:11 280:9,
11,12,14 281:3
282:12 287:12
314:3 326:12

327:13 329:18
330:25 331:6
332:21 341:14
356:17,23
357:8,12,17,21
365:20 366:2,
12

**Morfin's**
211:19 212:16
286:25 313:4
314:1,3,7

**Morgan's**
191:11

**morning** 75:2
179:20

**Moser** 8:22
347:25 349:19
350:12 351:9

**mother** 267:3
269:14,18

**mouth** 316:4
319:1 350:19
351:17

**move** 33:3
286:19 299:12

**moved** 12:1,3
23:20 61:25
62:1 72:7

**moving** 156:23

**multiple** 147:9
208:21 292:23
297:2

**murder** 107:24
166:23 207:20
214:3 221:4
326:9,17,18
330:2,12,20
331:16 333:9,
25 334:1
337:17 343:19
346:1 347:2
348:5,18
349:14 350:23
351:9,19
353:19 354:17
355:9 359:16

**murders**
149:22 190:9
201:15 206:13

214:19 315:15,
19 324:7
350:23 368:1,
10,18 369:1,9

**mute** 180:24

**mutual** 302:20

---

**N**

---

**name's** 347:23

**named** 177:24
200:11,17
201:1 252:8
263:2 264:23
271:9 280:18

**names** 54:15
66:12 97:10
148:22 170:13
176:21 178:2
206:17,23
207:17 208:13
245:21 300:4,6
323:23 361:12,
17,22,25 362:2

**narcotics**
163:2 172:2
280:24 293:8

**narrative** 40:1,
3 55:20 119:14

**narrow** 41:9

**Nate** 8:12

**Nation** 19:4

**nature** 13:4
15:23 109:1
123:1,16
173:13,16
271:4 273:15

**necessarily**
257:17

**needed** 35:21
38:14 56:8
64:17 82:14
83:24 121:8
124:16 141:4,
12,16,18,19
142:4,10 143:4,
9 190:3,6
196:19

**negative** 193:4
234:23

**negotiated**
327:14

**neighborhood**
12:2 13:22
186:10,12
207:22 208:11

**neighborhood
s** 11:16,24

**Neil** 9:2 173:10
194:8 325:9
327:6 336:13
337:6 368:9,23

**Nemchawsky**
252:8 256:6
258:5 259:4,11
269:1

**Nemchawsky'
s** 256:24

**nervous**
299:23

**nervousness**
213:6

**newly** 17:5

**nice** 158:11

**Nicholas**
332:21

**Nick** 8:11
265:12,13,24
266:5 286:25
287:11 307:14
313:3 314:1,3,7
326:12 332:21
356:17,18,23
357:8,12,17,21

**nicknames**
204:16,19

**night** 213:4
258:14

**Ninety-nine**
227:24

**Noble** 12:9

**Norfie** 8:15,19
319:11,19

**norm** 155:5

174:7 184:25

**normal** 367:10

**north** 19:9,25
20:6,10 186:13
187:8,10,13
188:25

**note** 151:25
152:6 358:1

**notepad** 97:3

**notes** 37:12,
18,19,23,25
38:5,8,14,17,22
45:24 46:2,6,
15,22 86:4
95:3,4 96:21,
23,25 97:6,15
98:17 99:25
100:5,15
146:23 148:5,9,
12,13,14,18
152:17 153:2,7,
10 161:25
183:9,12,14,19
184:2,6 192:7,
11 193:17,19
209:8,12
257:10,12,17,
20,25 323:20

**notices** 14:14,
15

**notify** 125:17,
22

**November**
254:22 272:18

**number** 55:17
117:17,18
122:11 180:2,4,
16 181:10,11
239:21 275:7
348:17

**numbers**
204:13 360:12

**numerous**
170:11 203:8

---

**O**

---

**O'BRIEN** 9:5
150:8,12 166:8



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

220:25 221:16 232:8 233:13, 23 234:13 235:4,10 237:9 241:7,9 243:17, 19 244:16,19 246:15 248:10, 18 249:3,6,22 255:12 258:1,9 260:7,23 261:16,23 262:24 268:3, 12 270:1,9,19 271:2 272:11 274:17 275:24 276:12,22 277:24 280:15 281:5,11 282:19 283:20 285:2,8 287:14, 21 288:2,8,18, 23 289:2,11 298:5,8,9,10,25 302:2,18,25 303:12,19 306:8,24 307:5, 24 308:6 309:4 324:22 325:6,7, 22 326:5,16,23 327:4,11,19 328:1,16,22 329:2,8,24 330:10,16,24 331:5,11,20 332:8,15,25 333:6,14,23 334:5,11,21 335:10,20 336:10,19 337:4,21 338:2, 9,18 339:4 340:23 342:1, 21 343:25 344:2,5,12,22 345:4,15 346:15,23 347:10,17,19 365:11,17 366:5 369:20, 22 372:22

**O'CALLAGHAN** 9:1,6 191:10 325:8

**O'MARA** 9:5 325:8

**O'SHEA** 243:10,15 247:12,17,21 250:25 251:4,8

**Oberts** 8:17 17:10 18:9,11, 13 20:7 21:20 22:21 25:20 26:4,20 27:10, 13,15,17,20,24 28:3,5,9,14,22 29:4,25 30:13, 21 31:13,19,22 32:12 34:7 35:12 36:16,22 37:7,13 38:2,10 40:15,23 43:1, 16,24 44:2,11 45:6,25 46:8,16 47:2,17 48:14, 25 49:8,18 50:24 51:19 52:1,5,11,15,19 53:3,9 54:14, 20,25 55:5,15 56:2,6,16,22 57:10,21 59:2, 14 60:6 61:7 62:25 63:13,17 64:7,21 67:5 68:5,12 69:3, 15,25 70:8 71:8 72:3,17 73:13 74:18 75:14,20 76:5,11,14 77:8,10 78:5, 15,25 79:4,15, 25 80:4 81:2, 12,17,23,25 82:6,21 84:19, 23 85:7,15,21 86:18 87:1,9, 16,22 88:17 89:16 90:6,19, 23 91:12,20,22 92:4,12,20 93:2,15,25 94:6,13,23 95:9 96:9,15 97:7,22 98:4,19,22 99:5,14,17,21 100:2,16,24 101:9,16,24

102:6,14,21 103:3,16,22 104:4,6,12,19 105:9,19 106:1, 7,16,23 107:12, 18 108:1,4,13, 24 109:11,19 110:5,11 111:20 112:2,9, 16,25 113:7,16, 20,24 114:12, 16,25 115:17 116:7,15,20,23 117:3,14,22,24 118:3,10,16 119:11 120:1, 20 121:4,15 122:2,16 123:9 124:13,18 125:1,7,18 126:3,25 127:11,13 128:11,16 129:10,25 130:14 131:1, 10,17,24 132:3, 15,21 133:2,9, 16 134:11,25 135:14,21 136:10,14,23 137:11,17,22 138:9 139:1,3, 11,25 140:12, 24 141:6,8,14, 21,24 142:6,12, 19 143:7,19 144:1,7,19,22 145:2,4,13,20, 23 146:10,15, 20 147:10,23 148:3,15 150:13,21,24 151:8,13,21 152:20 153:4, 25 154:14,16 155:3,9,18,23, 25 159:24 160:7 161:4,17 162:2,11,19 163:6,14,23 164:5 165:6,12, 16,22 166:12, 24 167:12 169:9 170:2 171:1,3,9,11,16 173:25 174:15

175:14 176:1,7, 13 177:2,25 178:11,21 179:1 181:1,7, 13,22,25 183:1, 15 184:14 186:25 187:20 188:10 189:12 190:10,25 191:14,19 192:13,24 193:1,4,9 195:11,17,24 196:3,11,21 197:3,24 198:9, 16,25 199:6,10, 16,21 200:1,13, 20 201:2,9,16 202:23 203:7, 24 206:1 207:9 208:6 210:19, 24 211:6,13,15, 21 212:5,18,24 213:17 214:4,6, 10,13,23 215:5, 14 216:4,12,20 217:21 218:5 219:8,14 220:2, 10 221:6,10,17, 20 222:4,8,24 223:3,13,19,21 224:9,17,23 225:11 227:16, 19 228:11 229:5,13,22 230:6,15,20 231:2,4,11,22 232:13,19,21, 23 233:4,12,14, 18,24 234:9,20 235:3,5,12,16, 19,22 236:1,12, 20 237:10,15, 17,23,25 238:8, 16,23 239:12, 18 240:2 241:1, 13,22 242:14 244:15,17,25 245:5,8,13,16 246:7,16 247:19 248:11 249:7 250:5,20 251:21 252:21, 24 253:2,4,9, 11,13,19 254:4, 8,12,16,25

255:11,13,21 256:1,7,15,17 258:7,18 259:1, 6,21 260:6,8, 14,17 261:5,7, 11,22 262:6,15, 20,25 263:15, 17,25 264:12 265:6,14,19,21 266:11,23 267:5,17,23 268:10,24 269:1,3,6,8,24 270:7,18,20,25 271:19 272:1,9, 12 273:7,10 274:9,11,16,18, 23 275:5,13,16, 23,25 276:3,11, 13 277:4 278:10,17 279:7,15,23 280:1,3 281:4, 12,21 282:9,13, 18 283:2,14,24 284:10 285:1,3, 7,9,24 286:13, 17 287:7,13,20 288:12,17 289:10,19 290:13 291:1,4, 10 292:4,9,23, 25 293:13,18, 23 294:5,9,12, 14,25 295:13, 19,23 296:6,13, 15,19 297:1,5, 7,14,24 298:6, 17 299:5,10 300:8,19,23 301:10 302:10, 14,19 303:23 304:9,16,25 305:3,8,16,20, 25 306:7,11 307:6,9,15,25 308:5,12,19 309:3,7,9,13, 18,20 310:9,11, 13,18 313:16 315:2,11 317:2 319:15,23 324:16,18,24 338:25 343:22 344:4 346:21 347:6 354:5



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

355:20,22
356:13,25
357:2 358:10,
12,16,18
359:22 360:2,
22,24 361:2,6,
13,18,23
362:17,24
363:2,7,13,20
364:7 365:7,12,
23 366:6
369:18,24
370:9,13,17,19,
25 371:17
372:8,12,17

**object** 10:20
109:11 137:11
201:9 221:19,
20 228:11
236:21,22
237:11 303:24
316:13 347:6

**objected**
237:13 294:22,
23 295:9,16,17

**objecting**
188:4 294:4
304:10,20
370:19,20

**objection** 18:9
20:7 21:20
22:21 25:20
26:4 27:10,12,
22 28:10 29:4,
25 30:13,21
31:13 32:12
34:7 35:12
36:16,17,22
37:7,13 38:2,10
40:15,23 43:1,
16 44:11 45:6,
25 46:8,16
47:2,17 48:14,
25 49:8,18
50:24 51:19
52:1,5,11,15,19
53:3,9 54:14,
20,25 55:5,15
56:2,6,16,22
57:10,21 59:2
60:6 61:7 62:25
63:13 64:7,21
67:5,18 68:5,12
69:3,15,25 70:8

71:8 72:3,17
73:13 75:14,20
76:5,11 77:8
78:5,15,25
79:15,25 80:4
81:2,12,17,23
82:6,21 84:19,
23 85:7,15,21
86:18 87:1,9,
16,22 88:17
89:16 90:4,17
91:12,20 92:4,
12,20 93:15,25
94:6,13,23 95:9
96:9,15 97:7,22
98:4,19 99:5,
14,21 100:2,16,
24 101:9,16,24
102:6,14,21
103:3,16,22
104:4,6,12,19
105:9,19 106:1,
7,16,23,24
107:12,18
108:13 109:11,
19 110:5,11
111:20 112:2,9,
16,25 113:7,16,
20,24 114:12,
19,25 115:17
116:7,15 117:4,
14,22 118:3,10,
16 119:11
120:1,20 121:4,
15 122:2,16
123:9 124:13,
18 125:1,7,18
126:3,25
127:11,13
128:8,16
129:10,25
130:14 131:1,
10,17,22,24
133:2,9,16
134:11,25
135:14,21
136:10,14,23
137:17 138:9
139:3,11,25
140:12,24
141:6,14,21
142:6,12,19
143:7,19 144:1,
7,19 145:4,13
146:10,15,20
147:10,23

148:3,15
150:21 151:8,
13,21 152:20
153:4,25
154:14,16
155:3,9,18,23
159:24 160:7
161:4,17 162:2,
11,19 163:6,14,
23 164:5 165:6,
16,22 166:24
167:12 169:15
170:2 171:1,3
173:25 174:15
175:14 176:1,7,
13 177:2,15,25
178:8,11,12,21
179:1 183:1,15
184:14 186:25
188:4,10
189:12 190:10,
25 192:13,24
193:9 195:11,
17,24 196:3,11,
12,21 197:3,24
198:9,16,25
199:6,7,16
200:13,20
201:2,9,16
202:23 203:7,
24 206:1 207:9
208:6 210:19,
24 211:6,13,15,
21 212:18,24
213:17 214:11,
23 215:5,14
216:4,12,20
217:21 218:5,
19 219:8,14
220:2,10,25
221:6,7,10,16,
17 222:4,5,24
223:3,12,21
224:9,17,23,24
225:10 227:16,
19 229:5,13,22
230:6,15,20
231:2,3,11,22
232:8,12,19,20
233:3,4,12,13,
14,15,23 234:9,
10,11,13,20
235:3,4,6,14
236:25 237:1,9,
11 238:16
239:12,18

241:1,7,13,22
242:14 244:15,
16,25 246:7,15,
16 248:10,11,
18 249:3,6,7,22
250:5,20
251:21,22
253:19 254:25
255:11,12,21
256:1,15 258:1,
7,8,18 259:16,
21 260:6,7,14,
18 261:5,7,11,
16,22,23 262:6,
15,20,24
263:15,25
265:6 266:11,
23 267:5,17,23
268:3,10
269:24 270:1,7,
9,18,19,25
271:2 272:1,11,
12 273:7 274:9,
16,17,18,23
275:5,16,23,24
276:3,11,12,13,
22 277:4,24
278:10,17
279:7,15,17
280:15 281:4,5,
11,12,21 282:9,
13,18,19 283:2,
14,20,24
284:10 285:2,3,
7,8,24 286:13,
17 287:7,13,20,
21 288:2,8,12,
17,18,23 289:2,
10,11,19
290:13 291:4,
10 292:4,9,25
293:13,18,19
294:5 296:6
297:1,2,14,24
298:5,6,10,17,
25 300:8,19,23
301:10 302:2
303:12,19,23
304:9,23
305:20,25
306:7,8,11,24
307:5,6,15,24
308:5,6,12,19
309:3,4 311:9
312:11 313:6,
16 314:16,22

315:2,3,24
316:5,12,21
317:2,12,18,24
318:19 319:4
321:17 322:1,7,
23 323:15,25
324:10,15,16
325:20 326:3,
14,22 327:2,9,
17,24 328:12,
20,25 329:7,23
330:9,14,21,23
331:2,9,18
332:6,13,23
333:4,11,20
334:2,8,20
335:8,18 336:9,
18 337:2,19,25
338:7,16,23
340:22 341:24
342:18 343:22
344:11,20
345:2,13
346:14,20
347:4,15
348:21 349:9,
15,23 350:25
351:11,21
352:5,23 353:9
354:3,12,25
355:12 356:7
359:21 361:13,
18,23 362:3,17,
19,24 363:7,13,
20 364:7 365:1,
7,11,17,23
366:5 368:3,13,
19 369:3,10
370:6

**objections**
10:19,22 132:2,
19 165:12
222:9 235:24
236:3,4,9,11,13
237:18,22
238:1,3,4,19,22

**objective**
199:18

**obligations**
143:18 144:25

**observation**
322:13

**observations**



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

315:18 354:20

**observe**
315:21 316:2,8,
18

**observed**
355:8

**observing**
8:12 322:15

**obtain** 13:9

**obtaining**
138:13

**occasion**
320:11 323:1

**occasionally**
47:8 54:3

**occasions**
176:18,19
276:16

**occupied**
163:17

**occupying**
264:3

**occur** 123:14

**occurred**
193:24 278:19
280:4

**occurring**
353:18

**occurs** 356:2

**October** 192:6,
9 252:8 253:25
254:3,8,9,14
256:6,9,18
266:17 271:9
272:17 358:3

**odd** 12:16

**office** 20:19
23:10,13,24
26:18 30:12
31:25 32:25
33:1,5,10,13
34:23 39:6,25
40:16,19 42:10,
16 43:3 44:18
53:1,18 54:8
57:17 58:6,13,
14,20,25 59:4

60:5,8,10,13,21
61:1,6,14,22
62:1,2 63:10
65:1,8,19 68:1,
2 70:23 71:3,
11,15,18 72:7,9
79:17,22 80:15,
17 81:22 82:4
83:1 85:4
86:17,22 88:1
89:1,8 118:25
119:23 129:21
140:22 143:16
146:8 149:19,
20 155:21
157:14,22
162:13,18
163:22 173:22
176:15 182:5
184:12 189:16
190:22 194:24
195:2 204:18
212:10,11
213:25 226:17
228:8 246:19
251:25 268:6,7
275:1 277:21
278:24 281:9
283:5,19 284:9,
11,14,15,16,20,
25 285:4,6,13,
19 286:1,2,3
288:6 298:4,15
303:10 304:15
306:18,22
308:21 319:13
320:2,6,13,20
321:22 322:6,
16,20 325:14
329:16,21
330:18 331:7,
13 332:1 335:1,
5,14,22 336:3
337:24 339:9
340:11 341:3
342:13,16,23
348:18 351:24
352:15 364:5,
17 365:22
366:4,12,19,20
367:17 369:5

**officer** 8:22
13:19 14:8 15:6
19:23,25 23:6,
21 25:3,17

26:1,19 31:10
32:5,6 38:20,24
39:2 40:13
41:17 42:5,23
43:9 46:25
47:6,24 48:9,
11,18 49:4,12,
16,24 51:14
53:16 54:2 55:8
56:12 57:3
58:3,11,18,24
61:20,22 64:2,
6,12,18 68:15
69:11 70:24
71:4 72:13
73:14 75:3 77:1
81:14 83:4
84:1,18 86:8
91:15 98:14
129:22 157:25
158:3 175:8
195:3 289:8
293:9 298:23
347:24 349:8
350:2,5,12
368:25 369:8

**officers** 15:15
18:1,23 23:15,
16,19 24:3
37:18 43:14
54:1,2 58:21
61:5,10,13
62:15,16 63:6,7
71:16,23,24
82:20 84:13
85:6,14,19
123:12 130:8
136:15 160:18
164:12 175:12,
17,24 176:6,12,
20,25 178:7,18
179:16 277:14
314:25 335:13
350:24 354:23
355:1,4 364:6,
16,20,23
367:25 369:8

**offices** 89:15,
22 163:1,13
282:17

**oftentimes**
123:4,13,14
250:10 321:3
339:17

**Ogden** 11:19

**older** 198:1

**one-on-one**
52:13

**ongoing**
193:23 272:5,6
328:19 367:9

**open** 62:4,12,
22 135:20
136:2

**open-seating**
63:3

**open-type**
62:9

**operate** 22:1,5
27:9 28:25 29:3

**operated** 22:6
134:10 306:17

**operation**
134:12

**opinion** 214:4,
7 220:6,19

**opinions** 81:5

**opportunity**
101:8,15
185:19

**opposed**
135:17 148:22
150:1 154:7
346:11

**order** 143:5
150:4 236:8
325:25 340:10

**ordered** 324:8,
14

**ordering**
372:19

**orders** 35:1,2
48:3 129:18
363:6,12
372:13

**organizations**
335:13

**organize** 97:5

**original**

**Ogden** 201:19,23
207:19 221:2,3,
11 251:20,23
363:21

**originally**
188:3 334:24

**originated**
74:12

**outfit** 69:13

**outlying** 138:6

**Over-** 30:13
37:13

**over-broad**
27:10 32:12
52:1,5,11,15,20
55:15 56:2,6
57:10,21 82:21
85:7,15,21
89:16 90:6
91:20 92:4,12,
20 93:15,25
94:6,23 98:22
100:2,25
101:16,25
104:13 105:10,
20 106:1
109:19 184:14
203:24 244:18
283:2

**overhaul**
335:4

**overnight**
262:3,19

**overseeing**
159:21,23
172:11

**overview**
240:22

---

**P**

---

**P-O** 188:2

**p.m.** 74:25
146:2,5 166:17,
20 173:5 180:9,
12 225:23
226:1 264:16,
19 325:1,4
372:24,25



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273** Phone
**502.584.0119** Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

pad 97:4,5

pages 174:13

Palmer 60:9 73:23

pants 50:4

paper 130:19

papers 130:2,3

paperwork 340:24,25 341:5

paragraph 209:18 272:21 273:20 299:4, 13,19 300:2 312:1,3,16 313:22 356:10, 25 357:3 358:4 361:9

Parcel 12:25

Pardon 171:2 254:4

parent 49:3 101:15 153:14

parents 12:2 125:14,17 247:2 269:16

park 258:14 312:21 314:4,6 356:20 361:10, 12,17

parking 321:1

part 8:5 11:9 13:7 19:16,18 20:13,15 21:2, 18 23:2 55:20 72:22 75:2 115:10 121:6 122:6 134:7,8 158:18 161:1,6, 15 168:11 175:16 178:6 182:24 188:20, 23 211:7 225:15 227:20 228:2 231:9 249:5 265:11 280:22 299:9 303:25 304:4

326:19 331:25 333:16 348:17

partial 13:7 174:11

participate 138:13 182:6 226:18 279:2

participating 86:13 279:10

partner 343:6

parts 158:15 211:24 216:2

pass 16:14 181:2

passed 14:21 16:5 35:9 38:17

passing 309:14

past 190:22 370:22

pat 322:8 323:13 325:10

patience 173:7 209:16 325:12 348:2

Patricia 9:4

patrol 15:6 83:4

patrolman 15:6,7,19,20

patterns 248:22

Paul 42:1

pause 10:20

Pavlik 66:7

pay 136:5

Peck 66:13

pending 327:20,22 330:1 331:13 333:9

penitentiary 29:18 30:5

people 8:8 13:20,22 17:23 18:21,25 22:9 23:17 33:6 41:4 53:7,17,22 54:3,11 65:1 66:3,5,8 73:25 74:5,10,15 81:9 91:19 113:18 116:13 118:1 123:25 125:22 133:24 156:9, 23 157:16 159:11,12 179:5 187:18 188:1,4,19,24 190:9,13 193:22 195:6 201:6 206:14, 16 207:3,20,22 208:8,11 213:8 215:1 219:23 220:1,8 221:20 264:3 276:9 277:9 278:5 284:20 286:5,6, 8 292:15 300:17 302:22 321:4 326:11 332:21 345:25

people's 206:23

percent 216:25 227:24

performance 42:6,7,12,15,19 157:12,13

performed 355:9

period 21:1 31:17,19 41:19 59:1,10 62:20 63:5 168:8 174:8 183:23 203:12 253:25 256:18 271:23 272:4 281:25 327:6

periods 339:18

permanent 23:22

permanently 33:1

permission 131:8 164:12 205:12,18,20 261:24

permitted 144:5,13,16 205:17

person 34:20, 23 36:10 51:5 52:8 57:15,24 59:18 91:18 104:22 109:1 112:20 116:18, 24 118:25 119:5 198:7 221:19 228:4 341:2 357:9

person's 123:25

personal 63:24 79:12 199:9 246:4 260:22,24 261:1 305:1,4 306:21 308:9, 16 324:4 336:12 355:8

personally 77:13 114:13, 18 116:23 134:16,19 176:14 212:5,6 215:6 224:5 234:24 246:8 285:1

personnel 157:18 247:3 349:6

persons 36:10 245:22

pertinent 162:4

perusing 322:20

Peter 267:16, 22

phone 164:3,6,

11,17,21 165:2 273:21 277:16 300:18 362:21

phonetic 66:7, 13 166:2 172:17 201:1

photographs 243:22

photos 206:10, 11 244:6,7 250:8,9,11 286:23

phrase 208:18, 24 263:22

physical 14:20 107:11,17 179:4,11

Physically 130:19

pick 128:21 150:10 160:17 179:20 274:25 275:4,12 283:7 320:24

picked 275:21

picking 128:1, 14 275:17 276:2 338:21

picture 286:12 287:1

pictures 285:15,20,22 286:9,21,22

piece 169:23

pieces 191:4

pin 348:7

place 114:24 115:8 116:6,13 117:9,13 118:2, 7 124:11 147:2 148:1 150:20 178:17 182:24 185:23 224:22 225:4 232:5 233:11 234:6 256:19 273:1 315:18

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**placement**
305:24

**places** 97:10
185:4

**Plaintiff** 326:7

**plaintiffs** 8:10

**plan** 213:14
214:2,18 215:3,
11,12,19 216:2,
11 218:1,3
258:6

**planned**
179:19 210:12,
16 211:3
212:16 353:1

**planning**
302:22

**plans** 215:7
258:13,17

**plausible**
218:3,14

**play** 37:17
222:5 237:17
260:14 266:18
294:8

**playback**
237:14

**playing** 217:4,
9 221:25
294:15

**PLAYS** 28:18
31:5 217:13
222:3,7 237:8
238:7 260:13,
16 268:2
294:13,17,20

**plea** 327:14
330:11

**pleasant**
187:23

**Podolsky**
300:5

**point** 13:9,12
20:2 22:11
60:13 62:23
64:16 65:16
67:2 73:24

80:23 95:16
96:1 100:10,14
123:3 153:8
172:14 184:5
189:7 206:18
211:11 213:15
214:3,22
215:13 223:11,
18 236:18
250:9 259:4
284:25 289:7
293:2 299:3,4,7
335:4,12

**points** 170:11

**police** 13:13,
14,16,19,23
14:5,6,16,24
15:1,15 20:3
21:22 23:5,15,
16,19 26:16,17
32:18 33:17
35:25 40:1,2
46:20 51:13
53:1 54:1,2
61:13 62:14,16
64:1 71:17,22,
23 78:12 82:17,
20,25 84:12,13
85:6,13,19 86:7
91:15 98:13
123:12 129:19
130:8 134:14
136:15 140:15,
18 156:17
157:25 158:3
160:17 164:12
176:11 178:7,
18 179:16
195:3 201:23
207:18 220:14
221:3,13
222:15 240:21
275:9 277:14
306:19 314:25
323:18 326:19
335:2,12 350:2,
5,12 363:14
364:5 367:25
368:24 369:8

**policies** 34:25
36:3,5 47:23
48:3,6,8,12,20,
23 49:2 67:23

**policy** 49:6,9
163:20,25
164:2

**Pope** 188:3

**Popes** 19:4
186:7,10,20,23
187:7,8,15,17
188:9,18,19,22,
25 199:15
206:15 273:24
312:20 313:3
314:2,4,7
361:10,12,17

**population**
134:6 135:17,
23 339:16

**porn** 322:17

**pornography**
290:7

**posed** 252:17

**position** 23:22
64:25 152:21
206:13,15
238:6 265:3

**possibility**
151:2 210:6

**possibly**
147:5,21
203:13 240:13

**post** 286:8

**potential** 332:4

**Pravier** 66:7

**precautions**
320:17,22

**predominantly**
11:18 26:12
29:18 30:4

**preferred**
134:23

**prep** 247:15
341:18

**preparation**
169:14 334:7

**prepare** 158:7
159:1,5,8,15
240:8,11

**prepared**
240:9 311:4,18
313:13

**prepped**
246:17 247:9

**prepping**
247:15

**presence** 49:3
99:11 247:1
332:10

**present** 36:10
57:6 87:14
88:8,12,16,23
90:1,16 91:8,
11,24 92:9,18,
25 93:9 94:10
95:13 96:5
101:8,15 117:7,
21 118:8 119:2,
17 120:8 142:5
146:9,14,17,18
150:20 151:3,6,
12,16,17 152:3,
8,11 153:14,17,
20 173:12
177:1,6 180:13
181:20 182:9,
12,18 185:13
193:22 194:4,7,
10 195:7,8
201:6 221:15
227:10,14
228:19 229:11
231:1,18 239:2,
6,9,17 243:14,
18 245:4,24
246:5,13
247:12 248:7
256:22,25
257:3 267:3
269:14,16,18
273:1 293:10
296:4 312:3,8
314:2 315:5,8
329:15,20
343:10,14
352:18 353:3,
15 365:15,22
366:2,13,20,21,
25 369:6

**presentation**
88:3 149:25

**presented**
183:21

**preserve** 38:1

**pretty** 10:5
39:25 79:23
167:6 175:10
184:16 286:5
323:17

**prevention**
279:10 280:13

**previously**
39:1 112:19
226:2 293:5
327:21 349:2

**primarily**
74:15

**print** 172:6,7
191:13 257:13

**printed** 180:1

**prior** 26:20
39:9 58:18 90:8
168:2 169:7
186:5 188:13
189:16 199:8
202:5 209:1,2
217:22 230:8
258:13 272:13
290:2 294:7
306:4,10 324:3,
13 350:24

**priority** 149:24

**prison** 74:5,8,
12 127:19
132:8 188:21

**prisoner** 119:8
122:10 130:21,
22 154:4,6,11,
15,19,20
161:19 281:24
320:24

**prisoners**
134:9 164:6
321:4 339:19

**prisons** 74:7

**privacy** 62:11

**private** 321:3

**privilege**

Read and Sign copy only

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

279:18

**privy** 246:20

**probable** 225:9 353:24

**problem** 213:22 288:11

**procedure** 299:15,16

**procedures** 34:25 36:3 48:4,7,8,12,21, 24 67:23 128:24

**proceed** 237:3

**proceeded** 291:18

**PROCEEDINGS** 8:1

**process** 69:2 76:21,25 79:13, 20 129:23 162:6,23 202:5 253:24 306:17

**produced** 231:21 241:6

**proffer** 113:19 114:7,10,23 115:3,8,12,16, 23 116:6,13 117:8,12,16 118:2,7,14,20 119:1,10,13,15, 19,25 120:9,13, 15,16,18,19 121:3,9,14,17, 19 122:1 180:1, 3,15 181:3,21 182:15,20 196:20 197:1 223:2 224:22 225:4 226:3,7, 14,16,22 227:10,18,25 228:7 229:12 231:21 232:3 233:9 234:4,5 329:4,9,14,19 330:7 331:1 366:7

**proffers** 114:1 329:4,25 348:25

**program** 252:6 279:3,10 280:5, 13 303:11

**prominent** 18:15

**promises** 119:3

**promoted** 32:1 156:4,11 241:20

**pronounce** 29:15

**proofer** 75:4

**proper** 50:14 219:25

**prosecute** 23:10

**prosecuted** 143:17

**prosecuting** 75:25 286:8 327:15 334:1 337:17 343:21 344:18

**prosecution** 19:10 20:17,18 22:12 23:2,4,8, 9,13 24:2,14,17 25:4,6,10,14,25 31:11 32:5 33:8 38:21,25 39:10, 14 40:5,13 41:1,10 42:5,23 43:10 44:6,15, 17 45:11,23 46:25 47:14,20, 25 48:9 49:13, 17 51:8,15 53:17 55:9 56:13 57:4 58:9,10,12,20 59:18,21 60:22, 25 61:5,11 62:21 64:2,6 68:15,20 69:7 70:25 71:5,19 72:13 77:2,12

78:8 79:6 80:5, 8,18,19,22 81:15 83:22 84:2 143:17 157:4 168:14, 23 172:1 175:9, 13 195:3,4 204:24 242:25 327:6 330:19 332:20 333:2 336:16,21 345:24 348:5, 19 349:14 350:23 351:10 353:19 354:17 359:17 364:1 369:9,14 370:1, 4

**prosecutions** 328:19 335:23 351:19

**prosecutor** 126:17 132:25 133:8,14 141:3 142:4,10,16 143:3 152:1 243:3 287:5 329:10

**prosecutors** 79:7 141:4 354:21

**prospective** 164:23

**protecting** 160:18

**protection** 23:17 129:18 219:2 252:5 303:11 306:6 363:6

**protective** 129:24 130:23 131:5,20 132:25 133:7, 13,15,20 134:10,13,18, 24 135:8,11,19, 24 136:8,19 137:16,25 138:8 159:21 160:3,5,11,15 161:14,24

162:17 163:12, 21 164:3,14,18 165:5,15,20 274:14,15,19 276:20 277:10 289:9 339:7,12, 13 340:3

**protocol** 164:3,10

**protocols** 128:1,4,14

**prove** 106:3

**prover** 85:25 86:1 88:12,15, 18,24

**provide** 122:7 142:17 143:4 224:21 359:17

**provided** 35:21 217:18, 19 331:14 346:18 370:3

**providing** 293:11 332:2

**Ptak** 66:14 170:10,13,21 194:8 244:1

**Pulaski** 12:4

**pull** 202:9,14

**Pulling** 204:5

**pumpkin** 204:5

**punitive** 370:15,20 371:1,6,7,8

**purpose** 304:13

**purposes** 64:9 74:9 124:14 330:17 355:18

**pursuant** 113:18 120:18 121:3,14 196:19

**put** 14:14,15 33:2 89:4 231:9 235:23 244:13 277:16 278:18

300:4,17,25 316:3 340:3,10, 19 348:7 350:18 351:16 357:3 362:20

**putting** 319:1

**Q**

**quarter** 308:10

**quarter's** 299:14

**quarters** 274:19,21 275:4,12,15,22 276:10,24,25 277:3,10 278:6, 18 281:25 282:1,8 283:7, 11 290:4,7,12, 18 292:16 296:24 297:13 300:18 301:21, 25 305:24 306:6 307:23 308:4,17 309:1 320:13,20,25 323:2,17 339:6, 9 340:8,12,15, 18,19 341:3,11, 17,22 342:4,8, 23 362:16

**question** 10:8, 10,15,17,19 11:2,3 27:18 28:10,11,18,25 31:3,5 48:16 68:19 90:22,24 108:4 117:1 132:15,17 155:16 161:12 175:2,20 214:8, 12 216:22 217:13 222:3,7, 8 235:12,20 237:5,8,21 238:2,7,20 245:9,14,16 246:12 249:13 252:17 256:7 258:20 260:13, 16,17 267:18 268:2 269:13



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273** Phone
**502.584.0119** Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

282:5,23 294:2,
6,13,17,20
295:2,6 300:9
302:23 307:10
324:5 343:25
350:8,11
355:15 357:7
369:25

**questioning**
56:24 248:3
305:12 348:14
364:3 370:15

**questions**
57:15,19 81:11
132:14 161:21
190:19 197:10,
12,14,15 236:2,
7 294:9 295:11,
21 296:20
302:24 304:11,
19 323:21
324:21,22
334:12 348:1
358:7,9,16
359:22 370:9,
20,25

**quick** 10:6
128:7 172:25
225:18 366:18

**quickly** 346:25
355:17

**quote** 356:16

_____
**R**
_____

**R-A-D-K-E**
41:15

**radio** 15:22

**Radke** 41:13

**raise** 9:11

**raised** 11:20
98:25

**ran** 185:7
206:13 363:11

**randomly**
344:14

**re-** 112:11

**re-ask** 175:20

**re-**
**characterizing**
90:9

**re-interview**
112:20

**re-interviewed**
112:14

**reach** 276:20

**reached**
119:20

**reaching**
276:23

**reacting** 22:10

**read** 193:1
201:23 222:15
223:8 245:8,10,
12,19 246:8
247:14 273:20
294:7 300:12,
14 312:2,5,19
313:21 314:9,
19 356:20,25
357:2

**reading** 201:18
248:8

**ready** 28:16
310:1

**real** 128:6
191:12 366:18

**realize** 180:1

**realized** 172:5
182:1

**reason** 228:1,8
229:10 271:25
292:6

**rebuttal** 302:19

**recall** 16:23
66:8 78:11,17
90:8 94:18
118:4 120:10
122:17 126:12,
21 164:20
165:17 170:19
173:10 179:14,
25 182:22
188:20 195:19
196:5 197:14,
20 206:8

209:14 240:13,
14 246:9
249:14 251:2
256:3 258:2
261:17 266:19
267:10 274:24
278:9 281:6
287:15,22
288:3 290:15
293:7 313:22
320:22 327:23
341:12,15
343:10,13,14
351:20,22
364:21 366:25
367:13,19

**recalled** 251:6

**receive** 46:24
47:7 341:7

**received** 56:4
274:4 293:8
333:8,15 346:5

**receiving**
343:19,23

**recognize**
226:12 291:3,6
303:6,13,14
304:12,17
311:2,17

**recollect**
185:14

**recollection**
72:1 148:6
166:4 169:13,
19,20 199:9
213:2 241:15
257:5 264:22
269:21 291:22
318:8

**reconstructio**
**n** 89:17

**record** 8:3,7
74:22,23,24
98:2 99:1,4,20
141:4,12,16
146:1,3,4,13
147:1,12 148:1
151:6,11,17
152:19 153:13,
16,19 166:17,
18,19 173:2,3,4

180:5,8,10,11,
24 181:22
194:18 206:19,
22 217:8
225:22,24
226:1 231:18
235:23 257:3
264:16,17,18
275:8 311:1
325:1,2,3 362:2
372:7,23

**record-keeper**
138:25 139:2,7

**recorded**
99:13 129:14
141:19 142:25
143:5 146:7,17
152:4 204:19,
21 207:10

**recording**
98:15 129:23
130:19 139:10,
13 151:1 152:7,
18 194:1
272:22

**recordings**
140:6

**recordkeeping**
174:2

**records** 124:2
130:9 139:8
205:6 257:2
306:5,12,22

**RECROSS-**
**EXAMINATIO**
**N** 366:16

**recruited**
15:12 17:5,14,
23,25 19:23
22:12 32:25
33:4

**recruiting**
17:19

**redecorating**
286:20

**REDIRECT**
359:23

**reduce** 44:25
146:24 183:7

192:11

**reduced**
148:12 192:6,7
193:16,17
239:10

**reduces** 86:4

**referred** 293:7

**referring** 200:1
204:11 253:21
256:8 319:20
326:8 355:4
357:8

**refers** 356:23
357:16,20

**reflect** 201:3
224:6

**reflected** 38:5,
7 142:25 206:8
207:11 257:11

**refresh** 264:21
291:22

**refused** 266:14

**regard** 166:24

**regime** 65:18
156:19

**regular** 46:24
47:7 52:4 53:6

**rehab** 127:10,
12,15 251:5,9

**rehabilitation**
126:11

**related** 21:9,15
48:21,24 164:2
168:6 185:10
293:4,5 299:9
313:23

**relating** 197:16
314:5

**relation** 35:6

**relaying**
220:16 357:11

**reliability**
218:21

**reliable** 220:17

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273** Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

remain 34:1

remaining 330:19

remember 13:3 16:2 18:23,25 19:6 24:7,20 25:13,16 27:18 28:11 30:7,9 31:11,16,23 32:20 34:20 38:18 42:1 46:17 53:21,24 54:11,15 58:2 60:19 66:12 71:20,24 72:5 78:18,19 81:10 83:6,19 85:23 89:14 94:22 96:20 99:7 107:4 120:3 122:3 127:16 136:7 138:11 154:24 155:5,22 164:13 165:4,14 166:2 167:4,9,18 168:3,4,5,13,19,25 169:6 170:7,13,17 171:17 172:18 173:8,10,15 176:21 177:4,5,18,20,22 178:2,3,5,6,10,14,16,20 179:3,15,18,19 181:20 182:1 184:11,19,20 185:1,2,7,12,18,21,24 186:15,16,17,19,22 187:25 188:11 189:3,9,19,23,24 190:1,18 192:14 194:14,16 195:9,13 196:24 197:8,9,12 198:17 199:24 200:8,23 201:25 202:3 203:5,11,19 205:19,20,23 206:6,21,23 208:25 209:24 210:14 211:16

212:2,3,10,19 216:22 217:23 218:1,9,12,16 219:10 228:12,19,21 229:7 235:19,21 239:16,19,21 240:4,15 241:20,25 242:1,10 243:14,16,18,20,25 246:19 247:3,6,8 248:24 249:2,20,24 250:13,24 251:13,18 252:7 257:3,23 258:4,10,16 259:8 261:2,12,14 262:3,19 263:2,5,8,11,16,19 265:10 266:4,8,9,13,20 267:8,14 268:4 271:8,11 275:7,17,18,20,25 276:2,23 277:16 278:4,7,13,14 281:8,19 282:10,14,24 283:17,21 284:3,4,6,17,24 285:10,15 286:2,11,25 287:9,17,24 289:3,14,17,18,21,24 290:11,17,22 291:8,11 292:18,22 293:10,15,17,24,25 294:10,25 295:1,4,20 296:11,14,22 297:4,8,9 298:3,12,21 299:1,15,18 301:8,15,16,19,23 307:20,22 308:1,24 314:15 318:14 343:17 350:3 351:18,23 352:10 361:11,17,22 367:2,3

remembered

314:6

remembering 67:13

remembers 277:6

remove 130:20

repeat 27:19 216:23 265:14 267:24 295:21 296:20

repeated 238:20 274:6

repeating 236:2 237:10

rephrase 10:8 76:6 102:1 344:4

replay 236:5

replayed 237:21

report 36:1,4 37:6 38:5,7,15,22 39:7,8,21,22,24 40:2 68:4 86:5 93:1 101:3 129:16 140:8 142:1 147:8,12,21 148:1,7,14,19 149:1,8,11 153:10 165:19,21 169:20 182:23 183:2,7,13 184:2,9 192:1,7,19,23 193:2,12,18,21 194:21 196:8,12,13 199:24 200:9,10,16,21 201:8 207:10 209:15 224:6,11 229:2 230:5,18 231:18 232:11 234:8 238:14 239:10,11 246:9,23 247:21 248:8,9,17 249:5,20,24 250:3,17 253:21,23,24 254:20 255:18,

20,24 256:21 257:7 259:10,15 263:6 265:17 267:6,12 269:1,22 270:13,20 271:21 291:3 296:3 300:25 301:18 310:25 311:2,4,7,15,17,18,22 312:1,13 313:13 317:17,23 337:12 355:22 356:10 361:21 362:6

report's 292:7

reported 143:13 157:5 289:8 296:5 299:20 308:25 313:24

reporter 8:3,6 9:10,16 10:13 11:6 24:23 27:12,14 28:18 31:4,5 74:21,24 95:8,13 145:21 146:1,4 166:16,19 173:1,4 180:6,8,11,20,22 181:10,12,14 217:2,4,8,11,13,15 221:24 222:2,3,6,7 225:22 237:5,7,8,13,16,19 238:7 260:13,15 264:15,18 268:1,2,18,20 271:15 294:13,16,17,20 298:9 302:4 309:8,12 324:25 325:3 371:20,24 372:2,4,6,10,13,16,19,23

reporting 39:1 68:10,17 192:5 273:2 291:18,19 293:6 298:3 299:21 300:3

reports 36:9,15,20,25 37:20 39:11,15,18 123:12 140:11,15 150:1,18,22 158:9,12 169:17 178:2 183:22 187:12 189:7 191:10,16 194:19,23 201:18,19,23 207:7,18,25 208:10,12,15,16 221:3,11,13 222:16,22 223:9 231:6 234:19 235:2 240:20 246:13,18,20,24 247:14 255:3 310:5,21 314:19 317:10 334:13,15,17 336:25 337:7,9 365:5,8 371:22

REPOTER 260:16

represent 310:3 325:8 347:23 348:10

representing 9:6,9

reprint 180:4

request 45:9,14 46:2,6 55:17,19,22 56:8,10 57:23 69:5,9 108:2 130:6 170:5 174:12 175:18 240:21,25 241:12 255:9 283:5 284:1 338:4,6,10 339:2 341:19 343:20 359:18

requested 28:18 31:5 72:25 107:9 217:13 222:3,7 237:8 238:7 260:13,16 268:2 281:20



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

283:17 284:5,6 294:13,17,20

**requesting** 55:20 65:2 338:15

**requests** 24:10 107:1,5

**require** 69:19 250:8

**required** 340:10

**requiring** 97:8

**reread** 294:7

**reserve** 309:5 370:12,14 372:9

**reserving** 309:14 372:18

**resided** 12:5

**residencies** 122:25

**respect** 326:6 348:18 349:13, 20 353:18,19 354:16 355:7

**respond** 15:17 359:18

**responding** 15:24

**response** 87:6 237:14

**responsibility** 86:23 87:6 98:10 102:19

**responsible** 138:16 160:11 343:6

**rest** 65:11 309:5

**restart** 359:1

**restating** 90:10

**restraint** 321:12,16

**restraints** 323:5

**restructuring** 65:20

**result** 121:18 333:7

**retained** 173:22

**retire** 32:18,23 33:11 95:18

**retired** 23:21 32:20,24 58:2 156:17 325:13

**returned** 133:15

**revealed** 230:3

**review** 42:7 130:21 158:10 169:14 240:15, 19 241:11 255:25 318:2

**reviewed** 240:16,20

**reviewing** 158:8 323:20

**reviews** 42:6, 12,15,20 157:12,13,16

**RI** 272:22

**rid** 153:9

**ride** 127:2 202:16

**Ridgeway** 188:15

**Rights** 33:22, 24

**righty** 319:7

**RIS** 273:22 291:21

**roam** 342:15

**robberies** 21:8

**role** 15:5,11,18 16:3,25 17:2 21:24 22:4 25:3 26:11 27:1

32:11 40:6,8,12 41:12 42:25 53:22 54:10 56:12,20 57:9 65:5 66:19,21, 22 75:3,6 80:25 82:5 83:14,17 84:6 108:17 122:7 126:16 134:16 138:24 153:23 154:5 159:21 190:15 221:4 266:18

**roll** 28:16 202:9,15 204:5

**room** 8:8 122:12,15 154:9,12 160:21 161:20 163:5 284:18 299:23 318:12

**rooms** 89:6 163:8,10,17 186:1 284:18

**rotated** 22:17 32:1

**route** 209:7 248:22

**Royals** 73:22

**Rukn** 29:10,12, 13,15,18,22,23 30:3,8,11

**Rukns** 319:12, 21

**rule** 10:19,22 38:16 342:2

**rules** 10:6 34:19,21 35:8, 10,14

**run** 47:20 339:20

**running** 213:5

---

**S**

---

**SA** 94:17

**safer** 135:17

**safety** 74:8 206:19 207:1 320:16,17

**sake** 158:22 207:1

**sandwich** 137:6,13

**Santillo** 300:5

**sat** 158:13 193:18 348:25

**saving** 277:10

**scene** 106:14 206:9,12 209:4, 5,7 210:8 243:23 248:17, 20 249:14,21 250:4,18 273:12

**school** 11:22 12:7,8,11,12, 13,14,18 16:12, 17,19,22 17:3 125:13,15,16, 23 126:1,20,21 247:2

**schools** 11:21 14:17

**scope** 25:20 26:5 36:17,22 37:7,13 38:3 40:23 45:6 48:15 49:1 53:10 54:20,25 55:5 70:8 76:12 78:6 81:12 117:24 362:24 363:8 371:2,3,4

**Scott** 8:14 9:9 167:20,22,25 168:11 184:22 189:17,20 190:18 194:7 196:1 197:15 199:13 203:17, 20 218:6,12 240:10 244:8 284:6,9,24 287:4,11,18,25 288:6,10,15 310:4 315:21

316:2,8,18,24 317:8,15,21 320:2,5 322:17, 19 324:12 327:5 336:6,12 337:6 343:20 351:24 353:1 364:4,5,16,19, 23 366:11 367:22,25 368:23 369:7

**Scott's** 322:16 366:19,20 367:17 369:5

**screwed** 235:15

**scrutiny** 119:23

**scum** 188:7

**Sean** 9:1 243:17,19 260:22

**search** 206:9 322:4 323:13

**seconds** 302:11 309:12, 13

**secretaries** 286:4

**Secretary** 124:5

**section** 23:17 40:1 133:22,23, 25 134:5,13 285:11 339:14

**sectioned** 134:7

**sections** 15:16 74:10

**secured** 323:18

**security** 117:17 122:7 343:6

**seeking** 341:2

**sees** 339:25

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Senior** 273:3, 21

**sense** 10:23 15:21 50:12 88:19 135:16 139:7 322:12

**sentence** 265:21 312:2 356:16

**sentences** 148:21 312:19

**separate** 42:15 65:11 191:10

**September** 169:5 178:7,19 226:19,25 228:16 229:2, 12 230:19 232:5 233:9,21 234:6 238:15 292:7 314:25 315:9 348:9,11, 16 349:7,13,22 351:5 352:4 356:2

**serial** 204:13

**serve** 75:4 88:15 139:19 328:6

**Service** 12:25

**serving** 82:9

**set** 120:8 128:20 149:17 150:4 305:11

**sex** 73:1 319:12

**Shae** 325:10

**shaking** 11:5

**shape** 340:5

**share** 355:16

**shared** 201:25

**Shea** 9:4,7

**sheer** 123:16

**Sheriff** 23:15 71:23 339:21, 24

**sheriff's** 54:2 62:15 63:6 71:17 129:19 134:14 136:15 160:17 164:12 275:8,12,13 277:14 306:18, 19 340:3 362:18,20 363:14

**sheriffs** 130:7 335:12

**shirt** 50:4,19

**shoot** 203:3 264:3

**shooter** 222:23

**shooting** 193:23 202:15 208:23 209:20 211:8 221:15

**shootings** 185:8 202:16

**shopping** 136:16

**short** 168:8 174:8

**shortage** 170:14

**show** 70:17 184:9 191:2 226:2 263:5 264:11 300:6

**showed** 232:4 265:13,25

**showing** 165:4,8,14

**sic** 273:23

**side** 12:3 15:2 19:9,13 30:4 41:7,12,21 73:19,21 186:8, 13 187:6,8,10, 11,13,14 188:25

**sided** 191:16

**sign** 115:11,12 116:25 119:14

131:6 152:9 155:1 227:24 253:17 254:24 342:22 343:1

**sign-** 130:17

**sign-ins** 130:13

**sign-off** 130:7

**signature** 226:14 227:12 372:9,18

**signed** 116:9 130:3,19,24 153:1,23 154:6, 25 155:2 160:16 181:21 182:1,15 227:11,14,18 228:7 229:12, 16 246:21 254:21 272:18 329:14,19,25 330:7,11 331:1 336:25 337:7 343:5

**significance** 292:24

**significant** 216:8,9 297:11

**signing** 154:23

**signs** 255:18

**silent** 34:1

**similar** 10:5 11:9 216:3

**similarly** 87:5 343:1

**Simon** 73:22

**simply** 346:11

**sir** 9:11 93:4 242:4 245:20 269:13 271:8 310:4,23 311:1, 11,22 312:13, 22 313:9,13 314:10,24 316:18 318:2,6 319:7 320:1,9 323:20 325:7

327:1 330:7 347:23 355:15, 19 358:6,19 369:17

**sister** 12:3

**sit** 160:22 161:10 321:8 341:9,13 350:21 351:7

**sit-down** 364:9

**site** 83:3

**sits** 86:2

**sitting** 62:4 238:13 328:13

**situation** 64:24 298:3

**sized** 320:5

**skip** 193:25

**skipped** 194:10

**slang** 204:3,6

**slip** 45:9,15 55:10,14,17,24 56:5 130:6 167:16,19 169:24 170:5 173:18 174:12 175:3,4,12 244:3,14,24 245:1 338:6,10 339:2 341:19 343:20

**slipped** 284:20

**slips** 69:5,9 173:21 174:6, 25 175:18,23 240:21,25 241:12 283:12 338:4 359:18

**slow** 148:20

**small** 320:4

**so-called** 74:10

**soft** 50:4,18

**solemnly** 9:12

**solid** 13:18

**solve** 325:25 328:24 346:16

**solved** 326:18, 19

**someone's** 260:4

**son** 273:23

**Sopron** 8:10 172:17 180:16 191:8,24 218:3 239:25 240:5 242:4 245:3 252:12,23 268:18,23 269:4 271:17 272:4 288:1 290:25 291:17 307:3 311:1 313:4 314:3,7 323:23 348:11 352:3 353:25 362:9 368:1,10, 17,25

**Sopron's** 286:11

**sort** 75:13

**sound** 217:9

**sounded** 218:14 220:16 227:5,6

**south** 30:4 186:8 187:6,11, 13 188:25

**space** 62:18

**speak** 13:21 56:9,24 57:23 133:25 247:16 266:6,14 271:5 273:14 284:8 329:15 359:13

**SPEAKER** 147:17 150:6, 10,15

**speaking** 22:9, 22 88:19 132:1, 7,19 235:24 236:4,11

Read and Sign Version Only

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273** Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of NORFIS BISIOLLA, taken on August 22, 2023

405

238:21 245:22 350:22

**speaks** 196:12

**special** 133:24 168:13,23 171:25 287:5 335:23

**specific** 29:6 39:19 65:17 73:8,11 81:16 107:1,7 119:10 121:13 125:5 132:16,22 206:6 248:3 282:6 367:15

**specifically** 19:12 30:9 64:18 65:23 66:9 108:25 312:15 336:15 363:18

**speculating** 295:5

**speculation** 38:10 43:17 64:8,21 68:5 75:14 76:14 79:15 87:22 96:9,15 98:4 99:17,22 110:6, 11 112:2,9,16 119:12 120:20 131:11,17,24 132:3 133:3,9, 16 134:11,25 135:15 138:9 139:4 141:8,21 142:6,12,19 143:7,19 144:1, 8,19 145:4 146:15 151:22 162:20 163:6, 14,23 165:16, 22 173:25 175:14 176:1 178:22 179:1 183:15 190:10, 25 195:11,17 196:4 197:24 198:9,16,25 199:7,16 201:9 210:19,24 213:18 214:24

220:2,11 223:3, 13,21 228:11 229:5,22 230:21 231:2, 11,22 232:13, 21 233:14,24 234:9,20 235:3, 7 236:3,24 239:12 241:2, 13 242:14 244:15 248:11 250:21 251:21 254:25 255:14 256:17 259:1,6, 21 260:8 262:6, 15 263:17 265:7 266:12, 23 268:10 269:25 270:8 272:13 273:10 274:9 277:4 278:17 283:3, 14 292:9 293:14 297:15, 24 298:7,18 300:23 306:1 308:5,13,20 317:3 365:24

**spell** 41:14

**spelled** 9:23

**spent** 12:10 31:24

**spics** 188:3,4

**spoke** 165:2 242:5 243:21 245:3,23 247:12 268:7 269:14,15 270:22 330:6, 25 356:17,22 357:8,12

**spoken** 247:21,25 271:3

**sports** 50:13

**spot** 63:21

**sprays** 208:23

**staffing** 51:16, 17,25

**stamp** 191:15, 20 226:8

**stamped** 302:6 312:14 313:11

**stand** 101:21 102:4,11 187:16

**standard** 34:19 149:10 236:25 237:1

**standing** 187:9 236:8

**standpoint** 214:17

**stands** 188:2

**start** 8:7 10:15 13:12 22:25 25:24 29:20 38:13 40:8 42:11 58:5 64:25 66:18 74:8 114:21 123:13 125:3 148:18 188:5 191:23 197:16 245:6 310:15, 16

**started** 23:12, 13,18 36:15,20 40:8 41:10,12 42:22 44:5,20 45:22 46:14 47:13 54:10 59:10,13,22 63:9 65:4 67:11 70:12 71:14 74:4 75:8 94:10,16 96:2 111:15 156:23 186:23 224:15 279:11 306:22 319:1

**starting** 245:10 318:25 360:2

**starts** 180:20 312:16 356:11, 12

**state** 23:16 45:3 53:25 62:14 71:17,22

79:22 117:21 119:18 124:5 127:2 143:23 150:23 265:4 310:6 311:23 313:2 314:13 318:9 319:3 326:11

**state's** 9:2 20:18 23:10,12, 14,23 24:7,10, 13,16,18 25:5 26:17 30:11 31:11,14,16,24, 25 32:25 33:1, 4,7,10,13 39:6, 25 40:9,16,19 41:21 42:9,15, 16,19 43:3,14 44:18,20 45:4, 14,16,18 47:21 51:22 52:9 53:1,18,22 54:7,8,12,18 55:10,16 56:9, 14,20,25 57:14, 22 58:5,14 61:14 62:11,17 63:10,14,18,25 64:5,12,14,17 65:1,5,8,14,19, 22 67:16,22 68:1,2,20 69:1, 5,14 70:4,13,23 71:2,6,11,15, 16,18 72:20 73:3 75:9,12,23 77:7,23 78:22 79:1,2,17 80:9, 13,15,17,20,22 81:1,20,22 82:4 83:1 84:5,18 85:4,5,19 86:16,22 87:7 88:12,16,25 89:8,14,19,21, 25 90:13,15 91:2,8,11,25 92:9 93:23 94:10,17 95:14, 17 97:20 98:11, 25 99:19 101:4, 22 102:12 103:9,19 106:19,20

108:7,17 109:5, 17,23 110:3,9, 16,19 111:18 112:4 117:17, 18 118:7,25 119:6,23 120:6 121:12,16,21, 24 122:8,14,19 123:7 127:19, 24 128:15,18 138:16,24 139:20 140:2, 19,21,22 141:18 143:16 145:10 146:7 149:14,19 152:25 156:16, 20,21,22 157:14 158:13 161:6,14,25 162:17,21,25 163:13,17,22 165:4,14 167:20,22 171:24 173:8 175:4,5,18,23 176:25 177:5 182:5 192:11, 20,22 194:2,7, 24 212:11 213:19,24 225:7 226:17 229:25 232:17, 25 240:9,11 242:23 244:8, 12 246:19 250:2,18 251:1, 5,10,24 255:7, 24 257:23,24 259:23 260:3 273:11 275:1 277:20 278:7, 24 281:9 282:25 283:4,5, 10,18,21,23 284:1,3,4,19 288:25 289:4 297:23 298:4, 14 303:10 304:14 306:5, 12,21 307:18 320:6,13,20 321:22 322:6, 16 325:9,13,18 326:2 327:14 328:3,18,19,23



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

329:9,15,20
330:12,18
331:7,12,15
332:1,2,3
333:25 334:14,
23 335:1,5,14,
21 336:3 337:5,
16,22,24 338:4,
15,19 339:8
340:7,11,18
341:1,3,16
342:12,16,23
343:11,15
344:9,17
345:23 348:18
349:6 355:6
365:21 366:3,
12

**stated** 154:21
258:12 273:21
291:18 313:25
314:5 318:3
362:18

**statement**
92:11 105:7
107:11 120:18
122:1 139:16,
17 146:7
152:10 153:1,
22,23 154:6,13,
22,24,25
259:17 260:4,5
293:11 298:22
345:6,19
346:11 360:4

**statements**
34:15 105:18,
24 119:24
120:12 139:10
142:25 143:5
152:3,15
205:24 206:12
209:6 211:19
217:18 310:6
319:8 331:22,
24 332:10
345:8,9 360:1

**states** 149:23
270:20 304:11
305:6 312:20
320:2

**stating** 236:12

**Station** 15:14
60:10

**status** 343:8

**stay** 33:12
60:21 154:5,9,
12 155:7

**stayed** 58:8,10
155:13 287:4

**step** 123:17

**Stephenson**
8:13 28:4,8
31:2,6 90:4,17,
21 128:6
131:22 132:6,
12 141:7,23
144:9 166:6,11
169:15 177:15
178:8 180:23
181:3,11,17
191:5 224:10
225:17,21
226:7 230:8
302:12,24
309:16,25
310:3,8,16,19
311:10 312:12
313:8,17
314:18,23
315:7,13 316:1,
7,17,23 317:5,
14,20 318:1,20
319:6,18,25
321:19 322:3,
10,25 323:19
324:2,11,20
358:13 362:3
366:17 368:5,
15,21 369:4,12,
16 370:18
371:10,15
372:15

**steps** 94:21
95:2 211:18
212:10,22

**Steve** 9:4
325:10

**stint** 20:15

**stole** 322:14

**Stone** 19:4

**stop** 95:16

**stopped** 46:19
265:11,23

**stores** 13:3

**stories** 113:12

**story** 87:15
92:1 112:23
113:4 220:16

**street** 12:9
13:21 15:14
19:15 21:17
22:3,10 27:7
37:17 57:16
61:23 73:23
88:1 89:3 91:1,
3 121:10
125:15 206:14,
15 273:24

**street-by-
street** 202:13

**stretch** 309:21

**strictly** 15:17

**strike** 48:7
49:21 88:11
103:7,9 120:6
200:9 228:22
250:24 260:21

**stuff** 167:8
202:17 277:18

**subject** 119:1
194:2 314:8

**subjects**
179:21 353:5

**submit** 37:15,
19 38:17 46:6,
10,15 153:10

**submitted**
38:14 140:8
158:9,12
167:18 197:17
240:22 246:18,
24

**submitting**
38:13,22

**subpoena**
55:21 154:8

**subpoenas**
82:9 328:6

**substance**
293:4

**substantially**
311:8,14

**Suffield** 9:3,7

**suggest**
345:18

**suggested**
109:17 111:21
359:10

**suggestions**
236:17

**suit** 50:9,14,21
69:19

**Sullivan**
173:11 325:9
337:11 343:16
368:9,24

**summaries**
140:4 334:15

**summarized**
230:25

**summarizes**
311:22

**summarizing**
139:16,17
231:8

**summary**
36:13 140:9,11
142:1 148:12
192:12 270:15
311:23

**summer** 350:1,
4,8,11,15

**superintenden
t** 157:22

**supervise**
157:8 160:2,10,
14 172:16

**supervising**
160:4 343:24

**supervisor**
19:22 22:15,19
40:12,18,19,22

41:3,6,11,16,20
45:10,15,16,19
55:25 66:25
67:2,8,12 69:4
155:20 156:4,5,
6,7,11 157:2,3,
11,15 167:1
168:21,22
172:13,15,21
174:7,23 175:3
177:24 241:21
242:2 255:18
278:2 291:20,
23 292:7,15,17,
18 293:3 299:8,
14,20 300:3
336:21 341:23

**supervisors**
22:17 42:2
337:23

**supplied**
123:11

**supply** 158:11
301:11

**supplying**
301:8

**support**
325:19 326:6
328:2 332:2
333:16 359:17
363:19,22,25
370:3

**supporting**
344:17

**supposed**
69:13 140:7
209:25 227:7
231:17 355:2

**supposedly**
190:5

**suspect** 88:20
201:14

**suspects**
35:16 44:25
82:9 142:11
179:10,13,16
315:1

**SV** 157:7

**swabbing**

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

204:14

**swear** 9:10,12

**swearing** 318:12,15

**swiftest** 292:13

**switch** 319:7

**switched** 68:14

**swore** 99:19

**synchronizing** 148:14

**system** 29:18 30:5 74:5,12 79:10 82:23

_____

**T**
_____

**table** 321:8,9

**tactic** 98:20

**tactical** 18:1

**tactics** 98:18, 21,23

**tail** 172:23

**takes** 86:4

**taking** 131:22 132:7,9,10,24 152:6,17 153:1, 22 346:11

**talk** 10:14 57:5 128:14 184:22 190:6 265:12, 23 266:10 280:9 282:16 287:11 330:4 331:22,23 334:22 336:6 338:3 339:5 348:24 350:20 352:16 353:1

**talked** 88:10 93:21 184:20 206:14 207:21 219:5 264:2 287:18,25 329:3 347:12 353:5 355:25

364:9 369:25

**talking** 10:16 14:15 27:7 28:17 41:24 57:17 65:14 66:9 80:5 85:1 89:19 90:25 91:1 104:14 106:11 107:7 108:15 121:9 127:3 129:18 136:4 152:5 154:3 185:1 202:24 214:17 253:8 254:9 267:19 277:8 296:18 304:1 326:8 348:13 351:4,8 353:4 364:16

**task** 15:13,14, 18,25 16:1,4 22:20 23:3 45:19 71:10 149:8 229:25 244:20 338:14

**tasked** 82:7 92:10

**tasks** 44:17,20 45:4 170:3 344:21 353:3 364:20 367:23

**teacher** 49:3

**team** 52:4,18, 22 242:7,13,16, 17,21

**teams** 342:4

**telephone** 276:24 293:5 299:15,16 300:6

**telling** 101:4 106:4 184:11 185:3 201:20 202:14 218:2, 22 224:15 313:2 345:6 351:24 357:23 367:22

**ten** 32:15 66:8,

13

**ten-minutes** 348:1

**Tennessee** 265:1 269:16 271:6 356:2

**tenure** 111:12

**term** 110:20 111:2 202:9,11, 13,18,21 337:23

**terminated** 158:18

**terminology** 264:1 329:5

**terms** 119:10 202:24 203:22, 25 204:3 328:2 345:6,10

**test** 16:6

**testified** 10:3 83:7,17 86:7 240:16,24 248:6 259:5 269:17 270:14 307:3 334:25 349:2

**testifies** 358:2

**testify** 25:8 50:20 69:20 82:14 83:13,22, 25 84:6 87:21, 24 88:1,7 101:7,14,21 102:4,11 150:19 151:3 240:8,12 266:16,18 268:8 270:10 331:16

**testifying** 240:4 248:7 347:3,13

**testimony** 9:13 20:8 30:1 61:8 74:11 87:14 90:5,9,18 100:18 106:24 121:13 177:16

196:18,19 197:2 199:8 212:16 216:10, 19 217:22 218:14 219:9, 15 220:11 230:9 232:23 233:15 241:19 242:11 247:6,8 259:12,18,19 270:22 271:1 272:13 290:14 296:13 315:3,4 318:7 320:11 331:3 349:16 351:6 352:24 362:4,18,19

**that'd** 47:11 60:2

**that'll** 10:17

**theory** 232:18

**there'd** 75:22 107:1 130:6 250:7

**There'll** 302:24

**thereabouts** 13:8

**thing** 10:16,18, 25 21:11 27:22 37:17 69:19 150:2,15 163:2 164:25 172:6 174:20 177:9 181:2 185:6 213:13,20 236:23 240:23 286:6

**things** 13:3 15:23 37:5 65:12 81:5 82:11 122:25 140:23 141:19 173:13 184:12 198:20 204:7 206:3,4 208:21 209:11 213:6,7, 8 234:23 236:10 247:2 316:25 318:3 319:9 322:22 329:3 330:5 349:1 367:7

**thinking** 64:19, 23 199:18 204:12

**Thomas** 170:10 194:8 244:1 271:9 272:25 273:3, 20,23 274:4,7 291:21 350:16 351:18

**Thomas's** 273:2

**thought** 21:15 33:3 75:16 110:13 121:7 140:14 190:12, 15 213:20,25 218:2,22,24 220:22 224:5 254:12 297:17 360:17

**threaten** 101:22 315:22

**threatened** 99:3 321:5 358:19 359:2

**threatening** 99:7

**threats** 252:6

**three-page** 174:12

**throwing** 167:7

**tie** 50:6,19,21 69:20

**tied** 15:22

**till** 183:21

**time** 11:1,4 12:16 13:23 15:4,14 17:16 18:7 20:13,22 22:16,23 23:11 24:4,6,11,15, 19,22 25:20 26:5 30:24 31:17,19,24 32:4,7,9,10,15 33:3 34:21,22 36:14,17 37:19

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

38:19,21 39:10
40:23 41:17
42:4 45:6 48:2,
14,25 49:8,10
50:24 53:3,9,19
56:21,23 58:23
59:1,10 60:3,
21,25 61:4,18
62:20 63:5
65:9,21 66:6,18
67:7,12 70:8
72:20 73:10
74:24 75:21
76:11 78:2,5,
17,25 79:15
81:12,16 83:7
84:25 85:23
89:7 95:9,24
96:1,2,4 100:2,
19 103:4 109:8,
16,20,22
118:19 123:14
129:20 130:20,
21 131:6 137:7
138:5 146:1,5
148:21 149:10,
17,21,22 150:4
151:19 152:21
154:17 156:14,
19 157:6
160:12 165:7
166:20 167:24
168:8,12,16,21
169:23 170:12
174:8 183:23
184:6 186:2
188:18 197:19,
20 203:4,6,9,
16,18,19 224:7
225:23 235:24
236:19 240:24
241:21 242:1
243:20 248:23
257:24 264:9,
16,18 266:21
269:17 270:16,
23 278:3
282:20,21
284:17 285:7,9
286:6,18 290:2,
19 295:15,16,
17,20 298:9
299:20 302:10,
16 306:4,10,16
308:24 309:6,7,
10,14 313:5

322:13 323:22
324:6 325:1,4
327:6 330:6
331:7 339:18,
21 343:4
347:11,12,20
348:3 349:2
350:7,19 351:3,
20,22 352:10
353:24 357:13
358:7 362:8
366:9 367:3
370:13,15,24
371:8,19
372:14,24

**timeline**
172:19

**times** 21:7,21
22:18 37:24
46:13,14 52:24
53:4 54:21 55:1
57:2,4 75:18,22
77:20 82:8
85:16 90:11,15
93:9,20 95:6,10
97:9 108:10,19
109:13 110:2
111:16,21
112:11 114:1
117:15 126:9
147:3,4,12,13
154:24 155:1
176:24 177:5
227:24 238:17,
20 250:2,7
251:9 254:19
263:7 273:11
275:4,7,21
276:6 281:1
290:11 292:11,
23 297:2
321:13,25
322:8 340:15
363:5 365:20
366:10,22

**title** 20:1,3 65:6
70:18 168:15
177:23 187:9

**titled** 291:25

**titles** 168:19

**today** 8:16
155:16 158:7
159:1,5,8,15

169:14 238:13
325:12 329:4
331:3,21 341:9,
13 350:21
351:7,17
370:16

**told** 36:13
37:19 78:2 92:2
100:6,11,12
106:20 107:22
120:5 145:8
156:25 185:17
189:24 190:2
198:18 200:17
207:11,16,22
208:12 209:19
215:7,8 220:22
224:7 232:16
274:7 278:2,4,7
300:3 311:23
319:11 359:7

**Tom** 66:13

**Tony** 8:21
180:23 347:23
369:19

**top** 182:4
203:12 254:7,
16 272:17
291:14 303:17

**topic** 34:12

**total** 309:10

**touch** 87:13

**towns** 126:24

**track** 123:20
328:4

**tracking** 123:3

**trained** 33:18,
21 34:5,11
35:6,20 36:8,9
39:17 86:8

**training** 14:6,8,
24 16:20 21:19,
21 22:2 29:6
33:17 34:17
35:4 36:1,6
37:11 39:19
40:6 42:24
43:7,8 46:24
47:7,9 67:17

140:18

**trainings**
47:15,20

**transcript**
372:20

**transcript's**
268:24

**transcription**
372:13

**transcripts**
165:15

**transferred**
281:1

**transpired**
353:2

**transport**
126:19 127:9,
15,19,23
250:25 266:18
320:12 321:4
323:1 341:21

**transportation**
251:23 323:6

**transported**
251:4,19
342:24

**transporting**
126:17 251:13
320:10,19
322:5

**treatment**
126:14

**trial** 170:18
171:15,22
172:3 240:5
243:1 247:9
280:25 305:10
307:14 325:19
326:6 328:2
332:2,12
333:16 334:7
341:18 359:17
363:19,21,24
366:24 370:3

**trials** 370:8

**Trinity** 12:8

**trooper** 139:19

**trouble** 158:16
276:25 277:2,
13,21

**trucks** 13:1

**true** 103:2,11,
14,20 104:3,11,
18 106:22
107:6 171:9
184:13 220:17
247:19 252:2
280:8 311:5,20
312:9 313:15
315:11 318:6
319:9 324:14,
17,18 334:17
338:25 339:1
341:8 349:24
355:11,13
358:24,25
359:1,4,5,6,7,8,
9,10,11,12
363:1 368:6,7

**trust** 91:14

**truth** 9:13,14
19:6 106:4
170:20 218:22
247:4 274:7

**truthful**
220:20,23
345:10

**truthfulness**
332:4

**turn** 45:12
255:4 291:16,
20 303:9

**turned** 169:17
188:6 338:10

**Turner** 293:10

**Two-and-a-
half** 14:7

**two-minute**
324:23

**type** 36:24 37:5
44:7 65:12
107:23 148:25
149:4 150:2
163:2 164:25
166:13 172:13
177:9 185:6

*Blank and Version Only*

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273** Phone
**502.584.0119** Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

188:21 204:12 240:23 257:14 273:15 332:11 354:9,22

**typed** 36:21,24 192:19

**types** 352:13 370:25

**typewriters** 36:19

**typical** 194:22 273:5

**typically** 188:9 198:23

**typing** 150:22

---

**U**

**uh-huh** 11:6 41:2 48:19 96:22 211:9 222:21 242:9 243:5 273:4 274:2

**underling** 198:24

**underlings** 198:18

**understand** 10:7,24 11:8 30:15 33:24 35:10 57:9 75:12 85:25 86:11,22 87:5, 12,13 90:21 91:24 101:6 102:3 104:1 108:4 114:22 117:1 121:16 140:6 141:3,25 142:23 143:11 160:4 175:16 187:15 197:10 199:14 204:10, 16 212:14 213:4 215:3 222:8 231:20 235:12 238:5 253:24 256:7 260:17 267:18

296:9 347:8 351:6

**understanding** 35:13 46:5 64:16 92:8 94:18 101:13, 20 102:10 118:20,23,24 134:22 135:11 144:12 188:8 196:17 199:12 202:1 224:20 225:7 229:20 234:7 287:3 302:21 364:15, 22

**understood** 10:11 87:20 90:23 98:1 142:16 171:16 231:16,20 232:3 234:3,5 242:10 318:7 320:10

**unethical** 297:18

**UNIDENTIFIE D** 147:17 150:6, 10,15

**uniform** 69:17, 18

**unit** 17:5,10,12, 15,18,20,22 19:7,10,25 20:6,10,16,17, 18 21:5,16,18 22:12,15,23 23:2,5,8,13,23 24:2,14,17 25:4,10,14,25 27:1 31:11 32:5 33:8 38:21,25 39:10,14 40:5, 13 41:1,10 42:5,23 43:10 44:6,15,17 45:10,12,23 47:1,7,14,20,25 48:9 49:12,13, 17,25 50:2,9, 11,12,13,17 51:2,8,15 53:17

55:9 56:13 57:4 58:10,12,19,25 59:11,13,18,19, 20,21,22,23 60:4,22,25 61:5,11 62:21 63:7 64:2,6 65:10,17,24 66:10,25 67:3,8 68:15,20 69:6, 7,11 70:25 71:5,19 72:13 73:1,11 75:4 77:2,4,12,20 78:8 79:6,23 80:8,18,22 81:15 83:13,22 84:2 95:23 157:1,3 159:21 163:5 167:2 168:7,11,15,23 170:14 171:18 172:1,15 175:9, 13 195:4 204:25 205:2 242:25 280:24 287:6 334:24 335:6,23,24,25 336:21 363:19, 22,25 364:1 370:1,4

**United** 12:25

**units** 43:14 138:8 172:1

**unknown** 314:4 353:15

**unnecessarily** 235:25 236:2

**unnecessary** 322:9,11,12

**unsupervised** 321:22

**unusual** 213:13 262:5 272:9 273:18

**update** 8:4 177:11,13

**upset** 289:4

**usual** 272:7,9, 10,14

**utilized** 134:6 280:6

---

**V**

**vague** 18:9 20:7 21:20 22:21 25:21 26:4 27:10 28:10 29:4 30:1,13,21 32:12 34:7 36:16,22 37:7, 13 38:2,10 40:15 44:11 45:25 46:8,16 47:2 48:14,25 49:8,18 50:24 51:19 52:1,5, 11,15,20 53:3,9 54:20,25 55:5, 15 56:2,6,16,22 57:10,21 59:2 60:6 61:7 62:25 63:13 67:5 68:5,12 69:3, 15,25 70:8 72:17 73:13 75:20 76:5,11 77:10 78:5,15, 25 81:2,12,25 82:21 84:24 85:7,15,21 86:18 87:1,9,16 88:17 89:16 90:6,19 91:20 92:4,12,20 93:15,25 94:6, 13,23 95:9 97:7 98:19 99:5 100:16,24 101:9,16,24 102:7,14,21 103:3,16,22 104:4,6,12,19 105:9,19 106:1, 7,16,24 107:12, 18 108:13,24 109:11,19 110:5 111:20 112:25 113:7, 16,20,24 114:12,18,19, 25 115:17 116:7,15

117:14,22 118:3,10,16 119:11 120:1, 20 121:4,15 122:16 123:9 124:13 125:1,7 126:4,25 128:8, 16 129:10,25 131:1,10,22 135:14,21 136:10,14,24 137:11,17,22 139:5,11,25 140:13,25 141:6,15,21 142:7 144:7,19 145:6,13 146:10,15,20 147:10,23 148:3,15 150:21 151:21, 22 152:20 153:4,25 154:14,16 155:3,9 159:24 160:7 161:4,17 162:2,11 163:14 164:5 165:6,16 166:24 167:12 170:2 175:15 176:7,13 177:2, 16,25 178:13 183:1,15 184:15 188:10 192:13 193:9 196:13,21 197:24 200:13, 20 201:2 202:23 203:7, 24 206:2 207:9 208:6 211:15, 21 212:18 215:5,14 216:21 217:22 218:5 221:10 229:23 230:6, 15 233:24 250:5 253:19, 20 258:7,8,18 261:7,11 263:15 265:6 267:23 272:1 273:7 274:16, 18,23 276:11, 13 281:12



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

282:18 283:2, 24 284:10 285:3 287:13, 20 288:17 289:20 291:4 297:14 300:9, 19 306:11 307:6,15,25 317:2 343:22 347:6 361:18 363:20 364:7

**van** 209:19,20 263:22 264:2,4, 7 356:19 357:20

**vary** 91:19,21

**vegetables** 277:11

**vehicle** 208:22

**veracity** 332:4

**verbalize** 11:4

**verbally** 244:23

**verbatim** 36:12 140:8,11 193:17 311:23 334:17

**verbatims** 140:7

**verifications** 208:15

**verified** 121:8 207:15 331:21

**verify** 103:1,8, 10,20 104:11, 17,23,25 105:6 106:13,21 107:6 109:9,13 111:19,25 112:7 121:18 184:12 205:24 206:3 208:12 209:6 210:15 216:17 217:17 244:10,12 328:14

**verifying** 121:2,25 332:9

**Veronica** 8:24

**version** 130:12 257:7

**versus** 233:16

**viable** 142:11

**Vice** 19:3 73:19,21

**victim-witness** 23:17

**victims** 34:14 35:15 82:9 267:22

**violate** 204:6 277:18

**violated** 110:20 111:2,4 198:20

**violation** 111:7,10

**violations** 111:12

**violent** 264:4

**visit** 274:14

**visiting** 106:14 274:24

**Vitale** 182:12 185:13 194:12 195:16 312:4,8

**Vittum** 312:21 314:4,6 361:10, 11,17

**voice** 28:20 98:25

**voluntarily** 154:3,8

___

**W**

___

**wait** 269:6 304:9 310:13

**waive** 372:8

**walk** 321:1 367:6,7

**walked** 158:23

**wall** 285:16,17 286:1,12

**walls** 286:9

**wander** 321:21

**wanted** 13:19 33:9 90:1,2 132:2 140:3 156:25 167:9 201:8 219:2 233:10,21 235:1 283:10 298:14,19 338:5 341:16 360:3

**wars** 74:7 188:15

**was.'** 246:2

**Wayne** 8:10 209:19 240:5 286:16 288:1 323:23 362:12 368:1,10,17 369:1

**ways** 106:19 148:23

**weapon** 107:25

**wear** 49:25 50:3,5,8,13,18 51:4 69:13 158:17

**week** 348:9,10, 16 349:7,21 351:4,5 352:4

**weeks** 348:14, 15

**weird** 93:6,7 180:18

**west** 12:3 15:2 19:13 73:19,21 273:1

**Western** 58:23,25 60:17, 21

**William** 169:3 180:15 181:21 182:6 184:8,20 185:1 189:4,11,

15 190:20 192:2 194:3,4 211:19 212:15 214:18 215:10 216:2 217:25 293:11 301:9, 13,20,24 303:17 311:18 313:14,22 314:5 350:12 351:9

**Williams** 293:3,10 299:8, 22,24 300:7,10

**Williams'** 300:5

**window** 353:24

**Wirller** 156:14, 15,23

**withdraw** 251:21 324:5

**withhold** 144:5,13,17 235:2 238:10

**withholding** 234:19 235:6

**witness'** 153:16 154:23

**witness's** 33:21 92:11 105:7 119:19 273:6 316:4

**witnessed** 115:15

**witnesses** 25:7,8 33:19 34:14 35:15 44:24 54:23 55:3 56:14 70:14 71:7 82:8 86:24 87:7 88:2 89:1,3,11 91:11 104:21 114:23 116:5 117:21 119:24 122:20 123:4,13 126:8, 11,17 134:23 136:8 137:15, 25 138:7,14 145:1 160:3,5

162:16 163:12, 21 164:3,16 165:5,15 189:10 190:7 213:6 216:19 217:19 261:21 273:13 306:6 320:10 321:5 328:4 331:12 332:17,18 333:17 334:7 340:19 342:3, 10 343:12,19 344:8,24 345:1 346:4,5,8,10,12 348:25

**Wood** 19:15

**word** 187:17 188:7 216:25 242:16 288:21 328:10

**words** 11:7 23:10 50:4 132:19 162:24 187:24 202:15 264:3 316:4 319:1 325:24 340:2 343:7 345:16 347:2 350:18 351:16 352:25 354:1

**wore** 51:9

**work** 13:18 21:4,6 24:8 25:17 29:9 32:25 33:10 40:9 54:17 55:3 72:25 85:18 124:12 137:24 166:3,22 167:5, 8,10 168:9 169:6,23 170:8 172:3,11,16 176:6 177:12 203:23 204:15 232:17 242:12, 22 280:17 325:7 336:5 348:5 350:7 353:19 355:8

**worked** 12:14, 24 15:13 24:9 25:14,25 26:3,



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

15 30:3,8 31:12 35:3 53:22 59:4 72:14 81:16 124:19 129:20 167:24 168:1, 20 171:19 177:18 186:6,9 203:20 336:6 338:22

**working** 13:12 21:8 24:11 25:11 26:10 27:6 29:20 31:17 32:10,15 38:19,24 41:10 42:22 44:7 45:22 46:19 47:13 53:7 54:4 58:5 59:11,13 63:9,18,24 64:11,14 65:4 68:2,22 69:1 71:14 72:19,21 73:4,7 75:8 95:16 110:2 149:20 173:8 178:3 186:19, 23 203:4,6,8,16 315:22 316:3,9, 19,24 317:8,15, 21 333:2 335:1

**worn** 69:19

**worries** 260:12

**worth** 348:1

**would've** 13:7 14:13 17:9 123:20 146:16 155:11 169:2 185:25 201:11 258:19 274:25 298:19 308:4, 10,17 352:3

**Wow** 150:9

**writ** 129:5,8 131:14,21 133:1 138:7,21, 22

**write** 37:5 97:17,21 192:23 231:18 250:3 309:9 317:9,16,22

337:12

**writing** 36:1,4, 20 45:1 68:4 148:13,18 150:18,22 192:7 228:24 249:20,24 253:24 357:24

**writs** 138:13,17

**written** 14:19 34:25 36:3,5 47:23 48:3,8 67:23 118:24 152:9 154:25 192:18 230:12

**wrong** 227:6 360:14,18

**wrote** 55:10 175:4 181:17 356:10,16,22 357:7,15,17,19

---

**Y**

---

**yard** 133:25 134:1

**year** 13:5 16:7, 23 17:7 22:21 33:2 41:24 59:12,25 60:18, 19 67:4 71:20, 25 83:6 110:23, 24 157:14 186:17 278:14 290:21 312:25

**years** 12:18,21 15:10 16:2 20:11 22:14 33:2 41:8 47:11 187:12 198:2 202:25 266:25 312:24,25

**yell** 288:15,25

**yelled** 318:21

**YOA** 312:21,24

**you-** 66:17 224:3

**you-all** 66:16 166:8 219:6

**young** 198:6 326:18 337:17

**youth** 198:2

---

**Z**

---

**Zoom** 150:13 372:19

**Zuganelis** 194:12 195:22 312:5,7



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com