

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA

# CASE NO. 19-CV-08254; CASE NO. 21-CV-05525; CASE NO. 22-CV-00320

## MATTHEW SOPRON

## V.

## FORMER ASSISTANT STATE'S ATTORNEY SCOTT CASSIDY, ET AL.

## AND

## NICHOLAS MORFIN

## V.

## FORMER ASSISTANT STATE'S ATTORNEY SCOTT CASSIDY, ET AL.

## AND

## WAYNE ANTUSAS

## V.

## FORMER ASSISTANT STATE'S ATTORNEY SCOTT CASSIDY, ET AL.

## DEPONENT: WILLIAM MARLEY

## DATE: January 12, 2024



schedule@kentuckianareporters.com

877.808.5856 | 502.589.2273

www.kentuckianareporters.com

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN
DISTRICT OF ILLINOIS, EASTERN DIVISION
CASE NO. 19-CV-08254; CASE NO. 21-CV-05525; CASE NO.
22-CV-00320

MATTHEW SOPRON,
Plaintiff

V.

FORMER ASSISTANT STATE'S ATTORNEY SCOTT CASSIDY, ET
AL.,
Defendants

AND

NICHOLAS MORFIN,
Plaintiff

V.

FORMER ASSISTANT STATE'S ATTORNEY SCOTT CASSIDY, ET
AL.,
Defendants
AND

WAYNE ANTUSAS,
Plaintiff

V.

FORMER ASSISTANT STATE'S ATTORNEY SCOTT CASSIDY, ET
AL.,
Defendants

DEPONENT:  WILLIAM MARLEY
DATE:      JANUARY 12, 2024
REPORTER:  ZOE NYHUS

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

APPEARANCES

ON BEHALF OF THE PLAINTIFFS, MATTHEW SOPRON, NICHOLAS

MORFIN, WAYNE ANTUSAS:

Russell Ainsworth, Esquire

Carla Agbiro, Esquire

Julia Rickert, Esquire

Loevy & Loevy

311 North Aberdeen Street

Third Floor

Chicago, Illinois 60607

Telephone No.: (312) 243-5900

E-mail: russell@loevy.com

        agbiro@loevy.com

        julia@loevy.com

(Appeared via videoconference)

APPEARANCES (CONTINUED)

ON BEHALF OF THE DEFENDANT, GEORGE HOLMES:

Sean O'Callaghan, Esquire

Maureen O'Brien, Esquire

O'Mara & O'Callaghan LLC

230 West Monroe Street

Suite 2620

Chicago, Illinois 60606

Telephone No.: (312) 600-5588

E-mail: maureen.obrien@O2Lawyers.com

        sean.ocallaghan@O2Lawyers.com

(Appeared via videoconference)

ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:

Carolyn Isaac, Esquire

Michael Best & Friedrich, LLP

444 West Lake Street

Suite 3200

Chicago, Illinois 60606

Telephone No.: (312) 222-0800

E-mail: ceisaac@michaelbest.com

(Appeared via videoconference)

APPEARANCES (CONTINUED)

ON BEHALF OF THE DEFENDANT, SCOTT CASSIDY:

Matthew Howroyd, Esquire

Hinshaw & Culbertson LLP

151 North Franklin Street

Suite 2500

Chicago, Illinois 60606

Telephone No.: (312) 704-3052

E-mail: mhowroyd@hinshawlaw.com

(Appeared via videoconference)

ON BEHALF OF THE DEFENDANTS, HOLMES, GRAF, GRAFFEO,

ARGENBRIGHT, MOSER:

Anthony J. Masciopinto, Esquire

Heather Afra, Esquire

Kulwin, Masciopinto & Kulwin, L.L.P.

161 North Clark Street

Suite 2500

Chicago, Illinois 60601

Telephone No.: (312) 641-0300

E-mail: amasciopinto@kmklawllp.com

        hafra@kmklawllp.com

(Appeared via videoconference)

APPEARANCES (CONTINUED)

ON BEHALF OF THE DEFENDANTS, WILLIAM MARLEY, DICIOLLA:

Bill Oberts, Esquire

Amy Kunzer, Esquire

Tribler Orpett & Meyer, P.C.

225 West Washington Street

Suite 2550

Chicago, Illinois 60606

Telephone No.: (312) 201-6400

E-mail: woberts@tribler.com

        amkunzer@tribler.com

(Appeared via videoconference)



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

INDEX

                                                    Page

PROCEEDINGS                                           9

DIRECT EXAMINATION BY MR. AINSWORTH                  11

CROSS-EXAMINATION BY MR. MASCIOPINTO                231

EXAMINATION BY MS. O'BRIEN                          244

EXAMINATION BY MR. HOWROYD                          258

EXAMINATION BY MR. OBERTS                           259

REDIRECT EXAMINATION BY MR. AINSWORTH              267

RE-EXAMINATION BY MR. OBERTS                        282

FURTHER REDIRECT EXAMINATION BY MR.                283
AINSWORTH

EXHIBITS

Exhibit                                            Page

  200 - Interview with Daniel Callaghan      54

  201 - Coppolillo Missing Person Records    75

  202 - Interview with Anthony Coppolillo    86

  203 - Interview with Doris Montejano       99

  204 - Interview with James Minizzi        102

  205 - Interview with Frank Minizzi        105

  206 - Interview with John Gizowski        108

  *207 - First Interview with William
        Bigeck                              114

  *208 - DiCiolla and Bigeck Interview      169

Page 7

EXHIBITS (CONTINUED)

Exhibit                                            Page

  209 - Investigative Report
        November 3, 1996 - Bigeck
        Third Interview                     177

  *210 - Report Contact Michelle Zielinski  182

  211 - Barnoski Investigative Report 24
        October 1996                        211

  212 - Marley Hearing Testimony
        February 9, 1998                    214

  213 - Negative Interview with
        Matt Sopron                         238

  *214 - Conversation Regarding Narcotics
        Report April 11, 2001               256

        (*Will forward exhibit upon receipt)

Page 8

STIPULATION

The deposition of WILLIAM MARLEY was taken at KENTUCKIANA COURT REPORTERS, 110 NORTH WACKER DRIVE, CHICAGO, ILLINOIS 60606, via videoconference in which all participants attended remotely, on the 11th day of JANUARY 2024 at 10:05 a.m. (CT); said deposition was taken pursuant to the FEDERAL Rules of Civil Procedure. THE OATH IN THIS MATTER WAS SWORN REMOTELY PURSUANT TO FRCP 30.

It is agreed that ZOE NYHUS, being a Notary Public and Digital Reporter for the State of ILLINOIS, may swear the witness and the reading and signing of the witness is not waived.

Page 9

PROCEEDINGS

THE REPORTER: We are now on record. Will all parties, except for the witness, please state your appearance, how you're attending, and your location?

MR. AINSWORTH: This is Russell Ainsworth, appearing on behalf of the plaintiffs, appearing remotely from Illinois. And also, on behalf of the plaintiffs appearing today are Julia Rickert and Carla Agbiro.

MR. OBERTS: Morning. Bill Oberts on behalf of Deponent.

MR. O'CALLAGHAN: And Sean O'Callaghan on behalf of Defendants Linehan, Hyland, Suffield, Shae, Dinolfo, and Andrews, and with me as well is Maureen O'Brien.

MR. HOWROYD: Good morning. Matthew Howroyd from Hinshaw & Culbertson, for Defendant Scott Cassidy, appearing remotely from Cook County, Illinois.

MR. MASCIOPINTO: Good morning. Tony Masciopinto on behalf of CPD individual defendants, from Kulwin, Masciopinto & Kulwin, appearing remotely from Cook County.

MS. ISAAC: Good morning. Carolyn Isaac on

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 10

behalf of the City of Chicago, appearing remotely from Chicago, Illinois.

MS. KUNZER: Amy Kunzer, also on behalf of the Cook County State's Attorney investigators.

THE REPORTER: Thank you. I believe that was everyone. Mr. Marley, will you please state your full name for the record?

THE WITNESS: William J. Marley.

THE REPORTER: Thank you. Off record, parties agreed to stipulate that this is, in fact, William J. Marley; is that still true?

MR. AINSWORTH: That is correct on behalf of the plaintiffs.

THE REPORTER: Thank you. Mr. Marley, will you raise your right hand for me? Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE REPORTER: Thank you.

THE WITNESS: There's a big black part here.

MR. AINSWORTH: Sir?

MR. OBERTS: Hold on one second, Russell.

MR. AINSWORTH: Okay.

MR. OBERTS: So this is just -- got it. It's

Page 11

being recorded. So this is being recorded for audio and video, okay? So that's means got it, and now we're good to go. So he's asking you the questions. That's you.

THE WITNESS: Okay.

MR. OBERTS: Here we go. Sorry about that. Go ahead, Russell.

DIRECT EXAMINATION

BY MR. AINSWORTH:

Q. Sir, could you please state and spell your name for the record?

A. William Marley, M-A-R-L-E-Y.

Q. All right. Mr. Marley, when was the last time you were deposed?

A. About six months ago.

Q. In what case was that?

A. The defendant's name is Max Maxon, M-A-X-O-N.

Q. Are you a defendant in that lawsuit?

A. Yes, sir.

Q. Prior to the Maxon lawsuit -- or deposition, when was the last time you were deposed before that?

A. I can't say offhand. I don't remember.

Q. How many times have you been deposed?

A. I'd say five or six times.

Q. In each of those occasions, were you a

Page 12

defendant in the lawsuit or were you a witness at times?

A. I think defendant.

Q. Have you ever gone to trial in a civil case?

A. I -- I don't think so.

Q. Okay. Meaning, have you ever appeared at trial with a -- either a judge or a jury who's determining the merits of the lawsuit against you?

A. No.

Q. Because it's been a little while since you were deposed, can I go over the ground rules?

A. Sure. Sure.

Q. The first thing we ask you to do is to answer just as you've been doing thus far, which is answer out loud with a yes or a no if the question calls for it, okay?

A. Okay.

Q. Next thing we ask you to do is to wait until I'm done with my question, even if you know what the question is going to be, before you begin your answer, okay?

A. Okay.

Q. Now, I'll try and do the same with you, that is to wait until you're done with your answer before beginning my next question, so we make life easier on Zoe, our court reporter, okay?

Page 13

A. Yes.

Q. If you don't understand my question, please ask me to rephrase the question, re-ask the question, or in some way indicate to me that you do not understand my question, okay?

A. Yes.

Q. The flip side of that is that, if you answer my question, I'll assume that you've understood my question as I've phrased it, fair?

A. Yes.

Q. Do you have any -- are you on any medication or do you have any medical conditions that would affect your ability to testify truthfully and accurately here today?

A. No. I mean, I'm on some medication, but I don't think it would have any effect.

Q. All right. If you need a break to take medication or for any other reason, will you let us know?

A. Sure. Yes.

Q. And you're entitled to take a break at any time. All that we ask is that you answer the question that's pending before taking a break, okay?

A. Yes.

Q. Is there any other condition that would affect

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 14

your ability to testify truthfully and accurately here today, such as fatigue or stress or life events?

A. No.

Q. Are you a high school graduate, sir?

A. Yes.

Q. Where did you graduate high school from?

A. Mount Carmel High School in Chicago.

Q. When did you graduate from Mark Carmel -- Mount Carmel?

A. 19 -- 1956.

Q. Do you have any military experience?

A. Yes.

Q. When did you enter the -- when were you in the military?

A. From -- three years, from 1957 to 1960.

Q. Where'd you serve?

A. Germany and Georgia.

Q. Georgia the state?

A. Yes.

Q. Okay. And --

A. And North -- and North Carolina.

Q. And which branch of the military were you in?

A. It was the Army.

Q. And I assume you didn't have any combat experience; is that right?

Page 15

A. No.

MR. OBERTS: Is that true?

BY MR. AINSWORTH:

Q. Were you --

MR. OBERTS: Is that true?

THE WITNESS: Is what true?

MR. OBERTS: Just objection. Form, just based on the form of the question he said.

MR. AINSWORTH: Sure.

BY MR. AINSWORTH:

Q. Did you --

MR. OBERTS: Was it true that you did not have any medical -- any military or active --

BY MR. AINSWORTH:

Q. Combat?

A. No combat experience, no.

Q. Did you serve in the military police?

A. No.

Q. What was your role in the military?

A. I was an armorer artificer in an armored unit.

Q. Do you have any post-high-school educational experience?

A. Could you repeat that? I couldn't hear it.

Q. Sure. Do you have any post-high-school education experience?

Page 16

A. Just military schools.

Q. Which law enforcement agencies did you work for, or have you worked for?

A. The Chicago Police Department.

Q. When did you start with the Chicago Police Department?

A. I -- in January of 1961.

Q. And when did you leave the Chicago Police Department?

A. In 1993. I'm not sure of the date.

Q. In your time with the Chicago Police Department, what positions did you hold?

A. Originally, a patrolman, then I was promoted to detective.

Q. When did you make detective?

A. In 1965.

Q. Did you hold any positions with the Chicago Police Department other than patrolman and detective?

A. No.

Q. Did you ever sit for a sergeant's exam?

A. Yes.

Q. Did you ever -- were you ever promoted to sergeant?

A. I was not.

Q. Why did you leave in 1993?

Page 17

A. Could you repeat that? I'm sorry.

Q. Why did you leave the Chicago Police Department in 1993?

A. I just felt it was time to leave. I had been on a long time, and I was tired of working overtime.

Q. In which area were you assigned when you left the Chicago Police Department?

MR. OBERTS: You hear the question?

THE WITNESS: It's quiet.

MR. OBERTS: Oh. Russell, we're just trying to increase the volume on his computer.

MS. KUNZER: Okay. Should be good.

THE WITNESS: Okay.

BY MR. AINSWORTH:

Q. Is that better, sir?

A. Yes, it is. Yes.

Q. Oh, good. Okay. But please do tell me if you need me to speak up and I will do so.

A. No, this is fine.

Q. Great. Were you assigned to a detective area when you left in 1993?

A. Yes.

Q. Which detective area were you assigned when you left in 1993?

A. Area 2, Violent Crimes.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 18

Q.   How long had you been assigned to Area 2, Violent Crimes?

A.   Approximately ten years.

Q.   So from approximately 1983 to 1993?

A.   Yes.

Q.   What did you do for employment after you left the Chicago Police Department in 1993?

A.   I -- I went to work for the State's Attorney's Office.

Q.   When did you start with the Cook County State's Attorney's Office?

A.   It was in 1993, but I -- I'm not sure of the exact date.

Q.   For how long did you work for the Cook County State's Attorney's Office?

A.   19 years.

Q.   So if my math is right, you left in 2012; is that right?

A.   I left 2013.

Q.   Okay.  When you were hired by the Cook County State's Attorney's Office, what was your title?

A.   Investigator.

Q.   Were you given any training when you became an investigator for the Cook County State's Attorney's Office?

Page 19

A.   No.

Q.   How did you know what you were supposed to do as an investigator for the Cook County State's Attorney's Office?

A.   Well, we were assigned to trial support and the assistant state's attorneys would give us our tasks.

Q.   When you were at the Chicago Police Department, were you trained to document your activities as a Chicago police officer?

A.   Yes.

Q.   And were you trained to document the information that was good for the prosecution as well as the information that was good for the defense?

A.   Yes.

Q.   When you were a Cook County State's Attorney investigator, did you -- were you -- well, strike that. When you were a Cook County State's Attorney investigator, did you document both the information that was good for the prosecution as well as the information that was good for the defense?

A.   Yes.

Q.   And did you document each interview that you conducted while you were a Cook County State's Attorney investigator?

MR. OBERTS:  Objection.  Overbroad.  Go ahead.

Page 20

And vague.

MR. AINSWORTH:  You can answer.

MR. OBERTS:  Objection.  Vague and overbroad. But go ahead.

THE WITNESS:  I'm -- did we -- could you repeat the question?  I'm sorry.

BY MR. AINSWORTH:

Q.   Sure, sir.  When you were a Cook County State's Attorney investigator, did you document each interview that you conducted?

A.   Yes.

Q.   And how would you document the interviews that you conducted?

A.   It -- in a form.  We'd fill in the form.

Q.   When you say you fill in a form, what do you mean?

A.   They had a report form that was used for that purpose.

Q.   I see.  So you would document who conducted the interview and when the conduct -- when the interview was conducted?

A.   Correct.

Q.   Would you document the circumstances of the interview --

MR. OBERTS:  Objection.  Vague.

Page 21

BY MR. AINSWORTH:

Q.   -- like where it was held --

MR. AINSWORTH:  Sorry.

BY MR. AINSWORTH:

Q.   Like where it was held and who and what time it was conducted?

A.   Usually, yes.

Q.   And would you document the substance of the information that was provided to you during that interview?

A.   Yes.

Q.   When you were a Chicago police detective, were you trained not to provide information to the witness before the witness provided the information to you?

A.   Correct.

Q.   And that was so that you could test the reliability of the information being provided to you; is that correct?

A.   Yes.

Q.   Meaning, if the witness provided information to you that you knew from your reports, you would have some indication that the witness was providing you with reliable information; is that right?

MR. OBERTS:  Objection.  Vague.  Form.

THE WITNESS:  I -- I don't understand the

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 22

question.

BY MR. AINSWORTH:

Q. That's fair. The reason that you wouldn't tell witnesses information before the witnesses provided it to you was because if they -- if you had provided the information to the witness, then you wouldn't know whether the witness was just repeating what you had said or if they independently knew that information; is that fair to say?

MR. OBERTS: Objection. Vague. Form. Incomplete hypothetical.

THE WITNESS: I think so, yes.

BY MR. AINSWORTH:

Q. Okay. While you were a Cook County State's Attorney investigator, did you work with a partner?

A. Yes, I did.

Q. Did you work with more than one partner?

A. Yes.

Q. How many partners did you have?

MR. OBERTS: Objection. Time frame. Scope.

THE WITNESS: Do you mean over the entire time?

BY MR. AINSWORTH:

Q. Yes, sir.

A. Probably about four.

Q. Which partners did he have while you were a

Page 23

Cook County State's Attorney investigator?

A. Leonard Bajenski. When I -- when I say -- I'd like to clarify. When I say "partners," we would have a partner, say, for a day or two. Sort of -- it's sort of hard to describe. We -- where we'd be working together, there'd be two of us, but not full-time partnership, say.

Q. Were -- do you -- were you sometimes assigned to a partner who you would be partners with for more than a month at a time?

A. Yes.

Q. All right. And so, that's an important clarification. I appreciate that. I understand that you may have had, you know, a partner who was assigned to you for a day or two or for a particular assignment, but I'm asking about partners that you had who you were assigned to be partners for more than a month at a time, okay?

A. Yes.

Q. And so, who were your partners, while you were a Cook County State's Attorney investigator, who you were partnered with for more than a month at a time?

A. Carl Ekman, E-K-M-A-N. Again, Leonard Bajenski. For -- I can't really think of another one for longer periods. You might be partnered up with

Page 24

someone just for a week or so.

Q. Did you know Leonard Bajenski before you joined the Cook County State's Attorney investigators?

A. I did.

Q. How did you know Bajenski?

A. He was a Chicago policeman.

Q. And how did you know him?

A. Well, I -- I worked in the same unit with him.

Q. Which unit?

A. Area 2, Violent Crimes.

Q. And so, for how long did you and Bajenski work at Area 2 together?

A. I never worked with him at Area 2. We were just assigned there at the same time.

Q. Were you assigned to the same watch?

A. I'm not sure.

Q. Were you ever assigned to the same watch as Bajenski while you were at Area 2?

MR. OBERTS: Objection. Asked and answered.

THE WITNESS: I -- I don't recall.

BY MR. AINSWORTH:

Q. When did you begin being partners with Bajenski when you joined the Cook County State's Attorney's investigator's office?

MS. O'BRIEN: Object to the form.

Page 25

THE WITNESS: I can't say. I'm not sure.

BY MR. AINSWORTH:

Q. All right. Who was the first partner that you were assigned to after joining the Cook County State's Attorney's Office?

MS. O'BRIEN: Objection. Form --

MR. AINSWORTH: And I mean partner --

MS. O'BRIEN: -- and --

MR. AINSWORTH: -- for more than a month at a time.

MS. O'BRIEN: -- and foundation.

THE WITNESS: I can't recall.

BY MR. AINSWORTH:

Q. Was it someone other than Leonard Bajenski?

MR. OBERTS: Objection. Foundation.

THE WITNESS: Yes, it would've been.

BY MR. AINSWORTH:

Q. And why do you say it would've been somebody other than Leonard Bajenski?

A. Because I -- I was assigned to Bajenski rather late in my career over there.

Q. And so, about what time frame were you partnered with Bajenski?

MR. OBERTS: Objection. Asked and answered. Foundation.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 26

THE WITNESS: Actually, on this case, just the day before we were assigned to it.

BY MR. AINSWORTH:

Q. And how do you know that?

A. We were in different units. I was in narcotics, and he was in, I -- I believe, general investigations.

Q. And so, when you say the day before this case, what -- which dates are you talking about?

A. It would be the day before that meeting. I -- I don't -- I don't recall the date.

Q. You mean the meeting with the Cook County -- or with the Chicago police officers and the representatives from the Cook County State's Attorney's Office?

A. Yes.

MS. O'BRIEN: Objection. Form. Foundation.

MR. OBERTS: Misrepresents testimony. Foundation. Listen to the question.

BY MR. AINSWORTH:

Q. It's okay. When did you join the narcotics unit of the Cook County State's Attorney's Office?

A. I was there probably about 15 years.

Q. Was that your first assignment upon joining the Cook County State's Attorney's Office?

Page 27

A. No. I was assigned to -- at Bridgeview. What's the far south one?

Q. Markham?

A. Markham, yes, sir. Little brain cramp.

Q. That's all right. And what were you -- do you know why you were assigned to Markham when you first joined the Cook County State's Attorney's Office?

A. No.

Q. What were your job duties when you were assigned to Markham?

A. Whatever the -- we were trial support for the state's attorneys there. Witness transports, taking photos of crime scenes, anything the state's attorneys preparing their cases wanted done.

Q. Did you interview witnesses while you were in Markham -- assigned to Markham?

A. I'm sure I did.

Q. For how long were you assigned to Markham?

A. I would say about a year and a half.

Q. Why did your job duties change after about a year and a half of being assigned to Markham?

A. I asked for a transfer.

Q. Why did you ask for a transfer?

A. I wanted to go in the narcotic unit.

Q. Why did you want to go into the narcotic unit?

Page 28

A. I had experience in it, and I felt it was more interesting.

Q. What was your understanding of what the narcotics unit would be doing -- or strike that. What was your understanding of what you would be doing in the narcotics unit before you joined it?

A. Trial support for narcotic prosecutions.

Q. Did you receive a transfer to the narcotics unit?

A. Yes.

Q. And where was your office when you were assigned to the narcotics unit?

A. At 26 and California.

Q. Which floor?

A. 14.

Q. And you remained in narcotics for 15 years; is that correct?

A. Yes.

Q. Until about 2009?

A. No. Until 2013.

Q. Oh, until your -- the end of your --

A. I stayed there until I retired.

Q. All right. So just doing the math, that -- according to my math, that would -- if you were there for 15 years, that would mean you started in the

Page 29

narcotics unit in about 1998; does that sound right?

A. Approximately, yes.

Q. All right. And if you started in the narcotics unit in approximately 1998, then that seems like, if you started in the Cook County State's Attorney's Office in 1993, that you spent about five years in Markham before you went to narcotics, or does that not seem right?

A. That's not right. I spent about a year and a half in Markham, possibly two years, and the rest of the time at -- you know, I do remember I was transferred to what was called general investigations first and then to narcotic.

Q. Okay. All right. When were you transferred to general investigations?

A. After about a year and a half in Markham. I'm not sure of the date.

Q. When you were assigned to general investigations, where was your office?

A. At 26 and California.

Q. Which floor?

A. Also on 14.

Q. And what were your job duties when you were in -- assigned to general investigations?

A. Trial support for the state's attorneys.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 30

Q. So when you were assigned to this case the day before that meeting, were you assigned to general investigations or Markham or narcotics?

A. Narcotics.

Q. When you worked in general investigations, did you work with Leonard Bajenski?

A. I -- I may have. I don't recall for sure.

Q. Who left Area 2 first, you or Bajenski?

A. I don't know.

Q. Were you ever disciplined by the Cook County State's Attorney's Office?

A. No.

Q. Were you ever questioned by anyone in the Cook County State's Attorney's Office about your duties as a Chicago Police officer while you were a Cook County State's Attorney's -- State's Attorney investigator?

MR. OBERTS: Objection. Vague. Form.

THE WITNESS: I -- I don't understand the question.

BY MR. AINSWORTH:

Q. Well, what I'm trying to get at is -- remember there was a special prosecutor who is appointed to investigate activities that occurred under the supervision of Detective Jon Burge?

MS. O'BRIEN: Objection. Form. Foundation.

Page 31

MR. OBERTS: Join.

THE WITNESS: I -- could you clarify that? I -- I don't understand it.

BY MR. AINSWORTH:

Q. Well, you remember there's a special prosecutor appointed to investigate, you know, activities that occurred at Area 2 under the command of Jon Burge, right?

A. Okay.

MR. OBERTS: Objection. Foundation.

MS. O'BRIEN: Objection. Form. Foundation.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. Did anyone from the Cook County State's Attorney's Office ever question you about your activities as an Area 2 detective under the supervision of Jon Burge while you were a Cook County State's attorney investigator?

MS. O'BRIEN: Objection. Form. Foundation.

MR. OBERTS: And relevance.

THE WITNESS: Not that I recall.

BY MR. AINSWORTH:

Q. What did you do to prepare for today's deposition?

A. I went over my old reports.

Page 32

Q. Okay. What -- did you do anything else to prepare for today's deposition?

A. No.

Q. Did you meet with your attorney?

A. Oh, yes.

Q. All right. I don't want to hear what you and your attorney talked about, okay?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q. But I want to know when you met with your attorney in preparation for this deposition?

A. Several times, the last being yesterday.

Q. All right. How long did you meet with your attorney yesterday?

A. Was about two or three hours.

Q. And who was present for that meeting yesterday?

A. The attorneys and myself. Nobody else.

Q. So is that Bill and Amy?

A. Yes.

Q. Anyone else?

A. No.

Q. When was the time before yesterday that you met with your attorneys in preparation for this

Page 33

deposition?

A. It is -- today is Friday. No, Thursday.

MS. KUNZER: Thursday.

MR. OBERTS: Today is Thursday.

THE WITNESS: It's Thursday. Is it Tuesday? Tuesday, Wednesday. I'm a little confused on the dates. I met with them several times.

BY MR. AINSWORTH:

Q. Okay. Did you meet with them more than once this week?

A. Yes.

Q. All right. The time before yesterday, how long did you meet with your attorneys?

A. Several hours. I'm -- I'm not sure on the time.

Q. And did you meet with your attorneys before those two times this week that you met with them?

A. Yes.

Q. And when did you meet with them before this week?

A. I don't know the date.

Q. Was it sometime last week or was it before then?

A. It was before.

Q. And on that prior occasion before last week,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 34

for how long was that meeting?

A. Again, several hours, but I'm -- I'm not giving you a precise number. I don't know.

Q. And who was present for that meeting, the one that occurred before last week?

A. The same two attorneys.

Q. And what about earlier this week? Who was present for that meeting?

A. Same.

Q. The same two attorneys?

A. Yes.

Q. Did you review any documents apart from your own reports in preparation for this deposition?

A. No.

Q. Did you review any transcripts of testimony?

A. Yes.

Q. What transcripts of testimony did you review?

A. It was testimony by me, and I'm not sure how to describe it. It was court testimony from me.

Q. All right. How many transcripts of your testimony did you review?

A. Just one.

Q. Okay. Did you review the transcripts of anyone else's testimony?

A. I don't think -- no.

Page 35

Q. Did you review any photographs?

A. No.

Q. Did you review any Chicago Police Department --

A. Wait.

Q. -- report? Sure.

A. On photographs, I did see some photographs of some of the defendants. Yes.

Q. Okay. Which people did you see photographs of in preparation for this deposition?

A. Could you repeat that?

Q. Sure. Well, did you recognize the photographs that you saw?

A. Did I recognize the photographs I saw? I --

Q. You said you reviewed some photographs of people, and I'm wondering, did you recognize the people whose photographs you saw?

A. Yes, I did.

Q. All right. Who did you recognize them to be?

A. That's where there -- there was -- there was about four or five. Matt Sopron, Wayne Antusas, William Bigeck, and the Gizowskis.

Q. Which Gizowskis?

A. I'm not sure right now.

Q. Okay. Anyone else?

Page 36

A. I don't think so.

Q. Had you known any of those people before this case, meaning Matt Sopron, Wayne Antusas, Billy Bigeck, or the Gizowskis?

A. No.

Q. Had you heard of the Popes street gang before this case?

A. Yes, I did.

Q. How did you -- how had you heard of the Popes street gang before this case?

A. I don't remember specifically, but through the police department.

Q. Did you ever investigate a case involving the Popes?

A. No.

Q. Did you ever know the Popes to have committed shootings before, before this case?

A. No, I -- I was aware of their existence, I knew nothing about them, though.

Q. Had you heard of the Ridgeway Lords before this case?

A. No.

Q. Was there anything that you wanted to review in preparation for this deposition, but you didn't have the opportunity to do so?

Page 37

MR. OBERTS: Objection. Vague. Form. Foundation.

THE WITNESS: No.

BY MR. AINSWORTH:

Q. Do you feel that you're adequately prepared to answer questions about this -- in this deposition?

A. Would you repeat that, please?

Q. Sure. Do you feel that you're adequately prepared to answer questions in this deposition?

MR. OBERTS: Objection. Vague. Form.

THE WITNESS: I hope to.

BY MR. AINSWORTH:

Q. Did you -- and I'm sorry. Did you review any -- I can't remember what you said. Did you review any Chicago Police Department reports?

A. I don't think so, no.

Q. So you didn't review any supp reports or evidence reports; is that right?

A. No. No.

Q. That's correct?

A. Yes.

Q. All right. Which -- what were the subjects of the reports that you reviewed in preparation for this deposition?

A. Assignments I had been given for trial

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 38

support.

Q. Okay. So which reports did you review that you authored?

A. There was several of them. I'm not sure how to answer that.

Q. Well, tell me which reports you recall reviewing.

A. The interview -- interview reports for instance.

Q. Who are the subjects of the interview, the interviews?

A. Can I look at the reports?

Q. Right now -- I appreciate the question. If, you know, at points during this deposition I'll direct you to look at documents, but for right now I'm just wondering what you recall.

A. I would have to refresh my memory.

Q. All right. And so, what do you have in front of you?

A. Nothing right now.

MR. OBERTS: He has nothing right now.

BY MR. AINSWORTH:

Q. Do you have your report -- do you have paper copies of your reports with you?

MR. OBERTS: We have them, yes.

Page 39

BY MR. AINSWORTH:

Q. And are those the reports that you reviewed in preparation for this deposition?

A. Yes.

Q. All right. Could you please pull those out and just tell me who the subject of those interviews are?

A. Daniel Callaghan.

Q. Okay.

A. Anthony Coppolillo.

Q. Okay.

A. Edward Morfin.

Q. Okay.

A. Billy Bigeck.

Q. Okay.

A. Doris Montejano, I think you pronounce it. Montejano, Montejano.

Q. Got it.

A. John Gizowski.

Q. Okay.

A. Eugene Gizowski.

Q. Okay.

A. James Minizzi.

Q. Okay.

A. Donald Barnoski.

Page 40

Q. Okay.

A. Michelle Zielinski.

THE REPORTER: I'm sorry, could you repeat that one more time?

THE WITNESS: The last name?

THE REPORTER: The full name.

THE WITNESS: Michelle Zielinski.

THE REPORTER: Thank you.

MR. AINSWORTH: Michelle Zielinski.

THE WITNESS: Z-I-E-L-I-N-S-K-I.

BY MR. AINSWORTH:

Q. Anyone else?

A. No, that's it.

Q. I think you mentioned a James Minizzi. Was it Frank Minizzi? Oh, sorry, there's a James and a Frank. Did you review reports from a James and a Frank or just James?

A. James.

Q. Okay. All right. In review of those reports, was there anything in your review where you noticed something was wrong where you had inaccurately recorded some information?

MR. OBERTS: Objection. Over broad. Form and vague. Go ahead.

THE WITNESS: No, not that I'm aware of.

Page 41

BY MR. AINSWORTH:

Q. Okay. I want to ask you about the process of creating reports when you're a Cook County State's Attorney investigator, okay?

A. Process of what?

Q. Creating reports.

A. Creating reports, okay.

Q. All right. When you interviewed witnesses, would you take notes?

A. Yes.

Q. And after you -- and would you take notes while you were contemporaneously interviewing the witness?

A. Sometimes, yes.

Q. And how would -- when you say sometimes, would you sometimes take notes after the interview was concluded?

A. No.

Q. So what do you mean by sometimes you would take notes?

A. Well, you might only have one question for them, and if yes or no perhaps, and you didn't really need notes.

Q. I see. So if the interview was not very complex, you wouldn't necessarily take notes; is that

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 42

right?

A.    Yes.

Q.    But if the interview covered, you know, a number of topics, then you would take notes; is that fair to say?

A.    That's fair, yes.

Q.    And then what would you do with your notes after you created them?

MR. OBERTS:  Objection.  Over broad.  Vague.

THE WITNESS:  Well, we'd have an interview report.  I would discard the notes then.

BY MR. AINSWORTH:

Q.    All right.

A.    You have to make -- oh, pardon me.

MR. OBERTS:  Go ahead and finish it.  Finish it.

THE WITNESS:  I'd use the notes so -- for the information I have and then discard them.

BY MR. AINSWORTH:

Q.    Okay.  Would you have a file that you would carry with you while you investigated a case?

MR. OBERTS:  Objection.  Vague.  Form. Mischaracterizes testimony and assumes facts not in evidence.

MS. O'BRIEN:  Objection.  Foundation.

Page 43

THE WITNESS:  When we would do interviews, it was usually at the request of a state's attorney for trial support.

BY MR. AINSWORTH:

Q.    My question is: Would you carry a file during the investigations that you conducted?

MR. OBERTS:  Objection.  Mischaracterizes testimony.  Form and foundation.

THE WITNESS:  Well, we -- we would hear previous interviews concerning the same -- the same crime, we would have those with us.

BY MR. AINSWORTH:

Q.    And would that file contain your handwritten notes?

MR. OBERTS:  Objection.  Vague.

MS. O'BRIEN:  Foundation.  Objection.

THE WITNESS:  I'm -- I'm confused as to what -- what the question is.

BY MR. AINSWORTH:

Q.    Sure.  Let me break it down.  What would you call that file that you would carry with you that had prior reports in it?

MR. OBERTS:  Objection.  Vague.

MS. O'BRIEN:  Objection.  Form.  Foundation.

THE WITNESS:  It -- it had no particular name.

Page 44

Just a folder.

BY MR. AINSWORTH:

Q.    Okay.  Would you call it the full -- like if you're telling your partner to grab the file before you left the office, would you say grab the folder, grab the file?  What would you say?

MR. OBERTS:  Objection.  Vague.  Form.

THE WITNESS:  I don't know how to answer that.

BY MR. AINSWORTH:

Q.    All right.

MR. OBERTS:  Foundation.

BY MR. AINSWORTH:

Q.    Why don't you know how to answer that?

A.    Well, it was -- it was a folder containing, like, previous interviews, you would you -- would just have it.  I --

Q.    All right.  Well, and did you have any name for that folder?

MR. OBERTS:  Objection.  Asked and answered. And foundation.

THE WITNESS:  No.

BY MR. AINSWORTH:

Q.    All right.  If I refer to it as the file, the file folder, do you know what I'm talking about?

MR. OBERTS:  Objection.  Vague.

Page 45

THE WITNESS:  Yes.

BY MR. AINSWORTH:

Q.    Okay.  In that file folder, would you -- what would be contained in that file folder?

MR. OBERTS:  Objection.  Vague.  Foundation.

THE WITNESS:  Basically, any previous interviews you had done that touched on --

BY MR. AINSWORTH:

Q.    And would that --

A.    -- that touched on what you were going to -- going out to interview for.

Q.    And would that contain both typewritten and handwritten reports?

A.    It could.

Q.    And as I understand it, once you created handwritten notes of an interview, you would then create a typed report of the interview; is that right?

MR. OBERTS:  Objection.  Form.

THE WITNESS:  Yes.

BY MR. AINSWORTH:

Q.    And tell me about the process of how that typewritten report would be created from your handwritten notes?

MR. OBERTS:  Objection.  Vague and over broad.  Go ahead.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
—— COURT REPORTERS ——

Page 46

THE WITNESS: Well, I'd use the information from the notes taken during the interview and put it into the report.

BY MR. AINSWORTH:

Q. All right. And would you physically type the report, or would you dictate it, or how would the typewritten report be created?

MR. OBERTS: Objection. Over broad.

THE WITNESS: I would type it.

BY MR. AINSWORTH:

Q. And is that true in 1996 you would type the report?

A. Yes.

Q. And would you type it into a computer?

A. No.

Q. Would you type it on a typewriter?

A. Yes.

Q. Like a manual typewriter?

A. Correct.

Q. And then would you make copies of that typewritten report?

MR. OBERTS: Objection. Vague. Foundation. Over broad.

THE WITNESS: No.

BY MR. AINSWORTH:

Page 47

Q. What would you do with the typewritten report after you typed it up?

MR. OBERTS: Objection. Over broad.

THE WITNESS: I would -- I would turn it in to my supervisor.

BY MR. AINSWORTH:

Q. Would you keep a copy of that report for your file folder?

MR. OBERTS: Objection. Over broad. Foundation.

THE WITNESS: You might, but I don't recall doing that.

BY MR. AINSWORTH:

Q. Do you know what happened with the report after you turned it in to your supervisor?

MR. OBERTS: Objection. Foundation. Over broad. And speculation.

THE WITNESS: He would review it and sign it, and he would turn it into the office staff.

BY MR. AINSWORTH:

Q. Would you sign it before you sent it to the supervisor?

MR. OBERTS: Objection. Over broad. Form and foundation.

THE WITNESS: I might.

Page 48

BY MR. AINSWORTH:

Q. Why do you say you might sign it?

MR. OBERTS: Objection. Form. Foundation. And -- form and foundation.

THE WITNESS: Well, I knew it was going to be reviewed. I would say generally I would sign it. I don't think it would -- would have been necessary at that point.

BY MR. AINSWORTH:

Q. And I guess I'm wondering, did you wait to see if your supervisor was going to have edits for you, or if the supervisor was going to review it before you signed the report?

MR. OBERTS: Objection. Form. Foundation. And vague.

THE WITNESS: That sounds about right, yes.

BY MR. AINSWORTH:

Q. Would your supervisor sometimes have edits for you?

A. I don't recall any.

Q. Do you know what happened to your reports after the supervisor turned it in to office staff?

A. They would then enter it into the computers.

Q. And then what would happen in -- to your typewritten report after the office staff entered it in

Page 49

to the computers?

MR. OBERTS: Objection. Form. Speculation. Foundation.

THE WITNESS: I don't know.

BY MR. AINSWORTH:

Q. How do you know that office staff would enter your reports into the computer?

MS. O'BRIEN: Objection. Form. Foundation.

THE WITNESS: Oh, we would be given a copy after they had typed it in.

BY MR. AINSWORTH:

Q. And what would you do with that copy?

MR. OBERTS: Objection. Over broad. Form. Foundation.

THE WITNESS: We'd review it and sign it.

BY MR. AINSWORTH:

Q. And what would you do after you -- with the copy of the report that was given to you after you reviewed it and signed it?

MR. OBERTS: Objection. Over broad. Form. Foundation.

THE WITNESS: I don't -- I don't recall specifically. I believe it went back to the supervisor.

BY MR. AINSWORTH:

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 50

Q. Would you keep a copy in your file folder?

MR. OBERTS: Objection. Over broad. Vague. Foundation.

THE WITNESS: Possibly. I think yes.

BY MR. AINSWORTH:

Q. How did you come to be assigned to this case?

MR. OBERTS: Objection. Form. Speculation.

THE WITNESS: I don't know.

BY MR. AINSWORTH:

Q. You said you were assigned to this case, meaning the homicide of Carrie Hovel and -- I've forgotten her name. I'm embarrassed.

MR. OBERTS: Helena Martin.

BY MR. AINSWORTH:

Q. Helena Martin. The Martin and Hovel homicides the day before the meeting. Do you have a memory of that happening?

A. I do.

Q. And so, how were you assigned to the Hovel and Martin homicides the day before the meeting?

A. My supervisor told me that I would be assigned to it, and that any open jobs that I had from the narcotics section I should turn back into him to be reassigned.

Q. Who was your supervisor at the time?

Page 51

A. Willie Johnson.

Q. Did you know at that time you would be partnered with Bajenski on this case?

MR. OBERTS: Objection. Form. Foundation. And vague. At the time the supervisor told him, Russell?

MR. AINSWORTH: Yeah.

MR. OBERTS: Do you understand the question?

THE WITNESS: I understand it, but I'm not sure when I was told.

BY MR. AINSWORTH:

Q. Okay. The day before that meeting at the Cook County -- sorry. The day before that meeting with members of the Chicago Police Department and Cook County State's Attorney's Office representatives, did you review reports related to the case?

MS. O'BRIEN: Objection. Form. Foundation. Misstates evidence. Assumes facts not in evidence.

MR. OBERTS: Join. And, Russell, do you want to just agree to joining objections if stated?

MR. AINSWORTH: Yes.

MR. OBERTS: Without repeating? Very good. Join those objections. Do you understand the question?

THE WITNESS: Yes. No.

Page 52

BY MR. AINSWORTH:

Q. Why didn't you review reports the day before you started working on this -- or day before you had a meeting about this case?

MS. O'BRIEN: Objection. Form. Foundation.

MR. OBERTS: And speculated.

MS. O'BRIEN: Facts not in evidence.

THE WITNESS: We didn't know anything about what -- what case would be or what we were be -- what we would be doing.

BY MR. AINSWORTH:

Q. Okay. I want -- give me one second.

MR. OBERTS: At some point, Russell, can we take about a five-minute break, a bathroom break?

MR. AINSWORTH: Sure.

BY MR. AINSWORTH:

Q. When you're referring -- the meeting that you're referring to, who attended that meeting?

A. Lenny Bajenski, myself, Scott Cassidy. I think Laura. What's Laura's name? Laura Sullivan. There were several police officers whose names I don't really know. I'm -- I'm not sure of the rest.

MR. AINSWORTH: Okay. Let's take five minutes and come back at 11:05.

MR. OBERTS: Very good.

Page 53

(OFF THE RECORD)

THE REPORTER: We are back on the record. Counsel, you may proceed.

BY MR. AINSWORTH:

Q. I forgot to ask you, sir. As a Cook County State's Attorney investigator, did you have police powers?

A. Yes.

Q. So you were able to make arrests?

MR. OBERTS: Objection. Speculation. Form. Foundation.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. Did you -- when you worked as a Cook County State's Attorney investigator in 1996, did you carry a gun?

A. Yes.

Q. Did you have handcuffs?

A. Yes.

Q. And did you carry them on your person?

A. Yes.

Q. Did you have any other equipment that you would carry with you when you're in the field apart from your side arm and cuffs?

A. No. Well, possibly a radio.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 54

MR. AINSWORTH: All right. I'm going to show you what we marked -- what we'll mark as Exhibit 200.

(EXHIBIT 200 MARKED FOR IDENTIFICATION)

BY MR. AINSWORTH:

Q. And this is the interview with Daniel Callaghan; do you see it in the screen?

A. Yes.

Q. Okay. It says date drafted September 10, 1996. What does that refer to?

A. Where -- where am I looking at? Oh, date drafted, okay.

Q. Do you see it, sir?

MR. OBERTS: Objection. Form. See what he's talking about?

THE WITNESS: I do, but can you go to the bottom?

BY MR. AINSWORTH:

Q. Certainly.

A. The signature because -- okay. That would be the -- that would be the date that it was written, 9-10-96.

Q. Okay. Was this report typewritten?

A. Originally, yes.

Q. And is this the typewritten report or the

Page 55

computer-generated report that we're looking at? Can you tell?

A. This is the computer report.

Q. And how do you know?

A. There's a number up in the extreme upper left, which is something to do with the computer filing, we had no input of that.

Q. All right. So the file control number was not something that you had put on your reports; is that right?

A. Correct.

Q. And this is signed on September 10, 1996. Would -- is that the date that you signed this report?

A. Yes.

Q. All right. It says investigators and then supervisor's approval. I don't see a supervisor's signature on here, do you?

A. I don't.

Q. That's your signature. William Marley; is that right?

A. Yes.

Q. And that was your partner, Leonard Bajenski's signature; is that right?

A. I think it is, yes.

Q. Do you know why there's no supervisor's

Page 56

signature on this report?

MR. OBERTS: Objection. Foundation. Speculation.

THE WITNESS: No.

BY MR. AINSWORTH:

Q. Okay. So this report, which for the record is Bates number Sopron 5816, Exhibit 200. It says, "Daniel Callaghan was interviewed at his residence on September 10, 1996, by investigators William Marley and L. Bajenski"; do you see that?

A. Yes.

Q. All right. And so, it was customary for you to include the date of the interview and where the interview took place; is that right?

MR. OBERTS: Objection. Over broad.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. All right. And so, if you -- and this was an interview regarding the shooting that occurred at Hale Park; is that right?

A. Correct.

Q. Okay. And so, the meeting that you're referring to where you were first, you know, learned about this case and what your assignments would be, it would have occurred sometime before -- or on or before

Page 57

September 10, 1996; is that right?

MR. OBERTS: Objection. Vague. Form. Go ahead.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. Okay. I'm going to stop sharing for a minute. And so, can you tell us what was said at that meeting that was attended by yourself, Bajenski, Cassidy, Sullivan, various police officers? And were there other people from the Cook County State Attorney's Office there that you don't recall?

MS. O'BRIEN: Objection. Form. Foundation.

MR. OBERTS: Objection. Form. Foundation. And compound.

THE WITNESS: I don't know.

BY MR. AINSWORTH:

Q. Okay. What was stated at that meeting that you attended?

MS. O'BRIEN: Objection. Form. Foundation.

THE WITNESS: Mr. Cassidy outlined what had happened, the murder in the park of the two girls.

BY MR. AINSWORTH:

Q. Where did this meeting take place?

A. It was in the conference room of the chief investigator.



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 58

Q. What floor?

A. 14.

Q. Of the 26th and Cal?

A. Yes.

Q. What time of day was the meeting?

MR. OBERTS: Objection. Foundation.

THE WITNESS: I don't remember.

BY MR. AINSWORTH:

Q. You don't remember if it was early in the morning, or late at night, or anywhere in-between; is that right?

MR. OBERTS: Objection. Foundation. Asked and answered.

THE WITNESS: It was during the day, but I don't know at what time.

BY MR. AINSWORTH:

Q. All right. What else was said at that meeting apart from Scott Cassidy outlining the murder that occurred in the park of the two girls?

MS. O'BRIEN: Objection. Form. Foundation.

THE WITNESS: He just gave an overview of what had happened, and I think it was by way of introducing the investigators with the -- to the state's attorneys who would -- we would be working for.

Page 59

BY MR. AINSWORTH:

Q. Did you know Scott Cassidy before that time? Before that meeting?

A. Yes.

Q. How'd you know Scott Cassidy?

A. He was a supervisor in the state's attorneys. I didn't really know what section he was in, although I believe it was gangs.

Q. Had you worked on cases with Cassidy before this one?

A. No.

Q. Had you known Laura Sullivan before this? Before that meeting?

A. I knew who she was.

Q. How'd you know who she was?

A. Well, she was a state's -- an assistant state's attorney over there, and come across one another.

Q. Did you know any of the police officers who attended that meeting on or before September 10, 1996?

MS. O'BRIEN: Objection. Form. Foundation.

MR. OBERTS: Misstates --

MS. O'BRIEN: Yeah.

MR. OBERTS: Objection. Mischaracterizes testimony. And foundations.

Page 60

THE WITNESS: Thinking about that, I don't think there were actual Chicago police officers, there were state's attorneys, not police investigators.

BY MR. AINSWORTH:

Q. Why did you say there were police officers before, sir?

MS. O'BRIEN: Objection. Form. Foundation. That was your testimony.

MR. OBERTS: Yeah.

MR. AINSWORTH: Oh, excuse me. Maureen, we will check the transcript and that's why we have a transcript.

MS. O'BRIEN: That was just what I heard.

MR. AINSWORTH: Well, we have a transcript.

BY MR. AINSWORTH:

Q. So I'm just curious, sir, because, you know, before we took a break you said that police officers were at that meeting, right?

MR. OBERTS: Objection. Mischaracterizes testimony. Go ahead.

THE WITNESS: I did -- I did say that, yes.

BY MR. AINSWORTH:

Q. And then we took a five-minute break that stretched on for over ten minutes, right?

Page 61

A. I don't know.

Q. Okay. Well, the court reporter keeps the time of the breaks, but we called for a break to come back at 11:05, right?

MS. O'BRIEN: I'm going to object to this. I'm going to object to the form of this question.

THE WITNESS: I don't know.

BY MR. AINSWORTH:

Q. All right. Did you hear me say, you know, let's come back on the record at 11:05?

A. I did.

Q. Okay. And then, you know, we came back after 11:10. And I'm curious, sir, did you talk to your attorney during the break about whether there were police officers at that meeting that you attended?

MR. OBERTS: Objection. Calls for legal attorney-client privilege.

THE WITNESS: No, I went to the washroom.

BY MR. AINSWORTH:

Q. All right. So are you going to not answer the question on the basis of the attorney-client privilege?

MR. OBERTS: He answered the question, but go ahead.

THE WITNESS: I -- I don't -- I don't really understand what the question is.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 62

BY MR. AINSWORTH:

Q. The question is: Sir, did you talk with your attorney during the break about whether police officers were present at that meeting?

MR. OBERTS: Object. Calls for attorney-client privilege, but he already answered the question.

BY MR. AINSWORTH:

Q. So -- well, are you going to take your attorney's advice and not answer the question, sir?

A. I still don't understand. I -- I spoke with him telling him I wanted to go to the washroom.

Q. And so, my question is: Sir -- well, tell me, what did you say to your attorney, what did your attorney say to you during the break?

A. I said I had to go to the washroom.

MR. OBERTS: Object. Calls for attorney-client privilege. He just answered, so what -
-

BY MR. AINSWORTH:

Q. Tell me everything that you and your attorney said during the break, sir?

MR. OBERTS: Objection. Calls for attorney- client privilege. And I'm going to instruct him not to answer any further.

MR. AINSWORTH: I think he's waived the

Page 63

privilege by, you know, answering the question thus far.

MR. OBERTS: I disagree.

BY MR. AINSWORTH:

Q. Are you going to take your attorney's advice and not answer the question?

A. I don't know what to -- to say, sir.

MR. OBERTS: Say yes.

BY MR. AINSWORTH:

Q. All right. Sir, how did you -- what jogged your memory to indicate to you that police officers were not present at the meeting that you were present at?

A. I don't know, specifically.

Q. And that's the meeting that occurred on or before September 10, 1996, right?

MS. O'BRIEN: Objection. Form. Foundation.

MR. OBERTS: Go ahead.

THE WITNESS: Not sure on the date, but it was --

BY MR. AINSWORTH:

Q. Sure.

A. It was the first -- the first meeting with Mr. Cassidy. Yes.

Q. Let me just go back to Exhibit 200. This is the report that you generated, right?

Page 64

A. Yes.

Q. And this report was regarding an interview that you conducted on September 10, 1996, right?

A. Correct.

Q. And so, the meeting that you're referring to occurred on or before September 10, 1996, right?

MR. OBERTS: Objection. Form. Vague. Asked and answered.

THE WITNESS: I believe so.

BY MR. AINSWORTH:

Q. And why do you believe so?

A. Because we had nothing to do with this case before that.

Q. And the meeting was the first thing that you did regarding this case, right?

MR. OBERTS: Objection. Vague.

THE WITNESS: Yes. That was -- yes.

BY MR. AINSWORTH:

Q. Okay. So when you talked to Daniel Callaghan on September 10, 1996, he told you that he saw two boys running northbound in the park, right?

A. Yes.

Q. And that one of his dogs went to go chase the boys. They turned toward -- the boys turned towards Mr. Callaghan, and then the boys continued running

Page 65

northbound; is that right?

MR. OBERTS: Objection. Vague. Are you asking, from his personal recollection, or based upon the report that you have on the screen?

MR. AINSWORTH: Based upon the report.

MR. OBERTS: So you're asking if that's what it states in the report?

MR. AINSWORTH: Yeah.

MR. OBERTS: Can you see the report?

THE WITNESS: Yes. Most of it.

MR. OBERTS: You know, could he use just the hard copy of the report because he can't see the full -- because with our screens in the --

MR. AINSWORTH: Sure.

THE WITNESS: Right in front. Oh, this is it. I'm sorry.

MR. OBERTS: Okay. Russell, could you just -- so that's the report --

THE WITNESS: Okay.

MR. OBERTS: -- that's on the screen. So that's easier for you to look at. And then, Russell, could you just state your question, please?

BY MR. AINSWORTH:

Q. Mr. Marley?

A. Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 66

Q. So do you remember your conversation with Mr. Callaghan?

A. I do.

Q. What did Mr. Callaghan tell you?

MR. OBERTS: Without reading the reports? It's personal recollection?

MR. AINSWORTH: Yep.

THE WITNESS: He said he was walking his dogs.

BY MR. AINSWORTH:

Q. Okay.

A. He asked me if he heard any shots. He said no because he was listening to music. He had some sort of headphones on, or earplugs, whatever. He saw two guys running. The dogs started to go. I don't know if both dogs -- one of the dogs started to go after them. They stopped, but then the dogs came back to him, and they continued on.

Q. And they continued on which direction?

A. North.

Q. All right. So the two guys were running northbound, right?

MR. OBERTS: He's only asking you your -- whatever you recall. Don't read your report right now.

THE WITNESS: Oh.

Page 67

MR. OBERTS: He'll tell you if you need to reread your report.

THE WITNESS: Oh, okay. Sorry. Could you repeat that, please?

BY MR. AINSWORTH:

Q. Sure. The -- and Mr. Callaghan told you that the boys were running northbound, right?

A. Yes.

Q. And that -- not that they were running westbound, but they were running northbound, correct?

MR. OBERTS: Objection. Form. Foundation.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. If Mr. Callaghan had told you that the boys were running westbound, you would've documented that he said you were -- they were running westbound, right?

A. Yes.

Q. And so, the fact that the -- oh, strike that. Okay. Did you recall your conversation with Mr. Callaghan, before you reviewed your report of your interview with him, in preparation for this deposition?

A. In general. Yes.

Q. Okay. Was your memory refreshed, based on your review of the report?

A. It was.

Page 68

Q. What did you review? What did you remember about your interview of him before you refreshed your recollection?

A. Just that he had been -- wait. Could you clarify that a minute, or -- please?

Q. Okay. Sure. I'm wondering what did you recall, in general terms, of your interview with Mr. Callaghan before your memory was refreshed by reviewing a report.

A. Well, just that he had been in the park at the time of the shooting, and -- but that he really couldn't identify anybody, that he saw the two boys running, but that was about it.

MR. AINSWORTH: Okay. All right. I want to show you, now, Exhibit -- what we've marked previously as Exhibit 197.

BY MR. AINSWORTH:

Q. This is a police report. Okay. I'm going to go back up to the top of this. All right. Do you remember what CPD supp reports looked like back in the 1990s?

A. Yes.

Q. Okay. So this is a supplemental report, and this is the first page of Exhibit 197. Going down to the bottom of the first page, this is a report generated

Page 69

by Holmes and Argenbright, dated September 26, 1996; do you see that?

A. I do.

Q. Okay.

MR. OBERTS: Objection. Foundation.

BY MR. AINSWORTH:

Q. And this report indicates that they have Wayne Antusas and Matthew Sopron in custody; do you see that on Page 2?

MR. OBERTS: Objection. Foundation.

MS. O'BRIEN: Objection. Form.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. All right. And then going on to Page 3 of Exhibit 197 -- oh, sorry. I mean, Page 4 of Exhibit 197. Do you see where it says, "Personnel assigned"?

MR. OBERTS: Objection. Foundation.

THE WITNESS: I do.

BY MR. AINSWORTH:

Q. And from the CPD, it says Detectives Argenbright, Holmes, Ball, and Turner?

MS. O'BRIEN: Objection. Form. Foundation.

MR. OBERTS: Objection. Foundation.

THE WITNESS: I see that.

BY MR. AINSWORTH:

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 70

Q.   Okay.  Did you know Detective -- any of Detectives Argenbright, Holmes, Ball, or Turner prior to September 16, 1996?

A.   I had met Argenbright and Holmes, socially, just in passing, wakes and that type of thing.

Q.   Had you ever worked with them?

A.   No.

Q.   All right.  And then, continuing on under, "Personnel assigned," it says, "Cook County State -- Cook County Assistant State's Attorneys, Neil Lenihan, Jack Hynes, Scott Cassidy, Laura Sullivan, Colleen Hyland"; do you see that?

MS. O'BRIEN:  Objection.  Foundation.

MR. OBERTS:  Objection.  Foundation.

THE WITNESS:  I see it.

BY MR. AINSWORTH:

Q.   And then, it has a list of investigators. Investigator Ptak, Maicke, McDonald, Marley, Bajenski, and then Police Officer DeLacy; do you see that?

A.   Yes.

MR. OBERTS:  Objection.  Foundation.

BY MR. AINSWORTH:

Q.   Okay.  Have you seen this report before, sir?

A.   I don't think so.

Q.   Okay.  Let's go on to Page 5 of Exhibit 197.

Page 71

Under "Investigation," the report reads, "Reporting detectives were assigned by Sergeant Graffeo of this command to assist the Cook County State's Attorney's Office in the further investigation into the shooting deaths of Helena Martin and Carrie Hovel, which occurred on December 14, 1995 at 6149 South Melvina. Reporting detectives, along with Sergeant Graffeo met with members of the Cook County State's Attorney's Office at 26th and California, at about 0600 hours on September 16, 1996. At that time, a coordinated effort to locate various subjects was discussed and subsequently implemented. This effort resulted in the location of several potential witnesses in the case. These subjects were then interviewed by assistant State's attorneys and their investigators"; do you see that, sir?

MS. O'BRIEN:  Objection.  Form.  Foundation. Improper.  Anything --

MR. OBERTS:  Objection.  Foundation.

THE WITNESS:  I do.

BY MR. AINSWORTH:

Q.   I'm sorry.  What -- okay.  Were you present at this meeting that occurred on September 16, 1996 at about 6:00 in the morning at the Cook County State's Attorney's Office?

A.   I believe I was.

Page 72

Q.   All right.  And at that meeting, there were members of the Cook County State's Attorney's Office and members of the Chicago Police Department; is that right?

MR. OBERTS:  Objection.  Foundation.

MS. O'BRIEN:  Objection.  Form.

THE WITNESS:  Yes.

BY MR. AINSWORTH:

Q.   And what was said at that meeting?

MR. OBERTS:  Objection.  Foundation.

THE WITNESS:  I don't really remember, specifically.  We were assigned individuals to try to locate.

BY MR. AINSWORTH:

Q.   All right.  And what was your understanding of how it was going to work, as far as locating the individuals -- well, strike that.  Was it your understanding that you would be working with Chicago police officers and Cook County State's Attorney investigators to find individuals?

MR. OBERTS:  Objection.  Foundation. Speculation.  Form.

MS. O'BRIEN:  Objection.  Form.  Foundation.

THE WITNESS:  Well, I was working with a -- a State's Attorney's investigator, not a Chicago police officer.

Page 73

BY MR. AINSWORTH:

Q.   Okay.  Did you -- what -- who ran the meeting on September 16, 1996?

MR. OBERTS:  Objection.  Foundation. Speculation.

THE WITNESS:  I don't remember.

BY MR. AINSWORTH:

Q.   Can you tell us anything that was said at that meeting, on September 16, 1996?

MR. OBERTS:  Objection.  Speculation. Foundation.  Asked and answered.

THE WITNESS:  Just -- I remember our part in it.  We were assigned an individual to try to locate.

BY MR. AINSWORTH:

Q.   All right.  What was your part in it, and who is "you" when you're referring to "you"?

MR. OBERTS:  Objection.  Form.  Foundation.

THE WITNESS:  Who?

BY MR. AINSWORTH:

Q.   You said --

A.   Who was -- who was my partner?

Q.   Yeah.

A.   That would've been Bajenski, Lenny Bajenski.

Q.   All right.  And what was you and Bajenski's

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 74

role?

MR. OBERTS: Objection. Mischaracterizes testimony.

THE WITNESS: What was the kid's name? We were --

MR. OBERTS: Form and foundation.

THE WITNESS: We were given the name and address of a witness that they wanted located. We went to his house.

BY MR. AINSWORTH:

Q. And who was that witness?

A. The name?

MR. OBERTS: Foundation.

THE WITNESS: The name escapes me, right now. It's a young kid.

BY MR. AINSWORTH:

Q. Was it Anthony Coppolillo [sic]?

A. That's it.

Q. Okay. When you're conducting investigations and in gang-related cases, did you have the ability to run background checks on witnesses?

MS. O'BRIEN: Objection. Form. Foundation. When you are in -- conducting investigations.

BY MR. AINSWORTH:

Q. You can answer.

Page 75

A. Yes.

Q. And how would you -- what access to background information did you have back in 1996?

A. No, I don't really remember if it was through our own computer system, or if they had access to Chicago, so I'm not sure.

MR. AINSWORTH: All right. Let me mark -- well, let me show you what we'll mark as Exhibit 201. Hang on. Sorry. I'm not sure why it's not coming up. Hang on. Okay. So let's mark as Exhibit 201, document Bates-numbered CCSAO CAB 13671 through 13676.

(EXHIBIT 201 MARKED FOR IDENTIFICATION)

BY MR. AINSWORTH:

Q. I'm going to show you the first page of Exhibit 201. Do you see the handwriting that's highlighted, that says, "Senior at St. Lawrence High School"?

A. I do.

Q. Is that your handwriting, sir?

MR. OBERTS: Foundation. What? Objection. Foundation. Did you hear the question?

THE WITNESS: Could -- could you repeat the question?

BY MR. AINSWORTH:

Page 76

Q. Is that your handwriting, sir?

A. No.

Q. Do you know whose handwriting that is?

A. No.

Q. All right. Do you recognize this type of report?

MR. OBERTS: Objection. Vague.

THE WITNESS: Not really. No.

BY MR. AINSWORTH:

Q. Okay. Do you see, at the -- on the first page, it says, SOS 091096 1506?

A. Yes.

Q. And then that -- and so that date refers to September 10, 1996; is that right?

MR. OBERTS: Objection. Foundation and speculation.

THE WITNESS: I don't know.

BY MR. AINSWORTH:

Q. You don't know if 091096 refers to September 10, 1996?

MR. OBERTS: Objection. Asked and answered. Foundation and speculation.

THE WITNESS: Well, I'm -- it would appear so, but I'm not familiar with this report.

BY MR. AINSWORTH:

Page 77

Q. Okay. You see where it says, "Coppolillo, Anthony J"?

MR. OBERTS: Objection. Foundation.

THE WITNESS: Yes. I do.

BY MR. AINSWORTH:

Q. Okay. And then you see where it says, "Previous inquiries within last ten days on driver's license number," and it gives the driver's license number, there?

A. Uh-huh.

MR. OBERTS: Objection. Foundation.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. And it says, "Cook County State's Attorney, September -- date/time, September 3, 1996, at 11:59." See it?

MR. OBERTS: Objection. Foundation.

THE WITNESS: I see it. Yes.

BY MR. AINSWORTH:

Q. Okay. So according to Page 1 of Exhibit 2000 -- or 201, it says, "Previous inquiries within the last ten days on this particular driver's number -- driver's license number," was one inquiry on September 3, 1996, right?

MR. OBERTS: Objection. Foundation and

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 78

speculation.

THE WITNESS: Could -- would -- would you repeat that, please?

BY MR. AINSWORTH:

Q. Sure. So according to Page 1 of Exhibit 201, the previous inquiry within the last ten days of this report was an inquiry by the Cook County State's Attorney's Office on September 9 -- September 3, 1996; do you see that?

MR. OBERTS: Objection. Foundation and speculation. He's already stated he's not familiar with this report.

MR. AINSWORTH: Okay. We don't --

MR. OBERTS: I mean, it's not fair. It would never be --

MR. AINSWORTH: No --

MR. OBERTS: -- question. It would never be introduced into evidence. It would never be going this far --

MR. AINSWORTH: Bill --

MR. OBERTS: -- if we were at trial. It's not fair.

MR. AINSWORTH: Bill, you are not going to do this in this deposition. You are not going to have speaking objections, and the fact whether it's

Page 79

introduced into evidence, which is something that will be decided at trial, has no bearing whatsoever on what questions I can ask this witness. You know that. You're an experienced attorney. So the only thing that I can take from you speaking and making an objection of that type, is that you're trying to cue the witness, which is not fair. We will stop the deposition. We will contact the judge. We will ask the judge if you continue doing this, so please don't.

MR. OBERTS: That's it. And let me state my statement. He repeatedly stated -- he told you he wasn't familiar with the document. He didn't know the document. It wasn't his handwriting. Yet, you continue to ask questions regarding the document, asking if this is true, if this is true, when he already said that he wasn't familiar with it. It wouldn't have gone this far if we were in court. That's regardless of whether it was admitted into evidence or not. It wouldn't be used with this witness after he stated he wasn't familiar. That's my --

MR. AINSWORTH: That is a nonsensical objection. I think we are all dumber for having you -- having said it.

Page 80

MR. OBERTS: I'm repeatedly stating a foundation objection.

MR. AINSWORTH: Then states foundation. You know how to do this.

MR. OBERTS: I'm repeatedly stating that --

MR. AINSWORTH: Thank you. No speaking objections. That's all I'm asking. You can say, foundation. I haven't said word one about your objections. I just -- don't make speaking objections. Thank you. We can agree on that.

BY MR. AINSWORTH:

Q. Going on to Page -- actually sticking on Page 1 of Exhibit 201, you see that it has a driver's license number ending in 9317 for Anthony Coppolillo?

MR. OBERTS: Objection. Foundation and speculation.

THE WITNESS: I -- I see his name, but I don't see the driver's license number.

BY MR. AINSWORTH:

Q. That's all right. See where it says DLNC 144-0107-9317?

MR. OBERTS: Objection. Foundation and speculation.

THE WITNESS: Oh. Oh, right at the bottom of the report. Yes.

Page 81

BY MR. AINSWORTH:

Q. And then -- and so it ends in 9317, right?

MR. OBERTS: Objection. Foundation. Speculation.

THE WITNESS: What is the question?

BY MR. AINSWORTH:

Q. Mr. Marley, the driver's license, according to Exhibit 201, that's assigned to Anthony Coppolillo ends in 9317; do you see that?

A. Yes.

MR. OBERTS: Objection. Foundation. Speculation.

BY MR. AINSWORTH:

Q. And then --

A. Yep. Yes.

Q. Where it talks about previous inquiries within the last ten days, on driver's license number, it refers to a driver's license number ending in 9317; you see that?

MR. OBERTS: Objection. Foundation and speculation.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. Okay. Going on to Page 2 of Exhibit 201, there's a -- it says, "Name search response"; you see

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 82

that?

MR. OBERTS: Objection. Foundation and speculation.

THE WITNESS: I do.

BY MR. AINSWORTH:

Q. And then going down to Page 3 of Exhibit 201, you see there's a -- or it appears to be a fax banner at the top dated September 11, 1996?

MR. OBERTS: Objection. Foundation and speculation.

THE WITNESS: I see September 11th. Yes.

BY MR. AINSWORTH:

Q. And there's a reference on Page 3 of Exhibit 201 to the father and mother of Anthony Coppolillo; do you see that?

MR. OBERTS: Objection. Foundation and speculation.

THE WITNESS: I do.

BY MR. AINSWORTH:

Q. And then the bottom of page 3 of Exhibit 201, it says, under, "Juvenile information summary," it says, "Last name, Coppolillo, first name, Anthony"; you see that?

MR. OBERTS: Objection. Foundation. Speculation.

Page 83

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. And there's a trespassing charge, a juvenile trespassing charge for him; is that right?

MR. OBERTS: Objection. Foundation. Speculation.

THE WITNESS: I -- I'm not -- I'm not really familiar with this report, but it would seem to be. Yes.

BY MR. AINSWORTH:

Q. And then going on to Page 4 of Exhibit 201, it says, "Previous inquiries within the last ten days on Coppolillo, Anthony. Cook County State's Attorney's Office on September 10, 1996"; do you see that?

MR. OBERTS: Objection. Foundation and speculation.

THE WITNESS: I do.

BY MR. AINSWORTH:

Q. There's a photograph of a person on Page 5 of Exhibit 201, right?

MR. OBERTS: Objection. Foundation. Speculation.

THE WITNESS: Yes. There's a photograph.

BY MR. AINSWORTH:

Q. And then on the last page, is this your

Page 84

handwriting?

A. No.

Q. Do you know whose handwriting this is?

MR. OBERTS: Objection. Speculation and foundation.

THE WITNESS: I don't.

BY MR. AINSWORTH:

Q. All right. It says Anthony Coppolillo, MW, that's common abbreviation for male, White; is that right?

A. Yes.

Q. It says, "Senior at St. Lawrence High School?"

MR. OBERTS: Objection. Foundation. Speculation.

BY MR. AINSWORTH:

Q. Right?

A. Yes.

Q. Okay. I'm going to stop sharing. Oh, sorry. I wanted to show you one other thing from that report. It's on Page 4. So that same report, Exhibit 201. Do you see at the top of Page 4, of Exhibit 201, it says, "Request DiCiolla"?

MR. OBERTS: Objection. Foundation and speculation.

THE WITNESS: I do. Yes.

Page 85

BY MR. AINSWORTH:

Q. Do you know anybody named DiCiolla?

A. Yes.

Q. Who is that?

A. He's a supervisor at the State's Attorney's Office.

Q. Was he your supervisor?

A. No.

Q. Who was your supervisor on this investigation?

MR. OBERTS: Objection. Mischaracterizes testimony.

MS. O'BRIEN: Objection. Form. Foundation.

THE WITNESS: DiCiolla was on it. I don't know if there were other ones also assigned.

BY MR. AINSWORTH:

Q. And then before you went to talk to Anthony DiCiolla [sic] -- sorry. Before you went to talk to Anthony Coppolillo, you had the ability to search his name and find out where he lived and who he was, right?

MR. OBERTS: Objection. Form. Foundation.

THE WITNESS: Would have that ability. Yes.

BY MR. AINSWORTH:

Q. Okay. When you were assigned the task of interviewing Anthony Coppolillo, one of the first things you would do -- well, strike that. When you were

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 86

assigned the task of interviewing Anthony Coppolillo, you would run his name to try and find out where he lived and information about him, right?

MR. OBERTS: Objection. Presumes facts not in evidence. Foundation, and form, and vague as well.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. All right. And that would tell you whether he had any pending charges, for example?

MR. OBERTS: Objection. Speculation, and foundation, and form.

THE WITNESS: Pending charges, possibly.

BY MR. AINSWORTH:

Q. It would tell you how old he was, right?

MR. OBERTS: Objection. Speculation, foundation, and form.

THE WITNESS: It would.

BY MR. AINSWORTH:

Q. And, like, where you could find him, right?

MR. OBERTS: Objection. Form. Foundation.

THE WITNESS: Yes.

MR. AINSWORTH: All right. Let's take a look at what we'll mark as Exhibit 202.

(EXHIBIT 202 MARKED FOR IDENTIFICATION)

BY MR. AINSWORTH:

Page 87

Q. All right. What we're marking as Exhibit 202 is an investigative report regarding your interview with Anthony Coppolillo. It's a one-page document, Bates-numbered Sopron 5852.

MR. OBERTS: And, Russell, if you'd like to ask him about the report, can he just look at it hard copy?

MR. AINSWORTH: Yes.

THE WITNESS: Oh, sorry.

MR. OBERTS: All right. The witness has a hard copy of the report that's on the screen in front of him.

BY MR. AINSWORTH:

Q. Okay. So taking a look at Exhibit 202, you see where it says, "Subject," and then, "Coppolillo," and then his age, and date of birth, and address, and telephone number, and Social Security number, and driver's license number, and height, weight; do you see all that?

A. I do.

Q. And so, that's information that you would have accessible to you before you spoke to Mr. Coppolillo; is that right?

MR. OBERTS: Objection. Speculation, --

MS. O'BRIEN: Form. Foundation.

Page 88

MR. OBERTS: -- foundation, and form.

THE WITNESS: Generally. Yes.

BY MR. AINSWORTH:

Q. Okay. Like, you might not have his telephone number, but you'd have his date of birth, and address, and driver's license number, right, if you had one --

MR. OBERTS: Objection. Form. Foundation. Speculation.

THE WITNESS: Correct.

BY MR. AINSWORTH:

Q. Okay. So the report reads, "On September 16, 1996, the reporting investigator, while working with Investigator William Marley, went to the home of this subject and observed him leaving his home. The reporting investigators approached him, and asked him to accompany them to the Bridgeview Courthouse to be interviewed." I'm going to pause there, okay? Did I read it correctly so far?

A. Yes.

Q. All right. And so, in the report, I believe it was authored by your partner Bajenski, right?

MR. OBERTS: Objection. Speculation. Foundation.

THE WITNESS: We both signed it. I'm not really sure who authored it.

Page 89

BY MR. AINSWORTH:

Q. Well, at the top it says, "On September 16, 1996, the reporting investigator, while working with Investigator William Marley"; do you see that?

A. Okay. Yeah.

Q. That indicates to you that it was Bajenski who authored this?

A. I would think so. Yes.

Q. All right. And so, in the report, it indicates the date of the contact with Coppolillo as well as where the contact took place and the circumstances, you know, observing Coppolillo leaving his home, right?

A. Yes.

Q. All right. And then the report, the Exhibit 202 continues, saying, "He agreed. And when the reporting investigators learned his age, and told him that they had to inform his parents, he stated that the reporting investigators should not inform his mother because she was very hyper and he was afraid that she would get sick. He furnished the reporting investigators with his father's phone number, and asked that he be notified, instead. The reporting investigators finally contacted the father, who gave Anthony permission to be interviewed by ASA Laura

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 90

Sullivan. That interview is recorded in a statement taken by ASA Sullivan and witnessed by Investigator L. Bajenski, dated December 14, 1996 at 2:20 p.m."; do you see that?

A. I do.

Q. Did you interview Mr. Coppolillo?

MR. OBERTS: Objection. Vague. Form. Foundation.

THE WITNESS: No.

BY MR. AINSWORTH:

Q. Were you present for an interview of Mr. Coppolillo?

MR. OBERTS: Objection. Foundation, form, and vague.

THE WITNESS: I was in the building, but I wasn't a witness to it.

BY MR. AINSWORTH:

Q. How do you know that?

A. I would have been listed on there as the witness to it. I wasn't.

Q. Oh, I don't mean the statement. You know, it says -- I don't mean the statement that was given to Laura Sullivan. I mean were you -- did you and/or Bajenski interview Coppolillo before he was interviewed by Laura Sullivan?

Page 91

MR. OBERTS: Objection. Form. Speculation. Asked and answered.

THE WITNESS: We -- we talked to him at his residence when we first contacted him, yes.

BY MR. AINSWORTH:

Q. Did you interview him at the Bridgeview Courthouse about his -- about the murders of Martin and Hovel?

MR. OBERTS: And you, you're referring to Mr. Marley, correct?

MR. AINSWORTH: Yes.

THE WITNESS: I did --

MR. OBERTS: Objection. Asked and answered. Foundation, but go ahead.

THE WITNESS: I did not.

BY MR. AINSWORTH:

Q. If you had conducted an -- or been present for an interview with Mr. Coppolillo at the Bridgeview Courthouse, would you have noted that in your report?

A. Yes.

Q. Okay. Is there anything else about your contact with Anthony Coppolillo that you recall that we haven't discussed?

MR. OBERTS: Objection. Vague, form, foundation, speculation.

Page 92

THE WITNESS: I don't really know how to answer that. I'm not sure what -- what the question is.

BY MR. AINSWORTH:

Q. Sure. Tell me everything you recall about your contact with Anthony Coppolillo.

A. Stop. Did that -- did that go off?

Q. Just the -- I took it off the screen sharing.

MR. OBERTS: And he is not asking about your report right now.

THE WITNESS: Oh, okay.

MR. OBERTS: He's asking about --

BY MR. AINSWORTH:

Q. Tell me everything you -- that happened in your contact with Anthony Coppolillo?

A. When we contacted him at his house, he was leaving the house and we told him what we wanted -- wanted to talk to him about those murders. He asked us to not do it in front of his mother, that his mother was, I don't remember, sick in some -- some fashion. I don't really remember what the problem was, but that she was very nervous, and he asked if we would contact his father rather than talk to the mother.

Q. Okay. Anything else you recall? Go ahead.

A. Well, we did contact --

MR. OBERTS: Objection. Vague. Go ahead.

Page 93

Objection. Vague. But go ahead.

THE WITNESS: We did contact the father and explained what the situation was, and he gave permission to talk to the son, or to Anthony.

BY MR. AINSWORTH:

Q. Any other -- anything else about your contact with Anthony Coppolillo that you recall?

MR. OBERTS: Objection. Form, vague, foundation. Go ahead.

THE WITNESS: Not that I recall, no.

BY MR. AINSWORTH:

Q. Did he have anything to say about the murders of Martin and Hovel in your presence?

A. Not in my presence.

Q. Right. And then just going back to Exhibit 202 -- well, strike that. No. Going back to Exhibit 202, you see that his date of birth is November 7, 1997 -- or 1979?

A. Yes.

Q. And so, in 1996, he would've been 16 years old; is that right?

A. Yes.

Q. And you would've known his age before you talked to him, right?

MR. OBERTS: Objection. Speculation,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 94

foundation.

THE WITNESS: I don't remember if we had that information or not.

BY MR. AINSWORTH:

Q. Well, why wouldn't you have that information if the first thing you would've done -- or if before you interviewed him, you would've ran his name and learned his date of birth?

MR. OBERTS: Objection.

MS. O'BRIEN: Objection. Form, foundation.

MR. OBERTS: Objection. Mischaracterizes testimony. Form, foundation, speculation, and argumentative.

THE WITNESS: I have no specific memory of knowing it prior, but we well might have.

BY MR. AINSWORTH:

Q. Any reason to think that you wouldn't have known how old he was before you go to talk to a witness in a double homicide case?

MR. OBERTS: Objection. Speculation, asked and answered, and foundation, and form.

THE WITNESS: None in particular, but I just don't remember.

BY MR. AINSWORTH:

Q. Okay. But you --

Page 95

THE REPORTER: I'm sorry to interrupt, Mr. Marley. You cut out there for a second. Could you please repeat what you just said?

THE WITNESS: I said, I -- I -- I just don't remember whether we had the information or not.

BY MR. AINSWORTH:

Q. You said you had no particular reason; is that right?

MR. OBERTS: Said, "None in particular. I just don't remember"; is that accurate?

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. Okay, sir. So you know, at trial, I'll ask you if you have any reason to not have known Coppolillo's age at the time, you know, before you went to go talk to him. And I'd like to know if you have any reason for that. Oh, I screwed up that question. Let me strike it.

MS. O'BRIEN: Thank you.

MR. AINSWORTH: You're welcome.

BY MR. AINSWORTH:

Q. All right, sir. So I would like to know now if you have any basis for believing that you didn't know Coppolillo's age before you went to go talk to him on September 16, 1996?

Page 96

MR. OBERTS: Objection.

MS. O'BRIEN: Objection. Form, foundation.

MR. OBERTS: He just stated that. Objection. Asked and answered. He just stated that.

BY MR. AINSWORTH:

Q. You can answer, sir.

A. I'm confused now. I --

Q. Come on.

MR. OBERTS: Objection. Asked and answered. He just stated that. You can play it back with the court reporter.

MR. AINSWORTH: No, Bill, no. We don't do that.

MR. OBERTS: Well, you -- if you can't -- it's not fair to ask him the same question twice. And he just asked for his answer, and he'd said the answer.

MR. AINSWORTH: So let me let me put it this way. When you say, no particular reason, I just want to make sure I understand what that means, okay?

MR. OBERTS: That wasn't the full answer. Then you could ask him that. Then you could ask him what -- but you could repeat his answer and say, what do you mean by that? But to ask him the same question, that's not fair. That's asked and

Page 97

answered.

MR. AINSWORTH: Hey, Bill, you know, if you think that it's unfair, then --

MR. OBERTS: It is asked and answered. I mean, that's -- I mean, it's not --

MR. AINSWORTH: Then file a motion, bring -- call the judge or let him answer the question, all right? You're not -- are you telling him not to answer?

MR. OBERTS: No. He did answer the question. That's the whole purpose of the objection.

MR. AINSWORTH: Then let's move on because I'm trying to get to this particular point and here's all I want to know, sir. Can you think of any reason why you wouldn't have known Anthony Coppolillo's age at the time you went to go speak to him?

MS. O'BRIEN: Objection. Form, foundation.

THE WITNESS: No.

BY MR. AINSWORTH:

Q. All right. I want to ask you -- you interviewed a Doris Montejano, the police officer who had her guns burgled, right?

A. Yes.

Q. And when you talked to her, you were aware

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 98

that she'd been interviewed in conjunction with the investigation that occurred in December 1995, right?

MR. OBERTS: Objection. Foundation and form.

THE WITNESS: I -- I imagine we did, but I don't have any specific memory of it.

BY MR. AINSWORTH:

Q. All right. When you're talking to witnesses in a double homicide, you want to know if they're interviewed before, right?

MR. OBERTS: Objection. Vague.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. And you want to know what -- if they're interviewed before, so you can tell whether they're giving you different information or the same information, right?

MR. OBERTS: Objection. Vague, foundation. Assumes the fact not in evidence.

THE WITNESS: Would you repeat that? I'm getting confused with this.

BY MR. AINSWORTH:

Q. Sure. One of the reasons why you want to know if a witness was interviewed before is so you can tell whether or not the witness is giving you the same information or different information, right?

Page 99

MR. OBERTS: Objection. Vague, form, foundation, and assumes a fact not in evidence.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. Let's mark as Exhibit 203 the interview that you conducted with Ms. -- or Officer Montejano. And --

MR. OBERTS: 203, right?

MR. AINSWORTH: Yes. 203. And for the record, it's Bates number Sopron 5846. All right. Do you know who authored this report?

(EXHIBIT 203 MARKED FOR IDENTIFICATION)

MR. OBERTS: Just hold on. We're getting the report right now.

MR. AINSWORTH: Okay.

MR. OBERTS: Let the record show the witness has a copy of the report in his hand. Please go ahead, Russell, again.

THE WITNESS: I -- I think I did.

BY MR. AINSWORTH:

Q. Why do you think you did?

A. Because my signature is first on the bottom.

Q. Okay. So at the bottom of your report that we've marked as 203, it states, "When she arrived at Area 1" -- It's kind of in the middle of the paragraph, that bottom paragraph. Do you see where I'm talking

Page 100

about?

A. Yes.

Q. "When she arrived at Area 1, she observed a male white sitting in the office. She recognized him as one of the two boys she had earlier observed by her residence. She informed the detectives of this information. They identified the boy as Billy Bigeck"; do you see that?

A. I do.

Q. All right. So Officer Montejano told you that she had told the detectives that interviewed her that she recognized Bigeck as one of the boys who had been observed earlier outside her residence, right?

MR. OBERTS: Objection. Form, foundation.

MS. O'BRIEN: I'm going to object. Form, foundation, when this interview took place.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. And looking at the second paragraph down from the top, says, "She observed two young men walk by the house. They looked suspicious to her. Her mother came out and Montejano and she drove off"; do you see that?

THE WITNESS: I do.

MS. O'BRIEN: Objection. Again, form, foundation, date of interview.

Page 101

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. And this interview occurred on September 25, 1996, right?

MR. OBERTS: Objection. Foundation.

THE WITNESS: Yes, it did.

BY MR. AINSWORTH:

Q. Okay. Did you conduct any investigation to find out why it wasn't documented that Officer Montejano had identified Billy Bigeck as one of the two suspicious youths who were outside her house on the day of the burglary?

MS. O'BRIEN: Objection. Form, foundation, assumes facts not in evidence.

THE WITNESS: I didn't.

BY MR. AINSWORTH:

Q. All right. Did you have a supervisor named McDonald?

A. Yes.

MR. OBERTS: Objection. Vague, time frame. Go ahead.

BY MR. AINSWORTH:

Q. Who is -- who is supervisor McDonald?

A. He is a -- a supervisor in child -- child support. I beg your pardon. Trial support.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 102

Q. Was he your supervisor in 1996 or somebody else's?

A. Somebody else's.

Q. Did -- was anything said between you, your partner, or Officer Montejano that was not recorded in your report marked Exhibit 203?

MR. OBERTS: Objection. Vague, foundation, and form.

THE WITNESS: No.

BY MR. AINSWORTH:

Q. All right. Let's mark the next one as Exhibit 204. 204 is an interview you conducted with James Minizzi, Bates numbered Sopron 5868 and 5869. Do you have a hard copy there?

(EXHIBIT 204 MARKED FOR IDENTIFICATION)

MR. OBERTS: We're getting it right now.

MR. AINSWORTH: Thanks.

MR. OBERTS: He has a hard copy of the exhibit. James Minizzi report in his hand.

BY MR. AINSWORTH:

Q. All right. At the top of Exhibit 204, there's a blank for report number. Do you know what information is supposed to go in there?

A. Not quite sure where you mean.

Q. Well, at the top it's headed "Investigative

Page 103

Report."

A. Yes.

Q. And then there it says type of case, homicide?

A. Yes.

Q. To the right of that, it says report number and there's a blank space.

A. Oh, I see. No, I don't know what that is.

Q. Okay. And you signed this report first. Does that indicate to you that you're one who authored this report?

A. Yes.

Q. All right. So you indicate at the beginning of your report that the interview was conducted on October 2, 1996 at 5:15 p.m. at the Cook County State's Attorney's Office at 2650, South California; do you see that?

A. I do.

Q. So that was consistent with your practice of including the time and date and location of interviews when you documented them, right?

A. Yes.

Q. The second paragraph states "he," meaning James Minizzi, "was informed that a telephone call had been made to his house from Matt Sopron's house at 6:02 p.m, December 14, 1996. He denied that the call was to

Page 104

him. He stated that Matt Sopron's mother and his mother are good friends and often talk on the phone"; do you see that?

A. I do. I do.

Q. Was that the reason that you were interviewing James Minizzi was because there was a phone call between Matt Sopron's house and his house on December 14, 1996?

MR. OBERTS: Objection. Speculation, foundation.

MS. O'BRIEN: Form.

THE WITNESS: I don't recall.

BY MR. AINSWORTH:

Q. Do you know why you were interviewing James Minizzi on October 2, 1996?

MR. OBERTS: Objection. Speculation, foundation.

THE WITNESS: I don't.

BY MR. AINSWORTH:

Q. Did James Minizzi tell you anything in that conversation that's not documented on Exhibit 204 of your report of your interview with him?

MR. OBERTS: Objection. Foundation.

THE WITNESS: No.

BY MR. AINSWORTH:

Q. Were you thorough in your report writing?

Page 105

A. I tried to be.

Q. You understood that your reports should be used as an aid to your memory later, right?

MR. OBERTS: Objection. Speculation, foundation.

THE WITNESS: Could you repeat that? I -- I didn't hear all of --

BY MR. AINSWORTH:

Q. Sure. You understood that one of the reasons for creating reports was to act as an aid to your memory later?

A. Yes.

MS. O'BRIEN: Objection. Form.

BY MR. AINSWORTH:

Q. And so, you wanted your reports to be accurate and comprehensive, right?

MR. OBERTS: Objection. Assumes a fact not in evidence.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. All right. Let's mark this as Exhibit 205. It's your interview with Frank Minizzi. I'm not sure if you have a hard copy of that, but I'll put it on the screen.

(EXHIBIT 205 MARKED FOR IDENTIFICATION)

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 106

MR. OBERTS: This is Exhibit 205?

MR. AINSWORTH: Yes.

MR. OBERTS: Was the last one 204? I have it at 203, so I -- that's a mistake on my part.

MR. AINSWORTH: The interview with Montejano was 203.

MR. OBERTS: Okay.

MR. AINSWORTH: 204 is James Minizzi and 205 will be Frank Minizzi.

MR. OBERTS: Okay. Thank you.

MR. AINSWORTH: Thanks for helping us keep score.

BY MR. AINSWORTH:

Q. Exhibit 205 is Bates number Sopron 5857, and this one just says your signature at the bottom, right?

A. Yes.

Q. All right. Have you seen this report recently?

A. I have seen it, but I'm not sure just when.

Q. Okay. I'm going to give you the opportunity to read it, but before I do so, it says at the top, "Period covered, October 2, 1996"; do you see that?

A. I do.

Q. What does October -- what does period covered refer to?

Page 107

MR. OBERTS: Objection. Speculation, foundation.

THE WITNESS: I'm not sure.

BY MR. AINSWORTH:

Q. Okay.

A. Is -- is there a hard copy of this?

Q. There is not.

A. Because -- because I can't see the -- like, the right-hand side of it.

MR. OBERTS: He can't see. We're going to try to move your screen. He said he can't see the right- hand side of it because our screen's in -- we're going to try to see. Okay. Okay. So now all of our screens are at the bottom going horizontal.

THE WITNESS: Yep.

MR. OBERTS: And then if you could just --

MR. AINSWORTH: Scroll down?

MR. OBERTS: -- can you read it and you tell him when you want it moved up, okay?

THE WITNESS: Okay.

MR. OBERTS: He wants you to read the entire report, right, Russell?

MR. AINSWORTH: Yeah.

THE WITNESS: Okay. I read it.

BY MR. AINSWORTH:

Page 108

Q. Right. Do you recall interviewing Frank Minizzi?

A. I don't.

Q. All right. Is there anything that was said during your interview with Frank Minizzi on October 2nd or -- strike that. Is there anything that was said during your interview with Frank Minizzi that's not documented in Exhibit 205?

MR. OBERTS: Objection. Foundation, speculation.

THE WITNESS: Not that I know of.

BY MR. AINSWORTH:

Q. All right. Let's mark as Exhibit 206 your interview with John Gizowski. Although before I -- before you look at the report, can you tell me, do you recall interviewing John Gizowski?

(EXHIBIT 206 MARKED FOR IDENTIFICATION)

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. What do you recall about your interview with John Gizowski?

MR. OBERTS: Objection. Vague, form, foundation. Go ahead.

THE WITNESS: I would have to review the report. I don't remember the specifics.

Page 109

BY MR. AINSWORTH:

Q. Where did you interview John Gizowski?

MR. OBERTS: Objection. Foundation.

THE WITNESS: Again, I'd have to review the report.

BY MR. AINSWORTH:

Q. Where'd you first come in contact with John Gizowski?

MR. OBERTS: Objection. Foundation, speculation.

THE WITNESS: I -- I would -- I would have to review the report.

BY MR. AINSWORTH:

Q. Do you remember anything about your interaction with John Gizowski independently of your report?

MR. OBERTS: Objection. Foundation, speculation.

THE WITNESS: Not offhand.

BY MR. AINSWORTH:

Q. Do you remember anything that John Gizowski said to you without -- independent of your report?

MR. OBERTS: Objection. Foundation, speculation, to the extent, asked and answered.

THE WITNESS: No. Do we have that report?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 110

MR. OBERTS: Yeah. He's just asking you personal recollect. We'll give you the report when he winds up.

THE WITNESS: Oh.

MR. AINSWORTH: All right. Then let me show you what we'll mark as Exhibit 206.

BY MR. AINSWORTH:

Q. All right. This is a two-page document, Exhibit 206, Bates numbered Sopron 1198 and 1199. Turning to the end of the report, your name is signed first on this report; is that right?

A. It is.

Q. And so, that suggests that you were the author of this report; is that right?

A. That's what it would usually indicate, yes.

MR. OBERTS: And just for the record, he has a hard copy in front of him.

MR. AINSWORTH: Thank you.

MR. OBERTS: Of the subject exhibit. Of the subject exhibit.

BY MR. AINSWORTH:

Q. All right. So tell me --

MR. OBERTS: Actually, I'm sorry. It doesn't look -- the copy in front of him is Bates stamped 592593, and it's not the same document you have on

Page 111

the screen. The document he has in front of him is Sopron 19-CV-8254 00592 and 00593.

MR. AINSWORTH: Correct.

MR. OBERTS: So it's not the exact same in Court that -- we can front that you have on the screen. You could either you -- just look at the screen first.

THE WITNESS: Okay.

MR. AINSWORTH: Yeah. Bill, how does it differ?

MR. OBERTS: It looks like Sopron, the two Bates stamps I talked to you about, 000592, there are handwritten notes on the report and there's underlines on the report on that page, that being Page 592.

BY MR. AINSWORTH:

Q. Sure. So let's just use the one on the screen and then we can go back to, you know --

A. Excuse me.

Q. Okay. Okay. So taking a look at the first paragraph of Exhibit 206, can you tell us when the interview with John Gizowski occurred?

A. The date would be on the top of the report, but I can't see it.

Q. Sure. Okay.

Page 112

MR. OBERTS: Objection. Foundation, speculation, and form.

THE WITNESS: It'd be 24 October, '96.

BY MR. AINSWORTH:

Q. All right. So it says October 24, 1996 and then period covered is September 26, 1996; do you see that?

A. I do.

Q. Do you know if the -- and so we've looked at some other reports that have the date in the upper left-hand corner and that date has not corresponded to the date of the interview. Have you noticed that?

A. Yes.

Q. So what makes you think that this interview was conducted on October 24, 1996?

MR. OBERTS: Objection. Foundation and speculation.

THE WITNESS: I think I misspoke. I think that might be the date -- I'm looking at this thing on the screen. I think that that's the date it was entered into the system, that one on 24 October.

BY MR. AINSWORTH:

Q. And have you noticed that where it indicates the period covered that corresponds with the date of the interview?

Page 113

MR. OBERTS: Objection. Speculation, foundation, and over broad.

THE WITNESS: I'm not sure what the question is.

BY MR. AINSWORTH:

Q. Well, let's take a look back at Exhibit 204. That was James Minizzi's interview. And you see where it says, "Period covered"?

A. Yes.

Q. "October 2, 1996." And the interview was conducted on October 2, 1996, see that?

A. Okay.

Q. And if we look at Anthony Coppolillo's interview, which is Exhibit 202, you see it says, "Period covered September 16, 1996, and the interview was conducted on September 16, 1996"?

A. Yes.

Q. And if you take a look at Doris Montejano's interview, which is Exhibit 203, you see where it says, "Period covered, September 25, 1996"?

A. I do.

Q. And then what was the date that you interviewed Officer Montejano?

A. 25 September, '96.

Q. Which corresponds to the period covered,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 114

right?

A. It does.

Q. And let's mark as Exhibit 207 --

MS. O'BRIEN: Oh.

MR. AINSWORTH: Well, I didn't -- I mean, I'm going to have to put this in the chat because I didn't send it around to you guys, but it's John Gizowski's handwritten statement.

MS. O'BRIEN: I think it's been previously merged, Russell.

MR. AINSWORTH: I think that's right. Anybody know what that is? It would've been from Eugene Sr.'s deposition.

THE WITNESS: Is that a question?

MR. AINSWORTH: No, it is not for you. I'm sorry. Oh, we're just trying to get the exhibit number right.

MR. OBERTS: Could we take a break while you're doing that? Or --

MR. MASCIOPINTO: I have it as number 1, which is number 1.

MR. AINSWORTH: All right.

MS. O'BRIEN: Yeah, I do, too. I do, too. Sorry. I had to get up to look for it.

MR. AINSWORTH: All right. Let me just --

Page 115

MS. O'BRIEN: Do you need the cite too, Russell or no?

MR. AINSWORTH: No, I have it.

MS. O'BRIEN: Okay.

BY MR. AINSWORTH:

Q. I think it's -- so I'm showing you Exhibit number 1. This is -- so for the record, it is not 207. It's Exhibit number 1. You see it's a statement of John Gizowski taken on September 26, 1996?

MR. OBERTS: Objection. Foundation. Speculation.

THE WITNESS: Yes, I see it.

BY MR. AINSWORTH:

Q. All right. And so going back to Exhibit 206, where it says, "Period covered, September 26, 1996." Does that indicate to you that your interview with John Gizowski was on September 26, 1996, and not October 24th?

MR. OBERTS: Objection. Speculation. Foundation.

THE WITNESS: No.

THE REPORTER: I'm sorry to interrupt.

BY MR. AINSWORTH:

Q. When was this --

THE REPORTER: I'm sorry to interrupt. Are you

Page 116

now referencing a previous exhibit, or did you want to mark this exhibit as 207?

MR. AINSWORTH: No, that's Exhibit 1. And I said on the record it is not Exhibit 207.

THE REPORTER: Thank you.

BY MR. AINSWORTH:

Q. So, Mr. Marley, you think that this interview with John Gizowski was not on September 26th?

MR. OBERTS: Objection. Speculation and foundation.

THE WITNESS: I'm not sure.

MR. OBERTS: And form.

THE WITNESS: I'm not sure. There's been some confusion over these dates up in the upper left-hand corner, which I believe is the date it's entered into the computer system. The date should be next to my signature would -- would be the correct date.

BY MR. AINSWORTH:

Q. And that's the date that you signed the computer version, right?

A. Would you repeat that?

Q. That's the date next to your -- the date next to your signature is the date that you signed the computer copy, which would not be the date that you conducted the interview, right?

Page 117

MR. OBERTS: Just going to object. If you're referring to this report, if you could actually show it to him, please.

MR. AINSWORTH: I'm asking him a question not about this report.

MR. OBERTS: Okay.

MR. AINSWORTH: Please let me conduct the inter -- the deposition.

THE WITNESS: I -- I don't understand the question.

BY MR. AINSWORTH:

Q. Let me say it again. The date next to your signature would be the date that you signed the computer-generated report, right?

MR. OBERTS: Objection. Speculation and foundation.

THE WITNESS: I'm not sure.

BY MR. AINSWORTH:

Q. Well, let's look. Exhibit 206, second page, dated November 14, 1996; you see that?

A. Yes.

Q. So that's not the date you conducted this interview, right?

MR. OBERTS: Objection. Speculation and foundation.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 118

THE WITNESS: Apparently, that's the date after it was entered into the system.

BY MR. AINSWORTH:

Q. Correct. Okay. So do you have any reason to believe -- so in the other reports that we looked at, where it says period covered, that indicated the date of the interview, right?

MR. OBERTS: Objection. Speculation. Foundation and mischaracterizes testimony.

THE WITNESS: As I said, there's been some confusion over that and I'm -- I'm not sure how to answer.

BY MR. AINSWORTH:

Q. Well, what confusion? I mean, I -- in each of the other reports that we referenced, it indicates -- so for example, if I take you back to Exhibit 202, period covered September 16, 1996, the interview was conducted on September 16, 1996, right?

A. Yes.

MR. OBERTS: So state what the report you're talking about, what exhibit you have.

BY MR. AINSWORTH:

Q. Exhibit 202. Look at Exhibit 203, period covered September 25, 1996. The interview was conducted on September 25, 1996, right?

Page 119

A. Is that a question?

Q. Yes. It's a question. Right?

A. Calm down. Calm down.

MR. OBERTS: Yeah. You know, go ahead. Let's -- if we could just take it slow, listen to his questions. Everybody, just -- fine.

THE WITNESS: Would you repeat the question, please?

BY MR. AINSWORTH:

Q. Yes. It's -- see where it says the period covered September 25, 1996, that matches the date that the interview was conducted on September 25, 1996?

A. Okay. Yes.

Q. And so, in each of these reports, the period covered indicates the date of the interview, right?

MR. OBERTS: Objection. Overbroad. Mischaracterizes his prior testimony. Speculation and foundation.

THE WITNESS: I'm not sure about the other reports, but in this one, yes.

BY MR. AINSWORTH:

Q. Okay. And the one we just looked at for Coppolillo Exhibit 202, right?

A. I think so.

Q. Let's take a look at Exhibit 204 for

Page 120

James Minizzi. This is period covered October 2, 1996 and the interview is conducted on October 2, 1996, right?

A. Yes.

Q. Okay. And so, then turning back to Exhibit 206, this is the interview of John Gizowski. Period covered is September 26, 1996; do you see that?

A. I do.

Q. Do you have any indication that this interview took place on a time -- a date other than September 26, 1996?

MR. OBERTS: Objection. Speculation. Foundation. Form. And asked and answered.

THE WITNESS: No.

MR. AINSWORTH: All right. So there is a request for a break. Do you guys want to take a break now? I can go through this report or what do you want to do?

MR. OBERTS: I think I'd like to take some type of little lunch break. So if you'd like to go instead of -- if you'd like to finish the report or if you want to take a lunch break, now I'll leave it to your -- at least -- at a minimum, I need, like, a five, ten-minute break, a five-minute break just to go to the bathroom, but then we could take the

Page 121

report and then perhaps discuss the lunch break.

MR. AINSWORTH: Well, I mean, why then -- why don't we just take a lunch break now?

MR. OBERTS: Yep. Understand. I just don't want to break off your whatever you --

MR. AINSWORTH: No, I would -- I appreciate that, Bill. Why don't we go off the record and we'll talk about a break?

MR. OBERTS: Okay.

(OFF THE RECORD)

THE REPORTER: We are back on the record. You may continue.

BY MR. AINSWORTH:

Q. All right. Sir, did you get a chance to get something to eat?

A. Yes.

Q. And you know, same rules apply. If there's anything, if you feel fatigued or stressed or anything like that, you let us know, anything that might affect your testimony, okay?

A. Yes.

Q. Thank you. Sometimes you, as a Cook County State's Attorney investigator, would conduct interviews with just you and your partner, no ASA present, right?

A. Pardon? Can you --

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 122

MR. OBERTS: Object to form --

THE WITNESS: Could you repeat?

MR. OBERTS: -- and vague.

BY MR. AINSWORTH:

Q. Sometimes when you're a Cook County State's Attorney investigator, you and your partner would conduct interviews with no ASA present, right?

A. Yes.

Q. And sometimes you would sit in on an interview conducted by an ASA, right?

MR. OBERTS: Objection. Form and vague, but go ahead.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. And sometimes you would conduct an interview with a witness without an ASA present, and then an ASA would come in and conduct their own interview while you were still present, right?

MR. OBERTS: Objection. Form. Speculation. Foundation and assumes facts not in evidence. Go ahead.

THE WITNESS: I don't recall that happening.

BY MR. AINSWORTH:

Q. So in your memory, it was only either investigators present -- well, strike that. Well, did

Page 123

you sometimes conduct interviews with the witness and then determine they had valuable information and bring in an ASA to hear what they had to say?

MR. OBERTS: Objection. Form. Foundation. Speculation and incomplete hypothetical.

THE WITNESS: I don't -- I don't recall that happening.

BY MR. AINSWORTH:

Q. So how would -- so in each case, you would -- it would either be an interview with just you -- just the investigators or with an ASA and the investigators, but it wouldn't happen where you would start out with just investigators and then bring in an ASA?

MS. O'BRIEN: Objection. Form. Foundation.

MR. OBERTS: And vague.

THE WITNESS: I don't recall that ever happening.

BY MR. AINSWORTH:

Q. All right. So going back to Exhibit 206, the -- your interview with John Gizowski.

MR. AINSWORTH: Oh, I'm sorry, Bill, I meant to ask you. We were having -- I think I got the Bates number wrong. What was the Bates number of the hard copy of this exhibit?

MR. OBERTS: That we have?

Page 124

MR. AINSWORTH: Yes.

MR. OBERTS: Sopron 19-CV-8254. And then it's 000592 and 000593. And when I said there were -- the differences were there was some handwritten notes that those are not my handwritten notes.

MR. AINSWORTH: Okay.

MR. OBERTS: And right now, though, you want him to review the exhibit that you marked on the screen, correct?

MR. AINSWORTH: Yes, please.

MR. OBERTS: Okay.

MR. AINSWORTH: Okay.

MR. OBERTS: So just put any documents down.

THE WITNESS: Sure.

MR. OBERTS: And just look at the screen or just wait for his question, but you're not going to look at any document.

THE WITNESS: Okay.

BY MR. AINSWORTH:

Q. All right. Showing you Exhibit 206. Did John Gizowski say anything during your interview with him that's not recorded in Exhibit 206?

MR. OBERTS: Objection. Foundation.

MS. O'BRIEN: Objection. Form. Foundation.

MR. OBERTS: Speculation. Form.

Page 125

THE WITNESS: Not that I recall.

BY MR. AINSWORTH:

Q. Is there anything that would refresh your memory?

MR. OBERTS: Objection. Speculation.

THE WITNESS: I -- I don't know what would. I don't -- I don't know.

BY MR. AINSWORTH:

Q. Okay. So before I asked you where you came in contact with Mr. Gizowski, and you said you would have to review a report. So please, you know, review any portion of Exhibit 206 that you'd like and tell us where you came in contact with Mr. Gizowski.

MR. OBERTS: Do you understand the question? No, he has the report on the screen.

THE WITNESS: This is that -- oh.

MR. OBERTS: It's the same -- it's basically the same -- it's the same. The content is the same.

THE WITNESS: Okay.

MR. OBERTS: So he's just -- do you understand the question?

THE WITNESS: No.

MR. OBERTS: He gave you a question that asked you to review the document to answer the question. So do you understand what the question was?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 126

THE WITNESS: No.

MR. AINSWORTH: No. Let me ask it again, Bill. I'll do it.

BY MR. AINSWORTH:

Q. So, Mr. Marley, taking a look at the exhibit that's on the screen. You told us earlier that you would need to review this report in order to tell us where you came in contact with Mr. Gizowski. And so, I'm asking you, take a -- please take a look at this report and tell us if that refreshes your recollection where you came in contact with Mr. John Gizowski.

A. I'm not sure.

Q. Why didn't you indicate in your report where you came in contact with Mr. John Gizowski?

A. It -- it should be in there, but it isn't.

Q. If an -- if a witness is employed, you include their employment information under subject usually, correct?

A. Yes.

MR. OBERTS: Objection. Speculation. Form. Foundation.

THE WITNESS: Sometimes.

BY MR. AINSWORTH:

Q. Any reason you wouldn't document where Mr. John Gizowski is employed? The witness in a double

Page 127

homicide case?

Q. No reason.

MR. OBERTS: Speculation. Foundation.

THE WITNESS: Pardon me.

MR. OBERTS: Go ahead.

THE WITNESS: No -- no reason, no.

BY MR. AINSWORTH:

Q. Does the fact that there's no indication of employment status on this report indicate to you that Mr. Gizowski was unemployed at the time? Or can you not tell?

MR. OBERTS: Objection. Speculation. Foundation.

THE WITNESS: I don't think so.

BY MR. AINSWORTH:

Q. You don't think he was employed; is that right?

A. No, I don't think it was left off of there because he is -- was unemployed. I'm not sure if he's employed or not.

Q. What time did you come in contact with Mr. Gizowski?

A. I don't know.

Q. How long was Mr. John Gizowski at 26 and Cal before he was -- before a handwritten statement was

Page 128

started with him?

MR. OBERTS: Objection. Speculation. Foundation.

MS. O'BRIEN: Objection. Form.

THE WITNESS: I don't know.

BY MR. AINSWORTH:

Q. What were your typical hours of work at the Cook County State's Attorney's investigator's office?

MR. OBERTS: Just objection. Time frame. Scope.

BY MR. AINSWORTH:

Q. In September 1996?

A. I'd say 9:00 to 5:00 approximately.

Q. And you left the CPD because you were tired to having to work overtime, right?

A. That's correct.

Q. And there's less overtime at the Cook County State's Attorney's Office, right?

A. Yes.

Q. How often did you work overtime at the Cook County State's Attorney's Office?

MR. OBERTS: Objection. Vague. Scope. Time frame.

THE WITNESS: I -- I would a little more than most because I had other duties concerning the vault

Page 129

and bringing evidence back into the vault. Sometimes that ran into the evening.

BY MR. AINSWORTH:

Q. What were your duties with the vault?

A. Just when attorneys would need evidence to take to court, we would sign it out to them, and it would be brought back after they were done with it. But sometimes that would run into the evening past the regular vault hours.

Q. But as far as investigating, you typically wouldn't work over -- overtime while you were investigating; is that right?

MR. OBERTS: Objection. Overbroad. Speculation. Foundation.

THE WITNESS: Generally speaking, no.

BY MR. AINSWORTH:

Q. All right. Did you like having a 9:00 to 5:00 job?

A. I preferred a little later, 10:00 to 6:00 say.

Q. But only working 40 hours a week. That was preferable to you?

A. Yes.

Q. All right. So I'm showing you Exhibit 1. That's the handwritten statement taken by John -- or taken from John Gizowski by Colleen Highland and

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 130

witnessed by Investigator Lenny Bajenski; do you see that, sir?

A. I do.

MR. OBERTS: Objection. Foundation.

BY MR. AINSWORTH:

Q. And according to the document it was taken in -- on September 26, 1996, at 9:00 p.m. Do you know how long before that handwritten statement was begun at 9 p.m. Mr. John Gizowski was at the Cook County State's Attorney's office?

MR. OBERTS: Objection. Speculation. Foundation. Form. Asked and answered.

THE WITNESS: I don't.

BY MR. AINSWORTH:

Q. And can you tell us, do you have any way to approximate how long John Gizowski was at the Cook County State's Attorney's office before that statement was begun at 9:00 p.m.?

MS. O'BRIEN: Objection. Form. Foundation.

THE WITNESS: No.

MR. OBERTS: Join.

BY MR. AINSWORTH:

Q. All right. Turning back to Exhibit 206. Well, let me just ask you, sir. When you interview witnesses as a Cook County State's Attorney investigator, if they

Page 131

don't want to speak to you, are you allowed to arrest them?

MS. O'BRIEN: Objection. Form. Foundation.

MR. OBERTS: Calls for a legal conclusion, but go ahead.

THE WITNESS: No.

BY MR. AINSWORTH:

Q. Can you stop them from leaving if they want to -- if a witness wants to leave?

MR. OBERTS: Objection. Foundation. Speculation and form.

THE WITNESS: No.

BY MR. AINSWORTH:

Q. Did you barge into John Gizowski's house with your partner, Lenny Bajenski, on September 26, 1996, uninvited?

A. No.

MR. OBERTS: Objection. Foundation. You got the answer --

BY MR. AINSWORTH:

Q. Would it be --

MR. OBERTS: You got the answer though, right?

THE WITNESS: No was the answer.

BY MR. AINSWORTH:

Q. Would it be improper for you to enter

Page 132

John Gizowski's house on September 26, 1996, without being invited?

MR. OBERTS: Objection. Calls for a legal conclusion. Speculation and foundation.

THE WITNESS: Sure. Yes.

BY MR. AINSWORTH:

Q. Did you prevent John Gizowski or did -- strike that. Did you physically restrain John Gizowski when you came in contact with him at his home on September 26, 1996?

MR. OBERTS: Objection. Foundation. Speculation. Asked and answered. Go ahead.

THE WITNESS: No.

BY MR. AINSWORTH:

Q. Did you tell John Gizowski -- or strike that. Did you or your partner Bajenski tell John Gizowski that he had to come with you to the Cook County State's Attorney's office?

MR. OBERTS: Objection. Foundation.

THE WITNESS: No.

BY MR. AINSWORTH:

Q. Were you armed with a gun when you came in contact with Mr. Gizowski at his home on -- or when you came in contact with Mr. Gizowski on September 26, 1996?

Page 133

A. Yes.

Q. Did you physically restrain Mr. Gizowski from leaving your presence or -- strike that. Did you or your partner Bajenski physically restrain John Gizowski from leaving your presence on September 26, 1996?

MS. O'BRIEN: Objection. Form. Foundation. Assumes facts not in evidence. And asked and answered.

MR. OBERTS: Join.

THE WITNESS: No.

BY MR. AINSWORTH:

Q. In your presence, did anyone promise John Gizowski that he would be relocated in return for his assistance in testifying against Matt Sopron and Wayne Antusas?

MR. OBERTS: Objection. Foundation.

MS. O'BRIEN: Objection. Form.

MR. OBERTS: And form.

THE WITNESS: No. No.

BY MR. AINSWORTH:

Q. In your presence, did anyone promise John Gizowski that he would receive either a city job or a job with the military in return for his assistance in the Hovel and Martin homicide investigation?

MR. OBERTS: Objection. Foundation. Form.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 134

THE WITNESS: No.

BY MR. AINSWORTH:

Q. Did you talk with John Gizowski about the military?

MR. OBERTS: Objection. Foundation.

THE WITNESS: No.

BY MR. AINSWORTH:

Q. In your presence, did Lenny Bajenski tell John Gizowski that if someone says he laughed while Sopron gave the order, he could be charged with murder?

MR. OBERTS: Objection. Form. Foundation.

THE WITNESS: Could -- could you -- I -- I missed some of the question. Could you repeat it, please?

BY MR. AINSWORTH:

Q. Sure. Did anyone in your presence tell John Gizowski that if someone says you laughed while Sopron gave an order, you could be charged with murder?

MR. OBERTS: Objection. Form. Foundation.

THE WITNESS: Are you saying laughed?

BY MR. AINSWORTH:

Q. Laughed, yes.

A. No. No.

Q. Did Lenny -- in your presence, did Lenny Bajenski threaten John Gizowski to charge him with a gun

Page 135

charge and the murder of the two girls?

MR. OBERTS: Objection. Form. Foundation.

THE WITNESS: No.

BY MR. AINSWORTH:

Q. Did Scott Cassidy in your presence call John Gizowski a liar and threaten to charge him with murder?

MR. OBERTS: Objection. Form. Foundation.

THE WITNESS: No.

BY MR. AINSWORTH:

Q. Did anyone in your presence tell John Gizowski that he was White and a lot of Black people in prison would love him?

MR. OBERTS: Objection. Form. Foundation.

THE WITNESS: No.

BY MR. AINSWORTH:

Q. In your presence, did Scott Cassidy tell John Gizowski that Polish guys have big dicks?

MR. OBERTS: Objection. Form. Foundation.

THE WITNESS: No.

BY MR. AINSWORTH:

Q. Did anyone in your presence tell John Gizowski that if his story differed from Bigeck's story, that he'd be charged with perjury?

MR. OBERTS: Objection. Form. Foundation.

Page 136

THE WITNESS: No.

BY MR. AINSWORTH:

Q. Did anyone in your presence tell John Gizowski that he had to agree with Bigeck's story?

MR. OBERTS: Objection. Form. Foundation.

THE WITNESS: No.

BY MR. AINSWORTH:

Q. Were you present when John Gizowski was brought before the grand jury?

MR. OBERTS: Objection. Foundation.

THE WITNESS: No.

BY MR. AINSWORTH:

Q. Did you transport John Gizowski to the -- to 26th and Cal so he could be presented to the grand jury?

MR. OBERTS: Objection. Foundation.

THE WITNESS: I -- I don't remember doing so. I -- I don't remember.

BY MR. AINSWORTH:

Q. Did you meet with John Gizowski the morning that he was to be presented to the grand jury?

MR. OBERTS: Objection. Foundation.

THE WITNESS: Not that I remember.

BY MR. AINSWORTH:

Q. In your presence, did Scott Cassidy, a female assistant state's attorney, your partner, and yourself

Page 137

rehearse John Gizowski's story with him before he testified in front of the grand jury?

A. No.

Q. How many times did you talk to John Gizowski?

MR. OBERTS: Objection. Foundation. Speculation.

THE WITNESS: I'm -- I'm not sure.

BY MR. AINSWORTH:

Q. Was it more than once?

MR. OBERTS: Objection. Foundation.

THE WITNESS: It would've -- it would've been more than once, yes.

BY MR. AINSWORTH:

Q. All right. So you met with him once on September 26, 1996. When was the next time you met with John Gizowski?

MR. OBERTS: Objection. Foundation. Speculation. Form.

THE WITNESS: I don't know.

BY MR. AINSWORTH:

Q. What was the reason that you met with John Gizowski a second time after your initial meeting on September 6th -- 26, 1996?

MR. OBERTS: Objection. Speculation. Foundation. Mischaracterizes testimony and assumes

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:22-cv-00320 Document #: 235-24 Filed: 07/17/26 Page 37 of 103 PageID #:4720
The Deposition of WILLIAM MARLEY, taken on January 12, 2024
138..141

Page 138

facts not in evidence.

THE WITNESS: I don't know.

BY MR. AINSWORTH:

Q. Why do you believe you met with John Gizowski more than once?

MR. OBERTS: Objection. Foundation. Go ahead.

THE WITNESS: I don't know.

BY MR. AINSWORTH:

Q. So why'd you say under oath that you met with him more than once?

A. I believe I did.

Q. Why do you believe you did?

A. I don't know how to answer that. I -- I just believe I did talk to him more than once.

MR. OBERTS: Can you clarify when you say more than once? I -- well, objection. Vague. Different dates or same date?

MR. AINSWORTH: He's asking you, Mr. Marley.

MR. OBERTS: Okay.

BY MR. AINSWORTH:

Q. Mr. Marley, when you say you talked to John Gizowski more than once, do you mean on separate dates? More than one date?

MR. OBERTS: Objection. Foundation and speculation.

Page 139

THE WITNESS: I think so, but I'm not sure.

MR. AINSWORTH: Did Oberts just object to his own question? That was amazing.

MR. OBERTS: Just now?

MR. AINSWORTH: Yeah.

MR. OBERTS: I didn't say anything just now.

MR. AINSWORTH: You just objected. I asked your question and then you objected to it. That was amazing. I haven't seen that before. All right.

MR. OBERTS: Oh, I'm sorry. You clarified it based on my objection. I'm sorry. Yes. I understand what you just said. I understand what you said.

BY MR. AINSWORTH:

Q. All right. So --

MR. OBERTS: I understand what you said. Sorry.

BY MR. AINSWORTH:

Q. You believe it is on more than one date; is that right, sir?

MR. OBERTS: Objection. Foundation.

THE WITNESS: I'm not sure.

BY MR. AINSWORTH:

Q. You're not sure. Okay. Did you ever talk with John Gizowski on April 11, 2001, regarding narcotics dealing?

Page 140

MR. OBERTS: Objection. Foundation.

THE WITNESS: That -- that was after this was all over?

BY MR. AINSWORTH:

Q. After the trial, yeah.

A. Yes, I did.

Q. And why did you meet or -- how did it come to be that you met with John Gizowski regarding narcotics dealing?

A. I was -- I was working late. I was in the vault, and he came up to the -- the 14th floor and asked the girl -- he -- he wanted to go back to the narcotics section and she came -- she knew I was in the vault. So she came over and asked me to talk to him. She knew I was assigned to narcotics.

Q. So according to you, John Gizowski came to the 14th floor of the 20 -- of 26th and Cal and asked to speak to somebody in narcotics; is that right?

A. Yes.

Q. And a lady went and got you and then -- from the vault; is that right?

A. Yes. The vault is right there.

Q. And what did you do after you were notified that -- were you notified that it was John Gizowski or just that it was somebody?

Page 141

A. Just somebody.

Q. Okay. And what did you do when you were notified that somebody had come to speak about narcotics?

A. I went out there to meet him and for the life of me, I couldn't remember which one he was. I mean, I recognized him, but I didn't know -- I -- I couldn't put a name to him.

Q. So you didn't know if it was John or a different Gizowski?

A. Yes.

Q. All right. And so, what did you say and what did he say when you went out to speak to him -- to this person?

A. He said he had a lot of narcotic information and that he wanted to make some money also, that he realized that they pay -- what you call it? Rewards for successful information. And I tried to explain to him that the narcotic -- that the State's Attorney's Office, while it had a narcotics section, it wasn't an active narcotics section. I mean, it wasn't a street narcotics section. It was trial support of cases that were already in the system.

Q. Right. You would think that somebody who's looking for reward money or money to be as an informant



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 142

would go to the police to provide information, right?

MR. OBERTS: Objection. Speculation. Foundation.

THE WITNESS: I -- I don't disagree, but I don't know an answer for that.

BY MR. AINSWORTH:

Q. Do you have any explanation for why a Gizowski would come to the state's attorney's office seeking money in return for information?

MR. OBERTS: Objection. Speculation. Foundation. And asked and answered.

THE WITNESS: I don't.

BY MR. AINSWORTH:

Q. Did you interview the Gizowski to find out what he had -- what information he had?

A. Yes.

Q. What did the Gizowski tell you?

A. He provided a lot of locations, names and location, but not any -- anything -- nothing in depth.

Q. When you say names and locations, what do you mean?

A. He would say -- for instance, he would name a bar and say, yeah, they're dealing cocaine out of that bar or -- or a guy's name out of his house. It was very general information.

Page 143

Q. I mean, what made you think it was general when he's saying this particular person is dealing drugs out of this particular address?

MR. OBERTS: Objection. Vague. Speculation. Foundation.

THE WITNESS: He wasn't specific about anything. Just that they're moving a lot of cocaine out of this location or that location.

BY MR. AINSWORTH:

Q. And when you mean he wasn't specific, what kind of specifics were you looking for?

MR. OBERTS: Objection. Assumes facts not in evidence and vague. Go ahead.

THE WITNESS: Offender's names, dates, customers' names, dates, money involved.

BY MR. AINSWORTH:

Q. Did you agree to provide him with any compensation?

A. With any what? I'm sorry.

Q. Compensation?

A. No. No.

Q. How long did you meet with the Gizowski?

A. Well, I'm not sure.

Q. Did you take any notes of your meeting?

A. I did.

Page 144

Q. Did you create a report regarding your meeting?

A. I did. Yes.

Q. Have you seen that report?

A. I -- I did, somewhere along the line here. Yes.

Q. When was the last time you saw that report?

A. I couldn't tell you. Several weeks.

Q. I'm sorry. Several weeks --

A. Yes.

Q. -- from when? Several weeks from when?

A. From now. From today.

THE WITNESS: Did he hear me, or is there a --

MR. AINSWORTH: I did. I'm sorry.

THE WITNESS: Oh, that's okay.

MR. AINSWORTH: Just give me a minute. I'm scrolling through a -- an exhibit.

BY MR. AINSWORTH:

Q. Did you ever meet with John Gizowski in a restaurant?

A. No.

Q. Did you meet with John Gizowski during the pendency of the prosecution of Sopron and Antusas with your partner, Len Bajenski?

MR. OBERTS: Objection. Foundation and

Page 145

speculation.

THE WITNESS: I -- I didn't really hear what you -- did I meet with him during what?

BY MR. AINSWORTH:

Q. Meaning, while the prosecution of Antusas and Sopron was going on, did you and Bajenski go by Gizowski's house to check up on him?

MR. OBERTS: Objection. Speculation. Foundation.

THE WITNESS: No.

MR. OBERTS: Form.

THE WITNESS: No.

BY MR. AINSWORTH:

Q. While you were at the Cook County State's Attorney's Office as an investigator, did you -- would you re-interview witnesses just to see if they had something else, you know -- that their statement might change?

MS. O'BRIEN: Objection. Form. Foundation.

MR. OBERTS: Objection. Vague as well.

THE WITNESS: No.

BY MR. AINSWORTH:

Q. Was there any reason why you would go visit John Gizowski at his house while the charges against Sopron and Antusas were pending?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 146

MR. OBERTS: Objection.

MS. O'BRIEN: Objection. Form. Foundation. Asked and --

THE WITNESS: No.

MR. OBERTS: Asked and answered.

BY MR. AINSWORTH:

Q. All right. I'm going to go back to what we marked as Exhibit 206. All right. Do you see, in the second paragraph, it begins, "John then stated that he told his brother, Gene, that he needed a ride to Nick Morfin's house, and Euge gave John a ride to Nick's house"; do you see that?

A. I do.

Q. Did John Gizowski say whether Gene came inside the house?

MR. OBERTS: Objection. Foundation.

THE WITNESS: Inside his house, or -- or --

BY MR. AINSWORTH:

Q. Inside Nick Morfin's house.

MR. OBERTS: Objection. Foundation.

THE WITNESS: He said his brother went in, but he stayed outside.

BY MR. AINSWORTH:

Q. I'm not asking what Eugene said. I'm asking what John said. Did John say that Eugene went inside

Page 147

Nick Morfin's house?

MR. OBERTS: Objection. Foundation.

THE WITNESS: I'm getting mixed up here with these people.

MR. OBERTS: Listen to the question. If you get mixed up, just listen to the question. Ask him to repeat the question.

BY MR. AINSWORTH:

Q. Let me ask it again. Did John Gizowski say that his brother, Eugene, went inside Nick Morfin's house?

MR. OBERTS: Objection. Foundation. Do you want him to read the report to answer that question?

MR. AINSWORTH: I'm asking him if he knows.

MR. OBERTS: Okay. Because he's reading the report, and that's why I want to know which way you want.

THE WITNESS: I'm -- I'm confused by the question, with these names.

BY MR. AINSWORTH:

Q. What's confuse -- what's confusing about the question?

A. Well, if I knew what was confusing, it wouldn't be confusing.

Q. Fair. Okay. So I just want to know, your

Page 148

interview was with John Gizowski that's documented in Exhibit 206, okay?

A. (No audible response.)

Q. Sir?

A. Yes.

Q. So when you were talking to John Gizowski, did he tell you that his brother, Eugene, went inside Nick Morfin's house?

MR. OBERTS: Objection. Foundation.

MR. AINSWORTH: Okay.

THE WITNESS: Wait.

MR. OBERTS: Just listen to the question. Don't read anything. He's just asking you a question.

THE WITNESS: Without reading it, I can't answer it.

BY MR. AINSWORTH:

Q. Okay. If you'd like to review the report, and --

MR. AINSWORTH: And I don't mind if he takes a look at the handwritten report -- or the typewritten report that's the hard copy.

MR. OBERTS: And that's fine. I just didn't know if your question was based upon his personal, or is based on read the report and then answer the question.

Page 149

MR. AINSWORTH: Yeah. I get it.

MR. OBERTS: Okay. So can you repeat what you'd like him to do then, Russell?

BY MR. AINSWORTH:

Q. I'd like you to tell me, Mr. Marley, during your conversation with John Gizowski, did he tell you whether Eugene Gizowski came inside the house? Nick Morfin's house.

MR. OBERTS: Objection. Vague and foundation.

THE WITNESS: Yes, he did.

BY MR. AINSWORTH:

Q. What did he tell you?

A. That he took him there, he went in, and he -- John did not go in. The brother went in.

Q. So John told you that he stayed outside, and Eugene went inside?

A. Yes. Yes.

Q. All right.

MR. OBERTS: Objection. Foundation.

BY MR. AINSWORTH:

Q. And John Gizowski stayed outside?

MR. OBERTS: Objection. Foundation.

THE WITNESS: I'm -- I'm getting my Gizowskis mixed up here.

BY MR. AINSWORTH:



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 150

Q. But you --

A. John -- John went in. Eugene stayed outside.

Q. Okay. How do you know that John said that Eugene stayed outside?

A. He told us.

Q. All right. Why didn't you write in your report that John said Eugene stayed outside?

MR. OBERTS: Objection. Vague and foundation.

THE WITNESS: I don't know.

BY MR. AINSWORTH:

Q. And how do you remember that John told you that Eugene stayed outside while he went inside, when I asked you what you recalled of your conversation with Mr. Gizowski, and you told me you couldn't remember anything without reviewing the report, right?

MR. OBERTS: Well --

MS. O'BRIEN: Objection. Form and foundation.

MR. OBERTS: -- objection. He just read the report, based on your request, Russell. That's --

MR. AINSWORTH: Please, no speaking objections.

MR. OBERTS: But that's not -- objection. Mischaracterizes the testimony. Mischaracterizes what just occurred. Form.

BY MR. AINSWORTH:

Q. Please answer the question.

Page 151

MR. OBERTS: And foundation.

THE WITNESS: I'm not sure what the question is.

BY MR. AINSWORTH:

Q. Sir, you agree with me there's nothing in the report that says that Eugene stayed outside of the house when John went there, right?

MR. OBERTS: Objection. Foundation. Give him an opportunity to read it then.

THE WITNESS: At some point, Eugene told us that he didn't go into the house and that he had never been in the house.

BY MR. AINSWORTH:

Q. I'm not asking about your conversation with Eugene, okay? I just want to make that real clear. All of my questions have been about your conversation with John, all right? Did John tell you that Eugene did not go inside the house?

A. I don't remember.

MR. OBERTS: Objection. Foundation.

BY MR. AINSWORTH:

Q. Okay. You want -- so John Gizowski told you that Matt Sopron gave an order to light up the van; is that right?

MR. OBERTS: Objection. Foundation.

Page 152

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. You wanted to know who witnessed that order from Matt Sopron to commit a double homicide, right?

MR. OBERTS: Objection. Foundation. Speculation. Form.

THE WITNESS: Could -- could you repeat it, please? I'm -- I'm missing some of what you're saying.

BY MR. AINSWORTH:

Q. Sure. You wanted to know who was a witness to Matt Sopron giving the order to light up the van that led to a double homicide, right?

MR. OBERTS: Objection. Form, assumes a fact not in evidence, and foundation, and speculation.

THE WITNESS: I don't remember.

BY MR. AINSWORTH:

Q. Okay. So let me ask it this way then if you don't remember. You wanted to gather information that would assist in learning who was responsible for the murder of Carrie Hovel and Helena Martin, right?

MR. OBERTS: Objection. Form, assumes a fact not in evidence, mischaracterizes testimony, and foundation.

THE WITNESS: Yes.

Page 153

BY MR. AINSWORTH:

Q. And you wanted to find witnesses who might assist you to determine who was responsible for the murders of Carrie Hovel and Helena Martin, right?

MR. OBERTS: Objection. Mischaracterizes testimony, form, and foundation.

THE WITNESS: Ideally, yes.

BY MR. AINSWORTH:

Q. And so, when a witness tells you that they heard somebody give an order to shoot somebody else, you, as an investigator, want to know who else heard that order, right?

MR. OBERTS: Objection. Form. Foundation.

THE WITNESS: Correct.

BY MR. AINSWORTH:

Q. Because that way, you can then go talk to those witnesses and have them corroborate the, you know -- the allegation that somebody gave an order to shoot somebody else, right?

MR. OBERTS: Objection. Mischaracterizes testimony, assumes a fact not in the evidence, speculation, and foundation, and form.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. All right. Can you think of any reason, sir,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 154

why you would not have wanted to know from John Gizowski who witnessed Matt Sopron giving the order to light up the van?

MR. OBERTS: Objection. Speculation, form, and foundation.

THE WITNESS: No. No.

MR. AINSWORTH: Do you want some water?

THE WITNESS: I -- I got some. Thank you.

BY MR. AINSWORTH:

Q. So then -- and I don't mean to be argumentative, but I'm asking you, can we agree then that, when you were talking to John Gizowski, you wanted to know who else witnessed Matt Sopron give the order to light up the van?

MR. OBERTS: Objection. Form, speculation, and foundation.

THE WITNESS: I would think so.

BY MR. AINSWORTH:

Q. All right. Would you expect that your report would indicate who was present for Matt Sopron giving the order to light up the van?

MR. OBERTS: Objection. Speculation, foundation, and assumes a fact not in evidence.

THE WITNESS: Yes.

MR. OBERTS: In addition to form.

Page 155

THE WITNESS: Oh. Yes.

BY MR. AINSWORTH:

Q. All right. So let's take a look at your report, Exhibit 206. And can you tell us, from reviewing the report -- and take as much time as you need to review it. Tell us who is present for Matt Sopron giving the order to light up the van? And if you want to look at the hard copy, that's okay by me, too.

MR. OBERTS: Why don't you look at the hard copy? We have it.

THE WITNESS: Is that it?

MR. OBERTS: And do you understand, he asked you a question, but he is asking you to review that document to answer the question.

THE WITNESS: Okay.

MR. OBERTS: Do you understand that?

THE WITNESS: Yes.

MR. OBERTS: Do you understand the question?

THE WITNESS: Yeah. Who else was present for the -- for him ordering it.

BY MR. AINSWORTH:

Q. Or who were all the people who were present for the order given by Matt Sopron to light up the van?

MR. OBERTS: Did you hear him?

THE WITNESS: Yeah. There were other people

Page 156

mentioned as being present, but whether they were present to hear that, it -- it doesn't say.

MR. OBERTS: Russell, you hear that?

MR. AINSWORTH: Yes, sir.

BY MR. AINSWORTH:

Q. Okay. So do you have any explanation for why your report does not list who else was present for Matt Sopron giving the order to light up the van?

MR. OBERTS: Objection to foundation, speculation, and form.

THE WITNESS: It -- it does mention other people being present, but not for that statement.

BY MR. AINSWORTH:

Q. All right. And so, my question is: Do you have any explanation for why your report does not indicate who was present for the statement by Matt Sopron to light up the van?

MR. OBERTS: Objection. Foundation, speculation, and form.

THE WITNESS: It does mention other people being present, but it doesn't -- it doesn't specify that they were there to witness that statement.

BY MR. AINSWORTH:

Q. And I understand that, sir. My question is a little bit different. It's just do you have any

Page 157

explanation for why your report does not indicate who witnessed the statement by Matt Sopron saying, "light up the van"?

A. No.

MS. O'BRIEN: Objection. I'm sorry for the late objection. Form. Foundation.

BY MR. AINSWORTH:

Q. All right. So after you talked to John Gizowski, you wanted to try to corroborate his claim that he went to Matt Sopron -- or he went to Nick Morfin's house and witnessed this exchange, right?

MR. OBERTS: Objection. Foundation, speculation, and form.

THE WITNESS: Yes.

MR. AINSWORTH: All right. Let's mark -- actually, does anyone know the exhibit number for Gene Gizowski's interview? I meant to pull that, but I didn't.

MR. OBERTS: Yeah. We have it.

MR. AINSWORTH: Thank you.

MR. OBERTS: Oh, what exhibit it is, or what Bates stamp numbers?

MR. AINSWORTH: What exhibit it is.

MR. OBERTS: Oh, I don't know the exhibit.

MR. AINSWORTH: I know it was used before.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 158

MR. OBERTS: I have the Bates stamp number. I don't have the --

MR. AINSWORTH: All right. Let me grab it. I think I have it.

MS. O'BRIEN: I Think it's 24. I think 24, guys.

BY MR. AINSWORTH:

Q. All right. I'm going to show you what we've previously marked as Exhibit 24. This is the report of your interview with Gene Gizowski, Bates numbered Sopron 5856.

THE WITNESS: Is it okay to look at this one?

MR. OBERTS: Just wait until he --

THE WITNESS: Oh.

MR. OBERTS: It is on the screen. Do you -- would you like to have him look at that?

MR. AINSWORTH: Sure. He can have the -- although, you're right. I'm sorry. You're a step ahead of me.

BY MR. AINSWORTH:

Q. Do you remember -- what do you remember of your interview with Gene Gizowski?

MR. OBERTS: Don't read it yet. He's just asking a question. Just listen to his question first, and then he'll tell you when to read it.

Page 159

THE WITNESS: Okay. Would you repeat that, please?

BY MR. AINSWORTH:

Q. Yes. What do you recall of your interview with Gene Gizowski?

A. I -- I would have to refresh my memory. I don't recall it.

Q. All right. When you spoke to Gene Gizowski, you wanted to know if he drove to -- if he drove his brother, John, to Nick Morfin's house as described by John Gizowski, right?

MR. OBERTS: Objection. Speculation, assumes fact not in evidence, form, and foundation.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. And -- all right. So showing you Exhibit 24, the Gizowski -- the Eugene Gizowski report, looking at the bottom, is that your signature?

A. It is.

Q. Does it -- the fact that you signed it first indicate that you authored this report?

MR. OBERTS: Objection. Speculation. Foundation.

THE WITNESS: That was generally the case.

BY MR. AINSWORTH:

Page 160

Q. All right. You indicate in your report that you interviewed Eugene Gizowski at his home at 9:30 a.m. on September 30, 1996; do you see that?

A. Yes.

Q. So for this report, you indicate where you interviewed him and at what time, right?

A. I did.

Q. And that was consistent with your practice to indicate the circumstances of the interviews that you conducted, correct?

A. Generally, yes.

Q. Why do you say generally yes?

A. Because apparently, there's some where -- where we didn't.

Q. Okay. But it was your -- you attempted, or you intended to include the date, and time, and location of each interview that you conducted in your reports, right?

A. Ideally, yes.

MR. OBERTS: Objection. Asked and answered.

THE WITNESS: Oh, pardon.

BY MR. AINSWORTH:

Q. All right. And so, Eugene Gizowski told you that he drove his brother, John, to Nick's house, but never entered the house himself, right?

Page 161

MR. OBERTS: Objection. Vague. Are you referring to him looking at this report, if that's what the report states, or his personal recollection? Because we already -- objection. Vague.

MR. AINSWORTH: Well, I mean, the witness can answer based on either the report, or his memory based on the report. But I'm showing him Exhibit 24.

MR. OBERTS: Okay.

MR. AINSWORTH: And I'm asking him, did Eugene tell you that he drove his brother, John, to Nick's house, but he didn't enter the house himself?

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. Did Eugene tell you that he has never been inside Nick Morfin's house?

A. He did.

Q. Did you show your notes to Eugene Gizowski to ensure that they were accurate?

MS. O'BRIEN: Objection. Form.

THE WITNESS: No.

BY MR. AINSWORTH:

Q. Why not? Why didn't you show your notes to Eugene Gizowski to make sure that you had actively



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 162

recorded what he told you?

MS. O'BRIEN: Objection. Form.

MR. OBERTS: Foundation. Assumes a fact not in evidence.

THE WITNESS: I -- I have never shown a -- a person being interviewed any notes I took.

BY MR. AINSWORTH:

Q. All right. Well, putting that to the side, one way to ensure that your notes are accurate, or an accurate recitation of what a witness tells you, is to show the notes to the witness and ask them, does this -- do these notes accurately transcribe what you told me, right?

MS. O'BRIEN: Objection. Form. Foundation. Among others.

MR. OBERTS: Assumes a fact not in evidence.

THE WITNESS: Yes. I might -- I might ask him to clarify something, but I wouldn't show him the notes themselves.

BY MR. AINSWORTH:

Q. And I appreciate that you're trying to answer my initial question, and sometimes that throws people off. I -- I'm no longer asking you about whether you showed this particular witness, or any witness, your notes. I'm asking you, do you agree that one way to

Page 163

ensure that your notes are accurate is to show them to the witness, and have the witness tell you if the notes accurately describe the information they told you?

MS. O'BRIEN: Objection. Form.

MR. OBERTS: Foundation and speculation.

THE WITNESS: It could be.

BY MR. AINSWORTH:

Q. Okay. Was there anything preventing you from showing Eugene Gizowski your notes to see if you accurately transcribed what he was -- or accurately summarized the information he gave to you?

MR. OBERTS: Objection. Foundation.

MS. O'BRIEN: Objection. Form and foundation.

THE WITNESS: Could you repeat that again? With these other voices coming in, it gets confusing.

BY MR. AINSWORTH:

Q. Sure. Was there anything preventing you from showing your notes to Eugene Gizowski to ask him if your notes accurately summarized the information he gave to you?

A. Nothing --

MS. O'BRIEN: Objection.

MR. OBERTS: Objection. Form, vague, and foundation.

THE WITNESS: Nothing to prevent it. No.

Page 164

BY MR. AINSWORTH:

Q. All right. Did Eugene Gizowski tell you anything in your interview with him that's not documented in Exhibit 24?

MR. OBERTS: Objection. Foundation.

THE WITNESS: Not that I recall.

BY MR. AINSWORTH:

Q. Is there anything that would refresh your memory?

MR. OBERTS: Objection. Speculation.

MS. O'BRIEN: Objection.

THE WITNESS: If --

MS. O'BRIEN: He said that he didn't recall.

BY MR. AINSWORTH:

Q. I'm sorry. What's your answer, sir?

A. I was going to say, perhaps if I could read the report.

Q. Sure. Take a look at Eugene Gizowski's report, Exhibit 24.

THE WITNESS: Okay to look at this one?

MR. OBERTS: Do you understand the question?

THE WITNESS: He was asking if there's anything that would refresh my mother -- or memory regarding that.

BY MR. AINSWORTH:

Page 165

Q. Regarding whether Eugene Gizowski said anything else to you that's not documented in Exhibit 24?

A. The -- the reports -- the report reflects what I remember as -- as being accurate.

Q. And was there anything else that was said to you by Eugene Gizowski in that conversation?

MR. OBERTS: Objection. Vague, form, and foundation.

THE WITNESS: No. I don't believe so.

MR. AINSWORTH: Okay. So let me mark as an Exhibit 207 your first interview with William Bigeck. I'm sorry, folks. It's not -- for some reason, the first Bigeck interview is not -- here. I'm going to put it in the chat.

(EXHITT 207 MARKED FOR IDENTIFICATION)

MR. OBERTS: I have a -- well, you could identify that they -- I have a hard copy, Russell.

MR. AINSWORTH: I know. I got to -- for all the people playing along at home.

MR. OBERTS: I understand. And hold on. Just wait until the question, but just have that ready.

THE WITNESS: Oh, I'm sorry.

MR. OBERTS: Just have that one ready independent of the other reports, so you don't mix

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 166

them up. For that exhibit.

MR. AINSWORTH: All right. So now, I got to open it. Yeah. I just sent the wrong one. I want the 10-24 interview. All right. Thank you for your patience. I got the correct one, and I'm going to put it in the chat now.

BY MR. AINSWORTH:

Q. All right. I'm showing you what we'll mark as Exhibit 207. This is a document Bates numbered Morfin-Kogut 8344. And that's your signature at the bottom of the page; is that right?

A. Yes.

Q. And just so we're on the same page, is this the -- literally, is this the hard copy that you have in front of you?

A. Is it okay to look at it?

Q. Period --

MR. OBERTS: Do you want him to reference that now?

MR. AINSWORTH: Yeah.

BY MR. AINSWORTH:

Q. Period covered, September 18, 1996?

A. Yes.

Q. All right.

MR. OBERTS: Okay. The witness has the hard

Page 167

copy in front of him of the Exhibit 207 posted on the screen.

BY MR. AINSWORTH:

Q. Why did you interview William Bigeck, or Bigeck, on September 18, 1996?

MR. OBERTS: Objection. Foundation, speculation, and form. Let's -- just listen to the question.

THE WITNESS: Well, the state's attorney, Cassidy, wanted basically to introduce us to him.

BY MR. AINSWORTH:

Q. And did Cassidy tell you why he wanted to introduce you to Billy Bigeck?

A. Not specifically. No.

Q. Do you have any understanding as to why you were being introduced to Billy Bigeck?

MR. OBERTS: Objection. Foundation, speculation, and form. Go ahead.

THE WITNESS: No.

BY MR. AINSWORTH:

Q. You state in the second paragraph, "William Bigeck was asked to describe his activities on December 14, 1995." Why -- well, can you tell us who asked William Bigeck to describe his activities on December 14, 1995?

Page 168

MR. OBERTS: Objection. Foundation. Speculation.

THE WITNESS: That would have -- that would have been Lenny Bajenski or myself.

BY MR. AINSWORTH:

Q. Okay. Why did you or your partner ask Bigeck to describe his activities on December 14, 1995?

MR. OBERTS: Objection. Foundation.

THE WITNESS: I don't recall.

BY MR. AINSWORTH:

Q. All right. Your report states, "He went on to relate substantially the same information as he had previously provided to CCSAO investigators Norfie DiCiolla and Thomas Ptak," right?

A. Yes.

Q. Is it DiChiolla or DiCiolla? I can never remember.

A. DiCiolla.

Q. DiCiolla. Okay. Thank you. So before you spoke to Billy Bigeck, you had reviewed the report created by DiCiolla and Ptak describing what -- Bigeck had told them, right?

MR. OBERTS: Objection. Foundation. Speculation. Assumes a fact not in evidence.

THE WITNESS: I'm sure we did, but I have no

Page 169

specific memory of it.

BY MR. AINSWORTH:

Q. The only way you would know that Bigeck was telling you the same information that he told DiCiolla and Ptak was to either talk to them or review the report, right?

MR. OBERTS: Objection. Speculation. Foundation. Assumes a fact not in evidence.

THE WITNESS: Yes.

MR. AINSWORTH: All right. Let's mark it as Exhibit 208 -- oh, I did have the -- I'm sorry. I did have the September 18th report that we just reviewed as part of the exhibits that I sent around. I just didn't see it. All right. Now let's mark as Exhibit 28 -- sorry, I said 28. I mean 208. Dinolfo and Ptak's interview. I put this in the chat, so everybody should have it. This is a document Bates numbered Sopron --

MR. OBERTS: We don't have it. Let -- let's look at this.

THE WITNESS: Okay.

BY MR. AINSWORTH:

Q. Sopron 5873 through 5875. And this is not a report that you authored, and it describes events that you were not present for, just so we're clear, okay?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 170

(EXHIBIT 208 MARKED FOR IDENTIFICATION)

MS. O'BRIEN: Russell you indicated Dinolfo earlier, so could -- you want to correct that? You said it was Dinolfo.

MR. AINSWORTH: I -- I'm sorry. DiCiolla.

MS. O'BRIEN: Okay. Thank you.

MR. AINSWORTH: Yes.

BY MR. AINSWORTH:

Q. All right. I'm showing you on the screen -- are you able to read this, sir?

A. Yes.

Q. Okay. I'm just going to direct you initially. This regard -- this regards to an interview of William Bigeck. And if you look at the bottom of the first paragraph, it says, "Also present were assistant state's attorneys Scott Cassidy and Neil Linehan and Investigator Thomas Ptak. The interviews occurred on August 12, 1996, and August 29, 1996, and the CCSAO at 26 and California"; do you see that?

A. I do.

MR. OBERTS: Objection. Foundation.

BY MR. AINSWORTH:

Q. Okay. And in this next paragraph, it says, "William Bigeck when asked to describe his whereabouts and activities on December 14, 1995"; do you see that?

Page 171

A. I do.

MR. OBERTS: Objection. Foundation.

MS. O'BRIEN: Object to form. Foundation.

BY MR. AINSWORTH:

Q. The report goes on to detail what happened -- or what Billy Bigeck says happened on that day, December 14, 1995. You're welcome to review any portion of this that you'd like. But I just had a question. I just want to -- you know, and -- well, I guess I should let you review this report. And all I want you to do is just read it and tell me whether it mentions John Gizowski in the report, okay?

MR. OBERTS: Objection. Form. Foundation. Speculation.

MS. O'BRIEN: Yeah. Same objection. Not his report. Not present.

MR. AINSWORTH: I'm asking if the report says John Gizowski. Your objections are getting kind of ridiculous at this point.

MS. O'BRIEN: Well, I mean, I don't think so. I don't want to belabor it, but you know as well as I do in court that, you know, he didn't prepare the report. He can't be impeached with it.

MR. AINSWORTH: I'm not trying to impeach him. That's nonsensical. Honestly. I'm asking him, does

Page 172

the report say, as written, say John Gizowski's name?

MR. OBERTS: You understand the question?

THE WITNESS: I do, but I can only see a little bit of the report.

MR. AINSWORTH: Yeah. And I'm going to ask you, sir, to read it and I'm going to see if I can make it a little bit bigger for you, and just tell me when you need me to scroll down, okay?

THE WITNESS: Okay. Could you bring it up some?

BY MR. AINSWORTH:

Q. Yes, sir.

A. And again. Okay.

Q. Should I go on to the next page?

A. One second.

Q. Sure.

A. Okay. Okay.

Q. Sorry.

A. All right. Okay. Okay.

Q. Do you see this part? I'm sorry.

A. Yes. Okay. Reading this on here gets rather confusing.

Q. Well, I'm -- at this point, I'm just asking you if John Gizowski name is mentioned by Bigeck?

Page 173

MR. OBERTS: Objection. Form. Foundation. Speculation.

THE WITNESS: I have not seen it.

BY MR. AINSWORTH:

Q. Okay. All right. And so, then going back to your interview on September 18, 1996, can I assume that because Billy Bigeck related substantially the same information as he previously provided, that Billy Bigeck did not in this conversation with you mention John Gizowski as being present?

MR. OBERTS: Objection. Speculation. Foundation. And form.

THE WITNESS: I don't know what his -- I don't know what his reason was, but it's not here.

BY MR. AINSWORTH:

Q. Okay. And then going back to Exhibit 208, this is the report by DiCiolla. Do you see on Page 2 of Exhibit 208 says, "After the shooting, they were to run back through the park to get picked up by Nick Liberto and Nick Morfin on 62nd Street west of the park"; do you see that?

MS. O'BRIEN: Objection. Form. Foundation.

MR. OBERTS: Objection. Foundation. Speculation.

THE WITNESS: Yes, I see it. Yes.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 174

BY MR. AINSWORTH:

Q. All right. So according to what -- what's written on this report, Bigeck was saying that the getaway plan was to run back through the park to be picked up west of the park, right?

A. Yes.

MS. O'BRIEN: Objection. Form. Foundation.

MR. OBERTS: Object to form. Foundation, and speculation.

BY MR. AINSWORTH:

Q. All right. And going up to -- sorry, I guess this is also Page 2 of Exhibit 208. You see where it says, "A little later, Misfit and two Popes from Vittum Park came by. They're about 21 to 23 years of age." And it says -- and then I'm just -- I'm --

MR. OBERTS: Objection. Form. Foundation, and speculation.

BY MR. AINSWORTH:

Q. Oh. And then it says, "Misfit left with his two friends"; do you see that?

MR. OBERTS: Objection. Form. Foundation and speculation.

THE WITNESS: Okay. Yes, I do.

BY MR. AINSWORTH:

Q. All right. And you understand that Misfit is

Page 175

the nickname for Matt Sopron?

A. Yes.

Q. All right. So according to Bigeck, Misfit left with his good -- with his two friends, right?

MR. OBERTS: Objection. Form. Foundation.

MS. O'BRIEN: Objection. Form. Foundation.

MR. OBERTS: Speculation.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. And according to John Gizowski, when he talked to you, he left alone with -- and was driven back by Eugene Gizowski, right?

MR. OBERTS: Objection. Form. Foundation and speculation.

THE WITNESS: Yeah, I believe so, yes.

BY MR. AINSWORTH:

Q. All right. And just so I've got the timeline correct, you talked to -- as we saw, you talked to Billy Bigeck on September 18, 1996, and then you talked to John Gizowski on September 26, 1996; is that right?

MR. OBERTS: Objection. Foundation.

MR. AINSWORTH: Do you want to see those dates again?

THE WITNESS: I don't -- I don't have those dates in front of me.

Page 176

BY MR. AINSWORTH:

Q. Sure. I'll show you -- so you talked to Billy Bigeck.

MR. AINSWORTH: And just so we're oriented, this is Exhibit 207.

BY MR. AINSWORTH:

Q. That's your name down at the bottom, right?

A. It is.

Q. And it says William Bigeck was interviewed on September 18th?

A. It does.

Q. And then John Gizowski, he's interviewed on September 26th?

MR. OBERTS: Objection.

MR. AINSWORTH: Right?

MR. OBERTS: Form. Foundation and speculation. And asked and answered.

THE WITNESS: I don't see the date of the interview. I -- can you raise it up a little bit?

BY MR. AINSWORTH:

Q. I can, sir, but it's not -- this is the one where you didn't write the date, but he's interviewed on --

A. Okay.

Q. -- September 26th, and we looked at Exhibit 1,

Page 177

the handwritten statement, which is also dated September 26th?

A. Okay.

MR. OBERTS: Objection. Well, what's the question?

BY MR. AINSWORTH:

Q. Do -- all right. So Billy -- you interviewed Billy Bigeck on September 18th, and then you interviewed John Gizowski on September 26, 1996; is that right?

MR. OBERTS: Objection. Foundation. Speculation. To the extent. Asked and answered.

THE WITNESS: I believe so.

BY MR. AINSWORTH:

Q. All right. And so, then let's mark as Exhibit 209 -- did you -- well, I guess I should ask you. Did you interview Billy Bigeck again after your September 18th interview with him?

MR. OBERTS: Objection. Foundation.

THE WITNESS: I don't know.

BY MR. AINSWORTH:

Q. Did you have any reason to interview Billy Bigeck again after you interviewed him, and he told you the same thing that he had told DiCiolla and Ptak?

MR. OBERTS: Objection. Foundation. Speculation and form.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 178

THE WITNESS: I -- I don't know.

BY MR. AINSWORTH:

Q. Can you think of a reason to interview Billy Bigeck again, after you were introduced to him -- interviewed him and he told you the same thing he told DiCiolla and Ptak?

MS. O'BRIEN: Objection. Form. Foundation

MR. OBERTS: And speculation.

THE WITNESS: After 25 years, I -- I -- I don't know.

BY MR. AINSWORTH:

Q. All right. Let's look at Exhibit -- what we've marked -- what we'll mark as Exhibit 209. This is Bates numbered Sopron 6143. And this is a report, it says, "Prepared by," yourself, "William Marley." And that's your signature at the bottom, right?

(EXHIBIT 209 MARKED FOR IDENTIFICATION)

THE WITNESS: It is.

BY MR. AINSWORTH:

Q. And it says, "William Bigeck was interviewed by the undersigned investigator on September 27, 1996. The interview took place in the Cook County Jail Witness Quarters. Also present were assistant state's attorneys Neil Linehan and Scott Cassidy. Bigeck related the following in summary and not verbatim. William Bigeck

Page 179

was asked to recall his activities on December 14, 1995. Bigeck related essentially the same account as reported on August 12th and 29th with the following addition." Have I read that correctly so far?

A. Yes.

Q. So this is the interview that was conducted on September 27th, the day after you interviewed John Gizowski on the 26th, right?

MR. OBERTS: Objection. Foundation.

THE WITNESS: I -- I guess so.

BY MR. AINSWORTH:

Q. All right. And now it states, "Bigeck stated that on the date he was at Nick Morfin's house with several other friends, all present were Popes except Ed Morfin, Nick Morfin's cousin," and then there's a redaction. And it says, "Matt Sopron arrived with two unknown Vittum Park Popes. As he went on relating his activities, William Bigeck stated that he had remembered the name of one of the two Vittum Park Popes who had accompanied Matt Sopron to Nick Morfin's house. He identified that subject as Blank. Blank was identified as John Gizowski"; do you see that?

A. I do.

Q. So the day after John Gizowski says he witnessed Matt Sopron order this murder, Bigeck in his

Page 180

third interview now identifies John Gizowski as being present; do you see that, sir?

MR. OBERTS: Objection. Misstates the evidence. Form. Foundation. And speculation.

THE WITNESS: Could you repeat the question?

BY MR. AINSWORTH:

Q. Sure. So now the day after John Gizowski identifies -- states that he was present for Matt Sopron giving the order to shoot up the van, Billy Bigeck now says, oh yeah, I remember that John Gizowski was present at the house; do you see that, sir?

MR. OBERTS: Objection. Foundation. Speculation and form.

THE WITNESS: Okay. Okay.

BY MR. AINSWORTH:

Q. Did you bring up John Gizowski's name or nickname to Billy Bigeck before he brought up the name John Gizowski or his nickname, Climber, to you?

MR. OBERTS: Objection. Foundation. Speculation.

THE WITNESS: No.

BY MR. AINSWORTH:

Q. Can you tell us what led to Billy Bigeck on his third interview about the events of December 14th now suddenly recalling the name Climber, or John

Page 181

Gizowski, after failing to recall it the previous two times he was talked to?

MR. OBERTS: Objection. Foundation, and form, and speculation.

THE WITNESS: No.

BY MR. AINSWORTH:

Q. Do you have any explanation for how Billy Bigeck remembers John Gizowski's name or his nickname Climber the day after you have John Gizowski implicate Matt Sopron in this murder?

MR. OBERTS: Objection. Form. Speculation, and foundation.

THE WITNESS: Oh, no.

BY MR. AINSWORTH:

Q. All right. When you interviewed the witnesses you talked to in this case, were you trying to find out the truth?

MR. OBERTS: Objection. Vague. Speculation. And foundation.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. Some of these questions are simple ones.

MR. OBERTS: Russell?

MR. AINSWORTH: Would you, sir -- yes?

MR. OBERTS: Go with your -- whatever this

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 182

block is, if you will, and then if we could take a break?

MR. AINSWORTH: Sounds good.

BY MR. AINSWORTH:

Q. Would you agree with me, sir, that you're only supposed to document interviews that you were present for?

MR. OBERTS: Objection. Form. Foundation. Speculation. But go ahead.

THE WITNESS: Yes.

MR. AINSWORTH: Why don't we take a break now? How much time do you want?

MR. OBERTS: Like, five to ten minutes.

MR. AINSWORTH: Okay. Let's come back at 2:45.

(OFF THE RECORD)

THE REPORTER: We are back on the record.

BY MR. AINSWORTH:

Q. All right, sir.

MR. AINSWORTH: Let me show you what we'll mark as -- shoot, I may have -- are we on 210 now?

MS. O'BRIEN: Yes.

MR. AINSWORTH: Thank you. As Exhibit 210, this is a report regarding in your contact with Michelle Zielinski, and it's Bates numbered Sopron

Page 183

5903.

(EXHIBIT 210 MARKED FOR IDENTIFICATION)

BY MR. AINSWORTH:

Q. All right. Do you have a hard copy of this present with you?

A. Yes. Oh.

Q. Okay. So how'd you come to be in contact with Michelle Zielinski?

MR. OBERTS: And you want him -- without reading report right now, right?

MR. AINSWORTH: You can read the report. That's fine.

THE WITNESS: I don't -- I don't recall where we got her name, but we had some difficulty in locating her.

BY MR. AINSWORTH:

Q. What difficulty did you have locating her?

A. I remember we -- we couldn't find her at first, but we found out where she worked and served a subpoena on her there.

Q. A subpoena for what?

A. I believe it was -- I may -- I may have misspoke to her. I think we served a subpoena on her. In -- in any event, we contacted her at her place of employment.

Page 184

Q. Okay. Well, your report that we've marked as Exhibit 210 doesn't say that you talked to her at her work, or you had any trouble finding her, right?

A. It doesn't.

Q. And so, you're saying that independently, you remember from 1996 that you had trouble finding Michelle Zielinski and that you found her at her work?

A. Yes.

Q. Okay. If you were having trouble finding Michelle Zielinski, can you explain to us how she knew to have a hardcover loose-leaf binder containing numerous letters written to her by Nicholas Morfin to present to you?

MS. O'BRIEN: Objection. Form.

MR. OBERTS: Object to form. Foundation.

THE WITNESS: I -- I have no memory of that at all.

BY MR. AINSWORTH:

Q. You have no memory of her providing you a binder?

A. The binder, I remember, but I -- I don't remember what led up to it.

Q. Okay. The binder was evidence in a double homicide, right?

MR. OBERTS: Objection. Speculation.

Page 185

Foundation. Form.

THE WITNESS: Yes.

MS. O'BRIEN: Hey, Russell, I'm sorry to interrupt you, but what was the Bates stamp on that one? I'm sorry. I don't think --

MR. AINSWORTH: It's okay. Sopron 5903 and a copy of it is in the exhibits that were e-mailed to you.

MS. O'BRIEN: Oh, okay. All right. Thank you. Appreciate it.

MR. AINSWORTH: You're welcome.

BY MR. AINSWORTH:

Q. All right. You state the binder was inventoried under number 33475 on December 19, 1996, at the Cook County State's Attorney's Office; do you see that?

A. I do.

Q. All right. And so, did you place the binder into evidence the same day you received it?

MR. OBERTS: Objection. Foundation. Speculation.

THE WITNESS: I don't remember.

BY MR. AINSWORTH:

Q. Any reason why you wouldn't put it into evidence the same day you received it?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 186

MR. OBERTS: Objection. Foundation. Speculation.

THE WITNESS: Again, I -- I don't have a reason. I don't know.

BY MR. AINSWORTH:

Q. Did you interview Michelle Zielinski about what she might know about the homicides?

MR. OBERTS: Objection. Foundation. Speculation.

THE WITNESS: I believe we did.

BY MR. AINSWORTH:

Q. What did she tell you?

A. I don't remember the interview.

Q. Did you document the interview?

MR. OBERTS: Foundation.

THE WITNESS: I don't think so. I -- or I haven't seen a report of it.

BY MR. AINSWORTH:

Q. Why didn't you document the interview?

MR. OBERTS: Foundation.

THE WITNESS: Yeah. I don't have an answer. I don't know.

BY MR. AINSWORTH:

Q. Can you think of any reason why you wouldn't document your interview with a witness in a double

Page 187

homicide who was dating one of the defendants and who provided you with evidence in the case?

MR. OBERTS: Objection. Speculation. Foundation.

MS. O'BRIEN: Form.

THE WITNESS: No.

BY MR. AINSWORTH:

Q. Okay. I'm going to show you now an exhibit --

MR. AINSWORTH: Matt, do you know what exhibit the Morfin investigative report is?

MR. HOWROYD: Let me check, Russell. I know we definitely used it, the last one.

MR. AINSWORTH: We did.

MR. HOWROYD: So give me one sec, Russell. I just have to pull up --

MR. AINSWORTH: Thank you.

MR. HOWROYD: -- the Excel sheet here. Hold on one second. 191, Russell.

MR. AINSWORTH: Thank you.

MR. HOWROYD: You're welcome.

MR. AINSWORTH: I appreciate that.

BY MR. AINSWORTH:

Q. Let me show you what we previously marked as Exhibit 191. This is a report regarding Edward Morfin, your interview with Edward Morfin. And I jumped the gun

Page 188

again. Before you take a look at the report, do you have any memory of your interview with Edward Morfin?

A. Nothing in particular, no.

Q. Well, do you remember anything at all?

A. Not really.

Q. Do you remember what Edward Morfin looks like?

A. Yes.

Q. What does he look like?

A. He's short. He's Hispanic. Black hair, brown eyes. I -- I think he has some tattoos.

Q. Where?

A. His arms.

Q. Did you look at a photograph of Edward Morfin before this deposition or in preparation for this deposition?

A. No.

Q. Why'd you interview Eddie Morfin?

MR. OBERTS: Objection. Speculation, foundation, form.

THE WITNESS: I don't recall.

BY MR. AINSWORTH:

Q. Had Eddie Morfin been interviewed by somebody, by Cook County State's attorney investigators or an assistant state's attorney about the Hovel Martin murders before you spoke to him?

Page 189

MR. OBERTS: Objection. Speculation, foundation.

THE WITNESS: I don't know.

BY MR. AINSWORTH:

Q. Who was present for the interview of Edward Morfin when you spoke to him?

MR. OBERTS: Objection. Foundation, speculation.

THE WITNESS: I would have to look at the report. I don't remember.

BY MR. AINSWORTH:

Q. All right. Let's take a look at Exhibit 191. All right. Take a look at Exhibit 191, your report regarding your interview of Edward Morfin, and tell us if that refreshes your recollection as to who was present for that interview.

A. Myself and Leonard Bajenski.

Q. Okay. So Edward Morfin was incarcerated at the time that you spoke to him, right?

MR. OBERTS: Objection. Foundation, speculation. Of each of these questions, are you asking him to look at his report for the answer?

MR. AINSWORTH: No. Not necessarily. If he knows it, he knows it. But if you need to look at your report, then tell me.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 190

THE WITNESS: I believe he was.

BY MR. AINSWORTH:

Q. Okay. So he wasn't -- you know, there wasn't a question of when he would be available, right?

MR. OBERTS: Objection. Speculation, foundation.

THE WITNESS: Well, they make appointments to bring people over from the jail, but other than that, he would be available.

BY MR. AINSWORTH:

Q. Yeah. He didn't have anywhere else to be. He's incarcerated, right?

A. Correct.

Q. And so, if you needed to speak to Edward Morfin, you could do it any time you wanted, you just had to schedule him to be brought over, right?

MR. OBERTS: Objection. Speculation, foundation.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. Right. Can you tell us why you interviewed Edward Morfin at 6:30 at night?

MR. OBERTS: Object. Speculation, foundation.

THE WITNESS: Not off-hand, but that would probably more be the convenience of the jail to

Page 191

supply him.

BY MR. AINSWORTH:

Q. Why would it be convenient for the jail to supply him at 6:30 p.m.?

MR. OBERTS: Speculation. Foundation.

THE WITNESS: Well, they all come through Division 5 and 5:00 is their busiest time. So it -- they have people available after that.

BY MR. AINSWORTH:

Q. Well, if you work 9:00 to 5:00, typically, then why didn't you interview him at noon or at 9:00 a.m. or some other time during the day?

MR. OBERTS: Speculation, foundation.

THE WITNESS: I have no idea what -- we might have been doing other things.

BY MR. AINSWORTH:

Q. Well, I guess the question is: Why didn't you interview him the next day, you know, September 19th at 9:00 a.m. or 10:00 a.m. or any time during the day?

MR. OBERTS: Objection. Speculation and foundation.

THE WITNESS: I don't know.

BY MR. AINSWORTH:

Q. The jail didn't have any problem bringing inmates over before 5:00 p.m., right?

Page 192

MR. OBERTS: Objection. Speculation.

THE WITNESS: No.

BY MR. AINSWORTH:

Q. Why didn't you sign this report?

MR. OBERTS: Speculation. Foundation.

THE WITNESS: I don't know.

BY MR. AINSWORTH:

Q. Why isn't the report dated?

MR. OBERTS: Objection. Speculation, foundation.

THE WITNESS: I don't know.

BY MR. AINSWORTH:

Q. Do you have any explanation for why you didn't sign this report?

MR. OBERTS: Objection. Asked and answered. Foundation.

THE WITNESS: No.

BY MR. AINSWORTH:

Q. All right. So looking at page 2 of Exhibit 91 or 191, I should say. At the bottom of the first full paragraph on the page, there's a sentence that reads, "There they could shoot up the van, and run back through the park and be picked up on 62nd Street, west of the park"; do you see that?

A. I do.

Page 193

Q. All right. So according to Eddie Morfin, he, like Billy Bigeck, was recorded as saying that the pickup spot would be west of the park, right?

MR. OBERTS: Objection. Speculation, foundation.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. On 61st Street, right? Or sorry, 62nd Street, right?

MR. OBERTS: Objection. Speculation, foundation.

THE WITNESS: Yes. West of the park.

BY MR. AINSWORTH:

Q. And so, Eddie told you the plan was to meet up west of the park to be picked up, just foundationally, right?

A. Yes.

MR. OBERTS: Objection. Foundation, speculation.

BY MR. AINSWORTH:

Q. And then in the next paragraph of Exhibit 191, on the page -- on second page of that exhibit, it states that, "They all ran back through the park with Billy running straight through, and Eric and Ed going around the back of the school and running north"; do you see

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 194

that?

A. I do, yes.

Q. So Ed told you that the meeting spot was to be west of the park and that he ran north, right?

MR. OBERTS: Objection. Speculation and foundation.

THE WITNESS: Yes. That's what he said.

BY MR. AINSWORTH:

Q. And he said that he saw a guy with two small white dogs, right?

A. Yes.

MR. OBERTS: Objection. Speculation and foundation.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. And you interviewed a guy with two small white dogs, right?

A. I did.

Q. And the guy with the two small white dogs said he viewed two boys running north, right?

A. He did.

MR. OBERTS: Foundation.

BY MR. AINSWORTH:

Q. And Ed Morfin said that he and Eric Anderson, the 15-year-old, ran north after the shooting, right?

Page 195

MS. O'BRIEN: Objection. Form, foundation.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. Did you ask Eddie Morfin why he ran north after the shooting instead of west to the meetup spot?

MR. OBERTS: Objection. Foundation.

MS. O'BRIEN: Assumes facts not in evidence.

THE WITNESS: I don't remember asking him that.

BY MR. AINSWORTH:

Q. Is there any reason why you wouldn't ask Eddie Morfin why he ran -- if the getaway plan was to run west and be picked up, why he and Eric both ran north if there was a getaway plan to be picked up west to the spot?

MR. OBERTS: Objection. Speculation, and foundation, and form.

THE WITNESS: I didn't ask him specifically. No.

BY MR. AINSWORTH:

Q. Well, generally, did you ask -- did you have a conversation with Ed Morfin about if the plan was to get picked up west of the park, why he and Eric Anderson both ran north through the park and not west?

MR. OBERTS: Objection. Foundation and form.

THE WITNESS: I didn't ask him that

Page 196

specifically, but these are all young guys who are in a panic. So plans tend to go out the window.

BY MR. AINSWORTH:

Q. Well, did you ask him to find out if the reason he ran north instead of west was because he was panicking, the plan went out the window?

MR. OBERTS: Objection. Foundation.

THE WITNESS: No.

BY MR. AINSWORTH:

Q. Was there anything preventing you from asking Ed Morfin why he ran north instead of to the meetup spot?

MR. OBERTS: Objection. Speculation, foundation.

THE WITNESS: No.

BY MR. AINSWORTH:

Q. Did Ed Morfin tell you anything about, you know, the getaway car wasn't where it was supposed to be, and that's why they didn't get a ride?

MR. OBERTS: Objection. Foundation.

THE WITNESS: I -- I don't remember.

BY MR. AINSWORTH:

Q. If Ed Morfin had told you that the getaway car wasn't where it was supposed to be and that's why he didn't get a ride, would you have documented that fact?

Page 197

MR. OBERTS: Objection. Speculation, foundation, and form.

THE WITNESS: We would try to document anything we could. Sure.

BY MR. AINSWORTH:

Q. And, you know, if part of the plan was to get picked up and the plan didn't work out because the getaway driver wasn't there, that would explain why they ran away on foot rather than being driven, right?

MR. OBERTS: Objection. Speculation, foundation, and form.

MS. O'BRIEN: Objection. Form.

THE WITNESS: Partially, yes.

BY MR. AINSWORTH:

Q. And so, that's something that you would try to document in your report, correct?

MR. OBERTS: Objection. Speculation, foundation, and form.

THE WITNESS: It would.

BY MR. AINSWORTH:

Q. Did Ed Morfin explain why he was previously willing to tell about other gang -- that other gang members' involvement in the murder, including Eric Anderson being the person who shot, but wasn't willing to talk about there being a plan to be driven away?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 198

MS. O'BRIEN: Objection. Form.

MR. OBERTS: Objection, assumes facts not in evidence, form, speculation, and foundation.

THE WITNESS: Could -- could you repeat the question? I didn't understand it.

BY MR. AINSWORTH:

Q. Sure. Did you ask Eddie Morfin why he was willing to, you know, talk about -- previously talk about other gang members' involvement in the murder, including Eric Anderson being the person shooting, but not willing to talk about the fact that there was a plan for a getaway driver until September or October of 1996?

MR. OBERTS: Objection, vague. Assumes in fact not in evidence.

MS. O'BRIEN: Form.

MR. OBERTS: Speculation, form, and foundation.

THE WITNESS: No. I didn't.

BY MR. AINSWORTH:

Q. Why not?

MR. OBERTS: Objection. Speculation, vague, form, foundation, and assumes a fact not in evidence.

THE WITNESS: I have no answer. I don't know.

BY MR. AINSWORTH:

Page 199

Q. All right. I want to show you -- let's stop sharing. Show you another exhibit that was previously marked as Exhibit 46. I'm having my own problems with the sun. I'm not complaining about seeing the sun, but --

MR. OBERTS: Yeah. We're trying to fix it. No. No. Be careful. Hold on one second.

THE WITNESS: I'm ready to sit over here, I think.

MR. OBERTS: There we go, sir.

THE WITNESS: I think so. I can see you.

MR. OBERTS: Careful.

THE WITNESS: What am I looking at?

MS. O'BRIEN: Just -- I'm trying to come down.

MR. OBERTS: There it goes to the right to be able to do that, but that's okay. I'll knock it out. Oh, nicely done. Nicely done. All right. Okay. Nice. Okay. All right. Sorry about that. Sure. Yeah. Look at that one. Okay. Sorry about that. Russell, what number are you -- what are you on now?

MR. AINSWORTH: Exhibit 46. This is a proffer letter to Edward Morfin. And it's -- sorry, I thought there was a date on here.

THE WITNESS: Last September.

Page 200

BY MR. AINSWORTH:

Q. Do you see this proffer letter as witnessed by DiCiolla?

MR. OBERTS: Objection. Form, foundation, speculation.

THE WITNESS: Just a little bit to -- the signatures are covered by the picture.

BY MR. AINSWORTH:

Q. I'm sorry. Let me try and move it.

A. Okay. I can -- oh.

Q. Oh, sorry.

A. I -- yeah. I can see it.

Q. Okay. You were not present for the proffer lever -- letter being provided to Edward Morfin; is that right?

MR. OBERTS: Objection. Form.

THE WITNESS: That's correct.

BY MR. AINSWORTH:

Q. Were -- and were you present for the interview with Edward Morfin on September 5, 1995?

MR. OBERTS: Objection. Foundation, speculation.

THE WITNESS: I don't -- I don't know which one that is. Sorry. Do we have a copy of it?

MR. OBERTS: He'll show you.

Page 201

THE WITNESS: Oh.

BY MR. AINSWORTH:

Q. I'll represent to you that we have your report of an interview with Edward Morfin on September 18, 1996. We have no report from you regarding an interview with Edward Morfin on September 5, 1995. I think it's supposed to be 1996, but -- and so my question is: Were you present for an interview with Edward Morfin on September 5, 1996?

MR. OBERTS: Objection. Foundation, speculation.

THE WITNESS: I'm not sure.

BY MR. AINSWORTH:

Q. If you had been present for an interview with Edward Morfin about a double homicide, would you have made sure that the interview was documented in some way?

MR. OBERTS: Objection. Speculation, form, foundation.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. Did any member of the Cook County State's Attorney's Office ever tell you, "Bill, don't document this interview that you had with the witness. We don't want it to get out"?

MR. OBERTS: Objection. Foundation.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 202

THE WITNESS: No.

BY MR. AINSWORTH:

Q. Did anybody from the Cook County State's Attorney's Office tell you not to document an interview that you conducted with a witness?

A. No.

Q. How tall are you?

A. About 6' even.

Q. And were you the same height in September 1996?

A. Yeah.

Q. How much did you weigh then?

A. Then? About -- about 180.

Q. Did you wear glasses?

A. I do.

Q. Did you then in September 1996?

A. I did.

Q. Did you have any facial hair?

A. No.

Q. What color was your hair in September, 1996?

A. It was gray then, too.

Q. I won't ask about the amount.

A. That's fleeting.

Q. Did you -- if you had witnessed misconduct by a Cook County State's Attorney investigator, would you

Page 203

have reported it?

MR. OBERTS: Objection. Foundation, speculation. Incomplete hypothetical. Go ahead.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. Who would you have reported it to?

MR. OBERTS: Objection. Speculation.

THE WITNESS: My supervisor.

BY MR. AINSWORTH:

Q. During your tenure at the Chicago Police Department, did you ever report a fellow officer for misconduct?

A. For what? What was the last word?

Q. Misconduct.

A. No.

Q. Did you ever in your -- how many years were you in the CPD?

A. 32 years.

Q. In your 32 years in the job, did you ever witness another Chicago police officer commit misconduct?

MR. OBERTS: Objection. Speculation, relevance, vague. Go ahead.

THE WITNESS: Minor things, I suppose.

BY MR. AINSWORTH:

Page 204

Q. Well, let's talk about while you were at Area 2, sir, as a detective.

A. While -- while I was what?

Q. While you were at Area 2 as a detective.

A. Okay.

Q. Did you witness any police officer ever mistreat a suspect?

MS. O'BRIEN: Objection. Form, foundation.

MR. OBERTS: And vague.

THE WITNESS: No.

BY MR. AINSWORTH:

Q. While you were at Area 2, did you witness any detective mistreat a witness?

MR. OBERTS: Objection. Vague, form, foundation.

THE WITNESS: No.

BY MR. AINSWORTH:

Q. While you were at Area 2, did you ever mistreat a witness?

A. No.

Q. While you were at Area 2, did you mistreat a suspect?

A. No.

Q. You were sued by Eric Kane; is that right?

A. I -- I was what by him? I'm sorry.

Page 205

Q. You were sued by Eric Kane?

A. Yes.

Q. And that case settled; is that right?

A. I believe so.

MR. OBERTS: Objection. Speculation, foundation.

THE WITNESS: I believe so.

BY MR. AINSWORTH:

Q. For $10.25 million; is that right?

MS. O'BRIEN: Objection. Form, foundation.

MR. OBERTS: Objection. Speculation.

THE WITNESS: I -- I have no idea of the amount.

BY MR. AINSWORTH:

Q. Did you take the Fifth in your inter -- in your deposition in the Eric Kane case?

MS. O'BRIEN: Objection. Form, foundation.

MR. OBERTS: Objection. Relevance.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. Did you ever witness a Cook County State's Attorney investigator commit misconduct?

A. What was the end of that? I couldn't --

Q. Commit misconduct.

A. No.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q. Did you witness a Cook County State's attorney investigator mistreat a witness?

A. No.

Q. Would it have been completely wrong to threaten John Gizowski that he could be charged with murder if he didn't cooperate?

MS. O'BRIEN: Objection. Form, foundation.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. Would it be completely wrong to threaten John Gizowski that if he didn't match his story to Bigeck's story, he would be charged with perjury?

MS. O'BRIEN: Objection. Form, foundation.

MR. OBERTS: Objection. Form and foundation.

THE WITNESS: It would.

BY MR. AINSWORTH:

Q. And would it be completely wrong to tell John Gizowski that he was a White guy and that there were a lot of Black guys in jail who would be very happy to see him?

MS. O'BRIEN: Objection. Form, foundation.

THE WITNESS: Yes.

MR. OBERTS: Let's stand up for a second.

THE WITNESS: Just a sore knee, among other parts.

BY MR. AINSWORTH:

Q. You interviewed Matt Sopron; is that right?

MR. OBERTS: Objection. Vague. Objection. Vague and foundation.

THE WITNESS: I did not interview Sopron.

BY MR. AINSWORTH:

Q. Did you attempt to interview Matt Sopron?

A. Yes.

Q. All right. Well, tell us what happened. Where did the interview take place?

A. That was at --

MS. O'BRIEN: Objection. Form, foundation. He just said he didn't interview him.

MR. AINSWORTH: Well, let's find out.

THE WITNESS: That was at Chicago Police Area 1 at 51st and State Street, or I believe it -- no. 51st and Wentworth. I'm sorry. And he had just been transported there from the 8th Police District. And when he arrived there, Lenny Bajenski and myself introduced ourselves to him and told him we were from the State's Attorney's Office and we'd like to talk to him. He told us that he had a -- an attorney who had advised him not to talk to anybody.

BY MR. AINSWORTH:

Q. And then no further statements were made; is

that right?

A. Not to us. We left at that point.

Q. And Matt Sopron didn't say anything else or didn't do anything else in your presence; is that correct?

MR. OBERTS: Objection. Form.

THE WITNESS: That's correct. That was the entire conversation.

BY MR. AINSWORTH:

Q. You interviewed a Don Barnoski; is that right?

MR. OBERTS: Objection. Foundation, speculation, and form.

MR. AINSWORTH: How is it speculation exactly?

MR. OBERTS: I don't know. I mean, until he knows, he doesn't know.

MR. AINSWORTH: But I'm not asking him to speculate. I'm asking him if he did or didn't. How is that asking him to speculate?

MR. OBERTS: If he doesn't know.

MR. AINSWORTH: Really? Is that what the witness --

MR. OBERTS: It's based on foundation, because you don't know if he has the information, but it's speculation because I don't know who Don Barnoski is. You haven't even established Don Barnoski yet.

MR. AINSWORTH: But that -- those aren't proper objections to a question about whether he talked to a particular person. I -- I'm confused by your objections, but I suppose I'll just continue letting him -- you make your rather irrelevant objections, and we'll move on.

MR. OBERTS: Well --

BY MR. AINSWORTH:

Q. Sir, did you interview Don Barnoski?

MR. OBERTS: Would it be nice for me to say your irrelevant or misleading questions? I mean, that's not nice.

MR. AINSWORTH: Well, Bill, I mean, when you say that it's be -- that it lacks foundation, whether somebody talked to somebody else, I guess if there's multiple conversations where you have a question about when the conversation took place, I can maybe see it, but speculation? And, you know, I will -- there are some of my questions that will turn out to be irrelevant, that is true, but --

MR. OBERTS: I get it. I'm not criticizing the -- I'm just saying for you to criticize my objections as irrelevant. I'm not stating your -- you know, your -- I'm not quoting on the record that I think your questions are this, that, or the other

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 210

thing, you know?

MR. AINSWORTH: Yeah.

MR. OBERTS: I've objected. But I'm not criticizing the exact -- the objection. Excuse me, the question.

MR. AINSWORTH: It's just that, you know, it's caused problems during the course of the deposition. Because then the witness doesn't remember and the question and I have to repeat and it -- I don't know. It -- I could see somebody looking at this transcript and saying, "You know what, that Oberts really makes a lot of objections that aren't really well-founded. And maybe it's an attempt to disrupt the flow of the deposition."

MR. OBERTS: I don't think that's fair. I think you have an 85-year-old man that suffers from trans -- whatever, amnesia, that we're talking about 30 years ago. And I think that could be a very big part of it rather than any objections viable.

BY MR. AINSWORTH:

Q. Well, sir, you -- there's -- you don't have any medical condition that would affect your ability to testify truthfully and accurately, right?

A. What? I'm sorry.

Q. You don't have any medical condition that

Page 211

would affect your ability to truth -- testify truthfully and accurately, correct?

A. No.

Q. All right. I just want to make sure. All right. Did you speak -- did you interview Donald Barnoski?

A. I don't remember. The name is familiar, but I don't remember.

Q. Okay. Let's take a look at what we'll mark as Exhibit 211.

(EXHIBIT 211 MARKED FOR IDENTIFICATION)

MR. OBERTS: Exhibit 211, you said?

MR. AINSWORTH: Yes. It'll be the Barnoski report as soon as I find it in this --

MR. MASCIOPINTO: Hey, Russell? I have a quick question.

MR. AINSWORTH: Yes, sir.

MR. PASCIOPINTO: Did you mark in the context of interviewing Sopron, the Sopron investigative report or not?

MR. AINSWORTH: I didn't.

MR. MASCIOPINTO: Okay.

MR. AINSWORTH: All right. I'm showing you what we marked as Exhibit 211 or what we will mark as Exhibit 211. This is Bates numbered Sopron 1 and

Page 212

then it has a black -- a blank page is back as Sopron 2.

MR. OBERTS: Okay.

BY MR. AINSWORTH:

Q. Taking a look at the report of the interview with Don Barnoski, does this refresh your recollection that you interviewed Don Barnoski?

A. Yes. It does.

Q. Okay. Did you ever interview Mike Barnoski?

A. I don't think so.

Q. Did -- and you can take a look at Exhibit 211 to help answer this question, but my question to you is: Did Don Barnoski tell you anything that isn't documented in Exhibit 211?

MR. OBERTS: Objection. Foundation and speculation.

THE WITNESS: Could you repeat the question, please?

BY MR. AINSWORTH:

Q. Sure. Did Donald Barnoski tell you anything that you did not document in Exhibit 211?

MR. OBERTS: Objection. Foundation and speculation.

THE WITNESS: I -- no. I don't understand the question.

Page 213

BY MR. AINSWORTH:

Q. Okay. So you created a report regarding your conversation with Donald Barnoski, right?

A. Yes.

Q. And does that report contain everything that Donald Barnoski told you of substance or are there things that Donald Barnoski told you that are not contained in Exhibit 211?

MR. OBERTS: Objection. Foundation, speculation.

THE WITNESS: As I remember, this contains everything.

BY MR. AINSWORTH:

Q. Okay. So there's -- Donald Barnoski did not tell you anything that's not contained in Exhibit 211, right?

MR. OBERTS: Objection. Asked and answered and form.

THE WITNESS: Right.

BY MR. AINSWORTH:

Q. Okay. And you indicate in -- on Exhibit 211, Donald Barnoski's employment, right?

A. Yes.

Q. Did you interview a man named Charles Baker or a boy named Charles Baker, I should say?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 214

A. Not sure.

Q. Excuse me?

A. I said I'm not sure.

Q. Do you recall on the testimony you reviewed in preparation for this deposition, talking about a -- talking about an interview that you conducted with Charles Baker?

A. These names are all beginning to run into each other. I -- I'm not sure.

Q. All right. Let's mark as Exhibit 212 your testimony. If you have a hard copy of this, you're welcome to take a look at the hard copy. Otherwise, you can look on the screen. I'm going to first orient you. So this is your testimony in front of Judge Kazmierski on February 9, 1998 in the People v. Antusas and Sopron case. And this was a pretrial hearing, so it wasn't in front of a jury. And your testimony starts on Page 2 of Exhibit --

MR. OBERTS: Got it on there?

MR. AINSWORTH: -- 211.

(EXHIBIT 212 MARKED FOR IDENTIFICATION)

BY MR. AINSWORTH:

Q. I'm just trying to orient you. Do you see that this is your testimony, sir?

MS. O'BRIEN: I'm going to object. I don't

Page 215

think it was pretrial. I'm not trying to be difficult, but if it's on 2-9 of '98, did you say?

MR. AINSWORTH: Yes.

MS. O'BRIEN: Yeah, that's the trial.

MR. AINSWORTH: Oh, that is the trial. I'm sorry. I misled you, and I was wrong to do so. Okay.

BY MR. AINSWORTH:

Q. So in any event, sir, do you see that this is your testimony?

MR. OBERTS: Objection. Foundation.

THE WITNESS: It is.

BY MR. AINSWORTH:

Q. Okay. I'm going to direct your attention to Page 4 of Exhibit 211.

THE WITNESS: It's 211?

MR. AINSWORTH: Wait. Sorry. Is the transcript 211 or am I on 212 now?

MR. OBERTS: 212.

MR. HOWROYD: 212.

MR. AINSWORTH: It's 212. Sorry. 212 was -- 211 was Barnoski. Let me correct the record.

THE WITNESS: So -- I'm sorry, sir.

BY MR. AINSWORTH:

Q. Your transcript we'll mark as Exhibit 212. And

Page 216

Exhibit -- Page 4 of Exhibit 212 refers to a -- an interview of Charles Baker conducted on January 30, 1998.

MR. OBERTS: And, Russell, could you say, at the bottom page? What does the bottom Bates say? R what? Or whatever it is?

THE WITNESS: H.

MR. OBERTS: H, what?

MR. AINSWORTH: It's H133.

MR. OBERTS: 133? H133? Okay. Okay. We're on H133. Please go ahead, whatever the question was.

MR. AINSWORTH: All right.

MR. OBERTS: Okay. Listen to the question.

BY MR. AINSWORTH:

Q. Sir, do you see on -- there's a reference on Page H133 of Exhibit 212 to a conversation with Charles Baker on January 30, 1998?

A. I do.

Q. When you reviewed this transcript in preparation for this deposition, was there anything in the transcript that you thought was incorrect?

MR. OBERTS: Objection. Foundation and speculation.

THE WITNESS: Not that I noticed.

Page 217

BY MR. AINSWORTH:

Q. What -- can you tell us why you talked to Charles Baker?

MR. OBERTS: Objection. Foundation.

THE WITNESS: I don't remember.

BY MR. AINSWORTH:

Q. Do you remember anything about your conversation with Charles Baker?

MR. OBERTS: Objection. Foundation and asked and answered.

THE WITNESS: Not really, no.

BY MR. AINSWORTH:

Q. And I guess I should be more precise. Do you remember any conversation that was had with Charles Baker on January 30, 1998, in your presence?

A. I don't.

Q. All right. Would you review Exhibit 212? Read it to yourself, and then tell us if it refreshes your recollection at all of your conversation or any conversation that was had with Charles Baker on January 30, 1998?

A. Read what page? I'm sorry.

Q. Read from Page H133 to the end.

MR. OBERTS: Do you understand the question --

THE WITNESS: Yeah.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 218

MR. OBERTS: -- while you're reading it?

MR. HOWROYD: Russell, do you have a Bates on yours?

MR. AINSWORTH: Yes, it's -- was -- it was e-mailed around and it's Sopron --

MR. HOWROYD: Oh, yeah.

MR. AINSWORTH: -- 9612 through -- oh, 9612, and then picks up at Sopron 9701 through 9709.

MR. HOWROYD: Thank you.

THE WITNESS: Yeah. I do remember this now.

BY MR. AINSWORTH:

Q. Okay. Can you tell us why you went to go see Charles Baker?

A. That, I don't know.

Q. All right. What conversation occurred in your presence with Charles Baker on January 30, 1998?

A. He said that he hated John Gizowski.

Q. All right. Any other conversation that was had with Charles Baker in your presence?

A. Not really. He was less than cooperative. He was slouched down, and seemed totally uninterested.

Q. Do you recall that or are you just reading that?

A. I read it, but I do recall it also after reading it.

Page 219

Q. How old was Mr. Baker?

A. A young guy. 20, I guess.

Q. Do you remember that he was 14 years old at the time you interviewed him?

A. No, I didn't.

Q. 12 years old at the time of the crime?

MR. OBERTS: Objection. Speculation. Foundation.

THE WITNESS: No.

BY MR. AINSWORTH:

Q. Do you recall anything else about your -- or the conversation that was had with Charles Baker, apart from that he was slouching and appeared to you to -- well, strike that. Apart from him slouching on the couch, was there anything else about Charles Baker that indicated to you that he was not cooperative?

A. He acted bored with the whole conversation, like it was of no importance.

Q. Okay. And did -- was there any other conversation involving Mr. Baker, apart from him saying that he hated John Gizowski?

A. Well, his mother got up. His mother had been present. She got up and left the room, so I went to talk to her to ask what -- why because she left rather abruptly.

Page 220

Q. Okay. Let's go back to my question. My question was: Was there any other conversation involving Mr. Charles Baker apart from Mr. Baker saying that he hated John Gizowski?

A. Not that I remember.

Q. And what -- did you have any conversation with Charles Baker's mother?

A. I did.

Q. All right. Do you recall that conversation or are you just reading it off the page?

A. Well, both actually.

Q. What did she look like? What did Charles Baker's mom look like?

A. I couldn't tell you.

Q. Do you -- can you tell us anything about her? What race she was?

A. She was White.

Q. Hair color?

A. White female. I -- as far as describing her, though, I couldn't do it.

Q. What do you recall about Charles Baker's mom saying?

A. She seemed just to be disgusted with the whole -- the son's whole attitude in talking with us.

Q. Okay. Did she say anything?

Page 221

A. I don't remember.

Q. Okay. What made you -- what about her made you feel that she was disgusted with the -- her son's attitude?

A. Just her whole manner.

Q. What about her whole manner?

A. I didn't hear the last part, what you said?

Q. What about her whole manner?

MR. OBERTS: Objection. Form.

THE WITNESS: Well, she got up and just left the room. It's sort of hard to describe.

BY MR. AINSWORTH:

Q. Well, do your best. How can you articulate what about her manner made you think she was disgusted particularly with her son's behavior as opposed to the state's attorney or yourself?

A. She told him to quit lying.

Q. Are you reading that, or do you remember that?

MR. OBERTS: Russell, are you asking his personal recollection or him to review the transcript to answer the question? Could you clarify that for him?

MR. AINSWORTH: He can review the transcript. I don't have a problem with that.

BY MR. AINSWORTH:

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 222

Q. I'm just following up to ask, do you remember her saying, quit lying, or is that just what you're reading on the page?

A. Well, after reading it, I did remember it. She left the room, like, sort of hard to describe what contempt is, but she looked like she was contemptuous of his lying, I guess that'd be the best way to put it.

Q. Okay. Did you then ask her what the truth was?

A. No.

MS. O'BRIEN: Objection. Form. Foundation.

BY MR. AINSWORTH:

Q. Well, if she was telling -- stating in your presence that, you know, her son -- telling her son, quit lying, indicating that she knew he was lying, did you ask her to find out what she knew to be the truth?

A. No.

Q. Did you ask her how she knew he was lying?

MR. OBERTS: Objection. Foundation.

THE WITNESS: No, I didn't.

BY MR. AINSWORTH:

Q. Why didn't you ask her how she knew her son was lying?

MR. OBERTS: Objection. Speculation and foundation.

Page 223

THE WITNESS: How did she know?

BY MR. AINSWORTH:

Q. Yes. Why didn't you ask her how she knew her son was lying?

A. I don't remember asking her that.

Q. I understand you didn't ask her that. My question is: Why didn't you ask her that?

MR. OBERTS: Objection. Speculation. Foundation.

THE WITNESS: I don't know.

BY MR. AINSWORTH:

Q. So for example, you know, if she knew that he was lying because she had heard him talking with his friends the day before, something contradictory, then that would be helpful information to know, right?

MS. O'BRIEN: Objection. Form.

THE WITNESS: Yes, it would.

BY MR. AINSWORTH:

Q. And so, why didn't you ask the mom how she knew that her son was lying?

MS. O'BRIEN: Objection. Asked and answered.

MR. OBERTS: Objection. Asked and answered. Speculation and foundation.

THE WITNESS: I don't remember. I really don't.

Page 224

BY MR. AINSWORTH:

Q. Why did you leave the Cook County State's Attorney's office?

A. Oh, well, I was there 19 years. It was time to go.

Q. What do you mean, it was time to go?

A. I was tired, and I had some medical issues also. I had cancer.

Q. Have you had any employment since you left the Cook County State's Attorney's Office?

A. No.

Q. I'm going to ask you some questions, sir. And they are about your -- you know, generally about your family. If you don't wish to answer them, that's fine by me. But if you don't answer them now, I'm going to ask the Court to bar you from answering these questions at trial. And so, are you married, sir?

A. No.

Q. Have you ever been married?

A. No.

Q. Do you have any children?

A. No.

MR. AINSWORTH: And, Mr. Oberts, what do you want to do about punitive damages questions?

MR. OBERTS: You know, I don't know what we

Page 225

have agreed to with everybody as far as --

MR. AINSWORTH: I don't think we have.

MR. OBERTS: -- if we have agreed to anything.

MR. AINSWORTH: I don't think we've come --

MR. OBERTS: I think --

MR. AINSWORTH: I'm sorry. Go ahead.

MR. OBERTS: I think whatever it would be. I don't want to agree to something without everybody agreeing. I think it would be appropriate that all counsel address that issue as to all witnesses because I don't think that's been -- I think perhaps it was raised with Mr. Cassidy to a certain extent, but I don't think it's been raised with any other witnesses. And as far as punitive damages purposes as monetary stuff, I mean, as -- if you want to keep asking those types of questions, I mean, with regards to family-wise, please do so. As far as punitive damage- wise, with regards to monetary stuff, I'd ask that all counsel have a 37.2 conference regarding how to handle that question -- how to handle that issue.

MR. AINSWORTH: Well, I've raised it with --

MR. OBERTS: And that hasn't been addressed before.

MR. AINSWORTH: Well, it's just that I've got

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:22-cv-00320 Document #: 235-24 Filed: 07/17/26 Page 59 of 103 PageID #:4742
The Deposition of WILLIAM MARLEY, taken on January 13, 2021
226..229

Page 226

the witness here, so I'd like to ask the questions. I won't ask the questions if you can agree that, upon an adverse ruling to -- on -- at summary judgment for this particular defendant, that you'll re-present him for a deposition solely limited to financial questions and have him answer the written discovery about financial condition. Then I can hold him off, but otherwise I think I have to ask the questions.

MR. OBERTS: I understand your position. I can't agree to that. I don't want to agree to an open-ended like that. I understand that he would have to -- I anticipate that the Court would order, if upon an adverse ruling, some sort of answers to certain punitive damages questions. I don't know whether that would be necessary to re-depose him rather than answer certain interrogatories for a certain scope. I know it varies by different judge, and it's been addressed, you know, not in this case, per se, but in other cases. So I can't make such an agreement. I can tell you that I would certainly agree to a 37.2 conference. I respect that we didn't do that before. And you have the witness here. I would object to him providing information regarding punitive damages information, as far as

Page 227

monetary information. You want to keep talk -- asking about the family stuff, I did not object to anything of that nature. And I'd ask him that -- I would object to him answering such, absent a 37.2 conference agreement, either by counsel or a court order, directing how that would be handled in this case for all witnesses, not -- well, excuse me. All parties, not just Mr. Marley.

MR. AINSWORTH: Okay. So Mr. Oberts, I'm -- just to telegraph what I'm going to do, I'm going to start asking him financial questions. I suggest that you -- I mean, what should happen is you then stop the deposition and seek a protective order to prevent me from asking the questions. That's the -- I think the proper procedural vehicle to get this done.

MR. OBERTS: This is the last pointing -- I wouldn't do that unless this is the last questions you're asking.

MR. AINSWORTH: Yeah. These are the last questions that I'm asking the witness.

MR. OBERTS: Okay. And do you have any other --

MR. AINSWORTH: Although, I should --

MR. OBERTS: -- with regards to family stuff

Page 228

or -- because I'm not -- like you said, married, unmarried, whatever, I didn't object to anything of that.

MR. AINSWORTH: Yeah.

BY MR. AINSWORTH:

Q. Well, let me ask you this, Mr. Marley. Did you talk to any other witnesses regarding the Hovel, Martin homicides, apart from the ones we've discussed today?

A. At the time it happened, you mean? At the time of the investigation?

Q. I mean, at any point.

A. I talked to several of the witnesses during the course of the investigation. Is that what you're referring to?

Q. Well, what I'm saying is, I asked you about a number of the witnesses that you talked to, right?

A. Okay.

Q. During the course of this deposition. And I'm just trying to find out if you had other conversations with witnesses that we have not discussed here today?

A. Oh, no. I don't think so. No.

Q. All right. And so -- and just to be clear, I'm asking, not just about if there are other witnesses that you talked to, who we haven't discussed, but also

Page 229

if you had additional conversations with the witnesses we have discussed that haven't yet been mentioned in this deposition?

A. No.

Q. All right. So there's no other -- all the conversations that you had with witnesses related to the Hovel, Martin homicides have been discussed in this deposition; is that correct?

A. Yes.

MR. OBERTS: Objection. Asked and answered. Overbroad.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. All right. Sir, now I'm going to ask you some questions about your financial condition. Do you own your own home?

MR. OBERTS: And this is the last -- you don't have any other questions, correct, other than punitive?

MR. AINSWORTH: Right. Correct.

BY MR. AINSWORTH:

Q. Do you own your own home, sir?

MR. OBERTS: I'm going to object to the questioning regarding punitive damages, as far as monetary information, assets, until the attorneys



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 230

can have a 37.2 conference to address how that will be handled with all witnesses. That hasn't happened. And we've had several party depositions and the -- to be able to bring this. If the agreement cannot be reached, to the Court for resolution.

BY MR. AINSWORTH:

Q. Okay. Then with that understanding, I will not answer -- or not ask you any further questions about your financial condition at this time, based on your attorney's representation. Although I'm just going to check, sir, are you taking your attorney's advice and not answering the question?

A. Yes.

MR. AINSWORTH: Okay. All right. Does anyone else have questions for this witness?

MR. OBERTS: Can we take a break before we go ahead?

MR. AINSWORTH: Sure.

MR. MASCIOPINTO: Can we take ten minutes, please?

MR. AINSWORTH: Yes.

(OFF THE RECORD)

THE REPORTER: We are back on the record. Counsel, you may proceed.

Page 231

MR. MASCIOPINTO: Are you done, Russell?

MR. AINSWORTH: Yes.

MR. MASCIOPINTO: All right. Does anybody mind if I go first?

MR. OBERTS: Okay.

MR. MASCIOPINTO: All right.

CROSS-EXAMINATION

BY MR. MASCIOPINTO:

Q. Sir, good afternoon. My name is Tony Masciopinto. I represent the CPD individual defendants. Argenbright, Holmes, et cetera. I just have a few questions for you. I know it's been a long day. Appreciate your time. Let me go to a specific document, if I might.

MR. MASCIOPINTO: I need someone to -- yeah. There we go.

BY MR. MASCIOPINTO:

Q. Sir, do you see a document on your screen?

A. Yes.

Q. Okay. This -- you will have a hard copy in front of you. You can feel free to use it.

MR. MASCIOPINTO: This is the Exhibit 200 for the record.

BY MR. MASCIOPINTO:

Q. Are you with me?

Page 232

MR. OBERTS: Yeah. Hold on one second. Yeah. It's Dan Callaghan.

THE WITNESS: Oh, yes. Okay.

BY MR. MASCIOPINTO:

Q. All right. Sir, just to get your head back in the -- this Exhibit 200, if you look at it, you'll see it is a Cook County State's Attorney's Office Investigation Bureau investigative report; do you see that?

A. Yes.

Q. In the top right, maybe the fourth row, third row, it says the investigators are who?

A. Oh. William Marley and L. Bajenski.

Q. All right. And the date that this document is -- according to this document, it has a date drafted date. What's that date drafted date?

A. 9-10-96.

Q. Okay. So September 10th of '96?

A. Yes.

Q. And who is the subject, or the individual being interviewed according to this document, second row?

A. Daniel Callaghan.

Q. Okay. And the first -- strike that. And the document at the very bottom is signed on the very --

Page 233

what date?

A. 9-10-96.

Q. Okay. And it's signed by whom?

A. Me.

Q. Okay. As well as Bajenski?

A. And Bajenski, yes.

Q. All right. Fine. And the first sentence says what?

A. Do you want me to read it?

Q. Yeah. Go ahead.

A. "Daniel Callaghan was interviewed at his residence on 10 September" -- oh, boy. "On 10 September, '96 by Investigator Marley and Bajenski."

Q. All right. Now, is it fair to say -- and this is the gentleman who was walking the dogs; is that right?

A. Yes, it is.

Q. All right. Sir, is it fair to say that you were first assigned the matter of these murders before September 10, 1996 based on your memory and based on this document?

A. Yes.

Q. Okay. And do you have any approximation, and I know it was almost 30 years ago, but do you have any approximation as to when you first learned that you were



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 234

going to get rid of all your narcotics cases, assignments, and start working support for this murder and the -- this murder matter prosecution, relative to the September 10, '96 date?

A. Not that I recall.

Q. Okay. Do you have any idea if this was one of the first tasks that you did on this murder matter that you were tasked with?

A. I think it was.

Q. Okay. Now you said previously how -- the person who assigned you this murder matter and took you off of all your narcotics cases was who?

A. Well, my own -- who actually assigned me to it? Would be my own supervisor, Willie Johnson.

Q. Okay. But, ultimately, who would have -- who are the individuals who direct tasks to you for this matter and prosecution?

A. Could you repeat that? Who direct what?

Q. I understand that your supervisor said, "Hey, Bill, I need you to work on this murder matter prosecution. So we're going to relieve you of the narcotics matters." But, ultimately, who would have asked for your support to do tasks supportive of this murder matter and prosecution?

MR. AINSWORTH: Objection. Foundation.

Page 235

BY MR. MASCIOPINTO:

Q. If you know?

A. I believe it was Mr. Cassidy.

Q. Okay. And the general standard operating procedure at the time was that Cook County State's Attorneys were the ones directing tasks to investigators; is that fair?

MR. AINSWORTH: Objection. Leading.

THE WITNESS: Yes.

BY MR. MASCIOPINTO:

Q. Did you answer? I -- I'm sorry. Did you answer?

A. Yes.

Q. Okay. All right. Now, you -- do you have a memory of being first educated on what this murder prosecution and matter involved, factually?

A. There was a meeting held to let us know what it was all about.

Q. Okay. Is it fair to say that that first meeting would have occurred before September 10, 1996?

A. Yes.

Q. Okay. And is it your -- who were the ASA -- who was the ASA or ASAs in that first meeting that you recall, if any?

A. Scott Cassidy.

Page 236

Q. Anyone else?

A. Neil Linehan. There were several there. Well, I believe Laura Sullivan, but I'm not a -- I'm not 100 percent sure on that one.

Q. Okay. To the best of your memory, and if you don't remember, that's fine, I don't want you to guess, but this initial meeting where there was one or more ASAs debriefing you for the first time on what this prosecution and matter involved, was that during normal work hours, or before, or after?

A. Normal work hours.

Q. And there's a little ambiguity in the record, so I want to ask you, as you sit here right now, after going through seven hours of this deposition, seeing all this paper, for this very first meeting during normal work hours with the ASA or ASAs, was any CPD officer present, if you recall?

A. I don't think they were for the first meeting.

MR. MASCIOPINTO: All right. We can stop share on that.

BY MR. MASCIOPINTO:

Q. Sir, Plaintiff's lawyer asked you a lot of questions about all your different interviews with the gentleman walking the dog, with Billy Bigeck, with Eddie Morfin, with a whole host of other people. Here's my

Page 237

question for you, rather than going through each one individually. For all of those interviews that you conducted of -- for this murder prosecution, was any CPD officer with you during any of those interviews?

A. I don't think so.

Q. And would you defer to the investigative reports to inform us who was present?

A. Yes.

Q. Is it fair to say that, if someone was present for any of your interviews, with Bajenski or whomever, if someone else was present, that person would be documented on the investigative report?

A. Yes.

MR. MASCIOPINTO: I might be done. I just need one -- I need 30 seconds. And you know what? Rather than wait, I don't want -- I'm going to pass the witness. If I have any short follow-up, I'll do it after everybody's done. Thank you, sir. Appreciate your time.

MR. OBERTS: Next up?

MS. ISAAC: The City doesn't have any questions. Thank you.

THE REPORTER: Is anyone else going to question the deponent?

MR. OBERTS: Next? Sean? Maureen?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 238

MR. HOWROYD: I don't have any questions at this time. If I need something after, I'll jump in. Thank you.

MS. O'BRIEN: I -- can we just take a five-minute break? I just want to clarify something, please. Thank you.

(OFF THE RECORD)

THE REPORTER: We are back on the record.

MR. MASCIOPINTO: Okay.

BY MR. MASCIOPINTO:

Q. Sir, I apologize. I do have just a couple more questions. Let me see if I can pull up the document. Sir, I'm showing you a document, which is new.

MR. MASCIOPINTO: I just want to mark it for the record as the next in order, and I don't have that handy.

MR. AINSWORTH: 213.

MR. MASCIOPINTO: Okay. Thank you.

(EXHIBIT 213 MARKED FOR IDENTIFICATION)

BY MR. MASCIOPINTO:

Q. Sir, I'm going to show you what's been marked as 213. For the record -- I know I'm going fast. I apologize. For the record, it's Bates stamped Sopron 5858 and 5859. Let's go to the top. This is another

Page 239

one of these Cook County State's Attorney's Office Investigation Bureau investigative report; do you see that?

A. Yes.

MR. OBERTS: And, Tony, I just gave the witness a hard copy.

MR. MASCIOPINTO: Yeah. That's great.

BY MR. MASCIOPINTO:

Q. And this document, sir, who does it list in the third row, for lack of a better term, as the investigators?

A. Who does it list as the investigators?

Q. Yeah. Third row or second row, who does it list as the investigators associated with this report?

A. Tom Ptak, Lenny Bajenski, and myself.

Q. All right. And if we go to the very bottom of the first page, who are the investigators that sign off on this report?

A. Tom Ptak, myself, and Bajenski.

Q. Okay. And these are all Cook County State's Attorney Office investigators, yes?

A. Yes, they are.

Q. Okay. And then the second page is handwritten. I'll go -- oh, you've got it in front of you. Whose handwriting is this?

Page 240

A. I'm -- I'm assuming it's Tom Ptak.

Q. And you're assuming that why?

A. Well, his -- his is the only name on there signing it.

Q. Got it. Okay. So just briefly then, interestingly in the second row -- well, who is the subject of the interview or attempted interview according to the first row?

A. Oh, Matthew Sopron.

Q. Okay. And then right under his name, Matthew Sopron, there's a line that says, "Synopsis of report"; do you see that? Do you see where it says synopsis?

A. I don't.

Q. It's right under Matthew Sopron's name. Sort of -- like, what I've been calling maybe the second big row?

MR. OBERTS: That's a different report. It was a type-written report.

BY MR. MASCIOPINTO:

Q. Yeah. Page 1. Page 1, like --

A. Oh, okay. See that. I see it. "Negative interview," it says.

Q. Ah, okay. Negative interview. And what do you understand the phrase "negative interview" to mean?

A. That no -- no new information was gleaned from

Page 241

the interview.

Q. Okay. And again, I know we've got this strange term "period covered," but this phrase under "period covered," what's the date?

A. 19 September, '96.

Q. Okay. And if you go to the narrative, it does say, "On 19 September, '96, after conversing with supervisor McDonald, the undersigned proceeded to the Chicago Police Department 8th District"; did I read that right?

A. Yes.

Q. Okay. And then the rest of the narrative talks about -- strike that. You are the first signed investigator on the bottom of Page 1; do you see that?

A. Yes.

Q. And if you go to the, like, in the middle of the narrative, it -- like, fourth row in the middle, it says, "While at Area 1, the R/I was joined by Investigators Bajenski and Marley"; do you see that?

A. I do.

Q. Okay. So does the first signature and this sentence suggest who wrote this typed first page?

A. It does.

Q. Who?

A. Tom Ptak.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 242

Q. Okay. And according to this narrative by Ptak, "Sopron was advised of his rights and related that his attorney Rick Bueke had advised him not to make any statements concerning the fatal shootings of Carrie Hovel and Helena Martin. Interview terminated"; did I read that right?

A. Yes.

Q. Okay. So do you have any memory of this particular encounter with Matt Sopron?

A. I do.

Q. Who are -- so what happened? You know, tell me what you recall about this encounter?

A. He had been held in the 8th Police District and he had been sent by squadron -- by police truck to Area 1. Bajenski and myself went to Area 1 to see if we could talk to him, but we arrived right at the same time he did. So when we spoke with him, he wasn't even in an interview room yet, he was just being brought in. We identified ourselves and told him we were from the State's Attorney's Office and asked him if he wanted to talk to us. And he said his lawyer said not to talk to anybody.

Q. And was that request by Sopron to invoke his rights under Miranda respected by the State's Attorney's Office?

Page 243

A. Yes. We left at that point.

Q. Is it accurate to say that the folks, at least for this report, for this encounter with Sopron, the folks who wanted to interview Sopron were State's Attorney Office personnel -- investigators, fair? Not CPD?

MR. HOWROYD: Object to the form of the question. Go ahead and answer.

MR. OBERTS: Do you understand the question?

THE WITNESS: I -- I do and I don't. He was being transported to a police facility.

MR. OBERTS: Just ask him to repeat -- rephrase it.

THE WITNESS: Yeah. Could you repeat it, please?

BY MR. MASCIOPINTO:

Q. Yeah. The question is: Based on your memory and based on this report, is it fair to say that the individuals who wanted to interview Sopron at this time were the Cook County State's Attorney's Office investigators and not CPD personnel?

MR. AINSWORTH: Objection. Foundation.

THE WITNESS: Yes.

MR. MASCIOPINTO: Okay. I don't have anything further. Thank you, sir.

Page 244

MS. O'BRIEN: Okay. I have some questions, if I may go next. If that's okay with everybody?

EXAMINATION

BY MS. O'BRIEN:

Q. Good afternoon, sir. Maureen O'Brien from O'Mara O'Callaghan. How are you?

A. Fine.

Q. A couple of questions, sir, can you please tell us your birthdate?

A. March 7, 1938.

Q. And sir, how old are you today?

A. 85.

Q. All right. And I did notice that you had a little bit of trouble hearing some of the questions. So do you have any issues with your hearing?

A. I do.

Q. And what type of issues do you have with your hearing, sir?

A. I think just old age is -- my hearing is failing.

Q. Okay. I'm going to try to keep this brief, but I'd like to direct your attention.

MS. O'BRIEN: And I think, Matt, if you could help me, I would really appreciate it.

BY MS. O'BRIEN:

Page 245

Q. I'd like to direct your attention to February 9th of 1998, Exhibit 212. Counselor had asked you regarding some testimony that you gave in the Sopron and Antusas trial. Do you remember that trial, sir?

A. Yes.

MS. O'BRIEN: All right. And, Matt, if you could put up that exhibit?

MR. HOWROYD: The transcript? Yes.

MS. O'BRIEN: Yes, please.

MR. HOWROYD: I will do my best. Hold on one second.

MS. O'BRIEN: And Bill, do you have a hard card of that or no?

MR. OBERTS: He has it in front of him. Just please state the H page at the bottom, whatever page you're referring to.

MS. O'BRIEN: All right. I just have one clarification for the record, though. The exhibit that you sent out, Russell, is a Joint City Defendants. And then I thought you said another one. Is that -- am I wrong? I'm going to be citing Joint City Defendants because that's what you sent out, but if you have the transcript in front of you, I'm referring to 212 and I want to start at Page, it looks like, H-131.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 246

MR. HOWROYD: Is it on all your screens or are you seeing it?

MS. O'BRIEN: You just have your list of documents. You don't have it booted up yet.

MR. HOWROYD: Hold on. Is it there yet or no? I'm sorry. I'm playing around here.

MS. O'BRIEN: Not yet. No.

MR. HOWROYD: All right. Hold on.

MR. AINSWORTH: I think I exited out of everything I needed to --

MR. HOWROYD: Bear with me. Sorry. Hold on. Here it comes.

MS. O'BRIEN: Fantastic. All right. If you can just -- I guess we'll start at --

MR. HOWROYD: H -- I have H --

MS. O'BRIEN: -- I think 131. All right.

BY MS. O'BRIEN:

Q. So, sir, do you recall testifying as a rebuttal witness in People v. Sopron and Antusas? And did you testify on February 9th of 1998?

A. Yes.

Q. And you have indicated previously that you have reviewed the transcript of your testimony; is that correct?

A. I have, yes.

Page 247

Q. All right. And during that examination, were you asked these questions, and did you give these answers? Question, "Officer, will you please state your name and spell your last name?" Answer, "William Marley, M-A-R-L-E-Y." Were you asked that question and did you give that answer?

A. Yes.

Q. And were you then asked, "And are you an investigator for the Cook County State's Attorney's Office?" Answer: "Yes, sir." Were you asked that question and did you give that answer?

A. Yes. Yes.

Q. I'm going to direct your attention to further down. "Now, Investigator Marley" -- were you asked these -- were you asked this question, and did you give this answer during your testimony? "Investigator Marley, I want to call your attention to September 30th of 1996. Did you have occasion to interview a person by the name of Eugene Gizowski? Answer: "Yes, I did." Were you asked that question and did you give that answer?

MR. AINSWORTH: I'll object to the leading and the improper impeachment.

THE WITNESS: What page is that on?

BY MS. O'BRIEN:

Page 248

Q. It -- it's on the next page, 132. And it's on the screen as well, sir.

A. Okay. Yes.

Q. Okay. Were you asked the following questions, and did you give the following answers? Question: "And where did you interview him at?" Answer: "At his home." Question: "Would that be at 5056 South Laverne?" Answer: "Yes, sir." Did you give those answers, sir?

A. I did.

MR. AINSWORTH: Same objection.

BY MS. O'BRIEN:

Q. Were you asked these questions and did you give these answers? Who -- what -- question: "Who was present for this interview?" Answer: "My partner, Leonard Bajenski, and Eugene's mother."

A. Yes.

MR. AINSWORTH: Same objections.

BY MS. O'BRIEN:

Q. Were you -- and were you asked these -- this question as well and gave this answer? "And what about -- what -- what" -- I'm sorry. Question: "And about what time of day, if you recall, was this? Approximately 9:30 a.m.?" Scroll to the next page, please. Answer: "Yes. In the morning." Question: "And

Page 249

at that time, did you have an occasion to ask him if he was in the Morfin house on December 14th of 1995?" Answer: "Yes." Were you asked those questions, and did you give that those answers?

MR. AINSWORTH: Object to the leading and object to the improper impeachment. I don't know what you're doing, Maureen, but this is -- it -- it's improper.

MS. O'BRIEN: Okay. Thank you.

BY MS. O'BRIEN:

Q. Did you give those answers, sir?

A. I did.

Q. All right. And going forward on that date of 2-9-98, were you asked these questions, and did you give these answers? Question: "What did he tell you at the time?" Answer: "He stated he was not, on that date, nor had he" -- okay. Can I -- can you -- okay.

"He stated he was not, on that date, nor had he ever been in that." Question: "In the Morfin house?" Answer: "Yes." Were you asked those questions, and did you give those answers?

MR. AINSWORTH: Object to the leading. Object to the improper impeachment.

THE WITNESS: I did.



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 250

BY MS. O'BRIEN:

Q. Now, sir, you also indicated that you wrote -- you or your partner wrote a report regarding your interview with Eugene Gizowski; is that fair to say?

A. Yes.

Q. And is it also fair to say that in your report that you wrote, you wrote that Gene Gizowski told you he did not go into the house when his -- when he dropped his brother John off into the house; is that correct?

A. Yes.

MR. AINSWORTH: Object to the leading.

BY MS. O'BRIEN:

Q. Did he also tell or is it also in your report that Eugene Gizowski told you that he had never been inside the Nick Morfin house?

MR. AINSWORTH: Objection. Leading.

THE WITNESS: That's what he told us.

MS. O'BRIEN: Hey, Matt?

THE WITNESS: It's in the report.

MS. O'BRIEN: Can you pull up that report? I'm just trying to look for the number.

MR. HOWROYD: It was previously marked as 24, I believe.

MS. O'BRIEN: Was it? Oh, yeah. Can you put that -- can you pull that up?

Page 251

MR. HOWROYD: Yep. Hold on one sec.

MS. O'BRIEN: Thank you.

MR. OBERTS: We just handed him a hard copy as well.

MS. O'BRIEN: Thank you. Oh, I guess I could look on mine. Matt, are you trying to put that up or not?

MR. HOWROYD: Yeah, I am.

MS. O'BRIEN: Okay. I -- you know, I'm going to move on for a second while you're trying to do that, okay? Oh, there we go.

BY MS. O'BRIEN:

Q. All right. Officer, in looking at this Exhibit number 24, is this your investigative report that you wrote regarding your interview with Eugene Gizowski approximately September 30th --

A. Yes.

Q. -- of 1996?

A. It is.

Q. And does this report indicate -- well, actually, can you just read the first paragraph of the report?

A. "The reporting investigators interviewed Gizowski at his home at -- at 9:30 a.m. on 30 September 1996. He related in substance, but not verbatim, that

Page 252

on 14 December 1995, at approximately 2:30 p.m. his brother received a phone call from Matt Sopron. His brother, John Gizowski, then asked -- asked Eugene, also known as Euge, if he -- if he could drive him to Nick's house. He told Eug that Nick had some guns at his house, and John wanted to look at them. Euge drove his brother to Nick's house, but never entered the house himself. He stated that he has never been inside Nick Morfin's house. After waiting about ten minutes, he knocked on the door and Nick Morfin answered. He stood in the doorway -- he stood in the hallway by the door and asked Nick to tell his brother John that he was ready to leave. He didn't see anyone else in the house, and his brother exited the house a short time later, and he drove him back home. He stated that the only conversation that they -- that he had with Nick was, 'Get John.'"

Q. Okay. Thank you, sir. At the time that you got involved in this case, were you assisting with the prosecution of an ongoing criminal indictment that was pending in Circuit Court, in criminal court, sir?

MR. AINSWORTH: Objection. Leading.

THE WITNESS: I don't quite understand what you mean.

MS. O'BRIEN: I'll withdraw that question.

Page 253

Okay. I am working backwards, Russell, don't get mad. I'm just trying to --

BY MS. O'BRIEN:

Q. When you did your reports, when you wrote your reports, I think you testified that you turned them over to the -- your supervisor in the investigators unit, right?

A. That's correct.

Q. All right. State's attorneys didn't proofread or edit your reports, did they?

A. No.

Q. You were also asked regarding an interview that you conducted with a person by the name of Billy Bigeck on approximately September 18th of 1996. Do you recall when you were asked those questions by Counselor?

A. Yes.

Q. And at the time that you were asked those questions, you -- I think you were -- they went over your report. I guess my question is, when you interviewed Billy Bigeck on September 18th of 1996, you interviewed him in the Cook County State's Attorney's witness quarters, correct?

A. I -- I believe so, yes.

Q. So you knew that he was -- is it fair -- well, let me ask you this. Did you know he was in the witness

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 254

quarters when you interviewed him the first time?

A. Yes.

Q. And did you know that he was a defendant in a murder case at the time that you interviewed him?

A. I did.

Q. At the time that you interviewed him, did you know that he was a defendant who was going to testify against his co-defendants?

A. Yes.

Q. Did you -- when you were interviewing other witnesses, were you attempting to verify information that Billy Bigeck gave to you and to the state's attorneys?

A. Some of them, yes.

MR. AINSWORTH: Object to the form of the question. Leading.

BY MS. O'BRIEN:

Q. Did you learn the identity of some of these witnesses from your conversation with Billy Bigeck?

MR. AINSWORTH: Objection. Foundation.

MS. O'BRIEN: Did he answer?

BY MS. O'BRIEN:

Q. Did you answer, sir?

A. I -- I didn't because I don't -- I'm not sure.

MS. O'BRIEN: I'm sorry. Just bear with me,

Page 255

guys.

BY MS. O'BRIEN:

Q. Is it fair to say that your investigator reports that you prepared in the -- this murder case are summaries?

A. Yes.

Q. Are they not verbatim and not in their entirety, sir?

MR. AINSWORTH: Objection. Leading.

THE WITNESS: Yes.

BY MS. O'BRIEN:

Q. You were also asked about a conversation or at least you talked about a conversation that you said that you had April -- I think you said April 11, 2001. You spoke with John Gizowski because he wanted to give you information regarding narcotics; is that fair to say, sir?

A. Yes.

Q. Did you write a report regarding that conversation?

A. I -- I think that is my report. I'd have to look at it, though. I'm not sure if I authored it or not.

Q. Well, do you have it in front of you right now?

Page 256

MR. OBERTS: I --

THE WITNESS: Okay. It is -- it is my report.

MR. OBERTS: Just for the record, giving -- just provided the witness a report, Bates stamped CCSAO CAD 021153 021161.

BY MS. O'BRIEN:

Q. And, sir, it -- I don't have a copy of that document handy, but is that a report that you wrote regarding your conversation that you had with John Gizowski on 2 -- on February 11th of 2001?

MR. AINSWORTH: Object to the form of the question.

THE WITNESS: It is.

MR. OBERTS: You want to mark that, Maureen?

MS. O'BRIEN: Yeah. I'm -- I don't have it, though, and I can't put it up, so I don't know if anybody else has it. I will -- I guess I'll mark it as Exhibit number -- are we on 214?

MR. MASCIOPINTO: 214 is the next one.

MS. O'BRIEN: Okay.

(EXHIBIT 214 MARKED FOR IDENTIFICATION)

BY MS. O'BRIEN:

Q. And sir, what is the date of that report?

A. Okay. 4-11-01.

Page 257

Q. All right. And, sir, that report, Exhibit number 214 with that Bates stamp, that is a report that -- is that a report that you authored? Is your signature on that report?

A. No, it's not.

Q. Whose signature is on it?

A. A supervisor, a Pat Flaherty.

Q. Does it indicate who the author of the report is?

A. Yes, me.

Q. Oh --

A. My name is on the bottom.

Q. Okay. So this April 11, 2001, that was after John Gizowski testified for the prosecution in People v. Sopron and Antusas; is that correct?

A. Yes.

Q. In-between February 9th of 1998 and this date of April 11, 2001, do you recall any other contact that you had with John Gizowski?

A. No.

Q. Did you make any attempts to reach out to him between those dates?

A. No.

Q. Okay. At any time, did you and Investigator Bajenski ever meet John Gizowski at a restaurant?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 258

A.   Is this after the trial or --

Q.   Yes.  After the trial?

A.   No.

Q.   Okay.  Did you at any time meet him at a restaurant?

A.   I -- I don't think so.

MS. O'BRIEN:  Just one second, please.  I just want to -- I don't have anything further at this time. Thank you so much for your time.

MR. HOWROYD:  I just have a couple quick questions.  Is that okay, Bill?

MR. OBERTS:  Sure.

EXAMINATION

BY MR. HOWROYD:

Q.   Okay.  Mr. Marley, thank you for your patience.  My name is Matthew Howroyd and I represent Defendant Scott Cassidy, former Assistant State's Attorney.  Now, Mr. Marley, you indicated that one of your first tasks was to interview Daniel Callaghan, correct?

A.   Yes.

Q.   And that took place on September 10th of 1996; is that correct?

MR. OBERTS:  Let's get into the report.

BY MR. HOWROYD:

Page 259

Q.   Exhibit number 200?

MR. OBERTS:  Hold on.  Let's -- we're finding that report.

THE WITNESS:  Yes.  10 September.

BY MR. HOWROYD:

Q.   And you had a meeting -- or did you have a meeting with the prosecutors before you interviewed Daniel Callaghan?

A.   Yes.

Q.   And would that have been common to meet with the prosecutors to get up to speed about the case?

A.   Well, I -- I had never -- I don't know if it was common.  We had never been involved in one of these before.

Q.   In your career, had you ever met with prosecutors to get up to speed on a case before you conducted your first task?

A.   No.

Q.   Okay.  So you never spoke with prosecutors before you conducted an interview?

A.   No, not that I recall.

MR. HOWROYD:  Okay.  I have nothing further.

EXAMINATION

BY MR. OBERTS:

Q.   Okay.  Mr. Marley, how old are you?

Page 260

A.   85.

Q.   And would it be fair to say that you've had some trouble recalling activities that occurred approximately 30 years ago?

A.   Yes.

Q.   Do you suffer -- you were asked a couple times whether you have any type of medical condition that would impact your ability to testify truthfully; do you recall being asked that?

A.   Yes.

Q.   And you said no, correct?

A.   Correct.

Q.   Do you have any type of medical condition that would impact your memory?

A.   I do.

Q.   What is that medical condition?

A.   It's called TGA, trans global amnesia.

Q.   What does that mean?

A.   It's -- it's rather hard to describe.  It's just where you have blanks in your memory that are, as the doctors told me, that are just gone and will never come back.

Q.   So that amnesia can -- medical condition that you have, that impacts your ability to remember things; is that correct?

Page 261

A.   It does.

Q.   And while certainly you have testified truthfully today, the medical -- the amnesia medical condition that you just described, the trans global amnesia, may affect your ability to remember the events correctly; is that accurate?

A.   Yes.

MR. AINSWORTH:  Objection.  Leading.

BY MR. OBERTS:

Q.   Would the -- would trans global amnesia impact your memory?

A.   It does.

MR. AINSWORTH:  Objection.  Foundation.

BY MR. OBERTS:

Q.   How do you know that trans global amnesia would impact your memory at -- how do you know that?

A.   The doctors told me that.

Q.   And do you also know that based upon experience?

A.   Yes.

MR. AINSWORTH:  Objection.  Leading.

BY MR. OBERTS:

Q.   Do -- you don't drive on the expressway, correct?

A.   No.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 262

Q. And why don't you drive on the expressway?

A. I don't feel my reflexes are sufficient to -- to do so.

Q. And is it -- do you feel overwhelmed by doing so?

A. I do.

MR. AINSWORTH: Objection. Leading.

BY MR. OBERTS:

Q. Have you felt overwhelmed during this deposition today?

A. Yes.

Q. And while you certainly attempted to testify truthfully, your memory may be impacted based upon the passage of time in addition to your medical condition, correct?

A. Correct.

MR. AINSWORTH: Objection. Leading.

BY MR. OBERTS:

Q. We talked about the Dan Callaghan report a couple times now. And I think you have it in front of you, right?

A. I do.

Q. And you said this was your first assignment, correct?

A. Yes.

Page 263

Q. Okay. Now, when we say it -- the report is -- states that -- the first sentence states "Dan Callaghan was interviewed at his residence on September 10, 1996," correct?

A. Yes.

Q. Now, how did you receive the -- strike that. The -- you -- did you interview -- strike that. You stated that the first act of the -- your first act of providing trial support for this prosecution was this Dan Callaghan interview, correct?

A. Yes.

Q. But at the time you received your assignment for -- as part of trial support for this prosecution, did you know the name Dan Callaghan?

A. No.

MR. AINSWORTH: Objection. Form.

BY MR. OBERTS:

Q. How -- what -- it states that you interviewed him on September 10, 1996, correct?

A. Yes.

Q. How did you determine -- how did you locate Dan Callaghan and identify Dan Callaghan? How did you -- strike that. How did you locate and identify Dan Callaghan?

A. Well, in police reports or -- or in the

Page 264

information we were supplied, they mentioned that right at the time of the -- right -- right after the shooting, that the boys who did it were running through Hale Park. There was a -- a -- what they said, an old guy with gray hair and two dogs there, that they ran by him. They stopped for a moment, then they continued on. So we started looking for an old guy with gray hair and two dogs.

Q. Okay. And did you locate him on September -- well, strike that. How -- did it take a few days to even locate Dan Callaghan?

A. It did.

Q. And did it take a few days to ever identify Dan Callaghan?

A. Yes.

Q. And putting it in perspective, so if you interviewed him on September 10, 1996, you would have received the assignment prior to September 10, 1996, correct?

A. Yes.

Q. And it took a few days to complete this assignment in that being identify, and locate, and interview him, correct?

A. Yes. Yes.

Q. Now, you were -- you talked about how your

Page 265

first assignment as part of the trial support was locating and interviewing Dan Callaghan, correct?

A. Yes.

Q. And you were asked, you know, why you would interview this person, that person, or whatever other witness that you wrote a report from. Do you recall being asked those questions?

A. Yes.

Q. Anybody that you interviewed, was that based upon an assignment from the prosecuting ASA as part of trial support for the --

MR. AINSWORTH: Objection.

BY MR. OBERTS:

Q. -- ongoing prosecution of the murders of Martin and Hovel?

MR. AINSWORTH: Objection. Leading.

THE WITNESS: I -- I -- I don't understand the question.

BY MR. OBERTS:

Q. Why did you go out and interview anyone?

A. We would be assigned to.

Q. And who had assigned you?

A. Our supervisor.

Q. And your supervisor received the assignment from who?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 266

A.  The state's attorney.

MR. AINSWORTH:  Objection.  Foundation.

BY MR. OBERTS:

Q.  How do you know your supervisor received the assignment from the state's attorney?

A.  We -- we were attached for this case through the state's -- the state's attorney.  We were working for specific state's attorneys.

Q.  And did you receive some type of document regarding that assignment?

A.  Do you mean a document --

Q.  Like an assignment slip?  Did you receive some type of document regarding this?

A.  No.  No.

Q.  How did -- so any assignment that you had to interview anyone came from your supervisor, that came from the prosecuting ASA; is that accurate?

A.  I believe so.

MR. AINSWORTH:  Objection.  Leading.

BY MR. OBERTS:

Q.  And any assignment you performed, why would you perform that?

A.  That was part of our job.  We were assigned to assist the state's attorney in this case.

Q.  And why -- the assistance that you were

Page 267

providing the state's attorney in this case, this case being the Martin and Hovel murder, was that part of the trial preparation for the prosecution of that case?

A.  Yes.

MR. AINSWORTH:  Objection.  Leading.

BY MR. OBERTS:

Q.  As a state's attorney investigator, you testified that you provided trial support for Cook County State's Attorneys, correct?

A.  Yes.

MR. AINSWORTH:  Objection.  Leading.

BY MR. OBERTS:

Q.  And is that what you did in this case?

A.  Yes.

MR. AINSWORTH:  Objection.  Leading.

BY MR. OBERTS:

Q.  Why did you complete any assignment of any interview in this case?

MR. AINSWORTH:  Objection.  Asked and answered.

THE WITNESS:  It was our job.

MR. OBERTS:  Bear with me.  One minute, please.  I have no other questions.

REDIRECT EXAMINATION

BY MR. AINSWORTH:

Q.  All right.  Sir, I want to show you what's

Page 268

been marked as Exhibit 214.  It's that report regarding the April 11, 2001, meeting you had.  You got a hard copy in front of you, and I just want to --

A.  Yes.

Q.  So on the first page, lists your name, William Marley, right, under SAI?

A.  Yes.

Q.  And then under "complainants," it says, "Anonymous.  Male, White, approximately 23 years of age, 6' tall, 180 pounds, blue eyes, fair complexion"; is that right?

A.  Yes.

Q.  And so, the anonymous complainant was about 6' tall, right?

A.  Yes.

Q.  Your height?

A.  6'.

Q.  And -- I mean, the same as your height, right?

MR. OBERTS:  Object to the form.  Go ahead.

THE WITNESS:  I --

BY MR. AINSWORTH:

Q.  You're about 6' tall.  The complainant was about the same height, right?

A.  He was tall.  I -- I couldn't say how tall.

Q.  Okay.  Sir, you wrote 6' tall on the document,

Page 269

right?

A.  Approximate.

Q.  And you're about 6' tall, correct?

A.  Yes.  Correct.

Q.  So the complainant was about your height, right?

A.  I -- I'm not sure.  He was close to it.  I think he was taller.

Q.  Why did you write 6' tall as the -- so you think the complainant was taller than you, right?

A.  I -- I have no explanation of it.  He was tall and slender.

Q.  Okay.  So he was at least 6' tall, maybe taller than you, right?

A.  Yes.

Q.  Okay.  Say, "Anonymous male, White, presented himself at the CCSAO narcotics investigations"; you see that, sir?

A.  I do.

Q.  On Page 2 of Exhibit 214 --

MR. OBERTS:  I'm just going to -- for the record, it stated more -- that sentence stated more than what you read, but --

MR. AINSWORTH:  Fair enough.  I'm moving on to Page 2.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 270

MR. OBERTS: Just to be make this clear.

MR. AINSWORTH: Okay.

BY MR. AINSWORTH:

Q. It says, "On April 11, 2001, the undersigned was assigned by supervisor, Patrick Flaherty, to interview a male white subject regarding narcotic trafficking information"; do you see that?

A. Yes.

Q. Was Patrick Flaherty the female or the lady who went to get you from the vault when somebody came to report narcotics information?

A. No. Patrick's a male.

Q. Okay. So why'd you -- I thought you were -- it was the woman who came and got you, not your supervisor?

A. That was the -- the receptionist.

Q. Okay. Why'd you write that Patrick Flaherty assigned you. Did Patrick Flaherty assign you to this investigation?

A. Yes.

MR. OBERTS: Objection. Vague. Objection. Vague and mischaracterizes his testimony.

BY MR. AINSWORTH:

Q. Okay. You said --

A. Flaherty was the -- oh.

Page 271

Q. Go ahead.

A. I'm sorry. Flaherty was the supervisor in narcotics. He might --

Q. Did he assign you?

A. Yes.

Q. Did Flaherty assign you?

A. Yes, he did.

Q. So before you talked to the person, you had talked to Flaherty and Flaherty said you should be the one to talk to this person?

MR. OBERTS: Objection. Objection. Foundation.

THE WITNESS: As -- as I remember it, I -- I explained it to him that we didn't have an active narcotic unit. We had an -- a narcotic trial support unit, not an active street narcotic unit.

BY MR. AINSWORTH:

Q. That's what you explained it -- to Patrick Flaherty?

A. No, to this guy.

Q. I'm not asking about that guy. I'm asking you, sir, you know, did Patrick -- was Patrick Flaherty the one who said you should interview this guy?

A. Yeah. Yes.

Q. Okay. So the lady came to the vault. And then what did you do?

Page 272

A. I went out to -- out and talked to him, and he said that he was interested in making some money and he had information.

Q. But did you -- okay. Did you talk to Patrick Flaherty before you interviewed the guy?

A. No.

Q. So how did Patrick Flaherty assign you to interview the guy?

A. I probably called back there to let them know that there was a guy wanting to give information.

Q. Okay. You -- so you didn't talk to Patrick Flaherty?

A. I'm not sure.

MR. OBERTS: Objection. Foundation.

THE WITNESS: I'm not sure.

BY MR. AINSWORTH:

Q. Okay. Then why did you say you were assigned by Patrick Flaherty to interview the guy?

MR. OBERTS: Objection. Foundation.

THE WITNESS: Well, the report says that.

BY MR. AINSWORTH:

Q. Okay. Well, in any event, sir, you said in your report that the subject refused to identify himself, right?

A. Yes.

Page 273

Q. So he wouldn't tell you who he was, right?

A. Correct.

Q. So you don't know who he was, right?

MR. OBERTS: Objection. Mischaracterizes testimony.

THE WITNESS: I -- I had -- I vaguely recognized him, but I just couldn't put a name with what I was looking at, with who he was.

BY MR. AINSWORTH:

Q. Okay. Well, let's scroll down in the report. You see where it -- it's got a picture of John Gizowski. You recognize him?

A. Yeah. Yes.

Q. All right. How tall is John Gizowski?

A. Well, here it -- here it says 5'9".

Q. John Gizowski was not 6' tall or taller, right?

MR. OBERTS: Objection. Foundation. Go ahead.

MS. O'BRIEN: And form.

THE WITNESS: Well, John -- right here, here it says he's 6'1".

BY MR. AINSWORTH:

Q. Where's that?

MR. OBERTS: This is --

THE WITNESS: Wait. There's -- there's two



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 274

different pictures of him here.

MR. OBERTS: Yeah.

THE WITNESS: The one says 6'1". The -- the other one says 5'9".

BY MR. AINSWORTH:

Q. 5'9"?

A. Yes.

Q. All right. When you -- why did you write that the subject refused to identify himself when you recognized who he was?

MR. OBERTS: Objection. Mischaracterizes testimony.

THE WITNESS: That -- that was the problem. I -- I recognized the face, but I couldn't put a name to it. I knew I had met him, but I didn't know who he was.

BY MR. AINSWORTH:

Q. All right. How did you -- did you ever figure out who the person was?

A. Somewhere along the line, yes.

Q. How?

A. I -- I have no memory of it.

Q. Well, sir, you didn't know who he was when you talked to him and he was in front you, right?

A. Right.

Page 275

MR. OBERTS: Objection. Mischaracterizes testimony.

BY MR. AINSWORTH:

Q. And so, did you create a report to document that you figured out this informant who came to see you was John Gizowski?

MR. OBERTS: Objection. Speculation and foundation.

THE WITNESS: I don't recall doing so.

BY MR. AINSWORTH:

Q. Did you -- I want to show you -- all right. So the guy you spoke to had blue eyes, right?

MR. OBERTS: Objection. Foundation.

THE WITNESS: I don't know.

MR. OBERTS: Yeah. Are you asking personal recollection or based on the report?

MR. AINSWORTH: Either one.

MR. OBERTS: Objection. Compound or vague.

THE WITNESS: That's not on the report either.

BY MR. AINSWORTH:

Q. Now, Mr. Marley, do you remember, did the guy have blue eyes?

A. I have no idea.

Q. All right. Take a look at Page 1 of the report. You described the guy as having blue eyes,

Page 276

right?

A. Oh, okay. Up here. Yes.

Q. Any reason to dispute the fact that you said the guy had -- or strike that. Any reason to dispute the fact that the guy you talked to had blue eyes?

MR. OBERTS: Objection. Foundation.

THE WITNESS: No.

BY MR. AINSWORTH:

Q. All right. And you can't tell us any way, shape, or form why you believe this anonymous guy who came to the office on April 11, 2001 was John Gizowski, right?

MR. OBERTS: Objection. Mischaracterizes testimony. Asked and answered. And form.

THE WITNESS: I -- I don't really understand the question.

BY MR. AINSWORTH:

Q. Can you tell us any reason to believe that the guy, the anonymous guy who came to see you on April 11, 2001, was John Gizowski?

MR. OBERTS: Objection. Asked and answered.

THE WITNESS: Well, he supplied the narcotic information from his neighborhood.

BY MR. AINSWORTH:

Q. How do you know it was John Gizowski?

Page 277

MR. OBERTS: Objection. Asked and answered.

THE WITNESS: See, my problem is, I don't know who -- he was sent into the back to talk to someone. I don't know who he talked to because I -- I was in the vault, and I couldn't leave the vault.

BY MR. AINSWORTH:

Q. What do you -- Mr. Marley, I'm asking you, how do you know the person you talked to is John Gizowski?

MR. OBERTS: Objection. Asked and answered.

THE WITNESS: Well, I see his -- his picture is attached to the report here.

BY MR. AINSWORTH:

Q. Okay.

A. He had to be identified during -- during the interview.

Q. How was he -- how did you identify -- if the guy refused to identify himself and you did not recognize him, how did you identify the person as John Gizowski?

MR. OBERTS: Objection. Mischaracterizes testimony. Form. Foundation. And asked and answered.

THE WITNESS: I don't remember.

BY MR. AINSWORTH:

Q. Can you give us any explanation for why we

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 278

should believe the anonymous person who refused to identify himself and who you did not recognize came to be identified as John Gizowski?

MR. OBERTS: Objection. Mischaracterizes testimony. Form. Foundation. And asked and answered.

THE WITNESS: I don't know how to answer that. I don't know how he was identified because I just don't remember.

BY MR. AINSWORTH:

Q. All right. And so, is the reason why you're saying this was John Gizowski is because John Gizowski's photograph and information is attached to this report?

MR. OBERTS: Objection. Asked and answered. And mischaracterizes testimony.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. All right. Sir, when you conducted -- strike that. When you were a detective at -- in the CPD, you conducted interviews of witnesses, right?

MR. OBERTS: Objection. Beyond the scope of cross.

THE WITNESS: Could you repeat that, please?

BY MR. AINSWORTH:

Q. Sure. When you were a detective in the CPD,

Page 279

you conducted interviews of witnesses, right?

A. Yes.

MR. OBERTS: Objection. Beyond the scope of cross-examination.

BY MR. AINSWORTH:

Q. In this case, you conducted interviews of witnesses, right?

MR. OBERTS: Objection. Beyond the scope of cross-examination.

THE WITNESS: I did.

BY MR. AINSWORTH:

Q. Can you tell us any way that your interviews of witnesses in this case differed from your interviews of witnesses in -- as a Chicago police detective?

MS. O'BRIEN: Objection. Form. Foundation.

MR. HOWROYD: Join.

MR. OBERTS: And vague.

THE WITNESS: I don't really understand the question.

BY MR. AINSWORTH:

Q. Sure. When you were questioning witnesses in this case, you're trying to find out whether they had reliable information, right?

A. Yes.

MR. OBERTS: Objection. Form. Foundation.

Page 280

MR. AINSWORTH: You're trying to find out whether they're telling the truth, correct?

MR. OBERTS: Objection. Form. Foundation. And mischaracterizes testimony.

THE WITNESS: Yes.

BY MR. AINSWORTH:

Q. And you're trying to find out the truth of what happened in the commission of the murder of Carrie Hovel and Helena Martin, right?

MR. OBERTS: Objection. Form. Foundation.

THE WITNESS: Right.

BY MR. AINSWORTH:

Q. And when you were a Chicago police detective, you would try and find out if witnesses had reliable information, correct?

A. Yes.

Q. And you would try to find out the truth of what happened in the crimes you're investigating, correct?

A. That's correct.

Q. And so, did you conduct your interviews as a investigator in this case the same way you would conduct your interviews as a detective in the Chicago Police Department?

MR. OBERTS: Objection. Form. Foundation. And

Page 281

to the extent, asked and answered.

MR. HOWROYD: Join.

THE WITNESS: When you're saying this case, are you referring to Gizowski or --

BY MR. AINSWORTH:

Q. The Hovel and Martin murder investigation.

A. Oh, okay.

Q. Did you -- so let me ask you again. Did you conduct your investigation and questioning witnesses the same way in the Hovel Martin murder investigation as you did in the -- as a detective in the Chicago Police Department?

MS. O'BRIEN: Objection. Form. Foundation.

MR. HOWROYD: Join.

THE WITNESS: I believe so.

BY MR. AINSWORTH:

Q. And, you know, one of the things that you did in this case was case you tracked down how to find Callaghan, right?

A. Yes.

Q. You had to investigate to figure out who the person was to interview as a witness, right?

A. Yes.

Q. Okay.

MR. AINSWORTH: I don't have any further



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 282

questions for this witness.

MR. OBERTS:  Anybody have any?

MR. HOWROYD:  Not me.

MR. OBERTS:  Anybody else have any?  I do have a couple.  I just wanted to see if anybody else has any first.  Okay.  I'll go.

RE-EXAMINATION

BY MR. OBERTS:

Q.   So with regards to this April 11, 2001 meeting regarding John Gizowski, that report that we talked about.

A.   The original meeting?

Q.   That -- not the original meeting, the one about the narcotics transactions.  Recall that?

A.   Yes.

Q.   Okay.  You initially recognized the person that came to you, you just couldn't place him and didn't know his name; is that accurate?

A.   Yes.

MR. AINSWORTH:  Objection.  Leading.

BY MR. OBERTS:

Q.   There -- was there some type of investigation -- well, strike that.  At some point, you learned that it was John Gizowski who spoke with you, correct?

Page 283

A.   Yes.

Q.   You just don't recall how, --

MR. AINSWORTH:  Objection.  Leading.

BY MR. OBERTS:

Q.   -- correct?

A.   Correct.

Q.   You're talking about days of interviewing witnesses as a CPD officer or detective and days of interviewing witnesses as a CCSAO investigator.  Do you recall that testimony, those questioning right there?

A.   Yes.

Q.   When you were a detective with the Chicago Police Department, your function was to investigate and solve a crime, correct?

A.   Yes.

Q.   When you were a Cook County State's Attorney investigator, you interviewed individuals based upon the request of the prosecuting ASA, correct?

A.   That's correct.

MR. AINSWORTH:  Objection.  Leading.

MR. OBERTS:  No other questions.  Anybody else?

FURTHER REDIRECT EXAMINATION

BY MR. AINSWORTH:

Q.   Just real quick.  One question, sir.  When you were a Chicago Police detective, you were assigned cases

Page 284

based on your supervisor, right?

A.   Based on my supervisor?

Q.   Your supervisor would assign you to cases and assign you what to do, right?

A.   Yes.

MS. O'BRIEN:  Objection.  Form.  Foundation.

MR. AINSWORTH:  All right.  I don't have any further questions.

MR. HOWROYD:  Signature?

MR. OBERTS:  We'll reserve.

THE REPORTER:  Reserve signature.  And then Mr. Ainsworth, how would you like your copy?

MR. AINSWORTH:  I don't need it written at this time.  Thank you.

THE REPORTER:  Okay.  Mrs. O'Brien?

MS. O'BRIEN:  Oops.  Sorry.

THE REPORTER:  No worries.

MS. O'BRIEN:  Well, whatever -- I'll do whatever Sean tells me to do.

THE REPORTER:  Okay.  Mr. O'Callaghan?

MR. O'CALLAGHAN:  We'll -- we are not ordering at this time.  We're good.  Thank you.

THE REPORTER:  Okay.  Mr. Howroyd?

MR. HOWROYD:  We are not ordering at this time.  Thank you, Zoe.

Page 285

THE REPORTER:  Okay.  Ms. Isaac?

MS. ISAAC:  We are also not ordering at this time.  Thank you.

THE REPORTER:  Okay.  And Mr. Oberts?

MR. OBERTS:  I'm not going to order.  Just send it to me if somebody orders and we'll -- I'll take care of reviewing with him for signature.

THE REPORTER:  Okay.  Last but not least, Mr. Masciopinto?

MR. MASCIOPINTO:  Yeah.  We'll not be ordering at this time.  Thank you.

THE REPORTER:  Okay.  I'll go ahead and get us off the record here.

(DEPOSITION CONCLUDED AT 5:15 P.M. CT)

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 286

CERTIFICATE OF DIGITAL REPORTER

STATE OF ILLINOIS

I do hereby certify that the witness in the foregoing transcript was taken on the date, and at the time and place set out on the Stipulation page hereof by me after first being duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the said matter was recorded digitally by me and then reduced to typewritten form under my direction, and constitutes a true record of the transcript as taken, all to the best of my skills and ability. I certify that I am not a relative or employee of either counsel, and that I am in no way interested financially, directly or indirectly, in this action.

OFFICIAL SEAL
ZOE NYHUS
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES SEPT. 20, 2027

ZOE NYHUS,

DIGITAL REPORTER/NOTARY

COMMISSION EXPIRES ON: 09/20/2027

SUBMITTED ON: 03/08/2024



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

## Exhibits

**Exhibit 200_ Marley** 54:2,3, 4 56:7 63:24 231:22 232:6 259:1

**Exhibit 201_ Marley** 75:8,9, 10,11,13,16 78:5 80:13 81:8,24 82:6, 13,14,20 83:11, 20 84:20,21

**Exhibit 202_ Marley** 86:23, 24 87:1,14 89:15,16 93:15, 16,17 113:14 118:16,23 119:23

**Exhibit 203_ Marley** 99:5,11 102:6 113:19 118:23

**Exhibit 204_ Marley** 102:11, 12,15,21 104:20 113:6 119:25

**Exhibit 205_ Marley** 105:21, 25 106:1,14 108:8

**Exhibit 206_ Marley** 108:13, 17 110:6,9 111:21 115:14 117:19 120:5,6 123:19 124:20, 22 125:12 130:23 146:8 148:2 155:4

**Exhibit 209_ Marley** 177:14, 15 178:13,17

**Exhibit 211_ Marley** 211:10, 11,12,24,25

212:11,14,21 213:8,15,21 215:15

**Exhibit 212_ Marley** 214:10, 21 215:25 216:1,17 217:17 245:2

**Exhibit 213_ Marley** 238:20

---

### $

**$10.25** 205:9

---

### 0

**000592** 111:12 124:3

**000593** 124:3

**00592** 111:2

**00593** 111:2

**021153** 256:6

**021161** 256:6

**0600** 71:9

**091096** 76:11, 19

---

### 1

**1** 77:20 78:5 80:13 99:24 100:3 114:20, 21 115:7,8 116:3 129:23 176:25 207:15 211:25 240:20 241:14,18 242:15 275:24

**10** 54:9 55:12 56:9 57:1 59:20 63:15 64:3,6,20 76:14,20 83:14 233:12,20 234:4 235:20 259:4 263:3,19 264:17,18

**10-24** 166:4

**100** 236:3

**10:00** 129:19 191:19

**10th** 232:18 258:22

**11** 82:8 139:24 255:14 257:13, 18 268:2 270:4 276:11,19 282:9

**1198** 110:9

**1199** 110:9

**11:05** 52:24 61:4,10

**11:10** 61:13

**11:59** 77:15

**11th** 82:11 256:11

**12** 170:18 219:6

**12th** 179:3

**131** 246:16

**132** 248:1

**133** 216:10

**13671** 75:11

**13676** 75:12

**14** 28:15 29:22 58:2 71:6 90:3 103:25 104:7 117:20 167:23, 25 168:7 170:25 171:7 179:1 219:3 252:1

**144-0107-9317** 80:21

**14th** 140:11,17 180:24 249:2

**15** 26:23 28:16, 25

**15-year-old** 194:25

**1506** 76:11

**16** 70:3 71:9,22 73:3,9 88:11 89:2 93:20 95:25 113:15, 16 118:17,18

**18** 166:22 167:5 173:6 175:19 201:4

**180** 202:13 268:10

**18th** 169:12 176:10 177:8, 17 253:14,20

**19** 14:10 18:16 185:14 224:4 241:5,7

**19-CV-8254** 111:2 124:2

**191** 187:18,24 189:12,13 192:20 193:21

**1938** 244:10

**1956** 14:10

**1957** 14:15

**1960** 14:15

**1961** 16:7

**1965** 16:16

**197** 68:16,24 69:15,16 70:25

**1979** 93:18

**1983** 18:4

**1990s** 68:21

**1993** 16:10,25 17:3,21,24 18:4,7,12 29:6

**1995** 71:6 98:2 167:23,25 168:7 170:25 171:7 179:1 200:20 201:6 249:3 252:1

**1996** 46:11 53:15 54:10 55:12 56:9 57:1 59:20 63:15 64:3,6,20 69:1

70:3 71:9,22 73:3,9 75:3 76:14,20 77:15, 24 78:8 82:8 83:14 88:12 89:3 90:3 93:20 95:25 101:4 102:1 103:14, 25 104:7,14 106:22 112:5,6, 15 113:10,11, 15,16,20 115:9, 15,17 117:20 118:17,18,24, 25 119:11,12 120:1,2,7,11 128:12 130:7 131:15 132:1, 10,25 133:5 137:15,23 160:3 166:22 167:5 170:18 173:6 175:19, 20 177:9 178:21 184:6 185:14 198:13 201:5,7,9 202:10,16,20 233:20 235:20 247:18 251:18, 25 253:14,20 258:22 263:3, 19 264:17,18

**1997** 93:18

**1998** 29:1,4 214:15 216:3, 18 217:15,21 218:16 245:2 246:20 257:17

**19th** 191:18

---

### 2

**2** 17:25 18:1 24:10,12,13,18 30:8 31:7,16 69:9 81:24 103:14 104:14 106:22 113:10, 11 120:1,2 173:17 174:12 192:19 204:2,4, 12,18,21 212:2



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

214:17 256:11 269:20,25

**2-9** 215:2

**2-9-98** 249:14

**20** 140:17 219:2

**200** 54:3,4 56:7 63:24 231:22 232:6 259:1

**2000** 77:21

**2001** 139:24 255:14 256:11 257:13,18 268:2 270:4 276:11,20 282:9

**2009** 28:19

**201** 75:9,11,13, 16 77:21 78:5 80:13 81:8,24 82:6,14,20 83:11,20 84:20, 21

**2012** 18:17

**2013** 18:19 28:20

**202** 86:23,24 87:1,14 89:16 93:16,17 113:14 118:16, 23 119:23

**203** 99:5,7,8, 11,23 102:6 106:4,6 113:19 118:23

**204** 102:12,15, 21 104:20 106:3,8 113:6 119:25

**205** 105:21,25 106:1,8,14 108:8

**206** 108:13,17 110:6,9 111:21 115:14 117:19 120:6 123:19 124:20,22 125:12 130:23 146:8 148:2

155:4

**207** 114:3 115:7 116:2,4 165:12,16 166:9 167:1 176:5

**208** 169:11,15 170:1 173:16, 18 174:12

**209** 177:15 178:13,17

**21** 174:14

**210** 182:21,23 183:2 184:2

**211** 211:10,11, 12,24,25 212:11,14,21 213:8,15,21 214:20 215:15, 16,18,22

**212** 214:10,21 215:18,19,20, 21,25 216:1,17 217:17 245:2, 24

**213** 238:18,20, 23

**214** 256:19,20, 22 257:2 268:1 269:20

**23** 174:14 268:9

**24** 112:3,5,15, 21 158:5,9 159:16 161:9 164:4,19 165:3 250:22 251:14

**24th** 115:18

**25** 101:4 113:20,24 118:24,25 119:11,12 178:9

**26** 28:13 29:20 69:1 112:6 115:9,15,17 120:7,11 127:24 130:7 131:15 132:1,

10,24 133:5 137:15,23 170:19 175:20 177:9

**2650** 103:15

**26th** 58:3 71:8 116:8 136:14 140:17 176:13, 25 177:2 179:8

**27** 178:21

**27th** 179:7

**28** 169:15

**29** 170:18

**29th** 179:3

**2:20** 90:3

**2:30** 252:1

**2:45** 182:15

**2nd** 108:5

---

**3**

---

**3** 69:14 77:15, 24 78:8 82:6, 13,20

**30** 160:3 210:18 216:2,18 217:15,21 218:16 233:24 237:15 251:24 260:4

**30th** 247:18 251:16

**32** 203:18,19

**33475** 185:14

**37.2** 225:19 226:22 227:4 230:1

---

**4**

---

**4** 69:15 83:11 84:20,21 215:15 216:1

**4-11-01** 256:25

**40** 129:20

**46** 199:3,22

---

**5**

---

**5** 70:25 83:19 191:7 200:20 201:6,9

**5'9"** 273:15 274:4,6

**5056** 248:7

**51st** 207:16,17

**5816** 56:7

**5846** 99:9

**5852** 87:4

**5856** 158:11

**5857** 106:14

**5858** 238:25

**5859** 238:25

**5868** 102:13

**5869** 102:13

**5873** 169:23

**5875** 169:23

**5903** 183:1 185:6

**592** 111:15

**592593** 110:25

**5:00** 128:13 129:17 191:7, 10,25

**5:15** 103:14 285:14

---

**6**

---

**6'** 202:8 268:10, 13,17,22,25 269:3,9,13 273:16

**6'1"** 273:21 274:3

**6143** 178:14

**6149** 71:6

**61st** 193:8

**62nd** 173:20 192:23 193:8

**6:00** 71:23 129:19

**6:02** 103:24

**6:30** 190:22 191:4

**6th** 137:23

---

**7**

---

**7** 93:18 244:10

---

**8**

---

**8344** 166:10

**85** 244:12 260:1

**85-year-old** 210:16

**8th** 207:18 241:9 242:13

---

**9**

---

**9** 78:8 130:9 214:15

**9-10-96** 54:22 232:17 233:2

**91** 192:19

**9317** 80:14 81:2,9,18

**96** 112:3 113:24 232:18 233:13 234:4 241:5,7

**9612** 218:7

**9701** 218:8

**9709** 218:8

**98** 215:2

**9:00** 128:13 129:17 130:7, 18 191:10,12, 19



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**9:30** 160:2 248:24 251:24

**9th** 245:2 246:20 257:17

---

**A**

---

**a.m** 248:24

**a.m.** 160:2 191:12,19 251:24

**abbreviation** 84:9

**ability** 13:13 14:1 74:20 85:18,21 210:22 211:1 260:8,24 261:5

**abruptly** 219:25

**absent** 227:4

**access** 75:2,5

**accessible** 87:22

**accompanied** 179:20

**accompany** 88:16

**account** 179:2

**accurate** 95:10 105:15 161:20 162:9,10 163:1 165:5 243:2 261:6 266:17 282:18

**accurately** 13:13 14:1 162:12 163:3, 10,19 210:23 211:2

**act** 105:10 263:8

**acted** 219:17

**active** 15:13 141:20 271:13, 15

**actively** 161:25

**activities** 19:8 30:23 31:7,16 167:22,24 168:7 170:25 179:1,18 260:3

**actual** 60:2

**addition** 154:25 179:3 262:14

**additional** 229:1

**address** 74:8 87:16 88:5 143:3 225:10 230:1

**addressed** 225:23 226:19

**adequately** 37:5,8

**admitted** 79:19

**adverse** 226:3, 14

**advice** 62:9 63:5 230:12

**advised** 207:23 242:2,3

**affect** 13:12,25 121:19 210:22 211:1 261:5

**affirm** 10:16

**afraid** 89:20

**afternoon** 231:9 244:5

**Agbiro** 9:10

**age** 87:16 89:17 93:23 95:15,24 97:16 174:14 244:19 268:9

**agencies** 16:2

**agree** 51:20 80:10 136:4 143:17 151:5 154:11 162:25

182:5 225:8 226:2,11,22

**agreed** 10:10 89:16 225:1,3

**agreeing** 225:9

**agreement** 226:21 227:5 230:5

**ahead** 11:7 19:25 20:4 40:24 42:15 45:25 57:3 60:21 61:23 63:17 91:14 92:23,25 93:1,9 99:17 101:21 108:23 119:4 122:12,21 127:5 131:5 132:12 138:6 143:13 158:19 167:18 182:9 203:3,23 216:11 225:6 230:18 233:10 243:8 268:19 271:1 273:18 285:12

**aid** 105:3,10

**Ainsworth** 9:6 10:12,22,24 11:9 15:3,9,10, 14 17:14 20:2,7 21:1,3,4 22:2, 13,22 24:21 25:2,7,9,13,17 26:3,20 30:20 31:4,13,22 33:8 37:4,12 38:22 39:1 40:9,11 41:1 42:12,19 43:4,12,19 44:2,9,12,22 45:2,8,20 46:4, 10,25 47:6,13, 20 48:1,9,17 49:5,11,16,25 50:5,9,14 51:7, 11,21 52:1,11, 15,16,23 53:4, 13 54:1,5,18 56:5,17 57:5,

16,22 58:8,16 59:1 60:5,11, 15,16,23 61:8, 19 62:1,7,19,25 63:4,9,20 64:10,18 65:5, 8,14,23 66:7,9 67:5,13 68:14, 17 69:6,13,19, 25 70:16,22 71:20 72:7,13 73:1,7,15,20 74:10,16,24 75:7,14,25 76:9,18,25 77:5,13,19 78:4,13,16,20, 23 79:23 80:3, 6,11,19 81:1,6, 13,23 82:5,12, 19 83:2,10,18, 24 84:7,15 85:1,15,22 86:7,13,18,22, 25 87:8,13 88:3,10 89:1 90:10,17 91:5, 11,16 92:3,12 93:5,11 94:4, 16,24 95:6,12, 20,21 96:5,12, 17 97:2,6,12,20 98:6,12,21 99:4,8,14,19 100:18 101:2,7, 16,22 102:10, 17,20 104:12, 18,24 105:8,14, 20 106:2,5,8, 11,13 107:4,17, 23,25 108:12, 19 109:1,6,13, 20 110:5,7,18, 21 111:3,9,16 112:4,22 113:5 114:5,11,15,22, 25 115:3,5,13, 23 116:3,6,18 117:4,7,11,18 118:3,13,22 119:9,21 120:15 121:2,6, 13 122:4,14,23 123:8,18,21 124:1,6,10,12, 19 125:2,8

126:2,4,23 127:7,15 128:6, 11 129:3,16 130:5,14,22 131:7,13,20,24 132:6,14,21 133:11,20 134:2,7,15,21 135:4,10,16,21 136:2,7,12,18, 23 137:8,13,20 138:3,8,18,20 139:2,5,7,14, 17,22 140:4 142:6,13 143:9, 16 144:14,16, 18 145:4,13,22 146:6,18,23 147:8,14,20 148:10,16,19 149:1,4,11,20, 25 150:10,20, 24 151:4,13,21 152:2,10,17 153:1,8,15,24 154:7,9,18 155:2,21 156:4, 5,13,23 157:7, 15,20,23,25 158:3,7,17,20 159:3,15,25 160:22 161:6, 11,15,23 162:7, 20 163:7,16 164:1,7,14,25 165:11,19 166:2,7,20,21 167:3,11,20 168:5,10 169:2, 10,22 170:5,7, 8,22 171:4,17, 24 172:6,12 173:4,15 174:1, 10,18,24 175:9, 16,22 176:1,4, 6,15,20 177:6, 13,20 178:2,11, 19 179:11 180:6,15,22 181:6,14,21,24 182:3,4,11,14, 18,20,23 183:3, 11,16 184:18 185:6,11,12,23 186:5,11,18,23 187:7,9,13,16,



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of WILLIAM MARLEY, taken on January 12, 2024

290

19,21,22
188:21 189:4,
11,23 190:2,10,
20 191:2,9,16,
23 192:3,7,12,
18 193:7,13,20
194:8,15,23
195:3,9,19
196:3,9,16,22
197:5,14,20
198:6,19,25
199:22 200:1,8,
18 201:2,13,20
202:2 203:5,9,
25 204:11,17
205:8,14,20
206:9,16 207:1,
6,14,24 208:9,
13,16,20 209:1,
8,13 210:2,6,20
211:13,17,21,
23 212:4,19
213:1,13,20
214:20,22
215:3,5,8,13,
17,21,24 216:9,
13,15 217:1,6,
12 218:4,7,11
219:10 221:12,
23,25 222:12,
21 223:2,11,18
224:1,23 225:2,
4,6,22,25
227:9,20,24
228:4,5 229:13,
20,21 230:7,15,
19,22 231:2
234:25 235:8
238:18 243:22
246:9 247:22
248:11,18
249:5,23
250:11,16
252:22 254:15,
20 255:9
256:12 261:8,
13,21 262:7,17
263:16 265:12,
16 266:2,19
267:5,11,15,19,
24 268:21
269:24 270:2,3,
23 271:16
272:16,21
273:9,22 274:5,
17 275:3,10,17,

20 276:8,17,24
277:6,12,24
278:10,17,24
279:5,11,20
280:1,6,12
281:5,16,25
282:20 283:3,
20,23 284:7,12,
13

**allegation**
153:18

**allowed** 131:1

**amazing**
139:3,9

**ambiguity**
236:12

**amnesia**
210:17 260:17,
23 261:3,5,10,
15

**amount** 202:22
205:13

**Amy** 10:3
32:20

**and/or** 90:23

**Anderson**
194:24 195:22
197:24 198:10

**Andrews** 9:15

**anonymous**
268:9,13
269:16 276:10,
19 278:1

**answering**
63:1 224:16
227:4 230:13

**answers**
226:14 247:3
248:5,9,14
249:4,11,15,22

**Anthony** 39:10
74:17 77:2
80:14 81:8
82:14,22 83:13
84:8 85:16,18,
24 86:1 87:3
89:25 91:22
92:5,14 93:4,7

97:15 113:13

**anticipate**
226:13

**Antusas** 35:21
36:3 69:8
133:15 144:23
145:5,25
214:15 245:4
246:19 257:15

**apologize**
238:11,24

**apparently**
118:1 160:13

**appearance**
9:5

**appeared** 12:5
219:13

**appearing** 9:7,
9,19,24 10:1

**appears** 82:7

**apply** 121:17

**appointed**
30:22 31:6

**appointments**
190:7

**approached**
88:15

**approval**
55:16

**approximate**
130:16 269:2

**approximately**
18:3,4 29:2,4
128:13 248:24
251:16 252:1
253:14 260:4
268:9

**approximation**
233:23,25

**April** 139:24
255:14 257:13,
18 268:2 270:4
276:11,19
282:9

**area** 17:6,20,
23,25 18:1

24:10,12,13,18
30:8 31:7,16
99:24 100:3
204:2,4,12,18,
21 207:15
241:18 242:15

**Argenbright**
69:1,21 70:2,4
231:11

**argumentative**
94:13 154:11

**arm** 53:24

**armed** 132:22

**armored** 15:20

**armorer** 15:20

**arms** 188:12

**Army** 14:23

**arrest** 131:1

**arrests** 53:9

**arrived** 99:23
100:3 179:16
207:19 242:16

**articulate**
221:13

**artificer** 15:20

**ASA** 89:25 90:2
121:24 122:7,
10,16 123:3,11,
13 235:22,23
236:16 265:10
266:17 283:18

**ASAS** 235:23
236:8,16

**assets** 229:25

**assign** 270:18
271:4,6 272:7
284:3,4

**assigned** 17:6,
20,23 18:1 19:5
23:8,14,17
24:14,15,17
25:4,20 26:2
27:1,6,10,16,
18,21 28:12
29:18,24 30:1,2
50:6,10,19,21

69:16 70:9 71:2
72:11 73:13
81:8 85:14,23
86:1 140:15
233:19 234:11,
13 265:21,22
266:23 270:5,
18 272:17
283:25

**assignment**
23:15 26:24
262:23 263:12
264:18,22
265:1,10,24
266:5,10,12,15,
21 267:17

**assignments**
37:25 56:24
234:2

**assist** 71:3
152:20 153:3
266:24

**assistance**
133:14,23
266:25

**assistant** 19:6
59:16 70:10
71:14 136:25
170:15 178:23
188:24 258:17

**assisting**
252:19

**assume** 13:8
14:24 173:6

**assumes**
42:23 51:18
98:18 99:2
101:14 105:17
122:20 133:7
137:25 143:12
152:14,22
153:21 154:23
159:12 162:3,
16 168:24
169:8 195:7
198:2,14,22

**assuming**
240:1,2

**attached** 266:6
277:11 278:13

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**attempt** 207:7 210:13

**attempted** 160:15 240:7 262:12

**attempting** 254:11

**attempts** 257:21

**attended** 52:18 57:8,18 59:20 61:15

**attending** 9:5

**attention** 215:14 244:22 245:1 247:13, 17

**attitude** 220:24 221:4

**attorney** 10:4 19:15,17,23 20:9 22:15 23:1,21 24:3 30:16 31:18 32:4,7,12,15 41:4 43:2 53:6, 15 59:17 61:14 62:3,13,14,20 72:18 77:14 79:4 121:23 122:6 130:25 136:25 167:9 188:23,24 202:25 205:22 206:1 207:23 221:16 239:21 242:3 243:5 258:18 266:1,5, 7,24 267:1,7 283:16

**attorney's** 18:8,11,15,21, 24 19:4 24:24 25:5 26:14,22, 25 27:7 29:6 30:11,14,16 31:15 51:15 57:10 62:9 63:5 71:3,8,24 72:2, 24 78:8 83:13 85:5 103:15

128:8,18,21 130:10,17 132:18 141:19 142:8 145:15 185:15 201:22 202:4 207:21 224:3,10 230:11,12 232:7 239:1 242:20,24 243:20 247:9 253:21

**attorney-** 62:22

**attorney-client** 61:17,21 62:5, 16

**attorneys** 19:6 27:12,13 29:25 32:19,25 33:13, 16 34:6,10 58:24 59:6 60:3 70:10 71:14 129:5 170:16 178:23 229:25 235:6 253:9 254:13 266:8 267:9

**audible** 148:3

**audio** 11:1

**August** 170:18 179:3

**author** 110:13 257:8

**authored** 38:3 88:21,25 89:7 99:10 103:9 159:21 169:24 255:22 257:3

**aware** 36:18 40:25 97:25

_____

**B**

_____

**back** 49:23 50:23 52:24 53:2 61:3,10,12 63:24 66:16 68:19,20 75:3 93:15,16 96:10

111:18 113:6 115:14 118:16 120:5 121:11 123:19 129:1,7 130:23 140:12 146:7 173:5,16, 19 174:4 175:11 182:14, 17 192:22 193:23,25 212:1 220:1 230:24 232:5 238:8 252:15 260:22 272:9 277:3

**background** 74:21 75:2

**backwards** 253:1

**Bajenski** 23:2, 24 24:2,5,11, 18,23 25:14,19, 20,23 30:6,8 51:3 52:19 56:10 57:8 70:18 73:24 88:21 89:6 90:3,24 130:1 131:15 132:16 133:4 134:8,25 144:24 145:6 168:4 189:17 207:19 232:13 233:5,6,13 237:10 239:15, 19 241:19 242:15 248:16 257:25

**Bajenski's** 55:22 73:25

**Baker** 213:24, 25 214:7 216:2, 18 217:3,8,15, 20 218:13,16, 19 219:1,12,15, 20 220:3

**Baker's** 220:7, 13,21

**Ball** 69:21 70:2

**banner** 82:7

**bar** 142:23,24

224:16

**barge** 131:14

**Barnoski** 39:25 208:10, 24,25 209:9 211:6,13 212:6, 7,9,13,20 213:3,6,7,14 215:22

**Barnoski's** 213:22

**based** 15:7 65:3,5 67:23 139:11 148:23, 24 150:19 161:7,8 208:22 230:10 233:20 243:17,18 261:18 262:13 265:9 275:16 283:17 284:1,2

**basically** 45:6 125:17 167:10

**basis** 61:21 95:23

**Bates** 56:7 99:9 102:13 106:14 110:9, 24 111:12 123:22,23 157:22 158:1, 10 166:9 169:18 178:14 182:25 185:4 211:25 216:5 218:2 238:24 256:4 257:2

**Bates-** 87:3

**Bates-numbered** 75:11

**bathroom** 52:14 120:25

**bear** 246:11 254:25 267:21

**bearing** 79:2

**beg** 101:25

**begin** 12:19

24:22

**beginning** 12:24 103:12 214:8

**begins** 146:9

**begun** 130:8, 18

**behalf** 9:7,8, 11,14,22 10:1, 3,12

**behavior** 221:15

**belabor** 171:21

**believing** 95:23

**big** 10:21 135:18 210:18 240:15

**Bigeck** 35:22 36:3 39:14 100:7,12 101:10 165:13, 14 167:4,5,13, 16,22,24 168:6, 20,21 169:3 170:14,24 171:6 172:25 173:7,8 174:3 175:3,19 176:3, 9 177:8,16,22 178:4,20,24,25 179:2,12,18,25 180:9,17,23 181:8 193:2 236:24 253:14, 20 254:12,19

**Bigeck's** 135:23 136:4 206:12

**bigger** 172:8

**Bill** 9:11 32:20 78:20,23 96:12 97:2 111:9 121:7 123:21 126:2 201:22 209:13 234:20 245:12 258:11

**Billy** 36:3 39:14 100:7 101:10

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

167:13,16 168:20 171:6 173:7,8 175:18 176:2 177:7,8, 16,21 178:4 180:9,17,23 181:8 193:2,23 236:24 253:13, 20 254:12,19

**binder** 184:11, 20,21,23 185:13,18

**birth** 87:16 88:5 93:17 94:8

**birthdate** 244:9

**bit** 156:25 172:5,8 176:19 200:6 244:14

**black** 10:21 135:12 188:9 206:19 212:1

**blank** 102:22 103:6 179:21 212:1

**blanks** 260:20

**block** 182:1

**blue** 268:10 275:12,22,25 276:5

**booted** 246:4

**bored** 219:17

**bottom** 54:17 68:25 80:24 82:20 99:21,22, 25 106:15 107:14 159:18 166:10 170:14 176:7 178:16 192:20 216:5 232:25 239:16 241:14 245:15 257:12

**boy** 100:7 213:25 233:12

**boys** 64:20,24, 25 67:7,14 68:12 100:5,12

194:20 264:3

**brain** 27:4

**branch** 14:22

**break** 13:17, 21,23 43:20 52:14 60:18,24 61:3,14 62:3, 14,21 114:18 120:16,17,20, 22,24 121:1,3, 5,8 182:2,11 230:17 238:5

**breaks** 61:3

**Bridgeview** 27:1 88:16 91:6,18

**briefly** 240:5

**bring** 97:6 123:2,13 172:10 180:16 190:8 230:4

**bringing** 129:1 191:24

**broad** 40:23 42:9 45:24 46:8,23 47:3,9, 17,23 49:13,20 50:2 56:15 113:2

**brother** 146:10,21 147:10 148:7 149:14 159:10 160:24 161:12 250:9 252:2,3, 7,12,14

**brought** 129:7 136:9 180:17 190:16 242:18

**brown** 188:9

**Bueke** 242:3

**building** 90:15

**Bureau** 232:8 239:2

**Burge** 30:24 31:8,17

**burglary** 101:12

**burgled** 97:23

**busiest** 191:7

---

**C**

**CAB** 75:11

**CAD** 256:6

**Cal** 58:3 127:24 136:14 140:17

**California** 28:13 29:20 71:9 103:15 170:19

**call** 43:21 44:3 97:7 103:23,25 104:6 135:5 141:17 247:17 252:2

**Callaghan** 39:8 54:7 56:8 64:19,25 66:2,4 67:6,14,20 68:8 232:2,23 233:11 258:19 259:8 262:19 263:2,10,14,22, 24 264:11,14 265:2 281:19

**called** 29:12 61:3 260:17 272:9

**calling** 240:15

**calls** 12:14 61:16 62:5,16, 22 131:4 132:3

**Calm** 119:3

**cancer** 224:8

**car** 196:18,23

**card** 245:12

**care** 285:7

**career** 25:21 259:15

**careful** 199:7, 12

**Carl** 23:23

**Carla** 9:10

**Carmel** 14:7,8, 9

**Carolina** 14:21

**Carolyn** 9:25

**Carrie** 50:11 71:5 152:21 153:4 242:4 280:9

**carry** 42:21 43:5,21 53:15, 20,23

**case** 11:16 12:3 26:1,8 30:1 36:3,7,10, 13,17,21 42:21 50:6,10 51:3,16 52:4,9 56:24 64:12,15 71:13 94:19 103:3 123:9 127:1 159:24 181:16 187:2 205:3,16 214:16 226:19 227:7 252:19 254:4 255:4 259:11,16 266:6,24 267:1, 3,13,18 279:6, 13,22 280:22 281:3,18

**cases** 27:14 59:9 74:20 141:22 226:20 234:1,12 283:25 284:3

**Cassidy** 9:19 52:19 57:8,20 58:18 59:2,5,9 63:23 70:11 135:5,17 136:24 167:10, 12 170:16 178:24 225:12 235:3,25 258:17

**caused** 210:7

**CCSAO** 75:11 168:13 170:18

256:5 269:17 283:9

**cetera** 231:11

**chance** 121:14

**change** 27:20 145:18

**charge** 83:3,4 134:25 135:1,6

**charged** 134:10,18 135:24 206:5, 12

**charges** 86:9, 12 145:24

**Charles** 213:24,25 214:7 216:2,17 217:3,8,14,20 218:13,16,19 219:12,15 220:3,7,12,21

**chase** 64:23

**chat** 114:6 165:15 166:6 169:17

**check** 60:12 145:7 187:11 230:12

**checks** 74:21

**Chicago** 10:1, 2 14:7 16:4,5,8, 11,17 17:2,7 18:7 19:7,9 21:12 24:6 26:13 30:15 35:3 37:15 51:14 60:2 72:3,17,24 75:6 203:10,20 207:15 241:9 279:14 280:13, 23 281:11 283:12,25

**chief** 57:24

**child** 101:24

**children** 224:21

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Circuit** 252:21

**circumstance s** 20:23 89:12 160:9

**cite** 115:1

**citing** 245:21

**city** 10:1 133:22 237:21 245:19,22

**civil** 12:3

**claim** 157:10

**clarification** 23:13 245:18

**clarified** 139:10

**clarify** 23:3 31:2 68:5 138:15 162:18 221:22 238:5

**clear** 151:15 169:25 228:23 270:1

**client** 62:23

**Climber** 180:18,25 181:9

**close** 269:7

**co-defendants** 254:8

**cocaine** 142:23 143:7

**Colleen** 70:12 129:25

**color** 202:20 220:18

**combat** 14:24 15:15,16

**command** 31:7 71:3

**commission** 280:8

**commit** 152:4 203:20 205:22, 24

**committed** 36:16

**common** 84:9 259:10,13

**compensation** 143:18,20

**complainant** 268:13,22 269:5,10

**complainants** 268:8

**complaining** 199:4

**complete** 264:21 267:17

**completely** 206:4,10,17

**complex** 41:25

**complexion** 268:10

**compound** 57:14 275:18

**comprehensiv e** 105:16

**computer** 17:11 46:14 49:7 55:3,6 75:5 116:16,20, 24

**computer- generated** 55:1 117:14

**computers** 48:23 49:1

**concluded** 41:17 285:14

**conclusion** 131:4 132:4

**condition** 13:25 210:22, 25 226:7 229:15 230:10 260:7,13,16,23 261:4 262:14

**conditions** 13:12

**conduct** 20:20 101:8 117:7 121:23 122:7, 15,17 123:1 280:21,22 281:9

**conducted** 19:23 20:10,13, 19,21 21:6 43:6 64:3 91:17 99:6 102:12 103:13 112:15 113:11, 16 116:25 117:22 118:17, 24 119:12 120:2 122:10 160:10,17 179:6 202:5 214:6 216:2 237:3 253:13 259:17,20 278:18,20 279:1,6

**conducting** 74:19,23

**conference** 57:24 225:20 226:22 227:5 230:1

**confuse** 147:21

**confused** 33:6 43:17 96:7 98:20 147:18 209:3

**confusing** 147:21,23,24 163:15 172:23

**confusion** 116:14 118:11, 14

**conjunction** 98:1

**consistent** 103:18 160:8

**contact** 79:8 89:10,11 91:22 92:5,14,21,24 93:2,6 109:7 125:10,13

126:8,11,14 127:21 132:9, 23,24 182:24 183:7 257:18

**contacted** 89:24 91:4 92:15 183:24

**contained** 45:4 213:8,15

**contemporane ously** 41:12

**contempt** 222:6

**contemptuous** 222:6

**content** 125:18

**context** 211:18

**continue** 79:9, 15 121:12 209:4

**continued** 64:25 66:17,18 264:6

**continues** 89:16

**continuing** 70:8

**contradictory** 223:14

**control** 55:8

**convenience** 190:25

**convenient** 191:3

**conversation** 66:1 67:19 104:20 149:6 150:13 151:14, 16 165:7 173:9 195:21 208:8 209:17 213:3 216:17 217:8, 14,19,20 218:15,18 219:12,17,20 220:2,6,9 252:16 254:19

255:12,13,20 256:10

**conversations** 209:16 228:20 229:1,6

**conversing** 241:7

**Cook** 9:19,24 10:4 18:10,14, 20,24 19:3,15, 17,23 20:8 22:14 23:1,21 24:3,23 25:4 26:12,14,22,25 27:7 29:5 30:10,13,15 31:14,17 41:3 51:12,14 53:5, 14 57:10 70:9, 10 71:3,8,23 72:2,18 77:14 78:7 83:13 103:14 121:22 122:5 128:8,17, 20 130:9,16,25 132:17 145:14 178:22 185:15 188:23 201:21 202:3,25 205:21 206:1 224:2,10 232:7 235:5 239:1,20 243:20 247:9 253:21 267:8 283:16

**cooperate** 206:6

**cooperative** 218:20 219:16

**coordinated** 71:10

**copies** 38:24 46:20

**Coppolillo** 39:10 74:17 77:1 80:14 81:8 82:14,22 83:13 84:8 85:18,24 86:1 87:3,15,22 89:10,12 90:6, 12,24 91:18,22 92:5,14 93:7



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

119:23

**Coppolillo's** 95:15,24 97:16 113:13

**copy** 47:7 49:9, 12,18 50:1 65:12 87:7,11 99:16 102:14, 18 105:23 107:6 110:17, 24 116:24 123:24 148:21 155:8,10 165:18 166:14 167:1 183:4 185:7 200:24 214:11,12 231:20 239:6 251:3 256:8 268:3 284:12

**corner** 112:11 116:15

**correct** 10:12 20:22 21:15,18 28:17 37:20 46:19 55:11 56:21 64:4 67:10 88:9 91:10 111:3 116:17 118:4 124:9 126:18 128:16 153:14 160:10 166:5 170:3 175:18 190:13 197:16 200:17 208:5,7 211:2 215:22 229:8,18,20 246:24 250:9 253:8,22 257:15 258:20, 23 260:11,12, 25 261:24 262:15,16,24 263:4,10,19 264:19,23 265:2 267:9 269:3,4 273:2 280:2,15,19,20 282:25 283:5,6, 14,18,19

**correctly** 88:18 179:4

261:6

**corresponded** 112:11

**corresponds** 112:24 113:25

**corroborate** 153:17 157:9

**couch** 219:15

**counsel** 53:3 225:10,19 227:5 230:25

**Counselor** 245:2 253:15

**County** 9:19, 24 10:4 18:10, 14,20,24 19:3, 15,17,23 20:8 22:14 23:1,21 24:3,23 25:4 26:12,14,22,25 27:7 29:5 30:10,14,15 31:14,17 41:3 51:13,14 53:5, 14 57:10 70:9, 10 71:3,8,23 72:2,18 77:14 78:7 83:13 103:14 121:22 122:5 128:8,17, 21 130:9,17,25 132:17 145:14 178:22 185:15 188:23 201:21 202:3,25 205:21 206:1 224:2,10 232:7 235:5 239:1,20 243:20 247:9 253:21 267:9 283:16

**couple** 238:11 244:8 258:10 260:6 262:20 282:5

**court** 12:25 34:19 61:2 79:18 96:11 111:5 129:6 171:22 224:16 226:13 227:5

230:5 252:21

**Courthouse** 88:16 91:7,19

**cousin** 179:15

**covered** 42:3 106:22,24 112:6,24 113:8, 15,20,25 115:15 118:6, 17,24 119:11, 15 120:1,7 166:22 200:7 241:3,4

**CPD** 9:22 68:20 69:20 128:14 203:17 231:10 236:16 237:3 243:6,21 278:19,25 283:8

**cramp** 27:4

**create** 45:16 144:1 275:4

**created** 42:8 45:15,22 46:7 168:21 213:2

**creating** 41:3, 6,7 105:10

**crime** 27:13 43:11 219:6 283:14

**crimes** 17:25 18:2 24:10 280:18

**criminal** 252:20,21

**criticize** 209:22

**criticizing** 209:21 210:4

**cross** 278:22

**cross-examination** 231:7 279:4,9

**CT** 285:14

**cue** 79:7

**cuffs** 53:24

**Culbertson** 9:18

**curious** 60:17 61:13

**custody** 69:8

**customary** 56:12

**customers'** 143:15

**cut** 95:2

_____

**D**

_____

**damage-** 225:18

**damages** 224:24 225:14 226:15,25 229:24

**Dan** 232:2 262:19 263:2, 10,14,22,23 264:11,14 265:2

**Daniel** 39:8 54:6 56:7 64:19 232:23 233:11 258:19 259:8

**date** 16:10 18:13 26:11 29:17 33:21 54:9,11,21 55:13 56:13 63:18 76:13 87:16 88:5 89:10 93:17 94:8 100:25 103:19 111:23 112:10,11,12, 19,20,24 113:22 116:15, 16,17,19,22,23, 24 117:12,13, 22 118:1,6 119:11,15 120:10 138:17, 23 139:18 160:16 176:18, 22 179:13

199:24 232:14, 15,16 233:1 234:4 241:4 249:13,17,19 256:24 257:17

**date/time** 77:15

**dated** 69:1 82:8 90:3 117:20 177:1 192:8

**dates** 26:9 33:7 116:14 138:17, 22 143:14,15 175:22,25 257:22

**dating** 187:1

**day** 23:4,15 26:2,8,10 30:1 50:16,20 51:12, 13 52:2,3 58:5, 14 101:11 171:6 179:7,24 180:7 181:9 185:19,25 191:12,18,19 223:14 231:12 248:23

**days** 77:7,22 78:6 81:17 83:12 264:10, 13,21 283:7,8

**dealing** 139:25 140:9 142:23 143:2

**deaths** 71:5

**debriefing** 236:8

**December** 71:6 90:3 98:2 103:25 104:7 167:23,25 168:7 170:25 171:6 179:1 180:24 185:14 249:2 252:1

**decided** 79:2

**defendant** 9:18 11:18

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

12:1,2 226:4 254:3,7 258:17

**defendant's** 11:17

**defendants** 9:14,23 35:8 187:1 231:10 245:20,22

**defense** 19:13, 20

**defer** 237:6

**Delacy** 70:19

**denied** 103:25

**department** 16:4,6,9,12,18 17:3,7 18:7 19:8 35:4 36:12 37:15 51:14 72:3 203:11 241:9 280:24 281:12 283:13

**deponent** 9:12 237:24

**deposed** 11:14,21,23 12:10

**deposition** 11:20 31:24 32:2,12 33:1 34:13 35:10 36:24 37:6,9,24 38:14 39:3 67:21 78:24 79:8 114:13 117:8 188:14, 15 205:16 210:7,14 214:5 216:21 226:5 227:13 228:19 229:3,8 236:14 262:10 285:14

**depositions** 230:3

**depth** 142:19

**describe** 23:5 34:19 163:3 167:22,24 168:7 170:24 221:11 222:5

260:19

**describes** 169:24

**describing** 168:21 220:19

**detail** 171:5

**detective** 16:14,15,18 17:20,23 21:12 30:24 31:16 70:1 204:2,4,13 278:19,25 279:14 280:13, 23 281:11 283:8,12,25

**detectives** 69:20 70:2 71:2,7 100:6,11

**determine** 123:2 153:3 263:21

**determining** 12:7

**Dichiolla** 168:16

**Diciolla** 84:22 85:2,13,17 168:14,16,18, 19,21 169:4 170:5 173:17 177:23 178:6 200:3

**dicks** 135:18

**dictate** 46:6

**differ** 111:10

**differed** 135:23 279:13

**differences** 124:4

**difficult** 215:2

**difficulty** 183:14,17

**Dinolfo** 9:15 169:16 170:2,4

**direct** 11:8 38:14 170:12

215:14 234:16, 18 244:22 245:1 247:13

**directing** 227:6 235:6

**direction** 66:18

**disagree** 63:3 142:4

**discard** 42:11, 18

**disciplined** 30:10

**discovery** 226:7

**discuss** 121:1

**discussed** 71:11 91:23 228:8,21,25 229:2,7

**disgusted** 220:23 221:3, 14

**dispute** 276:3, 4

**disrupt** 210:13

**District** 207:18 241:9 242:13

**Division** 191:7

**DLNC** 80:20

**doctors** 260:21 261:17

**document** 19:8,11,18,22 20:9,12,19,23 21:8 75:11 79:13,14,15 87:3 110:8,25 111:1 124:17 125:24 126:24 130:6 155:14 166:9 169:18 182:6 186:14, 19,25 197:3,16 201:22 202:4 212:21 231:13, 18 232:14,15,

21,25 233:21 238:13 239:9 256:9 266:9,11, 13 268:25 275:4

**documented** 67:15 101:9 103:20 104:20 108:8 148:1 164:4 165:2 196:25 201:16 212:13 237:12

**documents** 34:12 38:15 124:13 246:4

**dog** 236:24

**dogs** 64:23 66:8,14,15,16 194:10,17,19 233:15 264:5,8

**Don** 208:10,24, 25 209:9 212:6, 7,13

**Donald** 39:25 211:5 212:20 213:3,6,7,14,22

**door** 252:10,12

**doorway** 252:11

**Doris** 39:16 97:22 113:18

**double** 94:19 98:8 126:25 152:4,13 184:23 186:25 201:15

**drafted** 54:9,12 232:15,16

**drive** 252:4 261:23 262:1

**driven** 175:11 197:9,25

**driver** 197:8 198:12

**driver's** 77:7,8, 22,23 80:13,18 81:7,17,18 87:18 88:6

**dropped** 250:8

**drove** 100:22 159:9 160:24 161:12 252:6, 15

**drugs** 143:2

**dumber** 79:24

**duties** 27:9,20 29:23 30:14 128:25 129:4

---

**E**

**e-** 218:4

**E-K-M-A-N** 23:23

**e-mailed** 185:7

**earlier** 34:7 100:5,13 126:6 170:3

**early** 58:9

**earplugs** 66:13

**easier** 12:24 65:21

**eat** 121:15

**Ed** 179:15 193:24 194:3, 24 195:21 196:11,17,23 197:21

**Eddie** 188:17, 22 193:1,14 195:4,11 198:7 236:24

**edit** 253:10

**edits** 48:11,18

**educated** 235:15

**education** 15:25

**educational** 15:21

**Edward** 39:12 187:24,25

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of WILLIAM MARLEY, taken on January 12, 2024

296

188:2,6,13 189:5,14,18 190:15,22 199:23 200:14,20 201:4,6,9,15

**effect** 13:16

**effort** 71:10,12

**Ekman** 23:23

**else's** 34:24 102:2,3

**embarrassed** 50:12

**employed** 126:16,25 127:16,20

**employment** 18:6 126:17 127:9 183:25 213:22 224:9

**encounter** 242:9,12 243:3

**end** 28:21 110:10 205:23 217:23

**ending** 80:14 81:18

**ends** 81:2,8

**enforcement** 16:2

**ensure** 161:20 162:9 163:1

**enter** 14:13 48:23 49:6 131:25 161:13

**entered** 48:25 112:21 116:15 118:2 160:25 252:7

**entire** 22:21 107:21 208:8

**entirety** 255:8

**entitled** 13:21

**equipment** 53:22

**Eric** 193:24

194:24 195:12,22 197:23 198:10 204:24 205:1,16

**escapes** 74:14

**essentially** 179:2

**established** 208:25

**Eug** 252:5

**Euge** 146:11 252:4,6

**Eugene** 39:21 114:12 146:24,25 147:10 148:7 149:7,16 150:2,4,7,12 151:6,10,15,17 159:17 160:2,23 161:11,16,19,25 163:9,18 164:2,18 165:1,7 175:12 247:19 250:4,14 251:15 252:3

**Eugene's** 248:16

**evening** 129:2,8

**event** 183:24 215:9 272:22

**events** 14:2 169:24 180:24 261:5

**everybody's** 237:18

**evidence** 37:18 42:24 51:18 52:7 78:18 79:1,20 86:5 98:18 99:2 101:14 105:18 122:20 129:1,5 133:7 138:1 143:13 152:15,23 153:21 154:23 159:13 162:4,16

168:24 169:8 180:4 184:23 185:19,25 187:2 195:7 198:3,15,23

**exact** 18:13 111:4 210:4

**exam** 16:20

**examination** 11:8 244:3 247:1 258:13 259:23 267:23 283:22

**Excel** 187:17

**exchange** 157:11

**excuse** 60:11 111:19 210:4 214:2 227:7

**exhibit** 54:2,4 56:7 63:24 68:15,16,24 69:15 70:25 75:8,10,13,16 77:21 78:5 80:13 81:8,24 82:6,13,20 83:11,20 84:20,21 86:23,24 87:1,14 89:15 93:15,16 99:5,11 102:6,11,15,18,21 104:20 105:21,25 106:1,14 108:8,13,17 110:6,9,19,20 111:21 113:6,14,19 114:3,16 115:6,8,14 116:1,2,3,4 117:19 118:16,21,23 119:23,25 120:5 123:19,24 124:8,20,22 125:12 126:5 129:23 130:23 144:17 146:8 148:2 155:4 157:16,21,23,24 158:9 159:16 161:8

164:4,19 165:2,12 166:1,9 167:1 169:11,15 170:1 173:16,18 174:12 176:5,25 177:14 178:12,13,17 182:23 183:2 184:2 187:8,9,24 189:12,13 192:19 193:21,22 199:2,3,22 211:10,11,12,24,25 212:11,14,21 213:8,15,21 214:10,18,21 215:15,25 216:1,17 217:17 231:22 232:6 238:20 245:2,7,18 251:14 256:19,22 257:1 259:1 268:1 269:20

**exhibits** 169:13 185:7

**EXHITT** 165:16

**existence** 36:18

**exited** 246:9 252:14

**expect** 154:19

**experience** 14:11,25 15:16,22,25 28:1 261:19

**experienced** 79:4

**explain** 141:18 184:10 197:8,21

**explained** 93:3 271:13,17

**explanation** 142:7 156:6,15 157:1 181:7 192:13 269:11 277:25

**expressway** 261:23 262:1

**extent** 109:24 177:11 225:12 281:1

**extreme** 55:5

**eyes** 188:10 268:10 275:12,22,25 276:5

---

**F**

---

**face** 274:14

**facial** 202:18

**facility** 243:11

**fact** 10:10 67:18 78:25 98:18 99:2 105:17 127:8 152:14,22 153:21 154:23 159:13,20 162:3,16 168:24 169:8 196:25 198:11,14,22 276:3,5

**facts** 42:23 51:18 52:7 86:4 101:14 122:20 133:7 138:1 143:12 195:7 198:2

**factually** 235:16

**failing** 181:1 244:20

**fair** 13:9 22:3,9 42:5,6 78:14,22 79:7 96:15,25 147:25 210:15 233:14,18 235:7,19 237:9 243:5,18 250:4,6 253:24 255:3,16 260:2 268:10 269:24

**familiar** 76:24 78:11 79:13,17,21 83:8 211:7

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of WILLIAM MARLEY, taken on January 22, 2024

297

| | | | | |
|---|---|---|---|---|
| **family** 224:14 227:2,25 | **find** 72:19 85:19 86:2,19 101:9 142:14 153:2 181:16 183:18 196:4 207:14 211:14 222:16 228:20 279:22 280:1,7, 14,17 281:18 | 20:14,15,17 21:24 22:10 24:25 25:6 26:17 30:17,25 31:11,19 37:1, 10 40:23 42:22 43:8,24 44:7 45:18 47:23 48:3,4,14 49:2, 8,13,20 50:7 51:4,17 52:5 53:10 54:14 57:2,12,13,19 58:20 59:21 60:8 61:6 63:16 64:7 67:11 69:11,22 71:16 72:5,21,22 73:18 74:6,22 85:12,20 86:5, 11,16,20 87:25 88:1,7 90:7,13 91:1,24 93:8 94:10,12,21 96:2 97:18 98:3 99:1 100:14,15, 24 101:13 102:8 104:10 105:13 108:22 112:2 116:12 120:13 122:1, 11,19 123:4,14 124:24,25 126:20 128:4 130:12,19 131:3,11 133:6, 17,18,25 134:11,19 135:2,8,14,19, 25 136:5 137:18 145:11, 19 146:2 150:17,23 152:6,14,22 153:6,13,22 154:4,15,25 156:10,19 157:6,13 159:13 161:21 162:2,14 163:4, 13,23 165:8 167:7,18 171:3, 13 173:1,12,22 174:7,8,16,21 175:5,6,13 176:16 177:25 | 178:7 180:4,13 181:3,11 182:8 184:14,15 185:1 187:5 188:19 195:1, 16,24 197:2,11, 12,18 198:1,3, 16,17,22 200:4, 16 201:17 204:8,14 205:10,17 206:7,13,14,21 207:12 208:6, 12 213:18 221:9 222:11 223:16 243:7 254:15 256:12 263:16 268:19 273:19 276:10, 14 277:21 278:5 279:15, 25 280:3,10,25 281:13 284:6 | 84:5,13,23 85:12,20 86:5, 11,16,20 87:25 88:1,7,23 90:8, 13 91:14,25 93:9 94:1,10, 12,21 96:2 97:18 98:3,17 99:2 100:14,16, 25 101:5,13 102:7 104:9,16, 22 105:5 107:2 108:9,23 109:3, 9,17,23 112:1, 16 113:2 115:10,20 116:10 117:16, 25 118:9 119:18 120:13 122:20 123:4, 14 124:23,24 126:21 127:3, 13 128:3 129:14 130:4, 12,19 131:3,10, 18 132:4,11,19 133:6,16,25 134:5,11,19 135:2,8,14,19, 25 136:5,10,15, 21 137:5,10,17, 25 138:6,24 139:20 140:1 142:3,11 143:5 144:25 145:9, 19 146:2,16,20 147:2,12 148:9 149:9,19,22 150:8,17 151:1, 8,20,25 152:5, 15,24 153:6,13, 22 154:5,16,23 156:9,18 157:6, 12 159:13,23 162:3,14 163:5, 12,13,24 164:5 165:9 167:6,17 168:1,8,23 169:8 170:21 171:2,3,13 173:1,12,22,23 174:7,8,16,21 175:5,6,13,21 176:16 177:10, 18,24 178:7 179:9 180:4,12, |
| **family-wise** 225:17 | | | | |
| **Fantastic** 246:13 | | | | |
| **fashion** 92:19 | | | | |
| **fast** 238:23 | | | | |
| **fatal** 242:4 | | | | |
| **father** 82:14 89:24 92:22 93:2 | | | | |
| **father's** 89:22 | **fine** 17:19 119:6 148:22 183:12 224:14 233:7 236:6 244:7 | | | |
| **fatigue** 14:2 | | | | |
| **fatigued** 121:18 | **finish** 42:15 120:21 | | | |
| **fax** 82:7 | **five-** 238:4 | | | |
| **February** 214:15 245:1 246:20 256:11 257:17 | **five-minute** 52:14 60:24 120:24 | | | |
| | **fix** 199:6 | | **forward** 249:13 | |
| **feel** 37:5,8 121:18 221:3 231:21 262:2,4 | **Flaherty** 257:7 270:5,9,17,18, 25 271:2,6,9, 18,21 272:5,7, 12,18 | | **found** 183:19 184:7 | |
| **fellow** 203:11 | | | **foundation** 25:11,15,25 26:17,19 30:25 31:10,11,19 37:2 42:25 43:8,16,24 44:11,20 45:5 46:22 47:10,16, 24 48:3,4,14 49:3,8,14,21 50:3 51:4,17 52:5 53:11 56:2 57:12,13,19 58:6,12,20 59:21 60:8 63:16 67:11 69:5,10,17,22, 23 70:13,14,21 71:16,18 72:4, 9,20,22 73:4, 11,18 74:6,13, 22 75:21,22 76:15,22 77:3, 11,17,25 78:10 80:2,3,8,15,22 81:3,11,20 82:2,9,16,24 83:5,15,21 | |
| **felt** 17:4 28:1 262:9 | **fleeting** 202:23 | | | |
| **female** 136:24 220:19 270:9 | **flip** 13:7 | | | |
| **field** 53:23 | **floor** 28:14 29:21 58:1 140:11,17 | | | |
| **figure** 274:18 281:21 | **flow** 210:14 | | | |
| **figured** 275:5 | **folder** 44:1,5, 14,18,24 45:3,4 47:8 50:1 | | | |
| **file** 42:20 43:5, 13,21 44:4,6, 23,24 45:3,4 47:8 50:1 55:8 97:6 | **folks** 165:13 243:2,4 | | | |
| | **follow-up** 237:17 | | | |
| **filing** 55:6 | **foot** 197:9 | | | |
| **fill** 20:14,15 | **forgot** 53:5 | | | |
| **finally** 89:24 | **forgotten** 50:12 | | | |
| **financial** 226:6,7 227:11 229:15 230:10 | **form** 15:7,8 | | | |

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

19 181:3,12,19 182:8 184:15 185:1,20 186:1, 8,15,20 187:4 188:19 189:2,7, 20 190:6,18,23 191:5,13,21 192:5,10,16 193:5,11,18 194:6,13,22 195:1,6,16,24 196:7,14,20 197:2,11,18 198:3,17,22 200:4,21 201:10,18,25 203:2 204:8,15 205:6,10,17 206:7,13,14,21 207:4,12 208:11,22 209:14 212:15, 22 213:9 215:11 216:23 217:4,9 219:8 222:11,19,25 223:9,23 234:25 243:22 254:20 261:13 266:2 271:11 272:14,19 273:18 275:8, 13 276:6 277:21 278:5 279:15,25 280:3,10,25 281:13 284:6

**foundationally** 193:15

**foundations** 59:25

**fourth** 232:11 241:17

**frame** 22:20 25:22 101:20 128:9,23

**Frank** 40:15,16 105:22 106:9 108:1,5,7

**free** 231:21

**Friday** 33:2

**friends** 104:2 174:20 175:4 179:14 223:14

**front** 38:18 65:15 87:11 92:18 110:17, 24 111:1,5 137:2 166:15 167:1 175:25 214:14,17 231:21 239:24 245:14,23 255:24 262:20 268:3 274:24

**full** 10:7 40:6 44:3 65:13 96:21 192:20

**full-time** 23:6

**function** 283:13

**furnished** 89:21

---

### G

---

**gang** 36:6,10 197:22 198:9

**gang-related** 74:20

**gangs** 59:8

**gather** 152:19

**gave** 58:21 89:24 93:3 125:23 134:10, 18 146:11 151:23 153:18 163:11,19 239:5 245:3 248:21 254:12

**Gene** 146:10, 14 157:17 158:10,22 159:5,8 250:7

**general** 26:6 29:12,15,18,24 30:2,5 67:22 68:7 142:25 143:1 235:4

**generally** 48:6 88:2 129:15 159:24 160:11, 12 195:20 224:13

**generated** 63:25 68:25

**gentleman** 233:15 236:24

**Georgia** 14:17, 18

**Germany** 14:17

**getaway** 174:4 195:11,13 196:18,23 197:8 198:12

**girl** 140:12

**girls** 57:21 58:19 135:1

**give** 10:16 19:6 52:12 106:20 110:2 144:16 151:8 153:10 154:13 187:14 247:2,6,11,15, 21 248:5,8,14 249:4,11,15,22 255:15 272:10 277:25

**giving** 34:3 98:15,24 152:12 154:2, 20 155:7 156:8 180:9 256:3

**Gizowski** 39:19,21 108:14,16,21 109:2,8,15,21 111:22 115:9, 17 116:8 120:6 123:20 124:21 125:10,13 126:8,11,14,25 127:10,22,24 129:25 130:9, 16 132:7,8,15, 16,23,24 133:2, 4,13,22 134:3, 9,17,25 135:6,

11,18,22 136:3, 8,13,19 137:4, 16,22 138:4,22 139:24 140:8, 16,24 141:10 142:7,14,17 143:22 144:19, 22 145:24 146:14 147:9 148:1,6 149:6, 7,21 150:14 151:22 154:1, 12 157:9 158:10,22 159:5,8,11,17 160:2,23 161:19,25 163:9,18 164:2 165:1,7 171:12, 18 172:25 173:10 175:10, 12,20 176:12 177:9 179:8,22, 24 180:1,7,10, 18 181:1,9 206:5,11,18 218:17 219:21 220:4 247:19 250:4,7,14 251:16,24 252:3 255:15 256:11 257:14, 19,25 273:11, 14,16 275:6 276:11,20,25 277:8,19 278:3, 12 281:4 282:10,24

**Gizowski's** 114:8 131:14 132:1 137:1 145:7 157:17 164:18 172:1 180:16 181:8 278:12

**Gizowskis** 35:22,23 36:4 149:23

**glasses** 202:14

**gleaned** 240:25

**global** 260:17

261:4,10,15

**good** 9:17,21, 25 11:3 17:12, 17 19:12,13,19, 20 51:22 52:25 104:2 175:4 182:3 231:9 244:5 284:22

**grab** 44:4,5 158:3

**graduate** 14:4, 6,8

**Graffeo** 71:2,7

**grand** 136:9, 14,20 137:2

**gray** 202:21 264:4,7

**great** 17:20 239:7

**ground** 12:10

**guess** 48:10 171:9 174:11 177:15 179:10 191:17 209:15 217:13 219:2 222:7 236:6 246:14 251:5 253:19 256:18

**gun** 53:16 132:22 134:25 187:25

**guns** 97:23 252:5

**guy** 194:9,16, 19 206:18 219:2 264:4,7 271:19,20,22 272:5,8,10,18 275:12,21,25 276:4,5,10,19 277:17

**guy's** 142:24

**guys** 66:13,20 114:7 120:16 135:18 158:6 196:1 206:19 255:1

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**H**

**H-131** 245:25

**H133** 216:9,10, 11,17 217:23

**hair** 188:9 202:18,20 220:18 264:5,7

**Hale** 56:19 264:3

**half** 27:19,21 29:10,16

**hallway** 252:11

**hand** 10:15 99:16 102:19 107:12 112:11

**handcuffs** 53:18

**handed** 251:3

**handle** 225:20, 21

**handled** 227:6 230:2

**handwriting** 75:16,20 76:1,3 79:14 84:1,3 239:25

**handwritten** 43:13 45:13,16, 23 111:13 114:8 124:4,5 127:25 129:24 130:8 148:20 177:1 239:24

**handy** 238:17 256:9

**Hang** 75:9,10

**happen** 48:24 123:12 227:12

**happened** 47:14 48:21 57:21 58:22 92:13 171:5,6 207:9 228:10 230:3 242:11 280:8,18

**happening** 50:17 122:22 123:7,17

**happy** 206:19

**hard** 23:5 65:12 87:6,10 102:14,18 105:23 107:6 110:17 123:23 148:21 155:8,9 165:18 166:14, 25 183:4 214:11,12 221:11 222:5 231:20 239:6 245:12 251:3 260:19 268:2

**hardcover** 184:11

**hated** 218:17 219:21 220:4

**he'll** 67:1 158:25 200:25

**head** 232:5

**headed** 102:25

**headphones** 66:13

**hear** 15:23 17:8 32:6 43:9 61:9 75:22 105:7 123:3 144:13 145:2 155:24 156:2,3 221:7

**heard** 36:6,9, 20 60:14 66:11 153:10,11 223:13

**hearing** 214:16 244:14,15,18, 19

**height** 87:18 202:9 268:16, 18,23 269:5

**held** 21:2,5 235:17 242:13

**Helena** 50:13, 15 71:5 152:21 153:4 242:5

280:9

**helpful** 223:15

**helping** 106:11

**Hey** 97:2 185:3 211:15 234:19 250:18

**high** 14:4,6,7 75:17 84:12

**Highland** 129:25

**highlighted** 75:17

**Hinshaw** 9:18

**hired** 18:20

**Hispanic** 188:9

**hold** 10:23 16:12,17 99:12 165:21 187:17 199:7 226:8 232:1 245:10 246:5,8,11 251:1 259:2

**Holmes** 69:1, 21 70:2,4 231:11

**home** 88:13,14 89:13 132:9,23 160:2 165:20 229:16,22 248:6 251:24 252:15

**homicide** 50:11 94:19 98:8 103:3 127:1 133:24 152:4,13 184:24 187:1 201:15

**homicides** 50:15,20 186:7 228:8 229:7

**Honestly** 171:25

**hope** 37:11

**horizontal** 107:14

**host** 236:25

**hours** 32:16 33:14 34:2 71:9 128:7 129:9,20 236:10,11,14, 16

**house** 74:9 92:15,16 100:21 101:11 103:24 104:7 131:14 132:1 142:24 145:7, 24 146:11,12, 15,17,19 147:1, 11 148:8 149:7, 8 151:6,11,12, 18 157:11 159:10 160:24, 25 161:13,17 179:13,20 180:11 249:2, 20 250:8,9,15 252:5,6,7,9,13, 14

**Hovel** 50:11, 15,19 71:5 91:8 93:13 133:24 152:21 153:4 188:24 228:7 229:7 242:5 265:15 267:2 280:9 281:6,10

**how'd** 59:5,15 183:7

**Howroyd** 9:17 187:11,14,17, 20 215:20 218:2,6,9 238:1 243:7 245:8,10 246:1,5,8,11,15 250:22 251:1,8 258:10,14,16, 25 259:5,22 279:16 281:2, 14 282:3 284:9, 23,24

**Hyland** 9:14 70:12

**Hynes** 70:11

**hyper** 89:20

**hypothetical**

22:11 123:5 203:3

**I**

**idea** 191:14 205:12 234:6 275:23

**Ideally** 153:7 160:19

**IDENTIFICATI ON** 54:4 75:13 86:24 99:11 102:15 105:25 108:17 165:16 170:1 178:17 183:2 211:11 214:21 238:20 256:22

**identified** 100:7 101:10 179:21 242:19 277:14 278:3,8

**identifies** 180:1,8

**identify** 68:12 165:18 263:22, 23 264:13,22 272:23 274:9 277:16,17,18 278:2

**identity** 254:18

**Illinois** 9:8,20 10:2

**imagine** 98:4

**impact** 260:8, 14 261:10,16

**impacted** 262:13

**impacts** 260:24

**impeach** 171:24

**impeached** 171:23

**impeachment** 247:23 249:6, 24

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**implemented**
71:11

**implicate**
181:10

**importance**
219:18

**important**
23:12

**improper**
71:17 131:25
247:23 249:6,8,
24

**in-between**
58:10 257:17

**inaccurately**
40:21

**incarcerated**
189:18 190:12

**include** 56:13
126:16 160:16

**including**
103:19 197:23
198:10

**incomplete**
22:11 123:5
203:3

**incorrect**
216:22

**increase** 17:11

**independent**
109:22 165:25

**independently**
22:8 109:15
184:5

**indicating**
222:15

**indication**
21:22 120:9
127:8

**indictment**
252:20

**individual** 9:22
73:13 231:10
232:20

**individually**
237:2

**individuals**
72:11,16,19
234:16 243:19
283:17

**inform** 89:18,
19 237:7

**informant**
141:25 275:5

**information**
19:12,13,18,19
21:9,13,14,17,
20,23 22:4,6,8
40:22 42:18
46:1 75:3 82:21
86:3 87:21
94:3,5 95:5
98:15,16,25
100:7 102:22
123:2 126:17
141:15,18
142:1,9,15,25
152:19 163:3,
11,19 168:12
169:4 173:8
208:23 223:15
226:24,25
227:1 229:25
240:25 254:11
255:16 264:1
270:7,11 272:3,
10 276:23
278:13 279:23
280:15

**informed**
100:6 103:23

**initial** 137:22
162:22 236:7

**initially** 170:12
282:16

**inmates**
191:25

**input** 55:7

**inquiries** 77:7,
21 81:16 83:12

**inquiry** 77:23
78:6,7

**inside** 146:14,
17,19,25
147:10 148:7
149:7,16

150:12 151:18
161:17 250:15
252:8

**instance** 38:9
142:22

**instruct** 62:23

**intended**
160:16

**inter** 117:8
205:15

**interaction**
109:15

**interested**
272:2

**interesting**
28:2

**interestingly**
240:6

**interrogatorie
s** 226:17

**interrupt** 95:1
115:22,25
185:4

**interview**
19:22 20:10,20,
24 21:10 27:15
38:8,10 41:16,
24 42:3,10
45:11,16,17
46:2 54:6
56:13,14,19
64:2 67:21
68:2,7 87:2
90:1,6,11,24
91:6,18 99:5
100:16,25
101:3 102:12
103:13 104:21
105:22 106:5
108:5,7,14,20
109:2 111:22
112:12,14,25
113:7,10,14,15,
19 115:16
116:7,25
117:23 118:7,
17,24 119:12,
15 120:2,6,9
122:9,15,17
123:10,20

124:21 130:24
142:14 148:1
157:17 158:10,
22 159:4
160:17 164:3
165:12,14
166:4 167:4
169:16 170:13
173:6 176:19
177:16,17,21
178:3,22 179:6
180:1,24 186:6,
13,14,19,25
187:25 188:2,
17 189:5,14,16
191:11,18
200:19 201:4,6,
8,14,16,23
202:4 207:5,7,
10,13 209:9
211:5 212:5,9
213:24 214:6
216:2 240:7,22,
23,24 241:1
242:5,18 243:4,
19 247:19
248:6,15 250:4
251:15 253:12
258:19 259:20
263:7,10
264:23 265:5,
20 266:16
267:18 270:6
271:22 272:8,
18 277:15
281:22

**interviewed**
41:8 56:8 71:14
88:17 89:25
90:24 94:7
97:22 98:1,9,
14,23 100:11
113:23 160:2,6
162:6 176:9,12,
22 177:7,8,22
178:5,20 179:7
181:15 188:22
190:21 194:16
207:2 208:10
212:7 219:4
232:21 233:11
251:23 253:20,
21 254:1,4,6
259:7 263:3,18
264:17 265:9

272:5 283:17

**interviewing**
41:12 85:24
86:1 104:5,13
108:1,16
211:19 254:10
265:2 283:7,9

**interviews**
20:12 38:11
39:6 43:1,10
44:15 45:7
103:19 121:23
122:7 123:1
160:9 170:17
182:6 236:23
237:2,4,10
278:20 279:1,6,
12,13 280:21,
23

**introduce**
167:10,13

**introduced**
78:18 79:1
167:16 178:4
207:20

**introducing**
58:23

**inventoried**
185:14

**investigate**
30:23 31:6
36:13 281:21
283:13

**investigated**
42:21

**investigating**
129:10,12
280:18

**investigation**
71:1,4 85:9
98:2 101:8
133:24 228:11,
14 232:8 239:2
270:19 281:6,9,
10 282:23

**investigations**
26:7 29:12,15,
19,24 30:3,5
43:6 74:19,23
269:17

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**investigative** 87:2 102:25 187:10 211:19 232:8 237:6,12 239:2 251:14

**investigator** 18:22,24 19:3, 16,18,24 20:9 22:15 23:1,21 30:16 31:18 41:4 53:6,15 57:25 70:18 72:24 88:12,13 89:3,4 90:2 121:23 122:6 130:1,25 145:15 153:11 170:17 178:21 202:25 205:22 206:2 233:13 241:14 247:9, 14,16 255:3 257:24 267:7 280:22 283:9, 17

**investigator's** 24:24 128:8

**investigators** 10:4 24:3 55:15 56:9 58:23 60:4 70:17 71:15 72:19 88:15 89:17,19,22,24 122:25 123:11, 13 168:13 188:23 232:12 235:7 239:11, 12,14,17,21 241:19 243:5, 21 251:23 253:6

**invited** 132:2

**invoke** 242:23

**involved** 143:15 235:16 236:9 252:19 259:13

**involvement** 197:23 198:9

**involving** 36:13 219:20 220:2

**irrelevant** 209:5,11,20,23

**Isaac** 9:25 237:21 285:1,2

**issue** 225:10, 21

**issues** 224:7 244:15,17

———

**J**

**Jack** 70:11

**jail** 178:22 190:8,25 191:3, 24 206:19

**James** 39:23 40:14,15,16,17, 18 102:13,19 103:23 104:6, 13,19 106:8 113:7 120:1

**January** 16:7 216:2,18 217:15,20 218:16

**job** 27:9,20 29:23 129:18 133:22,23 203:19 266:23 267:20

**jobs** 50:22

**jogged** 63:10

**John** 39:19 108:14,16,21 109:2,7,15,21 111:22 114:7 115:8,17 116:8 120:6 123:20 124:21 126:11, 14,25 127:24 129:24,25 130:9,16 131:14 132:1,7, 8,15,16 133:4, 13,21 134:3,9, 17,25 135:6,11, 18,22 136:3,8, 13,19 137:1,4, 16,21 138:4,21 139:24 140:8,

16,24 141:9 144:19,22 145:24 146:9, 11,14,25 147:9 148:1,6 149:6, 14,15,21 150:2, 3,7,11 151:7, 17,22 154:1,12 157:9 159:10, 11 160:24 161:12 171:11, 18 172:1,25 173:9 175:10, 20 176:12 177:9 179:7,22, 24 180:1,7,10, 16,18,25 181:8, 9 206:5,11,18 218:17 219:21 220:4 250:9 252:3,6,12 255:15 256:10 257:14,19,25 273:11,14,16, 20 275:6 276:11,20,25 277:8,18 278:3, 12 282:10,24

**John.'** 252:17

**Johnson** 51:1 234:14

**join** 26:21 31:1 51:19,23 130:21 133:9 279:16 281:2, 14

**joined** 24:3,23 27:7 28:6 241:18

**joining** 25:4 26:24 51:20

**Joint** 245:19,22

**Jon** 30:24 31:8, 17

**judge** 12:6 79:8,9 97:7 214:14 226:18

**judgment** 226:4

**Julia** 9:9

**jump** 238:2

**jumped** 187:25

**jury** 12:6 136:9, 14,20 137:2 214:17

**juvenile** 82:21 83:3

———

**K**

**Kane** 204:24 205:1,16

**Kazmierski** 214:14

**kid** 74:15

**kid's** 74:4

**kind** 99:24 143:11 171:18

**knee** 206:24

**knew** 21:21 22:8 36:19 48:5 59:14 140:13, 14 147:23 184:10 222:15, 16,18,22 223:3, 12,20 253:24 274:15

**knock** 199:16

**knocked** 252:10

**knowing** 94:15

**Kogut** 166:10

**Kulwin** 9:23

**Kunzer** 10:3 17:12 33:3

———

**L**

**lack** 239:10

**lacks** 209:14

**lady** 140:20 270:9 271:24

**late** 25:21 58:10 140:10 157:6

**laughed** 134:9, 17,20,22

**Laura** 52:20 59:12 70:11 89:25 90:23,25 236:3

**Laura's** 52:20

**Laverne** 248:8

**law** 16:2

**Lawrence** 75:17 84:12

**lawsuit** 11:18, 20 12:1,7

**lawyer** 236:22 242:21

**leading** 235:8 247:22 249:5, 23 250:11,16 252:22 254:16 255:9 261:8,21 262:7,17 265:16 266:19 267:5,11,15 282:20 283:3, 20

**learn** 254:18

**learned** 56:23 89:17 94:7 233:25 282:24

**learning** 152:20

**leave** 16:8,25 17:2,4 120:22 131:9 224:2 252:13 277:5

**leaving** 88:14 89:12 92:16 131:8 133:3,5

**led** 152:13 180:23 184:22

**left** 17:6,21,24 18:6,17,19 30:8 44:5 55:5 127:18 128:14 174:19 175:4, 11 208:2 219:23,24 221:10 222:5



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of WILLIAM MARLEY, taken on January 22, 2024

302

224:9 243:1

left- 112:10

left-hand 116:14

legal 61:16 131:4 132:3

Len 144:24

Lenihan 70:10

Lenny 52:19 73:24 130:1 131:15 134:8, 24 168:4 207:19 239:15

Leonard 23:2, 23 24:2 25:14, 19 30:6 55:22 189:17 248:16

letter 199:23 200:2,14

letters 184:12

letting 209:4

lever 200:14

liar 135:6

Liberto 173:19

license 77:8,23 80:13,18 81:7, 17,18 87:18 88:6

life 12:24 14:2 141:5

light 151:23 152:12 154:2, 14,21 155:7,23 156:8,17 157:2

limited 226:5

Linehan 9:14 170:16 178:24 236:2

list 70:17 156:7 239:9,12,14 246:3

listed 90:19

listen 26:19 119:5 147:5,6 148:12 158:24

167:7 216:14

listening 66:12

lists 268:5

literally 166:14

lived 85:19 86:3

locate 71:10 72:12 73:14 263:21,23 264:9,11,22

located 74:8

locating 72:15 183:15,17 265:2

location 9:5 71:12 103:19 142:19 143:8 160:16

locations 142:18,20

long 17:5 18:1, 14 24:11 27:18 32:14 33:13 34:1 127:24 130:8,16 143:22 231:12

longer 23:25 162:23

looked 68:20 100:21 112:9 118:5 119:22 176:25 222:6

loose-leaf 184:11

Lords 36:20

lot 135:12 141:15 142:18 143:7 206:19 210:12 236:22

loud 12:14

love 135:13

lunch 120:20, 22 121:1,3

lying 221:17 222:2,7,15,18, 23 223:4,13,20

**M**

M-A-R-L-E-Y 11:12 247:5

M-A-X-O-N 11:17

mad 253:2

made 103:24 143:1 201:16 207:25 221:2, 14

Maicke 70:18

mailed 218:5

make 12:24 16:15 42:14 46:20 53:9 80:9 96:19 141:16 151:15 161:25 172:8 190:7 209:5 211:4 226:20 242:3 257:21 270:1

makes 112:14 210:12

making 79:5 272:2

male 84:9 100:4 268:9 269:16 270:6, 12

man 210:16 213:24

manner 221:5, 6,8,14

manual 46:18

March 244:10

mark 14:8 54:2 75:7,8,10 86:23 99:5 102:11 105:21 108:13 110:6 114:3 116:2 157:15 165:11 166:8 169:10,14 177:14 178:13 182:20 211:9, 18,24 214:10

215:25 238:15 256:15,18

marked 54:2,4 68:15 75:13 86:24 99:11,23 102:6,15 105:25 108:17 124:8 146:8 158:9 165:16 170:1 178:13, 17 183:2 184:1 187:23 199:3 211:11,24 214:21 238:20, 22 250:22 256:22 268:1

Markham 27:3, 4,6,10,16,18,21 29:7,10,16 30:3

marking 87:1

Marley 10:6,8, 11,14 11:12,13 55:19 56:9 65:24 70:18 81:7 88:13 89:4 91:10 95:2 116:7 126:5 138:18,21 149:5 178:15 227:8 228:6 232:13 233:13 241:19 247:5, 14,17 258:15, 18 259:25 268:6 275:21 277:7

married 224:17,19 228:1

Martin 50:13, 15,20 71:5 91:7 93:13 133:24 152:21 153:4 188:24 228:8 229:7 242:5 265:15 267:2 280:9 281:6,10

Masciopinto 9:21,22,23 114:20 211:15, 22 230:20 231:1,3,6,8,10,

15,17,22,24 232:4 235:1,10 236:19,21 237:14 238:9, 10,15,19,21 239:7,8 240:19 243:16,24 256:20 285:9, 10

match 206:11

matches 119:11

math 18:17 28:23,24

Matt 35:21 36:3 103:24 104:1,7 133:14 151:23 152:4,12 154:2, 13,20 155:6,23 156:8,16 157:2, 10 175:1 179:16,20,25 180:8 181:10 187:9 207:2,7 208:3 242:9 244:23 245:6 250:18 251:6 252:2

matter 233:19 234:3,7,11,17, 20,24 235:16 236:9

matters 234:22

Matthew 9:17 69:8 240:9,10, 14 258:16

Maureen 9:16 60:11 237:25 244:5 249:7 256:15

Max 11:17

Maxon 11:17, 20

Mcdonald 70:18 101:18, 23 241:8

meaning 12:5 21:20 36:3 50:11 103:22



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

145:5

**means** 11:2 96:19

**meant** 123:21 157:17

**medical** 13:12 15:13 210:22, 25 224:7 260:7, 13,16,23 261:3 262:14

**medication** 13:11,15,18

**meet** 32:4,14 33:9,13,16,19 136:19 140:7 141:5 143:22 144:19,22 145:3 193:14 257:25 258:4 259:10

**meeting** 26:10, 12 30:2 32:17 34:1,4,8 50:16, 20 51:12,13 52:4,17,18 56:22 57:7,17, 23 58:5,17 59:3,13,20 60:19 61:15 62:4 63:12,14, 22 64:5,14 71:22 72:1,8 73:2,9 137:22 143:24 144:2 194:3 235:17, 20,23 236:7,15, 18 259:6,7 268:2 282:9,12, 13

**meetup** 195:5 196:11

**Melvina** 71:6

**member** 201:21

**members** 51:14 71:7 72:2,3

**members'** 197:23 198:9

**memory** 38:17 50:16 63:11 67:23 68:8 94:14 98:5 105:3,10 122:24 125:4 159:6 161:7 164:9,23 169:1 184:16,19 188:2 233:20 235:15 236:5 242:8 243:17 260:14,20 261:11,16 262:13 274:22

**men** 100:20

**mention** 156:11,20 173:9

**mentioned** 40:14 156:1 172:25 229:2 264:1

**mentions** 171:11

**merged** 114:10

**merits** 12:7

**met** 32:11,25 33:7,17 70:4 71:7 137:14,15, 21 138:4,9 140:8 259:15 274:15

**Michelle** 40:2, 7,9 182:25 183:8 184:6,10 186:6

**middle** 99:24 241:16,17

**Mike** 212:9

**military** 14:11, 14,22 15:13,17, 19 16:1 133:23 134:4

**million** 205:9

**mind** 148:19 231:3

**mine** 251:6

**minimum** 120:23

**Minizzi** 39:23 40:14,15 102:13,19 103:23 104:6, 14,19 105:22 106:8,9 108:2, 5,7 120:1

**Minizzi's** 113:7

**Minor** 203:24

**minute** 57:6 68:5 144:16 238:5 267:21

**minutes** 52:23 60:25 182:13 230:20 252:9

**Miranda** 242:24

**mischaracteri zes** 42:23 43:7 59:24 60:20 74:2 85:10 94:11 118:9 119:17 137:25 150:22 152:23 153:5,20 270:22 273:4 274:11 275:1 276:13 277:20 278:4,15 280:4

**misconduct** 202:24 203:12, 14,21 205:22, 24

**Misfit** 174:13, 19,25 175:3

**misleading** 209:11

**misled** 215:6

**Misrepresents** 26:18

**missed** 134:13

**missing** 152:8

**misspoke** 112:18 183:23

**Misstates**

51:18 59:22 180:3

**mistake** 106:4

**mistreat** 204:7, 13,19,21 206:2

**mix** 165:25

**mixed** 147:3,6 149:24

**mom** 220:13,21 223:19

**moment** 264:6

**monetary** 225:15,18 227:1 229:25

**money** 141:16, 25 142:9 143:15 272:2

**Montejano** 39:16,17 97:22 99:6 100:10,22 101:9 102:5 106:5 113:23

**Montejano's** 113:18

**month** 23:10, 17,22 25:9

**months** 11:15

**Morfin** 39:12 173:20 179:15 184:12 187:10, 24,25 188:2,6, 13,17,22 189:6, 14,18 190:15, 22 193:1 194:24 195:4, 11,21 196:11, 17,23 197:21 198:7 199:23 200:14,20 201:4,6,9,15 236:25 249:2, 20 250:15 252:10

**Morfin's** 146:11,19 147:1,10 148:8 149:8 157:11 159:10 161:17

179:13,15,20 252:9

**Morfin-** 166:9

**morning** 9:11, 17,21,25 58:10 71:23 136:19 248:25

**mother** 82:14 89:19 92:18,22 100:21 104:1 164:23 219:22 220:7 248:16

**motion** 97:6

**Mount** 14:7,9

**move** 97:12 107:11 200:9 209:6 251:10

**moved** 107:19

**moving** 143:7 269:24

**multiple** 209:16

**murder** 57:21 58:18 134:10, 18 135:1,7 152:21 179:25 181:10 197:23 198:9 206:6 234:2,3,7,11, 20,24 235:15 237:3 254:4 255:4 267:2 280:8 281:6,10

**murders** 91:7 92:17 93:12 153:4 188:25 233:19 265:14

**music** 66:12

**MW** 84:8

———————

**N**

———————

**named** 85:2 101:17 213:24, 25

**names** 52:21 142:18,20 143:14,15

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

147:19 214:8

**narcotic** 27:24,
25 28:7 29:13
141:15,19
270:6 271:14,
15 276:22

**narcotics**
26:6,21 28:4,6,
8,12,16 29:1,4,
7 30:3,4 50:23
139:25 140:8,
12,15,18 141:4,
20,21 234:1,12,
22 255:16
269:17 270:11
271:3 282:14

**narrative**
241:6,12,17
242:1

**nature** 227:3

**necessarily**
41:25 189:23

**needed** 146:10
190:14 246:10

**negative**
240:21,23,24

**neighborhood**
276:23

**Neil** 70:10
170:16 178:24
236:2

**nervous** 92:21

**nice** 199:18
209:10,12

**nicely** 199:17

**Nicholas**
184:12

**Nick** 146:10,19
147:1,10 148:7
149:8 157:11
159:10 161:17
173:19,20
179:13,15,20
250:15 252:5,9,
10,12,16

**Nick's** 146:11
160:24 161:12
252:4,7

**nickname**
175:1 180:17,
18 181:9

**night** 58:10
190:22

**nonsensical**
79:23 171:25

**noon** 191:11

**Norfie** 168:13

**normal** 236:9,
11,15

**north** 14:21
66:19 193:25
194:4,20,25
195:4,13,23
196:5,11

**northbound**
64:21 65:1
66:21 67:7,10

**noted** 91:19

**notes** 41:9,11,
16,20,23,25
42:4,7,11,17
43:14 45:16,23
46:2 111:13
124:5 143:24
161:19,24
162:6,9,11,12,
19,25 163:1,2,
9,18,19

**notice** 244:13

**noticed** 40:20
112:12,23
216:25

**notified** 89:23
140:23,24
141:3

**November**
93:18 117:20

**number** 34:3
42:4 55:5,8
56:7 77:8,9,23
80:14,18 81:17,
18 87:17,18
88:5,6 89:22
99:9 102:22
103:5 106:14
114:17,20,21

115:7,8 123:23
157:16 158:1
185:14 199:20
228:17 250:21
251:14 256:19
257:2 259:1

**numbered**
87:4 102:13
110:9 158:10
166:9 169:18
178:14 182:25
211:25

**numbers**
157:22

**numerous**
184:12

---

**O**

---

**O'BRIEN** 9:16
24:25 25:6,8,11
26:17 30:25
31:11,19 42:25
43:16,24 49:8
51:17 52:5,7
57:12,19 58:20
59:21,23 60:8,
14 61:5 63:16
69:11,22 70:13
71:16 72:5,22
74:22 85:12
87:25 94:10
95:19 96:2
97:18 100:15,
24 101:13
104:10 105:13
114:4,9,23
115:1,4 123:14
124:24 128:4
130:19 131:3
133:6,17
145:19 146:2
150:17 157:5
158:5 161:21
162:2,14 163:4,
13,22 164:11,
13 170:2,6
171:3,15,20
173:22 174:7
175:6 178:7
182:22 184:14
185:3,9 187:5
195:1,7 197:12

198:1,16
199:14 204:8
205:10,17
206:7,13,21
207:12 214:25
215:4 222:11
223:16,21
238:4 244:1,4,
5,23,25 245:6,
9,12,17 246:3,
7,13,16,17
247:25 248:12,
19 249:9,10
250:1,12,18,20,
24 251:2,5,9,12
252:25 253:3
254:17,21,22,
25 255:2,11
256:7,16,21,23
258:7 273:19
279:15 281:13
284:6,15,16,18

**O'
CALLAGHAN**
9:13 244:6
284:20,21

**O'MARA** 244:6

**oath** 138:9

**Oberts** 9:11
10:23,25 11:6
15:2,5,7,12
17:8,10 19:25
20:3,25 21:24
22:10,20 24:19
25:15,24 26:18
30:17 31:1,10,
20 33:4 37:1,10
38:21,25 40:23
42:9,15,22
43:7,15,23
44:7,11,19,25
45:5,18,24
46:8,22 47:3,9,
16,23 48:3,14
49:2,13,20
50:2,7,13 51:4,
8,19,22 52:6,
13,25 53:10
54:14 56:2,15
57:2,13 58:6,12
59:22,24 60:10,
20 61:16,22
62:5,16,22
63:3,8,17 64:7,

16 65:2,6,9,11,
17,20 66:5,22
67:1,11 69:5,
10,17,23 70:14,
21 71:18 72:4,
9,20 73:4,10,18
74:2,6,13 75:21
76:7,15,21
77:3,11,17,25
78:10,14,17,21
79:11 80:1,5,
15,22 81:3,11,
20 82:2,9,16,24
83:5,15,21
84:4,13,23
85:10,20 86:4,
10,15,20 87:5,
10,24 88:1,7,22
90:7,13 91:1,9,
13,24 92:8,11,
25 93:8,25
94:9,11,20 95:9
96:1,3,9,14,21
97:4,10 98:3,
10,17 99:1,7,
12,15 100:14
101:5,20 102:7,
16,18 104:8,15,
22 105:4,17
106:1,3,7,10
107:1,10,16,18,
21 108:9,22
109:3,9,17,23
110:1,16,19,23
111:4,11 112:1,
16 113:1
114:18 115:10,
19 116:9,12
117:1,6,15,24
118:8,20 119:4,
16 120:12,19
121:4,9 122:1,
3,11,19 123:4,
15,25 124:2,7,
11,13,15,23,25
125:5,14,17,20,
23 126:20
127:3,5,12
128:2,9,22
129:13 130:4,
11,21 131:4,10,
18,22 132:3,11,
19 133:9,16,18,
25 134:5,11,19
135:2,8,14,19,
25 136:5,10,15,



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

21 137:5,10,17, 24 138:6,15,19, 24 139:2,4,6, 10,16,20 140:1 142:2,10 143:4, 12 144:25 145:8,11,20 146:1,5,16,20 147:2,5,12,15 148:9,12,22 149:2,9,19,22 150:8,16,18,21 151:1,8,20,25 152:5,14,22 153:5,13,20 154:4,15,22,25 155:9,12,16,18, 24 156:3,9,18 157:12,19,21, 24 158:1,13,15, 23 159:12,22 160:20 161:1, 10 162:3,16 163:5,12,23 164:5,10,21 165:8,17,21,24 166:18,25 167:6,17 168:1, 8,23 169:7,19 170:21 171:2, 13 172:3 173:1, 11,23 174:8,16, 21 175:5,7,13, 21 176:14,16 177:4,10,18,24 178:8 179:9 180:3,12,19 181:3,11,18,23, 25 182:8,13 183:9 184:15, 25 185:20 186:1,8,15,20 187:3 188:18 189:1,7,20 190:5,17,23 191:5,13,20 192:1,5,9,15 193:4,10,18 194:5,12,22 195:6,15,24 196:7,13,20 197:1,10,17 198:2,14,17,21 199:6,10,12,15 200:4,16,21,25 201:10,17,25

203:2,7,22 204:9,14 205:5, 11,18 206:14, 23 207:3 208:6, 11,14,19,22 209:7,10,21 210:3,11,15 211:12 212:3, 15,22 213:9,17 214:19 215:11, 19 216:4,8,10, 14,23 217:4,9, 24 218:1 219:7 221:9,19 222:19,24 223:8,22 224:23,25 225:3,5,7,23 226:10 227:9, 17,22,25 229:10,17,23 230:17 231:5 232:1 237:20, 25 239:5 240:17 243:9, 12 245:14 251:3 256:1,3, 15 258:12,24 259:2,24 261:9, 14,22 262:8,18 263:17 265:13, 19 266:3,20 267:6,12,16,21 268:19 269:21 270:1,21 271:11 272:14, 19 273:4,18,24 274:2,11 275:1, 7,13,15,18 276:6,13,21 277:1,9,20 278:4,14,21 279:3,8,17,25 280:3,10,25 282:2,4,8,21 283:4,21 284:10 285:4,5

**object** 24:25 61:5,6 62:5,16 100:15 117:1 122:1 139:2 171:3 174:8 184:15 190:23 214:25 226:24 227:2,4 228:2

229:23 243:7 247:22 249:5,6, 23 250:11 254:15 256:12 268:19

**objected**
139:7,8 210:3

**objection** 15:7 19:25 20:3,25 21:24 22:10,20 24:19 25:6,15, 24 26:17 30:17, 25 31:10,11,19 37:1,10 40:23 42:9,22,25 43:7,15,16,23, 24 44:7,19,25 45:5,18,24 46:8,22 47:3,9, 16,23 48:3,14 49:2,8,13,20 50:2,7 51:4,17 52:5 53:10 54:14 56:2,15 57:2,12,13,19 58:6,12,20 59:21,24 60:8, 20 61:16 62:22 63:16 64:7,16 65:2 67:11 69:5,10,11,17, 22,23 70:13,14, 21 71:16,18 72:4,5,9,20,22 73:4,10,18 74:2,22 75:21 76:7,15,21 77:3,11,17,25 78:10 79:6,24 80:2,15,22 81:3,11,20 82:2,9,16,24 83:5,15,21 84:4,13,23 85:10,12,20 86:4,10,15,20 87:24 88:7,22 90:7,13 91:1, 13,24 92:25 93:1,8,25 94:9, 10,11,20 96:1, 2,3,9 97:11,18 98:3,10,17 99:1 100:14,24 101:5,13,20

102:7 104:8,15, 22 105:4,13,17 107:1 108:9,22 109:3,9,17,23 112:1,16 113:1 115:10,19 116:9 117:15, 24 118:8 119:16 120:12 122:11,19 123:4,14 124:23,24 125:5 126:20 127:12 128:2,4, 9,22 129:13 130:4,11,19 131:3,10,18 132:3,11,19 133:6,16,17,25 134:5,11,19 135:2,8,14,19, 25 136:5,10,15, 21 137:5,10,17, 24 138:6,16,24 139:11,20 140:1 142:2,10 143:4,12 144:25 145:8, 19,20 146:1,2, 16,20 147:2,12 148:9 149:9,19, 22 150:8,17,18, 21 151:8,20,25 152:5,14,22 153:5,13,20 154:4,15,22 156:9,18 157:5, 6,12 159:12,22 160:20 161:1,4, 21 162:2,14 163:4,12,13,22, 23 164:5,10,11 165:8 167:6,17 168:1,8,23 169:7 170:21 171:2,13,15 173:1,11,22,23 174:7,16,21 175:5,6,13,21 176:14 177:4, 10,18,24 178:7 179:9 180:3,12, 19 181:3,11,18 182:8 184:14, 25 185:20 186:1,8 187:3

188:18 189:1,7, 20 190:5,17 191:20 192:1,9, 15 193:4,10,18 194:5,12 195:1, 6,15,24 196:7, 13,20 197:1,10, 12,17 198:1,2, 14,21 200:4,16, 21 201:10,17, 25 203:2,7,22 204:8,14 205:5, 10,11,17,18 206:7,13,14,21 207:3,12 208:6, 11 210:4 212:15,22 213:9,17 215:11 216:23 217:4,9 219:7 221:9 222:11, 19,24 223:8,16, 21,22 229:10 234:25 235:8 243:22 248:11 250:16 252:22 254:20 255:9 261:8,13,21 262:7,17 263:16 265:12, 16 266:2,19 267:5,11,15,19 270:21 271:11 272:14,19 273:4,18 274:11 275:1,7, 13,18 276:6,13, 21 277:1,9,20 278:4,14,21 279:3,8,15,25 280:3,10,25 281:13 282:20 283:3,20 284:6

**objections**
51:20,23 78:25 80:7,9,10 150:20 171:18 209:2,4,5,23 210:12,19 248:18

**observed**
88:14 100:3,5, 13,20

**observing**

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of WILLIAM MARLEY, taken on January 22, 2024

89:12

**occasion** 33:25 247:18 249:1

**occasions** 11:25

**occurred** 30:23 31:7 34:5 56:19,25 58:19 63:14 64:6 71:5,22 98:2 101:3 111:22 150:23 170:17 218:15 235:20 260:3

**October** 103:14 104:14 106:22,24 108:5 112:3,5, 15,21 113:10, 11 115:17 120:1,2 198:12

**off-hand** 190:24

**Offender's** 143:14

**offhand** 11:22 109:19

**office** 18:9,11, 15,21,25 19:4 24:24 25:5 26:15,22,25 27:7 28:11 29:6,19 30:11, 14 31:15 44:5 47:19 48:22,25 49:6 51:15 57:10 71:4,8,24 72:2 78:8 83:14 85:6 100:4 103:15 128:8, 18,21 130:10, 17 132:18 141:19 142:8 145:15 185:15 201:22 202:4 207:21 224:3, 10 232:7 239:1, 21 242:20,25 243:5,20 247:10 276:11

**officer** 19:9 30:15 70:19 72:25 97:22 99:6 100:10 101:9 102:5 113:23 203:11, 20 204:6 236:16 237:4 247:3 251:13 283:8

**officers** 26:13 52:21 57:9 59:19 60:2,6,18 61:15 62:3 63:11 72:18

**one-page** 87:3

**ongoing** 252:20 265:14

**Oops** 284:16

**open** 50:22 166:3

**open-ended** 226:12

**operating** 235:4

**opportunity** 36:25 106:20 151:9

**opposed** 221:15

**order** 126:7 134:10,18 151:23 152:3, 12 153:10,12, 18 154:2,13,21 155:7,23 156:8 179:25 180:9 226:13 227:6, 13 238:16 285:5

**ordering** 155:20 284:21, 24 285:2,10

**orders** 285:6

**orient** 214:13, 23

**oriented** 176:4

**original** 282:12,13

**Originally** 16:13 54:24

**outlined** 57:20

**outlining** 58:18

**overbroad** 19:25 20:3 119:16 129:13 229:11

**overtime** 17:5 128:15,17,20 129:11

**overview** 58:21

**overwhelmed** 262:4,9

—————

**P**

—————

**p.m** 103:25

**p.m.** 90:3 103:14 130:7,9, 18 191:4,25 252:1 285:14

**panic** 196:2

**panicking** 196:6

**paper** 38:23 236:15

**paragraph** 99:24,25 100:19 103:22 111:21 146:9 167:21 170:15, 23 192:21 193:21 251:21

**pardon** 42:14 101:25 121:25 127:4 160:21

**parents** 89:18

**park** 56:20 57:21 58:19 64:21 68:10 173:19,20 174:4,5,14

179:17,19 192:23,24 193:3,12,15,23 194:4 195:22, 23 264:3

**part** 10:21 73:12,16 106:4 169:13 172:21 197:6 210:19 221:7 263:13 265:1,10 266:23 267:2

**Partially** 197:13

**parties** 9:4 10:9 227:8

**partner** 22:15, 17 23:4,9,14 25:3,7 44:4 55:22 73:22 88:21 102:5 121:24 122:6 131:15 132:16 133:4 136:25 144:24 168:6 248:15 250:3

**partnered** 23:22,25 25:23 51:3

**partners** 22:19,25 23:3, 9,16,17,20 24:22

**partnership** 23:6

**parts** 206:25

**party** 230:3

**PASCIOPINTO** 211:18

**pass** 237:16

**passage** 262:14

**passing** 70:5

**past** 129:8

**Pat** 257:7

**patience** 166:5 258:16

**Patrick** 270:5, 9,17,18 271:17, 21 272:5,7,12, 18

**Patrick's** 270:12

**patrolman** 16:13,18

**pause** 88:17

**pay** 141:17

**pendency** 144:23

**pending** 13:23 86:9,12 145:25 252:21

**people** 35:9,16 36:2 57:10 135:12 147:4 155:22,25 156:12,20 162:22 165:20 190:8 191:8 214:15 236:25 246:19 257:14

**percent** 236:4

**perform** 266:22

**performed** 266:21

**period** 106:22, 24 112:6,24 113:8,15,20,25 115:15 118:6, 16,23 119:10, 14 120:1,6 166:17,22 241:3,4

**periods** 23:25

**perjury** 135:24 206:12

**permission** 89:25 93:4

**person** 53:20 83:19 141:14 143:2 162:6 197:24 198:10 209:3 234:11 237:11 247:19

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

253:13 265:5 271:8,10 274:19 277:8,18 278:1 281:22 282:16

**personal** 65:3 66:6 110:2 148:23 161:3 221:20 275:15

**personnel** 69:16 70:9 243:5,21

**perspective** 264:16

**phone** 89:22 104:2,6 252:2

**photograph** 83:19,23 188:13 278:13

**photographs** 35:1,7,9,12,14,15,17

**photos** 27:13

**phrase** 240:24 241:3

**phrased** 13:9

**physically** 46:5 132:8 133:2,4

**picked** 173:19 174:5 192:23 193:15 195:12,13,22 197:7

**picks** 218:8

**pickup** 193:3

**picture** 200:7 273:11 277:10

**pictures** 274:1

**place** 56:14 57:23 89:11 100:16 120:10 178:22 183:24 185:18 207:10 209:17 258:22 282:17

**Plaintiff's** 236:22

**plaintiffs** 9:7,9 10:13

**plan** 174:4 193:14 195:11,13,21 196:6 197:6,7,25 198:11

**plans** 196:2

**play** 96:10

**playing** 165:20 246:6

**point** 48:8 52:13 97:13 151:10 171:19 172:24 208:2 228:12 243:1 282:23

**pointing** 227:17

**points** 38:14

**police** 15:17 16:4,5,8,11,18 17:2,7 18:7 19:7,9 21:12 26:13 30:15 35:3 36:12 37:15 51:14 52:21 53:6 57:9 59:19 60:2,3,6,18 61:15 62:3 63:11 68:18 70:19 72:3,18,25 97:22 142:1 203:10,20 204:6 207:15,18 241:9 242:13,14 243:11 263:25 279:14 280:13,23 281:11 283:13,25

**policeman** 24:6

**Polish** 135:18

**Popes** 36:6,9,14,16 174:13 179:14,17,19

**portion** 125:12 171:7

**position** 226:10

**positions** 16:12,17

**possibly** 29:10 50:4 53:25 86:12

**post-high-school** 15:21,24

**posted** 167:1

**potential** 71:13

**pounds** 268:10

**powers** 53:7

**practice** 103:18 160:8

**precise** 34:3 217:13

**preferable** 129:21

**preferred** 129:19

**preparation** 32:12,25 34:13 35:10 36:24 37:23 39:3 67:21 188:14 214:5 216:21 267:3

**prepare** 31:23 32:2 171:22

**prepared** 37:5,9 178:15 255:4

**preparing** 27:14

**presence** 93:13,14 133:3,5,12,21 134:8,16,24 135:5,11,17,22 136:3,24 208:4 217:15 218:16,19 222:14

**present** 32:17 34:4,8 62:4 63:12 71:21 90:11 91:17

121:24 122:7,16,18,25 136:8 154:20 155:6,19,22 156:1,2,7,12,16,21 169:25 170:15 171:16 173:10 178:23 179:14 180:2,8,10 182:6 183:5 184:13 189:5,16 200:13,19 201:8,14 219:23 236:17 237:7,9,11 248:15

**presented** 136:14,20 269:16

**Presumes** 86:4

**pretrial** 214:16 215:1

**prevent** 132:7 163:25 227:14

**preventing** 163:8,17 196:10

**previous** 43:10 44:15 45:6 77:7,21 78:6 81:16 83:12 116:1 181:1

**previously** 68:16 114:9 158:9 168:13 173:8 187:23 197:21 198:8 199:2 234:10 246:22 250:22

**prior** 11:20 33:25 43:22 70:2 94:15 119:17 264:18

**prison** 135:12

**privilege** 61:17,21 62:6,17,23 63:1

**problem** 92:20 191:24 221:24 274:13 277:2

**problems** 199:3 210:7

**procedural** 227:15

**procedure** 235:5

**proceed** 53:3 230:25

**proceeded** 241:8

**PROCEEDINGS** 9:1

**process** 41:2,5 45:21

**proffer** 199:22 200:2,13

**promise** 133:12,21

**promoted** 16:13,22

**pronounce** 39:16

**proofread** 253:9

**proper** 209:1 227:15

**prosecuting** 265:10 266:17 283:18

**prosecution** 19:12,19 144:23 145:5 234:3,17,21,24 235:16 236:9 237:3 252:20 257:14 263:9,13 265:14 267:3

**prosecutions** 28:7

**prosecutor** 30:22 31:6

**prosecutors**



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

259:7,11,16,19

**protective**
227:13

**provide** 21:13
142:1 143:17

**provided** 21:9,
14,17,20 22:4,5
142:18 168:13
173:8 187:2
200:14 256:4
267:8

**providing**
21:22 184:19
226:24 263:9
267:1

**Ptak** 70:18
168:14,21
169:5 170:17
177:23 178:6
239:15,19
240:1 241:25
242:2

**Ptak's** 169:16

**pull** 39:5
157:17 187:15
238:12 250:20,
25

**punitive**
224:24 225:14,
18 226:15,25
229:19,24

**purpose** 20:18
97:11

**purposes**
225:14

**put** 46:2 55:9
96:17 105:23
114:6 124:13
141:7 165:15
166:6 169:16
185:24 222:7
245:7 250:24
251:6 256:17
273:7 274:14

**putting** 162:8
264:16

---

**Q**

**quarters**
178:23 253:22
254:1

**question**
12:14,18,19,24
13:2,3,5,8,9,22
15:8 17:8 20:6
22:1 26:19
30:19 31:15
38:13 41:21
43:5,18 51:8,24
61:6,21,22,25
62:2,6,9,12
63:1,6 65:22
75:22,24 78:17
81:5 92:2 95:17
96:15,25 97:7,
10 113:3
114:14 117:4,
10 119:1,2,7
124:16 125:14,
21,23,24,25
134:13 139:3,8
147:5,6,7,13,
19,22 148:12,
13,23,25
150:25 151:2
155:13,14,18
156:14,24
158:24 162:22
164:21 165:22
167:8 171:8
172:3 177:5
180:5 190:4
191:17 198:5
201:8 209:2,17
210:5,9 211:16
212:12,17,25
216:11,14
217:24 220:1,2
221:21 223:7
225:20 230:13
237:1,23 243:8,
9,17 247:3,5,
11,15,20 248:5,
7,14,21,22,25
249:15,20
252:25 253:19
254:16 256:13
265:18 276:16
279:19 283:24

---

**questioned**
30:13

**questioning**
229:24 279:21
281:9 283:10

**questions**
11:3 37:6,9
79:3,15 119:6
151:16 181:22
189:21 209:11,
19,25 224:12,
16,24 225:16
226:1,2,6,9,15
227:11,14,18,
21 229:15,18
230:9,16
231:12 236:23
237:22 238:1,
12 244:1,8,14
247:2 248:4,13
249:4,14,22
253:15,18
258:11 265:7
267:22 282:1
283:21 284:8

**quick** 211:15
258:10 283:24

**quiet** 17:9

**quit** 221:17
222:2,15

**quoting** 209:24

---

**R**

**R/i** 241:18

**race** 220:16

**radio** 53:25

**raise** 10:15
176:19

**raised** 225:12,
13,22

**ran** 73:2 94:7
129:2 193:23
194:4,25 195:4,
11,12,23 196:5,
11 197:9 264:5

**re-ask** 13:3

**re-depose**

---

226:16

**RE-
EXAMINATIO
N** 282:7

**re-interview**
145:16

**re-present**
226:5

**reach** 257:21

**reached** 230:5

**read** 66:23
88:18 106:21
107:18,21,24
147:13 148:13,
24 150:18
151:9 158:23,
25 164:16
170:10 171:11
172:7 179:4
183:11 217:17,
22,23 218:24
233:9 241:9
242:6 251:21
269:23

**reading** 66:5
147:15 148:14
172:22 183:10
218:1,22,25
220:10 221:18
222:3,4

**reads** 71:1
88:11 192:21

**ready** 165:22,
24 199:8
252:13

**real** 151:15
283:24

**realized**
141:17

**reason** 13:18
22:3 94:17
95:7,14,17
96:18 97:15
104:5 118:4
126:24 127:2,6
137:21 145:23
153:25 165:14
173:14 177:21
178:3 185:24

---

186:4,24
195:10 196:5
276:3,4,18
278:11

**reasons** 98:22
105:9

**reassigned**
50:24

**rebuttal** 246:19

**recall** 24:20
25:12 26:11
30:7 31:21
38:6,16 47:11
48:20 49:22
57:11 66:23
67:19 68:7
91:22 92:4,23
93:7,10 104:11
108:1,16,20
122:22 123:6,
16 125:1 159:4,
7 164:6,13
168:9 179:1
181:1 183:13
188:20 214:4
218:22,24
219:11 220:9,
21 234:5
235:24 236:17
242:12 246:18
248:23 253:15
257:18 259:21
260:9 265:6
275:9 282:14
283:2,10

**recalled**
150:13

**recalling**
180:25 260:3

**receive** 28:8
133:22 263:6
266:9,12

**received**
185:19,25
252:2 263:12
264:18 265:24
266:4

**recently**
106:18

**receptionist**

---

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

270:16

**recitation**
162:10

**recognize**
35:12,14,16,19
76:5 273:12
277:18 278:2

**recognized**
100:4,12 141:7
273:7 274:10,
14 282:16

**recollect** 110:2

**recollection**
65:3 66:6 68:3
126:10 161:4
189:15 212:6
217:19 221:20
275:16

**record** 9:3
10:7,9 11:11
53:1,2 56:6
61:10 99:8,15
110:16 115:7
116:4 121:7,10,
11 182:16,17
209:24 215:22
230:23,24
231:23 236:12
238:7,8,16,23,
24 245:18
256:3 269:22
285:13

**recorded** 11:1
40:21 90:1
102:5 124:22
162:1 193:2

**redaction**
179:16

**REDIRECT**
267:23 283:22

**refer** 44:23
54:10 106:25

**reference**
82:13 166:18
216:16

**referenced**
118:15

**referencing**
116:1

**referring**
52:17,18 56:23
64:5 73:17 91:9
117:2 161:2
228:15 245:16,
24 281:4

**refers** 76:13,19
81:17 216:1

**reflects** 165:4

**reflexes** 262:2

**refresh** 38:17
125:3 159:6
164:8,23 212:6

**refreshed**
67:23 68:2,8

**refreshes**
126:10 189:15
217:18

**refused** 272:23
274:9 277:17
278:1

**regard** 170:13

**regular** 129:9

**rehearse**
137:1

**relate** 168:12

**related** 51:16
173:7 178:24
179:2 229:6
242:2 251:25

**relating** 179:17

**relative** 234:3

**relevance**
31:20 203:23
205:18

**reliability**
21:17

**reliable** 21:23
279:23 280:14

**relieve** 234:21

**relocated**
133:13

**remained**
28:16

**remember**
11:22 29:11
30:21 31:5
36:11 37:14
58:7,9 66:1
68:1,20 72:10
73:6,12 75:4
92:19,20 94:2,
23 95:5,10
108:25 109:14,
21 136:16,17,
22 141:6
150:11,14
151:19 152:16,
19 158:21
165:5 168:17
180:10 183:18
184:6,21,22
185:22 186:13
188:4,6 189:10
195:8 196:21
210:8 211:7,8
213:11 217:5,7,
14 218:10
219:3 220:5
221:1,18 222:1,
4 223:5,24
236:6 245:4
260:24 261:5
271:12 275:21
277:23 278:9

**remembered**
179:18

**remembers**
181:8

**remotely** 9:8,
19,24 10:1

**repeat** 15:23
17:1 20:5 35:11
37:7 40:3 67:4
75:23 78:3 95:3
96:23 98:19
105:6 116:21
119:7 122:2
134:13 147:7
149:2 152:7
159:1 163:14
180:5 198:4
210:9 212:17
234:18 243:12,
14 278:23

**repeatedly**
79:12 80:1,5

**repeating** 22:7
51:22

**rephrase** 13:3
243:12

**report** 20:17
35:6 38:23
42:11 45:17,22
46:3,6,7,12,21
47:1,7,14
48:13,25 49:18
54:23,25 55:1,
3,13 56:1,6
63:25 64:2
65:4,5,7,9,12,
18 66:23 67:2,
20,24 68:9,18,
23,25 69:7
70:23 71:1
76:6,24 78:7,12
80:25 83:8
84:19,20 87:2,
6,11 88:11,20
89:9,15 91:19
92:9 99:10,13,
16,22 102:6,19,
22 103:1,5,8,
10,13 104:21,
25 106:17
107:22 108:15,
25 109:5,12,16,
22,25 110:2,10,
11,14 111:13,
14,23 117:2,5,
14 118:20
120:17,21
121:1 125:11,
15 126:7,10,13
127:9 144:1,4,7
147:13,16
148:17,20,21,
24 150:7,15,19
151:6 154:19
155:4,5 156:7,
15 157:1 158:9
159:17,21
160:1,5 161:2,
3,7,8 164:17,19
165:4 168:11,
20 169:6,12,24
171:5,10,12,16,
17,23 172:1,5
173:17 174:3
178:14 182:24
183:10,11
184:1 186:17

187:10,24
188:1 189:10,
13,22,25 192:4,
8,14 197:16
201:3,5 203:11
211:14,20
212:5 213:2,5
232:8 237:12
239:2,14,18
240:11,17,18
243:3,18 250:3,
6,13,19,20
251:14,20,22
253:19 255:19,
21 256:2,4,9,24
257:1,2,3,4,8
258:24 259:3
262:19 263:1
265:6 268:1
270:11 272:20,
23 273:10
275:4,16,19,25
277:11 278:13
282:10

**reported** 179:2
203:1,6

**reporter** 9:3
10:5,9,14,20
12:25 40:3,6,8
53:2 61:2 95:1
96:11 115:22,
25 116:5
121:11 182:17
230:24 237:23
238:8 284:11,
15,17,20,23
285:1,4,8,12

**reporting** 71:1,
6 88:12,15
89:3,17,19,21,
23 251:23

**reports** 21:21
31:25 34:13
37:15,17,18,23
38:2,6,8,12,24
39:2 40:16,19
41:3,6,7 43:22
45:13 48:21
49:7 51:16 52:2
55:9 66:5 68:20
105:2,10,15
112:10 118:5,
15 119:14,20
160:17 165:4,



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

25 237:7 253:4, 5,10 255:4 263:25

**represent** 201:3 231:10 258:16

**representation** 230:11

**representatives** 26:14 51:15

**request** 43:2 84:22 120:16 150:19 242:23 283:18

**reread** 67:2

**reserve** 284:10,11

**residence** 56:8 91:4 100:6,13 233:12 263:3

**resolution** 230:6

**respect** 226:22

**respected** 242:24

**response** 81:25 148:3

**responsible** 152:20 153:3

**rest** 29:10 52:22 241:12

**restaurant** 144:20 257:25 258:5

**restrain** 132:8 133:2,4

**resulted** 71:12

**retired** 28:22

**return** 133:13, 23 142:9

**review** 34:12, 15,17,21,23 35:1,3 36:23 37:13,14,17 38:2 40:16,19,

20 47:18 48:12 49:15 51:16 52:2 67:24 68:1 108:24 109:4, 12 124:8 125:11,24 126:7 148:17 155:6,13 169:5 171:7,10 217:17 221:20, 23

**reviewed** 35:15 37:23 39:2 48:6 49:19 67:20 168:20 169:13 214:4 216:20 246:23

**reviewing** 38:7 68:8 150:15 155:5 285:7

**reward** 141:25

**Rewards** 141:17

**Rick** 242:3

**Rickert** 9:9

**rid** 234:1

**ride** 146:10,11 196:19,25

**Ridgeway** 36:20

**ridiculous** 171:19

**right-** 107:12

**right-hand** 107:9

**rights** 242:2,24

**role** 15:19 74:1

**room** 57:24 219:23 221:11 222:5 242:18

**row** 232:11,12, 22 239:10,13 240:6,8,16 241:17

**rules** 12:10 121:17

**ruling** 226:3,14

**run** 74:21 86:2 129:8 173:18 174:4 192:22 195:12 214:8

**running** 64:21, 25 66:14,20 67:7,9,10,15,16 68:12 193:24, 25 194:20 264:3

**Russell** 9:6 10:23 11:7 17:10 51:6,19 52:13 65:17,22 87:5 99:17 107:22 114:10 115:1 149:3 150:19 156:3 165:18 170:2 181:23 185:3 187:11,14,18 199:20 211:15 216:4 218:2 221:19 231:1 245:19 253:1

---

**S**

**SAI** 268:6

**scenes** 27:13

**schedule** 190:16

**school** 14:4,6, 7 75:18 84:12 193:25

**schools** 16:1

**scope** 22:20 128:10,22 226:18 278:21 279:3,8

**score** 106:12

**Scott** 9:19 52:19 58:18 59:2,5 70:11 135:5,17 136:24 170:16 178:24 235:25 258:17

**screen** 54:7 65:4,20 87:11 92:7 105:24 107:11 111:1,6, 7,17 112:20 124:9,15 125:15 126:6 158:15 167:2 170:9 214:13 231:18 248:2

**screen's** 107:12

**screens** 65:13 107:14 246:1

**screwed** 95:17

**scroll** 107:17 172:9 248:24 273:10

**scrolling** 144:17

**Sean** 9:13 237:25 284:19

**search** 81:25 85:18

**sec** 187:14 251:1

**seconds** 237:15

**section** 50:23 59:7 140:13 141:20,21,22

**Security** 87:17

**seek** 227:13

**seeking** 142:8

**send** 114:7 285:5

**Senior** 75:17 84:12

**sentence** 192:21 233:7 241:22 263:2 269:22

**separate** 138:22

**September** 54:9 55:12 56:8

57:1 59:20 63:15 64:3,6,20 69:1 70:3 71:9, 22 73:3,9 76:14,19 77:15, 24 78:8 82:8,11 83:14 88:11 89:2 95:25 101:4 112:6 113:15,16,20, 24 115:9,15,17 116:8 118:17, 18,24,25 119:11,12 120:7,11 128:12 130:7 131:15 132:1, 10,24 133:5 137:15,23 160:3 166:22 167:5 169:12 173:6 175:19, 20 176:10,13, 25 177:1,8,9,16 178:21 179:7 191:18 198:12 199:25 200:20 201:4,6,9 202:9,16,20 232:18 233:12, 13,20 234:4 235:20 241:5,7 247:18 251:16, 24 253:14,20 258:22 259:4 263:3,19 264:9, 17,18

**sergeant** 16:23 71:2,7

**sergeant's** 16:20

**serve** 14:16 15:17

**served** 183:19, 23

**settled** 205:3

**Shae** 9:15

**shape** 276:10

**share** 236:19

**sharing** 57:6 84:18 92:7



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

199:2

**she'd** 98:1

**sheet** 187:17

**shoot** 153:10, 19 180:9 182:21 192:22

**shooting** 56:19 68:11 71:4 173:18 194:25 195:5 198:10 264:2

**shootings** 36:17 242:4

**short** 188:9 237:17 252:14

**shot** 197:24

**shots** 66:11

**show** 54:1 68:15 75:8,15 84:19 99:15 110:5 117:2 158:8 161:19, 24 162:11,18 163:1 176:2 182:20 187:8, 23 199:1,2 200:25 238:22 267:25 275:11

**showed** 162:24

**showing** 115:6 124:20 129:23 159:16 161:8 163:9,18 166:8 170:9 211:23 238:13

**shown** 162:5

**sic** 74:17 85:17

**sick** 89:21 92:19

**side** 13:7 53:24 107:9,12 162:8

**sign** 47:18,21 48:2,6 49:15 129:6 192:4,14 239:17

**signature** 54:20 55:17,19, 23 56:1 99:21 106:15 116:17, 23 117:13 159:18 166:10 178:16 241:21 257:4,6 284:9, 11 285:7

**signatures** 200:7

**signed** 48:13 49:19 55:12,13 88:24 103:8 110:10 116:19, 23 117:13 159:20 232:25 233:3 241:13

**signing** 240:4

**simple** 181:22

**sir** 10:22 11:10, 19 14:4 17:15 20:8 22:23 27:4 53:5 54:13 60:7,17 61:13 62:2,9,12,21 63:7,10 70:23 71:15 75:20 76:1 95:13,22 96:6 97:14 121:14 130:2, 24 139:19 148:4 151:5 153:25 156:4, 24 164:15 170:10 172:7, 13 176:21 180:2,11 181:24 182:5, 19 199:10 204:2 209:9 210:21 211:17 214:24 215:9, 23 216:16 224:12,17 229:14,22 230:12 231:9, 18 232:5 233:18 236:22 237:18 238:11, 13,22 239:9 243:25 244:5,8, 11,18 245:4

246:18 247:10 248:2,8,9 249:11 250:2 252:18,21 254:23 255:8, 17 256:8,24 257:1 267:25 268:25 269:18 271:21 272:22 274:23 278:18 283:24

**sit** 16:20 122:9 199:8 236:13

**sitting** 100:4

**situation** 93:3

**slender** 269:12

**slip** 266:12

**slouched** 218:21

**slouching** 219:13,14

**slow** 119:5

**small** 194:9,16, 19

**Social** 87:17

**socially** 70:4

**solely** 226:5

**solemnly** 10:15

**solve** 283:14

**son** 93:4 222:14,22 223:4,20

**son's** 220:24 221:3,15

**Sopron** 35:21 36:3 56:7 69:8 87:4 99:9 102:13 106:14 110:9 111:2,11 124:2 133:14 134:10,18 144:23 145:6, 25 151:23 152:4,12 154:2, 13,20 155:7,23 156:8,17 157:2,

10 158:10 169:18,23 175:1 178:14 179:16,20,25 180:8 181:10 182:25 185:6 207:2,5,7 208:3 211:19,25 212:2 214:15 218:5,8 238:24 240:9,11 242:2, 9,23 243:3,4,19 245:3 246:19 252:2 257:15

**Sopron's** 103:24 104:1,7 240:14

**sore** 206:24

**sort** 23:4 66:12 221:11 222:5 226:14 240:14

**SOS** 76:11

**sound** 29:1

**sounds** 48:16 182:3

**south** 27:2 71:6 103:15 248:7

**space** 103:6

**speak** 17:18 97:16 131:1 140:18 141:3, 13 190:14 211:5

**speaking** 78:25 79:5 80:6,9 129:15 150:20

**special** 30:22 31:5

**specific** 94:14 98:5 143:6,10 169:1 231:13 266:8

**specifically** 36:11 49:23 63:13 72:11 167:14 195:17 196:1

**specifics** 108:25 143:11

**speculate** 208:17,18

**speculated** 52:6

**speculation** 47:17 49:2 50:7 53:10 56:3 72:21 73:5,10 76:16,22 78:1, 11 80:16,23 81:4,12,21 82:3,10,17,25 83:6,16,22 84:4,14,24 86:10,15 87:24 88:8,22 91:1,25 93:25 94:12,20 104:8,15 105:4 107:1 108:10 109:10,18,24 112:2,17 113:1 115:11,19 116:9 117:15, 24 118:8 119:17 120:12 122:19 123:5 124:25 125:5 126:20 127:3, 12 128:2 129:14 130:11 131:11 132:4, 12 137:6,18,24 138:25 142:2, 10 143:4 145:1, 8 152:6,15 153:22 154:4, 15,22 156:10, 19 157:13 159:12,22 163:5 164:10 167:7,18 168:2, 24 169:7 171:14 173:2, 11,24 174:9,17, 22 175:7,14 176:16 177:11, 25 178:8 180:4, 13,20 181:4,11, 18 182:9 184:25 185:21 186:2,9 187:3 188:18 189:1,8,

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

21 190:5,17,23 191:5,13,20 192:1,5,9 193:4,10,19 194:5,12 195:15 196:13 197:1,10,17 198:3,17,21 200:5,22 201:11,17 203:3,7,22 205:5,11 208:12,13,24 209:18 212:16, 23 213:10 216:24 219:7 222:24 223:8, 23 275:7

**speed** 259:11, 16

**spell** 11:10 247:4

**spent** 29:6,9

**spoke** 62:10 87:22 159:8 168:20 188:25 189:6,19 242:17 255:15 259:19 275:12 282:24

**spot** 193:3 194:3 195:5,14 196:12

**squadron** 242:14

**Sr.'s** 114:13

**St** 75:17 84:12

**staff** 47:19 48:22,25 49:6

**stamp** 157:22 158:1 185:4 257:2

**stamped** 110:24 238:24 256:4

**stamps** 111:12

**stand** 206:23

**standard**

235:4

**start** 16:5 18:10 123:12 227:11 234:2 245:24 246:14

**started** 28:25 29:3,5 52:3 66:14,15 128:1 264:7

**starts** 214:17

**state** 9:4 10:6 11:10 14:18 57:10 65:22 70:9 79:11 118:20 167:21 185:13 207:16 245:15 247:3

**state's** 10:4 18:8,11,15,21, 24 19:3,6,15, 17,23 20:9 22:14 23:1,21 24:3,23 25:4 26:14,22,25 27:7,12,13 29:5,25 30:11, 14,16 31:14,17 41:3 43:2 51:15 53:6,15 58:24 59:6,16,17 60:3 70:10 71:3,8, 14,23 72:2,18, 24 77:14 78:7 83:13 85:5 103:14 121:23 122:5 128:8,18, 21 130:9,17,25 132:17 136:25 141:19 142:8 145:14 167:9 170:15 178:23 185:15 188:23, 24 201:21 202:3,25 205:21 206:1 207:21 221:16 224:2,10 232:7 235:5 239:1,20 242:20,24 243:4,20 247:9 253:9,21 254:12 258:17 266:1,5,7,8,24

267:1,7,9 283:16

**stated** 51:20 57:17 78:11 79:12,21 89:18 96:3,4,10 104:1 146:9 179:12, 18 249:16,19 252:8,15 263:8 269:22

**statement** 79:12 90:1,21, 22 114:8 115:8 127:25 129:24 130:8,17 145:17 156:12, 16,22 157:2 177:1

**statements** 207:25 242:4

**states** 65:7 80:3 99:23 103:22 161:3 168:11 179:12 180:8 193:22 263:2,18

**stating** 80:1,5 209:23 222:13

**status** 127:9

**stayed** 28:22 146:22 149:15, 21 150:2,4,7,12 151:6

**step** 158:18

**sticking** 80:12

**stipulate** 10:10

**stood** 252:11

**stop** 57:6 79:7 84:18 92:6 131:8 199:1 227:13 236:19

**stopped** 66:16 264:6

**story** 135:23 136:4 137:1 206:11,12

**straight** 193:24

**strange** 241:3

**street** 36:6,10 141:21 173:20 192:23 193:8 207:16 271:15

**stress** 14:2

**stressed** 121:18

**stretched** 60:25

**strike** 19:16 28:4 67:18 72:16 85:25 93:16 95:18 108:6 122:25 132:7,15 133:3 219:14 232:24 241:13 263:6,7, 23 264:10 276:4 278:18 282:23

**stuff** 225:15,19 227:2,25

**subject** 39:6 87:15 88:14 110:19,20 126:17 179:21 232:20 240:7 270:6 272:23 274:9

**subjects** 37:22 38:10 71:11,13

**subpoena** 183:20,21,23

**subsequently** 71:11

**substance** 21:8 213:6 251:25

**substantially** 168:12 173:7

**successful** 141:18

**suddenly** 180:25

**sued** 204:24 205:1

**suffer** 260:6

**suffers** 210:16

**sufficient** 262:2

**Suffield** 9:14

**suggest** 227:11 241:22

**suggests** 110:13

**Sullivan** 52:20 57:9 59:12 70:11 90:1,2, 23,25 236:3

**summaries** 255:5

**summarized** 163:11,19

**summary** 82:21 178:25 226:3

**sun** 199:4

**supervision** 30:24 31:16

**supervisor** 47:5,15,22 48:11,12,18,22 49:24 50:21,25 51:5 59:6 85:5, 7,9 101:17,23, 24 102:1 203:8 234:14,19 241:8 253:6 257:7 265:23, 24 266:4,16 270:5,15 271:2 284:1,2,3

**supervisor's** 55:16,25

**supp** 37:17 68:20

**supplemental** 68:23

**supplied** 264:1 276:22

**supply** 191:1,4

**support** 19:5

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:22-cv-00320 Document #: 235-24 Filed: 07/17/26 Page 101 of 103 PageID #:4784
The Deposition of WILLIAM MARLEY, taken on January 12, 2024

313

27:11 28:7 29:25 38:1 43:3 101:25 141:22 234:2,23 263:9, 13 265:1,11 267:8 271:15

**supportive** 234:23

**suppose** 203:24 209:4

**supposed** 19:2 102:23 182:6 196:18, 24 201:7

**suspect** 204:7, 22

**suspicious** 100:21 101:10

**swear** 10:15

**synopsis** 240:11,12

**system** 75:5 112:21 116:16 118:2 141:23

---

**T**

---

**takes** 148:19

**taking** 13:23 27:12 87:14 111:20 126:5 212:5 230:12

**talk** 61:13 62:2 85:16,17 92:17, 22 93:4 94:18 95:16,24 104:2 121:8 134:3 137:4 138:14 139:23 140:14 153:16 169:5 197:25 198:8, 11 204:1 207:22,23 219:24 227:1 228:7 242:16, 21 271:10 272:4,11 277:3

**talked** 32:7 64:19 91:3

93:24 97:25 111:12 138:21 157:8 175:10, 18,19 176:2 181:2,16 184:2 209:2,15 217:2 228:13,17,25 255:13 262:19 264:25 271:8,9 272:1 274:24 276:5 277:4,8 282:10

**talking** 26:9 44:24 54:15 98:7 99:25 118:21 148:6 154:12 210:17 214:5,6 220:24 223:13 283:7

**talks** 81:16 241:13

**tall** 202:7 268:10,14,22, 24,25 269:3,9, 11,13 273:14, 16

**taller** 269:8,10, 14 273:16

**task** 85:23 86:1 259:17

**tasked** 234:8

**tasks** 19:6 234:7,16,23 235:6 258:19

**tattoos** 188:10

**telegraph** 227:10

**telephone** 87:17 88:4 103:23

**telling** 44:4 62:11 97:8 169:4 222:13, 14 280:2

**tells** 153:9 162:10 284:19

**ten** 18:3 60:25 77:7,22 78:6 81:17 83:12

182:13 230:20 252:9

**ten-minute** 120:24

**tend** 196:2

**tenure** 203:10

**term** 239:10 241:3

**terminated** 242:5

**terms** 68:7

**test** 21:16

**testified** 137:2 253:5 257:14 261:2 267:8

**testify** 13:13 14:1 210:23 211:1 246:20 254:7 260:8 262:12

**testifying** 133:14 246:18

**testimony** 10:16 26:18 34:15,17,18,19, 21,24 42:23 43:8 59:25 60:9,21 74:3 85:11 94:12 118:9 119:17 121:20 137:25 150:22 152:23 153:6,21 214:4, 11,14,17,24 215:10 245:3 246:23 247:16 270:22 273:5 274:12 275:2 276:14 277:21 278:5,15 280:4 283:10

**TGA** 260:17

**that'd** 222:7

**there'd** 23:6

**thing** 12:12,17 64:14 70:5 79:5 84:19 94:6 112:19 177:23

178:5 210:1

**things** 85:24 191:15 203:24 213:7 260:24 281:17

**Thinking** 60:1

**Thomas** 168:14 170:17

**thought** 199:24 216:22 245:20 270:13

**threaten** 134:25 135:6 206:5,10

**throws** 162:22

**Thursday** 33:2,3,4,5

**time** 11:13,21 13:22 16:11 17:4,5 21:5 22:20,21 23:10, 17,22 24:14 25:10,22 29:11 32:24 33:12,15 40:4 50:25 51:2,5 58:5,15 59:2 61:2 68:11 71:10 95:15 97:16 101:20 103:19 120:10 127:10,21 128:9,22 137:15,22 144:7 155:5 160:6,16 182:12 189:19 190:15 191:7, 12,19 219:4,6 224:4,6 228:10, 11 230:10 231:13 235:5 236:8 237:19 238:2 242:16 243:19 248:23 249:1,16 252:14,18 253:17 254:1,4, 6 257:24 258:4, 9 262:14 263:12 264:2 284:14,22,24 285:3,11

**timeline** 175:17

**times** 11:23,24 12:1 32:13 33:7,17 137:4 181:2 260:6 262:20

**tired** 17:5 128:14 224:7

**title** 18:21

**today** 9:9 13:14 14:2 33:2,4 144:12 228:9,21 244:11 261:3 262:10

**today's** 31:23 32:2

**told** 50:21 51:5, 10 64:20 67:6, 14 79:12 89:17 92:16 100:10, 11 126:6 146:10 149:15 150:5,11,14 151:10,22 160:23 162:1, 12 163:3 168:22 169:4 177:22,23 178:5 193:14 194:3 196:23 207:20,22 213:6,7 221:17 242:19 250:7, 14,17 252:5 260:21 261:17

**Tom** 239:15,19 240:1 241:25

**Tony** 9:22 231:9 239:5

**top** 68:19 82:8 84:21 89:2 100:20 102:21, 25 106:21 111:23 232:11 238:25

**topics** 42:4

**totally** 218:21



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**touched** 45:7, 10

**tracked** 281:18

**trafficking** 270:7

**trained** 19:8,11 21:13

**training** 18:23

**trans** 210:17 260:17 261:4, 10,15

**transactions** 282:14

**transcribe** 162:12

**transcribed** 163:10

**transcript** 60:12,13,15 210:11 215:18, 25 216:20,22 221:21,23 245:8,23 246:23

**transcripts** 34:15,17,20,23

**transfer** 27:22, 23 28:8

**transferred** 29:11,14

**transport** 136:13

**transported** 207:18 243:11

**transports** 27:12

**trespassing** 83:3,4

**trial** 12:3,6 19:5 27:11 28:7 29:25 37:25 43:3 78:21 79:2 95:13 101:25 140:5 141:22 215:4,5 224:17 245:4 258:1,2 263:9,13 265:1,

11 267:3,8 271:14

**trouble** 184:3, 6,9 244:14 260:3

**truck** 242:14

**true** 10:11 15:2, 5,6,12 46:11 79:16 209:20

**truth** 10:17,18 181:17 211:1 222:8,16 280:2, 7,17

**truthfully** 13:13 14:1 210:23 211:1 260:8 261:3 262:13

**Tuesday** 33:5, 6

**turn** 47:4,19 50:23 209:20

**turned** 47:15 48:22 64:24 253:5

**Turner** 69:21 70:2

**turning** 110:10 120:5 130:23

**two-page** 110:8

**type** 46:5,9,11, 14,16 70:5 76:5 79:6 103:3 120:19 244:17 260:7,13 266:9, 13 282:22

**type-written** 240:18

**typed** 45:17 47:2 49:10 241:22

**types** 225:16

**typewriter** 46:16,18

**typewritten** 45:12,22 46:7,

21 47:1 48:25 54:23,25 148:20

**typical** 128:7

**typically** 129:10 191:10

---

**U**

---

**Uh-huh** 32:8 77:10

**ultimately** 234:15,22

**underlines** 111:14

**undersigned** 178:21 241:8 270:4

**understand** 13:2,4 21:25 23:13 30:18 31:3 45:15 51:8,9,23 61:25 62:10 96:19 117:9 121:4 125:14,20,25 139:12,16 155:12,16,18 156:24 164:21 165:21 172:3 174:25 198:5 212:24 217:24 223:6 226:10, 12 234:19 240:24 243:9 252:23 265:17 276:15 279:18

**understanding** 28:3,5 72:14,17 167:15 230:8

**understood** 13:8 105:2,9

**unemployed** 127:10,19

**unfair** 97:3

**uninterested** 218:21

**uninvited** 131:16

**unit** 15:20 24:8, 9 26:22 27:24, 25 28:4,6,9,12 29:1,4 253:6 271:14,15

**units** 26:5

**unknown** 179:17

**unmarried** 228:2

**upper** 55:5 112:10 116:14

---

**V**

---

**vague** 20:1,3, 25 21:24 22:10 30:17 37:1,10 40:24 42:9,22 43:15,23 44:7, 25 45:5,24 46:22 48:15 50:2 51:5 57:2 64:7,16 65:2 76:7 86:5 90:7, 14 91:24 92:25 93:1,8 98:10,17 99:1 101:20 102:7 108:22 122:3,11 123:15 128:22 138:16 143:4, 13 145:20 149:9 150:8 161:1,5 163:23 165:8 181:18 198:14,21 203:23 204:9, 14 207:3,4 270:21,22 275:18 279:17

**vaguely** 273:6

**valuable** 123:2

**van** 151:23 152:12 154:3, 14,21 155:7,23 156:8,17 157:3 180:9 192:22

**varies** 226:18

**vault** 128:25

129:1,4,9 140:11,13,21, 22 270:10 271:24 277:5

**vehicle** 227:15

**verbatim** 178:25 251:25 255:7

**verify** 254:11

**version** 116:20

**viable** 210:19

**video** 11:2

**viewed** 194:20

**Violent** 17:25 18:2 24:10

**visit** 145:23

**Vittum** 174:13 179:17,19

**voices** 163:15

**volume** 17:11

---

**W**

---

**wait** 12:17,23 35:5 48:10 68:4 124:16 148:11 158:13 165:22 215:17 237:16 273:25

**waiting** 252:9

**waived** 62:25

**wakes** 70:5

**walk** 100:20

**walking** 66:8 233:15 236:24

**wanted** 27:14, 24 36:23 62:11 74:8 84:19 92:16,17 105:15 140:12 141:16 152:3, 11,19 153:2 154:1,12 157:9 159:9 167:10, 12 190:15 242:20 243:4,



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

19 252:6 255:15 282:5

**wanting** 272:10

**washroom** 61:18 62:11,15

**watch** 24:15,17

**water** 154:7

**Wayne** 35:21 36:3 69:7 133:15

**wear** 202:14

**Wednesday** 33:6

**week** 24:1 33:10,17,20,22, 25 34:5,7 129:20

**weeks** 144:8,9, 11

**weigh** 202:12

**weight** 87:18

**well-founded** 210:13

**Wentworth** 207:17

**west** 173:20 174:5 192:23 193:3,12,15 194:4 195:5,12, 13,22,23 196:5

**westbound** 67:10,15,16

**whatsoever** 79:2

**Where'd** 14:16 109:7

**whereabouts** 170:24

**white** 84:9 100:4 135:12 194:10,16,19 206:18 220:17, 19 268:9 269:16 270:6

**whomever** 237:10

**why'd** 138:9 188:17 270:13, 17

**William** 10:8, 11 11:12 35:21 55:19 56:9 88:13 89:4 165:12 167:4, 22,24 170:13, 24 176:9 178:15,20,25 179:18 232:13 247:4 268:5

**Willie** 51:1 234:14

**window** 196:2, 6

**winds** 110:3

**wise** 225:18

**withdraw** 252:25

**witnessed** 90:2 130:1 152:3 154:2,13 157:2,11 179:25 200:2 202:24

**witnesses** 22:4 27:15 41:8 71:13 74:21 98:7 130:24 145:16 153:2, 17 181:15 225:10,14 227:7 228:7,13, 17,21,24 229:1, 6 230:2 254:11, 19 278:20 279:1,7,13,14, 21 280:14 281:9 283:8,9

**woman** 270:14

**wondering** 35:16 38:16 48:10 68:6

**word** 80:8 203:13

**work** 16:2 18:8, 14 22:15,17 24:11 30:6 72:15 128:7,15, 20 129:11 184:3,7 191:10 197:7 234:20 236:10,11,16

**worked** 16:3 24:8,13 30:5 53:14 59:9 70:6 183:19

**working** 17:5 23:5 52:3 58:24 72:17,23 88:12 89:3 129:20 140:10 234:2 253:1 266:7

**worries** 284:17

**would've** 25:16,18 67:15 73:24 93:20,23 94:6,7 114:12 137:11

**write** 150:6 176:22 255:19 269:9 270:17 274:8

**writing** 104:25

**written** 54:21 172:1 174:3 184:12 226:6 284:13

**wrong** 40:21 123:23 166:3 206:4,10,17 215:6 245:21

**wrote** 241:22 250:2,3,7 251:15 253:4 256:9 265:6 268:25

---

**Y**

**year** 27:19,21 29:9,16

**years** 14:15 18:3,16 26:23 28:16,25 29:7,

10 93:20 174:14 178:9 203:16,18,19 210:18 219:3,6 224:4 233:24 260:4 268:9

**yesterday** 32:13,15,18,24 33:12

**young** 74:15 100:20 196:1 219:2

**youths** 101:11

---

**Z**

---

**Z-I-E-L-I-N-S-K-I** 40:10

**Zielinski** 40:2, 7,9 182:25 183:8 184:7,10 186:6

**Zoe** 12:25 284:25

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com